Redacted Version for Public Filing Cleared by CSO



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ZAYN HUSAYN, )
  (aka "ABU ZUBAYDAH") )
   *Petitioner*, )
    )
v. ) No. _____
    )
ROBERT M. GATES, )
   *Respondent/Defendant.* )

### EMERGENCY MOTION FOR IMMEDIATE DISCLOSURE
### OF PETITIONER'S MEDICAL RECORDS
### AND FOR RELATED RELIEF

#### Introduction

Pursuant to 28 U.S.C. §§2241, 2243, 2246; the Fifth and Eighth Amendments to the Constitution; Rule 6(a) of the Rules Governing §2254 Cases; and the inherent supervisory power of the Court, undersigned counsel respectfully moves for an order directing Respondents to provide un-redacted copies of Petitioner's medical records since his arrival at Guantánamo in September 2006, as well as un-redacted copies of all guard and staff reports, logs, and notes, in whatever form maintained, regarding Petitioner's seizures and seizure-related episodes at Guantánamo. Counsel also moves for permission to meet with Petitioner's treating physicians to discuss Petitioner's condition, and for permission to provide Petitioner's medical records to an independent physician of counsel's choosing. In support of this motion, undersigned counsel offers the following:

#### Facts

1. Petitioner Abu Zubaydah is detained at Guantánamo in a facility known as Camp 7. Though he is in solitary confinement, he is housed alongside, and can occasionally speak with, Majid Khan, another prisoner whose case is before this Court.

1

See *Khan v. Gates*, No. 06-cv-1690 (RBW) (D.D.C.). Mr. Khan is represented by Gitanjali Gutierrez and Wells Dixon of the Center for Constitutional Rights. In early August, Ms. Gutierrez returned from a visit to the base and advised undersigned counsel that Mr. Khan had provided her with urgent, time-sensitive information about Mr. Zubaydah. Counsel sought and received permission from Robert Loeb, Respondent's counsel, for Ms. Gutierrez to share this information with undersigned counsel at the secure facility in Crystal, Virginia. That meeting took place August 12, 2008.

2. Undersigned counsel has learned that Mr. Zubaydah has once again begun to suffer from the seizures that have plagued him for years in U.S. custody. When undersigned counsel was at the base in June 2008, Mr. Zubaydah reported he had not had a seizure for approximately 50 days. According to Mr. Khan, however, the seizures resumed shortly after counsel's visit, and are now as frequent and as severe as they have been since the two arrived at Guantánamo, occurring several times per week. Mr. Khan reports that Mr. Zubaydah is in considerable distress.[1]

3. The CIA brought Mr. Zubaydah to Guantánamo ▬▬▬▬▬▬ in September 2006.[2] Since that time, he has suffered approximately 150 seizures.[3] According to Petitioner, the seizures are brought on by noise and bright lights, and begin

---

[1] In her meetings with Mr. Khan, Ms. Gutierrez took detailed notes about the timing, frequency, and severity of Mr. Zubaydah's seizures since June 2008. Those notes, however, had not arrived at the secure facility by the time Ms. Gutierrez met with undersigned counsel, and Ms. Gutierrez was not available to meet with counsel again before this motion was completed. Counsel reserves the right to update this motion once those notes arrive and appropriate declarations can be provided to the Court.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[3] Counsel has received clearance to state publicly that Petitioner has said he experienced 116 seizures between his arrival at Guantánamo in September 2006 and counsel's first visit with him in February 2008. In June 2008, Mr. Zubaydah told counsel the number was over 120. The higher number in the body of the motion reflects the estimated total as of today's date, based on Mr. Khan's observations that he has suffered several seizures per week since June. We have also received clearance to state publicly that based on our conversations with Petitioner, we are "very concerned" about his health.

2

with a headache. It is an excruciating pain, starting at the base of his skull near the top of his neck, and traveling along a line that traces up the back of his skull, along the center and slightly to the left of center. It is the same area where he was injured in late 1992, fighting the communists in Afghanistan. He feels as though electricity is pulsing through his head.[4]

4. Along with the headache, his right hand begins to shake. It is a small tremor that he cannot control. On some occasions, he loses the ability to grasp with that hand. Sometimes he also has a tremor in his right leg, below the knee, again beyond his control. At the same time, he feels as though his ears are closing. Sounds become faint, indistinct, and distant. Occasionally he is dizzy, and sometimes he vomits.

