REDCTED VERSION FOR PUBLIC FILING CLEARED BY CSO

FILED WITH
COURT SECURITY OFFICER
8/21/08
DATE

[ORAL ARGUMENT NOT YET SCHEDULED]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016), | ) ) ) | |
| *Petitioner.* | ) ) | |
| v. | ) ) | No. 8CV-1360 |
| ROBERT M. GATES, | ) ) | |
| *Respondent.* | ) · ) ) | |

### MOTION FOR
### PRESERVATION ORDER, ORDER REQUIRING GOVERNMENT AGENCIES TO INDENTIFY EXISTING AND DESTROYED DOCUMENTS, AND OTHER RELIEF

In November 2005, the Central Intelligence Agency ("CIA") deliberately destroyed hundreds of hours of videotaped evidence, thereby compromising the ability of Zayn al-Abidin Muhammad Husayn ("Petitioner") to defend himself. In light of the government's admitted destruction of evidence, and to prevent any further such destruction, Petitioner respectfully moves this Court to order Respondent and all applicable government agencies and entities to preserve and maintain all evidence, documents, and information (hereinafter collectively referred to as "documents") that may be relevant to Petitioner's arrest, detention, interrogation, and torture.[1] In particular, Petitioner asks that Respondent and each applicable government agency:

- catalogue relevant documents that are currently in its possession

---

[1] As used in this motion, "documents" has the meaning given it under Fed. R. Civ. Pro. 34.

- catalogue relevant documents that were previously in its possession, but are no longer in its possession, including, for example, those that have been turned over to another agency, inadvertently misplaced, and/or intentionally destroyed

- produce a certified list of relevant documents that are currently in its possession

- produce a certified list of relevant documents that were previously in its possession, including the approximate dates of destruction, misplacement, or transfer of possession.

To be effective, any order issued by this Court must be served upon and bind the White House, the Office of the Vice President, the Central Intelligence Agency ("CIA"), the Federal Bureau of Investigation ("FBI"), the National Security Agency ("NSA"), the National Security Council ("NSC"), the Department of State ("State"), and, of course, the department of Defense ("DOD").[2] In addition, any preservation order issued by the Court should bind all contractors

---

[2] It recently became known that high ranking representatives of these Departments participated in discussions regarding Petitioner's interrogation and torture. These officials were members of the National Security Council's Principals Committee, a select group of senior officials including Vice President Dick Cheney, former National Security Adviser Condoleezza Rice, Defense Secretary Donald Rumsfeld, Secretary of State Colin Powell, CIA Director George Tenet, and Attorney General John Ashcroft. *See* Jan Crawford Greenburg, Howard L. Rosenberg, and Ariane de Vogue, *Sources: To Bush Advisors Approved 'Enhanced Interrogation': Detailed Discussions Were Held About Techniques to Use on al Qaeda Suspects*, ABC NEWS, Apr. 9, 2008. http://abcnews.go.com/print?id=4583256. Approval of individual interrogation techniques can be traced directly to the highest levels of government: indeed, in September 2002, White House counsel Alberto Gonzales, Vice President Cheney's counsel David Addington, and Department of Defense general counsel John Haynes, personally traveled to Guantanamo, where they met with Combat Commander Mike Dunlavey, witnessed detainee interrogations, and ultimately provided approval for torture. *See, e.g.,* Satyam, *Cheney Lawyer Claims 'Congress Lacks Constitutional Power' To Investigate VP's Role In Torture Approval*, THINKPROGRESS, Apr. 29, 2008, http://thinkprogress.org/2008/04/29/addington-testify-torture/; Saytam, *Addington, Gonzales Witnessed Gitmo Interrogations In 2002; Approved Of 'Whatever Needs To Be Done,'* THINKPROGRESS, Apr. 21, 2008, http://thinkprogress.org/2008/04/21/sands-guantanamo/. Moreover, in order to assuage the concerns of CIA interrogators, who feared criminal liability for carrying out "enhanced interrogation techniques" against Petitioner, the Justice Department issued opinions in which they attempted to provide legal cover. *See, e.g.,*

that came into contact with Petitioner during his detention, including but not limited to his detention in secret CIA black sites around the globe.[3]  In the case of contractors, Petitioner asks this Court to order each agency (1) to identify to this Court and to Petitioner's counsel any contractor involved and (2) to serve a copy of the Court's order on said contractor in a timely fashion.[4]

Without limiting the breadth of the requested Preservation Order, Petitioner also seeks an order that preserves the specific categories of documents set out in Exhibit A, all of which are

---

Jane Mayer, THE DARK SIDE, at 154 (Doubleday 2008). One such memorandum, dated August 1, 2008, was released to the public for the first time in July 2008 via a Freedom of Information Act (FOIA) lawsuit brought by the American Civil Liberties Union.  Memorandum from Office of Legal Counsel to CIA, Aug. 1, 2002. http://www.aclu.org/pdfs/safefree/cia_3686_001.pdf (The memorandum was signed by then-Assistant Attorney General Jay Bybee and written by then-Deputy of the Justice Department's Office of Legal Counsel John Yoo). Although this memorandum is almost entirely redacted from public view, it is believed to describe in detail the methods of interrogation that the CIA was using on abu Zubaydah. *See, e.g.,* Scott Shane, *Documents Laid Out Interrogation Procedures*, N.Y. TIMES, July 25, 2008. http://www.nytimes.com/2008/07/25/us/25detain.html?_r=1&oref=slogin&ref=us&pagewanted=print.

