REACTED VERSION FOR PUBLIC FILING CLEARED BY CSO

~~IN: TOP SECRET//CODEWORD~~

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

| | |
|---|---|
| ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016), | ) ) ) |
| *Petitioner.* | ) ) |
| v. | ) ) |
| ROBERT M. GATES, | ) No. 8CV-1360 (RWR) ) |
| *Respondent.* | ) ) ) |

### REPLY IN SUPPORT OF MOTION FOR PRESERVATION ORDER, ORDER REQUIRING GOVERNMENT AGENCIES TO IDENTIFY EXISTING AND DESTROYED DOCUMENTS, AND OTHER RELIEF

In light of the CIA's willful destruction of evidence of this is vitally important to Petitioner's defense and of the corresponding lack of prejudice that would be imposed upon the Government by the issuance of a preservation order, Petitioner requests that the Court grant its motion. The Government's arguments in opposition to the motion are, for all intents and purposes, legally and factually without basis.

### ARGUMENT

1. **The Government's Argument that a Preservation Order is not Necessary is Belied by the Law and the Facts.**

Whether a preservation order should be entered is determined by application of a two-prong test, showing (1) that entry of a preservation order is necessary and (2) that entry of a preservation order is not unduly burdensome.[1] Petitioner prevails on both prongs. The first prong is "met by demonstrating that the opposing party has lost or destroyed evidence in the

---

[1] This Court has repeatedly ruled that the two-prong test, articulated in Pueblo of Laguna, is the correct standard for entry of a preservation order. See Petitioner's Motion at 11, n.30



~~TO    TOP SECRET//CODEWORD~~

TO PROTECT/FOREWORD

past," *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (Fed. Cl. 2004), the second by the opposing party's "represent[ations] that it will not destroy the information at issue," since such a concession establishes that "a preservation order will not impose any harm or prejudice upon them." *Abdah v. Bush*, Civ. No. 04-1254 (HHK) (D.D.C. June10, 2005) (Order). Here, the Government admits both that it has destroyed evidence relevant to Petitioner's case in the past and that it will not destroy such evidence in the future. The inquiry begins and ends with these concessions. The Government's opposition is thus without merit and the preservation order requested by Petitioner should be entered.

### a. The Need for a Preservation Order is Established by the Government's Past Destruction of Evidence.

The Government contends that "[P]etitioner cannot prove that a preservation order is necessary." Opp. at 6. But past is prologue, and the movant discharges his burden "by demonstrating that the opposing party has lost or destroyed evidence in the past." *Pueblo of Laguna, supra.* Here, the Government admits it deliberately destroyed evidence relevant to Petitioner's defense. Thus, Petitioner has satisfied his burden of showing necessity.

To support its argument that a preservation order is unnecessary, the Government claims that "other judges of this Court have previously held when deciding similar motions for a preservation order, *see, e.g., El-Banna v. Bush*, Civ. No. 04-1144 (RWR) (D.D.C. July 17, 2005) (Order); *Abdullah v. Bush*, Civ. No. 05-0023 (RWR) (D.D.C. July 18, 2005) (Order); *Al-Shabany v. Bush*, No. 05-2029 (JDB) (D.D.C. Nov. 17, 2005), it is unnecessary to require respondents to preserve records relating to alleged torture or mistreatment of petitioner because respondents are already under a duty to preserve such records." *Opp.* at 4.

But this is simply a misstatement of the law. The Government relies, for instance, on *El-Banna.* But in that case, the Court determined that it *was* necessary to enter a preservation order


TO PROTECT/FOREWORD

to require respondents to preserve records relating to the alleged torture or mistreatment of these petitioners. *See, e.g., El-Banna, supra* ("Respondents shall preserve and maintain all evidence, documents and information, without limitation, now or ever in respondent's possession, custody or control, regarding the individual detained petitioners in these cases.").

Likewise, the Government contends that a preservation order is not necessary because preservation orders have been entered in other cases, including *Al-Marri v. Bush*, Civ. No. 04-2035 (GK) (D.D.C. Mar. 7, 2005) (Order); *Al-Adahi v. Bush*, Civ. No. 05-0280 (GK) (D.D.C. Apr. 28, 2005) (Order); *Abdah v. Bush*, Civ. No. 04-1254 (HHK) (D.D.C. June 10, 2005) (Order). But this is misleading. In each of these cases, the Court ordered "that Respondents shall preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees     at Guantanamo Bay detention facility." (emphasis added). As the

Finally, the fact that this Court has found it necessary to enter preservation orders to protect evidence regarding other Guantanamo detainees – and not just in one case, but in several – does not militate against entering a preservation order to protect evidence relevant to Petitioner. As stated by this Court in *El-Banna*, "[A] preservation order in habeas proceedings, particularly in proceedings such as these where there has been no full disclosure of the facts on the public record to authorize the challenged detention, is not superfluous or unnecessary," but rather is proper and just. *Id.*



### b. The Government is No Longer Entitled to a Presumption That It Will Not Destroy Evidence in Petitioner's Case.

Although the government concedes that it deliberately destroyed evidence that is central to Petitioner's, and other prisoners', defense, it suggests to the Court that there is no risk that other evidence will be destroyed. The basis for this assertion will, doubtless, remain an enduring mystery. The Government has been engaged in an extensive campaign of dissimulation against Petitioner in an attempt to justify the extensive torture of an individual who was never even a member of al Qaeda, much less a highly placed member of al Qaeda as the Government has claimed.[2] Indeed, the government is quietly but systematically amending the factual returns of other prisoners and deleting all references to Petitioner as a "co-conspirator" and member of al Qaeda.[3]

Petitioner accepts that the Court normally would not be predisposed to assume that the Government would alter or destroy records in its possession; however, in this case, it is clear that

---

[2] See, e.g., Emma Schwartz, *Justice Dept. Inspector General Claims CIA Hampered Its Investigation: Report says the agency blocked access to senior al Qaeda operative Abu Zubaydah*, U.S. NEWS & WORLD REPORT, May 20, 2008. http://www.usnews.com/articles/news/2008/05/20/justice-dept-inspector-general-claims-cia-hampered-its-investigation.html.

[3] For example, in 2005, Petitioner was named as a co-conspirator in military commission cases against four prisoners: Jabran Al Qahtani; Sufyian Berhoumi; Ghassan al Sharbi; and Binyam Mohamed. *See* Jabran Al Qahtani 2005 Charge Sheet, http://www.defenselink.mil/news/Nov2005/d20051104qahtani.pdf; Sufyian Barhomi 2005 Charge Sheet http://www.defenselink.mil/news/Nov2005/d20051104barhoumi.pdf; Ghassan al Sharbi 2005 Charge Sheet http://www.defenselink.mil/news/Nov2005/d20051104sharbi.pdf; Binyam Mohamed 2005 Charge Sheet, http://www.defenselink.mil/news/Nov2005/d20051104muhammad.pdf. The charges against these four prisoners also named as co-conspirators Osama bin Laden, Saif al Adel, Dr. Ayman al Zawahari, Muhammed Atef, Noor al Deen, and Akrama al Sudani. *See, e.g.*, Al Qahtani, Barhoumi, al Sharbi 2005 Charge Sheets, ¶ 14 ("In furtherance of this enterprise and conspiracy, al Sharbi, Barhoumi, al Qahtani, Abu Zubadya, Binyam Muhammad, Noor al Deen, Akrama al Sudani, and other members or associates of Al Qaida committed the following acts:").

These four prisoners were recharged in 2008. The 2008 charge sheets, however, *do not mention Zubaydah and do not identify him as a co-conspirator*, though they continue to name the others. *See* Jabran al Qahtani 2008 Charge Sheet http://www.defenselink.mil/news/d20080529Qahtani.pdf; Sufyian Barhoumi 2008 Charge Sheet http://www.defenselink.mil/news/d20080529Sufyian.pdf; Ghassan al Sharbi 2008 Charge Sheet http://www.defenselink.mil/news/d20080529Sharbi.pdf; Binyam Mohamed 2008 Charge Sheet http://www.defenselink.mil/news/Mohamed%20-%20sworn0603.pdf. Indeed, *Zubaydah is not named in any of the charges against any of the prisoners currently being prosecuted by military commission.*





TOP SECRET//CODEWORD

the government will go to great lengths to prevent embarrassment and protect high government officials from exposure to indictment for war crimes for having engaged in state sponsored torture. Hundreds and hundreds of hours of evidence were destroyed after the CIA was repeatedly advised that the videotapes could not be destroyed. Once a party has engaged in the deliberate spoliation of evidence, it is no longer entitled to the benefit of the doubt. Nevertheless, the Government argues that it is "entitled to the presumption" that it will "act properly and according to law." *Opp.* at 4. As indicated above, such a presumption simply cannot stand in the face of clear evidence that the Government has engaged in the deliberate, premeditated spoliation of evidence. *See, e.g., Fund for Animals v. Williams*, 245 F.Supp.2d 49 (D.D.C. 2003), *vacated on other grounds* ("The presumption of administrative regularity is just that – a presumption – and may be overcome."). Here, the Government deliberately destroyed evidence. Accordingly, the presumption of regularity is overcome.

### c. To Ensure Accountability, Factual Assertions and Refutations by the Government Should Be Accompanied by the Signature of a Representative of the Appropriate Government Agency.

Petitioner has moved that the Government be required to have a representative from each agency act as a signatory to factual assertions that are made in the Government's pleadings. The Government claims "[t]here is no reasonable basis for this request or any indication that such a procedure would be necessary to insure the accuracy of the government's representations to the Court." Nothing could be further from the truth.

Throughout the Guantanamo-related cases, misinformation has been provided to the courts. Factual statements have been made to courts, even the Supreme Court, that were, at best, incorrect. On April 28, 2004, during oral argument, then-Solicitor General Paul Clement assured the Justices that the United States did not engage in torture. Four hours later, photographs of



TOP SECRET//CODEWORD



tortured prisoners from Abu Ghraib were released. In early December 2004, the government

attorney arguing before Judge Green assured the court that no torture was taking place at

Guantanamo. Three weeks later, thousands of pages of FBI documents released as the result of

Freedom of Information Act litigation refuted his assurance statement. A recently issued report

by the Inspector General of the Federal Bureau of Investigation discusses these documents and

other government wrongdoing over the course of 438 pages.[4] Indeed, District Court Judge

Leonie Brinkema, who presided over the trial of Zacarias Moussaoui, has publicly stated that the

Government's willingness to lie to the court is "[o]ne of the saddest realities I've had to face."[5]

In particular, the Government has made numerous, material false statements about Petitioner[6]

and has deliberately suppressed information that is exculpatory.[7]  The Government's actions

have compromised Petitioner's ability to defend himself and thus require direct court

intervention.

---

[4] *A Review of the FBI's Involvement and Observations of Detainee Interrogation in Guantanamo Bay, Afghanistan, and Iraq*, Department of Justice, May 2008. http://www.usdoj.gov/oig/special/s0805/final.pdf

[5] More than a year after the trial of Zacarias Moussaoui, it has come to light that the Government lied to the court and failed to turn over key evidence. According to Judge Brinkema, in light of the Government's lies and the fallout that would have resulted from a death penalty sentence built upon them, the jury's decision to spare Moussaoui's life had done "an extraordinary service to the legal system.") Matthew Barakat, *Judge to Moussaoui Jury: You Got it Right, Associated Press*, Jul. 23, 2008.

[6] For example, among the many false statements that the Government has made, the Government has falsely stated (1) that Petitioner was the number three man in al Qaeda; (2) that Petitioner was the head of tactical operations for al Qaeda; ▓▓▓▓▓▓▓▓▓ and (4) that Petitioner was responsible for the capture of Khalid Sheikh Mohamad. Each statement is categorically false and known by the government to be so.

[7] *See, e.g.*, Emma Schwartz, *Justice Dept. Inspector General Claims CIA Hampered Its Investigation: Report says the agency blocked access to senior al Qaeda operative Abu Zubaydah*, U.S. News & World Report, May 20, 2008. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Josh White, *From Chief Prosecutor To Critic at Guantanamo*, Wash. Post, Apr. 29, 2008, at A1. (reporting that the Defense Department's former chief prosecutor, Col. Morris Davis, testified that the military justice system has been corrupted by politics and inappropriate influence from senior Pentagon officials).





TO  SECRET//CODEWORD

As stated in Petitioner's motion, Petitioner does not contend that DOJ trial and appellate attorneys are purposefully, or even knowingly, misleading the Court.[8] It is clear, however, that information has been provided to DOJ attorneys that was false and that this information was repeated to the courts. To ensure that such incorrect information does not continue to be disseminated to the Courts, accountability is needed. With increasing frequency, the Government has adduced evidence from other government agencies when the Government perceived it to be in its interest. In essence, it seems the Government merely seeks to avoid accountability. All Petitioner asks – and his request is eminently reasonable – is that when factual statements are made in a court filing, a responsible attorney from the agency or department that provided the information be a signatory to the filing. This Court should require agency signatories on all court filings that involve factual assertions or refutations. This is particularly necessary with the CIA, DOD, and White House. Only in this way can accountability be achieved. The alternative is to hold DOJ attorneys who have no direct knowledge of the facts and no way to ensure that they receive correct information accountable.

**2. The Government's Argument that a Preservation Order is Unduly Burdensome is Belied by the Law and the Facts.**

**a. An Obligation Cannot Be Burdensome When The Government Has Already Pledged to Undertake It.**

The Government claims it is "fully aware of its obligations to preserve" information and that it intends to do so. *Opp.* at 2. This concession proves conclusively that a preservation order imposes no additional burden, and therefore cannot harm or prejudice the Government. *See, e.g., Abdah, supra* ("[B]ecause respondents represent that it will not destroy the information at issue, a preservation order will not impose any harm or prejudice upon them."); *Al-Marri, supra*

---

[8] Mot. at 17. *See also Barakat, supra* (Judge "Brinkema said she did not blame the prosecutors who handled the case day to day. Instead she faulted 'the folks behind them who were giving me misinformation.'").



TP SECRET/CODEWORI

("Respondents represent that the information at issue will not be destroyed, so the Court finds that entering a preservation order will inflict no harm or prejudice upon them).

### b. The Government's assertion that cataloguing relevant documents would be unduly burdensome is illusory.

Despite the Government's assertions to the contrary, Petitioner's request that the Government be required to catalogue existing and destroyed documents is not a significant burden. Indeed, there is nothing in the record to suggest that DOJ has any knowledge that Petitioners request would be unduly burdensome.[9] The Government does not even indicate how many relevant documents are in existence. It may be that, upon inquiry, agencies report there are no relevant documents.

Petitioner has no way to gauge the extent of the Government's spoliation. *See, e.g., Abdah v. Bush*, Civ. No. 04-1254 (HHK) (D.D.C. June 10, 2005) (Order) ("[I]n this case, all of the documents relevant to the adjudication of petitioner's claims, along with petitioner-detainees themselves, are in the sole custody and control of respondents. In addition, petitioners' counsel's access to their clients is quite restricted. It is almost inconceivable that within these confines, petitioners could identify specific instances of document destruction. Rather, the court finds entry of a preservation order appropriate."). At a minimum, representatives from each agency should be required to come forward and inform the Court of the number of documents in their possession and identify documents that have been destroyed and the dates when they were destroyed.

---

[9] This is yet another example why it is necessary to require the agency/department personnel to sign off on court filings.



T  P SECRET/CODEWORD



TOP SECRET/CODEWORD

**c. The Government's assertion that it is burdened by having to take action with respect to a wide-range of information that may or may not be relevant to Petitioner's case is misplaced at this time.**

Petitioner is not asking that these documents be produced in discovery, but only that the Court protect its own jurisdiction and be able to determine the proper relief. The Government argues at length about the uncertainty of what discovery framework should be applied; however, that discussion is premature and not appropriate here. *See, e.g., El-Banna, supra* ("Respondent's statement that 'Petitioner's proposal improperly, and without good cause, would put respondents in the position of having to take action with respect to a wide range of documents . . . mistakenly equates preservation obligations with production obligations and erroneously presumes that respondents will have no opportunity to litigate future discovery requests."); *compare Opp.* at 2 ("The order would require respondents to take action now with respect to a wide range of information that may or may not be relevant to petitioner's core habeas rights.").

**d. The fact that there are other habeas cases pending should not be used as an excuse to warrant cutting corners in Petitioner's case.**

The Government's assertion that Petitioner's request should be denied because it would divert Government resources from the other habeas cases is inappropriate and should be peremptorily dismissed. Petitioner is entitled to individual relief, and the Government's attempts to "streamline" the more than 200 habeas cases pending before this Court should not be countenanced. *Opp.* at 2. As stated by this Court, the district court's authority in fashioning a preservation order "in aid of its fact-finding obligations in habeas corpus proceedings is intended to be flexible and should be exercised as the circumstances require for a proper and just disposition" in the individual case. *El-Banna, supra.* Petitioner has been wrongfully imprisoned from more than six and half years, and the fact that other proceedings are ongoing should not be used as a basis for further delay. *See Boumediene*, 128 S.Ct. 2229, 2275 (2008) ("While some

TOP SECRET/CODEWORD



delay in fashioning new procedures is unavoidable, the costs of delay can no longer be borne by

those who are held in custody.'").

## CONCLUSION

For all of the foregoing reasons, Petitioner's Motion should be granted.

Dated:  September 12, 2008
        Washington, District of Columbia

Respectfully submitted,

*Joe Margulies*

Joseph Margulies [Bar No. 48487]
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0890

George Brent Mickum IV [Bar No. 396142]
Amanda L. Edwards
Spriggs & Hollingsworth
1350 I Street NW
Washington, D.C. 20001
Tel: (202) 898-5866
Fax: (202) 682-1639

Baher Azmy
SETON HALL LAW SCHOOL
CENTER FOR SOCIAL JUSTICE
One Newark Center
Newark, NJ 07102
(973) 642-8700

*Counsel for Petitioner*

OP SECRET//CODEWOR



## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the Court Security Officer for clearance

and filing this 12th day of September 2008. My understanding is that the Court Security Officer will

serve the government. Once Petitioner's counsel has been notified that the document has been cleared

and filed, copies will be served on the following via first class mail:

Judry L. Subar
Terry M. Henry
Andrew I. Warden
Jean Lin
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusettes Avenue, N.W.
Washington, D.C. 20530

_____
George Brent Mickum IV

Exhibit A

# CAPTURED ON TAPE

## INTERROGATION AND VIDEOTAPING
## OF DETAINEES IN GUANTÁNAMO

By

Mark Denbeaux
Professor, Seton Hall University School of Law
Director, Seton Hall Law Center for Policy and Research

Joshua Denbeaux,* and R. David Gratz,*
Denbeaux & Denbeaux
Counsel to two Guantánamo Detainees
Jennifer Ellick '09
Michael Ricciardelli '08
Matthew Darby '08
Research Fellows
Seton Hall Law Center for Policy and Research

Contributors

Shana Edwards, Daniel Mann, Megan Sassaman and Helen Skinner (Class of 2008),
Grace Brown, Jillian Camarote, Douglas Eadie, Daniel Lorenzo,
Mark Muoio, Courtney Ray and Nebroisa Zlatanovic (Class of 2009),
Adam Deutsch, James Hlavenka, Gabrielle Hughes, Brianna Kostecka,
Michael Patterson and Anthony Torntore (Class of 2010),
Research Fellows, Seton Hall Law Center for Policy and Research,
and  John Gregorek*

*Senior Research Fellows, Seton Hall Law Center for Policy and Research

Electronic copy available at: http://ssrn.com/abstract=1093330

## EXECUTIVE SUMMARY

This report—the first in a series of reports that will focus on interrogation at Guantánamo—is, like all Seton Hall Law Center for Policy and Research reports, based upon documents prepared and released by the United States Government. A significant majority of the relied-upon documents were released to the public through Freedom of Information Act lawsuits brought by the American Civil Liberties Union; others were released voluntarily by the Department of Justice or the Department of Defense. In either case, the documents are often heavily redacted: names, dates, and other facts (including descriptions of "interrogation techniques") are, in many cases, completely obscured.

Despite these limitations, publicly available Government documents demonstrate the following:

More than 24,000 interrogations have been conducted at Guantánamo since 2002.

*Every interrogation conducted at Guantánamo was videotaped.*

The Central Intelligence Agency is just one of many entities that interrogated detainees at Guantánamo.

The agencies or bureaus that interrogated at Guantánamo include: the Central Intelligence Agency and its Counterterrorism Center; the Criminal Investigation Task Force (CITF); the Federal Bureau of Investigation (FBI); the Behavioral Analysis Unit (BAU) of the FBI; Defense Intelligence Analysis (DIA); Defense Human Intelligence (HUMINT); Army Criminal Investigative Division (ACID); the Air Force Office of Special Investigations (OSI); and the Naval Criminal Investigative Service (NCIS). Private contractors also interrogated detainees.

Each of these entities has identical motives to destroy taped investigations as has the Central Intelligence Agency. As one former senior Central Intelligence Agency official put it: "It's a qualitatively different thing—seeing it versus reading about it."

One Government document, for instance, reports *detainee treatment so violent as to "shake the camera in the interrogation room" and "cause severe internal injury."* Another describes an interrogator positioning herself between a detainee and the camera, in order to block her actions from view.

The Government kept meticulous logs of information related to interrogations. Thus, it is ascertainable which videotapes documenting interrogations still exist, and which videotapes have been destroyed.

2

Electronic copy available at: http://ssrn.com/abstract=1093330

## INTRODUCTION

United States District Court Judge Henry Kennedy issued an order to the Government in June 2005 mandating that "all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the United States Naval Base at Guantánamo Bay" be preserved. Other United States District Court judges issued similar orders as early as March 2005. In November 2005, however, Central Intelligence Agency officials destroyed at least two videotapes documenting the interrogations of two Guantánamo detainees.[1] The destruction of these two tapes occurred not only after the order's were issued but also after the United States Supreme Court ruled that individuals detained at Guantánamo could pursue *habeas corpus* actions.[2] Attempting to ward off judicial inquiry into the destruction of the tapes, the Government argued that inquiry by the courts would compromise the Justice Department's investigation of the matter. On January 24, 2008, however, United States District Court Judge Richard W. Roberts issued an order which became the first to require that the Government provide information regarding the tapes' destruction.[3]

The Roberts order does not, however, require the Government to provide any information regarding tapes *other* than the two tapes to which the Government admits destroying. Indeed, while judicial inquiry into the destruction of these two tapes is under way, there has not yet been any inquiry by the courts into the existence or destruction of other tapes documenting interrogations conducted at Guantánamo by the Central Intelligence Agency; nor have the courts yet inquired into the existence or destruction of taped interrogations conducted by entities other than the Central Intelligence Agency that interrogated detainees at Guantánamo.

This report reveals the following:

I.  A report issued by a Lieutenant General of the United States Army indicates that more than 24,000 interrogations have been conducted at Guantánamo since 2002.

II.  A second report, produced almost simultaneously by the Surgeon General of the United States Army, reveals that all interrogations conducted at Guantánamo were videotaped. Thus, many videotapes documenting Guantánamo interrogations do or did exist.

III.  An infrastructure for videotaping exists at Guantánamo.

IV.  The Central Intelligence Agency is just one of many entities that interrogated detainees in Guantánamo.

---

[1] Scott Shane, "Court Inquiry on Tape Case is Opposed" *New York Times* (Dec. 6, 2007). Retrieved January 26, 2008 at http://www.nytimes.com/2007/12/16/washington/16intel.html?scp=28&sq=guantanamo&st=nyt.

[2] *Rasul v. Bush*, 124 S. Ct. 2686, 159 L. Ed. 2d 548 (U.S. 2004).

[3] Scott Shane, "Judge Demands a Report on Destroyed C.I.A. Tapes" *New York Times* (Jan. 25, 2008). Retrieved January 26, 2008 at http://www.nytimes.com/2008/01/25/washington/25gitmo.html?ref=us.

V.  Each of these entities has identical motives to destroy taped investigations as has the Central Intelligence Agency, and each can apply to its destruction of tapes an identical justification:  its interest in "protecting" the interrogators. Any videotapes that may still exist are vulnerable to destruction if they have not already been destroyed.

VI.  Because the Government kept detailed logs of interrogations, it is readily ascertainable which videotapes still exist and which tapes have been destroyed. Such an inquiry is crucial to the evaluation—as required by Combatant Status Review Tribunal procedures, the Military Commission Act, and the Detainee Treatment Act—of the reliability of hearsay evidence against a detainee.

## I.

### *Many* Videotapes Documenting Guantánamo Interrogations Do or Did Exist.

On May 24, 2005, Lieutenant General Kevin C. Kiley, M.D.—the Surgeon General of the United States Army—issued a report reviewing medical policies at Guantánamo Bay, Operation Enduring Freedom and Operation Iraqi Freedom.  The report was created because of "concerns regarding the appropriate treatment of detainees, including during interrogation and access to medical care[.]"[4]  Specifically, the report examined "whether detainee medical records were properly maintained; whether medical personnel were aware of detainee abuse and failed to report abuse; and to determine whether medical personnel received and/or are currently receiving appropriate training so that they are fully prepared to perform the mission of caring for detainees."[5]

As the Surgeon General's report acknowledged, the "revelations of detainee abuse in the Abu Ghraib Detention Facility in Iraq…[and] reports in the press [that] have alleged wrongdoing by military medical personnel," created an increased awareness of the military's interrogation procedures.[6]  Indeed, the *New England Journal of Medicine*[7] reported concerns regarding military doctors' treatment of prisoners.  And in 2004, the American Medical Association "support[ed] calls for a new investigation into whether doctors were complicit in the torture of prisoners held by US military forces in Iraq and Afghanistan."[8]

Lieutenant General Kiley's report arose out of the medical community's concerns, and was released in May 2005.  Chapter 18 of the report contains a section labeled "Overview of Site Visits to Afghanistan (OEF), Cuba (GTMO), and Iraq (OIF)"; Subsection 18-2 addresses specifically the site visits to Guantánamo Bay.  Within Section 18-2, the report notes that

---

[4] *See* Appendix 1-4 § 2-1(a).
[5] *See* Appendix 1-4 § 2-1(d).
[6] *See* Appendix 1-4 § 2-1(a).
[7] New England Journal of Medicine, *Doctors and* Torture, Robert Jay Lifton, M.D.,Volume 351:415-416, Number 5, *available at:*, http://content.nejm.org/cgi/content/full/351/5/415, retrieved February 3, 2008.
[8] http://www.bmj.com/cgi/content/full/329/7473/993

4

"[m]edics randomly observe interrogations and have the ability to halt an interrogation at any point they deem necessary."[9]

The same section of the report assures that: *"All interrogations are videotaped."*[10]

On June 9, 2005, within weeks of the release of Lieutenant General Kiley's report, Lieutenant General Randall Schmidt produced an amended report which reviewed FBI allegations of detainee abuse at Guantánamo Bay.[11] According to Lieutenant General Schmidt's report, more than 24,000 interrogations had been completed at Guantánamo Bay since 2002.

Together, these two reports—which were released almost simultaneously—indicate that the Government conducted and videotaped more than 24,000 interrogations at Guantánamo Bay.

## II.

### Videotaping Infrastructure and Policies

Records indicate that an infrastructure for videotaping exists at Guantánamo. Cameras are positioned in every interrogation room, and each room is monitored from elsewhere, as illustrated by the following:

> [REDACTED] and I were in monitoring room 5 in gold building observing the approach of [REDACTED] a fellow interrogator. [REDACTED] was interrogating in interrogation room 4. Monitoring room 5 overlooks both interrogation room 4 and interrogation room 6.[12]

Many other documents reference the Closed Circuit Television ("CCTV") system at Guantánamo Bay. As just one more example, a Special Agent for the Federal Bureau of Investigation documented the following:

> Got called out the other night for [REDACTED]. He called the guards and said he wanted to talk to somebody now. We watched him groom himself and prayer-up for his "meeting." [An Agent, REDACTED] and a linguist went over and E & I *watched on the video monitor*.... We continue to review the files, consult with the teams and continue the work at Delta.[13]

In fact, the Defense Department's Standard Operating Procedures for Guantánamo's Camp Delta *mandate* that "monitors will observe all interrogations" and that monitors "will be

---

[9] *See* Appendix 1-6 § 18-2(d).
[10] *Id. (emphasis added)*.
[11] *Available at:* http://www.dod.gov/news/Jul2005/d20050714report.pdf, retrieved: February 3, 2008.
[12] *See* Appendix 2
[13] *See* Appendix 3-1 *(emphasis added)*.

located either in a monitor room that is equipped with two way mirrors and CCTV, or in a CCTV only room."[14]  Thus, an infrastructure for taping exists at Guantánamo.

Additionally, agencies that interrogated detainees at Guantánamo have policies encouraging if not requiring videotaping of interrogations. The policy of the Department of Defense's Criminal Investigation Task Force ("CITF"), for instance, states the Department's strong preference for videotaping final interviews with detainees who are being transferred and who are potential witnesses. Exceptions to this policy, in fact, require special approval. This policy is stated in a lengthy document identified as the "CITF MEMORANDUM FOR ALL PERSONNEL ASSIGNED TO THE DOD CRIMINAL TASK FORCE" dated October 3, 2003, and signed Brittain P. Mallow, COL. MP Commanding:

> 2. (U) The purpose of this memorandum is to reiterate my previous guidance to Criminal Investigation Task Force (CITF) personnel, related to the conduct of interrogations of detainees or persons under custody. For the purposes of this memorandum all references to detainees will also apply to persons under custody.

> 4. Interrogation:

> f. (U) Photographs and or video recordings of interrogations are not required as a matter of policy; however, they may be generated at the discretion of the agent conducting the interview with the concurrence of the RAC. ["Resident Agent in Charge"] CITF personnel may consider videotaping the final interview with detainees who are to be released/transferred and will *strongly consider videotaping a final interview of any detainee who is being transferred who has possible value as a witness. Exceptions to this policy must be approved* by CITF-HQ at the Commander (CDR) or Deputy Commander (DCO) level. The DCO is also the Senior Agent in Charge (SAC).[15]

Thus, the videotaping of interrogations was clearly authorized by the CITF, and in some very important cases (that is, when a transferred detainee was perceived as a potential witness), disallowed only with permission.

There were, of course, many different agencies each with their own procedures and policies with regard to videotaping. As an example of another agency's policies, the Army field manual for Human Intelligence Collection Operations ("HUMINT")[16] interrogators states HUMINT's preference for videotaping as a means of recording interrogations:

> Video recording is possibly the most accurate method of recording a questioning session since it records not only the voices but also can be examined for details of body language and source and collector interaction.[17]

---

[14] *See* Appendix 4-2.
[15] *See* Appendix 5-2 (*emphasis added*).
[16] HUMINT was one of multiple agencies that interrogated detainees at Guantánamo. *See* Part II of this report.
[17] *See* Appendix 6-4.

Interestingly, the two potential drawbacks of videotaping—that filming requires equipment, and that cameras might inhibit a source—do not apply to Guantánamo because (a) the detainees were already being "monitored" by cameras, and (b) the detainees already *believed* they were being filmed.  One Agent for the Federal Bureau of Investigation, for instance, reported the following:

> During a prior interview (FD-302 dated 10/26/2002) [REDACTED] made the comment: "I got out of the circle and now I am in chains." He was asked about the meaning of the comment. He said he did not remember the reason he said it and asked to be told what the comment was in relation to.  When told that it concerned [REDACTED, REDACTED, REDACTED] became defensive and stared at the ground. He told the interviewers to *"check the tapes," referring to his belief that all interviews are videotaped.*[18]

Thus, the policies as well as the infrastructure in place at Guantánamo support the videotaping of interrogations.

## III.

### The Central Intelligence Agency Is Just One of Many Intelligence-Gathering Agencies To Have Interrogated Detainees on Camera.

The following federal agencies or bureaus interrogated at Guantánamo: the Central Intelligence Agency and its Counterterrorism Center; the Criminal Investigation Task Force (CITF); the Federal Bureau of Investigation (FBI); the Behavioral Analysis Unit (BAU) of the FBI; Defense Intelligence Analysis (DIA); Defense Human Intelligence (HUMINT); Army Criminal Investigative Division (ACID); the Air Force Office of Special Investigations (OSI); and the Naval Criminal Investigative Service (NCIS).[19]  In addition, private contractors interrogated detainees.[20]  As just one example of the number of entities engaged in interrogations of Guantánamo detainees, the following is excerpted from an incident report filed on April 26, 2003 by an analyst for a private contractor hired by the Defense Department, in which the analyst reported abuse of a prisoner—not by a Central Intelligence Agent, but by Army and Navy analysts—in a video-monitored interrogation room:

> When we walked into a monitoring room, we saw another interrogation in room 7 was going on. In the monitoring room was a female Army analyst and a male Navy analyst. The Army analyst was controlling a monitor and had a speaker so that both parties could hear the interrogation.  The speaker was loud enough that I could hear it muffled even though I had headsets on.  In the interrogation room

---

[18] *See* Appendix 7-2 (*emphasis added*).

[19] *See* Appendix 8-2 – 8-8. [Most cites to agencies' participations are found in Responses.]

[20] *See* Griff Witte and Renae Merle, "Contractors Are Cited in Abuses at Guantánamo" *Washington Post*, (Jan. 4, 2007), at D01.  The first private contractors hired to interrogate detainees was Affiliated Computer Systems (ACS). ACS was later replaced by Chenega.

was the interrogator [REDACTED], a male Navy interpreter, two male MPs and the detainee.[21]

This Guantánamo Bay interrogation was not by the Central Intelligence Agency, but by the Army and the Navy, reported by a Department of Defense private contractor who was also an interrogator.

Additionally, on September 14, 2004, an FBI Agent from the Counterterrorism Division issued a report to FBI Headquarters in response to a query as to whether he had witnessed any abuse toward prisoners during interrogations. In his response, he described incidents involving the Army Criminal Investigative Division (ACID), the Air Force Office of Special Investigations (OSI) and the Naval Criminal Investigative Service (NCIS), all of which he indicated were involved in interrogations at Guantánamo.[22] In the same report, the FBI Agent indicated that the employees of the NICS checked with the agency's attorneys to determine whether harsh or aggressive interrogation techniques were permitted to be used on the prisoners.[23] While the Agent was unclear as to whether he witnessed the NCIS engage in abuse, he stated in the report that harsh techniques *were* used by "DIA/DHS."[24]

Notwithstanding the diverse entities involved in interrogation at Guantánamo, the Government has not acknowledged that the Department of Defense, the Federal Bureau of Investigation, or *any* entity other than the Central Intelligence Agency taped interrogations of detainees. Tapes produced by any of these other entities—and indeed, tapes produced anywhere at Guantánamo Bay—*do not* fall within the scope of the Justice Department's narrow investigation into the matter of the two videotapes destroyed by the Central Intelligence Agency.

IV.

**Any Videotapes That Still Exist are Vulnerable to Destruction If They Have Not Already Been Destroyed.**

That the Government has not provided any videotaped interrogations for evaluation is unsurprising, given what is (or was) the content of some of the videotapes. In fact, one interrogator, aware that her interrogation of a detainee was on camera, attempted to shield her actions from view:

She directed a marine to duct tape a curtain over the two-way mirror between the interrogation room and the observation room.... Through the surveillance monitor, [Special Agent, REDACTED] then observed [REDACTED] position herself between the detainee and the surveillance camera [.][25]

---

[21] *See* Appendix 8-1 – 8-8.
[22] *See* Appendix 8-3.
[23] *See* Appendix 8-8.
[24] "DIA" stands for Defense Intelligence Agency. "DHS" stands for Defense HUMINT Services.
[25] *See* Appendix 8-1 – 8-8.

One can only guess at the interrogation techniques the agent was trying to hide from the cameras.

Leaving less to the imagination is the following record of another interrogation, documented by an ex-military civilian contractor (and interrogator) for the Department of Defense:

> They [the detainee, the Navy interpreter, the interrogator, and the two military policemen] were all standing in the center of the floor. The MPs held the detainee by the upper arms. The interpreter was standing to the rear of the detainee and [REDACTED] was standing directly in front of the detainee. [REDACTED] was yelling questions at the detainee very rapidly, [REDACTED] yelled "DOWN." *The MPs then pushed the detainee to the floor with enough force to not only shake the camera in the interrogation room, but also in the room that* [REDACTED] *was conducting his interrogation.* He would then yell "GET UP," and the MPs would jerk the detainee up. Each time the female analyst first heard the word "DOWN" [REDACTED] the analyst stood up to watch this as it was happening and was laughing about it.
>
> [REDACTED] then shouted "DOWN" and the two detainee escorts pushed the detainee to the floor. When I say pushed to the floor I mean they pushed in the back of the detainee's knees with their knees, taking the detainee to his knees. Then holding the detainee by the upper arms they slammed his upper body to the floor. This series of motions was all done in one swift movement, so that the detainee went from the standing position to a prone position all at once. The force with which the detainee's body hit the floor was such that [REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED] was interrogating. Immediately before the detainee was pushed to the floor, [REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED, REDACTED] and the Navy analyst were laughing about the treatment of the detainee…. The force with which the detainee hit the floor was, in my estimation, *adequate to cause severe internal injury.* I left the monitoring room.[26]

Clearly, descriptions of the physical trauma exacted upon the prisoner by Department of Defense officials were redacted not because of concern for national security, but rather because of concern for the Department's potential liability. A natural corollary to that concern is an even greater desire to destroy any filmed evidence of whatever was redacted—for, in the words of a former senior Central Intelligence Agency official: "It's a qualitatively different thing—seeing it versus reading about it."[27]

---

[26] *See* Appendix 9-3 (*emphasis added*).
[27] Kevin Whitelaw, "The New CIA Acts a Bit Like the Old CIA," *U.S. News & World Report* (Dec. 24, 2007), at 26.

## V.

## The Government Kept Meticulous Records of All Interrogations.

The name of each detainee, the identity of each interrogator, and the date, the time, and the place of each interrogation were meticulously recorded in logs. One FBI Special Agent stated, in response to an FBI Special Inquiry, that, while he did not know the identity of a particular "bleeding detainee" or the personnel that interrogated him, the agent believed that:

> [D]etermining their identities would be possible by querying logs maintained by the military at GITMO. According to SA [REDACTED], the date, interviewing room, and the identities of the interviewers and detainees for each interview were maintained by the military at GITMO.[28]

Predictably, identifying details pertinent to interrogations were logged in detail by the FBI and by the Department of Defense. Department of Defense employees could even "request and obtain transcripts, reports and after-action interviews of any and all interviews conducted by other agencies and entities to determine the law enforcement value of the information and the effectiveness of the interrogation strategies being employed."[29] Thus, to determine what was videotaped and which tapes were destroyed would not be burdensome for the Government.

## CONCLUSION

Combatant Status Review Tribunal procedures, the Military Commission Act and the Detainee Treatment Act all require that the reliability of the evidence against a detainee be evaluated. The reliability of hearsay evidence, in particular, *must* be evaluated.[30] The taped interrogations recorded at Guantánamo Bay are equally as important to evaluating the reliability of the evidence against a detainee as were the two videotapes destroyed by the Central Intelligence Agency. Judge Roberts's recent order represents an important shift from the court's reliance upon the Government's self-investigation, but—like the investigation itself—it applies only narrowly. Judicial and perhaps congressional inquiry is necessary—not only into the publicized destruction of two videotapes, but with respect to the *many other* taped interrogations which either still exist or were destroyed.

---

[28] *See* Appendix 8-5.

[29] *See* Appendix 8-1 – 8-8.

[30] This rule was not followed the first time around, however. *See* Declaration of Lieutenant Stephen Abraham, certifying that Combatant Status Review Tribunals did not review all evidence, and that exculpatory evidence was withheld.

# APPENDIX

1-1



DEPARTMENT OF THE ARMY
OFFICE OF THE SURGEON GENERAL
5109 LEESBURG PIKE
FALLS CHURCH, VA 22041-3258

MCJA

MAY 2 4 2005

MEMORANDUM FOR RECORD

SUBJECT. Approval of Findings and Recommendations of Functional Assessment Team Concerning Detainee Medical Operations for OEF, GTMO, and OIF

1. I have reviewed the findings and recommendations of the assessment team concerning detainee medical operations for OEF, GTMO, and OIF and the legal review of that report.

2. I hereby approve all the findings and recommendations except the recommendation that psychiatrists/physicians not be used as members of a Behavioral Science Consultation Team (BSCT) and that all detained individuals be treated to the same care standards as U.S. patients in the theater of operation. I direct that these recommendations be further reviewed to determine whether these recommendations should be approved.

3. I also direct the MEDCOM Staff Judge Advocate to make appropriate coordination with the Army Inspector General's Office concerning the alleged misconduct of two senior officers pursuant to paragraph 8-3, AR 20-1.

4. Lastly, I direct that the MEDCOM Staff Judge Advocate coordinate with the appropriate Command Investigative Organization to determine the final disposition of the other three incidents that were previously referred by the assessment team for appropriate action.

KEVIN C. KILEY, M.D.
Lieutenant General
The Surgeon General

12

1-2



DEPARTMENT OF THE ARMY
US ARMY MEDICAL RESEARCH AND MATERIEL COMMAND
504 SCOTT STREET
FORT DETRICK MD 21702-5012

REPLY TO
ATTENTION OF

MCMR-ZA

13 April 2005

MEMORANDUM FOR The Army Surgeon General, 5109 Leesburg Pike,
Falls Church, VA 22041-3258

SUBJECT: Assessment of Detainee Medical Operations for OEF, GTMO, and OIF

1. Reference Memorandum, TSG, Army, Subject: Appointment as Team Leader,
Functional Assessment Team, dated 12 November 2004.

2. The attached report documents the assessment of detainee medical operations for
the OEF, GTMO, and OIF completed during the period 23 November 2004 to 13 April
2005.

3. The report includes the background and methodology utilized by the Team and
addresses each area of interest specified in the appointment memorandum, with
findings, discussion and recommendations. The report highlights other key
observations pertinent to detainee medical operations, and includes a history of reported
incidents and allegations related to medical records, medical practice, interrogation,
supplies, staffing, and potential abuse.

4. The team appreciated the assistance and cooperation provided throughout the visits
by all headquarters and staff elements and their personnel, particularly the 30th Medical
Brigade and European Regional Medical Command which provided outstanding support
for our commissions travels. In traveling to more than 22 states and five foreign countries,
an extensive logistical effort was required to arrange travel and provide work space
for the interviews. The team was continually impressed by the dedication and devotion
of the Soldiers interviewed. Their commitment to providing quality healthcare for
detainees as well as U.S. and Coalition Forces was clearly evident.

5. POC for the attached report is COL ████
████

LESTER MARTINEZ-LOPEZ
Major General, Medical Corps
Commanding

Encl

13

1-3

# FINAL REPORT

## ASSESSMENT OF
## DETAINEE MEDICAL OPERATIONS
## FOR
## OEF, GTMO, AND OIF

## OFFICE OF THE
## SURGEON GENERAL
## ARMY

**13 April 2005**

1-4

## Chapter 2
## Background

### 2-1. Synopsis

a. With the current hostilities in Afghanistan (OEF) and Iraq (OIF), and the confinement by U.S. military personnel of detainees in Afghanistan (GTMO) and Iraq, concerns regarding the appropriate treatment of detainees, including during interrogation and access to medical care, have arisen. Increased concern arose with revelations of detainee abuse in the Abu Ghraib Detention Facility in Iraq. Additionally, reports in the press have alleged wrongdoing by military medical personnel.

b. A series of investigations have alleged wrongdoings and have recommended reforms, including actions of Army medical personnel. Some of these reports looked at medical issues; however, to date, there has not been a medical specific assessment of detainee operations in OEF, GTMO or OIF.

c. The Army Surgeon General (TSG), LTG Kevin C. Kiley, reviewed the Fay/Jones report (Cit. 25) with the Army's senior leadership, including recommendations that further inquiry was necessary to determine (i) if detainee medical records were properly maintained; and (ii) if medical personnel were aware of detainee abuse and failed to report the abuse.

d. On 12 November 2004, LTG Kiley directed MG Lester Martinez-Lopez, Commander of the U.S. Army Medical Research and Material Command, to lead a Functional Assessment Team (the Team) to determine whether detainee medical records were properly maintained; whether medical personnel were aware of detainee abuse and failed to report abuse; and to determine whether medical personnel received and/or are currently receiving appropriate training so that they are fully prepared to perform the mission of caring for detainees.

### 2-2. Chronology of Important Events

| Date | Event |
| --- | --- |
| 7 Oct 01 | OEF begins in Afghanistan |
| 11 Nov 01 | First detainees secured at Mazar-e-Sharrif |
| Dec 01 | Bagram Holding Area (BHA) and Kandahar Holding Area (KHA) open |
| Jan 02 | ICRC conducts first visit to Bagram detention facility |
| Jan 02 | First detainees arrive at GTMO |
| Jan 02 | ICRC conducts first visit to GTMO detention facility |
| 19 Mar 03 | Invasion of Iraq begins (OIF) |
| 4 Aug 03 | Abu Ghraib prison reopened by the Coalition Provisional Authority (CPA) |

2-1

15

1-5

## Chapter 18
## Other Issues

### Section I
Overview of Site Visits to Afghanistan (OEF), Cuba (GTMO), and Iraq (OIF)

**18-1. Operation Enduring Freedom**

a. The overall level of outpatient and inpatient detainee medical care is extremely high.

b. Living conditions are very good and detainees are treated respectfully.

c. During a walk-through of the ^(b)(2)                    the Team reviewed the care of a detainee in the Intermediate Care Ward (ICW). Some entries in his record were not signed by an attending physician. Although this was apparently not a common practice at the Hospital, others were also hesitant to put their names on entries, as these documents might eventually be given to detainees upon their release from the facility.

d. The Bagram/Kandahar (BHA/KHA) SOP, dated 3 March 2005 (S), states that medical records will be destroyed after three years from the time of any detainee's release. This does not specifically follow the provisions of AR 40-400, paragraphs 15-2 and 15-8, which require fixed and deployed MTFs to transmit/provide PASBA with the medical records and workload reports. Additionally, PASBA has been designated the interim inpatient record holding/processing facility for records from the deployed level III MTFs, memorandum dated 12 Mar 2004, unsigned (Clt. 32).

e. Policies and procedures were often hard to obtain prior to a unit's arrival in theater. Mobilizing units should have access to these well in advance of arrival.

f. Medical care and initial screening procedures at BHA were streamlined and well-conceived.

**18-2. Guantanamo Bay Detention Facility**

a. The overall level of outpatient and inpatient detainee medical care is extremely high. Staff has the ability to utilize four beds at the Naval Hospital for detainees as well, which can include Intensive Care Unit (ICU) care. According to the Hospital's Commander the GTMO Naval Hospital recently received full Joint Commission Accreditation for Healthcare Organizations (JCAHO) with no findings.

b. Detainee medical records are extremely complete, and mirror U.S. medical records. Outpatient records examined had complete master problem lists. Inpatient discharge summaries are also translated into native languages for those patients being sent home.

18-1

16

1-6

c. Detainee living conditions overall appeared very good.

d. All interrogations are videotaped. Medics randomly observe interrogations and have the ability to halt an interrogation at any point they deem necessary.

**1B-3. Operation Iraqi Freedom**

a. ˮˑˑˑ and Camp Bucca

(1) Overall the level of medical care was felt to be exceptional.

(2) Entire staff takes responsibilities seriously; mottos include: "Restoring America's Honor," and "Detention Healthcare is a Globally Visible, Strategic-level Mission."

(3) Initial intake assessments are very comprehensive and are appropriately recorded. This includes history and physical, dental, nutritional, chest x-ray, immunizations, and retinal scanning. Master problem lists are very complete. Comprehensive care is also available for more complicated chronic diseases, including a multi-disciplinary team for diabetic patients, prosthesis clinic with physical therapy/occupational therapy, and 24 hour in patient and out patient psychiatric care.

(4) Daily sick call is well-organized (average up to 10% of the population on any given day) and ranges from on-site in the camp to the emergency room.

(5) Records security is excellent. The staff is well-versed on keeping medical information separate from MI personnel.

(6) Living conditions appeared very good; all detainees were treated respectfully. Detainee rights and patient rights are clearly posted. All staff are directed to report even minimally-suspected abuses.

(7) BSCT staff is appropriately utilized with carefully-defined roles. They do not provide any clinical care.

(8) There is comprehensive development of policies and medical forms, with generally widespread dissemination and education of all staff. Hospital committees are well-organized, including: executive, credentials, pharmacy and therapeutics, and bioethics.

(9) Strong recommendations from the staff to the Team were to widen detention medical training, e.g., incorporate at JRTC, etc.

b. DIF Visits at Tikrit and Baghdad

1B-2

17

3-1

GTMO Gazette                                                        Page

b5 -3
b7E 1

b6 -2   **From:**
b7C -1  **To:**
        **Date:**   Wed, Aug 28, 2002 12:23 PM
        **Subject:**  GTMO Gazette

Some more info re what we are doing. This can serve as our weekly report, if you like. I know☐ is
forwarding you the Sit Reps.

We have heard (read) from☐ is the approval to get re-imbursed for our "living" expenses. We have
the receipts and will submit to her the itemized list.

1) We are continuing our assistance to the FBI/CITF and secondly the DHS interview teams. We are
listening up with the progress (yes, these folks ARE making progress) and keep notes of that here. They
are chipping away and getting some results. I will not report on too many specifics here. Got called out
the other night for ☐☐☐ He called the guards and said he wanted to talk to somebody now.
We watched his growth himself and prayer-up for his "meeting". ☐ used a linguist went over and PB I
watched on the video monitor. The good news is, he is really getting tired of this, the bad news is, he still
has strength to resist. He complained to ☐ said he had told the truth.
☐☐☐ He would not. (By the way, that has been an effective technique here with certain
detainees. We have actually seen some who have done it) He said he was going on a hunger strike and
informed him that although others have tried, it has not been effective, as they are eating again. That
was that and we shall see what happens. We continue to review the files, consult with the teams and
continue the work at Delta.

2) There is a release package for about 20 detainees now up at Behroit for authority to release. That will
be a big boost here for the cooperation of others.

3) ☐ and I met with the Joints Chief of Staff Review Board re who we are, what we do and our
recommendations. (Their request) They were very impressed with this kind of resource offered by the
FBI and expressed how needed and appropriate it is (their words, not ours) Our recommendations were☐

4) We got drafted into a PsyOps meeting by Col☐ our new best friend. He is in charge of like
everything and digs our stuff. The BSCT☐ are involved with this more than we are. We
attended the briefing and our suggestions were focussed on the relationship of the plan with the interview
process. Col☐ told us later that he wanted our involvement to evoke sure that the plan remains
practical and FIRME. (You can imagine some of the ideas that these folks are floating) I will not go into
details, as it is just too lengthy and classified.

5) Col☐ also asked us to review some DIA Behavioral Ops plan. We are looking at that now and
will give you details later. There is no request for us to actively do anything, but☐ has taken on
the attitude that he wants us (SAU) to be aware of all the behavioral Ops and have us review them. It is
also classified, so we will give you more on that later.

6) Providing on-going training to the new folks coming in on the interview teams. ☐☐☐ that is
an on-going thing here. The DHS command has asked for our program (dag on this, but have been
informed that this is our creation and we will be happy to continue our training for them, I am still
re-tooling the presentation to fit the needs here. I will e-mail it to you later.

7) We met with the medical staff re the detainees and interview process. They gave us an insight into
the outpatient clinic and the fleet hospital. They were very agreeable to working directly with the
interviewers and the MPs on getting treatment to the detainees. We had a situation with a detainee that
told the interviewers that he would talk, and tell them whatever they needed if ONLY they would help him
get some relief from his constipation. Ah, mother nature works in beautiful ways.

b6 -2
b7C -1

b2 -3
b5 -1
b7E -1

b6 -2
b7C -1

b2 -3
b6 -1,3,1
b7C -1,3,1
b7D -1
b7E -1
b7F -1

b6 -2
b7C -1

b6 -1
b7C -1

b6 -2
b7C -1

DETAINEES-3293

DOJFBI-002523

18

3-2

@TMO Gazette                                                                    Page 2

b6 -1
b7C -1

b6 -1
b7C -1

9) [redacted] has arranged for us to meet with the JTF-160 personnel (guards) re what kinds of information our interview teams would want to know. We are having sessions with some of them tomorrow and more on Friday.

b6 -1
b7C -1

9) We are still searching for all of the resources available to these teams that they are not aware of. [redacted] is leading this effort and has really come up with a lot of stuff out there that is helpful. We are sharing that with the group today at the OPS meeting. She attends the daily Scheduling meetings and has networked beautifully with these folks.

10) All of the above is being facilitated and coordinated with the appropriate command and interview team folks, so that we are in sync.

b6 -1
b7C -1

[redacted] I will plug you into all of this when you get here.

There is probably more, but I have to take off now for the OPS meeting.

b6 -1
b7C -1

[redacted] we eagerly await your arrival. I repeat, we eagerly await your arrival.

We would really appreciate someone looking through our mail and fed-exing some stuff to us.

We have a half-day on Sat, and off days are Sun. & Mon. By the way, do we get holiday pay for Monday, since we are AW TDY? We appreciate any "bennies" we can get.

b6 -1
b7C -1

There is a library here, with minimal resource info for this stuff, [redacted] and I have procured some resource material that we will leave here for you. I am currently living in team the Camp [redacted]

Later, Gators,
EEN

CC:                    [redacted]                b6 -1
                                                 b7C -1

DETAINEES-3294

DOJFBI-002524

19

4-1

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Camp Delta Standard
Operating Procedures (SOP)**

Headquarters
Joint Task Force - Guantanamo (JTF-GTMO)
Guantanamo Bay, Cuba
28 March 2003

UNCLASSIFIED//FOR OFFICIAL USE ONLY

4–2

UNCLASSIFIED//FOR OFFICIAL USE ONLY

21

5-1

UNCLASSIFIED

 DEPARTMENT OF DEFENSE
CRIMINAL INVESTIGATION TASK FORCE
9440 4TH STREET
FORT MEYERS, VIRGINIA 22046

160
(Do4)

CITF-CDR                                                    3 October 2003

MEMORANDUM FOR ALL PERSONNEL ASSIGNED TO THE DOD CRIMINAL
INVESTIGATION TASK FORCE

Subject: Interrogation Procedures Guidance (S) (U)

1. (U)(S) References:

    a. (U) Presidential Order Concerning Detention, Treatment and Trial of Certain Non-Citizens in the War Against Terrorism, 13 Nov 01.
    b. SECDEF Memo, 16 Apr 03, Counter-Resistance Techniques in the War on Terrorism (S).(U)

2. (U) The purpose of this memorandum is to reiterate my previous guidance to Criminal Investigation Task Force (CITF) personnel, related to the conduct of interrogations of detainees or persons under custody. For the purpose of this memorandum all references to detainees will also apply to persons under custody

3. (U)(S) The President's order of 13 Nov 01 sets forth certain policy guidelines regarding the treatment of persons detained by DoD who are subject to the order. Specifically, the order states that detainees will be treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or similar criteria. The general guidelines provided are consistent with the criminal investigator's objectives in eliciting information from the detained persons during interrogation and the Secretary of Defense Guidance, dated 16 April 2003, concerning Counter-Resistance Techniques in the War on Terrorism (S).(U)

4. (U)(S) Interrogation:

    a. (S) Detainees will be treated humanely. Physical torture, corporal punishment and mental torture are not acceptable interrogation tactics and are not allowed under any circumstances. Basic human needs, such as food and water, will not be withheld as a means to obtain information. CITF will not arbitrarily limit the duration of the interrogation as a matter of policy. The interrogator may discontinue interrogation when he deems that continued efforts would be unproductive.

                                      DRV FM: Multiple REFID 99131.13
                                        Dated: April 16, 2003
                                        DECL: On: 16 April 2013

SECRET//NOFORN
UNCLASSIFIED

6863

DOD-045121

22

5-2

160
(2 of 4)

UNCLASSIFIED
~~SECRET//NOFORN~~

CITF-CDR
Subject: Interrogation Procedures Guidance (S//U)

b. (U) CITF personnel will not participate in any interrogation that violates this policy. When CITF personnel are conducting a joint interrogation with another U.S. government organization, and a member of that other organization employs tactics that are, or appear to the investigator to be, inhumane or cruel and unusual, the CITF personnel will immediately disengage from the interrogation, report the incident to their CITF chain of command, and document the incident in a memorandum for record to the CITF Resident Agent In Charge (RAC), who will then forward a memorandum for record to the CITF Deputy Special Agent In Charge (DSAC).

c. (S//NF) The use of isolation facilities will not be employed as an interrogation tactic; however, on a case-by-case basis it can be used as an incentive. The use of isolation as an incentive must be approved by the DSAC, and will only be used with the consent of the detainee.

d. (S//NF) The use of deception or ruse may be employed as an interrogation tactic. Examples of deception tactics include but are not limited to the use of false intelligence, false information attributed to other detainees, false identification of physical or forensic evidence and false representations as to the identity of the interrogator. The interrogator may not employ a deception or ruse in any manner that would constitute inhumane treatment of the detainee.

e. (U) All interrogations will be documented on a CITF Form 40 that will include the ISN of the detainee, time and date of the interrogation, duration of the interrogation and either the identities or organizations of all persons present for the interrogation. All CITF personnel participating in the interrogation must be documented appropriately in the case file, either in the investigative notes or on the Form 40.

f. (U) Photographs and or video recordings of interrogations are not required as a matter of policy; however, they may be generated at the discretion of the agent conducting the interview with the concurrence of the RAC. CITF personnel may consider videotaping the final interview with detainees who are to be released/transferred and will strongly consider videotaping a final interview of any detainee who is being transferred who has possible value as a witness. Exceptions to this policy must be approved by CITF-HQ at the Commander (CDR) or Deputy Commander (DCO) level. The DCO is also the Senior Agent In Charge (SAC).

2
~~SECRET//NOFORN~~
UNCLASSIFIED

6864

DOD-045122

6-1

# FM 2-22.3 (FM 34-52)

# HUMAN INTELLIGENCE
# COLLECTOR OPERATIONS

## HEADQUARTERS, DEPARTMENT OF THE ARMY

.

.

**September 2006**

**DISTRIBUTION RESTRICTION:** Approved for public release; distribution is unlimited.

**NOTE:** All previous versions of this manual are obsolete. This document is identical in content to the version dated 8 September 2006. All previous versions of this manual should be destroyed in accordance with appropriate Army policies and regulations.

6-2

## HUMINT COLLECTION AIDS

9-28. There are numerous procedural and recording aids that can assist the HUMINT collector in conducting rapid, accurate, yet systematic questioning. They include—

- HUMINT Collector's Guide. This guide is a pamphlet or notebook designed to guide the HUMINT collector through the questioning. The HUMINT team leader should ensure that team members prepare a HUMINT collector's guide, which could be included in the unit's SOP. The guide is made based on the AO and supported command intelligence requirements. The HUMINT collector and available intelligence analysts should jointly prepare the guide. Appendix G provides the basic topics and example questions that can be adapted to construct a HUMINT collector's guide. The guide must be updated for each interrogation as part of planning and preparation. The guide should contain information such as—
  - Intelligence requirements and ISR tasks.
  - Topical questioning sequence format.
  - Actual prepared questions to be used during questioning.
  - Guidelines for employing the various approach techniques.
  - Formats or samples of completed reports used by HUMINT collectors.
- Time Event Chart. A timeline, or event chart, is a graphic display upon which the HUMINT collector enters chronological information as it is collected. This facilitates the HUMINT collector in understanding and organizing the collected information. It also enables the HUMINT collector to identify gaps in information, to sequence events properly to facilitate follow-up questions, and to identify deception. The HUMINT collector can develop a basic timeline prior to questioning. The source should not be able to observe the timeline since doing so will help a deceptive source "keep his story straight." See Chapter 12 for how to create and use a time event chart.
- Organizational Chart. An organizational chart is a graphic representation of an organization. It is the equivalent of a military line-and-block chart. This is used to facilitate the questioning of organizations and in establishing their hierarchical and lateral linkages. A basic chart can be developed prior to the questioning based on the expected organizational questioning.

## RECORDING TECHNIQUES

9-29. Accuracy and completeness are vital principles to reporting. However, it is usually not possible to completely record all information in a questioning session. Recording techniques may involve memory, handwritten or typed notes, tape recordings, and video recordings. Each has its advantage and corresponding disadvantage.

- Memory. Relying on one's memory has certain advantages. It does not require any equipment or extra time, and is the least intrusive method of recording information. It allows maximum interaction with the source and projects sincerity. An individual can train himself to

25

6-3

FM 2-22.3

remember highly detailed information. Often in elicitation, memory is the only viable recording method. However, in general, using the memory exclusively to record information is the most inaccurate methodology. Particularly in a long questioning session, details are forgotten and information tends to be generalized.

- Handwritten notes: Handwritten notes require minimal equipment (a pad and pencil), are not intimidating to most sources, and can be as detailed as the HUMINT collector desires. If an analyst or second interrogator is present, he should also take notes. This second set of notes can aid in report writing. The interrogator should not rely solely on an analyst's notes unless absolutely necessary. However, writing notes while questioning an individual often interferes with the rapport between the collector and the source. The collector loses eye contact and can easily miss subtle body language that might indicate lying. Detailed note taking can be extremely time consuming and many sources will, over time, begin to limit their responses so they do not have to repeat information or wait for the collector to write it down. It is somewhat intrusive and inhibiting to the source and is totally inappropriate in certain situations such as liaison and most casual source contacts. Handwritten notes can also be inaccurate, have limited details, and can be hard to read after the fact.

- Computer notes: With the proliferation of computer equipment, particularly laptops and handheld devices, note taking on computers is increasingly commonplace. A computer can provide access to data-based information that may support questioning such as foreign language dictionaries or technical support manuals, either through the Internet (if connected) or on its harddrive. If the computer is linked to a communications system, it also allows the HUMINT collector to transmit data, including SALUTE reports, during the course of the questioning. Notes taken on a computer, however, have many of the same disadvantages as handwritten notes. In addition, computer notetaking requires more equipment and technological support and access to either electricity or a plentiful supply of batteries. Computers may be intimidating to some sources and the fact that what the source says is being entered into a computer may cause the source to alter the information he is providing. Computers tend to isolate the collector from the source by dividing the collector's attention between the computer and the source, and again may cause the collector to miss critical body language clues. Finally, the computer is even more inappropriate to casual and controlled source operations than are handwritten notes.

- Audiotapes: If recording equipment is discrete and functioning properly, audiotapes can be extremely accurate. Use of tapes also allows the HUMINT collector to place his entire attention on the source. This not only enhances rapport but also allows the HUMINT collector to observe the source's body language. Taping a questioning session, if done overtly though, tends to be extremely inhibiting to the source and may seriously curtail the information obtained. Surreptitious taping can be illegal in some situations and dangerous in some situations as well. Consult your legal advisor to determine if

26

6-4

taping is legal. Taped information can also be seriously affected by ambient noise and the relative positioning of the source and collector to the microphone. Writing a report based on a taped session can be extremely time consuming, since it takes as long to listen to a tape as it took to record it. This drawback can be reduced somewhat through the use of voice activated recording devices. Exclusive dependence on audiotapes tends to make the collector less attentive and more likely to miss follow-up questions. Also, if the tape is lost or damaged or does not function properly, the collector has no backup.

- Video recording: Video recording is possibly the most accurate method of recording a questioning session since it records not only the voices but also can be examined for details of body language and source and collector interaction. It is also the most resource intensive requiring proper lighting, cameras, viewing equipment, and possibly trained operators. If done overtly, video recording can be by far the most inhibiting to the source. Even if the source is willing to be videotaped, there is a tendency for both the source and the collector to "play to the camera," creating an artificiality to the questioning. Consult your legal advisor to determine the legality of overt or covert videotaping.

## QUESTIONING WITH AN ANALYST OR A TECHNICAL EXPERT

9-30. The HUMINT collector may often find himself in the position where he needs to use an analyst or a technical expert, or both, in order to conduct questioning. Many of the techniques involved in using an analyst or technical expert are the same as those with using an interpreter (see Chapter 11). The HUMINT collector must pre-brief these supporting personnel. The degree to which the analyst or technical expert is involved in the actual questioning is dependant on the established relationship between the analyst or technical expert and the HUMINT collector. The HUMINT collector will always remain in charge of the questioning, be present throughout the questioning, and ensure that the questioning follows his questioning plan. He must ensure that the supporting analyst or technical expert has the proper security clearance.

9-31. An analyst or technical expert can participate in the questioning to various degrees listed below from least intrusive to most intrusive. As the degree of participation by the analyst or technical expert increases, the technical fidelity of the information collected usually increases but the rapport between the HUMINT collector and the source decreases as does the HUMINT collector's ability to control the content and judge the truthfulness of the information. The analyst or technical expert may provide—

- Advice Only: The HUMINT collector does the questioning. The expert provides information prior to the meeting and may review the collected information after the meeting. The technical expert is not present at the actual questioning.
- Remote Support: The HUMINT collector does the questioning. In addition to the above, the expert monitors the questioning and provides input to the HUMINT collector after the questioning as required. Based on the technological support, this can involve the expert sitting in on, but not participating in the questioning (which

27

7-1

UNCLASSIFIED//FOR OFFICIAL USE ONLY

FEDERAL BUREAU OF INVESTIGATION

Investigation on
Date
by

54

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to
your agency; it and its contents are not to be distributed outside your agency.

11/28/2002

On 11/27/2002 _____ was interviewed at Camp Delta, Guantanamo
Bay, Cuba by Det. _____. FBI Task Force Officer. Also
present during the interview was SA _____ Air Force Office
of Special Investigations. _____ was informed of the nature of
the interview by the interviewers. The results of the interview are
as follows:

The interviewers apologized to _____ for having to
interview him again prior to the end of Ramadan. He was assured
that every attempt was made to keep from interviewing him until the
end of Ramadan. _____ asked one of the interviewers to swear
that he had done everything possible to avoid the interview before
the end of Ramadan.

_____ was asked again about the possibility of a
planned mass suicide occurring amongst the detainees at the Camp.
He said that it was not applicable for him, in his state of being,
to commit suicide. He would not say if it might be applicable for
others at the Camp to commit suicide. He has heard talk from
previous interviewers and from other detainees pertaining to rumors
of suicide. Suicide might be possible since detainees are provided
sheets and blankets. The Muslim religion and fatwas generally
prohibit the taking of one's own life except during exceptional
circumstances i.e. the torturing of an individual during
interrogation. _____ is not aware of specific plans for
coordinating suicide at the detainees.

11/27/2002        Guantanamo Bay, Cuba         DCTA?NFES-3939

255A-?? C99102

Date. _____

7-2



During a prior interview (FD 302 dated 10/26/2002) [redacted] made the comment: "I got out of the circle and now I am in trouble." He was asked about the meaning of this comment. He said he did not remember the reason he said it and asked to be told what the comment was in relation to. When told that it concerned [redacted] became defensive and stated at the ground. He told the interviewers to "check the tapes", referring to his belief that all interviews are video taped. [redacted] also opined that [redacted] has been hired by the United States and is being paid to provide information to authorities. [redacted] was told that information regarding his involvement in a terrorist training camp came from multiple sources, not just [redacted] said that if [redacted] provided the information, he was also being paid. [redacted] was reminded of an earlier statement he made indicating his hate for [redacted] and was told that [redacted] had only disappointed with [redacted]. At this point, [redacted] and asked if [redacted] was in custody.

[redacted] was asked if he had ever made any mistakes. His response [redacted] to ask whether interviewers meant general or specific mistakes. [redacted] was then confronted with the fact that the government believes that he was in a terrorist training camp in Afghanistan.

[redacted] was told that he is beginning to believe his own lies about where he was during this time period. He was asked to realize and admit his mistakes and move ahead with his life so he had done with [redacted] and so the interviewer had done with [redacted] said that the supposed 'inconsistencies in his statements are our problem and not his. He said that [redacted] will confirm his whereabouts for this time period and [redacted] repeated many times "It's not my problem".

[redacted] in an FD-302 dated 10/26/2002, [redacted] The interviewers asked [redacted] what he would

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DETAINEES-3540

8-1

# Detainees
# Positive
# Responses

8-2

Message                                                                    Page 1 of 5

(INSD) (FBI)

From:                                    (HQ) (HU)          b6 -1
Sent:    Wednesday, August 18, 2004 12:53 PM              b7C -1
To:                                      (INSD) (FBI)
Subject: RE: GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

A military interrogator and I were interviewing a new arrival at GITMO during the evening hours when we heard what sounded like thunder. After hearing several "thunderclaps" we stepped outside the interview room to take a break and see of the weather had made a dramatic change from the clear skies we had witnessed prior to the start of our interview. As we walked down the hallway of the temporary building where the interview rooms were located, I glanced in an open doorway where I saw at least two individuals dressed in BDU's standing and an inmate kneeling on the floor with his forehead on the ground. The inmate was bleeding his nose and crying. There was a small amount of blood on the floor near the inmate's face. I asked the BDU-clad personnel what had happened. They explained that the inmate had become upset, beat them and threw himself to the floor. (I had heard previously that one of the inmate military personnel would wet his hands and pound their hands as part of their psych-ops to make the inmates feel "unclean" and "upset them). The inmate's nose appeared to be bleeding. One of the military personnel left the room to retrieve a medical kit for the inmate.  saw nothing else to contradict the military personnel's explanation of events.

SA                                       b6 -1
Houston Division - Corpus Christi RA     b7C -1

b6 -1

-----Original Message-----
From:                      (INSD) (FBI)
b6 -1   Sent: Thursday, July 29, 2004 9:59 AM
b7C -1  To:                 (HQ) (FBI)
        Subject: RE: GTMO

        SENSITIVE BUT UNCLASSIFIED
        NON-RECORD

        Could you please provide a short summary of what you observed.  Thanks.

b6 -1   -----Original Message-----
b7C -1  From:                 (HQ) (FBI)
        Sent: Friday, July 09, 2004 5:50 PM
        To:                   (INSD) (FBI)
        Subject: RE: GTMO

        SENSITIVE BUT UNCLASSIFIED
        NON-RECORD

        I observed what may have been aggressive techniques used by non-FBI interrogators.  Does this
b6 -1   still fall into what you are looking into?
b7C -1
        SA
        Houston Division - Corpus Christi RA
b6 -1

                                      RESPONSES-69

8-3

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   09/07/2004

Special Agent (SA) [redacted], Federal Bureau of Investigation (FBI), who entered on duty with the FBI on [redacted] and arrived in the Houston Division of the FBI, Corpus Christi Resident Agency (CCRA), on or about 01/22/1998, and whose telephone number is [redacted] was advised of the identity of the interviewing Assistant Inspector (AI) and the purpose of the interview. SA [redacted] then provided the following information telephonically:

SA [redacted] was assigned to an interviewing team at the detention facility at Guantanamo Bay, Cuba (GITMO), from about September until late November 2002. The interviewing team consisted of three people, including SA [redacted]. Besides himself, SA [redacted] interviewing team included a contract linguist, whom SA [redacted] believes was contracted through the military and whose identity SA [redacted] could not recall, and an Army representative whose name SA [redacted] could not recall, either. The Army representative was from an organization similar to the Air Force's Office of Special Investigations (AFOSI), an investigative entity; however, SA [redacted] could not recall the name of the organization. He was certain it was not a military intelligence entity since the activities of his interviewing team, deemed by officials at GITMO to be low-enforcement activities, were separated from intelligence-gathering interviews that military intelligence personnel and representatives from other government agencies performed. For most of his stay at GITMO, SA [redacted] and his team performed interviews in the morning. The afternoons and evenings were reserved for interviews conducted by those who were gathering intelligence. SA [redacted] did not know of the specific activities that occurred during the afternoon and evening interviews.

Near the end of SA [redacted] a tour of duty at GITMO, about two to three weeks before Thanksgiving, SA [redacted] was partnered with a female military intelligence enlisted person whose identity SA [redacted] could not recall, but who may have been a military reservist since she indicated to SA [redacted] that she was a probation officer in Los Angeles, California. SA [redacted] and the military intelligence soldier were detailed to an interviewing effort that focused on a recent group of detainee arrivals at GITMO. These interviews, unlike those he had

Investigation on   09/07/2004   at Washington, DC   (telephonically)

File # 297-HQ-A1327669-A   365   Date dictated   N/A

by   SSA/AI [redacted]

RESPONSES-70

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

32

8-4

FD-302a (Rev. 10-6-95)

237-HQ-A1327669-A

b6  1
b7C -1

Continuation of FD-302 of _____, On 03/07/2004, Page 2

performed with the other interviewing team, occurred in the
evenings. The purpose of the interviews was to gain as much
information as possible from the detainees before they were
exposed to the general detainee population.

SA _____ heard through the person placed in charge of
law enforcement agency personnel at GITMO that law enforcement
agencies were using female military intelligence personnel in
psychological operations-type activities against the detainees.
The person in charge, whose identity SA _____ could not recall,
told SA _____ that in an effort to disrupt detainees who were
praying during interrogations, female military intelligence
personnel would wet their hands then touch the detainees' face,
causing the detainee to stop praying because he considered
himself unclean. The person responsible for law enforcement
agency personnel emphasized to SA _____ that law enforcement
agency personnel were not allowed to use this type of practice
when interviewing detainees. SA _____ did not witness this
technique, or anything similar to it, performed on a detainee.

SA _____ did not have knowledge of interviewing
tactics or techniques addressed in any type of Department of
Defense policy since he never received a briefing or written
materials describing such a policy. SA _____ was only aware of
the technique of wetting of the hands from his conversation with
the person placed in charge of law enforcement agency personnel.

Sometime near the end of his tour at GITMO, when he was
partnered with the military intelligence soldier, SA _____ and
the soldier were conducting an evening interview of an Iraqi
detainee who had been apprehended in Afghanistan. During the
interview, SA _____ and the soldier heard banging sounds
similar to claps of thunder, but were perplexed by the sounds
since there had not been any indication of rain when they
entered the interviewing facility. They decided to exit the
facility to investigate the sounds.

As SA _____ and the soldier were exiting the
interviewing facility, they noticed a detainee on the floor in
another interviewing room, "crumpled over," and crying. SA _____
_____ asked the personnel in the interviewing room, all of whom
appeared to be military personnel based on their uniforms, what
had happened. SA _____ recalled that the military personnel
may have responded that the detainee had thrown himself to the
floor. SA _____ observed that the detainee's nose appeared to

RESPONSES-71

33

8-5

FD-302a (Rev. 10-6-95)

297-HQ-A1327669-A

b6 -1
b7C -1

Continuation of FD-302 of _____                    On 09/07/2004 , Page   3

be bleeding. SA[____]did not see or hear anything else about the incident that disputed the account offered by the military personnel present in the room. SA[____]did note that when he exited the facility, there was no indication of thunder outside. The lack of thunder caused him to wonder about the noises he had heard. However, since he did not observe the events that transpired in the other interviewing room, and he did not receive other information contradicting the account of events provided by those in the room where he found the detainee bleeding; apparently from the nose, SA[____]could not say that what transpired in that interview room fell outside U.S. Department of Justice (DOJ) policy. However, SA[____]stated that there was potential for the events occurring in that interview room to not fall in line with either FBI or DOJ policy. SA[____]emphasized that he did not observe any FBI or DOJ personnel present in the interviewing room where he observed the bleeding detainee.

b6 -1
b7C -1

SA[____]did not know the identity of the personnel present in the interviewing room where he observed the bleeding detainee, or the identity of the detainee; however, SA[____]felt that determining their identities would be possible by querying logs maintained by the military at GITMO. According to SA[____], the date, interviewing room, and the identities of the interviewers and detainees for each interview were maintained by the military at GITMO. SA[____]produced an FD 302 of his interview of the Iraqi detainee that evening; however, he did not maintain a copy.

b6 -1
b7C -1

In addition to the military intelligence soldier on SA[____]'s interviewing team on the evening he observed the bleeding detainee, SA[____]received interviewing assistance from an Army psychologist or psychiatrist who was an officer. SA[____]stated that this individual was a major, but that he could not recall his name. SA[____]made a comment about what he had observed to this person.

b6 -1
b7C -1

SA[____]described the interviewing facilities at GITMO as temporary structures. The interviewing facility he used consisted of about 12 interviewing rooms on either side of a hallway. There were six rooms in a row on one side of the hallway and six rooms on the other side. Adjacent to each room were surveillance rooms that allowed other persons to observe interviews without entering an interviewing room. During the evening when SA[____]saw the bleeding detainee, SA[____]was

RESPONSES-72

34

8-6

FD-302a (Rev. 10-6-95)

297-HQ-A1327669-A

b6 -1
b7C -1

Continuation of FD-302 of _____, On 08/27/2004 , Page 4

occupying an interviewing room at one end of the facility, and he observed to detainee in an interviewing room two to three rooms from his, and on the same side of the hallway.

SA [        ] received a tour of the detention facilities at GITMO; however, he did not talk about what went on at the facility with the military personnel he encountered during the tour. SA [        ] did not consider any of these contacts substantive in nature.

SA [        ] noted that during the course of at least one detainee interview, but possibly another as well, he documented information he received from the detainee about abuses that may have occurred in Afghanistan. SA [        ] stated that the Iraqi he interviewed the evening he observed the bleeding detainee was one of the detainees whose information about possible abuses in Afghanistan was specific enough to document in an FD 302. SA [        ] documented the information relating to possible detainee abuse in a separate case file; one that was being set up to address possible war crimes. SA [        ] did not know the case file number and he did not maintain a copy of the FD 302. SA [        ] believed that representatives from other law enforcement agencies at GITMO documented information regarding possible detainee abuse.

Based on the condition of the facilities, and having had the opportunity to walk through the cells where detainees were held, SA [        ] had no indication of systemic detainee abuse at GITMO. SA [        ] believed the detainees were well fed and provided with essential needs, such as medical treatment. He was made aware of one detainee who received medical treatment costing around $100,000.00 for an eye injury he sustained while building an explosive device in Afghanistan intended for use against U.S. soldiers.

RESPONSES-73

35


8-7

**FEDERAL BUREAU OF INVESTIGATION**

Precedence: ROUTINE                    Date: 07/12/2004

To: Counterterrorism          Attn:

From: Laboratory Division
      Special Photographic Unit /
      Contact:

Approved By:

Drafted By:              jth

Case ID #: 297-PG-A1327669-A-[?}(Pending)

Title: Counterterrorism Division, GTMB, Inspection Special
Inquiry

Synopsis: No observation of aggressive treatment of detainees
but photographed one detainee who had blood shot eyes and what
appears to be blood that congealed to his eyelashes.

Enclosure(s): One CD containing all images of
FBI number            ISN number            photographed on
March 12, 2004 at 4:36 PM by (sic) Photographer
       Fifteen 9 x 12 color prints of the detainee are also
included in this enclosure. Photographs of         are
available from the Special Photographic Unit, Quantico,
Virginia.

Details:                           Photographer (Scientific and
Technical) of the Special Photographic Unit, Laboratory
Division, was assigned to rephotograph the detainee's new
mug shots on several days and two travel assignments from
March 11 to March 16, during 2004 and June 10 to 17, 2004.

During the first assignment, on March 12, 2004
detainee              FBI number            ISN number
        was photographed and Major Case printed at 4:36
PM. It was observed that          has blood shot eyes
with slight swelling around his left eye. After reviewing the
photographs what appears to be blood that congealed to his
eyelashes was found. No observation was made as to how this
condition came about, and no comments where heard from any
Army personnel regarding aggressive treatment towards the
detainee.

RESPONSES-176.

36

Message                                                                    page 1 of 3

From: [redacted] (INSD) (FBI)

Sent: Monday, July 12 2004 8:31 AM

To: [redacted] (DT) (FBI)

Subject: RE: GTMO

UNCLASSIFIED
NON-RECORD

I will put you down as a positive response, so no need to do an EC. I will print out the email and at OGC
ascertain if the treatment is beyond the scope. Thank you for your response.

-----Original Message-----
From: [redacted] (DT) (FBI)
Sent: Friday, July 09, 2004 5:32 PM
To: [redacted] (INSD) (FBI)
Subject: RE: GTMO

Mr. [redacted]. I was trying to err on the side of caution here, so these incidents may or may not fall
within the parameters you are using. I have been repeatedly assured that, although some of the
techniques utilized by some of the non-FBI interrogators here are well outside what would
generally be considered standard procedure for a CONUS FBI interview, all of the techniques
used have been approved by the SecDef. However I personally feel about these techniques, I have
been assured that DOD had permission. I further do not believe anything akin to the activities at
Abu Ghareb in Iraq have taken place here.

1). [redacted]

Situation: I was told on or about Thursday, 22 April 2004 by a member of DOD's North Africa-
Europe (NAE) team that [redacted] whom he debriefs, had provided the following: Sometime in the
second or third week of February of 2004, [redacted] was taken to interrogation. [redacted] was on both FBI
and NAE hold.) He did not recognize the interviewers and when he told them he didn't want to
speak to anyone unless they were introduced by his regular interrogators, he was yelled at for 25
minutes, [redacted] was short-shackled, the room temperature was significantly lowered, strobe lights
were used, and possibly loud music. There were two male interrogators, one stood behind him,
and the other in front. They yelled at him and told him he was never leaving here. The
interrogator tried to get [redacted] to identify photos. After the initial 25 minutes of yelling, [redacted] was left
alone in the room in this condition for approximately 12 hours. At one point, the interrogator
came back in the afternoon to make sure he was still there. During the 12 hours, [redacted] was not
permitted to eat, pray, or use the bathroom. One of the interrogators was described as old late
50's, grey and black hair, mustache with no beard, short, skinny, and wore a blue shirt.
My actions: I verbally informed my UTMO SSA when I received the information. I later
informed the GTMO On-Scene Commander via e-mail on 05/04/2004.
Note: It is my understanding all of these techniques were, at that time, permitted per DOD. We
believe the interviewers may have been with CITC based upon the physical description and the fact
that [redacted] was taken to an interview room without appearing on the schedule. I believe they are the
only entity here that can do that.

2). [redacted]

Situation: I observed the following in early April of 2004: [redacted] was being debriefed for several

RESPONSES-214

7/12/2004

37

9-1

## MEMORANDUM FOR RECORD

**Date:** ████████

**To:** ████████████████

**From:** ████████████████

**Re:** INCIDENT ON SEARCH

THE FOLLOWING INCIDENT TOOK PLACE ON 12 APRIL 2003 AT CAMP DELTA, GTMO. AT APPROXIMATELY 2630 HOURS██ AND I WERE IN MONITORING ROOM 8 IN GOLD BUILDING OBSERVING THE APPROACH TECHNIQUE OF ████████████ A FELLOW INTERROGATOR. ████████████ WAS INTERROGATING IN INTERROGATION ROOM 4. MONITORING ROOM 8 OVERLOOKS BOTH INTERROGATION ROOM 4 AND INTERROGATION ROOM 6. AT 2450 TIME THERE WAS AN INTERROGATION OF ANOTHER DETAINEE TAKING PLACE IN INTERROGATION ROOM 8. ████████████ AND A ██████████ ANALYST WHOSE NAME I DO NOT ████ WERE ALSO IN MONITORING ROOM 8 OBSERVING THIS INTERROGATION. IN INTERROGATION ROOM 6 I SAW ████████ A MILITARY LINGUIST, TWO DETAINEE ESCORTS, AND A ████████. THE DETAINEE WAS STANDING A LITTLE BACK FROM CENTER OF THE ROOM. ████ I WAS IN FRONT OF THE DETAINEE THE TWO ESCORTS WERE ON EITHER SIDE OF THE DETAINEE HOLDING THE DETAINEE BY HIS UPPER ARMS. THE LINGUIST WAS STANDING IN BACK OF THE DETAINEE. THE TWO ANALYSTS IN THE MONITORING ROOM 8 HAD A SPEAKER PLUGGED INTO THE AUDIO OUTPUT FROM ROOM 6 AND ████████████. (b)(1)

████████████ I WAS ONLY ONE OF ████████ IN SO THAT I COULD TRANSLATE THE ARABIC. ████████████ WAS ████████ TO ████████ WHO DOES NOT SPEAK ARABIC. OVER THE ████████ THAT ████████████ AND THE OTHER ANALYST WERE USING I COULD ████████ BECOMING LOUDER AND LOUDER IN HIS INTERROGATION. ████████ WAS REPEATING THE SAME QUESTION, "WHAT WERE YOU DOING IN PAKISTAN" TO THE DETAINEE. THIS DETAINEE IN MY OPINION SEEMED INCOHERENT. INCITE AS AN INTERROGATOR I HAVE SEEN DETAINEE FROM INCOHERENCE TO AVOID INTERROGATION, BUT SUCH WAS NOT THE CASE HERE IN MY ESTIMATION. ████████ WAS REPEATING THE QUESTION OVER AND OVER, IN RAPID FIRE FASHION, SO QUICKLY THAT THE INTERPRETER WAS NOT KEEPING UP WITH THE QUESTIONING AND THE DETAINEE WOULD NOT HAVE BEEN ABLE TO ANSWER WITHOUT INTERRUPTING ████. ████████████ THEN SHOUTED "DOWN" AND THE TWO DETAINEE ESCORTS PUSHED THE DETAINEES TO THE FLOOR. WHEN I SAY PUSHED TO THE FLOOR I MEAN THEY PUSHED IN THE BACK OF THE DETAINEES KNEES WITH THEIR KNEES, TAKING THE DETAINEE TO HIS KNEES. THEN HOLDING THE DETAINEE BY HIS UPPER ARMS THEY SLAMMED HIS UPPER BODY TO THE FLOOR. THIS SERIES OF MOTIONS WAS ALL DONE IN ONE SWIFT MOVEMENT, SO THAT THE DETAINEE WENT FROM A STANDING POSITION TO A PRONE POSITION ALL AT ONCE. THE ████ THEN WHICH THE DETAINEE'S BODY HIT THE (b)(1) FLOOR WAS VERY LOUD. ████ (b)(1)

████████████ ████████████ DURING THE DETAINEE WAS PUSHED TO THE FLOOR, (b)(1) ████████████ AND THE ████ ANALYST WERE LAUGHING ABOUT THE TREATMENT OF THE DETAINEE. THE DETAINEE WAS SLAMMED TO THE FLOOR IN THE

**232**

**1329**

9-2

MEMORANDUM FOR RECORD: INCIDENT ON ████████

MANNER SEVEN TO EIGHT TIMES. ████████ WOULD YELL "DOWN" IMMEDIATELY PRECEDING EACH TIME THE DETAINEE WAS SLAMMED TO THE FLOOR. AFTER THE FIRST TWO SLAMS I TOOK OUT MY EARPIECE AND OBSERVED THE HAPPENINGS IN ROOM 6. ████████ WAS ONCE AGAIN ASKING THIS DETAINEE "WHAT WERE YOU DOING IN ████████" WHEN, AFTER 6 TO 10 MINUTES OF THIS ████████ TO ANSWER, RAPID FIRE QUESTIONING THE DETAINEE WOULD NOT ANSWER, ████████ SHOUTED "DOWN," AND THE SLAMMING PROCESS TOOK PLACE APPROXIMATELY TEN TO TWELVE MORE TIMES. THE DETAINEE WAS BEING SLAMMED TO THE FLOOR SO HARD THAT I WAS CONCERNED FOR HIS SAFETY. THE FORCE WITH WHICH THE DETAINEE HIT THE FLOOR WAS, IN MY ESTIMATION, ADEQUATE TO CAUSE SEVERE INTERNAL INJURY. I LEFT THE MONITORING ROOM, ALONG WITH ████████ TO CALL MY SUPERVISOR AND REPORT THIS INCIDENT. AS WE LEFT I COULD HEAR ████████ SHOUTING "DOWN" AND I ALSO HEARD IMMEDIATELY FOLLOWING EACH ████████ CONSISTENT WITH THE SOUND THAT WAS MADE WHEN THE DETAINEE WAS SLAMMED TO THE FLOOR. I HEARD THIS COMBINATION OF SOUNDS AND THUS I LEFT TO BEGIN MORE TIMES AS I EXITED THE BUILDING. ████████ REMAINED AT GOLD BUILDING WHILE I WENT TO MAKE THE PHONE CALL. WHEN I ARRIVED AT BUILDING 6, I ATTEMPTED TO CALL MY SUPERVISOR, ████████ BUT GOT NO ANSWER. I THEN WALKED ████████ TO GOLD BUILDING WHERE ████████ GAVE ME THE NUMBER TO CALL. ████████ TOLD ████████ THAT ████████ THINGS GOING ON AT THE CAMP THAT COULD ADVERSELY AFFECT THE MISSION AND THAT I NEEDED HIS GUIDANCE ON HOW TO PROCEED. ████████ TOLD ME HE WOULD COME TO CAMP DELTA, ALONG WITH ████████ AND DISCUSS THE MATTER. WHILE WAITING FOR THEM TO ARRIVE I SPOKE WITH ████████ WHO WAS NOW AT BUILDING 6. ████████ HAD APPARENTLY BEEN TOLD THAT I WAS REPORTING HIS CONDUCT TO MY SUPERVISOR. I HAD A CONFERENCE WITH ████████ WHICH LASTED APPROXIMATELY TEN MINUTES DURING WHICH ████████ TRIED TO CONVINCE ME THAT WHAT HE HAD DONE WAS PROPER. HE TOLD ME THAT WHEN THE GUARDS WERE TAKING THE DETAINEE TO THE FLOOR THEY WERE, AT THE VERY LAST SECOND, PULLING UP ON HIS ARMS TO LESSEN THE IMPACT, AND THAT THE LOUD SOUNDS I HEARD WERE ONLY BOOTS BEING STOMPED ON THE FLOOR. I TOLD ████████ THAT AS AN EXPERIENCED INTERROGATOR, WHO ████████ ████████ I HAD NEVER SEEN IN FM 34-52 ANY ████████ DESCRIBING OR PRESCRIBING WHAT HE HAD DONE TO THE DETAINEE. ████████ TOLD ME THAT ████████ HAD BEEN CALLED IN TO RUN THE APPROACH ON THIS DETAINEE BECAUSE THE INTERROGATOR RESPONSIBLE FOR THE DETAINEE HAD RUN "EVERY APPROACH A TO Z, AND HAS GOTTEN NOWHERE." I TOLD ████████ THAT I THOUGHT HE HAD JEOPARDIZED THE MISSION AND THAT MOST LIKELY WHOEVER INTERROGATED THAT SOURCE WOULD HAVE TO UNDO THE DAMAGE HE HAD DONE. I LEFT THE OFFICE WHERE HE HAD BEEN TALKING AND WALKED OUTSIDE WHERE I FOUND ████████ AND ████████ TO WHOM I RECOUNTED WHAT I HAD SEEN.

THE PERSONNEL I COULD NOT IDENTIFY BY NAME, I WOULD BE ABLE TO IDENTIFY BY SIGHT.

████████████████

INTERROGATOR, ADS DEFENSE

4/28/2008

233

1330

9-3

**MEMORANDUM FOR RECORD**



**Re:   INCIDENT OR [REDACTED]**

[The body of the memorandum is heavily redacted and illegible.]

(b)(c)

(b)(c)

Analyst, ACS Defense Inc

234
1331