

FILED WITH
COURT SECURITY OFFICER
DATE 12|16|08 MDads20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016), | ) ) | |
| *Petitioner.* | ) ) ) | |
| v. | ) ) | No. 08-CV-1360 |
| ROBERT M. GATES, | ) ) | |
| *Respondent.* | ) ) ) | |

### MEMEORANDUM IN SUPPORT OF MOTION FOR PRESERVATION ORDER, ORDER REQUIRING GOVERNMENT AGENCIES TO INDENTIFY DESTROYED DOCUMENTS, AND OTHER RELIEF

On April 17, 2002, at or about the time that the extensive torture of Zayn al Abidin Muhammad Husayn ("Petitioner"), more commonly known as abu Zubaydah, was about to begin at a Central Intelligence Agency ("CIA") black site in ▮▮▮▮ President Bush publicly announced that Petitioner had been captured: "We recently apprehended one of al Qaeda's top leaders, a man named Abu Zubaydah. He was spending a lot of time as one of the top operating officials of al Qaeda, plotting and planning murder."[1]

The capture and imprisonment of Petitioner was touted as a great achievement in the fight against terrorism and al Qaeda.[2]  There was just one minor problem:  the man described by

---

[1] President Outlines War Effort: Remarks by the President to the George C. Marshall ROTC Award Seminar on National Security, Cameron Hall: Virginia Military Institute, Lexington, Virginia, April 17, 2002, http://www.whitehouse.gov/news/releases/2002/04/20020417-1.html.

[2] Secretary of Defense Donald Rumsfeld described Petitioner on April 1, 2002 as follows: I don't think there is any doubt but a man named abu Zubaydah is a close associate of [Osama bin Laden], and if not the number two, very close to the number two person in [al Qaeda]." DOD News Briefing - Secretary Rumsfeld and Joint Chief of Staff chairman Gen. Richard Myers, April 1, 2002, http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3384.   On

President Bush and others within his administration alternatively as a "top operative", the "number two person" in al Qaeda, and al Qaeda's "chief of operations" was never even a member of al Qaeda, much less an individual who was among al Qaeda's "inner circle." The facts really are no longer contested: Petitioner was not, and never had been, a member of either the Taliban or al Qaeda. CIA determined this after torturing Petitioner extensively and numerous CIA officials, ███████████████████████████████████████████████████████████ ███████████████████████████████████ Petitioner was never a member or a supporter of any armed forces that were allied against the United States. Petitioner had no weapon when he was taken into illegal custody. Petitioner never took up arms against the United States nor against its coalition allies. Petitioner was not in Afghanistan at the time of his detention, but was taken into custody in Pakistan, where he was wrongfully attacked, shot, and nearly killed by the ███████████████████████

    The truth of the foregoing now appears to be beyond conjecture based on the government's surreptitious but systematic purging of any mention or reference to Petitioner from

---

April 2, 2002, White House press Secretary Ari Fleischer described Petitioner as an "operational planner" for al Qaeda and a member of bin Laden's "inner circle." Statement by the Press Secretary, April 2, 2002, http://www.whitehouse.gov/news/releases/2002/04/20020402-2.html ("This represents a very significant blow to Al-Qaeda."). On April 3, 2002, apparently alluding to Petitioner's impending torture, Secretary Rumsfeld made the following statement: "[Abu Zubaydah] being a very senior al Qaeda official who has been intimately involved in a range of activities for the al Qaeda, there's no question but that having an opportunity to visit with him is helpful. Sometimes I understate for emphasis." DOD News Briefing - Norwegian Minister of Defense Kristin Krohn Devold, April 3, 2002, http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3388. Deputy Secretary Paul Wolfowitz described Petitioner as the number three person in al Qaeda on July 9, 2002. Deputy Secretary Wolfowitz Interview with Greta Van Susteren, Fox News Channel, July 9, 2002, http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3545.

[3] For a more extensive discussion of Petitioner's arrest, detention, and torture, *see* Amended Petition for Writ of *Habeas Corpus* filed on August 29, 2008. (*See also* "Background" section below.)

the charge sheets and factual returns of other prisoners whose cases are going forward, albeit without any reference to Petitioner.[4] Facts, however, rarely have proved to be more than a minor annoyance to an Administration that has clothed itself with a mantle of legal omnipotence based on the premise that the President's powers cannot be checked.  Almost immediately after Petitioner's capture, a group of some of the highest ranking government officials in the land met in the White House to orchestrate and oversee the torture of Petitioner, months before the now infamous torture memoranda signed by Jay Bybee and authored by John Yoo were issued in August 2002.[5]  A report issued on December 11, 2008 by the Senate Armed Services Committee that examined the "Treatment of Detainees in U.S. Custody" unequivocally states that "[m]embers of the President's Cabinet and other senior officials participated in meetings in the White House in 2002 and 2003 where specific interrogation techniques were discussed.  National Security Council Principals reviewed the CIA's interrogation program during that period."[6]  The

---

[4] For example, in 2005, four Guantanamo Bay inmates were charged by military commission based in part on information allegedly provided by a "high al Qaeda operative" (Abu Zubaydah): Binyam Mohamed, Sufyian Barhoumi, Ghassan al Sharbi, and Jabran Said al Qahtani. However, the four were recharged in 2008 and all references to Abu Zubaydah were removed. *Compare* Binyam Mohamed 2005 Charge Sheet, ¶ 13, 14(g, h, j, k) *with* Binyam Mohamed 2008 Charge Sheet http://www.defenselink.mil/news/Mohamed%20-%20sworn0603.pdf (notably, Binyam Mohamed's alleged meetings with Jose Padilla, Ghassan al Sharbi, and Jabran Said al Qahtani remained in tact). *Compare also* Al Qahtani, 2005 Charge Sheet ¶ 2 – 15; Barhoumi, 2005 Charge Sheet ¶ 2 – 15; and al Sharbi, 2005 Charge Sheet ¶ 2 – 15 *with* Jabran Said Bin al Qahtani, 2008 Charge Sheet, http://www.defenselink.mil/news/d20080529Qahtani.pdf; Sufyian Barhoumi, 2008 Charge Sheet, http://www.defenselink.mil/news/d20080529Sufyian.pdf; Ghassan Abdullah al Sharbi, 2008 Charge Sheet, http://www.defenselink.mil/news/d20080529Sharbi.pdf. *See also Anam v. Bush*, 04-CV-1194 (HHK);

[5] Memorandum from Office of Legal Counsel to the Central Intelligence Agency, Aug. 1, 2002. http://www.aclu.org/pdfs/safefree/cia_3686_001.pdf.

[6] Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody, Dec. 11, 2008, http://levin.senate.gov/newsroom/supporting/2008/Detainees.121108.pdf. (Conclusion 2).

individuals involved in this shameful, unlawful activity – Vice President Cheney, former National Security Advisor Condoleezza Rice, former Secretary of Defense Donald Rumsfeld, former Attorney General for the Department of Justice ("DOJ") John Ashcroft, and former Secretary of State Colin Powell – came from disparate government agencies and departments, all of which were privy to exculpatory information relating to Petitioner. ████████████

████████████████████████████████████████████████

████████████████

The Senate Armed Services Committee's Report concluded that the memoranda issued by the Department of Justice's Office of Legal Counsel ("OLC") "distorted the meaning and intent of anti-torture laws, rationalized the abuse of detainees in U.S. custody and influenced the Department of Defense determinations as to what interrogation techniques were legal for use during interrogations. . . ."[8]

The purpose of this motion is to require all federal agencies and departments to preserve evidence that still exists and to identify evidence that has been destroyed. Because so many federal agencies and departments were directly involved in Petitioner's arrest, detention and torture, it is necessary for this court to issue an order that extends to all federal officials who may possess information or who destroyed information.

████████████████████████████████████████████████

[8] Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody, Dec. 11, 2008, http://levin.senate.gov/newsroom/supporting/2008/Detainees.121108.pdf. (Conclusion 6).

## BACKGROUND

On or about March 28, 2002, Petitioner was attacked and shot three times by ██████ ████████████████████████████████████████████████████ Wounded and in critical condition from gunshots to the groin, thigh, and stomach,[10] Petitioner was nursed back to health only to become a prisoner in a secret program conducted by the CIA, initiated after September 11, in which alleged suspects were jailed and systematically tortured at secret prisons outside the United States known as "black sites." [11]   Since March 2002, Petitioner has been held incommunicado in the unlawful custody of the CIA at various black sites around the world, ██████████████████████ Guantanamo Bay, and several other locations that may ████████████████████████████████ This Court should take note



[10] *Id.*

[11] *See, e.g.*, Dan Froomkin, *Bush's Exhibit A for Torture*, Wash. Post, Dec. 18, 2007; *see also* Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, at A1.



During his captivity, Petitioner has been subjected to various forms of torture[14] over extended periods of time,[15] including, but not limited to, waterboarding,[16]

---

[14] The International Red Cross concluded in a report presented secretly to the Bush administration in 2007 that the treatment of Petitioner was "categorically torture." *See, e.g.*, Amy Goodman, *The Dark Side: Jane Mayer on the Inside Story of How the War on Terror Turned Into a War on American Ideals*, Interview Transcript, Democracy Now, July 18, 2008.http://www.democracynow.org/2008/7/18/the_dark_side_jane_mayer_on.

[15] Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016, Mar. 27, 2007. http://www.defenselink.mil/news/transcript_ISN10016.pdf (Although Petitioner's description of his torture is deleted from the unclassified return, Government censors failed to delete references elsewhere in the return. At page 23, the Tribunal President states: "In your statement, you mentioned months of torture."); Dan Eggen and Walter Pincus, *FBI, CIA Debate Significance of Terror Suspect: Agencies Also Disagree On Interrogation Methods*, Wash. Post, Dec. 18, 2007, at A1;

*see also Director's Statement on the Taping of Early Detainee Interrogations: Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early Detainee Interrogations*, Dec. 6, 2007. https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html



█████████ In addition to his torture, he has been subjected to cruel, inhumane, and degrading treatment and physical and psychological interrogation techniques specifically designed to

███████████████████████████████████████

Since being returned to Guantanamo in 2006, Petitioner has suffered approximately 175 seizures that appear to be directly related to his extensive torture – particularly damage to Petitioner's head that was the result of beatings sustained at the hands of CIA interrogators and exacerbated by his lengthy isolation. It is well established that severe beatings and/or damage to the head can cause seizures. An enlisted soldier at Guantanamo named Sean Baker, who was beaten so severely by the Initial Reaction Force at Guantanamo after posing as an inmate in an orange prison uniform, is now an epileptic, who, at last report, was suffering up to 15 seizures a day.[23]

Most, if not all of the torture techniques used on Petitioner have been widely reported in the press, as well as official investigative reports produced by, among others, █████████



[23] *See* 60 Minutes report at http://www.cbsnews.com/stories/2004/11/02/60II/main652953.shtml, attached as Exhibit 12.

███████ The Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody released on December 11, 2008 also discusses these torture techniques in some detail.[25] Nevertheless, the Government continues to argue that Petitioner's torture must remain classified, arguing that revealing the specific techniques of torture would allow future captured prisoners to prepare themselves to withstand future torture if they are captured by American forces. ████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

Setting aside the speciousness of the Government's reasoning for justifying the classification of the techniques of torture, it is now uncontested that approval of individual interrogation techniques can be traced directly to the highest levels of government.[26]   As



[25] Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody, Dec. 11, 2008, http://levin.senate.gov/newsroom/release.cfm?id=305735

[26] Conclusion 2, Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody, Dec. 11, 2008, http://levin.senate.gov/newsroom/release.cfm?id=305735; Philippe Sands, *The Green Light*, Vanity Fair, May 2008; *see also* Senate Armed Services Committee Hearing: *The Origins of Aggressive Interrogation Techniques: Part 1 of the Committee's Inquiry into the Treatment of Detainees in U.S. Custody, Documents referenced in Senator Levin's opening statement*, June 17, 2008, at Tab 19 (January 15, 2003 Memorandum from Navy SERE School Training Specialist and SERE Coordinator to Officer in Charge, Subject: After Action Report, Joint Task Force Guantanamo Bay (JTF GTMO) Training Evolution, at Enclosure 2) (confirming that a "high-level directive" initiated the travel of the SERE training specialist to Guantanamo to provide training in physical pressures); *id.* at Tab 15 (November 27, 2002

indicated previously, many high-ranking government officials essentially participated in Petitioner's torture by specifically approving the techniques used. Later, in September 2002, White House Counsel Alberto Gonzales, Vice President Cheney's counsel David Addington, and Department of Defense general counsel John Haynes, personally traveled to Guantanamo, where they met with Combat Commander Mike Dunlavey, witnessed detainee interrogations, and ultimately provided their approval for the use of torture.[27] Directly contradicting the Bush Administration's assertions that instances of prisoner abuse arose spontaneously in the field, documents recently released by Senate Armed Services Committee chairman Carl Levin reveal that senior Department of Defense officials sought out information regarding detainee "exploitation" from the Joint Personnel Recovery Agency ("JPRA") (the Agency that oversees the Survival Evasion Resistance and Escape ("SERE") Program) as early as December 2001.[28] Thereafter, discussions were held at the White House among high-ranking government officials

---

Memorandum from William J. Haynes (DOD GC) to Secretary of Defense Donald Rumsfeld, Subject: Counter-Resistance Techniques) (providing approval for these techniques, upon which Rumsfeld added the handwritten note: "I stand for 8-10 hours a day. Why is standing limited to 4 hours?"). As discussed above, in practice, prisoners were subjected to stress positions for periods well in excess of four hours. *See supra* n. 20.

[27] *See, e.g.,* Conclusion 6, Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody released on December 11, 2008 at http://levin.senate.gov/newsroom/release.cfm?id=305735; Satyam, *Cheney Lawyer Claims 'Congress Lacks Constitutional Power' To Investigate VP's Role In Torture Approval,* ThinkProgress, Apr. 29, 2008, http://thinkprogress.org/2008/04/29/addington-testify-torture/; Saytam, *Addington, Gonzales Witnessed Gitmo Interrogations In 2002; Approved Of 'Whatever Needs To Be Done,'* ThinkProgress, Apr. 21, 2008, http://thinkprogress.org/2008/04/21/sands-guantanamo/.

[28] *See* Facsimile, from JPRA Chief of Staff, Lt Col Dan Baumgartner, to Richard Shiffrin, Deputy General Counsel for Intelligence, Dec. 17, 2001, http://levin.senate.gov/newsroom/release.cfm?id=303575. JPRA is the agency responsible for overseeing SERE training, a program designed to prepare soldiers for abusive interrogations they might suffer if captured by an outlaw regime. For additional discussion regarding the JPRA, *see* Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody released on December 11, 2008 at http://levin.senate.gov/newsroom/release.cfm?id=305735.

regarding the specific use of these interrogation techniques.[29] These discussions were even approved by the President.[30] According to former CIA agent John Kiriakou, when it came to approving the interrogation techniques used on Petitioner, the "cable traffic back and forth [between Washington and interrogators in the field] was extremely specific."█

　　To assuage the concerns of CIA interrogators, who feared criminal liability for carrying out "enhanced interrogation techniques" against Petitioner, DOJ also was heavily involved in the process. Michael Chertoff, who was head of DOJ's Criminal Division when Petitioner was arrested, reportedly played a central role in providing legal reassurance,[32] and Deputy Assistant

---

[29] *See, e.g.*, Response of Condoleezza Rice to inquiry by Senator Carl Levin, Senate Armed Services Committee, Sept. 12, 2008, http://levin.senate.gov/newsroom/release.cfm?id=303575.

[30] *See, e.g.*, Dan Froomkin, *Bush OK'd Torture Meetings*, Wash. Post, Apr. 14, 2008; Jan Crawford Greenburg, Howard L. Rosenberg, and Ariane de Vogue, *Bush Aware of Advisers' Interrogation Talks: President Says He Knew His Senior Advisers Discussed Tough Interrogation Methods*, ABC News, Apr. 11, 2008; *see also* Full Transcript of ABCs Martha Raddatz Interview: ABC's White House Correspondent Sat Down with the President in Crawford, TX, ABC News, Apr. 11, 2008, http://abcnews.go.com/print?id=4634219.



[32] Chertoff was consulted extensively "at every turn" about the potential criminality of detainee treatment.　Jane Mayer, The Dark Side, at 154 (Doubleday 2008); *see also* response of Condoleezza Rice to inquiry by Senator Carl Levin, Senate Armed Services Committee, Sept. 12, 2008, http://levin.senate.gov/newsroom/release.cfm?id=303575.

Attorney General at the Justice Department's Office of Legal Counsel, John Yoo, reportedly provided advice at several White House meetings.[33] Thereafter, DOJ issued opinions in which they attempted to provide legal cover to interrogators.[34] One such memorandum, dated August 1, 2002, was released to the public for the first time in July 2008 via a Freedom of Information Act (FOIA) lawsuit brought by the American Civil Liberties Union.[35] Although this memorandum is almost entirely redacted, it describes in detail the methods of interrogation that the CIA was using on Petitioner.[36]

The government now admits that Petitioner and other prisoners were waterboarded.[37] As a practical matter, General Hayden's statement that only three individuals were waterboarded is at best misleading. ███████████████████████████████████████
███████████████████████████████████████████████████ Accordingly Gen.

---

[33] Response of John B. Bellinger III, Rice's legal adviser at the State Department, to inquiry by Senator Carl Levin, Senate Armed Services Committee, Sept. 12, 2008, http://levin.senate.gov/newsroom/release.cfm?id=303575.

[34] *See, e.g.,* Jane Mayer, The Dark Side, at 154 (Doubleday 2008).

[35] Memorandum from Office of Legal Counsel to the Central Intelligence Agency, Aug. 1, 2002. http://www.aclu.org/pdfs/safefree/cia_3686_001.pdf (The memorandum was signed by then-Assistant Attorney General Jay Bybee and written by then-Deputy of the Justice Department's Office of Legal Counsel John Yoo).

[36] *See, e.g.,* Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody released on December 11, 2008 at
http://levin.senate.gov/newsroom/release.cfm?id=305735; Scott Shane, *Documents Laid Out Interrogation Procedures*, N.Y. Times, July 25, 2008 (specifically naming Petitioner as the believed subject of these procedures).

37 *See, e.g.,* Richard Esposito and Jason Ryan, *CIA Chief: We Waterboarded: Gen. Hayden Confirms the Agency Waterboarded Three 'High-Value' Detainees,* ABC News, Feb. 5, 2008.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Hayden's suggestion that simulated drowning were restricted to three prisoners is false.  The government (via Gen. Hayden) also admitted that it videotaped Petitioner's detention during the time when he was tortured and interrogated, and that it has since destroyed this evidence.[39] Presumably, General Hayden was referring to the torture ███████████████████  That destruction reportedly was ordered in late 2005 by Jose A. Rodriguez, Jr., Director of the National Clandestine Service of the CIA, following years of internal discussion over the propriety of destroying the tapes,[40] including discussions involving White House counsel, Alberto R. Gonzales, David S. Addington, John B. Bellinger, and Harriet E. Miers.[41]  The Court should note that CIA's Inspector General issued a classified report in the spring of 2004 that concluded the interrogation methods used on the prisoners "appeared to constitute cruel, inhumane and degrading treatment, as defined by the International Convention Against Torture."[42]

What Gen. Hayden did not address in his remarks about the destruction of evidence is that Petitioner was ███████████████████████████████████ ████████████████████  Hundreds, and perhaps thousands, of hours of interviews exist from

---

39 *See, e.g.,* Scott Shane and Mark Mazetti, *CIA Tapes Lived and Died to Save Image*, N.Y. Times, Dec. 30, 2007, at A1.

40 *See* Mark Mazzetti and David Johnston, *Inquiry Begins into Destruction of Tapes*, N. Y. Times, Dec. 9, 2007.

41 *See* Mark Mazzetti and Scott Shane, *Bush Lawyers Discussed Fate of C.I.A. Tapes*, N.Y. Times, Dec. 19, 2007.

[42] Jason Leopold, CIA Torture Tapes Destroyed After Watchdog Concluded Methods Illegal (12/11/08), http://www.pubrecord.org/nationworld/552-cia-destroyed-torture-tapes-after-watchdog-concluded-methods-illegal.html

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

those interrogations. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Whether those videotapes still exist or have been

destroyed is among the issues being addressed in this motion.

The destruction of the videotapes of Petitioner's torture also highlights the CIA's earlier

failure to disclose the tapes' existence, despite detailed requests for information regarding

Petitioner by the 9/11 Commission[44] and targeted Freedom of Information Act requests by the

American Civil Liberties Union.[45] As a result, the destruction of the tapes is now a matter of

Congressional inquiry and a criminal investigation authorized by Attorney General Mukasey and

headed by John Durham.[46] In addition, the court adjudicating the ACLU's claim has ordered an

*in camera* inquiry of CIA reports regarding the contents of the destroyed tapes and the protocols

and procedures employed in their destruction.[47] Finally, the destruction of the videotapes of

Petitioner's torture was the subject of motions practice before various federal district and

appellate court judges.[48]

---

[44] *See* Joby Warrick and Dan Eggen, *CIA Tapes Were Kept from 9/11 Panel, Report Says*, Wash. Post, Dec. 23, 2007, at A11.

[45] *See ACLU, NYCLU Ask Court to Hold CIA in Contempt*, Dec. 12, 2007, http://www.nyclu.org/node/1534.

[46] *See* Pamela Hess, *CIA Will Release Videotape Documents*, Wash. Post, Dec. 20, 2007. Petitioner's counsel have spoken with Mr. Durham on two occasions to provide information.

[47] *See American Civil Liberties Union et al. v. Department of Defense et al.*, United States District Court, Southern District of New York, Case No. 1:04-cv-04151-AKH, 01/16/08.

[48] *See e.g., Abdullah v. Bush*, No. 05-23 (RWR); *Said v. Bush*, 05-2384 (RWR); *Zalita v. Bush*, Civ. No. 05-1220 (RMU); *See also Mustafa al-'Uzayti a/k/a Abu Faraj al-Libbi v. Robert Gates*, D.C. Court of Appeals No. 07-1527.

## DISCUSSION

In November 2005, the Central Intelligence Agency ("CIA") deliberately destroyed hundreds of hours of videotaped evidence, thereby irrevocably compromising Petitioner's ability to defend himself. In light of the government's admitted destruction of evidence, and to prevent any further such destruction, Petitioner respectfully moves this Court to order Respondent and all applicable government agencies, departments, and entities to preserve and maintain all evidence, documents, and information (hereinafter collectively referred to as "documents") [49] that may be relevant to any claim and/or defense that relates to Petitioner's background, surveillance, arrest, detention, transfers, treatment, mental and/or physical evaluations, torture, abuse, and incarceration. [50] Relevant information should include any information relating, referring or leading to the decision by the CIA and other individuals and agencies within the government to destroy the videotaped recordings of Petitioner's interrogation and torture. Said evidence would include internal communications, including communications involving White House officials, the CIA, Federal Bureau of Investigation ("FBI"), the National Security Agency ("NSA"), the National Security Counsel ("NSC"), the Department of Defense ("DOD"), the Department of State ("State"), DOJ, JPRA, and any private contractors, whether in the form, for example, of "Intelligence Operation Cables," "Intelligence Reports," "Accompanying Operation Cables," "Exclusive For" documents, classified memoranda, e-mails, or otherwise. Most important, relevant information should include all exculpatory information, including complete copies of all

---

[49] As used in this motion, "documents" has the meaning given it under Fed. R. Civ. Pro. 34.

[50] This motion was previously filed on August 20, 2008, *see* Petitioner's Motion For Preservation Order, Order Requiring Government Agencies To Identify Existing And Destroyed Documents, And Other Relief (docket # 17), but was withdrawn on October 2, 2008 in order to account for newly disclosed information by the Senate Armed Services Committee, regarding the involvement of high-ranking government officials in Petitioner's torture.

of Petitioner's interrogation reports and Petitioner's diaries. Without limiting the breadth of the requested Preservation Order, Petitioner also seeks an order that preserves the specific categories of documents set out in Exhibit 13, all of which are believed to exist and relate to Petitioner and/or his treatment and detention.[51]   In addition, Petitioner asks that Respondent and each applicable government agency provide to the court a certified list of relevant documents that were previously in its possession, but have since been destroyed and/or transferred out of its care, custody and control.

To be effective, any preservation order issued by this Court must be served upon and bind the White House, the Office of the Vice President, CIA,  FBI, NSA, NSC, JPRA, DOJ, State, and, of course, DOD.  As indicated above, it is now known that members of the National Security Council's Principals Committee, a select group of senior officials that included Vice President Dick Cheney, former National Security Advisor Condoleezza Rice, Defense Secretary Donald Rumsfeld, Secretary of State Colin Powell, CIA Director George Tenet, and Attorney

---

[51] Many of the categories of documents described in Exhibit 13 were the subject of a Protective Order that was entered in connection with *El-Banna v. Bush*, 04-1144 (RWR).  A copy of that order is attached as Exhibit 14.  That order involved prisoners incarcerated at Guantanmo and involved records and information systems identified by a confidential former interrogator at Guantanamo. ████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████  *See* "President Discusses Creation of Military Commissions to Try Suspected Terrorists," Office of the Press Secretary, Sept. 6, 2006. http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html ("I'm announcing today that Khalid Sheikh Mohammed, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in CIA custody have been transferred to the United States Naval Base at Guantanamo Bay."). ████
████████████████ it is especially appropriate that this information be subject to a preservation order. *See also* Preservation Orders entered by this Court in *Abd Al-Rahim Hussain Mohammed Al-Nashiri v. Gates*, No. 08-1007 (Mar. 12, 2008); *Majid Khan v. Gates*, No. 07-1324 (Dec. 11, 2007).

General John Ashcroft participated in discussions regarding interrogation techniques to be used on Petitioner.[52]   Indeed, Condoleezza Rice, who was the National Security Advisor to the President, has recently admitted that cross-agency discussions were held in the White House beginning in 2002, regarding the use of specific interrogation techniques and torture on detainees[53] even before the DOJ issued legal opinions from OLC in August 2002.[54]

In addition, any preservation order issued by the Court should bind all contractors that came into contact with Petitioner during his detention, including but not limited to those involved in his detention in secret CIA black sites around the globe.[55]   Such allegedly independent contractors must include contractors who were directly involved in Petitioner's torture, including but not limited to companies such as Air Security International or Air Routing International, Houston, Texas; Mitchell, Jessen, & Associates, Spokane, Washington; Jeppesen /

---

[52] See Jan Crawford Greenburg, Howard L. Rosenberg, and Ariane de Vogue, *Sources: Top Bush Advisors Approved 'Enhanced Interrogation': Detailed Discussions Were Held About Techniques to Use on al Qaeda Suspects*, ABC News, Apr. 9, 2008.

[53] See Response of Condoleezza Rice to inquiry by Senator Carl Levin, Senate Armed Services Committee, Sept. 12, 2008, http://levin.senate.gov/newsroom/release.cfm?id=303575; *see also* Response of John B. Bellinger III, Rice's legal adviser at the State Department, to inquiry by Senator Carl Levin, Senate Armed Services Committee, Sept. 12, 2008, http://levin.senate.gov/newsroom/release.cfm?id=303575 (providing that there were meetings at the White House "at which SERE training was discussed").

[54] See, e.g., A Review of the FBI's Involvement and Observations of Detainee Interrogation in Guantanamo Bay, Afghanistan, and Iraq, Department of Justice: Office of the Inspector General, May 2008. http://www.usdoj.gov/oig/special/s0805/final.pdf ("CIA personnel assured [FBI agent Gibson] that the procedures being used on Zubaydah had been approved 'at the highest levels' and that Gibson would not get in any trouble."); *see also* discussion above at n. 5-6; n. 26-33.

[55] Petitioner was interrogated by a team "overseen by James Elmer Mitchell, a consulting psychologist under contract to the CIA, who reportedly adapted ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Mitchell and staff CIA psychologist, Bruce Jessen, took over the interrogation of [Petitioner] in May 2002, and for months subjected Zubaydah to ▆▆▆▆▆▆▆▆▆

Jeppesen Dataplan, San Jose, California; Aero Contractors (or Aviation Specialties), Smithfield, North Carolina; Tepper Aviation, Crestview, Florida; Richmor Aviation, Hudson, New York; Windrose Aviation, Berlin, Germany; and all relevant individuals at these companies. Individual contractors also should be covered by any order, including but not limited to: James E. Mitchell of Florida; Bruce Jessen, of Washington State; Eric Ernest Jividen of Virginia; Lyle E. Lumsden of Virginia and Arizona; Adam Buzzard of Virginia and Florida; Leroy Doland Buell of Washington D.C. and Florida; and Thomas Medina. All of the foregoing were involved in Petitioner's torture and/or involved in the transport of CIA prisoners, including Petitioner, to/from the CIA's secret black sites. In the case of contractors, Petitioner asks this Court to order each agency (1) to identify to this Court and to Petitioner's counsel any contractor involved and (2) to serve a copy of the Court's order on said contractor in a timely fashion.

Failure to preserve this evidence, whether intentionally or through neglect, would substantially impair Petitioner's and this Court's ability to determine whether Petitioner is lawfully detained as an "enemy combatant." Petitioner stresses that the issue before the Court is not whether these documents must be produced. Petitioner seeks an order that requires relevant material to be preserved in light of potential litigation and to catalogue documents that were destroyed.[56]

Finally, Respondent already is on notice that much of the evidence at issue in this motion must be preserved for possible congressional hearings, criminal investigations, and internal

---

[56] Petitioner has no way to gauge the extent of the Government's spoliation to date. *See, e.g., Abdah v. Bush*, Civ. No. 04-1254 (HHK) (D.D.C. June 10, 2005) (Order) ("[I]n this case, all of the documents relevant to the adjudication of petitioner's claims, along with petitioner-detainees themselves, are in the sole custody and control of respondents. In addition, petitioners' counsel's access to their clients is quite restricted. It is almost inconceivable that within these confines, petitioners could identify specific instances of document destruction. Rather, the court finds

agency investigations concerning the methods of interrogation used on Petitioner by government officials and/or contractors. Respondent also is already on notice that much of the evidence at issue must be preserved for the congressional hearings, criminal investigations, and internal agency investigations concerning the destruction of the interrogation videotapes.[57]  Accordingly, entry of a preservation order in Petitioner's case creates no additional burden on these agencies. For these additional reasons, Petitioner's motion for a preservation order should be granted.

**ARGUMENT**

The Court's power to issue preservation orders is beyond cavil.  Courts have long "held that they have the inherent power to order that evidence be preserved and have, for good cause, required that specific procedures be adopted to ensure such preservation." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135 (Fed. Cl. 2004). "These powers are governed not by rule or statue but by the control necessarily vested in courts." *Id.*; *see also Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 433-35 (W.D. Pa. 2004) (The issuance of a preservation order, where it is alleged that the integrity or existence of evidence is threatened, should be considered in light of "the court's power to oversee discovery and correct abuses [. . .] In the presence of a significant threat, if an order of court can prevent the loss, deterioration or destruction of evidence, while also considering all other relevant circumstance, then such an order may be an appropriate remedy."). Pursuant to this authority, Petitioner asks the Court to require all parties bound by any Protective Order both to preserve all relevant documents going

---

entry of a preservation order appropriate."). At a minimum, each agency/department should be required to identify those documents that were destroyed.

[57] *See, e.g.*, Stephanie Kichgaessner, *CIA faces criminal probe on destroyed tapes*, Fin. Times, Jan. 3, 2008; David Johnston, *FBI to lead investigation of destroyed CIA tapes*, Int'l Herald Tribune, Jan. 3, 2008; Josh White, Justice, *CIA Begin Probe into Video Destruction*, Wash. Post, Dec. 9, 2007, at A4.

19

and to produce a list of those documents to the Court, accompanied by certification from the

agency that the information provided is accurate. Because the officials in the Bush

Administration with knowledge of the existence of relevant documents and/or the fact(s) relating

to destruction will soon leave office, any order should issue quickly. By doing so, the Court may

assure itself that evidence is accounted for and preserved.

    To be entitled to relief, Petitioner need only show (1) that absent a preservation order,

there is a significant risk that relevant evidence will be lost or destroyed—a requirement that is

easily met since the Government has already conceded that it destroyed crucial evidence,[58] and

(2) that compliance with a preservation order would not be unduly burdensome—a requirement

that is easily met since the Government has asserted that it intends to comply with the

requirements that would be made explicit in a preservation order.[59] *See, e.g., Pueblo of Laguna*

*v. United States*, 60 Fed. Cl. 133, 135 (Fed. Cl. 2004).[60]

---

[58] *See e. g., Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135 (Fed. Cl. 2004) ("To meet the first prong of this test, the proponent ordinarily must show that absent a court order, there is significant risk that relevant evidence will be lost or destroyed—a burden often met by demonstrating that the party has lost or destroyed evidence in the past.").

[59] *See, e.g., Abdah v. Bush*, Civ. No. 04-1254 (HHK) (D.D.C. June 10, 2005) ("[B]ecause respondents represent that it will not destroy the information at issue, a preservation order will not impose any harm or prejudice upon them.").

[60] Although when it comes to cases involving prisoners at Guantanamo, the Government has repeatedly argued that a preliminary injunction standard should be applied in deciding whether to issue a preservation order, this Court has repeatedly found that the application of a preliminary injunction standard is neither necessary nor prudent. *See, e.g., Abdah v. Bush*, No. 04-1254 (HHK) (D.D.C. June 10, 2005) ("[w]hile preservation orders take the form of an injunction, in that they order a party to perform or refrain from performing an act, petitioners need not meet the four-part preliminary injunction test in order to protect relevant documents from destruction."); *Al-Marri v. Bush*, No. 04-2035 (GK) (D.D.C. March 7, 2005) ("[a] document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery. Thus, Petitioners need not meet such a standard when seeking a preservation order."); *El-Banna v. Bush*, 2005 WL 1903561, *1 n.3 (D.D.C. 2005) ("[t]he parties

20

I.    **A PRESERVATION ORDER IS NECESSARY BECAUSE THE GOVERNMENT'S PRIOR CONDUCT SHOWS A SUBSTANTIAL LIKELIHOOD OF SPOLIATION**

This case cries out for a preservation order.  While Petitioner must establish "that absent a court order, there is significant risk that relevant evidence will be lost or destroyed," his burden is easily discharged by a showing "that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place."  *Id.; accord United Medical Supply Co., Inc. v. United States*, 73 Fed. Cl. 35, 36-37 (Fed. Cl. 2006); *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006).  The government has conceded that the CIA deliberately destroyed videotaped recordings of Petitioner's detention, torture, and interrogation, even after it was advised to retain the tapes, and even after preservation orders had been entered in other Guantanamo cases.[61]  *See, e.g., El-Banna v. Bush*, 04-1144 (RWR) (order attached as Exhibit 14).  The Court should also note that the tapes were destroyed after CIA's Inspector General issued a classified report in the spring of 2004 that concluded the interrogation methods used on the prisoners "appeared to constitute cruel, inhumane and degrading treatment, as defined by the International Convention Against Torture."[62]  The evidence destroyed was without doubt

---

advocate different standards for preservation orders, a dispute that need not be resolved here. First, the distinction between the standard articulated in *Pueblo of Laguna v. United States*, urged by petitioners, and the standard four-factor test employed in preliminary injunction decisions, urged by respondents, may be one without a practical difference. Second, respondents argue that a preservation order must meet the test of a preliminary injunction, but also concede that the Federal Rules of Civil Procedure impose preservation obligations on civil litigants in every civil action filed, automatically and without court review, two positions in tension with each other.") (Internal citations omitted).

[61] *Director's Statement on the Taping of Early Detainee Interrogations: Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early Detainee Interrogations*, Dec. 6, 2007. https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html.
[62] Jason Leopold, CIA Torture Tapes Destroyed After Watchdog Concluded Methods Illegal (12/11/08), http://www.pubrecord.org/nationworld/552-cia-destroyed-torture-tapes-after-watchdog-concluded-methods-illegal.html

exculpatory, since it would have disclosed the fact of Petitioner's torture in excruciating detail and also is likely to have disclosed the falsity of the government's allegations against Petitioner and the truth of his protestation that he was never a member of al Qaeda. The destroyed evidence thus bore directly on the legitimacy of the military's determination of Petitioner as an "enemy combatant" and the lawfulness of his continued detention.

Absent a preservation order and the active intervention by this Court there is a substantial risk that other evidence relating to Petitioner's detention, torture, and interrogation will disappear. Because the government already destroyed what may be the best evidence of its unlawful interrogations of Petitioner and his innocence, the Court simply cannot be confident that any remaining exculpatory evidence will not meet a similar fate.[63] Any assertion by the government to the contrary must be weighed in light of its admitted spoliation of evidence.

In addition to the hundreds of hours (more likely thousands of hours) of videotapes that the Government admits to having destroyed, it is likely that other videotapes containing exculpatory evidence have been or will be destroyed if a preservation order is not entered. For example, despite the fact that the Government has created the misleading impression that

---

[63] While the Government may contend that it is entitled to the presumption that it will act properly and according to law, any such presumption does not stand in the face of clear evidence that the Government has not acted according to law. *See, e.g., Fund for Animals v. Williams*, 245 F.Supp.2d 49 (D.D.C. 2003), *vacated on other grounds* ("The presumption of administrative regularity is just that – a presumption – and may be overcome."). Here, the presumption of regularity is overcome. The Government did destroy evidence, and it is no longer entitled to a presumption to the contrary.



It is widely recognized that every interrogation at Guantanamo since 2002 was routinely videotaped.[67]



Furthermore, the CIA's admission regarding the destruction of Petitioner's interrogation tapes is one of many reported examples in which the government has destroyed or otherwise mishandled evidence regarding purported enemy combatants.[68] These disclosures concerning

---

[67] *See, e.g.*, Mark Denbeaux, *Captured on Tape: Interrogation and Videotaping of Detainees in Guantanamo Bay*, Seton Hall University, Feb. 14, 2008. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1093330. **fn 43**

[68] For example, several military officers involved in the CSRTs have testified recently about the loss, destruction and suppression of critical evidence, including exculpatory evidence, concerning Guantanamo prisoners. *See* Declaration of Rear Admiral (Retired) James M. McGarrah, executed May 31, 2007; Declaration of Stephen Abraham, executed June 15, 2007.

the suppression of similar evidence further underscore the risk of spoliation here.  As such, in the

context of "enemy combatant" litigation, and particularly with respect to former CIA prisoners

like Petitioner, the government is simply no longer entitled to any presumption of credibility or

regularity when discharging its obligations.

## II.   A PRESERVATION ORDER IS NOT UNDULY BURDENSOME BECAUSE IT REQUIRES NOTHING MORE THAN WOULD BE REQUIRED IN ORDINARY CIVIL DISCOVERY

The preservation order requested by Petitioner "will be effective, but not overbroad."

*Pueblo of Laguna*, 60 Fed. Cl. at 138.  Petitioner's request is tailored to preserve all documents

concerning matters that may be relevant to him and to defenses that may be available to him.  In

particular, this motion seeks the preservation of evidence in the possession of the CIA, FBI,

NSA, NSC, DOJ, DOD, JPRA, State, and the White House that relates to Petitioner.  As the D.C.

Circuit has already acknowledged, "[d]ocuments, evidencing treatment of detainees, whether

---

Most notably, the disappearance or destruction of evidence regarding torture or abuse appears to have been widespread.  *See e.g.*, Eric Saar and Viveca Novak, Inside the Wire: A Military Soldier's Eyewitness Account of Life at Guantanamo 102, 136 (2005); Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005; Redacted Email by CPT John Carr dated March 15, 2004.  In the military commission, the government recently revealed the existence of exculpatory evidence that had been withheld from a Guantanamo prison for several years. *See* William Glaberson, *Decks Are Stacked in War Crimes Cases, Lawyers Say*, N.Y. Times, Nov. 8, 2007.  The same has recently been revealed by the Justice Department. *See e.g.*, Redacted Letter from Justice Department to U.S. Court of Appeals for the Fourth Circuit and the U.S. District Court for the Eastern District of Virginia, dated Oct. 25, 2007, at 3 of 5; Greg Gordon, *CIA Admits to Recording Interrogations of Top Al Qaida Captives*, McClatchy Washington Bureau, Nov. 14, 2007.  Furthermore, the FBI has produced records pursuant to a Freedom of Information Act lawsuit by the American Civil Liberties Union that document efforts by the military to "cover up" evidence of the physical abuse of detainees.  *See* Urgent Report, dated June 25, 2004.  Specifically, the FBI email confirms that unnamed individuals "observed numerous physical abuse incidents . . . . includ[ing] strangulation, beatings, placement of lit cigarettes into the detainees['] ear openings, and unauthorized interrogations." *Id.* at 2.  The email further reports that unnamed individuals "were engaged in a cover-up of these abuses." *Id. See also* Josh White, *From Chief Prosecutor To Critic at Guantanamo*, Wash. Post, Apr. 29, 2008, at A1 (reporting that the Defense Department's former chief prosecutor, Col. Morris Davis, testified that the military justice system has been corrupted by politics and inappropriate influence from senior Pentagon officials).

statements of official government policy, cumulative evidence of specific practices, or something else, may be probative of the treatment of [Petitioner and other prisoners] or may lead to other probative evidence." *See, e.g.*, Mem. Order at 5, *Zadran v. Bush*, No. 05-2367 (RWR) (D.D.C. July 19, 2006) (docket #36).

Again, the issue at this juncture is not whether this information must ultimately be produced. Petitioner only requests that the relevant material be preserved and that destroyed evidence be identified in light of potential litigation. This motion, thus, seeks a preservation order that imposes no greater obligation on Respondents than the Federal Rules of Civil Procedure would otherwise impose on a litigant engaged in discovery of an ordinary civil action. *Id.* at 5-6; *see also Hamoud v. Bush*, 2006 WL 1876947, *3 (D.D.C. 2006); *Alsaaei v. Bush*, 2006 WL 2367270, *3 (D.D.C. 2006). Furthermore, the D.C. Circuit has entered previous orders, specifically finding that "entering a preservation order [against Respondents] will inflict no harm or prejudice upon them." *See* Order at 1-2, *Jarallah Al-Marri v. Bush*, Civ. No. 04-2035 (GK) (D.D.C. March 7, 2005) (docket #25); Order, *Khan v. Gates*, No. 07-1324 (D.D.C. Dec. 11, 2007).

The preservation order that Petitioner seeks is neither a futile nor vain gesture.[69] As stated by the court in establishing the standard for issuance of a preservation order: "If nothing else, it will serve to reemphasize that [the government] needs to take extraordinary precautions . .

---

[69] That the destruction of some evidence relevant to Petitioner's defense is the subject of a criminal investigation and that the persons who are being investigated have stated that they do not intend to destroy similar evidence does not mean that a preservation order would be pointless: rather, it merely goes to show that the Government will not be prejudiced or unduly burdened by the requirements of a preservation order. *See, e.g., Al-Marri v. Bush*, No. 04-2035 (GK) (D.D.C. March 7, 2005) ("[r]espondents represent that the information at issue will not be destroyed, so the Court finds that entering a preservation order will inflict no harm or prejudice upon them.").

. to prevent the purposeful or inadvertent destruction or loss of records. Such an order also serves as fair warning that sanctions may be imposed should [the Government] instead fail adequately to protect records relevant to this action." *Pueblo of Laguna*, 60 Fed. Cl. at 139; *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 369 (S.D.N.Y. 2006) (finding that the view that a preservation order is needless because preservation obligations are already known is "shortsighted" because "[e]ven litigation that concerns relatively precise issues, statements, and timeframes may nevertheless involve information, including electronic documents, that may be in danger of destruction in the absence of a preservation order," and "[f]urther, a preservation order protects the producing party by defining clearly the extent of its obligations"). As stated by this Court in *El-Banna v. Bush*, Civ. No. 04-1144 (RWR) (D.D.C. July 17, 2005), "[A] preservation order in habeas proceedings, particularly in proceedings such as these where there has been no full disclosure of the facts on the public record to authorize the challenged detention, is not superfluous or unnecessary," but rather is proper and just.

### III.   AFFECTED GOVERNMENT AGENCIES AND DEPARTMENTS SHOULD BE REQUIRED TO CERTIFY COMPLAINCE AND THE ACCURACY OF ANY FACTUAL ASSERTIONS CONTAINED IN COURT PAPERS

Finally, Petitioner expressly requests that the Court enter an Order that requires affected federal agencies and departments to certify compliance with the Court's order and certify the accuracy of court filings that make assertions of fact on behalf of that agency or department. In the alternative, the government be required to have an attorney associated with the appropriate person or entity, including but not limited to CIA, FBI, NSA, NSC, DOJ, JPRA, State, the White House, private contractors, or any other entity, be a signatory to the filing in order to assure accountability to the Court. Given the number of false statements made by government officials

in this and other cases, such relief is a necessary precaution to ensure that accurate information is provided to the Court.

With respect, throughout the Guantanamo-related cases, misinformation has been provided to the courts. Factual statements have been made to courts, even the Supreme Court, that were demonstrably incorrect. For example, on April 28, 2004 during oral argument, then-Deputy Solicitor General, Paul Clement, assured the Justices that the United States did not engage in torture. Four hours later, photographs of tortured prisoners from Abu Ghraib were released. In early December 2004, a government attorney arguing before Judge Green assured the court that no torture was taking place at Guantanamo. Three weeks later, thousands of pages of FBI documents released as the result of Freedom of Information Act litigation brutally refuted that statement. More than a year after the trial of Zacarias Moussaoui, it has come to light that the Government lied to the court and failed to turn over key evidence.[70] U.S District Judge Leonie Brinkema, who presided over the trial, has described the Government's willingness to lie to the court as being "[o]ne of the saddest realities I've had to face."[71]

At this time, Petitioner does not contend that DOJ trial and appellate attorneys have purposefully, or even knowingly, misled the court.[72] It is clear, however, that information has been provided to DOJ attorneys in the past that was false and that this information was repeated to courts. To ensure that incorrect information is not disseminated to the Courts, accountability is needed. Petitioner requests that when factual statements are made in court filings, a

---

[70] Matthew Barakat, *Judge to Moussaoui Jury: You Got it Right,* Associated Press, Jul. 23, 2008.

[71] *Id.* (Indeed, according to Judge Brinkema, in light of the Government's lies and the fallout that would have resulted from a death penalty sentence built upon them, the jury's decision to spare Moussaoui's life had done "an extraordinary service to the legal system.")

[72] *See also id.* ("Brinkema said she did not blame the prosecutors who handled the case day to day. Instead she faulted 'the folks behind them who were giving me misinformation.'").

responsible official from the agency or department that provided the information certify compliance and/or the accuracy of the filing. In this way, the Court has accountability in the event that misstatements are made.

As concerns Petitioner, in particular, the Government has made numerous, material false statements[73] and has deliberately suppressed information that is exculpatory to him.[74]   The Government's actions have compromised Petitioner's ability to defend himself and thus require direct court intervention.

## CONCLUSION

For all of the foregoing reasons, Petitioner's motion should be granted.

Dated: December *16*, 2008

---

[73] For example, among the many false statements that the Government has made, the Government has falsely stated (1) that Petitioner was the number two or three man in al Qaeda; (2) that Petitioner was the head of tactical operations for al Qaeda; (3) that Petitioner was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[74] *See, e.g.,* Office of the Inspector General, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq,* May 2008, http://www.usdoj.gov/oig/reports/FBI (reporting that "the CIA's reasons for objecting to OIG access to Zubaydah were unwarranted, and its lack of cooperation hampered our investigation."). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, even aside from the actual destruction of evidence, in Petitioner's case, by keeping Petitioner incommunicado, flying him to secret places around the world, classifying every bit of related information, and denying access and review, even to other specialized Government agencies, the CIA has blocked access to the truth, and to justice, at every turn.

Washington, District of Columbia

Respectfully submitted,

Joseph Margulies [Bar No. 48487]
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0890

George Brent Mickum IV [Bar No. 396142]
Amanda L. Edwards
Spriggs & Hollingsworth
1350 I Street NW
Washington, D.C. 20001
Tel: (202) 898-5866
Fax: (202) 682-1639

Baher Azmy
SETON HALL LAW SCHOOL
CENTER FOR SOCIAL JUSTICE
One Newark Center
Newark, NJ 07102
(973) 642-8700

*Counsel for Petitioner*

29

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the Court Security Officer for

clearance and filing this _16th_ day of December 2008.  My understanding is that the Court Security

Officer will serve the government.  Once Petitioner's counsel has been notified that the document

has been cleared and filed, copies will be served on the following via first class mail:

Terry M. Henry
Andrew I. Warden
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusettes Avenue, N.W.
Washington, D.C. 20530

_____
George Brent Mickum IV

# EXHIBIT 1







# EXHIBIT 2







# EXHIBIT 3





# EXHIBIT 4







# EXHIBIT 5





# EXHIBIT 6





# EXHIBIT 7





# EXHIBIT 8







# EXHIBIT 9





# EXHIBIT 10





# EXHIBIT 11













# EXHIBIT 12

# ◉CBS NEWS

> BACK    > PRINT

# G.I. Attacked During Training
### Nov. 3, 2004

**(CBS)** Pictures from Abu Ghraib prison tell a story that has shocked the world.

There are no pictures of what happened in the prison camp at Guantanamo last year. But **Correspondent Bob Simon** has a shocking story – and it's not about what Americans did to foreign detainees. It's about what Americans did to a fellow American soldier, Sean Baker.

Sean Baker has seizures an average of four times a week. *60 Minutes Wednesday* went to see him a few weeks ago in a New York hospital.

Baker, a National Guardsman, was working last year as a military policeman in the Guantanamo Bay prison when other MPs injured him during a training drill. It was a drill during which Baker was only obeying orders.

"I was assaulted by these individuals," says Baker. "Pure and simple."

It's all the more bizarre because Baker was considered a model soldier and he had served as an MP in Saudi Arabia during the First Gulf War.

Then, minutes after the attack on the Pentagon on Sept. 11, Baker made a phone call from the auto repair shop in Lexington, Ky., where he was working. "I had to get back in the military right then," recalls Baker. "I had to go back then. I had to do something."

And he did. At 35, married and with a child, Baker volunteered to join the 438th Military Police Company in Murray, Ky., because it was about to be deployed overseas.

Ron England was Baker's first sergeant. "He seemed to like being a soldier," says England. "He loved being a soldier. He was always more than willing to give his part and somebody else's, or to pitch in for somebody else."

In November 2002, Baker's unit was sent to Guantanamo Bay, home to what the Pentagon called the most vicious terrorists in the world. Spc. Baker's job was to escort prisoners and walk the causeways of the prison block.

He was the new guy on the block, and he says he got special treatment from the detainees: "They wanna try the new guy. See how much they can push you. You know? How much water they can throw on you. How much urine they can throw on you. How much feces they can dump on you."

His unit was on duty at 2 a.m. on Jan. 24, 2003, when his squad leader got a message. "Someone needs to go for training,'" says Baker. "And I looked around the room. I couldn't believe that everyone had not stood up, and said, 'I'll go.' But I said, 'Right here, Sarg.'"

Baker was always the first to volunteer. This time, it was to go to the block where the most dangerous detainees were kept in isolated cells. There, Baker was met by Second Lt. Shaw Locke of the 303rd Military Police Company from Michigan. Locke, who was in charge of an IRF (Immediate Reaction Force) team, briefed Baker about the training drill he was planning.

"'We're going to put you in a cell and extract you, have their IRF team come in and extract you. And what I'd like you to do is go ahead and strip your uniform off and put on this orange suit,'" says Baker, who was ordered to wear an orange jumpsuit, just like the ones worn by the detainees at Guantanamo.

"I'd never questioned an order before. But, at first I said, my only remark was, 'Sir?' Just in the form of a question. And he said, 'You'll be fine,'" recalls Baker. "I said, 'Well, you know what's gonna happen when they come in there on me?' And he said, 'Trust me, Spc. Baker. You will be fine.'"

Drills to practice extracting uncooperative prisoners took place every day, with a U.S. soldier playing the role of a detainee, but not in an orange jumpsuit, and not at full force.

"You always train at 70 percent. Never 100 percent," says Michael Riley, who was Baker's platoon sergeant. "Seventy percent means you want to practice and be proficient, but not get anybody hurt."

Baker says his orders that night were to get under a bunk on a steel floor in a dark cell, and wait: "I said, 'Sir, you're going to tell that IRF team that I'm a U.S. soldier?' He said, 'Yes, you'll be fine, Spc. Baker. Trust me.'"

But in fact, Locke later acknowledged in a sworn statement that he did not indicate "whether the scenario was a drill or not a drill to the IRF team." Locke did, however, tell the team the detainee had not responded to pepper spray.

"They wanted to make training a little more realistic," says Baker. "Put this orange suit on."

Locke gave Baker a code word -- red - to shout out in case of trouble. From under the bunk, Baker heard the extraction team coming down the causeway. In sworn statements, however, four members of the team said they thought they were going after a real detainee.

"My face was down. And of course, they're pushing it down against the steel floor, you know, my right temple, pushing it down against the floor," recalls Baker. "And someone's holding me by the throat, using a pressure point on me and holding my throat. And I used the word, 'red.' At that point I, you know, I became afraid."

Apparently, no one heard the code word 'red' because Baker says he continued to be manhandled, especially by an MP named Scott Sinclair who was holding onto his head.

"And when I said the word 'Red,' he forced my head down against the steel floor and was sort of just grinding it into the floor. The individual then, when I picked up my head and said, 'Red,' slammed my head down against the floor," says Baker. "I was so afraid, I groaned out, 'I'm a U.S. soldier.' And when I said that, he slammed my head again, one more time against the floor. And I groaned out one more time, I said, 'I'm a U.S. soldier.' And I heard them say, 'Whoa, whoa, whoa,' you know, like he wanted to, he was telling the other guy to stop."

Bloodied and disoriented, Baker somehow made it back to his unit, and his first thought was to get hold of the videotape. "I said, 'Go get the tape,'" recalls Baker. "'They've got a tape. Go get the tape.' My squad leader went to get the tape."

Every extraction drill at Guantanamo was routinely videotaped, and the tape of this drill would show what happened. But Baker says his squad leader came back and said, "There is no tape."

"That was the only time that I heard that a tape had gone missing," says Riley, Baker's platoon sergeant.

"Of all the tapes, this was probably the most important one that we should have kept," adds England.

Baker started having a seizure that morning and was whisked to the Naval Hospital at Guantanamo. "[He looked like] he'd had the crap beat out of him. He had a concussion. I mean, it was textbook," says Riley. "[His face] was blank. You know, a dead stare, like he was seeing you, but really looking through you."

Baker was airlifted to the Portsmouth Naval Medical Center in Virginia, where doctors determined he had suffered an injury to the right side of his brain. He was released after four days, and Baker says he requested to go back to Cuba.

"I wanted to go back and perform my duties," says Baker. "I wanted to be back with my unit."

Baker got back to Guantanamo, and hoped no one would notice he was having seizures, but they got to the point where he says he couldn't hide them: "I was shaking and convulsing around people."

Some days, he says, he was having 10 to 12 seizures per day.

What does he think would have happened if he had been a real detainee? "I think they would have busted him up," says Baker. "I've seen detainees come outta there with blood on 'em. ...If there wasn't someone to say, 'I'm a U.S. soldier,' if you were speaking Arabic or Pashto or Urdu or some other language in the camp, we may never know what would have happened to that individual."

Baker was finally taken off Guantanamo and sent to the Walter Reed Army Medical Center, where he was put in a psychiatric ward. His diagnosis: traumatic brain injury. After 47 days, he was ordered to report to a medical hold unit at Fort Dix, N.J. But the seizures continued.

"He was shaking all over his whole body. It just looked like he was -- you ever seen 'The Exorcist?' That's what it looked like. It was pretty freaky," says Spc. Sean Bateman, who saw Baker. "He had plenty [of seizures]. I can't count them all is pretty much what I'm saying. He had some so often, it was pretty much expected."

But back at Guantanamo, a promised investigation into what happened to Baker wasn't getting anywhere.

"There was what was called a commander's inquiry. It doesn't really tell me anything," says England. "And after that it more or less seemed like, least said the best said. That was my opinion of it."

Riley says he and England approached Capt. Judith Brown, the commander of the Kentucky National Guard at Guantanamo, and asked her what was going on with that investigation. What did the captain say? "I'll paraphrase. It's something like, it's being looked into, but we really don't wanna get anybody in trouble," says Riley.

Nobody got into trouble because the Army didn't conduct a serious investigation into what happened to Spc. Baker – not for 17 months. Only then, and only after word of Baker's beating got leaked to the media, did the Pentagon launch a criminal investigation into how he got so badly hurt that January morning in Guantanamo.

The criminal investigation is still going on. *60 Minutes Wednesday* wanted to talk to someone at the Pentagon about the Baker case, but was told no one would talk about it.

Despite repeated calls, Capt. Judith Brown refused to speak to *60 Minutes Wednesday*. Crews tried to interview Shaw Locke, the man in charge that night, and Scott Sinclair, the man Baker accused of bashing his head, but they wouldn't meet with *60 Minutes Wednesday* either. Sinclair did write in a sworn statement after the incident that Baker was resisting and that Sinclair merely placed his head back on the floor of the cell.

Meanwhile, Baker was stuck in bureaucratic limbo at Fort Dix for 10 months, long after Locke, Sinclair and the 303rd returned home to Michigan to a celebration in September 2003.

Baker was left to fight the Pentagon for a disability check, and he says it took four months to get his first check. Meantime, he says drew unemployment insurance, about half of what he was accustomed to making, to get by.

"These are our American veterans," says England. "Sean Baker was one that wasn't taken care of. In my own personal opinion, Sean Baker wasn't taken care of."

When Baker got home to Kentucky, he didn't complain. But he needed help just to get his disability check. Attorney Bruce Simpson agreed to help Baker, pro bono. But Baker is unable to sue because of a 1950 Supreme Court ruling that bars members of the military from suing the government.

"He'll not get a dime from what happened to him through the court system because the doors to the federal courthouse as to Sean Baker are closed," says Simpson, who adds that no one has paid a price for what happened to Baker that night. "He's been destined to a life of walking in a minefield of unexploded seizures. He doesn't know when they're gonna come. And he doesn't know when they are gonna bring him to his knees."

"It's as if they just went on living their lives, as if they've done nothing. Nothing wrong," adds Baker, who now takes nine medications a day, can't get a job, has put on 50 pounds and has constant nightmares.

At the end of September, Baker went to Columbia University Medical Center in New York to consult with Dr. Carl Bazil, a seizure specialist, and one of the top neurologists in the country.

While undergoing testing, Baker suffered a seizure in front of Bazil, who believes Baker has intractable epilepsy – which means his seizures are difficult to control.

Is it an injury Baker could have received as a result of having his head repeatedly knocked against a steel floor? "Oh, absolutely. That is the kind of injury that would be severe enough to result in epilepsy," says Bazil, who believes that with better treatment, Baker's condition could improve. "If he doesn't get better treatment, that will probably continue indefinitely."

"So, if you got your health back, I take it, after your experience with the Army, you'd never serve again," Simon asks Baker.

"I'd be in," says Baker. "Till the day I die."

© MMIV, CBS Worldwide Inc. All Rights Reserved.

⤳ **Feedback**  ⤳ **Terms of Service**  ⤳ **Privacy Statement**

# EXHIBIT 13

## DOCUMENTS SUBJECT TO PRESERVATION ORDER

The following list consists of documents that Petitioner contends should be subject to any Preservation Order entered by this Court. To the extent any of the documents listed below may be called or referred to by another name or names, Petitioners respectfully request that any order entered by this Court be sufficiently broad to encompass the same.

1. Any and all photographs, video recordings, or audio recordings showing the arrest, detention, interrogations, interviews, and debriefings of the Petitioner; any and all transcripts of any such recordings; and any other photographs or recordings of Petitioner made from the time of his arrest to the present.

2. Any and all photographs, video recordings, or audio recordings of Petitioner made prior to his arrest and transcripts of any such recordings, including but not limited to recordings and transcripts of telephone conversations or other electronic or radio communications; recordings and transcripts in which other persons mention or refer to Petitioner; or any other recordings or signals interceptions that contain information about the Petitioner.

3. Any and all equipment or implements used during Petitioner' detention and interrogation (or identical versions of the same) including but not limited to:

   a. equipment or implements used during Petitioner's waterboarding;



   f. any other similar materials or things used during interrogation.

4. All text or recordings containing communications between U.S. government personnel referring to the Petitioner, whether naming the Petitioner by his correct or similarly spelled name, by any alleged aliases or nicknames, or by any cryptonym or nickname assigned to him, including but not limited to:

   a. Any and all such communications between CIA executive directors, officers, analysts, support staff, medical staff, security personnel, pilots and crew on transport planes, or any other CIA personnel, contractors, or agents.

   b. Any and all such communications between CIA stations and bases or between CIA stations or bases and CIA headquarters in Langley, Virginia, including:

     i. Intelligence Operational Cables, in which CIA personnel, stations, or bases report on intelligence gathering activities and about intelligence gathering events in which they are involved.
    ii. Intelligence Reports ("IRs"), in which CIA personnel, stations, or bases detail facts and information gathered pursuant to CIA operations.
   iii. Accompanying Operational Cables ("AOCs"), in which CIA personnel, stations, or bases report more specifically on operations or steps taken during operations and request authorizations (or, when sent from headquarters, grant authorizations) for additional action.

c. Any and all such communications from CIA stations or bases or CIA headquarters to any and all personnel in the executive branch and its agencies, including:

       i. The President;
      ii. All personnel in the Office of the President;
     iii. The Vice-President;
     iv. All personnel in the Office of the Vice President;
     v. The National Security Advisor, Deputy National Security Advisors, and all personnel in the Office of the National Security Advisor;
    vi. All personnel in the National Security Council;
   vii. The Attorney General;
  viii. All personnel in the Office of the Attorney General and all personnel in the Department of Justice;
    ix. The Director of the Federal Bureau of Investigation (FBI)
     x. All FBI personnel
    xi. The Secretary of Defense;
   xii. All personnel in the Office of the Secretary of Defense and all Department of Defense personnel
  xiii. The Secretary of State;
  xiv. All personnel in the Office of the Secretary of State and all State Department Personnel.

d. Documents to be protected pursuant to the preceding paragraph should include "Exclusive For" documents—communications from CIA printed out for sole review by particular executive officers such as the President, Vice President, and National Security Advisor. Documents should include communications between and within any joint or combined agency group, or between the CIA and any other law enforcement, intelligence or military agency. Documents should also include any files kept in or by the "Special Detainee File Group." Documents should include communications sent from stations and bases in countries in which the Petitioner was held (including but not limited to ██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

    e. Any and all other such communications contained in e-mail messages between, to, or from CIA personnel, including executive directors, officers, analysts, support staff, medical staff, security personnel, pilots and crew on transport planes, or any other CIA personnel, contractors, or agents.

5. Any and all other documents similar to the above, whether communicated by cable or e-mail or otherwise, including:

    a. Memoranda or reports discussing the Petitioner, his interrogations, or intelligence he provided during his detention;

    b. Interrogation logs or records;

    c. Interrogation plans;

    d. Approvals for interrogation plans;

    e. Legal memoranda discussing interrogation plans for the Petitioner or legal issues surrounding such interrogation plans, and

    f. Any and all other reports detailing any aspect of the Petitioner's detention, treatment, or interrogation.

6. Any and all exculpatory materials, including but not limited to:

    a. Communications between government personnel or between government personnel and the Petitioner, including communications in which personnel state that they were aware that the Petitioner is not a member of al Qaeda or that Petitioner may have made false admissions during interrogations.

    b. Other notes, documents, recordings, transcripts or materials relating to the detention or interrogation of other CIA detainees which contain information about the Petitioner; or any other documents containing information which might tend to exculpate the Petitioner.

7. Any and all notes made during interrogation by analysts, interrogators, supporting psychologists, and other CIA personnel, and any reports written by those personnel about interrogations or about the Petitioner.

8. Any and all medical records or notes about Petitioner made or recorded by any medical personnel, including by doctors, nurses, physicians' assistants, psychiatrists, psychologists, including any and all records or notes about Petitioner made or recorded by personnel who were or had been previously employed by the Department of Defense in the Joint Personnel Recovery Agency (JPRA) or any Survival, Evasion, Resistance or Escape (SERE) school operated by the Department of Defense.

9. Any other medical records, including those relating to Petitioner's capture. (As the respondent is aware, Petitioner was almost killed during his arrest. The CIA flew a surgeon from Johns Hopkins to meet the CIA capture team and to treat the Petitioner. In addition, additional medical examinations of prisoners have likely taken place over the past several years, resulting in the creation of additional medical records. Prisoner

medical records were reportedly available to interrogators, individual psychological records and evaluations. In addition, all detainees at Guantanamo undergo a physical examination immediately upon arrival at Guantanamo.)

10. Any and all other notes, documents, reports, memoranda, recordings, transcripts, or materials that were created or prepared by CIA personnel (including contractors) in relation to the detention, interrogation, or medical care of the Petitioner.

11. Any lists or other documents listing personnel at detention or interrogation sites at which Petitioner was detained and interrogated, including but not limited to staffing lists, personnel logs, visitor logs, or other similar documents.

12. Names and contact information for all individual or corporate contractors, contracting companies, and other agents of CIA who were involved, in any manner, with the arrest, transport, detention, or interrogation of the Petitioner, or in providing the Petitioner with human necessities such as food and water, or health care, including but not limited to contracts and communications with:

    a. Air Security International or Air Routing International, Houston, Texas
    b. Mitchell, Jessen, & Associates, Spokane, Washington
    c. Jeppesen / Jeppesen Dataplan, San Jose, California
    d. Aero Contractors (or Aviation Specialties), Smithfield, North Carolina
    e. Tepper Aviation, Crestview, Florida
    f. Richmor Aviation, Hudson, New York
    g. Windrose Aviation, Berlin, Germany
    h. All relevant individuals at above companies

       Other individual contractors, including but not limited to:

    i. James E. Mitchell of Florida
    j. Bruce Jessen, of Washington State
    k. Eric Ernest Jividen of Virginia
    l. Lyle E. Lumsden of Virginia and Arizona
    m. Adam Buzzard of Virginia and Florida
    n. Leroy Doland Buell of Washington D.C. and Florida
    o. Thomas Medina

13. Any other documents containing information about the Petitioner, including "Knowledgeability Briefs," Prisoner Dossiers, or records maintained by interrogation teams or supporting expert teams.

    a. Knowledgeability Briefs: This document is prepared by an interrogation team before a prisoner arrives at Guantanamo. It contains the prisoner's name, family background, date of birth, a summary of the reasons for detention, and may include an inventory of the prisoner's personality at the time of capture. Copies of these documents are transferred back to Washington. Because Petitioner is

publicly reported to have been imprisoned ██████████████

b. Prisoner Dossiers: Prisoner dossiers are created and maintained. They contain all the information provided by a prisoner to his interrogators and all interrogation results, generally even if a prisoner refused to talk. Dossiers include original notes from interrogations that took place at locations where prisoners were incarcerated prior to Guantanamo as well as interrogations that took place at Guantanamo. In this case that would include information from all locations where Petitioner was interrogated and/or imprisoned. It also contains "interrogation plans" (*see* below) that are prepared by interrogation teams and reviewed and approved by various government agencies and authorities. In this case, there is evidence that multiple agencies micromanaged Petitioner's torture. Dossiers also include instructions that interrogators gave regarding the prisoner's treatment, as well as all cell transfers, incentive action justifications, and punishments.

c. Guantanamo Interrogation Team Records: Generally, prisoners at Guantanamo are assigned to an interrogation team that consists of an interrogator, analyst, translator, law enforcement, and a Behavioral Science Consulting Team ("BSCT") member. Each of these team members is likely to have maintained records relating to Petitioner.

d. Guantanamo BSCT Records: BSCT maintains records that are separate from those shared with the interrogation team.

e. Other Intelligence Reports: Various other government agencies, including, but not limited to, the CIA, FBI, NSA, NSC, JPRA, State, the White House, and OGA maintain their own files on detainees both at Guantanamo and in other offices.

f. Guantanamo Videos: All interrogations at Guantanamo are videotaped. All of these videos are/were maintained on the computer system at the base. An index exists that identifies these videos by country of visitor.

g. Photographs: Photographs exist of all prisoners who have been to Guantanamo. It is believed that photographs of Petitioner were taken at each location where he has been imprisoned.

h. Polygraphs: Many prisoners have been subjected to one or more polygraph tests.

i. Voice Prints and Voice Stress Tests: Many prisoners have been subjected to voice print or voice stress tests.

j. Computer Records: A variety of computer records exist that relate to Petitioner. These include, but are not limited to, the Joint Detention Operation Group Records ("JDOG"), which contains a record of every incident, every prisoner request (for example medial or dental requests), and every prisoner infraction. The Interrogation Control Element ("ICE") is another important set of prisoner-

related records. Because Petitioner was in the CIA's custody for years, in different locations, records are sought from each.

k. Prisoner Numbers: Each prisoner was issued four different identification numbers, including, but not limited to, INS Numbers and numbers assigned by MPs.

l. System of Rewards: These documents describe four levels of rewards and a series of privileges that interrogators can bestow upon the detainees.

m. Mail: Copies of all redacted and unredacted letters to and from the detainees.

n. Other Reports or Other Documents: Any and all other reports or documents related to petitioners.

# EXHIBIT 14

−7−

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JAMIL EL-BANNA et al.,          )
                                )
       Petitioners,             )
                                )
v.                              )       Civil Action No. 04-1144 (RWR)
                                )
GEORGE W. BUSH et al.,          )
                                )
       Respondents.             )
_____ )
                                )
HANI SALEH RASHID ABDULLAH      )
   et al.,                      )
                                )
       Petitioners,             )
                                )
v.                              )       Civil Action No. 05-23 (RWR)
                                )
GEORGE W. BUSH et al.,          )
                                )
       Respondents.             )
_____ )

## MEMORANDUM OPINION AND ORDER

Petitioners in each of the above-captioned habeas corpus proceedings —— foreign nationals detained at Guantanamo Bay in the custody of the United States, or their next friends —— seek an order directing respondents to "preserve and maintain all evidence, documents, and information regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility, and to preserve and maintain all evidence, documents and information relating or referring to Petitioners."

-7-

(Mot. for Preservation Order.)    Respondents oppose each motion,

  1 El-Banna, Dkt. 145; Abdullah, Dkt. 30.

  2 El-Banna, Dkt. 147; Abdullah, Dkt. 32.

  ' The parties advocate different standards for preservation orders, a dispute that need not be resolved here. First, the distinction between the standard articulated in Pueblo of Laguna v. United States, 60 Fed. Cl. 133 (2004), urged by petitioners, and the standard four-factor test employed in preliminary injunction decisions, urged by respondents (see Opp'n at 3), may be one without a practical difference. See also, Hester, 206 F.R.D. at 685. Second, respondents argue that a preservation order must meet the test of a preliminary injunction (Opp'n at 3), but also concede that the Federal Rules of Civil Procedure impose preservation obligations on civil litigants in every civil action filed, automatically and without court review (Opp'n

requested order is both "overbroad and potentially burdensome to the extent that it goes beyond what might otherwise be permissible with respect to any discovery that might ever be appropriate in a habeas case." (Opp'n at 7, citing Harris v. Nelson, 394 U.S. 296, 300 (1969) .)

The Supreme Court's opinion in Harris v. Nelson makes clear that the discovery provisions of the Federal Rules of Civil Procedure do not automatically apply in whole to federal habeas corpus proceedings. See 394 U.S. at 294 n. 5, 298-99.

Therefore, the preservation obligations that flow to a litigant from the federal discovery rules cannot be presumed to apply to habeas litigants absent some express application by a court. Accordingly, a preservation order in habeas proceedings, particularly in proceedings such as these where there has been no full disclosure of the facts on the public record to authorize the challenged detention, is not superfluous or unnecessary.

Further, Harris v. Nelson also makes clear that a district court's authority to issue orders pursuant to 28 U.S.C. § 1651 in aid of its fact-finding obligations in habeas corpus proceedings is intended to be flexible and should be exercised as the circumstances require for a proper and just disposition.

---

at 5), two positions in tension with each other.

-7-

[The Supreme Court has] held explicitly that the purpose and function of the All Writs Act to supply the courts with the instruments needed to perform their duty [to issue orders appropriate to assist them in conducting factual inquiries] . . . extend to habeas corpus proceedings.

At any time in the [habeas corpus] proceedings, when the court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held so that the court may properly "dispose of the matter as law and justice require," either on its own motion or upon cause shown by the petitioner, it may issue such writs and take or authorize such proceedings with respect to development, before or in conjunction with the hearing of the facts relevant to the claims advanced by the parties, as may be "necessary or appropriate in aid of [its jurisdiction] . . . and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

. . . Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the "usages and principles of law."

394 U.S. at 299-300 (footnote omitted). The opinion in Harris v. Nelson does not support respondents' suggestion that the requested preservation order "goes beyond . . . any discovery that might ever be appropriate in a habeas case." (Opp'n at 7.)

4

---

· Respondents' statement, that "Petitioners' proposal improperly, and without good cause, would put respondents in the position of having to take action with respect to a wide range of documents without having the opportunity to utilize the process of objection and litigation available in the discovery context to fine tune or challenge discovery requested based on, for example, overbreadth, relevance, or burden" (Opp'n at 7), mistakenly equates preservation obligations with production obligations and erroneously presumes that respondents will have no opportunity to litigate future discovery requests.

To the contrary, "the power of inquiry on federal habeas corpus
is plenary" and its exercise depends entirely on the
circumstances. Harris v. Nelson, 394 U.S. at 291.

Petitioners' filings challenge the fact and duration of
their custody as being in violation of the Constitution or laws
or treaties of the United States, matters that are cognizable
under the general habeas statute. See Rasul v. Bush, 124 S.Ct.
2686, 2698 (2005) ("§ 2241 confers . . . jurisdiction to hear
petitioners' habeas corpus challenges to the legality of their
detention at the Guantanamo Bay Naval Base"); Chatman-Bey v.
Thornburgh, 864 F.2d 804, 807 (D.C. Cir. 1988) (a prisoner's
challenge to the date on which he was eligible to be considered
for parole "falls comfortably within the broad reach of habeas
corpus"). The petitions also raise other complaints for which
habeas relief has not been foreclosed, namely, that certain
conditions they face in detention constitute violations of
specific provisions of the Constitution, laws or treaties of the
United States. See Preiser v. Rodriguez, 411 U.S. 475, 499
(1973) ("When a [state] prisoner is put under additional and
unconstitutional restraints during his lawful custody, it is
arguable that habeas corpus will lie to remove the restraints
making the custody illegal.") (citation omitted); Johnson v.
Avery, 393 U.S. 483 (1969) (removing restraint on the habeas

-7-

corpus petitioner's ability to assist fellow prisoners in writ-
writing). The preservation order requested is tailored to
preserve "documents and information in . . . [respondents']
possession" that may be "relevant to litigation or potential
litigation or are reasonably calculated to lead to the discovery
of admissible evidence." Wm. T. Thompson Co. v. General
Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984).
Documents evidencing treatment of detainees -- whether statements
of official policy, cumulative evidence of specific practices, or
something else -- may be probative of the treatment of
petitioners or may lead to other probative evidence. The
requested order imposes no greater obligation on respondents than
the federal discovery rules' preservation obligations impose on a
litigant in a typical civil lawsuit. Respondents' contrary view
of the requested order (Opp'n at 7) may underscore the need for a
preservation order.

However, since the very preservation order sought by
petitioners for all materials regarding treatment of all
Guantanamo Bay detainees has already been issued against the same
respondents in Al-Marri v. Bush, Civ. No. 04-2035 (D.D.C. Mar. 7,
2005) (Order), and Abdah v. Bush, Civ. No. 04-1254 (D.D.C. June
10, 2005) (Order), respondents here are already under a duty to

preserve those records and another preservation order would be unnecessary. Accordingly, it is hereby

ORDERED that petitioners' motions, insofar as they seek preservation orders governing evidence, documents, and information regarding the torture, mistreatment and/or abuse of detainees held at the Guantanamo Bay detention facility be, and hereby are, DENIED without prejudice as moot. It is further

ORDERED that petitioners' motions otherwise be, and hereby are, GRANTED. Respondents shall preserve and maintain all evidence, documents and information, without limitation, now or ever in respondents' possession, custody or control, regarding the individual detained petitioners in these cases.

SIGNED this 18th day of July, 2005.

/   s   /
RICHARD W. ROBERTS
United States District Judge