Approved for Filing by the CSO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED WITH
COURT SECURITY OFFICER
DATE

| | | |
|---|---|---|
| ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016), | ) ) ) | |
| *Petitioner.* | ) ) | |
| v. | ) ) | No. 08-CV-1360 |
| ROBERT M. GATES, | ) ) | |
| *Respondent.* | ) ) ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR ORDER REQUIRING THE GOVERNMENT TO RETURN THE ORIGINAL UNREDACTED COPIES OF PETITIONER'S DIARY AND OTHER WRITINGS, AND TO ALLOW PETITIONER TO SHARE HIS WRITINGS WITH COUNSEL

Petitioner Zayn Al Abidin Muhammad Husayn ("Petitioner") respectfully moves this Court for an Order directing the Government to return to Petitioner all original volumes of his diary[1] and other original writings and to allow Petitioner to share them with counsel. In support of this Motion, counsel offers the following:

1. In 1992, while Petitioner was fighting the Afghan communists, he sustained a serious head injury when a mortar exploded near his position. As we have previously described in other submissions to the Court, the injury cost him dearly.[2] Most notably for the purpose of this

---

[1] As recounted below, the Government has given Petitioner's counsel two volumes of Petitioner's diary. Those volumes are at the secure facility awaiting translation. Recently, and only after extended negotiations, the Government also agreed to release three additional volumes. Subsequent to these negotiations, however, when counsel visited Petitioner at the base, military officials refused to release these three volumes. In any case, all branches of the Executive Branch have consistently refused to release the most valuable volumes, including those created while Petitioner was in CIA custody and those written closest in time to Petitioner's arrest and the events of September 11.

[2] *See, e.g., Husayn v. Gates*, Emergency Motion for Immediate Disclosure of Medical Records and for Related Relief, No. 08-1360 [dkt 26] (RWR) (D.D.C. Aug. 19, 2008); Mem. Opinion and

motion, his injury significantly impaired both his long - and short - term memory.  To this day, he cannot remember his mother's face or name.  He cannot remember his father's name, and dimly recalls that he looked like a movie star in the Arab world (whose name he cannot remember).  He cannot remember the name of his business partner with whom he ran a news agency prior to his arrest.  Long after his 1992 injury, once Petitioner had recovered the ability to speak and write, he began to keep a diary.  It is his memory.  Without it, he is lost.

2.  To date, Petitioner has completed eleven volumes of his diary, each written in a slender, bound notebook.  He currently is writing volume 12.  He wrote the first six volumes before his March 2002 arrest.  Volumes 7 through 9 were drafted while Petitioner was in CIA custody.  Volumes 10 and 11 were completed in DoD custody at Guantanamo, after September 2006; only these last two volumes, written after Petitioner was transferred from CIA to DoD custody, were given to counsel in late 2008 by Petitioner because they were in his possession. At the present time, Petitioner has access to volumes 1 – 4 in his cell, and the Government and CIA are wrongfully denying Petitioner access to volumes 5 – 9, which, arguably, are most relevant to issues that are likely to arise before this Court in connection with Petitioner's defense. Volumes 5 and 6 were drafted before Petitioner's arrest and date most closely to the time of his arrest.  They are critically important to show what Petitioner was doing during this time frame and contain exculpatory evidence.  For example, volumes 7 – 9 were drafted while Petitioner

---

Order at 1-2 [dkt 53] (D.D.C. Nov. 28, 2008); *see also* Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016, Mar. 27, 2007, http://www.defenselink.mil/news/transcript_ISN10016.pdf, at 2

was in CIA custody and recount his torture and damaging exculpatory admissions made by Petitioner's torturers and other CIA officials.[3]

    3.  Quite apart from his diary, Petitioner created other relevant writings and drawings, none of which have been returned to him.



    4.  CIA operatives interrogated Petitioner at length about the content of his diary and other writings.

---

[3] It has been publicly reported that there are translations of Petitioner's diary. The fact that Petitioner's diary was cited in his CSRT in English attests to this fact. Petitioner expressly requests copies of all translations as well.

5. Without explanation, when Petitioner arrived at Guantanamo █████████████
September 6, 2006—the Government seized all his writings and drawings. In other words, once
he arrived at a location where he could confer with counsel and challenge the lawfulness of his
detention, the Government seized the same material it had allowed Petitioner to maintain for
years. This included his account of his treatment and torture at the hands of the CIA.
Subsequently, the Department of Defense allowed Petitioner to begin writing new volumes, and
as noted, the two volumes Petitioner wrote since███████arrival at Guantanamo in September
2006 have been delivered to counsel. But the CIA has steadfastly refused to return both the
writings that pre-dated his capture, and those that were created while he was in CIA custody.

6. Counsel first learned of this history when they met with Petitioner early in 2008.
Specifically, while discussing with Petitioner the circumstances of his seizure and detention and
attempting to ascertain the elementary facts necessary to understanding his case, Petitioner
repeatedly lapsed into total forgetfulness. He seemed confident that he could more meaningfully
respond to counsel's inquiries if he had the diaries in which hundreds of factual details are
recorded. Because the volumes represent Petitioner's collective memory, counsel asked that
DoD representatives immediately return all volumes that were taken from Petitioner, and that
Petitioner be allowed to share them with counsel. The Government refused. When counsel
protested, he was told by the Staff Judge Advocate in charge of the so-called "high value
detainees" that while the military had no objection to giving counsel the volumes, the CIA had
refused counsel's requests.[5] Counsel recently renewed the request with DOJ counsel, and again
learned that the CIA had refused.

---

[5] Counsel knows the identity of the Staff Judge Advocate, but she is no longer stationed at the
base. Because the Government has indicated a preference for redacting identifying information,

7. Although the Government has refused to allow Petitioner or his lawyers to see these volumes, they have selectively used their content to justify his continued detention. According to the Summary of Evidence presented at Petitioner's CSRT hearing, "[t]he following facts support the determination that the detainee is an enemy combatant. . . .

> f. The detainee made a diary entry in 2000 in which he described plans against America consisting of explosions and the burning of cities and farms. . . .
>
> i. The detainee made a diary entry in 2001 in which he stated within days of the attacks of 11 September 2001 he was preparing for counter attacks. The detainee stated he was working within a military and security plan that Usama bin Laden devised in anticipation of an American military action by buying and storing weapons and arming individuals as well as preparing defensive lines and planning ambushes.
>
> j. The detainee made a diary entry in 2002 in which he stated he would wage war against the United States. The detainee stated he would use several dimensions such as instigating racial wars, timed explosive attacks, attacking gas stations and fuel trucks, and starting timed fires.[6]

8. In addition, at least part of the diary was provided to Petitioner's Personal Representative at the CSRT (whose name is not known to counsel).[7]

---

and because the identity of the SJA is not pertinent to this Motion, counsel has omitted it here. Counsel can provide it on request.

[6] See Verbatim Transcript of Combatant Status Review Tribunal, Mar. 19, 2007, at http://www.defenselink.mil/news/ISN10016.pdf. Petitioner, of course, does not concede that these passages accurately reflect either the content or context of Petitioner's diaries. Indeed, it is because Petitioner is so skeptical of the CSRT's attribution to his writing that he wishes to examine them and share them with counsel, in preparation for his habeas case.

[7] See Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016 at 7, 10-11, at http://www.defenselink.mil/news/transcript_ISN10016.pdf.

9.   While the Government relied on selective portions of Petitioner's diary to make its case against Petitioner, retired FBI agent Dan Coleman, who had previously reviewed the diary closely, has described it as "a huge disappointment. Instead of operational intelligence, [it] contained hundreds of pages of nearly incoherent blather. Zubayda, he said, wrote in three different voices, giving himself three different names, Hani 1, 2, and 3, each apparently reflecting himself at a different age."[8]   Based on Coleman's review, combined with the knowledge that Petitioner had suffered a severe head injury, he and others at the FBI concluded Petitioner had severe mental problems.[9]

10.   During meetings with counsel, Petitioner repeatedly had severe difficulty recalling answers to counsels' questions. He has frequently informed us that the answers to questions are likely to be found in his diary. Many of his movements and actions prior to 9/11 are recounted in his diary. Because Petitioner cannot recall his movements, his diary and other writings may represent the only evidence available to rebut the Government's allegations.

## ARGUMENT

Petitioner's writings and drawings represent his memory, and without them, he cannot avail himself of the right recognized in *Boumediene v Bush*, 128 S. Ct. 2229 (2008). A portion of his memory—the diary—was used selectively to justify his detention, and was previously returned to Petitioner. The writings and sketches contain exculpatory information, including, for

---

[8] Jane Mayer, *The Dark Side,* 178 (Doubleday 2008); *see also* Ron Suskind, *The One Percent Doctrine: Deep Inside America's Pursuit of its Enemies since 9/11* 100-01 (Simon & Schuster, 2006) ("Around the room a lot of people just rolled their eyes when we heard comments from the White House. I mean, Bush and Cheney knew what we knew about Zubaydah. The guy had psychological issues. ... The thinking was, why the hell did the President have to put us in a box like this?").

[9] Dan Eggen and Walter Pincus, *FBI, CIA Debate Significance of Terror Suspect: Agencies Also Disagree On Interrogation Methods,* WASH. POST, Dec. 18, 2007, at A1.

instance, Petitioner's account of █████████████████████████████████████████
████████████████████████████████████████████████████████ Finally, under the
terms of the Protective Order just entered in this litigation, Petitioner's memory, as memorialized
in his writings and drawings, is among the information Petitioner's counsel presumptively
"needs to know."  Nothing in logic or law, therefore, justifies the Government in continuing to
withhold it.  Accordingly, all original writings and drawings should be returned to Petitioner
without delay, and he should be allowed to share them with counsel.

First, the writings and drawings are necessary to a meaningful challenge to the lawfulness
of Petitioner's detention.  The Supreme Court in *Boumediene* considered it "uncontroversial …
that the privilege of *habeas corpus* entitles the prisoner to a meaningful opportunity to
demonstrate that he is being held pursuant to the erroneous application or interpretation of
relevant law."  *Id.* at 2266 (*internal citations omitted*).  Though "more may be required," the
fundamental right to show that he simply does not fall within the category of people who may be
lawfully held is one of the "easily identified attributes of any constitutionally adequate habeas
corpus proceeding." *Id.* at 2267.  In addition, the Court contemplated meaningful fact finding on
remand.  It ruled that a habeas court "must have the means to correct errors that occurred during
the CSRT proceedings," including the authority to "assess the sufficiency of the Government's
evidence against the detainee." *Id.* at 2270.

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Yet Petitioner often cannot recall the details of his own life. And because he is in custody, he has no other means by which he can reconstruct that memory. For example, he visited the United States in the 1980s and stayed with American families as he traveled to consider various masters programs in computer science. He cannot remember their names. His writings and drawings, therefore, are the *sine qua non* of a meaningful challenge to his detention. Even the CSRT recognized and relied upon his diary, albeit selectively; and even the CSRT recognized that his diary had to be shared with Petitioner's Personal Representative. Yet the Supreme Court struck down the CSRT as an inadequate substitute for habeas precisely because it placed undue "constraints" on the detainee's "means to find or present evidence." *Id.* at 2269. It would be ironic indeed if the Government allowed Petitioner to present his case more thoroughly to the CSRT, a constitutionally inadequate forum, than to this Court.

Second, what little we know of them confirms that the writings contain a trove of exculpatory information. To begin with, the diary apparently provides a detailed account of Petitioner's actions before and after the attacks on September 11 and confirms his repeated assertion that he is neither a member of al Qaeda nor an enemy combatant. Petitioner wrote in his dairy that he was opposed to the attacks of September 11, and that any attack of this sort was forbidden by Islamic law.[11] As Petitioner observed, "[m]ost importantly, my diary can refute the accusations against me and it can show that I am personally against the sort of acts that were committed."[12] In addition, the diary sheds important light on Petitioner's mental state. It

---

[11] *Id.* at 15 ("One part I do remember, I write against eleven September."); *id.* (They killing of our child so we not care to killing their child; it's not allowed in Islam. I have it exactly, if you read my diary nice, you will understand my idea nice.").

[12] *Id.* at 22. *See also id.* at 22-23 ("My diary will prove that some of [y]our accusations were not my plans."); *see also id.* at 11 ("'[T]he Detainee' asked that [his CSRT "personal representative"] submit the Detainee's personal diary to the President and Members of this Combatant Status Review Tribunal as an exhibit for the Detainee to help corroborate his Oral

apparently provides a detailed description of his 1992 head injury and its effects.[13] And as noted, it has been suggested by those who have seen it that his writings indicate a severe mental disorder.[14]

Of course, such information is both discoverable and admissible under *Boumediene*. As the Court in *Boumediene* observed, "[f]or the writ of habeas corpus ... to function as an effective and proper remedy," Petitioner must be able to present exculpatory evidence. *Id.* at 2270. This opportunity has been a settled feature of habeas practice in this country for nearly two hundred years, *id.* at 2267-68, and is "constitutionally required" as a "means to correct errors that occurred during the CSRT proceedings." *Id.* at 2270. And evidence in the Government's possession that Petitioner is not an enemy combatant is the very definition of exculpatory. *See, e.g., In re Sealed Case No. 99-3096*, 185 F.3d 887, 889 (D.C. Cir. 1999) (holding that the government was required to disclose "exculpatory" information where it "would be affirmatively favorable to [defendant's] assertion of innocence"), as is evidence of Petitioner's impaired mental state. *See, e.g., United States v. Spagnoulo*, 960 F.2d 990, 995 (11th Cir. 1992).

Third, because Petitioner's right to access to the court means nothing without access to his memory, Petitioner must be permitted both to reconstruct his memory by reviewing his writings and to share that memory with counsel. *Cf. Al-Joudi v. Bush*, 406 F. Supp.2d 13, 21

---

Statement Exhibit D-b before the Tribunal Members."); *id.* at 10 (responding to the accusations against him: "as my diary shows . . . as I referenced in my diary . . . and I wrote about this sort of thing in my diary").

[13] *See, e.g.*, Suskind, *The One Percent Doctrine, supra* at 95.

[14] *Id.* at 100-01; Mayer, *The Dark Side* at 178. The Court has already recognized that access to Petitioner's medical records "is a legitimate and important effort to provide effective representation and present the court with appropriate information affecting the lawfulness of [Petitioner's] detention." *See Husayn v. Gates*, No. 08-1360, Mem. Opinion and Order at 6-7 [dkt 53] (D.D.C. Nov. 28, 2008).

(D.D.C. 2005) ("in order to properly represent Petitioners, their counsel must have access to them," because "access to the Court means nothing without access to counsel"); *see also id* at 22 (quoting *Bounds v. Smith*, 430 U.S. 817, 821–22 (1977) (access to the courts must be "adequate, effective, and meaningful")); *see also Husayn v. Gates*, Mem. Opinion and Order at 6 [dkt 53], No. 08-1360 (D.D.C. Nov. 28, 2008) (RWR).   Thus, the government can no more preclude Petitioner and counsel's access to these writings than it could attempt to monitor attorney-client communications or inspect attorney-client notes. *See Al Odah v. United States*, 346 F. Supp. 2d 1, 12 (D.D.C. 2004).

Indeed, the express provisions of the Protective Order recently entered in this case effectively codify this entitlement by stipulating that Petitioner's counsel "is presumed to have a 'need to know' all the information in the Government's possession concerning" Petitioner. *Husayn v. Gates*, Amended Protective Order for Habeas Cases Involving Top Secret/Sensitive Compartmented Information, No. 08-1360 [dkt 78] (RWR) (D.D.C. Jan. 9, 2008), Para. 28. Although this presumption may be overcome upon a showing by the Government that the information is "highly sensitive," the Government can hardly maintain that Petitioner's writings should be so designated; after all, they are, in their entirety, Petitioner's creation.   As importantly, Petitioner had been allowed to keep these writings throughout much of his CIA detention.   And of course, the diary was provided to both the CSRT and his Personal Representative.[15]

As indicated above, translations of Petitioner's diary clearly exist because passages in English appear in Petitioner's CSRT transcript. As such, Petitioner expressly requests that he be

---

[15] In addition, three of Petitioner's counsel have TS/SCI security clearance.

provided with copies. Given the time frame, pending deadlines, and the sheer volume of writing, Petitioner is at a severe disadvantage without access to these translations. Furthermore, it has been widely reported that the military's translation from Arabic to English has been noted to be of poor quality. Petitioner should be entitled to determine whether any passage relied upon by the government was inaccurately translated and/or taken out of context and therefore exculpatory. Accordingly, the Court should grant Petitioner's request for access to copies of all translations of Petitioner's complete writings, including, but not limited to, Petitioner's diaries.

Finally, the CIA's effort to withhold writings that recount Petitioner's torture is wholly self-serving. Having wrongfully destroyed videotapes of Petitioner's torture, the CIA apparently hopes the Court will allow it to prevent other records from being disclosed. These hopes should not be fulfilled. Accordingly, all writings and drawings *in original form* that remain in the Government's possession should be returned to Petitioner and made available to his counsel immediately.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court compel the production of Petitioner's writings and drawings.

Dated: January 14, 2009
          Washington, D.C.

Respectfully submitted,


Joseph Margulies
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL  60611

11

(312) 503- 0890

George Brent Mickum IV [Bar No. 396142]
Amanda L. Edwards
Spriggs & Hollingsworth
1350 I Street NW
Washington, District of Columbia 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Baher Azmy
Seton Hall Law School
Center for Social Justice
One Newark Center
Newark, NJ 07102
(973) 642-8700

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the Court Security Officer for clearance and filing this 14th day of January 2009.  My understanding is that the Court Security Officer will serve the government.  Once Petitioner's counsel has been notified that the document has been cleared and filed, copies will be served on the following via first class mail:

Nicholas A, Oldham
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

_____
George Brent Mickum IV

13