UNCLASSIFIED//FOR PUBLIC RELEASE



FILED WITH THE
COURT SECURITY OFFICER
CSO: CMartin
DATE: 5/11/09

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ZAYN AL ABIDIN MUHAMMAD       )
HUSAYN (ISN # 10016),         )
                              )
*Petitioner.*                 )
                              )
v.                            )       No. 08-CV-1360
                              )
ROBERT M. GATES,              )
                              )
*Respondent.*                 )
                              )

## MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM IMPROPER CLASSIFICATION

Petitioner Zayn al Abidin Muhammad Husayn ("Petitioner" or "abu Zubaydah"), by and through undersigned counsel, hereby moves this Court to order the Government to remove unauthorized redactions from Petitioner's pleadings and court filings and to order the Government to expedite the classification review process of documents Petitioner submitted to the Department of Justice Court Security Office ("CSO") for filing with the court. The Government's extensive redactions, which cover (1) Petitioner's description of the interrogation techniques inflicted upon him while in CIA custody; (2) other personal knowledge of his experience within the CIA Torture and Rendition Program; and (3) statements made by Petitioner's counsel based upon information that is found within the public domain, represent an serious abuse of the classification process, which indisputably can no longer be maintained in light of recent official disclosures of the same information.

## PRELIMINARY STATEMENT

On April 16, 2009, President Obama ordered the near total declassification of four memoranda authored by high ranking lawyers in the Office of Legal Counsel dated August 1,



1

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

2002, May 10, 2005, and May 30, 2005 (the "Torture Memos"), which collectively set forth in

chilling, bureaucratic detail, legal license to subject so-called "high value detainees" in secret

CIA custody to a regime of long-term torture and abuse.[1]  The August 1, 2002 Memo, authored

by now-Judge Jay Bybee, was devoted exclusively to mapping the interrogation of abu

Zubaydah, authorizing a menu of techniques against him such as "walling" "facial slap" or

"insult slap," "cramped confinement in a box with an insect," stress positions, sleep deprivation,

and "the waterboard."[2]

The President's declassification Order came on the heels of the release of an ICRC report

that recounted specific details from abu Zubaydah and other so-called "high value detainees"

about their interrogation and abuse while in CIA custody and the locations the CIA used to

detain them.[3]  That report, in turn, merely memorialized dozens of public reports from credible

journalists and authors about the CIA interrogation and detention program.[4]  Thus, in explaining

his decision to declassify the Torture Memos, the President stated:

> First, the interrogation techniques described in these memos have already
> been widely reported.  Second, the previous Administration publicly
> acknowledged portion of the program – and some of the practices –
> associated with these memos.  Third, I have, already ended the techniques

---

[1] *See* Memorandum for John Rizzo, Acting General Counsel of the Central Intelligence Agency, from Jay S. Bybee, Assistant Attorney General, U.S. Department of Justice, Office of Legal Counsel, Aug. 1, 2002 (hereinafter "Bybee Memo") (attached as Exhibit A); Memoranda for John Rizzo, Senior Deputy General Counsel of the Central Intelligence Agency from Stephen G. Bradbury, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Office of Legal Counsel, May 10, 2005 (attached as Exhibits B and C); Memorandum for John Rizzo, Senior Deputy General Counsel of the Central Intelligence Agency from Stephen G. Bradbury, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Office of Legal Counsel, May 30, 2005 (attached as Exhibit D).

[2] Bybee Memo at 2-20.

[3] International Committee for the Red Cross, *Report on the Treatment of Fourteen "High Value Detainees" in CIA Custody*, Feb. 14, 2007 (hereinafter "ICRC Report"), available at: www.nybooks.com/icrc-report.pdf.

[4] *See, e.g.,* Jane Mayer, *The Black Sites, A rare look inside CIA's secret interrogation program*, The New Yorker, Aug. 13, 2007; Katherine Eban, *Rorschach and Awe*, Vanity Fair, July 17, 2007; Dick Marty, *Secret detentions and illegal transfers of detainees involving Council of Europe member states: Second Report*, Council of Europe Parliamentary Assembly, June 7, 2007; Brian Ross and Richard Esposito, *CIA's Harsh Interrogation Techniques Described – Sources Say Agency's Tactics Lead to Questionable Confessions, Sometimes to Death*, ABC News, Nov. 18, 2005. *See also* Petition for Habeas Corpus, Husayn v. Bush, ¶¶ 42 to 57 (cataloguing numerous reports about Petitioners detention and interrogation).

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

described in the memos through an Executive Order. Therefore, withholding these memos would only serve to deny facts that have been in the public domain for some time.[5]

In sum, the President of the United States has formally and finally concluded that the disclosure of the interrogation techniques employed against Petitioner is not a threat to national security. Accordingly, the Government is indisputably foreclosed from claiming that classification of such information is authorized on the ground that it "could reasonably be expected to result in damage to the national security." *See* Executive Order Pursuant to Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003) (amending Executive Order 12958), § 1.1(a)(iv). Therefore, any descriptions or written depictions by Petitioner or others relating to his interrogation in CIA custody may not properly be redacted.

Likewise, the Government may not prevent Petitioner from revealing the locations where he believes he was detained by the CIA. Because Petitioner is not a Government employee who is contractually obligated to keep his experiences secret, the Government has no legal authority to restrict information that comes from his own personal observation or experience. In addition, the Government has no basis to redact statements by Petitioner's counsel about facts already in the public record. While the Government may wish to avoid the obvious public criticism that will follow from an honest discussion of the Government's conduct in this case and surely benefits from handicapping Petitioner's counsel's ability to meaningfully challenge the legality of his detention – it has no lawful basis to do so.

Once the pretext for the Government's claimed authority to classify such information is properly dismissed, all that remains is the Government's simple desire to keep information about its treatment of abu Zubaydah secret, or to continue to cover up evidence contradicting its own

---

[5] Statement of President Barack Obama on Release of OLC Memos, The White House, Office of the Press Secretary, April 16, 2009 (hereinafter "Obama Statement on OLC Memos"); http://www.whitehouse.gov/the_press_office/Statement-of-President-Barack-Obama-on-Release-of-OLC-Memos/.



UNCLASSIFIED//FOR PUBLIC RELEASE



UNCLASSIFIED//FOR PUBLIC RELEASE

public misstatements about abu Zubaydah as well as potential evidence of further as-yet-undisclosed Government wrongdoing: for example, the fact that Petitioner was tortured before the August 1, 2002 memorandum authored by Jay Bybee was issued. Such an interest is certainly not cognizable, nor could it overcome Petitioner's interest in fully investigating (through investigators, expert and other witnesses) the circumstances of his abduction and imprisonment, or to share with mental health experts his own descriptions of his treatment. *See Husayn v. Gates*, No. 08-1360 [dkt 53], Mem. Op. and Order at 7 (Nov. 28, 2008) (holding, "[i]f Zubaydah's right to present his case with the assistance of counsel is to have any meaning," counsel must be allowed to ascertain Petitioner's mental state).

Such an interest also cannot compete with the requirements of openness and transparency that are elementary to a democracy. *See* Barack Obama, Memorandum for the Heads of Executive Departments and Agencies Re Freedom of Information Act ("A democracy requires accountability, and accountability requires transparency. . . . The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve");[6] *see also Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) ("Democracies die behind closed doors").

## **ARGUMENT**

### I. THE GOVERNMENT LACKS AUTHORITY TO CLASSIFY INFORMATION WITHIN ABU ZUBAYDAH'S PERSONAL KNOWLEDGE INCLUDING HIS DESCRIPTIONS OF CIA INTERROGATIONS.

Although courts ordinarily defer to classification determinations made by the Executive, criminal defendants and civil litigants have an indisputable right to challenge whether

---

[6] http://www.whitehouse.gov/the_press_office/FreedomofInformationAct/



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

information is properly classified. *See e.g., Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003).

Petitioner challenges two categories of extensive Government redactions of his court filings

related to his experience in the CIA's detention program covering: (1) detailed information he

possesses about his abuse and interrogation by the CIA; (2) information he possesses about the

location of his detention and conditions of confinement while in CIA custody. Because the

Government has no authority under the governing Executive Order to classify such information

and because the Government's manifest desire to keep such information secret is for the

improper purpose of avoiding embarrassment and disclosure of wrongdoing, such redactions

must be removed.

> A. **The Government's Blanket Classification of Every Detail Concerning abu**
> **Zubaydah's Experience in the CIA Torture Program Violates the**
> **Limitations of Executive Order 13292 § 1.1(a).**

The Executive's authority to classify information derives from the National Security Act,

50 U.S.C. § 401 et seq., and generally from the limited powers vested in the President by the

Constitution and laws of the United States. The Executive's classification authority is currently

governed by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003) (amending Exec.

Order 12958). Section 1.1(a) of Executive Order 13292 provides that information may be

classified only when all of the following criteria are present:

> i.    an original classification authority is classifying the information;[7]
>
> ii.   the information is owned by, produced by or for, or is under the control of the
>       United States Government;
>
> iii.  the information falls within one or more of the categories of information listed in
>       section 1.4 of this order; and
>
> iv.   the original classification authority determines that the unauthorized disclosure of
>       the information could reasonably be expected to result in damage to the national

---

[7] Petitioner does not, at this time, assert any argument that the Government fails to meet this first criteria.

UNCLASSIFIED//FOR PUBLIC RELEASE



UNCLASSIFIED//FOR PUBLIC RELEASE

security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Section 1.4 provides, in relevant part, that the Government may classify "intelligence sources or methods." Exec. Order 13292 § 1.4(c). That Order attempts to balance "democratic principles requir[ing] that the American people be informed of the activities of their Government" with the recognition that certain qualifying documents may be kept secret in the national interest. Exec. Order No. 12,958. Thus, all three criteria are required for classification to be proper. *Singh v. FBI*, 574 F.Supp.2d 32, 42 (D.D.C. 2008). Because the Government cannot satisfy criteria 1.1(a)(ii)-(iv), the redactions are improper.

Abu Zubaydah's need for disclosure of these two categories of information is not merely academic, but rather goes to the very heart of his right to challenge his detention with meaningful legal assistance. He cannot adequately respond to the Government's factual return without independently investigating the facts and circumstances leading to his abduction, imprisonment, and torture. In particular, he must be able to retain investigators to locate and interview witnesses to corroborate his testimony and experts. In addition, abu Zubaydah must retain independent experts to assist with his case, including psychologists to evaluate the effects of his torture and the ability of him to participate in his defense. That is not possible as a practical matter unless information about his abduction, imprisonment, and torture may be disclosed to them.

> 1. The Information within abu Zubaydah's Personal Knowledge Is Not Owned, Produced, or Controlled by the Government (§ 1.1(a)(2)).

The Government continues to classify all statements and descriptions by Petitioner about his experience in the CIA rendition and interrogation program, including his own recollections about abuses perpetrated by the CIA. Yet only in the most Orwellian construction could abu Zubaydah's own recollections be considered "owned by" "produced by or for" or otherwise

6



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



"under the control of" the U.S. Government. *See* Exec. Order 13292 § 1.1(a)(2). What abu Zubaydah thinks, feels, observes, and recollects is owned, produced, and controlled only by him. Choosing to imprison him does not give the Government control over his mind.

Courts have specifically held that the Government may not classify information after the Government has officially disclosed that information to private individuals lacking security clearances or official responsibilities necessary to have access to classified information. *See, e.g., Halperin v. Dep't of State*, 565 F.2d 699, 704 (D.C. Cir. 1977) (classification of statements improper under nearly identical terms of preceding Executive Order, where State Department officials had previously disclosed those statements to reporters without security clearances). Counsel is aware of no authority to the contrary.

It is true that the Government may enjoin the disclosure of information by a Government employee in ways that, if imposed on private individuals, would be unlawful. However, "this principle implies a substantially *voluntary assumption* of special burdens in exchange for special opportunities." *Wright v. F.B.I.*, 2006 WL 2587630 (D.D.C. 2006) (emphasis added); *see also McGehee v. Casey*, 718 F.2d 1137, 1147-49 (C.A.D.C. 1983) ("One who enters the foreign intelligence service thereby occupies a position of 'special trust' reached by few in Government"); *Stillman v. CIA*, 517 F. Supp.2d 32, 37 (D.D.C. 2007) (former CIA employee foreclosed from publicly discussing information obtained after his termination under broad terms of non-disclosure agreements signed in consideration for offer of CIA employment). Unlike Government employees, Petitioner's involvement in the CIA torture and detention program has obviously not been voluntary, nor based on a special relationship of trust. His exposure to this program carries with it no consideration in the form of salary, benefits or prestige.

UNCLASSIFIED//FOR PUBLIC RELEASE



UNCLASSIFIED//FOR PUBLIC RELEASE

It should come as no surprise, therefore, that there are numerous cases in which private

individuals have filed civil actions against the Government for torture and abuse by the CIA and,

in their pleadings, have publicly described their observations and recollections of classified

Government programs in which they were brutalized. *See, e.g., Orlikow v. United States*, 6 2 F.

Supp. 77 (D.D.C. 1988) (involving allegations about CIA cover research project involving LSD);

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) (same). Even in cases recognizing a

broad entitlement to withhold any information in the Government's possession under the state

secrets doctrine, plaintiffs have been free to make public allegations about classified programs at

the core of their complaints, which come from their personal observations and recollections. *See*

*El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007) (former prisoner describing CIA

rendition program); *Mohammed v. Jeppesen Dataplan*, No. 08-15693 (9th Cir. Apri. 28, 2009)

(same). They are permitted to make allegations precisely because the Government does not own,

produce, or control the information within their personal knowledge.

In addition, other subjects of the CIA torture and detention program – who have no

security clearance or confidentiality agreement with the CIA – have freely discussed, without

injunction or interference from the Government, their experiences in CIA custody. *See, e.g.,*

*Seven Years of Torture: Binyam Mohamed Tells His Story*, Andy Worthington (Mar. 8, 2009);

Declaration of El-Masri (Nov. 3, 2006); Human Rights Watch, *Ghost Prisoner: Two Years in*

*Secret CIA Detention* (Feb. 2007); Amnesty International, USA: *A Case to Answer from Abu*

*Ghraib to Secret CIA Custody: The Case of Khaled al-Maqatari* (Mar. 2008); Center for Human

Rights and Global Justice, Surviving the Darkness: Testimony from the U.S. "Black Sites"



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE


(2007); Craig S. Smith & Souad Mekhennet, *Algerian Tells of Dark Term in U.S. Hands*,

N.Y.Times, July 7, 2006, at A1.[8]

The Government's ability to place restrictions on a detainee's conditions of confinement

– which derives from its authority to maintain a system of prison security – is plainly distinct

from its ability to classify that detainee's knowledge – which must come from the Executive

Order.[9]   Yet nothing in the Executive Order or logic would permit the Government to draw a

distinction about its classification authority simply based on its unilateral decision to continue to

detain him (not to mention a decision to disappear and torture him).  Such a rule, it goes without

saying, would produce incentives that are perverse.

> 2. Information within abu Zubaydah's Personal Knowledge About His
>    Torture and Detention Cannot Reasonably or Legitimately Be Expected to
>    Result in Damage to National Security (§ 1.1(a)(4)).

Petitioner's descriptions of his interrogation and torture while in CIA custody cannot

reasonably or legitimately be expected to result in damage to national security.  *See* Exec. Order

13292 § 1.1(a)(4).[10]  The recent public release of the four Torture Memos[11] that describe the

---

[8]  The Government has not confirmed or denied allegations by former prisoners concerning their experiences in secret CIA prisons.  The Government routinely refuses to comment on media reports about the CIA program.  Thus, in Petitioner's case, the Government can choose to neither confirm nor deny the facts provided by Petitioner, without risking giving Petitioner's allegations the imprimatur of the Government.

[9] Notably, defendants subjects to Special Administrative Measures in criminal cases are routinely permitted access to the outside world, including regular telephone calls and visits with their families. *See, e.g., United States v. Abu Ali*, 396 F. Supp. 2d 703, 710 (E.D. Va 2005) (pretrial detainee accused of terrorism "retains the ability to meet with and talk to his attorneys and family members," and is permitted regular family telephone calls); *United States v. El-Hage*, 213 F.3d 74, 78 (2d Cir. 2000) (pretrial defendant accused of embassy bombing permitted regular family telephone calls).

[10]  According to Executive Order 13292, "'Top Secret' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe." Sec. 1.2(a)(1).  "'Secret' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe." Sec. 1.2(a)(2).  "'Confidential' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe." Sec. 1.2(a)(3).  Here, the Government has classified Petitioner's personal knowledge of the CIA Torture and Rendition Program as Top Secret in its entirety. This is undoubtedly an over-classification:  indeed, as discussed, none of these classifications is warranted, let alone the highest.


UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



granular details of dozens of interrogation tactics used against Petitioner constitutes an "official disclosure" of such information, and effectively waives the Government's entitlement to claim that similar information from Petitioner or even from other Government sources would harm national security. *See Assassination Archives Ctr v. CIA*, 334 F.3d 55, 60 (D.C. Cir. 2003). More to the point, by ordering the release of these Memos, the President of the United States made specific findings that disclosure of information about the torture and interrogation of Petitioner in fact presents no threat to national security.[12] The President seriously considered the views of the CIA and other officials who opposed disclosure of information contained in the Memos on the grounds that disclosure would enable enemies to train against interrogation tactics and otherwise somehow compromise CIA sources and methods[13] – *i.e.*, all of the arguments that presumably supported the Government's decision to redact similar statements by Petitioner in this case. After deliberation, he rejected those views.[14] Specifically, the President found that continuing to keep the Memoranda classified is unnecessary because (1) the interrogation techniques they describe "have already been widely reported"; (2) the Bush Administration had "publicly acknowledged the program – and some of the practices – associated with these memos"; and (3) he "already ended the techniques described in the memos through an Executive Order."[15]

---

[11] *See supra* note 1 and Exhibits A, B, and C.

[12] See Obama Statement on OLC Memos, *supra* note 5.

[13] *See* R. Jeffrey Smith, Michael D. Shear and Walter Pincus, *In Obama's Inner Circle, Debate over Memos' Release Was Intense,* Wash. Post, April 24, 2001, at A01 (describing President's consideration of opposing positions regarding release of memos and final decision in favor of full disclosure); Mark Mazzetti & Scott Shane, *Interrogation Memos Detail Harsh Tactics by CIA,* N.Y. Times, April 17, 2009, at A1 (describing objections of CIA to disclosure of CIA interrogation techniques);

[14] As Petitioner has stated in his previous pleadings, and as has been redacted from Petitioner's previous pleadings, ████████████████████████████████████████████ Memorandum in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Destroyed Documents, and Other Relief, ███ ███ Please note: throughout this motion, where Petitioner provides examples of improper redactions, the redacted words will be highlighted in order that they may be distinguished as such.

[15] Obama Statement on OLC Memos, *supra* note 5. Indeed, the President remarked:

10

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



This broad determination by the President regarding the need for public disclosure of all

aspects of the interrogation practices used against Petitioner now categorically forecloses the

Government from claiming that deviations in Petitioner's statements from the precise contents of

the Memoranda still mandate keeping those statements classified.  The Commander-in-Chief has

concluded that disclosure of all aspects of Petitioner's interrogation will not harm national

security.  That conclusion is entitled to substantial deference.[16]

Similarly, the Government should no longer be permitted to classify statements by

Petitioner related to the location of his detention and involvement of foreign nationals in his

imprisonment and rendition.  The use of "black sites" by the CIA in locations around the world

has already been widely reported,[17] publicly acknowledged by the previous Administration,[18]

and ultimately abolished by an Obama executive order.[19]  Thus, the same reasons governing

---

I prohibited the use of these interrogation techniques by the United States because they undermine our moral authority and do not make us safer. Enlisting our values in the protection of our people makes us stronger and more secure. A democracy as resilient as ours must reject the false choice between our security and our ideals, and that is why these methods of interrogation are already a thing of the past. *Id.*

[16] For the same reason, the Government cannot be permitted to redact from Petitioner's court filings, public statements made by CIA and FBI officials about Abu Zubaydah's interrogation and torture.

[17] Jane Mayer, *The Black Sites: A rare look inside C.I.A.'s secret interrogation program*, The New Yorker, Aug. 13, 2007. http://www.newyorker.com/reporting/2007/08/13/070813fa_fact_mayer; *United States' "Disappeared" CIA Long-term "Ghost Detainees"*, Human Rights Watch, http://www.hrw.org/backgrounder/usa/us1004/index.htm;

[18] *See, e.g.*, President Discusses Creation of Military Commissions to Try Suspected Terrorists, The White House, Sept. 6, 2006, http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html.

[19] *See* President Barack Obama, Executive Order, Ensuring Lawful Interrogations, Jan. 22, 2009, http://www.whitehouse.gov/the_press_office/EnsuringLawfulInterrogations, at Sec. 4(a) ("The CIA shall close as expeditiously as possible any detention facilities that it currently operates and shall not operate any such detention facility in the future.").  The Director of the CIA, Leon Panetta, announced on April 9, 2009 that the CIA has not and would no longer use any secret overseas prison sites to house terrorist suspects. *See* Karen DeYoung, *CIA Has Quit Operating Secret Jails, Chief Says*, April 10, 2009 (reporting CIA director's statements that "black sites" were not operational since February 2009, and would be permanently decommissioned).  Moreover, many of these sites

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

President Obama's conclusion that disclosure of interrogation techniques will not harm national

security also apply to disclosure of information regarding the locations of Petitioner's detention.

Indeed, as one court explained:

> It is a matter of common sense that the presence of information in the public
> domain makes the disclosure of that information less likely to 'cause damage to
> the national security.'  [I]f the information has already been disclosed and is so
> widely disseminated that it cannot be made secret again, its subsequent disclosure
> will cause no *further* damage to the national security.

*Washington Post v. Dep't of Defense*, 766 F. Supp. 1, 10 (D.D.C. 1991) (internal citations

omitted) (emphasis in original); *accord Ashfar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir.

1983).

In addition, a claim that public release of information pertaining to CIA "black sites"

would compromise relationships with foreign governments is undermined not only by vast public

reporting about foreign governments' participation in the CIA black sites and rendition program,

but by the Government's express acknowledgement of the involvement of certain foreign

governments.  *See, e.g.*, John F. Burns, *CIA Used British Island to Transport Terrorism Suspects*,

N.Y.Times, Feb. 22, 2008 (CIA confirms use of Diego Garcia); ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████  Nonetheless, even these locations are redacted from

Petitioner's pleadings.[20]

At a minimum, Petitioner must not be prevented from revealing that he was imprisoned

████████████████████████████████████████████████████████████████

---

have not been in operation for years. *See, e.g.*, ████████████████████████████████

[20] *See, e.g.*, Petition for Writ of Habeas, at 15 n.25; Brent Mickum, *The Truth About Abu Zubaydah: The Bush Administration's False Claim that My Client was a Top Al-Qaeda Official Has Led to His Imprisonment and Torture*, The Guardian, Mar. 30, 2009 ("Mickum Article") (attached at Exhibit E) (with highlighting in place of redactions).

12

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████

███████████

Nonetheless, Petitioner's statements that he was ████████

████████ continue to be redacted.[22] The only explanation for this is the

Government's desire to prevent or delay the release of embarrassing and potentially

incriminating information.[23]

    In addition to the Government's use of "enhanced interrogation techniques" and secret

"black site" prisons various other pieces of information, which Petitioner seeks to disclose in his

public filings, have likewise already been publicly acknowledged by Government officials.  For

example, it has been publicly acknowledged that abu Zubaydah was arrested in Pakistan by

██████ Pakistani ███████ forces,"[24] ████████  Nonetheless, this

information is redacted from Petitioner's pleadings.[26] (redactions highlighted).   It has, likewise,

---

[22] *See, e.g.,* Motion for Preservation Order, Order Requiring Government Agencies to Identify Destroyed
Documents, and Other Relief, at 66-67.
[23] *See, e.g.,* Motion for Preservation Order, Order Requiring Government Agencies to Identify Existing and
Destroyed Documents, and Other Relief, at 6 n.11, in which this explanation for the Government's secrecy has also
been redacted: ████████

████████

[24] *See, e.g.,* Inquiry into the Treatment of Detainees in U.S. Custody, Report of the Committee on Armed Services,
United States Senate, Nov. 20, 2008, at 16; *see also* President Bush, Radio Address by the President to the Nation,
April 20, 2002; http://www.whitehouse.gov/news/releases/2002/04/20020420.html ("The United States also
continues to work with our friends and allies around the world to round up individual terrorists, such as Abu
Zubaydah, a top al Qaeda leader captured in Pakistan.").

████████

[26] Petition for Writ of Habeas, at 3.

13

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



been publicly acknowledged that Petitioner was held in Pakistan ███████████[27]

Nonetheless, this information is redacted from Petitioner's pleadings.[28] It is, furthermore, a

matter of public acknowledgement that ███████████ were directly involved in Petitioner

torture.[29] Nonetheless, this, too, has been redacted.[30] The Government also has officially

acknowledged that the interrogation techniques used on Petitioner were adapted from U.S.

military Survival Evasion Resistance and Escape (SERE) training, which is overseen by the Joint

Personnel Recovery Agency (JPRA).[31] Accordingly, the statement in abu Zubaydah's Petition

for Writ of Habeas that " ████████████████████████████████

████████████████████████████ warrants no

redaction."[32] The Government, likewise, has no basis to redact the following statement:

███████████████████[33] Information, such as this, which has been officially

acknowledged by the Government cannot be said to create a matter of national security when

acknowledged by Petitioner in his pleadings.

---

[27] *See, e.g., A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq,* Department of Justice, Office of the Inspector General, May 2006, at 67.
[28] Petition for Writ of Habeas, at 13.
[29] *See, e.g.,* Senate Armed Services Committee Inquiry into the Treatment of Detainees in U.S. Custody, Testimony of former Secretary of State Condoleezza Rice.
[30] *See, e.g.,* Motion for Preservation Order, Order Requiring Government Agencies to Identify Existing and Destroyed Documents, and Other Relief, at 22 ("████████████████████████
██████████ (redacted).
[31] *See, e.g.,* Senate Armed Services Committee Hearing on the Authorization of SERE Techniques for Interrogations in Iraq: Part II of the Committee's Inquiry into the Treatment of Detainees in U.S. Custody.
[32] Petition for Writ of Habeas, at ██; Ex Parte Opposition to Motion for Reconsideration of Standard Protective Order, at 8 ("To assist in the interrogation of Petitioner, ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
[33] Memorandum in Support of Unopposed Motion to Withdraw. Notably, any alleged basis for this redaction is undermined by the fact that the Government has conceded that the following information does not warrant redaction: "Petitioner we interrogated by a team ████████████████████████
██████████████████████████ took over the interrogation of
[Petitioner] in May 2002." Memorandum in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Destroyed Documents, and Other Relief, at ████████

14

UNCLASSIFIED//FOR PUBLIC RELEASE



3. Information within abu Zubaydah's Personal Knowledge Does Not Constitute an Intelligence Source or Method Because the Information Has Not Been Confirmed or Denied and Because the CIA's Actions were Illegal and Ultra Vires (§§ 1.1(a)(3), 1.4(c))

The Government also cannot claim that abu Zubaydah's personal knowledge concerning the locations of the secret prisons, the complicity of foreign Governments, and the torture methods inflicted on him constitute intelligence "sources and methods" within the meaning of Executive Order 13292 § 1.4(c). "An intelligence source provides, or is engaged to provide, information the [CIA] needs to fulfill its statutory obligations." *CIA v. Sims*, 471 U.S. 159, 177 (1985). While broad, that definition is not met here for two reasons.

First, when a private party makes allegations about a classified program, those allegations do not result in the disclosure of intelligence sources or methods absent Government confirmation or denial of the information. *See El-Masri v. United States*, 479 F.3d 296, 310, 311 (4th Cir. 2007) ("The general subject matter of [ ] allegations [concerning prisoner's experience in CIA Torture and Rendition Program] could be discussed without revealing state secrets"; only actual evidence necessary to defense against allegations are "CIA means and methods").

Second, the purported sources and methods at issue here—i.e., the CIA's use of forced disappearance and torture—fall outside the CIA's statutory authority. Because these actions are *ultra vires*, they are not properly classified under Executive Order 13292 §§ 1.1(a)(3) and 1.4(c). The CIA is only entitled to withhold legitimate sources and methods that "fall within the Agency's mandate." *Sims*, 471 U.S. at 169. Indeed, Executive Order 12,958 specifically recognizes this limitation, prohibiting classification in order to conceal "violations of law." § 1.7(a)(1). Even a desire to conceal "*possible* 'violations of the law'" would be enough to "raise concern" that the Government's classification and withholding was improper. *See* ACLU v. DOD, 389 F. Supp. 2d 547, 564-65 (S.D.N.Y. 2005) (citing Exec. Order No. 12,958) (emphasis



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



added).  Finally, to the extent that Petitioner was tortured before the August 1, 2002

memorandum signed by Jay Bybee was issued, Petitioner's torture constitutes criminal activity

that was not approved.  Any attempt to retroactively justify Petitioner's torture after the fact

cannot be countenanced by this Court.

    There can be no honest dispute that the interrogation methods inflicted on abu Zubaydah

constituted torture, as well as cruel inhuman and degrading treatment.[34]  Abu Zubaydah's forced

disappearance was also indisputably illegal under U.S. and international law, including treaties

signed by the United States.  *See* Convention Against Torture and Other Cruel, Inhuman or

Degrading Treatment or Punishment, G.A. res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51,

U.N. Doc. A/39/51 (1984), entered into force June 26, 1987 (Art. 3 prohibits transfers to torture);

International Covenant on Civil and Political Rights, G.A. res. 22000A (XXI), 21 U.N. GAOR

Supp. (No. 16), U.N. Doc A/6316 (1966), 999 U.N.T.S. 171, entered into force Mar. 23, 1976

(Arts. 7 and 9 prohibit transfers to torture).[35]

    The decision by President Obama to order the end of the interrogation techniques and use

of secret detention at issue only adds force to the claim that prior CIA conduct was *ultra vires*

and cannot be properly classified.[36]  *Cf. Orlikow v. United States*, 682 F. Supp. 77, 82 (D.D.C.

1988) (if plaintiffs' allegations concerning CIA abuse were resolved in their favor, "the [CIA]

---

[34] *See, e.g.*, ICRC Report, *supra* note 5, at 25 (concluding that the ill-treatment to which abu Zubaydah was subjected while held in the CIA program, "either singly or in combination, amounted to torture and/or cruel, inhuman and degrading treatment."); Transcript: Senate Confirmation Hearings: Day One, Jan. 16, 2009, http://www.nytimes.com/2009/01/16/us/politics/16text-holder.html (Holder: "I agree with you, Mr. Chairman, waterboarding is torture.").

[35] *See also id.* (describing international humanitarian and human rights law violations arising from secret detentions and concluding that the "totality of the circumstances in which the fourteen [high value detainees] were held effectively amounted to an arbitrary deprivation of liberty an enforced disappearance, in contravention of international law").

[36] President Barack Obama, Executive Order, Ensuring Lawful Interrogations, Jan. 22, 2009, http://www.whitehouse.gov/the_press_office/EnsuringLawfulInterrogations.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



would have acted so far beyond its authority that in any proper construction the action could not

be termed discretionary.").

> **B. The Government's Classification of abu Zubaydah's Personal Knowledge Violates Executive Order 13.292 § 1.7(a) Because Its Purpose Is Plainly To Conceal Violations of the Law, Prevent Embarrassment, and Prevent or Delay the Release of Information Not Requiring Protection.**

The Government further lacks legal authority to classify Petitioner's personal knowledge

of the CIA torture and detention program because its intended purpose is plainly to conceal

violation of law, prevent embarrassment, and prevent or delay the release of information that

does not require protection. *See* Exec. Order 13292 § 1.7(a). According to Executive Order

13292, "[i]n no case shall information be classified" for such purposes. *Id.* [37]

> As the former U.S. Solicitor General, Erwin Griswold explained:

> It quickly becomes apparent to any person who has considerable experience with classified material that there is massive overclassification, and that the principal concern of the classifiers is not with national security, but rather with Governmental embarrassment of one sort or another.[38]

Indeed, this "Court should be concerned to prevent a concentration of unchecked power that

would permit such abuses." *Jeppessen*, No. 08-15693, slip op. at 4944 n. 7.

Evidence of intent to conceal criminal conduct and prevent embarrassment exists in

several respects. The CIA's attempt to classify abu Zubaydah's experience in the CIA torture

and secret detention program despite repeated, consistent disclosures concerning the program,

official or otherwise, reveals its improper intentions. *See ACLU v. DOD*, 389 F. Supp. 2d at 564-

65 ("The discussions of [information] in the public press, undoubtedly arising from numerous

---

[37] "In no case shall information be classified in order to: (1) conceal violations of law, inefficiency, or administrative error, (2) prevent embarrassment to a person, organization, or agency, (3) restrain competition, or (4) prevent or delay the release of information that does not require protection in the interests of the national security."

[38] Erwin N. Griswold, *Secrets Not Worth Keeping: the Courts and Classified Information*, Wash. Post, Feb. 15, 1989, at A25. *See also* Garry Wills, *Why the Government Can Legally Lie*, 56 N.Y. Rev. Books, 32, 33 (2009) (revealing that the real reason the Government wished to resist disclosure in United States v. Reynolds, was not to protect "details of any secret project the plane was involved in," but "instead, . . . a horror story of incompetence, bungling, and tragic error.").

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



leaks . . . raise concern [ ] that the purpose of the CIA's [classification] responses is less to

protect intelligence activities, sources, or methods than to conceal possible 'violations of law' in

the treatment of prisoners, or 'inefficiency' or 'embarrassment' of the CIA.").  Indeed, the CIA's

creation and execution of a secret detention and interrogation program have had as their very

object the avoidance of anti-torture statutes as well as every major international anti-torture

treaty, agreement, or declaration to which the United States is party and/or signatory.  This leads

to no other conclusion than that U.S. officials further undertook efforts to conceal crimes by

abusing and misusing their classification authority.

　　　In looking at specific examples of information that the Government has redacted,

Petitioner's counsel can discern no valid explanation for the redactions, other than an attempt to

prevent and delay the disclosure of information that is detrimental to the Government's case.  For

instance, what basis can there be for the following redactions other than to prevent

embarrassment: '

This information is plainly exculpatory: it makes clear that Petitioner was not who

the Government touted him to be, and further, that the Government realized this only after

---

[39] Memorandum in Support of Motion for Order Requiring the Government to Return the Original Unredacted
Copies of Petitioner's Diaries and Other Writings, and to Allow Petitioner to Share His Writing With Counsel, at
(Memorandum in Support of Motion for Diaries).
[40] Memorandum in Support of Preservation Order, Order Requiring Government Agencies to Identify Destroyed
Documents, and Other Relief, at

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

████████████████

sadistically torturing him.[42]  The Government, further, redacts the following statement: "█████

████████████████████████████████████████████████████████████

████████[43]

     The Government is plainly attempting to prevent or delay the public recognition of

exculpatory evidence.  Indeed, as Petitioner has previously argued in its pleadings, and as has

also been redacted from the public, Petitioner's post-arrest diaries, drawings, and other writings

are a trove of exculpatory evidence.[44] ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████ These redactions are plainly improper and serve only to shield the Government

from responsibility for its errors.

---

[42] Reply in Support of Motion to Require the Government to Unseal the Amended Petition for Relief under the Detainees Treatment Act of 2005, and, in the Alternative, for Writ of Habeas Corpus and Other Relief, Mar. 28, 2008 (D.C. Cir.) at 2. ("The CIA and the Bush Administration argue that national security is at stake in this litigation. That is not surprising given that the CIA nearly killed Petitioner.").

[43] *See* Memorandum in Support of Motion for Diaries, at 7 n.10

[44] *Id.* at 7 ("████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ Memorandum in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Destroyed Documents, and Other Relief, ██████████████████████████ is also a subject of redaction and potentially exculpatory information. *See* Motion for Preservation Order, Order Requiring Government Agencies to Identify Existing and Destroyed Documents, and Other Relief, ██████

████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Moreover, it is high time that Petitioner should be able to publicly respond to the public

lies and accusations asserted by the Government about him.  For example, in an earlier pleading

filed before the D.C. Circuit, the position of the former Administration, regarding its ability to be

the only voice heard in the public discourse was made plain:  "The Bush Administration asserts

that Petitioner was waterboarded and that waterboarding is legal.  Can Petitioner respond?  No.

The Bush Administration and the CIA contend that Petitioner was waterboarded on a single

occasion and that no water was forced into his lungs.  What can Petitioner say in response?

Nothing. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮[47]  According to information recently revealed by the Obama

Administration, however, abu Zubaydah was not waterboarded once, but rather was

waterboarded "at least 83 times during August 2002."[48]  Why shouldn't Petitioner be permitted

to respond?  There is no valid reason.  The real explanation behind the Government's stance is

merely the desire is to conceal violation of law, prevent embarrassment, and prevent or delay the

release of information that does not require protection:  for instance, if Petitioner were able to

respond, he would inform the public that ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

## II.  THE GOVERNMENT LACKS AUTHORITY UNDER EXECUTIVE ORDER 13.292 OR THE TERMS OF THE PROTECTIVE ORDER TO CLASSIFY INFORMATION OBTAINED BY COUNSEL VIA PUBLIC SOURCES.

---

[47] *Reply in Support of Motion to Unseal*, Husayn v. Gates, 07-1520 (D.C.Cir), ▮▮▮ *See also id.* ("The CIA and the Bush Administration claim that Petitioner was instrumental in identifying, locating, and capturing Khalid Sheikh Mohamad ("KSM"). Is it true? No. Can Petitioner respond? No. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[48] Memorandum for John A. Rizzo, Senior Deputy General Counsel, Central Intelligence Agency, May 30, 2005, at 37.

[49] *See, e.g.*, Mickum Article (in which the highlighted statement has been redacted from public view).

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

According to express terms of the Protective Order, "counsel is not precluded from making private or public statements about information already in the public domain." P.O. § D.32. While Petitioner's counsel may not reveal any personal knowledge from non-public sources, or disclose that counsel had access to non-public sources that confirm, contradict, or otherwise relate to classified information that enters the public domain, counsel is not prohibited from citing or repeating information in the public domain that Petitioner's counsel does not know to be classified or derived from classified information. *Id.* at D.33. The Government's redaction of such statements clearly constitutes an abuse of the classification process that is contrary to the terms of the protective order. Such actions, moreover, place Petitioner's counsel in a precarious position, where even citation to public source documents, of which it has not other knowledge, may at the Government's discretion, turn out to be classified.

### A. The Citation of Public News Sources Is Not an Implicit Confirmation by Petitioner's Counsel of Classified Information.

Petitioner does not contend that all of the information that has been cited in his pleadings comes from his personal knowledge; rather, most comes from public source material. For example, Petitioner's pleadings cite to all of the torture techniques allegedly used by the CIA, but Petitioner does not contend that he was subjected to every single one of these techniques. For instance, Petitioner personally was not subjected to the following interrogation techniques:

█████████████████████████ Petitioner's counsel cites to all of the torture techniques reportedly used by the CIA,[50] which is publicly available information, in order to provide context for his defense.

Petitioner has been held virtually incommunicado for the past seven years and, therefore, is unable to know, let alone confirm or deny, much of the information that the Government

---

[50] *See, e.g.*, Petition for Writ of Habeas.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

redacts.  For example, Petitioner was hooded, handcuffed, and secretly extradited to black sites

around the world:  much of the information that is known about the exact locations of

Petitioner's imprisonment comes not from Petitioner or Petitioner's counsel, but rather from

investigations conducted by the European Parliament and reporters, among others.  Indeed,

Petitioner's counsel has expended significant time and effort to prepare extensive footnoting of

the public sources for the information that appears in Petitioner's court filings.[51]

The Government has redacted Petitioner's pleadings even where Petitioner's counsel

makes explicit the public source on which it relies, does not even intimate personal knowledge,

and merely offers argument.  For example, consider the following redacted statement:



In none of these statements does Petitioner's counsel intimate personal

knowledge.  As seen in the redactions to Petitioner's Preservation Motion Reply, for instance,

Petitioner's counsel merely pointed out that, contrary to Government's own public statements,

---

[51] *See, e.g., id.*

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

[55] Petitioner's counsel cannot even make such an argument, where they are merely highlighting a discrepancy between the Government's account of events and the events that are otherwise being reported publicly, and hypothesizing regarding what is at stake in this discrepancy (namely, the preservation of evidence in Petitioner's case), without having their arguments redacted.[56] This standard is not only unreasonable, it is an inappropriate use of the classification system.

The fact that Petitioner's counsel has now met with Petitioner does not allow the Government to assert that unclassified, public information may be classified whenever referenced by Petitioner. In many cases, Petitioner's counsel are merely reciting information, exactly as it was cited in the original habeas petition, prior to meeting with Petitioner or reviewing any classified documents. Under the express terms of sections 5(O) and 5(P) of the Protective Order, Petitioner's counsel are permitted to make statements about information already in the public domain. The Government's interpretation of the public domain exception cannot be accepted because it renders this exception meaningless. A proper interpretation of the Protective Order must recognize the difference between conveying information from classified sources and merely reciting information that already is in the public record.

B. **Petitioner's Reliance on Public Documents Does Not Constitute an Implicit Agreement or Disagreement by the United States to the Facts Asserted Therein.**

---

[55] Motion for Preservation Order, Order Requiring Government Agencies to Identify Existing and Destroyed Documents, and Other Relief, ▮▮▮▮

[56] Compare, for instance, the manner in which this information is presented in a later pleading, after Petitioner's counsel was able to confirm this information:

Petitioner's Memorandum in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Destroyed Documents, and Other Relief, ▮▮▮▮

23

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

The Government has previously attempted to argue that such statements are properly classified because they appear to have the imprimatur of the Government. In anticipation that the Government will once again argue that "official disclosures" can occur by implication, it should be noted that information can constitute an official disclosure only when it comes from the Government, not when it comes from Petitioner.[57]

If the Government wants to prevent any confusion over whether it impliedly affirms or denies Petitioner's statements, all it needs to do is explicitly affirm, deny, or otherwise respond to Petitioner. Alternatively, the Government can simply say nothing. However, it is improper, in an adversarial proceeding to silence Petitioner merely in order to avoid the need for such response. The Government's use of selective redaction makes clear that it is abusing the classification process for just this purpose. For example, in his filings, Petitioner recites statements made by the Government, which Petitioner asserts are false, regarding Petitioner's treatment and enemy combatant status; yet the Government picks and chooses among them, redacting those it does not wish to address. The Government has no basis to allow only one of the following four points to be viewed by the public: "the Government has falsely stated (1) that Petitioner was the number three man in al Qaeda;

---

[57] The cases that the Government has previously cited in support of its argument that Petitioner's statements bear a Government imprimatur are misapplied in this regard. Unlike the information involved in *Fitzgibbon v. CIA*, 911 F.2D 755 (D.C. Cir. 1990), and *Wolf v. CIA*, 473 F.3D 370 (D.C. Cir. 2007), the redactions in question here are not contained in documents produced by the Government. As indicated by the ruling in *Fitzgibbon*, it is one thing for Petitioner to assert in his defense that a thing may be so, or even is so; it is quite another thing for the Government itself to officially say that it is so.

24

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



[REDACTED] [58] Instead, it appears that the classification process is merely a front for allowing the Government to select which arguments Petitioner can and cannot make in his defense.

### C. The Government's Classification of Petitioner's Citation of Public Source Documents Violates Executive Order 13.292 § 1.7(a) Because Its Purpose Is Plainly To Conceal Violations of the Law, Prevent Embarrassment, and Prevent or Delay the Release of Information Not Requiring Protection.

As set-forth in Section I.C. above, evidence that the Government is abusing its classification authority in order to evade public accountability abounds. This is true not only of the classification of information within Petitioner's personal knowledge, but also of the classification of statements made by Petitioner's counsel based on information, which Petitioner has no basis to know, but which is found within the public domain.

Indeed, the Government has even redacted the following citation and summarization of information from the Senate Armed Services Committee:



Likewise, despite public recognition of the use of SERE training, the Government redacts the fact that [REDACTED]

[REDACTED] [60] This information is not

[REDACTED]

[59] Reply in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Existing and Destroyed Documents, and Other Relief, at 6, n7.

25

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



only public, but also is officially acknowledged; citation to this information by Petitioner's

counsel cannot be properly classified.

### III.    THE GOVERNMENT MUST PROVIDE LEGITIMATE JUSTIFICATION FOR ITS CLASSIFICATION DECISIONS.

The Government has, for far too long, been permitted to invoke the classification system

without judicial oversight or inquiry. As a result, the classification process has become utterly

arbitrary. Compare, for example, the following three excerpts from Petitioner's pleadings:

> "In addition to his torture, he has been subjected to cruel, inhumane, and degrading treatment and ▮▮▮▮▮▮▮▮▮▮▮▮▮ interrogation techniques designed specifically to isolate him from the world, reduce him to a state of learned helplessness, and render him wholly dependent on his captors."[61]

> "In addition to his torture, he has been subjected to cruel, inhumane, and degrading treatment and physical and psychological interrogation techniques designed specifically to isolate him from the world, reduce him to a state of learned helplessness, and render him wholly dependent on his captors."[62]

> "In addition to his torture, he has been subjected to cruel, inhumane, and degrading treatment and physical and psychological interrogation techniques specifically designed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[63]

Indeed, the Government's redactions bring to mind the dark humor of Joseph Heller's Catch-22:

> "For example, among the many false statements that the Government has made, the Government has falsely stated (1) that Petitioner was the number three man in al Qaeda; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[64]

> "For example, among the many false statements that the Government has made, the Government has falsely stated (1) that Petitioner was the number three man in al Qaeda; (2) that Petitioner was the head of tactical operations for al Qaeda; (3) ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[61] Petition for Writ of Habeas Corpus , at 5.
[62] Motion for Preservation Order, Order Requiring Government Agencies to Identify Existing and Destroyed Documents, and Other Relief, at 8.
[63] Memorandum in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Destroyed Documents, and Other Relief, at 8.
[64] Opposition to Motion to Designate as "Protected Information" Unclassified Information (D.C. Cir.), at 16.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████████████████████████████████████████;
and (4) that Petitioner was responsible for the capture of Khalid Sheikh Mohammad."[65]

"For example, among the many false statements that the Government has made, the Government has falsely stated (1) that Petitioner was the number three man in al Qaeda; (2) that Petitioner was the head of tactical operations for al Qaeda; ████████████████
████████████████████████████████████████████████ ."[66]

The Government's present classification efforts make a mockery of the entire process. They call out for judicial review. Whether the Government may attempt to argue that the above-mentioned examples are errors of exceptionally grave danger, or errors of little significance at all, it is clear to Petitioner that this process is horribly flawed.

## IV.    THE GOVERNMENT MUST EXPEDITE ITS CLASSIFICATION REVIEW OF PETITIONER'S OUTSTANDING AND FUTURE FILINGS

According to the protective order, any pleading or other document filed by Petitioner with this Court shall be filed under seal and submitted by the Court Security Officer (CSO) for classification review. *See* P.O. at § I.F.48. Implicit in this process, however, is the requirement that the Government shall unseal court filings or portions of filings that do not actually contain classified or protected information. *See id.*

Despite the Government's obligations in this regard, Petitioner continues to await the return of many of his pleadings, including, for example, his Amended Petition, which was provided to the Government for classification review approximately nine months ago.[67] Accordingly, the Court should order the Government to promptly complete the classification

---

[65] Reply in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Existing and Destroyed Documents, and Other Relief, at 6 n.6.

[66] Memorandum in Support of Motion for Preservation Order, Order Requiring Government Agencies to Identify Destroyed Documents, and Other Relief, at 28 n.73.

[67] Petitioner has made repeated requests, over many months, that these pleadings be cleared for public release, but to no avail. Furthermore, despite repeated inquiry into the status of the classification review of his pleadings, no indication has been given to Petitioner to even suggest that Petitioner can expect to see the results of the review process at any time within the foreseeable future. Nor has any explanation been offered for the months and months of ongoing delay.

27



 SE

review for outstanding documents and avoid further delay in the review of future filings in this

case.

CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that his request for relief be

GRANTED.

Dated: May ___, 2009
      Washington, D.C.

                                  Respectfully submitted,

                                  Joseph Margulies
                                  MacArthur Justice Center
                                  Northwestern University School of Law
                                  357 East Chicago Avenue
                                  Chicago, IL  60611
                                  (312) 503- 0890

                                  George Brent Mickum IV [Bar No. 396142]
                                  Amanda L. Edwards
                                  Spriggs & Hollingsworth
                                  1350 I Street NW
                                  Washington, District of Columbia 20005
                                  Telephone: (202) 898-5800
                                  Facsimile: (202) 682-1639

                                  Baher Azmy
                                  Seton Hall Law School
                                  Center for Social Justice
                                  One Newark Center
                                  Newark, NJ 07102
                                  (973) 642-8700

28

UNCLASSIFIED//FOR PUBLIC RELEASE



## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the Court Security Officer for clearance and filing this ____ day of May 2009. My understanding is that the Court Security Officer will serve the Government. Once Petitioner's counsel has been notified that the document has been cleared and filed, copies will be served on the following via first class mail:

James Luh, Esquire
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

_____
George Brent Mickum IV

29

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT A

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

U.S. Department of Justice
Office of Legal Counsel
Memo
August 1, 2002

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT B

UNCLASSIFIED//FOR PUBLIC RELEASE

U.S. Department of Justice
Office of Legal Counsel
Memo (Techniques)
May 10, 2005

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT C

UNCLASSIFIED//FOR PUBLIC RELEASE

U.S. Department of Justice
Office of Legal Counsel
Memo (Combined Use of Techniques)
May 10, 2005

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT D

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

U.S. Department of Justice
Office of Legal Counsel
Memo
May 30, 2005

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT E

UNCLASSIFIED//FOR PUBLIC RELEASE

Zayn al Abidin Muhammad Husayn, more commonly known as abu Zubaydah, is my client. After being extensively tortured by the CIA and imprisoned in various black sites around the world, Zayn may finally be approaching his day in court. I and my co-counsel welcome that day. But what if we are successful and establish that Zayn is not an enemy combatant? Would any country agree to take our client? The Bush Administration's misrepresentations about Zayn make that virtually impossible unless I am allowed to tell his side of the story. This article is the first step in that reclamation process.

For many years, abu Zubaydah's name has been synonymous with the war on terror because of repeated false statements made by the Bush Administration, the majority of which were known to be false when uttered. On April 17, 2002, ███████████████████ ████████████████████████████████████ President Bush publicly announced when Zayn had been captured: "We recently apprehended one of al Qaeda's top leaders, a man named Abu Zubaydah. He was spending a lot of time as one of the top operating officials of al Qaeda, plotting and planning murder." There was, however, just one minor problem with the claim that Zayn's capture was a significant blow to terrorism and al Qaeda: the man described by President Bush and others within his administration alternatively as a "top operative," the "number two person" in al Qaeda was never even a member of al Qaeda, much less an individual who was among al Qaeda's "inner circle." The Bush Administration had made another mistake.

These facts really are no longer contested: Zayn was not, and never had been, a member of either the Taliban or al Qaeda. CIA determined this after torturing him extensively and ████████████████████████████████████████████ ████████████████████████████ Zayn was never a member or a

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

supporter of any armed forces that were allied against the United States. He had no weapon

when he was taken into illegal custody. He never took up arms against the United States nor

against its coalition allies. He was not picked up on a battlefield in Afghanistan at the time of his

detention, but was taken into custody in Pakistan, where he was wrongfully attacked, shot, and

nearly killed. So serious were his wounds, that a surgeon from John Hopkins University was

flown to Pakistan to perform emergency surgery to save the life of a man the Bush

Administration believed to be the number three man in al Qaeda.

████████████████████████████████████████████████

████████████████████████████████████ Pulitzer Prize winning author

David Suskind has reported that a knowledgeable CIA source wryly told him: "We gave [abu

Zubaydah] the best medical help in the world so we could start torturing him." Abu Zubaydah

was tortured so vilely that even attorneys who are familiar with the Administration's illegal

actions over the years would be appalled. The Government will not allow me to tell you what

techniques of torture it approved for use on my client, but suffice it to say that given Zayn's

treatment, it is not surprising that the videotapes of his torture were destroyed. Just recently, the

Government revealed that 90 of the 92 videotapes that the CIA destroyed related to my client.

Much attention has been paid to a series of notorious, once-secret torture memoranda

authored by senior members of the Bush Administration and championed by Vice President

Cheney and his *aide-de-camp* David Addington. ████████████████████████

████████████████████

The Senate Armed Services Committee recently released a public report that establishes

that almost immediately after Zayn's capture, a group of some of the highest ranking government

officials in the land met in the White House to orchestrate and oversee his torture, months before

2

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

the now infamous torture memoranda signed by Jay Bybee and authored by John Yoo were issued in August 2002.   The individuals involved in this activity included Vice-President Cheney, former National Security Advisor Condoleezza Rice, former Secretary of Defense Donald Rumsfeld, former Attorney General for the Department of Justice ("DOJ") John Ashcroft, and former Secretary of State Colin Powell.   Aghast at the enormity of the Government's willingness to approve torture, former Attorney General Ashcroft, has been quoted as saying:  "Why are we discussing this here?  History will not judge us kindly."

███████████████████████████████████████████████████████████

██████████████████████████████████ but the public is prevented from seeing them due to policies of the Administration that have nothing do with national security; instead they have everything to do with preventing embarrassment and shielding individuals from potential war crimes charges.  Why is our client not allowed to tell his story?  The Government has admitted to waterboarding him, ███████████████████████████████████

████████████████████████ The Government's description of what that entailed is categorically false, like so many statements about our client.

But why is it important that abu Zubaydah be allowed to speak in his own behalf?  If Zayn is ever to receive any form of justice, he must be allowed to proclaim his innocence and pave the way for his possible release.  No country is likely to be willing to take someone accused of being the number three man in al Qaeda.   It is possible, however, that with a new Administration, some countries may be willing to consider accepting a man who always refused to join al Qaeda.

Who is abu Zubaydah?   He was born in Saudi Arabia, but is not a Saudi citizen.  He was educated in India.  Following his university training, he traveled through the United States,

3

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

considering possible universities where he might pursue his master's degree. In an interview with ABC, former CIA agent John Kiriakou described Petitioner as "a very friendly guy," who wrote poetry and was keen to talk about current events and compare and contrast the differences and similarities between Islam and Christianity. That has been my experience as well.

Like many other young Muslims before him, Zayn ultimately embraced the teachings of the Koran and traveled to Afghanistan to fight against communist insurgents who remained after the withdrawal of the Soviet Army. In 1992, while fighting on the front lines, he was injured in a motor attack that left him with two pieces of shrapnel that remain embedded in his head to his day. So severe were his injuries that he lost the ability to speak for more than one year. His memory is compromised even today. He cannot remember his mother's name or picture her face. He cannot remember his father's name, but recalls that he looked like a prominent movie star in the Arab community. Although Zayn ran a news agency with a partner, he cannot remember his former partner's name. And because he couldn't rember how to shoot a rifle, he wasn't permitted to fight against the communists.

Later, when Zayn returned to the front lines, he was told that he was no longer fit for fighting because couldn't remember how to shoot a rifle. The Bush Administration has widely alleged that abu Zubaydah was the head of a military camp that trained terrorists. That allegation is false at all levels. Significantly, the camp in question, Khalden, was closed by the Taliban at the request of Osama bin Laden because the emir of Khalden (not abu Zubaydah) refused to allow the camp to fall under the organizational control of bin Laden or al Qaeda. Indeed, as a result of these repeated refusals, the Taliban ordered Khalden closed in 2000.

Like the weapons of mass destruction and the need for war in Iraq, it is no longer shocking to find that the Bush Administration got it all wrong. Abu Zubaydah's supposed

4

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

relationship with al Qaeda is a complete myth. In an ever growing litany of horrors, the Bush Administration simply tortured the wrong guy, just as it tortured my former clients, British residents Bisher al-Rawi and Jamil el-Banna and British citizen Martin Mubanga, who were returned to England without charge. But what additional evidence exists to support the assertion that abu Zubaydah was never with al Qaeda?

First, my client has never been charged with any crime and is not facing a military commission trial as are, for example, most, if not all, of the individuals alleged to have played any roles in the attacks on the United States. If Zayn had been the chief operating officer for al Qaeda as the Bush Administration claimed, it is virtually certain that he would be facing charges and the death penalty. Is the Government avoiding his prosecution because he was tortured? That is not likely, because there is no real debate that all of the so-called "high value" detainees were tortured. The Administration has admitted that it waterboarded both Khalid Sheikh Mohammed and Abd al-Rahim al-Nashiri, both of whom are facing criminal charges and the death penalty. So the fact of torture is not an impediment to filing charges against my client.

More important, the Government is conducting a surreptitious but systematic purging of any reference to my client from the charge sheets and factual returns of other prisoners whose cases were being prosecuted. Abu Zubaydah has been linked to nearly 50 prisoners and former prisoners through media accounts and official Guantanamo Bay documents. Of these, approximately two dozen have either had their charges dropped or have been released from custody, including British resident Binyam Mohamed, who was recently released to British authorities without any charges. Before charges were dropped against Binyam Mohamed, Sufyian Barhoumi, Ghassan al Sharbi, and Jabran Sard al Qahtani, each had their charge sheets redrafted to remove every reference to abu Zubaydah.

5

UNCLASSIFIED//FOR PUBLIC RELEASE

Internationally, several individuals alleged to have known abu Zubaydah have had their charges dropped, been released, or received other relief from their handlers. For example, Abousofian Abdelrazik was alleged by the State Department to be closely associated with Abu Zubaydah. In 2008, Canada asked the United Nations to remove Abousfian Abdelrazik from its terrorism watch-list. Another prisoner, Mohamed Harkat, was supposedly even more closely related to abu Zubaydah, but later released by Canadian authorities. But there are many other cases in which the Administration has airbrushed abu Zubaydah out of history, which it has done because, ultimately, he could not have been privy to the information the Government alleged he had provided. That such evidence was obtained from an individual under torture was not an issue in 2002 when our client was a prisoner in CIA black sites and the Bush Administration was taking the position that prisoners had no legal rights. But the legal landscape has changed since then. Following the Supreme Court's 2008 decision in Boumediene v. Bush, the Bush Administration finally realized that evidence procured by torture from an individual who was never associated with al Qaeda and had renounced the activities of al Qaeda was problematic.

What becomes of Zayn depends on whether the truth can be revealed to the public. Consistent with the Bush Administration's position involving other prisoners who were seized in error such as Canadian citizen Maher Arar, who was mistakenly arrested and sent to Syria for torture; like German citizen, Khaled el-Masri, who was tortured in Afghanistan at a prison called the "Salt Pit" and eventually dumped alone on a road in Albania and left to make it back to his wife and home; the Bush Administration never admitted to making any mistakes with respect to any of the prisoners in its extraordinary rendition program or to any of the prisoners jailed at Guantanamo these many years, despite mounting, irrefutable evidence of its incompetence and malfeasance. It was much easier simply to assert over and over again that only the "worst of the

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

worst" were housed at Guantanamo. In fact, when all the trials are finished, my best guess is that there are not likely to be more that 25 - 30 actual trials that occur, out of the more than 1000 prisoners who have been jailed and tortured at the prison camps.

Unfortunately, unlike Maher Arar and Khaled el-Masri whose countries championed their return, no country is extending a hand to help a stateless Palestinian, given the Administration's public statements about him. Unless the Obama Administration allows me to negotiate openly on his behalf and provide officials with an actual account of his activity, he will continue to fade from view, which is, I fear, exactly what the Administration wants.


George Brent Mickum IV is counsel for abu Zubaydah along with Joseph Margulies, Baher Azmy, and Amanda Edwards. He has Top Secret - SCI security clearance.

UNCLASSIFIED//FOR PUBLIC RELEASE