UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| ) | Misc. No. 08-442 (TFH) |
| IN RE: ) | |
| GUANTANAMO BAY ) | Civil Action No. |
| DETAINEE LITIGATION ) | 08-CV-1360 (RWR) |
| ) | |
| ) | |
| ) | |

## FACTUAL RETURN

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Respondents hereby submit, as explained herein, a factual return pertaining to the

petitioner identified as the subject of the attached Narrative. This return sets forth factual bases[1]

supporting petitioner's lawful, ongoing detention pursuant to the Authorization for the Use of

Military Force.

Dated: April 3, 2009                    Respectfully submitted,

                                        MICHAEL F. HERTZ
                                        Acting Assistant Attorney General

                                        TERRY M. HENRY
                                        Assistant Branch Director

                                        ANDREW I. WARDEN
                                        PAUL E. AHERN
                                        NICHOLAS A. OLDHAM (D.C. Bar No. 484113)
                                        DAVID C. BLAKE (D.C. Bar No. 976977)
                                        JAMES C. LUH
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Avenue N.W.
                                        Washington, DC 20530
                                        Tel: (202) 514-3367

                                        Attorneys for Respondents

---

[1] Respondents reserve the right to seek leave to further supplement the record with additional factual bases supporting petitioner's detention, as necessary.

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | Misc. No. 08-442 (TFH) |
| IN RE: ) | |
| GUANTANAMO BAY ) | Civil Action No. |
| DETAINEE LITIGATION ) | 05-CV-2367 (RWR) |
| ) | |
| ) | |
| ) | |

## DECLARATION OF REAR ADMIRAL DAVID THOMAS

### Declaration of Rear Admiral David M. Thomas. Jr.

Pursuant to 28 U.S.C. § 1746, I, David M. Thomas, Jr.. hereby declare under penalty of pejury under the laws of the United States of America that to the best of my knowledge, information, and belief, the following is true, accurate, and correct:

I am a Rear Admiral in the United States Navy, with 31 years of active duty service. I currently serve as Commander, Joint Task Force-Guantanamo (JTF-GTMO), at Guantanamo Bay, Cuba. I have held this position since 27 May 2008. As such, I am directly responsible for the successful execution of the JTF-GTMO mission to conduct detention and interrogation operations in support of the Global War on Terrorism, coordinate and implement detainee screening operations, and support law enforcement and war crimes investigations.

The attached narrative and supporting materials from files of the Department of Defense or other government agencies contain information used by the Department of Defense to establish the status of the individual who is the subject of the narrative as an enemy combatant and to substantiate their detention as an enemy combatant at Guantanamo Bay, Cuba.

Dated:

DAVID M. THOMAS, JR.
Rear Admiral, U.S. Navy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ZAYN HUSAYN,                           ) | |
|                                        ) | |
|     Petitioner,    ) | |
|                                        ) | |
|     v.             ) | Civil Action No. 08-1360 (RWR) |
|                                        ) | |
| ROBERT GATES,                          ) | |
|                                        ) | |
|     Respondent.    ) | |
|                                        ) | |

## RESPONDENT'S STATEMENT OF LEGAL JUSTIFICATION FOR DETENTION

The Court's Order of November 6, 2008 (Dkt. No. 48), requires submission of a

statement of legal justification for detention of petitioner (ISN 10016) in the above-captioned

case. As his statement of legal justification, respondent relies upon and incorporates by reference

the Memorandum Regarding the Government's Detention Authority Relative to Detainees Held

at Guantanamo Bay, Misc. No. 08-442, Mar. 13, 2009 (Dkt. No. 1690), a copy of which is

attached as Exhibit A.

Dated: April 3, 2009               Respectfully submitted,

                                  MICHAEL F. HERTZ
                                  Acting Assistant Attorney General

                                  TERRY M. HENRY
                                  Assistant Branch Director

                                  */s/ Julia A. Berman*
                                  NICHOLAS A. OLDHAM (D.C. Bar No. 484113)

JAMES C. LUH
DAVID C. BLAKE (D.C. Bar No. 976977)
JULIA A. BERMAN (D.C. Bar No. 986228)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC 20530
Tel: (202) 616-8480
Fax: (202) 616-8470
Email: Julia.Berman@usdoj.gov

*Attorneys for Respondent*

- 2 -

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit A

UNCLASSIFIED//FOR PUBLIC RELEASE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: | Misc. No. 08-442 (TFH) |
| GUANTANAMO BAY | |
| DETAINEE LITIGATION | |

02-cv-0828, 04-cv-1136, 04-cv-1164, 04-cv-1194,
04-cv-1254, 04-cv-1937, 04-cv-2022, 04-cv-2035,
04-cv-2046, 04-cv-2215, 05-cv-0023, 05-cv-0247,
05-cv-0270, 05-cv-0329, 05-cv-0359,
05-cv-0392, 05-cv-0492, 05-cv-0520, 05-cv-0526,
05-cv-0569, 05-cv-0634, 05-cv-0748,
05-cv-0764, 05-cv-0877, 05-cv-0883, 05-cv-0889,
05-cv-0892, 05-cv-0993, 05-cv-0994, 05-cv-0998,
05-cv-0999, 05-cv-1048, 05-cv-1189, 05-cv-1124,
05-cv-1220, 05-cv-1244, 05-cv-1353,
05-cv-1429, 05-cv-1457, 05-cv-1458, 05-cv-1487,
05-cv-1490, 05-cv-1497, 05-cv-1504, 05-cv-1505,
05-cv-1506, 05-cv-1509, 05-cv-1555, 05-cv-1592,
05-cv-1602, 05-cv-1607, 05-cv-1623,
05-cv-1638, 05-cv-1639, 05-cv-1645,
05-cv-1704, 05-cv-1971, 05-cv-1983,
05-cv-2010, 05-cv-2088, 05-cv-2104, 05-cv-2185,
05-cv-2186, 05-cv-2199, 05-cv-2249, 05-cv-2349,
05-cv-2367, 05-cv-2370, 05-cv-2371,
05-cv-2379, 05-cv-2380, 05-cv-2381, 05-cv-2384,
05-cv-2385, 05-cv-2386, 05-cv-2387, 05-cv-2444,
05-cv-2479, 06-cv-0618, 06-cv-1668,
06-cv-1690, 06-cv-1758, 06-cv-1759, 06-cv-1761,
06-cv-1765, 06-cv-1766, 06-cv-1767, 07-cv-1710,
07-cv-2337, 07-cv-2338, 08-cv-0987, 08-cv-1085,
08-cv-1101, 08-cv-1104, 08-cv-1153, 08-cv-1185,
08-cv-1207, 08-cv-1221, 08-cv-1223, 08-cv-1224,
08-cv-1227, 08-cv-1228, 08-cv-1229, 08-cv-1230,
08-cv-1231, 08-cv-1232, 08-cv-1233, 08-cv-1235,
08-cv-1236, 08-cv-1237, 08-cv-1238, 08-cv-1310,
08-cv-1360, 08-cv-1440, 08-cv-1733, 08-cv-1805,
08-cv-2083, 08-cv-1828, 08-cv-1923, 08-cv-2019,
09-cv-0031

## RESPONDENTS' MEMORANDUM REGARDING
## THE GOVERNMENT'S DETENTION AUTHORITY RELATIVE
## TO DETAINEES HELD AT GUANTANAMO BAY

Case 1:08-cv-01360-RWR   Document 204-1   Filed 07/29/09   Page 9 of 67
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:08-mc-00442-TFH   Document 1690   Filed 03/13/2009   Page 2 of 13

## INTRODUCTION

Through this submission, the Government is refining its position with respect to its authority to detain those persons who are now being held at Guantanamo Bay. The United States bases its detention authority as to such persons on the Authorization for the Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001). The detention authority conferred by the AUMF is necessarily informed by principles of the laws of war. *Hamdi v. Rumsfeld,* 542 U.S. 507, 521 (2004) (plurality). The laws of war include a series of prohibitions and obligations, which have developed over time and have periodically been codified in treaties such as the Geneva Conventions or become customary international law. *See, e.g., Hamdan v. Rumsfeld,* 548 U.S. 557, 603-04 (2006).

The laws of war have evolved primarily in the context of international armed conflicts between the armed forces of nation states. This body of law, however, is less well-codified with respect to our current, novel type of armed conflict against armed groups such as al-Qaida and the Taliban. Principles derived from law-of-war rules governing international armed conflicts, therefore, must inform the interpretation of the detention authority Congress has authorized for the current armed conflict. Accordingly, under the AUMF, the President has authority to detain persons who he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for the September 11 attacks. The President also has the authority under the AUMF to detain in this armed conflict those persons whose relationship to al-Qaida or the Taliban would, in appropriately analogous circumstances in a traditional international armed conflict, render them detainable.

Thus, these habeas petitions should be adjudicated under the following definitional framework:

1

The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

There are cases where application of the terms of the AUMF and analogous principles from the law of war will be straightforward. It is neither possible nor advisable, however, to attempt to identify, in the abstract, the precise nature and degree of "substantial support," or the precise characteristics of "associated forces," that are or would be sufficient to bring persons and organizations within the foregoing framework. Although the concept of "substantial support," for example, does not justify the detention at Guantanamo Bay of those who provide unwitting or insignificant support to the organizations identified in the AUMF, and the Government is not asserting that it can detain anyone at Guantanamo on such grounds, the particular facts and circumstances justifying detention will vary from case to case, and may require the identification and analysis of various analogues from traditional international armed conflicts. Accordingly, the contours of the "substantial support" and "associated forces" bases of detention will need to be further developed in their application to concrete facts in individual cases.

This position is limited to the authority upon which the Government is relying to detain the persons now being held at Guantanamo Bay. It is not, at this point, meant to define the contours of authority for military operations generally, or detention in other contexts. A forward-looking multi-agency effort is underway to develop a comprehensive detention policy with respect to individuals captured in connection with armed conflicts and counterterrorism operations, and the views of the Executive Branch may evolve as a result. *See* Declaration of Attorney General Eric H. Holder, Jr., ¶¶ 3, 11. The effort has been undertaken at the direction of

2

Case 1:08-cv-01360-RWR   Document 204-1   Filed 07/29/09   Page 11 of 67
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:08-mc-00442-TFH   Document 1690   Filed 03/13/2009   Page 4 of 13

the President and is a major priority of the Executive Branch. *Id.,* ¶ 3. The Government will apprise the Court of relevant developments resulting from this ongoing process.

## DISCUSSION

In response to the attacks of September 11, 2001, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." AUMF, § 2(a). The September 11 attacks were carried out by al-Qaida, which was harbored by the Taliban regime in Afghanistan. In October 2001, under the authority of the AUMF, the United States launched Operation Enduring Freedom to remove the Taliban regime from power and to suppress al-Qaida. The United States and its coalition partners continue to fight resurgent Taliban and al-Qaida forces in this armed conflict. Below, we set out the Government's position regarding the detention authority provided by the AUMF as it applies to those captured during that armed conflict and held at Guantanamo Bay.

## I.   THE AUMF GIVES THE EXECUTIVE POWER TO DETAIN CONSISTENT WITH THE LAW OF ARMED CONFLICT.

The United States can lawfully detain persons currently being held at Guantanamo Bay who were "part of," or who provided "substantial support" to, al-Qaida or Taliban forces and "associated forces." This authority is derived from the AUMF, which empowers the President to use all necessary and appropriate force to prosecute the war, in light of law-of-war principles that inform the understanding of what is "necessary and appropriate." Longstanding law-of-war principles recognize that the capture and detention of enemy forces "are 'important incident[s] of war.'" *Hamdi,* 542 U.S. at 518 (quoting *Ex Parte Quirin,* 317 U.S. 1, 28 (1942)).

3

Case 1:08-cv-01360-RWR   Document 204-1   Filed 07/29/09   Page 12 of 67
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:08-mc-00442-TFH    Document 1690    Filed 03/13/2009    Page 5 of 13

The AUMF authorizes use of military force against those "nations, organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." AUMF, § 2(a). By explicitly authorizing the use of military force against *"nations, organizations, or persons"* that were involved in any way in the September 11 attacks (or that harbored those who were), the statute indisputably reaches al-Qaida and the Taliban. Indeed, the statute's principal purpose is to eliminate the threat posed by these entities.

Under international law, nations lawfully can use military force in an armed conflict against irregular terrorist groups such as al-Qaida. The United Nations Charter, for example, recognizes the inherent right of states to use force in self defense in response to any "armed attack," not just attacks that originate with states. United Nations Charter, art. 51. The day after the attacks, the United Nations Security Council adopted Resolution 1368, which affirmed the "inherent right of individual or collective self-defence in accordance with the Charter" and determined "to combat by all means threats to international peace and security caused by terrorist acts." U.N. General Assembly Security Council Resolution of Sept. 12, 2001 (S/RES/1368). "Since no one was seriously suggesting a State was behind the attacks, the Council was by definition implicitly acknowledging the acceptability of using military force against terrorists under the law of self-defense." Michael N. Schmitt, *U.S. Security Strategies: A Legal Assessment,* 27 Harv. J.L. & Pub. Pol'y 737, 748 (2004). The North Atlantic Treaty Organization and the Organization of American States treated the attacks as "armed attacks" for purposes of their collective self-defense provisions.[1] The AUMF invokes the internationally

---

[1] *See* Organization of American States, Meeting of Consultation of Ministers of Foreign Affairs, Terrorist Threat to the Americas (Sept. 21, 2001), http://www.oas.org/OASpage/

4

recognized right to self-defense. *See* AUMF, Preamble (it is "both necessary and appropriate

that the United States exercise its rights to self-defense and to protect United States citizens both

at home and abroad"). Other nations joined or cooperated closely with the United States'

military campaign against al-Qaida and the Taliban. *See* Schmitt, 27 Harv. J.L. & Pub. Pol'y at

748-49.

The United States has not historically limited the use of military force to conflicts with

nation-states:

> [A] number of prior authorizations of force have been directed at non-state actors, such as slave traders, pirates, and Indian tribes. In addition, during the Mexican-American War, the Civil War, and the Spanish-American War, U.S. military forces engaged military opponents who had no formal connection to the state enemy. Presidents also have used force against non-state actors outside of authorized conflicts.

Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*,

118 Harv. L. Rev. 2047, 2066-67 (2005) (citing U.S. use of military force in the Chinese Boxer

Rebellion, against the Mexican rebel leader Pancho Villa, and in the 1998 cruise missile attacks

against al-Qaida targets in Sudan and Afghanistan).

Thus, consistent with U.S. historical practice, and international law, the AUMF

authorizes the use of necessary and appropriate military force against members of an opposing

armed force, whether that armed force is the force of a state or the irregular forces of an armed

group like al-Qaida. Because the use of force includes the power of detention, *Hamdi,* 542 U.S.

at 518, the United States has the authority to detain those who were part of al-Qaida and Taliban

forces. Indeed, long-standing U.S. jurisprudence, as well as law-of-war principles, recognize

that members of enemy forces can be detained even if "they have not actually committed or

---

crisis/RC.24e.htm; North Atlantic Council, Statement by the North Atlantic Council (Sept. 12, 2001), http://www.nato.int/docu/pr/2001/p01-124e.htm; Statement by NATO Secretary General, Lord Robertson (Oct. 2, 2001), http://www.nato.int/docu/speech/2001/ s011002a.htm.

5

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

attempted to commit any act of depredation or entered the theatre or zone of active military operations." *Ex parte Quirin*, 317 U.S. at 38; *Khalid v. Bush*, 355 F. Supp. 2d 311, 320 (D.D.C. 2005), *rev'd on other grounds sub nom., Boumediene v. Bush,* 128 S. Ct. 2229 (2008); *see also* Geneva Convention (III) Relative to the Treatment of Prisoners of War of Aug. 12, 1949, art. 4, 6 U.S.T.S. 3316 (contemplating detention of members of state armed forces and militias without making a distinction as to whether they have engaged in combat). Accordingly, under the AUMF as informed by law-of-war principles, it is enough that an individual was part of al-Qaida or Taliban forces, the principal organizations that fall within the AUMF's authorization of force.[2]

Moreover, because the armed groups that the President is authorized to detain under the AUMF neither abide by the laws of war nor issue membership cards or uniforms, any determination of whether an individual is part of these forces may depend on a formal or functional analysis of the individual's role. Evidence relevant to a determination that an individual joined with or became part of al-Qaida or Taliban forces might range from formal membership, such as through an oath of loyalty, to more functional evidence, such as training with al-Qaida (as reflected in some cases by staying at al-Qaida or Taliban safehouses that are

---

[2] Moreover, courts should defer to the President's judgment that the AUMF, construed in light of the law-of-war principles that inform its interpretation, entitle him to treat members of irregular forces as state military forces are treated for purposes of detention. *See* AUMF, § 2(a) (authorizing the President to use "all necessary and appropriate force" against those that "he determines" planned, authorized, committed, or aided the September 11 terrorist attacks or harbored those organizations); *The Paquete Habana,* 175 U.S. 677, 700 (1900) (court construes customary international law *de novo* only in the absence of a "controlling executive or legislative act or judicial decision"). A deferential approach in this context is consistent with the commonsense understanding that "[t]he war power of the national government 'is the power to wage war successfully,'" *Lichter v. United States,* 334 U.S. 742, 767 n.9 (1948) (citation omitted), as well as the Supreme Court's directive in *Boumediene* that "[i]n considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches," 128 S.Ct. at 2276 (2008) (citing *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320 (1936)).

UNCLASSIFIED//FOR PUBLIC RELEASE

regularly used to house militant recruits) or taking positions with enemy forces. In each case, given the nature of the irregular forces, and the practice of their participants or members to try to conceal their affiliations, judgments about the detainability of a particular individual will necessarily turn on the totality of the circumstances.

Nor does the AUMF limit the "organizations" it covers to just al-Qaida or the Taliban. In Afghanistan, many different private armed groups trained and fought alongside al-Qaida and the Taliban. In order "to prevent any future acts of international terrorism against the United States," AUMF, § 2(a), the United States has authority to detain individuals who, in analogous circumstances in a traditional international armed conflict between the armed forces of opposing governments, would be detainable under principles of co-belligerency.

Finally, the AUMF is not limited to persons captured on the battlefields of Afghanistan. Such a limitation "would contradict Congress's clear intention, and unduly hinder both the President's ability to protect our country from future acts of terrorism and his ability to gather vital intelligence regarding the capability, operations, and intentions of this elusive and cunning adversary." *Khalid*, 355 F. Supp. 2d at 320; *see also Ex parte Quirin*, 317 U.S. at 37-38. Under a functional analysis, individuals who provide substantial support to al-Qaida forces in other parts of the world may properly be deemed part of al-Qaida itself. Such activities may also constitute the type of substantial support that, in analogous circumstances in a traditional international armed conflict, is sufficient to justify detention. *Cf. Boumediene v. Bush*, 579 F. Supp. 2d 191, 198 (D.D.C. 2008) (upholding lawfulness of detaining a facilitator who planned to send recruits to fight in Afghanistan, based on "credible and reliable evidence linking Mr. Bensayah to al-Qaida and, more specifically, to a senior al-Qaida facilitator" and "credible and reliable evidence demonstrating Mr. Bensayah's skills and abilities to travel between and among countries using false passports in multiple names").

7

Accordingly, the AUMF as informed by law-of-war principles supports the detention
authority that the United States is asserting with respect to the Guantanamo detainees.

## II. READ IN LIGHT OF THE LAWS OF WAR, THE AUMF AUTHORIZES THE NATION TO USE ALL NECESSARY AND APPROPRIATE MILITARY FORCE TO DEFEND ITSELF AGAINST THE IRREGULAR FORCES OF AL-QAIDA AND THE TALIBAN.

Petitioners have sought to restrict the United States' authority to detain armed groups by
urging that all such forces must be treated as civilians, and that, as a consequence, the United
States can detain only those "directly participating in hostilities."[3] The argument should be
rejected. Law-of-war principles do not limit the United States' detention authority to this limited
category of individuals. A contrary conclusion would improperly reward an enemy that violates
the laws of war by operating as a loose network and camouflaging its forces as civilians.

It is well settled that individuals who are part of private armed groups are not immune
from military detention simply because they fall outside the scope of Article 4 of the Third
Geneva Convention, which defines categories of persons entitled to prisoner–of-war status and
treatment in an international armed conflict. *See* Third Geneva Convention, art. 2, 4. Article 4
does not purport to define all detainable persons in armed conflict. Rather, it defines certain
categories of persons entitled to prisoner-of-war treatment. *Id.*, art. 4. As explained below, other
principles of the law of war make clear that individuals falling outside Article 4 may be
detainable in armed conflict. Otherwise, the United States could not militarily detain enemy

---

[3] The "direct participation in hostilities" standard is taken from two additional protocols
to the Geneva Conventions that the United States has not ratified. *See* Additional Protocols of 8
June 1977 to the Geneva Conventions of 12 Aug. 1949 and Relating to the Protection of Victims
of International Armed Conflicts (Additional Protocol I), art. 51(3), 1125 U.N.T.S 3 ("Civilians
shall enjoy the protection afforded by this Section unless and for such time as they take a direct
part in hostilities."); Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 Aug.
1949 and relating to the Protection of Victims of Non-International Armed Conflicts (Additional
Protocol II), art. 13(3), 1125 U.N.T.S. 609. The United States recognizes the standard for
targeting but its scope is unsettled.

UNCLASSIFIED//FOR PUBLIC RELEASE

Case 1:08-cv-01360-RWR   Document 204-1   Filed 07/29/09   Page 17 of 67
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:08-mc-00442-TFH   Document 1690   Filed 03/13/2009   Page 10 of 13

forces except in limited circumstances, contrary to the plain language of the AUMF and the law-of-war principle of military necessity.

For example, Common Article 3 of the Geneva Conventions provides standards for the treatment of, among others, those persons who are part of armed forces in non-international armed conflict and have been rendered *hors de combat* by detention. Third Geneva Convention, art. 3. Those provisions pre-suppose that states engaged in such conflicts can detain those who are part of armed groups. Likewise, Additional Protocol II to the Geneva Conventions expressly applies to "dissident armed forces" and "other organized armed groups" participating in certain non-international armed conflicts, distinguishing those forces from the civilian population. Additional Protocol II, art. 1(1), 13.

Moreover, the Commentary to Additional Protocol II draws a clear distinction between individuals who belong to armed forces or armed groups (who may be attacked and, *a fortiori*, captured at any time) and civilians (who are immune from direct attack except when directly participating in hostilities). That Commentary provides that "[t]hose who belong to armed forces or *armed groups* may be attacked at any time." *See* ICRC, Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 Aug. 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts (Additional Protocol II), ¶ 4789, http://www.icrc.org/ihl.nsf/ COM/475- 760019?OpenDocument (emphasis added). Accordingly, neither the Geneva Conventions nor the Additional Protocols suggest that the "necessary and appropriate" force authorized under the AUMF is limited to al-Qaida leadership or individuals captured directly participating in hostilities, as some petitioners have suggested.

Finally, for these reasons, it is of no moment that someone who was part of an enemy armed group when war commenced may have tried to flee the battle or conceal himself as a civilian in places like Pakistan. Attempting to hide amongst civilians endangers the civilians and

9

Case 1:08-cv-01360-RWR   Document 204-1   Filed 07/29/09   Page 18 of 67
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:08-mc-00442-TFH   Document 1690   Filed 03/13/2009   Page 11 of 13

violates the law of war. *Cf.* ICRC, Commentary on the Additional Protocols of 8 June 1977 to

the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of

International Armed Conflicts (Additional Protocol I), ¶ 1944, http://www.icrc.org/ihl.nsf/

COM/470-750065?OpenDocument ("Further it may be noted that members of armed forces

feigning civilian non-combatant status are guilty of perfidy."). Such conduct cannot be used as a

weapon to avoid detention. A different rule would ignore the United States' experience in this

conflict, in which Taliban and al-Qaida forces have melted into the civilian population and then

regrouped to relaunch vicious attacks against U.S. forces, the Afghan government, and the

civilian population.

## III. THE GOVERNMENT IS CONTINUING TO DEVELOP A COMPREHENSIVE DETENTION POLICY.

Through this filing, the Government has met the Court's March 13, 2009 deadline to

offer a refinement of its position concerning its authority to detain petitioners. The Court should

be aware, however, that the Executive Branch has, at the President's direction, undertaken

several forward-looking initiatives that may result in further refinements. Although the

Government recognizes that litigation will proceed in light of today's submission, it nevertheless

commits to apprising the Court of any relevant results of this ongoing process.

On January 22, 2009, the President issued two Executive Orders initiating Reviews

addressing issues related to prospective detention policy. *See* Exec. Order No. 13492, 74 Fed.

Reg. 4897 (Jan. 22, 2009); Executive Order 13493, 74 Fed. Reg. 4901 (Jan. 22, 2009). This

effort is a Government priority. *See* Holder Decl. ¶ 3.

Pursuant to Executive Order 13,493, the Government is undertaking "a comprehensive

review of the lawful options available to the United States with respect to the apprehension,

detention, trial, transfer, release, or other disposition of individuals captured or apprehended in

10

UNCLASSIFIED//FOR PUBLIC RELEASE

connection with armed conflicts and counterterrorism operations, and to identify such options as are consistent with the national security and foreign policy interests of the United States and the interests of justice." Exec. Order No. 13,493, § 1(e). Fully developing the Government's prospective detention policy implicates important national security interests, including diplomatic interests. Exec. Order No. 13,492, § 2(b); Holder Decl. ¶ 11. Because the detainees are citizens of foreign countries, these detentions and their legal justification necessarily affect the United States' relations with other nations. Cooperation of the country's international partners is central to the United States' anti-terrorism efforts. And detention policy raises important national security and humanitarian issues. *See id.* Such issues are also being considered in connection with Executive Order 13,492, pursuant to which the Government is examining "the factual and legal bases for the continued detention of all individuals currently held at [Guantanamo Bay]" on an ongoing basis. Exec. Order No. 13,492, § 2(d). Highlighting the urgency and importance of the Review, the Executive Order required that the Review process "commence immediately." *Id.* at § 4(a); *see also id.* at §§ 2(b), 2(d), 4(c)(1), 4(c)(2), 4(c)(4).

The Government commits to apprise the Court of any relevant results of these ongoing processes.

## CONCLUSION

For the foregoing reasons, the Government's new explication of who may be detained in this armed conflict is consistent with the AUMF and the laws of war that inform the scope of "necessary and appropriate" force the AUMF authorizes the President to use. If the judges of the Court desire oral argument relating to the scope of the Government's detention authority in these cases, the Government urges the Court to consider conducting a single argument in a consolidated manner before the Court and that the Court endeavor, to the extent possible, to reach a common ruling regarding the framework to apply to these cases.

11

UNCLASSIFIED//FOR PUBLIC RELEASE

Dated: March 13, 2009

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

JOSEPH H. HUNT
Director

TERRY M. HENRY
Assistant Branch Director

DAVID J. ANDERSON
Counselor to the Assistant Attorney General

*/s/ Christopher Hardee*

PAUL AHERN
CHRISTOPHER HARDEE (D.C. Bar No. 458168)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 305-8356
Fax: (202) 616-8470

*Attorneys for Respondents*

12

UNCLASSIFIED//FOR PUBLIC RELEASE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **IN RE:** | **Misc. No. 08-442 (TFH)** |
| **GUANTANAMO BAY** | |
| **DETAINEE LITIGATION** | **Civil Action No. _____** |

## DECLARATION OF ATTORNEY GENERAL
## ERIC H. HOLDER, JR.

1. I am the Attorney General of the United States. I submit this Declaration in connection with Respondents' Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay.

2. I am informed that there are habeas petitions pending in this Court involving more than 200 individuals detained by the Department of Defense at Guantanamo Bay, Cuba. The Supreme Court in *Boumediene v. Bush* has instructed that these petitioners are entitled to a "prompt hearing." Mindful of the Supreme Court's admonition, the Government is submitting herewith an explanation of its detention authority upon which it intends to rely in this litigation, notwithstanding its continuing intensive efforts to develop fully its prospective detention policies.

3. Promptly determining the appropriate disposition of those detained at Guantanamo Bay is a high priority for the President. On January 22, 2009, the President issued two Executive Orders – Executive Orders 13492 and 13493 – initiating reviews to determine the appropriate disposition of the detainees held there and to develop prospective detention policy.

4. Pursuant to Executive Order 13493, an interagency Special Task Force on Detention Policy has been created to "conduct a comprehensive review of the lawful options available to the Federal Government with respect to the apprehension, detention, trial, transfer, release, or other disposition of individuals captured or apprehended in connection with armed conflicts and counterterrorism operations, and to identify such options as are consistent with the national security and foreign policy interests of the United States and the interests of justice."

5. This Special Task Force consists of participants from the Department of Justice, the Department of Defense, the Department of State, the Department of Homeland Security, the Office of the Director of National Intelligence, the Central Intelligence Agency, and the Joint Chiefs of Staff. Officials from the Department of Defense and Department of Justice are serving as Co-Chairs of the Special Task Force.

6. Executive Order 13493 gives the Special Task Force approximately six months to complete its consideration of these complex issues, requiring the Special Task Force to provide periodic preliminary reports to the President, and to present a final report within 180 days of the date of Executive Order 13493.

7. Executive Order 13492, also implicating the proper scope of detention authority, directs the closure of the detention center at Guantanamo Bay and orders a legal and factual review of each detainee's status, with a view toward determining whether the detainee can be transferred or released, prosecuted for criminal conduct in an appropriate forum, or subjected to some other lawful disposition.

8. Section 3 of Executive Order 13492 provides that "[a] review of the status of each individual . . . shall commence immediately. The review shall determine whether the continued detention of any such individual is lawful and in the national security and foreign policy interests of the United States and the interests of justice."

9. I have appointed Matthew Olsen, the former Acting Assistant Attorney General for the National Security Division, to lead the interagency Task Force involved in the review mandated by Executive Order 13492. That Task Force also includes participants from the Department of Justice, the Department of Defense, the Department of State, the Department of Homeland Security, the Office of the Director of National Intelligence, and the Joint Chiefs of Staff. The Task Force is obtaining information pertinent to the disposition of individuals currently detained at Guantanamo Bay. Based on its review of that information, the Task Force will provide recommendations to a Review Panel consisting of senior-level officials from the Department of Justice, the Department of Defense, the Department of State, the Department of Homeland Security, the Office of the Director of National Intelligence, and the Joint Chiefs of Staff, regarding appropriate dispositions of the detainees.

10. The reviews addressing the disposition of detainees at Guantanamo Bay and the vital issue of detention policy are ongoing. In conjunction with these reviews, the Executive Branch has refined the Government's position with respect to the detention authority to be asserted in this litigation, as stated in Respondents' Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay.

11. The Task Forces will continue to deliberate regarding these issues as part of their work. The development of detention policy requires consultation and coordination among all of the agencies involved in the Executive Order reviews. Important and difficult legal, diplomatic, and national security issues are at stake. As they continue

to consider these significant issues pursuant to the President's directives, the Task Forces will advise the Civil Division of any policy developments that may affect the petitioners in the habeas litigation.

This Declaration is submitted pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2009.

Eric H. Holder, Jr.
Attorney General of the United States

- 3 -

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET/NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ZAYN HUSAYN,<br><br>    Petitioner,<br><br>v.<br><br>ROBERT GATES,<br><br>    Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 08-1360 (RWR) |

## FACTUAL RETURN FOR ABU ZUBAYDAH (ISN 10016)

1.    Zayn al-Abidin Muhammad Husayn, more commonly known as Abu Zubaydah

("Zubaydah"), is a Palestinian currently detained at the United States Naval Base in Guantanamo

Bay, Cuba. As described below, and based on the materials submitted with this Factual Return,

Zubaydah ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████ Consequently, for these and other reasons,

SECRET/NOFORN

SECRET//NOFORN

Zubaydah is lawfully subject to detention pursuant to the Authorization for the Use of Military
Force and the laws of war.

2.     The following Narrative and attached materials set forth the factual bases
supporting Zubaydah's lawful detention. This Narrative is not intended to be a complete
explication of the information in support of Zubaydah's detention in those materials.

3.     In the attached materials, there are materials reflecting interviews conducted by
law enforcement and intelligence personnel, as well as information derived from other sources
and methods.  Information received from these sources and methods is typically reproduced in
reports created by the collecting officer.  Such information is also commonly analyzed by law
enforcement or intelligence personnel and used to produce other intelligence products.  *See* Decl.
of b3 ░░░░░░░░░░░░░, *Background Declaration, Intelligence 101* (Sept. 19, 2008);
Decl. of b3 ░░░░░░░░░ (Aug. 22, 2008).

4.     As with all detainees at Guantanamo, Zubaydah has been assigned an Internment
Serial Number or ISN.  The ISN is an administrative code assigned to military detainees.
Zubaydah's full ISN is b2 ░░░ GZ-010016 b2 ░░, in which the number "10016" is Zubaydah's unique
identifier and the "GZ" designation indicates that he is a Palestinian.  Source materials attached
as exhibits to this Narrative may refer to Zubaydah by name, alias, full ISN, or various short
forms, such as "10016" or "ISN 10016."  Likewise, other military detainees may be referred to in
source materials and this Narrative by name, alias, or full or short forms of their ISN.

5.     It is common for those engaged in terrorist activities to use an alias, commonly
known in Arabic as a *kunya*.  *See* Decl. of b3 ░░░░░░░░░░░░░░░░░  *Background Declaration*

SECRET//NOFORN

SECRET//NOFORN

– *Names, Aliases, Kunyas and Variants* (Sept. 19, 2008). Zubaydah has used several *kunyas*, including, for example, Tariq. *E.g.*, Tr. of Ahmed Ressam Trial Testimony at 546-47, *United States v. Haouari*, No. S4 00 Cr. 15 (JFK) (July 3, 2001) ("Ressam Trial Test."), excerpts attached; June 2002 Deposition of Ahmed Ressam at 61, *In re: Int'l Letters Rogatory* (dated Aug. 27, 2001) ("Ressam Deposition"), excerpts attached; ███████████████ ████

███████████████████████ In addition, names and aliases are sometimes spelled differently when transliterated to Latin characters. For example, Tariq could be transliterated as Tarek, Tareq, or another form. There are numerous transliterations of the same names and aliases in the attached materials and, where obvious, this Narrative does not note such instances of transliterations.

## GENERAL BACKGROUND

6.  Al-Qaida ("the Base") was founded by UBL and others around 1988 or 1989 for the purpose of opposing certain governments and officials with force and violence. THE 9/11 COMMISSION REPORT 56 (2004); Decl. of [b3] ███████ *Background Declaration – Al-Qaida* (Sept. 22, 2008) ("Al-Qaida Background Decl.").

7.  UBL is recognized as the emir (prince or leader) of al-Qaida. THE 9/11 COMMISSION REPORT 56; Al-Qaida Background Decl. at 2

---

[b6] ███ has identified [b7] ███████ of Zubaydah on multiple occasions. *E.g.*,
[b6] ███████████████████████████████████████

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

8.      A purpose or goal of al-Qaida, as stated by UBL and other al-Qaida leaders, is to support violent attacks against property and nationals (both military and civilian) of the United States and other countries. THE 9/11 COMMISSION REPORT 59-61; Al-Qaida Background Decl. at 1-2.

9.      Since its founding until 2001, al-Qaida established training camps, guesthouses, and business operations in Afghanistan, Pakistan, and other countries for the purpose of training and supporting violent attacks against property and nationals (both military and civilian) of the United States and other countries. THE 9/11 COMMISSION REPORT 64-67.



Decl. of[53]                  Background Declaration – Guesthouses (Sept. 19, 2008), ("Guesthouses Decl.").

10.     In 1996, UBL issued a public "Declaration of Jihad Against the Americans." This declaration called for the murder of U.S. military personnel serving on the Arabian Peninsula. THE 9/11 COMMISSION REPORT 48.

11.     In February 1998, UBL and Ayman al-Zawahiri (UBL's second-in-command) issued a fatwa (purported religious ruling) requiring all Muslims able to do so to kill Americans – whether civilian or military – anywhere in the world. THE 9/11 COMMISSION REPORT 47; Al-Qaida Background Decl. at 2.

SECRET//NOFORN

SECRET//NOFORN

12.     Since its founding, members and associates of al-Qaida, known and unknown, have carried out numerous terrorist attacks. These attacks have included, but are not limited to, the attacks against the American Embassies in Kenya and Tanzania in August 1998, which killed approximately 200 people, THE 9/11 COMMISSION REPORT 68-70; the attack against the USS COLE in October 2000, which killed 17 United States Navy sailors, *id.* at 190-93; and the September 11, 2001 attacks, which killed approximately 3,000 people. *See id. passim*; *see also* Al-Qaida Background Decl. at 3.

13.     Most but not all of al-Qaida's inner core swore allegiance (or *bayat*) to UBL. Other operatives were committed to UBL or to his goals and would take assignments for him, but they did not swear *bayat* and maintained, or tried to maintain, some autonomy. THE 9/11 COMMISSION REPORT 67; *see also* Al-Qaida Background Decl. at 2 (describing al-Qaida as a loose global network that includes several thousand members and associates; the associates, although they may not pledge allegiance to al-Qaida, support its ideology and methods).

14.     The Taliban (students of Islamic knowledge) is an Islamic fundamentalist group that was formed in Afghanistan in 1994. *See* The Taliban in Afghanistan, *available at* www.cfr.org/publication/10551. After two years of violent conflict that included the capture of Kabul (Afghanistan's capital), the Taliban took control of Afghanistan's national government in 1996. THE 9/11 COMMISSION REPORT 65. Although never formally recognized by the United States, *id.* at 124, the Taliban controlled Afghanistan's national government from 1996 until the United States-led military campaign ousted the Taliban from power in 2001. *Id.* at 337-38. During the period in which the Taliban controlled Afghanistan's national government, it

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

provided safe harbor and support to al-Qaida and UBL. *Id.* at 64-67.

15.     On September 18, 2001, following the September 11, 2001 attacks on the United States, Congress adopted the Authorization for the Use of Military Force. 115 Stat. 224 (2001). Recognizing that the attacks of September 11, 2001 "render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens at home and abroad," Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Within weeks, United States military forces were deployed in Afghanistan. THE 9/11 COMMISSION REPORT 337.

16.     The United States led the initial aerial bombing campaign of Afghanistan, with ground forces composed of United States forces and Afghanistan militia opposed to the Taliban, including the Northern Alliance. The Northern Alliance is an association of Afghan groups opposed to the Taliban. The Northern Alliance has assisted the United States in its military campaign in Afghanistan to defeat al-Qaida and the Taliban. THE 9/11 COMMISSION REPORT 330-34; 336-38.

17.     In December 2001, the United States-led military campaign removed the Taliban from control of Afghanistan's national government. THE 9/11 COMMISSION REPORT 337-38. Taliban and al-Qaida forces, however, have continued to operate in Afghanistan and attack coalition forces.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

18.　　Currently, two major military operations are underway in Afghanistan. First,

Operation Enduring Freedom (OEF) is a multinational coalition military operation, led by the

United States, initiated in October 2001 to counter terrorism and bring security to Afghanistan in

collaboration with Afghan forces. *See* www.state.gov/r/pa/prs/ps/2006/60083.htm. OEF

operations led to the collapse of the Taliban government and helped bring security and stability

to Afghanistan. *Id.* OEF involves troops from over 20 nations, including about 19,000 United

States forces and about 3,000 non-United States troops. *Id.* Second, the International Security

Assistance Force (ISAF) is a United Nations-mandated international coalition operating under

the command of the North Atlantic Treaty Organization (NATO). *See*

www.nato.int/isaf/index.html. ISAF was established in 2002 with the goal of creating conditions

for stabilization and reconstruction in Afghanistan. ISAF is comprised of approximately 50,000

troops from 40 countries. *Id.*

## ZUBAYDAH'S PERSONAL BACKGROUND

19.　　Zubaydah is a Palestinian who was born on March 12, 1971 in Saudi Arabia.

20.　　████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████[2]████████████████████

---

[2]　████████████████████████████████████████████████████

████████████ For purposes of justifying Zubaydah's lawful detention
in this Factual Return, the Government relies only on statements Zubaydah made before his
capture.

SECRET//NOFORN

SECRET//NOFORN

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████ [3]

21.   ███████████████████████████████████████████████

████████████████████████████████████████████████████

██ [4] ████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[3] ███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

[4] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████ Decl. of ██ *Background Declaration – Terrorist Training Camps* (Sept. 19, 2008) ("Training Camps Decl."). ████████████████████████████████████████

████ *Id.* ██████████████████████████████████████████████

████████████████████████████████████████████ *Id.*
████████████████████████████████████████████████ *Id.*;
*see also* (██ FM 40 3/3/2004) (generally describing training at al-Faruq and Jihad Wal in the late 1990s). ████████████████████████████████████████

████████████████████████ ; *see also* ████████████████████████ . At least seven of the 9/11 hijackers trained at al-Faruq. *Id.* Al-Sadiq was also a training camp associated with UBL.

SECRET//NOFORN

SECRET//NOFORN



22.

23.

24.

(Ressam 302 5/29/01).

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



25. ██████████████████████████████████████

█████████████████████. Khaldan is discussed in detail *infra*.

26. ████████████████████████████. Training Camps Decl. at

8; *see also* ████████████████. ████████████████████████

████████████████████████████████████████████ Training

Camps Decl. at 2-3, 8. ████████████████████████

████████████████████████████████████████████

██████████████████████████. Khaldan never reopened.

27. ████████████████████████████████████

SECRET//NOFORN

- 10 -

SECRET/NOFORN



28. 

Zubaydah's actions after September 11 are discussed in detail *infra.*

29.     Zubaydah was captured on March 28, 2002 during a raid of a safehouse in Faisalabad, Pakistan.



30.

*see also* Training Camps Decl. at 7.

SECRET/NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

31. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Training Camps Decl. at 7. According to Ressam,

however, Zubaydah coordinated and cooperated with UBL in the conduct of training and trainee

movements between their camps. (Ressam 302 5/22/2001).[5]

### Background on Ahmed Ressam

32. On April 6, 2001, a jury convicted Ahmed Ressam on various terrorism-related

charges based on his plan to bomb the Los Angeles International Airport (LAX) at the start of the

millennium. Tr. of Ressam Re-Sentencing at 5-8, 12, *United States v. Ressam*, No. CR99-

666JCC (Dec. 3, 2008) ("Tr. of Ressam Sentencing"). Ressam has provided detailed information

about the aid he received from Zubaydah to arrive at and depart from the Khaldan training camp

(including staying at Zubaydah's Pakistan guesthouse) where he studied for his terrorist

operation. *See infra* ¶ 34.

a. Ressam was arrested in December 1999 at Port Angeles, Washington, after

arriving on a ferry from Victoria, British Columbia. *See* THE 9/11 COMMISSION REPORT 176-9;

---

[5] There are at least two examples of trainees being exchanged between the camps. First,
Ressam describes how a member of his terrorist training cell at Khaldan was sent to one of
UBL's camps while Ressam was there because he was selected for leadership training. (Ressam
302 5/24/2001). Next, when ▮▮ ▮▮▮▮▮▮'s (*see infra* ¶ 41.b.) Khaldan training was
complete, he was given an audience with UBL "because of his good progression in the training."
Tr. of FBI Special Agent ▮▮ ▮▮▮▮▮ Trial Test. at 1997, *U.S. v. Bin Laden*, No. S(7) 98 Cr.
1023 (Jan. 8, 2001). Thereafter, ▮▮ took UBL's advice and obtained advanced additional
training at al-Qaida's camps. *Id.* at 1997-98.

SECRET//NOFORN

SECRET//NOFORN

Ressam Trial Test. at 605-06. Among other things, Ressam had materials for making a bomb including explosive substances, materials for making explosives, and four sophisticated timing devices that Ressam manufactured himself in Canada. (Ressam Trial Test. at 575-76, 607, 615-17); (Ressam 302 5/10/2001); Training Camps Decl. at 6; Decl. of ▆▆ b3

*Background Declaration* – ▆▆▆ *Watch* (Sept. 19, 2008).

    b.    In June 2001, Ressam entered a cooperation agreement with the Government. (Ressam Cooperation Agmt.) Ressam provided highly detailed information to investigators and testified under oath about his training for, and participation in, Islamic extremist activity, of which his plot to bomb LAX was only a part. Ressam's criminal defense counsel was involved in his interactions with the Government throughout Ressam's cooperation.

    c.    On December 3, 2008, the United States District Court for the Western District of Washington re-sentenced Ressam to 22 years in prison and 5 years supervised release. Tr. of Ressam Sentencing at 41.[6] During the hearing, Ressam recanted all of his previous statements. *E.g.*, *id.* at 10 ("I retract all. I repeat, all of the statements that I made in the past and do not want my word counted in my trial. So sentence me to life in prison or as you wish."). Ressam had previously sent letters notifying the United States Attorney's Office that he wanted to withdraw all of his statements and notifying the district court that he wanted to withdraw statements he had made against another suspect, ▆▆ b6 ▆▆ (Letter from Ressam to ▆▆ b3

---

    [6] For the reasons explained in the transcript of Ressam's sentencing, the Government opposed a downward departure. *See* Tr. of Ressam Sentencing. The Government has filed a notice of appeal. *United States v. Ressam*, No. CR99-666JCC (Dec. 30, 2008) (dkt. No. 428).

SECRET//NOFORN

**SECRET//NOFORN**

[b3] ███████████████████████ (Letter from Ressam to Judge John C. Coughenour dated

November 23, 2006). At Ressam's December 2008 re-sentencing, Judge Coughenour stated that

Ressam had provided valuable intelligence to law enforcement that assisted in the fight against

international terrorism. Based in part on this cooperation, Judge Coughenour granted a

significant downward departure from Ressam's advisory sentencing guideline range. *See* Tr. of

Ressam Sentencing.

███████████████████████████████████████████████

33. As described by Ressam and ████████████, Zubaydah was the key

facilitator for the Khaldan training camp. *E.g.,* ███████████████; (Ressam 302

5/22/2001) (describing Zubaydah as "a facilitator"); (Ressam Trial Test. at 547); (Ressam

Deposition at 58). According to Ressam, Zubaydah was the "top guy" and was "in charge" for

moving persons who came to Pakistan/Afghanistan for training and for assisting with their

papers, money or providing safe harbor at a guesthouse. (Ressam Deposition at 58, 69); *see also*

(Ressam Trial Test. at 547); (Ressam 302 5/22/2001). Indeed, according to Ressam, Zubaydah

went so far as to employ an "artist" to do visa and passport stamp forgeries. (Ressam 302

8/3/2001). Zubaydah was also responsible for the Khaldan training camp expenses. (Ressam

Trial Test. at 547); *see also* (Ressam 302 8/3/2001); ███████████████████[7]

---

[7] Ressam gave differing statements about whether he believed that Zubaydah was the
overall leader or "emir" of either the Khaldan training camp, the Derunta training camp, or both
camps. Regardless, he consistently indicated his understanding that Zubaydah was a significant
person with respect to at least the Khaldan training camp. (Ressam Deposition at 64, 69, 101,

**SECRET//NOFORN**

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

34.     Ressam's own story of how he arrived at the Khaldan training camp from Canada and subsequently returned to Canada is but one example of the primary facilitator role played by Zubaydah.

        a.     A friend and jihadist who trained in Afghanistan arranged for Ressam to meet Zubaydah. (Ressam Trial Test. at 546); (Ressam Deposition at 32-34, 42-43, 45-47); (Ressam 302 5/16/2001); (Ressam 302 5/29/2001); (Ressam 302 11/28/2001). Ressam arrived in Karachi, Pakistan in mid-March 1998 and called Zubaydah. (Ressam Trial Test. at 546); (Ressam Deposition at 44-47); (Ressam 302 5/16/2001); (Ressam 302 5/29/2001).

        b.     Zubaydah instructed Ressam to find his way to Islamabad and to call him again from there. (Ressam 302 5/29/2001); (Ressam Deposition at 46-47). In Islamabad, Ressam stayed for one night with Zubaydah who then told Ressam to travel to Peshawar and to meet another associate, b6 ▮▮▮ (Ressam Deposition at 48-49, 57); (Ressam 302 5/29/2001). Zubaydah gave Ressam a letter of introduction to Khaldan. (Ressam Trial Test. at 547-48).

        c.     Ressam then traveled by bus to Peshawar and met with b6 ▮▮▮ who brought Ressam to Zubaydah's guesthouse. (Ressam Deposition at 49-50); (Ressam 302 5/29/2001).

        d.     Ressam stayed at the guesthouse for two to three weeks, growing his beard and preparing to enter Afghanistan. (Ressam 302 5/29/2001).

---

105, 293); *see also* (Ressam Trial Test. at 547) (Ressam called Zubaydah the "person in charge" of the camps); (Ressam 5/10/2001); ▮▮▮▮▮▮▮▮▮▮ ; (Ressam 302 5/24/2001); (Ressam 302 11/29/2001).

SECRET//NOFORN

SECRET//NOFORN

e.     Some of the others that Ressam interacted with at the guesthouse included three Saudi men who had attended either the al-Faruq or al-Sidiq al-Qaida training camps. (Ressam 302 5/29/2001); *see also* (Ressam 302 6/12/2001).

f.     Ressam left the guesthouse and was guided through the mountains and into Afghanistan by an Afghani assistant of Zubaydah's. (Ressam Trial Test. at 547-48); (Ressam Deposition at 50-51, 53-54); (Ressam 302 5/29/2001). After traveling through the mountains to Afghanistan, Ressam stayed at another guesthouse operated by Zubaydah in Jalalabad. (Ressam Deposition at 54-55); (Ressam 302 5/29/2001).

g.     Ressam arrived at the Khaldan training camp in late April 1998. (Ressam Trial Test. at 548). He stayed there for approximately 5-6 months. (Ressam Trial Test. at 548).

h.     After training at Khaldan, in about September 1998, Ressam was also trained at the Derunta terrorist training camp. (Ressam Trial Test. at 554-55) (the Derunta camp is referred to in this part of the transcript as "Toronta"); (Ressam Deposition at 101, 104); (Ressam 302 5/29/2001) (Ressam explained that he was able to train at Derunta based on a letter provided by Zubaydah authorizing Ressam to take explosives manufacturing).[8]

i.     After Ressam's training, he returned to Zubaydah so Zubaydah could facilitate Ressam's return to Canada. (Ressam Trial Test. at 557); (Ressam 302 1/17/2002).

35.     Ressam discussed his planned operation with Zubaydah in "general terms" while Ressam was in Pakistan. (Ressam 302 1/19/2002). Ressam specifically informed Zubaydah that

---

[8] Ressam has indicated that it was ▮▮▮▮ who actually sent Ressam to Derunta. (Ressam 302 5/24/2001).

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Ressam's target would be the United States, but he did not tell Zubaydah the exact target or date.[9] (Ressam 302 1/19/2002); (Ressam 302 5/22/2001). Zubaydah advised Ressam to proceed with any terrorist operation in the United States slowly and carefully. (Ressam 302 6/12/2001).

▮▮▮▮▮▮▮▮▮▮▮▮

36.     Zubaydah's key facilitator role for the Khaldan camp substantially contributed to the terrorist recruits' ability to engage in Islamic extremist activity. *E.g.*, (Ressam 302 11/19/2002) (stating that the purpose of training at Khaldan was for jihad); ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. According to Ressam, one of four options available to trainees after training was to travel to a "high profile" country, like the United States or United Kingdom, to plan a terrorist operation. (Ressam 302 6/12/2001).[10]

37.     The training, which lasted four to six months, included multi-week courses in weapons training (e.g., assault rifles, anti-tank grenade launchers), explosives training, military tactics (e.g., sabotage and assassinations), urban warfare and operation security. (Ressam Deposition at 66, 374-75); (Ressam Trial Test. at 548-52); (Ressam 302 5/29/2001); (Ressam 302 1/17/2002); (Ressam 302 6/13/2001); (Ressam 302 5/17/2001); (Ressam 302 5/10/2001); (Ressam 302 11/28/2001); ▮▮▮▮▮▮▮

---

[9] During one interview, Ressam told interviewers that he did not tell Zubaydah that his cell was planning an attack in the United States. (Ressam 302 5/29/2001).

[10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

SECRET//NOFORN

SECRET//NOFORN

38.     In addition, trainees learned by discussing past terrorist attacks (also known as

"operations") both successful and not, and why those operations succeeded or failed. (Ressam

302 5/29/2001).

39.     The tools for training – weapons – were obtained from the Taliban. (Ressam Trial

Test. at 549); (Ressam 302 5/29/2001).

40.     Khaldan had several regular instructors, but some others associated with al-Qaida

and Egyptian Islamic Jihad (EIJ) also came and addressed trainees. (Ressam Deposition at 65);

(Ressam 302 5/22/2001); (Ressam 302 5/29/2001); *see also* Decl. of ███ *Egyptian*

*Islamic Group* (Oct. 17, 2008). When instructing the recruits, the trainers indicated that viable

targets were American interests anywhere in the world, but specifically included United States

consulates, United States warships, hotels holding conferences of important individuals, barracks

of United States military personnel, commercial/economic targets, petroleum targets, and

information/technology centers. (Ressam 302 5/10/2001). At least one Khaldan instructor also

strongly encouraged suicide missions. (Ressam 302 5/29/2001).

███████████████████

41.     Numerous Khaldan trainees have fought against the United States or engaged in

acts of terrorism. For example:

        a.     ███████████████████

███████████████████

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

b.       Mohamed al-'Owahali was one of four individuals convicted of the al-Qaida bombings of the American Embassies in Kenya and Tanzania in August 1998, and sentenced to life in prison. *See In re Terrorist Bombings of U.S. Embassies in East Africa v. Odeh*, 549 F.3d 146 (2d Cir. 2008). The attacks killed approximately 200 people, including 12 American citizens, and injured some 5,000 more. 9/11 COMMISSION REPORT 70. Al-'Owahali trained at the Khaldan camp. Tr. of FBI Special Agent ███ Trial Test. at 1995-96, *U.S. v. Bin Laden*, No. S(7) 98 Cr. 1023 (Jan. 8, 2001).



c.       ███

; ███ FM40 6/7/2004); ███ FM40 6/4/2004) ███ stated that he trained at the Khalden camp ███, including training on weapons, mountain tactics, and urban warfare); ███ FM40 6/10/2004); ███ FM40 6/12/2004).

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET/NOFORN

42.     In addition, Khaldan training camp trained other Islamic extremists from

numerous and varied extremist groups and nationalities, including al-Qaida, Egyptian Islamic

Jihad (EIJ), Armed Islamic Group (GIA), Salafite Group for Preaching and Fighting (GSPC),

Hamas, and Hizballah. (Ressam 302 5/22/2001) (al-Qaida members were present at Khaldan

while Ressam was there training); (Ressam Trial Test. at 548); (Ressam 302 5/23/2001);

(Ressam 302 5/29/2001); *see also* Decl. of [b3] ████████ *Background Declaration – Algerian*

*Terrorist Groups*; Decl. of [b3] ████████ *Egyptian Islamic Group* (Oct. 17, 2008); Al-Qaida

Background Decl. at 1 (al-Qaida merged with EIJ in 2001 and GSPC in 2006).

████████████████████████████████████████████ [11]

43.     ████████████████████████████████████

████████████████████████████████████

████████████████████████.

---

[11]   Before September 11, 2001, a committee of the United Nations Security Council had
identified Zubaydah as an individual belonging to or associated with Al-Qaida. *See*
The Consolidated List established and maintained by the 1267 Committee with respect to Al-
Qaida, Usama bin Laden, and the Taliban and other individuals, groups, undertakings and entities
associated with them, *available at*
http://www.un.org/sc/committees/1267/consolist.shtml (Zubaydah, entry number QI.H.10.01,
was listed on January 25, 2001). Shortly after September 11, 2001, Zubaydah was also listed in
the Annex to Executive Order 13224, which blocked assets and prohibited transactions
with certain entities and persons who support terrorism. Exec. Order No. 13224, 66 Fed. Reg.
49,079 (Sept. 25, 2001). Zubaydah remains a Specially Designated Global Terrorist as listed on
the Treasury Department's Office of Foreign Assets Control list. See
http://www.treas.gov/offices/enforcement/ofac/sdn.

SECRET/NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## ZUBAYDAH WAS A CLOSE ASSOCIATE OF AND ACTIVELY SUPPORTED UBL

44.    Zubaydah closely associated with and actively supported UBL and al-Qaida. ███

████████████████████████████████████████████████████████████████████

███████████████████████; (Ressam 302 5/22/2001) (Zubaydah did not have to report to

anyone above him and he was an associate of UBL, equal to and not subordinate to UBL).[12]



45.    Zubaydah coordinated and cooperated with UBL in the conduct of training and

trainee movements between their camps.  (Ressam 302 5/22/2001).

---

[12] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████ UBL was in Kandahar, Afghanistan when news of
the attack on the USS COLE arrived. b2███ FM 40 6/15/2004); b2███ FM 40
6/12/2004). b1 b6
b1 b6 ████████████████████████████████████████████████████████
b2 ██████ FM 40 6/15/2004); b2███ FM 40 9/28/2004); b2██████ They
believed that the United States would retaliate because of the United States' previous reactions to
the 1998 bombings of the embassies in Kenya and Tanzania. b2███ FM 40 9/28/2004).

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET/NOFORN~~

46.     After the September 11 attacks, Zubaydah made a propaganda video that was

seized from his personal briefcase at the time of his capture.  (FM40 ████████);  ████████



47.     ████████████████████████████████████████

~~SECRET/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

48.



. [13] *See also supra* at n. 12.

---

[13] Zubaydah did not have a singular affiliation to any specific terrorist group. *See, e.g.,* (Ressam 302 5/22/2001).

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

a.



The Government provides the information in this footnote as background solely to make clear its position. Specifically, the Government does not assert for purposes of establishing Zubaydah's lawful detention in this Factual Return that Zubaydah swore *bayat* to UBL. Rather, irrespective of whether Zubaydah swore *bayat* to UBL, he was clearly "part of" and "substantially supported" al-Qaida and associated forces based on, at a minimum, the materials submitted with this Factual Return.

SECRET//NOFORN

~~SECRET//NOFORN~~

b. ███████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████ ██ is currently on the FBI's list of most wanted terrorist suspects for his role in the

1998 United States Embassy bombings. *See* www.fbi.gov/wanted/terrorists/fugitives.htm.

████████████████████████████████████████████
████████████████████████████████████████████

49. ████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

██████████

50. ████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████ *see also* (Map). ██████████████████████

~~SECRET//NOFORN~~

SECRET//NOFORN



51.

see also (Map).

52.

SECRET//NOFORN

SECRET/NOFORN



53.

b1, b2 14

a.

14 b1, b2

b1, b2

SECRET/NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

b.      Abu Mus'ab al-Zarqawi ("Zarqawi") relocated to Iraq after the Coalition

invasion of Afghanistan where he became emir of al-Qaida in Iraq. *See* Al-Qaida Background

Decl. at 2. He was killed during an American bombing mission in 2006. *See* Zarqawi killed in

air strike, *available at*

http://dr15.ahp.dr1.us.army.mil/index.php?option=com_content&task=view&id=344<emid=130.

c.      Khalid Sheikh Mohammed, commonly referred to as Mukhtar or KSM, is

a high-level al-Qaida leader currently detained at Guantanamo Bay and has been charged with,

among other things, attacking civilians, terrorism, and murder. In December 2008, he indicated

his desire to plead guilty to having had a role in planning the September 11 attacks. In a recent

filing in his military commission's case, KSM (along with four others) stated that "killing

[Americans] and fighting [Americans], destroying [Americans] and terrorizing [Americans] ...

are all considered to be great legitimate duty in our religion." (The Islamic Response To The

Government's Nine Accusations).

54.

---

[15]                                                      Training Camps Decl. at 4.

SECRET//NOFORN

SECRET//NOFORN



55.

56.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



57.

*see also* (Map).[17]

58.

59.

60.

17

b2

b2

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET/NOFORN~~



*see also* (Map).

~~SECRET/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



SECRET/NOFORN

61.



62.

Decl. of b3 *Background Declaration – Lashkar-e-Tayyiba*

(Sept. 29, 2008)

63.     On March 28, 2002, Zubaydah was captured in Faisalabad.

64.     Many of those residing at the safehouse where Zubaydah was captured had actively supported al-Qaida, the Taliban, or associated forces. For example, the following individuals were residing at the safehouse:

SECRET/NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



a. ████ **b6** ████████████████████ is ████████

and admits that he is a terrorist and has vowed that if he is ever released from Guantanamo he

would immediately return to Afghanistan to fight the United States. (███ 302 8/6/2002); (███

302 9/11/2002); ████████████████████████ **b6** ████ is currently

detained at Guantanamo, and has a pending habeas petition. **b6** ██████ v. *Obama*, Civil Action

No. ████ (D.D.C.).

i. **b1 b6** ████████████████████████

**b1 b6** ████████████████████████████ (███ 302

8/6/2002); (███ 302 9/11/2002); **b2** ████████ **b1 b6** ████████████

**b1 b6** ████████████████████████████

**b1 b6** ████████████ (███ 302 8/6/2002); (███ 302 9/11/2002); (███ 302

12/12/2002); **b2** ████████████ After completing his training, he

went to the front to fight the Northern Alliance. (███ 302 9/15/2002); (███ 302 12/12/2002). **b1**

**b1** ████████ (███ 302 12/12/2002); **b2** ████████████

ii. Subsequently, **b6** ██████ stayed at a madrassa in Barmel,

Afghanistan, where he met with Abd al-Hadi al-Iraqi and Zubaydah. ████████████

████████████████████████ in Afghanistan, where the recruits would

train others on how to build improvised explosive devices (IEDs) for attacks on Coalition forces.

████████████████ **b6** ████████████

**b6** ████████████ ████████████████

████████████ ████████ **b2** FM40 7/27/2004); **b2** FM40

SECRET//NOFORN

7/28/2004);  ☒ b2   FM40 ☒ b2



SECRET//NOFORN

SECRET//NOFORN



iii. ████████████████████████████████

████████████████████████████████████

b1 ██████████████████████████████ b2 ███████

b2 ██████ b2 ███ FM 40 Sept. 10, 2003); ████████████ b2 ████████

b2 ████████ b2 ████████████████████ ████████████

██████████████████████ b1 b6 ████████████████

b1 b6 ██████████████████████████████████

b1 b6 ████████████████████████████████ b2 ██████

b2 ██████ b2 ███ FM 40 Sept. 10, 2003); ████████ b2 ████████ Hadi al-

Iraqi ████████████████████████████████████

████████ and he helped fund operations against Coalition forces. b2 ███ FM 40 Sept. 10,

2003); ████████████████████████ Hadi al-Iraqi is

currently detained at Guantanamo.

b. b1 b6 ████████████████████████████████

b1 b6 ██████ b2 ███ ████████ b2 ████████████ b6 ███ is

currently detained at Guantanamo, and has a pending habeas petition. b6 ████ *v. Obama*, Civil

Action No. ████████ (D.D.C.).

i. b1 b6 ██████████████████████████

b1 b6 ████████████████████████████████████

b1 b6 ██████████ ████████████████████████

( b2 ███ ARB Testimony (January 2008)). b1 ████████████████████

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET/NOFORN~~



ARB Testimony (January 2008)).

ii.

b2 [redacted] [20] [redacted], b2 [redacted] FM40 7/27/2004); (b2 [redacted] FM40 7/28/2004); [redacted]

c.

[redacted] b6 [redacted] is currently detained at Guantanamo. His habeas petition was dismissed on March 16, 2009 at his request. b6 [redacted] *v. Obama*, Civil Action No. [redacted] (D.D.C.).

---

[20] [redacted] has denied having experience with, or being an expert in, explosives. ( [redacted] ARB Testimony (January 2008)).

~~SECRET/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



i. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ [21]

ii.  During his detention, ▮▮ b6 has unequivocally proclaimed that he has taken up arms against, and is an enemy of, the United States. (April 27, 2006 Tr. Of Military Commissions Hearing); (March 6, 2009 Tr. Of Hearing Before Judge Sullivan).

d.  b1 b6 ▮▮▮▮▮

b1 b6 ▮▮▮▮▮ [22] ▮▮▮▮▮

b2 ▮▮▮▮▮

▮▮ b6 ▮▮ is currently detained at Guantanamo, and has a pending habeas petition.

b6 ▮▮ *v. Obama*, Civil Action No. ▮▮▮ (D.D.C.).

i.  b1 b6 ▮▮▮▮▮

b1 b6 ▮▮▮▮▮

b1 b6 ▮▮▮▮▮ b2 ▮▮▮▮▮

---

[21] b6 ▮▮▮▮▮
b1 b6 ▮▮▮▮▮

b2 ▮▮▮▮▮

[22] b1 ▮▮▮▮▮ b2

b2 ▮▮  During his CSRT, he stated that Zubaydah was the "second man in charge" of the Khaldan camp. (ISN b2 ▮ CSRT Stmt.).

SECRET//NOFORN

~~SECRET/NOFORN~~



ii.

iii.

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET/NOFORN~~



65.

66.

~~SECRET/NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

67.

UNCLASSIFIED//FOR PUBLIC RELEASE



SECRET//NOFORN

68.



69.

70.     Zubaydah long plotted to attack the United States. For example, before Ressam

departed Pakistan for Canada, in the winter of 1998-1999, Zubaydah told Ressam that he wanted

Ressam to acquire at least five genuine Canadian passports and send them to Zubaydah. (Ressam

27

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Trial Test. at 557); (Ressam 302 1/19/2002); (Ressam 302 10/18/2001); (Ressam 302 8/6/2001);

(Ressam 302 5/29/2001). Zubaydah wanted the passports for himself and a team of his

assistants. (Ressam 302 1/19/2002); (Ressam 302 5/29/2001). He explained that he wanted the

passports to enable his team to come to the United States and conduct a terrorist operation,

"possibly several bombings in several cities." (Ressam 302 5/29/2001); *see also* (Ressam 302

10/18/2001); (Ressam 302 9/12/2001); (Ressam 302 8/6/2001). Every month or two, Ressam

would use pay phones in Montreal or Vancouver to telephone Zubaydah from Canada to see how

Zubaydah was doing and discuss the passports. In telephone conversations, Ressam referred to

passports as "books" or "precious things." (Ressam 302 1/19/2002); (Ressam 302 6/13/2001).

Ressam, however, was never able to acquire the requested Canadian passports and thus never

provided passports to Zubaydah. (Ressam Trial Test at 558); (Ressam 302 1/19/2002).

71.     Ressam stated that Zubaydah's "idea" was to conduct "simultaneous terrorist

attacks on U.S. soil and then wait for a period of time (approximately three to four months) when

law enforcement would become complacent, then strike again," and to use "multiple cells

operating independently ... that could execute ten (10) operations simultaneously or in sequence

that would produce a big impact on the United States." (Ressam 302 10/18/2001 at 5); (Ressam

302 9/12/2001). Zubaydah told Ressam that, even if this operation took a year or more to

arrange, it should be carried out. (Ressam 302 5/29/2001). Zubaydah made clear to Ressam that

targets on United States soil were "of more value than American targets overseas." (Ressam 302

10/18/2001). And Zubaydah further stated that the objective of the operation would be to

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

influence the United States Government policy to release The Blind Sheikh. (Ressam 302 5/29/2001).

72. 

73.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



## CONCLUSION

For reasons described above and in the attached exhibits, the petitioner is lawfully detained by the United States.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE