SECRET/NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZAYN HUSAYN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v.                               ) | Civil Action No. 08-1360 (RWR) |
| ) | |
| ROBERT GATES, ) | |
| ) | |
| Respondent. ) | |
| ) | |

# Transcript of Ressam Re-Sentencing, *United States v. Ressam*, No. CR99-666JCC (Dec. 3, 2008)

SECRET/NOFORN

1

2

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
IN SEATTLE

UNITED STATES OF AMERICA,             )
                                      )   NO. CR99-666JCC
                          Plaintiff,  )
                                      )
              vs.                     )
                                      )
AHMED RESSAM,                         )
                                      )
                          Defendant.  )
                                      )

4

5

6

7

8

9

10                          SENTENCING

11

12

13          BEFORE THE HONORABLE JOHN C. COUGHENOUR

14

15                       December 3, 2008

16

17   APPEARANCES:

18   Jeffrey C. Sullivan
     United States Attorney

19   Mark N. Bartlett
          and
20   Helen J. Brunner
     Assistant United States Attorneys
21   Representing the Plaintiff

22   Thomas W. Hilier
     Attorney at Law
23   Representing the Defendant

24   Also present:

25   Interpreter:  Komal Abou-Zaki

1    THE CLERK: Case number CR99-666 United States versus

2  Ressam. Counsel please make your appearances.

3    MR. BARTLETT: Good morning, your Honor, Mark Bartlett

4  on behalf of the United States. Seated at counsel table also is

5  our appellate supervisor Vicki Brunner and the US Attorney Jeff

6  Sullivan.

7    THE COURT: Mr. Bartlett.

8    MR. HILIER: Good morning, your Honor. Tom Hilier with

9  and on behalf of Mr. Ressam. Your Honor, Mr. Ressam has

10  requested and been granted leave to represent himself at this

11  sentencing hearing. I will, with the Court's permission, put on

12  the record some preliminary matters related to having reviewed

13  materials relative to the sentencing.

14    THE COURT: All right. Why don't you go ahead and do

15  that?

16    MR. HILIER: Thank you. If it please the Court and

17  counsel. Your Honor, Mr. Ressam, in anticipation of sentencing

18  this morning, has had the opportunity to review the government's

19  sentencing memorandum, which was reviewed with him with an

20  interpreter this week at the SeaTac Federal Detention Center.

21    In addition, this morning Mr. Ressam and I had the

22  opportunity to review a letter which was provided to the Court

23  from a Mr. Gordon Haberman.

24    And, finally, your Honor, Mr. Ressam and I discussed an

25  updated review of the presentence report, which hasn't really

1    been updated, is my understanding, but is rather the same report

2    that we prepared back in 2005.  Mr. Ressam is aware of that.

3        I did request of the Probation Office that the report include

4    an update concerning conditions of confinement.  I think that is

5    important information.  I would ask that the Court ask Probation

6    to ultimately do that.  Mr. Ressam is currently confined at

7    Florence in super max in solitary confinement and, of course, the

8    conditions of that sort of confinement are relevant, as set forth

9    in our original sentencing memoranda.

10       In that regard, your Honor, we renew the objections to the

11   guideline calculations as presented in our original sentencing

12   memoranda and supplemental memoranda back in 2005.

13       THE COURT:  I will direct the probation office to do an

14   update regarding the conditions of confinement.

15       Mr. Bartlett, do I understand correctly the government

16   concurs with the guideline calculations that are contained in the

17   presentence report?

18       MR. BARTLETT:  That is correct, your Honor.

19       THE COURT:  Okay.  In the time since Mr. Ressam's

20   July 27th, 2005 sentencing, the Ninth Circuit issued an opinion

21   in *United States versus Carty*, which for the first time required,

22   among other things, that the district judge begin sentencing

23   proceedings by determining the applicable Guidelines range.

24   Because I did not do so at Mr. Ressam's original sentencing,

25   because I had assumed that everybody was reading from the same

1   page at that time, the Ninth Circuit has remanded for

2   resentencing.  Therefore, in accordance with *Carty*, I find and

3   rule as follows:

4       18 USC Section 3553 provides me with the overarching

5   statutory charge to impose a sentence sufficient but not greater

6   than necessary to reflect the seriousness of the offense, promote

7   respect for the law and provide just punishment; to afford

8   adequate deterrence; to protect the public; and to provide the

9   defendant with needed educational or vocational training, medical

10  care or other correctional treatment.

11      I will begin the process of arriving at a sentence that fits

12  such a description by determining the applicable Guidelines

13  range, and then of course I will give the parties an opportunity

14  to argue regarding the appropriate sentence.  The Guidelines are

15  the starting point and the initial benchmark and are to be kept

16  in mind throughout the sentencing process.  After I calculate

17  this Guidelines range, the parties will be given a chance to

18  argue for a sentence they believe is appropriate.

19      The November 2000 edition of the United States Sentencing

20  Commission Guidelines Manual has been used in this case to avoid

21  violation of the ex post facto clause of the United States

22  Constitution.  The government questions whether the 2008

23  Guidelines Manual could be used because the sentencing Guidelines

24  are no longer mandatory after *United States versus Booker*.

25  Regardless, the government does not argue strenuously for

1   application of the 2008 Guidelines, recognizing that although the
2   new Guidelines would result in a higher total offense level by
3   one point, they would not result in a different advisory
4   Guidelines range.  Accordingly, the Court will follow the
5   Guidelines calculation set forth in the 2005 presentence report,
6   which was based on the 2000 Sentencing Guidelines Manual and was
7   prepared in consultation with the Sentencing Commission.

8        Mr. Ressam was convicted of nine counts.  Count 1 charged
9   Defendant with Committing an Act of Terrorism Transcending a
10  National Boundary, in violation of 18 USC Section 2332b(a)(1)(B).
11  This crime is not listed in the statutory index of the Guidelines
12  Manual.  Therefore, Guidelines Section 1B1.2 directs the Court to
13  use the most analogous guideline.  The Court finds that
14  Section 2K1.4, which covers offenses involving property damage by
15  use of explosives, is the most analogous guideline for this
16  count.  Because the offense created a substantial risk of death
17  or serious bodily injury to any person other than the participant
18  in the offense, and that risk was created knowingly, the base
19  level of the offense is 24.

20       Under Section 3A1.4(a), since the offense is a felony that
21  involves a federal crime of terrorism, there is a 12-level
22  increase, for a total adjusted offense increase of 36.  In
23  addition, Defendant's criminal history category is Category IV.
24  Therefore, the applicable sentencing guideline range for Count 1
25  would be 324 to 405 months.  However, the statutory maximum for

1   this crime is 25 years, and therefore the guideline range for

2   Count 1 is 300 months.  Any sentence imposed for this crime must

3   run consecutively with any other term of imprisonment.

4        Counts 2, 6, 7 and 8 are grouped because they involve the

5   same victim and two or more acts connected by a common scheme or

6   plan.  I will refer to these counts collectively as Group 1.

7   Under Section 3D1.3 the offense level applicable to Group 1 is

8   the highest offense level of the counts in Group 1.  Count 6,

9   Smuggling, has the highest offense level.  The guideline

10  applicable to this offense contains a cross-reference that states

11  that if the offense involves a contraband item covered by another

12  guideline, I should apply that guideline if the resulting offense

13  level is greater than that determined under Section 2T3.1.  Thus,

14  turning to Section 2K2.1, which applies to the unlawful

15  transportation of firearms, the base offense level for Group 1 is

16  20 since the offense involved a firearm as described in

17  Section 26 USC 5845(a), which includes destructive devices, and

18  the defendant is a prohibited person.  In addition, there is a

19  one level increase because the offense involved four firearms or

20  destructive devices.  There is also a two-point upward adjustment

21  because the offense involved a destructive device.  Further,

22  evidence indicates that Defendant knew the devices would be used

23  in connection with another felony offense, warranting a

24  four-level upward adjustment under Section 2K2.1(b)(5).  Finally,

25  there is one victim-related adjustment applicable to Count 6, a

1  12-point upward adjustment pursuant to Section 3A1.4(a) for

2  committing a felony that involved or was intended to promote a

3  federal crime of terrorism.  These enhancements result in an

4  adjusted total offense level of 39 for Group 1.

5       Counts 3, 4 and 5 are grouped pursuant to Section 3D1.2(b)

6  because they involve the same victim and two or more acts

7  connected by a common scheme or plan.  I will refer to these

8  counts collectively as Group 2.  Under Section 3D1.3(a) the

9  offense level applicable to Group 2 is the highest offense level

10  of the counts in Group 2.  Count 3, Possessing False

11  Identification Documents, results in the highest guideline range,

12  because the guideline applicable to this offense contains a

13  cross-reference to Section 2X1.1.  The cross-reference is

14  applicable if the defendant used a passport in the commission of

15  a felony offense, other than an offense involving violation of

16  the immigration laws, and if it results in a higher offense

17  level.  In this case the defendant used a fraudulent Canadian

18  passport to enter the United States to commit an act of

19  terrorism.  Therefore, I am instructed to use the sentencing

20  guideline for attempt, solicitation or conspiracy with respect to

21  the felony offense described in Count 1.  Accordingly, the base

22  offense level is 24, plus a 12-point adjustment pursuant to

23  Section 3A1.4(a) for committing a felony that involved or was

24  intended to promote a federal crime of terrorism.  Accordingly,

25  the adjusted offense level for Group 2 is 36.

1       Section 3D1.4 provides that groups one and two are each

2  assigned one unit, resulting in a two-level increase to the group

3  with the highest offense level. This yields an adjusted offense

4  level of 41 for Counts 2 through 8. Under Section 3A1.4(b), a

5  defendant's criminal history category shall be VI for offenses

6  intended to promote a federal crime of terrorism. Therefore, the

7  applicable sentencing guideline range for Counts 2 through 8 is a

8  sentence of 360 months to life.

9       Count 9, Carrying an Explosive Device During the Commission

10  of a Felony, in violation of 18 USC Section 844(h)(2) requires

11  the Court to impose a ten-year mandatory sentence of imprisonment

12  to run consecutively to all other charges.

13      In sum, based on a total offense level of 41 and a criminal

14  history category of VI, the guideline range of imprisonment on

15  Counts 2 through 8 is 360 months to life. The term of

16  imprisonment imposed on Count 1 is to run consecutively to the

17  term of imprisonment imposed on Counts 2 through 8. The

18  guideline range on Count 1, based on the total offense level of

19  36, and a criminal history category of VI, is 324 months to 405

20  months. However, since the maximum sentence the Court may impose

21  on Count 1 is 25 years, the guideline sentence is 300 months.

22  Therefore, the combined guideline range for Counts 1 through 8 is

23  660 months to life. Finally, the sentence on Count 9 requires a

24  ten-year mandatory consecutive sentence.

25      Having determined the applicable Guidelines range let me now

1    hear from the Defendant or, if applicable, Mr. Hilier regarding

2    the sentence he believes is appropriate.

3        Mr. Ressam, do you wish to be heard, sir?

4            THE DEFENDANT:  Yes.

5            MR. HILIER:  Mr. Ressam would like to be heard.

6            THE COURT:  Please step up to the lectern.

7            MR. HILIER:  Approach the podium, your Honor?

8            THE DEFENDANT:  Thank you for giving me the opportunity

9    to present myself.  I suffered severe shock after the trial and I

10   lost my mental faculty and I did not know what I was saying.  The

11   government attorney and the investigator, they know about my

12   mental condition that I was going through, and about my mental

13   faculty and the procedure exposed to their own interests.  They

14   interpret some of my statements to suit their interests.  And the

15   statement that was put in my mouth, which I said yes, because --

16   due to the extreme mental exhaustion I was going through.  I also

17   am subject of pressures put upon me by the attorneys and the

18   investigators.

19       The evidence presented in court should be obtained from a

20   solid source that cannot be doubted.  But if the evidence and the

21   statements are obtained from dubious sources or under pressure or

22   a threat or from a mental incompetent source it should not be

23   admitted.  And that is the situation I was in.

24       I sent in the past a letter to the government attorney Joe

25   Bianco, in which I retrieved all my statements that I gave in the

1    investigation in the past; all those I gave during the testimony

2    of Makhtar Haouari in the New York court because I neither

3    proceed my mental faculties (sic) or I know what I was saying.

4        The New York judge was suspicion of my letter, and he thought

5    that I was doing that because -- and I did not because in

6    order --   He thought that I was doing that because I had nothing

7    to lose and because I was already tired.   I did not do that in

8    order to win or to lose.   First, I did that because I was not

9    mentally competent and I did not know what I was saying.   Second,

10   I did that because -- in the presence of that judge.   I retract

11   all.   I repeat, all of the statements that I made in the past and

12   do not want my word counted in my trial.   So sentence me to life

13   in prison or as you wish.   I have no objection to your

14   sentencing.

15       I want from you and from the New York justice to take another

16   look as to Mokhtar Haouari case.   Sentencing should set when the

17   evidence at the hand is absolute, and look if the evidence is in

18   doubt it would be preferable to rescind the decision.   I go to

19   different subject.

20       I will move to the case about Abu Doha and Samir Mohamed.

21   Previously the government attorney called me, Bruce, about to

22   testify in the case of Abu Doha and Samir Mohamed in front of a

23   jury in New York.   At the beginning I refused, and then I accept

24   because I could not find an alternative to that.   And also in

25   order to appear at the earliest possible time in the court for my

1   sentencing.

2      The later reason will affect the case of Abu Doha and Samir

3   Mohammed and cause their cases to be dismissed in America.

4      When I appeared in front of the jury in New York I retrieved

5   almost all the statements that I made in the past as to Abu Doha

6   and Samir Mohamed.  I indicate in my earlier statement because I

7   did not know what I was saying.

8      Later on the government attorney, attorney Bruce, in a

9   session attended by two of the FBI investigators, and the lawyer

10  Tom Hilier, and the lawyer Michael Filipovic and interpreter

11  Walid (phonetic) told me that I was lying.  Since that attorney,

12  attorney Bruce, believed that I was lying he should have charged

13  me with perjury because the American law dictate that.  Or would

14  that not serve your interest?  And you are behaving according to

15  your interest and not according to the law.  The attorney Bruce

16  believes that I lie so how can he take my statement and present

17  it in the courts?  Isn't that a crime?  And then to be a

18  criminal?

19      I have retrieved all the past statements that I made in the

20  jury about Abu Doha and Samir Mohamed in front of the jury

21  presence.  So why the government attorney and other holding on my

22  initial statement?  Is it to lie to the people or gain publicity

23  based on lies?

24      I restate my words finally, I retrieve all the statements

25  that I made previously to the investigator, so do not count on

1    them because they were wrong.

2        I do not want to say a single word about my trial.  Sentence

3    me to life in prison or anything you wish.  I will have no

4    objection to your sentence.  Thank you.

5             THE COURT:  Mr. Bartlett.

6             MR. BARTLETT:  May it please the Court, Mr. Hilier,

7    Mr. Sullivan, Ms. Brunner.  On April 6th, 2001, this defendant

8    was convicted following a jury trial of some of the most serious

9    crimes a person can commit within the United States.  Count 1

10   convicted him of Conspiring to Commit an Act of Terrorism

11   Transcending National Boundaries.  The eight other convictions

12   involved explosive and false document related crimes.

13       The defendant did not just commit a technical violation of

14   the law or show a momentary lapse in judgment.  Instead, the

15   defendant chose to undertake a series of carefully calculated

16   actions over a period of several years that he hoped would

17   culminate in the senseless murder of countless innocent men,

18   women and children in the Los Angeles International Airport on

19   the eve of the millennium.

20       The defendant hoped to not only kill as many people as he

21   could, but he also hoped that his senseless act of violence would

22   strike terror into our country, that it would disrupt the

23   transportation system in our major urban area and in fact cripple

24   our ability to govern.

25       As this Court wrestles with trying to determine what is the

1    appropriate sentence for this defendant, I would ask you to keep

2    one image in your mind.  During the trial of this defendant, and

3    actually during the April 2005 initial sentencing hearing, the

4    Court and the public had a chance to see a very short video,

5    23 seconds long.  That video depicted a car sitting in the middle

6    of an empty field.  Seven seconds into that video that car is

7    shredded; it is ripped apart.  That showed part of the bomb

8    material this defendant was bringing.  As the Court watched, the

9    car was strewn across that field.

10    What many forget is that video doesn't depict the bomb he was

11    actually planning on putting into LAX on the millennium.  The

12    actual bomb he was actually planning on putting into LAX was 40

13    times greater than that depicted in the video.

14    So as we sit here today, I would ask the Court to think about

15    the number of people that would have been killed, the

16    destruction, the carnage, the disruption that would have been

17    inflicted upon totally innocent people had this defendant's

18    dogged efforts come to fruition, then determine what is the

19    appropriate sentence for a person who dedicated much of his adult

20    life to making sure that nightmare became a reality.

21    The Court has very carefully gone through the sentencing

22    guideline calculations, and I agree totally with all of the

23    Court's assessment.  The bottom line, of course, even after

24    Booker, is that we are all going to look at the Guidelines.  And

25    in this case the low end, the minimal sentence recommended by the

1    Guidelines, is 65 years in jail, with the upper end being life.

2        What that tells the Court is this is the most serious crime

3    virtually anyone can face in the United States.

4        Before discussing the sentencing factors in 3553 I want to

5    take just a brief moment to address one issue.  The defense

6    argued on several occasions during the initial sentencing hearing

7    that this Court should start its analysis of what is the

8    appropriate sentence for this defendant at 25 years, because that

9    is an offer that Jerry Diskin conveyed prior to trial.

10       I strenuously object to that argument on two different

11   grounds.  First of all, just legally it is improper.  It inserts

12   the Court into the delicate process of plea negotiations, and

13   that is an area where no court wants to involve itself.  But more

14   fundamentally, factually it is just simply inaccurate.  That

15   25-year offer was not an appropriate sentence in the view of

16   anyone on the government's team.

17       Instead, as in with most pretrial offers, it is a

18   substantially discounted offer taking into account the risk of

19   litigation.  And in this case, as this Court knows more than

20   anyone, there were very substantial risks in litigation.

21       The government's evidence with regard to Count 1, the most

22   serious charge and the one that carried the most weight prior to

23   trial, was very thin.  And in fact during the trial some of the

24   most important evidence was developed.  That's what that 25-year

25   offer meant.

```
 1              THE COURT:  I have a hard time accepting that,
 2   Mr. Bartlett.  I mean, he was found with four timing devices --
 3   Let me finish.  You just had to look at them.  They were like
 4   something out of a TV show.  His fingerprints were all over them.
 5   He had two quarts of the equivalent of nitroglycerin in the trunk
 6   of his car, he had 100 pounds of fertilizer in the trunk of his
 7   car.  When the customs agent held the jar up and turned it over,
 8   he dove under the car, apparently in fear that it was going to
 9   ignite.  Then when they pulled him out he shrugged his coat off
10   and ran.
11              MR. BARTLETT:  There is no question.  Perhaps I was
12   inarticulate, your Honor.  There is no question the government
13   had very substantial confidence in gaining convictions in this
14   case.  What I was trying to emphasize to the Court was the most
15   serious charge in this case was the Conspiracy to Commit an
16   International Act of Terrorism Transcending National Boundaries.
17   With regard to our evidence on that count, we were incredibly
18   thin.  And, in fact, as the rulings from this Court --
19              THE COURT:  I still have a hard time understanding that.
20   He crossed the border using a phony passport, carrying 100 plus
21   pounds of explosives.  Why was it so thin?
22              MR. BARTLETT:  With regard to proving what was his
23   intent with regard to those things.  First of all, proving that
24   he in fact knew what was in the car and that he was planning to
25   do something with those as opposed to, as this Court sees
```

1    routinely, being a courier on behalf of someone else.

2         THE COURT:  Why would he have dove under the car when

3    the customs agent turned the one quart thing of nitroglycerin

4    upside down?

5         MR. BARTLETT:  The Court is free to make its own

6    assessment with regard to what the evidence is.  I can tell you I

7    have specifically spoken with the trial team.  I have talked with

8    them on how in their view the case was going.  We did not get in

9    the evidence with regard to Judge Bruguiere.

10        One of the most critical pieces of evidence, the actual

11   fingerprints of the defendant on the book we recovered from his

12   apartment wasn't even uncovered until midway through the trial.

13        I understand the Court's assessment and I understand --

14        THE COURT:  His fingerprints were all over the timing

15   devices.

16        MR. BARTLETT:  But regarding the proof of what was going

17   on with regard to what he was going to do with those.

18        THE COURT:  All right.

19        MR. BARTLETT:  The Court has gone through the Sentencing

20   Guideline calculations.  As I said, I accept and agree with them.

21   That is not the total end of the Guidelines calculations,

22   however, because in this case, as the Court is very well aware,

23   there was a 5K motion filed with regard to this defendant.  That

24   was based on his assistance with regard to the Haouari trial in

25   the Southern District of New York in 2001.  He also provided

1   valuable information with regard to the actual bomb device that

2   Richard Reid had in his shoe, that was important to analyze the

3   bomb and also in protecting people. · And he also provided

4   information that, as Special Agent Humphries explained last time,

5   was provided throughout the government.  Most of that -- in fact

6   the huge majority of that information was not new information to

7   the intelligence side.  But his testimony and his initial

8   cooperation allowed the intelligence information to be thrown

9   over and provided to law enforcement.  And that was important.

10          THE COURT:  Well, his testimony also was critical to the

11   conviction of Mr. Haouari.

12          MR. BARTLETT:  That's right.  Absolutely.  He was one of

13   the two cooperating defendants, along with Mr. Meskini, his

14   testimony.

15      Clearly, given the defendant's statement today, we will

16   provide a record of his statement to the Southern District of

17   New York and also Mr. Haouari's defense counsel, and they can

18   make with it what they want.

19      A defendant's cooperation, however, is not a snapshot at any

20   given point in time.  The defendant's cooperation is viewed as a

21   movie that covers everything.

22          THE COURT:  The 5K is not a moving target, though.

23          MR. BARTLETT:  It is, your Honor.  As the Court sits

24   here it isn't trying to decide whether there should be a 5K ·

25   motion.

```
 1              THE COURT:  That is already done.

 2              MR. BARTLETT:  Instead the Court has to weigh what is

 3    the value of that cooperation.  And in assessing that I would ask

 4    the Court to consider a number of factors.  The first is the

 5    timing of the defendant's cooperation.  This defendant, unlike

 6    most defendants, did not choose to cooperate prior to trial.

 7    Instead he waited until after trial, 18 months after he was

 8    arrested, months before 9-11.

 9         Last night I had the privilege of meeting Gordon Haberman.

10    Mr. Haberman is seated in the front row here.

11              THE COURT:  Let me interrupt, Mr. Bartlett.

12    Mr. Haberman, I have read your statement, and it will be made

13    part of the record.

14              MR. HABERMAN:  Thank you, your Honor.

15              MR. BARTLETT:  Mr. Haberman's daughter was killed in the

16    collapse of the World Trade Center on 9-11.  He told me he wanted

17    to be here for sentencing.  In fact, he said he would pay his own

18    way up to attend here, it meant so much to him.

19         His daughter had gotten engaged in September of 2001.  She

20    didn't live in New York.  She was actually back there on a

21    one-week training exercise at the World Trade Center.  Tragically

22    and ironically, it really wasn't even her week that she was

23    supposed to be back there.  She had traded with a friend who

24    wanted a different week.  And she lost her life.

25         Last night as we were talking to Mr. Haberman he told me --
```

1    he said he can't help thinking what if this defendant had chosen

2    to cooperate immediately after 9-11, after he was arrested in

3    December 1999.  What if he had provided all of the information

4    immediately, information that would have and could have led to

5    the arrest of Abu Doha, Zabeda, maybe 9-11 wouldn't have

6    happened.  Can anyone answer that?  No.  In assessing how

7    valuable was this defendant's cooperation, the Court should take

8    into consideration the timing of it.

9        In assessing the cooperation, the Court also, clearly,

10   especially given the defendant's statement today, must look at

11   what happened subsequently.  The first big change, of course, was

12   after initially providing information about Abu Doha, that has

13   been withdrawn.

14       As this Court well knows, the defendant's original

15   debriefings provided critical information about Abu Doha, who is

16   without question one of Europe's highest ranking terrorists, with

17   direct links to Osama Bin Laden.  He is a person who recruited

18   and funneled scores of extremists, terrorists into the al Qaeda

19   training camps in Afghanistan.  He was not only a central figure

20   in this conspiracy, Mr. Ressam's conspiracy, but he was an

21   integral part in the aborted attack to bomb Christmas Market in

22   Strasbourg, France in 2000.  In March of 2002, the defense

23   themselves described Doha as, quote, a major player in the arena

24   of terrorist activity.

25       Before the defendant's sentencing in 2005, we told the Court,

1   if Mr. Ressam does not cooperate we will have to dismiss our

2   charges.  At that point the defense told the Court that they

3   thought that was, quote, unbelievable, and assured the Court even

4   if we did dismiss -- even if the Southern District of New York

5   had to dismiss their charges, other countries were lined up to

6   charge Doha and he would never see the light of day.  Now the

7   Court knows the facts.

8       Within weeks of Ressam's July 2005 sentencing, based on his

9   steadfast refusal to fulfill his promise to continue to

10  cooperate, the United States was forced to dismiss our charges

11  against Abu Doha and withdraw our extradition requests to

12  Great Britain.

13      Currently Doha is not indicted in any other country.

14  Ironically, Great Britain actually had criminal charges against

15  him which they dismissed when the Southern District charges were

16  filed, and they were unable to refile them.  He has been released

17  from custody.  Mr. Doha is living in England, fighting

18  extradition to Algeria.

19      The second significant change that has occurred since the

20  last sentencing is Samir Mohamed.  Mohamed was a Canadian

21  co-conspirator of Ressam, who was arrested at our request and

22  held in Canada for years as he fought extradition back to the

23  Southern District of New York.  Mohamed had provided critical

24  assistance in Ressam's millennium bombing plot.  As Robin Baker's

25  letter made clear to the Court, in addition to helping Ressam's

1  plot Mohammed himself had discussed committing his own terrorist

2  acts in Canada, involving a bombing and an attack on a Jewish

3  neighborhood in Montreal.

4     One month after this defendant's July sentencing in 2005 the

5  Southern District was forced to dismiss its charges and withdraw

6  its extradition request to Canada.  Mr. Mohamed was released from

7  custody.

8     I want to emphasize to the Court it is not only that the

9  United States was forced to dismiss charges that should have been

10 brought against known, confirmed terrorists, and have them held

11 accountable for their charges, that is problematic but, in

12 addition, our government was put in a horrible situation.  We had

13 gone to two of our closest allies, Great Britain and Canada, and

14 said, on our behalf arrest these people, on our behalf detain

15 these people, keep them in custody, and we promise we will bring

16 them back to the United States, we will try them, and they will

17 be held accountable.  And then we have to go back to them and

18 say, sorry, we cannot fulfill our word.  We are dismissing our

19 charges.  It puts us in a horrible situation.

20    As this Court can really appreciate, it just doesn't put the

21 country in a horrible position, it puts the court system in those

22 countries in a horrible position.  A judge just like yourself in

23 Canada and Great Britain had to take on these high profile cases,

24 had to make the difficult decisions to detain these defendants,

25 Doha and Mohamed, for years based on our word, only to suddenly

1    find that rug pulled out from under them and the charges

2    dismissed.

3        The defendant in his statements to the Court has tried to

4    retract all of his prior statements.  I am absolutely not going

5    to get into a factual argument with this defendant and with the

6    Court about what he might or might not have said.  All I would

7    ask the Court to do is look back, look back on the sentencing

8    memorandums - not filed by the government - look back at the

9    sentencing memorandums filed by this defendant in his original

10   sentencing memo.  And uniquely at that point in time the defense

11   chose to provide to this Court their notes - not our notes -

12   their notes of what this defendant had said in summary form about

13   these individuals, about Abu Doha, about Samir Mohamed.  And you

14   can look at their own notes as to what he really said.

15       There have been attempts by the defense to explain the

16   defendant's continued failure to cooperate against Doha and

17   Mohamed as being a mental breakdown; his heart is in the right

18   place, but he is incapable of doing that.  I think we have his

19   own statement today that proves unequivocally that is not the

20   case.

21       Even before today's statement the Court knew that wasn't

22   true, because in November of 2006 this defendant wrote a letter

23   to the Court.  The letter helped to set free his fellow

24   terrorists, Hassan Zemiri.  The Court of course was familiar with

25   the name Hassan Zemiri, because actually he had been brought up

1  several times, first at the defendant's sentencing memorandum,

2  the defense reply memorandum and the cross-examination of Special

3  Agent Humphries, as a good thing, that this defendant had

4  provided critical information against Hassan Zemiri, who

5  currently is being held as an enemy combatant in Guantanamo Bay,

6  and as a result of that he was being detained, and that was a

7  good thing, and he should get credit for that.

8      The defense conceded he was a dangerous terrorist.  They had

9  to because he provided, of course, critical funds to the

10  defendant to help him pick out the plan to bomb LAX.  He provided

11  other material.  Most interestingly, in May of 2001, as soon as

12  Hassan Zemiri heard this defendant had chosen to cooperate, what

13  did he do?  He fled to the Tora Bora region of Afghanistan, where

14  he was eventually arrested fighting on behalf of the Taliban.

15      There has been no problem with this defendant's memory.  If

16  he wanted to he could continue to help us in critical ways.

17  Instead he has had a change of heart.  He wrote a detailed letter

18  to this Court.  He provided a detailed statement to this Court

19  right now.  And what is he saying?  I have a great memory; it is

20  a little bad right after a bad trial because it was so traumatic,

21  but I now have a great memory and I am telling you all of those

22  things I originally said are wrong and I am withdrawing them.

23  His memory, he claims, is perfect.  It just isn't going to be

24  used to help hold terrorists accountable for their actions.

25  Instead, now he is trying to use his position as a, quote,

1  government cooperator to try to free as many terrorists as he

2  can.

3      He hasn't even stopped with his friend Hassan Zemiri.   In

4  addition, he has also provided aid to Adil Charkaoui, another

5  person he described in detail during his debriefing; a person who

6  had been at the training camps when he arrived in 1998; a person

7  that he knew attempted to acquire illegal weapons in Canada, and

8  when asked point blank indicated this was a person the Canadian

9  government should be afraid of, a danger.   He has now withdrawn

10  all of those allegations to try and help Mr. Charkaoui as he

11  attempts to avoid deportation in Canada.

12      We now know that the defense claims that this defendant's

13  heart is in the right place but he is simply mentally unable to

14  continue his cooperation is totally wrong, totally false.   His

15  memory is fine.   He simply does not want to help.   He does not

16  want to fulfill his obligation under the cooperation agreement.

17      To insure that the record is perfectly clear, had the United

18  States government known in May of 2001 what we know today, how

19  this was going to end up, we never would have entered into

20  cooperation with this defendant.   Any benefit he provided us

21  initially has been substantially outweighed by his reversal, and

22  now attempts to use his position as a cooperating defendant to

23  help his fellow terrorists.

24      In the post-*Booker* world the Court isn't just going to look

25  at what is the Sentencing Guidelines, what are the 5K motions,

1   you are going to look at the 3553(a) factors.  And I want to go

2   through those briefly.  The first factor under 3553 is the nature

3   and circumstances of the offense.  As previously mentioned, the

4   defendant was convicted of one of the most serious crimes a

5   person can be convicted of in federal court.  The fact that his

6   sentencing guideline range at the low end of 65 years, at the

7   high end life, is indicative of that.

8       Terrorism is unique.  Terrorists want to do more than kill

9   innocent people and destroy buildings.  Their aim is actually to

10  tear apart the very fabric that holds our societies together.  As

11  this Court mentioned, Mr. Haberman took the time to write a

12  letter to this defendant, and the Court has been provided a copy

13  of that.  In that letter Mr. Haberman stated:  "I have tried to

14  understand your hate.  I cannot.  What I do understand is that

15  your message of hate and murderous intentions have failed to

16  defeat the ideals and spirit and faith of this nation.  History

17  will only remember your pathetic life as that of a heinous

18  criminal, whose only purpose was to take that which was not

19  yours, the most precious gift God gave us all, life.  No one ever

20  recovers from the senseless, intentional murder of a totally

21  innocent loved one.  No one."

22      When the Court considers the nature and circumstances of this

23  offense, think of all of the Gordon Habermans this defendant

24  wanted to create in his attack on LAX.  Think of all the totally

25  innocent people he hoped to kill and maim on the millennium.

1    The second factor under 3553 involves the history and

2    characteristics of the defendant.  I will state the obvious,

3    there is nothing in this defendant's history or characteristics

4    that would provide any basis for support of leniency by this

5    Court.

6    The record establishes that Mr. Ressam has never held a

7    meaningful job and has supported himself primarily through

8    criminal activity.  As he became more radicalized in the 1990s

9    his focus turned to how he could best become a successful

10   terrorist.  He acquired numerous false identities.  He traveled

11   to Afghanistan where he was trained by al Qaeda.  He was

12   obviously committed and dedicated because he was chosen by

13   al Qaeda leaders in Afghanistan not only to undertake the basic

14   training but to go on to a second school where he was trained in

15   explosives and bombs.

16   When Ressam returned to Canada in February 1999 he carried

17   the recipe, the cash and the chemical ingredients necessary for

18   his terrorist attack.  He was supposed to be joined in Canada by

19   others from his cell, a number of others.  All of those people

20   could not get into Canada.  I would suggest to the Court that

21   most people at that point in time, as they sat alone in Canada,

22   all of the co-conspirators still over in Europe, would have said,

23   I can't do this by myself.  Mr. Ressam did not say that.  Instead

24   he forged ahead.  He got money, he rented a room, he manufactured

25   the explosive devices, he got the timing devices, he rented a

1    car.

2        Most people don't even remember in August of 1999 he actually

3    attempted an armed bank robbery of a currency store in Montreal

4    as he attempted to self-finance this terrorist attack.  He was

5    recorded talking with his friend Mokhtar Haouari about the 1990

6    African embassy bombings, the very bombings that killed over 225

7    people and injured over 4000.  In those recordings Ressam was

8    heard saying, quote, they were a good thing, referring to the

9    bombings, but that, quote, it would have been better to have

10   carried the bombings out inside of America.

11       I bring this up to emphasize the defendant's involvement in

12   these horrible crimes was not a temporary decision caused by a

13   momentary lapse of judgment.  Far from it.  This was a plan

14   Ressam had dedicated several years of his life to committing, and

15   he did everything possible to make sure it was successful.

16       What do we know about the defendant's current state of mind?

17   I think it is pretty clear from this morning.

18       During our 2005 hearing you made a very astute observation to

19   me, which struck me at the time.  At that point you said,

20   Mr. Bartlett, the defendant's decision to cooperate, quote, might

21   indicate some change in attitude on his behalf.  You were, of

22   course, right.  The reverse is equally true, though.  As we sit

23   here today, the defendant's now reversed change of attitude shows

24   something about him.  The defendant's decision to end cooperation

25   and to affirmatively assist known terrorists indicates an

1   incredible change in attitude.  It is a strong signal to any

2   objective observer that defendant's long-held allegiance to

3   radical terrorist beliefs have returned, and that he once again

4   unequivocally is a danger to innocent people throughout the

5   world.

6       The next factor that 3553(a) asks the Court to consider is

7   the need for the sentence imposed to reflect the seriousness of

8   the offense, to promote respect for the law and to provide just

9   punishment.

10      The facts in this case couldn't be clearer, but for the

11  great, some might even call lucky work of the Port Angeles

12  Customs Inspector, Diane Dean, on April 14th, 1999, this

13  defendant would have become one of the most notorious mass

14  murders in United States history.  He would have been right next

15  to Timothy McVeigh in the Oklahoma City bombing attack.

16      Terrorist attacks are one of the most serious crimes facing

17  society today.  The Court, unfortunately, needn't look further

18  back than last week at the attacks in Mumbai, India.  They killed

19  over 200 innocent people.  And think back over the years, the

20  9-11 attacks that killed almost 3,000 people; the October 2002

21  nightclub attacks in Bali, Indonesia; the May 2003 suicide

22  bombings in Riyadh, Saudi Arabia; the March 2004 commuter bombing

23  attacks in Madrid, Spain; the July 2005 subway bombing in London,

24  England; the April 2006 resort bombings in Dahab, Egypt.

25      Terrorist attacks don't just impact discreet victims, they

1   don't even just impact a single city or a single nation,

2   terrorists impact the entire world.  And that is not an accident.

3   That is what terrorists want them to do.  They don't choose

4   military targets.  Instead terrorists, just as Mr. Ressam did,

5   choose to focus on innocent men, women and children.  And they

6   hope to strike fear into all of our lives.  There is no crime

7   that is more serious that this Court can face.  And I would ask

8   the Court's sentence reflect that.

9       The Court's sentence must also promote respect for the law.

10  The American people, and the world at large, must have confidence

11  that our justice system works both ways; that when terrorists are

12  arrested and indicted they will be fairly tried, and eventually.

13  if they are convicted they will be justly punished.

14      As this Court noted in an article in July 2008, federal

15  courts provide an adequate venue for trying terrorism suspects,

16  and are a tremendous asset in combating terrorism.  In that

17  article you noted, "I also worry that special terrorism courts

18  risk elevating the status of those innocent people.  Despite the

19  supposed grandeur of their aims, terrorists should surrender

20  their liberty just like any other criminal."  That is so true.

21      Ressam has received honestly the best our judicial system has

22  to offer, a fair trial before an impartial jury of his peers,

23  superb representation for years on behalf of Mr. Hilier and the

24  other members of the Public Defender's Office.  He, like all

25  defendants, deserved nothing less.  We are at the completion of

1    that process now, however.  His sentence requires that justice

2    recognize the seriousness of his crime and provide the public the

3    assurance that this Court appreciates that.

4         Despite the defense attempt to wrap a cloak of grandeur

5    around this defendant and his post-conviction alleged changed of

6    heart, as he stands here today that cloak of grandeur is gone.

7    He is just, as you noted, like any other criminal.  He committed

8    a horrible crime, he has broken his promise to cooperate, and now

9    he must be treated as such and feel the full weight of his

10   actions.

11        3553 also asks the Court to reflect the need to impose a

12   sentence that affords adequate deterrence for criminal conduct

13   and protects the public from further crimes of this defendant.

14        The unfortunate reality of today's world, made so abundantly

15   clear last week in Mumbai, is that the possibility of future

16   terrorist attacks is a continuing and genuine threat.  The

17   sentence this Court imposes on Mr. Ressam must not only act as a

18   deterrent to Mr. Ressam and his future actions, but equally

19   important they must also act as a deterrent to future potential

20   terrorists who are contemplating actions against the United

21   States.  It must broadcast the clear message to extremists that

22   when they are caught and convicted they will suffer serious

23   consequences.

24        During the 2005 sentencing this Court noted that this was

25   probably the most significant sentence anybody ever faced in your

1    long tenure on the bench.  I assume as we sit here three years
2    later your opinion hasn't changed.  I fully agree with the
3    Court's assessment.  The Court must send the defendant away for a
4    long enough period of time so there is no chance he will ever
5    target innocent victims again.

6        In addition, the sentence must also send an unequivocal
7    message to extremists that there is a horrendous price to pay for
8    targeting the United States.  The Gordon Habermans of this
9    country deserve nothing less from our judicial system.

10       The Court's July 2005 sentence, if reimposed, would mean that
11   this defendant would be released in ten years, he would be out of
12   jail in 2018.  He would be 51 years of age.  Think about the
13   defendant's life prior to the arrest in this case, his fanatical
14   commitment to jihad, his single-minded pursuit to attack the
15   United States.  Think about his recent decisions to help
16   Abu Doha, Samir Mohamed, his most recent decision to
17   affirmatively help Hassan Zemiri and Adil Charkaoui, and as of
18   today his attempt to withdraw even his cooperation in the trial
19   against Haouari.

20       The Court must also, under 3553, avoid unwarranted sentencing
21   disparities among defendants with similar records who have been
22   found guilty of similar conduct.  We have prepared a chart for
23   the Court.  I am not going to go through that.  But I will
24   observe what is clearly obvious.  When one looks at the chart it
25   is clear that this defendant's actions are actually almost at the

1    very top of any objective assessment of terrorist acts committed

2    in the United States.

3        The 1993 bombings of the World Trade Center, the initial

4    bombings, clearly were most heinous.  They actually occurred,

5    people died.  But short of that attack, virtually no one has been

6    caught on the cusp of an attack.  It is the equivalent of

7    arresting Timothy McVeigh as he drove into Oklahoma City with the

8    truck filled with explosives.  Everything had been done by

9    Mr. Ressam.  This wasn't done with some government instigator,

10   some cooperating witness providing supplies.  He did it all on

11   his own.  Virtually every other person in his category has

12   received a sentence of life imprisonment or its equivalent.

13       I know how proud this Court is of the trial that was

14   conducted in this case, and everyone involved in it should be.  I

15   know how much you and all of us wanted to believe that in

16   May 2001 this defendant had a sincere change of heart when he

17   first indicated a desire to cooperate.  This Court, time and time

18   again, has shown this defendant fairness and compassion.  And he

19   has repaid the Court with lies and contempt.

20       Remember back to February of 2003.  In February of 2003 the

21   United States was seeking a continuance in this case because we

22   did not have Doha and Mohamed back in the country, and we needed

23   his cooperation.  And the defense was vigorously fighting us on

24   that.  And this Court took the unusual step of interceding and

25   saying, in substance, I will give you a continuance United

1    States, but I want you to file a 5K motion now.  Not at the end

2    of the sentencing, which is the universal practice, but right

3    now.  And I know this Court did that because you had a letter

4    from this defendant that he had sent on February 17th, 2003,

5    where he said, I am a changed man; I promise you, Judge

6    Coughenour, I will cooperate after I have been sentenced.  And

7    you relied on his promise.

8         What we now know is even on that date when he sent that

9    letter in February of 2003 it was a total lie.  He had already

10   made up his mind he wasn't going to cooperate.  You can look at

11   the debriefing that occurred right before that February date.

12   But most telling -- You interceded on his behalf.  And the next

13   time in April of 2003 when he meets with Robin Baker and they try

14   to get ready to get Mohamed back from Canada, his memory is gone.

15   He doesn't cooperate at all.  In fact, he never cooperates from

16   that point in time.  He manipulated this Court in February

17   of 2003 to get what he wanted.

18        Remember in April of 2005 at the initial sentencing you told

19   him, I am the one sentencing you, Mr. Ressam.  I have looked at

20   your statements.  These are facts you would remember.  I want you

21   to cooperate.  I want to help you.  You put your faith in him.

22   And how did he repay you?  He refused to cooperate.  He tried to

23   hide his true motives by saying I am just unable to cooperate.

24   We now know that is a lie.  We know that from his statements

25   today.  We know it from his letter.  He simply did not want to

1  cooperate.

2  You gave him a huge break, I would suggest, with a sentence

3  of 22 years. And how does he repay that? He sends a letter to

4  this Court and he says, not only am I not going to fulfill my

5  bargain, not only am I not going to help bring to justice

6  horrible terrorists that have threatened the safety of this

7  world, I want the Court to go out and help free a guy we all know

8  is a terrorist, Hassan Zemiri. He wants the Court to do his

9  bidding to help free a terrorist. It is time to say enough.

10  The United States in our sentencing memo had recommended that

11  this defendant receive a sentence of 45 years. After hearing his

12  statements today, which confirm our worst fears about this

13  defendant, I would withdraw that recommendation and I would ask

14  this Court to sentence him to life imprisonment.

15  We believe that only that sentence will provide protection

16  for the innocent people that he will strike if ever let out of

17  jail. It will equally show there is a heavy price for trying to

18  attack this country. Even if you temporarily try to cooperate,

19  eventually withdrawing that cooperation. Thank you, your Honor.

20  THE COURT: Mr. Ressam, do you have anything else you

21  wish to say?

22  THE DEFENDANT: No, your Honor.

23  MR. HILIER: Your Honor, would you like us to go to the

24  podium?

25  THE COURT: That's not necessary, Mr. Hilier.

1    The Ninth Circuit has made clear that the Sentencing

2    Guidelines are only one factor to be considered among those

3    factors set forth in 18 USC Section 3553(a), in determining an

4    appropriate sentence.   I may not presume that the Guidelines

5    range is reasonable.   Nor should the Guidelines factor be given

6    more or less weight than any other factor.   Accordingly, I have

7    also considered the other Section 3553 factors in arriving at the

8    sentence I am imposing today.

9    On the one hand I recognize the need for the sentence imposed

10   to reflect the seriousness of the offenses Mr. Ressam has

11   committed, to provide just punishment for those offenses, and to

12   promote respect for the law.   Mr. Ressam's crimes, if carried to

13   their intended conclusion, would have resulted in the deaths and

14   injuries of hundreds of innocent people and instilled fear across

15   the country and even the world.   Fortunately, Mr. Ressam's arrest

16   prevented such an outcome.   Because of the work of an attentive

17   Port Angeles Customs Inspector, Mr. Ressam's crimes did not lead

18   to loss of life or limb, nor destruction of property.

19   Nevertheless, the seriousness and heinousness of the act of

20   terrorism Mr. Ressam was carrying out at the time of his arrest

21   cannot be understated.

22   On the other hand, I recognize Mr. Ressam's extensive and

23   valuable cooperation in the fight against terrorism during the

24   first two years after his trial.   Although it ended unwisely and

25   prematurely, Mr. Ressam's cooperation, unique in its breadth and

1    scope, weighed heavily in my initial sentencing decision and its

2    import has not changed in my analysis today.   The government's

3    5K1.1 motion filed in February 2003 requested a downward

4    departure from the Sentencing Guidelines based on Mr. Ressam's

5    substantial assistance in the case of *United States versus*

6    *Mokhtar Haouari*, a matter prosecuted in the Southern District of

7    New York in the summer of 2001 and resulting in the conviction of

8    Mr. Haouari.

9        Mr. Haouari was sentenced in 2002 to a term of 24 years'

10   imprisonment.   Mr. Ressam's testimony at the trial connected

11   Mr. Haouari to the terrorist plot, of which Mr. Ressam himself

12   was a part, to bomb the Los Angeles International Airport on New

13   Year's Day 2000.   In addition to his substantial cooperation in

14   that case Mr. Ressam also testified before a German tribunal on

15   behalf of the German government in the trial against Mounir

16   el Motassadeq.   I am butchering that name.   I will spell it.   It

17   is M-O-U-N-I-R, E-L M-O-T-A-S-S-A-D-E-Q.   In December 2002, which

18   resulted in a conviction and sentence of 15 years.

19       The Court recognizes that Mr. Ressam's later decision to end

20   his cooperation resulted in the dismissal of two pending

21   prosecutions and the retraction of certain of his statements

22   against two other terrorist suspects.   However, Mr. Ressam's

23   cooperation, while it lasted, provided the United States

24   government and the governments of Great Britain, Spain, Italy,

25   Germany, France and Canada extensive intelligence that proved to

1   be invaluable in the fight against international terrorism.   The

2   defendant's sentencing memorandum submitted before the July 2005

3   sentencing hearing summarizes the far-reaching impact of

4   Mr. Ressam's cooperation on the investigations and prosecutions

5   of terrorist activities in this country and abroad.

6        Downplaying the cooperation that Mr. Ressam provided the

7   government would diminish the likelihood of future cooperation by

8   other apprehended terrorists.   Further, doing so would not be

9   fair to Mr. Ressam.   After his trial he told me that the fairness

10  of his trial was not what he expected, given what he had done.

11  The fair treatment that Mr. Ressam received in his public trial

12  was a major influence on his decision to break with his past and

13  cooperate, a choice that undoubtedly saved innocent lives.   In

14  making that decision, he put his own life at risk.   In addition,

15  he has spent years in solitary confinement in a country far from

16  his family and loved ones and will, by any measure, be

17  sacrificing a large portion of his life to pay for his crimes.

18       I believe that the sentence I am imposing today will serve as

19  a deterrent while promoting respect for the American rule of law

20  by demonstrating the fairness of our federal court system rather

21  than merely its punitiveness.

22       In addition, I have taken into account Mr. Ressam's history

23  and characteristics.   Reading Mr. Hilier's 2005 sentencing

24  memorandum and the report from Dr. Grassian leads me to the

25  conclusion that Mr. Ressam's life history and personal

1    characteristics support favorable sentencing consideration.   His

2    life and reasons for involvement in his crime do not support a

3    conclusion that he is a good person, but it also deserves

4    consideration.   Mr. Hilier describes a quiet, solitary and devout

5    man whose true character is manifest in his decision to

6    cooperate.   Through the course of the trial and immediately

7    thereafter, Mr. Ressam wrestled with what he had done and why.

8    As Mr. Hilier put it, Mr. Ressam determined that violent action

9    brought shame to the concerns he was trying to promote, and that

10   as a result what he was doing was harmful in all respects.

11        I have also taken into account the nature of Mr. Ressam's

12   crimes required that he be held in solitary confinement for

13   upwards of four years, if not for the likely entirety of his

14   sentence.   This isolation is exacerbated by the fact that he does

15   not speak English and has no opportunity for visits by friends

16   and family abroad.   These harsh conditions of confinement

17   necessarily set Mr. Ressam's situation apart from that of the

18   typical criminal sentencing.   I am also persuaded that

19   Mr. Ressam's mental health deteriorated somewhat from the

20   isolation of his confinement and the repetitive, intensive

21   questioning to which he submitted, and that these conditions

22   contributed to the early termination of his cooperation.

23        Moreover, I have considered the need to avoid unwarranted

24   sentence disparities among defendants with similar records who

25   have been found guilty of similar conduct.   Mr. Haouari, for

1    example, was sentenced to 24 years for his involvement in the

2    same plot.  Abdel Meskini, also indicted based on his connection

3    to Mr. Ressam and prosecuted in the Southern District of

4    New York, pled guilty and received a sentence of six years.

5        Finally, I have spent a good deal of time since Mr. Ressam's

6    previous sentencing reviewing other terrorism-related

7    prosecutions around the country.  According to a recent study of

8    124 defendants sentenced in terrorism trials in American federal

9    courts since September 12, 2001 to December 31, 2007, a paper

10   that was prepared by two former federal prosecutors, the average

11   term of imprisonment was a little over eight years.  These cases

12   involved different sets of facts and did not influence my

13   decision in determining an appropriate sentence in this case.

14   However, I mention a few of them here to provide a backdrop

15   against which Mr. Ressam's conviction and sentence may be viewed.

16   For example, John Walker Lindh was captured during the 2001

17   invasion of Afghanistan while he was fighting in the Taliban

18   army.  Mr. Lindh was trained by al Qaeda and fought on the front

19   lines in Afghanistan against the Northern Alliance.  The

20   notoriety of his case stemmed in part from his involvement in a

21   violent uprising in Afghanistan in which a CIA agent was killed.

22   He was later brought to the United States and indicted on ten

23   charges in the Eastern District of Virginia.  Ultimately, he pled

24   guilty to supplying services to the Taliban army and carrying an

25   explosive during the commission of a felony.  He received a

1    sentence of 20 years.

2        In 2002, Imran Mandhai pled guilty in the Southern District

3    of Florida to conspiring to destroy electrical power stations by

4    means of fire and explosives in retaliation for the US

5    government's support of Israel and in an effort to secure the

6    release of Muslim prisoners.  After numerous sentencing appeals

7    Mr. Mandhai received a sentence of 14 years.

8        In 2005, after being held for three years as an enemy

9    combatant, Jose Padilla was indicted in the Southern District of

10   Florida on federal terrorism charges.  After a four-month jury

11   trial, he was convicted of conspiracy to murder, kidnap and maim,

12   and conspiracy to provide material support to terrorists.  The

13   conviction resulted in a sentencing guideline range of 360 months

14   to life.  Mr. Padilla received a sentence of 17 years and four

15   months.  In imposing the sentence, the Court considered the fact

16   that Mr. Padilla had been held in solitary confinement under

17   harsh conditions for a significant period of time and would

18   likely be held under similar conditions in the future.

19   Mr. Padilla's co-conspirators, Mr. Hassoun and Mr. Jayyousi,

20   received sentences of 15 years and eight months and 12 years and

21   eight months, respectively.

22        I note that none of the defendants in these cases cooperated

23   as extensively, providing as much valuable information to the

24   fight against terrorism as Mr. Ressam did.  As I emphasized

25   earlier, Mr. Ressam's cooperation provided authorities in this

1   country and abroad with an unprecedented view of the inner

2   workings of al Qaeda that almost certainly thwarted future

3   attacks.  In fact, it was the extent of Mr. Ressam's cooperation

4   in the conviction of one of his co-conspirators that resulted in

5   the government filing a 5K1.1 motion, specifically requesting

6   that Mr. Ressam be sentenced below the applicable guideline

7   range.

8       Therefore, based on all the factors listed in 18 USC

9   Section 3553, I hereby reimpose a sentence of 22 years and a

10  period of supervised release of five years subject to the

11  standard conditions, together with those additional conditions

12  set forth in the presentence report.  I recognize that the

13  sentence I am imposing reflects a significant downward deviation

14  from the advisory guideline range.  However, I believe the

15  factors I have examined on the record are sufficiently compelling

16  to support the degree of the variance.

17      Mr. Ressam, you may have a right to appeal this sentence.  If

18  you wish to file a notice of appeal it must be filed within ten

19  days of today.  If you wish the assistance of an attorney in

20  filing a notice of appeal, one will be appointed to assist you if

21  you so request.  If you wish the assistance of a clerk in filing

22  a notice of appeal, she will assist you if you so request.  Do

23  you understand, sir?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  As I said at Mr. Ressam's previous

1  sentencing in 2005, determining an appropriate sentence in this

2  case is a decision I struggled with more than any other

3  sentencing decision I have made in my 27 years on the bench.   In

4  the time since Mr. Ressam's first sentencing, however, I have

5  come to feel even more confident that the sentence I originally

6  imposed was the correct one.   Mr. Ressam's trial and the

7  outstanding professionalism of both the prosecution and defense

8  throughout this case illuminate how our country can deal with

9  threats to our national security without denying the accused

10  constitutional fundamental protections within the framework of

11  our public federal court system.

12      As our nation prepares for a new chapter of American history

13  with a new president, it is my hope that those with the power to

14  affect the way terrorism trials are conducted in this country

15  will look favorably upon this case and share my view.

16      We will be in recess.

17                            (Adjourned)

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3

4

5

6

7

8

          I, Barry L. Fanning, Official Court Reporter, do hereby
9    certify that the foregoing transcript is true and correct.

10

11                              S/Barry L. Fanning

12                              _____
                                Barry L. Fanning
13

14

15

16

17

18

19

20

21

22

23

24

25