Page 658

[1] don't come.

[2]   **Q:** You did not select your friend Zemmiri to go with you to

[3] Los Angeles to help you plant the bomb, correct?

[4]   **A:** No.

[5]   **Q:** Is that correct?

[6]   **A:** Yes, I didn't want him; yes, I didn't tell him, sorry, I

[7] didn't tell him.

[8]   **Q:** To shortcut this, you had a number of other close friends

[9] in Canada during this time who assisted you in preparing for

[10] your operation, correct?

[11]   **A:** They didn't help me in my plan; they did a few simple

[12] things.

[13]   **Q:** In doing those simple things, these men knew that you were

[14] about to commit a terrorist act in the United States, correct?

[15]   **A:** They had a feeling but not, they didn't have any details.

[16]   **Q:** They knew because you told them that you were about to do

[17] an operation in the United States, correct?

[18]   **A:** To some I said that, not to all.

[19]   **Q:** You did not select any of those trusted friends of yours

[20] to accompany you to Los Angeles, correct?

[21]   **A:** Yes.

[22]   **Q:** In addition to those men, you had another friend named

[23] Dahoumane, correct?

[24]   **A:** Yes, Dahoumane.

[25]   **Q:** Dahoumane was in Vancouver with you, correct?

Page 659

[1]   **A:** Yes.

[2]   **Q:** Dahoumane helped you burglarize a fertilizer store,

[3] correct?

[4]   **A:** Yes, correct.

[5]   **Q:** Dahoumane helped you assemble the bombs, correct?

[6]   **A:** Yes, correct.

[7]   **Q:** Dahoumane contributed money to the cause, correct?

[8]   **A:** Not much. I don't remember.

[9]   **Q:** Dahoumane showed up with no money in Vancouver?

[10]   **A:** He had some, some very little money.

[11]   **Q:** Dahoumane drove with you to the ferry in Victoria,

[12] correct?

[13]   **A:** Yes, until the end of the stop there in Victoria.

[14]   **Q:** And it was not until that point when you reached the ferry

[15] in Victoria that you told Dahoumane that you didn't want him

[16] to come with you, correct?

[17]   **A:** How's that?

[18]   **Q:** When did you make the decision that Dahoumane was not

[19] coming with you to the United States?

[20]   **A:** I had made that decision way before that, in Montreal.

[21]   **Q:** Are you sure about that?

[22]   **A:** Yes. Once I found Abdelghani, I stopped thinking of him.

[23]   **Q:** You stopped thinking of Dahoumane?

[24]   **A:** Yes, in regard to taking him with me to America.

[25]   **Q:** Do you remember your very first meeting with the FBI on

Page 660

[1] May 10, 2001?

[2]   **A:** Yes.

[3]   **Q:** Do you remember that there was an FBI agent there, the

[4] assistant United States attorney for the Western District of

[5] Washington was there, and your lawyers were there; do you

[6] remember that?

[7]   **A:** Yes.

[8]   **Q:** Do you recall telling those people in your very first

[9] interview that you said that it was not predetermined that

[10] Dahoumane and Ressam would part company at Victoria, but

[11] Ressam made that decision in Victoria? Do you remember

[12] telling them that; do you remember saying that to those people

[13] the very first time you met them?

[14]   **A:** No. I might have made a mistake. I had bought him a

[15] ticket to Montreal, back to Montreal; how do I take him on

[16] with me?

[17]   **MR. OLLEN:** May I approach the witness.

[18]   **THE COURT:** You may. What are you showing him,

[19] 3560A?

[20]   **MR. OLLEN:** Page 9. I would like the interpreter to

[21] read it to him, just the underlined part.

[22]   (Pause)

[23]   **A:** That's wrong. It could be my mistake.

[24]   **Q:** Let me ask you this first, then we will get to who makes a

[25] mistake on this. Does reading that document, does the

Page 661

[1] interpreter reading that document to you refresh your

[2] recollection as to whether or not you told those people the

[3] very first day you met them that it was not predetermined,

[4] that Dahoumane and Ressam would part company at Victoria, but

[5] Ressam made that decision in Victoria?

[6]   **A:** I might have misspoke.

[7]   **Q:** Did you say that?

[8]   **A:** Maybe I have said that, yes, I may have said that; I am

[9] not sure. Maybe I misunderstood the question, but I may have

[10] said that wrongly. It is possible that I said it.

[11]   **Q:** Mr. Ressam, at the time that you were formulating your

[12] plan to blow up the airport, you had several trusted friends

[13] in Canada, correct?

[14]   **A:** Not many, just a few.

[15]   **Q:** The people that we just mentioned?

[16]   **A:** Yes.

[17]   **Q:** They had similar political and religious beliefs to your

[18] own, correct?

[19]   **A:** Some; not all of them did.

[20]   **Q:** Some had participated in jihad activity, correct?

[21]   **A:** Yes.

[22]   **Q:** And at least one of them had fought for jihad in Boznia,

[23] correct?

[24]   **A:** Yes.

[25]   **Q:** These people, some of them gave you money, correct?

**Trial Volume 6**
**July 5, 2001**

Page 662

[1]   A: Hassan Zemmirl, yes.

[2]   Q: The other man gave you $100; you bought the watch?

[3]   A: Yes.

[4]   Q: Instead of using these men to help you, you trusted

[5]   Mokhtar Haouari to send a complete stranger to Los Angeles to

[6]   help you blow up an airport; is that your testimony?

[7]   A: How was that?

[8]   Q: I am sorry?

[9]   A: How was that; can you repeat the question please.

[10]   THE COURT: Please read the question back.

[11]   (Record read)

[12]   A: Yes.

[13]   MR. OLLEN: May I approach for a moment, your Honor.

[14]   THE COURT: Sure, you may.

[15]   (Discussion off the record at the sidebar)

[16]   THE COURT: We are going to recess until tomorrow

[17]   morning. We are going to resume at 10:00 tomorrow morning.

[18]   Don't discuss the case or come to any conclusions concerning

[19]   the case. 10:00. Thank you very much. The schedule I told

[20]   you tentatively on Tuesday still holds. It looks very much

[21]   like you will be getting the case probably on Wednesday of

[22]   next week.

[23]   (Jury leaves courtroom)

[24]   THE COURT: Before counsel leave, I would like to see

[25]   them one more time at the sidebar without the court reporter.

Page 663

[1]   (Discussion off the record at the sidebar)

[2]   (Witness excused)

[3]   (Trial adjourned to Friday, July 6, 2001, 10:00 a.m.)

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 664

[1]              INDEX OF EXAMINATION
[2]   Witness              D      X     RD    RX
[3]   AHMED RESSAM ............588   620
[4]
[5]              GOVERNMENT EXHIBITS
[6]   Exhibit No.              Received
[7]   71 ...........................................612
[8]   345 .........................................612
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

## Lawyer's Notes

## $

$100 652:21; 662:2
$3,000 592:11; 593:22; 594:2
$3500 655:10
$5,000 594:3

## 1

10 627:13, 21, 22; 644:2; 660:1
100 612:1; 617:7
10:00 662:17, 19; 663:3
11 639:3
11-month 639:21
14 605:2
14th 603:19
15 627:22; 633:1, 5
159 608:13; 609:19
17 638:18; 639:2
17th 592:4
1990s 653:14
1992 651:10
1994 588:15; 637:25; 638:3
1997 631:5, 9, 12, 20, 24; 638:3, 5, 7, 9, 12, 24
1998 638:18, 24; 639:2
1999 591:8; 594:18; 601:22; 605:2; 632:6; 638:9, 12, 20; 639:2; 648:24

## 2

2001 623:5, 21; 624:24; 627:13; 633:5; 652:3; 653:10; 660:1; 663:3
23 652:3; 656:2
23rd 653:10
24 615:20; 623:5, 17, 21; 624:24
2400 593:4, 5; 603:23
253-3479 610:3
26 616:15
2:20 619:11, 12; 620:2

## 3

30 650:16
310 610:16
311 608:24, 25, 25
311A 608:25; 609:8
330 611:6
345 610:21; 612:7, 10; 614:5
3560A 660:19

## 4

4 594:3
40 614:7
44 615:22
46 615:4
48 616:24

## 5

55 618:7
56 617:22
58 612:24, 25
58A 612:24; 613:2
591-3944 610:18

## 6

6 601:16; 663:3
60 613:15, 16
61 613:15, 16
62 613:15, 16
63 613:24
68 612:15
6th 603:19

## 7

7 601:16; 639:2
71 611:23; 612:2, 5; 617:5; 618:25
7th 603:19

## 9

9 660:20
930 617:6
938 611:25
96 631:16
968 618:25
97 631:16
98 588:15
99 591:11

## A

a.m 663:3
Abdelghani 596:7, 22, 22; 597:7; 604:7, 17; 605:14; 607:2, 16, 20; 618:13, 14; 650:12; 654:11; 659:22
Abdelmajid 593:10, 11; 604:5; 605:7, 8; 606:4, 10; 650:22
able 599:21; 622:2; 627:8; 629:2
Abu 599:5, 7, 8, 19; 618:12; 623:20; 643:7, 20
accompany 658:20
according 644:22
acid 616:5, 6, 14; 621:8
acids 593:1
act 629:18, 25; 640:5, 6, 19; 641:6; 655:15; 657:20; 658:14
activities 645:9; 657:18
activity 653:5; 661:20
actual 593:11
actually 620:25; 624:9; 650:24; 654:4
add 588:23
added 621:8
addict 650:3, 5
addition 658:22
additional 588:15; 591:18
address 600:15; 632:10, 16, 17; 635:19
adjourned 663:3
adult 630:8; 631:2; 633:12; 635:4
advice 650:24; 652:15
advised 649:16; 650:2, 14; 652:13
advocate 639:13
affairs 593:20
Afghanistan 591:22; 598:3, 20; 599:10; 613:9; 616:11; 620:9; 624:2; 637:16; 638:16; 639:24; 640:23; 641:19; 643:20; 645:12; 647:13; 648:6, 12, 18
afraid 607:7
Africa 590:15
AFTERNOON 620:1, 4; 643:14
again 591:13; 594:20; 597:22; 601:13; 603:1; 609:20; 612:13; 646:4; 652:10
against 590:18; 626:11
agenda 609:2, 3, 13, 24
Agent 623:13; 625:21; 633:2; 641:24; 643:7, 20; 660:3
agents 623:6; 625:14; 627:23; 628:6, 10; 633:6, 19, 22; 634:5; 652:4, 8; 653:11; 656:3
ago 589:3, 23; 601:24, 24; 628:16
agreement 590:12; 591:3
ahead 639:18; 642:21
AHMED 588:10; 620:5; 630:7
aim 630:2
air 624:7, 11, 15
Airplane 594:13; 601:23; 602:1
airport 607:17; 627:3, 5, 7, 10; 629:11, 15, 17, 22;
649:14; 651:3, 8, 9, 10, 20; 652:11, 19; 653:18; 654:2; 661:12; 662:6
Ait 590:4; 595:5; 598:13; 636:19; 645:3; 647:7; 648:16; 657:2
Al 623:20, 20
Algeria 608:7; 642:1, 2; 648:2; 651:8, 11; 653:12, 14, 16; 654:10
Algerian 591:16; 608:3; 641:12
Algiers 651:11
allow 653:19
along 596:16; 649:2
America 590:18, 22; 591:24; 622:9; 649:15; 655:17; 657:22; 659:24
American 617:10; 618:25; 622:7, 21; 647:24
Americans 617:10
Among 623:11; 633:11; 648:19
amount 619:1; 624:15
Angeles 606:7, 13, 15; 607:1, 4, 5; 623:7; 649:25; 653:18; 654:4, 12; 658:3, 20; 662:5
appears 609:13; 610:4, 7; 618:3
application 610:24, 25; 611:2; 612:7; 614:4; 632:13; 633:15
approach 608:8; 609:11; 611:7; 644:7; 660:17; 662:13
Approximately 591:4; 592:3, 14; 594:17, 22; 595:23; 601:15; 603:6; 604:22; 627:13
Araar 595:5; 608:17, 19; 609:23
Arabic 610:4
area 597:1
areas 642:6
armed 649:10, 13; 650:2
around 622:19; 632:9; 647:5; 654:15, 19, 25
arrangements 598:3; 605:16
arrest 605:3; 606:23; 611:24; 612:14, 22
arrested 603:20; 606:25; 611:14; 614:16; 617:6; 649:24
arrived 603:19; 606:5
Artisanat 610:11
assassinate 634:22
assassinating 634:21
assemble 659:5
assist 591:17; 653:17; 654:2
assistance 591:18
Assistant 652:4, 9; 656:4; 660:4
assisted 658:9
assisting 603:8
associate 654:25
associates 630:1; 654:14, 18
asylum 633:14
ATM 632:20
attack 593:12; 642:6; 648:20; 649:14; 655:13
attacks 647:24
attempt 629:2
attention 605:2; 612:12
attorney 660:4
Attorneys 652:4, 9; 656:4
authorities 589:8; 627:21; 633:14
avoid 626:18; 643:10
aware 655:23; 657:20
away 617:21; 657:12

## B

back 588:13; 610:14; 618:8, 9, 11; 622:14; 638:24; 640:9; 647:2, 4; 660:15; 662:10
bad 639:17
bag 616:25
Baker 618:23; 628:4; 633:6
bank 631:5; 634:12, 14, 15; 656:19, 21
bear 600:19
beard 649:22
becomes 615:21
began 633:19
beginning 594:18; 600:13; 601:12, 16
behave 639:11
behind 634:23
beings 622:3
beliefs 641:11; 661:17
benefits 635:20
Beniza 630:11, 15
Benni 595:1; 600:6, 7; 613:8; 614:2; 630:20; 632:20
Bennie 595:2; 608:21
besides 617:17
better 651:23
beyond 643:10
BIANCO 588:9, 12; 602:9; 608:8; 609:11, 16; 611:7, 19, 22; 612:6, 11; 618:18, 21; 619:7; 620:8, 12; 623:11; 624:24; 628:1, 20, 21; 629:3
blew 629:11
bloodstream 626:7
blow 626:21, 25; 629:14; 652:19; 661:12; 662:6
blowing 629:16, 22;



648:25
body 626:8
bomb 627:6, 10; 628:13, 16, 22; 648:20; 651:3; 652:22; 658:3
bombed 651:7, 9
bombing 590:18; 651:10; 653:18; 654:2
bombings 589:22; 590:15
bombs 627:5; 656:12; 659:5
book 609:14, 25; 612:17
booster 615:7; 616:22
Bosnia 645:14, 15; 646:7, 10, 23
bother 635:10, 12
bothered 653:15
bottle 615:6, 24
bought 594:11; 601:23; 605:9; 606:10; 660:14; 662:2
box 620:24; 621:2, 6; 623:2
Boznia 661:22
break 619:9
breathe 621:24
briefly 620:9; 616:4; 636:25; 637:1
bring 588:3; 596:15; 613:13; 651:2, 21
bringing 596:20
Britain 598:2, 16, 17, 21; 599:5; 600:4
brought 650:24
building 624:7, 11, 12; 626:21, 22, 23, 25
buildings 642:7
bureau 649:10
burglarize 659:2
business 610:12; 632:10
busy 650:7
buy 594:10, 10; 652:22; 23, 24
buying 592:25

**C**

cafe 636:11, 16; 640:11
California 612:19
call 593:20; 597:8, 19; 598:5; 599:24; 604:18; 605:1; 618:17; 627:6, 9; 628:12, 16, 22; 629:11, 15, 17, 20, 21; 651:15
called 593:5; 597:7; 598:16; 615:8; 629:13, 19, 19
calling 597:11; 617:19, 20
calls 598:18; 613:20
came 510:16; 616:12; 631:22; 637:23; 638:24

camouflage 655:8
camp 626:6; 623:18; 624:19; 625:24; 626:2; 639:25; 640:23; 643:20; 648:5, 18
camps 620:9, 13, 17; 624:2; 637:16; 638:16, 21; 639:20; 641:4; 642:4; 643:7; 644:19; 647:12, 20; 653:8, 9
can 588:3; 589:17; 590:4, 8; 591:13, 20; 592:4, 11, 18; 595:2; 598:5, 7; 599:6, 6; 600:2; 605:3; 606:17; 607:2, 9; 608:18, 25; 609:20, 25; 610:6, 23; 615:12, 16; 616:4; 617:2; 619:9; 625:10; 636:1; 637:18; 640:11; 662:9
Canada 588:22; 601:3; 636:2, 5; 645:5, 18; 646:24; 648:25; 649:4; 654:14, 19, 25; 655:4; 657:12; 658:9; 661:13
Canadian 592:12, 13; 612:1; 617:7; 619:1; 632:1; 633:14
capabilities 643:10
car 594:13; 605:19, 20; 606:3, 4, 12, 21; 607:4, 6, 8, 16, 18, 18; 611:18
card 597:11; 608:22; 610:12, 15; 612:7; 613:25; 614:3; 618:8, 9, 11; 631:5, 6; 632:10, 13, 16, 19, 20, 23, 24; 633:7
cards 613:17, 21; 617:19, 20; 635:8
care 605:14
carried 589:25; 590:19; 607:21; 623:25; 625:11; 651:12
carry 590:1; 601:6; 634:15; 649:2; 651:16; 652:15; 656:18; 657:7, 22
carrying 621:1; 643:22
cars 589:2
case 614:19; 619:11, 12; 627:16, 24; 628:1, 4; 644:3, 4; 656:3; 662:18, 19, 21
cause 659:7
cell 597:4; 611:10, 11, 16; 613:22
center 623:6; 633:2
certain 619:1; 625:7; 637:22
changed 596:22; 597:1
charge 599:8; 616:23
cheating 636:6
Chechnya 636:11
check 607:17
checks 652:23
chemical 592:25; 593:2; 594:10
chemicals 592:23; 593:7

chief 620:25; 621:2, 6
choose 654:1
chose 653:17; 654:5
CIA 642:11
circuit 614:11, 12; 652:18
circuits 652:24
citizen 622:11, 16
citizens 622:7
city 635:3
civilian 626:18
civilians 626:24
claim 629:24
clear 637:4; 648:14
clearly 637:9; 657:3
close 637:19; 657:14, 15; 658:8
closer 645:6
Cohen 623:13; 628:6; 633:3
combined 594:4
comfortable 646:17, 18
coming 605:13; 659:19
commit 634:14; 655:15; 657:20; 658:14
committed 588:14, 22; 631:2; 633:11; 634:1; 636:1
commonly 615:10
communicate 613:18
company 607:4; 660:10; 661:4
complete 662:5
comport 639:11
computers 588:25
concentrated 615:18
concern 646:20
concerned 601:5; 604:17; 607:9; 614:23
concerning 619:12; 662:18
conclusion 619:12
conclusions 644:3; 662:18
condone 639:14
conduct 623:2
conducted 620:13, 17, 23; 623:19; 624:23; 625:7, 24; 648:20
conferring 618:23; 619:14
connect 614:19
connection 618:24
considerable 653:12
consisted 611:25
contact 593:21; 632:7; 639:21
contain 609:5
contained 615:6; 616:17, 24
continue 588:8; 644:13
Continued 588:11; 619:18; 635:16; 642:22; 644:15; 653:20

continuing 607:6
contributed 659:7
conversation 590:3; 602:25; 604:19; 636:14, 21, 21; 637:6, 10, 15; 640:5, 9, 10, 12, 18, 22; 641:15; 644:21; 648:25; 652:3
conversations 591:4, 10, 13, 15, 25; 647:6
cooperate 627:16
cooperating 603:12; 633:20
copy 613:2
corner 610:7
counsel 662:24
counter 643:2
counterintelligence 642:7, 15
country 589:14; 590:20, 21
course 630:8; 631:2; 642:7, 9, 12, 14, 16
courses 642:4, 5, 5
COURT 588:1, 4, 5, 7; 592:18, 21; 594:7; 601:21; 602:1, 3, 5, 8; 608:9; 609:12, 18; 611:8, 21; 612:4, 9; 618:19, 22; 619:6, 8, 14, 15; 620:3, 4; 622:14; 623:7; 630:3; 638:23; 639:5, 5, 8, 10, 13, 15, 18; 642:3, 9, 14, 17, 21; 643:12, 16; 644:2, 8, 9, 10, 12, 13; 645:22, 22; 646:3, 6, 16, 21; 654:25; 660:18; 662:10, 14, 16, 24, 25
courtroom 654:12; 662:23
credit 608:22; 629:17, 22; 631:6; 632:10, 13, 16, 23; 633:7; 635:8
crimes 631:3; 633:11, 13; 634:1
cross 619:8
CROSS-EXAMINATION 620:6; 628:17; 644:15
cross-examine 620:4
cut 635:20
cyanide 621:6, 8; 624:1, 2, 6, 6, 10, 14, 20, 22; 625:1, 3; 626:16

**D**

Dahoumane 593:10, 11; 603:8; 604:5; 605:13, 16; 650:22, 25; 651:2, 21; 652:11, 11; 655:18, 23; 656:5, 8, 12, 17; 658:23, 24, 25; 659:2, 5, 7, 9, 11, 15, 18, 23; 660:10; 661:4
date 595:16, 17; 652:7
dates 638:17
day 588:1, 1, 8; 594:24;

595:25; 598:9; 602:17, 19, 23, 24; 604:23; 605:3, 4, 6, 10, 19; 626:24; 629:9, 10; 637:3; 661:3
days 629:4, 7
deal 599:17
dealing 599:17, 18; 642:10
dealings 638:10, 13
death 625:2; 626:18
December 594:18; 601:16; 602:5; 603:18, 19; 605:2; 631:9, 11, 12, 20, 22, 22, 23; 638:18, 24; 639:1
decide 654:3
decided 627:16
decision 659:18, 20; 660:11; 661:5
defendant 590:10, 15, 25; 591:10, 14, 25; 592:5; 593:14, 22; 594:1; 595:6, 11, 21; 597:22; 599:19; 600:11; 602:12; 603:3
defendant's 597:5
defrauding 659:8
Deny 600:25; 601:4, 10
Deronta 602:17; 623:18; 624:19; 625:24; 626:2
describe 589:18; 605:3; 608:18; 615:16; 616:4; 635:22, 24
describing 591:9
designed 626:11
desire 648:17
Despite 643:2
detail 600:22
details 655:14, 25; 658:15
detected 624:17
detention 623:6; 633:2
detonator 615:13; 616:3
device 650:15, 16; 651:20, 25; 652:10, 23
devices 614:21
die 624:21; 625:3
died 621:10, 20
different 605:9; 647:17; 652:6
difficult 624:5
DIRECT 588:11; 626:17; 644:17
directed 625:17
directing 605:2
discuss 590:14, 17; 597:14, 15; 600:22, 23; 619:11; 644:3; 662:18
discussed 590:6; 596:1; 628:19; 636:13, 15; 637:3, 5; 652:6
discussing 590:11; 633:1; 650:14; 651:6, 14, 19; 652:14, 25; 654:1, 15; 656:3
discussion 589:24;



595:6, 9; 596:19; 619:16;
644:11; 647:3; 662:15;
663:1

discussions 589:11, 15,
17, 18

disguise 649:16

dishonest 635:22, 25

District 660:4

DNA 650:5

document 610:8, 21;
625:6; 660:25; 661:1

documents 625:8;
631:9, 17

dog 621:2, 10, 18, 19, 20

dogs 620:17, 23, 24;
621:14, 21; 622:1; 623:1,
19; 624:20, 20, 23, 23;
625:1, 3, 11, 12, 19

Doha 599:5, 7, 19

dollars 611:25; 612:1;
618:25; 619:1; 652:22, 23

done 589:9; 625:15;
630:3; 640:6

Donuts 598:13

doorknob 626:6

doorknobs 626:4

Douri 630:24, 24

down 646:18

dried 616:6

driver 631:6

driver's 591:16; 595:17;
617:25

drove 659:11

drug 650:3, 5

dry 615:20

Dunkin 598:13

during 588:17; 592:16;
596:13; 603:25; 604:2;
621:23; 623:3, 17, 24;
626:17, 24; 636:12, 20;
639:20, 20; 648:24;
649:16; 653:14; 655:4;
657:5; 658:9

### E

earlier 608:3; 617:19;
629:13

early 591:11, 15, 25;
602:5; 603:18

EDGN 616:18, 18, 18

effect 607:3; 624:4

EGDN 607:10; 616:19

Either 589:2; 650:12

else 596:6, 19; 639:5;
642:3

embassy 590:14

emits 614:14

empty 626:22

end 635:13, 14; 643:15,
17; 659:13

endangering 624:16

enemies 622:10

enemy 622:9, 17, 24, 25

enforcement 627:15, 21;
628:9

engage 657:9

engaged 639:15; 640:4

English 597:17

enough 605:15; 635:12

entered 613:14

entire 636:2

error 643:9

errors 636:1

establish 648:17

etc 604:25

Europe 608:7, 7

even 641:9

evening 605:1, 25, 25

everybody 588:5;
626:23; 642:20

everyone 588:1

everyplace 635:2

evidence 608:11; 612:2,
5, 7, 10; 614:4

exactly 590:13

EXAMINATION 588:11;
626:17; 644:17

examples 624:8, 10

except 641:2, 20

exchange 649:11

exchanged 617:10, 13

excused 619:10, 13;
644:5; 663:2

executed 643:24

Exhibit 608:13, 24, 24;
610:6, 14, 21; 611:6, 23;
612:2, 5, 7, 10, 15, 24;
613:15, 24; 614:4, 7;
615:4, 22; 616:15, 24;
617:5, 22; 618:7, 25

exhibits 608:10

experience 653:9, 12

experienced 653:5, 17

experiment 620:24;
621:1, 10; 623:4; 624:23

experiments 620:13, 16,
18, 22; 621:23; 623:1, 19,
25; 625:7, 11, 24, 25

expertise 651:18; 653:7

explain 595:2, 13;
596:24; 597:20; 600:2;
602:20; 606:17; 607:9;
615:12

explosion 616:22;
648:21

explosions 617:3

explosive 615:14, 21;
616:2, 20; 650:15

explosives 592:17;
603:21; 605:21; 607:3, 10;
614:13, 14; 616:7; 627:3;
642:5; 647:15, 22; 648:10,
13; 655:18, 22, 24; 656:6,
10, 14, 16

eyes 630:1

### F

face 621:23

fact 628:18

fair 635:22

fake 607:20; 618:1, 2, 5;
630:15; 631:25; 632:1, 16;
633:17

fall 638:9, 12

false 589:7; 632:13, 16;
635:19

familiar 633:24

far 590:4, 8; 592:4, 11;
617:18; 634:9; 637:18

fashion 615:21

FBI 623:6; 625:13, 21;
628:6; 641:24; 642:11;
645:19; 652:4, 8; 653:11;
656:11; 659:25; 660:3

February 638:9, 12, 20,
24; 639:2

federal 623:6; 627:20, 23,
23; 628:10; 633:2, 22;
634:5; 653:11; 656:3

feeling 658:15

ferry 606:1, 2, 12; 659:11,
14

fertilizer 659:2

few 597:16, 17; 599:6;
608:18; 629:4, 7; 658:11;
661:14

field 624:5; 653:9

fighting 653:14

fights 622:25

figure 642:9

fill 610:25; 632:18

filling 614:3

finally 611:6; 618:7

finance 655:12

find 651:22; 656:23;
657:1

fine 643:16; 646:19

fingerprints 650:8

finish 619:14

firing 634:18, 19, 23

First 592:25; 594:24;
599:14; 600:17; 602:15;
603:12; 627:18; 628:15;
636:9, 12, 15, 21; 637:5;
644:21; 646:1; 659:25;
660:8, 13, 24; 661:3

fix 652:18

flew 602:6

flight 602:22; 605:16

focus 612:12

followed 650:24

follower 639:6

following 602:24

form 594:6; 606:20;
610:24

formulating 661:11

fought 645:14; 646:7, 10,
23; 661:22

found 643:8, 21; 659:22

four 603:7; 614:17, 18,
20; 621:17, 19

frame 588:18; 591:5

France 588:14, 19, 20;
589:4, 4, 6, 7, 8, 14, 15, 18,
19, 22; 590:1, 2; 601:4

fraud 608:22; 631:3;
633:12

fraudulent 631:21

French 612:21; 633:17

Friday 620:8, 20; 663:3

friend 591:20, 21, 22, 23;
593:21; 595:10; 596:2, 14,
15, 19, 21; 597:18, 18, 19;
598:2, 2, 16, 16, 17, 18,
21, 21; 599:2, 5, 14, 15;
608:20; 617:14, 15; 618:6,
12, 13, 13; 619:3, 4;
629:12, 15, 17; 631:6;
634:2; 636:22, 24; 637:7,
19; 640:12; 643:5; 645:2;
647:12; 650:20; 651:4;
652:13; 655:2, 4; 656:1;
657:14, 15; 658:2, 22

friends 607:25; 613:21;
617:16, 17; 619:2; 645:6,
9, 18; 648:8, 17; 649:4;
658:8, 19; 661:12

front 608:10; 618:8

further 596:14; 618:21

future 590:2; 595:17;
598:4; 600:20; 601:3;
629:20

### G

garbage 616:25

gas 622:4; 624:18

gases 624:5

gasoline 648:21

gave 592:9; 593:22;
594:2; 595:17; 596:2, 21;
597:19; 606:20; 617:14,
17; 618:14; 624:8; 631:20,
25; 635:19; 652:15, 21, 21;
655:7, 10; 661:25; 662:2

general 589:25; 590:14,
16; 593:17; 600:23;
621:13; 622:8, 19, 20;
648:1

Generally 591:2; 592:24;
602:18; 606:17

gentlemen 619:10

gets 640:16

Ghani 596:5; 597:12, 21

giving 600:1; 618:16

gloves 649:19

goatee 649:22

goes 626:23

Good 588:1, 1, 5, 6;
590:1, 18; 620:4; 644:1;
647:12; 650:21

good-bye 607:25

government 603:11;

616:24; 618:7; 622:18;
624:11; 626:23; 627:12;
633:19

Government's 608:13,
24; 610:6, 14, 21; 611:6,
23; 612:1, 5, 7, 10, 15, 24;
613:15, 24; 614:4, 7;
615:4, 22; 616:15; 617:5,
22

governmental 642:6

green 616:25

grenade 657:9, 11

grenades 657:1, 4, 6, 8

group 589:25

grow 649:22

guess 603:18

gun 634:2, 11

guy 637:11, 12; 641:22,
24

### H

hand 657:1, 4, 6, 8, 9, 11

handle 600:23

Haouari 588:2; 589:11;
594:20; 603:1; 631:10, 14,
17, 20, 25; 632:3, 7, 9, 22;
633:6; 636:10, 15, 20, 22;
637:5, 6, 10, 15, 19, 25;
638:2, 5, 10, 13; 639:21;
640:4, 6, 10, 12, 15, 19,
22, 25; 641:14, 17, 22;
644:21; 650:10; 654:16;
662:5

happen 599:21; 614:24;
643:19, 21

happened 598:15; 606:5,
8, 15, 17; 660:4

Hassan 619:5, 5; 655:1,
2, 4; 662:1

hat 649:19

hats 649:24

hear 634:20

heard 618:24; 648:16

Holly 628:6

help 591:20; 593:7;
603:4, 9, 9, 24; 604:1;
607:2; 632:22; 637:24;
646:12, 13, 14; 647:1;
650:20; 651:3, 22; 652:1,
11; 654:3; 658:3, 11;
662:4, 6

helped 610:25; 632:18;
649:10, 12, 13; 652:18;
656:19; 659:2, 5

helpful 609:17

helping 637:23; 646:10,
24

hero 629:25; 630:4, 5

Hexamine 615:9, 9, 18;
616:5

himself 651:12

HMTD 615:10, 12, 17

hold 608:25

holds 662:20

home 595:22; 611:17;
626:23; 631:8; 635:16, 18
Honor 588:9; 592:7;
608:8; 609:11, 16; 611:7,
19, 22; 612:6; 618:18, 21;
619:7; 622:13; 623:9;
644:14; 662:13
hope 588:7
hotel 589:2; 593:4, 5;
594:14; 603:23; 605:8, 9;
606:9; 607:14
hours 615:20; 627:24, 25
house 596:13; 597:5
How's 659:17
human 622:3
hundred 652:21, 23

**I**

idea 590:12
ideas 603:10; 649:12;
654:3
identification 613:5
illegal 588:20; 589:6
immediately 597:7
immigration 589:4, 8;
633:12, 13
impact 607:7, 10, 11
impending 625:2
implanted 648:20
important 642:6; 644:18
improperly 625:16
included 625:25
incorrectly 624:22;
625:5, 8
individuals 603:4
infiltrate 626:8
information 606:20;
623:24; 633:23
initiator 615:15
inject 625:1, 19
injected 624:19; 625:3
injecting 625:4
inside 590:22; 615:6, 24
instead 650:15; 652:24;
662:4
instruction 623:19
instructions 600:1;
601:8
instruments 592:25;
594:10
intake 624:7, 11, 15
intelligence 626:12;
643:2, 11
intend 627:5, 7; 657:8
intended 628:16; 629:1,
16
intention 629:15; 634:22;
651:2
intentionally 603:14
interest 649:1
interested 623:3; 637:7;
640:13; 641:13, 20, 23;

647:9
interpret 645:25
INTERPRETER 592:7;
622:12; 645:20, 20; 646:2,
17, 19; 660:20; 661:1
interview 623:18; 660:9
interviewed 623:5
interviews 627:12
into 606:25; 643:20
introduce 598:17; 599:2
introduced 598:20, 20,
25; 599:11; 643:19
investigators 650:6
involved 588:17; 645:9;
651:10; 657:18
Islam 622:9, 10, 17
Israel 622:16, 17, 18, 20,
22
Israeli 622:11, 16, 23;
649:1
issue 633:1; 636:13;
651:17, 17
issues 637:2; 652:6
items 612:14

**J**

Jaffar 599:8; 618:12;
629:12, 15, 17, 21
jar 616:17
Jewish 622:19, 21
Jihad 629:18, 25; 636:10,
15, 21, 23; 637:2, 3, 5, 7,
16; 640:4, 6, 10, 13, 19;
641:6, 13, 21, 23; 644:22;
645:9; 647:9, 10; 648:3;
649:5; 653:5, 12; 654:15;
657:18, 19; 661:20, 22
Job 595:14; 629:24;
636:2, 3; 655:17; 656:9,
13, 18; 657:23
Judge 644:1, 7; 646:15
July 663:3
June 652:3; 653:10;
656:2
jury 588:3, 4, 6; 599:6;
619:13; 620:3, 22; 626:19;
644:5, 12; 662:23

**K**

Karim 647:1
keep 635:7; 650:6
kill 624:15; 626:9, 24
killing 621:20; 624:18
kind 613:5; 626:25; 657:6
knew 640:4, 6, 18, 22;
641:1, 4, 6, 11; 647:9, 14,
15, 15, 17, 17; 651:6, 7,
10, 14; 655:15; 18; 656:5,
11, 13, 14, 17; 657:22;
658:13, 16
knowledge 600:25;
601:4

known 637:21; 642:1;
654:10
knows 655:25
Koran 639:6, 8, 10, 13

**L**

LA 607:13
ladies 619:10
language 612:20, 21
larger 648:21
last 602:12, 17; 604:23,
23; 629:4, 7
later 600:9, 25; 602:22,
23; 603:16; 604:18; 616:6;
622:1; 629:20
latter 601:22
law 627:15, 20; 628:9
lawyer 628:18
lawyers 612:5; 652:5, 9;
653:10; 656:4; 660:5
leader 621:20; 653:13, 17
learned 626:2; 644:18
lease 600:5, 8
least 645:14; 661:22
leave 598:1, 4; 600:9;
602:19, 21, 22; 605:9, 11;
611:13; 650:2; 662:24
leaves 662:23
leaving 593:14; 602:13,
16
Lebanese 601:10
lectures 642:17
left 597:7; 601:13;
604:13; 611:17; 638:18,
23; 639:1
left-hand 610:7
legally 589:4
legitimate 636:3
less 639:4
lessons 644:18
license 591:16; 595:17;
617:25; 618:3, 5; 651:16
lied 633:14, 19; 634:6
lies 633:24
life 628:15; 630:8; 631:2;
633:12; 636:1
limited 638:2
lines 649:3
list 591:14
listen 629:14; 643:18
little 604:25; 615:19;
616:5; 659:10
live 639:10; 657:11
lived 635:3; 636:2, 5;
638:5
loaded 605:24
location 634:25
logical 643:13
long 592:14; 595:25;
607:7; 621:13, 15, 16, 17;
622:25; 637:21; 638:21;
647:11

looking 616:24
looks 662:20
Los 607:4, 5; 623:7;
653:18; 654:4, 12; 658:3,
20; 662:5
lot 627:3; 652:15
lozenge 615:6
lunch 618:23; 619:9, 10
Luncheon 619:17

**M**

Maghrebi 623:20
main 616:23
Majid 650:20, 21, 21, 22
makes 660:24
making 589:3; 616:2, 7,
8; 655:18; 656:12
man 598:7; 643:4, 4;
646:23; 652:25; 653:3, 5;
654:1; 662:2
manufacturing 655:24;
656:6
many 603:6; 614:15;
617:17; 627:15, 17, 20, 24,
25; 636:25; 637:1; 639:15;
647:6; 649:4; 652:6;
661:14
March 639:1
Marche 595:1, 2; 600:5;
608:21
Mario 595:19; 618:4, 5;
630:22, 25
Mark 630:24, 24
marking 609:10
Martez 599:8
mask 621:23; 649:18
material 621:15; 617:7
materials 593:2
matter 628:19
may 588:8; 608:8, 9;
609:11, 12, 16, 18; 611:7,
8, 21; 618:18; 620:4;
623:5, 17, 21; 624:24;
627:13, 21; 633:1, 5;
644:7, 13; 646:15, 16;
660:1, 17, 18; 661:8, 9;
662:13, 14
Maybe 588:21; 621:17;
625:4, 10; 636:24; 643:22;
661:8, 9
mean 592:23; 633:13;
646:7; 648:11; 649:18;
654:7
Medjadi 630:18
meet 593:21; 594:19, 23;
595:10, 13; 597:20, 21;
618:17; 637:22, 22
meeting 595:15, 20, 21,
22, 23, 24; 596:1, 13;
597:5; 623:11, 13, 15;
624:24; 659:25
meetings 625:13; 627:20
members 642:11

men 658:18, 22; 662:4
mention 656:16
mentioned 628:18, 19;
629:5; 631:23; 636:24;
661:15
mentioning 589:14
Meskini 650:12; 654:8,
11
message 604:13, 14
met 594:24; 595:4, 5;
596:9; 628:9; 637:25;
643:4; 645:1; 654:11;
660:13; 661:3
metro 597:9
might 609:17; 614:25, 25,
25; 623:22; 638:15;
642:11; 651:12; 657:5;
660:14; 661:6
Mine 609:4; 611:12;
655:2
minutes 601:24, 24;
621:18, 19; 628:16; 644:3;
650:16
mishear 638:25
misrepresented 623:24
missed 602:21
missile 647:24
misspoke 661:6
mistake 623:22, 23;
625:15; 643:9; 660:14, 23,
25
misunderstood 661:9
mix 626:3
mixed 615:19; 616:6;
626:16
mixing 593:7
mobile 597:4
Mohamed 590:4; 595:5;
598:14; 600:15; 636:18,
19; 645:3; 647:7, 9, 15, 17,
20; 648:4, 9, 12, 16, 19,
24; 657:2
Mokhtar 589:11; 590:5;
594:19; 596:11; 597:18;
598:13, 18, 20, 24; 599:14,
15; 603:1; 608:2; 609:25;
610:5, 9, 13, 15; 611:11;
617:16, 17; 618:6, 15;
619:3; 631:20; 636:9, 17,
20; 637:5, 10; 638:10, 13;
639:21; 640:4; 641:2, 25;
643:5; 644:21; 645:2, 6;
650:10; 654:9, 15; 662:5
Mokhtar's 609:15;
618:13
moment 588:13; 589:3;
609:16; 618:18; 646:15;
654:22; 662:13
money 591:17; 592:9;
593:24, 25; 594:1, 4;
596:16; 598:6; 600:4;
603:9; 611:23; 617:5, 7, 8,
10, 12, 13, 14, 14, 17;
618:24; 619:2; 635:7;
652:24; 655:12; 659:7, 9,
10; 661:25

months 639:3
Montreal 588:24; 592:19;
594:15, 19, 22; 601:13, 19;
602:4, 6, 10, 13; 605:12;
607:23; 611:17; 613:23;
617:11; 634:25; 635:18;
636:11, 16; 649:11;
659:20; 660:15, 15
more 601:11; 627:4;
643:23; 646:17, 18;
648:21; 662:25
morning 588:5, 6; 605:7;
662:17, 17
most 624:11; 644:18
move 609:16
movement 607:11
much 592:10; 593:18;
594:1; 595:23; 596:17, 18;
597:15; 601:12; 626:18;
645:6; 646:19; 657:17;
659:8; 662:19, 20
multiple 614:21
Muslim 641:12
must 625:8
Mustapha 623:20; 631:6
Mustapha's 631:8
myself 593:25; 606:4;
613:14; 623:3; 634:7, 9

N

name 595:3, 12, 18;
596:3, 3, 4; 598:8, 10, 21,
22, 25; 599:2; 600:5, 7, 8,
10; 607:18, 18, 20; 609:13,
15; 610:9, 10, 12, 15;
611:4; 613:4, 7; 614:1;
618:3; 630:6, 11, 15, 18,
24; 632:13, 20; 641:9;
646:22; 651:7; 655:1
named 658:22
names 598:19; 603:11,
16; 609:5; 630:9
naming 651:7
near 624:7, 11, 15
need 634:14, 19; 644:9;
645:25; 657:4, 6, 7
needed 624:4; 657:13
neglected 589:17
neighborhood 648:25
New 591:24; 597:1, 1;
629:7, 7
next 605:10, 17; 608:24;
619:18; 642:22; 653:20;
662:22
nice 588:8
nitrio 593:1; 616:5, 14
noise 634:20
Nord-Sud 610:11
Noris 600:7; 613:8;
614:2; 630:20; 632:20
notebook 616:9, 13
notes 616:8; 625:13, 20
November 591:11, 15;
592:1, 4; 601:22

number 596:2, 21, 23,
25; 597:19; 598:1; 609:13,
25; 610:4, 20, 20; 612:13;
630:8; 638:7; 649:24;
654:18; 658:8
number's 618:11
numbers 609:5; 610:17;
618:9, 12, 13, 14, 16
numerous 637:2

O

O.K 612:14
Object 594:6
Objection 594:7; 612:3, 8
observe 625:1
obtained 614:3; 631:5
occasions 637:22
occur 614:25
occurred 589:19, 22;
636:10
October 591:6
off 619:16; 644:11; 647:3;
662:15; 663:1
offer 611:25; 612:1, 6
office 635:19
officers 626:12
offices 642:6
often 637:22
olly 626:16
olive 616:17
OLLEN 594:6; 612:3, 8;
620:7; 623:9; 639:19;
643:1, 12, 15, 17; 644:1, 7,
9, 13, 14, 16; 645:25;
646:3, 5, 15; 647:4;
654:22; 660:17, 20;
662:13
Omar 598:21, 23, 25;
599:16
omission 633:24
once 593:20; 595:12, 13;
596:9; 601:11, 11; 607:1,
13; 659:22
one 589:14; 590:8; 597:1;
608:12, 12; 611:17, 17;
613:2; 614:19, 21; 617:18;
618:22; 619:2; 622:2, 10;
624:10; 625:4; 626:2;
628:23, 25; 631:1; 634:1;
635:18; 636:2, 3, 3; 643:7;
644:18; 645:14, 18; 646:7,
10; 648:4; 649:7; 650:15;
651:15; 654:22; 661:22;
662:25
only 596:25; 626:15;
635:2; 649:13
open 588:4; 600:17, 18,
18; 606:21; 608:21; 620:3;
644:12
opened 600:3
operation 589:19, 21, 25;
590:2; 601:6; 603:4;
607:21; 626:18; 645:19;
646:11, 24; 647:5; 649:2,

17; 650:20; 651:15;
652:16; 654:20; 655:5, 19;
656:7; 657:5, 24; 658:10,
17
operations 622:2;
647:17
opinion 635:23
opposed 607:5
oral 611:19
order 632:10; 657:12
others 603:6; 614:20;
624:25
ours 608:20
out 589:25; 590:1, 19;
601:7; 602:5; 604:7, 11,
20; 605:8; 607:17, 21;
609:24; 610:25; 613:2, 13;
614:3; 615:20; 621:1;
623:25; 624:8; 625:11;
627:7; 632:18; 634:15;
642:10; 643:8, 21, 23;
649:2; 651:12, 16; 652:15;
656:18; 657:7, 22
over 593:19; 597:2;
599:23; 609:17; 621:23;
630:8; 644:10
overruled 594:7
own 648:5; 652:9; 661:18

P

p.m 620:2
packet 609:9
page 609:10, 13, 24;
613:2; 619:18; 642:22;
653:20; 660:20
pager 604:13; 610:20
pages 609:9
Pakistan 629:21; 637:12;
640:16; 643:3
pardon 632:17
part 601:22; 655:19;
656:7; 657:24; 660:10, 21;
661:4
participated 651:15;
661:20
participating 654:4
particular 648:9
parties 611:20
passed 599:23
passport 591:17;
596:11, 11; 607:25; 608:1,
3, 5; 613:6, 10; 630:14, 15;
631:21, 25; 632:2, 4;
633:17
passports 635:7
past 589:20; 634:1
Pause 618:20; 654:24;
660:22
pay 594:13; 597:11;
599:25; 604:10; 613:20
people 598:19; 603:5, 11;
613:19; 622:19; 623:11,
17, 21; 624:16; 625:13;
627:6; 628:9; 634:20;

635:4, 10; 636:7; 642:10;
647:14; 648:13; 649:7;
654:21; 656:2; 660:8, 12;
661:2, 15, 25
percentage 600:4
perfectly 637:4
perform 622:2
performed 640:19; 641:6
period 636:12; 638:22;
639:21; 650:17
peroxide 615:9, 18
person 598:23; 608:14;
622:21; 625:20; 626:6;
635:22, 25; 640:5, 25;
641:4, 6, 20, 25; 644:25;
649:7, 10, 16; 650:9, 9, 14,
19; 651:6, 14, 19; 652:10,
14, 18, 25; 653:11, 12;
654:7, 9
person's 598:8
personality 653:13
personally 620:23;
623:2, 3; 625:12
phone 597:3, 4, 10, 11;
599:12, 23, 25; 604:9, 10;
609:5; 610:20; 611:10, 11,
16; 613:17, 21, 22, 22
phones 613:18, 20
photo 612:1
photograph 596:7, 10;
608:13, 25; 609:1, 3;
611:23, 25; 613:4
photographs 609:9
phrase 633:24
pistol 634:19; 649:8;
656:23
pizza 602:25
pizzeria 602:14
place 602:25; 631:24;
651:20, 25; 652:10
placed 606:23; 608:10;
650:16
placing 624:6
plan 607:1, 22; 634:21,
23; 649:10, 13; 654:3;
656:19; 658:11; 661:12
plane 592:20
planned 615:1; 634:10
planning 604:3; 630:17;
645:19; 647:5; 654:19;
655:5
plant 658:3
planted 627:5
please 588:3; 625:21;
629:14; 643:18; 645:22;
651:24; 654:22; 662:9, 10
point 591:23; 643:12;
659:14
poison 621:24; 626:7, 8
poisons 625:18, 18, 25;
626:3
police 657:9, 12
political 589:11; 641:11;
661:17
Port 606:7, 13, 15; 607:1;

649:25
possible 626:18; 627:1;
643:25; 661:10
Possibly 624:4
Post-it 608:9, 10
potential 622:1
practice 634:16, 17, 18,
19
practiced 622:1
praised 650:21
precisely 591:2; 594:3;
595:13, 16; 597:25;
621:17; 631:15; 633:9;
652:7
predetermined 660:9;
661:3
preferable 590:19
prepare 593:19, 20;
646:10, 24
preparing 592:17, 22,
22; 593:1, 7; 658:9
present 588:4; 590:3;
600:15; 620:3, 25; 621:3;
623:3; 625:10; 644:12;
655:4
preserve 644:19
prior 592:5; 593:14;
605:25; 617:12
probably 662:21
problem 602:19
problems 600:20, 21, 22;
601:3
procedure 626:11
procedures 626:14
proceeds 600:2
prompt 588:7
prosecutors 627:23;
653:11
protect 634:7
protecting 634:9
provide 603:16; 643:3
punishment 643:6
purpose 618:16
purposes 613:21
purses 588:16
put 592:17; 593:25;
607:3; 614:21; 615:19, 20;
616:14; 620:24; 621:2, 6;
624:10, 14; 626:3; 655:22
putting 603:21; 615:1

Q

quite 657:3

R

Rachid 598:22; 599:3, 4,
16, 16, 19; 618:12
ran 606:21
RDX 615:25; 616:1
reach 604:6, 20; 643:12
reached 604:11; 659:14

**Trial Volume 6**
**July 5, 2001**

read 609:25; 611:21; 622:14, 15; 639:8, 9; 645:22, 24; 646:4; 660:21; 662:10, 11

reading 660:25; 661:1

real 600:10; 618:1; 630:6

reason 624:1, 10, 14; 629:21

recall 589:10, 11, 14; 590:7, 25; 591:11; 597:24; 604:14; 620:16; 623:17; 624:24; 653:10; 656:2, 5; 660:8

receive 592:5

Received 612:4, 5, 9, 10; 620:13

recent 634:1

recess 619:17; 643:13, 14; 644:2, 6; 662:16

recognize 596:9; 608:14; 610:21; 611:9; 612:16, 25; 613:16; 614:7; 615:4, 22; 616:15; 617:22; 618:8

recollection 661:2

recommended 660:19; 651:19; 652:10

record 619:16; 622:15; 644:11; 645:24; 647:3; 662:11, 15; 663:1

recorder 655:7

Reda 595:12; 597:18; 604:17

reestablished 632:7

reference 589:3; 600:1; 611:2; 616:8

referred 608:3; 609:20; 615:10; 640:25

referring 588:21; 609:24; 647:1

reflected 613:3

refresh 661:1

refrigerator 615:20

regard 588:14, 23; 598:6; 622:8; 649:15; 650:2, 8; 659:24

regarding 596:14; 602:15, 18; 608:22

reinforce 616:22

relating 627:24; 628:1, 4; 631:3

relation 602:16

relationship 638:2, 14; 647:10

relayed 624:22; 625:16

religion 639:9

religious 637:2; 661:17

remember 589:4, 8, 13, 24; 591:2; 592:4, 11; 594:3; 595:8, 16, 22; 596:15; 597:25, 25; 601:23; 604:15; 605:5; 606:19; 617:18; 620:9, 14; 621:17; 623:5, 20; 626:4, 19; 628:14; 629:10; 630:25; 631:1, 15; 632:25; 633:1, 4, 5, 7, 9; 636:17;

637:9, 18; 638:6, 8; 644:19; 652:5, 8, 12; 653:15; 657:3; 659:8, 25; 660:3, 6, 11, 12

remembered 597:17

remind 599:6; 608:18; 617:2

rent 594:13

rental 605:20; 607:6

rented 605:8

repeat 662:9

repeated 622:13

repetition 645:21

rephrase 654:16, 17

report 645:22

reporter 619:15; 644:9; 662:25

represent 610:19

representatives 627:16

request 657:3

requests 596:14; 645:21

require 627:3

reservations 606:9

respect 600:11, 21; 654:4

respected 652:25; 657:16

respond 651:24

responded 640:15

response 590:10, 25; 591:1

responsibilities 600:19

responsibility 629:24

RESSAM 588:10, 13; 601:21; 608:10; 611:24; 612:12; 617:19; 620:5, 8; 629:16, 25; 630:6, 7; 637:4; 641:22; 642:4; 643:18; 644:17; 660:10, 11; 661:4, 5, 11

rest 636:5

restrict 625:21

resume 619:11; 662:17

resumed 588:10; 620:5

return 601:19; 602:10; 606:10; 607:3, 23; 638:19

returned 594:15, 22; 639:2

returning 594:19

right 619:8; 622:11; 624:11, 13, 21; 625:14; 628:7, 10; 629:11; 630:11, 16; 632:20; 639:8; 640:7; 642:18; 644:2; 645:16; 646:6, 21; 647:18; 649:8

robberies 634:15

robbery 634:12, 14; 649:10, 13; 650:2; 656:19; 657:7, 8

Rolg 591:19; 618:4, 5; 630:22, 25, 25

robin 605:8; 607:14

run 657:10

running 626:7

## S

same 598:19; 617:3; 637:6; 649:16; 650:9, 14; 656:2

Sami 630:11, 15

Samir 590:4, 9; 595:5; 598:13; 600:15; 636:17, 18, 19; 645:3; 647:6; 648:16; 657:2

saw 602:12; 625:3, 3

saying 590:23; 601:23; 623:21; 624:22; 633:7; 652:12; 660:12

scare 628:13, 16, 22

scene 650:3

schedule 662:19

school 642:2

screen 612:13

searching 606:21

seated 628:6

Seattle 595:11; 597:20; 605:1; 606:9; 618:17; 623:7, 9; 628:10; 633:2, 5; 652:5; 656:2

second 595:24; 596:1; 604:19, 20; 619:15; 644:7

secrets 644:19, 22, 25

security 627:6, 9; 632:19

select 658:2, 19

sell 631:14; 635:7

send 598:7, 19; 662:5

sensitive 607:10, 12; 613:20; 615:7, 13; 627:4

sent 596:10; 600:4; 643:6

sentence 615:12, 16

sentences 599:6; 608:18

series 591:10

serious 648:21

SESSION 620:1

set 614:13; 650:15, 18

seven 601:24

several 615:1; 645:6; 661:12

share 598:6; 644:25

sheikh 623:25

ship 606:6

shock 607:7

short 614:25; 625:2

shortcut 652:14; 658:8

shortly 621:10

showed 596:7; 659:9

showing 610:6, 14; 611:6; 612:24; 613:15; 614:7; 617:5; 618:7; 660:18

side 644:10

sidebar 619:15, 16; 644:11; 662:15; 25; 663:1

silencer 643:3; 12, 14, 15, 19; 649:8; 656:23

similar 631:15; 661:17

simple 658:11, 13

sitting 646:17

situation 648:1; 653:19

six 601:24

small 604:25; 621:18

smear 626:4

sneaking 634:23

Social 632:19

soil 657:21

sold 631:9, 17; 632:1, 1

somebody 651:22

someone 634:21, 23; 648:19

sometimes 588:25; 589:2

somewhere 650:6

soon 594:22; 626:6

sorry 588:16; 603:25; 639:2; 645:25; 646:5; 652:21; 658:6; 662:8

sort 635:17

sound 625:5

spark 614:14

speak 597:12; 603:1; 647:20

speaking 589:21; 591:3; 595:8; 622:9; 629:4

specific 614:13; 636:14

specifically 589:23; 629:3; 637:3

spent 603:21

spoke 589:19, 22; 595:10; 597:21; 599:14; 627:18, 22, 23; 628:9; 636:9, 25; 637:1, 2; 647:22, 24; 648:1, 3, 4

spoken 627:15; 628:1, 4, 6

spy 643:7

stage 603:4

stamps 613:9

start 600:3; 605:4; 609:19; 620:23; 648:5

started 593:1; 603:12; 606:21; 627:12

Starting 608:12; 612:15

starts 619:8

state 612:18

statements 589:8

States 605:13; 616:12; 636:22; 637:7, 11, 12; 640:13; 641:1, 23; 642:11; 643:4, 20; 645:11; 646:11, 25; 647:6; 652:4, 9; 655:13; 656:4; 657:21; 658:14, 17; 659:19; 660:4

station 597:9

steal 635:6

still 662:20

stipulation 611:19

stole 588:16, 25; 593:1; 635:1

stolen 631:5, 5; 635:2, 3

stop 621:20; 635:12;

643:22, 22; 659:13

stopped 588:19; 591:9; 606:16, 22; 635:13, 15; 659:22, 23

store 595:1, 3, 4, 7, 20, 24; 598:7; 600:2, 3, 5, 12, 17, 18, 19; 608:21; 610:9; 611:2, 4; 659:2

stranger 654:5; 662:5

strong 653:13

studied 642:1, 2

subject 599:15

substance 607:12; 615:15; 616:2, 18, 20

substances 626:3, 16

sudden 607:11

suffer 621:14, 19

suggest 591:18

suggested 649:19, 22

suitcase 614:21

suitcases 588:16; 607:3

Suleiman 623:20

sulfuric 593:1; 615:19; 616:6

sulphuric 621:8

summer 632:6; 648:24

sunglasses 649:19

supported 636:6

supports 622:20, 22

supposed 602:19

sure 615:1; 618:19; 628:22; 644:8, 10; 648:15; 655:21; 656:15; 659:21; 661:9; 662:14

surmised 641:16, 17

surveillance 656:21

suspicion 613:23

sympathetic 649:5

syringe 624:20; 650:3, 6

syringes 624:25

## T

table 628:7

talk 599:19, 22; 604:11, 25

talked 589:25; 599:15; 649:15

talking 590:6, 7, 8; 621:4; 636:10, 14; 640:9; 646:23, 25; 650:10

target 593:11; 626:22; 627:4

targets 626:6, 8; 634:24

teach 639:10; 648:10, 11

techniques 622:1, 3

Tehar 630:18

telephone 596:2, 21, 22, 25; 598:1; 638:7

telling 597:25; 601:2; 623:17; 626:19; 652:8; 653:10, 15; 656:5; 660:8, 12



tentatively 662:20
terms 590:14, 16; 593:17; 600:23
terrorist 648:20; 649:14; 655:15; 657:20; 658:14
test 626:14
tester 652:18
testified 628:17
testify 620:17
testifying 620:16
testimony 625:6, 9; 628:21; 641:18; 643:3; 644:23; 654:5, 6; 662:6
thefts 588:14, 15, 17, 22, 24
theoretical 626:15
thereafter 621:10
thievery 639:13, 14, 15
thinking 659:22, 23
though 591:3; 630:14
thought 628:24, 25
three 591:19; 595:25; 603:7; 614:20
Throw 617:21; 657:9, 11
ticket 602:22; 605:9; 606:6, 10; 660:15
tickets 594:11, 12, 13; 601:23; 602:1
timer 650:16
times 627:15, 17, 22; 636:25; 637:1, 2; 652:6
timing 614:11, 12, 21
TNT 617:4
together 592:17; 593:25; 603:21; 626:3; 639:3; 642:2; 655:22
told 593:18, 19; 596:22; 597:17; 598:2, 9, 16; 600:25; 602:21; 606:19; 619:4; 623:1; 624:25; 626:17; 628:12, 21, 25; 632:1; 633:5; 634:7; 636:20, 22; 637:6, 10, 15; 640:11, 12; 641:2, 12, 19, 22; 642:19; 644:17, 22; 648:5, 9, 12, 19; 650:17, 17; 651:22, 25; 654:18; 655:7, 12, 13; 656:8, 8, 13, 16; 658:16; 659:15; 661:2; 662:19
tomorrow 662:16, 17
took 593:24; 606:2; 631:24; 642:4, 4, 5
tore 613:13; 616:14
total 654:5
touch 607:2; 626:6
tourist 612:17
tourists 635:1, 6
train 607:4, 5, 13; 625:17; 648:13
trained 624:1, 6, 15; 645:12
training 620:9, 12; 625:18; 641:20; 643:2; 648:5, 10

translate 646:4
translated 625:5, 8
translation 625:16
travel 591:22; 592:19; 602:15, 18
traveled 635:15
Trial 663:3
trip 592:6; 601:21; 613:9
truck 648:21
true 626:8; 634:8, 9; 637:21
trunk 605:21
trust 640:15; 642:19; 645:2, 3
trusted 637:11; 643:5; 653:3; 658:19; 661:12; 662:4
trusting 643:22
trusts 654:10
try 604:19; 624:8
trying 632:22; 642:9
Tuesday 588:13; 589:10; 591:9; 644:17; 662:20
turn 654:14
Turning 608:24; 609:8
TV 609:17; 612:13
Two 592:15, 15, 16, 23; 595:25; 611:17; 628:16; 650:15
Tylenol 615:24
type 594:12; 597:3, 10; 603:8; 604:9
types 613:18

## U

U.S 592:12; 607:1; 611:15; 613:14; 617:6; 640:6; 649:14
under 606:23; 607:19; 613:7; 623:19
undercover 643:7
underlined 660:21
underneath 610:4, 17
understood 606:19; 638:23; 641:15
United 605:13; 616:12; 636:22; 637:7, 11, 12; 640:13, 25; 641:23; 642:10; 643:4, 20; 645:1; 646:11, 25; 647:6; 652:4, 9; 655:13; 656:4; 657:21; 658:14, 17; 659:19; 660:4
unknown 654:9
up 605:7; 608:25; 616:6, 14; 626:21, 25; 629:11, 14, 16, 22; 634:23; 635:8; 637:15; 646:2; 648:25; 652:19; 659:9; 661:12; 662:6
Upon 594:19
upper 610:7
urban 624:3
urea 594:11; 617:1, 2

use 594:4, 9; 598:23; 599:2; 600:8; 602:1, 3; 604:9; 609:17; 613:18, 20, 22; 618:17; 624:1, 2, 4, 5, 6; 630:17, 24; 632:9; 634:7, 10, 11; 650:15, 19; 652:19; 653:17; 655:7; 657:5, 6, 8
used 591:24; 594:10; 598:21; 604:10; 610:9; 611:2; 614:12, 13; 615:13; 616:2, 21, 22; 617:2, 3, 19, 20; 624:18, 23, 25; 625:19; 626:11; 630:8, 11, 12, 14, 14, 15, 18; 632:13, 16; 635:17; 637:22; 639:17; 652:22, 24; 655:12
using 597:11; 598:21; 605:19; 615:18; 662:4

## V

vacant 626:21
Vancouver 592:2, 6, 14, 16, 19; 593:4, 14, 15, 17, 23; 594:5; 601:18, 22; 602:4, 6; 603:19, 24; 604:1, 6; 606:2, 11; 616:7; 650:25; 655:19, 24; 656:6, 9, 17; 657:25; 658:25; 659:9
variety 631:3
various 608:10; 609:5; 648:3
veteran 653:14
Victoria 605:18; 606:1, 2, 5, 6, 10; 659:11, 13, 15; 660:10, 11; 661:4, 5
video 655:7
view 622:10
views 622:21
VIPs 626:12
visa 610:24; 612:7; 613:25; 614:3; 631:5
visas 598:3; 643:3
voice 604:13

## W

wants 641:19
warfare 624:3
warned 601:12
warning 601:11; 642:16
warnings 600:11
Washington 633:2; 660:5
watch 652:22, 24; 662:2
watched 621:2, 13, 19; 624:20
way 607:7; 625:4; 650:5, 9; 659:20
weapon 656:25
wear 649:16, 19
Wednesday 662:21

week 595:11; 597:19; 603:25; 604:2, 6; 636:3; 662:22
weeks 592:15, 15, 16, 24
welfare 635:19; 636:6
weren't 639:16
Western 660:4
whack 635:8
what's 610:10; 630:6
Whenever 643:16
Who's 598:23; 618:11
whose 600:5; 607:18, 18; 609:3, 13; 610:12; 611:11
willing 643:3; 644:25; 657:11
withdraw 654:16
withhold 603:14
within 609:8; 625:2
Without 591:13, 13; 619:15; 624:16, 16; 651:7; 662:25
WITNESS 592:20; 601:25; 602:2, 4, 7; 619:5; 630:5; 639:1, 4, 7, 9, 12, 14, 17; 642:8, 13, 16, 19; 660:17; 663:2
word 592:8; 656:16
words 597:16, 17
wore 621:23
work 596:25; 597:2; 601:6; 610:9; 614:19, 23, 24, 25; 615:2; 626:24; 643:23
working 600:3; 656:1
world 622:19
wrong 651:9; 660:23
wrongly 661:10

## Y

year 591:7; 627:21; 638:22; 639:4
years 639:16
yesterday 588:8
York 591:24; 597:1; 629:7, 8

## Z

Zemmiri 619:5, 5; 655:1, 2, 4, 7, 13, 18, 23; 656:5, 8, 11, 17, 19, 21, 23; 657:1, 14; 658:2; 662:1
zinc 615:6
Zubeida 643:7, 21

**Lawyer's Notes**

Page 665

[1] UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
[2]
[3] UNITED STATES OF AMERICA,
[4]        v.        S4 00 Cr. 15 (JFK)
[5] MOKHTAR HAOUARI,
[6]        Defendant.
[7]
[8]              July 6, 2001
                      10:00 a.m.
[9]
[10]
    Before:
[11]
              HON. JOHN F. KEENAN
[12]
              District Judge
[13]
[14]
              APPEARANCES
[15]
MARY JO WHITE
[16]   United States Attorney for the
       Southern District of New York
[17] JOSEPH F. BIANCO
     ROBIN BAKER
[18]   Assistant United States Attorneys
[19] DANIEL OLLEN
       Attorney for Defendant
[20]
    Also present:
[21] ADAM COHEN, Special Agent, FBI
     JAMES HELLY, Special Agent, FBI
[22]
       ISABELLE DUCHESNE
[23] MONIQUE DELIYANIDIS
       French Interpreters
[24]
[25]

---

Page 666

[1] (Trial resumed; in open court, jury not present)
[2]    THE COURT: I just received information from Mr. Ryan
[3] that a Canadian reporter by the name of Chris Brown, who I
[4] assume is one of the people in the courtroom, apparently saw
[5] one of our jurors at a restaurant, and apparently the juror
[6] and Chris Brown talked.
[7]    Come up, Mr. Brown, please. Have a seat in the jury
[8] box in the first seat.
[9]    Put Mr. Brown under oath.
[10] Chris Brown,
[11] having been duly sworn, answered questions put to him by
      judge Keenan as follows:
[12]    THE COURT: You want to tell us what happened.
[13]    MR. BROWN: Well, I am, as you said, from Canada and
[14] it was July 4th and I wanted to see a bit of New York, so I
[15] went and saw a play, came back to my hotel. I looked on the
[16] Internet for a place to have dinner and I picked a couple and
[17] I went to one in the East Village and I waited in line and sat
[18] down, ordered my meal by myself, and after about 15 minutes or
[19] so, a woman came up to me and asked me if I was a journalist,
[20] and I was quite surprised, said I was, and she asked me if I
[21] had been at the trial, a terrorism trial in New York, and I
[22] said I had, and she identified herself to me as one of the
[23] jurors in the case and we had a chuckle that it was a pretty
[24] small world and it was a pretty odd coincidence that we would
[25] be here. I told her my first name and she told me her name.

---

Page 667

[1]    THE COURT: What is her first name?
[2]    MR. BROWN: I believe it's Coree.
[3]    THE COURT: Do you know what seat she is in?
[4]    MR. BROWN: I am not sure. I would not have
[5] recognized her if we had not met.
[6]    THE COURT: What else was said?
[7]    MR. BROWN: I asked her if, I said I didn't realize
[8] you would still be working during a trial, she said she worked
[9] in the evening and she wrote plays, and that was essentially
[10] it.
[11]    THE COURT: Did you ask her about interviewing her?
[12]    MR. BROWN: We exchanged some phone numbers. I am
[13] going back to Canada probably this evening, and that was it.
[14]    THE COURT: Was there a discussion about interviewing
[15] her?
[16]    MR. BROWN: It wasn't, no, there was no discussion
[17] about interviewing her. I gave her my phone number.
[18]    THE COURT: What was the purpose of giving her your
[19] phone number if it was not to interview her?
[20]    MR. BROWN: To talk about the trial afterwards when I
[21] was back in Canada.
[22]    THE COURT: There was some talk about interviewing
[23] her after the trial?
[24]    MR. BROWN: I suppose she might have construed it as
[25] that. It would have not been for an interview; we don't do

---

Page 668

[1] that back in Canada, we don't interview jurors.

[2]     THE COURT: Was there any talk between the two of you

[3] about anything that happened during the course of the trial?

[4]     MR. BROWN: She mentioned that it was, I think, I

[5] can't remember her exact words, she said it was very

[6] interesting, and she said that, no, she made a zipper movement

[7] on her mouth to say — this was unprompted, I did not ask her

[8] to speak to me about the trial — she said, oh, there is a lot

[9] I would like to say, but she made a zipper movement.

[10]     THE COURT: Was there any reference to the fact that

[11] the defendant had hit himself in the head and hit his head

[12] upon the defense counsel table?

[13]     MR. BROWN: I wasn't here that day when that

[14] happened.

[15]     THE COURT: I didn't ask you if you were here that

[16] day. I asked if there was any discussion between you and her

[17] about that.

[18]     MR. BROWN: I don't recall; I don't honestly

[19] remember.

[20]     THE COURT: Mr. Ryan, when you first advised me about

[21] this three or four minutes ago, you told me that Mr. Brown had

[22] told you something about —

[23]     MR. RYAN: No, the juror told me, not him.

[24]     THE COURT: Is Juror No. 6 here, Coree Spencer?

[25]     MR. RYAN: Yes.

Page 669

[1]     THE COURT: Who spoke to you, Mr. Brown or

[2] Ms. Spencer?

[3]     MR. RYAN: Mr. Brown and Ms. Spencer.

[4]     THE COURT: Mr. Brown, I unequivocally tell you, you

[5] don't speak to my jurors; whether they come to you or don't

[6] come to you, don't speak to any jurors in this case,

[7] unequivocally.

[8]     I want to see Ms. Spencer with counsel in the robing

[9] room.

[10]     (Discussion off the record in the robing room)

[11]     THE COURT: Mr. Ryan, what was said to you about the

[12] incident when the defendant hit his head on the table and who

[13] said it?

[14]     MR. RYAN: Ms. Spencer, the juror, said they were

[15] joking around about the fact that the defendant banged his

[16] head on the table, and that somebody looked like a bird. They

[17] were joking about somebody's appearance; I don't know who they

[18] were referring to.

[19]     THE COURT: All right. Bring in Ms. Spencer.

[20]     (Juror No. 6 enters robing room)

[21]     THE COURT: Good morning, Ms. Spencer. We have

[22] interviewed Mr. Brown, the reporter from Canada.

[23]     What exactly happened?

[24]     JUROR NO. 6: I was working at the restaurant that I

[25] work at on the Fourth of July. He came into the restaurant.

Page 670

[1] He didn't know I worked there. He got a recommendation from

[2] someone. And I looked at him like he looked familiar. I went

[3] over to his table. I said you are a reporter and he said yes.

[4] I said I am a juror.

[5]     THE COURT: Why did you say that.

[6]     JUROR NO. 6: I shouldn't have?

[7]     THE COURT: Didn't I tell you each day not to discuss

[8] the case?

[9]     JUROR NO. 6: I am sorry. It's my fault.

[10]     THE COURT: You went over and said I am a juror.

[11] Tell us what happened.

[12]     JUROR NO. 6: Then he said, yes, it's a very

[13] interesting case. I said yes. He said something to that it

[14] was weird when Mr. Haouari got up and jumped up.

[15]     THE COURT: He said that?

[16]     JUROR NO. 6: Yes. I said yes.

[17]     THE COURT: He just told us that he wasn't here that

[18] day. He was the one who said that, not you?

[19]     JUROR NO. 6: No.

[20]     THE COURT: What did you say when he said that?

[21]     JUROR NO. 6: I said, yes, that was weird, kind of

[22] sad, because the other guy was grabbing his face then.

[23]     THE COURT: You exchanged phone numbers with him?

[24]     JUROR NO. 6: He said would you talk to me, I said I

[25] will talk to you after the case, and he asked me for my card.

Page 671

[1]     THE COURT: You gave him your card?

[2]     JUROR NO. 6: I gave him my card.

[3]     THE COURT: He gave you his card?

[4]     JUROR NO. 6: No, I never got his card; he said he

[5] was going to give it to me.

[6]     THE COURT: Did you say anything else to him or did

[7] he say anything else to you?

[8]     JUROR NO. 6: I said the guy on the defense just

[9] looked like a funny, little bird, the defense, Ressam. That's

[10] all, then I was like I shouldn't.

[11]     THE COURT: Excuse me?

[12]     JUROR NO. 6: I shouldn't be saying that.

[13]     Then we started talking about the fireworks. That

[14] was it; that was all.

[15]     THE COURT: Have you discussed any of this with any

[16] of the other jurors?

[17]     JUROR NO. 6: I came in, I told them that I saw him.

[18] They told me I should tell.

[19]     THE COURT: You came in when, yesterday or today?

[20]     JUROR NO. 6: Yesterday, I told them yesterday. I

[21] felt really bad. I came in today, I said, you know, I have

[22] got to tell someone.

[23]     THE COURT: How many jurors did you talk to about

[24] this?

[25]     JUROR NO. 6: They all know.

UNITED STATES OF AMERICA   v.
MOKHTAR HAOUARI

**Trial**
**July 6, 2001**

---

Page 672

[1]  THE COURT: They all know?

[2]  JUROR NO. 6: They all know.

[3]  THE COURT: Did you tell them what you said to the

[4]  reporter?

[5]  JUROR NO. 6: Yes, I did.

[6]  THE COURT: What did you tell them you said to the

[7]  reporter?

[8]  JUROR NO. 6: I told them exactly what I told you.

[9]  THE COURT: What did they say?

[10]  JUROR NO. 6: They said that I shouldn't have done

[11]  that.

[12]  THE COURT: Who told you, if you recall, amongst the

[13]  jurors that you shouldn't have done that, if you remember?

[14]  JUROR NO. 6: Basically all of them. They said, you

[15]  know. That's why I told you. I didn't know if I should come

[16]  forward.

[17]  THE COURT: Just wait outside a moment.

[18]  (Juror No. 6 leaves robing room)

[19]  THE COURT: Mr. Ryan, wait there with her, please.

[20]  What is the pleasure of counsel?

[21]  MR. OLLEN: Me?

[22]  THE COURT: Both sides.

[23]  MR. OLLEN: I think she should be excused.

[24]  MR. BIANCO: I agree.

[25]  THE COURT: Both sides think she should be excused,

---

Page 673

[1]  Anything else?

[2]  MR. OLLEN: No.

[3]  MR. BIANCO: No.

[4]  THE COURT: Bring the juror back in.

[5]  (Juror No. 6 reenters robing room)

[6]  THE COURT: Ms. Spencer, both sides, and I agree with

[7]  them, think you should be excused.

[8]  This is very serious stuff.

[9]  JUROR NO. 6: I know. I am sorry.

[10]  THE COURT: I know you say you are sorry. I am sure

[11]  you are. See, in order not to make everybody's lives

[12]  exceedingly difficult, I didn't put you in a hotel, I could

[13]  have done that. This is the kind of case where I could very

[14]  simply have just said I am going to sequester the jurors for

[15]  the course of the trial. We could have made everybody work

[16]  until 7:00 every night, because if I put you in a hotel,

[17]  sequestered you, I would be making life so difficult for the

[18]  jurors that I would try to get the case over faster.

[19]  You have really jeopardized something here very

[20]  seriously. I hope to some degree you understand that. The

[21]  point being that we only chose four alternates, we are going

[22]  to be down to one alternate juror.

[23]  Do you have anything in the jury room?

[24]  JUROR NO. 6: Yes, I have my bag.

[25]  THE COURT: I am going to ask you to wait with Mr.

---

Page 674

[1]  Ryan here.

[2]  Mr. Ryan, can you take Ms. Spencer out around through

[3]  Judge Carter's courtroom into the jury room alone and have the

[4]  jury brought in separately from her.

[5]  I don't want you talking to any of the jurors any

[6]  more. Wait outside. Thank you very much.

[7]  (Juror No. 6 excused)

[8]  THE COURT: Is there anything else anybody wants me

[9]  to say or do at this point?

[10]  MR. BIANCO: The reporter lied to you.

[11]  MR. OLLEN: Somebody is lying.

[12]  MR. BIANCO: Why would she lie about that?

[13]  THE COURT: There is nothing else that anybody wants

[14]  me to do. We can go off the record.

[15]  (Discussion off the record)

[16]  (Continued on next page)

---

Page 675

[1]  (In open court, jury present)

[2]  THE COURT: As I understand, you all know that former

[3]  Juror No. 6, Ms. Spencer, spoke to someone about the case out

[4]  of the courtroom on the Fourth of July. First of all, I want

[5]  to compliment you, because as I understand it, and as counsel

[6]  have been told, it was the other jurors who importuned her and

[7]  told her to tell us about it. She didn't tell us about it

[8]  yesterday and the person to whom she spoke didn't tell us

[9]  about it yesterday. We would have never learned it probably

[10]  had it not been for you. So I compliment you and I thank you.

[11]  But I think this impresses upon us all the importance

[12]  of not talking to anybody about the case. That means anybody.

[13]  And unfortunately, what the young lady did was she, both the

[14]  person to whom she spoke and she agree on this, she initiated

[15]  the conversation, which was one of the most incredible things

[16]  that I have heard about in my time, either at the bar or on

[17]  the bench.

[18]  So, I urge you, don't discuss the case with anyone.

[19]  Don't come to any conclusions concerning the case. If

[20]  somebody tries to talk to you about the case, just tell them

[21]  to go away and immediately tell Mr. Ryan and immediately tell

[22]  me.

[23]  Ms. Phillips, you are Juror No. 6.

[24]  The next thing I say to all 13 of you, stay healthy,

[25]  stay well. Watch yourself, watch yourself crossing the

---

Page 676

[1] street. If you go swimming over the weekend, go in the
[2] shallow end of the pool. If you see me on the golf course, go
[3] play the other 9, because I will be all over the place. All
[4] right. Thank you all again for your cooperation and for
[5] telling Ms. Spencer to let us know about it. Thank you.
[6]     You may continue cross-examination, Mr. Ollen.
[7]     MR. OLLEN: Thank you, judge.
[8] AHMED RESSAM, resumed.
[9]     (Through interpreter)
[10] CROSS-EXAMINATION (Continuing)
[11]     BY MR. OLLEN:
[12]     Q: Mr. Ressam, you told us on direct examination that there
[13] came a time where you discussed your views about the United
[14] States with Mr. Haouari, correct?
[15]     A: Yes, I discussed certain issues.
[16]     Q: You told us on direct examination that you told
[17] Mr. Haouari that the United States was an enemy of Islam and
[18] it was better to hit the biggest enemy, America, correct?
[19]     A: Yes.
[20]     Q: Do you remember on May 17, 2001, meeting in Seattle with
[21] assistant United States attorneys, your lawyers, and federal
[22] agents?
[23]     A: Yes.
[24]     Q: Do you recall telling all those law enforcement people on
[25] that day that you do not recall if you ever discussed your

Page 677

[1] views about the United States with Mokhtar?
[2]     A: I cannot remember that.
[3]     MR. OLLEN: May I approach, the witness, your Honor?
[4]     THE COURT: You may.
[5]     MR. OLLEN: I am going to show you a document, Mr.
[6] Ressam. I will ask the translator to read part of that
[7] document to you, and just don't answer, don't say anything
[8] until I ask you the question, just the part with the star.
[9]     (Interpreter reading document to witness)
[10]     Q: After hearing the translation of part of that document
[11] from the translator, Mr. Ressam, do you now recall that on May
[12] 17, you told federal law enforcement authorities that you do
[13] not recall if you ever discussed your views about the United
[14] States with Mokhtar?
[15]     A: At that time I did tell them that I did not remember
[16] whether I did discuss my opinions about the United States, but
[17] now that I remember, now I remember that I did.
[18]     Q: So back on May 17 of 2001, you told the law enforcement
[19] authorities you did not discuss your views about the United
[20] States, and today you remember that you actually did discuss
[21] your views; is that your testimony?
[22]     A: At that time I did not remember that I had discussed my
[23] views about the United States.
[24]     Q: You are the kind of person whose memory gets better over
[25] the course of time?

Page 678

[1]     A: Yes. Sometimes when I go back and think, I remember
[2] things.
[3]     Q: Let me ask you this question. You told us on direct
[4] examination that you discussed the United States Embassy
[5] bombings in Africa with Mr. Haouari and you told him the
[6] bombings were justified, remember?
[7]     A: I discussed with him in general terms, yes, the U.S.,
[8] America, and the explosives.
[9]     Q: And you told Haouari that in your opinion the American
[10] Embassy bombings in Africa were justified, correct?
[11]     A: Yes, I did.
[12]     Q: Do you recall in the same interview on May 17, 2001 in
[13] front of the same law enforcement officials, that you told
[14] them that you do not recall expressing to Mokhtar your belief
[15] that the bombings of the American Embassies in Africa were
[16] justified actions?
[17]     A: Yes.
[18]     Q: You told us on direct examination, Mr. Ressam, that you
[19] asked Mokhtar for a driver license and an Algerian passport
[20] and that Mokhtar produced both of those documents to you,
[21] correct?
[22]     A: I had told them initially that I requested from him a
[23] driver license, and then later I told them that I requested
[24] also an Algerian passport.
[25]     Q: You told us on your direct examination by Mr. Bianco that

Page 679

[1] Mokhtar Haouari produced a driver license and an Algerian
[2] passport, correct?
[3]     A: I asked him to obtain one for me. I said I asked him to
[4] obtain one for me and for me to get it later on from him. But
[5] he had given me only the driver license.
[6]     MR. OLLEN: May I have one moment, judge.
[7]     THE COURT: You may.
[8]     (Pause)
[9]     Q: Did you tell us on direct examination that after you asked
[10] Mr. Haouari for the Algerian passport, that Mr. Haouari found
[11] such a passport?
[12]     A: Yes.
[13]     Q: Did he ever produce to you an Algerian passport?
[14]     A: No, he did not. I had given him a photograph and I said
[15] upon my return from the U.S. I will take it from you.
[16]     Q: Mr. Ressam, you first met with the government on May 10,
[17] 2001, correct?
[18]     A: I don't remember the date precisely.
[19]     Q: Would it be fair to say that May 10 of 2001 is the
[20] approximate date of when you first met with the government
[21] when you were attempting to cooperate?
[22]     A: Yes.
[23]     Q: Since the time that you first met with the government, you
[24] met with them also on May 15, correct?
[25]     A: I met with them many days; I don't remember precisely

Page 680

[1] which ones.

[2]     Q: You met with them approximately 14 times between May 10
[3] and June 23 of this year, correct?

[4]     A: Approximately; I don't remember precisely.

[5]     Q: Isn't it a fact, Mr. Ressam, that during every single one
[6] of those meetings you were asked questions about your
[7] relationship with Mokhtar Haouari and about the facts
[8] detailing the Los Angeles bombing?

[9]     A: Yes.

[10]    Q: Isn't it true, Mr. Ressam, that not once during those
[11] meetings, from May 10 to June 23, did you ever mention that
[12] you asked Mokhtar Haouari for an Algerian passport?

[13]    A: Yes, correct.

[14]    Q: The only document that you received from Mokhtar Haouari
[15] was the Roig driver license, correct?

[16]    A: Yes, correct.

[17]    Q: You told us on direct examination that you were going,
[18] that you told Mokhtar Haouari that you were going to Vancouver
[19] to prepare things and to prepare your affairs; do you remember
[20] saying that?

[21]    A: Yes.

[22]    Q: Do you recall when you were interviewed by the FBI and
[23] others on May 16, 2001, that you told them that you told
[24] Mokhtar that you were going to Vancouver but you did not tell
[25] Mokhtar why you were going there; did you say that?

Page 681

[1]     A: Yes, that's correct; I did not tell him precisely what I
[2] was going to do.

[3]     Q: Later on, on May 17, 2001, when you were interviewed by
[4] the FBI and others, you told them on that day that you never
[5] told Mokhtar the reason for your trip to Vancouver, correct?

[6]     A: Yes, I told him that I am going to prepare my affairs; I
[7] did not tell him precisely what.

[8]     Q: Mr. Ressam, you told us on direct examination that you had
[9] discussed some bombings in France with Mr. Haouari, correct?

[10]    A: We talked very in general terms about the bombings in
[11] France and the embassy bombings in general terms.

[12]    Q: Mr. Ressam, isn't it a fact that not once in your 14
[13] meetings with the government, from May 10 to June 23, did you
[14] mention that you had ever discussed bombings in France with
[15] Mokhtar Haouari?

[16]    A: That's correct, I did not tell him.

[17]    Q: You say that it was your intention to bomb one airport and
[18] one airport only, correct?

[19]    A: Yes.

[20]    Q: You bought a map of Los Angeles while you were in Canada,
[21] correct?

[22]    A: Yes, correct.

[23]    Q: You bought that map of Los Angeles in September of 1999,
[24] correct?

[25]    A: I bought it in that summer.

Page 682

[1]     Q: If you only intended to blow up one airport, why did you
[2] circle three airports on the map?

[3]     A: To know precisely where those three airports are.

[4]     Q: Why did you need to know where the other airports were if
[5] you only intended to blow up Los Angeles International
[6] Airport?

[7]     A: Yes, the idea was to go to Los Angeles, check out the
[8] airports and possibly change my target. If I find that I am
[9] incapable of bombing Los Angeles Airport, I would choose
[10] another airport.

[11]    Q: Mr. Ressam, I am going to ask you some questions relating
[12] to the money that you had in your possession when you were
[13] arrested.

[14]    A: Yes.

[15]    Q: You told us that somebody named Zemmiri gave you $3500
[16] before your trip to the United States, correct?

[17]    A: Yes, he assisted me; he assisted me.

[18]    Q: The question is did Zemmiri give you $3500 before you went
[19] to the United States to conduct your operation?

[20]    A: It was in November, before that, before that.

[21]    Q: Did Zemmiri give you $3500, yes or no?

[22]    A: Yes, he did give me.

[23]    Q: You say that you told us yesterday that another person who
[24] will remain nameless gave you $100, correct?

[25]    A: Yes.

Page 683

[1]     Q: You say that Haouari gave you $3,000, correct?

[2]     A: As far as I can remember, yes.

[3]     Q: As far as you can remember?

[4]     A: No, he gave me that money, yes.

[5]     Q: Are you having some question about it as you sit here
[6] today?

[7]     A: No, no, no.

[8]     Q: Why would you answer such a question as "as far as I can
[9] remember" if you didn't have some doubt about it today?

[10]    A: It is the amount that I am thinking about it; it is not
[11] whether he gave me or not.

[12]    Q: So when you testified yesterday under oath on direct
[13] examination that Haouari gave you $3,000, is it your testimony
[14] you are not sure about that?

[15]    A: No, I remember he gave me the money. I am certain.

[16]    Q: How much money did he give you?

[17]    A: As far as I can remember, $3,000.

[18]    Q: Are you sure about that?

[19]    A: As far as I can remember, it was $3,000.

[20]    Q: Before you came to the United States, you were given
[21] $12,000 from one of your associates to use for your operation,
[22] correct?

[23]    A: Yes, that's correct.

[24]    Q: So the total amount of money between the four people we
[25] mentioned who donated to your cause was $18,600, correct?



Page 684

[1]   A: How is that?
[2]   Q: Pardon me?
[3]   A: How is that?
[4]   Q: Haouari gives you $3,000, right?
[5]   A: Yes.
[6]   Q: Zemmiri gives you $3500, right?
[7]   A: As far as I can remember.
[8]   Q: As far as you can remember?
[9]   A: The amount.
[10]  Q: You testified on direct examination under oath that the
[11]  amount was $3500. Are you saying today that you are not sure
[12]  of the amount that Zemmiri gave you?
[13]  A: Yes, it is correct. He gave me 2,500 or 2,000, and then
[14]  he added to that another $1500.
[15]  Q: Between the amount of money that you say Haouari gave you
[16]  and the amount Zemmiri gave you, that adds up to $6,500, is
[17]  that correct?
[18]  A: Yes.
[19]  Q: We add the $100 that the other guy gave you to give us
[20]  6600, correct?
[21]  A: Yes.
[22]  Q: And we add to that number the $12,000 you received from
[23]  your associate before you came to the United States.
[24]  A: Yes.
[25]  Q: That comes out to $18,600, am I right?

Page 685

[1]   A: Yes.
[2]   Q: How much money did you have with you when you were
[3]   arrested?
[4]   A: $1,000.
[5]   Q: About $1,000, am I right?
[6]   A: Yes, about.
[7]   Q: The money that you say Mokhtar Haouari gave you, the
[8]   $3,000, he gave that to you before you went to Vancouver on
[9]   November 17, 2001, correct?
[10]  A: Yes.
[11]  Q: You considered the $3,000 that Haouari gave you a loan
[12]  that you intended to repay, correct?
[13]  A: Yes, I told him later on, take it from my share in the
[14]  store.
[15]  Q: Before you got to the United States in December with the
[16]  bombs, you had already spent all the money that you say
[17]  Haouari gave you, correct?
[18]  A: I don't know precisely. I had a lot of money that I
[19]  combined together and I spent it. I don't know exactly.
[20]  Q: Let me ask you this. On May 15, 2001, do you remember
[21]  meeting in Seattle with FBI Agent Cohen, Assistant United
[22]  States Attorney Robin Baker, your lawyers, your defense
[23]  investigator, an Arabic translator, and an assistant United
[24]  States attorney for the Western District of Washington; do you
[25]  remember meeting with those people?

Page 686

[1]   A: Yes, I do.
[2]   Q: Do you remember telling all those law enforcement people,
[3]   on May 15, 2001, that you had spent the money that you were
[4]   given by Mokhtar Haouari?
[5]   A: Listen to me. I told them that the money that Haouari
[6]   gave me, I combined with the other money that I had, and I
[7]   spent them all together.
[8]   Q: Mr. Ressam, please listen to the question. Just answer
[9]   this question. Did you tell all those law enforcement people
[10]  on May 15, 2001, that you had spent the money that Haouari
[11]  gave you?
[12]  A: Yes, I spent it.
[13]  Q: The timing devices that you bought in order to set the
[14]  bomb off, you bought those bombing devices in September of
[15]  1999, correct?
[16]  A: Yes.
[17]  Q: Many of the ingredients you used to manufacture the bomb
[18]  you had brought with you from Afghanistan, correct?
[19]  A: Yes.
[20]  Q: The other components that you needed to make your bomb,
[21]  you stole most of them, correct?
[22]  A: Yes, correct.
[23]  Q: The driver license that you asked Haouari to get for you,
[24]  you asked Haouari to get you that license before your November
[25]  17 trip to Vancouver, correct?

Page 687

[1]   A: Yes, prior to my going to Vancouver.
[2]   Q: On November, I am talking about the Vancouver, November 17
[3]   trip.
[4]   A: Yes.
[5]   Q: You never told Mr. Haouari what you intended to do with
[6]   that license, correct?
[7]   A: That's correct, yes, that's correct.
[8]   Q: Mr. Haouari never asked you what you intended to do with
[9]   that license, correct?
[10]  A: Yes, that's correct.
[11]  Q: In fact, Mr. Ressam, you never even used the driver
[12]  license that Haouari gave you, correct?
[13]  A: That's correct, I did not use it. The idea was to use it
[14]  in America.
[15]  Q: Mr. Haouari, on May 17, 2001, do you recall —
[16]  THE COURT: You mean Mr. Ressam.
[17]  MR. OLLEN: Sorry. Thank you.
[18]  Q: Mr. Ressam, on May 17, 2001, do you recall telling federal
[19]  agents that you never told Mokhtar anything about what you
[20]  intended to do in the United States?
[21]  A: I did not, that's correct; I did not tell him precisely,
[22]  and I did not give him the target.
[23]  Q: Mr. Ressam, you testified yesterday that since you have
[24]  agreed to cooperate with the federal government, you have lied
[25]  to the federal agents and the prosecutors, correct?

Page 688

[1]  A: Yes, I lied a few times.

[2]  Q: One of the lies you told us about yesterday was the reason
[3] that you were purchasing the gun with a silencer, correct?

[4]  A: Yes.

[5]  Q: And the second lie that you told the law enforcement
[6] authorities was that you weren't up front about your jihad
[7] associates in Canada when you first spoke to them, correct?

[8]  A: I don't understand precisely your question; what do you
[9] want?

[10]  Q: You weren't totally honest with the government when you
[11] first began to speak to them about your friends in Canada and
[12] your associates in Canada who were involved in jihad, correct?

[13]  A: Yes.

[14]  Q: The reason you weren't up front with the government about
[15] your friends in Canada was because you were trying to protect
[16] them from prosecution, correct?

[17]  A: For two reasons, actually; I was concerned about them
[18] being prosecuted and also I was afraid about my family.

[19]  Q: Mr. Ressam, there came a time when you made some purchases
[20] relating to your operation and these purchases were made in
[21] Canada, correct?

[22]  A: Yes.

[23]  Q: Mokhtar Haouari never came with you when you made any of
[24] those purchases, correct?

[25]  A: Yes, that's correct.

Page 689

[1]  Q: When you were in Vancouver on your November 17 trip before
[2] you returned to Montreal, you had no contact whatsoever with
[3] Mokhtar Haouari, correct?

[4]  A: Do you mean when I was in Vancouver?

[5]  Q: Yes.

[6]  A: No, I did not contact him.

[7]  Q: When you get back from Vancouver, you say Haouari gives
[8] you the Roig driver license, correct?

[9]  A: Yes, that's right.

[10]  Q: Haouari doesn't ask you any questions about how you are
[11] going to use it, correct?

[12]  A: No, he did not ask me.

[13]  Q: You never told Haouari that your friend Abdelmajid
[14] Dahoumane was helping you in Vancouver, correct?

[15]  A: I don't remember that. I remember one thing. I told him
[16] that when Abdelmajid comes, give him a visa.

[17]  MR. OLLEN: May I have a moment, judge.

[18]  THE COURT: Sure. At some point I want to see
[19] counsel at the sidebar without the court reporter before you
[20] finish cross.

[21]  MR. OLLEN: Shall we do that now, judge.

[22]  THE COURT: Sure.

[23]  (Discussion off the record at the sidebar)

[24]  (In open court)

[25]  BY MR. OLLEN:

Page 690

[1]  Q: Mr. Ressam, let me just go back a moment. You never told
[2] Mr. Haouari that Dahoumane was assisting you in Vancouver, is
[3] that true?

[4]  A: I don't remember. I remember one thing.

[5]  Q: Just answer the question. You don't remember?

[6]  A: No, I don't remember.

[7]  MR. OLLEN: May I approach, your Honor.

[8]  THE COURT: You may.

[9]  MR. OLLEN: Take a look, I am going to ask the
[10] translator to read a passage to you, and don't say anything
[11] until I ask you a question, please.

[12]  (Interpreter reading document to witness)

[13]  THE COURT: Which exhibit?

[14]  MR. OLLEN: D, page 5, right in the middle.

[15]  (Pause)

[16]  BY MR. OLLEN:

[17]  Q: Having heard what the translator just read to you, does
[18] that refresh your recollection about whether or not you ever
[19] told Mokhtar — excuse me. Does that refresh your
[20] recollection that you never told Mokhtar that Abdelmajid was
[21] assisting you in Vancouver?

[22]  A: I didn't tell him. I don't think I told him.

[23]  Q: As a matter of fact, you never told Mokhtar —

[24]  A: Or rather I don't remember.

[25]  Q: You never told Mokhtar that Dahoumane was assisting you at

Page 691

[1] all in the operation, correct?

[2]  A: I don't remember I told him.

[3]  Q: You never told Mokhtar that you had a gun, correct?

[4]  A: No, I didn't tell him.

[5]  Q: I want to go back for a moment to the money and what you
[6] told the FBI about the money. You told us on
[7] cross-examination earlier that you told the FBI that you had
[8] spent the money that Haouari gave you, correct?

[9]  A: Yes.

[10]  Q: Did that, when you said that to the FBI, did that provoke
[11] a reaction in the room? Did they appear to be upset with you
[12] with that answer?

[13]  A: No. I have told you that I have, and I told them that I
[14] had put all the money together and I spent all the money.

[15]  (Continued on next page)

Page 692

[1]   Q: Do you remember in the same interview where you told them

[2]   that you spent the money, you later told them that it is

[3]   possible that some of the money you had upon your arrest was

[4]   the money that was provided by Mr. Haouari?

[5]   A: How is that?

[6]   Q: Did you say that to the FBI agents in the very same

[7]   interview?

[8]   A: The money that I had in my pocket?

[9]   Q: Yes, when you were arrested.

[10]   A: I repeat and say that the money that I got from Haouari I

[11]   took and combined with the other money and I spent from that

[12]   money.

[13]   Q: You saw Mr. Haouari two times immediately before you left

[14]   Vancouver on December 6th or December 7th; correct?

[15]   THE COURT: No. Read the question. Hold it. Read

[16]   the question back to Mr. Ollen. You can't have meant what you

[17]   said because it doesn't make any sense in the context of this

[18]   case.

[19]   Read the question, please.

[20]   (Record read)

[21]   MS. BAKER: I didn't mean Vancouver.

[22]   THE COURT: I knew you didn't.

[23]   MR. OLLEN: I'm sorry.

[24]   THE COURT: That's why I had the question read. Put

[25]   the question again.

Page 693

[1]   MR. OLLEN: I'm sorry.

[2]   THE COURT: No problem.

[3]   Q: Mr. Ressam, you left Montreal for Vancouver on

[4]   December 6th or December 7th, 2001; correct?

[5]   A: As far as I can remember, yes, that's right.

[6]   Q: Immediately before you left Montreal to go to Vancouver on

[7]   one of those days, you met Mr. Haouari two times; correct?

[8]   A: Yes, I met with him. I don't remember, more than twice.

[9]   Q: The day before you left, you met Mr. Haouari at a Dunkin

[10]   Donuts; correct?

[11]   A: Yes, I don't remember precisely the date, but I remember

[12]   the meeting and the place very specifically.

[13]   Q: And you told Mr. Haouari at that time that you were going

[14]   to Vancouver; correct?

[15]   A: Yes.

[16]   Q: You did not tell him why you were going to Vancouver;

[17]   correct?

[18]   A: No, he knew that I was going to America.

[19]   Q: Do you recall on May 17th telling FBI agents and others

[20]   that Ressam — that you never told Mokhtar the reason for your

[21]   trip to Vancouver? Do you remember that?

[22]   A: No, I don't remember.

[23]   MR. OLLEN: May I approach the witness, Judge?

[24]   THE COURT: You may.

[25]   MR. OLLEN: I'm going to ask again the translator to

Page 694

[1]   read a passage from this document. Judge, it is D-3, just the

[2]   underlined part. Please don't say anything until I ask you a

[3]   question.

[4]   Q: After having been read a portion of that document, does

[5]   that refresh your recollection that on May 17th of 2001, you

[6]   told federal agents that you never told Mokhtar the reason for

[7]   your trip to Vancouver?

[8]   A: Yes.

[9]   Q: You did say that to the FBI agents; correct?

[10]   A: I don't remember — I told them that — I don't remember

[11]   precisely what I told them. I was thinking of other things.

[12]   Q: The day you left for Vancouver on your final trip, you ran

[13]   into Mokhtar Haouari in a pizza place in Montreal; correct?

[14]   A: Correct. I was going to leave the day before, but I ran

[15]   into a problem, so I did run into him the next day.

[16]   Q: And in the pizza place, you never discussed Vancouver with

[17]   Mr. Haouari; correct?

[18]   A: No, we didn't discuss anything. He asked me: You didn't

[19]   leave yet? I said: No, I missed my plane.

[20]   Q: That was the last conversation that you ever had with

[21]   Mokhtar Haouari; correct?

[22]   A: Yes, I — as far as I can remember, it was the last on

[23]   that last evening; yes.

[24]   Q: I want to go back just briefly to your training at the

[25]   Afghanistan camps. And as part of your training, you were

Page 695

[1]   instructed about past terrorist operations; correct?

[2]   A: Yes.

[3]   Q: You studied these past operations in an attempt to learn

[4]   from past mistakes and past successes; correct?

[5]   A: Yes.

[6]   Q: And your instructors during these discussions gave you

[7]   examples of past terrorist attacks and they were discussed

[8]   among you as either failures or successes; am I right?

[9]   A: Yes.

[10]   Q: One of the examples that you were involved in discussing

[11]   was the assassination of Egyptian president Anwar Sadat;

[12]   correct?

[13]   A: Yes.

[14]   Q: And you and your associates in the camp considered the

[15]   assassination of Anwar Sadat as a success; correct?

[16]   A: Yes, correct.

[17]   Q: Another terrorist activity that you discussed was the

[18]   foiled assassination of Egyptian President Mubarak; correct?

[19]   A: Yes.

[20]   Q: And that foiled assassination was considered a failure by

[21]   you and your comrades because an AK-47 jammed and Mubarak did

[22]   not end up dead; correct?

[23]   A: Yes, as far as I can remember; correct.

[24]   Q: Another terrorist act that your men discussed was the

[25]   kidnapping by the PLO, the kidnapping, and the execution of

Page 696

[1] the Israeli athletes at the Olympics, do you remember that?

[2] A: Yes, correct.

[3] Q: That was a success in your view; correct?

[4] A: It failed. It didn't succeed.

[5] Q: The final terrorist act that you men discussed at the camp

[6] was the bombing of the marine barracks in Lebanon; correct?

[7] A: Yes.

[8] Q: That bombing killed over 250 American military personnel;

[9] correct?

[10] A: I don't remember the number, the exact number. We

[11] discussed also the bombing at the airport in Lebanon also.

[12] Q: Let's get back to the marine bombing. The bombing of the

[13] marine barracks in Lebanon resulted in the death of many

[14] American military personnel while they slept; correct?

[15] A: I don't know. I don't remember.

[16] Q: The bombing of the marine barracks in Lebanon was

[17] considered by you and your comrades as a successful operation;

[18] correct?

[19] A: Yes, correct.

[20] Q: You were taught at the camps in Afghanistan, you told us

[21] yesterday that it was — one of the first things you learned

[22] was to preserve your secrets; am I right?

[23] A: Yes, that's correct.

[24] Q: And the way that you accomplished preserving your secrets

[25] was that only two or three men in each operation would know

Page 697

[1] the details; correct?

[2] A: Yes, we share with them only what they need to know

[3] depending on their role.

[4] Q: Information should be given out on a need-to-know basis

[5] when you're conducting an operation; correct? That's what you

[6] were taught?

[7] A: Yes; that's correct.

[8] Q: Before you took your last trip to Vancouver to go to the

[9] United States, you had told Dahoumane, Zemmeri, the guy who

[10] blew up the airport, Mohamed, Abu Doha, Abu Jaffar, Araar,

[11] several other unnamed associates in Canada, Mokhtar Haouari,

[12] and you had asked Mokhtar Haouari to give information to

[13] Meskini who had told all those people about your planned

[14] operation; is that your testimony?

[15] A: No, they did not know the details.

[16] Q: Every single one of the people I just mentioned according

[17] to your testimony was aware that you were about to conduct a

[18] terrorist operation in the United States, is that your

[19] testimony?

[20] A: Some did not know. Said Araar did not know.

[21] Q: Said Araar did not know anything about your operation?

[22] A: He had a feeling about it, that's all. I did not discuss

[23] this with Araar. I did not discuss with him what I was going

[24] to do in America.

[25] Q: Said Araar was aware that you were planning a terrorist

Page 698

[1] operation and that you had been to Afghanistan for military

[2] training; correct?

[3] A: He knew, yes. He knew that I was in Afghanistan and I

[4] trained in Afghanistan, but in regard to the operation, he

[5] didn't know about it. He might have had a feeling about it,

[6] but I did not tell him. He might have felt something. That's

[7] something else.

[8] Q: Do you recall on June 23rd of 2001 discussing with the FBI

[9] agents Said Araar?

[10] A: Yes, I discussed Said Araar.

[11] Q: Do you remember telling the agents that Said Araar was

[12] aware that you were planning a terrorist operation?

[13] A: Maybe he felt from what I was telling him about what I was

[14] doing that I was planning an operation, but I did not come

[15] out — come straight out and tell him I was going to carry out

[16] an operation.

[17] Q: Mr. Ressam, before you decided to cooperate with the

[18] government, you had the opportunity to examine all the

[19] evidence in this case against you; correct?

[20] A: Yes, that's correct.

[21] Q: You went to trial in Los Angeles on your case; correct?

[22] A: Yes, that's correct.

[23] Q: You listened to the testimony of all the witnesses against

[24] you; correct?

[25] A: Yes.

Page 699

[1] Q: You were provided with a transcript of the proceedings;

[2] correct?

[3] A: Yes.

[4] Q: You were provided with free attorneys courtesy of the

[5] United States government; correct?

[6] A: Yes, that's correct.

[7] Q: You sat in court with your lawyers and their assistants

[8] and you listened to the testimony together; correct?

[9] A: Yes.

[10] Q: Your lawyers worked very hard for you; correct?

[11] A: Yes, that's correct.

[12] Q: Before you went to trial, you looked through hundreds of

[13] documents with the assistance of your lawyers; correct?

[14] A: Yes, correct.

[15] Q: You were able by looking at these documents before trial

[16] to see what phone calls that you made during your trip to

[17] Vancouver and the United States; correct?

[18] A: Yes.

[19] Q: And you were able to see what phone calls you received

[20] from others during that period; correct?

[21] A: Which calls do you mean?

[22] Q: Any phone calls that you might have received during your

[23] trip to Vancouver and later.

[24] A: Yes.

[25] Q: It was not until after you were convicted by a jury in Los

Page 700

[1] Angeles that you agreed to cooperate with the Federal
[2] Government in their case against Mokhtar Haouari; correct?
[3]   A: Yes, that's correct.
[4]   Q: You did that to save yourself a substantial amount of time
[5] in jail; correct?
[6]   A: Yes.
[7]   Q: You did that so you would not die in prison; correct?
[8]   A: Yes, that's correct.
[9]   MR. OLLEN: May I have one moment, Judge?
[10]   THE COURT: Sure.
[11]   (Pause)
[12]   Q: You signed your cooperation agreement with the United
[13] States government the Saturday before this trial started, is
[14] that correct?
[15]   A: Yes, that's correct.
[16]   Q: Every single one of your conversations with law
[17] enforcement officials from the United States government
[18] relating to this case took place after you were convicted;
[19] correct?
[20]   A: Yes, that's correct.
[21]   Q: Every one of those conversations took place after you
[22] reviewed every single piece of discovery material in your
[23] case; correct?
[24]   A: I was there. I was present during that period.
[25]   Q: And you reviewed before you decided to cooperate, you

Page 701

[1] looked at all the evidence that the government had against
[2] you; correct?
[3]   A: I didn't review anything.
[4]   Q: You didn't review the documents in your case with your
[5] lawyers?
[6]   A: After I was indicted?
[7]   Q: And before your trial?
[8]   A: Yes, yes, I looked over the files before the trial.
[9]   Q: And you did so with the assistance of your attorneys;
[10] correct?
[11]   A: Yes, that's correct.
[12]   Q: And, finally, Mr. Ressam, you did not agree to cooperate
[13] with the government until after you had listened to Abdelghani
[14] Meskini tell his version of the facts at your trial; correct?
[15]   A: That's not true.
[16]   Q: Perhaps I said "finally" too soon.
[17]   A: I don't understand your question.
[18]   THE COURT: He said: "I don't understand your
[19] question."
[20]   Let me ask you now: You went to trial in Los Angeles
[21] in April; right?
[22]   THE WITNESS: Yes, that's correct.
[23]   THE COURT: You had pleaded not guilty, is that
[24] right?
[25]   THE WITNESS: Correct, yes.

Page 702

[1]   THE COURT: How long did the trial last?
[2]   THE WITNESS: One month.
[3]   THE COURT: Did Abdelghani Meskini testify against
[4] you in Los Angeles in federal court at your trial?
[5]   THE WITNESS: Yes, he did testify.
[6]   THE COURT: Were you still pleading not guilty when
[7] he testified against you?
[8]   THE WITNESS: Yes.
[9]   THE COURT: Were you convicted by that jury in Los
[10] Angeles?
[11]   THE WITNESS: Yes.
[12]   THE COURT: When did you start to cooperate?
[13]   THE WITNESS: After my trial.
[14]   THE COURT: That was after Abdelghani Meskini
[15] testified against you, is that right?
[16]   THE WITNESS: Yes.
[17]   THE COURT: Go ahead.
[18]   MR. OLLEN: I have no further questions, your Honor.
[19]   THE COURT: All right.
[20]   Do you want to do redirect or do you want to recess
[21] now?
[22]   MR. BIANCO: If we could take a five-minute recess,
[23] your Honor.
[24]   THE COURT: We'll take our morning recess now.
[25]   Don't discuss the case or come to any conclusions

Page 703

[1] concerning the case.
[2]   (Jury excused)
[3]   (Recess)
[4]   (In open court; jury present)
[5] AHMED RESSAM, resumed.
[6]   THE COURT: You may proceed, Mr. Bianco.
[7]   MR. BIANCO: Thank you, your Honor.
[8]                 REDIRECT EXAMINATION
[9]                   BY MR. BIANCO:
[10]   Q: Mr. Ressam, do you recall Mr. Ollen asked you a series of
[11] questions about Samir Ait Mohamed?
[12]   A: Yes.
[13]   Q: What was the relationship between Samir Ait Mohamed and
[14] Mokhtar Haouari?
[15]   A: He was a colleague of his.
[16]   Q: Were they involved in crime together?
[17]   A: Yes.
[18]   Q: What was that?
[19]   A: In falsifying cards.
[20]   Q: The credit cards?
[21]   A: Yes, Visa cards.
[22]   Q: And you stated that in response to Mr. Ollen's questions
[23] that Samir was knowledgeable about the camps; correct?
[24]   A: Yes, he did.
[25]   Q: And he wanted to start his own camp in Afghanistan?

Page 704

[1] A: He and his colleagues, yes.

[2] Q: And you also testified that you spoke to the defendant

[3] about your experience in the camps generally?

[4] A: Yes.

[5] Q: Do you know whether Samir also spoke to the defendant

[6] about the camps and jihad?

[7] A: About jihad; yes.

[8] Q: And when you had those discussions about past bombings in

[9] France and the embassy bombings, Samir was there; correct?

[10] A: Yes, he was there.

[11] Q: Along with the defendant?

[12] A: Yes, Mokhtar.

[13] Q: And by the way, when you described the bombing in France,

[14] what were you referring to? What bombing was that?

[15] A: It is the bombings that occurred in past in '94, '95.

[16] Q: What was it?

[17] A: They were bombings at the metro stations.

[18] Q: And as far as your understanding went, who was responsible

[19] for those?

[20] A: It was, as far as I know, according to my information, it

[21] was the Algerian group.

[22] Q: And when you discussed that with the defendant, what did

[23] you say? What was your view of that bombing?

[24] A: We both were in agreement with those bombings.

[25] Q: Now, Mr. Ollen asked you a series of questions about trust

Page 705

[1] and security. Do you recall those questions?

[2] A: Yes.

[3] Q: And you stated you were going to send Abdelghani to camp

[4] based on Mokhtar Haouari's word; correct?

[5] A: Yes, that's correct.

[6] Q: And you were going to let Abdelghani help you with your

[7] terrorist operation based on Mokhtar Haouari's word?

[8] A: Yes.

[9] Q: And you told Mr. Ollen you were going to make — and you

[10] said you were going to make Abu Doha the contact person — I

[11] mean, you were going to make Mokhtar Haouari the contact

[12] person for Abu Doha after you?

[13] A: Yes, he will be put in contact with my colleague, Abu

[14] Doha, Rachid.

[15] Q: And without giving the defendant details of your

[16] operation, you entrusted with him with the fact that you were

[17] coming to the United States for a serious and dangerous job;

[18] correct?

[19] MR. OLLEN: Judge, I only object to the form of the

[20] question, not the content, Judge.

[21] THE COURT: You're objecting because it's leading?

[22] Sustained.

[23] Q: Well, what did you tell the defendant about your — in the

[24] meeting with him, when you told him you were coming to the

[25] United States, what did you tell him about the purpose of your

Page 706

[1] trip?

[2] A: I told him I have some very important business to do in

[3] America and dangerous, also.

[4] Q: And what did you tell him about the friend that he offered

[5] to help you? What instructions — what questions did you ask

[6] him regarding that friend?

[7] A: I asked him: Is he an Algerian? Does he speak the

[8] English language? Does he know how to drive? And also asked

[9] him whether he is well-known in the mosques.

[10] Q: And in the second meeting you had with the defendant, what

[11] did the defendant discuss with you concerning what he had told

[12] this friend about your purpose?

[13] A: About his friend?

[14] Q: Yes. What did he tell you he had told him?

[15] A: I asked him: Mokhtar, did you explain to him about the

[16] job? Yes, he said he told him that the job is shteah.

[17] Mokhtar told me that he told his friend that the job is

[18] shteah.

[19] Q: And what does "shteah" mean again?

[20] A: It is an Algerian word that represents fear.

[21] Q: Can you tell us why you entrusted the defendant with all

[22] these matters?

[23] A: How is that?

[24] Q: Can you explain to us why you trusted him — let me —

[25] THE COURT: The question is withdrawn. Go ahead.

Page 707

[1] Q: You were going to send Meskini to the Khalden camp?

[2] A: In Afghanistan, yes.

[3] Q: You were going to bring Meskini to conduct the operation

[4] with you?

[5] A: Yes.

[6] Q: Mokhtar Haouari was going to be the conduct person for Abu

[7] Doha?

[8] A: Yes.

[9] Q: Can you explain why you — why you trusted Mokhtar Haouari

[10] with these matters?

[11] A: I felt comfortable with him. I felt confident. I've

[12] known him for a while. They're all good friends, whether it

[13] was him or Hassan or Samir.

[14] Q: And Mr. Ollen referred to several other individuals in

[15] Canada who assisted you in the planning stage of the

[16] operation; correct? Do you recall that?

[17] A: They assisted me, not very much, some a little, some a

[18] lot.

[19] Q: Why did you choose any of those individuals to come to the

[20] United States with you?

[21] A: Their work does not permit them. Their situations did not

[22] permit them.

[23] Q: And what about Dahoumane, why did you choose Abdelghani

[24] over Dahoumane?

[25] A: When Abdelghani appeared, I gave up the idea of taking

Page 708

[1] Dahoumane. And I wanted somebody who drives. Abdelmajid did
[2] not drive. And Abdelmajid also was somewhat reluctant.
[3]   Q: And why did you trust Ghani with this important task?
[4]   A: First, because he knows Mokhtar, and then because he
[5] wanted to go to do the jihad.
[6]   Q: Can you explain to us why you turned to the defendant to
[7] provide you with the passport, which you didn't get, and the
[8] license? Why did you turn to him, as opposed to someone else?
[9]   A: I felt comfortable working with him and he had helped me
[10] also in the past.
[11]   Q: Now, you were asked some questions by Mr. Ollen about not
[12] telling the defendant about the actual target. Do you recall
[13] that?
[14]   A: Yes, that's correct.
[15]   Q: Did you tell anyone in Canada what your target was?
[16]   A: No, I did not.
[17]   Q: How about Dahoumane who you were mixing the chemicals
[18] with, did you tell him you were going to LAX?
[19]   A: No, not even Abdelghani knew.
[20]   Q: Abdelghani or?
[21]   A: Abdelmajid did not know the target, the nature of the
[22] target, neither did Abdelghani.
[23]   Q: Now, Mr. Ollen asked you a series of questions about
[24] money. When did you receive that $12,000 from your leader in
[25] the camp?

Page 709

[1]   A: When I was in Afghanistan.
[2]   Q: And approximately when was that?
[3]   A: When I left Afghanistan. In the beginning of '99,
[4] January.
[5]   Q: And by the end of that year, how much of that money did
[6] you have left by October or November of '99?
[7]   A: 4 to $5,000.
[8]   Q: Why did you ask the defendant for money in November of —
[9] November of 1999? Why did you need additional money?
[10]   A: I needed them for the operation in America.
[11]   THE COURT: Let me ask you something. The $12,000
[12] that you got in Afghanistan before — just before you left
[13] Afghanistan, was that 12,000 American or 12,000 Canadian?
[14]   THE WITNESS: American.
[15]   THE COURT: Thank you.
[16]   Q: And what did you spend that money on in October or
[17] November of '99, the money that you — that you borrowed and
[18] the several thousand dollars that you had?
[19]   A: I bought it to buy tickets, airplane tickets, renting
[20] hotel rooms, buying chemical instruments, and some chemical
[21] materials.
[22]   Q: Now, do you recall Mr. Ollen asking you about whether you
[23] spent all the money the defendant gave you or you combined it
[24] with your other money?
[25]   A: Yes, I had added the money that I borrowed with the money

Page 710

[1] that I had and I spent them all together.
[2]   Q: And do you remember him asking you some questions about
[3] what you told the FBI about that?
[4]   A: Yes.
[5]   MR. BIANCO: May I approach, your Honor?
[6]   THE COURT: Yes.
[7]   MR. BIANCO: If I could ask the translator, your
[8] Honor, to read the bottom of page 8 of 3560(b), three
[9] sentences.
[10]   THE COURT: All right.
[11]   MR. OLLEN: Judge, he hasn't — I object. He hasn't
[12] testified that he doesn't remember what he said. So, to read
[13] him a document, I object to that.
[14]   THE COURT: I overrule the objection.
[15]         BY MR. BIANCO:
[16]   Q: Does that refresh your recollection as to what you told
[17] the FBI about the money during that meeting?
[18]   A: Yes.
[19]   Q: What did you tell them during that meeting?
[20]   A: I told them that I took the money from Haouari and the
[21] money that I had already and I put them together and I spent
[22] it on the things that I've already told you about.
[23]   Q: Now, you were asked some questions about withholding the
[24] names of some your friends in Canada who helped you.
[25]   A: Yes.

Page 711

[1]   Q: And you said one of the reasons that you did that is that
[2] you were afraid for your family?
[3]   A: Yes.
[4]   Q: Can you explain what you meant by that?
[5]   A: Because they knew where my family lived, where my
[6] relatives lived, and they might go after them and hurt them.
[7]   Q: Now, other than withholding that information regarding
[8] some of your friends, and the purpose of the gun, did you make
[9] any other false statements to the government during those
[10] proffers?
[11]   MR. OLLEN: Objection.
[12]   THE COURT: Objection overruled.
[13]   A: No, as far as I can remember, no.
[14]   Q: Now, with respect to your agreement, first of all, who
[15] is — who is your sentencing judge?
[16]   A: Coughenour.
[17]   Q: It's a judge in Los Angeles?
[18]   A: In Seattle.
[19]   Q: In Seattle?
[20]   THE COURT: Wait. Did the judge from Seattle go down
[21] to Los Angeles and try your case? Is that what happened?
[22]   THE WITNESS: Yes.
[23]   THE COURT: Is that the judge who's going to sentence
[24] you?
[25]   THE WITNESS: Yes.

Page 712

[1] THE COURT: Do you know that judge's name?

[2] THE WITNESS: Coughenour.

[3] MR. BIANCO: Thank you, your Honor.

[4] Q: With respect to your agreement, what is the lowest

[5] sentence your lawyers can ask for under that agreement?

[6] A: That's the lowest, you mean?

[7] Q: Yes.

[8] A: 10 years.

[9] Q: The lowest your attorneys are allowed to ask for?

[10] A: 27 years.

[11] Q: And are you facing charges in other countries as well?

[12] A: Yes.

[13] Q: Does the outcome of this trial affect your cooperation

[14] agreement in any way?

[15] A: No.

[16] Q: If you lie during your testimony at this trial, what

[17] happens to your agreement?

[18] A: It will be nullified.

[19] Q: And what would the result be at your sentencing?

[20] A: It will be the first sentence.

[21] Q: You would get life?

[22] A: Yes.

[23] MR. BIANCO: I have nothing further, your Honor.

[24] THE COURT: All right. Any recross?

[25] MR. OLLEN: Just extremely briefly, Judge.

Page 713

[1] THE COURT: All right.

[2]                         RECROSS-EXAMINATION

[3]                         BY MR. OLLEN:

[4] Q: Mr. Ressam, who makes the decision in the first instance

[5] about whether or not you lied at this trial?

[6] A: The judge.

[7] Q: How about the prosecutors?

[8] A: Yes, that's possible.

[9] Q: And do the defense attorneys in this case have any input

[10] into that decision as far as you know?

[11] THE COURT: He means the defense attorneys for you.

[12] A: I don't know.

[13] Q: Mr. Bianco asked you something about your conduct — your

[14] contact — excuse me — with Abu Doha in Great Britain. Do

[15] you remember that?

[16] A: Yes.

[17] Q: And it's your testimony that you put Haouari on the phone

[18] with Abu Doha in Great Britain so that they would know each

[19] other's voices, is that correct?

[20] A: Yes.

[21] Q: And this was before you left for Vancouver for the final

[22] time; correct?

[23] A: As far as I remember, but listen, please, I want to tell

[24] you that I might not remember precisely, but I know where this

[25] conversation occurred.

Page 714

[1] Q: Abu Doha is a very important person in the jihad movement;

[2] correct?

[3] A: Yes, that's correct.

[4] Q: Some of his duties include deciding who gets to go to the

[5] Afghanistan camps; correct?

[6] A: Yes, he facilitates.

[7] Q: You knew at the time of this conversation that Mokhtar

[8] Haouari had never committed a jihad act in his life; correct?

[9] A: I don't know that. What do you mean?

[10] Q: Had he been in the camps in Afghanistan?

[11] A: No, he did not — he was not.

[12] Q: Had he been involved in bombings?

[13] A: I don't know that.

[14] Q: Had he been involved in terrorist activities?

[15] A: No, I don't know.

[16] Q: You put him on the phone with Abu Doha before you go to

[17] Vancouver and he speaks briefly with Abu Doha; correct?

[18] A: Yes, that's correct.

[19] Q: And just like that, Mokhtar Haouari becomes the point man

[20] in Canada for any Canadian who wants to go to an Afghanistan

[21] terror camp, is that your testimony?

[22] A: Yes, that I had trust in Mokhtar.

[23] MR. OLLEN: Nothing further.

[24] THE COURT: Anything else, Mr. Bianco?

[25] MR. BIANCO: No, your Honor.

Page 715

[1] THE COURT: All right. You're excused.

[2] (Witness excused)

[3] THE COURT: Your next witness, please?

[4] MS. BAKER: Your Honor, at this time, the government

[5] offers a written stipulation which has been marked as

[6] Government's Exhibit 443.

[7] THE COURT: All right 443 is received.

[8] (Government's Exhibit 443 received in evidence)

[9] THE COURT: You may read the stipulation.

[10] MS. BAKER: Thank you.

[11] "It is hereby stipulated and agreed that if called to

[12] testify, one or more knowledgeable witnesses from Fleet Bank

[13] would testify as follows: Government's Exhibits 288 and 288A

[14] are true and accurate copies of authentic records from Fleet

[15] Bank for bank account Nos. 9417072465 and 9413041135 in the

[16] name Benjamin Green.

[17] "Government's Exhibit 442 is a true and accurate copy

[18] of an authentic statement from Fleet Bank for Mastercard

[19] account No. 5447195163410978 in the name Eduardo Rocha. These

[20] records were created and maintained by Fleet Bank as part of

[21] its regularly-conducted business activity and consistent with

[22] its regular practice.

[23] "As a result, Government's Exhibits 288, 288A and 442

[24] satisfy the criteria for records of regularly-conducted

[25] activity under Rule 8036 of the Federal Rules of Evidence."

---

**Page 716**

[1] Your Honor, based on that stipulation, the government

[2] offers Exhibits 288, 288A and 442.

[3] MR. OLLEN: No objection.

[4] THE COURT: Received.

[5] (Government's Exhibits 288, 288A and 442 received in

[6] evidence)

[7] (Continued on next page)

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

**Page 717**

[1] MS. BAKER: The government calls Serge Marcoux.

[2] Serge Marcoux,

[3] called as a witness by the government,

[4] having been duly sworn, testified as follows:

[5] **DIRECT EXAMINATION**

[6] BY MS. BAKER:

[7] Q: Whom do you work for?

[8] A: I am a member of the Royal Canadian Mounted Police. I

[9] have been working for the RCMP for 19 years and I have been

[10] working on the national security section in Montreal for the

[11] last 6 years.

[12] Q: What is your rank with the RCMP?

[13] A: I am a constable in the RCMP.

[14] Q: Were you on duty for the RCMP on January 19, 2000?

[15] A: Yes, I was.

[16] Q: On that date were you assigned to carry out a search?

[17] A: Yes, I was. I carried on a search at an apartment at 6266

[18] rue de Marseille in Montreal, apartment 103.

[19] Q: Was that search carried out pursuant to a search warrant

[20] obtained from a Canadian court?

[21] A: Yes, I carried out the search under a search warrant

[22] signed by a judge in a Montreal court.

[23] MS. BAKER: May I approach, your Honor.

[24] THE COURT: You may.

[25] Q: I have handed you two items marked for identification as

---

**Page 718**

[1] Government Exhibits 388 and 389. Do you recognize those?

[2] A: Yes.

[3] Q: How are you able to recognize them?

[4] A: When I found those two pieces they were in the apartment

[5] in the bedroom inside of an ironing board. I recognize them

[6] because I put, when I searched the place, items 133 and 134, I

[7] wrote those numbers there because that was on the list, the

[8] number added to, I put my name, my signature right here and

[9] right here, Marcoux and Marcoux, and the project we were

[10] working on.

[11] Q: You mentioned the exhibit numbers and item numbers 133 and

[12] 134. Were those numbers you had previously assigned to those

[13] items when you seized them?

[14] A: Yes.

[15] Q: Were those all or only some of the items that you seized

[16] at that location that day?

[17] A: No, they are just some of items.

[18] MS. BAKER: Your Honor, the government offers 388 and

[19] 389.

[20] MR. OLLEN: No objection.

[21] THE COURT: Received.

[22] (Government Exhibits 388, 389 received in evidence)

[23] Q: Look first at Government Exhibit 388. Would you tell the

[24] jury, what is that item?

[25] A: It's a translation from a teller transaction, teller bank.

---

**Page 719**

[1] Q: ATM machine?

[2] A: ATM machine, yes.

[3] Q: Which bank is it from?

[4] A: The Scotia Bank.

[5] Q: Look at the upper left-hand corner of the receipt and tell

[6] the jury the date of the transaction shown there.

[7] A: November 19, 1999.

[8] Q: What is the type of transaction for which that is a

[9] receipt?

[10] A: That was a deposit of $9,982.46 — no, sorry, that was

[11] solde. It was a deposit of $9,980.

[12] Q: So the record is clear, the number you started to read,

[13] was that the balance?

[14] A: That was the balance on the account.

[15] Q: You were using a particular word solde, S-O-L-D-E?

[16] A: Yes.

[17] Q: Does that mean balance in French?

[18] A: That's balance.

[19] Q: Turn to Government Exhibit 389, the other item, what is

[20] that document?

[21] A: That's an ATM transaction at the Banque Laurentienne.

[22] Q: What is the date of that transaction?

[23] A: The date of the transaction is 20 November 1989 — 1999.

[24] Q: What kind of transaction was that according to the

[25] receipt?

Page 720

[1]   A: According to the receipt, it's a deposit to the account,
[2] deposit, that's $9,900.64.
[3]   Q: $9,900.64?
[4]   A: Yes.
[5]   Q: Putting aside the exhibit, on about how many occasions in
[6] total during your whole career for the RCMP have you
[7] participated in or been present in someone's residence when it
[8] was being searched?
[9]   A: Close to 100.
[10]   Q: On those occasions when you have been in people's
[11] residences, have you observed personal papers and documents?
[12]   A: Yes.
[13]   Q: How would you compare the amount of personal papers and
[14] documents that you saw in the apartment that you searched on
[15] January 19, 2000, which was apartment 103 at 6266 Rue de
[16] Marseille, with the amount of personal papers and documents
[17] that you have seen in other residences?
[18]   MR. OLLEN: Objection; relevance.
[19]   THE COURT: I am very much inclined to sustain the
[20] objection, Ms. Baker. If you make the representation to me
[21] that in some matter, shape or form the answer is going to be
[22] relevant under 401 of the Rules of Evidence, I will accept
[23] your representation as an officer of the court. I don't see
[24] how it's relevant if there were more or less papers in his
[25] other 99 searches.

Page 721

[1]   MS. BAKER: I asked the question because we believe
[2] it's relevant. I can approach and proffer, if you like.
[3]   THE COURT: I think Mr. Ollen is entitled to hear
[4] one.
[5]   (Continued on next page)
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 722

[1]   (At the sidebar)
[2]   MS. BAKER: This apartment was identified by the
[3] defendant as his residence at the time in various ways. The
[4] total amount of paper that was found in the apartment was
[5] about ten pieces of paper or documents.
[6]   THE COURT: Or less.
[7]   MS. BAKER: Pieces of paper or documents in total,
[8] only ten pieces of paper. The constable has told us that is
[9] substantially less than he would normally expect to find in a
[10] residence, from which we will argue that the defendant could
[11] have disposed of incriminating evidence.
[12]   THE COURT: I don't see anything wrong in bringing
[13] out there were only ten pieces of paper or ten documents. But
[14] to ask him to give his opinion that this is a lot less than
[15] there should be I think is objectionable. I think it's fine
[16] for you to bring out the number and then for you to make the
[17] argument in summation. I don't want to tell you how to sum
[18] up, but if the point you want to make is that is not an awful
[19] lot of stuff, fine, that's reasonable argument probably, but I
[20] don't think he is the one who should be drawing the
[21] conclusion.
[22]   MS. BAKER: I will withdraw the question and rephrase
[23] it.
[24]   (Continued on next page)
[25]

Page 723

[1]   (In open court)
[2]   THE COURT: The question is going to be withdrawn and
[3] you are going to put another question to the witness.
[4]   BY MS. BAKER:
[5]   Q: Constable, when you were in the apartment that day,
[6] apartment 103 at 6266 Rue de Marseille, how many documents or
[7] pieces of paper did you see in that apartment in total,
[8] including the two that are now in front of you as Exhibits 388
[9] and 389?
[10]   A: Not that many. I seized about 20 pieces.
[11]   Q: You were looking to find whatever documents you could when
[12] you were there?
[13]   A: Yes, and I was looking to find any bank transactions,
[14] telephone tolls, if there was business cards, receipts, bills.
[15] I seize only those, close to 20. There wasn't that much
[16] there.
[17]   Q: Did the items that you seized include any telephone bills?
[18]   A: I have to go through my notes; I don't remember.
[19]   Q: Let me withdraw that and ask you, if you recall, did the
[20] items you seized include any telephone books or directories?
[21]   A: No.
[22]   MS. BAKER: Nothing further.
[23]   THE COURT: Any cross?
[24]   MR. OLLEN: No, your Honor.
[25]   THE COURT: Thank you very much. Safe trip back to

Trial
July 6, 2001

UNITED STATES OF AMERICA   v.
MOKHTAR HAOUARI

Page 724

[1] Montreal.

[2] (Witness excused)

[3] MS. BAKER: Your Honor, if I may, I offer a

[4] stipulation which is marked for identification as Government

[5] Exhibit 390.

[6] THE COURT: 390 is received.

[7] (Government Exhibit 390 received in evidence)

[8] THE COURT: You may read it.

[9] MS. BAKER: (Reading)

[10] "It is hereby stipulated and agreed that:

[11] "1. If called to testify, one or more knowledgeable

[12] witnesses from the Scotia Bank would testify as follows:

[13] "A. Government Exhibit 391 is a set of true and

[14] accurate copies of authentic bank records from Scotia Bank

[15] relating to account number 00091-00472-28 in the name of

[16] Mounir Rebaine. Those records were created and maintained by

[17] Scotia Bank as part of its regularly conducted business

[18] activity and consistent with its regular practice. As a

[19] result, Government Exhibit 391 satisfies the criteria for

[20] records of regularly conducted activity under Rule 803(6) of

[21] the Federal Rules of Evidence and 18 U.S.C. Section 3505.

[22] "B. A review of those records indicates that on

[23] November 23, 1999, a counterfeit check in the amount of

[24] $9,980, which purported to be drawn on the account of 142630

[25] Canada LTEE/Ltd., was deposited into the Mounir Rebaine bank

Page 725

[1] account. After the fraud was discovered, the account was

[2] closed on December 24, 1999.

[3] "2. If called to testify, one or more knowledgeable

[4] witnesses from the Banque Laurentienne would testify as

[5] follows:

[6] "A. Government Exhibit 393 is a set of true and

[7] accurate copies of authentic bank account records from Bank

[8] Laurentienne relating to account number 090-000-125-801 in the

[9] name of Mounir Rebaine. Those records were created and

[10] maintained by Banque Laurentienne as part of its regularly

[11] conducted business and consistent with its regular practice.

[12] As a result, Government Exhibit 393 satisfies the criteria for

[13] records of regularly conducted activity under Rule 803(6) of

[14] the Federal Rules of Evidence and 18 U.S.C. Section 3505.

[15] "B. A review of those records indicates that, on

[16] November 20, 1999, a counterfeit check in the amount of

[17] $9,400.64, which purported to be drawn on the account of

[18] Galerie Liberto, was deposited in the Mounir Rebaine bank

[19] account. The fraud was discovered on or about November 23,

[20] 1999.

[21] "It is further stipulated and agreed that Government

[22] Exhibits 391T and 3193T are accurate translations of the

[23] French portions of Government Exhibit 391 and 393."

[24] Your Honor, based on that stipulation, the government

[25] offers 391, 391T, 393, 393T.

Page 726

[1] MR. OLLEN: No objection.

[2] THE COURT: Received.

[3] (Government Exhibits 391, 391T, 393, 393T received in

[4] evidence).

[5] THE COURT: The stipulation as read is now evidence

[6] in the case, as are those exhibits that were just received.

[7] MS. BAKER: Your Honor, so the record is clear, I was

[8] advised by one of my colleagues that in reading Government

[9] Exhibit 390, paragraph 1B, I might have inadvertently stated

[10] the date as December 24. In fact, the stipulation provides

[11] the date of November 24, 1999.

[12] THE COURT: November 24, 1999.

[13] MS. BAKER: Your Honor, at this time the government

[14] offers another written stipulation marked for identification

[15] as Government Exhibit 78. I apologize to the jury; it is a

[16] lengthy one about telephone records.

[17] "It is hereby stipulated and agreed that if called to

[18] testify, one or more knowledgeable witnesses from each of the

[19] following companies would testify that the records discussed

[20] herein were created and maintained as part of their regularly

[21] conducted business activities and consistent with their

[22] regular practices, and that:

[23] "1. Government Exhibits 79 through 84 are sets of

[24] true and accurate copies of authentic telephone records from

[25] BellAtlantic-New York, now known as Verizon-New York, for

Page 727

[1] telephone numbers 718-421-1118, 718-421-1732, 718-421-2556,

[2] 718-421-4788 and 718-421-7586.

[3] "2. Government Exhibit 88 is a set of true and

[4] accurate authentic telephone records from Sprint for telephone

[5] number 917-804-0309.

[6] "3. Government Exhibit 90 is a set of true and

[7] accurate copies of authentic records from R.S.L. Com Canada

[8] for 'TigerTalk' calling card number H172 2068.

[9] "4. Government Exhibit 92 is a set of true and

[10] accurate copies of authentic records from ITG Communications

[11] for Globo calling cards number 2822774640 and 0829204516.

[12] "5. Government Exhibit 190 is set of true and

[13] accurate copies of authentic records from a business called

[14] Everything for Living for voice mailbox number 212-631-8750

[15] and pager number 917-798-6490.

[16] "6. A review of true and accurate Verizon-New

[17] England records regarding telephone number 617-569-2484

[18] indicates that from on or about February 4, 1999, until at

[19] least on or about March 10, 1999, telephone numbers

[20] 617-569-2484 was subscribed in the name Fahd Ahmed, at 194

[21] Bennington, floor 3, East Boston, Massachusetts.

[22] "7. Government Exhibits 193 and 200 are sets of true

[23] and accurate copies of authentic records from Verizon-New

[24] England for telephone numbers 617-569-5792 and 617-846-2194.

[25] "8. Government Exhibit 196 is a set of true and

Page 728

[1] accurate copies of authentic telephone records from Cellular
[2] One for telephone number 617-640-3731.
[3] "9. Government Exhibit 198 is a set of true and
[4] accurate copies of authentic records from Maverick
[5] Communication for pager number 617-703-3942.
[6] "10. A review of true and accurate Verizon-New York
[7] records regarding telephone number 718-656-5220 indicates that
[8] that number is subscribed to Pakistan International Airlines,
[9] Jamaica, New York.
[10] "11. Government Exhibits 203 through 208 are sets of
[11] true and accurate copies of authentic telephone and subscriber
[12] records from Verizon-New York for telephone numbers
[13] 718-377-4737, 718-531-9470, 718-649-4304, 718-649-7836,
[14] 212-370-9150, and 718-656-4027.
[15] "12. Government Exhibits 210 and 211 are sets of
[16] true and accurate copies of authentic telephone records from
[17] MCI WorldCom telephone numbers 718-421-4788 and 718-649-6014.
[18] "13. Government Exhibit 221 is a set of true and
[19] accurate copies of authentic telephone records from Union
[20] Telecom for telephone number 514-289-0918.
[21] "14. A review of true and accurate Bell Canada
[22] records indicates that from March 7, 1999, until at least
[23] October 7, 1999, telephone number 514-253-3479 was subscribed
[24] in the name of Ouassila Lassouani, at 6266 Rue de Marseille,
[25] apartment 103, Montreal, Quebec, Canada.

Page 729

[1] "15. Government Exhibits 123, 225, 401, 402, 405,
[2] and 409 are sets of true and accurate copies of authentic
[3] telephone and subscriber records from Bell Canada for
[4] telephone numbers 514-289-0918, 514-523-3215, 514-287-7860,
[5] 514-596-2889, 450-628-3200, and 450-628-4105.
[6] "16. Government Exhibits 233 and 234 are true and
[7] accurate copies of authentic telephone records from Microcell
[8] Telecommunications for telephone numbers 514-574-7336 and
[9] 514-812-5232.
[10] "17. Government Exhibit 236 is a set of true and
[11] accurate copies of authentic telephone records from Telus
[12] Mobility Inc. for telephone number 514-808-1969.
[13] "18. Government Exhibits 341A and 341B are sets of
[14] true and accurate copies of authentic telephone records from
[15] Rogers Cantel Inc. for telephone number, 514-402-7550.
[16] "19. Government Exhibit 343 is a set of true and
[17] accurate copies of authentic telephone records from Rogers
[18] AT&T Wireless for pager number 514-851-4515.
[19] "20. Government Exhibit 407 is a set of true and
[20] accurate copies of authentic telephone records from Clearnet
[21] for telephone number 514-830-6231.
[22] "As a result, Government Exhibits 79-84, 88, 190,
[23] 193, 196, 198, 200, 203-208, 210, 211, 220, 223, 225, 233,
[24] 234, 341A-B, 343, 401, 402, 405, 407 and 409 —
[25] Excuse me, your Honor, I think we are missing a

Page 730

[1] number.
[2] (Pause)
[3] MS. BAKER: — and also Government Exhibits 90 and
[4] 92, satisfy the criteria for records of regularly conducted
[5] activity under Rule 803(6) of the Federal Rules of Evidence,
[6] and 236 as well."
[7] Based on that stipulation, your Honor, the
[8] governments offers those exhibit numbers that I just recited.
[9] MR. OLLEN: No objection.
[10] THE COURT: Received.
[11] (Government Exhibits 79-84, 88, 190, 193, 196, 198,
[12] 200, 203-208, 210, 211, 220, 223, 225, 233, 234, 341A-B, 343,
[13] 401, 402, 405, 407, 409, 90, 92, 236 received in evidence)
[14] THE COURT: Again, I want to compliment counsel. You
[15] were just saved an awful lot of time, as was I.
[16] MS. BAKER: Unfortunately, I am going to ask to do
[17] one more. I offer —
[18] THE COURT: It still saves time.
[19] MS. BAKER: — Government Exhibit 404.
[20] MR. OLLEN: No objection.
[21] THE COURT: Received.
[22] (Government Exhibit 404 received in evidence)
[23] MS. BAKER: (Reading)
[24] "It is hereby stipulated and agreed that:
[25] "1. If called to testify, one or more knowledgeable

Page 731

[1] witnesses from Bell Canada would testify that Bell Canada
[2] created and maintained records regarding telephone number
[3] 514-324-6439 as part of its regularly conducted business
[4] activity and consistent with its regular practice. A review
[5] of those records indicates that, from on or about April 1,
[6] 1999, until at least June 1, 2000, telephone number
[7] 514-324-6439 was subscribed in the name Sabah Kihalouche, at
[8] 6260-A Rue Louvois, St. Leonard, Quebec, Canada.
[9] "2. If called to testify, a knowledgeable witness
[10] from the Department of Citizenship and Immigration Canada
[11] would testify that the Department of Citizenship and
[12] Immigration Canada created and maintained immigration records
[13] regarding Brahim Cheriti and Sabah Kihalouche as records of a
[14] public office or agency setting forth the activities of the
[15] office or agency. A review of those records indicates that
[16] Sabah Kihalouche is Brahim Cheriti's wife."
[17] Your Honor, shall I call a witness.
[18] THE COURT: Why don't you call a witness.
[19] We will break after the witness.
[20] MS. BAKER: The government calls Steven Sorrells.
[21] STEVEN SORRELLS,
[22] called as a witness by the government,
[23] having been duly sworn, testified as follows:
[24]             DIRECT EXAMINATION
[25]         BY MS. BAKER:

Page 732

[1]  Q: Where do you work?

[2]  A: Federal Bureau of Investigation.

[3]  Q: How long have you worked for the FBI?

[4]  A: Approximately three years.

[5]  Q: In which office do you work for the FBI?

[6]  A: I am a special agent in the New York office.

[7]  MS. BAKER: May I approach, your Honor.

[8]  THE COURT: You may.

[9]  Q: I have handed you an item that has been marked for

[10] identification as Government Exhibit 360. Do you recognize

[11] that?

[12] A: Yes, I do.

[13] Q: How are you able to recognize it?

[14] A: I have a cell phone and I have my initials on the package

[15] as to when I checked the cell phone.

[16] Q: As part of your duties at the FBI were you asked to

[17] perform a certain investigation regarding that cell phone

[18] marked as Government Exhibits 360?

[19] A: Yes, I was.

[20] Q: What were you asked to do?

[21] A: I was asked to determine the actual cell phone number of

[22] this cell phone.

[23] Q: Before doing that did you obtain a search warrant from a

[24] court authorizing you to do that?

[25] A: Yes, I did.

Page 733

[1]  Q: After you had obtained the search warrant what did you do

[2]  in order to obtain the number of the cell phone?

[3]  A: This cell phone is a Nokia 5190. I obtained the manual,

[4]  the page that tells you how to check the phone, find the

[5]  actual cell phone number. When I was following the

[6]  instructions from the manual, I checked it and found the cell

[7]  phone number.

[8]  Q: What did you determine to be the telephone number of the

[9]  phone now marked Government Exhibit 360?

[10] A: The number was 514-812-5232.

[11] MS. BAKER: May I approach, your Honor.

[12] THE COURT: Yes.

[13] Q: I have handed you a document which is now in evidence as

[14] Government Exhibit 234. Those are telephone records, correct?

[15] A: Yes.

[16] Q: For what telephone number are those the records?

[17] A: 514-812-5232.

[18] Q: Is that the telephone number of the cell phone marked as

[19] Government Exhibit 360?

[20] A: Yes, it is.

[21] Q: Tell the jury, according to those records who was the

[22] subscriber of that telephone number 514-812-5232.

[23] A: The subscriber here is listed as Simon, S-I-M-O-N, Daho,

[24] D-A-H-O.

[25] Q: At what address?

Page 734

[1]  A: 5320 — I am not sure of the pronunciation — Rue

[2]  Dudemaine, in Montreal, Quebec.

[3]  Q: According to those records, Government Exhibit 234, on

[4]  what date did the service start for that telephone number?

[5]  A: It was activated according to the records on 12/30/99.

[6]  Q: Thank you. Turning your attention to a different subject,

[7]  did there come a time when you were asked as part of your

[8]  duties for the FBI to conduct some investigation regarding a

[9]  pay telephone in Montreal?

[10] A: Yes, I did.

[11] Q: As you sit here today do you recall the telephone number

[12] of that pay phone?

[13] A: I believe the number was 514-287-7860.

[14] MS. BAKER: May I approach, your Honor.

[15] THE COURT: You may.

[16] Q: Let me ask you to look first please at the document in

[17] evidence as Government Exhibit 401. Directing your attention

[18] to the top of that telephone record, the upper left-hand

[19] corner of the page, tell the jury what the telephone number is

[20] for that record.

[21] A: 514-287-7860.

[22] Q: Directing your attention to one line below that a little

[23] bit to the right, look at the line that starts with the

[24] letters NI, and tell the jury the name of the establishment

[25] where this telephone is located according to this subscriber

Page 735

[1]  record?

[2]  A: The record has it listed as Triangle Portugais.

[3]  Q: Spell that for the reporter.

[4]  A: T-R-I-A-N-G-L-E, P-O-R-T-U-G-U-A-I-S.

[5]  Q: Look at the line underneath that which begins with the

[6]  letters AS. Tell the jury the address at which the pay

[7]  telephone is located according to this subscriber record?

[8]  A: It lists 20 Duluth East, Montreal.

[9]  Q: Put that record aside. What were you asked to do

[10] regarding this pay phone located at 20 Duluth East in

[11] Montreal?

[12] A: I was asked to find the location at 20 East Duluth in

[13] relation to 4009 St. Laurent, the location of a business that

[14] Mokhtar Haouari had been affiliated with.

[15] Q: Did you go to Montreal to investigate that matter?

[16] A: Yes, I did.

[17] Q: Let me ask you to look at Government Exhibit 370 which

[18] should be in front of you; do you recognize Government Exhibit

[19] 370?

[20] A: Yes, I do.

[21] Q: What is Government Exhibit 370?

[22] A: It's a map showing the relative location of the 4009

[23] location, relative to the pay phone location.

[24] Q: Is that map, except as to scale, an accurate depiction of

[25] the relative locations of the store and pay phone?

Page 736

[1] A: Yes, it is.

[2] MS. BAKER: Your Honor, I offer Government Exhibit

[3] 370.

[4] MR. OLLEN: No objection.

[5] THE COURT: Received.

[6] (Government Exhibit 370 received in evidence).

[7] Q: I am showing you what's been marked for identification as

[8] Government Exhibit 370A; do you recognize this?

[9] A: Yes, I do.

[10] Q: What is that?

[11] A: That is an enlargement of the map or photograph, map that

[12] I have here.

[13] Q: It's an enlargement of Government Exhibit 370?

[14] A: Correct.

[15] MS. BAKER: I offer 370A.

[16] MR. OLLEN: No objection.

[17] THE COURT: Received.

[18] (Government Exhibit 370 received in evidence)

[19] MS. BAKER: May I show it to the jury.

[20] THE COURT: You may.

[21] MS. BAKER: May the witness step down to point out to

[22] the jury.

[23] THE COURT: If you need a pointer, you may get the

[24] pointer.

[25] Q: Show the jury where the two locations are on Government

Page 737

[1] Exhibit 370, the store and pay phone.

[2] A: The store is located here, 4009 St. Laurent. At the time

[3] I went there, it was Artisanat La Palmier, formerly called

[4] Artisanat Nord-Sud.

[5] Q: Where was the pay phone?

[6] A: Pay phone was located on the ground floor of 20 Duluth, in

[7] this area.

[8] THE COURT: The pay phone is inside of the building

[9] 20 Duluth?

[10] THE WITNESS: Yes, it is.

[11] Q: I have handed you photographs marked for identification as

[12] Government Exhibits 371 through 380. Do you recognize those

[13] photographs?

[14] A: Yes, I do.

[15] Q: Who took the photographs?

[16] A: I took the photographs.

[17] Q: Not going individually, just collectively, what do those

[18] photographs show?

[19] A: The photographs show just relative, if you were going from

[20] Artisanat Nord-Sud to the pay phone, just roughly the walking

[21] area and the relative relationship between the two.

[22] Q: Do those photographs accurately depict that location?

[23] A: Yes, I think they do.

[24] MS. BAKER: I offer 371 through 380.

[25] MR. OLLEN: No objection.

Page 738

[1] THE COURT: Received.

[2] (Government Exhibits 371-380 received in evidence)

[3] Q: Aside from when you were stopping to take photographs, did

[4] you also walk directly between the store and the pay phone or

[5] vice versa?

[6] A: Yes, I did.

[7] Q: How long did it take you to walk directly from one

[8] location to the other?

[9] A: I would say approximately 25 seconds, maybe a little less.

[10] Q: Essentially those two locations, the store and the pay

[11] phone, are around the corner from each other on the same

[12] block?

[13] A: Yes, on the same square block.

[14] MS. BAKER: No further questions.

[15] THE COURT: Any cross?

[16] MR. OLLEN: No, your Honor.

[17] THE COURT: You are excused. Thank you very much.

[18] (Witness excused)

[19] THE COURT: Why don't we recess for lunch. We will

[20] resume at 2:20. Don't discuss the case or come to any

[21] conclusions during the case.

[22] Can I see counsel at the sidebar. I don't think we

[23] need the reporter.

[24] (Discussion off the record at sidebar)

[25] (Lunch recess)

Page 739

[1] AFTERNOON SESSION

[2] 2:20 p.m.

[3] (In open court; jury present)

[4] THE COURT: You may proceed, Mr. Bianco.

[5] MR. BIANCO: Thank you, your Honor, the government

[6] calls Gaetan Potvin.

[7] MS. BAKER: Your Honor, while we're waiting for the

[8] witness, if I might advise the Court to an agreed-upon

[9] correction to a stipulation that I read before lunch.

[10] THE COURT: Sure you may.

[11] MS. BAKER: It was Government Exhibit 78, the one

[12] that listed one of the many sets of telephone records and in

[13] the list at the end of the stipulation, one of the numbers

[14] listed was 220, which was incorrect. It instead should have

[15] been 221.

[16] So, based on that, I offer Government's Exhibit 221

[17] in addition to the others previously offered.

[18] THE COURT: You've shown to it Mr. Ollen?

[19] MS. BAKER: Yes, I have and we've initialed the

[20] correction.

[21] THE COURT: Any objection?

[22] MR. OLLEN: No, your Honor.

[23] THE COURT: Received.

[24] (Government's Exhibit 221 received in evidence)

[25] THE COURT: Thank you.

Trial
July 6, 2001

UNITED STATES OF AMERICA v.
MOKHTAR HAOUARI

Page 740

[1] GAETAN POTVIN,
[2] called as a witness by the government,
[3] having been duly sworn, testified as follows:.
[4]    THE CLERK: State your full name and spell your first
[5] name and your last name for the record.
[6]    THE WITNESS: My name is get G-A-E-T-A-N family
[7] family P-O-T-V-I-N.
[8]    THE COURT: Could you sit forward a little bit and
[9] make sure you speak into that microphone. It's very important
[10] that everybody inside the rail hears you.
[11]    Go ahead.
[12]                    DIRECT EXAMINATION
[13]                    BY MR. BIANCO:
[14]    Q: Where do you work, Mr. Potvin?
[15]    A: I work with the Royal Canadian Mounted Police back in
[16] Montreal.
[17]    Q: What is your rank?
[18]    A: Corporal.
[19]    Q: What city do you work in?
[20]    A: Montreal.
[21]    Q: How long have you been with the RCMP?
[22]    A: 24 years.
[23]    Q: Directing your attention to January 10, 2000, were you
[24] working that day?
[25]    A: Yes, I was.

Page 741

[1]    Q: What was your assignment that day?
[2]    A: I was to arrest Mr. Haouari once I see him.
[3]    Q: And did you, in fact, make that arrest on January 10,
[4] 2000?
[5]    A: Yes, I did at approximately 1:18 in the afternoon.
[6]    Q: Were you alone or with other officers?
[7]    A: I was alone in my car, but I was helped with other
[8] officers for the arrest.
[9]    Q: Do you see Mr. Haouari in court today?
[10]    A: Yes, he's the gentleman sitting in the blue shirt, the
[11] striped shirt.
[12]    THE COURT: Indicating the defendant.
[13]    Q: Where was that arrest made on January 10?
[14]    A: On Jarry Street, near 7010 Jarry Street in Montreal.
[15]    Q: And was it in a location or out on the street?
[16]    A: It was out on the street.
[17]    Q: And after you made that arrest, where was Mr. Haouari
[18] transported?
[19]    A: After we arrested him, we brought him back to our office.
[20]    Q: Were any items seized then pursuant to that arrest?
[21]    A: Everything he had on him at the time. He had a cellular
[22] telephone, his wallet with a lot of documents in it and
[23] envelopes, also, receipts.
[24]    MR. BIANCO: May I approach, your Honor?
[25]    THE COURT: You may.

Page 742

[1]    A: That's the telephone.
[2]    Q: Wait.
[3]    Directing your attention to the exhibits before you,
[4] Government's Exhibit 360, 361 and 362 collectively, what are
[5] those items?
[6]    A: Well, 360 is a telephone cellular, Nokia brand that he had
[7] on him the day that we arrested him.
[8]    Q: 361 and 362 are business cards?
[9]    A: Yes, 361 is a business card that was seized in his wallet
[10] and I seized it because it was a lot of markings on the back,
[11] like there's a telephone number and a name, Brahim. And the
[12] same thing with Exhibit 362. It's a business card with phone
[13] numbers and names on the back.
[14]    MR. BIANCO: Your Honor, the government would offer
[15] 360, 361 and 362.
[16]    MR. OLLEN: No objection.
[17]    THE COURT: Received.
[18]    (Government's Exhibits 360, 361 and 362 received in
[19] evidence)
[20]    Q: Now, with respect to the second business card, are there
[21] phone numbers on the back of that card?
[22]    A: Yes, there is.
[23]    THE COURT: The second business card, Mr. Bianco, I
[24] take it is 362?
[25]    MR. BIANCO: That's correct, your Honor.

Page 743

[1]    THE COURT: O.K., thank you.
[2]    Q: Among the numbers on the back of that card, is there the
[3] name Ghani with a telephone number?
[4]    A: Yes, there is.
[5]    Q: And 361, on the back of that card, you said there was a
[6] name with some numbers?
[7]    A: Exactly, Brahim, and there's a phone number also.
[8]    MR. BIANCO: I have nothing further, your Honor.
[9]    MR. OLLEN: No questions.
[10]    THE COURT: All right. Thank you very much. You're
[11] excused.
[12]    THE WITNESS: Thank you.
[13]    (Witness excused)
[14]    MS. BAKER: The government calls Robert Duffy.
[15] ROBERT DUFFY,
[16] called as a witness by the government,
[17] having been duly sworn, testified as follows:
[18]    THE CLERK: State your full name and spell your last
[19] name for the record.
[20]    THE WITNESS: Robert Duffy; R-O-B-E-R-T D-U-F-F-Y.
[21]                    DIRECT EXAMINATION
[22]                    BY MS. BAKER:
[23]    Q: Who do you work for, Mr. Duffy?
[24]    A: The Federal Bureau of Investigation.
[25]    Q: How long have you worked for the FBI?

Page 744

[1]   A: A little over five years.

[2]   Q: What is your position with the FBI?

[3]   A: The actual title is Intelligence Research Specialist, but
[4]   they usually refer to us as Intelligence Analysts.

[5]   Q: Could you very briefly describe for the jury what kinds of
[6]   things you do as an analyst for the FBI?

[7]   A: Usually support case agents on our relevant data that's
[8]   brought to my attention during the course of investigations,
[9]   usually I use databases, relevant databases.

[10]   Q: And in the course of your duties as an analyst for the
[11]   FBI, are you also sometimes asked to analyze the contents of
[12]   various kinds of records?

[13]   A: Yes, that's correct.

[14]   Q: Now, for purposes of this case, were you asked to analyze
[15]   some telephone records?

[16]   A: Yes.

[17]   Q: Or telephone-related records?

[18]   A: Yes.

[19]   Q: What kinds of information were you asked to look for in
[20]   those records?

[21]   A: I was asked to analyze specific telephone records and
[22]   whether or not they were in contact with other specific
[23]   telephone numbers.

[24]   Q: And if there were contacts between telephones, what
[25]   additional kinds of information?

Page 745

[1]   A: I'm sorry. Can you just —

[2]   Q: Where you found that there were calls between telephone
[3]   numbers that you were asked to look at, what else — what
[4]   other information did you find besides the telephone numbers
[5]   themselves?

[6]   A: I was asked to look at duration, how many contacts there
[7]   were between the numbers, and during what time period the
[8]   numbers were contacted.

[9]   Q: So, when you said "duration" in your last answer, just to
[10]   be clear, are you referring to the duration of individual
[11]   phone calls or the date range over which the calls occurred?

[12]   A: The date range.

[13]   MS. BAKER: Your Honor, may I approach the witness?

[14]   THE COURT: You may.

[15]   Q: Mr. Duffy, let me ask you to look first, please, at the
[16]   charts which are marked for identification as Government's
[17]   Exhibits 410, 411, 413 and 414. Do you have those in front of
[18]   you?

[19]   A: Yes.

[20]   Q: Who prepared those charts?

[21]   A: I did.

[22]   Q: Do those charts show the results of analyses that you did
[23]   of telephone records?

[24]   A: Yes.

[25]   Q: To the best of your ability, do the charts accurately set

Page 746

[1]   forth the results of your analysis?

[2]   A: Yes.

[3]   MS. BAKER: Your Honor, I offer 410, 411, 413 and
[4]   414.

[5]   MR. OLLEN: No objection.

[6]   THE COURT: Received.

[7]   (Government's Exhibits 410, 411, 413 and 414 received
[8]   in evidence)

[9]   Q: Let me ask you to look first, please, at Government's
[10]   Exhibit 410. What kind of information is listed in the
[11]   left-hand column of Government's Exhibit 410?

[12]   A: Telephone numbers that may be associated with Mokhtar
[13]   Haouari.

[14]   Q: Let me ask you to turn, please, to the stack of telephone
[15]   records and other documents that is now in front of you also.

[16]   Q: Starting with 236?

[17]   Q: Starting with the document in evidence as Government's
[18]   Exhibit 236. And as we go through the next series of
[19]   questions, I'm going to ask you to keep switching back and
[20]   forth between your chart, Government's Exhibit 410, and the
[21]   telephone records. So, if you keep both of those in front of
[22]   you at the same time.

[23]   What is the first telephone number in the left-hand
[24]   column of Government Exhibit 410?

[25]   A: 514-808-1969.

Page 747

[1]   Q: Looking at the telephone record in evidence as
[2]   Government's Exhibit 236, is that a record for that telephone
[3]   number?

[4]   A: Yes, it is.

[5]   Q: Who is the subscriber of that telephone number according
[6]   to Government's Exhibit 236?

[7]   A: Haouari, Mokhtar.

[8]   Q: And according to Government's Exhibit 236, what was his
[9]   address?

[10]   A: 6266 Rue De Marseille, apartment 103, Montreal.

[11]   Q: Looking back at your chart, Government's Exhibit 410, what
[12]   is the second number in the left-hand column?

[13]   A: 514-289-0918.

[14]   Q: Now, looking at the telephone record in evidence as
[15]   Government's Exhibit 221, is 221 a record for the telephone
[16]   number you just read?

[17]   A: Yes.

[18]   Q: According to Government's Exhibit 221, who is the holder
[19]   or the subscriber of telephone number 514-289-0918?

[20]   A: It states: Artisanat Nord-Sud, but also underneath it, it
[21]   names Haouari, Mokhtar.

[22]   Q: And what is the address given?

[23]   A: 4009 St. Laurent, Montreal, Quebec.

[24]   Q: Turning next, please, to the telephone record in evidence
[25]   as Government's Exhibit 223, is this also a telephone record



Page 748

[1] for that same number, 514-289-0918?

[2] A: Yes.

[3] Q: And how is the subscriber listed on Government Exhibit

[4] 223?

[5] A: Artisanat Nord-Sud at 4009 St. Laurent, Montreal.

[6] Q: Looking back again at your chart, Government's Exhibit

[7] 410, what is the third telephone number in the left-hand

[8] column?

[9] A: 514-523-3215.

[10] Q: If you would look, please, at the telephone record in

[11] evidence as Government's Exhibit 225, is that a telephone

[12] record for the number that you just read?

[13] A: Yes.

[14] Q: Is the subscriber for this telephone according to

[15] Government's Exhibit 225 Mokhtar Haouari or some other name?

[16] A: Some other name.

[17] MS. BAKER: Your Honor, at this time, I would offer a

[18] written stipulation which is marked as Government's Exhibit

[19] 226.

[20] THE COURT: All right; received.

[21] MS. BAKER: And I would ask permission to read to the

[22] jury two of the paragraphs. I'd like to read the other two

[23] paragraphs later.

[24] THE COURT: You may do so.

[25] MS. BAKER: Paragraph 2 of Government's Exhibit 226

Page 749

[1] states: "It is hereby stipulated and agreed that if called to

[2] testify, a knowledgeable witness from Hudson Bay Company would

[3] testify as follows: Government's Exhibit 229 is a true and

[4] accurate copy of the authentic application for the Bay store

[5] credit card account No. 710-138-119-0 in the name Mokhtar

[6] Haouari. That application was maintained by Hudson Bay

[7] Company as part of its regularly-conducted business activity

[8] and consistent with its regular practice.

[9] "A review of the application which is dated 03.12.98

[10] indicates that 514-523-3215 was given as Mokhtar Haouari's

[11] home telephone number."

[12] Paragraph 4 of the same stipulation, Government's

[13] Exhibit 226 states: "If called to testify, a knowledgeable

[14] witness from GE Capital Canada would testify as follows:

[15] Government's Exhibit 231 is a true and accurate copy of the

[16] authentic application for Future Shop credit card account No.

[17] C 425-8946-816870-6 in the name of Mokhtar Haouari. That

[18] application was maintained by GE Capital Canada as part of its

[19] regularly-conducted business activity and consistent with its

[20] regular practice.

[21] "A review of the application which is dated

[22] December 17, 1998 indicates that 514-523-3215 was given as

[23] Mokhtar Haouari's home telephone number."

[24] Q: Mr. Duffy, turning back to your chart, Government Exhibit

[25] 410, what is the fourth telephone number in the left-hand

Page 750

[1] column of that chart?

[2] A: 514-574-7336.

[3] Q: If you would look, please, at the telephone records in

[4] evidence as Government Exhibit 233, according to Government's

[5] Exhibit 233 — withdrawn.

[6] Is 233 records for that telephone number that you

[7] just read which ends in 7336?

[8] A: Yes.

[9] Q: According to Government's Exhibit 233, is the subscriber

[10] of the telephone Mokhtar Haouari or another name?

[11] A: Another name.

[12] MS. BAKER: Your Honor, at this time, I would ask to

[13] read the other two — no, sorry. I withdraw that.

[14] Q: Mr. Duffy, if you would turn to the next item that should

[15] be in that stack in front of you. Do you have a document

[16] marked Government's Exhibit 108?

[17] A: Yes, I do.

[18] Q: Government's Exhibit 108 is already in evidence. Is there

[19] a marker indicating a portion on the front page of

[20] Government's Exhibit 108?

[21] A: Yes, there is.

[22] Q: First of all, could you just generally tell the jury what

[23] is Government Exhibit 108, what does it show?

[24] A: It looks like part of an address book or phone book.

[25] Q: Would you read to the jury the item that's marked on the

Page 751

[1] front page of Government's Exhibit 108?

[2] A: The name Mokhtar M-O-K-H-T-A-R is written and alongside

[3] that is telephone No. 1-514-574-7336.

[4] Q: Turning next to Government's Exhibit 106 already in

[5] evidence, what is that document?

[6] A: It also looks like an address book of some kind.

[7] Q: Please turn to the next-to-last page of Government's

[8] Exhibit 106 and in the right facing page of the telephone book

[9] shown there, about two-thirds of the way down, is there an

[10] entry for Mokhtar?

[11] A: Yes, there is.

[12] Q: Would you please tell the jury the telephone number

[13] written there for Mokhtar?

[14] A: 1-514-574-7336.

[15] Q: Thank you.

[16] Turning back again to your chart, Government's

[17] Exhibit 410, what is the next number listed in your chart?

[18] A: 514-253-3479.

[19] MS. BAKER: Your Honor, at this time, I'd like to

[20] read the other two paragraphs of the stipulation, Government

[21] Exhibit 226.

[22] THE COURT: You may do so.

[23] MS. BAKER: Paragraph 1 states: "If called to

[24] testify, a knowledgeable witness from Citibank would testify

[25] as follows: Government's Exhibit 227 is a true and accurate

UNITED STATES OF AMERICA v.
MOKHTAR HAOUARI

**Trial**
**July 6, 2001**

---

Page 752

[1] copy of the authentic application for Citibank Visa account
[2] No.4560900745592464 in the name of Mokhtar M.Haouari.That
[3] application was maintained by Citibank as part of its
[4] regularly-conducted business activity and consistent with its
[5] regular practice.
[6]    "A review of that application, which is dated
[7] October 13, 1999, indicates that 514-253-3479 was given as
[8] Mokhtar M. Haouari's telephone — home telephone number.
[9]    "Paragraph 3: If called to testify, a knowledgeable
[10] witness from Zeller's, Inc. would testify as follows:
[11] Government's Exhibit 230 is a true and accurate copy of the
[12] authentic application for Zeller's store credit card account
[13] No. 305-2-04844 in the name of Mokhtar Haouari.That
[14] application was maintained by Zeller's, Inc. as part of its
[15] regularly-conducted business activity and consistent with its
[16] regular practice.
[17]    "A review of the application which is dated March 23,
[18] 1999 indicates that 514-253-3479 was given as Mokhtar
[19] Haouari's home telephone number."
[20]    MS. BAKER: Your Honor, based on the stipulation,
[21] Government's Exhibit 226, the government offers at this time,
[22] Exhibits 227, 229, 230, and 231.
[23]    MR. OLLEN: I have no objection.
[24]    THE COURT: Received.
[25]    (Government's Exhibits 227, 229, 230 and 231 received

---

Page 753

[1] in evidence)
[2]    Q: Mr. Duffy, turning back to your chart, what is the next
[3] telephone number in the left-hand column of Government's
[4] Exhibit 410?
[5]    A: 514-591-3944.
[6]    Q: Let me direct your attention, please, to the next document,
[7] in the other stack in front of you, a document in evidence as
[8] Government's Exhibit 310. Would you look, please, at the
[9] business card shown in the upper left-hand corner?
[10]    A: O.K.
[11]    Q: What is the person's name on that business card?
[12]    A: H. Mokhtar.
[13]    Q: And what is the business name?
[14]    A: Artisanat Nord-Sud.
[15]    Q: What is the telephone number for the business on that
[16] business card?
[17]    A: 514-289-0918.
[18]    Q: What is the pager number on that business card?
[19]    A: 514-896-8145.
[20]    Q: And turning, please, to the back of Government's Exhibit
[21] 310, what is handwritten on the back of that business card?
[22]    A: Mokhtar M-O-K-H-T-A-R No. 591-3944.
[23]    Q: Turning back to your chart, Government's Exhibit 410, what
[24] is the next-to-last number in the blue boxes in the left-hand
[25] column?

---

Page 754

[1]    A: Next to last?
[2]    Q: Yes.
[3]    A: 514 — I'm sorry — 514-851-4515.
[4]    Q: Would you turn, please, to Government's Exhibit 343 in
[5] evidence. Is that a record relating to that pager number that
[6] you just read?
[7]    A: Yes.
[8]    Q: And if you would look at the back of Government Exhibit
[9] 343, what does the pager record say about who the subscriber
[10] was of that pager?
[11]    A: Mokhtar Haouari.
[12]    Q: At what address?
[13]    A: 4009 Boul. — I'm assuming that's Boulevard — St.
[14] Laurent.
[15]    Q: Thank you.
[16]    Turning back to your chart, Government Exhibit 410,
[17] what is the last number shown in the blue boxes in the
[18] left-hand column?
[19]    A: 514-896-8145.
[20]    Q: And if you would look, please, at Government's Exhibit
[21] 347 — I'm sorry, before you do that —
[22]    MS. BAKER: Your Honor, I would offer another written
[23] stipulation which is marked for identification as Government's
[24] Exhibit 346.
[25]    THE COURT: All right. You may. The stipulation is

---

Page 755

[1] received. And you may read it.
[2]    MS. BAKER: "It is hereby stipulated and agreed that
[3] if called to testify, a knowledgeable witness from Ni-Kol
[4] Cinema, Inc. would testify as follows: (1) Ni-Kol Cinema,
[5] Inc. owns the store at 4009 Boulevard, St. Laurent, Montreal,
[6] Quebec, Canada.
[7]    "Paragraph 2: Government Exhibit 347 is a true and
[8] accurate copy of the authentic application by Mokhtar Haouari
[9] to rent that store for the business Artisanat Nord-Sud. That
[10] application was received and maintained by Ni-Kol Cinema, Inc.
[11] as part of its regularly-conducted business activity and
[12] consistent with its regular practice."
[13]    Based on that stipulation, the government offers
[14] Exhibit 347.
[15]    MR. OLLEN: No objection.
[16]    THE COURT: Received.
[17]    (Government's Exhibit 347 received in evidence)
[18]    Q: Mr. Duffy, looking at Government's Exhibit 347, what is
[19] written in as the tenant's name?
[20]    A: Haouari, Mokhtar.
[21]    Q: And a few lines underneath that, what is written next to
[22] current address?
[23]    A: 6266 Rue De Marseille, No. 103.
[24]    Q: What is written underneath that in the space that begins
[25] "Tel."?

---

**Page 756**

[1] A: 514-896-8145.

[2] Q: And what are the letters that appear next to that?

[3] A: PAG.

[4] Q: Turning back to your chart in the first gray box in the

[5] left-hand column of Government's Exhibit 410, what is the

[6] telephone number?

[7] A: 514-287-7860.

[8] Q: If you would look at Government's Exhibit 401, which is

[9] already in evidence, according to Government's Exhibit 401, is

[10] that number that you just read the telephone number of a pay

[11] phone — let me withdraw the question.

[12] Looking at the top of Government's Exhibit 401, on

[13] the line that begins with the letters "AS," what is listed as

[14] the location of that telephone?

[15] A: 20 Duluth East, Montreal.

[16] Q: Finally, back at Government's Exhibit 410, what is the

[17] telephone number in the last box, in the left-hand column of

[18] Government's Exhibit 410?

[19] A: 514-596-2889.

[20] Q: And turning to Government's Exhibit 402 in evidence,

[21] looking at the top of Government's Exhibit 402, the upper

[22] left-hand corner, is Government's Exhibit 402 the subscriber

[23] record for that telephone number that you just read?

[24] A: Yes.

[25] Q: According to the line that begins with the letters "NI,"

**Page 757**

[1] what is the business name where that telephone is located?

[2] A: NCON/Harvey's.

[3] Q: And according to the line underneath that, what is the

[4] address where that telephone is located?

[5] A: 7001 Jarry, East Montreal.

[6] Q: Would you spell Jarry for the court reporter, please?

[7] A: J-A-R-R-Y.

[8] MS. BAKER: Your Honor, may I approach?

[9] THE COURT: You may.

[10] Q: Sir, I'm going to show you quickly diagrams marked as

[11] Government's Exhibits 410A through D, 411A, 413A, and 414A.

[12] Do you recognize those?

[13] A: Yes.

[14] Q: What are they?

[15] A: They are charts, blown-up charts of the charts that I have

[16] before me.

[17] MS. BAKER: Your Honor, I offer 410A through D, 411A,

[18] 413A and 414A.

[19] MR. OLLEN: No objection.

[20] THE COURT: I assume you've shown them to Mr. Ollen.

[21] MR. OLLEN: Yes.

[22] THE COURT: Is there any objection?

[23] MR. OLLEN: No.

[24] THE COURT: Received.

[25] (Government's Exhibits 410A through 410D, 411A, 413A

**Page 758**

[1] and 414A received in evidence)

[2] MS. BAKER: May we put up an easel and have the

[3] witness step down to use the charts?

[4] THE COURT: Yes. If you have to move, Mr. Ollen, and

[5] wish, to may do so without asking permission whenever you

[6] want.

[7] Q: The diagram that was facing the jury is Government's

[8] Exhibit 410A; correct?

[9] A: Yes.

[10] Q: Could you just explain to the jury generally what

[11] information is shown in Government Exhibit 410A and — well,

[12] before you answer that, I'm sorry, are 410B, C and D

[13] successive pages of that same chart?

[14] A: Yes.

[15] Q: Could you explain to the jury generally what kind of

[16] information is shown in that chart?

[17] A: Basically, on the left-hand side, in the blue, the number

[18] is — the telephone numbers we just went over are associated

[19] with Mokhtar Haouari. Above on the green are telephone

[20] numbers associated with Abdelghani Meskini.

[21] THE COURT: Hold it just a minute. Your back is to

[22] Ms. Rivera.

[23] THE WITNESS: Would you like me to stand —

[24] THE COURT: Just speak up nice and loud. Be sure she

[25] can hear you.

**Page 759**

[1] You were going across the top. You were saying the

[2] green, the numbers that were Mr. Meskini's numbers; correct?

[3] THE WITNESS: Correct, were associated with Mr.

[4] Meskini.

[5] THE COURT: Go ahead.

[6] A: Before I get to the numbers inside the cells; the

[7] different boxes are called "cells," I just want to let the

[8] jury know that running across this way are numbers that have

[9] been called or are in contact with telephone number 808-1969

[10] and the same goes on down the line as well.

[11] As for an example, 017-804-0300. Numbers that were

[12] in contact with this number run down the chart. For example,

[13] if you were to look at 514-808-1969 and compare it against

[14] those of 718-421-1118, you would have eight calls between

[15] those two numbers during this time period, 11/89 through

[16] 12/3/99.

[17] Q: Now, Mr. Duffy, let me ask you to briefly explain to the

[18] jury what process did you go through to arrive at the

[19] information which is now in the cells of Government Exhibit

[20] 410 and the blowups, 410A through D?

[21] A: I went through all of the telephone records on specific

[22] numbers during a certain time period.

[23] Q: Did you go through them manually or some other way?

[24] A: Some I had to go through manually. Others, the telephone

[25] companies provide on disk and when they provide on a disk, we

Page 760

[1] can upload it into a database and the computer will run the

[2] numbers instead of having somebody go through the numbers

[3] manually.

[4]   Q: Now, for some of the times when you looked at, were there

[5] one number called another number? Did you ever find the records

[6] for both of the two numbers that you were comparing?

[7]   A: Not in every case, but for most of — for several.

[8]   Q: And how did you — what did you do to avoid

[9] double-counting any calls where you had two sets of records?

[10]   A: I went through the numbers manually myself and I also ran

[11] the database for both numbers. So, I would run the calls

[12] specifically for let's say the number 808-1969 as well as the

[13] number that I was comparing the telephone calls to.

[14]   Q: Now, the numbers of calls that are shown in the cells of

[15] that chart, does that include calls where the duration was

[16] zero?

[17]   A: Quite possibly.

[18]   Q: And if you would look specifically in the third column

[19] from the left, the column headed "Abdelghani Meskini,"

[20] 718-421-4788, in the cell underneath that, next to 64 calls,

[21] there's an asterisk, could you explain to the jury the

[22] significance of that asterisk?

[23]   A: Yes. Going through the records of telephone No.

[24] 718-421-4788, I noticed there were telephone calls that were

[25] made to 514-808-1969; however, some of the telephone calls

Page 761

[1] weren't made directly from this number. They were billed to

[2] that number. So, somebody may have made a telephone call

[3] from, for example, a pay phone and billed it to this telephone

[4] number, sort of like you would with a calling card.

[5]   Q: If you would turn to the last panel which is on the easel

[6] now, which should be 410D.

[7]   A: 410D? Sure.

[8]   Q: Is that 410D?

[9]   A: Yes, it is.

[10]   Q: The right-hand column on 410D is headed "Abdelghani

[11] Meskini Fleet credit card," is that right?

[12]   A: Yes, it is.

[13]   Q: Could you just explain to the jury what was the record

[14] that you looked at to arrive at the information in that

[15] column?

[16]   A: In this column, this was a credit card bill and basically

[17] what showed up on the credit card bill was telephone call to

[18] 514-808-1969 and the call was placed on December 5, 1999 and

[19] billed to the credit card.

[20]   Q: If you would take 410D off the easel and put up, please,

[21] 411A.

[22]   A: 411A?

[23]   Q: Yes. Would you explain to the jury what is shown in

[24] Government Exhibit 411A.

[25]   A: Running down the left side are several numbers associated

Page 762

[1] with Mokhtar Haouari, two telephone numbers associated with

[2] Abdelghani Meskini.

[3]   Q: Now, are those numbers a subset of the telephone numbers

[4] that are in Government Exhibit 410 and 410A through D?

[5]   A: I don't understand "subset."

[6]   Q: Are those some of the same but not all of the same numbers

[7] that were in 410?

[8]   A: Exactly, yes, yes.

[9]   Q: And are in the two columns on 411A?

[10]   A: The first column is a number subscribed to Said Araar and

[11] the second column is telephone number subscribed by Brahim

[12] Cheriti.

[13]   Q: What do the cells in Government's Exhibit 411A show?

[14]   A: Various telephone calls between Mokhtar Haouari or

[15] Abdelghani Meskini and Said Araar and Brahim Cheriti.

[16]   Q: Turning to Government's Exhibit 413A. Actually, maybe

[17] what we could do is show 413A and 414A at the same time.

[18]   MS. BAKER: Mr. Bianco, could you hold 413A here at

[19] the end of the table.

[20]   Q: Could you explain to the jury generally what is shown in

[21] 413A and 414A?

[22]   A: It's a monthly breakdown over a two-year period of the

[23] numbers that were identified on the first chart, telephone

[24] contacts between or telephone calls made between numbers

[25] associated with Mokhtar Haouari and numbers associated with

Page 763

[1] Abdelghani Meskini.

[2]   Q: Is it correct that if you added up the numbness all of the

[3] cells on your first chart, which was marked as 410, and then

[4] parcelled those out over the months in which the calls were

[5] made, that that's the information shown in 413 and 414?

[6]   A: Correct.

[7]   Q: Let me ask you to look first at all of the months up

[8] through and including October 1999. Up through October 1999,

[9] what is the highest number of calls in any single month?

[10]   A: December of '98, 25 calls.

[11]   Q: And what is the number of calls in the single month of

[12] November 1999?

[13]   A: 50.

[14]   Q: And what is the number of calls in the single month of

[15] December 1999?

[16]   A: 78.

[17]   MS. BAKER: Thank you. You can take those down and

[18] resume the witness stand.

[19]   Q: Finally, Mr. Duffy, were you asked to examine the

[20] telephone records of Abdelghani Meskini to determine whether

[21] he had made any telephone calls to Pakistan International

[22] Airlines?

[23]   A: Yes.

[24]   Q: Do you have some notes up there with you that reflect your

[25] review of those telephone records?

Page 764

[1] A: I believe so; yes.

[2] Q: What were the telephone numbers for Pakistan International

[3] Airlines that you looked at?

[4] A: 212-370-9150, 718-656-4027; and 718-656-5220.

[5] Q: On which telephone or telephones associated with

[6] Abdelghani Meskini did you find calls to any of those three

[7] numbers?

[8] A: 718-421-4788 and 718-421-1118.

[9] Q: In total, how many calls did you find to these three

[10] Pakistan Airline numbers?

[11] A: Six.

[12] Q: Could you tell the jury the dates on which those calls

[13] were made?

[14] A: 12/1 — three were made on 12/1 and three were made on

[15] 12/6/1999.

[16] Q: 12/1 and 12/6?

[17] A: 1999.

[18] Q: Both 1999?

[19] A: Yes.

[20] MS. BAKER: No further questions — I'm sorry. May I

[21] confer with Mr. Bianco?

[22] THE COURT: You may confer with Mr. Bianco.

[23] (Pause)

[24] Q: Mr. Duffy, were some of the records that you reviewed

[25] cellular telephone records?

Page 765

[1] A: Yes.

[2] Q: And were some of the records that you reviewed records of

[3] hard lines, lines into buildings?

[4] A: Yes.

[5] Q: Could you explain to the jury what's the difference as far

[6] as what cell phone records versus hard line records would show

[7] about incoming telephone calls?

[8] A: Usually a hard line telephone record, you would get a

[9] telephone bill, as we're probably all familiar with, and it

[10] doesn't record incoming calls. It just charges you for the

[11] calls that you make; however, with a cell phone, it's

[12] different. A cell phone you get charged by incoming telephone

[13] calls as well as outgoing telephone calls.

[14] Q: So, if a person used a pay phone to call into a hard line,

[15] not collect, just a regular phone call from a pay phone made

[16] in some another way, would such a phone call show up on the

[17] records for the hard line?

[18] A: A pay phone to a hard line?

[19] Q: Yes.

[20] A: No.

[21] MS. BAKER: No further questions.

[22] THE COURT: All right. Cross?

[23] MR. OLLEN: No questions.

[24] THE COURT: All right. You're excused, Agent Duffy.

[25] Thank you very much. Thank you for keeping your voice up.

Page 766

[1] (Witness excused)

[2] (Continued on next page)

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 767

[1] MR. BIANCO: Before the next witness, we have two

[2] short stipulations to read.

[3] THE COURT: You may do so.

[4] MR. BIANCO: Government Exhibit 275:

[5] "It is stipulated between the parties that:

[6] "1. If called as a witness, Greg Fulton would

[7] testify as follows:

[8] "A. That he is an inspector for the United States

[9] Immigration and Natural Service at John F. Kennedy

[10] International Airport.

[11] "B. That, on December 9, 1998, an individual later

[12] identified as Mohamed Cherif Moui presented a suspicious and

[13] false Canadian passport and identification card to him at John

[14] F. Kennedy International Airport in an attempt to enter the

[15] United States.

[16] "2. The above-referenced Canadian passport and

[17] identification card, copies of which are marked as Government

[18] Exhibit 274, were later determined to be counterfeit.

[19] "It is further stipulation and agreed that this

[20] stipulation may be received in evidence as a government

[21] exhibit at trial."

[22] The government offers Exhibits 275 and 274.

[23] MR. OLLEN: No objection.

[24] THE COURT: Received.

[25] (Government Exhibits 274, 275 received in evidence)

Page 768

[1] MR. BIANCO: May I read another stipulation,
[2] Government Exhibit 280.
[3] THE COURT: You may do so.
[4] MR. BIANCO: (Reading)
[5]     "If called as a witness to testify at trial, a
[6] knowledgeable witness from the Office of Canadian Passport
[7] would testify as follows:
[8]     "A. The Office of Canadian Passport creates and
[9] maintains records relating to Canadian passports, each of
[10] which has a unique number. Those records are public records
[11] of public office or agency setting forth the activities of the
[12] office or agency, and they satisfy the criteria for public
[13] records and reports under Rule 803(8) of the Federal Rules of
[14] Evidence.
[15]     "B. A review of those records indicates that a
[16] Canadian passport number TD387037 was issued to Yves Lauzon
[17] and Canadian passport number VD872104 was issued to Mihai
[18] Nicolescu.
[19]     "2. If called to testify at trial, a knowledgeable
[20] witness from Citizenship and Immigration Canada would testify
[21] as follows:
[22]     "A. Citizenship and Immigration Canada creates and
[23] maintains records relating to applications for Canadian
[24] citizenship and the certificates of Canadian citizenship are
[25] issued when applications are granted. Each application for

Page 769

[1] Canadian citizenship has a unique number, and the resulting
[2] certificate of Canadian citizenship has the same unique
[3] number. Those records are public records of a public office
[4] or agency setting forth the activities of the office or
[5] agency, and they satisfy the criteria for public records and
[6] reports under Rule 803(8) of the Federal Rules of Evidence.
[7]     "B. A review of those records indicates that
[8] certificate of Canadian citizenship number 6416500 was issued
[9] to Wing Leung Lau, certificate of Canadian citizenship number
[10] 6525727 was issued to Kong Wang Tsui, and certificate of
[11] Canadian citizenship number 6501952 was issued to Scott
[12] Abraham Demercado."
[13]     Finally, Government Exhibit 444.
[14] I would move 280 and 444.
[15] MR. OLLEN: No objection.
[16] THE COURT: Received.
[17]     (Government Exhibits 280, 444 received in evidence)
[18] MR. BIANCO: (Reading)
[19]     "1. If called as a witness, Charles M. Schramek
[20] would testify as follows:
[21]     "A. That he is employed at system manager in the
[22] quality assurance and compliance unit at Delta Airlines;
[23]     "B. That, in his capacity as system manager, he is
[24] familiar with the recordkeeping procedures and practices used
[25] by Delta Airlines as part of its regular business activities;

Page 770

[1] "C. That flight maps and flight path records
[2] pertaining to Delta Airlines flights are maintained as part of
[3] the regularly conducted business activities of Delta Airlines;
[4] "D. That he has reviewed flight maps and records
[5] relating to Delta Airlines Flight 1995 on December 11, 1999
[6] from John F. Kennedy International Airport in New York City
[7] (hereinafter 'JFK Airport') to Seattle, Washington and Delta
[8] Flight 1994 on December 16, 1999, from Seattle, Washington to
[9] JFK Airport; and,
[10] "E. That a review of those records indicates the
[11] following: (1) Delta Airlines Flight 1995 on December 11,
[12] 1999 from JFK Airport to Seattle flew through the Southern
[13] District of New York; and (2) Delta Flight 1994 on December
[14] 16, 1999 from Seattle to JFK Airport flew through the Southern
[15] District of New York."
[16]     THE COURT: So the jury knows what the Southern
[17] District of New York is, it covers Manhattan, Bronx,
[18] Westchester, Putnam, and Dutchess Counties on the east side of
[19] the river. It covers Rockland, Orange, and Sullivan Counties
[20] on the west side. When I say the river, I mean the Hudson
[21] River. Manhattan, Bronx, Westchester, Putnam, Dutchess, and
[22] the other side, Rockland, Orange, and Sullivan Counties.
[23]     MS. BAKER: Your Honor, the government calls Alain
[24] Livernoche.
[25]     ALAIN LIVERNOCHE,

Page 771

[1] called as a witness by the government,
[2] having been duly sworn, testified as follows:
[3]         DIRECT EXAMINATION
[4]         BY MS. BAKER:
[5] Q: Whom do you work for?
[6] A: I work for the Royal Canadian Mounted Police.
[7] Q: How long have you worked for the RCMP?
[8] A: I have been with the RCMP for the last 24 years.
[9] Q: What is your rank?
[10] A: Constable.
[11] Q: In what city in Canada do you work?
[12] A: I presently work in Trois-Rivieres, a small town east of
[13] Montreal.
[14] THE COURT: Trois-Rivieres.
[15] THE WITNESS: Trois-Rivieres.
[16] THE COURT: Outside Montreal.
[17] THE WITNESS: Yes. There are two of them.
[18] THE COURT: My grandfather came from there. I never
[19] met anybody from Trois-Rivieres.
[20] Q: Do us the favor of spelling the name of the town for the
[21] reporter, please?
[22] A: T-R-O-I-S, R-I-V-I-E-R-E-S.
[23] Q: Were you on duty for the Royal Canadian Mounted Police on
[24] January 21, 2000?
[25] A: Yes, I was at that time I was working for the national

Page 772

[1] security investigation section in Montreal.

[2] Q: On that date, were you assigned to carry out a search at a

[3] location?

[4] A: Yes, on that date we did a search at 3190 Edgar Street,

[5] Laval, Quebec, under the authority of a search warrant.

[6] MS. BAKER: May I approach, your Honor.

[7] THE COURT: You may.

[8] Q: I have handed you items that have been marked for

[9] identification as Government Exhibits 426 through 431. Before

[10] you came to court today, did you have an opportunity to

[11] inspect those items or copies of those items?

[12] A: I saw copies of those items and I seized those items on

[13] January 21, 2000.

[14] Q: At the location you just mentioned?

[15] A: Yes.

[16] MS. BAKER: Your Honor, the government offers

[17] Exhibits 426 through 431.

[18] MR. OLLEN: No objection.

[19] THE COURT: Received.

[20] (Government Exhibits 426-431 received in evidence)

[21] Q: Look first please at 426; tell the jury what that is.

[22] A: Yes. This is a receipt for the Statue of Liberty Ferry,

[23] for an amount of $20.

[24] Q: What is the date on that receipt?

[25] A: The 11th month of the 6th day 1999.

Page 773

[1] Q: November 6, 1999?

[2] A: Yes.

[3] Q: Turning next to Government Exhibit 427, what is Government

[4] Exhibit 427?

[5] A: That's the group of credit cards, blank credit cards or

[6] blank cards used to make credit cards with magnetic stripe on

[7] it. They were seized by myself at 3190 Edgar in Laval on 21

[8] January.

[9] Q: It also appears there is some packaging material in that

[10] package with the cards.

[11] A: Yes, that's the bag that they were in when I found them.

[12] Q: Turning next to Government Exhibit 428, what is 428?

[13] A: That's the receipt for a room at the Ramada Inn, 114 Route

[14] 28, Kingston, New York.

[15] Q: What is the date on that?

[16] A: November 7, 1999, it's for the amount of $70.95.

[17] Q: Is there a name on the receipt?

[18] A: Yes, the name of Cathleen Marchand.

[19] Q: Turning next to Government Exhibit 429, what is 429?

[20] A: This is a bill from Sprint Canada for the amount of

[21] $24.93.

[22] Q: Look please at the second page of the bill; take it out of

[23] the plastic cover. What is the telephone number on the bill?

[24] A: 450-628-3200.

[25] Q: What is the name of the customer on the bill?

Page 774



[1] A: Cathleen Marchand.

[2] Q: Turn back to the second page, look at the list of calls.

[3] In the middle of that page on the line that starts with number

[4] 12, read the first several entries which give the date, time,

[5] and telephone number called.

[6] A: Date is 16 October at 9:53 a.m.

[7] Q: What was the number called?

[8] A: 718-421-4788, Brooklyn, New York.

[9] Q: Thank you. Turning next to Government Exhibit 430. What

[10] is Government Exhibit 430?

[11] A: That's a bill from the Clearnet Company.

[12] Q: For what telephone number? Look at the second page; I

[13] believe is shows the number.

[14] A: The number is 514-830-6231.

[15] Q: What is the name of the subscriber?

[16] A: Under the name Mr. Faid Araar.

[17] Q: The first name?

[18] A: F-A-I-D.

[19] Q: Thank you. Finally, Government Exhibit 431, what is

[20] Government Exhibit 431?

[21] A: It's an American Express credit card account statement

[22] under the name of Cathleen Marchand.

[23] Q: Turn to the second page of Government Exhibit 431. Look

[24] at the second transaction listed on that page. What is the

[25] date of that transaction?

Page 775

[1] A: 6 November.

[2] Q: What is the description of the transaction given?

[3] A: It says Gaseteria, 26 New York, service station, $20 U.S.

[4] Q: If you would provide the same information regarding the

[5] next transaction?

[6] A: The next transaction is dated on 8 November. It's under

[7] the name of Ramada Inn, Kingston, Kingston, for an amount of

[8] $70.95.

[9] Q: Does it say Kingston, New York?

[10] A: Yes, it says Kingston, Kingston, New York.

[11] MS. BAKER: Thank you. No further questions.

[12] THE COURT: Any cross?

[13] MR. OLLEN: No, your Honor.

[14] THE COURT: Thank you very much. You are excused.

[15] (Witness excused)

[16] MS. BAKER: The government next calls Daniel Jackson.

[17] THE COURT: Does anybody need a recess?

[18] DANIEL WESSLEY JACKSON,

[19] called as a witness by the government,

[20] having been duly sworn, testified as follows:

[21] DIRECT EXAMINATION

[22] BY MS. BAKER:

[23] Q: Whom do you work for?

[24] A: I work for the Federal Bureau of Investigation in

[25] Quantico, Virginia.

Page 776

[1] Q: What component of the FBI is there at Quantico where you

[2] work?

[3] A: I work for the laboratory division.

[4] Q: In what unit of the laboratory division?

[5] A: I am in the cryptographic and electronic analysis unit.

[6] Q: Describe very generally what that means, about what kinds

[7] of things you do usually.

[8] A: I am an electronics engineer and I work as a forensic

[9] examiner. If something electronic is used in a crime, it is

[10] sent to our lab. We look at it, try to determine what it is

[11] and how it was used, and provide a report to the submitting

[12] agency.

[13] Q: Were you asked to analyze some evidence in connection with

[14] this case?

[15] A: Yes, I was. I received 18 credit, debit-type cards in

[16] this case.

[17] Q: Let me ask you to look at the witness stand; there should

[18] be a package marked as Government Exhibit 427. Do you

[19] recognize the items in Government Exhibit 427? If you need to

[20] open it up, you can do that.

[21] A: Yes. This is the bag that was received in the Royal

[22] Canadian Mounted Police bag, then it was sealed in the FBI lab

[23] bag over the top of that.

[24] Q: Does Government Exhibit 427 contain the cards you

[25] analyzed?

Page 777

[1] A: Yes.

[2] Q: How many cards were there?

[3] A: There were 18 credit, credit-type cards. They are

[4] unmarked. They are just white plastic with a magnetic strip

[5] on one side.

[6] Q: What were you asked to look for on those cards?

[7] A: I was asked to see if we could determine any data that was

[8] programmed on the cards and specifically credit or debit

[9] account information on the cards.

[10] Q: Can you describe for the jury how you conducted that

[11] examination; what did you actually do?

[12] A: We used a magnetic strip reader and the cards were slid

[13] through there and programming information that was programmed

[14] in there was displayed and printed out.

[15] Q: Of the total of 18 cards were some of them blank?

[16] A: Yes, there were.

[17] Q: How many were blank?

[18] A: Could I refer to my case notes?

[19] THE COURT: You may.

[20] A: That is my official lab report and case notes here. There

[21] were 9 cards that were blank out of the 18.

[22] Q: Did any of the cards contain data in the format that would

[23] be on a credit card or debit card?

[24] A: Yes, 3 cards.

[25] Q: For reference, did you assign to each of the cards some

Page 778

[1] type of unique identifying number?

[2] A: Yes. When we receive evidence in the laboratory, it is

[3] given a laboratory specimen number. Each card had its own

[4] individual specimen number.

[5] Q: Which were the specimen numbers given the 3 cards on which

[6] you found data?

[7] A: Data was found, if I could refer to my report —

[8] THE COURT: You may.

[9] Are these in any way identified for record purposes?

[10] MS. BAKER: The cards collectively are in evidence as

[11] 427.

[12] THE COURT: I mean the document he is referring to to

[13] refresh his recollection.

[14] MS. BAKER: Yes, your Honor. They are marked as 3500

[15] exhibits, if I could find out the number.

[16] THE COURT: Yes, so we have that in the record. I

[17] apologize for interrupting. I think it's important that

[18] whatever is referred to be identified in the record.

[19] MS. BAKER: Your Honor, the handwritten notes are

[20] 3559B and the lab report is 3559C.

[21] THE COURT: Thank you.

[22] Could you read the last two questions, his answers,

[23] and the pending question.

[24] (Record read)

[25] THE WITNESS: Thank you.

Page 779

[1] THE COURT: OK.

[2] Q: Let me pose that question again so we can get the answer

[3] in one complete piece. Which were the identifying numbers you

[4] assigned to the 3 cards on which you found credit card or

[5] debit card information?

[6] A: The 18 credit cards were assigned numbers Q164 through

[7] Q181. On Q178, Q179, and the last card that data was found on

[8] was Q181, so 3 cards had credit card data on them.

[9] Q: Let me ask you about each of those cards in turn. The

[10] card you marked Q178, did you find a number on that card in

[11] the form of a credit card or debit card number?

[12] A: Yes. When that was put through the reader, an account

[13] number and name came up on that card.

[14] Q: What were the account number and name?

[15] A: The account number that was displayed was

[16] 5412345678901234. The name, I would like to spell the name

[17] because I don't know the pronunciation, Said Araar, and that's

[18] S-A-I-D A-R-A-A-R.

[19] Q: On the card you identified as Q179, what were the number

[20] and name?

[21] A: The account number is 4246152024194784, and the name is

[22] Zaleski, Z-A-L-E-S-K-I, Inessa, I-N-E-S-S-A.

[23] Q: Finally, on the card you identified as Q181, what were the

[24] number and name?

[25] A: The account number was 5490930080077559, and the same

name

Page 780

[1] as the last credit card, Zaleski, Inessa, spelled the same

[2] way. I can read it out if you want the spelling.

[3]   Q: That's fine; thank you. You testified that 3 cards had

[4] this information that you just provided. There were others

[5] that were blank. What was on the remaining cards, just

[6] generally?

[7]   A: There was information on those cards, but it was not in

[8] credit, in a format that was recognized as a credit card or

[9] debit card format. And I showed that card to some of the

[10] engineers who work on similar type cards, and it was not

[11] determined what that data was that was programmed on that.

[12]   MS. BAKER: Thank you. No further questions.

[13]   MR. OLLEN: No questions.

[14]   THE COURT: You are excused. Thank you, Mr. Jackson.

[15]   (Witness excused)

[16]   MS. BAKER: Your Honor, I would offer a written

[17] stipulation that relates to the testimony just given, but I

[18] would also, if perhaps, while I read that, we might pass

[19] Government Exhibit 427 through the jury.

[20]   THE COURT: I think what we ought to do is pass 427

[21] and after passing 427, I think we should take a ten-minute

[22] break. We will pass 427 around. We will take a recess. Then

[23] you can read the stipulation.

[24]   (Pause)

[25]   THE COURT: We will take a ten-minute recess. Don't

Page 781

[1] discuss the case or come to any conclusions concerning the

[2] case.

[3]   (Jury leaves courtroom)

[4]   THE COURT: Could I see counsel at the sidebar.

[5]   (Continued on next page)

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 782

[1]   (Discussion off the record at the sidebar)

[2]   THE COURT: This is being done outside the presence

[3] of the defendant. Is there any objection to that?

[4]   MR. OLLEN: Not at all.

[5]   THE COURT: It's strictly a legal matter. This is an

[6] indication, which has been agreed to by Mr. Ollen and

[7] presented to Mr. Ollen in a letter dated July 6 to him, and it

[8] sets forth several primarily typographical errors in the

[9] transcript. Both sides agree that the transcript should be

[10] corrected with regard to these, in the event the transcript

[11] ever has to be read by an appellate court or in case it has to

[12] be reviewed during jury deliberations.

[13]   I am going to give it to you, if I may, Ms. Stanley,

[14] and you and the other court reporters can make the appropriate

[15] changes in the record. Thank you very much.

[16]   (Recess)

[17]   (Continued on next page)

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 783

[1]   (In open court, jury present)

[2]   THE COURT: You may proceed.

[3]   MR. BIANCO: Thank you, your Honor. We are getting

[4] near the end of the stipulations. We have one more right now.

[5]   THE COURT: It still saves time.

[6]   MS. BAKER: I offer Government Exhibit 433.

[7]   THE COURT: Received. It's a stipulation.

[8]   (Government Exhibit 433 received in evidence)

[9]   MS. BAKER: (Reading)

[10]   "It is hereby stipulated and agreed that if called to

[11] testify at trial, a knowledgeable witness from First USA Bank

[12] would testify as follows:

[13]   "A. Government Exhibit 434 is a set of records from

[14] First USA Bank regarding Visa account number 4246152024194784

[15] in the name Kevin A. Zaleski. Those records were created and

[16] maintained by First USA Bank as part of its regularly

[17] conducted business activity and consistent with its regular

[18] practice. The records now marked as Government Exhibit 434

[19] are true and accurate copies of those authentic business.

[20] records. As a result, Government Exhibit 434 satisfies the

[21] criteria for records of regularly conducted activity under

[22] Rule 803(6) of the Federal Rules of Evidence.

[23]   "B. Government Exhibit 434 includes a list of

[24] fraudulent charges made on the Zaleski Visa account. Those

[25] charges, which total $7,915.71, were made between December 16,

Page 784

[1] 1999 and December 28, 1999, at merchants in Montreal, La

[2] Salle, St. Bruno, and Anjou, which are cities in the Province

[3] of Quebec, Canada. Copies of the receipts for the

[4] transactions, which First USA Bank obtained from each of the

[5] merchants, show that the fraudulent charges were all made with

[6] a counterfeit credit card bearing the number of the Zaleski

[7] Visa account and the name Javier Hernandez."

[8] The next paragraph is also number 1. It is obviously

[9] an error. It should be paragraph 2.

[10] "1. If called to testify at trial, a knowledgeable

[11] witness from JP Morgan Chase & Co. would testify as follows:

[12] "A. He or she has reviewed records from JP Morgan

[13] Chase & Co. regarding credit card account number

[14] 5490930080077559. Those records were created and maintained

[15] by JP Morgan Chase & Co. as part of its regularly conducted

[16] business activity and consistent with its regular practice.

[17] As a result, those records satisfy the criteria for records of

[18] regularly conducted activity under Rule 803(6) of the Federal

[19] Rules of Evidence.

[20] "B. Those records show that the true accountholders

[21] of credit card account number 5490930080077559 were K.A.

[22] Zaleski and Inessa Zaleski.

[23] "C. Those records show that unauthorized charges

[24] totalling $3,338.65 are were made on the account between

[25] November 17, 1999, and April 4, 2000. Those charges were made

Page 785

[1] at merchants in Montreal and Laval, Quebec, Canada, and in

[2] Spain."

[3] Your Honor, based on that stipulation, the government

[4] offers Exhibit 434.

[5] MR. OLLEN: No objection.

[6] THE COURT: Received.

[7] (Government Exhibit 434 received in evidence)

[8] MR. BIANCO: Your Honor, the government calls Monique

[9] Desjardins. She will being using a French interpreter.

[10] THE COURT: Fine.

[11] MONIQUE DESJARDINS,

[12] called as a witness by the government,

[13] having been duly sworn, testified as follows:

[14] (Through interpreter)

[15]         DIRECT EXAMINATION

[16]         BY MR. BIANCO:

[17] Q: Where do you work?

[18] A: I work for the Royal Canadian Mounted Police in Montreal.

[19] Q: How long have you been with the RCMP?

[20] A: For more than 25 years.

[21] Q: Directing your attention to January 7, 2000, were you

[22] working that day?

[23] A: Yes, I was working that day.

[24] Q: What was your assignment?

[25] A: I was supposed to follow Mr. Mokhtar Haouari.

Page 786

[1] Q: In what city?

[2] A: In the City of Montreal.

[3] Q: Do you see Mr. Haouari in court today?

[4] A: He is seated at the second table and he is wearing a

[5] striped blue and white shirt.

[6] THE COURT: Indicating the defendant.

[7] Q: Approximately when did you first observe the defendant on

[8] January 7, 2000?

[9] A: I saw him for the first time when he was coming out of a

[10] building at number 7010 Jolie Street.

[11] Q: Was that at approximately 8:50 in the evening?

[12] A: That's right.

[13] Q: Where did you see him when you saw him go out of that

[14] building?

[15] A: When he came out of the building he crossed the street and

[16] he went into Harvey's Restaurant which is located just across

[17] from the apartment complex.

[18] Q: What did you observe him do in Harvey's Restaurant?

[19] A: He used a public telephone and afterwards he went and sat

[20] at a table where he read a newspaper.

[21] Q: Directing your attention to a little later that evening at

[22] approximately 10:45 p.m., where were you at that time?

[23] A: I was at the bus terminal at Laval where I had followed

[24] Mr. Haouari. He went there to take the, get on the subway

[25] station Henri Bourrassa. He went inside the metro station,

Page 787

[1] subway station. He went down one level where there was a line

[2] of subway cars, and on that level he made a telephone call

[3] from the public phone, and after that he waited for the subway

[4] cars to arrive.

[5] Q: What was Mr. Haouari's demeanor when you were following

[6] him? What if anything was he doing when you were following

[7] him?

[8] A: He was looking all around him. He was looking to see if

[9] anyone was on surveillance with him.

[10] Q: Did you get on the train and follow him on the train?

[11] A: Yes.

[12] Q: Where did he go?

[13] A: He got off at the Jarring Station, and right before the

[14] exit on the street, he made several telephone calls from a

[15] public phone. After that, he used his own cell phone.

[16] Q: He used the public phone first, then his cell phone?

[17] A: That's correct.

[18] Q: What was his demeanor when he was in the train station at

[19] Jarring?

[20] A: While he was inside the station, he was looking at the

[21] windows all around him to see if there was anyone following

[22] him.

[23] MR. OLLEN: Your Honor, I object and move to strike

[24] as conclusion.

[25] THE COURT: The answer stands up to he looked around

Page 788

[1] him. For the purpose of his looking around him is stricken.

[2] The motion is granted. That's a conclusion of the witness.

[3] Sustained. The part that's stricken is a conclusion as to why

[4] he was looking around him and is no longer in the record for

[5] purposes of the jury.

[6] **BY MR. BIANCO:**

[7] Q: While he was in the train station did he walk around in

[8] the train station, any areas?

[9] A: He was walking around the metro station before getting on

[10] to the train, yes.

[11] Q: Directing your attention to 11:53 p.m., where were you at

[12] that time?

[13] A: I followed him up to a taxi where he got into a taxi,

[14] which took him to 3190 Edgar Street in Laval, L-A-V-A-L.

[15] Q: Did other officers follow him in the taxi at 3190 Edgar

[16] when he got there?

[17] A: Yes, that's correct, the whole team followed him.

[18] Q: At approximately 11:53 where were you?

[19] A: I saw Mr. Haouari get out of the taxi and go into 3190

[20] Edgar.

[21] Q: You mentioned Laval; where is Laval in relation to

[22] Montreal?

[23] A: Laval is located to the north of Montreal.

[24] Q: Approximately how far?

[25] THE COURT: Hold it a minute. The defendant wants to

Page 789

[1] confer. He is talking to the interpreter. Mr. Ollen has to

[2] know what's going on.

[3] MR. OLLEN: Thank you, your Honor.

[4] (Pause)

[5] MR. OLLEN: Thank you.

[6] **BY MR. BIANCO:**

[7] Q: Approximately how far outside of Montreal is that by time

[8] and miles?

[9] A: It depends on where you are. There is a bridge which

[10] separates, and a river, therefore, which separates Montreal

[11] from Laval.

[12] Q: What type of building is located at 3190 Edgar?

[13] A: A residence, apartment houses, apartment buildings.

[14] MR. BIANCO: Nothing further.

[15] THE COURT: Any cross?

[16] MR. OLLEN: Just a couple of questions.

[17] **CROSS-EXAMINATION**

[18] **BY MR. OLLEN:**

[19] Q: You mentioned that you saw Mr. Haouari on January 7, 2000

[20] at a restaurant called Harvey's, is that correct?

[21] A: That's correct.

[22] Q: Then you saw him, well, he sat at a table at the

[23] restaurant Harvey's in Montreal, is that correct?

[24] A: That's correct.

[25] Q: You followed him to a metro station, correct?

Page 790

[1] A: That's correct.

[2] Q: That was still on January 7 of the year 2000, correct?

[3] A: That's correct.

[4] Q: The metro station where you saw Mr. Haouari on January 7

[5] is within the City of Montreal, is that correct?

[6] A: That's correct.

[7] Q: Then you say you followed him and you saw him wind up at

[8] 3190 Edgar Street, is that correct?

[9] A: That's correct.

[10] Q: That's in the Town of Laval?

[11] A: That's correct.

[12] Q: That's right outside the City of Montreal, correct?

[13] A: That's correct.

[14] Q: Were you in Montreal on December 17, 1999?

[15] A: I have no idea if I was in Montreal on that day or not.

[16] Q: You work for the Royal Canadian Mounted Police, correct?

[17] A: That's correct.

[18] Q: You were aware in around the time of Ahmed Ressam's arrest

[19] that he had been arrested, correct; you became aware of that?

[20] A: I don't know if I was in Montreal or not. Normally during

[21] that time of the year I take vacation. I am not sure if I was

[22] on vacation during that time or not.

[23] THE COURT: But that is not Mr. Ollen's question.

[24] Let me put it to you a little differently. Whether you were

[25] in Montreal or not in Montreal, were you in Canada on or

Page 791

[1] around or about December 17, 1999?

[2] THE WITNESS: I can't tell you whether I was in the

[3] country or out of the country.

[4] Q: Ressam's arrest was front page news in Canada; correct?

[5] A: If I didn't see it on the day that you mention, I would

[6] have certainly seen it later.

[7] Q: Mokhtar Haouari was still in Montreal on January 7 of the

[8] year 2000; you saw him there, correct?

[9] A: That's correct.

[10] MR. OLLEN: Nothing further.

[11] THE COURT: Any redirect?

[12] MR. BIANCO: No, your Honor.

[13] THE COURT: You are excused.

[14] (Witness excused)

[15] MS. BAKER: Your Honor, the government offers three

[16] additional written stipulations marked as Government Exhibits

[17] 140, 142, and 144.

[18] THE COURT: You may read them. They are received in

[19] evidence.

[20] (Government Exhibits 140, 142, 144 received in

[21] evidence)

[22] MS. BAKER: Beginning with Government Exhibit 140:

[23] "It is hereby stipulated and agreed that if called to

[24] testify at trial, a knowledgeable witness from Societe de

[25] l'Assurance Automobile du Quebec would testify as follows:

Page 792

[1]    "1. Societe de l'Assurance Automobile du Quebec

[2]    ('SAAQ') issues all Quebec driver licenses and motor vehicle

[3]    registrations and maintains records relating to those driver

[4]    licenses and registrations.

[5]    "2. Each Quebec driver license has a unique bar

[6]    code.

[7]    "3. The records of SAAQ are public records of a

[8]    public office or agency setting forth the activities of the

[9]    office or agency, and they satisfy the criteria for public

[10]   records and reports under Rule 803(8) of the Federal Rules of

[11]   Evidence.

[12]   "4. A review of those records indicates that:

[13]   "A. The Quebec driver license issued in the name

[14]   Said Araar gives his address at 3190 Rue Edgar, Laval, Quebec;

[15]   "B. The only Quebec driver license issued in the

[16]   name Maurizio Calabrese bears a different address and number

[17]   than the Quebec driver license in the name Maurizio Calabrese

[18]   that is shown in Government Exhibit 106; and

[19]   "C. No Quebec driver licenses were issued in the

[20]   names Walid Azhar and Mario Roig."

[21]   (Continued on next page)

[22]

[23]

[24]

[25]

Page 793

[1]    MS. BAKER: Government Exhibit 144. "It is hereby

[2]    stipulated and agreed that if called to testify, a witness

[3]    with knowledge would testify as follows: The postal code for

[4]    7934 Papineau, Montreal, Quebec, Canada is H2E2H6."

[5]    Finally, your Honor, before reading Government

[6]    Exhibit 142, we would ask to show the jury on the TV two prior

[7]    exhibits which are referred to in this stipulation.

[8]    THE COURT: You may do so.

[9]    MS. BAKER: Your Honor, while they're fixing that,

[10]   before we turn to the last stipulation, right after I read

[11]   Government's Exhibit 140, I was advised of an error in it

[12]   where it referred to Government's Exhibit 109. Mr. Ollen has

[13]   referred to Government's Exhibit 106, it should have

[14]   the correction and we have initialed it on the document.

[15]   THE COURT: All right. It stands so corrected.

[16]   (Discussion off the record)

[17]   MS. BAKER: I was assured that the equipment was

[18]   working this morning.

[19]   THE COURT: One of the jurors has signalled to me, as

[20]   a matter of fact, two of them did, and I was going to

[21]   volunteer something else. Sometimes I think that I do talk

[22]   too much, but this time what I was going to say is apt. If

[23]   the equipment doesn't work, do it like I used to do it when I

[24]   tried the cases. Pass the exhibits to the jury. Let them see

[25]   it. You don't need all these electronic gimmicks. Just give

Page 794

[1]    the jury the exhibits and they can't look at it.

[2]    Is that working?

[3]    MS. BAKER: Yes.

[4]    THE COURT: What are the exhibits? My little thing

[5]    over here doesn't work.

[6]    MS. BAKER: On the screen now we have Government's

[7]    Exhibit 109, which is the photocopy and lying on top of it is

[8]    Government's Exhibit 56.

[9]    THE COURT: 109 and 56.

[10]   MR. BIANCO: It's on there now.

[11]   THE COURT: They're on there now; O.K.

[12]   MS. BAKER: So, as they show on the screen, it's part

[13]   of 109 showing at the top and 56 at the bottom.

[14]   THE COURT: All right.

[15]   MS. BAKER: Reading Government Exhibit 142, the

[16]   stipulation: "It is hereby stipulated and agreed that if

[17]   called to testify, Robert J. Kirkland would testify as

[18]   follows: 1. He works at the Federal Bureau of Investigation

[19]   laboratory; 2. He created Government's Exhibit 143A by

[20]   enlarging a portion of the Quebec driver's license in the name

[21]   Mario Roig, which license was referred to by the FBI

[22]   Laboratory as item Q-79B and is now marked as Government's

[23]   Exhibit 56.

[24]   "He created Government's Exhibit 143B by enlarging a

[25]   portion of the photocopy of the Quebec driver's license in the

Page 795

[1]    name of Maurizio Calabrese, which photocopy was referred to by

[2]    the FBI Laboratory as item QC-108 and is now marked" — and I

[3]    need to confer with Mr. Ollen again — and is now marked as

[4]    Government's Exhibit 109.

[5]    Your Honor, based on that stipulation, the government

[6]    offers 143A and 143B.

[7]    MR. OLLEN: No objection.

[8]    THE COURT: 143A and B are received.

[9]    (Government's Exhibits 143A and 143B received in

[10]   evidence)

[11]   MS. BAKER: And, your Honor, we would ask permission

[12]   to pass 143A and B through the jury.

[13]   THE COURT: You may. Do you have another copy?

[14]   Could I see it before them?

[15]   MS. BAKER: I'm afraid we have only the original, but

[16]   I can hand it to you first.

[17]   THE COURT: Give it to the jury first and give it to

[18]   me after the jury has seen it since it's in evidence. Go

[19]   ahead.

[20]   MS. BAKER: Your Honor, in case it wasn't clear from

[21]   the stipulation, 143A is the board which is the back part, and

[22]   143B is the clear plastic overlay. The jurors are welcome to

[23]   disassemble or reassemble it as it's passed along.

[24]   THE COURT: All right. Thank you.

[25]   MS. BAKER: The government rests.

Page 796

[1] THE COURT: All right. Could Ms. Rivera and Mr.

[2] Ollen and counsel come over to the sidebar.

[3]     (At the sidebar)

[4]     THE COURT: The record should reflect before Mr.

[5] Ollen makes his Rule 29 motion that after conferring with

[6] counsel informally, at which informal conference the Court

[7] suggested that perhaps there was some repetition in Count 6

[8] and 7, the government agreed that only Count 6 would be

[9] submitted. So, the indictment now only consists of six counts

[10] and the motion that you're about to make should be addressed

[11] to those counts.

[12]     Go ahead.

[13]     MR. OLLEN: Your Honor, pursuant to Rule 29, I am

[14] moving for a judgment of acquittal on the ground that the

[15] evidence is insufficient to state a conviction of any of the

[16] offenses charged in the indictment.

[17]     THE COURT: The motion is denied with respect to each

[18] and every count. You have an exception, sir.

[19]     MR. OLLEN: O.K. Of course on my one and only piece

[20] of evidence, I made a mistake in the date.

[21]     THE COURT: You want to move the television back.

[22]

[23]     (Continued on next page)

[24]

[25]

Page 797

[1]     (In open court; jury present)

[2]     THE COURT: All right, Mr. Ollen, for the defense.

[3]     MR. OLLEN: Your Honor, the defense has a written

[4] stipulation marked Defendant's Exhibit A that we would like to

[5] offer into evidence at this time.

[6]     THE COURT: All right. The stipulation, as I

[7] understand it, there are no objections to it, the stipulations

[8] are received in evidence and so this is evidence in the case.

[9] You may read the stipulation.

[10]     (Defendant's Exhibit A received in evidence)

[11]     MR. OLLEN: Thank you, your Honor.

[12]     "It is hereby stipulated and agreed by and between

[13] Mokhtar Haouari, the defendant, by and through his attorney,

[14] Daniel J. Ollen, and the United States of America, by Mary Jo

[15] White, United States Attorney for the Southern District of New

[16] York, Joseph F. Bianco and Robin L. Baker, Assistant United

[17] States Attorneys, of counsel, that if called to testify,

[18] witnesses with knowledge would testify as follows: (a) on

[19] December 24, 1999, Mokhtar Haouari voluntarily appeared for an

[20] interview with a member of the Royal Canadian Mounted Police

[21] and a member of the Canadian Security Intelligence Service.

[22]     "(b) The interview took place at the Montreal office

[23] of Mr. Haouari's Canadian attorney, Joseph Elfassy, Esq.

[24]     "(c) Among other topics, Mr. Haouari was asked

[25] questions relating to Ahmed Ressam.

Page 798

[1]     "(d) Among other things, the interviewer also told

[2] Mr. Haouari in substance that it would be in his best

[3] interests to report any fake documents that might be used by

[4] potential extremists because any attack in Canada or the

[5] United States would result in a criminal investigation and

[6] Haouari could be a target.

[7]     "(e) After the interview was completed, Mr. Haouari

[8] was not arrested."

[9]     THE COURT: All right.

[10]     MR. OLLEN: Defense rests, your Honor.

[11]     THE COURT: Now, ladies and gentlemen of the jury:

[12] That completes the evidence in the case. I had told you when

[13] we selected the jury back in June that we wouldn't be working

[14] this Monday, which is July 9th. We will also, insofar as the

[15] jury is concerned, not be working on Tuesday, July the 10th

[16] because I will be meeting with the lawyers for the better part

[17] of the day going over the charge of law.

[18]     And let me tell you what's going to happen on the

[19] 11th so that you will understand. The first thing that you

[20] should understand is this: I am not in any manner, shape or

[21] form going to sequester you. So, nobody has to worry about

[22] bringing a clean pair of socks or a toothbrush on Wednesday.

[23]     If you don't reach a verdict Wednesday, you'll just

[24] go home at around 5 o'clock and you will come back on

[25] Thursday. So, nobody has to worry about going to a hotel or

Page 799

[1] being sequestered. That's the first thing so that everybody

[2] understands that.

[3]     Now, what I suggest and what I suggest very strongly

[4] is this: That you get here at about 10 to 9 or quarter to 9

[5] on Wednesday, July the 11th. The reason I suggest that time

[6] is you can have coffee, get yourself set. There's going to be

[7] an awful lot taking place on Wednesday. I go through this in

[8] different forms, generally about three times every two months.

[9] So, I'm used to it, but Wednesday is going to be a very

[10] chock-full-of-business day for you.

[11]     You're going to hear first the government's main

[12] summation. That's going to take a few hours. Then you're

[13] going to hear Mr. Ollen. Then you're going to hear the

[14] government's rebuttal, and then I think you should have lunch.

[15] Then after that, you're going to hear me.

[16]     Now, although the case has been a short case and as

[17] I've complimented counsel, I do again, it's thanks to them and

[18] to your promptness that we got through this much quicker than

[19] anticipated. The whole prediction for this was a lot longer

[20] than it's been. But the charge, the law that I give you, my

[21] instructions on the law, they're quite long. They have to be.

[22] And you will get those on Wednesday afternoon.

[23]     Now, the likelihood is that I'll finish — I could be

[24] wrong by a half hour on either side — but I'd say the

[25] likelihood is I'll finish at 4:30 or quarter of 5. And what

Page 800

[1] I'm going to do at 4:30 or quarter of 5 is tell you: Thanks a
[2] lot, go home, because by then, you'll have heard so much and
[3] so many words that you're going to be mentally exhausted.
[4]     If it turns out that the summations only take a half
[5] hour each and if I charge in the morning, well, then I'll let
[6] you begin deliberations in the afternoon, but I anticipate
[7] realistically that I'm not going to be finished until
[8] Wednesday afternoon 4:30 quarter of 5.
[9]     Assuming that I'm somewhere near correct in my
[10] prediction, then you'll begin your deliberations on Thursday
[11] morning. You'll begin. I'll have you come at 9:30 and lunch
[12] will be brought in to you in the jury room and you will give
[13] Mr. Ryan a lunch order when you get here on Thursday morning.
[14] We'll worry about all of that next week.
[15]     But the big thing is this: Nobody has to be
[16] concerned in any manner, shape or form about being
[17] sequestered.
[18]     Now, what I said in an effort to lighten things this
[19] morning was a very serious situation here this morning. I
[20] repeat in a much more serious way. Be sure you don't talk to
[21] anybody about the case or let anybody talk to you about the
[22] case. If anybody comes anywhere near you, just tell them to
[23] get lost and take a hike. I don't believe it's going to
[24] happen, but if it should happen, make sure you contact us by
[25] phone Monday. Get Mr. Ryan Monday. I don't believe it's

Page 801

[1] going to happen.
[2]     And if when you come down here on Wednesday, anybody
[3] tries to contact you, just tell us right away, and because
[4] coincidences occur, if you should bump into somebody who in
[5] some manner, shape or form you think you've seen in the
[6] courtroom, for God's sake, walk the other way. Ignore them.
[7]     And what I said about staying healthy, I really mean.
[8] I mean, having anticipated the case was going to take three
[9] weeks, I picked four alternates. Normally I would only take
[10] two, but I took four. Thank God we took four.
[11]     So, stay healthy. Have a nice weekend. I'll see you
[12] Wednesday morning at 9 o'clock. Thanks again, all of you.
[13] (Jury excused)
[14]
[15] (Continued on next page)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 802

[1] (In open court; jury not present)
[2] THE COURT: Mr. Ollen, do you renew your Rule 29
[3] motion at the end of the entire case?
[4] MR. OLLEN: Yes, your Honor.
[5] THE COURT: The motion is denied in each and every
[6] respect.
[7]     Now, could I see Mr. Ryan, please, Tuesday's calendar
[8] here.
[9]     I propose that we begin the precharge conference at
[10] 10:30 on Tuesday morning, July 10th. I have a sentence and a
[11] violation of probation and one is at 9:30 the other is at
[12] 9:45.
[13]     Now, what I request of the government, instead of
[14] direct, I request it, I would like 15 copies of the new form
[15] of the indictment, the six-count indictment, and I have not
[16] read the new form of the indictment, so I don't know whether
[17] there's been a redaction of the conspiracy charge in Count 3
[18] as it would have related to old Count 7.
[19] MR. BIANCO: That was done, your Honor.
[20] THE COURT: That was done; all right. Well, that
[21] would require then a change, a small change in the charge.
[22] MR. BIANCO: That's correct.
[23] THE COURT: Could you get that to my chambers,
[24] please, by 4:30 on Monday.
[25]     Now, so that we have it, we'll go over the charge in

Page 803

[1] great detail. I do not generally and I'm not going to in this
[2] case, so that both sides know this before Tuesday, I'm not
[3] going to send in a copy of the charge to the jury. What the
[4] jury is going to get is 12 copies of the indictment and any
[5] exhibits they want.
[6]     So that you will all understand before I even have
[7] the precharge conference, what I tell my juries generally is
[8] it's better to ask for all the exhibits at once than asking
[9] for them piecemeal because invariably, if they ask for them
[10] piecemeal, what happens is they get the numbers gummed up and
[11] all it does is take more time.
[12]     So, it's going to be important also after you finish
[13] the precharge conference, one of the government lawyers,
[14] and both if you want, or at least one of the government
[15] lawyers, work with Mr. Ryan and Mr. Ollen on agreeing so
[16] everybody will be sure what's in evidence so that we have all
[17] the documents and items in evidence because it's a mountain of
[18] evidence here, that we have everything correctly cataloged so
[19] that if they ask for it, they get it, and we don't have some
[20] kind of silly argument or disagreement as to whether the
[21] exhibit is or is not in evidence.
[22]     Mr. Ryan has kept a very careful record all along. I
[23] know both sides have done the same thing and I've tried to.
[24] But I want you to iron that out on Tuesday so that when we
[25] begin on Wednesday, we know where we're at.

Page 804

[1]    As I understand it, and what I'm doing is I'm giving

[2]  the government a total of three and a half hours, that's what

[3]  they've asked for. If anything, I'm being a little generous.

[4]    And, Mr. Ollen, I'm going to give you — I'm not

[5]  saying you should use all of it, I'm certainly not saying the

[6]  government should use all of its three and a half hours

[7]  either, but you have three and a half.

[8]    Mr. Ollen, in view of what you said the other day

[9]  informally, I'm letting you reserve two hours, even if I don't

[10]  think you're going to use all of that. If it turned out that

[11]  both sides used all that time, I don't believe whether we'd

[12]  even finish the charge, but that's how much time is reserved.

[13]    If you get near three hours, Ms. Baker, I'll warn you

[14]  about 2:50 that you've only got 10 minutes left.

[15]    And, Mr. Ollen, if you get near two hours, I'll warn

[16]  you also.

[17]    MR. OLLEN: Judge, if I get near two hours, please

[18]  warn me. I won't get anywhere near that.

[19]    THE COURT: Fine. Have a very nice weekend. Thank

[20]  you very much.

[21]    (Proceedings adjourned to Tuesday, July 10, 2001 at

[22]  10:30 a.m.)

[23]

[24]

[25]

Page 805

[1]

[2]              INDEX OF EXAMINATION

[3]  Witness .        D    X    RD   RX

[4]  AHMED RESSAM .....676  676   703   713

[5]  Serge Marcoux............717

[6]  STEVEN SORRELLS..........731

[7]  GAETAN POTVIN............740

[8]  ROBERT DUFFY............743

[9]  ALAIN LIVERNOCHE.........770

[10]  DANIEL WESSLEY JACKSON....775

[11]  MONIQUE DESJARDINS.......785   789

[12]          GOVERNMENT EXHIBITS

[13]  Exhibit No.             Received

[14]  443 .........................................715

[15]  288, 288A and 442 ............................716

[16]  388, 389 ...........................718

[17]  390 .........................................724

[18]  391, 391T, 393, 393T ......................726

[19]  404 .........................................730

[20]  79-84, 88, 190, 193, 198, 198, 200, 203-208, 210,

[21]  211, 220, 223, 225, 233, 234, 341A-B, 343, 401,

[22]  402, 405, 407, 409, 90, 92, 236.............730

[23]  370 .........................................736

[24]  371-380 ...........................738

[25]  221 .........................................739

Page 806

[1]  360, 361, 362, 742, 410, 411, 413, 414.......746

[2]  227, 228, 230 and 231 .......................752

[3]  347 .........................................755

[4]  410A through 410D, 411A, 413A and 414A ......757

[5]  274, 275 .........................................767

[6]  280, 444 .........................................769

[7]  428-431 .........................................772

[8]  433 .........................................783

[9]  434 .........................................785

[10]  140, 142, 144 .........................................791

[11]  143A and 143B .............................795

[12]          DEFENDANT EXHIBITS

[13]  Exhibit No.             Received

[14]  A .........................................797

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Lawyer's Notes**