SECRET/NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ZAYN HUSAYN, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1360 (RWR) |
| | ) | |
| ROBERT GATES, | ) | |
| Respondent. | ) | |

# ISN 682 Transcript of Hearing Before Judge Sullivan
# (March 6, 2009)

SECRET/NOFORN

I

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: 5 1 31 09

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GHASSAN ABDULLAH Al SHARBI,          )
                                     )
          Petitioner,                )   Civil Action
                                     )   Nos. 05-234
     v.                              )
                                     )
GEORGE W. BUSH, et al.,              )   Friday, March 6, 2009
                                     )   12:15 p.m.
          Defendants.                )
                                     )   Washington, D.C.
                                     )
                                     )


* * * *  ▮▮▮▮▮▮▮  * * * * *


*TRANSCRIPT OF MOTION HEARING PROCEEDINGS*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT JUDGE*


APPEARANCES:

     For Petitioner:        Robert D. Rachlin, Esq.
                            DOWNS RACHLIN MARTIN PLLC
                            P.O. Box 190
                            Burlington, VT 05402-0190
                            (802) 846-8327
                            (802) 863-2573 (fax)
                            Rrachlin@drm.com

                            Colonel Thomas J. Krzminski, USAF
                            Office of the Military Commissions
                            1555 Wilson Boulevard
                            Arlington, VA 22209


     For Respondents:       Margaret K. Taylor, Taylor
                            U.S. DEPARTMENT OF JUSTICE
                            20 Massachusetts Avenue, NW
                            Room 5128
                            Washington, DC 20530
                            (202) 305-0658
                            Margaret.k.taylor@usdoj.gov


*Scott L. Wallace, RDR, CRR, Official Court Reporter*
*(202)354-3196 * scottlyn01@aol.com*

I

2

APPEARANCES: (Cont.)

For Respondents:          Charlotte A. Abel, Attorney
                          UNITED STATES ATTORNEY'S OFFICE
                          501 Third Street, NW
                          4th Floor
                          Washington, DC 20001
                          (202) 307-2332
                          (202) 514-8780 (fax)
                          Charlotte.abel2@usdoj.gov

                          Andrew I. Warden, Attorney
                          U.S. DEPARTMENT OF JUSTICE, CIVIL
                          DIVISION
                          20 Massachusetts Avenue, NW
                          Washington, DC 20530
                          (202) 616-5084
                          (202) 616-8460 (fax)
                          Andrew.warden@usdoj.gov

Also Present:
Ghassan Abdullah Al
Sharbi (Appearing by
video.)

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6509, U.S. Courthouse
                          Washington, D.C. 20001
                          202.326.0566
                          scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<pre>
 1                 AFTERNOON SESSION, MARCH 6, 2009

 2    (12:15 p.m.)

 3         THE COURTROOM CLERK:  Civil Action 05-2348, Ghassan

 4    Abdullah Al Sharbi versus George Bush, et al.  Would counsel

 5    please identify yourselves for the record.

 6         MR. RACHLIN:  Robert Rachlin, counsel for Mr. Al Sharbi by

 7    his next of kin.

 8         THE COURT:  All right, Mr. Rachlin.

 9         MS. ABEL:  Good afternoon, Your Honor.  Charlotte Abel on

10    behalf of the government, and also Andrew Warden is present and

11    Mark Eply from the Department of Defense.

12         THE COURT:  Good morning, counsel.

13         ALL PARTIES PRESENT:  Good morning.

14         THE COURT:  And I understand that there are attorneys

15    present who represent Mr. Al Sharbi in the military commission

16    proceeding, correct?

17         MR. KRZYMINSKI:  That's correct.

18         THE COURT:  And the reason for the delay is that you were

19    just cleared to be present and that's fine.  You wanted to put

20    something on the record, did you, or did you just want to be

21    present?

22         MR. KRZYMINSKI:  Actually, I would like to put something

23    on the record.

24         THE COURT:  Sure.

25         MR. KRZYMINSKI:  Thank you.
</pre>

```
 1          THE COURT:  Good morning.

 2          MR. KRZYMINSKI:  Good afternoon, Your Honor.

 3          THE COURT:  Is it afternoon already?  Good afternoon.

 4          MR. KRZYMINSKI:  Your Honor, Colonel Tom Krzyminski.  I am

 5     Mr. Al Sharbi's detailed military counsel for purpose of the

 6     Military Commissions process, and I'm sure you're familiar with

 7     that process.  Mr. Al Sharbi's case was preferred for the third

 8     time, I believe, on approximately January 13th of 2009.

 9          Based on that and seeing Mr. Al Sharbi and anticipating

10     him responding to questions, I feel, as his detailed military

11     counsel in a criminal proceeding, that Mr. Al Sharbi should be

12     advised that anything that he says today could possibly be used

13     against him in the Commission's case if that does go forward.  I

14     have not had an opportunity to meet with Mr. Al Sharbi.  I've

15     made attempts, but we have not met and discussed this issue in

16     the past.

17          But I do have some concerns about potentially what could

18     be asked today by both his habeas attorney and also the

19     government.

20          THE COURT:  All right.  That's fine.  Mr. Al Sharbi, good

21     afternoon.

22          THE DEFENDANT:  Yes.

23          THE COURT:  How are you today?

24          THE DEFENDANT:  I'm always good.  I'm always good.

25          THE COURT:  All right.  I don't know if you heard your
```

1    attorney, but my understanding is you've not had an opportunity

2    to speak with the Colonel before who just spoke to the Court.  He

3    represents you.  He's been appointed to represent you in the

4    Military Commissions proceeding.  Did you understand what he just

5    said?

6         THE DEFENDANT:  Well, I understood what he said, but it's

7    not important for me at all, and I told him through the officers

8    that he never represents me, neither him nor the other civilian

9    lawyers.  No matter what you guys call them, military attorneys,

10   civil attorney, they will never represent me and they do not

11   represent me.  That's what I'm saying, whether it's them or

12   someone else.

13        THE COURT:  All right.  Well, the Colonel just traveled

14   here and was concerned that you may say something that could be

15   used against you by the government in your Military Commissions

16   proceeding.  That's the reason why he asked to address the Court.

17   I just wanted to make sure you had a chance to understand him.

18   Was there anything else that you wish to say in response to what

19   the Colonel just said?  You certainly don't have to say anything,

20   but I want to at least give you the courtesy or afford you the

21   courtesy of saying something, if you would like to.

22        THE DEFENDANT:  Can I say, first of all -- (Spoke in

23   Arabic) -- in the name of Alah, the most gracious, the most

24   merciful.  Praise be to Alah and prayer be upon Prophet Mohaben.

25   What I was going to say is that since three or four years ago

1   when these Commissions started and all -- he's not the first, nor

2   the last one.  I've always had, like messages, letters, several

3   civilian lawyers and military lawyers trying to see me, trying to

4   talk to me, and I would always tell them no, you do not represent

5   me, you do not represent me, and they keep insisting, coming and

6   coming and coming, and I read your paper.  You came here to check

7   whether I voluntarily took and knowingly took a step which is

8   declining them, but apparently in Guantanamo nothing is

9   voluntary, even having a counsel and attorney since 2005; it's

10  mandatory.  It's involuntary to have a lawyer.  You have to have

11  a lawyer, you should have -- so, even in that regard, I do not

12  have a choice.  That's the case in Guantanamo.  You don't have a

13  choice of nothing, including representing yourself.  Someone has

14  to represent you and, guess what, it has to be American, it has

15  to be -- I'm not saying because he's American, I'm not, no.  But

16  I'm able to represent myself, and I make things easy, I make

17  things easy from day one and the Commission of 2005, even before

18  that.  You see, whatever -- you have so many names, I have been

19  through so many Commissions, and each time I come I make things

20  so easy.  This is an individual who took arms against the United

21  States of America, who fought against you guys, and I did

22  so-and-so because of so-and-so, and so I'm making -- I call it --

23  you call it Commissions, you call it court, I call it choice.  I

24  make it so easy for you, even the habeas, whatever now you're

25  trying to see, whether the government has the right to detain me

1    or whatever, am I an enemy combatant or whatever. I'm just

2    making it easy. I took arms against you, against the United

3    States of America, for valid reasons. Maybe you don't want to

4    hear that, those reasons, but I'm telling you that I took arms

5    against --

6         THE COURT: Let me -- let me -- I'm going to focus on the

7    only issue before me right now. We have an interpreter present.

8    It sounds as if you're well versed in the English language.

9    Would you feel more comfortable if we utilize the interpreter and

10   you spoke in your native language?

11        THE DEFENDANT: No, I'm fine. I'll speak -- I'm fine.

12        THE COURT: Fine. Let me just say this. Let me identify

13   myself for the record. My name is Emmet Sullivan, and I'm a

14   federal judge in Washington, D.C.

15        Your case was randomly assigned to me. We've never met in

16   person. I'm presiding over this case. It involves you, and this

17   case that's been filed by the attorney on behalf of family

18   members who are concerned about you and who love you seeks to

19   challenge the lawfulness of your detention by the United States

20   military at Guantanamo Bay, Cuba. Am I speaking too fast? Am I

21   talking too fast?

22        THE DEFENDANT: No.

23        THE COURT: All right.

24        THE DEFENDANT: No.

25        THE COURT: I received a letter dated August the 8th,

1    2008.  Colonel, if you would like to have a seat, you're welcome

2    to have a seat at counsel table, if you would like to.

3            MR. KRZYMINSKI:  Thank you.

4            THE COURT:  I received a letter dated August 8th, 2008

5    that appears to have been written by you -- I don't know that to

6    be a fact -- informing me that you do not wish to be represented

7    by Mr. Robert Rachlin or any other attorney and that you do not

8    wish to proceed with the habeas corpus petition filed on your

9    behalf.  I'm going to read that letter, just because I want to

10   make sure that this is the letter that you sent to me and that

11   you, indeed, signed.  It's addressed to me, United States

12   District Court for the District of Columbia, Emmet Sullivan.  It

13   has the date August 8th, 2008.  The letter starts as the Case

14   Number CA 05-2348 and the letter reads as follows:  It's written

15   in English.  "My name is Ghassan Abdullah Al Sharbi, and I am

16   currently detained by the U.S. government in Guantanamo Bay.  My

17   ISN in this detention center is number 682.  I have been recently

18   informed that I have petitioned the U.S. Courts with respect to

19   habeas petition 1.  I have never authorized or wanted to

20   authorize an attorney to represent me in the U.S. Courts; two, I

21   have never filed or wanted to file a case.  Therefore, I do

22   hereby drop and withdraw all or any cases filed by my name or on

23   my behalf in all U.S. Courts.  This includes habeas petition to

24   challenge the lawfulness of my detention.  Also, I do hereby

25   terminate all or any authorization given on my behalf to all or

1    any attorneys in order to represent me in the U.S. Courts.  This
2    includes lawyer Robert Rachlin authorized by my father.  Further,
3    I shall inform you that I hope and access to the U.S. -- further,
4    I shall inform you that I have an access to the U.S. Courts.
5    Therefore, there should not be in the future any case filed on my
6    behalf."  And that's underlined.
7            "Finally, I shall inform you that I am not coerced,
8    neither mentally nor physically with respect to writing this
9    letter."  And there's a signature line, Ghassan Al Sharbi,
10   detainee number 682, Guantanamo Bay."  I'm going to ask you
11   whether or not you recognize that letter, and if so, did you
12   write that letter?
13           THE DEFENDANT:  Yes, I recognize that letter, and I'm the
14   one who wrote it, yes, and it was as like summarized.  It is like
15   short and directly to the point that I want to drop the habeas
16   and I don't want none of these lawyers to represent me.
17           THE COURT:  Can I ask you a few questions, then, about the
18   letter?
19           THE DEFENDANT:  Go ahead.  Go ahead.
20           THE COURT:  The purpose of our discussion today is for me
21   to determine whether you are knowingly and voluntarily making the
22   decision to dismiss your attorney and to dismiss the habeas
23   corpus petition filed in your behalf.  Do you understand that?
24           THE DEFENDANT:  Yes.
25           THE COURT:  I've been told that you speak English and,

1    indeed, you've confirmed that through our brief conversation this

2    morning -- this afternoon, and your letter is written, indeed, in

3    very clear English. And you would like -- my understanding is

4    that you would like to have this discussion in English, then; is

5    that correct?

6              THE DEFENDANT:  Yes.

7              THE COURT:  That's fine.  Do you have any questions you

8    want to ask me before we get started?

9              THE DEFENDANT:  No.

10             THE COURT:  All right.  In the case of *Boumediene versus*

11   *Bush* -- it's a Supreme Court decision decided in June of 2008 --

12   that court held that individuals such as you who are detained at

13   Guantanamo Bay, Cuba have a right to challenge the legality of

14   their detention by petitioning this Court or the Court that I sit

15   on for a writ of habeas corpus.  Do you understand that?

16             THE DEFENDANT:  Yes.

17             THE COURT:  In December 2005, your father filed a habeas

18   petition on your behalf challenging the legality of your

19   detention.  That case was randomly assigned to me.  The case was

20   stayed for some time pending the Supreme Court's decision in

21   *Boumediene*.  However, the case is now ready to proceed and you

22   have the right to proceed in this case if you wish to do so.  Do

23   you understand that?

24             THE DEFENDANT:  Yes, I do understand.

25             THE COURT:  This Court is independent from the executive

1   branch of the United States government, and this Court is not a

2   part of the military that is detaining you at Guantanamo Bay,

3   Cuba.  Do you understand that?

4           THE DEFENDANT:  Yes, allegedly, yes.

5           THE COURT:  All right.  Do you have a question about that

6   that you want to ask me?

7           THE DEFENDANT:  No.

8           THE COURT:  All right.  In a habeas corpus petition such

9   as the one filed by your father on your behalf, you have the

10  right to challenge the government's evidence that the government

11  says supports your detention and to present evidence in an effort

12  to convince me that you are not being lawfully detained.  Do you

13  understand that?

14          THE DEFENDANT:  I do understand.

15          THE COURT:  Your father has retained Mr. Robert Rachlin to

16  represent you in this case.  Do you understand that?

17          THE DEFENDANT:  I knew that took place as a fact, and I

18  understand that my father loves me so much, and I love him so

19  much, and I know that -- I remember them saying it, but it's like

20  a drowning man clutching at straw, so he's just being -- I

21  believe that he's doing it just to get me out of this place,

22  especially when he saw the paper and watched the news and felt,

23  "my son is in this place, my son is being tortured, my son is

24  being so-and-so."  He's just clutching at the straw.  "Get my son

25  out of there no matter what."  So that is established, and I

1    understand that, and I'm just telling him, don't worry father,

2    don't worry father, God is going to take care of me, and I'm

3    happy here.   Not because it's a good place, not at all, no, but

4    because I took that cause in fighting people that deserved to be

5    fought because of their injustice.   So I'm happy, no matter how

6    long I stay here.

7         THE COURT:   I understand that you do not wish to be

8    represented by Mr. Rachlin or any other attorney fired by your

9    attorney; is that correct?

10        THE DEFENDANT:   Not necessarily hired by my father, but I

11   just do not -- the issue is these attorneys, and the whole legal

12   system, including you, as a judge, I'm declining such a show, no

13   matter what you call it, I'm declining such a show, and that's

14   my -- it's not the attorney or even you, whether you like what

15   I'm saying or not, it's the whole Commission, it's the whole U.S.

16   Supreme Court, it's all the good guys side.   The bad guy side --

17   executive branch -- the good guy side that has, of course, has to

18   be the Americans who are trying to apply justice.   The bad guys

19   have the hands and the good guys just have the tongue.

20   Nothing -- so I'm declining such a show, and that's --

21        THE COURT:   I'm not an employee of the government, though.

22   I don't do what the government tells me to do.   I'm independent

23   from the government.

24        THE DEFENDANT:   I understand.   That's my duty to say so

25   because it's true, you do not work for the government.   After

1    all, you work for Uncle Sam, you work for the United States of

2    America.  I'm not saying -- I'm not saying you're everything

3    American, no.  It is the case for bold reasons, and no matter

4    what, you're trying to say -- to wipe the dirt -- to wipe

5    whatever miss -- the government does, the American justice takes

6    place and try to fix the mistake, and we have been -- we do not

7    like what Bush is doing, we do not like whatever, so that's your

8    role and that's your goal, the good guys and the bad guys.  I'm

9    not saying you work for the government, but I'm declining such a

10   show.

11        THE COURT:  Now, President Bush is no longer the

12   president.  Are you aware of that?  The only reason I say that is

13   because you just mentioned his name.

14        THE DEFENDANT:  No, because it seems to me for the last

15   seven years it used to be Bush's -- Bush is misbehaving, is

16   making a lot of bad things in Guantanamo, or whatever Bush has

17   done.  Another president came.  The same nasty stuff taking place

18   here, and the same -- the executive branch, they're not doing

19   things properly and you, and I would say the Supreme Court and

20   the American justice is disappearing, and they're trying to --

21   they don't like what's going on.  And each time, 2004, 2006,

22   2008, the Supreme Court comes up, and they knew it before.  I

23   told my brothers, before June, last June, I told them, I'm going

24   to tell you the Supreme Court is going to rule in favor of us

25   because that's the show.  We do not like what the executive

1   branch is doing, the U.S. justice system is doing, whatever.

2   That's the show.  Good guys with the tongue; bad guys are doing

3   everything.  After all, you wipe -- I'll tell you this.  You are

4   just -- the American U.S. legal system is just like the lavatory

5   that flushes the dirty output of Uncle Sam.  You're just trying

6   to wipe out whatever he does, negative things.  Some people buy

7   it, but most people don't buy it.

8           THE COURT:  Let me ask you this.  If you do not wish to be

9   represented by Mr. Rachlin or another attorney hired by your

10  father, the Court could appoint an attorney to represent you.

11  This attorney would be a civilian and would not be a member of

12  the military.  He would not be paid by the military.  Do you

13  understand that?

14          THE DEFENDANT:  You're going to the same point.  I just

15  made it clear.  No lawyers, no -- not even the Commissions, not

16  even the -- I came here just for -- I knew that someone -- I did

17  not want you to say 682 did not -- was not able to show up so he

18  might have been -- he might be coerced or that's not his letter.

19  I came here just to make it clear to you it is my letter, and I

20  wrote it willingly, and that's my point from the past and now and

21  in the future.  That's what's going to happen.

22          THE COURT:  I also understand that you --

23          THE DEFENDANT:  -- it's not about --

24          THE COURT:  I also understand that you wish to withdraw

25  the habeas case and you do not wish to pursue this case

1  challenging the lawfulness of your detention; is that correct?

2       THE DEFENDANT:  Yes, I do not want to -- I don't want

3  to -- I drop that case because I do believe that -- or I waive --

4  to use your legal terms, I waive the right, the alleged right to

5  challenge the lawfulness of my detention because I do believe I

6  have greater rights even before coming to Guantanamo.  It is my

7  right back home and in the Middle East, it is my right to execute

8  and be free, and not the oppressor regimes being supported by the

9  United States in the name of strategic allies to obtain

10  supportive oil.  It is my right to live peacefully and securely

11  back home.  It is my right to practice my religion, true

12  religion, not you guys imposing your values in the Middle East in

13  the name of spreading democracy and spreading -- I have so

14  many -- it is my right to stop your Army from coming there and

15  here in the name of obtaining whatever objective they --

16       THE COURT:  Let me ask you this.

17       THE DEFENDANT:  If you don't like what I'm saying.

18       THE COURT:  I'm sorry?

19       THE DEFENDANT:  I'm saying, that's -- I'm just making your

20  job easier.  I'm saying I waive the so-called right to challenge

21  the lawful -- of my detention.

22       THE COURT:  I'm not looking for an easy resolution.  I'm

23  not looking for an easy resolution.  You don't need to worry

24  about making my life easy.

25       THE DEFENDANT:  I'm telling you -- what I'm saying now --

1    probably what I'm saying now you probably view as outside the --

2    maybe you're not focusing on the contents of the letter, and I'm

3    telling you this is all related to -- I hate to answer lengthy

4    questions related to the topic, but this is so relevant to the

5    topic.  I waive the alleged right, but I'll never waive -- I will

6    never waive my right to challenge the lawful -- you being in my

7    region.  I will never waive my right to challenge your policies

8    towards us, no matter what you call it, no matter what you call

9    it, maintaining strategic alliance in the region, whatever,

10   spreading democracy, supporting Israel, supporting -- it is my

11   challenge -- it is my right to challenge such policies, and I

12   will.  Even if you release me, and I doubt you will, but assuming

13   that you release me --

14          THE COURT:  Don't tell me what you're going to do if I

15   release you.  In withdrawing and abandoning your case, in

16   withdrawing and abandoning your case in this Court, you are

17   surrendering an important right that you have under the laws of

18   the United States.  Do you understand that?

19          THE DEFENDANT:  Yeah.  Let's go back to the letter.  You

20   are telling me that your words are.  I'm telling you, it all

21   depends.  If you release me, it depends on your policies, if you

22   stop your stupid policies towards our region.  No, that all

23   depends on you.  I react upon your action.  Again, yes, I'm aware

24   of the so-called sequences that you're trying to say and, as I

25   said, no matter even if I spent the rest of my life in this

1      place, I live proudly and --

2              THE COURT:  I'm going to ask you --

3              THE DEFENDANT:  If I drop --

4              THE COURT:  I'm going to ask you a few questions in an

5      effort to determine whether you're knowingly and voluntarily

6      making the decision to surrender your right to bring a habeas

7      case to challenge your detention.  What's your full name?

8              THE DEFENDANT:  Okay.  I like the "voluntarily" and

9      "knowingly."  I like that.  I saw it in the letter and I smiled,

10     "voluntarily" and "knowingly."  Okay.  My name is Ghassan

11     Abdullah Al Sharbi.

12             THE COURT:  And your date of birth?

13             THE DEFENDANT:  December 28th, 1974.

14             THE COURT:  And that makes you how old?

15             THE DEFENDANT:  Around 34, 34-something.

16             THE COURT:  How far did you go in school?

17             THE DEFENDANT:  Bachelor's.

18             THE COURT:  Bachelor's degree from which college or

19     university?

20             THE DEFENDANT:  Embry-Riddle Aeronautical University.

21             THE COURT:  I'm sorry, which one?

22             THE DEFENDANT:  Embry-Riddle Aeronautical University,

23     Arizona.

24             THE COURT:  In Arizona?

25             THE DEFENDANT:  Um-hmm.

1          THE COURT:  How far did you go?  You received a Bachelor's

2    degree?  How many years of college did you attend?

3          THE DEFENDANT:  In the states?

4          THE COURT:  Yes.

5          THE DEFENDANT:  In the states?

6          THE COURT:  Yes.

7          THE DEFENDANT:  Two years.

8          THE COURT:  Two years.  And the remainder of your

9    education?

10         THE DEFENDANT:  Two years, but I had some credits from

11   back home, so I was a transfer student and I spent two years in

12   that university.

13         THE COURT:  All right.  And you've lived in the United

14   States before then, correct?

15         THE DEFENDANT:  Yes.

16         THE COURT:  For how long?

17         THE DEFENDANT:  Three years.

18         THE COURT:  Two years?

19         THE DEFENDANT:  No, three.

20         THE COURT:  Three years.  Have you take taken any alcohol,

21   drugs or medication that could be affecting your ability to

22   understand what you are doing by dismissing your attorney and

23   withdrawing your habeas petition?

24         THE DEFENDANT:  No.

25         THE COURT:  Have you taken any alcohol, drugs or

1   medication in the last two days?

2          THE DEFENDANT:   No.

3          THE COURT:   And I'm not trying to insult you, but I have

4   to ask you whether or not you can read or write in the English

5   language.

6          THE DEFENDANT:   Yes.

7          THE COURT:   All right.   And you did write this letter

8   yourself.   You can't see the letter, but you're familiar with the

9   letter I read to you.   Was that written by you or was that

10  written by someone else?

11         THE DEFENDANT:   It was written by me.

12         THE COURT:   Have you ever received any treatment for any

13  type of mental illness or emotional disturbance?

14         THE DEFENDANT:   No.

15         THE COURT:   Have you ever experienced any physical or

16  emotional trauma that you believe impacts your ability to

17  understand what you're doing by dismissing your attorney and

18  withdrawing your habeas petition?

19         THE DEFENDANT:   No.

20         THE COURT:   Have you received a copy of the petition

21  that's been filed on your behalf?

22         THE DEFENDANT:   Do you mean the habeas petition?

23         THE COURT:   Yes.

24         THE DEFENDANT:   The one that was filed?

25         THE COURT:   Yes.

1          THE DEFENDANT:  The one that was filed 2005?

2          THE COURT:  That's correct.

3          THE DEFENDANT:  No.

4          THE COURT:  You never received a copy of that?

5          THE DEFENDANT:  I'm not sure, no.

6          THE COURT:  Would you like to have a copy of that before

7    you make a final decision?

8          THE DEFENDANT:  No.

9          THE COURT:  Would you like for me to read it to you?

10          THE DEFENDANT:  No.

11          THE COURT:  Has anyone forced you -- strike that.  Has

12   anyone, including your attorney, the government, any government,

13   the United States military, or anyone else made any promises to

14   you about what will happen if you withdraw your habeas corpus

15   petition?

16          THE DEFENDANT:  I don't want -- to be honest with you, no,

17   but I just told you, I'm prepared for your questions, your words,

18   the sequencies [sic], and I'm going to tell you yes.  So, I would

19   like to make a fast decision.  I don't really believe that I need

20   to read that.

21          THE COURT:  You don't need to read it?

22          THE DEFENDANT:  I don't think that I --

23          THE COURT:  If you want me to read it to you, I'll read it

24   to.

25          THE DEFENDANT:  No, no, no.

1          THE COURT:  And no one's made any promises to you about

2    what will happen if you withdraw your habeas corpus petition?

3          THE DEFENDANT:  No, and I'm not concerned about it.

4          THE COURT:  Has anyone forced you or threatened you or

5    coerced you in any way into withdrawing your petition?

6          THE DEFENDANT:  No.

7          THE COURT:  Do you understand that in withdrawing and

8    abandoning your habeas corpus petition in this Court, you're

9    giving up the right to challenge the lawfulness of your detention

10   and that this may result in indefinite detention?

11         THE DEFENDANT:  I understand the consequences really well,

12   and if I had the choice, I would have stopped my father three

13   years ago.

14         THE COURT:  Is there anything that you do not understand

15   about this proceeding?

16         THE DEFENDANT:  No, not really that I'm concerned about.

17         THE COURT:  Is there anything that you want to ask me or

18   Mr. Rachlin or anyone else or any other lawyer before you make a

19   final decision as to whether you wish to withdraw your petition?

20         THE DEFENDANT:  I have a question.  I'm directing these

21   questions to the -- the question is -- in the form of a question

22   to Rachlin.  I read his name and the other, Krzyminski, and these

23   names who are trying to -- one of them is a professor and one of

24   them is a high ranking officer, and they have those high legal

25   degrees.  And I called them, and I'm just wondering, don't they

1    have some -- don't they have some, I would say, mind or pride?

2    I'm not trying to insult no one here, no, but they know that from

3    three years ago, 682, Al Sharbi, does not want to be represented

4    by you.  Now they say, okay, the executive branch is forcing

5    things.  Allegedly they're out of the executive branch, what's

6    going on here in Guantanamo, but they're part of this show; we

7    have to have this.  And I kept saying, You do not represent me.

8    And I told Rachlin in the last letter or the last note, I told

9    him, I believe you are -- even if you are a professor, I hope --

10   I believe that you are a parasite for trying to climb over my

11   shoulder, but they're still insisting.  None of them has the

12   pride to say, "hey, this guy don't want me, I don't want him;

13   this guy says he doesn't want me and I'm not going to represent

14   him."  Why don't they do that?  At least -- it just seems to

15   be -- and they say, "Well, the government asked me to do so."  I

16   remember 2006, 2005, one of the military counsels says, the

17   government -- I have to.  So, after all, after all, he's

18   listening to them.  So, I believe that --

19          THE COURT:  Would you be more comfortable --

20          THE DEFENDANT:  -- if they say, hey --

21          THE COURT:  Would you be more comfortable if the Court

22   appointed a Muslim attorney to represent you?

23          THE DEFENDANT:  No, no, not really.  It's not -- it's

24   not -- as I said, I told you about what I believe about the game

25   of good guys/bad guys, and there should be someone to wipe the

1    dirt or the nasty or the nasty hands of Uncle Sam.  I know that.

2    And I know why it would be Americans.  I know they say for

3    safety, for security measurements, whatever, but it's not about

4    the -- even if you bring my father, or brother as an attorney,

5    even though he's not a lawyer, or some of my family members, I'm

6    not only declining those lawyers, I'm declining the whole

7    legal -- U.S. legal American system.  I'll tell you why.  The

8    military leader representative, the SJ Office, the military

9    representative when he came to me two days ago, he told me that

10   Judge Sullivan wants to see you, he wants to see whether you are

11   competent or not with respect to making that decision.

12       So, something came into my mind.  Now the judge wants to

13   see whether I'm incompetent or not.  I do believe, I strongly

14   believe that the U.S. Constitution is incompetent to run, first,

15   and that was obvious since 2001, 11th of September.  You just --

16   you got into a dilemma.  You refused -- the U.S. Constitution is

17   all but protected.  The terrorists could take advantage of it.

18   It's not overprotected; it's underprotected.  That's natural in

19   America.  It's a manmade law that you keep changing manmade law,

20   and it's not like Islamic law that -- I'm proud to be a Muslim.

21   Islamic law fits in peace war.  No matter what the circumstance

22   is, it just applicable.  Your Constitution is not justice.

23   Stop -- And now you're trying to figure out, what are we going to

24   do with these terrorists, they're going to run away with it, or

25   whatever.  So it's -- your Constitution is incompetent to run,

1    especially in that type of war and that was obvious. So it's not

2    me who's incompetent.

3         THE COURT:  Let me ask you this.  In light of our

4    discussion today, would you like some more time to think about

5    these issues?  Would you like some more time to think about

6    whether you wish to abandon your habeas challenge, whether you

7    wish to dismiss Mr. Rachlin as your attorney, in light of our

8    discussion?

9         THE DEFENDANT:  No, no, I don't need time.  And as I said,

10   it's not -- I'm trying to make this short and easy or something.

11   It's a decision that --

12        THE COURT:  We'll take whatever time you need.  There's no

13   easy resolution here.  We'll take whatever time you need.  If you

14   need some more time, we'll talk again.

15        THE DEFENDANT:  It won't be of use to me, to be honest

16   with you.  It's the same answer.  You'll get the same answer and

17   the same -- and, in fact, and I know that's not your concern, but

18   who knows, in the future you guys might force me into the process

19   because, as I say --

20        THE COURT:  Let me just say this, if I wasn't concerned

21   about it, I wouldn't be conducting this discussion with you, if I

22   wasn't concerned.  What you're giving up is your right to

23   challenge your detention, and it could result in your being there

24   forever.  Do you understand that?

25        THE DEFENDANT:  First of all, first of all, I'll tell you

1    one thing, it's -- no matter what you say or how you picture it

2    or how you try to transcript it, as I said I told you, and I'm

3    repeating a second time, I took that cause and I fought your

4    government --

5         THE COURT:  Okay.  Well, let me just ask you this --

6         THE DEFENDANT:  No.

7         THE COURT:  -- before you tell us about the circumstances.

8    I'm not really concerned about anything in the past leading up to

9    your being detained.  I'm concerned right now, right now about

10   your giving up your right to challenge your detention and to

11   essentially give up your right to have an attorney represent you.

12   I've offered one alternative, to appoint a Muslim attorney.

13   Maybe you have another thought in mind.  Is there an attorney

14   that you have in mind who I could appoint to represent you that

15   you would feel more comfortable with?

16        THE DEFENDANT:  As I said, when I go and I discuss issues

17   from the past, I'm not trying to go outside the --

18        THE COURT:  No.  But see, I don't want you to incriminate

19   yourself.  The reason I'm stopping you is because I'm concerned.

20        THE DEFENDANT:  No, no, excuse me.

21        THE COURT:  Let me just say one thing.  Let me just say

22   one thing.  Let me say one thing.  We can't both talk at the same

23   time.  Let me say one thing and I'll let you talk.

24        THE DEFENDANT:  Go ahead.

25        THE COURT:  I don't want you to jeopardize your rights.

1    You have rights, and I feel, you know -- I feel very strongly

2    about your rights and anyone's rights, especially when a person

3    is incarcerated, and I don't want you to unknowingly say

4    something that's going to be used against you at some point in

5    time.  Do you understand?  That's why I cutoff.  That's why I

6    interrupted you.  It wasn't being disrespectful to you.  I know

7    you have a story to tell, but now is not the day to tell it.  I'm

8    just concerned today with whether you understand your rights,

9    your right to have an attorney who can challenge your detention.

10   And I want to make sure you understand you're giving up your

11   right to challenge that and to essentially fire your attorney,

12   and that's why I said maybe you're not comfortable with the

13   attorney you have, maybe you want another attorney, maybe there's

14   someone that you believe you might have more confidence in, I

15   don't know, and maybe you've spoken to other people detained at

16   Guantanamo who are satisfied with the services of their attorney;

17   maybe you want me to appoint one of those attorneys to represent

18   you.  Is that something you've been considering?

19        THE DEFENDANT:  As I say, it's not a matter of me.  I have

20   a story that I wanted to say, but I believe it's all related,

21   because I'm here for that reason, and it's all related with each

22   other.  And as I said, when -- because you keep saying you might

23   stay here indefinitely, and I'm telling you that's not something

24   new.  I knew that the United States -- America is a big monster.

25   They have so much power.  But I know that God is more powerful.

1    I know that God -- if you are weak and being treated unjustly, I

2    know that God is going to grant you victory no matter how weak

3    you are and no matter how strong your opponent is; and that's not

4    philosophy, that's not preaching, that's a fact.

5         So, no matter whatever your religion is, if you are weak

6    and someone is trying to -- and is oppressing you, one day you're

7    going to win, one day, but you have to stay -- you have to have

8    confidence, don't be coward.

9         THE COURT:   So, you've not changed your mind about not

10   giving up your right to challenge your detention, and you've not

11   changed your mind about dismissing your attorney, then; is that

12   correct?

13        THE DEFENDANT:   As I said, I'm dismissing -- I'm dropping

14   that habeas, I'm dismissing those lawyers.   That's what I'm

15   saying.

16        THE COURT:   And that's a product of your -- that's a

17   product of your own free will?

18        THE DEFENDANT:   Yes, definitely.

19   .    THE COURT:   Do you have any questions you would like to

20   ask me?

21        THE DEFENDANT:   Not really, but as I say, who knows in the

22   future; the future, who knows.   When you say "voluntarily" and

23   "knowingly," the process here takes place involuntarily and

24   unknowingly, especially when it comes to dealing with detainees.

25   So, in the future, in the future, say like a Commission takes

1    place or a court, as I said, it's the same -- it's going to be

2    the same. And that's why I told -- or wrote in the letter in the

3    future I do believe that I have access to the U.S. legal system.

4    I don't want tomorrow or the day after a letter comes so-and-so

5    heard -- there is another case on your behalf. No.  I'm an

6    adult.  I have access to your legal system.  I'll represent

7    myself.  And as I said, you don't like me now talking.

8         THE COURT:  Let me ask you this, would you like to

9    represent yourself and challenge your detention in this Court?

10         THE DEFENDANT:  Represent myself, yes; challenge my

11   detention, yes; but not through the legal system that you're

12   trying.  I challenge the lawful --

13         THE COURT:  Well, now, I don't want you to talk about

14   other ways you're challenging.  If I understood you correctly,

15   you would like to represent yourself; is that right?

16         THE DEFENDANT:  Yes.

17         THE COURT:  All right.  And would you like to proceed with

18   your own habeas challenge in this Court before me?  Because you

19   certainly have the right to do that, if you would like to.

20         THE DEFENDANT:  No, no, no, I don't want to, no.  Because

21   I believe now you're saying, okay, they want us to appear -- not

22   appear like here is the separate legal system and the military

23   commission, and they want us to say, hey -- like, write to you

24   guys or write to the American legal -- to the civilian people and

25   say, as I said, as I said, the good guys, the bad guys, the

1    executive branch being the --

2        THE COURT:  I don't work for the executive branch, though.
3    I don't work for the executive branch.

4        THE DEFENDANT:  I know.  I did not say you.  I said you're
5    not in the executive branch, and, as I said, I don't want to
6    repeat, your role is to be like -- supposed to be a watcher for
7    the executive branch and to --

8        THE COURT:  I'm not a watcher for anyone other than the
9    rights of people who are detained.  I watch out for their rights,
10   people like you.

11       THE DEFENDANT:  Allegedly, yeah, that's how it has to be.
12   There has to be someone to wipe the, as I said, the lavatory to
13   flush the dirty output of Uncle Sam and say, Hey, we're still
14   Americans, we have values.  We don't like what they're doing, so
15   the show continues.  And guess what, as I said, the bad guys, the
16   show, the bad guys have the hands; the good guys just have the
17   mouth.

18       THE COURT:  Let me ask you this.  Let me ask you this.
19   I'm going to -- would you be opposed to, if I allow Mr. Rachlin
20   to ask a couple of questions, would you be opposed to answering
21   any questions that he asks you?

22       THE DEFENDANT:  Rachlin wants to ask me?

23       THE COURT:  He might.

24       THE DEFENDANT:  You're saying that he might?

25       THE COURT:  He might want to ask you some follow-up

1    questions.  He's present.

2         THE DEFENDANT:  I don't believe that there is a necessity.

3    I don't mind answering questions.  You don't want to talk about

4    what happened and what I did.

5         THE COURT:  Right, because I don't want you to incriminate

6    yourself, no.  I don't want you to.  I want you to --

7         THE DEFENDANT:  -- as I said, you know, fighting you --

8         THE COURT:  -- potentially incriminate yourself.

9         THE DEFENDANT:  Fighting is not criminal.  Fighting the

10   oppressors, fighting people, no matter how you call it, fighting

11   people --

12        THE COURT:  Well, let's not talk about fighting, let's

13   talk about your case here.  We've had a long discussion here.  I

14   had one thought to share with you, and maybe one thought is that

15   we both take some time to think about the questions that have

16   been asked and the answers given and we talk again in a couple of

17   weeks or so, maybe a month, to give you a chance -- maybe you

18   would like to have a copy of this transcript so you can read the

19   questions and the answers and reflect on those questions and

20   answers and see if you wish to change your mind.  I mean, I'm

21   open to suggestions you may have.  If you want to proceed -- it's

22   clear you want to represent yourself, not necessarily in this

23   Court, but you do want to represent yourself, right?  That's

24   clear.  Would you like to the opportunity to read the transcript

25   of this proceeding we've just gone through and then we talk again

1  in a couple of weeks after you've had a chance to reflect on the

2  questions and the answers?

3      THE DEFENDANT:  I'm saying it won't -- seriously, I'm not

4  being stubborn, but I'm really convinced it's not going to change

5  point 000 percent of my position.  If you want to call me in two

6  weeks, I wouldn't say no if there's a valid reason, but my

7  decision is not going to change.  It's not going to change from

8  day one, day two.  And guess what, I know it's not -- and I hate

9  to say this, I really hate to say it, but I have to.  It doesn't

10  mean that -- when I say that, I'm not coerced physically or

11  mentally, it's with respect to making that decision.  Why?

12  Because since 2004, 3, 2, that's my decision, always, always.

13  So, it's not -- it doesn't mean that this place is being -- that

14  things are going fine, no.  That's irrelevant.  I'm under

15  pressure here like before, before I get into Guantanamo.  I was

16  under pressure when I see your policies.  The same Muslims are

17  under pressure because of you, physical and mental pressure.

18  It's nothing, another pressure but a different form.  But still,

19  my decision with respect to that is it is my free will and, as I

20  said, if you call me in two weeks, three weeks, maybe I show up,

21  maybe I don't.  But if I show up, my decision is not going to

22  change.  It's not going to change at all.  And I'm expecting the

23  lawyers who are listening to what I'm saying, I'm expecting them

24  to have some thought and some pride and have some dignity and say

25  okay, 628 seems to be -- They seem to be like trying to be like a

1    muscle and "I'll fight for you, I'll fight for you," and I'm not

2    trying to say I'm a tough guy, you know, no.  Trust me, I'm so

3    weak physically, but God makes us strong, and I never imagined

4    that I would fight the monster of the United States and --

5          THE COURT:  Okay.  Let me do this.  We've been talking for

6    over --

7          THE DEFENDANT:  No, no, no.  I've been talking about --

8          THE COURT:  We've been talking for quite a while.  Let's

9    take a short recess, five- or ten-minute recess or so, and then

10   we'll talk again in a few.

11         THE DEFENDANT:  Ten minutes, because I want to also pray.

12         THE COURT:  Please.

13         THE DEFENDANT:  May I have ten minutes?

14         THE COURT:  Absolutely.

15         THE DEFENDANT:  Okay.

16         THE COURT:  And when you're -- and then we can talk again,

17   all right.  Do you have any questions before we leave?  Do you

18   have any questions you want to ask me?

19         THE DEFENDANT:  I just -- no, just one question.

20         THE COURT:  Sure.

21         THE DEFENDANT:  I want to question you.  I know it's --

22   you're trying to say, Hey, I don't want him to incriminate

23   himself and whatever, and I've said it willingly from day one.

24   And when I mention issues like, I took arms against the United

25   States --

1          THE COURT:  No, no, no, let's take a recess.

2          THE DEFENDANT:  No, no, don't try to -- that's my

3     question.  That's my question.  Do not change the topic, or do

4     not change -- Again, I'm not saying -- I'm not trying to -- but I

5     believe it is strongly relevant, it is strongly relevant to

6     what's going on, because that's why I'm here for eight, seven

7     years.

8          THE COURT:  You've already indicated that you would like

9     to go pray, and I need to take a recess as well, so we'll talk

10    again in a few minutes, all right.

11         THE DEFENDANT:  That's evidence that you want to change

12    the point, you want to change the topic.  And when we come back

13    I'm going to say the --

14         THE COURT:  Well, I don't --

15         THE DEFENDANT:  No, no.  I'm expecting you -- I know what

16    I'm saying.  I'm not saying -- I'm willing to spend not seven

17    years, 17 more years, not because I'm being crazy.  As I said, if

18    you believe what you are doing and --

19         THE COURT:  All right.

20         THE DEFENDANT:  All right.

21         THE COURT:  Let's talk again in 15 minutes, all right.

22         THE DEFENDANT:  I hope you will give me a chance whenever

23    I say the word fight that you don't stop me or change the topic.

24         THE COURT:  We'll talk again in 15 minutes, Mr. Al Sharbi.

25         (Thereupon, a break was had from 1:01 p.m. until 1:19

1    p.m.)

2         THE COURT:  Mr. Al Sharbi, we did not want to interfere

3    with your prayer session.  Had you finished?

4         MR. RACHLIN:  Your Honor, it's showing the microphone off

5    on the other side.

6         THE DEFENDANT:  This is obvious in your policies towards

7    the Muslim world, it's better than just words.  This is my point,

8    it's better than words.

9         THE COURT:  All right.  The point I was trying to make was

10   we did not interfere with your prayer session, right?  Did you

11   finish?

12        THE DEFENDANT:  (Nodded head affirmatively.)

13        THE COURT:  Great.

14        THE DEFENDANT:  I did.

15        THE COURT:  All right.

16        THE DEFENDANT:  I did.

17        THE COURT:  All right.  Let me just inquire of the

18   attorney your father hired to represent you if you have some

19   appropriate follow-up, brief follow-up.  I'll let you ask

20   questions.  It's not a discovery session, though.

21        MR. RACHLIN:  I don't have any questions to ask Mr. Al

22   Sharbi, but he asked a question directed both to me and to

23   Colonel Krzyminski.  Perhaps His Honor will allow me to respond

24   to that question.

25        THE COURT:  Sure.

```
 1          MR. RACHLIN:  The question that you asked, Mr. Al Sharbi,
 2    is why we don't have -- I think you referred to it as the pride
 3    to withdraw from the matter given the fact that you've stated
 4    over and over again your desire that we did so.  And I just want
 5    you to understand that there are two reasons why I do not
 6    withdraw and will not withdraw unless His Honor instructs me to
 7    do so.  The first is that your father and I have been in touch.
 8    He's very much concerned about you, and when I look at you, I
 9    realize I have children who are older than you, so I do feel, out
10    of respect for your father, that I should do everything in my
11    power to make sure that you have the full benefit of the laws of
12    this country, whether you desire that protection or whether you
13    do not.  And the second reason is that while I understand your
14    desire to be a shahid, and I can respect your desire, I, as a
15    member of the bar, am not willing to see the United States used
16    as a -- see the United States as complicit in that enterprise.
17    So, despite the fact that you have expressed a desire to be a
18    mujahid and to be a martyr, I, as a lawyer who has taken an oath
19    to support and defend the Constitution of my country, feel that I
20    have an obligation to keep that promise.
21          So, those are the two reasons that I have not withdrawn
22    and I will not withdraw unless His Honor dismisses me from the
23    case, in which case, of course, I'll have no choice.  Is there
24    anything else, Mr. Al Sharbi, that you would like to ask me since
25    you and I, despite our efforts to see you, you and I have -- this
```

1    is the first opportunity you and I have had to talk?  Anything
2    that you would like to ask me or anything that you would like to
3    ask Colonel Krzyminski?

4        THE DEFENDANT:  I just want to say, I want to comment,
5    when you said, first of all, my father talked to you and he hired
6    you, when I checked the paper, all the papers, the legal forms,
7    it says, Ghassan Al Sharbi versus, let's say, Bush, as if he's my
8    opponent, though we are talking about different positions.  It
9    doesn't say my father's name; it says my name versus him,
10   whatever, versus the government.

11        Second of all, again, I said that, and I'm repeating it, I
12   am an adult.  I am in Guantanamo, it's not my father.  And I know
13   that -- and that's what I'm trying to say.  You're not here for
14   me, nor for my father.  That's not the case.  You are here
15   defending the image -- the deteriorating image of your country.
16   You're trying to restore the bad image of, I'll say, the sick and
17   weakening Uncle Sam.  That's your objective.  You're not here for
18   me nor for my father.  That's a known fact.  And you just said it
19   in a different word, number 1.  Number 2, as I said, and I keep
20   saying and you keep -- no matter what excuse you're trying to
21   say, I have to -- after all, you're representing me without my
22   will, and I do believe and I do view that as just being, and I've
23   written it in a note to you when you came to Guantanamo, you're
24   just being a parasite.  And if you do care about the image of
25   your country and your Constitution and the United States of

1    America, you should take further -- start talking to your

2    politicians, go talk to your lawmakers, try to -- put your effort

3    to them to save your nation, to save your soldiers, to save your

4    -- not through me, not through one -- When you said I wanted to

5    be a shahid and a martyr, that's not true.  Who doesn't wish to

6    die in a good -- in a good -- in a decent cause, but that's not

7    what I was trying to tell the judge earlier on.  It's not about

8    me, that I just want to be a shahid and that's it, I want to bomb

9    myself, that's its, that's not the case, or I want to just stay

10   here.  I'm not crazy when I'm stating that I want to stay for the

11   rest of my life in prison.  I'm saying, I'm a person who just has

12   grown up, seen your country that you say you care about, walk in

13   their laws in my region, no matter what they're excuse is,

14   supporting oppressors, supporting the Saudi regime, the Egyptian

15   regime, the Iraqi regime.  Sadam Hussein is supporting under the

16   name of supporting our strategic allies in the region.

17        MR. RACHLIN:  Mr. Al Sharbi, allow me to interrupt you for

18   a moment.

19        THE DEFENDANT:  Let me finish.  Let me finish.  Do not

20   interrupt me.  Let me finish.  So, you've been saying supporting

21   our -- I grow up and I see you, I see those people, and I see it

22   happening.  Even my country, the government, the US Alliance, how

23   they treat us in prison, how they -- and it's all through your

24   support, military support, intelligence support, financial

25   support, the United States, the United States.  And you expect

1    me -- and then you send your troops here and there and you expect

2    me -- and you try to impose your values, no matter what you call

3    it, under the name of spreading democracy and (unintelligible), a

4    corrupted system that just collapsed.   See, I'm telling you how

5    this is an example that your Constitution cannot drop -- you

6    changed your (unintelligible) to correct the market.   That's

7    just -- you're trying to improve your financial ethics -- not

8    financial -- I'll say loss, your values, whatever, and all of a

9    sudden you're sending your troops supporting those oppressors,

10   and now you suddenly expect me to say, of course, and that's what

11   the judge doesn't like, and he likes to change when I say I took

12   arms.   It is part of the issue.   It is part of the --

13        MR. RACHLIN:   Excuse me, Mr. Al Sharbi.

14        THE DEFENDANT:   Now, if you don't like --

15        MR. RACHLIN:   Mr. Al Sharbi, I have to interrupt you at

16   this point.   I have to interrupt you because I'm dependent upon

17   the patience of our judge, and although he hasn't shown the

18   slightest disposition to stop our discussion, I have to recognize

19   the fact that he's probably not going to be amenable to an

20   indefinite extension of it.   First of all, let me say this to

21   you, sir.   You're mistaken when you say --

22        THE COURT:   So, that's why you stop me, I guess.

23        MR. RACHLIN:   I want to stop you for the moment.

24        THE DEFENDANT:   No, you want the judge to stop me.

25        MR. RACHLIN:   No, I don't want the judge to stop you and

1    he's not trying to stop me.  You're mistaken when you say your

2    name and that your father's name does not appear in the

3    paperwork.  That is incorrect.  In every pleading that has been

4    filed in this case, it does say "Ghassan Al Sharbi by his next

5    friend Abdullah Al Sharbi," so you're simply mistaken about that.

6         Secondly, I would point out to you that you have your view

7    as to what my motivations are.  Well, I would ask you not to draw

8    firm conclusions because I don't think that, with all of your

9    ability, that you have the ability to know what's in my mind and

10   my heart.

11        Lastly, Mr. Al Sharbi, I understand your feelings, and I

12   understand your feelings about the United States, and this is not

13   the time and place to go into it simply because neither -- no one

14   here wants you to make statements that may work to your detriment

15   later on.

16        I have nothing further to ask you except to say that I'm

17   happy, after all these years, at last to have an opportunity to

18   talk with you, because, despite repeated trips to Guantanamo and

19   repeated efforts to at least talk to you as one human being to

20   another, I haven't had that opportunity until this was arranged.

21   Is there anything more that you would like to ask me?

22        THE DEFENDANT:  Not really.  As I said, it seems that

23   maybe you're a danger for my father, I can tell.  And I hate to

24   be rude and bold towards him, but that's not my religion.  That's

25   not even anyone's man.  I hate to seem -- I'm not that person who

1   lacks gratitude.  I'm not saying that.  We are people that after

2   this experience we differentiate between people that really are

3   on our side and people who are really on the side -- I'm not

4   saying with the government, but the side of -- so it's not me

5   lacking gratitude, but I'm telling you we know how to

6   differentiate between true allies and non true allies.  This is

7   number 1.

8        Number 2, as I said, if you do care about my father and my

9   mother, and if you do care about their fathers and the mothers of

10  the Muslim world, your effort should be forwarded to your policy

11  makers and to the lawmakers even, because somehow they're

12  related, and it's obvious in the last seven years.  So, you have

13  to make your offer, even with your knowledge of law, towards that

14  effort.  It's not going to be my father only, it's got to be the

15  father of 1,500 million Muslims.  I believe this is better for

16  you to -- and as I said, my father, I love him so much.  I miss

17  him so much, so, so, so much, and I'm dying to see him just to

18  talk to him, especially after those eight years, but I'm telling

19  him, father, just be patient, be steadfast.  I'm happy after all.

20  Not being because I'm treated here so well or because the new

21  president is making things different, no, not at all, no

22  difference, but God made me strong.  God made us strong because

23  we did what we believed is right, and no matter how our opponent

24  -- what he says, what type of show they make, and what -- how

25  they make the show -- And after all, I've said it.  I was going

1    to say someone advised me to -- whatever I would say, you guys

2    should go and work for Hollywood.  I advise you to go work for

3    Hollywood, because after all, it's a show, and it's a circus with

4    different puppets, a circus with different clowns.  Another

5    lawyer come, another lawyer, whatever.  Even if your

6    politicians --

7         MR. RACHLIN:  Mr. Al Sharbi, I will pass on your -- I will

8    pass on your sentiments to your father, and I know he'll be happy

9    to hear that.  I would also again urge you not to draw

10   unwarranted conclusions about what motivates the people who are

11   trying to help you.  Unless you have -- do you have anything

12   further to ask me, sir?

13        THE DEFENDANT:  I would say (unintelligible) my father is

14   God.  God takes care of him.  God gets praise.  I pray at night

15   God sends peace to his heart and sends -- he doesn't need the

16   humiliation.  This is number 1.

17        Number 2, as I said, as I said, if you have an effort, at

18   this stage to care about my father, I would say care about the

19   fathers of the Muslims and do your effort with your politicians

20   and with your lawmakers.  That's what I'm saying.

21        And I do -- after all, you urged me to drop it, and I urge

22   you to -- as you say, you're independent.  I urge you to practice

23   that and be independent and be an independent one and say, okay,

24   this man doesn't want me, he seemed -- he is an adult, he has an

25   access, he has an access to the U.S. legal system.  See, I'm

1   talking, I'm writing letters.  I speak English.  He has access.

2   He can make his decisions.  So, I should respect -- and no

3   matter, you can -- I really have no choice because I've seen so

4   many -- I cannot control, like I say -- excuse me for choosing

5   that -- I cannot control parasites coming on my shoulders, but

6   you just hear me declining your services, declining your

7   services, declining your services from now on and until God only

8   knows what happens.

9        MR. RACHLIN:  Well, thank you, Mr. Al Sharbi.  I'm glad at

10  last I had an opportunity to talk with you.  I wish we could have

11  done it face-to-face on one of the many occasions that I came to

12  Guantanamo trying to do so.

13       Your Honor, I have nothing further.

14       THE COURT:  All right.  Thank you.  All right.  I'm

15  prepared to make some findings.  Do you have any questions you

16  want me to ask, government counsel?

17       MS. ABEL:  I have nothing, Your Honor.

18       THE COURT:  All right.  Mr. Al Sharbi, I respect your

19  decision.  I am satisfied that you're an extremely intelligent

20  man, that you're fully competent, that you're capable of making a

21  decision today.  And although I may disagree with your decision,

22  I understand that you understand the nature and consequences of

23  what you're doing and that you're acting voluntarily and of your

24  own free will.  I will tell you that, pursuant to your request,

25  I'm going to dismiss this case that was brought on your behalf by

1    your father through counsel without prejudice, which means that

2    if you change your mind, you can file either a petition on your

3    behalf -- you certainly have impressed me with your ability to

4    communicate with the Court. I've received this in the mail just

5    as I receive any other mail, and I was quite surprised to receive

6    your letter to me, but you certainly know how to communicate with

7    the Court when you desire to do so. And I will let you know

8    that -- I will inform you today that if you change your mind and

9    you wish to file a new proceeding on your behalf or reinstate

10   this one, either by yourself or through an attorney, or if you

11   change your mind and you wish the Court to appoint an attorney

12   for you, I'd be delighted to do so. Do you understand all that?

13           THE DEFENDANT: I do understand all that.

14           THE COURT: All right. Do you have any questions you want

15   to ask me or anything else you want to say? I'm prepared to

16   dismiss the case at your request and to discharge your attorney.

17   That's without prejudice, meaning that you can bring a new action

18   if you want to. Do you understand that?

19           THE DEFENDANT: I do understand that.

20           THE COURT: Anything else that you would like to say or

21   any other questions that you have to ask me?

22           THE DEFENDANT: I think I've focused so much and I've

23   talked so much that it sounded like I'm giving so many different

24   topics, but as I said, they're all related to each other, and I

25   tried to make it as short as possible, and that's the shortest

1   that I could come up with, and that's what I wanted, at least for

2   the time being.

3       THE COURT:  All right.  Let me ask you this:  You wrote

4   your letter to me in August, I think August the 8th.  Since then

5   there's been a change in the executive branch.  You referred to

6   the executive branch a couple of times.  You referred to

7   President Bush.  You did not mention the new president.  I don't

8   know what new policies, if any, there will be because there is a

9   new president, there's a new administration, but the fact that

10  there's been a change in the executive branch, does that have an

11  impact on your decision one way or the other to withdraw this

12  petition?  Or maybe you wish to wait and see what the change in

13  policies are, if any?

14      THE DEFENDANT:  As you said, it was written on August 8th,

15  during the last -- using that "executive branch" so it was before

16  that.  And even him coming again, as I said, it's the same

17  circus, different clown.  I'm not being -- when I say this,

18  hopefully it does not affect your decisions.

19      THE COURT:  No, I've been called worse.

20      THE DEFENDANT:  No, no, no.  I mean, I'm not talking

21  about, like, the president, same circus different clown, in that

22  way; the same strategy, different tactics.  You'll always support

23  Israel, you'll always support oppressors, regimes like the Saudi

24  government, Egypt government that are corrupt.  And guess what,

25  just -- you kill civilians in Iraq, and all of a sudden you say,

1    oh, oh, it was a mistake, we getting in Iraq was a mistake.  What

2    do you expect a Muslim individual who witnessed that after that

3    war and bloodshed from both sides?  And then they say, it was a

4    mistake, it was a mistake.  And who's paying the price of that?

5    Anyway, I know you don't like that topic, you just want us to

6    focus on the paper, but I'm just saying, as I said, hopefully

7    this does not affect the whole thing.  What we saw during those

8    two months since the new president came, I personally saw in

9    terms of -- you could call it torture even.  It took place just

10   like Bush, maybe worse, and it's okay.  And I'm not bullshit --

11   Excuse me.  I'm not, like, giving you, like, lies or something.

12   It just doesn't -- it's no change.  All what you are saying in

13   the media is just for you, it's not for us.  I have it on tape.

14   I have things.  Imagine, I'm giving you dates.  On the 7th of

15   February, this February after Obama took over, on the 7th of

16   February, 11:00 or 11:40 p.m. it's in tape, it is in tape.  I was

17   tortured by you guys just to get my way, and under the

18   supervision of doctors and some civilians who came that Obama

19   sent.  They kept choking me, suffocating, putting me here, there,

20   (indicating).  It wasn't taped.  If you don't believe me, 7th of

21   February, on the 7th of February, 11:40 p.m. when they wanted to

22   weigh me, just -- and it was a medical procedure, just to get a

23   weight, and the civilians that Obama sent, they witnessed the

24   whole thing, choke, whatever, and there was yelling, yelling,

25   like a chicken being choked, and the camera was -- with like

1    oh, oh, it was a mistake, we getting in Iraq was a mistake. What
2    do you expect a Muslim individual who witnessed that after that
3    war and bloodshed from both sides? And then they say, it was a
4    mistake, it was a mistake. And who's paying the price of that?
5    Anyway, I know you don't like that topic, you just want us to
6    focus on the paper, but I'm just saying, as I said, hopefully
7    this does not affect the whole thing. What we saw during those
8    two months since the new president came, I personally saw in
9    terms of -- you could call it torture even. It took place just
10   like Bush, maybe worse, and it's okay. And I'm not bullshit --
11   Excuse me. I'm not, like, giving you, like, lies or something.
12   It just doesn't -- it's no change. All what you are saying in
13   the media is just for you, it's not for us. I have it on tape.
14   I have things. Imagine, I'm giving you dates. On the 7th of
15   February, this February after Obama took over, on the 7th of
16   February, 11:00 or 11:40 p.m. it's in tape, it is in tape. I was
17   tortured by you guys just to get my way, and under the
18   supervision of doctors and some civilians who came that Obama
19   sent. They kept choking me, suffocating, putting me here, there,
20   (indicating). It wasn't taped. If you don't believe me, 7th of
21   February, on the 7th of February, 11:40 p.m. when they wanted to
22   weigh me, just -- and it was a medical procedure, just to get a
23   weight, and the civilians that Obama sent, they witnessed the
24   whole thing, choke, whatever, and there was yelling, yelling,
25   like a chicken being choked, and the camera was -- with like

1    six -- so it's not -- don't say that Obama is being whatever.

2    The same show continues.  In fact, in fact, those -- the show,

3    the good guys' show that I'm trying to -- the U.S. legal system,

4    similar, the show, the good guys' show makes it easier for the

5    bad guys.  Why?  Because he's a coverup.  So it makes it easier.

6         And this should not affect by no means my decision that I

7    made -- the letter that I wrote on August 8th.  As I said, this

8    has nothing to do with it, but I'm just telling you it's

9    continuing.  And thanks, God, it's worth it, it's worth it.  I go

10   on pain, physical page, psychological pain, that's fine, but at

11   least I tried to stop some injustices on millions.  And after

12   all, God is with us.  God is with us.

13        THE COURT:  All right.  So, it's your decision, then, just

14   to be clear, it's still your decision to dismiss this case then

15   and to not have Mr. Rachlin or anyone else represent you, then;

16   is that right?

17        THE DEFENDANT:  Absolutely, absolutely.

18        THE COURT:  You don't need anymore time to think about it?

19   You don't need anymore time to further think about it?

20        THE DEFENDANT:  No, no, no, not at all, not at all.

21        THE COURT:  And do you know that if you change your mind

22   you can do that?  You can contact me.  Do you know that?

23        THE DEFENDANT:  I know that, but I assure you, it won't

24   take place.

25        THE COURT:  I'm sorry, I just didn't hear you.

1          THE DEFENDANT:   I know that, but I assure you -- I know

2     that, but I assure you it won't take place, God willing.

3          THE COURT:   All right.   And you have no other questions

4     you would like to ask me?

5          THE DEFENDANT:   No.

6          THE COURT:   All right.   All right.   And for the last time,

7     at least on this discussion, you don't want me to appoint anyone

8     else to talk to you, someone other than Mr. Rachlin?

9          THE DEFENDANT:   Same circus, different clown.   No.

10          THE COURT:   All right.   All right, sir.   I'm going to

11     dismiss your case.   It's without prejudice.   Meaning, if you

12     change your mind, you can bring a new case or ask the Court to

13     reinstate this case.   Do you understand that?

14          THE DEFENDANT:   I do understand that.

15          THE COURT:   All right.   Do you have any questions about

16     your rights, any other questions you want to ask me about

17     anything?

18          THE DEFENDANT:   I like the word "rights," I like that.   No

19     no, no questions.

20          THE COURT:   All right.   All right.   Well, take care of

21     yourself.   Good luck to you.

22          All right.   That concludes this hearing, counsel.

23     Anything further, counsel?

24          MR. RACHLIN:   No, thank you.

25          THE COURT:   Counsel?

1           MS. ABEL:  No, Your Honor.

2           THE COURT:  All right.  Thank you.

3           (Proceedings adjourned at 1:42 p.m.)

4

5                        C E R T I F I C A T E

6

7                            I, Scott L. Wallace, RDR-CRR, certify
          That the foregoing is a correct transcript from the
8         Record of proceedings in the above-entitled matter.

9         _____          _____
10        Scott L. Wallace, RDR, CRR              Date
          Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ZAYN HUSAYN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1360 (RWR) |
| | ) | |
| ROBERT GATES, | ) | |
| | ) | |
| Respondent. | ) | |

# ISN 694 ARB Testimony (January 2008)

T2

## Summary of Administrative Review Board Proceedings for ISN 694

*The Administrative Review Board was called to order. 0850 hours.*

*The Detainee entered the proceedings.*

Presiding Officer: Good Morning Sir, I want to welcome you here today.

Presiding Officer: I want to make sure I pronounce your name correctly, Barghomi Sufyian.

Detainee (through translator): Yes, Barghomi Sufyian.

*The Presiding Officer announced the convening authority and purpose of the Administrative Review Board proceedings.*

*The Designated Military Officer (DMO) was sworn.*

*The Board Reporter, Translator, Assisting Military Officer (AMO) and Board Members were sworn.*

*The Presiding Officer asked the Detainee if he wishes to make a statement under oath. (Muslim oath offered).*

*The Detainee declined the oath.*

*The Presiding Officer read the hearing instructions to the Detainee and confirmed that he understood.*

Presiding Officer: Mr. Sufyian, do you understand this process?

Detainee (through translator): Yes.

Presiding Officer: Exhibit EC-A, Notification of the CSRT Decision, dated 7 January 2008 constitutes constructive notice of Enemy Combatant Notification of ISN 850.

*The Assisting Military Officer presented the Enemy Combatant Election Form, Exhibit EC-B, to the Administrative Review Board.*

*The Assisting Military Officer read the AMO Comments from the Enemy Combatant Election Form, Exhibit EC-B.*

The detainee's Administrative Review Board (ARB) interview was conducted on 17 January 2008 at 1000 hrs with a follow-up interview at 1400 hrs on 18 January 2008. After reviewing the ARB's purpose and procedures, the Arabic translated Unclassified Summary of Evidence was read to the detainee. When asked if he wanted to attend the

ISN 694
Enclosure (5)
Page 1 of 17

T2

DECLASSIFIED FOR PUBLIC RELEASE

T2

ARB, present a written or oral statement, or have the AMO speak on his behalf, the detainee was initially noncommittal, however later stated he would attend the ARB. The detainee was attentive throughout the interview. Copies of both the English and Arabic translated Unclassified Summaries of Evidence, were handed to the detainee according to the Joint Detention Group (JDG) Standard Operating Procedures. Written confirmation of the delivery of the documents was provided from the AMO to the JDG.

*Additional Comments:*

The detainee appeared at his interview wearing a tan uniform.

*Detainee Comments:*

- In response to the statement that in approximately 1994, while in London, United Kingdom, the detainee heard about the jihad in Afghanistan through the preaching of the imam Umar 'Uthman Mahmud, alias Abu Qatada, *the detainee stated that this information is incorrect. He was in Algeria until 1995. (3a1)*

- In response to the statement that the detainee was most likely connected to the Four Feathers Mosque in London, *the detainee stated that he has never heard of this mosque, and that he attended a large mosque on Baker Street in London. (3a2)*

- In response to the statement that the detainee stated while attending a mosque in London, he saw films about atrocities in Bosnia. The detainee wanted to help the Chechnya people win their freedom and stop the cruel treatment of Muslims in that area, *the detainee stated that the film was about the atrocities in Chechnya, not Bosnia. (3a3)*

- In response to the statement that the detainee stated in March 1999 he traveled with a false French passport and an airline ticket to Karachi, Pakistan, using an alias. Upon arriving in Karachi, Pakistan, the detainee purchased another ticket to Peshawar, Pakistan where he stayed at a guest house for three days and then took a bus to Jalalabad, Afghanistan, via Towrkham, Pakistan, *the detainee agreed. (3a4)*

- In response to the statement that the detainee stated that in March 2000 he stayed at a guest house in Kabul, Afghanistan and a guest house in Kandahar, Afghanistan. The detainee wanted to travel to Chechnya, but did not because the borders were too dangerous, *the detainee agreed. (3a5)*

- In response to the statement that the detainee stated that in August 2000 he traveled to a guest house in Jalalabad, Afghanistan. While at the guest house the

T2

DECLASSIFIED FOR PUBLIC RELEASE

DECLASSIFIED FOR PUBLIC RELEASE

T2

detainee exchanged his expired passport for an original document with someone else's name, changing the photo, *the detainee stated that this is not true.* (3a6)

- In response to the statement that the detainee stated that in November 2000 he returned to the guest house in Kabul, Afghanistan for approximately two weeks, *the detainee agreed.* (3a7)

- In response to the statement that the detainee stated that from June to September 2001 he again traveled between guest houses in Kabul, Kandahar and Jalalabad, Afghanistan. The detainee again intended to fight in Chechnya but the borders were still too dangerous, *the detainee agreed.* (3a8)

- In response to the statement that the detainee stated that in fall 2001 he crossed the mountains into Pakistan on foot and stayed at a safe house in Waziristan, Pakistan, *the detainee agreed.* (3a9)

- In response to the statement that the detainee stated that in November 2001 he traveled to Peshawar, Pakistan and stayed at a guest house for slightly less than one month, *the detainee agreed.* (3a10)

- In response to the statement that the detainee stated that in November 2001 he traveled to Peshawar, Pakistan and stayed at numerous places, *the detainee agreed.* (3a11)

- In response to the statement that when the detainee heard about the terrorist attacks in the United States on 11 September 2001, the detainee immediately celebrated, *the detainee stated this is untrue.* (3a12)

- In response to the statement that the detainee fought with other Mujahedin against Coalition forces during the latter part of 2001 in Afghanistan, including Tora Bora in December 2001, *the detainee stated that he had never been to Tora Bora.* (3a13)

- In response to the statement that the detainee stated in 1999 he trained at a small training camp between Jalalabad, Afghanistan and Kabul, Afghanistan. The detainee received training on the AK-47 assault rifle and other small arms as well as Russian and Chinese made mines. While practicing mine diffusion the detainee lost four fingers on his left hand, *the detainee agreed.* (3b1)

- In response to the statement that the detainee stated that from September or October 1999 until March 2000 he trained at the Khalden Camp located outside of Khowst, Afghanistan. The detainee received training on light arms, tactical movement, land navigation, artillery, mortars, and radio communication. The detainee also took an informal indoctrination class. The detainee watched movies

T2

DECLASSIFIED FOR PUBLIC RELEASE

T2

about the struggle and tactics used in Chechnya, *the detainee agreed*. He also stated that regarding the land navigation, it was about how to get to Chechnya, and even tourists need to learn how to read maps. *(3b2)*

- In response to the statement that the detainee stated that in June 2000 he returned to the guest house in Kabul, Afghanistan for approximately two months, where he was introduced to three Afghans. The detainee trained the Afghans on tactics and training the he learned at the Khalden Camp, *the detainee stated this was untrue and that he was teaching the Koran*. *(3b3)*

- In response to the statement that the detainee stated that in winter 2000 he went to a camp at Khowst, Afghanistan, where he was a trainer for approximately six or seven months, *the detainee stated that this doesn't make sense and it is untrue*. *(3b4)*

- In response to the statement that the detainee was identified as an al Qaida networks electronics and explosives trainer who used email to communicate with other al Qaida operatives, *the detainee stated that he is not and never has been a member of al Qaida*. *(3b5)*

- In response to the statement that the detainee was a trained remote controlled device specialist who also had training in car bombs, explosives, and small arms, *the detainee stated this is untrue*. *(3b6)*

- In response to the statement that the detainee was identified as an Algerian who used to be an explosives trainer in Afghanistan, *the detainee stated this was untrue*. *(3b7)*

- In response to the statement that the detainee was identified as the top battlefield tactics trainer in Tora Bora, teaching woodland and mountain tactics, small explosives, hand grenades, land mines, and first aid, *the detainee stated he was only in Afghanistan for two years and much of that time he was recovering from the injury to his hand. How would it be possible he could be the top trainer? Furthermore, he was never in Tora Bora*. *(3b8)*

- In response to the statement that the detainee provided remote control explosives training in preparation for attacks against the forces of Afghanistan's Interim Prime Minister Hamid Karzai, *the detainee stated this is untrue*. *(3b9)*

- In response to the statement that the detainee was identified as an Algerian in charge of the explosives and electronic detonator training, *the detainee stated this is untrue*. *(3b10)*

ISN 694
Enclosure (5)
Page 4 of 17

T2

DECLASSIFIED FOR PUBLIC RELEASE
By [redacted] on [redacted]
Case 1:08-cv-01360-RWR   Document 204-18   Filed 07/29/09   Page 56 of 82

T2

- In response to the statement that the detainee was identified as the instructor of a remote controlled explosives course, *the detainee stated that this is the same accusation repeated many times and it is untrue. (3b11)*

- In response to the statement that the detainee's alias was included on an al-Qaida membership list recovered from a computer disk. The disk was found at a home of deceased al-Qaida chief military commander Muhammad Atif, also known as, Abu Hafs al Masri, *the detainee responded that this was the first time he has ever heard of this. He denied knowledge of this saying that many people have similar names or aliases. (3c1)*

- In response to the statement that an Islamic extremist group, the Armed Islamic Group aims to overthrow the secular Algerian regime and replace it with an Islamic state. The Armed Islamic Group began its violent activity in 1992 after Algiers voided the victory of the Islamic Salvation Front, the largest Islamic opposition party, in the first round of legislative elections in December 1991. The group uses assassinations and bombings, including car bombs, and it is known to favor kidnapping victims and slitting their throats, *the detainee asked what does this have to do with him or with anything against American or coalition forces. (3c2)*

- In response to the statement that the detainee was identified as having a relationship with Usama bin Laden, *the detainee stated that everyone is accused of this and it is untrue. (3c3)*

- In response to the statement that the detainee, a known explosives trainer, was tasked to provide explosives detonator training at a safe house in Faisalabad, Pakistan in 2002. The detainee was given a sum of money, possibly 400 United States Dollars, to purchase the remote control device parts used in the training, *the detainee stated this was untrue. (3c4)*

- In response to the statement that the detainee was seen with al Qaida's second most senior explosives specialist in early 2001 in Kabul, Afghanistan, who sought the detainee's expertise in the development of remote control devices, *the detainee stated this was untrue. (3c5)*

- In response to the statement that the detainee traveled with Arab fighters during their escape from Afghanistan to Faisalabad, Pakistan, *the detainee stated he traveled with a lot of people who were trying to escape from the bombing in Afghanistan and he never asked the people if they were fighters. (3c6)*

- In response to the statement that in summer 2001, the detainee was asked if the detainee could construct a remote control device that would detonate an explosive in the United States using a mobile phone in Afghanistan, *the detainee stated that*

ISN 694
Enclosure (5)
Page 5 of 17

T2

T2 ████████████

*his interrogator had asked him the same thing and he stated that this never occurred. (3c7)*

- In response to the statement that the detainee stated that in February 2002 he traveled to a safe house in Faisalabad, Pakistan, where he stayed for a period of time before his capture, *the detainee agreed.* (3d)

- In response to the statement that detainee denied providing explosives training to anyone at the safe house and denied being asked to provide this training. The detainee stated he was never considered a teacher to anyone, despite previous admissions of conducting training in Afghanistan. When confronted with information from other detainees about him, the detainee called them liars. The detainee claimed to have passed the time eating and drinking at the safe house and he did not consider anyone at the house to be violent or dangerous, *the detainee stated this is true, but he only went to the training to go to Chechnya and that he stated he didn't know anything about the people at the safe house.* (4)

*The Designated Military Officer presented the Unclassified Summary of Evidence, Exhibit DMO-1, (and DMO-2 to DMO-3) to the Administrative Review Board.*

*The Designated Military Officer stated that a copy of these exhibits had been previously distributed to the Assisting Military Officer and Detainee.*

*The Presiding Officer noted from the Enemy Combatant Election Form that the Detainee wanted to respond to each item of information from the Unclassified Summary after it was presented.*

Presiding Officer: Mr. Sufyian, the Designated Military Officer will read each allegation from the Unclassified Summary; following the allegation the Assisting Military Officer will read your comments; you will be able to make comments as well, during this process and we (board members) may ask you questions during the reading of the Unclassified Summary of Evidence.

*The Designated Military Officer gave a brief description of the contents of the Unclassified Summary of Evidence, Exhibit DMO-1, to the Administrative Review Board.*

Designated Military Officer (3.a.1): In approximately 1994, while in London, United Kingdom, the detainee heard about the jihad in Afghanistan through the preaching of the imam Umar 'Uthman Mahmud, alias Abu Qatada.

Assisting Military Officer: Sir, the detainee stated that this information is incorrect. He was in Algeria until 1995.

ISN 694
Enclosure (5)
Page 6 of 17

T2 ████████████

T2

Presiding Officer: Is the date the only thing incorrect? Is the other information true?

Detainee (through translator): I told him (Assisting Military Officer) from the beginning, I never said that, I do not know Umar. I never said that in the interrogation; this is not true.

Designated Military Officer (3.a.2): The detainee was most likely connected to the Four Feathers Mosque in London.

Assisting Military Officer: Sir, the detainee stated that he has never heard of this mosque, and that he attended a large mosque on Baker Street in London.

Detainee (through translator): No comment was made.

Designated Military Officer (3.a.3): The detainee stated while attending a mosque in London, he saw films about atrocities in Bosnia. The detainee wanted to help the Chechnya people win their freedom and stop the cruel treatment of Muslims in that area.

Assisting Military Officer: Sir, the detainee stated that the film was about the atrocities in Chechnya, not Bosnia.

Detainee (through translator): No comment was made.

Designated Military Officer (3.a.4): The detainee stated in March 1999 he traveled with a false French passport and an airline ticket to Karachi, Pakistan, using an alias. Upon arriving in Karachi, Pakistan, the detainee purchased another ticket to Peshawar, Pakistan where he stayed at a guest house for three days and then took a bus to Jalalabad, Afghanistan, via Towrkham, Pakistan.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): Regarding the alias, I did not have any alias.

Designated Military Officer (3.a.5): The detainee stated that in March 2000 he stayed at a guest house in Kabul, Afghanistan and a guest house in Kandahar, Afghanistan. The detainee wanted to travel to Chechnya, but did not because the borders were too dangerous.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): No comment was made.

Designated Military Officer (3.a.6): The detainee stated that in August 2000 he traveled to a guest house in Jalalabad, Afghanistan. While at the guest house the detainee exchanged his expired passport for an original document with someone else's name,

T2

T2

changing the photo.

Assisting Military Officer: Sir, the detainee stated that this is not true.

Detainee (through translator): No comment was made.

Designated Military Officer (3.a.7): The detainee stated that in November 2000 he returned to the guest house in Kabul, Afghanistan for approximately two weeks.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): No comments was made.

Designated Military Officer (3.a.8): The detainee stated that from June to September 2001 he again traveled between guest houses in Kabul, Kandahar and Jalalabad, Afghanistan. The detainee again intended to fight in Chechnya but the borders were still too dangerous.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): No comment was made.

Presiding Officer: Were any of theses guest houses affliated with any organizations?

Detainee (through translator): No, it was a normal house.

Presiding Officer: Thank you.

Designated Military Officer (3.a.9): The detainee stated that in fall 2001 he crossed the mountains into Pakistan on foot and stayed at a safe house in Waziristan, Pakistan.

Assisting Military Officer: Sir, the detainee agreed.

Presiding Officer: Why were you walking across the mountain?

Detainee (through translator): The only route was through the mountain, you have to go that way, and it was not my choice.

Presiding Officer: Were you fleeing?

Detainee (through translator): The situation was not normal, so I left through the mountains.

Presiding Officer: Thank you.

ISN 694
Enclosure (5)
Page 8 of 17

T2

T2

Designated Military Officer (3.a.10): The detainee stated that in November 2001 he traveled to Peshawar, Pakistan and stayed at a guest house for slightly less than one month.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): No comment was made.

Designated Military Officer (3.a.11): The detainee stated that in December 2001 he went to Lahore, Pakistan and stayed at numerous places.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): No comment was made.

Designated Military Officer (3.a.12): When the detainee heard about the terrorist attacks in the United States on 11 September 2001, the detainee immediately celebrated.

Assisting Military Officer: Sir, the detainee stated this is untrue.

Presiding Officer: Do you consider the 9-11 highjacker murders or martyrs?

Detainee (through translator): As I have told them in the interrogation, if you killed innocence people like kids, this is not good for Islam, my religion does not allow this; Islam is Islam and those who make the mistake should be responsible for their mistake.

Presiding Officer: Thank you.

Designated Military Officer (3.a.13): The detainee fought with other Mujahedin against Coalition forces during the latter part of 2001 in Afghanistan, including Tora Bora in December 2001.

Assisting Military Officer: Sir, the detainee stated that he had never been to Tora Bora.

Presiding Officer: Did you fight anywhere in Afghanistan, against the Coalition Forces?

Detainee (through translator): A short time after September 11, I left Afghanistan.

Presiding Officer: So did you fight against Coalition Forces or not?

Detainee (through translator): No.

ISN 694
Enclosure (5)
Page 9 of 17

T2

T2 ████████████████

### Training

Designated Military Officer (3.b.1): The detainee stated in 1999 he trained at a small training camp between Jalalabad, Afghanistan and Kabul, Afghanistan. The detainee received training on the AK-47 assault rifle and other small arms as well as Russian and Chinese made mines. While practicing mine defusion the detainee lost four fingers on his left hand.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): No comment was made.

Designated Military Officer (3.b.2): The detainee stated that from September or October 1999 until March 2000 he trained at the Khalden Camp located outside of Khowst, Afghanistan. The detainee received training on light arms, tactical movement, land navigation, artillery, mortars, and radio communication. The detainee also took an informal indoctrination class. The detainee watched movies about the struggle and tactics used in Chechnya.

Assisting Military Officer: Sir, the detainee agreed. He also stated that regarding the land navigation, it was about how to get to Chechnya, and even tourists need to learn how to read maps.

Detainee (through translator): I did not take a course on how to read maps.

Presiding Officer: That's fine.

Designated Military Officer (3.b.3): The detainee stated that in June 2000 he returned to the guest house in Kabul, Afghanistan for approximately two months, where he was introduced to three Afghans. The detainee trained the Afghans on tactics and training he learned at the Khalden Camp.

Assisting Military Officer: Sir, the detainee stated this was untrue and that he was teaching the Koran.

Detainee (through translator): Yes, this is correct.

Presiding Officer: Other than diffusing mines were you trained in explosives?

Detainee (through translator): No, only the mines.

Designated Military Officer (3.b.4): The detainee stated that in winter 2000 he went to a camp at Khowst, Afghanistan, where he was a trainer for approximately six or seven months.

ISN 694
Enclosure (5)
Page 10 of 17

T2 ████████████████

DECLASSIFIED FOR PUBLIC RELEASE

Assisting Military Officer: Sir, the detainee stated that this doesn't make sense and it is untrue.

Board Member: Was he a trainer?

Detainee (through translator): No, I went there to receive training, not to be a trainer.

Board Member: What kind of training?

Detainee (through translator): The same information you have, the training you just read.

Board Members: Mine training?

Detainee (through translator): Light weapons, whatever you just read.

Designated Military Officer (3.b.5): The detainee was identified as an al Qaida networks electronics and explosives trainer who used email to communicate with other al Qaida operatives.

Assisting Military Officer: Sir, the detainee stated that he is not and never has been a member of al Qaida.

Presiding Officer: Do you have experience with electronics?

Detainee (through translator): No.

Designated Military Officer (3.b.6): The detainee was a trained remote controlled device specialist who also had training in car bombs, explosives, and small arms.

Assisting Military Officer: Sir, the detainee stated this is untrue.

Detainee (through translator): No comment was made.

Designated Military Officer (3.b.7): The detainee was identified as an Algerian who used to be an explosives trainer in Afghanistan.

Assisting Military Officer: Sir, the detainee stated this was untrue.

Detainee (through translator): All of this information is the same, you just keep repeating it, just in a different way.

Presiding Officer: Please be patience.

Designated Military Officer (3.b.8): The detainee was identified as the top battlefield tactics trainer in Tora Bora, teaching woodland and mountain tactics, small explosives,

ISN 694
Enclosure (5)
Page 11 of 17

DECLASSIFIED FOR PUBLIC RELEASE

T2 ███████████████████

hand grenades, land mines, and first aid.

Assisting Military Officer: Sir, the detainee stated he was only in Afghanistan for two years and much of that time he was recovering from the injury to his hand. How would it be possible he could be the top trainer? Furthermore, he was never in Tora Bora.

Detainee (through translator): No comment was made.

Designated Military Officer (3.b.9): The detainee provided remote control explosives training in preparation for attacks against the forces of Afghanistan's Interim Prime Minister Hamid Karzai.

Assisting Military Officer: Sir, the detainee stated this is untrue.

Detainee (through translator): No comment was made.

Designated Military Officer (3.b.10): The detainee was identified as an Algerian in charge of the explosives and electronic detonator training.

Assisting Military Officer: Sir, the detainee stated this is untrue.

Detainee (through translator): No comment was made.

Designated Military Officer (3.b.11): The detainee was identified as the instructor of a remote controlled explosives course.

Assisting Military Officer: Sir, the detainee stated; that this is the same accusation repeated many times and it is untrue.

Presiding Officer: Please repeat that we appreciate his patience.

Detainee (through translator):

*Connections and Associations*

Designated Military Officer (3.c.1): The detainee's alias was included on an al-Qaida membership list recovered from a computer disk. The disk was found at a home of deceased al-Qaida chief military commander Muhammad Atif, also known as, Abu Hafs al Masri.

Assisting Military Officer: Sir, the detainee responded that this was the first time he has ever heard of this. He denied knowledge of this saying that many people have similar names or aliases.

Detainee (through translator): No comment was made.

ISN 694
Enclosure (5)
Page 12 of 17

T2 █████████████

T2

Designated Military Officer (3.c.2): An Islamic extremist group, the Armed Islamic Group aims to overthrow the secular Algerian regime and replace it with an Islamic state. The Armed Islamic Group began its violent activity in 1992 after Algiers voided the victory of the Islamic Salvation Front, the largest Islamic opposition party, in the first round of legislative elections in December 1991. The group uses assassinations and bombings, including car bombs, and it is known to favor kidnapping victims and slitting their throats.

Assisting Military Officer: Sir, the detainee asked what does this have to do with him or with anything against American or coalition forces.

Detainee (through translator): No comment was made.

Designated Military Officer (3.c.3): The detainee was identified as having had a relationship with Usama bin Laden.

Assisting Military Officer: Sir, the detainee stated that everyone is accused of this and it is untrue.

Presiding Officer: What are you feelings concerning Usama bin Laden, is he a good person or bad person?

Detainee (through translator): He is a Muslim man, if he makes mistakes he is responsible for his mistakes I have nothing to do with it. If I am with al Qaida, then I would say I am with al Qaida, but I am innocence. I don't care, everyone has their own view and I have mine, I am a normal Muslim.

Presiding Officer: Thank you.

Designated Military Officer (3.c.4): The detainee, a known explosives trainer, was tasked to provide explosives detonator training at a safe house in Faisalabad, Pakistan in 2002. The detainee was given a sum of money, possibly 400 United States Dollars, to purchase the remote control device parts used in the training.

Assisting Military Officer: Sir, the detainee stated this was untrue.

Detainee (through translator): No comment was made.

Designated Military Officer (3.c.5): The detainee was seen with al Qaida's second most senior explosives specialist in early 2001 in Kabul, Afghanistan, who sought the detainee's expertise in the development of remote control devices.

Assisting Military Officer: Sir, the detainee stated this was untrue.

ISN 694
Enclosure (5)
Page 13 of 17

T2

Detainee (through translator): No comment was made.

Designated Military Officer (3.c.6): The detainee traveled with Arab fighters during their escape from Afghanistan to Faisalabad, Pakistan.

Assisting Military Officer: Sir, the detainee stated he traveled with a lot of people who were trying to escape from the bombing in Afghanistan and he never asked the people if they were fighters.

Detainee (through translator): No comment was made.

Designated Military Officer (3.c.7): In summer 2001, the detainee was asked if the detainee could construct a remote control device that would detonate an explosive in the United States using a mobile phone in Afghanistan.

Assisting Military Officer: Sir, the detainee stated that his interrogator had asked him the same thing and he stated that this never occurred.

Presiding Officer: Did you ever hear of plans to conduct attacks on the United States?

Detainee (through translator): No, they ask me many times, but I have not heard of any attacks.

### Other Relevant Data

Designated Military Officer (3.d): The detainee stated that in February 2002 he traveled to a safe house in Faisalabad, Pakistan, where he stayed for a period of time before his capture.

Assisting Military Officer: Sir, the detainee agreed.

Detainee (through translator): No comments were made.

Presiding officer: How many people were at this house?

Detainee (through translator): People come in and out; it was a general house for everyone. The Pakistanis was responsible so they bring people in and out.

Presiding Officer: Did you ever see any weapons or explosives at this house?

Detainee (through translator): No, I did not see.

*Designated Military Officer states the following factors favor release or transfer.*

ISN 694
Enclosure (5)
Page 14 of 17

DECLASSIFIED FOR PUBLIC RELEASE
By ███ on ███

T2 ██████████████

Designated Military Officer (4.a.): The detainee denied providing explosives training to anyone at the safe house and denied being asked to provide this training. The detainee stated he was never considered a teacher to anyone, despite previous admissions of conducting training in Afghanistan. When confronted with information from other detainees about him, the detainee called them liars. The detainee claimed to have passed the time eating and drinking at the safe house and he did not consider anyone at the house to be violent or dangerous.

Assisting Military Officer: Sir, the detainee stated this is true, but he only went to the training to go to Chechnya and that he stated he didn't know anything about the people at the safe house.

Detainee (through translator): Can you please repeat. I did not understand what he meant by correct.

Presiding Officer: AMO can you repeat your last statement?

Detainee (through translator): I did say before, I did have training with mines not explosives; just because they have combined the training with explosives; this is incorrect I did not have explosive training.

Presiding Officer: The board understands.

Board Member: How long were you in the guest house in Faisalabad?

Detainee (through translator): A little more than one week.

Board Member: While you were there did you pray with the others?

Detainee (through translator): Yes, I did pray.

Presiding Officer: Mr. Sufyian, we will give you an opportunity to make a statement before we conclude. Do you have any further comments concerning the allegations from the Unclassified Summary?

Detainee (through translator): I want to say something, do not be mad or upset; I just want to say the truth, my presence here is not going to change anything, but there is one point I would like to make, since you arrested me until now, I have been telling the truth, it has not changed; and it is up to you whether you believe me or don't believe me I do not care. I just tell the truth, this is all I have; I do not have anything else.

Presiding Officer: Thank you.

*The Designated Military Officer confirmed that he had no further unclassified information and requested a closed session to present classified information relevant to the disposition of the Detainee.*

ISN 694
Enclosure (5)
Page 15 of 17

T2 ██████████████

DECLASSIFIED FOR PUBLIC RELEASE

DECLASSIFIED FOR PUBLIC RELEASE
By [redacted] on [redacted]
Case 1:08-cv-01360-RWR   Document 204-18   Filed 07/29/09   Page 67 of 82

T2 [redacted]

*The Presiding Officer acknowledged the request.*

Detainee (through translator): I have one more point please before you close. I have faced the interrogator and asked him to bring me evidence, I told him to come over I am ready, but they could never face me (the interrogator). This is proof that this is only talk, I asked him to come over here; you are accusing me of something, you bring your evidence and I will bring mine and we will see whose evidence is stronger. They could never face me with their evidence, this is only he said, she said. If I ask you to bring me evidence you would say it is classified.

Presiding Officer: We are not interrogators, the only thing we can discuss here is the unclassified summary of evidence.

Detainee (through translator): Why do you hide classified information, face me with this classified information I can answer on it.

Presiding Officer: For security reasons we cannot talk about classified information; we can only talk about the unclassified summary of evidence.

Detainee (through translator): It is up to you, what is important is that I am here, I can face you, I am not afraid of anything. I can face you.

Presiding Officer: As stated earlier, we appreciate you being here.

Detainee (through translator): No problem that is all I have.

*The Presiding Officer opened the Administrative Review Board to the Detainee to present information with the assistance of the Assisting Military Officer.*

Presiding Officer: Mr. Sufyian, would you like to make a statement, if you do you can make your statement at this time.

Detainee (through translator): That's all I have. I have other comments but you would not like them.

Presiding Officer: Thank you.

*The Assisting Military Officer had no questions for the Detainee.*

*The Designated Military Officer had no questions for the Detainee.*

*Administrative Review Board Member's had no questions for the Detainee.*

Presiding Officer: What is your education?

Detainee (through translator): High School.

ISN 694
Enclosure (5)
Page 16 of 17

T2 [redacted]

T2

Presiding Officer: What would you do to support yourself if you were released or transferred?

Detainee (through translator): It is up to God, I will find whatever is convenient for me.

Presiding Officer: Thank you. Again the board appreciates you being here today.

*The Presiding Officer read the post-Administrative Review Board instructions to the Detainee and adjourned the open session of the Administrative Review Board.*

*The Presiding Officer opened the classified portion of the session.*

*The Presiding Officer adjourned the classified portion of the session and the Administrative Review Board was closed for deliberation and voting.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

T1, T3, T6

Colonel, United States Air Force
Presiding Officer

ISN 694
Enclosure (5)
Page 17 of 17

T2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ZAYN HUSAYN,                        )
                                    )
          Petitioner,               )
                                    )
     v.                             )          Civil Action No. 08-1360 (RWR)
                                    )
ROBERT GATES,                       )
                                    )
          Respondent.               )
                                    )

b2

b2

b1, b2



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ZAYN HUSAYN,             )
                            )
       Petitioner,       )
                            )
    v.                 )     Civil Action No. 08-1360 (RWR)
                            )
ROBERT GATES,        )
                            )
       Respondent.     )
                            )

b2 ████████████████████

b2 ████████████

b1,b2



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
                                    )
ZAYN HUSAYN,                        )
                                    )
         Petitioner,                )
                                    )
    v.                              )      Civil Action No. 08-1360 (RWR)
                                    )
ROBERT GATES,                       )
                                    )
         Respondent.                )
                                    )
```

# ISN 707 CSRT Statement

T2 ████████████

DECLASSIFIED FOR PUBLIC RELEASE

T2

*The Tribunal President explained the Tribunal process, then asked the Detainee if he understood this process. The Detainee stated the following:*

Detainee:  What are you talking about?

Tribunal President:  Do you understand why we are here?

Detainee:  Yes, I understand why we are here.

Tribunal President:  Do you understand that you not have to provide us any statement, but you may if you wish.

Detainee:  I told them in the past that I could not bring any witnesses.

Tribunal President:  I understand.  If at any time during this proceeding if you have any questions, you may ask us.

*The Tribunal President then requested the Detainee Election Form.  It was at the time that the Detainee requested an explanation as to what the form meant.*

Detainee:  What does this mean when you are talking about the Election Form?

Tribunal President:  I'll be happy to tell you.  Your Personal Representative has provided us a form, that just tells us that you wish to be here and that you did not have any request for witnesses or documents.  This is just administration so we have a complete record of this meeting.

*The Recorder then submits the Unclassified Evidence to the Tribunal (Exhibit R-1), which was previously translated and given to the Detainee.  The Recorder then provided a brief description of the general nature of the Unclassified Evidence.*

Detainee:  I wish to find out about the last weapon described.  I want to know the name of that weapon, the Zukair.

Recorder:  All I know is the name of the weapon was Zukair anti-aircraft weapon, that's all I know.

Detainee:  I do not know that.

Tribunal President:  OK.  Later in the proceedings you may be able to provide us any information you wish about all these items a little later.  I would like all of this to be read into the record at once, please.

*The Recorder then submitted the remainder of Unclassified Evidence.*

ISN #707
Enclosure (3)
Page 1 of 7

T2

T2 ▮▮▮▮▮▮▮▮▮▮▮▮

*The Tribunal President then asked if the Recorder had any witnesses or further evidence. The Recorder then requested a later time to review the Classified Evidence. The Tribunal President then informed the Detainee he could submit any evidence he wished to the Tribunal.*

Detainee: Are you talking about the points you just discussed?

Tribunal President: Yes, I have a few more instructions first. Your Personal Representative may assist you if you wish. Do you want to make a statement to this Tribunal about the Unclassified Evidence?

Detainee: Yes, I want to.

Tribunal President: Would you like to make your statement under oath?

Detainee: I don't wish to take the oath. My statement will be true.

Tribunal President: I understand. Thank you. You may proceed.

Detainee: The fact that we have read 13 points, I would like to read them one point at a time so I could address each point.

Tribunal President: I will ask the Personal Representative to assist you in that matter, and the Translator will translate all the information.

Personal Representative: (see 3.a-1.) The Detainee was trained in mountain warfare and weapons training on the Kalishnikov, PK machine gun, 75 and 82 mm heavy artillery, SPG-9 anti-tank weapon, 82 mm mortar, Zukair anti-aircraft weapon, and the RPG launcher at Khalden Camp.

Detainee: I did have the training on all the weapons mentioned with the exception of the Zukair.

Personal Representative (3.a-2) The Detainee delivered an electronic communication machine, possibly a facsimile machine, to Usama Bin Laden at the Al Qaida camp, Jihad Wali.

Detainee: I did not see Bin Laden, nor did I meet him. As far as the facsimile, I wanted to buy that facsimile for myself, and they sent an Afghani with me to buy it. That fax machine was for the Afghani guy. Somebody wanted to sell that fax machine, I showed it to a guy by the name of Abu Atta. He's the only one who has experience, and we wanted to buy it from him. That was not a fax machine, it was for interrogation. Show this machine to the guy Abu Atta, and find out from him if that was a machine that could be used (for interrogation). I took the machine to Abu Atta, and I don't know about him. I went to see this man, Abu Atta, and he told me he was busy. They said I could leave

ISN #707
Enclosure (3)
Page 2 of 7

T2 ▮▮▮▮▮▮▮▮▮▮

the machine there and pick it up tomorrow. When I came back the following day, they told me that machine was not a working machine.

Personal Representative (3.a-3): The detainee corresponded with a senior al Qaida lieutenant concerning the potential closing of Khalden camp.

Detainee: What happened was this. The person in charge of this camp is the Sheik's son. He is in charge of this tribe. The second man in charge was Abu Zubayda. The rest of the trainers, we met there, and they told us we were going to close that camp. They have all the authority to do that, we just simply follow what they have to say.

Personal Representative (3.a-4) The detainee's escape from Afghanistan was facilitated by a senior al Qaida lieutenant.

Detainee: Which al Qaida member are you talking about?

Personal Representative: I don't have that information. I just know he's a senior al Qaida person.

Detainee: I don't have any association with al Qaida, and I don't know anything about that.

Personal Representative (3.a-5): The detainee was provided a Somali passport, because he had no travel documents.

Detainee: I don't have a Somali passport, I don't have a passport, I don't have anything.

Personal Representative (3.a-6): The detainee is associated with senior al Qaida personnel.

Detainee: As I previously told you, I have no knowledge of al Qaida, and I don't know anybody from there. But if you want to say that I'm Muslim and want to make-believe I belong to al Qaida, then that is something different.

Personal Representative (3.a-7): The detainee was captured in a safehouse run by a senior al Qaida lieutenant.

Detainee: As far as that point is concerned, I don't know anything about this house. What I know is that I know Abu Zubayda was the person in charge of that safehouse. He is the person that told me go to that place until he made the traveling arrangements. That's all I have to say regarding that point.

Personal Representative (3.b): The detainee supported hostilities in aid of enemy armed forces.

DECLASSIFIED FOR PUBLIC RELEASE

DECLASSIFIED FOR PUBLIC RELEASE
By█ on█████

T2 ████████████████

Detainee: Where?

Tribunal President: I would suggest that the Personal Representative read the next point, which is more specific.

Personal Representative (3.b-1): The detainee was the "70th Taliban Commander."

Detainee: Again, I don't know anything about Taliban. I never carried arms with them. I don't know nothing about Taliban. I am not even convinced of the Taliban, so how do you associate me with the Taliban?

Personal Representative(3.b-2): The detainee was involved with the Khalden camp in order to train individuals who wished to prepare to fight with the Taliban.

Detainee: The Khalden camp is a place to get training. It has nothing to do with al Qaida. People come over to that camp, train for about a month to a month and a half, then they go back to their hometown. When the person gets the training and leaves the Khalden camp, he leaves the camp for their country, and he changes his mind about the whole thing. God gives them responsibility to fight, we cannot just prevent them from doing that.

Personal Representative (3.b-3): The detainee worked as a weapons instructor on the use of the AK-47, PK and RPG at the Khalden camp.

Detainee: All I trained on was the Kalishnikov, the light weapons. I trained for a period of three months only. That three months training depends on who attended the camp. Sometimes they come, sometimes they don't. That's all I did.

Tribunal President: I'd like to clarify that point that implied he was a teacher to others of these weapons.

Detainee: As I told you, yes I did train the people. For a period of three months...sometimes they come, sometimes they don't. I'd like to clear something for you. I'm not the only trainer there, there were other trainers as well. Not everybody that comes to the camp is trained by me.

Personal Representative (3.b-4): The Detainee provided logistics support at the Khalden training camp.

Detainee: I wish some clarification on b-4.

Tribunal President: What did you not understand?

Detainee: How is it that I provided logistics to the other people? Who are the other people, who are you referring to?

T2 ████████████

DECLASSIFIED FOR PUBLIC RELEASE

**T2** ▮▮▮▮▮▮▮▮▮▮

Tribunal President: Generic or general logistic support to the whole camp. This could mean providing food, providing shelter, providing weapons, clothes. Logistics is a term that is very general.

Detainee: I want to tell you something.

Tribunal President: Please.

Detainee: I used to bring the rice, and all the required food, vegetables. That's all I was doing. Sugar and other things, I would get for cost, take it to the camp or somewhere else.

Personal Representative (3.b-5): The detainee was frequently left in charge of the Khalden camp, because he was judged to be good with the people and could handle all aspects of the camp.

Detainee: As far as the camp, I did not manage it until the son of the sheik, and others with more seniority than me, who were there before me, before the Jihad. These people running that house, they ran it for a period of 5 months in his absence. And that five months could be divided among three different people that were there. That is the period of time that I spent in that house.

Personal Representative (3.b-6): The detainee stated he was in charge of the Khalden camp when the director was absent.

Detainee: I have just addressed that. Whenever the manager, was not managing it, he could select someone to manage it.

Tribunal President: Muhammed, does this conclude your statement?

Detainee: Yes.

*The Tribunal President then asked the Recorder, Personal Representative and Tribunal Members if they had any further questions. One Tribunal Member then asked the following:*

Board Member: Just had one clarifying question. At one point you said you don't know anything about the Taliban, and you're not even convinced of the Taliban. What do you mean by that?

Detainee: I am not convinced with their cause or with the Taliban.

Board Member: You're not convinced they even exist, or what?

ISN #707<br>
Enclosure (3)<br>
Page 5 of 7

**T2** ▮▮▮▮▮▮▮▮▮▮

T2 ████████████████████

Detainee: Everything that you want to do in life, you want to be convinced of what you're doing. When it comes to the Taliban, even scientists go against each other. Everybody sees it a different way. I am not convinced of the fighting, all I just came over there for was preparation, that's it.

Board Member: Was Abu Zubayda your boss, or just your friend?

Detainee: I don't know Abu Zubayda until the last times I was in that house. I know somebody was running this, but I don't know whether it was Abu Zubayda or anybody else. All I know is he is the son of the sheik or the head of that tribe.

Board Member: Abu Zubayda is the head or son of the sheik?

Detainee: No, the son of that sheik is somebody different.

Board Member: Thanks. That's all the questions I have.

Tribunal President: I have a question. Did you ever get a Somali passport?

Detainee: I don't have one.

Tribunal President: Did you ever have one while you were in Afghanistan?

Detainee: I didn't even have one before. I had a Sudanese passport. I don't have any other documentation.

Tribunal President: OK. I'd like you to clarify the purpose of the Khalden camp; and I understand it's a training camp for military equipment. I would like to know what organization founded, paid for and advertised the camp. Why is it there?

Detainee: As I told you before, this camp I don't know anything about it. All I know it is run by big man, the sheik. And in his own way, he gets support from different people. He can contact the people that get trained there, and tell them that the camp is running into certain circumstances, that they need some money or some kind of support. Whoever has money and can help, please provide us with that money.

Tribunal President: Why did you go to the camp and become a teacher?

Detainee: I did not go over there to train; I went there to get training myself.

Tribunal President: OK. For what reason, why did you go get trained?

Detainee: It is my duty as a Muslim to learn.

Tribunal President: OK, thank you. I understand.

ISN #707
Enclosure (3)
Page 6 of 7

T2 ████████████████████

T2 [redacted]

*Tribunal President then asked if the board had any further questions, and asked the Detainee if he had any more evidence for the Tribunal.*

Detainee: No, I do not have any other evidence.

*The Tribunal President explained the remainder of the Tribunal process to the Detainee and adjourned the open session.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

T1, T3, T6 [redacted]

Tribunal President

ISN #707
Enclosure (3)
Page 7 of 7

T2 [redacted]

SECRET/NOFORN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ZAYN HUSAYN,                         )
                                     )
          Petitioner,                )
                                     )
     v.                              )          Civil Action No. 08-1360 (RWR)
                                     )
ROBERT GATES,                        )
                                     )
          Respondent.                )
                                     )

# MAP

SECRET/NOFORN

