## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ZAYN AL ABIDIN MUHAMMAD      )
HUSAYN (ISN # 10016),        )
                             )
*Petitioner.*                )
                             )
v.                           )                No. 08-CV-1360
                             )
ROBERT M. GATES,             )
                             )
*Respondent.*                )
                             )

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
## INTERVENE AND UNSEAL BY RAYMOND BONNER

David A. Schulz
Jonathan Manes
Steven Lance (law student intern)
Andrew Udelsman (law student intern)
Beatrice Walton (law student intern)
Media Freedom & Information Access Clinic
Abrams Institute
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Phone: 212-850-6103
Fax: 212-850-6299

Chad Bowman
Levine Sullivan Koch & Schulz, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Phone:  202-508-1100
Fax:  202-861-8988

*Counsel for Movant Raymond Bonner*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...................................................................................................................2

A.      The Substantial Public Interest in This Proceeding .............................................3

B.      The Sealed Records at Issue ................................................................................5

C.      Previous Press Intervention in This Proceeding ..................................................7

ARGUMENT ........................................................................................................................8

I.      BONNER HAS A RIGHT TO INTERVENE TO
        ENFORCE THE RIGHT OF ACCESS TO JUDICIAL RECORDS ..................................8

II.     THERE IS A QUALIFIED FIRST AMENDMENT RIGHT
        OF ACCESS TO THIS PROCEEDING AND ITS RECORDS........................................9

        A.      The Constitutional Right of Access
                Applies To Habeas Proceedings and Their Records................................9

        B.      The Constitutional Right of Access
                is a Right of Contemporaneous Access .................................................11

III.    THE MASSIVE SEALING IN THIS CASE
        VIOLATES THE FIRST AMENDMENT RIGHT OF ACCESS ...................................12

        A.      A Strict Constitutional Standard
                Governs Any Limitation of the Access Right........................................12

                1.      The Supreme Court has articulated a
                        four-part test that must be satisfied in
                        order to overcome the First Amendment right of access ...........12

                2.      The Government does not carry its burden merely by
                        asserting that a judicial record contains classified information ................14

        B.      The Long-Term, Open-Ended Sealing of
                Records in This Case is Improper and Unjustifiable ...........................18

                1.      The challenged sealings and redactions are procedurally improper ..........19

                2.      The challenged sealings and redactions are unjustifiable ..........19

CONCLUSION................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameziane v. Obama*,
    699 F.3d 488 (D.C. Cir. 2012) .................................................................................26

*In re Application of Newsday, Inc.*,
    895 F.2d 74 (2d Cir. 1990) .......................................................................................9

*Ashworth v. Bagley*,
    351 F. Supp. 2d 786 (S.D. Ohio 2005) ....................................................................11

*Associated Press v. U.S. Dist. Court*,
    705 F.2d 1143 (9th Cir. 1983) .........................................................................11, 13, 14

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) (Tatel, J., dissenting) .............................................15

*Dhiab v. Obama*,
    70 F. Supp. 3d 486, 492 (D.D.C. 2014) ..................................9, 12, 15, 18, 20, 22

*EEOC v. Nat'l Children's Ctr., Inc.*,
    146 F.3d 1042 (D.C. Cir. 1998) .................................................................................8

*Gabrion v. United States*,
    No. 1:15-CV-447 (2015 WL 2354745 (W.D. Mich. May 15, 2015) .......................10

*Globe Newspaper Co. v. Pokaski*,
    868 F.2d 497 (1st Cir. 1989) ....................................................................................11

*Globe Newspapers Co. v. Superior Court*,
    457 U.S. 596 (1982) ................................................................................................8, 9

*Grove Fresh Distrib., Inc. v. Everfresh Juice Co.*,
    24 F.3d 893 (7th Cir.1994) ......................................................................................12

*In re Guantanamo Bay Detainee Litig.*,
    630 F. Supp.2d 5 (D.D.C. 2009) ...............................................................................9

*Halperin v. Kissinger*,
    606 F.2d 1192 (D.C. Cir. 1979) ..........................................................................16, 17

*Harris v. Nelson*,
    394 U.S. 286 (1969) .................................................................................................11

*Hartford Courant Co. v. Pellegrino*,
    380 F.2d 83 (2d Cir. 2004)..........................................................................10

*In re The Herald Co.*,
    734 F.2d 93 (2d Cir. 1982).................................................................13, 14, 20

*Husayn v. Poland*,
    Application No. 7511/13, Judgment 123 (Eur. Ct. H.R. July 24, 2014)....................................4

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)...............................................................................17, 24

*In re Knight Publ'g Co.*,
    743 F.2d 231 (4th Cir. 1984) ........................................................................8

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006)...............................................................10, 11, 13

*In re N.Y. Times Co.*,
    828 F.2d. 110 (2d Cir. 1987)....................................................................10, 14

*N.Y. Times Co. v. DOJ*,
    756 F.3d 100 (2d Cir. 2014)....................................................................17, 20

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971)...............................................................................15

*Nebraska Press Ass'n. v. Stuart*,
    427 U.S. 529 (1976)...............................................................................11

*Newman v. Graddicki*,
    696 F.2d 796 (11th Cir. 1983) ......................................................................10

*Omar v. Harvey*,
    514 F. Supp. 2d 74 (D.D.C. 2007) ..................................................................11

*Osband v. Ayes*,
    2007 WL 3096113 (E.D. Cal. Oct 22, 2007) ........................................................11

*Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for the Dist. of Ariz.*,
    156 F.3d 940 (9th Cir. 1998) .......................................................................14

*Ray v. Turner*,
    587 F.2d 1187 (D.C. Cir. 1978).....................................................................17

*Richmond Newspapers Inc. v. Virginia*,
    448 U.S. 555 (1980)..............................................................................9, 12

*Shelton v. Tucker*,
　　364 U.S. 479 (1960)........................................................................................13

*Shingara v. Skiles*,
　　420 F.3d 301 (3d Cir. 2005)..............................................................................8

*Union Oil Co. v. Leavell*,
　　220 F.3d 562 (7th Cir. 2000) ...........................................................................15

*United States v. Antar*,
　　38 F.3d 1348 (3d. Cir. 1994)............................................................................13

*United States v. Aref*,
　　533 F.3d 72 (2d Cir. 2008)..............................................................................17

*United States v. Erie Cnty.*,
　　763 F.3d 235 (2d Cir. 2014)............................................................................10

*United States v. Poindexter*,
　　732 F. Supp. 165 (D.D.C. 1990) .....................................................................16

*United States v. Rosen*,
　　487 F. Supp. 2d 703 (E.D. Va. 2007) .............................................................16

*United States v. Simone*,
　　14 F.3d 833 (3d Cir. 1994).............................................................................11

*In re Wash. Post Co.*,
　　807 F.2d 383 (4th Cir. 1986) .........................................................9, 13, 14, 16, 18

*Wash. Post Co. v. Robinson*,
　　935 F.2d 282 (D.C. Cir. 1991) .................................................................. passim

**Statutes**

Classified Information Procedures Act, 18 U.S.C., App. 3 (2000)...............................16

**Other Authorities**

Raymond Bonner, *The CIA's Secret Torture*, N.Y. Rev. of Books (Jan. 11, 2007),
　　http://www.nybooks.com/articles/2007/01/11/the-cias-secret-torture......................................2

Raymond Bonner, *'Incommunicado' Forever: Gitmo Detainee's Case Stalled For
　　2,477 Days And Counting*, ProPublica (May 12, 2015, 6:00 AM),
　　https://www.propublica.org/article/guantanamo-detainee-case-stalled-for-
　　2477-days-and-counting ...............................................................................2

*Hearing Before the S. Select Comm. on Intelligence*, 111th Cong. 18 (statement of
　　General James Clapper), http://fas.org/irp/congress/2010_hr/clapper.pdf ..........................24

iv

Fred Kaplan, *Obama's Secrecy Problem*, Slate, (Apr. 15, 2016 10:48 AM),
  http://www.slate.com/articles/news_and_politics/war_stories/2016/04/obama_
  says_too_much_information_is_classified_irony_alert.html .................................................26

E. Macaskill & G. Dance, *NSA Files Decoded*, Guardian (Nov. 1, 2013) (massive
  scale of the NSA collection of citizen's telephone and email data kept from
  the American public through classification),
  http://www.theguardian.com/world/interactive/2013/nov/01/snowden-nsa-
  files-surveillance-revelations-decoded .................................................................................18

Office of Legal Counsel, *Memorandum for John Rizzo, Acting General Counsel
  of the Central Intelligence Agency: Interrogation of al Qaeda Operative*,
  (Aug. 1, 2002). .........................................................................................................................3

S. Select Comm. on Intelligence, *Committee Study of the Central Intelligence
  Agency's Detention and Interrogation Program*, Executive Summary at 21
  (declassified and released Dec. 3, 2014).................................................................................3

Stephen J. Schullhoffer, "Access to National Security Information under the U.S.
  Freedom of Information Act," ...............................................................................................17

*Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN
  10016* 11 (Mar. 27, 2007) ....................................................................................................21

The White House Office of the Press Secretary, *Press Conference by the
  President*, (Apr. 29, 2009), https://www.whitehouse.gov/the-press-
  office/news-conference-president-4292009.............................................................................3

The White House Office of the Press Secretary, *Statement by the President:
  Report of the Senate Select Committee on Intelligence* (Dec. 9, 2014),
  https://www.whitehouse.gov/the-press-office/2014/12/09/statement-president-
  report-senate-select-committee-intelligence ...........................................................................3

## PRELIMINARY STATEMENT

This habeas proceeding was brought by Zayn al-Abidin Muhammad Husayn more commonly known as Abu Zubaydah ("Zubaydah"), who is currently being detained at the U.S. military base at Guantanamo Bay, Cuba. Zubaydah is the first individual alleged to have been subjected to torture by the CIA in the aftermath of 9/11, on the direct approval of high-ranking government officials. The U.S. Government has now held Zubaydah without charge for more than fourteen years, during which time his capture, treatment, and continued confinement have been the subject of numerous investigations and reports, including by international tribunals, human rights groups, and the U.S. Senate.

Zubaydah filed a petition for a writ of habeas corpus in 2008 to challenge his continuing confinement. However, more than eight years later, virtually none of the motions he has filed in connection with this proceeding have been ruled on and virtually the entire docket remains unavailable for public inspection. The systematic, open-ended denial of access to the court records in this proceeding plainly violates the public's First Amendment right of access. Journalist Raymond Bonner ("Bonner") now seeks permission to intervene for the limited purpose of enforcing the public access right and unsealing the court records of this case.

Though nearly the entire docket is unavailable for public inspection, Bonner seeks to gain access to those records most relevant to furthering the public understanding of the competing claims being made in this proceeding. Specifically, Bonner seeks access to: (a) twenty-eight records that have never been made available to the public in whole or in part, but which do not appear to have ever been sealed by the court, including two court orders and six *ex parte* filings; (b) six records that have been "sealed" by the court; and (c) an unredacted copy of the Government's factual return. Each of these records is subject to the public's constitutional right

of access, yet as far as can be determined from the docket, the Government has made no

demonstration that a proper basis exists to keep these records from the public.

## BACKGROUND

This motion for access to judicial records is brought by Raymond Bonner, a Pulitzer

Prize-winning investigative journalist and author with over 35 years of professional experience.

Bonner Decl. ¶ 2. Throughout his career, Bonner has reported and written for major publications,

including the *New York Times*, *New Yorker*, *Atlantic*, *New York Review of Books*, and *New York

Times Book Review*. *Id*. He is currently a contributing writer for *ProPublica*, an independent,

non-profit, online newsroom based in New York. *Id*. at ¶ 1. Bonner has written extensively about

international security, the U.S. War on Terror, the treatment of terrorist suspects in the aftermath

of 9/11, and U.S. detention practices at Guantanamo Bay, Cuba. *Id.* at ¶ 4.

Bonner has closely followed this habeas proceeding. *ProPublica* and *Politico* recently co-

published an article by Bonner regarding the status of this habeas proceeding and Zubaydah's

detention.[1] This article raised questions about the extreme delay in resolving Zubaydah's

petition, which has been pending now for more than seven years with virtually no movement.

The article noted that important, substantive documents in this case remain entirely unavailable

to the public and the majority of Zubaydah's motions have not been resolved. *Id.*

---

[1] Raymond Bonner, *'Incommunicado' Forever: Gitmo Detainee's Case Stalled For 2,477 Days
And Counting*, ProPublica (May 12, 2015, 6:00 AM),
https://www.propublica.org/article/guantanamo-detainee-case-stalled-for-2477-days-and-
counting.

### A.     The Substantial Public Interest In This Proceeding

According to public, U.S. government documents, Zubaydah has been held in U.S. custody since 2002.[2] While in CIA custody between 2002 and 2006, he was subjected to interrogation methods which the President has now banned as "torture,"[3] and which the Chairman of the Senate Select Committee on Intelligence has characterized as torture "under any common meaning of the term."[4] Zubaydah was the test subject of these controversial methods in two senses: he was the first detainee to physically experience them, and he was the prototypical example the Office of Legal Counsel relied upon to argue that the methods themselves were legal.[5]

The Government has acknowledged that Zubaydah was captured in Faisalabad, Pakistan, on March 28, 2002, in a raid conducted by "Pakistani government authorities, working with the CIA." *SSCI Report*, Executive Summary at 21; *see DOJ Report* at 67. Zubaydah was shot and wounded during the raid. *Id.* Shortly thereafter, he was rendered from Pakistan to a secret facility

---

[2] U.S. Dep't of Justice, Off. of the Inspector General, *A Review of the FBI's Involvement and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq* 67 (2008) [hereinafter "*DOJ Report*"].

[3] Office of the Press Secretary, *Press Conference by the President,* The White House (Apr. 29, 2009), https://www.whitehouse.gov/the-press-office/news-conference-president-4292009; *see also* The White House Office of the Press Secretary, *Statement by the President: Report of the Senate Select Committee on Intelligence* (Dec. 9, 2014), https://www.whitehouse.gov/the-press-office/2014/12/09/statement-president-report-senate-select-committee-intelligence.

[4] S. Select Comm. on Intelligence, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, Foreword at 4 (declassified and released Dec. 3, 2014) [hereinafter "*SSCI Report*"].

[5] *See generally* Office of Legal Counsel, Memorandum for John Rizzo, *Acting General Counsel for the Central Intelligence Agency: Interrogation of al Qaeda Operative*, U.S. Dep't of Justice, (Aug. 1, 2002).

in Thailand controlled by the CIA.[6] He was subsequently rendered to other secret facilities in Poland and elsewhere abroad. *Zubaydah v. Poland* at 164-66.

During his detention in secret CIA prisons, Zubaydah was used as the first test subject for the CIA's torture-based interrogation methods, *Zubaydah v. Poland* at 163; *see SSCI Report*, Executive Summary at 46; *see also id.* at 33 (CIA use of SERE-school techniques modeled after North Vietnamese "physical torture"). He was subjected to suffocation by waterboarding at least 83 times. *SSCI Report* at 118 n.698. This treatment caused Zubaydah to become "completely unresponsive, with bubbles rising through his open, full mouth." *Id.* at 43-44. At various times during his CIA detention, Zubaydah was kept nude, *id.* at 29, deprived of sleep, *id.*, placed in stress positions, *id.* at 42, locked in "confinement boxes" for over 290 hours, *id.*, slapped and grabbed by the face, *id.* at 41, shackled and hooded, *id.* at 40, harassed with around-the-clock bright light and loud noise or music, *id.* at 464, slammed against walls, *id.* at 40-41, denied access to solid food, *id.* at 493, subjected to forcible "rectal fluid resuscitation," *id.* at 488, and threatened with harm to members of his family, *id.* at 487. "Zubaydah lost his left eye while in CIA custody." *Id.* at 491.

Although mistaken intelligence once led U.S. agencies to "miscast Abu Zubaydah as a 'senior al-Qa'ida lieutenant,'" *id.* at 430, the Government no longer contends that he was even a member of Al-Qaeda, *id.* at 410. As a result of the CIA's mistaken premise that Zubaydah was a senior Al-Qaeda operative, Zubaydah was subjected to an ordeal with perhaps no precedent in U.S. history. *See SSCI Report*, Executive Summary at 31. Despite his severe interrogations, Zubaydah never provided any information related to an impending terrorist attack and the CIA ultimately "concluded [that] this was information Abu Zubaydah did not possess." *Id.* at 31.

---

[6] *Case of Husayn (Abu Zubaydah) v. Poland*, Application No. 7511/13, Judgment 123 (Eur. Ct. H.R. July 24, 2014) [hereinafter *Zubaydah v. Poland*]; *cf. SSCI Report* at 22-23.

Zubaydah was held by the CIA from 2002 until he was transferred to the custody of the

Department of Defense on September 5, 2006. *Id.* at 46. Since then, Zubaydah has been detained

at the military detention facility at the U.S. Naval Station at Guantanamo Bay. *Zubaydah v.*

*Poland* at 189. Even after 14 years in U.S. custody, Zubaydah has never been charged with any

crime. The current habeas action represents Zubaydah's attempt to procure judicial review of his

indefinite detention.

**B.**     **The Sealed Records at Issue**

Zubaydah brought his petition for writ of habeas corpus ("Petition") on August 6, 2008,

Dkt. 1, shortly after the Supreme Court held in *Boumediene v. Bush* that Guantanamo detainees

are entitled to the fundamental procedural protections of habeas corpus.  553 U.S. 723, 771

(2008). Zubaydah's Petition was sealed in its entirety at the outset. Dkt 1. Since then, the

Government and Zubaydah have litigated issues related to discovery, the designation of

classified information, and allegedly illegal activity by the CIA. Yet, the vast majority of both

parties' substantive filings are either sealed or otherwise administratively unavailable for public

viewing.

The governing Protective Order creates special procedures for filing records on the public

docket in this case. Jan. 9, 2009 Order, Dkt. 78. Both parties must initially submit their filings

under seal to a Court Security Officer ("CSO") and enter a "Notice of filing" on the ECF docket

that informs the Court and the public that a motion has been filed, but does not include any

substantive information other than a brief description of the motion's contents. Dkt. 78 at ¶¶ 48,

49(a). The CSO is then required to forward the sealed record to "the appropriate government

agencies" to screen for classified or "protected" information. Dkt. 78 at ¶ 48(a). Upon

completion of the classification review, the agencies must post the record in its entirety on ECF,

unless the agencies determine that the record contains classified or protected information, in

which case the CSO and agencies work together to prepare a redacted version for public filing. *Id.* If the entire document is classified, the parties are directed to add a new entry to the docket announcing that determination. *Id.* at ¶ 48(b). Thus, regardless of the outcome of the classification review, the docket should indicate the completion and outcome of the review. While the Protective Order does not specify how long the agencies have to conduct this classification review, it requires that a "version of the pleading or document appropriate for . . . the public record" be filed "[a]s soon as practicable following the original filing date." Dkt. 78 at ¶¶ 49(a), 50(a).

There are currently at least 56 substantive records that apparently have never been reviewed for their classification status, some filed as long as eight years ago, Bonner Decl. ¶¶ 11-12. These include six records that the Government has filed *ex parte* and *in camera*, whose status is unknown, but which are also unavailable on the docket. *Id.* at ¶ 11. An additional six documents are listed on the docket as "SEALED," indicating that they apparently have been sealed pursuant to a court order. Dkts. 1, 191, 203, 275, 287, 300. Some documents that have been made publicly available are riddled with redactions, without explanation for the basis of the redactions, including significantly the Government's Factual Returns. *See* Dkt. 204.

The public record contains no findings of fact or other explanation for the wholesale sealing of records from public view. This blanket sealing prevents the public from understanding what allegations Zubaydah has made, the Government's responses, or the reasons for complete judicial inaction. Through this motion, Bonner seeks to unseal nineteen records that are listed on the docket as "Noticed," but which have never been released in substance, two classified court orders, six *ex parte* filings by the Government, and 6 records that have been sealed. He also asks the Court to review the many redactions in the public version of the Government's Factual

Return that purports to justify Zubaydah's continuing confinement. These records are all subject to the public's constitutional and common law rights of access, and the Government has shown no proper basis for limiting those rights. In the alternative, Mr. Bonner respectfully requests this Court to make factual findings on the public record justifying the bases for denying access with sufficient particularity to enable appellate review.

**C.   Previous Press Intervention in This Proceeding**

This is not the first time that members of the press have sought access to the records of this proceeding. In 2009, the *Associated Press*, *New York Times*, and *USA Today* (the "Press Interveners") sought to intervene for the limited purpose of opposing a motion by the Government to designate all information in its factual returns in all Guantanamo proceedings as "protected" from public disclosure. *See Mot. to Intervene*, Dkt. 90. Then Chief Judge Hogan granted both the intervention motion, Minute Order of Apr. 7, 2009, and Press Interveners' substantive request for relief, requiring the Government to justify to the court its basis for seeking to seal any unclassified information. Order, Dkt. 173 at 19.

Of direct relevance to Mr. Bonner's current motion for access, Chief Judge Hogan held both that (a) the press had standing to intervene and enforce public access rights, and (b) the First Amendment and common law access rights apply to the judicial records of this habeas proceeding. *See* Dkt. 173 at 11, 17, 18-19. This ruling constitutes law of the case. In his earlier decision, Chief Judge Hogan rejected the Government's "attempt[] to broadly designate" unclassified information as "protected" and subject to sealing. *Id.* at 5. That decision stresses the "critical importance and relevance" of habeas proceedings to the public, and underscores that publicly disclosing records from the Guantanamo proceedings "would enlighten the citizenry and improve perceptions of the proceedings' fairness." *Id.* at 15.

The Press Interveners in that earlier proceeding did not challenge provisions of the Protective Order that allow classified information submitted to the court to be sealed in the first instance, objecting at that time only to the Government's request to seal *un*classified material. *See id.* at 4. Judge Hogan thus did not "choose[] . . . to question, generally, government determinations that providing classified information to the public would cause serious damage to national security." *Id.* at 16. His decision, however, does not foreclose scrutiny of the Government's classification determinations and whether they justify sealing specific court records—the issues now presented by this motion.

## ARGUMENT

### I.
### BONNER HAS A RIGHT TO INTERVENE TO
### ENFORCE THE RIGHT OF ACCESS TO JUDICIAL RECORDS

As was recognized earlier in this case, members of the news media have standing to enforce the right of public access to judicial records, and a right to be heard on their sealing. *See* Dkt. 173 at 11, 17, 18-19; *Shingara v. Skiles*, 420 F.3d 301, 305 (3d Cir. 2005) (granting newspaper's motion to vacate protective order "so that it can report the news"). The Supreme Court has repeatedly held that "representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion" from judicial proceedings. *Globe Newspapers Co. v. Superior Court*, 457 U.S. 596, 609 n.25 (1982) (internal quotation marks and citations omitted); *see also In re Knight Publ'g Co.*, 743 F.2d 231, 234 (4th Cir. 1984) (same). This right to be heard undeniably extends to the sealing of court records. *See Wash. Post Co. v. Robinson*, 935 F.2d 282, 289 (D.C. Cir. 1991) (in safeguarding the First Amendment access right, courts "must promptly allow interested persons an opportunity to be heard" on a motion to seal).

Intervention is the appropriate procedural vehicle for journalists to vindicate public access rights. "[E]very circuit court that has considered the question has come to the conclusion that nonparties may permissively intervene for the purpose of challenging confidentiality orders." *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998); *see also In re Application of Newsday, Inc.*, 895 F.2d 74, 75, 79 (2d Cir. 1990); *In re Wash. Post Co.*, 807 F.2d 383, 388 n.4 (4th Cir. 1986).

Movant Raymond Bonner is the proper party to assert the access right because he is a professional journalist who is being harmed by the massive sealing of records in this case. Because Bonner's lack of access to these court records prevents him from publishing about this case, he is suffering from the denial of public access to these proceedings and therefore has standing to intervene. *See In re Guantanamo Bay Detainee Litig.*, 630 F. Supp.2d 5 (D.D.C. 2009) (Dkt. 173 at 4). This Court should therefore grant Bonner leave to intervene for the limited purpose of enforcing the public access right. *See United States v. Moussaoui*, 65 Fed. Appx. 881, 885, 891 (4th Cir. 2003) (granting news coalition's motion to intervene for limited purpose of obtaining access to certain records).

## II.
### THERE IS A QUALIFIED FIRST AMENDMENT RIGHT OF ACCESS TO THIS PROCEEDING AND ITS RECORDS

#### A. The Constitutional Right Of Access Applies To Habeas Proceedings And Their Records

The First Amendment's express guarantees of "free speech, freedom of the press, and the right to petition the government carry with them an implicit right of public access to particular government information." *Dhiab v. Obama*, 70 F. Supp. 3d 486, 492 (D.D.C. 2014), citing *Richmond Newspapers Inc. v. Virginia,* 448 U.S. 555, 575-76 (1980). This right of access is based upon "the common understanding that a major purpose of [the First] Amendment was to

protect the free discussion of government affairs . . . to ensure that the individual citizen can effectively participate in and contribute to our republican form of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (internal quotation marks and citations omitted).

The Supreme Court has developed a so-called "experience and logic" test to determine where the constitutional access right applies. *Press-Enterprise II*, 478 U.S. at 9. Under the two-part test, the constitutional right of access attaches to a government proceeding if "the place and the process have historically been open to the press and general public" and public access "plays a significant positive role in the function of the particular process." 478 U.S. at 7-8 (experience and logic confirm right of access to pre-trial hearing); *see also Press-Enterprise I*, 464 U.S at 505-10 (experience and logic confirm access right to jury voir dire).

Once the right is determined to apply to a type of government proceeding, the right necessarily extends to those records that are fundamental to the proceeding. *See, e.g.*, *Hartford Courant Co. v. Pellegrino*, 380 F.2d 83, 96 (2d Cir. 2004) ("[D]ocket sheets enjoy a presumption of openness and [] the public and the media possess a qualified First Amendment right to inspect them"); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006) (applying the constitutional access right to motion papers and documents submitted on substantive motions); *In re N.Y. Times Co.*, 828 F.2d. 110, 113-14 (2d Cir. 1987) (pretrial motions papers). It is now firmly settled that wherever the right attaches, "[t]he first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *Robinson*, 935 F.2d at 287.

10

It has already been determined that the First Amendment access right extends to the records filed in this habeas proceeding.[7] Order, Dkt. 173, at 11. *See also, e.g.*, *Newman v. Graddick*, 696 F.2d. 796, 801 (11th Cir. 1983) (applying the First Amendment right of access to proceedings challenging "conditions of confinement"); *Osband v. Ayes*, 2007 WL 3096113, at * 1 (E.D. Cal. Oct 22, 2007) (applying constitutional right to habeas proceeding). Judge Hogan recognized that disclosure of the factual returns would "play a significant positive role" and would benefit both parties because "[t]he government's detention decisions would gain the legitimacy that accompanies transparency." Dkt. 173, at 16; *see also, Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring) ("Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges"). Indeed, openness improves the functioning of habeas proceedings in all the same ways it improves other trial-type proceedings, and is especially important in the habeas context where an individual's liberty is at stake. *See Omar v. Harvey*, 514 F. Supp. 2d 74, 78 (D.D.C. 2007) ("There is no higher duty of a court, under our constitutional system, than a careful processing and adjudication of petitions for writs of habeas corpus." (quoting *Harris v. Nelson*, 394 U.S. 286, 292 (1969)).

**B.     The Constitutional Right of Access
       Is a Right of *Contemporaneous* Access**

The Court of Appeals has long stressed the "critical importance of *contemporaneous* access" to court records. *Robinson*, 935 F.2d at 287.  The access right attaches as soon as a

---

[7] Courts have also upheld access to habeas records under common law which provides an independent basis for relief. *See Gabrion v. United States*, No. 1:15-CV-447, WL 2354745, at * 1 (W.D. Mich. May 15, 2015) (applying common law right); *Ashworth v. Bagley*, 351 F. Supp. 2d 786, 792 (S.D. Ohio 2005) (same). Because the First Amendment right applies, and is more protective than the common law, the Court need not separately consider the common law right. *United States v. Erie Cnty.*, 763 F.3d 235, 241 (2d Cir. 2014).

document is filed with the court, and even short delays can violate the access right. *See, e.g.*, *United States v. Simone*, 14 F.3d 833, 842 (3d Cir. 1994) (ten-day delay in release of transcript violates access right); *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 507 (1st Cir. 1989) ("even a one to two day delay impermissibly burdens the First Amendment"); *Associated Press v. U.S. Dist. Court*, 705 F.2d 1143, 1147 (9th Cir. 1983) (48 hour delay in public release of filed documents violates the access right); *see also Lugosch*, 435 F.3d at 126-27 ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (internal citations omitted).

Undue delays in affording access to court records are also inconsistent with the media's "traditional function of bringing news to the public promptly." *Neb. Press Ass'n v. Stuart*, 427 U.S. 529, 560-61 (1976). As the Seventh Circuit has explained: "The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression." *Grove Fresh Distrib., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir.1994) (internal citations omitted).

### III.
### THE MASSIVE SEALING IN THIS CASE
### VIOLATES THE FIRST AMENDMENT RIGHT OF ACCESS

**A.     A Strict Constitutional Standard
        Governs Any Limitation Of The Access Right**

> **1.     The Supreme Court has articulated a four-part test that must be satisfied in order to overcome the First Amendment right of access.**

The Government carries a "heavy burden" to seal the judicial record and defeat the public's qualified right of access. *Dhiab*, 70 F. Supp. 3d at 496. In a series of decisions defining the scope of the access right, the Supreme Court identified four standards that govern any request to limit the constitutional access right.

*First*, the party seeking to deny access must establish a *substantial probability* that openness will cause harm to a compelling interest. *See, e.g.*, *Richmond Newspapers*, 448 U.S. at 581; *Press-Enterprise I*, 464 U.S. at 510; *Press-Enterprise II*, 478 U.S. at 13-14; *Robinson*, 935 F.2d at 287. In *Press-Enterprise I*, the Supreme Court stressed that a denial of access is permissible only when "essential to preserve higher values." 464 U.S. at 510. In *Press-Enterprise II* it held specifically that a "reasonable likelihood" of harm standard is not sufficiently protective of the access right, and directed that a "substantial probability" standard must be applied. 478 U.S. at 14-15. *See, e.g.*, *In re Wash. Post Co.*, 807 F.2d at 392-93 (requiring "substantial probability" of harm to national security to close a hearing); *Robinson*, 935 F.2d at 290-92 (requiring "substantial probability" of harm to defendant to seal a plea agreement); *United States v. Antar*, 38 F.3d 1348, 1359-60 (3d. Cir. 1994) (requiring "substantial probability" of harm to jurors to seal voir dire transcript).

*Second*, there must be *no alternative that can adequately protect the threatened interest*. A "trial judge must consider alternatives and reach a reasoned conclusion that closure is a preferable course to follow to safeguard the interests at issue." *In re The Herald Co.*, 734 F.2d 93, 100 (2d Cir. 1982). *See also, e.g.*, *Press-Enterprise II*, 478 U.S. at 13-14 (faulting the California Supreme Court for "fail[ing] to consider whether alternatives short of complete closure" of a hearing existed).

*Third*, any restriction on access must be *narrowly tailored*. Even "legitimate and substantial" governmental interests "cannot be pursued by means that broadly stifle fundamental personal liberties, when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488 (1960). Thus, where no adequate alternative to closure or sealing exists, any limitation imposed on public access must be no broader than necessary to protect the threatened interest.

*See, e.g.*, *Press-Enterprise II*, 478 U.S. at 13-14; *Robinson*, 935 F.2d at 287; *Lugosch*, 435 F.3d at 124.

*Fourth*, any order limiting access must be *effective in protecting the threatened interest* for which the limitation is imposed. The party seeking secrecy must demonstrate "that closure would prevent" the harm sought to be avoided. *Press-Enterprise II*, 478 U.S. at 14. In particular, a sealing order cannot stand if "the information sought to be kept confidential has already been given sufficient public exposure." *In re The Herald Co.*, 734 F.2d at 101; *see also Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1146 (9th Cir. 1983) (requiring "a substantial probability that closure will be effective in protecting against the perceived harm" (citation omitted)).

If a court concludes that these four burdens have been met, it remains the duty of the court to make factual findings to justify the limitation on the constitutional right. *See, e.g.*, *In re Wash. Post Co.*, 807 F.2d at 392 (requiring the court to make "specific factual findings" before sealing documents or a courtroom); *Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for the Dist. of Ariz.*, 156 F.3d 940, 949 (9th Cir. 1998) (same). "Broad and general findings by the trial court . . . are not sufficient to justify closure." *N.Y. Times*, 828 F.2d at 116; *see also Press-Enterprise II*, 478 U.S. at 15 ("[C]onclusory assertion" of a fair trial right cannot defeat the First Amendment access right). Rather, the findings must be "specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enterprise I*, 464 U.S. at 510; *see also*, *Press-Enterprise* II, 478 U.S. at 13-14; *In re The Herald Co.*, 734 F.2d at 100; *Associated Press*, 705 F.2d at 1147.

**2.      The Government does not carry its burden merely by asserting that a judicial record contains classified information.**

The same constitutional access right applies to judicial records regardless of their content, even when the content is classified. *See, e.g.*, *Washington Post*, 87 F.2d at 392-93 (faulting the

district court for sealing classified affidavit without engaging in the required constitutional

analysis). As an element of the supreme law of the land, the constitutional access right

necessarily supersedes any contrary law, rule, or regulation, including Executive Order 13526

under which Executive Branch officers designate information as "classified." *See*, e.*g.*, *In re N.Y.*

*Times*, 828 F.2d 110, 115 (2d Cir. 1987) ("[O]bviously, a statute cannot override a constitutional

right"). Therefore, where a judicial record subject to the constitutional access right contains

classified information, the court must make its *own* determination that the constitutional

standards are satisfied before public access to the record may properly be denied. *See Bismullah*,

501 F.3d at 188 (citations omitted) (recognizing that "[i]t is the court, not the Government, that

has discretion to seal a judicial record, which the public ordinarily has the right to inspect and

copy").  As Judge Kessler explained in *Dhiab*, 70 F. Supp. 3d at 496, "it is our responsibility, as

judges, as part of our obligation under the Constitution, to ensure that any efforts to limit our

First Amendment protections are scrutinized with the greatest of care."

　　While national security constitutes a "compelling interest" sufficient to require the

sealing of judicial records, an independent judicial assessment of the need for secrecy remains

critically important. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J.,

concurring) ("The word 'security' is a broad, vague generality whose contours should not be

invoked to abrogate the fundamental law embodied in the First Amendment."); *accord Union Oil*

*Co. v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000) ("[D]isputes about claims of national security

are litigated in the open."). Otherwise, an "uncritical deference" to "vague, poorly explained

arguments for withholding broad categories of information" can quickly eviscerate "the

principles of openness in government." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331

F.3d 918, 937 (D.C. Cir. 2003) (Tatel, J., dissenting).

Case law in federal courts under the Classified Information Procedures Act, 18 U.S.C.,

App. 3 (2000) ("CIPA"), confirms that the fact of classification does not automatically trump the

constitutional access right.[8] CIPA does not purport to override the requirements of the First

Amendment with respect to public access to a criminal prosecution—nor could it. *See, e.g.*,

*United States v. Rosen*, 487 F. Supp. 2d 703, 710, 716-17 (E.D. Va. 2007) (a statute cannot

defeat a constitutional right and "government's *ipse dixit* that information is damaging to

national security is not sufficient to close the courtroom doors"). As the Fourth Circuit aptly

noted in applying CIPA procedures:

> [T]he mere assertion of national security concerns by the Government is
> not sufficient reason to close a hearing or deny access to documents.
> Rather, [courts] must independently determine whether, and to what
> extent, the proceedings and documents must be kept under seal.

*United States v. Moussaoui*, 65 F. App'x 881, 887 (4th Cir. 2003) (unpublished) (citations

omitted). Thus, to seal classified information where CIPA is involved, the government must still

make "a sufficient showing that disclosure of the information sought would impair identified

national interests in substantial ways," and the court must conduct an "independent review" to

determine that closure is "narrowly tailored to protect national security." *United States v. Aref*,

533 F.3d 72, 82-83 (2d Cir. 2008); *In re Wash. Post*, 807 F.2d at 393 (district court not excused

under CIPA "from making the appropriate constitutional inquiry"); *United States v. Poindexter*,

---

[8] CIPA, *inter alia*, permits a closed hearing to determine the use, relevance, and admissibility of classified information at trial, *id.* at § 6. If a judge determines classified information is needed, and the Government does not object to its introduction, CIPA allows the information to be admitted into evidence *in a public proceeding*, even though it remains fully classified. *Id.* § 8. If the Government does object to introduction of the classified evidence, CIPA requires the Government either to declassify the information, or to propose adequate evidentiary alternatives. *Id.* § 6(c). If it fails to do so, CIPA directs the court to impose sanctions on the Government for preventing the use of the needed classified information. *Id.* § 6(e). These CIPA provisions recognize that the Executive may not simply require a court to close a proceeding or seal a record because it contains classified information.

732 F. Supp. 165, 167 n.9 (D.D.C. 1990) ("CIPA obviously cannot override a constitutional right of access.").

Careful judicial enforcement of the access right is particularly important given "the well-documented practice of classifying as confidential much relatively innocuous or noncritical information." *Halperin v. Kissinger*, 606 F.2d 1192, 1204 n.77 (D.C. Cir. 1979) (explaining that the court "cannot conclude automatically that revelation of all 'top secret' documents will endanger national security"), *aff'd by an equally divided court*, 452 U.S. 713 (1981). Many studies have concluded that a great deal of information whose disclosure would be entirely harmless is nonetheless "classified" by the government. These studies suggest that this amounts to between 50%[9] and 90%[10] of classified information being not properly classified. Members of Congress specifically cited the "proclivity for overclassification" as the reason for requiring *de novo* judicial review in FOIA cases to guard "against the potential for mischief and criminal activity under the cloak of secrecy" when national security is asserted as the basis to keep information from the public. *Ray v. Turner*, 587 F.2d 1187, 1209 (D.C. Cir. 1978) (quoting Source Book: Legislative History, Texts and Other Documents (Comm. Print 1975) at 460-61).

Indeed, instances of classification made in excess of authority to conceal unlawful behavior or prevent embarrassment are well documented. *See, e.g.*, *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139-40 (1951); E. Griswold, *Secrets Not Worth Keeping*,

---

[9]  *See Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing*, Hearing Before the Subcomm. on National Security, Emerging Threats, and International Relations of the Comm. on Government Reform, 108th Cong. 263 at 82-83 (2004) (statement of J. William Leonard, Director, Information Security Oversight Office, National Archives and Records Administration).

[10]  *See* Stephen J. Schullhoffer, "Access to National Security Information under the U.S. Freedom of Information Act," at 11 ("[M]ost assessments suggest that roughly nine-tenths of classified material does not need to be so treated." (internal quotation marks omitted).)

Wash. Post. Feb. 15, 1989, at A25 (demonstrating that the principal concern of most classifiers is "governmental embarrassment of one sort or another"). Equally well documented are examples of public debate about civil rights and liberties being thwarted by the classification of information vital to those debates.[11]  Given this reality, the fact of classification alone is plainly insufficient to defeat the public access right. *Cf. Halperin*, 606 F.2d at 1204 n.77. "A blind acceptance by the courts of the government's insistence on the need for secrecy . . . would impermissibly compromise the independence of the judiciary and open the door to possible abuse." *Wash. Post*, 807 F.2d at 392.

In sum, the judicial records in this proceeding cannot properly be sealed based only upon assertions from the Executive that information is properly classified and that disclosure would harm national security. *See Id.*, 807 F.2d at 391-92 (rejecting the "notion that the judiciary should abdicate its decisionmaking responsibility to the executive branch whenever national security concerns are present"); *Dhiab*, 70 F. Supp. 3d at 495-96.  Rather, the court must be satisfied that the Government has established a probability of harm from the public release of the specific information at seeks to seal.  *See Press Enterprise II*, 478 U.S. at 14.

**B.      The Long-Term, Open-Ended Sealing of**
**Records In This Case Is Improper and Unjustifiable**

Zubaydah's docket currently indicates that 63 filings are being withheld in full from the public.  Zubaydah's original petition for writ of habeas corpus, filed on August 6, 2008, is the oldest such record. Dkt. 1. The Government has not explained why virtually all records in this

---

[11] *See, e.g.*, *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 104-08 (D.C. Cir. 2014) (surveying government efforts to shield the legal justifications relied upon in carrying out targeted killing); E. Macaskill & G. Dance, *NSA Files Decoded*, The Guardian (Nov. 1, 2013) (massive scale of the NSA collection of citizen's telephone and email data kept from the American public through classification), http://www.theguardian.com/world/interactive/2013/nov/01/snowden-nsa-files-surveillance-revelations-decoded.

case have remained unavailable for public inspection, year after year, and the Court has made no findings to justify this massive secrecy. Even the few substantive records that are available have been unilaterally redacted by the Government in large part, without explanation. *See, e.g.*, Dkt. 204 (declassified factual return). As far as can be determined, the Court has never reviewed these redactions. Bonner therefore requests the unsealing and public filing of each of the records identified in Exhibits B and C to his declaration, and unsealing of the redacted portions of the Government's Factual Returns (Dkt. 204).

       **1.      The challenged sealings and redactions are procedurally improper.**

While the Protective Order provides procedures for reviewing records and making them publicly available to the greatest extent possible, *see* Dkt. 78, ¶¶ 48-50, in practice the records of this case are being withheld in their entirety and indefinitely. The only document for which the Government gave any estimate for when it would be publicly available was Zubaydah's Amended Petition for Writ of Habeas Corpus, filed on August 29, 2008. Dkt. 19. In response to this Court's order for the Government to "reveal[]when the classification review process . . . will be complete," Dkt. 273 at 3, the Government on April 22, 2011 estimated that it would be completed by June 17, 2011, Dkt. 280 at 6. That review apparently remains incomplete today, five years overdue.

Many of the records that are still awaiting classification review were filed *years* ago. These records are clearly not being made available "contemporaneously," and the Court has made no findings of fact to justify withholding them from the public, as the constitutional access right requires. Thus, from a procedural perspective, the massive sealing of virtually all records in this lawsuit is plainly improper.

19

**2.      The challenged sealings and redactions are unjustifiable.**

A proper judicial review of the Government's sealings and redactions is also likely to

reveal that no proper basis exists for denying access to many of these records because there is no

"substantial probability" that disclosing the information they contain will cause harm to national

security.

**(a)      There is no proper basis for sealing and redacting publicly available
information.**

As a threshold matter, there is no basis for sealing, redacting, or otherwise withholding

information that is already publicly available, because the release of information that is widely

known cannot possibly result in meaningful harm to national security. *See, e.g.*, *N.Y. Times Co.

v. DOJ*, 756 F.3d at 119-120 (rejecting the Government's assertion that harm would result from

releasing a legal memorandum, because the contents of the memorandum were publicly

available). "[W]hen the sealed facts are already public, maintaining documents under seal is only

appropriate when, despite what the public already knows, the documents' release would *still* give

rise to a substantial probability of harm." *Dhiab*, 70 F. Supp. 3d at 496 (citing *Robinson*, 935

F.2d at 291-92).

Withholding already-public information will also necessarily fail the *effectiveness* prong

of the governing four-part test. *See supra* Part III.A.1. If the information in question is already

public, sealing it in this proceeding does not make it secret again—sealing abridges a

constitutional right for no purpose. *See Press-Enterprise II*, 478 U.S. at 14 (holding that the party

seeking secrecy must show "that closure would prevent" the purported harm). Records simply

cannot be sealed if "the information sought to be kept confidential has already been given

sufficient public exposure." *In re The Herald Co.*, 734 F.2d at 101.

In the present case, a prodigious amount of information about the capture and treatment of Abu Zubaydah by the Government already has been publicly documented and acknowledged. The following summarizes by way of example some selected categories of information about Zubaydah that are public and thus cannot be properly sealed or redacted in this proceeding:

### Zubaydah's Capture and Detention:

Zubaydah was captured in a raid by Pakistani and U.S. forces in Faisalabad, Pakistan, in late March, 2002. *DOJ Report at* 67; *SSCI Report*, Executive Summary, at 46.  During this operation, Zubaydah was shot "several times in the groin, thigh and stomach, which resulted in very serious wounds." *Zubaydah v. Poland* at 32. Zubaydah told a U.S. military panel in 2007 that neither he nor his companions fired back during the raid "because [they] had no guns."[12]

### Locations of Zubaydah's Detention:

From his capture in March 2002 until September 2006, Zubaydah was detained at CIA "black sites" in secret locations around the world. *Zubaydah v. Poland* at 32. He was first transferred from Pakistan to a CIA facility in Bangkok, Thailand, code-named "CATSEYE," and then transferred again in December 2002 to a CIA prison in Stare Kiejkuty, Poland. *Id.* at 123, 159, 162. The CIA transferred him out of Poland to another CIA detention facility on September 22, 2003. *Id.* at 126, 151. In September 2006, Zubaydah was transferred to the U.S. naval base at Guantanamo Bay, Cuba, where he remains today. *Zubaydah v. Poland* at 43.

### Zubaydah's Torture by the CIA:

The CIA initially held Zubaydah in "total isolation" and deprived him of clothes and sleep in order to create a "sense of hopelessness." *SSCI Report*, Executive Summary, at 29. He

---

[12] *Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016* 11 (Mar. 27, 2007). This document was released through an ACLU FOIA request and is available at: https://www.aclu.org/files/pdfs/safefree/csrt_abuzubaydah.pdf

was subjected to forcible rectal resuscitation and he was threatened with harm to members of his family. *Id.* at 487-88.

On August 4, 2002, **"**the CIA began subjecting [Zubaydah] to enhanced interrogation techniques" "on a near 24-hour-per-day basis. *Id.* at 40, 52 n.256. He was placed in "stress positions," locked in a coffin for hours, slammed against walls, and waterboarded. *Id.* at 40-42. Over the course of his captivity, Zubaydah was waterboarded at least 83 times by the CIA. *Id.* at 118 n.698.

### *The CIA's Response to Zubaydah's Deteriorating Health:*

Despite a medical assessment on August 15, 2002 that the CIA's harsh treatment was causing a "steady deterioration" of Zubaydah's surgical wound, he was provided only "absolute minimum wound care." *Id.* at 111 & n.649. This treatment was in accordance with directives from CIA Headquarters "that the interrogation process would take "precedence" over Abu Zubaydah's medical care." *Id.* at 111.

At some point during Zubaydah's CIA detention, he lost his left eye. *Id.* at 491. On October 2002, interrogators requested that his right eye be tested, explaining that "this request is driven by our intelligence needs vice humanitarian concern for AZ." *Id.*

In July 2002, Zubaydah's CIA interrogators sought assurances from headquarters before implementing certain "planned psychological pressure techniques." *Id.* at 35. CIA headquarters responded:

> There is fairly unanimous sentiment within HQS that [Abu Zubaydah] will never be placed in a situation where he has any significant contact with others and/or has the opportunity to be released. While it is difficult to discuss specifics at this point, all major players are in concurrence that [Abu Zubaydah] should remain incommunicado for the remainder of his life.

*Id.* (alterations in original).

\* \* \* \* \*

These details are a mere sampling of the publicly available information about Zubaydah and his experiences under CIA custody; in the Senate Torture Report alone, his name appears on 199 pages of the 525-page report. *SSCI Report*. To the extent that the sealed records contain similar or identical information, sealing that information is unjustifiable because its release would not entail a "substantial probability of harm." *Dhiab*, 70 F. Supp. 3d at 496.

The passage of time further undercuts the Government's "substantial harm" justification for withholding the records of this proceeding. The Factual Returns, for example, were redacted and declassified for public release on July 29, 2009. *See* Dkt. 204. Since then, a staggering quantity of new information regarding Abu Zubaydah has become public through the declassified sections of the SSCI Report, released to the public on December 3, 2014. Additional information became public through the 2013 European Court of Human Right case *Zubaydah v. Poland*, which thoroughly documents Zubaydah's activities as well has his capture, detention, renditions, and treatment by the U.S. government. Thus, even if information was properly redacted from the Government's Factual Return in 2009, the extensive subsequent revelations of information have rendered many of those redactions unjustifiable.

Because no harm to national security can result from the release of publicly available information, both the categorical sealing of records and extensive redactions of publicly available information violate the First Amendment right of public access to these records. The Court should review all sealed and redacted records and release forthwith those containing information that is publicly available.

**(b)    The potential for embarrassment to government agencies is not a valid reason for withholding information.**

Even facts that are not publicly known cannot properly be withheld if the reason for doing so is to avoid embarrassment or to prevent the disclosure of wrongdoing. Executive Order 13526 explicitly prohibits agencies from classifying information "in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; . . . or (4) prevent or delay the release of information that does not require protection in the interest of the national security." Exec. Order 13526, dated Dec. 29, 2009, at § 1.7.

The DNI has publicly acknowledged that agencies classify information for the improper reasons that EO 13526 prohibits:

> [W]e do overclassify. My observations are that this is more due to just the default—it's the easy thing to do—rather than some nefarious motivation to, you know, hide or protect things for political reasons. That does happen too . . . .[13]

President Obama recently made a similar admission: "There's classified, and then there's *classified*. There's stuff that is really top secret . . . and then there's stuff that . . . you might not want on the trancom . . . but is basically stuff that you could get in open source."[14]  This phenomenon of improper classification underscores the need for an independent judicial assessment of whether disclosure of the records at issue would pose a sufficient security threat to justify a denial of the public's constitutional rights.

---

[13] *Hearing Before the S. Select Comm. on Intelligence*, 111th Cong. 18 (statement of General James Clapper), http://fas.org/irp/congress/2010_hr/clapper.pdf; *see also Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 137-38 (1951) (finding that the Attorney General exceeded his authority conferred by executive order).

[14] Fred Kaplan, *Obama's Secrecy Problem*, SLATE.COM, (Apr. 15, 2016 10:48 AM), http://www.slate.com/articles/news_and_politics/war_stories/2016/04/obama_says_too_much_information_is_classified_irony_alert.html.

In this case in particular, ample evidence suggests that the agencies are using classification for the improper purposes prohibited by Executive Order 13526. Many of these sealed records contain allegations that the government has engaged in illegal actions. These include accusations that the CIA has intentionally destroyed evidence, *see* Dkt. 218, that the CIA improperly seized documents covered by the attorney-client privilege, *see* Dkt. 288, and that the Government has consistently failed to comply with Court orders, *see* Dkt. 290. Given the nature of these allegations, the CIA certainly has a motive to misuse classification to "prevent embarrassment."

Indeed, Congress has thoroughly documented the CIA's extensive use of deception to avoid public scrutiny of its treatment of Zubaydah and other Guantanamo detainees. Of the 20 conclusions in the SSCI Report, 8 relate to the CIA's attempts to avoid oversight. *SSCI Report*, Findings and Conclusions, at 2-19.[15] For example, in 2005, against the backdrop of calls in the Senate in favor of establishing "an independent commission to investigate U.S. detention policies and allegations of detainee abuse," Acting CIA General Counsel John Rizzo and other CIA personnel exchanged emails regarding the propriety of destroying the videotapes of its interrogations of Abu Zubaydah and others. *See id.*, Executive Summary, at 443 n.2488. The

---

[15]   "#2:   The CIA's justification for the use of its enhanced interrogation techniques rested on inaccurate claims of their effectiveness. . . .

#3:   The interrogations of CIA detainees were brutal and far worse than the CIA represented to policymakers and others. . . .

#4:   The conditions of confinement for CIA detainees were harsher than the CIA had represented to policymakers and others. . . .

#5:   The CIA repeatedly provided inaccurate information to the Department of Justice, impeding a proper legal analysis of the CIA's Detention and Interrogation Program. . . .

#6:   The CIA has actively avoided or impeded congressional oversight of the program. . . .

#7:   The CIA impeded effective White House oversight and decision-making. . .

#8:   The CIA impeded oversight by the CIA's Office of Inspector General . . .

#10:  The CIA coordinated the release of classified information to the media, including inaccurate information concerning the effectiveness of the CIA's enhanced interrogation techniques."

videotapes were destroyed shortly thereafter, on November 9, 2005. *Id.* at 444. These instances demonstrate that the CIA has used every resource at hand to avoid public scrutiny of its treatment of Zubaydah and other Guantanamo detainees.

In a similar vein, the CIA has intentionally used classification to misshape public opinion. "The CIA coordinated the release of classified information to the media, including inaccurate information concerning the effectiveness of the CIA's enhanced interrogation techniques." *Id.*, Findings and Conclusions, at 8. The purpose of the CIA's public relations campaign was "to counter public criticism, shape public opinion, and avoid potential congressional action" to rein in the CIA's detention and interrogation program. *Id.* To achieve those goals, "the CIA's Office of Public Affairs and senior CIA officials" coordinated to disclose inaccurate but nonetheless classified information on its detention and interrogation program to selected media outlets. *Id.* at 8-9. These *selective* disclosures of classified information raise significant self-governance concerns and further underscore the importance of careful judicial scrutiny of the CIA's classification decisions.

Because preventing embarrassment and concealing violations of law are invalid reasons for classification, this Court should scrutinize the Government's claims of the need for secrecy in this proceeding with extreme care, and release all records for which the Government has not met its constitutional burden. Uncritical deference to the Government's classification decisions would prevent the very democratic oversight the First Amendment seeks to ensure.

In sum, the Government has failed to meet its burden to demonstrate that a compelling need outweighs the public's First Amendment right of access to the records at issue. That burden is particularly high in detainee cases such as this one, wherein the judiciary "exercise[s] greater caution in deciding when to defer" to executive determinations. *Ameziane v. Obama*, 699 F.3d

488, 494 (D.C. Cir. 2012). "Liberty and security can be reconciled; and in our system they are

reconciled within the framework of the law." *Boumediene*, 553 U.S. at 798. That framework

does not afford the government the right to unilaterally seal information; it requires courts to

determine whether sealing is absolutely necessary. Because the Court has made no such

determination in this case—nor could it—the systematic sealing of Zubaydah's records violates

the public's First Amendment right of access.

## CONCLUSION

For each and all the foregoing reasons, this Court should permit Mr. Bonner to intervene

and grant his motion to unseal specific records in this proceeding, and enter such other and

further relief as the Court deems just and equitable.[16]

Dated:  April 18, 2016
New Haven, CT

Respectfully submitted,

MEDIA FREEDOM & INFORMATION
ACCESS CLINIC

By:  /s/ David A. Schulz
David A. Schulz (Bar ID 459197)
Jonathan Manes
Steven Lance (law student intern)
Andrew Udelsman (law student intern)
Beatrice Walton (law student intern)
Yale Law School
P.O. Box 208215
New Haven, CT 06520New Haven, CT 06511
t: (203) 432-9387
dschulz@lskslaw.com
jonathan.manes@yale.edu

Chad Bowman (Bar ID 484150)
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1899 L Street, NW
Suite 200

---

[16] This memorandum was prepared by the Media Freedom and Information Access Clinic, a
program of the Abrams Institute for Freedom of Expression and the Information Society Project
at Yale Law School. The brief does not purport to express the school's institutional views, if any.

Washington, DC 20036
t: (202) 508-1136
cbowman@lskslaw.com

*Counsel for Movant Raymond Bonner*