UNCLASSIFIED// FOR PUBLIC RELEASE

*Filed with the*
*CSO: /late*
*DATE: 8.25.08*

No. 8CV-1360

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**ZAYN AL ABIDIN MUHAMMAD HUSAYN,**
PRISONER, Guantánamo Bay Naval Station, Guantánamo Bay, Cuba,
*Petitioner/Plaintiff,*

v.

**ROBERT M. GATES,**
SECRETARY OF DEFENSE OF THE UNITED STATES OF AMERICA,
*Respondent/Defendant.*

---

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

---

Joseph Margulies
MacArthur Justice Center
Northwestern University School
of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone: (312) 503- 0890

Baher Azmy
Seton Hall Law School
Center for Social Justice
One Newark Center
Newark, NJ 07102
(973) 642-8700

George Brent Mickum IV
Amanda Edwards
Spriggs & Hollingsworth L.L.P.
1350 I Street N.W.
Washington, D.C. 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Attorneys for Petitioner

August 25, 2008

1.     Petitioner, Zayn Al Abidin Muhammad Husayn ("Abu Zubaydah") ("Petitioner"), seeks the Great Writ.

2.     All of the information that appears in this Petition comes from sources in the public domain or information derived from Petitioner that has been cleared for public release. Indeed, much of the information appeared in Petitioner's Amended Petition for Relief under the Detainee Treatment Act of 2005, and, in the Alternative, for Writ of Habeas Corpus that was cleared by the government for public release and has been widely disseminated.  The public sources that appear herein include newspapers, magazines, books, television and radio broadcasts, online publications, written reports and memoranda, and, in a very limited number of instances, anecdotal reports.[1]  No information contained in the petition is based on counsels' access to or review of any classified documents: indeed, the Government has refused to produce any classified information.[2]  An index of the documents and sources relied on is attached hereto as Exhibit 1.

3.     In an attempt to justify Petitioner's unlawful detention and torture, President Bush and other high level officials within his Administration have publicly proclaimed that Petitioner was one of al Qaeda's top three operatives and that, when subjected to "enhanced interrogation techniques," he revealed vital information to the Central Intelligence Agency that saved countless American lives and resulted in the capture of Khalid Sheikh Mohammed, the

---

[1] Citations to the public sources are set forth in footnotes.

[2] Although two of Petitioner's counsel, Joseph Margulies and George Brent Mickum IV, received the requisite security clearance – Top Secret-Sensitive Compartmentalized Information ("TS-SCI") – to review all classified information in the case nearly nine months ago, the Government has thus far refused to disclose any classified information.

alleged mastermind of the September 11 tragedy.[3]  These allegations are false and were known

to be false when pronounced by the Administration.[4]  During the past six years of Petitioner's

imprisonment, the Administration has failed to provide even the slimmest substantiation for their

claims.  The Bush Administration is unable to substantiate its assertions because they have no

basis.

4.      Petitioner was never a member or supporter of Taliban or al Qaeda forces.

Petitioner never committed any belligerent act or supported any hostilities against the United

States or its coalition allies.  Petitioner has never taken up arms against the United States or its

coalition allies.[5]

---

[3] *See, e.g.*, President Bush, Remarks by the President at Thaddeus McCotter for Congress
Dinner, October 14, 2002. http://www.whitehouse.gov/news/releases/2002/10/20021014-3.html
(describing Petitioner has "one of the top three leaders"); President Bush, Remarks by the
President    at    Connecticut    Republican    Committee    Luncheon,    Apr.    9,    2002.
http://www.whitehouse.gov/news/releases/2002/04/20020409-8.html (describing Petitioner as
"one of the top operatives plotting and planning death and destruction on the United States,");
President Bush, Remarks by the President in Address to the Nation, June 6, 2002.
http://www.whitehouse.gov/news/releases/2002/06/20020606-8.html (describing Petitioner as
"al Qaeda's chief of operations").  Yet the military recently described Khalid Sheikh Mohammed
as the number three man in al Qaeda.  *See, e.g.*, Ed Pilkington, *'I was responsible for 9/11, from
A to Z' - a confession from Guantánamo Bay*, The Guardian, March 15, 2007. But KSM is only
one of the many to earn this title.  So far, Hamza Rabia, Abu Faraj al-Libbi, and Saif al-Adel
have also been called al Qaeda's "number three."   *See, e.g.,* Steve Benen, *Another Al Qaeda
Number    3,*    Guest    Posting,    The    Washington    Monthly,    Jan.    31,    2008,
http://www.washingtonmonthly.com/archives/individual/2008_01/013025.php (questioning how
many "number three" men one terrorist organization could have).

[4] *See, e.g.*, Ron Suskind, The One Percent Doctrine: Deep Inside America's Pursuit of Its
Enemies Since 9/11, at 101 (Simon & Schuster 2006) ("'Around the room a lot of people just
rolled their eyes when we heard comments from the White House.  I mean, Bush and Cheney
knew what we knew about Zubaydah . . . ' said one top CIA official, who attended the 5 p.m.
meeting where the issue of Zubaydah came up. 'The thinking was, why the hell did the President
have to put us in a box like this?'").

[5] *Id.*

5.      In 1992, Petitioner sustained a serious head injury.[6]  He was fighting on the front lines against Afghan communists and was injured by an exploding mortar shell.  For more than a year, he could not speak; to this day, he still suffers from a severe memory loss.  Although Petitioner received treatment for his injury, two pieces of shrapnel remain lodged in his head.[7] As a result of this injury, Petitioner could not operate weaponry.[8]

6.      On or about March 28, 2002, Petitioner was in a guest house in Pakistan.  The house was attacked by combined Pakistani and United States forces ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Though neither Petitioner nor any of the other occupants of the home were armed, Petitioner was shot in the groin, thigh and stomach.  [9]

7.      Thereafter, Petitioner became a prisoner in a secret program initiated by the CIA after September 11, 2001, in which alleged suspects were jailed and systematically tortured at secret prisons outside the United States known as "black sites."[10]

---

[6] Suskind, *supra* note 4, at 95; Dan Eggen and Walter Pincus, *FBI, CIA Debate Significance of Terror Suspect: Agencies Also Disagree On Interrogation Methods*, Wash. Post., Dec. 18, 2007, at A1.

[7] Unclassified handwritten notes of George Brent Mickum dated Feb. 22, 2008; *see also* Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016, Mar. 27, 2007, at 22, http://www.defenselink.mil/news/transcript_ISN10016.pdf. (". . . I still have shrapnel in my head").

[8] *Id.* at 19-20.

[9] Brian Ross, *CIA- Abu Zubaydah: Interview with John Kiriakou: Transcript*, ABC News, Dec. 10,                                                                                               2007, http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript1_blotter071210.pdf;    J.J. Green, *Former CIA Officer: Waterboarding is Wrong, but it Worked*, WTOPnews.com, Mar. 20, 2008, http://www.wtop.com/?sid=1368866&nid=251.

[10] Dan Froomkin, *Bush's Exhibit A for Torture*, Wash. Post, Dec. 18, 2007, *see also* Dana Priest, *CIA Holds Terrors Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, at A1.

4

8.      Specifically, following his seizure, Petitioner was held incommunicado in the

unlawful custody of the CIA at black sites around the world, including ███████████

███████████████████████████████████████████████████  During his captivity,

Petitioner has been subjected to various forms of torture over extended periods of time,

including, but not limited to, waterboarding, ████████████████████████████

████████████████                  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████  The Government admits Petitioner was

waterboarded.[13]  The Government also admits it videotaped hundreds of hours of Petitioner's

torture and interrogations, and later destroyed the tapes.[14]

---

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[13] Director's Statement on the Taping of Early Detainee Interrogations: Statement to Employees
by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early
Detainee Interrogations, Dec. 6, 2007. https://www.cia.gov/news-information/press-releases-
statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html.

[14] Scott Shane and Mark Mazetti, *CIA Tapes Lived and Died to Save Image*, N.Y. Times, Dec.
30, 2007, at A1.

UNCLASSIFIED// FOR PUBLIC RELEASE

9.     In addition to his torture, Petitioner has been subjected to cruel, inhumane, and degrading treatment, as well as physical and psychological interrogation techniques specifically designed to isolate him from the world, reduce him to a state of learned helplessness, and render him wholly dependent on his captors.[15]  According to testimony by former Attorney General John Ashcroft before the House Judiciary Committee on July 17, 2008, Petitioner was subjected to these techniques well before the Department of Justice was commissioned to write legal memorandums to provide justification and approval for this treatment.[16]  The now infamous torture memoranda were not issued until August 2002.

10.     After more than four years of torture and incommunicado detention, on September 6, 2006, Petitioner was transferred from the last of his secret prison cells to the U.S. Naval Base at Guantánamo Bay,[17] where he remains today.  Petitioner has now been imprisoned without charge for nearly six and a half years.

---

[15] Jane Mayer, *The Black Sites: A rare look inside C.I.A.'s secret interrogation program*, The New Yorker, Aug. 13, 2007; Katherine Eban, *Rorschach and Awe*, Vanity Fair, July 17, 2007.

[16] Alex Koppelman, *Ashcroft suggests CIA sought legal approval after torture began*, Salon, July 17, 2008 ("The first memo – often called the Bybee memo – was dated August 1, 2002 and was authored by former Deputy Assistant Attorney General John Yoo . . . Rep. Jerrold Nadler, D-N.Y., pointed out that the abuse of Zubaydah had reportedly begun weeks, if not months, earlier. 'Did you offer legal approval of interrogation methods used at that time . . . prior to August 2002?' 'I have no recollection of doing that at all,' Ashcroft responded. He added that he did not remember anyone else at the Justice Department doing so either. He said later in the hearing that Zubaydah's interrogation was done without the opinion that was issued on the first of August.'"); *see also Id.* ("It appears that in May, June, and July—in other words, months before the infamous torture memos provided legal cover—the CIA has already begun to treat him in ways that were deeply troubling.").

[17] *See President Discusses Creation of Military Commissions to Try Suspected Terrorists*, Office of the Press Secretary, Sept. 6, 2006. http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html ("I am announcing today that Khalid Sheikh Mohammad, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in CIA custody have been transferred to the United States Naval Base at Guantanamo Bay.").

UNCLASSIFIED// FOR PUBLIC RELEASE

## I.
## JURISDICTION

11.      Petitioner invokes this Court's jurisdiction under 28 U.S.C. §§ 2241 and 2242. He also relies upon 28 U.S.C. §§ 1331, 1651, 2201, and 2202; 5 U.S.C. § 702; as well as the Suspension Clause and the Fifth, Sixth, and Eighth Amendments to the United States Constitution; the International Covenant on Civil and Political Rights; the American Declaration on the Rights and Duties of Man; the Convention Against Torture; other international treaties to which the U.S. is a signatory; and customary international law.  Because he seeks declaratory relief, Petitioner also relies on Fed. R. Civ. P. 57.

12.      This Court is empowered under 28 U.S.C. § 2241 and the Suspension Clause of the United States Constitution to grant the Writ of Habeas Corpus and to entertain this Petition. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdictions.

## II.
## PARTIES

13.      On information and belief, Petitioner was born in Riyadh, Saudi Arabia, on March 12, 1971.  Presently, Petitioner is incarcerated and held in Respondent's unlawful custody at Camp VII, Guantánamo.

14.      Robert M. Gates ("Respondent") is the Secretary of the United States Department of Defense.  Respondent Gates has been charged with maintaining the custody and control of the Petitioner.  He is sued in his official capacity.

7

UNCLASSIFIED// FOR PUBLIC RELEASE

### III.
### STATEMENT OF FACTS

15.      Petitioner is not, and never has been, an enemy alien, lawful or unlawful belligerent, or unlawful or enemy combatant of any kind.

16.      Petitioner is not, and never has been, an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004). He was not seized on a battlefield. He was never engaged in an armed conflict against the United States or its coalition allies, either in Afghanistan or anywhere else.

17.      At the time of his detention, Petitioner was not and never had been a member of either the Taliban or al Qaeda. He did not cause or attempt to cause any harm to American personnel or property at any time prior to his illegal detention. Petitioner did not have a weapon when he was taken into illegal custody. Petitioner was not in Afghanistan at the time of his detention, but was taken into custody in Pakistan after he was wrongfully attacked, shot, and severely injured and nearly killed by U.S. forces.

18.      From the time of his initial detention in Pakistan to the present, Petitioner has not been afforded any legal process that would satisfy even the most basic notions of due process and procedural fairness, let alone the requirements imposed by the Great Writ of habeas corpus or the Due Process Clause of the Fifth Amendment to the United States Constitution. Had Petitioner received such procedures, Respondent could not have proved by any standard that Petitioner either was, or should be classified as, an "enemy combatant."

### A.    THE ABSENCE OF LAWFUL AUTHORITY FOR PETITIONER'S PROLONGED DETENTION.

19.      In the wake of the September 11, 2001 attacks on the United States, a Joint Resolution of Congress authorized President Bush to use force against the "nations,

UNCLASSIFIED// FOR PUBLIC RELEASE

organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Authorization for Use of Military Force, Pub. Law 107-40, 115 Stat. 224 (Sept. 18, 2001) ("AUMF"). Petitioner did not participate in an armed conflict against the United States, nor was he arrested during the course of an armed conflict. He did not plan, authorize, commit, or aid any attacks on the United States, nor did he "harbor" persons who did. Petitioner is not and was not a member of al Qaeda. He is not properly detained pursuant to the AUMF.

20.    On November 13, 2001, President Bush issued a Military Order authorizing the United States military to detain indefinitely "any individual who is not a United States citizen with respect to whom [the President] determine[s] from time to time in writing" that there is "reason to believe that such individual, at the relevant times":

      i.    is or was a member of the organization known as al Qaeda;

      ii.    has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

      iii.    has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

Military Order, Detention, Treatment, and Trial of Certain Non-Citizens in the War against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001) ("Military Order"). Pursuant to the plain language of the Military Order, President Bush must make in writing the determination contemplated by the Military Order. The Military Order was neither authorized nor directed by Congress and is beyond the scope of the AUMF.

21.    On information and belief, President Bush never certified or determined in any manner, whether in writing or otherwise, that Petitioner is subject to the Executive Order.

22.    Petitioner is not properly subject to detention pursuant to the Executive Order issued by President Bush.

23.    Petitioner has not been, and is not being, detained lawfully either pursuant to the AUMF, the Executive Order, President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

**B.    PETITIONER'S SEIZURE IN PAKISTAN AND TRANSFER TO THE CUSTODY OF THE CIA**

24.    Petitioner was captured March 28, 2002, in Faisalbad, Pakistan.[18]   He suffered three gunshot wounds after being attacked by Pakistani and American forces during his capture and arrest.[19]

25.    The Government concedes that Petitioner was grievously injured, but contends that gunfire was exchanged during the raid.[20]   Petitioner, however, denies that he or anyone with him in the guest house had weapons: "When our house was raided, we had no guns, so all we could do was fight with our hands. One of us had a knife, and he got killed.  So, the statement that gunfire was exchanged was incorrect.  The gunfire only came from the soldiers who attacked our house."[21]

---

[18] United States' "*Disappeared" CIA Long-term "Ghost Detainees*", Human Rights Watch, http://www.hrw.org/backgrounder/usa/us1004/index.htm; Eggen and Pincus, *supra* note 6; John F. Burns, *A Nation Challenged: The Fugitives; In Pakistan's Interior, A Troubling Victory In Hunt for Al Qaeda*, N.Y. Times, Apr. 14, 2002.

[19] Johnston, *supra* note 12; *Pakistan: Musharraf's Risky Gambit*, Newsweek, Oct. 29, 2007 (noting that "Pakistan's own Inter-Services Intelligence directorate was kept largely in the dark about the operation").

[20] Unclassified Summary of Evidence for Combatant Status Review Tribunal, Mar. 19, 2007. http://www.defenselink.mil/news/ISN10016.pdf.

[21] Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016; Mar. 27, 2007. http://www.defenselink.mil/news/transcript_ISN10016.pdf.

26.     Former CIA agent John Kiriakou was a co-leader of the team of American and Pakistani forces that shot and took custody of Petitioner. During a television interview with ABC News, Kivakou described Petitioner as "a very friendly guy," who wrote poetry and was keen to talk about current events and compare and contrast the differences and similarities between Islam and Christianity.[22]

27.     Unclassified sources in the United Kingdom and elsewhere say that prior to Petitioner's arrest, Petitioner was a well-known figure who helped facilitate travel to and from Afghanistan after the Taliban became the *de facto* government in that country. Travelers from the United Kingdom who were familiar with Petitioner say he acted much like a travel agent, confirming accounts of FBI agents. They described him as gregarious and friendly.[23] Witnesses familiar with Petitioner and the CIA's allegations confirm that Petitioner was not a member of or associated with al Qaeda, as does Petitioner.

28.     CIA agent Kiriakou stated that Petitioner "was shot in the thigh, the groin, and the stomach with an AK-47." In the same interview, Kiriakou stated: "[Petitioner] was almost killed. And later that night one of the doctors, the Pakistani doctor who was treating him, told me that he had never seen wounds so severe where the patient had lived." "One of the things that sticks in my mind," Kiriakou later recalled, "was how much blood he lost. There was blood everywhere. It was all over him. It was all over the bed. It pooled underneath the bed." Kiriakou claims to have been the first person to speak to Petitioner when he came out of his coma.[24]

---

[22] Ross, *supra* note 9.

[23] Suskind, *supra* note 4, at 84.

[24] Ross, *supra* note 9.

11

29.     On information and belief, ████████████████████████████

████████████████████[25]

30.     On April 3, 2002, Donald Rumsfeld said the U.S. was "holding" Petitioner, who was receiving medical care.[26] ████████████████████████████

████████████████████████████████

## C.     THE DEVELOPMENT OF THE CIA TORTURE PROGRAM BEGAN WITH THE ARREST OF PETITIONER

31.     The CIA first implemented its secret detention and torture program after Petitioner's arrest, largely in order to facilitate interrogations outside of what the U.S. government had for years considered lawful boundaries.[28]

32.     To assist in Petitioner's interrogation, the CIA contracted with a group of retired military psychologists who had undergone Survival, Evasion, Resistance, and Escape ("SERE") training.[29]  "The [SERE] program . . . was created at the end of the Korean War.  It subjected trainees to simulated torture techniques, including waterboarding ..., sleep deprivation, isolation, and exposure to temperature extremes, enclosure in tiny spaces, bombardment with agonizing

---

████████████████████████████████████████████████████████████████

[26] *Fate and Whereabouts Unknown: Detainees in the War on Terror*, NYU School of Law: Center    for    Human    Rights    and    Global    Justice,    Dec.    17,    2005. http://www.chrgj.org/docs/Whereabouts%20Unknown%20Final.pdf.

████████████████████████████████████████████████████████████████

[28] Jane Mayer, *The Dark Side* (Doubleday, 2008).

[29] Mayer, *supra* note 15.

sounds at extremely damaging decibel levels, and religious and sexual humiliation."[30]  Although the SERE program was designed strictly for defense against regimes that would use these unlawful techniques to extract *false* confessions, the CIA's new team used these techniques against Petitioner, purportedly in order to obtain reliable information.[31]

33.  Petitioner was interrogated by a team "overseen by James Elmer Mitchell, a consulting psychologist under contract to the CIA," and Bruce Jessen, a staff CIA psychologist. Beginning in ▮▮▮▮▮▮▮ and continuing for months, Mitchell and Jessen subjected Zubaydah to a host of "extreme physical and psychological abuses."[32]   Mitchell and Jessen applied a theory called "learned helplessness," which derived from experiments done in the 1970s by American psychologist Martin Seligman, in which dogs were put in cages and repeatedly electrocuted in a way that so degraded and disoriented them, they became utterly compliant and dependent on their captors.[33]

34.  Together with other CIA interrogators, these psychologists implemented a regime of techniques that one well-informed former adviser to the American intelligence community describes as "a Clockwork Orange" kind of approach. [34]  "'They were very arrogant,

---

[30] *Id.*

[31] *Id.*



[34] Mayer, *supra* note 15.

and pro-torture,' a European official knowledgeable about the program said. 'They sought to render the detainees vulnerable – to break down all of their senses. It takes a psychologist trained in this to understand these rupturing experiences.'"[35]

35.     Neither Mitchell nor Jessen had any proof that their tactics would be effective in gathering reliable or truthful intelligence. To the contrary, all intelligence derived from the program was suspect because the interrogation training was based substantially on an article written in 1957 by Albert Biderman entitled "Communist Attempts to Elicit False Confessions From Air Force Prisoners of War."[36] Indeed, the SERE program itself was founded during the Cold War in an effort to re-create and understand the mistreatment that had led to thirty-six captured Americans to give stunningly false "confessions" during the Korean War.[37]

36.     Steve Kleinman, an Air Force Reserve Colonel and expert in human-intelligence operations, found it astonishing that the CIA "chose two clinical psychologists who had no intelligence background whatsoever, who had never conducted an interrogation, . . . to do something that had never been proven in the real world."[38] ████████████████████

████████████████████████████████████████████████████

████████████████████████[39]   Speaking of Mitchell and Jessen, Steve Kleinman

---

[35] *Id.*

[36] Scott Shane, *China Inspired Interrogations at Guantánamo*, N.Y. Times, July 2, 2008.

[37] *Id.* (describing the methods employed as "brainwashing" techinques); *see also* Mayer, *supra* note 28, at 158.

[38] *Id.*

[39] *Id*

14

UNCLASSIFIED// FOR PUBLIC RELEASE

has stated: "I think they have caused more harm to American national security than they'll ever understand."[40]



---

[40] *Id.*



UNCLASSIFIED// FOR PUBLIC RELEASE

UNCLASSIFIED// FOR PUBLIC RELEASE

39. ███████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

40. ███████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████



44 ████████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

UNCLASSIFIED// FOR PUBLIC RELEASE

41.     A CIA officer who knows one of the individuals who interrogated and tortured Khalid Sheikh Mohammed reports that the interrogator "has horrible nightmares. When you cross over that line of darkness, it's hard to come back. You lose your soul. You can do your best to justify it, but it's well outside the norm. You can't go to a dark place without it changing you . . . You are inflicting something really evil and horrible on somebody."[47]



[47] Mayer, *supra* note 15.

42.     From the outset, serious concerns were raised about the CIA's developing program. Indeed, the CIA's harsh treatment of Petitioner during his initial interrogation led to a bitter dispute regarding acceptable interrogation methods between the FBI and the CIA.[48]

43.     Following his arrest, Petitioner was initially interrogated by FBI agents ███ ██████████████████████[49]  Subsequently, however, CIA officials, who were being pressed for information by Respondent's predecessor and other officials within the Executive Branch, took over responsibility for Petitioner's interrogation.[50]  It was then that Mitchell and Jensen became involved and Petitioner was tortured using the reverse-SERE program.

44.     FBI agents on the scene protested the use of these tactics, but by then the CIA had taken the lead in the interrogation, and FBI leaders decided not to intercede.[51]

45.     When the CIA's use of interrogation techniques was brought to the attention of FBI headquarters, Director Robert S. Mueller III determined that the FBI would not participate in the interrogation: all FBI agents involved in the interrogation were instructed to leave the facility immediately.[52]

---

[48] Johnston, *supra* note 12; Eggen and Pincus, *supra* note 6.

[49] Mayer, *supra* note 28, at 155.

[50] *Id.*

[51] *Id.*

[52] OIG Report, *supra* note 46; *see also* Walter Pincus, *Pakistan Is Threatened, Intelligence Chief Says*, Wash Post, Feb. 6, 2008, at A3 (On February 5, 2008, in testimony before the Senate Select Committee on Intelligence, FBI Director Robert S. Mueller was careful to distance the FBI from CIA's unlawful actions and denied that the FBI had used waterboarding: "It has been our policy not to use coercive techniques.").

46.      According to knowledgeable government officials, "[o]ne [FBI] agent was so offended he threatened to arrest the CIA interrogators who were involved in the torture" of Petitioner[53]

### D.   PETITIONER BECAME A GHOST PRISONER AT CIA BLACK SITES AROUND THE WORLD

47.      Over the next four years, Petitioner was jailed at various CIA prisons around the world. "The CIA knew even less about running prisons than it did about hostile interrogations, but it had to hold its prisoners somewhere beyond the reach of the American legal system, and that was the impetus for the 'black sites program.'"[54]

48.

---

[53] Michael Isikoff, Mark Hosenball and Michael Hirsh, *Aggressive interrogation techniques of terror suspects is under scrutiny*, Newsweek, Dec 17, 2007. Some top CIA officials were, likewise, outraged. For example, R. Scott Shumate, the chief operational psychologist for the Counter-Terrorism Committee from 2001 to 2003, reportedly left the Agency in disagreement about what he saw as misuse of the SERE techniques. Mayer, *supra* note 33, at 162.

**49.**

**51.**





52.    On information and belief, after the disclosure of the CIA's operation of black

sites around the world, ████████████████████████████████████

████████████████████████ According to another report, Zubaydah also is

believed to have been transferred to ████████████████████████

████████████████████████████████████████████

████████

## E.    PETITIONER WAS SUBJECTED TO WATERBOARDING BY THE CIA

53.    John Kiriakou, the former CIA agent directly involved in the interrogation of

Petitioner, has said publicly that Petitioner was waterboarded and that waterboarding is torture.[67]

54.    In the wake of this admission, many former and present military and government

officials, including for example Mike McConnell, the current National Intelligence Director, and



[67] Richard Esposito and Brian Ross, *Coming in From the Cold: CIA Spy Calls Waterboarding Necessary But Torture: Former Agent Says Enhanced Technique Was Used on Al Qaeda Chief Abu Zubaydah*, ABC News, Dec. 10, 2007.

21

UNCLASSIFIED// FOR PUBLIC RELEASE

Tom Ridge, the former Homeland Security Secretary, have publicly acknowledged that waterboarding is torture.[68]

55.    On February 5, 2008, in testimony before the Senate Select Committee on Intelligence, CIA Director Michael V. Hayden publicly confirmed for the first time that the CIA and civilian contractors had used waterboarding on Petitioner and others in 2002 and 2003.[69] "A senior intelligence official at the hearing . . . said that the CIA officers and contractors who conducted interrogations involving waterboarding were told it was legal at the time, but added that 'the legal landscape has changed.'"[70]

56.    Until 2002, when the Bush Administration secretly approved the use of waterboarding, it was classified as a form of torture and treated as a serious criminal offense. The United States prosecuted Japanese military officials who waterboarded American soldiers for War Crimes following the Second World War and prosecuted American soldiers in the Vietnam War for waterboarding captives suspected of being affiliated with the Viet Cong.[71]

57.    Malcolm Wrightson Nance, a counterterrorism specialist who taught at the Navy's Survival, Evasion, Resistance and Escape (SERE) School in California, was subjected to waterboarding as part of his military training. He testified before a House oversight hearing on torture and enhanced interrogation techniques on November 8, 2007. He testified that waterboarding was clearly torture, and that such a method was never intended for use by U.S. interrogators because it is a relic of abusive totalitarian governments. In his testimony, Nance

---

[68] *See, e.g.*, Goodman, *supra* note 33.

[69] Pincus, *supra* note 52.

[70] *Id.*

[71] Walter Pincus, *Waterboarding Historically Controversial; In 1947, the U.S. Called It a War Crime; in 1968, It Reportedly Caused an Investigation*, Wash. Post, Oct. 5, 2006, at A17.

UNCLASSIFIED// FOR PUBLIC RELEASE

likened waterboarding to drowning and said those who experience it will say or do anything to make it stop, rendering the information they give nearly useless. Recounting his experience when he was waterboarded, he testified, "I didn't know what was happening until the water entered my nose and throat . . . It then pushes down into the trachea and starts the process of respiratory degradation. It is an overwhelming experience that induces horror and triggers frantic survival instincts. As the event unfolded, I was fully conscious of what was happening: I was being tortured." Nance testified that waterboarding is a long-standing form of torture used by history's most brutal regimes, including Nazi Germany, Imperial Japan, North Korea, Iraq, the Soviet Union and the Khmer Rouge of Cambodia. [72] The United States is now on that list: on February 6, 2008, the White House opined that waterboarding is legal.[73]

58.      Contrary to the Government's assertion that waterboarding is "simulated drowning," waterboarding is more aptly described as "simulated death." As Nance has observed, "It's not simulated anything. It's slow motion suffocation with enough time to contemplate the inevitability of blackout and expiration—usually the person goes into hysterics on the board."[74] According to Nance, if a prisoner is subjected to 90 seconds of waterboarding, approximately 1.2 gallons of water are forced down his nose and throat as he is strapped to a board.[75] As a prisoner's lungs fill with water, he is asphyxiated. Deprived of oxygen, a prisoner eventually

---

[72] Josh White, *Waterboarding Is Torture, Says Ex-Navy Instructor*, Wash. Post, Nov. 9, 2007, at A4.

[73] Dan Eggen, *White House Defends CIA's Use of Waterboarding in Interrogations*, Wash. Post, February 7, 2008, at A3; Jon Ward, *White House Says Waterboarding Not Torture*, Wash. Times, February 7, 2008.

[74] Mayer, *supra* note 28, at 173.

[75] White, *supra* note 72.

23

begins to lose consciousness. At that point, the procedure is halted, the prisoner vomits out the water from his lungs, is revived briefly, and the process is repeated.[76]

59.     Richard E. Mezo, who served in the Navy for six years, was waterboarded during his training to become a Navy flight crew member. Mr. Mezo has written: "[a]s someone who has experienced waterboarding, albeit in a controlled setting, I know that the act is indeed torture."[77] Describing the actual experience, Mezo writes:

> Two men grabbed me at my sides. They put a pole of some kind under my knees and bent me over backward. My head went down lower that the rest of my body. The questions (What is your unit? Where are you from?) were asked by one man. But we were not supposed to talk. I remember that the blindfold was heavy and completely covered my face. As the two men held me down, one on each side, someone began pouring water onto the blindfold, and suddenly I was drowning. The water streamed into my nose and then into my mouth when I gasped for breath. I couldn't stop it. All I could do is breath water, and it was terrifying. I think I began to lose consciousness. I felt my lungs begin to fill with burning liquid. Pulling out my fingernails or even cutting off a finger would have been preferable.[78]

60.     Professor Alfred McCoy, who has written extensively on torture, has described waterboarding in his book *A Question of Torture: CIA Interrogation, from the Cold War to the War on Terror*:

> There are several methods for achieving water boarding's perverse effect of drowning in open air: most frequently, by making the victim lie prone and then constricting breathing with a wet cloth, a technique favored by both the French Inquisition and the CIA; or, alternatively, by forcing water directly and deeply into the lungs, as French paratroopers did during the Algerian War.

---

[76] *Id.; see also* Mayer, *supra* note 33, at 173.

[77] Richard E. Mezo, *Why It Was Called 'Water Torture'*, Wash. Post, Feb. 10, 2008, at B7.

[78] *Id.*

After French soldiers used the technique on Henri Alleg during the Battle for Algiers in 1957, this journalist wrote a moving description that turned the French people against both torture and the Algerian War. "I tried," Alleg wrote, "by contracting my throat, to take in as little water as possible and to resist suffocation by keeping air in my lungs for as long as I could. But I couldn't hold on for more than a few moments. I had the impression of drowning, and a terrible agony, that of death itself, took possession of me."

Let us think about the deeper meaning of Alleg's sparse words--"a terrible agony, that of death itself." As the water blocks air to the lungs, the human organism's powerful mammalian diving reflex kicks in, and the brain is wracked by horrifically painful panic signals--death, death, death. After a few endless minutes, the victim vomits out the water, the lungs suck air, and panic subsides. And then it happens again, and again, and again--each time inscribing the searing trauma of near death in human memory.[79]

61.     Richard Armitage, the Deputy Secretary of State and a combat veteran from Vietnam, recently stated: "I am ashamed we are even having this conversation. Of course, waterboarding is torture."[80]

62.     As stated by Presidential candidate John McCain, in an interview conducted by the *The New York Times:* "All I can say is that it was used in the Spanish Inquisition, it was used in Pol Pot's genocide in Cambodia, and there are reports that it is being used against Buddish monks today [in Myanmar] . . . It is not a complicated procedure. It is torture." [81]

---

[79] Alfred McCoy, *The U.S. has a History of Using Torture*, History News Network, Dec. 4, 2006. http://hnn.us/articles/32497.html.

[80] Goodman, *supra* note 33 (noting, by way of example, that Mike McConnell, the current National Intelligence Directorate, has said, "If it was done to me, I would think it was torture," and that Tom Ridge, former Homeland Security Secretary, has publicly acknowledged that waterboarding is torture, as well).

[81] Mayer, *supra* note 28, at 171.

UNCLASSIFIED// FOR PUBLIC RELEASE

### F.    PETITIONER WAS TORTURED BY THE CIA FOR YEARS

63.  FBI agents and analysts familiar with Petitioner's treatment by the CIA ███████████████████████████████████

███████████████████████████████████████████████[82]

At least several of these alleged "enhanced" interrogation methods constitute torture and inhuman and degrading treatment as provided in Article 3 of the European Convention on Human Rights and the United Nations Convention against Torture.[83]

64.    Contrary to President Bush's claim on September 6, 2006 that the "alternative set of procedures" used by the CIA on Petitioner were "safe and lawful and necessary" and that "the United States does not torture," the International Red Cross has concluded, in report made secretly to the Bush administration, that the treatment of Petitioner was "categorically torture."[84]

65.



---

[82] Eggen and Pincus, *supra* note 6.

[83] *See* note 57, *supra*.

[84] Goodman, *supra* note 33.

UNCLASSIFIED// FOR PUBLIC RELEASE



66.

67.

68.

69.     At one point in the early weeks of his interrogation, Petitioner was taken to a hospital for medical treatment because he nearly died from infected wounds that became infected as a result of Petitioner's torture and lack of medical treatment.[95]

70.     On information and belief, US officials deliberately withheld painkillers from Petitioner as an interrogation device.[96]



[95] Johnston, *supra* note 12.

[96] *United States' "Disappeared" CIA Long-term "Ghost Detainees,"* Human Rights Watch, http://www.hrw.org/backgrounder/usa/us1004/index.htm; Serrin Turner & Stephen J. Schullhoffer, *The Secrecy Problem in Terrorism Trials,* Brennan Center for Justice, 55 (2005), http://brennan.3cdn.net/6a0e5de414927df95e_lbm6iy66c.pdf (stating, "For nearly forty-eight

28

71. 

72.

hours, around the clock, Zubaydah's condition went from complete relief when the [narcotic] drip was on to utter agony when it was off."); A. John Radsan, *Symposium on Reexamining the Law of War: The Collision Between Common Article Three and The Central Intelligence Agency*, 56 Cath. U.L. Rev. 959, 978 (2007); Charles H. Brower II, *The Lives of Animals, the Lives of Prisoners, and the Revelations of Abu Ghraib*, 37 Vand. J. Transnat'l L. 1353, 1374 (2004); Eun Young Choi, *Veritas, Not Vengeance: An Examination of the Evidentiary Rules for Military Commissions in the War Against Terrorism*, 42 Harv. C.R.-C.L. L. Rev. 139, 168 (2007); *Impunity for the Architects of Illegal Policy*, Human Rights Watch. http://www.hrw.org/reports/2005/us0405/6.htm; Mayer, *supra* note 28, at 142 ("According to New York Times reporter James Risen, Tenet explained to Bush not long after Zubayda[h]'s capture that intelligence gathering was going poorly because Zubayda[h] had been sedated with painkillers. Bush retorted, 'Who authorized putting him on pain medication?').



98

99

100

29

73.     Although Administration officials have stated that Petitioner's compliance was obtained after a single torture session,[101] that claim is false and was disseminated to spare the Bush Administration from public humiliation.  "[F]ormer and current officials disagreed that [Petitioner's] cooperation came quickly under harsh interrogation or that it was the result of a single waterboarding session.  Instead, these officials said harsh tactics used on him at a secret detention facility ███████████████████████████████████████████ These officials' accounts were confirmed by Petitioner at his CSRT hearing and in his unclassified factual return.  Although Petitioner's description of his torture is deleted from the unclassified return, Government censors failed to delete references elsewhere in the return.  At page 23, the Tribunal President states: "In your statement, you mentioned months of torture."[103]

74.     According to CIA sources familiar with Petitioner's torture, Petitioner was not waterboarded on merely one single occasion.  Rather, he was waterboarded repeatedly, ██████ ███████████████████████████████████████████████████████████ ███████████████████████████████████

---

[101] Ross, *supra* note 9; *see also Ex-CIA Agent: Waterboarding 'Saved Lives'*, CNNPolitics.com, Dec. 11, 2007.    http://www.cnn.com/2007/POLITICS/12/11/agent.tapes/#cnnSTCText;   J.J. Green, *Former CIA Officer: Waterboarding is Wrong, but it Worked*, WTOPnews.com, Mar. 20, 2008, http://www.wtop.com/?sid=1368866&nid=251; *Lauer Stirs Scandal Over How Water Boarding    Saved    Lives*,    Media    Research    Center,    Dec.    12,    2007. http://www.mediaresearch.org/cyberalerts/2007/cyb20071212.asp#1;        Ray        McGovern, *Destruction of CIA Tapes Can't Hide Barbaric U.S. Torture Methods*, AlterNet, Dec. 13, 2007. http://www.alternet.org/story/70490/; Tanya Nolan, *Former CIA Agent Reveals Use of 'Waterboarding'    in    Interrogations*,    The    World    Today,    Dec.    12,    2007. http://www.abc.net.au/worldtoday/content/2007/s2116703.htm.

███████████████████████████████████████████

[103] Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016, Mar. 27, 2007. http://www.defenselink.mil/news/transcript_ISN10016.pdf.

███████████████████████████████████████████

75.    As a result of the torture that Petitioner sustained at the hands of the CIA,

Petitioner has experienced relapses of symptoms from his 1992 head injury, including complete

memory loss and the inability to speak, read, or write.[105]  Since his transfer to Guantánamo in

2006, Petitioner told his counsel he has suffered more than 116 seizures.

### G.    THE GOVERNMENT DID NOT GAIN ANY INTELLIGENCE BY TORTURING PETITIONER.

76.    Retired Agent ▬▬▬ contradicts the contention by the CIA and Respondent

officials that Petitioner was a highly placed al Qaeda figure.  ▬▬▬ and others at the FBI

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬ is quoted as saying: ▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[106]

77.    Although the CIA and the Bush Administration have publicly claimed that

Petitioner was instrumental in identifying, locating, and capturing Khalid Sheikh Mohammed,

what actually occurred is that an informant walked in off the streets in Bagdad and provided the

information that resulted in KSM's arrest:

> The informant is now living in America, somewhere in America, with $25 million in the bank, and benefits, such as cradle-to-grave insurance and private school tuition for his children, and his relatives, and their children.  He, and his extended family, will be under protection for the rest of their lives.  'I know it seems like a lot of money,' said a CIA official who worked the case.  'But in terms of countless millions committed to finding a few people – with KSM high on the list – the math works.  This guy got him for us.  He's a hero.  You want to replicate him a hundred times.' [107]

---

[105] Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016, Mar. 27, 2007, http://www.defenselink.mil/news/transcript_ISN10016.pdf.

[106] Eggen and Pincus, *supra* note 6.

[107] Suskind, *supra* note 4.

78.    Retired Agent ███████ has reported that ███████████████

███████████████████████████████████████████████████████

███████████████████ According to █████████████████████████

███████████████████████████████████████████████████████

███████████████[108]    Subsequently, ███████ opinions came to be shared by the CIA's top

officials.[109]

79.    Under the influence of torture, Petitioner could only provide false information,

and so he told his interrogators anything he could conceive:  for example, that shopping malls,

apartment complexes, banks, nuclear plants, water systems, the Statute of Liberty and the

Brooklyn Bridge were all targets for attack, none of which occurred.[110]

80.    As Petitioner confirmed during his CSRT hearing, he said anything to make his

torture stop.  Although Petitioner's words are redacted, the President then responds:  "So I

understand that during this treatment [torture], you said things to make them stop and then those

statements were actually untrue, is that correct?" and  Petitioner's answer to the question was:

"Yes."[111]

81.    According to Senator Jay Rockefeller:

> As Chairman of the Senate Intelligence Committee, I have heard nothing
> to suggest that information obtained from enhanced interrogation
> techniques has prevented an imminent terrorist attack. And I have heard
> nothing to suggest that information obtained from these techniques could

---

[108] *Id.*

[109] Paul McLeary, *The Forgotten Story of Abu Zubaydah*, Columbia Journalism Review, Sept. 7, 2006. http://www.cjr.org/politics/the_forgotten_story_of_abu_zub.php.

[110] Suskind, *supra* note 4.

[111] Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016, Mar. 27, 2007. http://www.defenselink.mil/news/transcript_ISN10016.pdf

not have been obtained through traditional interrogation methods used by military and law enforcement interrogators. On the other hand, I do know that coercive interrogations can lead detainees to provide false information in order to make the interrogation stop.[112]

82.    The likelihood of eliciting false statements through torture is acknowledged by the CIA: according to Kirikaou, the reason why waterboarding was not used on more prisoners was "[b]ecause we didn't want these false confessions. We didn't want wild goose chases."[113] Furthermore, as Air Force Reserve colonel and expert in human-intelligence operations Steve Kleinman explains, the SERE methods, which find origin in Communist interrogation techniques, were never designed to get good information. Their goal, says Kleinman, was to generate propaganda by getting beaten-down American hostages to make statements that were against U.S. interests and used for propaganda purposes.[114]  In addition to the obvious legal and moral problems associated with the use of torture, the likelihood of obtaining no real intelligence is one of the main reasons why agencies like the FBI "don't do that,"[115] and why the CITF

---

[112] Mayer, *supra* note 28, at 330.

[113] Ross, *supra* note 9.

[114] Eban, *supra* note 15; *see also The origins of aggressive interrogation techniques: Part I of the Committee's inquiry into the treatment of detainees in U.S. custody*, at Tab 25 (February 10, 2005, Memorandum from LTG Wagner, Deputy Commander, JFCOM for Commander JPRA, Subject: JPRA Mission Guidance) (stating: "JRPA [Joint Personnel Recovery Agency] is primarily a school house, not an intelligence gathering activity. It focuses on training our own forces in evasion, survival, resistance, and escape . . . The expertise of JPRA lies in training personnel how to respond and resist interrogations—not in how to conduct interrogations . . . To the extent that request for JRPA support might pull that Agency outside the scope of its [defensive] training mission and into actual conduct of offensive operations, such requests were viewed as inappropriate.").

[115] OIG Report, *supra* note 46 (describing the decision made by FBI Counterterrorism Assistant Director Pasquale D'Amuro and FBI Director Mueller that FBI agents should be immediately removed from any involvement in the use of such tactics, a decision which was spurred by the CIA's use of aggressive interrogation against Petitioner).

33

(Criminal Investigation Task Force) "object[ed] to these aggressive interrogation techniques."[116]

Unlike rapport building approaches, which are proven to yield positive results, fear and pain based approaches are proven to be ineffective in producing reliable intelligence.[117] Moreover, according to the FBI, ████████████████████████████████████████████
████████████████[118]

83.     Petitioner's brutal treatment and prolonged, unlawful interrogation is all the more shocking in light of the absence of evidence against him and the lack of information he could provide.

## H.    THE    GOVERNMENT    HAS    PURPOSEFULLY    DESTROYED EXCULPATORY EVIDENCE

84.     In order to avoid the recognition that this brutality was exacted upon someone who was neither associated with al Qaeda nor otherwise hostile to the United States, the Government has deliberately suppressed and actively destroyed information that is exculpatory to Petitioner.[119]

---

[116] *The origins of aggressive interrogation techniques: Part I of the Committee's inquiry into the treatment of detainees in U.S. custody*, at Tab 18 (July 14, 2004 Memorandum from Alberto Mora for Inspector General, Department of the Navy, Subject: Statement for the Record of Alberto Mora for the Department of the Navy Inspector General); *see also* Shane, *supra* note 36.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[118] OIG Report, *supra* note 46.

[119] *See, e.g.*, Emma Schwartz, *Justice Dept. Inspector General Claims CIA Hampered Its Investigation: Report says the agency blocked access to senior al Qaeda operative Abu Zubaydah*, U.S. News & World Report, May 20, 2008. ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

85.     On information and belief, all of Petitioner's interrogations and torture were videotaped.[120] Throughout Petitioner's detention, video cameras were set up to record Petitioner twenty-four hours a day, including when he was interrogated and tortured.[121]

86.     By the Government's own admission, several hundred hours of videotapes of Petitioner that included his interrogation and torture were destroyed in November 2005, after Preservation Orders had been entered by trial judges for the District Court, including Judge Roberts and Judge Kennedy.[122]    A copy of Judge Roberts' Order was served on then-CIA Director, Porter Goss, FBI Director Robert Mueller, and the General Counsel for the Department of Defense in July 2005, well before the videotapes were destroyed.

87.     The destruction of these tapes has also brought attention to the CIA's earlier failure to disclose the tapes' existence, despite detailed requests for information regarding Petitioner by the 9/11 Commission[123] and targeted Freedom of Information Act requests by the

---

[120] Kevin Whitelaw, *Abu Zubaydah's Health Prompted CIA Videos: Suspect had been shot multiple times during operation to capture him*, U.S. News & World Report, Dec. 12, 2007; Denbeaux, *Captured on Tape: Interrogation and Videotaping of Detainees in Guantanamo Bay*, Seton    Hall    University,    Feb.    14,    2008. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1093330.

[121] Shane and Mazetti, *supra note 14; see also* Denbeaux, *supra note 120.*

[122] *See, e.g., CIA Destroyed Interrogation Videotapes Despite Court Orders*, FOX News, Dec. 12, 2007. http://www.foxnews.com/story/0,2933,316516,00.html.

[123] *See* Joby Warrick and Dan Eggen, *CIA Tapes Were Kept from 9/11 Panel, Report Says*, Wash. Post, Dec. 23, 2007, at A11.

American Civil Liberties Union.[124]  As a result, the destruction of the tapes is now a matter of

Congressional inquiry and a criminal investigation. [125]

88.    The Government's actions have compromised Petitioner's ability to defend

himself and compel the intervention of this Court to restore accountability.

**VIII.**
**CAUSES OF ACTION**
**FIRST CLAIM FOR RELIEF**
**(SUSPENSION CLAUSE, ARTICLE I, §9**
**OF THE CONSTITUTION OF THE UNITED STATES**
**AND HABEAS CORPUS STATUTE, 28 U.S.C. § 2241–**
**RIGHT TO WRIT OF HABEAS CORPUS)**

89.    Petitioner incorporates paragraphs __ to __ by reference.

90.    By the actions described above, Respondent has detained and continues to detain

Petitioner in Guantánamo Bay absent any sufficient lawful legal or factual basis.

91.    Such failure violates Petitioner's fundamental rights under the Suspension

Clause of the U.S. Constitution, Art. I, § 9, as effectuated by the habeas corpus statute, 28 U.S.C.

§ 2241, et. seq.

---

[124] *See ACLU, NYCLU Ask Court to Hold CIA in Contempt*, Dec. 12, 2007. http://www.nyclu.org/node/1534.  Furthermore, the FBI has produced records pursuant to a Freedom of Information Act lawsuit by the American Civil Liberties Union ███████████ ████████████████████████████████████████████████████████████ *See* Urgent Report, dated June 25, 2004.  Specifically, the FBI emai██████████████████████████ █████████████████████████████████████████████████████████ *Id.* at 2. The email further reports ███████ ██████ *Id.*

[125] *See* Pamela Hess, *CIA Will Release Videotape Documents*, Wash. Post, Dec. 20, 2007.

### SECOND CLAIM FOR RELIEF
### (DUE PROCESS – FIFTH AMENDMENT
### TO THE CONSTITION OF THE UNITED STATES
### UNLAWFUL DEPRIVATION OF LIBERTY)

92.    Petitioner incorporates paragraphs 1-91 by reference.

93.    By the actions described above, Respondent, acting under color of law, has violated and continues to violate Petitioner's right to be free from arbitrary, prolonged and indefinite detention protected by the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

### THIRD CLAIM FOR RELIEF
### (DUE PROCESS – FIFTH AMENDMENT
### TO THE CONSTITUTION OF THE UNITED STATES
### UNLAWFUL CONDITIONS OF CONFINEMENT)

94.    Petitioner incorporates paragraphs 1-93 by reference

95.    By the actions described above, Respondent, acting under color of law, has violated and continues to violate the right of the detained Petitioner to be free from unduly harsh conditions of confinement or conditions of confinement that would shock the conscience, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

### FOURTH CLAIM FOR RELIEF
### (DUE PROCESS – INTERNATIONAL LAW
### UNLAWFUL DEPRIVATION OF LIBERTY)

96.    Petitioner incorporates paragraphs 1-95 by reference.

97.    By the actions described above, Respondent, acting under color of law, has violated and continues to violate customary international law, Arts. 9 and 14 of the International Covenant on Civil and Political Rights, and Arts. XXV, XXVI, XXVIII of the American Declaration on the Rights and Duties of Man.

UNCLASSIFIED// FOR PUBLIC RELEASE

### FIFTH CLAIM FOR RELIEF
### (DUE PROCESS – INTERNATIONAL LAW
### UNLAWFUL CONDITIONS OF CONFINEMENT)

98.    Petitioner incorporates paragraphs 1-97 by reference.

99.    By the actions described above, Respondent, acting under color of law, has

violated and continues to violate the right of the detained Petitioner to be free from arbitrary,

prolonged, and indefinite detention, in violation of customary international law, Arts. 9 and 14 of

the International Covenant on Civil and Political Rights, and Arts. XXV, XXVI, XXVIII of the

American Declaration on the Rights and Duties of Man.

### SIXTH CLAIM FOR RELIEF
### (DUE PROCESS – FAILURE TO COMPLY
### WITH U.S. MILITARY REGULATIONS AND
### INTERNATIONAL HUMANITARIAN LAW)

100.    Petitioner incorporates paragraphs 1-99 by reference.

101.    By the actions described above, Respondent, acting under color of law, having

violated and continues to violate the rights accorded to persons seized by the United States

Military in times of armed conflict, as established by, inter alia, the regulations of the United

States Military, Articles 4 and 5 of Geneva Convention III, Geneva Convention IV, and

customary international law.

### SEVENTH CLAIM FOR RELIEF
### (WAR POWERS CLAUSE)

102.    Petitioner incorporates paragraphs 1-101 by reference.

103.    By the actions described above, Respondent, acting under color of law, has

exceeded the constitutional authority of the Executive and has violated and continues to the War

Powers Clause by ordering the prolonged and indefinite detention of the detained Petitioner

without Congressional authorization.

UNCLASSIFIED// FOR PUBLIC RELEASE

UNCLASSIFIED// FOR PUBLIC RELEASE

### EIGHTH CLAIM FOR RELIEF
### (ARBITRARY AND UNLAWFUL DETENTION – VIOLATION OF THE APA)

104.    Petitioner incorporates paragraphs 1-103 by reference.

105.    By detaining Petitioner for the duration and in the manner described herein, Respondent has arbitrarily, unlawfully, and unconstitutionally detained the Petitioner, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

### V.
### PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for relief as follows:

1.    Order Petitioner released from Respondent's unlawful custody unless Respondent can demonstrate the legality of his continued confinement by a lawful process;

2.    Order Respondent to allow counsel to meet and confer with the detained Petitioner, in private and unmonitored attorney-client conversations;

3.    Order Respondent to cease all interrogations of the detained Petitioner, direct or indirect, while this litigation is pending;

4.    Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner is arbitrary and unlawful, a deprivation of liberty without due process in violation of the Fifth Amendment to the United States Constitution, and in violation of the law of nations and treaties of the United States;

5.    Order and declare that Petitioner is being held in violation of the Fifth Amendment to the United States Constitution;

6.    Order and declare that Petitioner was tortured when he was waterboarded in violation of the laws of the United States and in violation of the law of nations and treaties of the United States;

UNCLASSIFIED// FOR PUBLIC RELEASE

7.      Order and declare that the detained Petitioner is being held in violation of customary international law, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man;

8.      Order and declare that the detained Petitioner is being held in violation of the regulations of the United States Military, the Geneva Conventions, and international humanitarian law;

9.      Order and declare that Petitioner's counsel, who have the highest level of security, clearance shall be afforded an opportunity to review any and all evidence in the possession of, *inter alia*, the CIA, FBI, the Department of Defense, NSA, Department of State, White House and any other governmental entity or agency that relates to Petitioner, his detention, treatment, and confinement.

10.     Order that counsel be allowed to have Petitioner examined by independent medical specialists to determine his present physical and mental state so as to allow counsel to determine whether he can assist in his own defense.

11.     To the extent Respondent contests any material factual allegations in this Petition, schedule an evidentiary hearing, at which Petitioner may adduce proof in support of his allegations;

12.     Order and declare that every time a factual assertion is made in a pleading, motion, opposition, reply, or any other paper filed with the court, that the Government be required to have an attorney associated with the appropriate government entity—including but not limited to the Department of Defense, Central Intelligence Agency, Federal Bureau of investigation, National Security Administration, Department of State, and/or White House or any other—be a signatory to the filing in order to assure accountability to the court.

13.    Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the United States Constitution, federal statutory law, and international law.

Dated:  August 25, 2008

Respectfully submitted,

Joseph Margulies
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL  60611
(312) 503- 0890

George Brent Mickum IV [Bar No. 396142]
Amanda L. Edwards
Spriggs & Hollingsworth
1350 I Street NW
Washington, District of Columbia 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Baher Azmy
Seton Hall Law School
Center for Social Justice
One Newark Center
Newark, NJ 07102
(973) 642-8700

*Counsel for Petitioner*

41

UNCLASSIFIED// FOR PUBLIC RELEASE

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the Court Security Officer for clearance

and filing this 22nd day of August 2008. My understanding is that the Court Security Officer will

serve the government. Once Petitioner's counsel has been notified that the document has been cleared

and filed, copies will be served on the following via first class mail:

Judry L. Subar
Terry M. Henry
Andrew I. Warden
Jean Lin
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusettes Avenue, N.W.
Washington, D.C. 20530


George Brent Mickum IV

42

UNCLASSIFIED// FOR PUBLIC RELEASE

UNCLASSIFIED// FOR PUBLIC RELEASE

# EXHIBIT 1

UNCLASSIFIED// FOR PUBLIC RELEASE

1.  *A Review of the FBI's Involvement and Observations of Detainee Interrogation in Guantanamo Bay, Afghanistan, and Iraq*, Department of Justice: Office of the Inspector General, May 2008.
    http://www.usdoj.gov/oig/special/s0805/final.pdf.

2.  A. John Radsan, *Symposium on Reexamining the Law of War: The Collision Between Common Article Three and The Central Intelligence Agency*, 56 Cath. U.L. Rev. 959, 978 (2007).

3.  *ACLU, NYCLU Ask Court to Hold CIA in Contempt*, Dec. 12, 2007.
    http://www.nyclu.org/node/1534.

4.  

5.  Alex Koppelman, *Ashcroft suggests CIA sought legal approval after torture began*, SALON, July 17, 2008. ·
    http://www.salon.com/politics/war_room/2008/07/17/ashcroft/index.html?source=refresh.

6.  Alfred McCoy, *The U.S. has a History of Using Torture*, HISTORY NEWS NETWORK, Dec. 4, 2006.  http://hnn.us/articles/32497.html

7.  Amy Goodman, *The Dark Side: Jane Mayer on the Inside Story of How the War on Terror Turned Into a War on American Ideals*, Interview Transcript, DEMOCRACY NOW, July 18, 2008.
    http://www.democracynow.org/2008/7/18/the_dark_side_jane_mayer_on

8.  

9.  Brian Ross and Richard Esposito, *CIA's Harsh Interrogation Techniques Described – Sources Say Agency's Tactics lead to Questionable Confessions, Sometimes to Death*, ABC NEWS, Nov. 18, 2005.
    http://abcnews.go.com/WNT/Investigation/story?id=1322866.

10. Brian Ross and Richard Esposito, *EXCLUSIVE: Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons: 10 Out of 11 High-Value Terror Leaders Subjected to 'Enhanced Interrogation Techniques,'* ABC NEWS, Dec. 5, 2005. http://abcnews.go.com/WNT/Investigation/story?id=1375123.

11. Brian Ross, *CIA - Abu Zubaydah: Interview with John Kiriakou*: Transcript, ABC NEWS, Dec. 10, 2007.

1

http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript1_blotter07
1210.pdf.

12.    Charles H. Brower II, *The Lives of Animals, the Lives of Prisoners, and the Revelations of Abu Ghraib*, 37 Vand. J. Transnat'l L. 1353, 1374 (2004).

13.    *CIA Destroyed Interrogation Videotapes Despite Court Orders*, FOX News, Dec. 12, 2007. http://www.foxnews.com/story/0,2933,316516,00.html.

14.    ███████████████████████████████████████████████████

15.    ███████████████████████████████████████████████████

16.    Dan Eggen and Walter Pincus, *FBI, CIA Debate Significance of Terror Suspect: Agencies Also Disagree On Interrogation Methods*, WASH. POST, Dec. 18, 2007, at A1. http://www.washingtonpost.com/wp-dyn/content/article/2007/12/17/AR2007121702151.html.

17.    Dan Eggen, *White House Defends CIA's Use of Waterboarding in Interrogations*, WASH. POST, February 7, 2008, A3. http://www.washingtonpost.com/wp-dyn/content/article/2008/02/05/AR2008020502764.html?hpid=moreheadlines

18.    Dan Froomkin, *Bush's Exhibit A for Torture*, WASH. POST, Dec. 18, 2007. http://www.washingtonpost.com/wp-dyn/content/blog/2007/12/18/BL2007121800862.html.

19.    ███████████████████████████████████████████████████

20.    Dana Priest, *CIA Holds Terrors Suspects in Secret Prisons*, WASH. POST, Nov. 2, 2005, A1. http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110101644.html.

21.    ███████████████████████████████████████████████████

22.    ███████████████████████████████████████████████████

2

UNCLASSIFIED// FOR PUBLIC RELEASE

23.    *Director's Statement on the Taping of Early Detainee Interrogations: Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early Detainee Interrogations*, Dec. 6, 2007. https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html.

24.    Ed Pilkington, *'I was responsible for 9/11, from A to Z' - a confession from Guantánamo Bay*, THE GUARDIAN, March 15, 2007. http://www.guardian.co.uk/world/2007/mar/15/alqaida.september11

25.    Emma Schwartz, *Justice Dept. Inspector General Claims CIA Hampered Its Investigation: Report says the agency blocked access to senior al Qaeda operative Abu Zubaydah*, U.S. NEWS & WORLD REPORT, May 20, 2008. http://www.usnews.com/articles/news/2008/05/20/justice-dept-inspector-general-claims-cia-hampered-its-investigation.html

26.    ██████████████████████████████████████████████████████████████

27.    Eun Young Choi, *Veritas, Not Vengeance: An Examination of the Evidentiary Rules for Military Commissions in the War Against Terrorism*, 42 Harv. C.R.-C.L. L. Rev. 139, 168 (2007).

28.    *Fate and Whereabouts Unknown: Detainees in the War on Terror, NYU School of Law: Center for Human Rights and Global Justice*, Dec. 17, 2005. http://www.chrgj.org/docs/Whereabouts%20Unknown%20Final.pdf.

29.    ██████████████████████████████████████████████████████████████

30.    *Impunity for the Architects of Illegal Policy*, Human Rights Watch. http://www.hrw.org/reports/2005/us0405/6.htm

31.    J.J. Green, *Former CIA Officer: Waterboarding is Wrong, but it Worked*, WTOPnews.com, Mar. 20, 2008. http://www.wtop.com/?sid=1368866&nid=251.

32.    Jane Mayer, *The Black Sites: A rare look inside C.I.A.'s secret interrogation program*, THE NEW YORKER, Aug. 13, 2007. http://www.newyorker.com/reporting/2007/08/13/070813fa_fact_mayer.

33.    Jane Mayer, THE DARK SIDE (Doubleday 2008).

34.    ██████████████████████████████████████████████████████████████

3

UNCLASSIFIED// FOR PUBLIC RELEASE

35.     Joby Warrick and Dan Eggen, *CIA Tapes Were Kept from 9/11 Panel, Report Says*, WASH. POST, Dec. 23, 2007, at A11.
        http://www.washingtonpost.com/wp-dyn/content/article/2007/12/22/AR2007122201622.html.

36.     John F. Burns, *A Nation Challenged: The Fugitives; In Pakistan's Interior, A Troubling Victory In Hunt for Al Qaeda*, N.Y. TIMES, April 14, 2002.
        http://query.nytimes.com/gst/fullpage.html?res=9A00EFDA123CF937A25757
        C0A9649C8B63

37.     Jon Ward, *White House Says Waterboarding Not Torture*, WASH. TIMES, February 7, 2008.
        http://washingtontimes.com/apps/pbcs.dll/article?AID=/20080207/NATION/15
        9391790/1002

38.     Josh White, *Waterboarding Is Torture, Says Ex-Navy Instructor*, WASH. POST, Nov. 9, 2007, at A4. http://www.washingtonpost.com/wp-dyn/content/article/2007/11/08/AR2007110802150.html

39.     Katherine Eban, *Rorschach and Awe*, VANITY FAIR, July 17, 2007.
        http://www.vanityfair.com/politics/features/2007/07/torture200707.

40.     Kevin Whitelaw, *Abu Zubaydah's Health Prompted CIA Videos: Suspect had been shot multiple times during operation to capture him*, U.S. NEWS & WORLD REPORT, Dec. 12, 2007.
        http://www.usnews.com/articles/news/2007/12/12/suspects-health-prompted-cia-videos.html.

41.     *Lauer Stirs Scandal Over How Water Boarding Saved Lives*, Media Research Center, Dec. 12, 2007.
        http://www.mediaresearch.org/cyberalerts/2007/cyb20071212.asp#1

42.     Mark Denbeaux, *Captured on Tape: Interrogation and Videotaping of Detainees in Guantanamo Bay*, Seton Hall University, Feb. 14, 2008.
        http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1093330.

43.     Michael Isikoff, Mark Hosenball and Michael Hirsh, *Aggressive interrogation techniques of terror suspects is under scrutiny*, NEWSWEEK, Dec 17, 2007.
        http://www.newsweek.com/id/74317.

44.     ███████████████████████████████████████████████

45.     Pamela Hess, *CIA Will Release Videotape Documents*, WASH. POST, Dec. 20, 2007.

UNCLASSIFIED// FOR PUBLIC RELEASE

46.   Paul McLeary, *The Forgotten Story of Abu Zubaydah*, COLUMBIA JOURNALISM
      REVIEW, Sept. 7, 2006.
      http://www.cjr.org/politics/the_forgotten_story_of_abu_zub.php.

47.   President Bush, Remarks by the President at Connecticut Republican
      Committee Luncheon, April 9, 2002.
      http://www.whitehouse.gov/news/releases/2002/04/20020409-8.html.

48.   President Bush, Remarks by the President at Thaddeus McCotter for Congress
      Dinner, October 14, 2002.
      http://www.whitehouse.gov/news/releases/2002/10/20021014-3.html.

49.   President Bush, Remarks by the President in Address to the Nation, June 6,
      2002. http://www.whitehouse.gov/news/releases/2002/06/20020606-8.html.

50.   *President Discusses Creation of Military Commissions to Try Suspected
      Terrorists*, Office of the Press Secretary, Sept. 6, 2006.
      http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html.

51.   Ray McGovern, *Destruction of CIA Tapes Can't Hide Barbaric U.S. Torture
      Methods*, AlterNet, Dec. 13, 2007. http://www.alternet.org/story/70490/.

52.   Richard E. Mezo, *Why It Was Called 'Water Torture'*, WASH. POST, Feb. 10,
      2008, at B7.  http://www.washingtonpost.com/wp-
      dyn/content/article/2008/02/08/AR2008020803156.html?sub-AR.

53.   Richard Esposito and Brian Ross, *Coming in From the Cold: CIA Spy Calls
      Waterboarding Necessary But Torture: Former Agent Says Enhanced
      Technique Was Used on Al Qaeda Chief Abu Zubaydah*, ABC NEWS, Dec. 10,
      2007. http://abcnews.go.com/Blotter/Story?id=3978231&page=5.

54.   Ron Suskind, *The One Percent Doctrine: Deep Inside America's Pursuit of its
      Enemies since 9/11*, New York: Simon & Schuster, 2006.

55.   ████████████████████████████████████████████

56.   Scott Shane and Mark Mazetti, *CIA Tapes Lived and Died to Save Image*, N.Y.
      TIMES, Dec. 30, 2007, at A1.
      http://www.nytimes.com/2007/12/30/washington/30intel.html?_r=1&oref=slog
      in.

57.   ████████████████████████████████████████████

UNCLASSIFIED// FOR PUBLIC RELEASE

UNCLASSIFIED// FOR PUBLIC RELEASE

58.    Scott Shane, *China Inspired Interrogations at Guantánamo*, N.Y. TIMES, July
       2, 2008.
       http://www.nytimes.com/2008/07/02/us/02detain.html?pagewanted=1&ei=508
       7&em&en=c0abf3c9181bff52&ex=1215144000.

59.    Serrin Turner & Stephen J. Schullhoffer, *The Secrecy Problem in Terrorism
       Trials,* Brennan Center for Justice, 55 (2005).
       http://brennan.3cdn.net/6a0e5de414927df95e_lbm6iy66c.pdf.

60.    Steve Benen, *Another Al Qaeda Number 3*, Guest Posting, THE WASHINGTON
       MONTHLY, Jan. 31, 2008.
       http://www.washingtonmonthly.com/archives/individual/2008_01/013025.php.

61.    Tanya Nolan, *Former CIA Agent Reveals Use of 'Waterboarding' in
       Interrogations*, THE WORLD TODAY, Dec. 12, 2007.
       http://www.abc.net.au/worldtoday/content/2007/s2116703.htm.

62.    The origins of aggressive interrogation techniques: Part I of the Committee's
       inquiry into the treatment of detainees in U.S. custody.

63.    Unclassified handwritten notes of George Brent Mickum, dated Feb. 22, 2008.

64.    Unclassified Summary of Evidence for Combatant Status Review Tribunal. (19
       March 2007). http://www.defenselink.mil/news/ISN10016.pdf.

65.    Unclassified Verbatim Transcript of Combatant Status Review Tribunal
       Hearing for ISN 10016. (27 March 2007).
       http://www.defenselink.mil/news/transcript_ISN10016.pdf.

66.    *United States' "Disappeared" CIA Long-term "Ghost Detainees*", Human
       Rights Watch. http://www.hrw.org/backgrounder/usa/us1004/index.htm.

67.    Walter Pincus, *Pakistan Is Threatened, Intelligence Chief Says*, WASH. POST,
       Feb. 6, 2008, at A3. http://www.washingtonpost.com/wp-
       dyn/content/article/2008/02/05/AR2008020502979.html

68.    Walter Pincus, *Waterboarding Historically Controversial*; In 1947, the U.S.
       Called It a War Crime: in 1968, It Reportedly Caused an Investigation, WASH.
       POST, Oct. 5, 2006, at A17. http://www.washingtonpost.com/wp-
       dyn/content/article/2006/10/04/AR2006100402005.html.

UNCLASSIFIED// FOR PUBLIC RELEASE