FILED WITH
COURT SECURITY OFFICER
9/21/09
DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                        x
                                        :
ZAYN AL ABIDIN MUHAMMAD HUSAYN,         :
                                        :
                Petitioner,             :
                                        :
        v.                              :    No: 08-cv-1360
                                        :
ROBERT M. GATES,                        :
                                        :
                Respondent.             :
                                        :
                                        :
                                        x
```

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION FOR SANCTIONS FOR THE SPOLIATION OF EVIDENCE

Petitioner Zayn Al Abidin Muhammad Husayn ("Petitioner"), by and through his undersigned counsel, hereby moves the Court to impose sanctions against Respondents for the deliberate destruction of material evidence relevant to Petitioner's *habeas corpus* action.

### PRELIMINARY STATEMENT

Eighty-three times, the United States government strapped Petitioner horizontally to a board, covered his face in cloth, and emptied bottles of water into his nose, mouth, and lungs, in order to create the incipient panic of death. The government subjected Petitioner to the waterboard, as well as to "walling," prolonged sleep and food deprivation, confinement in the "dog box," and a host of other "enhanced interrogation techniques," purportedly in order to ring truthful responses from Petitioner regarding his then-assumed association with al Qaeda or terrorist plots against the United States.

Indeed, so certain were Respondents of the truth-seeking function of their novel interrogation methods, they memorialized Petitioner's interrogation sessions on, at least, ninety

videotapes. These videotapes, however, not only revealed the unlawful interrogation techniques employed by U.S. officials, but also contained Petitioner's persistent, repeated, and categorical denials of wrongdoing. As fully described below, these videos—littered as they were with denials of guilt under pressure of torture and abuse—contain valuable exculpatory evidence that is critical in assisting Petitioner in proving himself innocent of many of the charges currently forming the basis of his detention. Yet, no doubt concerned about the legality of its conduct, in 2005, the CIA destroyed these ninety videotapes; and, it did so at a time when litigation about CIA conduct and about the legality of Petitioner's detention was most certainly foreseeable. The CIA's actions currently are the subject of a criminal investigation. The conduct also is unlawful in the civil context: it constitutes spoliation of material evidence for which Petitioner is entitled to a remedy. Under well established law, this Court is authorized to require the government to produce in the next best available form material evidence that the government has unlawfully destroyed. Indeed, Petitioner respectfully submits that this Court is obligated to do so, both to protect Petitioner from being prejudiced by the government's actions and to ensure that the government does not obtain a great strategic benefit in court from its serious wrongdoing and criminal conduct.

## FACTUAL BACKGROUND

### A. Petitioner's Torture

United States and Pakistani officials arrested Petitioner on March 28, 2002. Almost immediately, he was transferred to CIA custody                                                         Although the government has now largely backed down from their profoundly mistaken assumptions,[1]

---

[1] *See* Scott Shane, "Divisions Arose on Rough Tactics for Qaeda Figure," *N.Y. Times*, Apr. 18, 2009, at A1 (reporting that, far from being a top al Qaeda operative, Petitioner was little more than "a helpful training camp personnel clerk").

2

UNCLASSIFIED//FOR PUBLIC RELEASE

government officials suggested at the time of his capture that they had "one of the top three leaders" in al Qaeda who was "involved in every major terrorist operation [al Qaeda has] carried out."[2] Accordingly, government officials specially approved a menu of "enhanced interrogation techniques" which included, among other things, slamming him again and again into a wall, stripping him naked and suspending him for hours from hooks in the ceiling, repeatedly confining him in a coffin or jamming him into a tiny "dog box," depriving him of sleep for days on end, and, of course, strapping him to an inclined board, wrapping his face in cloth, and pouring water over his mouth and nose to create the panic of imminent death. These "enhanced" techniques were administered against Petitioner frequently, and for a period of months. Respnodents claim that in one month alone, Petitioner was waterboarded 83 times.[3]

Despite the torture he endured, Petitioner repeatedly denied all activity that would have justified his detention, including membership in or support for al Qaeda or participation in or knowledge of terrorist actions against the United States. *See* Exhibit 1, Declaration of Petitioner

---

[2] First quote: President Bush, Remarks by the President at Thaddeus McCotter for Congress Dinner (Oct. 14, 2002), http://www.whitehouse.gov/news/releases/2002/10/20021014-3.html; *see also* President Bush, Remarks by the President in Address to the Nation (June 6, 2002), http://www.whitehouse.gov/news/releases/2002/06/20020606-8.html (describing Petitioner as "al Qaeda's chief of operations"); second quote: Abu Zubaydah Memo at 7; *see also* Psychological Assessment of Zain al Abedin Muhammed Hassan a.k.a. Abu Zubaydah (fax copy to John Yoo, dated July 25, 2002) (stating that Petitioner was a "senior Bin Laden lieutenant," was "involved in every major Al Qa'ida terrorist operation" and rose to "third or fourth man in Al Qa'ida").

[3] Petitioner's interrogation has now been described in a number of official documents. *See, e.g.*, ICRC Report on the Treatment of Fourteen "High Value Detainees" in CIA Custody, Feb. 2007. http://www.nybooks.com/icrc-report.pdf, at 15 ("ICRC Report"); *with* Jay Bybee, Memorandum for John Rizzo, Acting General Counsel of the Central Intelligence Agency, *Interrogation of al Qaeda Operative*, Aug. 1, 2002 ("Abu Zubaydah Memo"); Memorandum for John A. Rizzo, Senior Deputy General Counsel, Central Intelligence Agency, Re: Application of United States Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees, Office of Legal Counsel, Department of Justice, March 30, 2005, at 37 ("March 30, 2005 Memorandum"); *see also* Jane Mayer, "The Black Sites," *The New Yorker*, Aug. 13, 2007; Jane Mayer, *The Dark Side: The Inside Story of How the War on Terror Turned into a War on American Ideals*, 164 (2008); Scott Shane & Mark Mazzetti, Tapes by C.I.A. Lived and Died To Save Image," *N.Y. Times*, Dec. 30, 2007, at A1. It has also been described in a number of pleadings filed with the Court. *See, e.g.*, Petitioner's Emergency Motion for Immediate Disclosure of Petitioner's Medical Records and for Related Relief [dkt 26] 2-6.

3

Zayn al Abidin Muhammad Husayn, dated July 23, 2009. Over and over again, as agents pulled him from the dog box, or returned him to the coffin, or released him from the hooks in the ceiling, or raised his body to vertical so he could vomit and gasp after another session strapped to the board—after they applied all the "enhanced" techniques that they insisted would produce truthful information—Petitioner maintained his innocence. *Id.* at ¶¶ 4-7, 13-17.[4] Eventually, even Petitioner's interrogators admitted to him that they had been mistaken—that he was not the person they thought he was when they began the interrogation, that he was not affiliated with al Qaeda, and that he had nothing to do with the attack of 9/11. *Id.* at ¶¶ 5, 24-26.

## B. The Government's Unlawful Destruction of Material Evidence

The CIA videotaped these interrogations. These tapes—90 in all—contained both Petitioner's protestations and a number of his interrogators' admissions. In 2005, however, the CIA destroyed the tapes. It did so despite repeated warnings from senior officials in every branch of government that the tapes should be preserved.[5] As early as 2002, for instance, Robert Muller, then the CIA's top attorney, warned against destroying the tapes. Muller brought the issue to the House Intelligence Committee and consulted Republican Chairman Porter Goss and the Committee's ranking Democrat, Jane Harman, both of whom opposed destruction.[6] In 2004, Goss became the Director of the CIA, where he again urged his subordinates to maintain the tapes. For her part, Harman has since openly condemned the Agency's decision. "I think what

---

[4] Indeed, in the May 2005 memorandum by the OLC, the author concedes the CIA continued to torture Petitioner even *after* his interrogators at the black site told officials in Langley that he was fully "compliant." The officials in Langley ordered the torture to continue, and questioned whether the torturers on the ground had "lost their spine." *See* Memorandum from Steven G. Bradbury, Principal Deputy Attorney General, to John A. Rizzo, Senior Deputy General Counsel, Central Intelligence Agency at 31 n. 28 (May 30, 2005); *see also* Joby Warrick & Peter Finn, "Internal Rifts on Road to Torment," *Wash. Post,* July 19, 2009, at A1.

[5] *See, e.g.,* Scott Shane & Mark Mazzetti, "Tapes by C.I.A. Lived and Died To Save Image," *N.Y. Times,* Dec. 30, 2007.

[6] *Id.*

4

UNCLASSIFIED//FOR PUBLIC RELEASE

was done was wrong," she said. "It may well have violated the law."[7] The Agency also consulted Harriet Miers, then the deputy White House Chief of Staff, and John D. Bellinger, former chief counsel for the National Security Council. Both advised against destruction.[8]

The Executive and Legislative Branch officials who warned against destruction were joined by the many federal judges who likewise ordered that such evidence be preserved.[9] John Durham, the federal prosecutor charged with investigating the tapes' destruction, has identified at least seventeen court orders that may have been violated by the destruction.[10] At least one of those was issued by this Court. In *Abdullah v. Bush*, 534 F. Supp 2d 22 (D.D.C. 2008), the petitioner had made a colorable showing that abu Zubaydah had supplied information about him in 2002, which compelled an order requiring the government to "preserve and maintain all evidence, documents and information, without limitation, now or ever in respondents' possession, custody or control, regarding the individual detained petitioner[ ] in th[is] case[ ]." *Id.* at 22-23. [11] Judge Leonie Brinkema of the Eastern District of Virginia likewise issued an order seeking documentation of Petitioner's interrogation while she presided over the trial of

---

[7] *Morning Edition: House Committee to Probe Ruin of CIA Tapes* (NPR radio broadcast Jan. 16, 2008).

[8] Mark Mazzetti, "CIA Was Urged to Keep Interrogation Videotapes," *N.Y. Times*, Dec. 8, 2007, at A1.

[9] *See* Mark Mazzetti & Scott Shane, "Tapes' Destruction Hovers Over Detainee Cases," *N.Y. Times*, Mar. 28, 2008, at A1.

[10] *Id.; CIA Destroyed Interrogation Videotapes Despite Court Orders*, FOX News, Dec. 12, 2007, *available at* http://www.foxnews.com/story/0,2933,316516,00.html.

[11] On September 2, 2009, in connection with Petitioner's outstanding Motion and Supplemental Motion for a Preservation Order in this case, the government filed a "Notice," alerting Petitioner and the Court that, despite its earlier, adamant reassurance that the government was aware of its "duty to preserve" evidence related to Petitioner's treatment and interrogation in CIA black sites, such evidence had, in fact, at some point been destroyed. Petitioner filed an emergent response to this government filing and reiterates his request that the Court order the relief requested in that filing and in Petitioner's pending motions for a preservation order. Respondent's revelation confirms that the CIA does not take seriously its legal obligations to this Court. It also entitles Petitioner to seek sanctions for such spoliation at a future date, when the government clarifies what in particular it has destroyed.

UNCLASSIFIED//FOR PUBLIC RELEASE

Zacarias Moussaoui in 2005.[12]   The Bush Administration assured her that no such tapes existed and, later the same month, destroyed the tapes.[13]  Judge Brinkema bemoaned the government's conduct in a speech at Colby College in 2008: "One of the saddest realities I've had to face," she lamented, "has been the reality that my government didn't always tell me the truth."[14]

This same reality confronted the members of the 9/11 Commission, who requested documentation regarding detainee interrogations. The CIA failed to provide Petitioner's tapes, falsely claiming that no such evidence existed.[15]   Upon learning of the tapes' destruction, the Commission's general counsel, Daniel Marcus, fumed that the Agency "knew we wanted to see those guys . . . we made clear we wanted the best available evidence of what happened."[16]

Despite the chorus calling for the tapes to be preserved, in November 2005, the clandestine operations director Jose A. Rodriguez ordered that they be destroyed. Apparently his order was followed.[17]  The Agency maintains it acted solely to protect the identities of its interrogators.[18]  But this argument is unpersuasive; available technology allows agent identities to be obscured while keeping video footage intact; even a redacted, verified, transcript from the tapes could have been created and provided to counsel.

---

[12] Mark Mazzetti & Scott Shane, "CIA Destroyed Tapes as Judge Sought Interrogation Data," *N.Y. Times*, Feb. 7, 2008, at A8.

[13] *Id.*

[14] Matthew Barakat, "Judge to Moussaoui Jury: You got it right," *Richmond Times Dispatch* (Virginia), July 24, 2008, at B5.

[15] Mark Mazzetti, "CIA Destroyed 2 Tapes Showing Interrogations," *N.Y. Times*, Dec. 7, 2007, at A1.

[16] Richard B. Schmitt, "Lost tapes may entangle CIA," *L.A. Times*, Dec. 11, 2007.

[17] Scott Shane & Mark Mazzetti, "Tapes by C.I.A. Lived and Died To Save Image," *N.Y. Times*, Dec. 30, 2007, at A1.

[18] Press Release, Gen. Mike Hayden, Director's Statement on the Taping of Early Detainee Interrogations (Dec. 6, 2007), *available at* https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html.

6

UNCLASSIFIED//FOR PUBLIC RELEASE

One former CIA agent has put forward a more plausible explanation for the CIA's actions: "[The footage] would definitely have shocked the conscience of the country . . . [T]he effect would have been unmanageable."[19] His claim is especially compelling in light of the scandal and legal consequences that followed the exposure of prisoner abuse at Abu Ghraib in 2004. Days after the Abu Ghraib photos became public, Bush administration officials held secret meetings to discuss the fate of the abu Zubaydah tapes.[20]

The tapes, however, are not the only record of what took place during these interrogations. The CIA also kept meticulous, contemporaneous logs and notes and drafted detailed reports which described the content of the interrogations in great detail. In addition, the Agency cabled almost daily updates on the progress of the interrogations to headquarters and other locations. These documents still exist.[21]

## ARGUMENT

## I. THIS COURT SHOULD IMPOSE SANCTIONS FOR THE GOVERNMENT'S DELIBERATE SPOLIATION OF EVIDENCE.

Spoliation is "the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999) (citing Black's Law Dictionary 1401 (6th ed.1990)). It is elementary that spoliators should not benefit from their wrongdoing. 1 Sir T. Willes Chitty, et al., Smith's Leading Cases, 404 (13th ed.1929) (all things are presumed

---

[19] Mayer, *The Dark Side*, at 333.

[20] Scott Shane & Mark Mazzetti, *Tapes by C.I.A. Lived and Died To Save Image, N.Y. Times*, Dec. 30, 2007, at A1.

[21] *See* Press Release, Gen. Mike Hayden, Director's Statement on the Taping of Early Detainee Interrogations (Dec. 6, 2007), *available at* https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html].

7

UNCLASSIFIED//FOR PUBLIC RELEASE

against a spoliator).[22] Accordingly, courts possess ample authority to sanction a party for its destruction of relevant evidence. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991) *Shepherd v. Amer. Broadcasting Co., Inc.*, 62 F.3d 1469, 1472 (D.C. Cir 1995) (courts have "inherent power to punish litigation misconduct"). Because this authority derives from the court's "inherent power to protect its integrity and prevent abuses of the judicial process," *Webb v. Dist. of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998), it may be exercised even in the absence of a discovery or preservation order. *Shepherd*, 62 F.3d at 1474-75 (D.C. Cir 1995).[23]

Likewise, the Court has broad equitable power to craft an appropriate sanction. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) ("[A] district court has broad discretion in crafting a proper sanction for spoliation . . . ."); *see also Davis v. U.S.* 641 A.2d 484, 494 (D.C. Ct. App. 1994) ("[T]he matter of what sanction, if any, is appropriate is within the discretion of the trial court."). In this context, courts use sanctions to deter future destruction, to redress past spoliation, and to minimize prejudice to the harmed party. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (explaining that spoliation sanctions are aimed at "leveling the evidentiary playing field" as well as "sanctioning the improper conduct").[24]

---

[22] *See also Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 848 n.2 (D.C. Ct. App. 1998); *U.S. v. Graham*, 102 F.2d 436, 442 (2d. Cir. 1939); *Davison v. Cole Sewell Corp.*, 231 Fed. Appx. 444, 451 (6th Cir. 2007); *Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126, 129 n.24 (7th Cir. 1974); *Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. Ry. Co.*,80 F.2d 32, 36–37 (8th Cir. 1935).

[23] *See also Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992); *Telecom Intern.*, 189 F.R.D. at 81 (citing *Chambers*, 501 U.S. at 43–45); *Blinzler v. Marriott Intern., Inc.*, 81 F.3d 1148 (1st Cir. 1996) (finding that spoliation sanctions are justified when "a party is aware of circumstances that are likely to give rise to future litigation.")

[24] *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 74 (S.D.N.Y.1991); *Skeete v. McKinsey & Co.*, No. 91 Civ. 8093, 1993 WL 256659, at *5 (S.D.N.Y. July 7, 1993); *see also National Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (sanctions for spoliation under Rule 37 penalize past conduct and deter future wrongdoing).

8

UNCLASSIFIED//FOR PUBLIC RELEASE

In this circuit, sanctions are appropriate if:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind'; and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it."

*Mazloum v. District of Columbia Metropolitan Police Dept.*, 530 F.Supp.2d 282,

291 (D.D.C. 2008) (these three elements materially state the standard for the District of Columbia). Based on this standard, the Court should impose sanctions against the government for spoliation of evidence.

### A. The Government Had an Obligation to Preserve the Tapes.

The government was under a duty to preserve the videotapes of abu Zubaydah's interrogation. A legal duty exists "when a party should have known that the evidence may be relevant to future litigation." *Mazloum*, 530 F. Supp.2d at 290 (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000)). In *Kronisch*, the defendants destroyed records about a controversial CIA program in which CIA agents administered lysergic acid diethylamide (LSD) to unsuspecting persons in an effort to evaluate LSD's usefulness in interrogations. *Id.* at 118. The court found that defendants were under a duty to preserve the records even though "no litigation, administrative action, or congressional investigation had commenced" because defendants should have reasonably anticipated litigation as a result their controversial conduct. *Id.* at 126–27.

The government's duty to preserve evidence was even greater in this case. Unlike documents in *Kronisch*, the videotapes of abu Zubaydah's interrogation were specifically the

9

UNCLASSIFIED//FOR PUBLIC RELEASE

subject of the investigation by the 9/11 Commission, as well as discovery orders and preservation motions from numerous federal judges, including this Court.[25] In addition, the in 2004, the Supreme Court ruled that detainees held in Guantanamo and potentially elsewhere, were entitled to access the writ of habeas corpus, *see Rasul v. Bush,* 542 U.S. 466 (2004) (writ reaches, at a minimum, U.S. detention operations in Guantanamo Bay), *al Maqaleh v. Obama,* 620 F.Supp.2d 51 (D.D.C. 2009) (writ reaches U.S. detention operations in Bagram, Afghanistan), and that habeas corpus guarantees a meaningful opportunity to challenge the lawfulness of a petitioner's detention, *see Hamdi v. Rumsfeld,* 542 U.S. 507 (2004). As a result, the government could not have failed to foresee that abu Zubaydah would challenge his detention. And, given the government's experience in prosecuting thousands of federal criminal defendants a year, it could not claim, unlike perhaps a private litigant, that it could not foresee that the evidence contained in those tapes would be material to abu Zubaydah's detention challenge. *See, e.g., United States v. Grammatikos,* 633 F.2d 1013 (2d Cir. 1980) (observing that "[t]he government has long been on notice of its duty to preserve discoverable evidence and has been repeatedly warned of the jeopardy in which it places its prosecutions when it disregards this obligation"); *see also Mazloum,* 530 F.Supp.2d at 291–292 ("[i]t is common knowledge that citizen complaints alleging police misconduct frequently form the basis of subsequent lawsuits," it "defies reason" for the nightclub owner not to have foreseen litigation, and that the "videotape evidence could be relevant in potential litigation.") Accordingly, the CIA was under a clear duty to preserve the videotapes.

---

[25] *See, e.g., Abdullah v. Bush,* 534 F.Supp.2d at 22–23 (discussing a preservation order that required the government to "preserve and maintain" evidence that included the video documentation of abu Zubaydah's interrogations); Mark Mazzetti & Scott Shane, "CIA Destroyed Tapes as Judge Sought Interrogation Data," *N.Y. Times,* Feb. 7, 2008, at A8 (discussing Judge Brinkema's order seeking documentation of abu Zubaydah's interrogations during the Moussaoui proceedings).

10

UNCLASSIFIED//FOR PUBLIC RELEASE

## B. The Government Destroyed the Tapes in Bad Faith

Under this standard, "bad faith destruction or concealment of evidence" includes both "deliberate destruction or concealment, and destruction or concealment with reckless disregard for the relevance of the evidence." *More v. Snow,* 480 F.Supp.2d 257, 275 (D.D.C. 2007) (internal quotes omitted).

First, the destruction was undertaken in knowing contravention of advice from numerous government officials *not* to destroy the tapes. Put on notice of its obligation to preserve this evidence, the Agency cannot plausibly suggest that its actions were accidental, rather than deliberate. Indeed, that a federal criminal investigation of Agency officials has been launched into motives for the destruction of the tapes should be conclusive evidence that the tapes were destroyed in "bad faith" under this necessarily broader civil spoliation standard. *See Battocchi v. Wash. Hosp. Center,* 581 A.2d 759, 765–66 (D.C. Ct. App. 1990) (noting that the intentional destruction of evidence by a party on notice not to do so constituted bad faith).

The government has suggested that it destroyed evidence of abu Zubaydah's interrogations for an assertedly lawful basis: to protect the identity of the parties involved in a controversial CIA interrogation program.[26] This is implausible. In *Kronish,* the defendants' similarly claimed that they destroyed records of their arguably unlawful experimentation on the plaintiffs merely in order to "preserve the confidential identities [of those involved], . . . prevent incomplete documents from being misunderstood, and to prevent paper overflow." 150 F.3d at 127. The court found it "somewhat hard to believe that" the defendants were not motivated by

---

[26] Press Release, Gen. Mike Hayden, Director's Statement on the Taping of Early Detainee Interrogations (Dec. 6, 2007), *available at* https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html.

UNCLASSIFIED//FOR PUBLIC RELEASE

"the possible consequences to themselves or to the CIA," and thought the defendants' concern for "being misunderstood" itself demonstrated an anticipation of litigation. *Id.*

As in *Kronish*, the government's excuses in this case cannot be credited. As the CIA certainly knows, technology exists which would have allowed the government to obscure the faces of government officials that appear in the tapes; alternatively, the government could have attempted to produce an independently verified, and—if necessary—redacted, version. In truth, there can be little doubt that the government destroyed the videotapes of abu Zubaydah because it feared the consequences, including *litigation consequences*, for the interrogators and the CIA if the public learned how it was treating its prisoners. The CIA recognized that the tapes would "shock[] the conscience of the country."[27]

At a minimum, because as described, their can be no credible dispute that Agency knew the tapes were "relevant to future litigation." *Mazloum, supra,* their destruction satisfies the "bad faith" prong of the spoliation. In *Mazloum*, the plaintiff brought suit against the police and the owner of a nightclub where the defendant alleged he was beaten by off-duty police officers. The owner of the night club destroyed a videotape that may have captured the altercation, despite being notified by the police that the patron had filed a complaint against the police officers. *Mazloum,* 530 F.Supp.2d at 291–292. *Id.* The court concluded that, because "[i]t is common knowledge that citizen complaints alleging police misconduct frequently form the basis of subsequent lawsuits," it "defies reason" for the nightclub owner not to have foreseen litigation, and that the "videotape evidence could be relevant in potential litigation." It similarly "defies reason" to believe the CIA was not aware that the evidence it chose to destroy would be relevant

---

[27] Mayer, *The Dark Side*, at 333 (quoting unnamed CIA officer).

UNCLASSIFIED//FOR PUBLIC RELEASE

in litigation initiated by Petitioner. In sum, because the CIA destroyed the tapes despite a legal duty not to do so, it possessed a "culpable state of mind." *Mazloum*, 530 F. Supp.2d at 291.

### C. The Destruction Deprived Petitioner of Relevant Evidence

Finally, by destroying the tapes, the Government deprived Petitioner of relevant and material evidence that bears directly on the lawfulness of his continued detention. Courts have repeatedly recognized what can scarcely be gainsaid—the Government's deliberate destruction of a defendant's taped statements may deprive him of material evidence. *See, e.g., United States v. Yevakpor*, 419 F. Supp. 2d 242, 245-52 (N.D.N.Y. 2006) (applying spoliation standard, court finds that deliberate destruction of 87.5% of video of defendant at Government facility, leaving only incriminating portions, compelled inference that Government knowingly destroyed material evidence and warranted exclusion of remaining portion); *Stuart v. State*, 907 P.2d 783, 813-816 (Idaho 1995) (deliberate destruction of taped jailhouse recordings between defendant and his counsel justified a "spoliation inference" against the Government); *cf. also United States v. Grammatikos*, 633 F.2d 1013 (2d Cir. 1980) ("severely chastis[ing]" the government for the deliberate destruction of tapes containing defendant's statements).[28]

Here, the Government undoubtedly destroyed material evidence. The Government alleges Petitioner is a devout al Qaeda operative and a close associate of Usama bin Laden who planned or participated in acts of terrorism against the United States. *See* Factual Return to Petitioner's Habeas Petition, Narrative, at 1. While in CIA custody, however, Petitioner repeatedly denied these allegations. Exhibit 1, Declaration of Petitioner at ¶¶ 4-7, 13-17. Even

---

[28] Whether and to what extent the Due Process Clause of the Fifth Amendment applies to this litigation is a matter that need not be resolved by this motion. Petitioner invokes the inherent power of the Court to sanction the deliberate spoliation of evidence—a power that exists independent of the Fifth Amendment. Regardless of the legal standard applied by these courts, the cases cited in the text bear on the spoliation inquiry because they reveal a judicial consensus that the deliberate destruction of a defendant's taped statements can deprive the accused of relevant and material evidence.

13

UNCLASSIFIED//FOR PUBLIC RELEASE

as he was subjected to the most ingenious interrogation techniques ever conceived by the United States Government, the very brutality of which were calculated to wring admissions from Petitioner's mouth, Petitioner denied membership in al Qaeda, denied support for bin Laden and his twisted version of *jihad*, and denied any role in unlawful acts against the United States. *See id.* Under these unique circumstances, the tapes were literally the best evidence of Petitioner's innocence. The extraordinary sight of Petitioner, straining against the straps that bound him to the board, gasping for air as he vomited the water poured up his nose and down his throat, yet still insisting upon his innocence, would have been the quintessential—indeed, iconic—image of a man whose detention is unlawful.

While the very nature of the Government's behavior in this case means that no prior judicial decision presents precisely the same spectacle of a bound, shackled, and tortured prisoner protesting his innocence on tape, courts have repeatedly held that tapes of a defendant's in-custody statements are material and must be disclosed when the *circumstances* surrounding those statements confirm their truthful or exculpatory character. In *Williamson v. Reynolds*, 904 F. Supp. 1529 (E.D. OK 1995), *aff'd on other grounds sub nom. Williams v. Ward*, 110 F. 3d 1508 (10th Cir. 1997), for instance, the government failed to disclose a videotape of the defendant's statements to government officials made following a polygraph examination. As in this case, the government in *Williamson* introduced inculpatory statements he supposedly made to other prisoners, but did not rely on defendant's statements to law enforcement but introduced. After viewing the tape, which contained "Petitioner's emphatic denial of participation in the murder," *id.* at 1565, the court held that it represented material evidence that should have been disclosed. "If the videotape had been accessible during trial, defense counsel could have

UNCLASSIFIED//FOR PUBLIC RELEASE

countered the prosecution's testimony regarding alleged *oral* admissions with the powerful tool of *visual* evidence of Petitioner's denials." *Id.* at 1564 (emphasis in original).

Likewise, in *Reasonover v. Washington*, 60 F. Supp. 2d 937, 950-54 (E.D. Mo. 1999), the Government failed to disclose the tape of a surreptitiously recorded conversation between the defendant and another suspect. On the tape, the two speakers protest their innocence and express their "bewilderment over their arrests, their shock and disgust about the murder ..., and their efforts to help police." *Id.* at 954. Because the defendant did not realize he was being taped, the court found her statements "a candid, reliable account of ... his actions before, during, and after the murder." *Id.* Because the circumstances in which the statements were made tended to corroborate the defendants protestation of innocence, the tape was obviously material and exculpatory, and should have been disclosed. *Id; see also Nickerson v. Texas*, 69 S.W. 3d 661 (Tex. Ct. App. 2002) (error to withhold videotape of defendant's aberrant behavior in jail).

The principle recognized in these cases is not limited to instances where the defendant's statement has been memorialized on tape. Courts have often held that, when the circumstances surrounding the creation of a defendant's statement tend to confirm its truthful or exculpatory character, that statement is material to the defense. In *United States v. Severdija*, 790 F.2d 1556 (11th Cir. 1986), for instance, a federal jury convicted the captain of a commercial vessel of narcotics offenses based on evidence that the Coast Guard found four tons of marijuana aboard his ship. Long before his arrest, however, the defendant had given a statement to a Coast Guard officer warning of his suspicions that the ship's crew was smuggling marijuana and encouraging the Coast Guard to remain in the area. The Government failed to disclose this statement. The defendant certainly knew what he had said to the Coast Guard and could himself describe such statements at trial. Nevertheless, just as in *Reasonover*, the significance of his statement arose

15

not solely from its content, but from the *circumstances* under which it was made. Given under
conditions that strongly suggested candor and truthfulness, the statement powerfully
corroborated Severdija's trial defense and was therefore material. *Id.* at 1557-60.[29]

## II. This Court Should Compel the Government to Produce Evidence and Submit to Depositions in an Attempt to Reconstruct the Spoliated Evidence.

Although nothing can be done to fully remedy the government's malfeasance here the
Court has broad authority to devise alternative remedial measures. Most importantly, the court
should "restor[e] the prejudiced party to the same position he would have been in absent the
wrongful destruction of evidence by the opposing party." *Kronisch*, 150 F.3d at 126. In addition,
the court's remedy should attempt at least in part to deter future destruction and punish the
spoliating party for its misconduct. *SeeAdkins v. Wolever*, No. 03-00797, slip op. at 3 (6th Cir.
Feb. 4, 2009); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155–56 (4th Cir. 1995); *Nation-
Wide Check Corp. v. Forest Hills Dist., Inc.*, 692 F.2d 214, 218 (1st Cir. 1982). When deciding
upon an appropriate sanction for parties that have destroyed evidence, courts should "be guided
by the 'concept of proportionality' between offense and sanction." *United States v. Phillip*

---

[29] In *Virgin Islands v. Martinez*, the Third Circuit confirmed the possibility that a defendant might himself
remember what he said to authorities in no way obviates the government's responsibility to turn over its records
memorializing those statements:

> The police account of the confession is not information which the defendant already has or, with any
> reasonable diligence, he can obtain himself. The assumption that a defendant has access to his own
> confession or statement overlooks both the possibility *that a defendant may not have total recall of what he
> said to the police, especially if the statement was made under pressured circumstances, and the reality that
> a defendant cannot, absent disclosure, know what the authorities recorded or retained of what he said.*

780 F.2d 302, 309 (3d Cir. 1985) (emphasis added); *see also United States v. Spagnuolo*, 960 F.2d 990 (11th Cir.
1992) (government must disclose psychiatric evaluation of defendant with mental health problems "because we will
not presume that Spagnuolo had the mental ability to know that the report existed...."

UNCLASSIFIED//FOR PUBLIC RELEASE

*Morris U.S.A. Inc.*, 327 F.Supp.2d 21, 25 (D.D.C. 2004) (quoting *Shea v. Donohoe Construction Co.*, 795 F.2d 1071, 1074 (D.C. Cir. 1986)).

The government's behavior in this case has been egregious, demonstrating a total disregard for its legal duties. As a result of such conduct this Court would be justified in entering a default judgment against the government. *See Shea*, 795 F.2d at 1074–75 (discussing dismissal or default judgment as a sanction for spoliation); *cf. Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988) (finding that dismissal may be appropriate where the government has violated a defendant's due process rights by destroying evidence in bad faith); *Shepherd*, 62 F.3d at 1474-75 ("The inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment"). It would also justify dismissal of particular charges or an adverse inference. *See id.* ("other inherent power sanctions available to courts include fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence") (internal citations omitted).

But abu Zubaydah asks this Court only to compel the government to reconstruct the evidence that it destroyed. Prescribing such measures falls within this Court's power to fashion remedies and to impose sanctions for the loss or destruction of evidence. *See Chambers*, 501 U.S. at 50 (1991) (finding that a court's inherent power to impose sanctions for bad-faith conduct during litigation was not displaced by, and went beyond, sanctioning mechanisms such as the Federal Rules of Civil Procedure); *Battocchi*, 581 A.2d at 765–66; *Cotton*, 388 A.2d at 869 ("Absent an abuse of discretion, the decision of what sanctions, if any, to impose [for loss of evidence] is committed to the trial court."). Indeed, it is well established that "federal courts enjoy a zone of implied power incident to their judicial duty, and that this inherent power is

17

governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs." *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 590 (5th Cir.2008) (quotation and citation omitted); *see, e.g., Adkins*, slip op. at 2–3.

Specifically, courts have repeatedly recognized that reconstruction of destroyed evidence is a remedial measure available to the Court. *See Africa v. Digulielmo*, 2004 WL 236041, *5 (E.D. Pa. 2004); *W.R. Grace & Co.-Conn. v. Zotos Intern., Inc.*, 2000 WL 1843258, *10 (W.D.N.Y., 2000) (citing *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991)); *see also Jefferson v. Reno*, 123 F. Supp. 2d 1, 2 (D.D.C. 2000) (describing court orders issued following a status conference with the parties that required reconstruction of destroyed records and discovery into the circumstances surrounding the destruction); *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 67 (D.D.C. 2003).[30]

Despite the destruction of the video documentation, much evidence related to abu Zubaydah's interrogations still exists. As detailed in the Declaration of John Sifton, attached as Exhibit 2, there are voluminous documents in the government's possession that would assist in reconstructing the content of the destroyed tapes. Specifically, in the Freedom of Information Act (FOIA) litigation in the Southern District of New York, *ACLU v. Department of Defense*, the government acknowledged that it has hundreds of documents relating to the content of the videotapes of Petitioner's interrogations. Among other, those include:

- A "133-page log book relating to Petitioner's detention and interrogation, dated April 13, 2002, and near-daily cables and other communications between the CIA bases at which Petitioner was held and CIA headquarters at Langley, Virginia, beginning April 13, 2002 and continuing through much of 2003." Decl. Sifton at ¶ 14.

---

[30] Remedial measures may also include discovery into the destruction or removal of the relevant evidence. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 34 F. Supp. 2d 28, 46 (D.D.C. 1998) (*Judicial Watch I*); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, No. 95-133 (RCL), 2000 WL 33243469, at *1–*2 (D.D.C. Dec. 5, 2000) (*Judicial Watch II*).

UNCLASSIFIED//FOR PUBLIC RELEASE

- Three cables dated August 4, 2002: the first, containing "strategies for interrogation sessions; the use of interrogation techniques to elicit information on terrorist operations against the U.S.; reactions to interrogation techniques; raw intelligence; a status of threat information; and medical information"; the second, containing an "overall status update"; and the third, containing "a 59-page notebook" of "handwritten notes concerning treatment and conduct of interrogations [and] reactions to the interrogations techniques." *Id.* at ¶ 17.

- "A host of documents" provided to the Office of Legal Counsel (OLC) by the CIA to assist the OLC in drafting legal memoranda regarding CIA interrogation techniques, including documents from the CIA's Office of Medical Services, letters and faxes from CIA's General Counsel, and CIA "Interrogation Guidelines." *Id.* at ¶ 19.

- "Reports or transcripts about the Petitioner's interrogations" on at least twenty-three individual occasions that were provided to the 9/11 Commission in 2002 and 2003. *Id.* at ¶ 21.

- A "CIA analytic report: *Clandestine Travel Facilitators: Key Enablers of Terrorism*," dated December 31, 2002 and a "CIA analytic report: *Al Qaeda Travel Issues*," dated January 2004, both of which were prepared in reliance on information obtained from Petitioner's interrogations. *Id.* at ¶ 22.

- "A CIA report prepared for the White House in late 2002, and finalized in January 2003, entitled *Iraqi Support to Terrorism*," which the Senate Select Committee on Intelligence (SSCI) has reported was prepared in reliance on information from Petitioner's interrogations, as well as "*four reports* detailing the debriefings of abu Zubaydah" that were provided by the CIA to the SSCI. *Id.* at ¶ 23.

Mr. Sifton also explains that there are likely other documents that would reconstruct information from the videotapes, including, *e.g.*, "[n]otes made during interrogation by analysts, interrogators, supporting psychologists, and other CIA and FBI personnel," as well as reports written by those personnel about Petitioner and/or Petitioner's interrogations. *Id.* at ¶ 26(b).

Furthermore, then CIA director Michael Hayden has admitted that "[abu Zubaydah's] interrogation sessions [were] exhaustively detailed in written channels."[31] Those involved in abu Zubaydah's interrogation can disclose exculpatory evidence discussed during those interrogations. *Cf. Abdullah v. Bush*, 534 F.Supp.2d 22, 23–25 (2008) (ordering the government

UNCLASSIFIED//FOR PUBLIC RELEASE

to disclose the "nature of any evidence specific to petitioner Abdulla" that the spoliated videotapes of abu Zubaydah's interrogations contained). Similarly, other detainees who were interrogated can offer evidence discussed during their interrogations that would exculpate abu Zubaydah. *Cf. id.* at 22–23 (implying that information discussed in one interrogation was likely also relevant to another detainee's case). Thus, this Court can remedy the CIA's spoliation of evidence by compelling the government to (i) produce any remaining video, audio, written, or other documentation of abu Zubaydah's interrogations—including the CIA cables transmitted to and from CIA Headquarters and notes taken during the interrogations which detail all of the events therein; (ii) permit undersigned counsel to depose all parties present during or otherwise observing Petitioner's interrogations; and (iii) permit undersigned counsel to depose all other persons detained or interrogated at any time at Guantánamo Bay or as part of the CIA program for the purpose of cross-corroborating their accounts of their respective interrogations to abu Zubaydah's. This will allow Petitioner to collect and present the remaining pieces of the evidence destroyed by the government.

While there is simply no equal substitute for the video documentation destroyed by the government, compelling the government to produce the evidence described above will begin to repair the damage caused by the government's spoliation. Moreover, compelling the government to produce evidence will afford this Court the opportunity to hear all relevant evidence in this case. This remedy will also put parties on notice that this Court will not permit such disregard for one's legal duty not to destroy evidence, thus deterring future spoliation.

---

[51] Dan Eggen & Joby Warrick, *CIA Destroyed Videos Showing Interrogations, Wash. Post,* Dec. 7, 2007, at A1, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/12/06/AR2007120601828_pf.html.

UNCLASSIFIED//FOR PUBLIC RELEASE

### Conclusion

For the foregoing reasons, in order to punish the government for its spoliation of evidence, to reconcile the harm done to Petitioner, and to deter future spoliation, the Court should impose sanctions on the government, compel the government to produce any and all remaining documentation of abu Zubaydah's interrogations, and allow abu Zubaydah's counsel to conduct depositions to reconstruct the evidence destroyed.

Dated: September 19, 2009
Washington, D.C.

Respectfully submitted,

Joseph Margulies
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
(312) 503- 0890

George Brent Mickum IV [Bar No. 396142]
Amanda L. Edwards
Spriggs & Hollingsworth
1350 I Street NW
Washington, District of Columbia 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Baher Azmy
Seton Hall Law School
Center for Social Justice
One Newark Center
Newark, NJ 07102
(973) 642-8700

UNCLASSIFIED//FOR PUBLIC RELEASE

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served on the Court Security Officer for clearance

and filing this 19th day of September 2009. My understanding is that the Court Security Officer

will serve the Government. Once Petitioner's counsel has been notified that the document has been

cleared and filed, copies will be served on the following via first class mail:

James Luh, Esquire
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

George Brent Mickum IV

# EXHIBIT 1

¶IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
|  | x |  |
|  | : |  |
| ZAYN AL ABIDIN MUHAMMAD HUSAYN, | : |  |
|  | : |  |
| Petitioner, | : |  |
|  | : |  |
| v. | : | No: 08-cv-1360 (RWR) |
|  | : |  |
| ROBERT M. GATES, | : |  |
|  | : |  |
| Respondent. | : |  |
|  | : |  |
|  | x |  |

## DECLARATION OF ZAYN AL ABIDIN MUHAMMED HUSAYN

Pursuant to § 1746, I hereby declare as follows:

1. I am detained by the Department of Defense in Guantanamo Bay, Cuba. I submit this declaration in connection with my petition for habeas corpus and in support of a motion to obtain records of my interrogations by U.S. government officials in lieu of video recordings of such interrogations that I understand have been destroyed.

2. This declaration describes some of what I said during interrogations, during which time I repeatedly explained that I was not a member of or affiliated with al Qaeda and that I never supported or engaged in any hostilities against the United States. I told my interrogators this information repeatedly, during calm interrogations and even during the extreme duress and violence of my most intense period of torture by the CIA. Any videotapes of such interrogations would have recorded these repeated statements of my innocence. This declaration is not meant to be a comprehensive description of my treatment or my interrogations. Time limitations and logistical difficulties make it difficult for me to do so.

1

3. After I was wounded and apprehended by the U.S. government in Pakistan in about March 2002, ▮▮▮▮▮▮▮▮▮▮▮ and spent time recovering in a hospital. Interrogations by FBI officials started then. After some period of recovery, the FBI moved me to an interrogation room. Here, I endured constant sleep deprivation, was shackled to a chair naked in freezing temperatures for about 2-3 weeks, and bombarded with high-decibel noise, and without solid food. FBI interrogators questioned me for hours each day.

4. They asked me many questions about al Qaeda, which made me think they believed I was a member. As I explained during my CSRT and in my habeas petition, I was not and never was a member of al Qaeda.

5. I was unconnected to al Qaeda, and did not train anyone for operations and did not support violence against the United States or Americans. In fact, people with the CIA later admitted to me that the were wrong to think I was in al Qaeda and apologized to me for my torture.

6. During the early interrogations, the interrogators believed that I was "number 3 in al Qaeda." This was absurd. I explained repeatedly that I was not a member and opposed violence against civilians. I did give them basic information about what I know of al Qaeda, but this was information that anyone who spent time in Afghanistan could know. I told the truth to them and gave them whatever information I could give.

7. When I told them I was not in al Qaeda, they said, "don't go there!" They said, "you are al Qaeda, do not deny it. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2

██████████████████████

██████████████ You are number 3." I continued to explain why they were

wrong.

8.    They also asked me repeatedly 3 questions: ████████████████

████████████████████████████████████████████

████████████████ I kept telling them I can't answer these questions. I

do not know any answers because I was not involved with al Qaeda or any of its

operations.

9.    At some point, the FBI officials who had been interrogating me, stopped.

I spent about 1 month in isolation, with no contact with interrogators. Still, I was kept

naked, underfed, and freezing.

10.    One day guards came into my cell with a man who later told me his name

was ████████████████████████████ I later learned

that he was working with the CIA███████████████████ I also

met a man who worked with████ and who I later began to call████ I believe he was

also one of either ████████████████████ came into my cell screaming

obscenities; he slammed me against the concrete wall, hitting my head repeatedly. He

said something like, "Are you ready to talk? Now we are going to tell you how real

interrogation is done!" Later, they put me (I was still naked) in a big black box made of

wood. They kept me confined in the black box for hours in extremely uncomfortable

positions without adequate air or food and with the extreme noise of a machine nearby.

11.    This began a period of my most painful and cruel period of torture, which

seemed to be directed by the men who I called ████████████ This torture included

slamming my head and body against a wall while my neck was collared by a towel;

3

██████████████████████

nights confined in a large box (about 3 feet wide, 3 feet deep and over 6 feet tall) or hours

confined in a small "dog box" (about 2 ½ fet wide, by 2 ½ feet long by 2 ½ feet high);

sleep deprivation; denial of food; exposure to cold; hanging by arms; prolonged, shackled

standing. These methods were used repeatedly during this time in different

combinations. The pain, discomfort and humiliation were incredible. Sometimes I

would pass out from the pain and stress.

12.     For example, the pain in the small box was unbearable. I was hunched

over in a contorted way and my back and knees were in excrutiating pain. I began

slamming my body and shackled arms against the inside and screaming for help and tried

to break the door. The wound in my stomach and leg opened up and I started bleeding,

yet I didn't care: I would do anything to stretch my leg and back for 1 minute.

13.     During the walling and in between these torture techniques,

screamed questions at me, like

Over and over I told them, "I don't know! I have nothing to tell you! I don't

know al Qaeda or what they are doing!" This was the truth, as they later admitted to me.

14.     Other times I would plead, "Tell me what you want me to say, I will say

it!" Other times I just said things that were false and that I had no basis to know or

believe, simply to get relief from the pain.

15.     Another technique the CIA used on me was the waterboard. As best as I

can remember, I was waterboarded for a period of six days, but I am not completely

certain. As best as I can remember, I would be waterboarded three times in a row, for

two sessions per day, over about six days.                were present and

administered all of the waterboarding sessions.

4

16.     I would be strapped to a board by my arms and legs and by my waist (which was very painful because of my wound). Guards with black costumes, masks and black goggles strapped me in. My mouth and nose and eyes were covered by a cloth. The board – and my body – were placed horizontally. My head was immobilized by a board. Someone poured over the cloth, which entered my mouth and nose. I could hear one water bottle empty out by the gurgling noise it made; I hoped that would end the process, then I heard another bottle start to pour. Water would enter into my lungs. It felt like my whole body was filled with water; even my eyes felt like they were drowning. I experienced the panicked sensation of death and my body convulsed in terror and resistance. I thought, "I will die. I will die." I lost control of my functions and urinated on myself. At the last possible moment, the board – and my body – would be made vertical. I instantly vomited water violently but at the same time was still panicked and desperate for air.

17.     ████████ would ask, "Are you ready to talk?" I told them, "I told you everything! I don't know anything!" Again and again, I tried to explain they were wrong about me.

18.     On about the fourth day of the waterboarding, ██ told me "nobody in Washington believes you" and started the waterboarding again. Also, in between the waterboarding sessions, I would be put in the dog box for hours and spend nights in the large box.

19.     In what was the last session of the waterboard, I noticed ██████████ in the room (in addition to ████████ and the guards), in the moment before the cloth was put over my face. One I saw again a month later and he introduced himself as a

5

doctor. The other I saw the next day – he was a debriefer who interrogated me for a long period after.

20.     After the last session of waterboarding, I was put in the big box. After a period of hours, ▮▮▮▮▮▮▮▮▮ took me out, but this time they did not collar me with a towel and slam me against the wall. They told me that Washington still didn't believe me and that I would be talking to new debriefers/interrogators. I was forced to stand naked, in shackles in front of a woman and a man. When I refused to talk with a woman present, ▮▮▮ beat my head agains the wall repeatedly. Eventually, they provided a towel to cover my private parts.

21.     These debriefers/interrogators commenced a process of questioning that lasted a shorter period of time than any of the previous debriefings. They questioned me for only one or two hours per day. These debriefers and then their successors interrogated me every day. But after that day, the brutal period of torture stopped.

22.     Interrogators did still ask me many of the same questions that the FBI asked. This process continued every day, for only one or two hours each day, until I was transferred to Guantanamo in 2006.

23.     For a period of weeks after this most intense time of torture, ▮▮▮▮▮ ▮▮▮▮ would still visit and talk to me in an intimidating manner. By what they said and their manner, I believed they were attempting to remind me that I could be sent to the torture if the CIA ordered it or if the government thought I was not cooperating. Over time, however, they became more civil with me and tried to greet me politely and ask how I was doing. I think they finally realized they were wrong about me, and that they finally accepted the truth about me. In fact, ▮▮▮▮ told me this later, and ▮▮▮ did too.

6

24.    To take one example, in a conversation with me, ███ old me about interrogations of al Qaeda members Khaled Sheik Mohammed and Abdel Rahim al Nashiri. ███ explained that when these men were asked about me, they each explained that I was never a member of al Qaeda. As ███ explained it to me, these men seemed to think that the notion that I was a member of al Qaeda was absurd and were surprised the Americans suggested it. To take another example, in a conversation with ███ he was bragging to me that the U.S. intelligence operations were so expert at uncovering al Qaeda and deciding who was lying or telling the truth. I joked with him, as we sometimes did when talking about the mistakes in my case, "What about me? What about your fancy satellites and intelligence – and you thought I was al Qaeda." He sort of smiled to acknowledge my point and nodded his head; he said, "well your case was a mistake." I had several other conversations with ███ in which it was acknowledged that I was not a member of al Qaeda.

25.    On a particular day, sometime in 2005, I was visited by ███ We got into a political discussion about my beliefs and my desire for a Palestinian homeland, my opposition to violence against civilians and that I had no interest in hurting Americans or fighting against them. He said he understood this. During this conversation he admitted to me that the U.S. was wrong about me. He said he had no problem doing what he did (torture) to Khaled Sheik Mohammed, but he was very sorry about what had been done to me, because I was not the person they once thought I was. At one point during this conversation, ███ became emotional and became unable to speak; he removed his glasses and wiped his eyes.

UNCLASSIFIED//FOR PUBLIC RELEASE

26.    Sometime in 2005 at a location I do not know, I was visited by a high
level official in the U.S. government. I was told that this person was the head of the
program I was in. I met with him on two occasions to discuss my conditions. During the
first conversation, he said that what happened to me was bad, and took personal
responsibility for it, even saying it was a mistake. He said he wished to put these events
behind us, and make things better for me now and in the future. He agreed to return my
diaries, give me exercise equipment, improve the food and cease body cavity searches.


      I swear under penalty of perjury under the laws of the United States of America,
that the foregoing is true and correct.


Guantanamo Bay, Cuba
July 23, 2009

                                          /s/ Zayn Al Abidin Muhammed Husayn

8

UNCLASSIFIED//FOR PUBLIC RELEASE

①

<u>DECLARATION OF ZAYN AL ABIDIN MUHAMMED HUSAYN</u>
(Pursuant to

Pursuant to § 1746, I hereby declare as follows:

1. I am detained by the Department of Defense in Guantanamo Bay, Cuba. I submit this declaration in connection with my petition for habeas corpus and in support of a motion to obtain records of my interrogation by U.S. government officials in lieu of videorecordings of such interrogation that I understand have been destroyed.

2. This declaration describes some of what I said during my interrogation, during which time I repeatedly explained ▮▮▮▮▮▮▮▮▮▮▮ that I was not a member of or affiliated with al Qaeda and that I never supported or engaged in any hostilities against the United States. I told my interrogators this information repeatedly, ▮▮▮▮▮ during calm interrogation and even during the extreme duress and violence of my most intense period of torture by the CIA. Any videotapes of such interrogation would have recorded these repeated statements of my innocence. This declaration is not meant to be a comprehensive description of my treatment or my interrogations. Time limitations and logistical difficulties make it difficult for me to do so at this time.

UNCLASSIFIED//FOR PUBLIC RELEASE

②

After I was wounded and apprehended by the U.S. government in Pakistan in about March 2002, ▮▮▮▮▮ and spent time recovering in a hospital. Interrogations by FBI officials started then. After some period of recovery, the FBI moved me to an interrogation room. Here, I endured constant sleep deprivation, was shackled to a chair naked, in freezing temperatures for 2 weeks, without solid food. FBI interrogators questioned me for hours each day.

They asked me many questions about al Qaeda, which made me think they believed I was a member. As I explained during my CSRT and during my habeas petition, I was not and never was a member of al Raida.

I was ▮▮▮▮ ▮▮▮▮▮▮ was ▮▮▮▮ to al Qaeda and did not train anyone for any operations and did not support violence against the United States

In fact, the CIA later admitted to me that they were wrong to think I was in al Qaeda and apologized to me for my torture.

UNCLASSIFIED//FOR PUBLIC RELEASE

⑤

During the early interrogations the interrogators believed
that I was "number 3 in al Qaeda." This was absurd.
I explained repeatedly that I was not a member and
opposed violence against the civilians. I did give them
basic information about what I knew of al Qaeda, but
this was information that anyone who spent time in Afghanistan
would know. I told the truth to them and gave them whatever information
I could give.
The FBI also repeatedly asked me 3 questions.
When I told them I was not in al Qaeda, they
said "don't go there!" They said "you are al Qaeda, do not
deny it. ████████████████ to prove it. You are number
I continued to explain why they were wrong, ████

████████████

They also asked me repeatedly 3 questions: ████

████████████████████████████

It kept telling them I
can't answer these questions. I do not know any answers
because I was not involved with al Qaeda or any of its
operations.

UNCLASSIFIED//FOR PUBLIC RELEASE



____. At some point the FBI officials who had ~~been~~ interrogating me, stopped. I spent ~~with about~~ ~~two~~ 1 month ~~alone in~~ isolati with no contact with interrogators. Still, I was kept ~~naked~~, ordered, and freezing.

____. One day guards came into my cell with a man who later told me his name was ████████████ ~~working with the~~ goeter;, I later learned that he was ~~for~~ CIA ~~contractor~~, and was either ██████████████████████████

He came in my cell screaming obscenities, he slammed me against the concrete wall, hitting my head repeatedly. He said something like, "Are you ready to talk? Now we are going to show you how real interrogation is done!"

Later, they put me (I was still naked) in a big black box made of wood. They kept me confined in this black box for hours in extremely uncomfortable positions, without adequate air, packed and with the extreme noise of a machine nearby.

____. This began a period of my most painful and cruel period of torture, which seemed to be directed by the men who called themselves ████████████████████████ This torture included

UNCLASSIFIED//FOR PUBLIC RELEASE

(8)

and body

slamming my head against a wall while my neck was collared by a towel; ~~days and~~ nights confined in a ~~small box~~ large box (about 3 feet wide, 3 feet deep and over 6 feet tall) or ~~in~~ a small "dog box" (about 2½ feet wide, by 2½ feet long by 2½ feet high); sleep deprivation; hanging by arms, prolonged shackled ~~the~~ denial of food; exposure to cold, and ~~the~~ waterboarding.

These methods were used repeatedly during this time in different combinations. The pain, discomfort and humiliation were incredible. Sometimes I would pass out from the pain and stress. For example, ~~one time~~ the pain in the small box was unbearable. ~~My~~ I was rushed over in a contorted way and my back and knees were in excruciating pain. I began slamming my body and shackled arms against the inside and ~~try to break the door.~~ and leg screaming for help, ~~if~~ my ~~stitches~~ wound in my stomach opened up and I started bleeding, yet I didn't care. I would do anything to stretch my leg back for 1 minute.

UNCLASSIFIED//FOR PUBLIC RELEASE

ⓔ

During the walling and in between these torture techniques ▮▮▮▮ screamed questions at me, ▮▮▮▮

Over and over I told them "I don't know!" I have nothing to tell you. I don't know al Qaeda or what they are doing!" This was the truth, as they later admitted to me.

Other times I would ▮▮ plead "Tell me what you want me to say! I will say it." ▮▮▮ Other times I just said things that were false and that I had no basis to know or believe, simply to get a relief from the pain.

▮ Another technique the CIA used on me was the waterboard. As best as I can remember, I was waterboarded for a period of six days, but I am not completely certain. As best as I can remember, I would be waterboarded ~~three~~ three times in a row, for 2 sessions per day, or about six days. ▮▮▮ were present ~~and included all~~ and administered 1) The Waterboardy sessions

UNCLASSIFIED//FOR PUBLIC RELEASE

⑦

——— I would be strapped to a board by my arms and legs and by my waist. (Which was very painful because of my wound). Guards with black costumes, masks and black goggles strapped me in. My mouth and nose, were covered and eyes by a cloth. The board — was and my body — were placed horizontally. My head was immobilized by a board.
Someone poured water over the cloth, which entered my mouth and nose. I could hear one water bottle empty out, by the gurgling noise it made; I hoped that would end the process, then I heard another bottle start to pour. Water would enter my teeth, through my mouth what I felt go down my nose and into my lungs. It felt like my whole body fill with water; even my eyes felt like they were drowning. I experienced the panicked sensation of death and my body convulsed in terror and resistance. I thought, I will die. I will die. I lost control of my function and urinated and defecated on myself. At the last possible moment, the board — and my body — would be made vertical. I instantly vomited water violently, but at the same time was still panicked and desperate for air.

UNCLASSIFIED//FOR PUBLIC RELEASE

(Q)

would ask, "Are you ready to talk?" I told them, "I told you everything! I don't know anything!" Again and again I tried to explain they were wrong about me.

On about the 4th day of the waterboarding, ▮ told me nobody in Washington believes you, and started the waterboarding again. Also in between the waterboarding sessions, I would be put in the small standing box for hours and spend nights in the large box.

During ▮ in what was the last session of the waterboarded, I noticed ▮ in the room (in addition to ▮ with the guards), in the few moments before the cloth was put over my face. One I saw again one month later and, he introduced himself a doctor. The other I saw the next day – he was a debriefer, who interrogated me for a long period after.

UNCLASSIFIED//FOR PUBLIC RELEASE

⑨

After this last session of waterboardings, I was put in the big box. After a period of hours, ▮▮▮▮ took me out, but this time they did not collar me with a cloth towel and slam me against the wall. They told me that Washington still didn't believe we are that I would be talking to new debriefers/interrogators. They I was forced to stand naked, in shackles in front of a woman and a asked me if I needed anything, and gave me a towel man. When I refused to talk with a woman around, ▮▮▮▮ beat my head to cover my naked private parts, as I requested, and against the wall repeatedly. Eventually, they provided a towel to chair to sit in cover my private parts.

These Debriefers/interrogators came to the room and commence a process of questioning that lasted a shorter period of time than any of the previous debriefings. They questioned my for only one or two hours per day only. These debriefers and then their successors interrogated me every day. brutal period of But after that day, This torture stopped.

Interrogators did still ask me many of the same questions that the FBI asked. This process continued every day, for only 1 or 2 hours each day, until I was transferred to Guantanamo in 2006.

UNCLASSIFIED//FOR PUBLIC RELEASE

(10)

—. For a period of weeks after this most intense time of torture, ▮▮▮▮▮▮▮▮▮▮ would still visit me and talk to me in an intimidating manner. By what they said and their manner, I believed they were attempting to remind me that ~~they could send me~~ I could be sent back to the torture if ~~they wished,~~ the CIA ordered it or if ~~they~~ thought I the government was not cooperating. Over time, however, they became more civil with me and tried to greet me politely and ask how I was doing. I think they finally realized ~~they~~ were wrong about me, and that they finally accepted the truth about me. In fact, ▮▮▮▮ told me this ~~~~ later, and ▮▮▮▮ did too.

UNCLASSIFIED//FOR PUBLIC RELEASE

(11)

___. To take one example, in a conversation with me, ███████ told me about interrogations of al Qaeda members Khaled Sheik Mohammed + Abdel Rahim al Nashiri. ███ explained that when these men were asked about me, they each explained that I was never a member of al Qaeda. As ███ explained it to me, these men seemed to think that the notion, that I was a member of al Qaeda, was absurd and were surprised the Americans even suggested it. To take another example, in a conversation with ███ he was bragging to me that the U.S. intelligence operations were so expert at uncovering al Qaeda + deciding who was lying or telling the truth. I joked with him, as I sometimes did when talking about the mistakes in my case, "What about me? What about your fancy satellites and intelligence — and you thought I was al Qaeda." He sort of smiled to acknowledge my point and nodded his head + said, "Well, your case was a mistake." ... In conversation with ___ I had several other conversations with ███████ in which it was acknowledged that I was not a member of al Qaeda.

UNCLASSIFIED//FOR PUBLIC RELEASE

⑫

On a particular day
___. In sometime in 2005, I was visited by ▮▮▮▮▮
We got into a political discussion about my beliefs
and my desire for a Palestinian homeland, my opposition
to violence against civilians and that I had no interest
in hurting Americans or fighting against them. He said he
understood this, ~~you~~ during this conversation, he admitted
to me that they ~~the U.S.~~ were wrong about me. He said he
had no problem doing what he did (torture) to Khaled
Sheik Mohammed, but he was very sorry about what
had been done to me, because I was not the person
they once thought I was. At one point during this
~~delegation~~ conversation, ▮▮▮▮ became emotional and
~~began to choke up, he~~ and became unable to speak; he
removed his glasses and wiped his eyes.

___. Sometime in 2005 at a location I do not know,
I was visited by ~~someone~~ a high level official in the ~~US~~ U.S. gov.
I was told that this person was the head of the program
I was in. I met with him on two occasions to discuss
my conditions. During the first conversation he said that what had

(13)

happened to me was bad, and took personal responsibility ~~and that of when his mistake~~ for it, even saying it was his mistake. He said he wished to put these events behind us, and make things better for me now and in the future. He agreed to return my diaries, give me exercise equipment, and improve the food, and cease body cavity searches.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Guantanamo Bay, Cuba
July 23, 2009



UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT 2

UNCLASSIFIED//FOR PUBLIC RELEASE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------- x
                                                   :
ZAYN AL ABIDIN MUHAMMAD                             :
HUSAYN (ISN # 10016),                              :
                                                   :
                    Petitioner,                    :
                                                   :   NO. 08-CV-1360
            v.                                      :
                                                   :   DECLARATION OF
ROBERT M. GATES,                                   :   JOHN SIFTON
                                                   :
                    Respondent.                    :
                                                   :
------------------------------------------------- X

## DECLARATION OF JOHN SIFTON

I, John Sifton, declare the following under penalty of perjury:

### INTRODUCTION

1. I have been asked by Petitioner's counsel to submit this declaration to provide information about documents and other material in Respondent's possession that relate to or bear on Petitioner's interrogation. Because I limit myself in that respect, I emphasize that this declaration *does not* describe all documents or other material in Respondent's possession that are relevant to Petitioner's case.

### A. CREDENTIALS

2. I am a resident of New York City, where I have lived most of my life.

3. **Curriculum Vitae.** Attached to this declaration is a true copy of my curriculum vitae.

4. **Education.** I hold a J.D. *cum laude* from New York University School of Law and a B.A. *cum laude* from St. John's College in Annapolis, Maryland.

5. **Experience.** I am a licensed attorney and a licensed private investigator; a human rights researcher and advocate; and an expert on human rights law, international humanitarian law,

and refugee law, among other subjects. I have extensive experience working in Afghanistan and Pakistan, and in other countries in South Asia and the Middle East and North Africa.

6. From October 2001 to September 2007 I worked as an investigator and researcher for Human Rights Watch, a global human rights research organization, spending significant time in Afghanistan and Pakistan. From January 2001 to September 2001 I worked for the International Rescue Committee, a humanitarian and advocacy group, as a researcher on refugee human rights protections in Afghanistan and Pakistan.

7. As part of my work for Human Rights Watch and the International Rescue Committee in Afghanistan and Pakistan, I regularly briefed ambassadors, U.S. military and executive branch officials, members of Congress, and journalists on security and human rights conditions in Afghanistan and Pakistan. I also worked as a human rights researcher in Albania and Kosovo during armed conflict there in 1999.

8. I am currently the executive director of One World Research, an investigation and research firm that specializes in international investigative services. One World Research, among other projects, has carried out extensive investigative work in Afghanistan and Pakistan for a variety of clients, including law firms and non-profit groups. This has included historical investigations into events that occurred in these countries throughout the 1990s and early 2000s. One World Research has also conducted training on fact-finding and investigative work for staffers of the Afghan Independent Human Rights Commission, a constitutionally-mandated government human rights monitoring group in Afghanistan. I have personally supervised all One World Research projects.

9. **Relevant Publications.** The attached CV details articles, reports, books, book chapters, and book reviews I have written, including reports and publications on U.S. military and intelligence operations.

10. In preparing this declaration, I consulted my previous research and investigation experience, including knowledge gained from extensive investigation into U.S. military and intelligence operations conducted over the last seven-and-a-half years. In addition, in preparing this declaration I consulted with staff of One World Research to confirm or obtain information about relevant practices, policies, and events, and to refresh my memory or add to my knowledge. Further, both I and staff under my supervision consulted with several contacts familiar with the matters discussed in this affidavit and engaged in telephone and e-mail correspondences with other knowledgeable sources.

## B. RELEVANT DOCUMENTS

11. Based on my research of available open source and public documentation, including reports and documents released by various congressional committees, the Department of Defense, the Department of Justice, and the CIA, as well as previously declassified documents that have been leaked to researchers and journalists and published or described online, I have determined that the CIA and other U.S. government agencies possess a substantial number of documents that relate to or bear on Petitioner's interrogation.

-2-

UNCLASSIFIED//FOR PUBLIC RELEASE

12. For instance, in FOIA litigation pending before the Southern District of New York, *ACLU v. Department of Defense*, 04-civ-4151 (S.D.N.Y), the government has recently acknowledged that they have hundreds of documents, numbering in the thousands of pages, relating to the content of the videotapes of Petitioner's interrogations. The government has listed 580 documents, mostly cables dated from April 13, 2002 (just over two weeks after Petitioner's arrest) to January 7, 2008. According to the government, these documents contain information about Petitioner's interrogations by CIA personnel, and about the CIA's videotaping of those interrogations.

13. In this same litigation, the government recently filed a set of modified Vaughn indexes which lists documents created by the CIA contemporaneously with the videotaping of parts of Petitioner's interrogation in 2002 and subsequent years. Copies of the government's Vaughn Indexes are attached to this declaration as Appendix B. The government has also provided details about the content of some of those documents. In one list, the government has provided descriptions of cables and documents dated August 2002. In another, a sample set of descriptions of other cables and documents dating from April to December 2002. (Judge Hellerstein, who is presiding over this litigation, ordered the sample set to include a description of every tenth relevant document.)

14. Although the underlying documents and cables have not been released, some information is known about their content. For instance, according to the CIA, the 580 documents include a 133-page log book relating to Petitioner's detention and interrogation, dated April 13, 2002, and near-daily cables and other communications between the CIA bases at which the Petitioner was held and CIA headquarters at Langley, Virginia, beginning April 13, 2002 and continuing through much of 2003

15. The indexes include descriptions of the following:

   a. A three page cable sent from Petitioner's location to CIA headquarters on April 13, 2002, approximately two weeks after the Petitioner's arrest, titled "Interrogation of Abu Zubaydah" contains "information concerning the interrogation of Abu Zubaydah, to include atmospherics and behavioral comments."

   b. A similarly titled three-page cable on April 17, 2002 contains "information concerning the interrogation of Abu Zubaydah and threat information."

   c. A four-page cable on April 19, 2002, entitled "SITREP on Abu Zubaydah" contains "information concerning the interrogation of Abu Zubaydah, atmospherics and medical comments."

   d. A similarly titled two-page cable on April 22, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospherics and behavioral comments, and medical information."

   e. A similarly titled four-page cable on April 25, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospherics, behavioral, and medical comments, and threat information."

-3-

UNCLASSIFIED//FOR PUBLIC RELEASE

f.  A similarly titled four-page cable on April 28, 2002, contains "information concerning the interrogation of Abu Zubaydah, atmospherics and behavioral comments, a medical update, and threat information."

g.  A three-page cable from May 1, 2002 entitled "Interrogation of Abu Zubaydah" contains "information concerning the interrogation of Abu Zubaydah, an [sic] comment on atmospherics of the session, and an assessment of the session."

h.  A similarly titled four-page cable from May 5, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospherics of the interrogation session, an assessment of the interrogations progress, and an update on threat information."

i.  A similarly titled four-page cable from May 8, 2002 contains "information concerning the interrogation of Abu Zubaydah, a comment on the atmospherics of the interrogation session, and an update on threat information."

j.  A similarly titled five-page cable from May 11, 2002 contains "information concerning the interrogation of Abu Zubaydah, an atmospheric comment, and an update on threat information."

k.  A four-page cable from May 14, 2002 entitled "SITREP on Abu Zubaydah" contains "information concerning the interrogation of Abu Zubaydah, an atmospheric and behavioral comment, an update to threat information."

l.  A six-page cable from May 17, 2002 entitled "Interrogation of Abu Zubaydah" contains "information concerning the interrogation of Abu Zubaydah, a comment on atmospherics of the session, and threat information."

m.  A similarly titled 12-page cable from May 17, 2002 contains "information concerning the interrogation of Abu Zubaydah, a comment on atmospherics of the session, and threat information."

n.  A three-page cable from May 24, 2002 entitled "SITREP on Abu Zubaydah" contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, a medical comment, and threat information."

o.  A similarly titled two-page cable from May 27, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, and a medical update."

p.  A similarly titled two-page cable from May 30, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, and a medical update."

q.  A similarly titled two-page cable from June 4, 2002 contains "information concerning the interrogation of Abu Zubaydah, comments on the atmospherics of the interrogation, Abu Zubaydah's behavior, and a medical update."

r.  A similarly titled four-page cable from June 8, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, and a medical update."

s.  A similarly titled three-page cable from June 13, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, and a medical update."

-4-

UNCLASSIFIED//FOR PUBLIC RELEASE

t.  A similarly titled three-page cable from June 22, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospherics and behavioral comments, a medical update and administrative information."

u.  A similarly titled three-page cable from July 2, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, and a medical update."

v.  A similarly titled three-page cable from July 12, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, a medical update, and administrative information."

w.  A similarly titled two-page cable from July 22, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, and a medical update."

x.  A similarly titled two-page cable from August 1, 2002 contains "information concerning the interrogation of Abu Zubaydah, atmospheric and behavioral comments, and a medical update."

16. Additional cables sent from Petitioner's location during August 2002 include, among other things, information "concerning the use of interrogation techniques," "atmospheric and behavioral" comments, "threat updates," "medical updates," and "administrative and security notes." Several cables from August 2002 include additional details such as "information and recommendations concerning preparations for interrogations," (August 2, 2002), and "information concerning the status of preparation at the field location." (August 3, 2002).

17. An August 4, 2002 cable includes "information concerning the strategies for interrogation sessions; the use of interrogation techniques to elicit information on terrorist operations against the U.S.; reactions to interrogation techniques; raw intelligence; a status of threat information; and medical information," (August 4, 2002). (It should be noted that almost all cables from August 2002 appear to include medical information about Petitioner.) A second cable sent the same day, August 4, 2002, includes an "overall status update." A third cable sent that day includes a 59-page "notebook containing handwritten notes concerning treatment and conduct of interrogations; reactions to the interrogation techniques; specific intelligence topics concerning terrorist threats to the U.S.; raw intelligence; and medical information."

18. Additional cables throughout August 2002 contain information on the "strategies for interrogation session," "the use of interrogation techniques to elicit information," "reactions to interrogation techniques," and "raw intelligence." Cables from August 10-11, 2002, also include information on "preliminary assessments." A five-page cable from August 20, 2009 includes interrogation information, comments, and "recommendations from CIA employees to their management on policy issues." Additional cables describing information about the Petitioner's interrogation are listed from September through December 2002.

19. Other material released by the Department of Justice reveal the existence of additional documents relating to Petitioner's interrogation (some of which were "released" pursuant to FOIA litigation in August 2009 but in mostly redacted form). Specific documents known to exist include:

-5-

a. A CIA "psychological assessment" of Petitioner, described on pages 6-9 of the August 1, 2002 memorandum for CIA General Counsel John Rizzo from the Department of Justice Office of Legal Counsel (OLC), entitled "Interrogation of al Qaeda Operative" (often known as the "Bybee memo"). The memorandum describes information and details provided to the OLC about interrogation techniques to be used on the petitioner, some of which may have been provided in written form;

b. A host of documents provided by CIA to OLC to assist in OLC's drafting of later memoranda on CIA interrogation techniques, and which describe in detail the interrogation techniques used on Petitioner and other CIA detainees at various times from 2002-2005, including:

1. Various documents from the CIA's Office of Medical Services (OMS) relevant to interrogations, including a document entitled "OMS Guidelines" (date unknown but likely from 2004).

2. A document dated January 28, 2003, from George Tenet, Director of Central Intelligence, entitled "Guidelines on Interrogation Conducted Pursuant to the [redacted]," (referred to in OLC memos as "Interrogation Guidelines")

3. A document from January 28, 2003, from George Tenet, Director of Central Intelligence, entitled "Guidelines on Confinement Conditions for CIA Detainees," (referred to in 2005 OLC memos as "Confinement Guidelines").

4. A July 30, 2004 letter from a CIA Associate General Counsel to Dan Levin, Acting Assistant Attorney General, OLC.

5. An August 2, 2004 letter from CIA Acting General Counsel John Rizzo to Mr. Levin.

6. An August 19, 2004 letter from a CIA Associate General Counsel to Mr. Levin.

7. An August 25, 2004 letter from a CIA Associate General Counsel to Mr. Levin.

8. An October 12, 2004 letter from a CIA Associate General Counsel to Mr. Levin.

9. An October 22, 2004 letter from a CIA Associate General Counsel to Mr. Levin.

UNCLASSIFIED//FOR PUBLIC RELEASE

10. A January 4, 2005 Fax from a CIA Assistant General Counsel to Mr. Levin.

11. An April 22, 2005 Fax from a CIA Assistant General Counsel to Acting Assistant Attorney General Stephen Bradbury.

12. Letter for Steve Bradbury from John Rizzo dated December 19, 2005, referred to on p. 1 of the OLC Opinion dated August 31, 2006 on application of the Detainee Treatment Act on conditions of confinement at CIA detention facilities ("August 31, 2006 OLC Opinion").

13. Memorandum for Steve Bradbury from DCI Counterterrorist Center concerning "Effectiveness of the CIA Counterintelligence Interrogation Techniques" dated March 2, 2005, referred to on p. 3 of the August 31, 2006 OLC Opinion.

14. Fax from DCI Counterterrorist Center concerning "Briefing Notes on the Value of Detainee Reporting" dated April 15, 2005, referred to on p. 3 of the August 31, 2006 OLC Opinion.

15. Fax to Steve Bradbury from [REDACTED], Assistant General Counsel, CIA dated April 22, 2005, referred to in footnote 15 of the May 10, 2005 OLC Opinion on application of section 2340.

16. Letter from [REDACTED] to Steve Bradbury concerning "Requests for Information on Security Measures" dated May 18, 2006, referred to on p. 3 of the August 31, 2006 OLC Opinion.

17. Letter to Steve Bradbury from Associated General Counsel, CIA dated January 1, 2006, referred to on p. 4 of the August 31, 2006 OLC Opinion.

18. Fax to Steve Bradbury from [REDACTED] dated April 19, 2006, referred to on p. 5 of the August 31, 2006 OLC Opinion.

19. Letter from [REDACTED] to Steve Bradbury dated May 23, 2006, referred to on p.5 of the August 31, 2006 OLC Opinion.

20. Letter from [REDACTED] to Steve Bradbury dated May 24, 2006, referred to on p. 5 of the August 31, 2006 OLC Opinion.

20. Other documents in the government's possession that contain information about the Petitioner include:

UNCLASSIFIED//FOR PUBLIC RELEASE

a. A "Zayn al-Abidin Muhammad Husayn Abu Zubaydah Bio" dated January 7, 2002, referred to on p. 12 of the August 31, 2006 OLC Opinion noted above. The document, produced before the Petitioner's capture, may contain statements made by the Petitioner recorded by signals intercept or wiretapping.

b. Khalid Shaykh Muhammad Bio dated November 1, 2002, referred to on p. 12 of the August 31, 2006 OLC Opinion. The document likely contains statements of the Petitioner, or reports or information based on such statements.

c. Document from CIA Directorate of Intelligence entitled "Khalid Shaykh Muhammad: Preeminent Source on al-Qa'ida" dated July 13, 2004, referred to on p. 12 of the August 31, 2006 OLC Opinion. The document likely contains statements of the Petitioner, or reports or information based on such statements.

21. Reports or transcripts about the Petitioner's interrogations were also provided to the National Commission on Terrorist Attacks Upon the United States (also known as the 9-11 Commission) in 2002 and 2003. The 9-11 Commission report and monographs released with it cite information provided during CIA interrogations of the Petitioner on various dates, including interrogations on:

1. May 23, 2002
2. May 27, 2002
3. June 7, 2002
4. June 20, 2002
5. July 10, 2002
6. August 26, 2002
7. August 29, 2002
8. September 25, 2002
9. October 7, 2002
10. October 10, 2002
11. October 29, 2002
12. November 1, 2002
13. November 7, 2002
14. December 4, 2002
15. December 5, 2002
16. April 10, 2003
17. April 12, 2003
18. May 16, 2003
19. June 9, 2003
20. June 25, 2003
21. December 13, 2003
22. February 18, 2004
23. February 19, 2004

-8-

UNCLASSIFIED//FOR PUBLIC RELEASE

22. Other reports cited by the 9-11 Commission that appear to be based on information provided by the Petitioner include a "CIA analytic report: *Clandestine Travel Facilitators: Key Enablers of Terrorism*," December 31, 2002; and "CIA analytic report: *Al Qaeda Travel Issues*," January 2004, cited at various points in the 9-11 Commission report (e.g., p. 497, note 106).

23. A CIA report prepared for the White House in late 2002, and finalized in January 2003, entitled *Iraqi Support to Terrorism*, was described in a report prepared by the Senate Select Committee on Intelligence (SSCI) entitled "U.S. Intelligence Community's Prewar Intelligence Assessments on Iraq." The SSCI report states at p. 324 that "The CIA provided *four reports* detailing the debriefings of Abu Zubaydah...." [emphasis added]. The Senate report suggests that other information from or about the Petitioner's interrogations was used by the CIA to prepare *Iraqi Support to Terrorism*.

24. Information from the Petitioner is also contained in various reports, memoranda, and briefings prepared by the former Department of Defense Undersecretary of Defense for Policy Douglas Feith, presented at various times in 2002 to Secretary of Defense Donald Rumsfeld, Director of Central Intelligence George Tenet, Deputy National Security Advisory Stephen Hadley, and Vice President Dick Cheney's Chief of Staff Lewis "Scooter" Libby, among other administration officials. According to the 2004 SSCI report cited above and a October 21, 2004 report on Feith's office, prepared by Sen. Carl Levin, the ranking member of the Senate Armed Service Committee, Feith and his staff used intelligence reports and other raw intelligence material, including information provided by detainee interrogations, to prepare the reports, memoranda, and briefings that they presented. (See Levin report, Appendix A, noting the existence of "*detainee debriefings cited by Feith* as important in helping his office develop its perspective on Iraq-al Qaeda links.") (Emphasis added.) From the discussion of the Feith documents in the 2004 SSCI report and Levin's report (see page 28-29), it appears highly likely that Feith, in preparing his materials, used information from Petitioner's interrogation. Notably, in correcting Feith in a subsequent letter, the CIA cited intelligence reports from interrogations of the Petitioner in 2003. (See report of the National Commission on Terrorist Attacks Upon the United States, known as the 9-11 Commission, p. 470, note 76, citing "Intelligence reports, interrogations of KSM and Zubaydah, 2003" cited in a "CIA letter, response to Douglas Feith memorandum," December 10, 2003, p. 5.

25. Details of Petitioner's interrogation collected or recorded by the Department of Justice Office of the Inspector General in preparing a report declassified in 2008, entitled *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq.* Chapter Eleven, Section VII of that report, "Abuse Allegations Involving Abu Zubaydah," (p. 317) discusses allegations that an FBI agent named Stephen Gaudin (given the pseudonym "Gibson" in the report) "spoke openly and with much enthusiasm about the torturing of captured al-Qaeda terrorists. . . and the brutal interrogation techniques by both CIA and FBI [in] which [he] was involved," and discusses Petitioner's interrogations from April through early May, 2002. Chapter Four, Section I of the report also discusses Petitioner's interrogation and high level Department of Justice discussions about the legality of the interrogations. Although numerous parts of the report are still classified and redacted, based on descriptions and context, it appears highly likely that the Department

UNCLASSIFIED//FOR PUBLIC RELEASE

of Justice Office of the Inspector General obtained numerous documents and recorded numerous interviews that detail the circumstances of Petitioner's interrogation.

26. Based on my research and experience, I strongly suspect that several other items are likely in the possession of the government and relevant to Petitioner's interrogation, including the following:

a. Equipment or implements used during Petitioner' detention and interrogation (or identical versions of the same) including but not limited to:

i. equipment or implements used during Petitioner's waterboarding;
ii. shackles, chains, or other instruments used to detain or restrain Petitioner;
iii. the "dog box" into which Petitioner was placed during interrogations;
iv. audio equipment and audio recordings played or otherwise used during the Petitioner's detention or interrogation to subject him to noise, sounds, or music, whether to deprive him of sleep or for other purposes;
v. video or light mechanisms or equipment used during Petitioner's detention and interrogation to produce visual or light stimuli directed at the detainee.

b. Notes made during interrogation by analysts, interrogators, supporting psychologists, and other CIA and FBI personnel, and reports written by those personnel about interrogations or about Petitioner.

c. Medical records or notes about Petitioner made or recorded by medical personnel, including doctors, nurses, physicians' assistants, psychiatrists, psychologists, including notes about Petitioner made by personnel from the Department of Defense in the Joint Personnel Recovery Agency (JPRA) or Survival, Evasion, Resistance or Escape (SERE) school operated by the Department of Defense.

I swear under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

John Sifton                                        September 17, 2009

UNCLASSIFIED//FOR PUBLIC RELEASE

# Appendix A

UNCLASSIFIED//FOR PUBLIC RELEASE

**JOHN SIFTON**
ONE WORLD RESEARCH, 25 WASHINGTON STREET, SUITE 408, BROOKLYN, NY 11201
TELEPHONE: +1 917 838 9736; E-MAIL: sifton@oneworldresearch.com

## EDUCATION

NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York
J.D., *cum laude,* May 2000

ST. JOHN'S COLLEGE, Annapolis, Maryland
B.A., *cum laude*, May 1996

## EXPERIENCE

ONE WORLD RESEARCH, New York, September 2007 – present

**Executive Director**
- Direct operations of a research and investigation firm specializing in public interest issues.
- Supervise a network of researchers and investigators supporting litigation and advocacy including work on Guantanamo Bay detention, abuses by U.S. military and intelligence personnel, criminal defense, Alien Tort Claims Act cases, natural resources exploitation in Africa and Asia, asylum cases, and U.S. civil rights cases, among other issues.
- Oversee researchers and consultants working in Asia, the Middle East and North Africa, Western Africa, and Central America.
- Write reports and memoranda for clients, including advocacy groups, non-profits, law firms, and law school clinics, testify and provide affidavits for court cases.
- Provide consulting services for non-profits, law firms, and other organizations.
- Conduct training for attorneys and investigators on research and investigation techniques.

HUMAN RIGHTS WATCH, Afghanistan, Pakistan, India, United States, October 2001 – September 2007

**Senior Researcher on Terrorism and Counter-Terrorism (2005-2007); Lead Researcher on Afghanistan (2002-2004); Researcher, Asia Division (2001-2002)**
- Researched terrorism and counter-terrorism issues, including human rights abuses and violations of the laws of war by governments, terrorist groups, insurgent groups, and other non-state actors.
- Directed research teams and conducted research interviewing human right victims and witnesses, government officials, and military and police personnel.
  — 2004-2007: Conducted research on terrorism-related violence by non-state groups in Pakistan, Afghanistan, Philippines, Iraq, and Egypt. Investigated covert CIA and U.S. military detention facilities, traveling to Afghanistan, Thailand, Morocco, Mauritania, Poland, and Germany; discovered evidence of secret detention sites in Poland, Afghanistan, and Morocco. Researched abuses by military and CIA forces in Iraq.
  — 2001-2004: Conducted general human rights research in Afghanistan, including investigations of election-related abuses, research on war crimes committed in the 1980s and 1990s, battle damage assessments at sites of U.S. air strikes, and general research on human rights and security conditions.
  — 2001-2006: Contributed to additional research in Pakistan, India, Kashmir, Iran, Iraq, Morocco and Jordan, and assisted in planning legal and research strategies.
- Wrote detailed factual reports and press releases, articles, editorials, and memoranda. Edited reports and press releases. Provided television, radio, and print media interviews. Represented Human Rights Watch at conferences and other events, and deliver comments and speeches at universities and other non-government organizations.

UNCLASSIFIED//FOR PUBLIC RELEASE

**JOHN SIFTON**
CONTINUED

- Briefed officials in Kabul, Islamabad, Delhi, Washington, and New York, including ambassadors and senior military officials, U.N. Security Council ambassadors, and officials in the U.S. Department of Defense, Department of State, and National Security Council.
- Testified as expert witness on Afghanistan before the House of Representatives Committee on International Relations.

INTERNATIONAL RESCUE COMMITTEE, November 2000 – September 2001

**Human Rights Advocacy and Protection Coordinator, Pakistan and Afghanistan**
Coordinated human rights research and refugee protection efforts, designing and implementing research initiatives, drafting briefings and reports for U.N. and international officials. Designed information-gathering projects for remote areas within Taliban-controlled Afghanistan to improve available information on human rights conditions. Advised on emergency humanitarian operations in Pakistan and Afghanistan. Served as Legal Researcher in the General Counsel's Office in 2000, conducting legal research on issues relating to IRC humanitarian aid operations in numerous countries in Asia, Africa, and the Middle East.

REFUGEES INTERNATIONAL, Washington D.C., Albania, Kosovo, April 1999 – August 1999

**Researcher,** Albania and Kosovo
During the Kosovo refugee crisis, interviewed refugees and host families. Seconded to the U.N. Development Program (UNDP), performed interviewing and fact-finding in Kosovo during and after the Serbian withdrawal. Drafted report on humanitarian and security conditions.

NEW YORK UNIVERSITY SCHOOL OF LAW, New York, 1998-2000.

**Teaching Assistant, Professor Lawrence Sager** (1999-2000)
**Research Assistant, Professor Peggy Davis** (1998-1999)
**Research Assistant, Immigration Clinic** (1997-1998)

UNIVERSITY OF MINNESOTA, Minneapolis, Minnesota, 1996.

**Teaching Assistant, Department of Philosophy**

## SELECTED WRITING

### Law Review and Magazine Articles

*United States Military and Central Intelligence Agency Personnel Abroad: Plugging the Prosecutorial Gaps* 43 Harvard Journal on Legislation 487 (Summer 2006).

*The Hugh Grant Connection*, The American Prospect, May 26, 2005.

*G.I.s Against Torture*, The Nation, March 9, 2005.

*Encounter: The One Who Stayed,* New York Times Magazine, December 16, 2001.

*Essay: Beyond the Khyber Pass*, New York Times Book Review, November 18, 2001.

*Temporal Vertigo: Premodern, Postmodern Afghanistan*, New York Times Magazine, September 30, 2001.

UNCLASSIFIED//FOR PUBLIC RELEASE

### Books

*Blood Stained Hands: Past Atrocities in Kabul and Afghanistan's Legacy of Impunity* (New York: Human Rights Watch, 2005).

"Out of Time," in *Another Day in Paradise: Frontline Stories from International Aid Workers* (New York: Mary Knoll, 2003), edited by Carol Bergman.

*"Killing You is a Very Easy Thing For Us": Human Rights Abuses in Southeast Afghanistan* (New York: Human Rights Watch, 2003), co-author: Zama Coursen-Neff.

### Commentary

*A Genuine Inquiry into Abuses*, International Herald Tribune, May 21, 2005 (with Sam Zarifi).

*Flawed Charter for a Land Ruled by Fear*, International Herald Tribune, January 7, 2004.

*Afghanistan's Warlords Still Call the Shots*, Asian Wall Street Journal, December 28, 2003.

*The Lesson of Afghanistan: Peacekeeping in Iraq*, International Herald Tribune, May 20, 2003 (with Sam Zarifi).

*Falling Back to Taliban Ways with Women*, International Herald Tribune, January 21, 2003 (with Zama Coursen-Neff).

*Additional articles in The Daily Beast, Slate, Salon, and TomPaine.com.*

### Published Reports

*Egypt: Anatomy of a State Security Case -- the Victorious Sect Arrests*, Human Rights Watch report, December 2007, 60 pages.

*Lives Destroyed: Attacks on Civilians in the Philippines*, Human Rights Watch report, July 2007.

*The Human Cost: The Consequences of Insurgent Attacks in Afghanistan*, Human Rights Watch report, April 2007, 120 pages.

*"No Blood, No Foul": Soldiers' Accounts of Detainee Abuse in Iraq*, Human Rights Watch Report, July 2006, 53 pages.

*The Rule of the Gun: Human Rights Abuses and Political Repression in the Run-up to Afghanistan's Presidential Election*, Human Rights Watch Report, September 2004, 53 pages.

*"Enduring Freedom": Abuses by U.S. Forces in Afghanistan*, Human Rights Watch Report, March 2004, 62 pages.

*"We Want to Live as Humans": Repression of Women and Girls in Western Afghanistan,* Human Rights Watch Report, December 2002, 50 pages (co-author: Zama Coursen Neff).

UNCLASSIFIED//FOR PUBLIC RELEASE

**JOHN SIFTON**
CONTINUED

> *"All Our Hopes are Crushed": Violence and Repression in Western Afghanistan*, Human Rights Watch Short Report, October 2002, 52 pages (co-author: Zama Coursen-Neff).

> *Afghanistan: Return of the Warlords*, Human Rights Watch Briefing Paper, June 2002, 20 pages.

## ADDITIONAL INFORMATION

- Member, Council on Foreign Relations
- Admitted to the New York Bar, September 2001

# Appendix B

UNCLASSIFIED//FOR PUBLIC RELEASE

ACLU v. Department of Defense
04-cv-4151

Hon. Alvin K. Hellerstein

| NUMBER | DATE | PAGE | TYPE OF DOC | FROM | TO | CLASSIFICATION |
|--------|------|------|-------------|------|-----|----------------|
| 1 | 4/13/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 2 | 4/13/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 3 | 4/13/2002 | 133 | HANDWRITTEN LOG BOOK | FIELD | RECORD | TOP SECRET |
| 4 | 4/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 5 | 4/15/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 6 | 4/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 7 | 4/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 8 | 4/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 9 | 4/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 10 | 4/16/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 11 | 4/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 12 | 4/17/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 13 | 4/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 14 | 4/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 15 | 4/18/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 16 | 4/18/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 17 | 4/18/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 18 | 4/18/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 19 | 4/19/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 20 | 4/19/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 21 | 4/19/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 22 | 4/19/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 23 | 4/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 24 | 4/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 25 | 4/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 26 | 4/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 27 | 4/21/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 28 | 4/21/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 29 | 4/21/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 30 | 4/21/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 31 | 4/21/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 32 | 4/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 33 | 4/22/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 34 | 4/22/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |

| 35 | 4/23/2002 | 3 | CABLE | FIELD | FIELD | TOP SECRET |
|----|-----------|---|-------|-------|-------|------------|
| 36 | 4/23/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 37 | 4/23/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 38 | 4/23/2002 | 3 | CABLE | FIELD | FIELD | TOP SECRET |
| 39 | 4/24/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 40 | 4/24/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 41 | 4/24/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 42 | 4/25/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 43 | 4/25/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 44 | 4/25/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 45 | 4/26/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 46 | 4/26/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 47 | 4/27/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 48 | 4/27/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 49 | 4/27/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 50 | 4/27/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 51 | 4/27/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 52 | 4/27/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 53 | 4/28/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 54 | 4/28/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 55 | 4/29/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 56 | 4/29/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 57 | 4/29/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 58 | 4/29/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 59 | 4/29/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 60 | 4/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 61 | 4/30/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 62 | 5/1/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 63 | 5/1/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 64 | 5/1/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 65 | 5/1/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 66 | 5/1/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 67 | 5/1/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 68 | 5/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 69 | 5/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |

| 70 | 5/3/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 71 | 5/4/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 72 | 5/4/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 73 | 5/5/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 74 | 5/5/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 75 | 5/5/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 76 | 5/5/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 77 | 5/5/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 78 | 5/5/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 79 | 5/6/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 80 | 5/6/2002 | 28 | CABLE | FIELD | HQTRS | TOP SECRET |
| 81 | 5/6/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 82 | 5/6/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 83 | 5/7/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 84 | 5/7/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 85 | 5/7/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 86 | 5/8/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 87 | 5/8/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 88 | 5/8/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 89 | 5/8/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 90 | 5/8/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 91 | 5/8/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 92 | 5/9/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 93 | 5/9/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 94 | 5/10/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 95 | 5/10/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 96 | 5/10/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 97 | 5/10/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 98 | 5/11/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 99 | 5/11/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 100 | 5/11/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 101 | 5/12/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 102 | 5/12/2002 | 2 | CABLE | FIELD | FIELD | TOP SECRET |
| 103 | 5/12/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 104 | 5/12/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |

UNCLASSIFIED//FOR PUBLIC RELEASE

ACLU v. Department of Defense

Hon. Alvin K. Hellerstein

04-cv-4151

| 105 | 5/12/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
|-----|-----------|----|-------|-------|-------|------------|
| 106 | 5/13/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 107 | 5/13/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 108 | 5/13/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 109 | 5/14/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 110 | 5/14/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 111 | 5/15/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 112 | 5/15/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 113 | 5/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 114 | 5/15/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 115 | 5/15/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 116 | 5/15/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 117 | 5/16/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 118 | 5/16/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 119 | 5/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 120 | 5/16/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 121 | 5/17/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 122 | 5/17/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 123 | 5/17/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 124 | 5/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 125 | 5/17/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 126 | 5/18/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 127 | 5/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 128 | 5/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 129 | 5/19/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 130 | 5/19/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 131 | 5/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 132 | 5/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 133 | 5/20/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 134 | 5/20/2002 | 12 | CABLE | FIELD | HQTRS | TOP SECRET |
| 135 | 5/20/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 136 | 5/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 137 | 5/21/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 138 | 5/21/2002 | 4 | CABLE | FIELD | FIELD | TOP SECRET |
| 139 | 5/22/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |

ACLU v. Department of Defense

04-cv-4151

Hon. Alvin K. Hellerstein

| 140 | 5/22/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
|-----|-----------|---|-------|--|-------|-------|------------|
| 141 | 5/23/2002 | 13 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 142 | 5/23/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 143 | 5/23/2002 | 6 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 144 | 5/23/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 145 | 5/24/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 146 | 5/24/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 147 | 5/25/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 148 | 5/25/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 149 | 5/26/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 150 | 5/26/2002 | 4 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 151 | 5/26/2002 | 6 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 152 | 5/26/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 153 | 5/26/2002 | 5 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 154 | 5/26/2002 | 8 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 155 | 5/27/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 156 | 5/27/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 157 | 5/28/2002 | 4 | CABLE | | HQTRS | FIELD | TOP SECRET |
| 158 | 5/28/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 159 | 5/28/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 160 | 5/28/2002 | 12 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 161 | 5/29/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 162 | 5/29/2002 | 5 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 163 | 5/29/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 164 | 5/30/2002 | 5 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 165 | 5/30/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 166 | 5/30/2002 | 4 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 167 | 5/30/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 168 | 5/31/2002 | 4 | CABLE | | FIELD | FIELD | TOP SECRET |
| 169 | 6/1/2002 | 5 | CABLE | | FIELD | FIELD | TOP SECRET |
| 170 | 6/1/2002 | 3 | CABLE | | FIELD | FIELD | TOP SECRET |
| 171 | 6/2/2002 | 8 | CABLE | | FIELD | FIELD | TOP SECRET |
| 172 | 6/2/2002 | 7 | CABLE | | FIELD | FIELD | TOP SECRET |
| 173 | 6/2/2002 | 3 | CABLE | | FIELD | FIELD | TOP SECRET |
| 174 | 6/3/2002 | 4 | CABLE | | FIELD | FIELD | TOP SECRET |

ACLU v. Department of Defense                                                                          Hon. Alvin K. Hellerstein
04-cv-4151

| 175 | 6/3/2002 | 4 | CABLE | FIELD | FIELD | TOP SECRET |
|-----|----------|---|-------|-------|-------|------------|
| 176 | 6/3/2002 | 4 | CABLE | FIELD | FIELD | TOP SECRET |
| 177 | 6/3/2002 | 5 | CABLE | FIELD | FIELD | TOP SECRET |
| 178 | 6/4/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 179 | 6/4/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 180 | 6/5/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 181 | 6/5/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 182 | 6/6/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 183 | 6/7/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 184 | 6/7/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 185 | 6/7/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 186 | 6/7/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 187 | 6/7/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 188 | 6/8/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 189 | 6/8/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 190 | 6/9/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 191 | 6/9/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 192 | 6/9/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 193 | 6/10/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 194 | 6/11/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 195 | 6/11/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 196 | 6/12/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 197 | 6/12/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 198 | 6/12/2002 | 10 | CABLE | FIELD | HQTRS | TOP SECRET |
| 199 | 6/13/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 200 | 6/14/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 201 | 6/16/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 202 | 6/16/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 203 | 6/17/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 204 | 6/18/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 205 | 6/19/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 206 | 6/19/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 207 | 6/19/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 208 | 6/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 209 | 6/21/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |

ACLU v. Department of Defense
04-cv-4151

Hon. Alvin K. Hellerstein

| 210 | 6/22/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
|-----|-----------|---|-------|-------|-------|------------|
| 211 | 6/23/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 212 | 6/24/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 213 | 6/25/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 214 | 6/26/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 215 | 6/27/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 216 | 6/28/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 217 | 6/29/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 218 | 6/30/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 219 | 7/1/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 220 | 7/2/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 221 | 7/3/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 222 | 7/4/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 223 | 7/5/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 224 | 7/6/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 225 | 7/7/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 226 | 7/8/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 227 | 7/9/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 228 | 7/10/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 229 | 7/11/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 230 | 7/12/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 231 | 7/13/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 232 | 7/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 233 | 7/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 234 | 7/16/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 235 | 7/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 236 | 7/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 237 | 7/19/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 238 | 7/20/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 239 | 7/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 240 | 7/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 241 | 7/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 242 | 7/24/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 243 | 7/25/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 244 | 7/26/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |

UNCLASSIFIED//FOR PUBLIC RELEASE

Hon. Alvin K. Hellerstein

| 245 | 7/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
|---|---|---|---|---|---|---|
| 246 | 7/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 247 | 7/29/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 248 | 7/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 249 | 7/31/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 250 | 8/1/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 251 | 8/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 252 | 8/3/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 253 | 8/4/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 254 | 8/4/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 255 | 8/4/2002 | 59 | HANDWRITTEN LOG BOOK | FIELD | RECORD | TOP SECRET |
| 256 | 8/5/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 257 | 8/5/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 258 | 8/6/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 259 | 8/6/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 260 | 8/7/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 261 | 8/7/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 262 | 8/8/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 263 | 8/8/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 264 | 8/8/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 265 | 8/9/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 266 | 8/9/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 267 | 8/10/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 268 | 8/10/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 269 | 8/11/2002 | 11 | CABLE | FIELD | HQTRS | TOP SECRET |
| 270 | 8/11/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 271 | 8/11/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 272 | 8/12/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 273 | 8/12/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 274 | 8/12/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 275 | 8/12/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 276 | 8/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 277 | 8/14/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 278 | 8/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 279 | 8/15/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |

ACLU v. Department of Defense
04-cv-4151

Hon. Alvin K. Hellerstein

| 280 | 8/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
|-----|-----------|---|-------|-------|-------|------------|
| 281 | 8/16/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 282 | 8/17/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 283 | 8/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 284 | 8/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 285 | 8/18/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 286 | 8/18/2002 | 9 | CABLE | FIELD | HQTRS | TOP SECRET |
| 287 | 8/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 288 | 8/19/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 289 | 8/19/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 290 | 8/20/2002 | 10 | CABLE | FIELD | HQTRS | TOP SECRET |
| 291 | 8/20/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 292 | 8/20/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 293 | 8/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 294 | 8/21/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 295 | 8/21/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 296 | 8/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 297 | 8/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 298 | 8/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 299 | 8/23/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 300 | 8/23/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 300 | 8/24/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 301 | 8/24/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 302 | 8/24/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 303 | 8/24/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 304 | 8/25/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 305 | 8/26/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 306 | 8/27/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 307 | 8/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 308 | 8/28/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 309 | 8/29/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 310 | 8/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 311 | 8/31/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 312 | 9/1/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 313 | 9/3/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 314 | 9/4/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 315 | 9/5/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 316 | 9/6/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 317 | 9/7/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 318 | 9/7/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 319 | 9/8/2002 | 5 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 320 | 9/8/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 321 | 9/8/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 322 | 9/9/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 323 | 9/9/2002 | 4 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 324 | 9/10/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 325 | 9/10/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 326 | 9/10/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 327 | 9/10/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 328 | 9/10/2002 | 4 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 329 | 9/11/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 330 | 9/11/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 331 | 9/11/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 332 | 9/11/2002 | 4 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 333 | 9/11/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 334 | 9/11/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 335 | 9/12/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 336 | 9/12/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 337 | 9/12/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 338 | 9/12/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 339 | 9/12/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 340 | 9/12/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 341 | 9/13/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 342 | 9/13/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 343 | 9/13/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 344 | 9/13/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 345 | 9/13/2002 | 2 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 346 | 9/14/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 347 | 9/14/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |
| 348 | 9/14/2002 | 3 | CABLE | | FIELD | HQTRS | TOP SECRET |

| 349 | 9/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
|-----|-----------|---|-------|-------|-------|------------|
| 350 | 9/14/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 351 | 9/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 352 | 9/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 353 | 9/14/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 354 | 9/15/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 355 | 9/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 356 | 9/15/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 357 | 9/15/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 358 | 9/15/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 359 | 9/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 360 | 9/16/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 361 | 9/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 362 | 9/17/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 363 | 9/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 364 | 9/17/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 365 | 9/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 366 | 9/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 367 | 9/18/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 368 | 9/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 369 | 9/20/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 370 | 9/20/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 371 | 9/20/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 372 | 9/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 373 | 9/20/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 374 | 9/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 375 | 9/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 376 | 9/21/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 377 | 9/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 378 | 9/22/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 379 | 9/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 380 | 9/22/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 381 | 9/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 382 | 9/22/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 383 | 9/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |

| 384 | 9/22/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
|---|---|---|---|---|---|---|
| 385 | 9/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 386 | 9/23/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 387 | 9/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 388 | 9/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 389 | 9/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 390 | 9/23/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 391 | 9/24/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 392 | 9/24/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 393 | 9/24/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 394 | 9/24/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 395 | 9/24/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 396 | 9/24/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 397 | 9/25/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 398 | 9/25/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 399 | 9/25/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 400 | 9/25/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 401 | 9/25/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 402 | 9/25/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 403 | 9/26/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 404 | 9/26/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 405 | 9/26/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 406 | 9/26/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 407 | 9/27/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 408 | 9/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 409 | 9/28/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 410 | 9/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 411 | 9/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 412 | 9/28/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 413 | 9/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 414 | 9/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 415 | 9/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 416 | 10/1/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 417 | 10/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 418 | 10/2/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |

UNCLASSIFIED//FOR PUBLIC RELEASE

| 419 | 10/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
|-----|-----------|---|-------|-------|-------|------------|
| 420 | 10/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 421 | 10/3/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 422 | 10/3/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 423 | 10/3/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 424 | 10/3/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 425 | 10/4/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 426 | 10/4/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 427 | 10/4/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 428 | 10/5/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 429 | 10/5/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 430 | 10/6/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 431 | 10/6/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 432 | 10/7/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 433 | 10/8/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 434 | 10/9/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 435 | 10/10/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 436 | 10/10/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 437 | 10/10/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 438 | 10/10/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 439 | 10/11/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 440 | 10/11/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 441 | 10/11/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 442 | 10/11/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 443 | 10/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 444 | 10/15/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 445 | 10/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 446 | 10/16/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 447 | 10/16/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 448 | 10/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 449 | 10/17/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 450 | 10/17/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 451 | 10/18/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 452 | 10/19/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 453 | 10/19/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |

| 454 | 10/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
|---|---|---|---|---|---|---|
| 455 | 10/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 456 | 10/23/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 457 | 10/24/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 458 | 10/24/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 459 | 10/25/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 460 | 10/25/2002 | 2 | CABLE | FIELD | FIELD | TOP SECRET |
| 461 | 10/25/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 462 | 10/26/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 463 | 10/26/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 464 | 10/26/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 465 | 10/27/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 466 | 10/29/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 467 | 10/29/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 468 | 10/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 469 | 10/31/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 470 | 10/31/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 471 | 11/1/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 472 | 11/1/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 473 | 11/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 474 | 11/3/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 475 | 11/3/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 476 | 11/4/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 477 | 11/4/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 478 | 11/5/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 479 | 11/5/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 480 | 11/6/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 481 | 11/7/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 482 | 11/8/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 483 | 11/8/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 484 | 11/9/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 485 | 11/11/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 486 | 11/13/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 487 | 11/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 488 | 11/14/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |

UNCLASSIFIED//FOR PUBLIC RELEASE

| 489 | 11/15/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
|---|---|---|---|---|---|---|
| 490 | 11/15/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 491 | 11/16/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 492 | 11/16/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 493 | 11/16/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 494 | 11/17/2002 | 11 | CABLE | FIELD | HQTRS | TOP SECRET |
| 495 | 11/17/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 496 | 11/18/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 497 | 11/18/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 498 | 11/18/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 499 | 11/19/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 500 | 11/20/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 501 | 11/20/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 502 | 11/21/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 503 | 11/21/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 504 | 11/21/2002 | 2 | CABLE | FIELD | FIELD | TOP SECRET |
| 505 | 11/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 506 | 11/21/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 507 | 11/21/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 508 | 11/21/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 509 | 11/21/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 510 | 11/21/2002 | 5 | CABLE | FIELD | HQTRS | TOP SECRET |
| 511 | 11/22/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 512 | 11/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 513 | 11/22/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 514 | 11/22/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 515 | 11/22/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 516 | 11/23/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 517 | 11/24/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 518 | 11/24/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 519 | 11/24/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 520 | 11/25/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 521 | 11/25/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 522 | 11/25/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 523 | 11/25/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |

| 524 | 11/26/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
|---|---|---|---|---|---|---|
| 525 | 11/27/2002 | 6 | CABLE | FIELD | HQTRS | TOP SECRET |
| 526 | 11/27/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 527 | 11/27/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 528 | 11/27/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 529 | 11/27/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 530 | 11/27/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 531 | 11/28/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 532 | 11/29/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 533 | 11/29/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 534 | 11/30/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 535 | 11/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 536 | 11/30/2002 | 11 | CABLE | FIELD | HQTRS | TOP SECRET |
| 537 | 11/30/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 538 | 11/30/2002 | 3 | CABLE | FIELD | HQTRS | TOP SECRET |
| 539 | 11/30/2002 | 1 | CABLE | FIELD | HQTRS | TOP SECRET |
| 540 | 11/30/2002 | 13 | MEMO | HQTRS | FIELD | SECRET |
| 541 | 12/1/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 542 | 12/1/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 543 | 12/1/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 544 | 12/2/2002 | 11 | CABLE | FIELD | HQTRS | TOP SECRET |
| 545 | 12/2/2002 | 2 | CABLE | FIELD | HQTRS | TOP SECRET |
| 546 | 12/3/2002 | 7 | CABLE | FIELD | HQTRS | TOP SECRET |
| 547 | 12/3/2002 | 8 | CABLE | FIELD | HQTRS | TOP SECRET |
| 548 | 12/4/2002 | 9 | CABLE | FIELD | HQTRS | TOP SECRET |
| 549 | 12/4/2002 | 4 | CABLE | FIELD | HQTRS | TOP SECRET |
| 550 | 1/9/2003 | 5 | MEMO FOR RECORD | HQTRS | Record | TOP SECRET |
| 551 | 2/3/2003 | 5 | INTERVIEW REPORT | HQTRS | Record | TOP SECRET |
| 552 | 2/10/2003 | 8 | INTERVIEW REPORT | HQTRS | Record | TOP SECRET |
| 553 | 5/22/2003 | 4 | MEMO FOR RECORD | HQTRS | Record | TOP SECRET |
| 554 | 6/17/2003 | 6 | HANDWRITTEN NOTES | HQTRS | Record | TOP SECRET |
| 555 | 6/18/2003 | 2 | EMAIL | HQTRS | Record | TOP SECRET |
| 556 | 6/18/2003 | 5 | INTERVIEW REPORT | HQTRS | Record | TOP SECRET |
| 557 | 12/3/2007 | 5 | EMAIL | HQTRS | HQTRS | TOP SECRET |
| 558 | 12/10/2007 | 5 | EMAIL W/MEMO | HQTRS | HQTRS | TOP SECRET |

ACLU v. Department of Defense                                                    Hon. Alvin K. Hellerstein
04-cv-4151

| 559 | 12/10/2007 | 2 | EMAIL | HQTRS | HQTRS | TOP SECRET |
|------|------------|----|-------|-------|-------|------------|
| 560 | 12/28/2007 | 7 | INTERVIEW REPORT | HQTRS | Record | TOP SECRET |
| 561 | 1/7/2008 | 13 | EMAIL | HQTRS | HQTRS | TOP SECRET |
| 562 | Unknown | 10 | DRAFT PRELIMINARY TIMELINE | Unknown | Unknown | TOP SECRET |
| 563 | Unknown | 9 | NOTES/OUTLINE | Unknown | Unknown | TOP SECRET |
| 564 | Unknown | 1 | NOTES/OUTLINE | Unknown | Unknown | SECRET |
| 565 | Unknown | 14 | NOTES/OUTLINE | Unknown | Unknown | TOP SECRET |
| 566 | Unknown | 19 | NOTES/OUTLINE | Unknown | Unknown | TOP SECRET |
| 567 | Unknown | 17 | NOTES/OUTLINE | Unknown | Unknown | TOP SECRET |
| 568 | Unknown | 3 | OUTLINE | Unknown | Unknown | TOP SECRET |
| 569 | Unknown | 29 | NOTES/OUTLINE | Unknown | Unknown | TOP SECRET |
| 570 | Unknown | 2 | NOTES | Unknown | Unknown | TOP SECRET |
| 571 | Unknown | 2 | NOTES | Unknown | Unknown | TOP SECRET |
| 572 | Unknown | 4 | NOTES | Unknown | Unknown | SECRET |
| 573 | Unknown | 2 | MEMO | Unknown | Record | SECRET |
| 574 | Unknown | 29 | DRAFT PRELIMINARY TIMELINE | Unknown | Unknown | TOP SECRET |
| 575 | Unknown | 38 | DRAFT PRELIMINARY TIMELINE | Unknown | Unknown | TOP SECRET |
| 576 | Unknown | 29 | DRAFT PRELIMINARY TIMELINE | Unknown | Unknown | TOP SECRET |
| 577 | 10/11/2002 | 1 | PHOTO | Unknown | Unknown | TOP SECRET |
| 579 | 5/9/2003 | 47 | NOTES | HQTRS | HQTRS | TOP SECRET |
| 580 | Unknown | 1 | NOTES | HQTRS | HQTRS | TOP SECRET |