DETAINEE BELIEVED THAT BARI SPOKE ARABIC BETTER THAN THE OTHER INSTRUCTORS. (FIELD COMMENT -- THE DETAINEE COULD NOT FURTHER IDENTIFY THE INSTRUCTORS.)

9.  ██████████        CAMP AFFILIATIONS WITH TALIBAN AND AL QAIDA.  DETAINEE CLAIMED THAT HE HAD NO KNOWLEDGE THAT THE KHALDEN TRAINING CAMP WAS CONTROLLED OR OPERATED BY EITHER AL QAIDA OR THE TALIBAN.  THE DETAINEE HAD NO INFORMATION CONCERNING HOW THE CAMP WAS FUNDED.

10. ██████████        IDENTIFICATION OF TRAINEES.  ONE OF THE TRAINEES THAT DETAINEE RECALLED FROM KHALDEN TRAINING CAMP SEEMED TO BE AN UNIDENTIFIED AFRICAN-AMERICAN MALE BETWEEN TWENTY AND THIRTY YEARS OLD, PERHAPS OF SOMALI DESCENT.  DETAINEE BELIEVED HE SPOKE FRENCH, AND MAY HAVE CONVERTED TO ISLAM WITHIN THREE TO FOUR YEARS PRIOR TO HIS ATTENDING KHALDEN.  THIS MAN WAS DESCRIBED AS 1.82 TO 1.87 METERS TALL, MEDIUM DARK SKIN, MEDIUM BUILD, SHORT BLACK HAIR, BEARD AND MUSTACHE.  THE DETAINEE COULD NOT RECALL THE NAME USED BY THE MAN.  THE DETAINEE BELIEVED THAT THIS MAN APPEARED TO HAVE SOME BACKGROUND IN MILITARY TRAINING.  THE DETAINEE AND OTHER TRAINEES AT KHALDEN THOUGHT THAT THE MAN MIGHT HAVE WORKED FOR U.S. INTELLIGENCE.  THE DETAINEE BELIEVED THIS MAN HAD A BAD ATTITUDE (FIELD COMMENT - DETAINEE COULD NOT FURTHER EXPLAINED WHY HE FELT THIS MAN HAD A BAD ATTITUDE).  THE MAN ONLY ATTENDED TRAINING FOR APPROXIMATELY THREE WEEKS, AND UPON HIS DEPARTURE, THE DETAINEE NEVER SAW HIM AGAIN.  THE DETAINEE DID NOT KNOW WHAT SPECIFIC TRAINING THIS MAN RECEIVED PRIOR TO KHALDEN, DID NOT KNOW HOW LONG HE HAD BEEN IN AFGHANISTAN PRIOR TO TRAINING, OR WHY HE ATTENDED TRAINING FOR ONLY THREE TO FOUR WEEKS.

11. ██████████        ANOTHER TRAINEE THAT ATTENDED THE KHALDEN TRAINING CAMP AT THE SAME TIME AS THE DETAINEE WAS A TUNISIAN NAMED ((SUHAIL)), NOT FURTHER IDENTIFIED.  AFTER THE ATTACKS ON 11 SEPTEMBER 2001, THE DETAINEE RECALLED SEEING SUHAIL'S PICTURE IN A MAGAZINE AS ONE OF THE INDIVIDUALS RESPONSIBLE FOR THE ASSASSINATION OF ((MASOUD)), THE LEADER OF THE NORTHERN ALLIANCE IN AFGHANISTAN.  DETAINEE BELIEVED THAT SUHAIL HAD SPENT TIME IN EUROPE, BUT DID NOT KNOW MORE INFORMATION BECAUSE THEY DID NOT ASK OR TELL PERSONAL DETAILS TO OTHER JIHADISTS WHILE IN AF.  THE DETAINEE DID NOT BELIEVE THAT SUHAIL HAD AN EXTENSIVE AMOUNT OF TRAINING.  SUHAIL ARRIVED AT KHALDEN A WEEK AFTER THE DETAINEE, IN MAY OR JUNE 2000.  THE DETAINEE BELIEVED THAT SUHAIL WAS NOT AN EXTREMIST, AND DESCRIBED HIM AS QUIET AND RESPECTFUL.

12. ██████████        THE DETAINEE HAD NO INFORMATION INDICATING THAT ANY OF THE 11 SEPTEMBER HIJACKERS OR ANY OTHER TERRORIST RECEIVED TRAINING AT THE KHALDEN TRAINING CAMP.

13. ██████████        STRUCTURES.  THERE WERE NO PERMANENT STRUCTURES ON THE KHALDEN TRAINING CAMP.  THE LIVING SPACES, MOSQUE, HEADQUARTERS, LATRINES AND KITCHEN AREAS WERE WITHIN SHALLOW CAVES DUG INTO THE SIDES OF THE HILLS ON EITHER SIDE OF THE CAMP.  WEAPONS WERE STORED IN A SMALL CAVE OFF TO ONE SIDE OF THE CAMP.  THE CAVE HAD A CLAY WALL SET UP IN THE FRONT AS A BARRIER.  THERE WERE NO GUARDS SECURING ANY OF THE WEAPONS.  THE DETAINEE BELIEVED THERE WERE ONLY ABOUT FIFTY AK-47S AND FIVE OR SIX PISTOLS.  THE WEAPONS WERE HAPHAZARDLY PLACED IN THIS CAVE.  AMMUNITION WAS ALSO STORED IN THE SAME CAVE.  ONE OF THE MORE EXPERIENCED TRAINEES WOULD BE TASKED TO RECOVER AND REPLACE THE WEAPONS AND AMMUNITION INTO THE CAVE.

14. ██████████        MOCK-UPS.  THERE WERE NO MOCK-UPS USED DURING ANY TRAINING AT THE KHALDEN TRAINING CAMP.  THERE WERE NO SPECIFIC MISSIONS DISCUSSED OR PLANNED.  NO PAST TERRORIST ATTACKS OR COMBAT BATTLES WERE DISCUSSED OR USED AS TEACHING POINTS.  DURING TRAINING OF MILITARY TACTICS, ROCKS OR OTHER ITEMS WOULD BE USED TO REPRESENT BUILDINGS, TARGETS ETC.  THERE WAS NO URBAN WARFARE TYPE TRAINING CONDUCTED.

15. ██████████        THE DETAINEE WAS NOT AN INSTRUCTOR AT ANY TIME WHILE AT THE KHALDEN TRAINING CAMP.

16. ██████████        CAMP VISITORS.  THERE WERE NO VISITORS TO THE KHALDEN TRAINING CAMP DURING DETAINEE'S ATTENDANCE.  THE DETAINEE HEARD FROM UNRECALLED SOURCES THAT USAMA BIN ((LADEN)) (UBL) HAD CAME TO THE CAMP A YEAR OR TWO

PREVIOUSLY, ATTEMPTING TO CONVINCE SOME OF THE INSTRUCTORS TO TEACH AT HIS OWN
CAMPS.
17. (C//REL ████████████ THE DETAINEE DID NOT RECOGNIZE ANY TRAINEES FROM THE
KHALDEN TRAINING CAMP AT ANY OTHER TIME IN AFGHANISTAN, PAKISTAN OR AT
GUANTANAMO BAY.


COMMENTS: 1. (U) (FIELD COMMENTS) -- THE INDIVIDUAL DESCRIBED IN PARAGRAPH TEN
WAS BELIEVED BY DETAINEE TO BE A US PERSON.  SEE INSTR BLOCK.
2. (U) DETAINEE PREVIOUSLY REPORTED THE DISCRIPTION OF INSTRUCTORS, THE
LOCATION, LAYOUT AND DETAILS OF HOW HE WAS SELECTED FOR AND TRAVELED TO THE CAMP
IN IIR 6 034 0309 04, IIR 6 034 0781 04 AND IIR 6 034 0899 04.  DETAINEE'S
DESCRIPTIONS OF WEAPON SYSTEMS WAS BASED ON PHOTOGRAPHS OF WEAPONS CONTAINED IN
THE AFGHANISTAN COUNTRY HANDBOOK, DOD-2630-AFG-001-02, DATED OCTOBER 2001.
3. (U) THIS REPORT FULLY ANSWERS ALL QUESTIONS CONTAINED IN ████████████
4. (U) THE DETAINEE ANSWERED ALL QUESTIONS IMMEDIATELY AND WITHOUT HESITATION.
THERE WERE NO INDICATIONS OF DECEPTION IN DETAINEE'S ANSWERS.
5. (U) THE DETAINEE IS AVAILABLE FOR FURTHER CONTACT.
6. (U) REQUEST THE ORIGINATOR ████████████████ PROVIDE CJTF GTMO WITH
AN OFFICIAL HUMINT IIR EVALUATION OF THIS REPORT IAW PROCEDURES OUTLINED
██████████████ ADDRESS ANY QUESTIONS CONCERNING THE CONTENTS OF
THIS IIR ████████████████████████████ ALL FORMAL
EVALUATIONS SHOULD BE SENT TO ████████████ INFO COPIES TO ████████

████████████████████████████ ADDRESS ALL REQUESTS FOR
RELEASE OF INFORMATION OR FOR FURTHER DISSEMINATION ██████████████████
██████████ OR EMAIL COMMENTS █████████


COLL: (U) BH; CA; DD.
INSTR: (U) U.S. YES 5.
PREP: ████
ACQ: ████
DISSEM: (U) FIELD -- NONE.
WARNING: (U) REPORT CLASSIFIED ████████████████████//RELEASABLE TO ████████

DRV FROM: DH SCG, OCT 2004
DECL: 25X1-HUMAN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZAYN HUSAYN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No. 08-1360 (RWR) |
| | ) |
| ROBERT GATES, | ) |
| | ) |
| Respondent. | ) |
| | ) |

IIR 6 034 0200 05

SECRET//NOFORN

C O N F I D E N T I A L //RELEASABLE TO ███████

SERIAL: (U) IIR 6 034 0200 05.

COUNTRY: (U) AFGHANISTAN (AF).

IPSP: (U) ███████

SUBJ: IIR 6 034 0200 05 ███████ - DETAINEE DESCRIBES TRAINING PROVIDED AND
LOCATION OF TURKISH-KURDISH CAMP (U)

WARNING: ███ THIS IS AN INFORMATION REPORT, NOT FINALLY EVALUATED INTELLIGENCE.
REPORT CLASSIFIED C O N F I D E N T I A L //RELEASABLE TO ███████

----------------------------------------------------------------------
                    DEPARTMENT OF DEFENSE
----------------------------------------------------------------------

DOI: (U) 20020300.

REQS: ███████

SOURCE: (C//REL ███████ //ISN ██ AG-00069 ██ //BORN 1973 AND CLAIMS
ALGERIAN CITIZENSHIP. DETAINEE TRAINED IN AFGHANISTAN IN PREPARATION FOR THE
JIHAD IN CHECHNYA. DETAINEE WAS CAPTURED IN ZUBAYDAH GUESTHOUSE IN MARCH 2002
WITH SEVERAL OTHERS. REPORTING RELIABILITY IS NOT ESTABLISHED.

SUMMARY: (C//REL ███████ DETAINEE TRAVELED TO THE SMALL CAMP RAN BY ABU
OMAR ((AL TURKEY)) KNOWN AS THE TURKISH/KURDISH CAMP, WHERE DETAINEE TRAINED ON
SIMPLE TACTICAL MOVEMENTS, SUCH AS LOW CRAWLING AND BASIC CONCEALMENT,
COMMUNICATIONS USING HAND HELD PORTABLE RADIOS, COMPASS TRAINING, MINE TRAINING,
AND ROCKET PROPELLED GRENADE (RPG) TRAINING.

TEXT: 1. (C//REL ████████████ SPECIFIC LOCATION OF THE CAMP. FROM THE
SAFEHOUSE RUN BY ABU HAMMAN IN
JALALABAD ████████
AFGHANISTAN (AF), DETAINEE TRAVELED TO THE SMALL CAMP RAN BY ABU OMAR ((AL
TURKEY)). THE TURKISH CAMP WAS LOCATED THIRTY MINUTES FROM JALALABAD GOING
SOUTHEAST TOWARDS PAKISTAN AND FIFTEEN MINUTES NORTH FROM THE MAIN ROAD. THE
VILLAGE OF ISMAIL KHAIL IS LOCATED NEAR THE CAMP. THE CAMP CONSISTED OF MUD
HOUSES AND HOUSED BETWEEN 15-25 PEOPLE OF NON-ARAB BACKGROUND. THERE IS ANOTHER
SMALL TRAINING CAMP LOCATED SOUTHEAST OF JALALABAD THAT DETAINEE ATTENDED FROM
MARCH 1999 TO MAY 1999. THE CAMP WAS LOCATED FORTY-FIVE MINUTES SOUTHEAST OF
JALALABAD ALONG THE ROUTE TO TOWR KHAM ████████
████████ PAKISTAN
(PK)AND THEN EAST ONTO A DIRT ROAD FOR 20-30 MINUTES. THE CAMP WAS NEAR A CREEK
BED AND SURROUNDED BY MOUNTAINS. THE CAMP CONSISTED OF MUD HOUSES AND HOUSED
BETWEEN 15-20 PEOPLE OF SAUDI ARABIAN AND YEMENI BACKGROUND. (FIELD NOTES- SEE
COMMENTS SECTION BELOW ) DETAINEE REFUSED TO DRAW A MAP. THE CAMP IS ALSO
KNOWN AS THE --TURKISH/KURDISH CAMP--.)
2. (C//REL ████████████ TRAINING AT THE TURKISH/KURDISH TRAINING CAMP.
DETAINEE WENT THROUGH THE TOPOGRAPHY COURSE WHICH LASTED APPROXIMATELY ONE
MONTH. WEAPONS TRAINING CONSISTED OF LIGHT WEAPONS AND MINE REMOVAL AND
PLACEMENT. THE WEAPONS WERE THE .303 LEE ENFIELD, 7.62-MM AK-47, AND THE 7.62-MM
PK WITHOUT TRIPOD. THE MINES WERE THE M15 ANTITANK MINE, MK-7 ANTITANK MINE, M18
ANTIPERSONNEL MINE, PMN ANTIPERSONNEL MINE, AND THE TYPE 72 ANTIPERSONNEL MINE.
SOME TRAINING MANUALS WERE PROVIDED ON HOW THE WEAPONS WERE MADE AND WORKED,
HOWEVER, THE BOOKS WERE VERY OLD. (FIELD COMMENT - SEE COMMENT THREE BELOW).

DETAINEE ALSO TRAINED ON SIMPLE TACTICAL MOVEMENTS, SUCH AS LOW CRAWLING AND

BASIC CONCEALMENT, COMMUNICATIONS USING HAND HELD PORTABLE RADIOS, COMPASS

TRAINING, MINE TRAINING, AND ROCKET PROPELLED GRENADE (RPG) TRAINING

3. ▆▆▆▆▆ NAMES AND PHYSICAL DESCRIPTIONS OF THE TRAINERS FROM

THE TURKISH/KURDISH CAMP. ABU AMOR, A TURKISH NATIONAL WAS RESPONSIBLE FOR THE

CAMP HE APPEARED TO BE AROUND 35 YEARS OLD. A MAN KNOWN AS ANAS WAS THE

TOPOGRAPHY TRAINER AT THE CAMP. COURSE WHICH LASTED APPROXIMATELY ONE MONTH.

THERE WERE POSSIBLY FIVE TRAINERS AT THE CAMP. AMOR ((AL-TURKI)), THE LEADER OF

THE TURKISH TRAINING CAMP LOCATED BETWEEN JALALABAD AND TOWR KHAM IN

AFHGANISTAN; MOHAMMED ((ALI)), A SAUDI ARABIAN, WAS A LIGHT WEAPONS TRAINER AT

THE CAMP. ALI WAS APPROXIMATELY 32-YRS-OLD AND 175-180 CM. ((ALI)) HAD A MEDIUM

BUILD, BLACK HAIR, BROWN EYES, AND A LIGHT, PATCHY BEARD. A MAN KNOWN AS

--ANAS-- WAS THE TOPOGRAPHY TRAINER AT THE CAMP.


COMMENTS: 1. ▆▆▆FIELD COMMENTS - THE DETAINEE ANSWERED ALL QUESTIONS WITHOUT

HESITATION AND IS AVAILABLE FOR FURTHER CONTACT.  DETAINEE CLAIMED THAT HE

PREVIOUSLY LIED ABOUT THE TRAINERS AT THE TURKISH / KURDISH CAMPS; HOWEVER, THIS

IS UNLIKELY.

2. ▆▆▆

PLEASE REFERENCE PRIOR REPORTING FOR THIS IIR, INCLUDING 000694 302 22-JUN-02,

000694 SIR 27-MAY-02, IIR 6 034 0588 02, AND 000694 SIR 24-MAY-02.

3. ▆▆▆ FIELD NOTES - THIS WAS PREVIOUSLY REPORTED IN 000694 SIR 27-MAY-02 AND

IIR 6 034 0588 02 AND CONFIRMED 08-APR05.  DETAINEE IDENTIFIED WEAPONS FROM THE

DOD-2630-AFG-001-02, AFGHANISTAN COUNTRY HANDBOOK.

4. ███ THIS IIR IS A PARTIAL RESPONSE █████████ AND A COMPLETE
RESPONSE █████████ NO ADDITIONAL INFORMATION CONCERNING THE SDR IS
AVAILABLE FROM DETAINEE, AND THIS STATION CONSIDERS IT FULFILLED.
5. ███ ADDRESS ANY QUESTIONS CONCERNING THE CONTENTS OF THIS IIR
█████████████████████████ ALL FORMAL EVALUATIONS SHOULD BE
SENT █████████ INFO COPIES █████████
█████████ ADDRESS
ALL REQUESTS FOR RELEASE OF INFORMATION OR FOR FURTHER DISSEMINATION
█████████ OR EMAIL COMMENTS ███


COLL: ███ BH; CA; DD.
INSTR: ███ U.S. NO.
PREP: ███
ACQ: ███
DISSEM: ███ FIELD -- NONE.
WARNING: ███ REPORT CLASSIFIED C O N F I D E N T I A L//RELEASABLE TO
█████████

DRV FROM: DH SCG, OCT 2004
DECL: 25X1-HUMAN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ZAYN HUSAYN,<br><br>    Petitioner,<br><br>     v.<br><br>ROBERT GATES,<br><br>    Respondent. | Civil Action No. 08-1360 (RWR) |

## IIR 6 034 0286 05

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

C O N F I D E N T I A L//RELEASABLE TO ▓▓▓▓▓▓▓

SERIAL: (U) IIR 6 034 0286 05.

COUNTRY: (U) AFGHANISTAN (AF); PAKISTAN (PK).

IPSP: (U) ▓▓▓▓▓▓▓

SUBJ: IIR 6 034 0286 05 ▓▓▓▓▓▓▓ - DETAINEE DESCRIBES TRAINING AT U/I CAMP
AND KHALDAN CAMP, NAMES TRAINERS AND TRAINEES (U)

WARNING: (U) THIS IS AN INFORMATION REPORT, NOT FINALLY EVALUATED INTELLIGENCE.
REPORT CLASSIFIED C O N F I D E N T I A L//RELEASABLE TO ▓▓▓▓▓▓▓
▓▓▓▓

-----------------------------------------------------------------------
                    DEPARTMENT OF DEFENSE
-----------------------------------------------------------------------

DOI: (U) 19990300.

REQS: (U) ▓▓▓▓▓▓▓

SOURCE: (C//REL ▓▓▓▓▓▓▓ /ISN ▓ AG-000694 /BORN 1973 AND CLAIMS
ALGERIAN CITIZENSHIP.  DETAINEE TRAINED IN CHECHNYA AND WAS A TRAINER IN
AFGHANISTAN.  DETAINEE WAS CAPTURED IN ABU ZUBAYDAH GUESTHOUSE IN MARCH 2002.
DETAINEE REPORTING IS NOT ESTABLISHED.  DETAINEE HAD DIRECT ACCESS TO THE
INFORMATION REPORTED.  CONTEXT STATEMENT - NONE.

SUMMARY: (C//REL ▓▓▓▓▓▓▓ AT U/I TRAINING CAMP STUDENTS SPENT APPROXIMATELY
TWO WEEKS TRAINING ON LIGHT ARMS, TWO WEEKS ON MORTARS, AND THREE WEEKS ON MINE
TRAINING.  AFTER ATTENDING THIS U/I CAMP DETAINEE WENT TO THE KHALDAN CAMP IN
KHOWST FOUR FOR TRAINING ON LIGHT ARMS, MINES, MORTARS, COMMUNICATIONS, AND
TACTICAL MOVEMENT. ▓▓▓▓▓▓▓

TEXT: 1. (C//REL              ) IN MAR/APR 1999, DETAINEE ATTENDED AN
UNIDENTIFIED CAMP, RUN BY ARABS, OUTSIDE JALALABAD
AFGHANISTAN (AF) FOR APPROXIMATELY TWO
MONTHS. A SAUDI
NAMED MOHAMMED ((ALI)) RAN THE U/I CAMP. DETAINEE TRAINED ON LANDMINES AT THIS
CAMP AND ALSO SPENT APPROXIMATELY TWO WEEKS TRAINING ON LIGHT ARMS, AND TWO
WEEKS TRAINING ON MORTARS. DETAINEE STAYED IN A ROOM WITHIN THE CAMP RATHER THAN
RETURN TO A GUEST HOUSE NIGHTLY (SEE COMMENT 2).
2. (C//REL         ) AFTER A MINE TRAINING ACCIDENT, TWO U/I AFGHANS
TRANSPORTED DETAINEE FROM THE CAMP TO THE LARGEST HOSPITAL IN JALALABAD, AF TO
TREAT HIS INJURED LEFT HAND. DETAINEE STATED THAT THESE TWO AFGHANS WORKED AT
THE CAMP. (FIELD COMMENT
DETAINEE DID NOT PAY A BILL FOR
HIS HOSPITAL STAY. DETAINEE CLAIMED THERE WERE MANY NON-PROFIT ORGANIZATIONS
WHO COVERED EXPENSES FOR CAMP TRAINEES. (FIELD COMMENT
AFTER LEAVING THE HOSPITAL IN
JUL/AUG 1999, DETAINEE STAYED AT A JALALABAD GUESTHOUSE FOR APPROXIMATELY TWO
WEEKS. THIS HOUSE WAS OWNED BY TWO U/I AFGHANS.
3. (C//REL         ) KHALDAN CAMP. IN AUG/SEP 1999, DETAINEE AND TWO
AFGHANS STAYED AT A GUEST HOUSE IN KHOWST
AF FOR
APPROXIMATELY TWO WEEKS WHILE WAITING FOR A CLASS TO BEGIN AT KHALDAN CAMP
IN SEP/OCT 1999, DETAINEE TRAINED AT THE
KHALDAN CAMP FOR APPROXIMATELY FIVE MONTHS AND LEFT IN MARCH 2000. DETAINEE
ATTENDED THREE WEEKS OF LIGHT ARMS TRAINING. THERE WERE FIFTEEN TO TWENTY

STUDENTS IN THIS CLASS. DETAINEE ATTENDED TACTICAL MOVEMENT TRAINING FOR SEVEN
TO TEN DAYS, COMPASS/LAND NAVIGATION TRAINING FOR TWO WEEKS, ARTILLERY/MORTARS
TRAINING FOR THREE WEEKS, AND COMMUNICATIONS/RADIO TRAINING FOR TWO WEEKS.
WHILE ATTENDING KHALDAN CAMP, DETAINEE ALSO TOOK A --
PRINCIPLES OF
ESTABLISHMENT-- CLASS. THIS CLASS WAS A TYPE OF INDOCTRINATION STYLE TRAINING,
WHICH DETAINEE CONSIDERED TO BE INFORMAL.  DETAINEE WATCHED MOVIES ABOUT THE
STRUGGLE AND TACTICS USED IN CHECHNYA.
4. (C//REL         ) KHALDAN CAMP WAS RELATIVELY SMALL IN SIZE AND IT TOOK
SEVEN TO TEN MINUTES TO WALK THE ENTIRE LENGTH OF THE CAMP. THE SECURITY AT
KHALDEN CONSISTED OF ONE ARMED GUARD AT THE FRONT OF THE CAMP AND ONE AT THE
BACK OF THE CAMP. EACH STUDENT HAD A TURN AS GUARD.
5. (C//REL         ) IN MARCH 2000, DETAINEE WENT TO KABUL AND STAYED FOR
APPROXIMATELY THREE DAYS AT THE ARAB GUEST HOUSE RUN BY A SAUDI ARABIAN NAMED
ABU ((HAMMAM)). HE THEN WENT TO THE KHANDAHAR GUEST HOUSE OWNED BY --ZUBAIR--.
DETAINEE WENT TO THE ZUBAIR GUEST HOUSE BECAUSE IT WAS DETAINEES INTENTION TO
FIGHT IN CHECHNYA. HOWEVER, DETAINEE DID NOT GO TO FIGHT BECAUSE THE BORDERS
WERE TOO DANGEROUS.  DETAINEE WAS DISCOURAGED AND STAYED IN THE ZUBAIR GUEST
HOUSE FOR APPROXIMATELY ONE MONTH.  IN JUNE 2000, DETAINEE STAYED AGAIN AT THE
        GUEST HOUSE FOR APPROXIMATELY TWO MONTHS.  ABU HAMMAM INTRODUCED
DETAINEE TO THREE AFGHANS AT THIS TIME.  DETAINEE TRAINED THE AFGHANS ON TACTICS
AND TRAINING DETAINEE LEARNED AT KHALDAN CAMP.  (DETAINEE COMMENT - I WENT TO
THE GUEST HOUSES IN KABUL AND JALALABAD TO TRAIN THE AFGHAN GUYS.)  DETAINEE WAS
KNOWN AS ((UBAYDAH)) AT THESE SAFEHOUSES.  IN AUGUST 2000, DETAINEE TRAVELED TO
JALALABAD/        AF AND STAYED IN THE    

GUEST HOUSE (CNA). DETAINEE EXCHANGED HIS EXPIRED PASSPORT AT THE ████
GUEST HOUSE. DETAINEE GOT AN ORIGINAL DOCUMENT WITH SOMEONE ELSES NAME FROM AN
U/I ALGERIAN AT THE GUEST HOUSE, AND CHANGED THE PICTURE IN IT. DETAINEE STAYED
AT THE ████████ GUEST HOUSE FOR APPROXIMATELY TWO MONTHS. IN THE NOV 2000
TIMEFRAME, DETAINEE RETURNED TO THE ████████ GUEST HOUSE FOR APPROXIMATELY TWO
WEEKS. (FIELD COMMENT - DETAINEE HAS PREVIOUSLY CLAIMED ZUBAIR ((AL-JAZAIRI)) -
LIKELY THE SAME ZUBAIR WHO DETAINEE CLAIMED OWNED THE KANDAHAR GUESTHOUSE - GAVE
DETAINEE AN ORIGINAL GREEK PASSPORT AT THE ████████ GUESTHOUSE IN KABUL, AF IN
EARLY SUMMER 2001. DETAINEE ALSO PREVIOUSLY CLAIMED THAT HE FIRST MET ZUBAIR AT
AN ARAB GUESTHOUSE IN JALALABAD ████████ AF OPERATED BY
MOHJEN ((AL-TAFI)), WHO IS LIKELY THE SAME PERSON AS ABU MUHJIN.)
6. (C//REL ████████ KHOWST CAMP, AF. DURING THE WINTER 2000 TIMEFRAME,
DETAINEE WENT TO KHOWST CAMP, AF (CNA) AND WAS A TRAINER FOR APPROXIMATELY SIX
TO SEVEN MONTHS. DETAINEE WAS WITH TWO U/I AFGHANS IN KHOWST (SEE COMMENT 4).
7. (C//REL ████████ TRAVEL AFTER KHOWST CAMP. IN JUNE 2001, DETAINEE WENT
TO THE ████████ GUEST HOUSE IN KABUL/ ████████
████ AF FOR
APPROXIMATELY ONE WEEK. HE THEN WENT BACK TO THE KHANDAHAR GUEST HOUSE OWNED BY
ZUBAIR (CNA). HE INTENDED TO TRY TO FIGHT IN CHECHNYA AGAIN, BUT THE BORDERS
WERE STILL TOO DANGEROUS, THUS PREVENTING HIS LEAVING FOR CHECHNYA. DETAINEE
STAYED IN THE ZUBAIR GUEST HOUSE FOR APPROXIMATELY ONE MONTH. IN JUL 2001,
DETAINEE AND TWO AFGHANS TRAVELED TO JALALABAD ████████
████ AF
AND STAYED IN THE ████████ GUEST HOUSE (CNA) APPROXIMATELY THREE WEEKS.
DETAINEE STATED THAT HE WENT TO THE ████████ GUEST HOUSE AFTER THE --BOMBING
INCIDENT--(NFI).

UNCLASSIFIED//FOR PUBLIC RELEASE

8. (C//REL ░░░░░ WAZIRISTAN, PK. IN FALL 2001, DETAINEE AND THE TRAINED
AFGHANS TRAVELED TO WAZIRISTAN ░░░░░░░░░░░░░░
PAKISTAN (PK).
THE GROUP CROSSED THE MOUNTAIN BORDER INTO PK ON FOOT AND
STAYED AT A SAFEHOUSE
RUN BY AN AFGHAN NAMED SHAMSHIR (LNU) IN WAZIRISTAN, PK FOR
APPROXIMATELY ONE
MONTH (SEE COMMENT 5). IN NOV 2001, DETAINEE AND THE TWO U/I
AFGHANS WENT FROM
WAZIRISTAN, PK TO PESHAWAR ░░░░░░░░░░░░░░ PK AND
STAYED AT THE
░░░░░░ GUEST HOUSE (CNA) FOR SLIGHTLY LESS THAN ONE
MONTH. DETAINEE LEFT
THE TWO (OR THREE) AFGHANS IN PESHAWAR. NUR ZAMAN INTRODUCED
DETAINEE TO HIS
FAMILY AND A PERSONAL FRIEND. THIS FRIEND WAS A PAKISTANI MAN
WHO OWNED TWO
SAFE HOUSES IN LAHORE ░░░░░░░░░░░ PK. TWO
YEMENIS, HOUDIFA
(LNU) AND ISSA (LNU) SPENT APPROXIMATELY ONE WEEK AT THE ░░░░
░░░░ SAFEHOUSE
ALSO (SEE COMMENT 6). IN DEC 2001, NUR ZAMANS U/I PAKISTANI FRIEND
TOOK
DETAINEE TO LAHORE, PK. DETAINEE SPENT TIME IN LAHORE BETWEEN
TWO SAFE HOUSES
OWNED BY THE U/I PAKISTANI AND ALSO VISITED MANY PEOPLE IN
LAHORE FOR SHORT
STAYS THAT WERE --ONLY DAYS AT A TIME.-- DETAINEE STAYED IN
LAHORE
APPROXIMATELY TWO AND ONE HALF MONTHS. DETAINEE STAYED AT
TWO SEPARATE
SAFEHOUSES APPROXIMATELY TWENTY FIVE MINUTES APART. DETAINEE
WENT BY THE NAME
UBAYDAH AT THESE GUEST HOUSES ALSO.
9. (C//REL ░░░░░ FAISALABAD GUESTHOUSE. IN FEBRUARY 2002,
DETAINEE
TRAVELED TO THE ABU ZUBAYDAH SAFEHOUSE IN
FAISALABAD ░░░░░░░░░░░░
░░░░░░░░░ PK , WHERE DETAINEE WAS CAPTURED. THE
FAISALABAD SAFE HOUSE
IN PAKISTAN WAS OWNED BY TWO PAKISTANIS, WHO WERE ARRESTED
WITH HIM DURING THE
2002 RAID. ADDITIONAL PEOPLE PRESENT WERE TWO SAUDIS NAMED
((JABRAN)) AND

((GHASSSAN)); A SUDANESE NAMED SAMIR (LNU); ABU ((MASOUD)), ABU ((ZALROUK)), AND

THREE OTHER PALESTINIANS (NFI). A MAN NAMED AHMED (LNU) OFTEN VISITED THE

ZUBAYDAH SAFEHOUSE IN FAISALABAD. AHMED (LNU) TRAVELED WITH AN U/I PAKISTANI AT

ALL TIMES AND WAS PRESENT DURING MEETING WITH ABU ZUBAYDAH. ALTHOUGH AHMED AND

THE U/I PAKISTANI DID NOT VISIT OFTEN, THEY WERE KNOWN AT THE HOUSE (SEE COMMENT

SECTION).

10. ████████████ TRAINING SUPPLIED AT FAISALABAD GUESTHOUSE. THERE WAS

A COMPUTER IN THE FAISALABAD SAFE HOUSE. ALTHOUGH OTHERS AT THE HOUSE TRIED TO

TEACH HIM HOW TO DO INSTANT MESSAGING, DETAINEE DID NOT KNOW HOW TO USE THE

COMPUTER (SEE COMMENT SECTION). DETAINEE SAW SEVERAL BOOKS IN THE FAISALABAD

SAFE HOUSE, BUT DETAINEE WAS NOT SURE WHO OWNED THEM. (FIELD COMMENT - THESE

BOOKS ARE TRAINING MANUALS NOW IN U.S. CUSTODY.) DETAINEE SPECULATED THAT THESE

BOOKS BELONGED TO GHASSAN, AS GHASSAN STUDIED ENGINEERING AT AN AMERICAN

UNIVERSITY IN ARIZONA (SEE COMMENT SECTION).

11. ████████████ OTHER CAMPS IDENTIFIED BY DETAINEE. DETAINEE

RECOGNIZED TWO PHOTOS OF THE DERUNTA TRAINING AREA NEAR JALALABAD, AF - A BODY

OF WATER DEPICTED IN THE FIRST PHOTO AND THE TUNNEL AND ROADS DEPICTED IN THE

SECOND PHOTO (SEE COMMENT SECTION).


COMMENTS: 1. ████████ FIELD COMMENTS -- DETAINEE IS AVAILABLE FOR

FURTHER QUESTIONING. ████████

2. ████████ DETAINEE PROVIDED A DESCRIPTION OF A SAUDI NAMED

MOHAMMED ((ALI)) IN IIR 2 340 7538 02 AND IIR 6 034 0588 02. ALSO SEE IIR 6 034

0588 02 FOR FURTHER DETAILS ON THE U/I CAMP. IT SHOULD ALSO BE NOTED DETAINEE

HAS YET TO PROVIDE THE NAME AND PROPER LOCATION OF THIS U/I
CAMP OTHER THAN THIS

U/I CAMP WAS LOCATED NEAR THE VILLAGE OF GHANI KHEIL, AF (CNA).

3. (C//REL                    DETAINEE HAS PREVIOUSLY PROVIDED NAMES
OF SOME KHALDAN

CAMP INSTRUCTORS, INCLUDING A PALESTINIAN NAMED ABD ((AL BARI)),
BUT HAS NOT

BEEN FULLY FORTHCOMING ON ALL THE TRAINING HE RECEIVED AT
KHALDEN. IT IS

SUSPECTED THAT DETAINEE FIRST MET FARID ((AL JAZAIRI)) AT
KHALDAN AND RECEIVED

EXPLOSIVES TRAINING THERE, PERHAPS EVEN TRAINING ON REMOTELY
CONTROLLED DEVICES.

4. (C//REL                   DETAINEE PREVIOUSLY CLAIMED THAT HE
TAUGHT U/I

STUDENTS ON THE KORAN AT AN U/I MADRASSA IN KHOWST, AF RUN BY
AN AFGHAN NAMEED

KHALIL ((GUL)) AND ONLY RECENTLY STATED THAT HE TRAINED U/I
STUDENTS IN U/I

SUBJECTS AT AN U/I KHOWST CAMP AT AN U/I LOCATION. THESE ARE
LIKELY THE SAME

LOCATION, DETAINEE ATTEMPTED TO AMEND HIS STATEMENT OF
PROVIDING TRAINING INTO

TEACHING THE KORAN.

5. (C//REL                   DETAINEE PROVIDED MORE DETAILS ON
SHAMSHIR IN IIR 6

034 0616 02. SEE IIR 6 034 0616 02 FOR MORE DETAILS ON THE SAFEHOUSES
IN LAHORE.

IN IIR 6 034 0616 02 DETAINEE HAS PREVIOUSLY CLAIMED THAT A
PAKISTANI NAMED

KHALID (LNU) WAS IN CHARGE OF THE SAFEHOUSE IN FAISALABAD, PK.
ACCORDING TO IIR

6 034 1396 03, DETAINEE WAS LIKELY TAUGHT BY A PERSON NAMED
AHMED. THIS AHMED

IS LIKELY TO BE BOTH THE SAME AHMED DETAINEE REFERS TO AND THE
SYRIAN NOOR UDIN

((AHMED)), AKA SALAH. DETAINEE HAS ALSO BEEN EVASIVE REGARDING
AHMED.

6. (C//REL                  SEE IIR 6 034 0616 02 FOR FURTHER
INFORMATION ON NUR

((ZAMAN)), VARIANT NOUR ((AZAMAN)).

7. (C//REL                  DETAINEE RECOGNIZED THE LANDSCAPE
CAPTURED IN THE TWO

PHOTOS TAKEN OF THE DERUNTA TRAINING AREA BUT DID NOT IDENTIFY
IT AS SUCH

UNCLASSIFIED//FOR PUBLIC RELEASE

█████████████████ IT IS STILL UNCLEAR WHEN DETAINEE WOULD
HAVE ATTENDED THIS
TRAINING SITE.
8. (C//REL █████████████ DETAINEE HAS BEEN EVASIVE ON ATTENDING
A
--TURKISH/KURDISH TRAINING CAMP-- INCLUDING THE NAME AND EXACT
LOCATION OF THE
CAMP.  DETAINEE ALTERNATIVELY CLAIMED THIS CAMP WAS LOCATED
NEAR THE VILLAGES OF
GHANI KHEIL, AF (CNA) AND ISMAEL KHEIL, AF (CNA). DETAINEE HAS
ALSO CLAIMED THE
TURKISH NATIONAL WHO RAN THE CAMP WAS NAMED ABU ((AMOR)).
THERE ARE
SIMILARITIES BETWEEN THIS U/I CAMP AND THE MARGUN CAMP (CNA)
THAT WAS OPERATED
BY AN ABU ((OMAR)) AL TURKI.
9. (C//REL █████████████ DETAINEES FREQUENT TRAVEL BACK AND
FORTH FROM A
MULTITUDE OF CAMPS MAY INDICATE THE DETAINEE WAS A HIGHLY
SOUGHT AFTER TRAINER.
DETAINEE AND THE AFGHANS THAT DETAINEE TRAINED MAY HAVE BEEN
--TRAVELING
TRAINERS--.
10. (U) THIS IIR IS A PARTIAL RESPONSE TO █████████████████
11. (U) ADDRESS ANY QUESTIONS CONCERNING THE CONTENTS OF THIS
IIR
█████████████████████████████ ALL FORMAL EVALUATIONS
SHOULD BE
SENT ██████████████████ INFO COPIES
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████ ADDRESS
ALL REQUESTS FOR RELEASE OF INFORMATION OR FOR FURTHER
DISSEMINATION █████████████████████
█████████████████████ OR EMAIL COMMENTS ██████
███████████████████████████████████████


COLL: (U) BH; CA; DD.
INSTR: (U) U.S. NO.
PREP: (U) █████████████
ENCL: (U) ██
███████████████████████
██████████████ (U//FOUO) ███████████████████
(U//FOUO)

UNCLASSIFIED//FOR PUBLIC RELEASE



(U//FOUO)

ACQ: (U)
DISSEM: (U) FIELD –
WARNING: (U) REPORT CLASSIFIED C O N F I D E N T I A L//RELEASABLE TO

DRV FROM: DH SCG, OCT 2004
DECL: 25X1-HUMAN

PROTECTED INFORMATION — FILED UNDER SEAL

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ZAYN HUSAYN, | ) |
| Petitioner, | ) |
| v. | ) Civil Action No. 08-1360 (RWR) |
| ROBERT GATES, | ) |
| Respondent. | ) |

# 10016 LHM APRIL 2007

SECRET//NOFORN

PROTECTED INFORMATION — FILED UNDER SEAL



**U.S. Department of Justice**
Federal Bureau of

gation

**SECRET//NOFORN**

In Reply, Please Refer to
File No.

Guantanamo Bay, Cuba
April 12, 2007



## **Preamble**

(U) On 04/06/2007, 04/07/2007 and 04/09/2007, Zayn al-Abidin Muhammad Husayn (a.k.a. Abu Zubaydah) was interviewed at Guantanamo Bay, Cuba (GTMO).  Interviewing agents present were SSA ▓▓▓▓▓ (FBI) and SA ▓▓▓▓▓ (DOD). The interview commenced at 0900 hrs on 04/06/2007.  Refer to the administrative portion at the end of this statement for further detail on starting and completion times, as well as comments on breaks, prayers, and meals offered during the course of the interview.

(U) This was the second series of interviews of Zubaydah by reporting agents.  The first series of interviews took place in February 2007.  During previous interviews, Zubaydah indicated he preferred to be interviewed in English.  Zubaydah was advised he could stop the interview at any time if he had any difficulty understanding any questions or had any difficulty communicating. Zubaydah was advised an Arabic linguist was on standby and he could request one at any time throughout the interview.

(U) Zubaydah recalled both interviewing agents' names from previous interviews.  Zubaydah was reminded SSA ▓▓▓▓▓ was an employee of the Federal Bureau of Investigation (FBI) and SA ▓▓▓▓▓ was a U.S. Army Officer employed by the U.S. Army Criminal Investigation Division (CID).  Zubaydah was also reminded SSA ▓▓▓▓▓ and SA ▓▓▓▓▓ were independent of any agency that may have spoken to him in the past, and were not interested in what Zubaydah may have said in the past or whom he may have spoken to.  Zubaydah was reminded he was currently in the custody of the Department of Defense and would remain so for the duration of his custody.  Zubaydah was reminded he would not be returning to the

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

███████████████

custody of any agency he may have been with in the past or any location he may have been to in the past.

(U) Zubaydah was reminded he may be asked questions concerning topics he has already discussed and may have been shown documents or photographs he has already seen or commented on. Zubaydah was advised interviewing agents were not interested in any previous statements. Zubaydah was reminded he did not have to speak with interviewing agents if he did not wish, and could terminate the interview at any time. Zubaydah was reminded that any statements he made to interviewing agents may be used against him in the future, or may be used in legal proceedings.

(U) Zubaydah acknowledged he understood these advisements and agreed to voluntarily speak with interviewing agents. Zubaydah commented he was glad to see both the interviewing agents again. After being advised of the identity of the interviewing agents and the nature of the interview, Zubaydah provided the following information:

## General Background

(U) Zubaydah's true name is Zayn al-Abidin Muhammad Husayn Abu Zubaydah. As he noted previously, Zubaydah did not assume an "Abu" name as other brothers typically did upon entering Afghanistan. Sometime in 1991, after Zubaydah received a head wound from mortar fire, he was taken to a hospital where a doctor found identification which bore Zubaydah's true name. As Zubaydah had difficulty communicating at the time due to his injuries, he became known to many as simply "Abu Zubaydah". Zubaydah was known by his family as "Hani".

(U) Zubaydah was born sometime in 1971 in Saudi Arabia. His father and mother were from Palestine, though his mother's relatives hailed from Jordan. Zubaydah was raised in Saudi Arabia and visited Palestine as a teenager.

## Zubaydah's Experiences in Lahore and Faisalabad (Late 2001-March 2002)

(U) Zubaydah arrived in Lahore, Pakistan after fleeing from Barmal, Afghanistan. His group resided in a safehouse provided by a Pakistani facilitator known as ███████████████. For security reasons, Zubaydah's group moved to another guesthouse in Lahore which was also provided by ███████████████. On yet another occasion while in Lahore, Zubaydah's group split and went

███████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



to two guesthouses, while Zubaydah went to a third location.  The
first half of Zubaydah's group moved to a house in Lahore provided
by ███████████████████.  Abd al-Hadi al-Iraqi was at this house.
████████████████ found a separate house for Abd al-Hadi al-Iraqi
and his wife.  ████████████ also took ████████, a
Lashkar-e-Tayyiba (LET) member, to another house.  The second half
of his group stayed at a house provided by ████████████████.
Zubaydah stayed at another house with ████████████████.  ████████
████████████ then found another residence for his entire group.
Zubaydah and his group moved to this last location in Lahore before
moving to Faisalabad.  Zubaydah left for Faisalabad after his group.
A friend of ████████████████, identified as ████████, picked
Zubaydah up in Lahore and took him to Gujranwala, Pakistan.  Zubaydah
stayed the night at the residence of ████████.  ████████████ then
took Zubaydah to Faisalabad where Zubaydah met ████████████████.
████████████████ took Zubaydah to the residence in Faisalabad
where Zubaydah was eventually captured.

          (U) While at the safehouse in Faisalabad, ████████████████
was supposed to bring Zubaydah two grenades which Zubaydah had given
████████████.  Zubaydah had also requested ████████████████
to bring rifles and grenades to the safehouse.  Zubaydah was captured
before ████████ and ████████████████ could bring any
of the weapons to the safehouse.

### Meeting with Khalid Sheikh Mohammad

          (U) Sometime in 1996, while at Bayt al-Shuhada' in Peshawar,
Pakistan, Zubaydah was introduced to Mukhtar (Khalid Sheikh Mohammad
(KSM) by ████████████████, after ████████████ brought
several individuals to Bayt al-Shuhada' without telling Zubaydah in
advance.  Zubaydah took ████████ aside and complained to ████████
about bringing Mukhtar to the house unannounced.  ████████ served
a similar function for al-Qaeda as Zubaydah did for Khalden;
raised money to support the al-Qaeda camps and facilitated their
travel into, and out of, the camps.

          (U) Zubaydah also elaborated as to how Mukhtar provided
him with $30,000 in 2002.  After speaking with ████████, Mukhtar
decided to give Zubaydah $30,000 to compensate him for all his efforts
for helping evacuate the brothers from Afghanistan and helping them
leave Pakistan.  Zubaydah received the money from a Pakistani named
████████, who ████████████████.  The Pakistani gave the
money to Zubaydah in a pizza restaurant.  The money was provided
in U.S. denominations.

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI
and is loaned to your agency; it and its contents are not to be distributed outside your agency.



## Zubaydah's Bank Accounts in Pakistan

(U)  When Zubaydah was the emir of the Bayt al-Shuhada'
guesthouse in Peshawar, he maintained several bank accounts which
he used to receive money from donors.  In 1994, he opened an account
at the Habib Bank in Peshawar under his true name.  In 1997, he opened
a second account under his true name at the Emirates Bank in Peshawar.

(U)  Out of concern for security, he discontinued using
these accounts and began using the hawala system.  As far as Zubaydah
could recall, he was the only one that had access to the bank accounts
and he did not remember ever closing the accounts.

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI
and is loaned to your agency; it and its contents are not to be distributed outside your agency.



To become an al-Qaeda member, one has to swear allegiance, or bayat, to Usama Bin Laden (UBL).

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

5



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

███████

███████████████

███████████████

## Nibras Guest House and Bayt al-Salem Guesthouse

(U) Zubaydah was provided with photographs of the al-Qaeda Haji Habash guesthouse and surrounding areas in an attempt to locate the Bayt al-Salem and al-Nibras guesthouses. In previous interviews, Zubaydah stated he had been to both these locations in Kandahar, Afghanistan, and that the al-Nibras guesthouse was located near the Haji Habash guesthouse. After reviewing the photographs, Zubaydah was unable to point out either guesthouse.

## Administrative

(U) The interview of Zubaydah began at 0900 hrs on 04/06/2007. Snacks and drinks were offered to Zubaydah which he accepted. A break was taken at 1030 hrs and the interview resumed at 1050 hrs. The interview stopped at 1130 hrs for lunch and resumed again at 1300 hrs. The interview was completed on this day at 1410 hrs.

(U) On 04/07/2007, the interview began at 0940hrs. Snacks and drinks were offered to Zubaydah which he accepted. Interviewers brought lunch and ate with Zubaydah. The lunch break lasted from 1200hrs to 1230hrs. Zubaydah advised interviewing agents he would pray at the conclusion of the interview. The interview for this day was completed by 1500hrs.

(U) On 04/09/2007, the interview began at 0900hrs and the first break was taken at 1145hrs for lunch and the interview resumed at 1300 hrs. Snacks and drinks were offered to Zubaydah which he accepted. The interview was completed at 1400hrs.

(U) Zubaydah was released from his hand irons during the course of all three interviews. In addition, during the course of all three interviews, Zubaydah was offered water, tea, coffee, snacks and was advised he could take a break as needed. On all occasions, Zubaydah openly conversed with interviewing agents, was respectful, and at numerous times, was observed laughing and joking with interviewing agents. Zubaydah commented he was glad to see the interviewing agents and stated he prayed for the health of the interviewing agents. Interviewing agents observed Zubaydah to be cooperative and answered questions in a straight forward fashion.

███████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

███████████████

Zubaydah agreed to meet with interviewing agents again in the future.

███████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PROTECTED INFORMATION — FILED UNDER SEAL

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ZAYN HUSAYN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1360 (RWR) |
| | ) | |
| ROBERT GATES, | ) | |
| | ) | |
| Respondent. | ) | |

Transcript of FBI Special Agent
Stephen Gaudin Trial Testimony

SECRET//NOFORN

PROTECTED INFORMATION — FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1884

137lbin1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                        S(7) 98 Cr. 1023

 5   USAMA BIN LADEN, et al.,

 6              Defendants.

 7   ------------------------------x

 8
                                    New York, N.Y.
 9                                  January 8, 2001
                                    9:55 a.m.
10

11

12   Before:

13                HON. LEONARD B. SAND,

14                                  District Judge

15

16

17

18

19

20

21

22

23

24

25
```

PROTECTED INFORMATION - FILED UNDER SEAL

1371BIN4                                                            1971

                              Gaudin - direct

1              A F T E R N O O N   S E S S I O N

2                          2:15 p.m.

3              (In open court; jury not present)

4              THE COURT:  All right.  Let's be seated.  All right.

5     The witness may come in and the jury may come in.

6              (Jury present)

7              THE COURT:  The government may call its next witness.

8              MR. BUTLER:  Government calls Stephen Gaudin, your

9     Honor.

10    STEPHEN GAUDIN,

11         called as a witness by the government,

12         having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. BUTLER:

15    Q.  How are you employed?

16    A.  I'm employed by the FBI.

17    Q.  And how long have you been an agent with the FBI?

18    A.  I've been with the FBI a little over nine years.

19    Q.  And where are you currently assigned?

20    A.  I'm currently assigned to the New York office of the FBI.

21    Q.  How long have you been with the New York office of the

22    FBI?

23    A.  I've been with the New York office of the FBI for a little

24    over three years.

25    Q.  Where were you assigned before the New York office?

PROTECTED INFORMATION - FILED UNDER SEAL

1972

1371BIN4

Gaudin - direct

1   A.  Prior to coming to New York I was assigned with the FBI in

2   upstate New York in Albany, New York.

3   Q.  In any unit or section while you were in Albany?

4   A.  While in Albany I worked on general crimes.

5   Q.  Concerning your time in Albany, did you conduct facility

6   interviews of suspects in criminal investigations?

7   A.  Yes, I did.

8   Q.  And about how many times?

9   A.  Dozens of times.

10  Q.  Now, were you one of the FBI agents sent to Nairobi Kenya

11  after the bombing of the American embassy on August 7, 1998?

12  A.  Yes, I was.

13  Q.  When did you arrive in Nairobi?

14  A.  I arrived in Nairobi on early Sunday morning, August 9,

15  1998.

16  Q.  Prior to your arrival what was your understanding of your

17  assignment while you were in Kenya?

18  A.  Prior to arriving in Kenya I wasn't given a specific

19  assignment but just general instructions that we were going to

20  Kenya to help out with the investigation of the bombing in any

21  way we could.

22  Q.  I'm talking specifically about what you did after arriving

23  in Kenya.  Did you receive an assignment on August 12, 1998?

24  A.  Yes, I did.

25  Q.  And what was that assignment?

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1973
1371BIN4
### Gaudin - direct

1   A.  On August 12th I was instructed to go with my Kenyan law

2   enforcement counterpart there is the CID, the investigators

3   from their Criminal Investigation Division.  I was to go with

4   them to a hotel.

5   Q.  And were you working with the Kenyan CID in this

6   investigation?

7   A.  Yes, I was.

8   Q.  Where was this hotel you were going to located?

9   A.  It was in Eastleigh Nairobi.

10  Q.  And where is Eastleigh located?

11  A.  It was about a twenty or thirty minute drive outside of

12  Nairobi.

13  Q.  And who was with you?

14  A.  I was with another FBI agent and a New York City Police

15  detective who was working with us, also.

16  Q.  And who else was with you?

17  A.  There were two Kenyan CID officers and their driver.

18  Q.  And how did you get to Eastleigh that day?

19  A.  We drove.  We were in the back of a truck.

20  Q.  And who drove the truck?

21  A.  The Kenyan CID driver drove the truck.

22  Q.  Where were you located?

23  A.  I was in the back of the truck.  It was a covered truck

24  sort of like a pickup truck with a big cab on the back.

25  Q.  Did there come a time when you arrived at the Iftin Lodge

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

1974

1371BIN4

Gaudin - direct

1    in Eastleigh?

2    A.  Yes, there was.

3    Q.  About what time was that?

4    A.  It was around 10 o'clock in the morning that day.

5    Q.  And what happened when you arrived at the Iftin Lodge?

6    A.  The CID investigators went into the hotel and they came

7    out with a man.

8    Q.  And at the time that you were in the truck could you see

9    the man that the CID officers were with?

10   A.  Yes, I could.  I was in the back of the truck, but it was

11   pretty hot, so we had the door open and I could see the CID

12   officers talking to this man.  I was very close.

13   Q.  At the time could you see if this person had any documents

14   on him?

15   A.  Yes.  This man was, had presented a white slip of paper of

16   some kind to the Kenyan CID officers.

17   Q.  And did you see that white slip of paper?

18   A.  Yes, I did.

19   Q.  What was it?

20   A.  It was a hospital, what appeared to me to be a hospital

21   admissions card showing that someone was treated at the MP Sha

22   Hospital on August 7, 1998.  It had a patient number written

23   on the top, printed on the top and a person's name Khalid

24   Saleh written in the handwritten form.

25        MR. BUTLER:  Your Honor, may I approach?

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1975

1371BIN4

Gaudin - direct

1           THE COURT:  Yes.

2    Q.  I'd like to show you what has been marked as Government

3    Exhibit 550 for identification.  If we could just show that

4    just for identification purposes.  Agent Gaudin, is this the

5    document that the individual who you saw in Eastleigh that day

6    had on him?

7    A.  This is it right here in my hand.

8           MR. BUTLER:  I move Government Exhibit 50350 into

9    evidence your Honor.

10          THE COURT:  Received.

11          (Government's Exhibit 550 received in evidence)

12   Q.  Now, was this person taken into custody?

13   A.  Yes, he was.

14   Q.  What was your understanding as to why this person was

15   arrested?

16   A.  He was arrested by the Kenyan CID officers for not having

17   any official identification on him.

18   Q.  And to be clear, who made that arrest?

19   A.  The Kenyan CID officers made that arrest.

20   Q.  And after the arrest where was he placed?

21   A.  He was put into the back of the truck with me.

22   Q.  And once inside the truck did this person confirm that he

23   was Khalid Saleh?

24   A.  Yes, he did.

25   Q.  And did he tell you where he was from?

PROTECTED INFORMATION - FILED UNDER SEAL

1976

1371BIN4

Gaudin - direct

1   A.   He said he was Yemen.

2   Q.   Looking around the courtroom do you recognize the

3   individual who identified himself as Khalid Saleh from Yemen

4   that day?

5   A.   Yes, I can.

6   Q.   Could you tell us where he is?

7   A.   He's sitting right there in between the two ladies in the

8   corner.  I can get up and point whatever is easier.

9        MR. COHN:  We concede the identification.

10       THE COURT:  The witness identifies the defendant

11  Al-'Owhali.

12  Q.   Did you observe whether he had any injuries that day?

13  A.   Yes, I could see that he did have injuries.

14  Q.   What type of injuries did he have?

15  A.   He had stitches on his forehead.  They weren't covered

16  with a bandage or bandaid.  I could see the stitches and both

17  of his hands had bandages on them.

18  Q.   And did you take any pictures of him after his arrest?

19  A.   Yes, we did.

20       MR. BUTLER:  May I approach, your Honor?

21       THE COURT:  Yes.

22  Q.   Agent Gaudin, I just handed you what has been marked as

23  Government Exhibits 551 A through I for identification.

24       If we could just show those for identification

25  purposes.  Are those copies of the photographs that you took

PROTECTED INFORMATION – FILED UNDER SEAL

1977

1371BIN4

Gaudin - direct

1   that day?

2   A.  Yes, these are.

3        MR. BUTLER:  Your Honor, I would move Government

4   Exhibits 551 A through I into evidence.

5        MR. COHN:  No objection.

6        THE COURT:  Received.

7        (Government's Exhibits 551-A through I received in

8   evidence)

9   Q.  If we could publish 551-A through I to the jury.

10       Agent Gaudin, do these photographs accurately depict

11  the injuries that you saw that day on Mr. Al-'Owhali?

12  A.  Yes.  Except in the fact that on his hand he doesn't have

13  the bandages on his hand, but at the time of arrest he did

14  have like a gauze with some bandaid or tape or something

15  covering those stitches on his hands.  That's the only

16  difference.

17  Q.  Now, Mr. Al-'Owhali obviously doesn't have a shirt on, but

18  did you notice whether the clothes that he was wearing were

19  the same clothes that he was wearing at the time of his

20  arrest?

21  A.  Yes.  In the first picture it does have his shirt on and,

22  yes, these were the clothes he was wearing on August 12th.

23  Q.  Did there come a time when you took custody of those

24  clothes?

25  A.  Yes, I did.

PROTECTED INFORMATION – FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

1978

I371BIN4

Gaudin - direct

1   Q.   When did you take custody of those clothes?

2   A.   On August 13th.

3   Q.   Did the FBI maintain custody of those clothes?

4   A.   Yes, they did.

5          MR. BUTLER:  May I approach, your Honor?

6          THE COURT:  Yes.

7   Q.   Agent Gaudin, I've just handed you a bag that's been

8   marked Government Exhibits 552 through 556 for identification.

9   I would ask you just to open those bags and just take a look

10  at those clothes.

11  A.   These are two paper bags I had put his clothes into.  The

12  first bag, the belt --

13  Q.   Don't show them to the jury yet.  Look at those clothes to

14  yourself, Agent Gaudin, and tell us whether those were the

15  clothes that you took from the defendant Al-'Owhali that day?

16  A.   The first bag is a belt, his jeans and his shirt.  The

17  second bag is socks and long underwear.

18  Q.   Are those the clothes that you took from him that day?

19  A.   Yes, they are.

20         MR. BUTLER:  We move Government Exhibits 552 through

21  556 into evidence, your Honor.

22         THE COURT:  Received.

23         (Government's Exhibits 552 through 556 received in

24  evidence)

25  Q.   We have some photographs of the clothing that we could

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

1979

1371BIN4

Gaudin - direct

1   publish to the jury.

2              (Pause)

3              Agent Gaudin, drawing your attention to August 22,

4   1998, did you have an opportunity to interview Mr. Al-'Owhali

5   on that date?

6   A.  Yes, I did.

7   Q.  And where did that interview take place?

8   A.  That interview took place at the CID headquarters in

9   Nairobi, Kenya in an office.

10  Q.  Who else was at that interview?

11  A.  There was Agent Steve Baugart.  There was an official from

12  the Department of Justice.  We had an FBI interpreter language

13  specialist, and there was two Kenyan CID investigators.

14  Q.  And on August 22 did Mr. Al-'Owhali agree to speak with

15  you?

16  A.  Yes, he did.

17  Q.  And did he place any conditions on his agreement to speak

18  with you?

19  A.  Yes, he did.

20             MR. COHN:  Objection, hearsay, your Honor, and it's

21  an interpreter question.  It's hearsay because it comes

22  through a third party, your Honor.

23             THE COURT:  Develop the events up until that point.

24  Q.  Agent Gaudin, how did you communicate with Mr. 'Owhali

25  during this interview?

PROTECTED INFORMATION – FILED UNDER SEAL

1980

1371BIN4

Gaudin - direct

1   A.   Through a translator.

2   Q.   And what language was that translator translating in?

3   A.   In Arabic, Mr. 'Owhali's language.

4   Q.   Did Mr. Al-'Owhali appear to understand the translator?

5   A.   Yes, he did.

6          MR. COHN:   Objection as to what appeared.

7          THE COURT:   Overruled.

8   Q.   Did Mr. Al-'Owhali -- were you able to communicate with

9   him effectively through the translator?

10  A.   We had no problems communicating with him through the

11  translator at all.

12         MR. COHN:   Objection, conclusion.

13         THE COURT:   Overruled.

14  Q.   Through the translator did Mr. Al-'Owhali tell you that he

15  had any conditions on his willingness to speak with you?

16         MR. COHN:   Renew my objection.

17         THE COURT:   Overruled.

18  A.   Yes, he did.   Mr. 'Owhali explained that he would tell us

19  his involvement in the bombing of the embassy if we would

20  guarantee him that he would be tried in the United States

21  because that the United States was his enemy and not Kenya so

22  he wanted a guarantee that he be tried in America to face his

23  enemy.

24  Q.   Did anyone guarantee him at that point that they would

25  take him to America?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

1981

1371BIN4

Gaudin - direct

1   A.   No.  He was not given an express guarantee that that would

2   happen.

3   Q.   Was the response to his request put into writing?

4   A.   Yes, it was.

5   Q.   And what did this writing tell him about whether you could

6   guarantee you would take him to the United States?

7   A.   The official from the Department of Justice had prepared a

8   form explaining all of these things to Mr. Al-'Owhali based on

9   his conditions.  The form stated that this official from the

10  Department of Justice would make his best efforts and make his

11  recommendations to the appropriate people in the US for

12  Mr. Al-'Owhali to be tried in the United States, but he

13  couldn't guarantee that that would happen.  It was only that

14  he would do his best.  He would recommend that this would

15  happen.

16  Q.   And did Mr. Al-'Owhali eventually accept the

17  recommendations eventually?

18  A.   Eventually, he did.

19  Q.   And did Mr. Al-'Owhali eventually sign this agreement that

20  you're referring to?

21  A.   Yes, he did.

22          MR. BUTLER:  May I approach, your Honor?

23          THE COURT:  Yes.

24  Q.   I'd like to show you what has been marked as Government

25  Exhibit 557 for identification.  What is exhibit 557, Agent

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

1982

1371BIN4

Gaudin - direct

1 Gaudin?

2 A. This is the form that Mr. Al-'Owhali eventually signed on

3 August 22.

4 　　　　MR. BUTLER: Move Government Exhibit 557 into

5 evidence, your Honor.

6 　　　　MR. COHN: Objection. Foundation, your Honor. I

7 don't want to do a speaking objection, but --

8 　　　　THE COURT: Trace the form until it gets to the

9 agent.

10 Q. Agent Gaudin, was this the agreement that Mr. Al-'Owhali

11 was first read?

12 A. No, it was not.

13 Q. And what was different about the agreement that he was

14 first read?

15 A. In the first form we had Mr. Al-'Owhali's name as we knew

16 it at the time, Khalid Saleh. At the time that he was willing

17 to sign the form he had instructed us that we would need to

18 put his real name on the form instead of the name that we

19 thought he had.

20 Q. Now, was the agreement, except for the name, otherwise the

21 same as this agreement marked as Government Exhibit 557?

22 A. Except for the name, it was the same agreement.

23 Q. And was that first agreement read to him?

24 A. Yes, it was.

25 Q. And how was it read to him?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION — FILED UNDER SEAL

..

Gaudin - direct

1  A.  The official from the Department of Justice read the form

2  to him through the interpreter, so the Department of Justice

3  official was speaking in English; the interpreter was

4  translating for Mr. Al-'Owhali in Mr. Al-'Owhali's native

5  language.

6  Q.  Did Mr. Al-'Owhali agree to sign that form at that time?

7  A.  No, he did not.

8  Q.  What did he say about why he wouldn't sign the form?

9  A.  Mr. Al-'Owhali had stated that he wanted to know if

10  recommend means the same as a guarantee.  And the official

11  from the Department of Justice told him it's not the same;

12  that a guarantee means a hundred percent certain or words to

13  that effect, and recommends means, we'll do our best.

14           And Mr. Al-'Owhali had expressed that he wanted a

15  guarantee.

16  Q.  So what did you do after Mr. Al-'Owhali said that he had a

17  problem with the word recommend?

18  A.  The official from the Department of Justice explained to

19  Mr. Al-'Owhali that this, the wording in this form was

20  probably about as strong as he could get it to be, as strong

21  as he could make it.  But it was up to Mr. Al-'Owhali whether

22  or not he was going to decide to speak with us or not on that

23  day; that he was the boss on that issue.  If he wanted to talk

24  to us, it was completely up to him.  If he wanted the

25  Department of Justice official to try to change the form, the

PROTECTED INFORMATION — FILED UNDER SEAL

1371BIN4

1984

Gaudin - direct

1  Department of Justice official told him, I can't promise you

2  that it's going to change any more. I'll try. I'll have to

3  contact my superiors. This could take some time but I don't

4  want to get your hopes up that I'm going to come back with

5  exactly what you want. This is probably about as strong as we

6  can make it.

7           MR. COHN: Your Honor, at this time I would ask for

8  the instruction as to why this is not hearsay, that it's not

9  being asserted for its truth, but merely that it was said, not

10  Mr. Al-'Owhali's state of mind.

11          THE COURT: Yes. The jury is so instructed this is

12  an instance in which the testimony is received not for its

13  truth but as evidence of the words spoken for whatever weight

14  you give it with respect to Mr. Al-'Owhali's state of mind,

15  what he understood, what he heard.

16  Q. Agent Gaudin, what happened after this discussion took

17  place?

18  A. The official from the Department of Justice left to make

19  whatever arrangements he could to try to get this.

20          MR. COHN: Objection as to why he left.

21          THE COURT: He left.

22  Q. And what happened after the Justice Department official

23  left?

24  A. After a while Mr. Al-'Owhali instructed me that he would

25  be willing to sign the form as it is, that he'd be willing to

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION — FILED UNDER SEAL

1985

1371BIN4

Gaudin - direct

1   accept our best faith efforts for the recommendation to be

2   tried in the US instead of the exact guarantee he said would

3   be fine, and he instructed me to get the official from the

4   Department of Justice and that we could continue.

5   Q.   And then did he sign the form at that time?

6   A.   Yes.  Yes, he did.

7   Q.   Did he sign at that particular time?

8   A.   No.  Eventually he signed it.  When the Department of

9   Justice official came back with the form it was presented to

10  him, and Mr. Al-'Owhali at that point instructed us that we

11  needed to put his true name, we had the name Khalid Saleh on

12  the agreement and at that point he had, Mr. Al-'Owhali told us

13  that his real name was Mohammed Rashid Daoud 'Owhali and that

14  he's from Saudi Arabia.  So the Department of Justice official

15  had to leave the room to put his, to reflect his true name on

16  the form and then came right back into the room.

17  Q.   And did Mr. Al-'Owhali sign the agreement at that time?

18  A.   Yes, he did.

19       MR. BUTLER:   Your Honor, we would offer Government

20  Exhibit 557.

21       MR. COHN:   Brief voir dire, your Honor.

22       THE COURT:   Yes.  Let me explain what a voir dire

23  means in this context.  When a document is offered in evidence

24  the opposing party may conduct a voir dire which is not

25  cross-examination.  It is intended to explore issues related

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION — FILED UNDER SEAL

PROTECTED INFORMATION – FILED UNDER SEAL

1986

1371BIN4

Gaudin - direct

1   to the admissibility in evidence of the document and it is

2   limited to that purpose. So that's what a voir dire means

3   during the course of the trial.

4   VOIR DIRE EXAMINATION

5   BY MR. COHN:

6   Q. Mr. Gaudin, this document was never translated into

7   written Arabic for Mr. Al--Owhali, was it?

8   A. No, sir, it was not.

9   Q. So it's fair to say that he could not read it, is that

10  right?

11  A. That will be fair to say.

12  Q. And is it not also true that it was never read to him in

13  its entirety, but that it was interrupted and a discussion

14  ensued with this Justice Department official?

15  A. No, sir. The way I remember it is when it was first read

16  to him it was read to him in its entirety. Then

17  Mr. Al-'Owhali expressed whatever problems he may have had

18  with him, and then those problems were addressed.

19  Q. Let me see, it came back. Were there two written versions

20  of this document? Was there another written version of this

21  document?

22  A. With his other name on it, yes, there was.

23  Q. And we don't know -- and you're attesting to the fact that

24  those documents are entirely identical except for the name.

25  Is that right?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1987

1371BIN4

Gaudin - direct

1   A.  To the best I can.

2   Q.  That's your testimony?

3   A.  To the best I can, sir.

4   Q.  To the best you can, which is from memory?

5   A.  Yes, sir.

6   Q.  But as to the second document when it came back, there was

7   an attempt to read it to him, wasn't there, when this second

8   document came back?

9   A.  Yes, there was.

10  Q.  And that was interrupted, was it not?  It was never

11  completed?

12  A.  Mr. Al-'Owhali --

13  Q.  Was it ever completed?  Was it ever completed?

14  A.  I'm sorry.  Was it read to him again?

15  Q.  Was it ever read to him in its entirety again?

16  A.  No, it was not.

17        MR. COHN:  I object.

18        THE COURT:  Overruled.  557 is received.

19        (Government's Exhibit 557 received in evidence)

20        MR. BUTLER:  Can we publish exhibit 557, please.

21  Q.  Agent Gaudin, when the name was changed on the agreement

22  that became exhibit 557, did Mr. Al-'Owhali ever ask you to

23  read it to him again?

24  A.  No, he did not.  In fact, it was the official of the

25  Department of Justice asked him, would you like me to read it

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

1988

1371BIN4

Gaudin - direct

1   again? I've changed the name. I'll read it again if you

2   like. Mr. 'Owhali said that it wasn't necessary. He trusted

3   us and he agreed to sign it.

4   Q. I ask you to please read for the jury Government Exhibit

5   557?

6   A. I Mohammed Rashed Daoud Al-'Owhali born in Saudi Arabia,

7   on January 18, 1977 am in the custody of Kenyan authorities in

8   Nairobi Kenya and have been fully advised of my rights,

9   including my right to remain silent and my right not to answer

10  questions without a lawyer present.

11          As I have been previously told I understand that

12  anything I say or have said can be used against me in court in

13  the United States. I also understand that if I choose not to

14  answer questions, my refusal to answer questions cannot be

15  held against me in court.

16          I further understand that if I choose to answer

17  questions, I can always change my mind and decide not to

18  answer any further questions. I understand that both Kenyan

19  and American authorities are investigating the murder of

20  various American and Kenyan victims in and around the United

21  States embassy in Nairobi. I have a strong preference to have

22  my case tried in the United States court because America is my

23  enemy and Kenya is not.

24          I would like my statement about what I have done and

25  why I have done it to be aired in public in an American

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1989

1371BIN4

Gaudin - direct

1   courtroom.  I understand that the American authorities who are

2   interviewing me want to know who committed the bombing of the

3   embassy and how it was carried out.

4         I am willing to waive my right and answer the

5   question of American authorities upon the condition that the

6   undersigned American law enforcement authorities make all best

7   efforts to see that I am brought to the United States to stand

8   trial.

9         I understand that the undersigned prosecutor is only

10  empowered to make recommendations to the Attorney General of

11  the United States and other executive officials in the United

12  States government, and I further understand that the United

13  States government only intends to act with the mutual

14  agreement of the Kenyan government.

15        No other agreements or promises have been made other

16  than as set forth in this document.  It's signed Mohamed

17  Rashid Daoud Al-'Owhali.  It's signed by the interpreter,

18  myself and Steve Baugart 4:36 p.m. on August 22, 1998.

19  Q.  After Mr. al-'Owhali signed Government Exhibit 557 did he

20  agree to speak with you?

21  A.  Yes, he did.

22  Q.  Did you interview him that day?

23  A.  Yes, I did.

24  Q.  And starting on August 22 over the course of how many days

25  did you interview him?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1990

1371BIN4

Gaudin - direct

1  A.  We interviewed him on the 22nd, the 23rd, the 24th and the

2  25th of August.

3  Q.  What language did you interview him in?

4  A.  I spoke in English and the interpreter translated to

5  Mr. Al-'Owhali in his native language.  Mr. Al-'Owhali would

6  usually respond back in his native language back through the

7  interpreter to me, and then I would come into English to me.

8  Q.  And approximately how many hours did each of these

9  interviews last?

10  A.  Around four hours each day.  Some less, some a little bit

11  more.

12  Q.  Was Mr. Al-'Owhali permitted breaks during the interviews?

13  A.  Yes, he was.

14  Q.  Was he given food during the course of these interviews?

15  A.  Yes, he was.

16  Q.  And was he permitted time to pray during the course of

17  these interviews?

18  A.  Every single time he asked to pray he was offered the

19  opportunity to do so.

20  Q.  And did you reread Government Exhibit 557 to him?

21  A.  No, I didn't.

22  Q.  Tell us what you did during each interview with regard to

23  Government Exhibit 557?

24  A.  At the beginning of each interview I would take the form

25  that he sign on the 22nd and tell him this is the form you

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

1991
1371BIN4
Gaudin - direct

1  signed on the 22nd saying that you'd be willing to speak to

2  us. Do you still, do you understand you still want to speak

3  to us now? You want to continue? And he said he did want to

4  continued. But I didn't reread it to him every time.

5  Q. Did Mr. Al-'Owhali during this period ever complain about

6  the treatment that he was receiving?

7  A. No, he did not.

8  Q. Did you ever see him being mistreated?

9  A. I never saw him being mistreated.

10 Q. Did you ever see him being mistreated by the Kenyans?

11 A. Absolutely not.

12 Q. Did you ever see any new injuries visible to you other

13 than the ones you saw on August 12th when you left him?

14 A. No, I did not.

15 Q. Did you ever see him getting medical treatment during this

16 period?

17 A. Yes, he did.

18 Q. Now, what happened after these interviews were concluded?

19 A. After the interviews were concluded he was taken back to

20 the United States.

21 Q. And what day was he taken back to the United States?

22 A. We left Nairobi Kenya in early morning on the 26th of

23 August.

24 Q. Going to the interview on August 22nd, did Mr. Al-'Owhali

25 say anything to you about how he wanted that interview to

PROTECTED INFORMATION - FILED UNDER SEAL

...

1992

1371BIN4

Gaudin - direct

1    proceed?

2    A.  Yes, he did.

3    Q.  What did he say?

4    A.  Mr. Al-'Owhali had told me that he wanted to tell his

5    entire story from the beginning to the end, and once he was

6    done telling his whole story, then I could go back and sort of

7    go over the questions with him.

8           He explained that this was going to be a very

9    emotional story, and that he was going to say names, and thing

10   like that that would be code names or movement names, may not

11   in fact be people's true names, but names as he knew them to

12   be.

13   Q.  And did he in fact finish his whole story on August 22nd?

14   A.  Yes, he did.

15   Q.  And did you then begin to ask him some questions on August

16   22nd?

17   A.  On August 22nd maybe some, a little followup questions but

18   not much on the 22nd.

19   Q.  Now, what did Mr. Al-'Owhali tell you about where he was

20   from during the course of this interview?

21   A.  Mr. Al-'Owhali told me that he was a Saudi citizen of

22   Saudi Arabia but that in fact he was born in Liverpool,

23   England.

24   Q.  Did he tell you how he came to be born in Liverpool,

25   England?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

1371BIN4
Gaudin - direct

1   A. Al-'Owhali told me that his father was in England

2   attending some sort of master's degree program and during that

3   point is when he was born January 18, 19977.

4   Q. And did Mr. Al-'Owhali tell you anything else about his

5   family in Saudi Arabia?

6   A. Al-'Owhali explained to me that his family comes from, has

7   a, his family's heritage has prominence in Saudi Arabia dating

8   back to certain point back and also up to this day; that he

9   comes from a very wealthy family and a very prominent family

10   in Saudi Arabia.

11   Q. Did he tell you anything about his religious upbringing?

12   A. Yes, he did.

13   Q. What did he tell you about his religious upbringing?

14   A. Al-'Owhali explained to me that a religion was a very big

15   part of his life and that even in his early teens he started

16   to become more and more deeply involved in conservative

17   religious teachings, and that he would read all kinds, certain

18   magazines and books and listen to audio cassettes and he

19   started to detail some of those for me.

20         Al-'Owhali told me that some of the magazines were Al

21   Jihad, al mujahideen, and al Shad, and that some of the books

22   two of the books that I can remember they were entitled U

23   Shakal, and the Love and Hour of the Martyrs. Al-'Owhali

24   explained to me that that's books or magazines detailed Muslim

25   men who died fighting in the jihad and went to Paradise.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

1994

1371BIN4

Gaudin - direct

1  Q.  Did he tell you about any specific scholars that he used

2  to listen to?

3  A.  Al-'Owhali explained to me that he would listen to these

4  sermons or teachings on audio cassettes and one in particular

5  was by a Sheik, Sheik Safa, Sheik Safa, Abdul Rachman al

6  Howari, and this particular audio cassette detailed what

7  Al-'Owhali explained to me as the Kissinger promise and

8  Al-'Owhali further described that as Kissinger's plan to

9  occupy the Arabian peninsula.

10       And Al-'Owhali told me that the teachings on this

11 particular cassette solidified his resentment towards any

12 presence, any US presence in the Arabian peninsula.

13 Q.  Did Mr. Al-'Owhali tell you what he did after high school?

14 A.  Yes, after high school Mr. Al-'Owhali told me after high

15 school he attend two years of religious university in Riyadh,

16 Saudi Arabia called Mohamed Bin Saud.

17 Q.  And what happened after he graduated from the university?

18 A.  Al-'Owhali told me about two years before the bombing

19 happened that a friend of his had come back from Bosnia and he

20 and his friends started discussing joining a jihad in

21 particular areas, Turkestan, Bosnia, Cheknia and that's what

22 they wanted to do, but they couldn't find what he described to

23 me as a cell to go there.  So they decided instead to go to

24 Afghanistan for training and join the jihad there.

25 Q.  Did Mr. Al-'Owhali actually go to Afghanistan?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

1995

1371BIN4

Gaudin - direct

1   A. Al-'Owhali explained to me he and this friend left Saudi

2   Arabia, they traveled to the country of Qatar, and then from

3   Qatar they made their way to Pakistan, and then from Pakistan

4   they made their way eventually into Afghanistan.

5   Q. And did he tell you where he went once he went to

6   Afghanistan?

7   A. Yes, he told me in Afghanistan they went to the Khaldan

8   Camp as what he described it to me as.

9   Q. Did he meet anybody at the Khaldan Camp?

10  A. Al-'Owhali explained to me that at the Khaldan Camp he was

11  met by the person who was in charge of the hospitality section

12  at the camp and this person's name was Abu Sayyid al Kirdi,

13  and this person al Kirdi had instructed them that from this

14  point on they could never use their true names again and never

15  say they were from Saudi Arabia again.  And that's when he was

16  given his first in a long series of aliases, as he described

17  them to me.

18  Q. And what was that alias?

19  A. He received an alias of Mohammed Akbar from the country of

20  Qatar.

21  Q. And did Mr. Al-'Owhali tell you about any other aliases

22  that he had used?

23  A. He said he explained to me he has many aliases, some to

24  include, the one I just said, Khalid Salim Saleh, Bin Rashid,

25  Abdul Jabar Ali Abdul Lahit, Mowat, and a series of long

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

1996

1371BIN4

Gaudin - direct

1  series of other aliases.

2  Q.  Now, what did Mr. Al-'Owhali do once he reached the

3  Khaldan Camp in Afghanistan?

4  A.  Al-'Owhali explained to me that the Khaldan Camp was sort

5  of a basic training type of camp for, a basic military

6  training camp.  Al-'Owhali explained to me that prior to his

7  arrival at the Khaldan Camp he had absolutely no comprehension

8  of military training before.  This was his first exposure to

9  that type of thing.

10        He told me he was instructed in different type, basic

11  types of military training to include light weapons, some

12  demolition, some artillery, some communication, things of that

13  nature, but he was also received periods of instruction in

14  religious ideology.

15  Q.  What did he tell you about the religious instruction that

16  he received?

17  A.  Al-'Owhali explained to me that part of his religious

18  ideology training included fatwas which called for violence,

19  and Al-'Owhali explained to me that if a ruler had changed

20  something in contradiction to Islam, well, that particular

21  ruler had blasphemed and therefore it was your right and duty

22  to kill him.

23  Q.  Did Mr. 'Owhali tell you about any other religious

24  statements or teaching that he heard in the Khaldan Camp?

25  A.  While also at the Khaldan Camp Al-'Owhali had heard

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

1997

1371BIN4

Gaudin - direct

1  statements from Usama Bin Laden and that these statements

2  further solidified his religious feelings and his religious

3  thoughts and things like that.

4  Q.  What happened after Mr. Al-'Owhali received his training

5  in the Khaldan Camp?

6  A.  Al-'Owhali explained to me that the emir of this camp, the

7  leader of this camp had nominated Al-'Owhali to have an

8  audience in front of Usama Bin Laden, because of his good

9  progression in the training, and that Al-'Owhali along with

10  some others were actually granted this audience with Usama Bin

11  Laden.  He said it was about three days before Ramadan of that

12  year.

13  Q.  What happened with this audience with Usama Bin Laden?

14  A.  At this audience with Usama Bin Laden, Bin Laden had spoke

15  to the group in general and he impressed upon them the need to

16  fight the Americans and to cast them out of the Arabian

17  peninsula.  He also instructed them that they should try to

18  get more training.

19  Q.  What did 'Owhali do after this meeting with Usama Bin

20  Laden?

21  A.  Al-'Owhali explained to me that he took Mr. Bin Laden's

22  advice and did get more training in what he called the al

23  Qaeda camps.

24  Q.  And did he name those camps for you?

25  A.  Al-'Owhali told me the al Qaeda camps he went to were al

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

1998
1371BIN4

Gaudin - direct

1  Sadeek, al Farouq, and the jihad war camp, and explained to me

2  that al Qaeda is not a particular place, but it's a group, and

3  it stands for the base of God's support, and that Bin Laden is

4  overall in charge of al Qaeda.

5  Q.  And what types of training did Mr. Al-'Owhali receive at

6  these camps?

7  A.  Al-'Owhali described the difference between the training

8  at these three camps from the Khaldan Camp to be more advanced

9  and more specialized; that he received training in security

10  and intelligence, how to gather information, how to protect

11  information from being divulged, how to conduct hijackings of

12  buses or planes, how to do kidnappings, how to seize and hold

13  buildings, things of that nature.

14  Q.  Did Mr. Al-'Owhali tell you whether he actually ever

15  joined al Qaeda?

16  A.  Mr. Al-'Owhali explained to me that it's not necessary for

17  you to actually join al Qaeda to actually serve with them.

18  Al-'Owhali explained this process of joining al Qaeda to be

19  taking the bayat is what he told me.  Al-'Owhali explained to

20  me the bayat is an oath or an allegiance to Bin Laden and al

21  Qaeda, but I don't have to do it.

22      Al-'Owhali explained to me that he had decided not to

23  take the bayat for a couple of different reasons.  He

24  explained that once you take the bayat and that's it, you no

25  longer have a choice of what missions you would like to do or

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

1999

1371BIN4

Gaudin - direct

1    want to do.  If you've taken a bayat you have to do whatever

2    is pretty much told to you.  And 'Owhali explained that al

3    Qaeda can assign you to both direct military roles, but also

4    supporting roles, administrative roles, bodyguards, thing like

5    that.

6           Al-'Owhali explained to me that he had a desire and

7    interest to make sure that he did military roles and he was

8    afraid that if he took the bayat he may end up in a

9    nonmilitary role, so he decided not to take it.

10   Q.  Did Mr. Al-'Owhali tell you what he did after he received

11   this training?

12   A.  Al-'Owhali explained to me that during and at the end of

13   this training he had met with Mr. Bin Laden several times, and

14   had expressed to him interest in missions that he would like

15   to do, and Mr. Bin Laden told him that, take your time.  Your

16   mission will come in time.

17   Q.  And what did he do after he had this meeting with Usama

18   Bin Laden?

19   A.  After this meeting Mr. -- I'm sorry -- Al-'Owhali

20   explained to me that he had heard that the Taliban was in a

21   crisis in the city of Kabul in Afghanistan and he had sought

22   permission from Bin Laden to go and assist the Taliban in the

23   fighting in that area, and Bin Laden granted him permission to

24   do that.

25   Q.  Did he tell you who the Taliban was?

PROTECTED INFORMATION – FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

2000

1371BIN4

### Gaudin - direct

1   A.  He didn't really explain to me much about the Taliban but

2   I had some idea of what it was at the time.

3   Q.  And what's the Taliban?

4   A.  The Taliban --

5           MR. COHN:  Objection.

6           THE COURT:  What's the basis of your information

7   about the Taliban?

8           THE WITNESS:  Newspapers and works, things like that,

9   sir.

10          MR. COHN:  Objection.

11          THE COURT:  Sustained.

12  Q.  We'll move on.  Did 'Owhali tell you whether he actually

13  went to fight with the Taliban at this time?

14  A.  Al-'Owhali explained to me that once given permission he

15  did go to fight alongside Taliban, but initially he wasn't

16  assigned to anything on the front lines, that he was more in a

17  support role.  And --

18  Q.  What happened once he went to fight with the Taliban in

19  the support role?

20  A.  He, Al-'Owhali, explained to me that he contracted

21  tuberculosis and became ill, and had to seek medical

22  assistance, and he did get that assistance alongside the

23  Taliban there and he was treated, not really treated, but he

24  had one of the people who helped with his treatment was a man

25  by the name of Azzam, and this person Azzam had also been

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2001

1371BIN4

Gaudin - direct

1  trained. He explained to me this person Azzam had also been

2  trained in the al Qaeda camps.

3  Q.  Did Mr. Al-'Owhali describe who Azzam was?

4  A.  'Owhali described Azzam to be from Saudi Arabia and has

5  another name of Jihad Ali. He was also trained as at the Bin

6  Laden camps, and that Azzam had told 'Owhali that fighting

7  alongside the Taliban here, this is a good mission for us,

8  this is honorable, but there are bigger missions, better

9  missions that we could be doing. And Al-'Owhali advised that

10 he would be interested in one of those. So Azzam told him

11 I'll be in contact when the mission starts to get ready, I'll

12 let you know.

13 Q.  And did Mr. Al-'Owhali eventually recover from his

14 tuberculosis?

15 A.  Al-'Owhali explained to me that did eventually overcome

16 his illness.

17 Q.  And what did he do after that?

18 A.  He then started to get in the direct fighting in and

19 around Kabul alongside of Taliban. Al-'Owhali explained to me

20 that he had fought with them for a while and that the Taliban

21 had suffered a major defeat near the city of Kabul. He

22 explained some very fierce fighting that had happened and many

23 of the people that he was with that were trained also in the

24 al Qaeda camps had been killed in this fighting.

25       And that Al-'Owhali and five other of the men were

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

2002

1371BIN4

Gaudin - direct

1    actually able to retreat into this hill, into a series of

2    hills. 'Owhali explained to me this was known as the, what he

3    said the C formation battle and 'Owhali described this as very

4    fierce fighting that he and only these five other people were

5    able to repel the forces that were fighting against them, and

6    they were actually able to hold their position. They didn't

7    lose it.

8    Q. What happened after this C formation battle?

9    A. 'Owhali explained to me that because of his fighting in

10   the C formation battle that he earned a reputation for loyalty

11   and proved himself to be a very good soldier and received a

12   lot of prominence in the Bin Laden camps because of his

13   ability as a fighter.

14   Q. Is there anything in particular that indicated his

15   prominence in the camps?

16   A. Al-'Owhali explained to me that he was actually, because

17   of his reputation that he earned during the fighting in the C

18   formation battle, that he was actually allowed to carry his

19   rifle anywhere in the al Qaeda camps that he went, even in

20   front of, even to include in the presence of Usama Bin Laden.

21   Q. And now what did Al-'Owhali do after this C formation

22   battle?

23   A. Shortly after that he was again contacted by Azzam, and

24   Azzam had told him that the mission that you said you might be

25   interested in is going forward. Are you still interested? If

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION — FILED UNDER SEAL

2003

1371BIN4

Gaudin - direct

1  you are, we need to start getting ready. An Al-'Owhali

2  advised Azzam, told me that he advised Azzam that he was still

3  interested and he did want to participate in the mission.

4  Q.  And what did they do after that?

5  A.  From there al-'Owhali tells me that he Azzam and four

6  others attended what he described as a very specialized

7  training for about a month.  They went somewhere outside of

8  Kabul, and received what he called the operation and

9  management of the cell training, which he described as far

10  more advanced than anything he had received up to this point.

11  Q.  Did Al-'Owhali tell you who he had gone to the training

12  with?

13  A.  He said he went with Azzam and four others but he didn't

14  give me the other people's names.

15  Q.  Did he tell you who taught the training?

16  A.  Al-'Owhali explained to me that the person who taught this

17  particular training whose name was Abdul Jafar and that he was

18  from Egypt.

19  Q.  What did 'Owhali tell you about this training?

20  A.  Al-'Owhali explained that this training which dealt with

21  the cell, he explained to me that the cell is made up of four

22  separate sections, the intelligence section, the

23  administration section, the planning and preparation section,

24  and then the execution section.

25          Al-'Owhali explained to me that the person who is in

SOUTHERN DISTRICT REPORTERS (212) 805-0300

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION – FILED UNDER SEAL

2004

1371BIN4
Gaudin - direct

1    top of the intelligence section is in charge of the overall

2    cell, and that he assigns deputies to conduct various tasks to

3    complete their mission.  He was also trained in intelligence,

4    in security and how to do site surveys of a particular target

5    using cameras with both still and video photography, and that

6    once a cell's target was actually identified it was also

7    called a station.

8    Q.  Did Mr. Al-'Owhali mention anyone else who was involved in

9    this training who taught this training?

10   A.  Al-'Owhali explained to me that he was, it was his

11   impression that this type of cell training was first taught at

12   the al Qaeda camps by another Egyptian man but he didn't know

13   that person's name.

14        Al-'Owhali further described that guy to be another,

15   I'm sorry, an Egyptian man that was trained either by the

16   American military or the American intelligence agencies, but

17   for some reason this man was no longer trusted in the Bin

18   Laden camps, so he no longer teaches there and Al-'Owhali

19   believers he lives somewhere in the United States.

20   Q.  Did Mr. Al-'Owhali tell you what happened after he

21   received this training?

22   A.  After this training Azzam again told Al-'Owhali that you

23   know the mission is getting more and more ready.  You need to

24   travel from here to Yemen.  And Al-'Owhali agreed to do that.

25   So in preparation to travel to Yemen he shaved his beard, and

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

2005

1371BIN4

Gaudin - direct

1    in the al Qaeda camps he received a new passport.

2         Al-'Owhali said he could choose from a variety of

3    passports and he picked and Iraqui passport in the name of

4    Abdul Ali Latif from Iraq. Al-'Owhali further explained to me

5    that Azzam's cousin Bilal left the area with and went to Yemen

6    in order to facilitate 'Owhali obtaining a Yemeni passport

7    once he got there because this person had connections, this

8    Bilal person had connections in Yemen that he could make that

9    happen.

10   Q.  And did Mr. Al-'Owhali tell you approximately when this

11   happened, when he took his trip to Yemen?

12   A.  He said it was sometime about three to five months before

13   the bombing.

14   Q.  Did he actually go to Yemen?

15   A.  He did. He told me he did.

16   Q.  And what did he do in Yemen?

17   A.  Al-'Owhali explained to me that prior to getting to Yemen

18   that he had telephoned Bilal because he had a small delay in

19   obtaining an exit visa, couldn't pick up his plane tickets

20   right away and Bilal had told him you know when you get here,

21   don't stay at a hotel, stay at a member, stay at a house of

22   one of the people from the camps.

23        So Al-'Owhali did that. Upon arrival Al-'Owhali

24   stayed with his friend Ahmed al Hazza who he also gave another

25   name of Abdul Aziz. He said this Ahmed al Hazza was someone

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2006

1371BIN4

Gaudin - direct

1  was a very good friend of his who was also trained in the Bin

2  Laden camps who fought alongside Al-'Owhali in that famous, as

3  he describe the famous C formation battle. So Al-'Owhali

4  stayed at this person's house.

5  Q. What did Al-'Owhali do while he was in Yemen?

6  A. Al-'Owhali telephoned his parents, and it was decided,

7  Al-'Owhali decided it would be too dangerous for him to travel

8  to Saudi Arabia, so his father, it was agreed that his father

9  would travel from Saudi Arabia to Yemen, and he did and he met

10  with Al-'Owhali and Ahmed al Hazza.

11  Q. And did Al-'Owhali mention anything else he did while he

12  was in Yemen?

13  A. While he was in Yemen he did receive the passport that was

14  facilitated by Bilal and he received a Yemen passport in the

15  name of Khalid Salim Saleh Bin Rashid. Al-'Owhali also met

16  with Ahmed al Hazza and his father and there was an agreement

17  made that Ahmed al Hazza would be the middleman in between

18  Al-'Owhali and his father. From this point on if Al-'Owhali

19  needed anything from his father, Ahmed al Hazza would be the

20  go between to make any of that happen.

21  Q. It did Mr. Al-'Owhali eventually leave Yemen?

22  A. Yes. He was again contacted that the mission was getting

23  closer and that he needed to come back to Pakistan.

24  Q. And who contacted him?

25  A. It was Azzam who had contacted him.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2007

1371BIN4

Gaudin - direct

1   Q.   And did he eventually go back to Pakistan?

2   A.   Yes, he did.

3   Q.   Did he tell you about when this was?

4   A.   This is about three months before the bombing.

5   Q.   What did he do when he went back to Pakistan?

6   A.   Al-'Owhali explained to me upon arrival in Pakistan he was

7   met by Azzam, and another person that Al-'Owhali described to

8   me to be named Khalid.

9   Q.   Did he describe Khalid at all?

10  A.   He described Khalid to be someone in his twenties from

11  Saudi Arabia but that's all, that's about all the description

12  he gave me.

13  Q.   And what happened when he met with Khalid and Azzam?

14  A.   Azzam told Al-'Owhali that Khalid was going to give him

15  his instructions on what the mission was and then to listen to

16  Khalid.  And then Azzam departed.

17  Q.   Did Al-'Owhali eventually have a meeting with Khalid?

18  A.   Yes, he did.  Al-'Owhali explained to me that Khalid told

19  him that the mission was going to be a martyrdom operation

20  that would end, that would result in Al-'Owhali's own death;

21  that there was going to be, there was a target against the

22  United States where Al-'Owhali would be assisting in driving a

23  truck full of explosives, and somehow at that target the truck

24  would explode and Mr. Al-'Owhali would become a martyr.

25  Q.   Did Khalid tell him anything about what the target was at

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2008

1371BIN4

Gaudin - direct

1    that time?

2    A.   He just told him it was a US target somewhere in East

3    Africa, but didn't specify the exact location of the target at

4    that time.

5    Q.   And did Al-'Owhali tell you he did anything else with

6    Khalid at this meeting?

7    A.   Al-'Owhali explained to me that Khalid then took what

8    Al-'Owhali described to me to be a martyrdom video where

9    Khalid operated a video camera and instructed Al-'Owhali to

10   say something while it was being filmed, and that this video

11   would be played upon the successful completion of his mission

12   and Mr. Al-'Owhali's martyrdom or death.

13   Q.   Did Mr. Al-'Owhali film this video?

14   A.   I'm sorry?

15   Q.   Did they actually film this video?

16   A.   'Owhali explained to me they did film the video and during

17   the filming Khalid instructed to Al-'Owhali to say that he was

18   with a particular unit.

19   Q.   Do you recall the name of that unit?

20   A.   Al-'Owhali told me the unit was the Third Martyr Barracks

21   First Squad of the El bara bin Malik division of the

22   Liberation Army of the Army of the -- I'm sorry -- of the Army

23   of Liberating the Islamic holy lands.

24   Q.   And did Mr. Al-'Owhali tell you whether he had ever heard

25   of this group before?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION – FILED UNDER SEAL

2009

1371BIN4

Gaudin - direct

1   A.   Mr. Al-'Owhali explained to me that he wasn't exactly sure

2   what that group was, but that's what Khalid told him to say so

3   that's what he said on the video.

4   Q.   Now, did Mr. Al-'Owhali tell you about any other public

5   statements that he had heard from the group at around that

6   time?

7   A.   Al-'Owhali explained to me that around this time, around

8   the time of the filming of the ABC interview with Khost,

9   Afghanistan of Bin Laden that he did meet with Bin Laden one

10  more time.

11  Q.   Did he hear about any public statement by any particular

12  group around that time?

13  A.   Al-'Owhali explained to me that he had learned of fatwas

14  that were put out and he described the fatwas put out by the

15  International Islamic Foundation -- I'm sorry -- the

16  International Islamic Front.  And that this particular fatwa

17  called for violence against the United States was the main,

18  the main cause of the fatwa of its main cause.

19  Q.   Did Mr. Al-'Owhali say anything about who he understood

20  belonged to the International Islamic Front?

21  A.   He said this particular fatwas was signed by Usama Bin

22  Laden and several other leaders of jihad groups.

23  Q.   Did Mr. Al-'Owhali tell you about anyone else who was

24  present in Khost during the time of the Bin Laden interview

25  with ABC News in May 1998?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1371BIN4                                                      2010

Gaudin - direct

1    A.  Al-'Owhali explained to me that Azzam was actually present
2    during the filming of that ABC interview of Usama Bin Laden.
3    Q.  Now, after Mr. 'Owhali filmed in videotape, did he have
4    any further conversations with Khalid?
5    A.  He told me that Khalid instructed him that time to go and
6    you're going to be traveling to Nairobi, Kenya, and upon
7    arrival in Nairobi Kenya you'll be met by others in the group
8    who will give you your last, your final instructions on the
9    mission.
10   Q.  Did Mr. Al-'Owhali eventually leave Pakistan for Nairobi?
11   A.  Al-'Owhali explained to me that he left, his itinerary to
12   leave Pakistan on July 31st and he was schedule to arrive in
13   Nairobi Kenya on Saturday, August 1st.  'Owhali explained to
14   me that his route of travel was on the Gulf Airline from Lahor
15   Pakistan to Karachi Pakistan, from Karachi to Muscat and from
16   Muscat to Abu Dhabi of the United Arab Emirates and from there
17   to one last leg to Nairobi Kenya where he should have arrived
18   on the 1st of August.
19            (Continued on next page)
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

2011

1371BIN4

### Gaudin - direct

1   Q.  Did Mr. al-'Owhali actually arrive in Nairobi on August 1?

2   A.  Al-'Owhali told me that on this journey that he missed a

3   connecting flight between Muscat and Abu Dhabi, and because he

4   missed his connection flight he calls Khalid and Khalid

5   explains to him that you're not going to arrive on time now so

6   you're going to miss the link-up with Azzam and the others who

7   are going to be going to Mombasa, but get the next connecting

8   flight to Nairobi and someone from the group will eventually

9   pick you up.  Upon arrival in Nairobi, take a taxi to the

10  Ramada Hotel in Iftin.

11  Q.  And when did Mr. al-'Owhali actually arrive in Nairobi?

12  A.  Al-'Owhali arrived in Nairobi on the Sunday, the 2nd of

13  August.

14  Q.  What did he do once he arrived in Nairobi?

15  A.  Upon arriving in Nairobi, he followed Khalid's

16  instructions and he took the taxi to the Ramada Hotel.  Upon

17  arrival at the hotel, he used a phone service, not at the

18  Ramada but nearby the Ramada, as he explained it to me, and

19  telephones Khalid and advised Khalid that he, Al-'Owhali, had

20  checked into room 24.  Khalid explains to Al-'Owhali that he

21  would contact Saleh in Mombasa and explain to him where he was

22  and to instruct someone to go pick up Al-'Owhali at the Ramada

23  Hotel.

24  Q.  And did Mr. al-'Owhali tell you about what time he arrived

25  in Nairobi?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION — FILED UNDER SEAL

2012
1371BIN4
Gaudin - direct

1   A.  He arrived on early morning on Sunday, the 2nd of August.

2   Q.  What happened after he checked into the Ramada Hotel in

3   Iftin?

4   A.  Like I said, he called Khalid, let people know that he was

5   in room 24, and before sunset that same day, a man Al-'Owhali

6   identified as Harun picked him up from the Ramada Hotel.

7   Q.  Did he describe Harun?

8   A.  He described Harun to be a Somali-looking man who was in

9   his 20s, around five-foot-five, just basic description like

10  that.

11  Q.  Did Mr. al-'Owhali eventually identify Harun?

12  A.  Yes, he did.

13  Q.  How did he identify Harun?

14  A.  We had a videotape queued up in a VCR for Mr. al-'Owhali

15  to view and when we put in the videotape he realized, and he

16  expressed to me that he realized, that this video was

17  regarding a ferry accident in Lake -- ferry accident, and at

18  the particular point where Harun's face became clear in the

19  monitor, he identified the person to be Harun.

20  Q.  What did Harun do once he got to the Ramada Hotel?

21  A.  Upon Harun arriving at the Ramada Hotel, he paid the bill

22  for Al-'Owhali even though he didn't stay there for the night,

23  he paid for whatever time he had stayed there, collected

24  Al-'Owhali and took Al-'Owhali to his house in Nairobi.

25  Q.  What happened after Mr. al-'Owhali went back to Harun's

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION — FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

2013

1371BIN4

Gaudin - direct

1   house in Nairobi?

2   A.  Al-'Owhali explained to me that he stayed at Harun's house

3   for the rest of the week up to the time of the bombing.  He

4   arrived in Harun's house again on the 2nd.  The very next day,

5   Azzam and Saleh came to Harun's house and that's when they

6   started to get the instructions on the mission from Azzam and

7   Saleh.

8   Q.  You mentioned Saleh.  Did Mr. al-'Owhali tell you who

9   Saleh was?

10  A.  Al-'Owhali described Saleh to be an Egyptian male in his

11  30s, physical, not very much more than that, other than that

12  he was the leader of the cell.

13  Q.  Did Mr. al-'Owhali say anything about Saleh's role in the

14  bombings?

15  A.  Al-'Owhali explained to me that Saleh was the planner of

16  both, of the bombing in Nairobi and the bombing in Dar es

17  Salaam.  Saleh was the leader of the cell that was going to

18  carry out both of these attacks.

19  Q.  Did Mr. al-'Owhali tell you anything about what Saleh said

20  about Harun?

21  A.  On this day when Saleh and Azzam came from Mombasa, Saleh

22  had given Al-'Owhali the details of what the mission was going

23  to be.  He said first that this Harun was the facilitator or

24  the person who was the administrator of inside the cell, that

25  Harun had obtained the house that they were staying at that

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

2014

1371BIN4

Gaudin - direct

1    time, his house here in Nairobi, and also that this is where

2    the truck and the bomb -- the truck was kept and where the

3    bomb was assembled, in the garage of Harun's house.

4    Q.  Did Mr. al-'Owhali meet with Saleh that day, on August 3?

5    A.  Yes, he did.

6    Q.  What did they discuss on August 3?

7    A.  On that day, Saleh started to give Al-'Owhali the details

8    of the mission.  Saleh explained to Al-'Owhali that in fact

9    there were going to be two bombings, there was going to be a

10   bombing of the U.S. embassy in Nairobi, Kenya and the bombing

11   of the U.S. embassy in Dar es Salaam, Tanzania; that both of

12   these were going to occur on the same day, on Friday, August

13   7th, between 10:30 and 11:00 in the morning.

14        Saleh then showed Al-'Owhali some photographs and

15   some drawings of the embassy in Nairobi and started to give

16   Al-'Owhali details of what his mission was going to be.  Saleh

17   explained to Al-'Owhali that Al-'Owhali's role was to assist

18   Azzam in getting the bomb truck to the embassy in Nairobi.

19   Azzam would be the driver, Al-'Owhali would be the passenger.

20        Upon arriving at the embassy, Al-'Owhali was to exit

21   the vehicle -- he had a couple missions.  One was to exit the

22   vehicle and use a pistol to get the guard to open the drop bar

23   so that Azzam could drive the truck as close to the embassy as

24   possible.  Upon that happening, Al-'Owhali was instructed that

25   he was to fire his gun in the air and also to throw several of

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2015

1371BIN4

Gaudin - direct

1  what Al-'Owhali described to me as homemade stun grenades

2  around the area and this was to scatter people out of the

3  area.

4          The last part of his mission was that the particular

5  truck, the way it was designed was that the bomb had to be

6  detonated by pressing some electric buttons from inside the

7  truck, that the driver of the truck would actually have to do

8  it.  It wasn't like a remote control or anything like that,

9  the driver had to press some buttons inside the truck.

10         If for some reason the electrical circuit didn't

11  work, Al-'Owhali's last portion of the mission was, he had

12  keys to the back of the truck where the door was in the back

13  and that's where the bomb was housed, and if for some reason

14  the electrical detonation didn't work, that he was to take

15  his -- these homemade stun grenades that were made out of a

16  portion of TNT and some other materials and he was to throw

17  them inside the back of the truck to cause the bomb to

18  manually explode instead of being detonated from the front.

19  Q.  Did Saleh tell anything to Mr. al-'Owhali about the bomb

20  that was going to be used?

21  A.  Saleh, Azzam and Harun and Al-'Owhali all then went to the

22  garage and they showed Al-'Owhali the truck that the bomb was

23  in, and Saleh had explained to Al-'Owhali that the bomb had

24  been built about two weeks ago.  And Al-'Owhali described the

25  truck to be light brown or beige-colored, that it had two

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2016

1371BIN4

Gaudin - direct

1   wheels in the front on the front axle and four wheels on the
2   back axle, and that the truck was, the compartment of the
3   truck was encased with metal.  The front part of the truck
4   just had a regular compartment for the driver and the
5   passenger, no additional seats, and that the bomb itself was
6   comprised of TNT, aluminum nitrate and aluminum powder that
7   were put in many, many wooden boxes or wooden crates and these
8   were all connected with wires to some batteries in the back of
9   the truck and that then the wiring would go to the front of
10  the truck where the bomb would be detonated.
11  Q.  Did Saleh tell anything to Mr. -- say anything to
12  Mr. al-'Owhali about the plan for the bombing in Dar es
13  Salaam?
14  A.  Yes, he did.  Al-'Owhali explained to me that Saleh told
15  him that in addition to the bombing in Nairobi on the 7th of
16  August, there would also be a truck bombing of the U.S.
17  embassy in Dar es Salaam and he explained to me some of the
18  differences between the two:  Whereas in Nairobi there would
19  be two people in the truck, in Dar es Salaam there would only
20  be one person in the vehicle.  And Al-'Owhali told me that
21  person's name was Ahmed Abdallah, who Al-'Owhali also knew as
22  Ahmed the German.
23  Q.  Did Mr. al-'Owhali tell you anything about Ahmed Abdallah?
24  A.  He referred to Ahmed the German to be someone who was from
25  Egypt who was a trainer in the Jihad Wal Camp in Afghanistan,

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2017

1371BIN4

Gaudin - direct

1   one of the al Qaeda's camps, and Al-'Owhali and him were

2   friends from that time at the camp.

3         Al-'Owhali expressed to me at that point that because

4   he had arrived a day late in Nairobi, he missed the link-up

5   that would have happened in Mombasa and he expressed to me

6   that because of him missing that date, he didn't get to say

7   good-bye to Ahmed the German in Mombasa. He expressed to me

8   that he would have liked to have done that.

9   Q. Did he give you any physical description for Ahmed the

10   German?

11   A. He was from -- that he was actually fair-skinned with

12   light hair and light eyes and that's, Al-'Owhali said, how he

13   gets the name Ahmed the German, even though he's someone from

14   Egypt.

15   Q. Did Saleh tell him anything about the plan to bomb the

16   embassy in?

17   A. Al-'Owhali told me that the plan to bomb the embassy

18   again, the bomb itself was also going to be delivered by a

19   truck, but this particular truck was a refrigerator truck. So

20   I asked him, was it meant to be kept cold for something? He

21   said, no, it's a refrigeration truck because it was the only

22   truck available.

23         Al-'Owhali told me that Saleh had bragged to

24   Al-'Owhali that they were able to build this bomb and get

25   everything ready in only ten days. He had said that several

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2018

1371BIN4

Gaudin - direct

1   days, Saleh was very boastful about being able to put the Dar

2   es Salaam bombing together in such a short period of time.

3   But also, one of the other differences between the two

4   bombings was that also comprised of the bomb in Dar es Salaam

5   was comprised of TNT, batteries, wires and things of that

6   nature, but also would also have a number of oxygen tanks or

7   gas canisters in the back of the -- in the back with the TNT.

8   And I asked Al-'Owhali why that was, and he said he wasn't a

9   bomb builder but from what he understood, it was for

10  additional fragmentation.

11  Q.  Did Mr. al-'Owhali tell you anything about the location of

12  the bomb truck in Dar es Salaam?

13  A.  He said that initially the plan was to put the truck

14  within a three-meter space at the embassy at Dar es Salaam.  I

15  didn't have a picture, he couldn't identify it, but I remember

16  him specifically saying a three-meter space, but for some

17  reason that this particular space was too close to the French

18  Embassy so that the planners decided to move it to one of the

19  security gates.

20  Q.  Did Mr. al-'Owhali tell you how Saleh kept in contact with

21  Ahmed the German in Dar es Salaam?

22  A.  Yes.  Al-'Owhali explained to me that Ahmed the German had

23  a mobile phone and that he would keep in touch with Saleh with

24  using that phone in case anything needed to be changed with

25  the mission or anything like that.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2019

1371BIN4

Gaudin - direct

1  Q. Did Mr. al-'Owhali tell you anything about who he reported

2  to in this mission?

3  A. Al-'Owhali explained to me that his organization is

4  loosely structured; that depending on the mission, you report

5  to different people at different times. Al-'Owhali explained

6  to me in this mission that he reported to the person who

7  recruited him, which would be Azzam, and then Azzam in turn

8  reported to somebody higher up, and that person higher up and

9  so on all the way up to the top.

10 Q. Did Mr. al-'Owhali tell you what if anything he believed

11 Usama Bin Laden's role in the bombing was?

12 A. Al-'Owhali explained to me that Usama Bin Laden is at the

13 very top of al Qaeda but that he has several senior military,

14 several senior military leaders directly under him, and that

15 Bin Laden provides the political objectives to these military

16 leaders or these senior leaders and that these people would

17 then provide the instructions down, down lower to the lower

18 chains of command. Al-'Owhali explained that it wouldn't be

19 normal for Bin Laden to directly give instructions to someone

20 like Azzam or directly to him.

21 Q. What happened after this meeting on August the 3rd that

22 Mr. al-'Owhali had with Saleh?

23 A. Al-'Owhali explained that on the 3rd of August -- I'm

24 sorry, on Tuesday, which would be the 4th of August, Saleh had

25 took Al-'Owhali to the American Embassy in Nairobi and showed

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION — FILED UNDER SEAL

2020

1371BIN4

Gaudin - direct

1    him where he wanted the bomb truck to be placed by the drop

2    bar in the rear rear of the U.S. embassy.

3           Al-'Owhali had expressed to Saleh that, wouldn't it

4    be better if we were to put the bomb truck in the front of the

5    U.S. embassy, and Saleh disagreed. And then Al-'Owhali

6    suggested, wouldn't it be better for us to put the bomb

7    underneath the U.S. Embassy in the garage that goes underneath

8    and that way we would cause more damage to the Americans since

9    it's the U.S. Embassy, but Saleh had explained to him that

10   would be difficult to do, to get it past the section of the

11   security gate to Al-'Owhali. The plan didn't get changed.

12   Q. Did Mr. al-'Owhali tell you anything about why the day,

13   that particular day was selected, Friday, August 7?

14   A. Al-'Owhali explained to me that he was part of the

15   execution phase of the bombing. He, you know, he didn't know

16   all that much about the planning and preparation except what

17   Saleh was telling him.

18          Saleh had explained to him that they had chose Friday

19   between 10:30 and 11 because that would be when most of them

20   should be either at mosque or on their way to mosque at that

21   time. This way, by doing it at that time on Friday, they

22   would be less likely to hurt any Muslims.

23   Q. Did Saleh say anything about why the embassy in Nairobi

24   was targeted?

25   A. Al-'Owhali explained to me that there were several reasons

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION — FILED UNDER SEAL

PROTECTED INFORMATION – FILED UNDER SEAL

2021

1371BIN4

Gaudin - direct

1    for picking -- explained to him through Saleh there were

2    several reasons why the embassy in Nairobi was picked.  First,

3    there was a large American presence at the U.S. Embassy in

4    Nairobi; that the ambassador of the U.S. Embassy was a female

5    and if the bomb resulted in her being killed, it would further

6    the publicity for the bombing.

7         Also, that there were embassy personnel in Nairobi

8    who were responsible for work in the Country of Sudan.  There

9    were also a number of Christian missionaries at the embassy in

10   Nairobi.  And lastly, that it was what Al-'Owhali explained as

11   ease of access to the embassy.  It was an easy target.

12   Q.  Did Mr. al-'Owhali discuss any other targets with Saleh at

13   this time?

14   A.  Al-'Owhali explained to me -- explained to me that there

15   were, there's a number of different targets.  He doesn't know

16   where they all are, but they're in the planning stages.

17        Al-'Owhali discussed with Saleh when, you know, are

18   there targets in the United States that we can attack?  Saleh

19   had explained to him there are targets in the U.S. that we

20   could hit, but things aren't ready yet, we don't have

21   everything prepared to do that yet.  First, we must -- first,

22   Saleh explains to Al-'Owhali that we have to have many attacks

23   outside the United States and this will weaken the U.S. and

24   make way for our ability to strike within the United States.

25   Q.  Did Mr. al-'Owhali tell you about anything that he learned

SOUTHERN DISTRICT REPORTERS (212) 805-0300

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

2022

1371BIN4

Gaudin - direct

1    about targets during his training on camps in Afghanistan?

2    A.   Al-'Owhali explained to me during his training they

3    emphasized priorities of attacks, three of those to be

4    military bases, U.S. missions or diplomatic posts and

5    kidnapping ambassadors.

6    Q.   Did Mr. al-'Owhali see Saleh again after Tuesday, August

7    4th?

8    A.   Al-'Owhali explained to me that after Tuesday, the 4th, he

9    never saw Saleh again.

10    Q.   What did Mr. --

11         MR. BUTLER:   Your Honor, we have about another half

12    an hour or so on direct.   Would you like to take a break?

13         THE COURT:   We'll take a recess at this point.

14         (Jury not present)

15         THE COURT:   Is this too early for a prayer recess?

16         MR. COHN:   Yes, prayer's okay now.

17         THE COURT:   Prayer is okay now.   Let's take a prayer

18    recess.

19         MR. COHN:   May I just raise scheduling?   Since the

20    government has another half hour and this will take to 4:15,

21    quarter to, leave us to quarter after, unless you're prepared

22    to let me finish my cross until the end, I would like to break

23    at the end of the government's witness's direct.

24         THE COURT:   Of direct.

25         MR. COHN:   I will either go to the end of mine, which

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

2023

1371BIN4

Gaudin - direct

1   is about 45 minutes, or I would like to go tomorrow.  I don't

2   want to split it up.

3          THE COURT:  I have no problem with it.  The

4   government has no problem.

5          MR. COHN:  Very good.

6          THE COURT:  All right.

7          (Recess)

8          THE COURT:  All set to resume?  All right, the

9   witness and the jury.

10          MR. COHN:  Judge, while we're waiting, just for the

11   record, we had a problem with the clothing.  I made an

12   objection in the robing room.  I didn't object when it came in

13   and that's because the government convinced me that I was

14   wrong, and I have withdrawn the objection.

15          THE COURT:  Very well.

16          (Jury present)

17          THE COURT:  Mr. Butler.

18   BY MR. BUTLER:

19   Q.  Agent Gaudin, you testified, I believe, as to certain

20   information that Mr. al-'Owhali learned about targets while he

21   was in the training camps in Afghanistan.  Did he tell you

22   anything about why embassies are specifically targeted?

23   A.  In addition to telling me the types of targets, he also

24   explained that hitting embassies achieves certain objectives

25   that he was instructed or that he was taught at the camps, and

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2024

1371BIN4

Gaudin - direct

1    by hitting an embassy the objectives are that you would

2    achieve would be you hit the ambassador by hitting the

3    embassy, you would also -- also an objective would be the

4    military attache, the press attache and what Al-'Owhali

5    described as, most importantly, the intelligence officers at

6    the embassy.

7    Q.  Just to be clear, what did Mr. al-'Owhali tell you about

8    what his understanding was of Usama Bin Laden's role in the

9    bombing of the embassy in Nairobi?

10   A.  Al-'Owhali explained to me that he was never specifically

11   told that this mission was Usama Bin Laden's mission, but he

12   always believed it to be so.  Al-'Owhali explained to me that

13   his understanding of the way things work is that Usama Bin

14   Laden, it's not likely that he would take direct credit for

15   attacks like this.  That's how he explained it to me.

16   Q.  Now, after this meeting with Saleh on August 4th, 1998,

17   what did Mr. al-'Owhali do after that?

18   A.  Al-'Owhali explained to me that after the 4th he spent the

19   next several days at Harun's house mentally preparing himself

20   to become a martyr, to die in the operation that was scheduled

21   for the 7th.  He explained to me that on either Wednesday or

22   Thursday, he wasn't sure which day, either the 5th or 6th of

23   August, another person came to Harun's house and they all

24   accompanied this person to the garage.

25             Al-'Owhali explained that this person's name was

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1371BIN4                                                                  2025

Gaudin - direct

1   Abdel Rahman and he was the, what Al-'Owhali described to me
2   as the technician who was, who would make the final electrical
3   connection between the bomb in the back of the truck and the
4   detonating device in the compartment, the driver's
5   compartment.
6   Q.  Did Mr. al-'Owhali describe Abdel Rahman for you?
7   A.  He described Abdel Rahman to be an Egyptian man who was in
8   his 30s, pretty much the basic description.
9   Q.  Did Mr. al-'Owhali tell you anything else that Abdel
10  Rahman did?
11  A.  Al-'Owhali explained that Abdel Rahman not only made the
12  final electrical connection for the bomb in Nairobi, but he
13  also did the same thing for the bomb in Dar es Salaam as well.
14  He said that this connection was done right in Al-'Owhali's
15  presence and that it didn't take very long at all.
16  Q.  And that was the connection in Nairobi?
17  A.  The connection in Nairobi, yes.
18  Q.  What else did Al-'Owhali tell you, if anything, that
19  happened while he was in Harun's house on Wednesday and
20  Thursday before the bombing?
21  A.  Al-'Owhali had explained to me that both on the -- between
22  the 4th and up to the day of the bombing that he made a series
23  of telephone calls to his friend in Yemen, Ahmed al Hazza, who
24  had fought with him in the C Formation battle I described
25  earlier today.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2026

1371BIN4

### Gaudin - direct

1        Al-'Owhali explained to me he made these phone calls,

2    they were collect calls that he had made from Harun's house,

3    and the number that he called in Yemen to reach Ahmed al Hazza

4    was 9671200578, he called that number to reach Ahmed al Hazza.

5    Q.  Did he tell you when the last call that he made to that

6    number was?

7    A.  Al-'Owhali explained to me the last phone call he made was

8    approximately an hour before the bomb exploded on Friday, the

9    7th of August.

10   Q.  Did Mr. Al-'Owhali tell you anyone else made phone calls

11   from Harun's house during this time period?

12   A.  Al-'Owhali explained to me that Azzam, Jiad Ali, also made

13   a series of phone calls to his family, to Azzam's family in

14   Saudi Arabia on those last few days before the bomb exploded.

15   Q.  Did Mr. al-'Owhali tell you about any instructions that

16   were made to the group during this time?

17   A.  Yes, he did.  Al-'Owhali explained that he was told from

18   both Harun and Azzam that Saleh had put out an order that

19   anyone even remotely associated with the bombings had to leave

20   the area immediately, had to leave before the explosion

21   actually took place.  Then Al-'Owhali gave me a couple of

22   examples of what that was.

23       Al-'Owhali said to me, for instance, whoever bought

24   the truck, the person responsible for buying the truck, that

25   person would have to leave immediately; and also anyone who

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2027

1371BIN4

Gaudin - direct

1   even knew what Saleh was doing would also have to leave before

2   the attack occurred.  The only people that should be remaining

3   in Nairobi on the day of the attack are the people who were

4   necessary to actually carry the attack out.

5   Q.  Now turning to the day of the bombing, what did

6   Mr. al-'Owhali tell you about the day of the bombing, August

7   7th?

8   A.  Well, on the 7th of August, on the day of the bombing,

9   August 7, Al-'Owhali had made his last phone call to his

10  friend Ahmed al Hazza around 20 past 9 in the morning.  At

11  about 9:45, they began to leave Harun's house.

12          Al-'Owhali explained that he was wearing black shoes,

13  blue jeans, white-colored shirt with short sleeves with

14  buttons that didn't go all the way down the shirt, just a few

15  buttons, and that the shirt had some sort of colored pattern

16  on it.  He also had a jacket, a blue cotton jacket, and inside

17  the jacket is where his pistol was, in the pocket of the

18  jacket, and he also had four of what he described to me as

19  these homemade stun grenades tucked into his belt.

20          He described these stun grenades to be comprised of a

21  quarter finger of TNT, some aluminum powder and some black

22  tape.  He had those tucked in his belt.  Around 9:45 that

23  morning, they departed Harun's house.  Harun would be driving,

24  and was driving, according to Al-'Owhali, a white pickup truck

25  and that Harun would be acting as the lead vehicle towards the

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION - FILED UNDER SEAL

2028
1371BIN4

Gaudin - direct

1   U.S. Embassy in Nairobi. Azzam would be the driver of the

2   bomb truck, the bomb vehicle, and Al-'Owhali was the only

3   passenger in the truck.

4   Q. What did Mr. al-'Owhali tell you about what he did on the

5   way to the embassy?

6   A. Okay. On the way to the embassy, Azzam had instructed

7   Al-'Owhali that your wearing that jacket may cause you

8   problems at reaching the stun grenades, you should take your

9   jacket off. So Al-'Owhali did take his jacket off.

10        They continued to drive towards the embassy. Harun

11  is driving the lead vehicle, Al-'Owhali and Azzam are

12  following them in the bomb vehicle, and on their way

13  Al-'Owhali described to me that he and Azzam were listening to

14  an audio cassette of what he described as chanting poems for

15  motivation in preparing to die on the way to the embassy.

16  Q. Now, did Harun go all the way to the embassy with Azzam

17  and Al-'Owhali?

18  A. Al-'Owhali explained to me that Harun didn't drive all the

19  way, they drove to a certain point, a traffic circle or

20  roundabout or something, and pulled off to the side and that

21  Azzam and Al-'Owhali continued on in the direction of traffic

22  along Haile Selassie Avenue towards the embassy.

23  Q. What happened when they reached the embassy?

24  A. Upon reaching the rear parking lot of the embassy, Azzam

25  pulls into the embassy and starts to head for the drop bar in

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

1371BIN4                                                          2029
                        Gaudin - direct

1    the back of the U.S. Embassy by the parking lot.  At that
2    point another vehicle had just exited that drop bar from the
3    U.S. Embassy and it created a little bit of a backup.  So
4    Azzam wasn't able to get exactly where he wanted to go.
5           As Azzam gets close to the drop bar, Al-'Owhali jumps
6    out of the vehicle and starts to go towards the guard.  And he
7    realized that his pistol that he was supposed to use to
8    confront the guard was in his jacket pocket that he had took
9    off in the truck, so he tells me that he hesitated for a
10   second to go back to the truck to get the gun but realized
11   that that was probably going to -- it was too much time, he
12   didn't want to do that.  So instead of using the gun, he ends
13   up pulling out one of those stun grenades in his right hand
14   and approaches the guard and demands that the guard open the
15   drop bar in English.  And Al-'Owhali explained to me that the
16   guard didn't move fast enough, so he pulls the pin with his
17   left hand and he throws the stun grenade in the direction of
18   the guard and that that caused a loud explosion and the guard
19   ran.
20          At that point, other people started to run also,
21   other people started to scatter from the area from the loud
22   explosion, and Azzam started to move the truck.  And as
23   Al-'Owhali described it, Azzam moved the truck somewhat
24   parallel to the embassy.  Al-'Owhali says at this point Azzam
25   starts shooting directly at the U.S. Embassy with a pistol.

                SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION – FILED UNDER SEAL

2030

1371BIN4

Gaudin - direct

1           And Al-'Owhali explains between Azzam firing the

2    pistol at the embassy and the loud explosion that was created

3    from when he threw the stun grenade, people started to

4    scatter.  And Al-'Owhali explains to me at this point he

5    realized that his mission is complete, that he did exactly

6    what he was instructed to do.  His mission was to help Azzam

7    get the truck as close as possible to the embassy and to

8    scatter away the people, the Kenyan people in and around the

9    area.  Al-'Owhali says to him -- says to me that, at that

10   point, that had happened and it was no longer necessary for

11   him to die in the attack.

12           Al-'Owhali explained to me that the reason he had

13   died was the mission didn't go exactly point for point and

14   time to time the way it was supposed to.  Al-'Owhali explained

15   to me that he was fully prepared to die in carrying out the

16   mission and that that would equate to being a martyr, to reach

17   martyrdom, dying in completion of your mission.  But to die

18   after your mission had already been complete, Al-'Owhali

19   explains to me, is not martyrdom, it's suicide, and he

20   explains that suicide is -- it's not acceptable in his

21   religion and that that wasn't what his mission was.  To die as

22   a martyr carrying out the mission was fine, but there was no

23   reason for him to commit suicide.

24   Q.  So what did Al-'Owhali do?

25   A.  Al-'Owhali ran toward, he explains to me that he ran

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

2031

1371BIN4

Gaudin - direct

1    towards the co-op building, and as he was running towards the

2    co-op building, Azzam detonated the bomb, causing the

3    explosion.

4    Q.  What happened to Al-'Owhali after the explosion?

5    A.  Al-'Owhali says in the blast that he's knocked down and

6    suffers some injuries and that he's able -- he picks himself

7    up and is able to walk to a first aid station or a clinic to

8    receive treatment for his injuries.  Upon arriving at the

9    clinic, he realized that he still had one of those stun

10   grenades tucked into his belt, so he got it and he threw it in

11   a trash can in the clinic.

12           After receiving some initial first aid from the

13   clinic he's taken by an ambulance to an actual hospital, which

14   Al-'Owhali describes to me as the MP Sha Hospital.  Upon

15   arriving at the MP Sha Hospital, he actually receives stitches

16   to his forehead, to his right hand, his wrist, I don't

17   remember which one, but inside both hands and also in the

18   center of his back.

19           After receiving treatment at the hospital, Al-'Owhali

20   starts to leave the hospital and is going to go back to

21   Harun's house.  So Al-'Owhali explains to me that he was

22   supposed to die in this attack.  There was absolutely no

23   extraction plan for him to leave the country.  All his plane,

24   his plane tickets, his passport in the name of Khalid Salim

25   Bin Rashed, the Yemen passport, a bunch of other travel

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2032

1371BIN4

Gaudin - direct

1   documents as well as Azzam's documents were all left with

2   Harun.  So he wanted to get back to Harun's house.

3           When he got out in front of the hospital, he went to

4   reach to see if he had any money on him.  He realized that he

5   still had the keys to the back of the truck and that was where

6   in case the bomb didn't get detonated by Azzam, he was

7   supposed to open the back of the truck and throw the stun

8   grenades in to manually detonate it.  He had the keys and he

9   also had three bullets in his pocket as well from that pistol.

10          So he goes back inside the hospital, and inside the

11  hospital he goes into the men's room and he tells me that he

12  washes the keys and the bullets in the sink to remove any

13  fingerprints on them and then tries to flush them down the

14  toilet to get rid of them.  But for some reason, he explained

15  that he couldn't get the toilet to flush them down, so he

16  retrieved them from the toilet and he hid them on a ledge in

17  the men's bathroom and then left the hospital.

18          MR. BUTLER:  Your Honor, may I approach?

19          THE COURT:  Yes.

20  Q.  Agent Gaudin, I have placed before you Government Exhibit

21  558 and 559 for identification.  Do you recognize Government

22  Exhibits 558 and 559?

23  A.  Yes, I do.

24  Q.  What are Government Exhibits 558 and 559?

25  A.  There's two keys and three bullets.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

2033

1371BIN4

Gaudin - direct

1    Q.  Did you show these items to Mr. al-'Owhali during the

2    course of your interview?

3    A.  Yes, I did.

4    Q.  What did Mr. al-'Owhali say when you showed him these

5    items?

6    A.  Al-'Owhali said to me that these are the keys and the

7    bullets that he hid in the MP Sha Hospital's bathroom, the

8    men's room.

9        MR. BUTLER:  Move Government Exhibits 558 and 559

10   into evidence, your Honor.

11       MR. COHN:  No objection.

12       THE COURT:  Received.

13       (Government Exhibits 558 and 559 received in

14   evidence)

15       MR. BUTLER:  May we publish a photo of those items to

16   the jury, your Honor?

17       THE COURT:  Yes.

18   Q.  Just to be clear, Agent Gaudin, Government Exhibit 558 is

19   what?

20   A.  They are two keys, Tri-Circle keys, they're called, the

21   name of the company of the keys.  I believe there's another

22   picture on the back that says Tri-Circle.

23   Q.  Can we show Government Exhibit 559, please.

24       What is Government Exhibit 559?

25   A.  Okay, it's actually three bullets.  You may see four

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2034

1371BIN4

Gaudin - direct

1    objects there, but one of the bullets is removed, the actual

2    bullet is removed from its casing.  That was done at the

3    laboratory.  The other two bullets are still intact.

4    Q.  After Mr. al-'Owhali left the MP Sha Hospital, what if

5    anything did he tell you that he did?

6    A.  Mr. al-'Owhali explained that he tried to find Harun's

7    house.  He left on foot but he couldn't find Harun's house, so

8    he decided to take a taxi back to what he explained to me as

9    the only other place he knew to go.  He went back to the

10   Ramada Hotel, which is the hotel he had checked in when he

11   arrived in Nairobi on Sunday, the 2nd.

12   Q.  What happened when he arrived in the Ramada Hotel?

13   A.  When he arrived at the Ramada Hotel, he had no money and

14   he went in to talk to the hotel clerk and explain to the hotel

15   clerk, I was here on the 2nd of August, I'm sure you remember

16   me, you keep my name in the ledger, I was here, I'm from

17   Yemen, but I lost all my travel documents and I was injured in

18   the explosion that happened earlier today.  Could you please

19   give me some credit and let me stay here, pay for my taxi, and

20   I'll contact people who will send me money and then I'll be

21   able to pay you whatever I owe you.  And the hotel clerk,

22   Al-'Owhali explained to me the hotel clerk agreed to do that.

23   Q.  Did he tell you what room he checked into?

24   A.  Al-'Owhali told me at that point he checked into room

25   number 7 at the Ramada Hotel.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1371BIN4                                                           2035

                            Gaudin - direct

1   Q.   What happened after he checked into room 7 at the Ramada
2   Hotel?
3   A.   Al-'Owhali explained to me that the clerk of the hotel
4   went into the town and tried to find another person from his
5   country, another person from Yemen who may be able to provide
6   Al-'Owhali with some help because he obviously needed help
7   from being injured in the explosion.
8          So this hotel clerk does find a person from Yemen and
9   that person gets a set of clothes for Mr. al-'Owhali.
10  Al-'Owhali takes off the clothes he was wearing.  Al-'Owhali
11  explained that he had blood on them, so he took the bloody
12  clothes off and he put them in a drawer inside of room 7 and
13  then put on the new clothes that this other person from Yemen
14  had just provided him.
15  Q.   What else did Al-'Owhali tell you that he did during this
16  period?
17  A.   Al-'Owhali explained to me that the next morning, the 8th,
18  he began to make a series of phone calls back to his friend in
19  Yemen, Ahmed al Hazza, at the number I had said earlier.
20  Al-'Owhali explained to me that again he had no plans to leave
21  the country.  He was supposed to die, he was prepared to die
22  in the explosion.  He had no money, no passport, no plane
23  tickets left, that was all left in the room.
24         He explains that calling his friend Ahmed al Hazza
25  was very frustrating for him because he was afraid the phones

                  SOUTHERN DISTRICT REPORTERS  (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2036

1371BIN4

Gaudin - direct

1   were being tapped or monitored, so when he would call him he

2   was talking to him as cryptically or as coded as he could.  So

3   he had to make a series of different phone calls to Ahmed al

4   Hazza and eventually get the point across that, I need help, I

5   need you to wire transfer me money and I also need you to get

6   me travel documents so that I can leave.  But ensure that

7   these travel documents that you get to me, make sure that they

8   are stamped, there's an entry stamp as entering Kenya after

9   the 7th of August, not before.

10          Also, he instructed Ahmed al Hazza to telephone

11  Khalid for him and give him the following message, and the

12  message was "tell Khalid I did not travel."  And Al-'Owhali

13  explained to me that that was code that Khalid would

14  understand is that Al-'Owhali didn't die while carrying out

15  the mission.

16  Q.  Did Mr. al-'Owhali eventually receive this wire transfer?

17  A.  Al-'Owhali explained to me that the money did eventually

18  get wire transferred to him and Al-'Owhali said that he picked

19  up a thousand dollars, a thousand U.S. dollars at a jewelry

20  store or a gold store near the Ramada Hotel called Sheer Gold

21  and he did receive that money.

22  Q.  What happened after Al-'Owhali received the thousand

23  dollars?

24  A.  Al-'Owhali explained to me that plans were in the works

25  for this Ahmed al Hazza to come to assist Al-'Owhali getting

PROTECTED INFORMATION - FILED UNDER SEAL

2037

1371BIN4

Gaudin - direct

1   out of the country, but Al-'Owhali explains that he was

2   arrested on the 12th. Had he been arrested the day or two

3   after, maybe he, both he and Ahmed al Hazza would have been

4   arrested instead of just him.

5   Q. Did this essentially complete Mr. al-'Owhali's story on

6   the 22nd?

7   A. Yes, it did.

8   Q. And did you ask him any questions following this story?

9   A. Yes, I did. In addition --

10  Q. What did you ask him?

11  A. In addition to making sure that I had the details of what

12  he explained to me as correct as I could, I asked him the

13  question of, what would it take for this fighting to stop, you

14  know, how can we prevent this, how can we end this?

15      Al-'Owhali explained to me that there were several

16  conditions that would have to be met, and he said the first

17  condition was that his -- he first said that the United States

18  is going to remain a target; that there's -- that the planning

19  to target the United States will not stop unless certain

20  conditions were met. First condition was that there would

21  have to be no U.S. presence, absolutely no U.S. presence

22  anywhere in the Arabian Peninsula; that the U.S. would also

23  have to stop providing any type of support for the enemies of

24  the Muslims, and he included specifically Israel and the

25  Serbs; and then the third statement was that the U.S. would

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

2038

1371BIN4

Gaudin - direct

1    have to stop using its influence from preventing Muslims from

2    instituting the sharia worldwide.

3    Q.  Did Mr. al-'Owhali identify a photograph of Azzam, also

4    known as Jiad Ali?

5    A.  Yes, he did.  When I presented him a photograph to

6    identify, Al-'Owhali picked up the photograph and he said this

7    is Azzam, also known as Jiad Ali.  He called Azzam a hero and

8    then he kissed the picture.

9    Q.  How did this interview end?

10   A.  The interview ended where Mr. al-'Owhali stated that he

11   would like to recite a poem to the investigators and he wanted

12   the official from the Department of Justice to also stay and

13   hear the poem as well.  So Al-'Owhali began to say this poem,

14   and it wasn't so much normal speak, it was a chanting, almost

15   a singing-type poem.

16          He was doing it in his -- in Arabic, in his language

17   and through the translator I was able to determine that this

18   particular chanting poem questioned whether or not two friends

19   would ever meet again in paradise, and Al-'Owhali explained to

20   me that this chanting poem is what he and Azzam were listening

21   to as they were driving for motivation, they were listening to

22   for motivation as they were driving to attack the U.S.

23   Embassy.  And as Al-'Owhali was reflecting on his friendship

24   with Azzam and this chanting poem, he started to cry.

25          MR. BUTLER:  No further questions, your Honor.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION - FILED UNDER SEAL

2039

1371BIN4

Gaudin - direct

1      THE COURT: All right, ladies and gentlemen, I think

2   we'll call it a day. Have a pleasant evening. Please

3   remember about not reading or listening or watching anything

4   about this case, and we'll resume tomorrow at the regular

5   time.

6          (Jury not present)

7      MR. COHN: Your Honor, before Agent Gaudin leaves,

8   would your Honor instruct him that although no questions has

9   been asked, the government has stopped and he's under cross

10  and he's not to talk with the government overnight?

11     MR. BUTLER: Your Honor, cross hasn't begun, so --

12     MR. COHN: I'll ask a question for that.

13     THE COURT: No. No.

14     MR. BUTLER: Mr. Cohn requested that we break after

15  direct.

16     THE COURT: Yes. I decline to give that instruction.

17     Anything that has to be addressed before the

18  resumption of the proceedings before the jury tomorrow?

19     MR. COHN: Your Honor, we are checking. It's our

20  feeling, and I just can't document it yet, that one of the two

21  numbers that was mentioned, telephone numbers that was

22  mentioned by Agent Gaudin as being given on the 22nd was in

23  fact being given during the period before the 22nd. We're

24  checking. We have no way of knowing that. We'll advise the

25  Court.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

PROTECTED INFORMATION – FILED UNDER SEAL

SECRET/NOFORN

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ZAYN HUSAYN,                     )
                                 )
            Petitioner,          )
                                 )
    v.                           )          Civil Action No. 08-1360 (RWR)
                                 )
ROBERT GATES,                    )
                                 )
            Respondent.          )
_____)

Transcript of Ressam Re-Sentencing, *United States v. Ressam*,
No. CR99-666JCC (Dec. 3, 2008)

SECRET/NOFORN

PROTECTED INFORMATION – FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

```
 1                        UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
 2                                  IN SEATTLE

 3

 4   UNITED STATES OF AMERICA,          )
                                        )   NO. CR99-666JCC
                          Plaintiff,    )
 5                                      )
                   vs.                  )
 6                                      )
                                        )
     AHMED RESSAM,                      )
 7                                      )
                          Defendant.    )
 8                                      )

 9

10                              SENTENCING

11

12

13            BEFORE THE HONORABLE JOHN C. COUGHENOUR

14
                              December 3, 2008
15

16

     APPEARANCES:
17
     Jeffrey C. Sullivan
18   United States Attorney

19   Mark N. Bartlett
          and
20   Helen J. Brunner
     Assistant United States Attorneys
21   Representing the Plaintiff

22   Thomas W. Hilier
     Attorney at Law
23   Representing the Defendant

24   Also present:

25   Interpreter:  Komal Abou-Zaki
```

PROTECTED INFORMATION - FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

2

```
 1            THE CLERK:  Case number CR99-666 United States versus
 2   Ressam.  Counsel please make your appearances.
 3            MR. BARTLETT:  Good morning, your Honor, Mark Bartlett
 4   on behalf of the United States.  Seated at counsel table also is
 5   our appellate supervisor Vicki Brunner and the US Attorney Jeff
 6   Sullivan.
 7            THE COURT:  Mr. Bartlett.
 8            MR. HILIER:  Good morning, your Honor.  Tom Hilier with
 9   and on behalf of Mr. Ressam.  Your Honor, Mr. Ressam has
10   requested and been granted leave to represent himself at this
11   sentencing hearing.  I will, with the Court's permission, put on
12   the record some preliminary matters related to having reviewed
13   materials relative to the sentencing.
14            THE COURT:  All right.  Why don't you go ahead and do
15   that?
16            MR. HILIER:  Thank you.  If it please the Court and
17   counsel.  Your Honor, Mr. Ressam, in anticipation of sentencing
18   this morning, has had the opportunity to review the government's
19   sentencing memorandum, which was reviewed with him with an
20   interpreter this week at the SeaTac Federal Detention Center.
21        In addition, this morning Mr. Ressam and I had the
22   opportunity to review a letter which was provided to the Court
23   from a Mr. Gordon Haberman.
24        And, finally, your Honor, Mr. Ressam and I discussed an
25   updated review of the presentence report, which hasn't really
```

3

1    been updated, is my understanding, but is rather the same report

2    that we prepared back in 2005.  Mr. Ressam is aware of that.

3         I did request of the Probation Office that the report include

4    an update concerning conditions of confinement.  I think that is

5    important information.  I would ask that the Court ask Probation

6    to ultimately do that.  Mr. Ressam is currently confined at

7    Florence in super max in solitary confinement and, of course, the

8    conditions of that sort of confinement are relevant, as set forth

9    in our original sentencing memoranda.

10        In that regard, your Honor, we renew the objections to the

11   guideline calculations as presented in our original sentencing

12   memoranda and supplemental memoranda back in 2005.

13        THE COURT:  I will direct the probation office to do an

14   update regarding the conditions of confinement.

15        Mr. Bartlett, do I understand correctly the government

16   concurs with the guideline calculations that are contained in the

17   presentence report?

18        MR. BARTLETT:  That is correct, your Honor.

19        THE COURT:  Okay.  In the time since Mr. Ressam's

20   July 27th, 2005 sentencing, the Ninth Circuit issued an opinion

21   in *United States versus Carty*, which for the first time required,

22   among other things, that the district judge begin sentencing

23   proceedings by determining the applicable Guidelines range.

24   Because I did not do so at Mr. Ressam's original sentencing,

25   because I had assumed that everybody was reading from the same

PROTECTED INFORMATION – FILED UNDER SEAL

4

1    page at that time, the Ninth Circuit has remanded for

2    resentencing. Therefore, in accordance with *Carty*, I find and

3    rule as follows:

4        18 USC Section 3553 provides me with the overarching

5    statutory charge to impose a sentence sufficient but not greater

6    than necessary to reflect the seriousness of the offense, promote

7    respect for the law and provide just punishment; to afford

8    adequate deterrence; to protect the public; and to provide the

9    defendant with needed educational or vocational training, medical

10   care or other correctional treatment.

11       I will begin the process of arriving at a sentence that fits

12   such a description by determining the applicable Guidelines

13   range, and then of course I will give the parties an opportunity

14   to argue regarding the appropriate sentence. The Guidelines are

15   the starting point and the initial benchmark and are to be kept

16   in mind throughout the sentencing process. After I calculate

17   this Guidelines range, the parties will be given a chance to

18   argue for a sentence they believe is appropriate.

19       The November 2000 edition of the United States Sentencing

20   Commission Guidelines Manual has been used in this case to avoid

21   violation of the ex post facto clause of the United States

22   Constitution. The government questions whether the 2008

23   Guidelines Manual could be used because the sentencing Guidelines

24   are no longer mandatory after *United States versus Booker*.

25   Regardless, the government does not argue strenuously for

PROTECTED INFORMATION – FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

5

1    application of the 2008 Guidelines, recognizing that although the

2    new Guidelines would result in a higher total offense level by

3    one point, they would not result in a different advisory

4    Guidelines range.  Accordingly, the Court will follow the

5    Guidelines calculation set forth in the 2005 presentence report,

6    which was based on the 2000 Sentencing Guidelines Manual and was

7    prepared in consultation with the Sentencing Commission.

8        Mr. Ressam was convicted of nine counts.  Count 1 charged

9    Defendant with Committing an Act of Terrorism Transcending a

10   National Boundary, in violation of 18 USC Section 2332b(a)(1)(B).

11   This crime is not listed in the statutory index of the Guidelines

12   Manual.  Therefore, Guidelines Section 1B1.2 directs the Court to

13   use the most analogous guideline.  The Court finds that

14   Section 2K1.4, which covers offenses involving property damage by

15   use of explosives, is the most analogous guideline for this

16   count.  Because the offense created a substantial risk of death

17   or serious bodily injury to any person other than the participant

18   in the offense, and that risk was created knowingly, the base

19   level of the offense is 24.

20       Under Section 3A1.4(a), since the offense is a felony that

21   involves a federal crime of terrorism, there is a 12-level

22   increase, for a total adjusted offense increase of 36.  In

23   addition, Defendant's criminal history category is Category IV.

24   Therefore, the applicable sentencing guideline range for Count 1

25   would be 324 to 405 months.  However, the statutory maximum for

PROTECTED INFORMATION - FILED UNDER SEAL

6

1  this crime is 25 years, and therefore the guideline range for
2  Count 1 is 300 months. Any sentence imposed for this crime must
3  run consecutively with any other term of imprisonment.
4      Counts 2, 6, 7 and 8 are grouped because they involve the
5  same victim and two or more acts connected by a common scheme or
6  plan. I will refer to these counts collectively as Group 1.
7  Under Section 3D1.3 the offense level applicable to Group 1 is
8  the highest offense level of the counts in Group 1. Count 6,
9  Smuggling, has the highest offense level. The guideline
10 applicable to this offense contains a cross-reference that states
11 that if the offense involves a contraband item covered by another
12 guideline, I should apply that guideline if the resulting offense
13 level is greater than that determined under Section 2T3.1. Thus,
14 turning to Section 2K2.1, which applies to the unlawful
15 transportation of firearms, the base offense level for Group 1 is
16 20 since the offense involved a firearm as described in
17 Section 26 USC 5845(a), which includes destructive devices, and
18 the defendant is a prohibited person. In addition, there is a
19 one level increase because the offense involved four firearms or
20 destructive devices. There is also a two-point upward adjustment
21 because the offense involved a destructive device. Further,
22 evidence indicates that Defendant knew the devices would be used
23 in connection with another felony offense, warranting a
24 four-level upward adjustment under Section 2K2.1(b)(5). Finally,
25 there is one victim-related adjustment applicable to Count 6, a

PROTECTED INFORMATION - FILED UNDER SEAL

7

 1    12-point upward adjustment pursuant to Section 3A1.4(a) for

 2    committing a felony that involved or was intended to promote a

 3    federal crime of terrorism.  These enhancements result in an

 4    adjusted total offense level of 39 for Group 1.

 5         Counts 3, 4 and 5 are grouped pursuant to Section 3D1.2(b)

 6    because they involve the same victim and two or more acts

 7    connected by a common scheme or plan.  I will refer to these

 8    counts collectively as Group 2.  Under Section 3D1.3(a) the

 9    offense level applicable to Group 2 is the highest offense level

10    of the counts in Group 2.  Count 3, Possessing False

11    Identification Documents, results in the highest guideline range,

12    because the guideline applicable to this offense contains a

13    cross-reference to Section 2X1.1.  The cross-reference is

14    applicable if the defendant used a passport in the commission of

15    a felony offense, other than an offense involving violation of

16    the immigration laws, and if it results in a higher offense

17    level.  In this case the defendant used a fraudulent Canadian

18    passport to enter the United States to commit an act of

19    terrorism.  Therefore, I am instructed to use the sentencing

20    guideline for attempt, solicitation or conspiracy with respect to

21    the felony offense described in Count 1.  Accordingly, the base

22    offense level is 24, plus a 12-point adjustment pursuant to

23    Section 3A1.4(a) for committing a felony that involved or was

24    intended to promote a federal crime of terrorism.  Accordingly,

25    the adjusted offense level for Group 2 is 36.

PROTECTED INFORMATION - FILED UNDER SEAL

8

1       Section 3D1.4 provides that groups one and two are each
2   assigned one unit, resulting in a two-level increase to the group
3   with the highest offense level. This yields an adjusted offense
4   level of 41 for Counts 2 through 8. Under Section 3A1.4(b), a
5   defendant's criminal history category shall be VI for offenses
6   intended to promote a federal crime of terrorism. Therefore, the
7   applicable sentencing guideline range for Counts 2 through 8 is a
8   sentence of 360 months to life.

9       Count 9, Carrying an Explosive Device During the Commission
10  of a Felony, in violation of 18 USC Section 844(h)(2) requires
11  the Court to impose a ten-year mandatory sentence of imprisonment
12  to run consecutively to all other charges.

13      In sum, based on a total offense level of 41 and a criminal
14  history category of VI, the guideline range of imprisonment on
15  Counts 2 through 8 is 360 months to life. The term of
16  imprisonment imposed on Count 1 is to run consecutively to the
17  term of imprisonment imposed on Counts 2 through 8. The
18  guideline range on Count 1, based on the total offense level of
19  36, and a criminal history category of VI, is 324 months to 405
20  months. However, since the maximum sentence the Court may impose
21  on Count 1 is 25 years, the guideline sentence is 300 months.
22  Therefore, the combined guideline range for Counts 1 through 8 is
23  660 months to life. Finally, the sentence on Count 9 requires a
24  ten-year mandatory consecutive sentence.

25      Having determined the applicable Guidelines range let me now

PROTECTED INFORMATION — FILED UNDER SEAL

9

```
 1   hear from the Defendant or, if applicable, Mr. Hilier regarding
 2   the sentence he believes is appropriate.
 3       Mr. Ressam, do you wish to be heard, sir?
 4           THE DEFENDANT:  Yes.
 5           MR. HILIER:  Mr. Ressam would like to be heard.
 6           THE COURT:  Please step up to the lectern.
 7           MR. HILIER:  Approach the podium, your Honor?
 8           THE DEFENDANT:  Thank you for giving me the opportunity
 9   to present myself.  I suffered severe shock after the trial and I
10   lost my mental faculty and I did not know what I was saying.  The
11   government attorney and the investigator, they know about my
12   mental condition that I was going through, and about my mental
13   faculty and the procedure exposed to their own interests.  They
14   interpret some of my statements to suit their interests.  And the
15   statement that was put in my mouth, which I said yes, because --
16   due to the extreme mental exhaustion I was going through.  I also
17   am subject of pressures put upon me by the attorneys and the
18   investigators.
19       The evidence presented in court should be obtained from a
20   solid source that cannot be doubted.  But if the evidence and the
21   statements are obtained from dubious sources or under pressure or
22   a threat or from a mental incompetent source it should not be
23   admitted.  And that is the situation I was in.
24       I sent in the past a letter to the government attorney Joe
25   Bianco, in which I retrieved all my statements that I gave in the
```

PROTECTED INFORMATION — FILED UNDER SEAL

10

1   investigation in the past; all those I gave during the testimony

2   of Makhtar Haouari in the New York court because I neither

3   proceed my mental faculties (sic) or I know what I was saying.

4       The New York judge was suspicion of my letter, and he thought

5   that I was doing that because -- and I did not because in

6   order --  He thought that I was doing that because I had nothing

7   to lose and because I was already tired.  I did not do that in

8   order to win or to lose.  First, I did that because I was not

9   mentally competent and I did not know what I was saying.  Second,

10  I did that because -- in the presence of that judge.  I retract

11  all.  I repeat, all of the statements that I made in the past and

12  do not want my word counted in my trial.  So sentence me to life

13  in prison or as you wish.  I have no objection to your

14  sentencing.

15      I want from you and from the New York justice to take another

16  look as to Mokhtar Haouari case.  Sentencing should set when the

17  evidence at the hand is absolute, and look if the evidence is in

18  doubt it would be preferable to rescind the decision.  I go to

19  different subject.

20      I will move to the case about Abu Doha and Samir Mohamed.

21  Previously the government attorney called me, Bruce, about to

22  testify in the case of Abu Doha and Samir Mohamed in front of a

23  jury in New York.  At the beginning I refused, and then I accept

24  because I could not find an alternative to that.  And also in

25  order to appear at the earliest possible time in the court for my

PROTECTED INFORMATION – FILED UNDER SEAL

1  sentencing.

2      The later reason will affect the case of Abu Doha and Samir

3  Mohammed and cause their cases to be dismissed in America.

4      When I appeared in front of the jury in New York I retrieved

5  almost all the statements that I made in the past as to Abu Doha

6  and Samir Mohamed.  I indicate in my earlier statement because I

7  did not know what I was saying.

8      Later on the government attorney, attorney Bruce, in a

9  session attended by two of the FBI investigators, and the lawyer

10  Tom Hilier, and the lawyer Michael Filipovic and interpreter

11  Walid (phonetic) told me that I was lying.  Since that attorney,

12  attorney Bruce, believed that I was lying he should have charged

13  me with perjury because the American law dictate that.  Or would

14  that not serve your interest?  And you are behaving according to

15  your interest and not according to the law.  The attorney Bruce

16  believes that I lie so how can he take my statement and present

17  it in the courts?  Isn't that a crime?  And then to be a

18  criminal?

19      I have retrieved all the past statements that I made in the

20  jury about Abu Doha and Samir Mohamed in front of the jury

21  presence.  So why the government attorney and other holding on my

22  initial statement?  Is it to lie to the people or gain publicity

23  based on lies?

24      I restate my words finally, I retrieve all the statements

25  that I made previously to the investigator, so do not count on

PROTECTED INFORMATION — FILED UNDER SEAL

1    them because they were wrong.

2        I do not want to say a single word about my trial.  Sentence

3    me to life in prison or anything you wish.  I will have no

4    objection to your sentence.  Thank you.

5            THE COURT:  Mr. Bartlett.

6            MR. BARTLETT:  May it please the Court, Mr. Hilier,

7    Mr. Sullivan, Ms. Brunner.  On April 6th, 2001, this defendant

8    was convicted following a jury trial of some of the most serious

9    crimes a person can commit within the United States.  Count 1

10   convicted him of Conspiring to Commit an Act of Terrorism

11   Transcending National Boundaries.  The eight other convictions

12   involved explosive and false document related crimes.

13       The defendant did not just commit a technical violation of

14   the law or show a momentary lapse in judgment.  Instead, the

15   defendant chose to undertake a series of carefully calculated

16   actions over a period of several years that he hoped would

17   culminate in the senseless murder of countless innocent men,

18   women and children in the Los Angeles International Airport on

19   the eve of the millennium.

20       The defendant hoped to not only kill as many people as he

21   could, but he also hoped that his senseless act of violence would

22   strike terror into our country, that it would disrupt the

23   transportation system in our major urban area and in fact cripple

24   our ability to govern.

25       As this Court wrestles with trying to determine what is the

PROTECTED INFORMATION — FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION - FILED UNDER SEAL

```
 1   appropriate sentence for this defendant, I would ask you to keep
 2   one image in your mind.  During the trial of this defendant, and
 3   actually during the April 2005 initial sentencing hearing, the
 4   Court and the public had a chance to see a very short video,
 5   23 seconds long.  That video depicted a car sitting in the middle
 6   of an empty field.  Seven seconds into that video that car is
 7   shredded; it is ripped apart.  That showed part of the bomb
 8   material this defendant was bringing.  As the Court watched, the
 9   car was strewn across that field.
10       What many forget is that video doesn't depict the bomb he was
11   actually planning on putting into LAX on the millennium.  The
12   actual bomb he was actually planning on putting into LAX was 40
13   times greater than that depicted in the video.
14       So as we sit here today, I would ask the Court to think about
15   the number of people that would have been killed, the
16   destruction, the carnage, the disruption that would have been
17   inflicted upon totally innocent people had this defendant's
18   dogged efforts come to fruition, then determine what is the
19   appropriate sentence for a person who dedicated much of his adult
20   life to making sure that nightmare became a reality.
21       The Court has very carefully gone through the sentencing
22   guideline calculations, and I agree totally with all of the
23   Court's assessment.  The bottom line, of course, even after
24   Booker, is that we are all going to look at the Guidelines.  And
25   in this case the low end, the minimal sentence recommended by the
```

PROTECTED INFORMATION - FILED UNDER SEAL

14

1   Guidelines, is 65 years in jail, with the upper end being life.

2       What that tells the Court is this is the most serious crime

3   virtually anyone can face in the United States.

4       Before discussing the sentencing factors in 3553 I want to

5   take just a brief moment to address one issue.  The defense

6   argued on several occasions during the initial sentencing hearing

7   that this Court should start its analysis of what is the

8   appropriate sentence for this defendant at 25 years, because that

9   is an offer that Jerry Diskin conveyed prior to trial.

10      I strenuously object to that argument on two different

11  grounds.  First of all, just legally it is improper.  It inserts

12  the Court into the delicate process of plea negotiations, and

13  that is an area where no court wants to involve itself.  But more

14  fundamentally, factually it is just simply inaccurate.  That

15  25-year offer was not an appropriate sentence in the view of

16  anyone on the government's team.

17      Instead, as in with most pretrial offers, it is a

18  substantially discounted offer taking into account the risk of

19  litigation.  And in this case, as this Court knows more than

20  anyone, there were very substantial risks in litigation.

21      The government's evidence with regard to Count 1, the most

22  serious charge and the one that carried the most weight prior to

23  trial, was very thin.  And in fact during the trial some of the

24  most important evidence was developed.  That's what that 25-year

25  offer meant.

1     THE COURT:  I have a hard time accepting that,

2  Mr. Bartlett.  I mean, he was found with four timing devices --

3  Let me finish.  You just had to look at them.  They were like

4  something out of a TV show.  His fingerprints were all over them.

5  He had two quarts of the equivalent of nitroglycerin in the trunk

6  of his car, he had 100 pounds of fertilizer in the trunk of his

7  car.  When the customs agent held the jar up and turned it over,

8  he dove under the car, apparently in fear that it was going to

9  ignite.  Then when they pulled him out he shrugged his coat off

10  and ran.

11     MR. BARTLETT:  There is no question.  Perhaps I was

12  inarticulate, your Honor.  There is no question the government

13  had very substantial confidence in gaining convictions in this

14  case.  What I was trying to emphasize to the Court was the most

15  serious charge in this case was the Conspiracy to Commit an

16  International Act of Terrorism Transcending National Boundaries.

17  With regard to our evidence on that count, we were incredibly

18  thin.  And, in fact, as the rulings from this Court --

19     THE COURT:  I still have a hard time understanding that.

20  He crossed the border using a phony passport, carrying 100 plus

21  pounds of explosives.  Why was it so thin?

22     MR. BARTLETT:  With regard to proving what was his

23  intent with regard to those things.  First of all, proving that

24  he in fact knew what was in the car and that he was planning to

25  do something with those as opposed to, as this Court sees

PROTECTED INFORMATION – FILED UNDER SEAL

16

1    routinely, being a courier on behalf of someone else.

2            THE COURT:  Why would he have dove under the car when

3    the customs agent turned the one quart thing of nitroglycerin

4    upside down?

5            MR. BARTLETT:  The Court is free to make its own

6    assessment with regard to what the evidence is.  I can tell you I

7    have specifically spoken with the trial team.  I have talked with

8    them on how in their view the case was going.  We did not get in

9    the evidence with regard to Judge Bruguiere.

10       One of the most critical pieces of evidence, the actual

11   fingerprints of the defendant on the book we recovered from his

12   apartment wasn't even uncovered until midway through the trial.

13       I understand the Court's assessment and I understand --

14           THE COURT:  His fingerprints were all over the timing

15   devices.

16           MR. BARTLETT:  But regarding the proof of what was going

17   on with regard to what he was going to do with those.

18           THE COURT:  All right.

19           MR. BARTLETT:  The Court has gone through the Sentencing

20   Guideline calculations.  As I said, I accept and agree with them.

21   That is not the total end of the Guidelines calculations,

22   however, because in this case, as the Court is very well aware,

23   there was a 5K motion filed with regard to this defendant.  That

24   was based on his assistance with regard to the Haouari trial in

25   the Southern District of New York in 2001.  He also provided

17

```
 1   valuable information with regard to the actual bomb device that
 2   Richard Reid had in his shoe, that was important to analyze the
 3   bomb and also in protecting people. And he also provided
 4   information that, as Special Agent Humphries explained last time,
 5   was provided throughout the government. Most of that -- in fact
 6   the huge majority of that information was not new information to
 7   the intelligence side. But his testimony and his initial
 8   cooperation allowed the intelligence information to be thrown
 9   over and provided to law enforcement. And that was important.
10         THE COURT: Well, his testimony also was critical to the
11   conviction of Mr. Haouari.
12         MR. BARTLETT: That's right. Absolutely. He was one of
13   the two cooperating defendants, along with Mr. Meskini, his
14   testimony.
15      Clearly, given the defendant's statement today, we will
16   provide a record of his statement to the Southern District of
17   New York and also Mr. Haouari's defense counsel, and they can
18   make with it what they want.
19      A defendant's cooperation, however, is not a snapshot at any
20   given point in time. The defendant's cooperation is viewed as a
21   movie that covers everything.
22         THE COURT: The 5K is not a moving target, though.
23         MR. BARTLETT: It is, your Honor. As the Court sits
24   here it isn't trying to decide whether there should be a 5K
25   motion.
```

PROTECTED INFORMATION – FILED UNDER SEAL

18

```
 1            THE COURT:  That is already done.

 2            MR. BARTLETT:  Instead the Court has to weigh what is

 3   the value of that cooperation.  And in assessing that I would ask

 4   the Court to consider a number of factors.  The first is the

 5   timing of the defendant's cooperation.  This defendant, unlike

 6   most defendants, did not choose to cooperate prior to trial.

 7   Instead he waited until after trial, 18 months after he was

 8   arrested, months before 9-11.

 9       Last night I had the privilege of meeting Gordon Haberman.

10   Mr. Haberman is seated in the front row here.

11            THE COURT:  Let me interrupt, Mr. Bartlett.

12   Mr. Haberman, I have read your statement, and it will be made

13   part of the record.

14            MR. HABERMAN:  Thank you, your Honor.

15            MR. BARTLETT:  Mr. Haberman's daughter was killed in the

16   collapse of the World Trade Center on 9-11.  He told me he wanted

17   to be here for sentencing.  In fact, he said he would pay his own

18   way up to attend here, it meant so much to him.

19       His daughter had gotten engaged in September of 2001.  She

20   didn't live in New York.  She was actually back there on a

21   one-week training exercise at the World Trade Center.  Tragically

22   and ironically, it really wasn't even her week that she was

23   supposed to be back there.  She had traded with a friend who

24   wanted a different week.  And she lost her life.

25       Last night as we were talking to Mr. Haberman he told me --
```

PROTECTED INFORMATION – FILED UNDER SEAL

1    he said he can't help thinking what if this defendant had chosen

2    to cooperate immediately after 9-11, after he was arrested in

3    December 1999.  What if he had provided all of the information

4    immediately, information that would have and could have led to

5    the arrest of Abu Doha, Zabeda, maybe 9-11 wouldn't have

6    happened.  Can anyone answer that?  No.  In assessing how

7    valuable was this defendant's cooperation, the Court should take

8    into consideration the timing of it.

9         In assessing the cooperation, the Court also, clearly,

10   especially given the defendant's statement today, must look at

11   what happened subsequently.  The first big change, of course, was

12   after initially providing information about Abu Doha, that has

13   been withdrawn.

14        As this Court well knows, the defendant's original

15   debriefings provided critical information about Abu Doha, who is

16   without question one of Europe's highest ranking terrorists, with

17   direct links to Osama Bin Laden.  He is a person who recruited

18   and funneled scores of extremists, terrorists into the al Qaeda

19   training camps in Afghanistan.  He was not only a central figure

20   in this conspiracy, Mr. Ressam's conspiracy, but he was an

21   integral part in the aborted attack to bomb Christmas Market in

22   Strasbourg, France in 2000.  In March of 2002, the defense

23   themselves described Doha as, quote, a major player in the arena

24   of terrorist activity.

25        Before the defendant's sentencing in 2005, we told the Court,

1    if Mr. Ressam does not cooperate we will have to dismiss our

2    charges.  At that point the defense told the Court that they

3    thought that was, quote, unbelievable, and assured the Court even

4    if we did dismiss -- even if the Southern District of New York

5    had to dismiss their charges, other countries were lined up to

6    charge Doha and he would never see the light of day.  Now the

7    Court knows the facts.

8        Within weeks of Ressam's July 2005 sentencing, based on his

9    steadfast refusal to fulfill his promise to continue to

10   cooperate, the United States was forced to dismiss our charges

11   against Abu Doha and withdraw our extradition requests to

12   Great Britain.

13       Currently Doha is not indicted in any other country.

14   Ironically, Great Britain actually had criminal charges against

15   him which they dismissed when the Southern District charges were

16   filed, and they were unable to refile them.  He has been released

17   from custody.  Mr. Doha is living in England, fighting

18   extradition to Algeria.

19       The second significant change that has occurred since the

20   last sentencing is Samir Mohamed.  Mohamed was a Canadian

21   co-conspirator of Ressam, who was arrested at our request and

22   held in Canada for years as he fought extradition back to the

23   Southern District of New York.  Mohamed had provided critical

24   assistance in Ressam's millennium bombing plot.  As Robin Baker's

25   letter made clear to the Court, in addition to helping Ressam's

1   plot Mohammed himself had discussed committing his own terrorist

2   acts in Canada, involving a bombing and an attack on a Jewish

3   neighborhood in Montreal.

4       One month after this defendant's July sentencing in 2005 the

5   Southern District was forced to dismiss its charges and withdraw

6   its extradition request to Canada. Mr. Mohamed was released from

7   custody.

8       I want to emphasize to the Court it is not only that the

9   United States was forced to dismiss charges that should have been

10  brought against known, confirmed terrorists, and have them held

11  accountable for their charges, that is problematic but, in

12  addition, our government was put in a horrible situation. We had

13  gone to two of our closest allies, Great Britain and Canada, and

14  said, on our behalf arrest these people, on our behalf detain

15  these people, keep them in custody, and we promise we will bring

16  them back to the United States, we will try them, and they will

17  be held accountable. And then we have to go back to them and

18  say, sorry, we cannot fulfill our word. We are dismissing our

19  charges. It puts us in a horrible situation.

20      As this Court can really appreciate, it just doesn't put the

21  country in a horrible position, it puts the court system in those

22  countries in a horrible position. A judge just like yourself in

23  Canada and Great Britain had to take on these high profile cases,

24  had to make the difficult decisions to detain these defendants,

25  Doha and Mohamed, for years based on our word, only to suddenly

PROTECTED INFORMATION – FILED UNDER SEAL

22

```
 1   find that rug pulled out from under them and the charges
 2   dismissed.
 3        The defendant in his statements to the Court has tried to
 4   retract all of his prior statements.  I am absolutely not going
 5   to get into a factual argument with this defendant and with the
 6   Court about what he might or might not have said.  All I would
 7   ask the Court to do is look back, look back on the sentencing
 8   memorandums - not filed by the government - look back at the
 9   sentencing memorandums filed by this defendant in his original
10   sentencing memo.  And uniquely at that point in time the defense
11   chose to provide to this Court their notes - not our notes -
12   their notes of what this defendant had said in summary form about
13   these individuals, about Abu Doha, about Samir Mohamed.  And you
14   can look at their own notes as to what he really said.
15        There have been attempts by the defense to explain the
16   defendant's continued failure to cooperate against Doha and
17   Mohamed as being a mental breakdown; his heart is in the right
18   place, but he is incapable of doing that.  I think we have his
19   own statement today that proves unequivocally that is not the
20   case.
21        Even before today's statement the Court knew that wasn't
22   true, because in November of 2006 this defendant wrote a letter
23   to the Court.  The letter helped to set free his fellow
24   terrorists, Hassan Zemiri.  The Court of course was familiar with
25   the name Hassan Zemiri, because actually he had been brought up
```

PROTECTED INFORMATION – FILED UNDER SEAL

23

1    several times, first at the defendant's sentencing memorandum,

2    the defense reply memorandum and the cross-examination of Special

3    Agent Humphries, as a good thing, that this defendant had

4    provided critical information against Hassan Zemiri, who

5    currently is being held as an enemy combatant in Guantanamo Bay,

6    and as a result of that he was being detained, and that was a

7    good thing, and he should get credit for that.

8         The defense conceded he was a dangerous terrorist.  They had

9    to because he provided, of course, critical funds to the

10   defendant to help him pick out the plan to bomb LAX.  He provided

11   other material.  Most interestingly, in May of 2001, as soon as

12   Hassan Zemiri heard this defendant had chosen to cooperate, what

13   did he do?  He fled to the Tora Bora region of Afghanistan, where

14   he was eventually arrested fighting on behalf of the Taliban.

15        There has been no problem with this defendant's memory.  If

16   he wanted to he could continue to help us in critical ways.

17   Instead he has had a change of heart.  He wrote a detailed letter

18   to this Court.  He provided a detailed statement to this Court

19   right now.  And what is he saying?  I have a great memory; it is

20   a little bad right after a bad trial because it was so traumatic,

21   but I now have a great memory and I am telling you all of those

22   things I originally said are wrong and I am withdrawing them.

23   His memory, he claims, is perfect.  It just isn't going to be

24   used to help hold terrorists accountable for their actions.

25   Instead, now he is trying to use his position as a, quote,

PROTECTED INFORMATION – FILED UNDER SEAL

24

1  government cooperator to try to free as many terrorists as he

2  can.

3      He hasn't even stopped with his friend Hassan Zemiri.  In

4  addition, he has also provided aid to Adil Charkaoui, another

5  person he described in detail during his debriefing; a person who

6  had been at the training camps when he arrived in 1998; a person

7  that he knew attempted to acquire illegal weapons in Canada, and

8  when asked point blank indicated this was a person the Canadian

9  government should be afraid of, a danger.  He has now withdrawn

10  all of those allegations to try and help Mr. Charkaoui as he

11  attempts to avoid deportation in Canada.

12      We now know that the defense claims that this defendant's

13  heart is in the right place but he is simply mentally unable to

14  continue his cooperation is totally wrong, totally false.  His

15  memory is fine.  He simply does not want to help.  He does not

16  want to fulfill his obligation under the cooperation agreement.

17      To insure that the record is perfectly clear, had the United

18  States government known in May of 2001 what we know today, how

19  this was going to end up, we never would have entered into

20  cooperation with this defendant.  Any benefit he provided us

21  initially has been substantially outweighed by his reversal, and

22  now attempts to use his position as a cooperating defendant to

23  help his fellow terrorists.

24      In the post-*Booker* world the Court isn't just going to look

25  at what is the Sentencing Guidelines, what are the 5K motions,

PROTECTED INFORMATION – FILED UNDER SEAL

1  you are going to look at the 3553(a) factors. And I want to go

2  through those briefly. The first factor under 3553 is the nature

3  and circumstances of the offense. As previously mentioned, the

4  defendant was convicted of one of the most serious crimes a

5  person can be convicted of in federal court. The fact that his

6  sentencing guideline range at the low end of 65 years, at the

7  high end life, is indicative of that.

8      Terrorism is unique. Terrorists want to do more than kill

9  innocent people and destroy buildings. Their aim is actually to

10 tear apart the very fabric that holds our societies together. As

11 this Court mentioned, Mr. Haberman took the time to write a

12 letter to this defendant, and the Court has been provided a copy

13 of that. In that letter Mr. Haberman stated: "I have tried to

14 understand your hate. I cannot. What I do understand is that

15 your message of hate and murderous intentions have failed to

16 defeat the ideals and spirit and faith of this nation. History

17 will only remember your pathetic life as that of a heinous

18 criminal, whose only purpose was to take that which was not

19 yours, the most precious gift God gave us all, life. No one ever

20 recovers from the senseless, intentional murder of a totally

21 innocent loved one. No one."

22     When the Court considers the nature and circumstances of this

23 offense, think of all of the Gordon Habermans this defendant

24 wanted to create in his attack on LAX. Think of all the totally

25 innocent people he hoped to kill and maim on the millennium.

PROTECTED INFORMATION – FILED UNDER SEAL

26

1      The second factor under 3553 involves the history and
2  characteristics of the defendant.  I will state the obvious,
3  there is nothing in this defendant's history or characteristics
4  that would provide any basis for support of leniency by this
5  Court.

6      The record establishes that Mr. Ressam has never held a
7  meaningful job and has supported himself primarily through
8  criminal activity.  As he became more radicalized in the 1990s
9  his focus turned to how he could best become a successful
10  terrorist.  He acquired numerous false identities.  He traveled
11  to Afghanistan where he was trained by al Qaeda.  He was
12  obviously committed and dedicated because he was chosen by
13  al Qaeda leaders in Afghanistan not only to undertake the basic
14  training but to go on to a second school where he was trained in
15  explosives and bombs.

16      When Ressam returned to Canada in February 1999 he carried
17  the recipe, the cash and the chemical ingredients necessary for
18  his terrorist attack.  He was supposed to be joined in Canada by
19  others from his cell, a number of others.  All of those people
20  could not get into Canada.  I would suggest to the Court that
21  most people at that point in time, as they sat alone in Canada,
22  all of the co-conspirators still over in Europe, would have said,
23  I can't do this by myself.  Mr. Ressam did not say that.  Instead
24  he forged ahead.  He got money, he rented a room, he manufactured
25  the explosive devices, he got the timing devices, he rented a

PROTECTED INFORMATION – FILED UNDER SEAL

PROTECTED INFORMATION - FILED UNDER SEAL

1    car.

2        Most people don't even remember in August of 1999 he actually

3    attempted an armed bank robbery of a currency store in Montreal

4    as he attempted to self-finance this terrorist attack.  He was

5    recorded talking with his friend Mokhtar Haouari about the 1990

6    African embassy bombings, the very bombings that killed over 225

7    people and injured over 4000.  In those recordings Ressam was

8    heard saying, quote, they were a good thing, referring to the

9    bombings, but that, quote, it would have been better to have

10   carried the bombings out inside of America.

11       I bring this up to emphasize the defendant's involvement in

12   these horrible crimes was not a temporary decision caused by a

13   momentary lapse of judgment.  Far from it.  This was a plan

14   Ressam had dedicated several years of his life to committing, and

15   he did everything possible to make sure it was successful.

16       What do we know about the defendant's current state of mind?

17   I think it is pretty clear from this morning.

18       During our 2005 hearing you made a very astute observation to

19   me, which struck me at the time.  At that point you said,

20   Mr. Bartlett, the defendant's decision to cooperate, quote, might

21   indicate some change in attitude on his behalf.  You were, of

22   course, right.  The reverse is equally true, though.  As we sit

23   here today, the defendant's now reversed change of attitude shows

24   something about him.  The defendant's decision to end cooperation

25   and to affirmatively assist known terrorists indicates an

PROTECTED INFORMATION - FILED UNDER SEAL

PROTECTED INFORMATION – FILED UNDER SEAL

28

 1    incredible change in attitude.  It is a strong signal to any

 2    objective observer that defendant's long-held allegiance to

 3    radical terrorist beliefs have returned, and that he once again

 4    unequivocally is a danger to innocent people throughout the

 5    world.

 6        The next factor that 3553(a) asks the Court to consider is

 7    the need for the sentence imposed to reflect the seriousness of

 8    the offense, to promote respect for the law and to provide just

 9    punishment.

10        The facts in this case couldn't be clearer, but for the

11    great, some might even call lucky work of the Port Angeles

12    Customs Inspector, Diane Dean, on April 14th, 1999, this

13    defendant would have become one of the most notorious mass

14    murders in United States history.  He would have been right next

15    to Timothy McVeigh in the Oklahoma City bombing attack.

16        Terrorist attacks are one of the most serious crimes facing

17    society today.  The Court, unfortunately, needn't look further

18    back than last week at the attacks in Mumbai, India.  They killed

19    over 200 innocent people.  And think back over the years, the

20    9-11 attacks that killed almost 3,000 people; the October 2002

21    nightclub attacks in Bali, Indonesia; the May 2003 suicide

22    bombings in Riyadh, Saudi Arabia; the March 2004 commuter bombing

23    attacks in Madrid, Spain; the July 2005 subway bombing in London,

24    England; the April 2006 resort bombings in Dahab, Egypt.

25        Terrorist attacks don't just impact discreet victims, they

PROTECTED INFORMATION – FILED UNDER SEAL

PROTECTED INFORMATION – FILED UNDER SEAL

29

1    don't even just impact a single city or a single nation,

2    terrorists impact the entire world.  And that is not an accident.

3    That is what terrorists want them to do.  They don't choose

4    military targets.  Instead terrorists, just as Mr. Ressam did,

5    choose to focus on innocent men, women and children.  And they

6    hope to strike fear into all of our lives.  There is no crime

7    that is more serious that this Court can face.  And I would ask

8    the Court's sentence reflect that.

9        The Court's sentence must also promote respect for the law.

10   The American people, and the world at large, must have confidence

11   that our justice system works both ways; that when terrorists are

12   arrested and indicted they will be fairly tried, and eventually

13   if they are convicted they will be justly punished.

14       As this Court noted in an article in July 2008, federal

15   courts provide an adequate venue for trying terrorism suspects,

16   and are a tremendous asset in combating terrorism.  In that

17   article you noted, "I also worry that special terrorism courts

18   risk elevating the status of those innocent people.  Despite the

19   supposed grandeur of their aims, terrorists should surrender

20   their liberty just like any other criminal."  That is so true.

21       Ressam has received honestly the best our judicial system has

22   to offer, a fair trial before an impartial jury of his peers,

23   superb representation for years on behalf of Mr. Hilier and the

24   other members of the Public Defender's Office.  He, like all

25   defendants, deserved nothing less.  We are at the completion of

1   that process now, however.  His sentence requires that justice

2   recognize the seriousness of his crime and provide the public the

3   assurance that this Court appreciates that.

4       Despite the defense attempt to wrap a cloak of grandeur

5   around this defendant and his post-conviction alleged changed of

6   heart, as he stands here today that cloak of grandeur is gone.

7   He is just, as you noted, like any other criminal.  He committed

8   a horrible crime, he has broken his promise to cooperate, and now

9   he must be treated as such and feel the full weight of his

10  actions.

11      3553 also asks the Court to reflect the need to impose a

12  sentence that affords adequate deterrence for criminal conduct

13  and protects the public from further crimes of this defendant.

14      The unfortunate reality of today's world, made so abundantly

15  clear last week in Mumbai, is that the possibility of future

16  terrorist attacks is a continuing and genuine threat.  The

17  sentence this Court imposes on Mr. Ressam must not only act as a

18  deterrent to Mr. Ressam and his future actions, but equally

19  important they must also act as a deterrent to future potential

20  terrorists who are contemplating actions against the United

21  States.  It must broadcast the clear message to extremists that

22  when they are caught and convicted they will suffer serious

23  consequences.

24      During the 2005 sentencing this Court noted that this was

25  probably the most significant sentence anybody ever faced in your

31

```
 1   long tenure on the bench.  I assume as we sit here three years
 2   later your opinion hasn't changed.  I fully agree with the
 3   Court's assessment.  The Court must send the defendant away for a
 4   long enough period of time so there is no chance he will ever
 5   target innocent victims again.
 6       In addition, the sentence must also send an unequivocal
 7   message to extremists that there is a horrendous price to pay for
 8   targeting the United States.  The Gordon Habermans of this
 9   country deserve nothing less from our judicial system.
10       The Court's July 2005 sentence, if reimposed, would mean that
11   this defendant would be released in ten years, he would be out of
12   jail in 2018.  He would be 51 years of age.  Think about the
13   defendant's life prior to the arrest in this case, his fanatical
14   commitment to jihad, his single-minded pursuit to attack the
15   United States.  Think about his recent decisions to help
16   Abu Doha, Samir Mohamed, his most recent decision to
17   affirmatively help Hassan Zemiri and Adil Charkaoui, and as of
18   today his attempt to withdraw even his cooperation in the trial
19   against Haouari.
20       The Court must also, under 3553, avoid unwarranted sentencing
21   disparities among defendants with similar records who have been
22   found guilty of similar conduct.  We have prepared a chart for
23   the Court.  I am not going to go through that.  But I will
24   observe what is clearly obvious.  When one looks at the chart it
25   is clear that this defendant's actions are actually almost at the
```

32

1    very top of any objective assessment of terrorist acts committed

2    in the United States.

3        The 1993 bombings of the World Trade Center, the initial

4    bombings, clearly were most heinous.  They actually occurred,

5    people died.  But short of that attack, virtually no one has been

6    caught on the cusp of an attack.  It is the equivalent of

7    arresting Timothy McVeigh as he drove into Oklahoma City with the

8    truck filled with explosives.  Everything had been done by

9    Mr. Ressam.  This wasn't done with some government instigator,

10   some cooperating witness providing supplies.  He did it all on

11   his own.  Virtually every other person in his category has

12   received a sentence of life imprisonment or its equivalent.

13       I know how proud this Court is of the trial that was

14   conducted in this case, and everyone involved in it should be.  I

15   know how much you and all of us wanted to believe that in

16   May 2001 this defendant had a sincere change of heart when he

17   first indicated a desire to cooperate.  This Court, time and time

18   again, has shown this defendant fairness and compassion.  And he

19   has repaid the Court with lies and contempt.

20       Remember back to February of 2003.  In February of 2003 the

21   United States was seeking a continuance in this case because we

22   did not have Doha and Mohamed back in the country, and we needed

23   his cooperation.  And the defense was vigorously fighting us on

24   that.  And this Court took the unusual step of interceding and

25   saying, in substance, I will give you a continuance United