5. Then he faints. Petitioner suffers a complete loss of consciousness, collapsing to the concrete. He can be unconscious for hours, though it may be less, depending on when the guards come for him. But always, he emerges from his episodes when the guards revive him. He does not wake himself up. The guards use ammonia in his nose or wake him up by carrying him from the floor to his cot. Sometimes when they revive him, he is in a state of semi-consciousness. He can hear, faintly, but cannot move, speak, or respond to instructions.

6. When he is conscious, the headache returns, only this time it is worse. It feels like someone is drilling in his head. And always the pounding is in the same place – the rear of his skull and slightly to the left. Sometimes he slams his head with his fists, or against the wall, in an unsuccessful attempt to relieve the pain. Very commonly after his episodes, he vomits. He is dizzy, and cannot stand up. The feeling of electricity in his

---

[4] Counsel has received clearance to state publicly that Petitioner sustained a head injury in 1992-93 that resulted from a mortar explosion. That injury left Petitioner without the ability to think clearly or speak for an extended period of time. Indeed, it took Petitioner more than a year to relearn his own language.

3

head returns. His right hand will close and he cannot open it of his own will. Often he will have a painful cramp in his left calf, the origin of which, like everything else in these episodes, he cannot explain. These symptoms typically last three to four hours.

7. As of June 2008, Mr. Zubaydah had seen at least four different physicians at Guantánamo, who have reached different diagnoses and have prescribed different medications, none of which has been effective in controlling his condition. The first three told him he suffers from a seizure disorder. One prescribed a medication Mr. Zubaydah remembers as tobamax. Zubaydah took it twice a day for roughly three months. It made him incoherent and interfered with his ability to write and speak. It caused his face to droop uncontrollably. It did not, however, prevent the episodes. While he was on tobamax, he became acutely psychotic. When the guards revived him, he believed he was still fighting the communists and that the guards were communists coming to attack him. Sometimes in this state he has lashed out at the guards until they shouted that they were Americans. Gradually he would return to his senses and stop.

8. The next medication, prescribed by the second doctor, was a pill that Zubaydah took twice a day. He cannot remember the name, or how long he took it. But this made his headaches far worse and caused terrible nausea. The third pill, which he also took twice a day for one or two months, caused a dramatic weight loss—more than 20 kilos—and the third doctor who prescribed it told him to stop taking it. Finally, the fourth doctor said he does not have a seizure disorder at all, but that he suffers from a complex migraine disorder with an acute sensitivity to light and noise, both of which are a constant presence in his cell.[5]

---

[5] Between September 5, 2006, and March 27, 2007—the day of his CSRT hearing—Zubaydah suffered 38 seizures, the last of which took place March 26, the day before his hearing. As on other occasions, seizure

4

9. Petitioner's condition and symptoms are hardly surprising, given the nature of his interrogation and detention since his arrest in Pakistan March 28, 2002. At his arrest, 2002, Petitioner was shot three times ███████████████████████████

Wounded and in critical condition from gunshots to the groin, thigh, and stomach,[6] Petitioner became a prisoner in a secret program conducted by the Central Intelligence Agency ("CIA"), initiated after September 11, 2001, in which alleged suspects were jailed and systematically tortured at secret prisons outside the United States known as "black sites."[7]

10. Since March 2002, Petitioner has been held incommunicado in the unlawful custody of the CIA at various black sites around the world, including ███████████ ███████████████████████████████ During his captivity, Petitioner has been subjected to various forms of torture over extended periods of time, including, but not limited to, water-boarding, ███████████████████

---

38 was set off by the incessant sound of the whirring electric motor from the fan his room. The prison staff turned the fan off the day after his CSRT hearing.

[6] Brian Ross, *CIA- Abu Zubaydah: Interview with John Kiriakou: Transcript*, ABC NEWS, Dec. 10, 2007, http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript1_blotter071210.pdf.

[7] Dan Froomkin, *Bush's Exhibit A for Torture*, WASH. POST, Dec. 18, 2007, http://www.washingtonpost.com/wp-dyn/content/blog/2007/12/18/BL2007121800862.html; *see also* Dana Priest, *CIA Holds Terrors Suspects in Secret Prisons*, WASH. POST, Nov. 2, 2005, at A1. http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110101644.html.

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

███████████████████

11. In addition to his torture, he has been subjected to cruel, inhumane, and degrading treatment and ████████████████ interrogation techniques specifically designed to isolate him from the world, reduce him to a state of learned helplessness, and render him wholly dependent on his captors.[10] According to testimony by former Attorney General John Ashcroft before the House Judiciary Committee on July 17, 2008, Petitioner was subjected to these techniques weeks, if not months, before the Department of Justice was commissioned to write legal memorandums to provide justification and approval for this treatment.[11]



---

[10] Jane Mayer, *The Black Sites: A rare look inside C.I.A.'s secret interrogation program*, THE NEW YORKER, Aug. 13, 2007. http://www.newyorker.com/reporting/2007/08/13/070813fa_fact_mayer; Katherine Eban, *Rorschach and Awe*, VANITY FAIR, July 17, 2007. http://www.vanityfair.com/politics/features/2007/07/torture200707.

[11] Alex Koppelman, *Ashcroft suggests CIA sought legal approval after torture began*, SALON, July 17, 2008. http://www.salon.com/politics/war_room/2008/07/17/ashcroft/index.html?source=refresh ("The first memo – often called the Bybee memo – was dated August 1, 2002 and was written by former Deputy Assistant Attorney General John Yoo. . . . Rep. Jerrold Nadler, D-N.Y., pointed out that the abuse of Zubaydah had reportedly begun weeks, if not months, earlier. 'Did you offer legal approval of interrogation methods used at that time . . . prior to August 2002?' 'I have no recollection of doing that at all,' Ashcroft responded. He added that he did not remember anyone else at the Justice Department doing so either. He said later in the hearing that Zubaydah's interrogation was done without the opinion that was issued on the first of August.'"); *see also id.* ("It appears that in May, June, and July— in other words, months before the

12. On August 13, 2008, undersigned counsel asked the Government to produce Mr. Zubaydah's medical records since September 2006, when he arrived at Guantánamo, as well as un-redacted copies of all guard and staff reports, logs, and notes regarding his seizures and seizure-related episodes at Guantánamo. The Government refused. Counsel also asked the Government for permission to interview Mr. Zubaydah's treating physicians about his condition. The Government refused. Counsel also asked the Government for permission to discuss Mr. Zubaydah's medical condition with an outside physician. The Government refused. This motion followed.

## Argument

Petitioner's records and medical condition are relevant to a number of claims and issues before the Court. First, and perhaps most importantly, the Court has the inherent power and duty to take those steps that are necessary and proper to ensure the welfare of the parties. *See, e.g., Estelle v. Gamble*, 429 U.S. 97 (1976)("An inmate must rely on prison authorities to meet his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical 'torture or a lingering death.'") This authority takes on special significance in habeas, where one party is literally held by and at the mercy of the other. And all the more so in this particular habeas; for years, Mr. Zubaydah—whose constitutional right to habeas was recently reaffirmed by the Supreme Court—has been subjected to the most violent forms of detention and interrogation ever sanctioned by the U.S. Government. He is now apparently in serious medical distress. Counsel have moved for modest relief, which

---

infamous torture memos provided legal cover—the CIA has already begun to treat him in ways that were deeply troubling.").

merely allows them to ascertain Petitioner's well-being by examining his records, speaking with his physicians, and discussing his condition with an independent professional.[12] To ensure that Mr. Zubaydah can vindicate his constitutional right to habeas, the Court should grant this request.

Second, a critical issue before the Court is whether Petitioner is an "enemy combatant," about which the parties are in sharp disagreement. Petitioner's medical condition bears directly on the fair adjudication of this issue, since his seizures not only imperil his immediate health but severely compromise his ability to participate in his case and prepare his defense. By themselves, the seizures reduce his ability to communicate with counsel and recall events. They also affect his capacity to write and speak. *See* Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016 at 21 (Mar. 27, 2007) (Exhibit A). But quite apart from these acute affects, repeated seizures over an extended period signal the likelihood of other serious disorders that may have profound cognitive consequences, including organic brain damage. "Because seizures can be an indication of another, underlying medical problem, such as a brain tumor, it is important to seek medical attention if you have even one seizure." *Seizure Disorder*, University of Pittsburg Medical Center, *available at* http://www.upmc.com/HealthManagement/ManagingYourHealth/HealthReference/Procedures/?chunkiid=11874. In order to assess whether and to what extent Petitioner's medical condition threatens to undermine his constitutional right to habeas, counsel must

---

[12] Counsel has deliberately and narrowly tailored his request. He has not, for instance, asked to interview the prison staff who responded to his seizures, nor has he sought medical records from any period prior to ▮▮▮▮▮▮▮▮▮▮ September 2006. He does not seek permission to speak with Mr. Khan, whose observations triggered the present motion, nor does he seek authority for an independent examination of Mr. Zubaydah. At this point, he seeks only what is needed to ascertain his client's condition, and reserves the right to seek further relief as the facts warrant.

8

examine his records, speak with his physicians, and consult with independent professionals.

Finally, the Government maintains that Petitioner has been found to be an "enemy combatant" by his CSRT. But as noted above, Petitioner had suffered 38 seizures between his arrival at the base in September 2006 and his CSRT hearing in March 2007, the last of which occurred the day before the hearing. Indeed, at his hearing, Petitioner continued to suffer the ill-effects of his seizures. "I have been having seizures lately," he told the Tribunal through his Personal Representative, which "affected my ability to speak and write without difficulty." CSRT Tr. at 21. Assessing the integrity of the hearing, therefore, requires, at minimum, an examination of the records surrounding his seizure disorder. It is simply impossible to determine whether this proceeding should be given any credence unless and until the Court knows Mr. Zubaydah's condition at the hearing.

Application of the law in this context is straightforward. Once the habeas petitioner establishes good cause, a habeas court should grant the necessary discovery "to fully develop the facts of a claim." *Teague v. Scott*, 60 F. 3d 1167, 1172 (5th Cir. 1995); *see also East v. Scott*, 55 F. 3d 996, 1001-02 (5th Cir. 1995) (when facial allegations are "facially sufficient to establish a due process claim," petitioner is entitled to discovery "to fully develop the facts."). Indeed, the blanket denial of discovery is an abuse of discretion is discovery is "indispensable to a fair, rounded, development of the material facts." *East, supra*; *Toney v. Gammon*, 79 F. 3d 693, 700 (8th Cir. 1996) (same). Applying this standard, habeas courts have routinely ordered discovery of a wide variety of records, including records held by the Government, law enforcement, or the custodian.

9

See, e.g., Rice v. Clark, 923 F. 2d 117, 118-19 (8th Cir. 1991) (noting district court order granting discovery of FBI records); McKenzie v. Risley, 915 F. 2d 1396, 1398 (remand for discovery of *ex parte* communications between prosecutor and judge); *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 971-76 (W.D. Tenn. 2000) (granting discovery of documents in state's possession, and to depose assistant district attorney); *United States ex rel. Brisbon v. Gilmore*, 1997 U.S. Dist. LEXIS 8314 at *8-*9 (N.D. Ill. 1997) (granting request for discovery of inmate prison and parole records).

Not surprisingly, courts have often ordered Respondents to disclose records relating to the Petitioner, including medical records. See, e.g., *Sherman v. McDaniel*, 333 F. Supp. 2d 960, 970-71 (D. Nev. 2004) (ordering discovery of petitioner's medical records held by state and municipal health providers); *Cowans v. Bagley*, 2002 U.S. Dist. LEXIS 21884 at *41-*46 (S.D. Ohio 2002) (ordering disclosure of "[a]ny and all psychological or medical records related to petitioner, in the possession of the state, the Ohio Department of Rehabilitation and Correction and/or the Ohio Adult Parole Authority, including mental health records"); *cf. also United States ex rel. Kennedy v. Page*, 1999 U.S. Dist. LEXIS 17905 at *7-*8 (N.D. Ill. 1999) (in lieu of ordering formal discovery, court directs Respondent and Illinois Department of Corrections to provide petitioner with his medical records to facilitate development of claim); *United States ex rel. Madej v. Gilmore*, 1999 U.S. Dist. LEXIS 4086 at *9 (N.D. Ill. 1999) (though granting habeas petitioner other discovery, court declines to grant discovery to obtain medical records because "the petitioner's own medical records are already available to the petitioner.").

Here, the relief sought is indispensable both for the "fair, rounded" development of the facts, *East, supra,* and for the careful exploration of whether and to what extent the Petitioner's health is in jeopardy. At the same time, however, the relief is modest and narrowly tailored. The motion should be granted forthwith.

## CONCLUSION

For the foregoing reasons, counsel respectfully asks that the relief sought be granted.

Dated: August 19, 2008

Respectfully submitted,

*Joe Margulies* by CBL

Joseph Margulies
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
(312) 503-0890

George Brent Mickum IV [Bar No. 396142]
Amanda L. Edwards
Spriggs & Hollingsworth
1350 I Street NW
Washington, District of Columbia 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

11