[3] Petitioner was interrogated by a team "overseen by James Elmer Mitchell, a consulting psychologist under contract to the CIA, who reportedly adapted 'brainwashing' techniques originally developed by the Chinese in the Korean War . . . Mitchell and staff CIA psychologist, Bruce Jessen, took over the interrogation of [Petitioner] in May 2002,

[4] Relevant material and/or information shall include, but not be limited to, all documents or information concerning Petitioner's background, surveillance, arrest, detention, transfers, treatment, mental and/or physical evaluations, torture, and abuse.  Relevant information also shall include any information relating, referring or leading to the decision by the CIA and other individuals and agencies within the government to destroy the videotaped recordings of Petitioner's interrogation and torture.  Said evidence would include internal agency communications, communications between the CIA, FBI, NSA, NSC, State, and private contractors and communications between any of the foregoing and White House officials.  Most important, relevant information shall include all exculpatory information, including complete copies of all of Petitioner's diaries.

believed to exist and relate to Petitioner and/or his treatment and detention.[5]  Failure to preserve

this evidence, whether intentionally or through neglect, would substantially impair Petitioner's

and this Court's ability to determine whether Petitioner is lawfully detained as an "enemy

combatant." Notably, the issue at this point is not whether these documents may ultimately be

produced. Petitioner seeks only that relevant material be identified and preserved in light of

potential litigation.

Finally, Respondent is on notice that much of the evidence at issue in this motion must be

preserved for possible congressional hearings, criminal investigations, and internal agency

investigations concerning the methods of interrogation used on Petitioner by government

officials and/or contractors.  Respondent is also on notice that much of the evidence at issue must

be preserved for the congressional hearings, criminal investigations, and internal agency

---

[5] Many of the categories of documents described in Exhibit A were the subject of a Protective
Order entered in connection with *El-Banna v. Bush*, 04-1144 (RWR).  A copy of that order is
attached as Exhibit B.  That order involved a prisoner incarcerated at Guantanmo and involved
records and information systems identified by a confidential former interrogator at Guantanamo.
Significantly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* "President Discusses Creation of Military Commissions to Try Suspected
Terrorists," Office of the Press Secretary, Sept. 6, 2006.
http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html ("I'm announcing today
that Khalid Sheikh Mohammed, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in
CIA custody have been transferred to the United States Naval Base at Guantanamo Bay."). ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also* Preservation Orders entered by this Court in *Abd Al-Rahim Hussain
Mohammed Al-Nashiri v. Gates*, No. 08-1007 (Mar. 12, 2008); *Majid Khan v. Gates*, No. 07-
1324 (Dec. 11, 2007).

investigations concerning the destruction of the interrogation videotapes.[6] For these additional

reasons, the motion for a preservation order should be granted.

**PRELIMINARY STATEMENT**

On or about March 28, 2002, Petitioner was attacked and shot three times ████████████ ████████████████████████████████████████████████ Wounded and in critical

condition from gunshots to the groin, thigh, and stomach,[8] Petitioner was nursed back to health

and became a prisoner in a secret program conducted by the CIA, initiated after September 11, in

which alleged suspects were jailed and systematically tortured at secret prisons outside the

United States known as "black sites."[9]   Since March 2002, Petitioner has been held

incommunicado in the unlawful custody of the CIA at various black sites around the world,

including ████████████████████████████████ and several other locations.[10]



---

[6] *See, e.g.*, Stephanie Kichgaessner, *CIA faces criminal probe on destroyed tapes*, FIN. TIMES,
Jan. 3, 2008; David Johnston, *FBI to lead investigation of destroyed CIA tapes*, INT'L HERALD
TRIBUNE, Jan. 3, 2008; Josh White, Justice, *CIA Begin Probe into Video Destruction*, WASH.
POST, Dec. 9, 2007, at A4.

[8] *Id.*

[9] Dan Froomkin, *Bush's Exhibit A for Torture*, WASH. POST, Dec. 18, 2007,
http://www.washingtonpost.com/wp-dyn/content/blog/2007/12/18/BL2007121800862.html; *see
also* Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, WASH. POST, Nov. 2, 2005, A1,
http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110101644.html;
*see also* Petition for Writ of Habeas Corpus, Aug. 4, 2008.

During his captivity, Petitioner has been subjected to various forms of torture[12] over

extended periods of time,[13] including, but not limited to, waterboarding,[14] ██████████



[12] The International Red Cross has concluded, in report made secretly to the Bush administration in 2007, that the treatment of Petitioner was "categorically torture." *See, e.g.*, Amy Goodman, *The Dark Side: Jane Mayer on the Inside Story of How the War on Terror Turned Into a War on American Ideals*, Interview Transcript, DEMOCRACY NOW, July 18, 2008.http://www.democracynow.org/2008/7/18/the_dark_side_jane_mayer_on.

[13] Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016, Mar. 27, 2007. http://www.defenselink.mil/news/transcript_ISN10016.pdf (Although Petitioner's description of his torture is deleted from the unclassified return, Government censors failed to delete references elsewhere in the return. At page 23, the Tribunal President states: "In your statement, you mentioned months of torture."); Dan Eggen and Walter Pincus, *FBI, CIA Debate Significance of Terror Suspect: Agencies Also Disagree On Interrogation Methods*, WASH. POST, Dec. 18, 2007, at A1. http://www.washingtonpost.com/wp-dyn/content/article/2007/12/17/AR2007121702151.html; Jane Mayer, THE DARK SIDE, at 173 (Doubleday 2008) ████████████

In addition to his

[14] *Director's Statement on the Taping of Early Detainee Interrogations: Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early Detainee Interrogations*, Dec. 6, 2007. https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html

torture, he has been subjected to cruel, inhumane, and degrading treatment and physical and

psychological interrogation techniques specifically designed to isolate him from the world,

reduce him to a state of learned helplessness, and render him wholly dependent on his captors.[20]



[20] Jane Mayer, *The Black Sites: A rare look inside C.I.A.'s secret interrogation program*, The New Yorker, Aug. 13, 2007.
http://www.newyorker.com/reporting/2007/08/13/070813fa_fact_mayer (The basic approach was to "break down [prisoners] through isolation, white noise, completely take away their ability to predict the future, create dependence on interrogators." As explained by CIA interrogators, they were going to become Zubaydah's "God."); Katherine Eban, *Rorschach and Awe*, Vanity Fair, July 17, 2007, http://www.vanityfair.com/politics/features/2007/07/torture200707.

The government now admits that Petitioner and other prisoners were waterboarded.[22] The government also admits that it has videotaped hundreds of hours of Petitioner's detention, during the time when he was tortured and interrogated, and that it has since destroyed this evidence.[23] The destruction was reportedly ordered in late 2005 by Jose A. Rodriguez, Jr., Director of the National Clandestine Service of the CIA, after years of internal discussion over the propriety of destroying the tapes,[24] including discussions involving White House counsel, Alberto R. Gonzales, David S. Addington, John B. Bellinger, and Harriet E. Miers.[25]

The destruction of these tapes has also brought attention to the CIA's earlier failure to disclose the tapes' existence, despite detailed requests for information regarding Petitioner by the 9/11 Commission[26] and targeted Freedom of Information Act requests by the American Civil

---

[22] *See, e.g.*, Richard Esposito and Jason Ryan, *CIA Chief: We Waterboarded: Gen. Hayden Confirms the Agency Waterboarded Three 'High-Value' Detainees*, ABC NEWS, Feb. 5, 2008, http://abcnews.go.com/Blotter/TheLaw/story?id=4244423&page=1; *see also* Petition for Writ of Habeas Corpus, Aug. 4, 2008.

[23] *See, e.g.*, Scott Shane and Mark Mazzetti, *CIA Tapes Lived and Died to Save Image*, N.Y. TIMES, Dec. 30, 2007, at A1, http://www.nytimes.com/2007/12/30/washington/30intel.html?_r=1&oref=slogin; *see also* Petition for Writ of Habeas Corpus, Aug. 4, 2008.

[24] *See* Mark Mazzetti and David Johnston, *Inquiry Begins into Destruction of Tapes*, N.Y. TIMES, Dec. 9, 2007, http://www.nytimes.com/2007/12/09/washington/09zubaydah.html

[25] *See* Mark Mazzetti and Scott Shane, *Bush Lawyers Discussed Fate of C.I.A. Tapes*, N.Y. Times, Dec. 19, 2007, http://www.nytimes.com/2007/12/19/washington/19intel.html?partner=rssnyt&emc=rss.

[26] *See* Joby Warrick and Dan Eggen, *CIA Tapes Were Kept from 9/11 Panel, Report Says*, WASH. POST, Dec. 23, 2007, at A11, http://www.washingtonpost.com/wp-dyn/content/article/2007/12/22/AR2007122201622.html.

Liberties Union.[27]  As a result, the destruction of the tapes is now a matter of Congressional inquiry.[28]  In addition, the court adjudicating the ACLU's claim has ordered an *in camera* inquiry of CIA reports regarding the contents of the destroyed tapes and the protocols and procedures employed in their destruction.[29]

## ARGUMENT

The Court's power in this regard is beyond cavil.  Courts have long "held that they have the inherent power to order that evidence be preserved and have, for good cause, required that specific procedures be adopted to ensure such preservation." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135 (Fed. Cl. 2004).  "These powers are governed not by rule or statue but by the control necessarily vested in courts." *Id.*; *see also Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 433-35 (W.D. Pa. 2004) (The issuance of a preservation order, where it is alleged that the integrity or existence of evidence is threatened, should be considered in light of "the court's power to oversee discovery and correct abuses . . . In the presence of a significant threat, if an order of court can prevent the loss, deterioration or destruction of evidence, while also considering all other relevant circumstance, then such an order may be an appropriate remedy.").

Pursuant to this authority, Petitioner asks the Court to require all parties bound by any Protective Order to catalogue relevant documents in its possession and to produce a certified list of those documents to the Court.  In addition, Petition asks that the Court require each agency to

---

[27] *See ACLU, NYCLU Ask Court to Hold CIA in Contempt*, Dec. 12, 2007, http://www.nyclu.org/node/1534.

[28] *See* Pamela Hess, *CIA Will Release Videotape Documents*, WASH. POST, Dec. 20, 2007.

[29] *See* American Civil Liberties Union et al. v. Department of Defense et al., United States District Court, Southern District of New York, Case No. 1:04-cv-04151-AKH, 01/16/08.

10

catalogue all relevant documents that were in its possession but were destroyed and to produce a list of those documents, including the approximate date of destruction, to the Court. By doing so, the Court may assure itself that evidence is accounted for and preserved.

In order to be entitled to relief, Petitioner need only show (1) that absent a preservation order, there is a significant risk that relevant evidence will be lost or destroyed—a requirement that is easily met since the Government has already destroyed crucial evidence, and (2) that compliance with a preservation order would not be unduly burdensome—a requirement that is easily met since the Government asserts that it already intends to comply with the requirements that would be made explicit in a preservation order. *See, e.g., Pueblo of Laguna v. United States,* 60 Fed. Cl. 133, 135 (Fed. Cl. 2004).[30]

### I.    A PRESERVATION ORDER IS NECESSARY BECAUSE THE GOVERNMENT'S PRIOR CONDUCT SHOWS A SUBSTANTIAL LIKELIHOOD OF SPOLIATION

This case cries out for a preservation order. While Petitioner must establish "that absent a court order, there is significant risk that relevant evidence will be lost or destroyed," his burden

---

[30] Although when it comes to cases involving prisoners at Guantanamo, the Government has repeatedly argued that a preliminary injunction standard should be applied in deciding whether to issue a preservation order, this Court has repeatedly found that the application of a preliminary injunction standard is neither necessary nor prudent. *See, e.g., Abdah v. Bush,* No. 04-1254 (HHK) (D.D.C. June 10, 2005) ("[w]hile preservation orders take the form of an injunction, in that they order a party to perform or refrain from performing an act, petitioners need not meet the four-part preliminary injunction test in order to protect relevant documents from destruction."); *Al-Marri v. Bush,* No. 04-2035 (GK) (D.D.C. March 7, 2005) ("[a] document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery. Thus, Petitioners need not meet such a standard when seeking a preservation order."); *El-Banna v. Bush,* 2005 WL 1903561, *1 n.3 (D.D.C. 2005) ("[t]he parties advocate different standards for preservation orders, a dispute that need not be resolved here. First, the distinction between the standard articulated in *Pueblo of Laguna v. United States,* urged by petitioners, and the standard four-factor test employed in preliminary injunction decisions, urged by respondents, may be one without a practical difference. Second, respondents argue that a preservation order must meet the test of a preliminary injunction, but also concede that the Federal Rules of Civil Procedure impose preservation obligations on civil litigants in every civil

is easily discharged by a showing "that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place." *Id.; accord United Medical Supply Co., Inc. v. United States*, 73 Fed. Cl. 35, 36-37 (Fed. Cl. 2006); *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006). The government has conceded that the CIA deliberately destroyed videotaped recordings of Petitioner's detention, torture, and interrogation, even after it was advised to retain the tapes, and even after preservation orders had been entered in other Guantanamo cases. [31] *See, e.g., El-Banna v. Bush*, 04-1144 (RWR) (order attached as Exhibit B). Manifestly, this evidence was potentially exculpatory, since it would have disclosed the falsity of the government's allegations against Petitioner and the truth of his protestations of innocence, as well as the nature of his torture. The destroyed evidence thus bore directly on the legitimacy of the military's determination of Petitioner as an "enemy combatant" and the lawfulness of his continued detention.

Absent a preservation order and the active intervention by this Court there is a substantial risk that other evidence relating to Petitioner's detention, torture, and interrogation will disappear. Because the government already destroyed what may be the best evidence of its unlawful interrogations and Petitioner's innocence, the Court simply cannot be confident that any remaining exculpatory evidence will not meet a similar fate. Any assertion by the government to the contrary must be weighed in light of its admitted spoliation of evidence.

In addition to the hundreds of hours of videotapes that the Government admits to having destroyed, it is highly likely that other videotapes that contain exculpatory evidence have been or

---

action filed, automatically and without court review, two positions in tension with each other.") (Internal citations omitted).

[31] *Director's Statement on the Taping of Early Detainee Interrogations: Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early*

will be destroyed if a preservation order is not entered. For example, despite the fact the

Government ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ This is one of the primary

reasons supporting Petitioner's request that government agencies be required to provide a

catalogue of documents that exist as well as a catalogue of evidence that has been destroyed.

Furthermore, the CIA's admission regarding the destruction of Petitioner's interrogation

tapes is one of many reported examples in which the government has destroyed or otherwise

---

*Detainee Interrogations*, Dec. 6, 2007. https://www.cia.gov/news-information/press-releases-
statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

mishandled evidence regarding purported enemy combatants.[35] These recent disclosures concerning the suppression of similar evidence further underscore the risk of spoliation here. As such, in the context of "enemy combatant" litigation, and particularly with respect to former CIA prisoners like Petitioner, the government is simply no longer entitled to a presumption of credibility or regularity when discharging its obligations.

> II.  **A PRESERVATION ORDER IS NOT UNDULY BURDENSOME BECAUSE IT REQUIRES NOTHING MORE THAN WOULD BE REQUIRED IN ORDINARY CIVIL DISCOVERY**

The preservation order requested by Petitioner "will be effective, but not overbroad."

*Pueblo of Laguna*, 60 Fed. Cl. at 138. Petitioner's request is tailored to preserve all documents

---

[35] For example, several military officers involved in the CSRTs have testified recently about the loss, destruction and suppression of critical evidence, including exculpatory evidence, concerning Guantanamo prisoners. *See* Declaration of Rear Admiral (Retired) James M. McGarrah, executed May 31, 2007; Declaration of Stephen Abraham, executed June 15, 2007. Most notably, the disappearance or destruction of evidence regarding torture or abuse appears to have been widespread. *See e.g.*, Eric Saar and Viveca Novak, Inside the Wire: A Military Soldier's Eyewitness Account of Life at Guantanamo 102, 136 (2005); Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. TIMES, May 22, 2005; Redacted Email by CPT John Carr dated March 15, 2004. In the military commission, the government recently revealed the existence of exculpatory evidence that had been withheld from a Guantanamo prison for several years. *See* William Glaberson, *Decks Are Stacked in War Crimes Cases, Lawyers Say*, N.Y. TIMES, Nov. 8, 2007. The same has recently been revealed by the Justice Department. *See e.g.*, Redacted Letter from Justice Department to U.S. Court of Appeals for the Fourth Circuit and the U.S. District Court for the Eastern District of Virginia, dated Oct. 25, 2007, at 3 of 5; Greg Gordon, *CIA Admits to Recording Interrogations of Top Al Qaida Captives*, MCCLATCHY WASHINGTON BUREAU, Nov. 14, 2007. Furthermore, the FBI has produced records pursuant to a Freedom of Information Act lawsuit by the American Civil Liberties Union that document efforts by the military to "cover up" evidence of the physical abuse of detainees. *See* Urgent Report, dated June 25, 2004. Specifically, the FBI email confirms that unnamed individuals "observed numerous physical abuse incidents . . . . includ[ing] strangulation, beatings, placement of lit cigarettes into the detainees['] ear openings, and unauthorized interrogations." *Id.* at 2. The email further reports that unnamed individuals "were engaged in a cover-up of these abuses." *Id. See also* Josh White, *From Chief Prosecutor To Critic at Guantanamo*, WASH. POST, Apr. 29, 2008, at A1. http://www.washingtonpost.com/wp-dyn/content/article/2008/04/28/AR2008042802982.html (reporting that the Defense Department's former chief prosecutor, Col. Morris Davis, testified that the military justice system has been corrupted by politics and inappropriate influence from senior Pentagon officials).

concerning matters that may be relevant to him and to defenses that may be available to him. In particular, this motion seeks the preservation of evidence in the possession of the CIA, FBI, NSA, NSC, DOD, DOS, and the White House that relates to Petitioner. As the D.C. Circuit has already acknowledged, "[d]ocuments, evidencing treatment of detainees, whether statements of official government policy, cumulative evidence of specific practices, or something else, may be probative of the treatment of [Petitioner and other prisoners] or may lead to other probative evidence." *See, e.g.,* Mem. Order at 5, *Zadran v. Bush*, No. 05-2367 (RWR) (D.D.C. July 19, 2006) (dkt. No. 36).

Notably, the issue at this stage is not whether this information may ultimately be produced. Petitioner seeks only that the relevant material be identified, catalogued, preserved, and maintained in light of potential litigation. This motion, thus, seeks a preservation order that imposes no greater obligation on Respondents than the Federal Rules of Civil Procedure would otherwise impose on a litigant engaged in discovery of an ordinary civil action. *Id.* at 5-6; *see also Hamoud v. Bush*, 2006 WL 1876947, *3 (D.D.C. 2006); *Alsaaei v. Bush*, 2006 WL 2367270, *3 (D.D.C. 2006). Furthermore, the D.C. Circuit has entered previous orders, specifically finding that "entering a preservation order [against Respondents] will inflict no harm or prejudice upon them." *See* Order at 1-2, *Jarallah Al-Marri v. Bush*, Civ. No. 04-2035 (GK) (D.D.C. March 7, 2005) (dkt. No. 25); Order, *Khan v. Gates*, No. 07-1324 (D.D.C. Dec. 11, 2007).

The preservation order that Petitioner seeks would not be futile.[36] As stated by the court in establishing the standard for issuance of a preservation order: "If nothing else, it will serve to reemphasize that [the government] needs to take extraordinary precautions . . . to prevent the purposeful or inadvertent destruction or loss of records. Such an order also serves as fair warning that sanctions may be imposed should [the Government] instead fail adequately to protect records relevant to this action." *Pueblo of Laguna*, 60 Fed. Cl. at 139; *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 369 (S.D.N.Y. 2006) (finding that the view that a preservation order is needless because preservation obligations are already known is "shortsighted" because "[e]ven litigation that concerns relatively precise issues, statements, and timeframes may nevertheless involve information, including electronic documents, that may be in danger of destruction in the absence of a preservation order," and "[f]urther, a preservation order protects the producing party by defining clearly the extent of its obligations").

Finally, Petitioner expressly requests that the Court order that every time a factual assertion is made in a pleading, motion, opposition, reply, or any other paper filed with the Court, the government be required to have an attorney associated with the appropriate government entity—including but not limited to Department of Defense, CIA, FBI, NSA, NSC, Department of State, the White House, private contractors, or any other—be a signatory to the filing in order to assure accountability to the Court. Given the number of false statements made

---

[36] That the destruction of some evidence relevant to Petitioner's defense is the subject of a criminal investigation and that the persons who are being investigated have stated that they do not intend to destroy similar evidence does not mean that a preservation order would be pointless: rather, it merely goes to show that the Government will not prejudiced or unduly burdened by the requirements of a preservation order. *See, e.g., Al-Marri v. Bush*, No. 04-2035 (GK) (D.D.C. March 7, 2005) ("[r]espondents represent that the information at issue will not be destroyed, so the Court finds that entering a preservation order will inflict no harm or prejudice upon them.").

by government officials in this and other cases, such relief is a necessary precaution to ensure that accurate information is provided to the Court.

Throughout the Guantanamo-related cases, misinformation has been provided to the courts. Factual statements have been made to courts, even the Supreme Court, that were demonstrably incorrect. For example, on April 28, 2004 during oral argument, then-Deputy Solicitor General, Paul Clement, assured the Justices that the United States did not engage in torture. Four hours later, photographs of tortured prisoners from Abu Ghraib were released. In early December 2004, a government attorney arguing before Judge Green assured the court that no torture was taking place at Guantanamo. Three weeks later, thousands of pages of FBI documents released as the result of Freedom of Information Act litigation brutally refuted that statement.

Petitioner does not contend that DOJ trial and appellate attorneys are purposefully, or even knowingly, misleading the court. It is clear, however, that information has been provided to DOJ attorneys that was false and that this information has been repeated to the Courts. To ensure that such incorrect information does not continue to be disseminated to the Courts, accountability is needed. The government argues that requiring representative accountability would interfere with the Attorney General's supervisory role over the conduct of litigation. With some frequency, the Government has adduced evidence from other government agencies when the Government perceived it to be in its interest. In essence, it seems the Government merely seeks to avoid accountability. All Petitioner asks is that when factual statements are made in a court filing, a responsible attorney from the agency or department that provided the information be a signatory to the filing. In this way, the Court has accountability in the event that misstatements are made.

17

## CONCLUSION

For all of the foregoing reasons, this motion should be granted.

Dated:  August 20, 2008

Washington, District of Columbia

Respectfully submitted,

*George B Mickum IV*          AtE

Joseph Margulies [Bar No. 48487]
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0890

George Brent Mickum IV [Bar No. 396142]
Amanda L. Edwards
Spriggs & Hollingsworth
1350 I Street NW
Washington, D.C. 20001
Tel: (202) 898-5866
Fax: (202) 682-1639

Baher Azmy
SETON HALL LAW SCHOOL
CENTER FOR SOCIAL JUSTICE
One Newark Center
Newark, NJ 07102
(973) 642-8700

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the Court Security Officer for clearance

and filing this 20th day of August 2008. My understanding is that the Court Security Officer will serve

the government. Once Petitioner's counsel has been notified that the document has been cleared and

filed, copies will be served on the following via first class mail:

Robert M. Loeb
Catherine Y. Hancock
Attorneys, Appellate Staff
Civil Division, Room 7236
U.S. Department of Justice
950 Pennsylvania, Ave., N.W.
Washington, D.C. 20530-0001


_____
George Brent Mickum IV

# EXHIBIT A

## DOCUMENTS SUBJECT TO PRESERVATION ORDER

The following list consists of documents that Petitioner contends should be subject to any Preservation Order entered by this Court. To the extent any of the documents listed below may be called or referred to by another name or names, Petitioners respectfully request that any order entered by this Court be sufficiently broad to encompass the same.

- Tapes (audio and video) and transcripts of Petitioner's detention, interrogation, arrest, and treatment while in the custody of the United States or any of its agents and/or contractors

- Tapes (audio and video) and transcripts of Petitioner's telephone conversation prior or subsequent to his arrest

- All documents that relate to communications between the CIA, FBI, NSA, NSC, State, and the White House pertaining to Petitioner's treatment at any time prior to or following his detention.

- The actual equipment and/or implements used in Petitioner' detention, interrogation, and torture, including the equipment used in Petitioner's waterboarding and █████████ among others

- **Knowledgeability Briefs**

  This document is prepared by an interrogation team before a prisoner arrives at Guantanamo. It contains the prisoner's name, family background, date of birth, a summary of the reasons for detention, and may include an inventory of the prisoner's personalty at the time of capture. Copies of these documents are transferred back to Washington. ███████████

- **Prisoner Dossiers**

  Prisoner dossiers are created and maintained. They contain all the information provided by a prisoner to his interrogators and all interrogation results, generally even if a prisoner refused to talk. Dossiers include original notes from interrogations that took place at locations where prisoners were incarcerated prior to Guantanamo as well as interrogations that took place at Guantanamo. In this case that would include information from all locations where Petitioner was interrogated and/or imprisoned. It also contains

"interrogation plans" (*see* below) that are prepared by interrogation teams and reviewed and approved by various government agencies and authorities. ██████████████████████ Dossiers also include instructions that interrogators gave regarding the prisoner's treatment, as well as all cell transfers, incentive action justifications, and punishments.

- **Interrogation Team Records**

  Generally, prisoners are assigned to an interrogation team that consists of an interrogator, analyst, translator, law enforcement, and a Behavioral Science Consulting Team ("BSCT") member. Each of these team members is likely to have maintained records relating to Petitioner.

- **BSCT Records**

  BSCT maintains records that are separate from those shared with the interrogation team.

- **Interrogation Plans**

  Interrogation teams prepared and submitted a detailed interrogation plans for every interrogation for each detainee. These plans were approved by the Team Chief, the Executive Officer, and the Commander of the Interrogation Section.

- **Medical Records**

  Petitioner was almost killed during his arrest. A surgeon form Johns Hopkins was flown to Pakistan to treat him. Extensive medical records undoubtedly exist. All prisoners at Guantanamo receive a physical immediately upon arrival. In addition, additional medical examinations of prisoners have taken place over the past several years, resulting in the creation of additional medical records. Prisoner medical records were available to interrogators. Included in medical records are psychological records and evaluations.

- **Intelligence Reports**

  Various government agencies, including, but not limited to, the CIA, FBI,

NSA, NSC, State, and the White House and OGA maintain their own files both at Guantanamo and in other offices.

- **Videos**

  All interrogations at Guantanamo are videotaped. All of these videos are/were maintained on the computer system at the base. An index exists that identifies these videos by country of visitor.

- **Photographs**

- **Polygraphs**

  Many prisoners have been subjected to one or more polygraph tests.

- **Voice Prints and Voice Stress Tests**

  Many prisoners have been subjected to voice print or voice stress tests.

- **Computer Records**

  A variety of computer records exist that relate to Petitioner. These include, but are not limited to, the Joint Detention Operation Group Records ("JDOG"), which contains a record of every incident, every prisoner request (for example medial or dental requests), and every prisoner infraction. The Interrogation Control Element ("ICE") is another important set of prisoner-related records. Because Petitioner was in the CIA's custody for years, in different locations, records are sought from each.

- **Prisoner Numbers**

  Each prisoner was issued four different identification numbers, including, but not limited to, INS Numbers and numbers assigned by MPs.

- **System of Rewards**

  These documents describe four levels of rewards and a series of privileges that interrogators can bestow upon the detainees.

- **Mail**

  Copies of all redacted and unredacted letters to and from the detainees.

- **Other Reports or Other Documents**

  Any and all other reports or documents related to petitioners.

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
JAMIL EL-BANNA et al.,              )
                                    )
        Petitioners,                )
                                    )
v.                                  )       Civil Action No. 04-1144 (RWR)
                                    )
GEORGE W. BUSH et al.,              )
                                    )
        Respondents.                )
_____)
                                    )
HANI SALEH RASHID ABDULLAH          )
   et al.,                          )
                                    )
        Petitioners,                )
                                    )
v.                                  )       Civil Action No. 05-23 (RWR)
                                    )
GEORGE W. BUSH et al.,              )
                                    )
        Respondents.                )
_____)
```

MEMORANDUM OPINION AND ORDER

Petitioners in each of the above-captioned habeas corpus proceedings -- foreign nationals detained at Guantanamo Bay in the custody of the United States, or their next friends -- seek an order directing respondents to "preserve and maintain all evidence, documents, and information regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility, and to preserve and maintain all evidence, documents and information relating or referring to Petitioners."

-2-

(Mot. for Preservation Order.)[1]  Respondents oppose each motion,
arguing that the requested order is superfluous in light of their
well-understood preservation obligations, yet also overbroad and
burdensome.  (Opp'n at 5, 7.)[2]  Because a preservation order can
be appropriate in a habeas corpus proceeding, but is only
partially warranted here, petitioners' motions will be granted in
part and denied in part.

Respondents argue that because they are well aware of their
preservation obligations, to "'supplement every complaint with an
order requiring compliance with the Rules of Civil Procedure
would be a superfluous and wasteful task, and would likely create
no more incentive upon the parties than already exists.'"  (Opp'n
at 5, quoting Hester v. Bayer Corp., 206 F.R.D. 683, 685 (M.D.
Ala. 2001)).[3]  Respondents then conclude that petitioners'

-----

  [1]  El-Banna, Dkt. 145; Abdullah, Dkt. 30.

  [2]  El-Banna, Dkt. 147; Abdullah, Dkt. 32.

  [3]  The parties advocate different standards for preservation
orders, a dispute that need not be resolved here.  First, the
distinction between the standard articulated in Pueblo of Laguna
v. United States, 60 Fed. Cl. 133 (2004), urged by petitioners,
and the standard four-factor test employed in preliminary
injunction decisions, urged by respondents (see Opp'n at 3), may
be one without a practical difference.  See also, Hester, 206
F.R.D. at 685.  Second, respondents argue that a preservation
order must meet the test of a preliminary injunction (Opp'n at
3), but also concede that the Federal Rules of Civil Procedure
impose preservation obligations on civil litigants in every civil
action filed, automatically and without court review (Opp'n

-3-

requested order is both "overbroad and potentially burdensome to the extent that it goes beyond what might otherwise be permissible with respect to any discovery that might ever be appropriate in a habeas case." (Opp'n at 7, citing <u>Harris v. Nelson</u>, 394 U.S. 296, 300 (1969).)

The Supreme Court's opinion in <u>Harris v. Nelson</u> makes clear that the discovery provisions of the Federal Rules of Civil Procedure do not automatically apply in whole to federal habeas corpus proceedings. <u>See</u> 394 U.S. at 294 n. 5, 298-99. Therefore, the preservation obligations that flow to a litigant from the federal discovery rules cannot be presumed to apply to habeas litigants absent some express application by a court. Accordingly, a preservation order in habeas proceedings, particularly in proceedings such as these where there has been no full disclosure of the facts on the public record to authorize the challenged detention, is not superfluous or unnecessary.

Further, <u>Harris v. Nelson</u> also makes clear that a district court's authority to issue orders pursuant to 28 U.S.C. § 1651 in aid of its fact-finding obligations in habeas corpus proceedings is intended to be flexible and should be exercised as the circumstances require for a proper and just disposition.

---

at 5), two positions in tension with each other.

-4-

[The Supreme Court has] held explicitly that the
purpose and function of the All Writs Act to supply the
courts with the instruments needed to perform their
duty [to issue orders appropriate to assist them in
conducting factual inquiries] . . . extend to habeas
corpus proceedings.

At any time in the [habeas corpus] proceedings, when
the court considers that it is necessary to do so in
order that a fair and meaningful evidentiary hearing
may be held so that the court may properly "dispose of
the matter as law and justice require," either on its
own motion or upon cause shown by the petitioner, it
may issue such writs and take or authorize such
proceedings with respect to development, before or in
conjunction with the hearing of the facts relevant to
the claims advanced by the parties, as may be
"necessary or appropriate in aid of [its jurisdiction]
. . . and agreeable to the usages and principles of
law."  28 U.S.C. § 1651.

. . . Obviously, in exercising this power, the court
may utilize familiar procedures, as appropriate,
whether these are found in the civil or criminal rules
or elsewhere in the "usages and principles of law."

394 U.S. at 299-300 (footnote omitted).  The opinion in Harris v.

Nelson does not support respondents' suggestion that the

requested preservation order "goes beyond . . . any discovery

that might ever be appropriate in a habeas case."  (Opp'n at 7.)[4]

---

[4]  Respondents' statement, that "Petitioners' proposal
improperly, and without good cause, would put respondents in the
position of having to take action with respect to a wide range of
documents without having the opportunity to utilize the process
of objection and litigation available in the discovery context to
fine tune or challenge discovery requested based on, for example,
overbreadth, relevance, or burden" (Opp'n at 7), mistakenly
equates preservation obligations with production obligations and
erroneously presumes that respondents will have no opportunity to
litigate future discovery requests.

-5-

To the contrary, "the power of inquiry on federal habeas corpus
is plenary" and its exercise depends entirely on the
circumstances.  Harris v. Nelson, 394 U.S. at 291.

Petitioners' filings challenge the fact and duration of
their custody as being in violation of the Constitution or laws
or treaties of the United States, matters that are cognizable
under the general habeas statute.  See Rasul v. Bush, 124 S.Ct.
2686, 2698 (2005) ("§ 2241 confers . . . jurisdiction to hear
petitioners' habeas corpus challenges to the legality of their
detention at the Guantanamo Bay Naval Base"); Chatman-Bey v.
Thornburgh, 864 F.2d 804, 807 (D.C. Cir. 1988) (a prisoner's
challenge to the date on which he was eligible to be considered
for parole "falls comfortably within the broad reach of habeas
corpus").  The petitions also raise other complaints for which
habeas relief has not been foreclosed, namely, that certain
conditions they face in detention constitute violations of
specific provisions of the Constitution, laws or treaties of the
United States.  See Preiser v. Rodriquez, 411 U.S. 475, 499
(1973) ("When a [state] prisoner is put under additional and
unconstitutional restraints during his lawful custody, it is
arguable that habeas corpus will lie to remove the restraints
making the custody illegal.") (citation omitted); Johnson v.
Avery, 393 U.S. 483 (1969) (removing restraint on the habeas

-6-

corpus petitioner's ability to assist fellow prisoners in writ-writing).  The preservation order requested is tailored to preserve "documents and information in . . . [respondents'] possession" that may be "relevant to litigation or potential litigation or are reasonably calculated to lead to the discovery of admissible evidence."  Wm. T. Thompson Co. v. General Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984). Documents evidencing treatment of detainees -- whether statements of official policy, cumulative evidence of specific practices, or something else -- may be probative of the treatment of petitioners or may lead to other probative evidence.  The requested order imposes no greater obligation on respondents than the federal discovery rules' preservation obligations impose on a litigant in a typical civil lawsuit.  Respondents' contrary view of the requested order (Opp'n at 7) may underscore the need for a preservation order.

However, since the very preservation order sought by petitioners for all materials regarding treatment of all Guantanamo Bay detainees has already been issued against the same respondents in Al-Marri v. Bush, Civ. No. 04-2035 (D.D.C. Mar. 7, 2005) (Order), and Abdah v. Bush, Civ. No. 04-1254 (D.D.C. June 10, 2005) (Order), respondents here are already under a duty to

-7-

preserve those records and another preservation order would be unnecessary. Accordingly, it is hereby

ORDERED that petitioners' motions, insofar as they seek preservation orders governing evidence, documents, and information regarding the torture, mistreatment and/or abuse of detainees held at the Guantanamo Bay detention facility be, and hereby are, DENIED without prejudice as moot. It is further

ORDERED that petitioners' motions otherwise be, and hereby are, GRANTED. Respondents shall preserve and maintain all evidence, documents and information, without limitation, now or ever in respondents' possession, custody or control, regarding the individual detained petitioners in these cases.

SIGNED this 18th day of July, 2005.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge