**ZAYN AL ABIDIN MUHAMMAD**  )
**HUSAYN (ISN # 10016),**  )
)
*Petitioner.*  )
)
**v.**  )          **No. 08-cv-1360 (EGS)**
)
**JIM MATTIS,**  )
)
*Respondent.*  )

### UNOPPOSED MOTION FOR LEAVE TO FILE REDACTED VERSION OF MOTION TO ORDER THE DIRECTOR OF NATIONAL INTELLIGENCE TO SEARCH FOR THE TAPES AND DRAWINGS DEPICTING PETITIONER'S TORTURE, TO REPORT THE RESULTS OF THAT SEARCH UNDER OATH, AND TO DELIVER ANY RESPONSIVE MATERIAL TO COURT SECURITY

Pursuant to Local Civil Rule 5.1(h), undersigned counsel respectfully moves to file the appended **MOTION TO ORDER THE DIRECTOR OF NATIONAL INTELLIGENCE TO SEARCH FOR THE TAPES AND DRAWINGS DEPICTING PETITIONER'S TORTURE, TO REPORT THE RESULTS OF THAT SEARCH UNDER OATH, AND TO DELIVER ANY RESPONSIVE MATERIAL TO COURT SECURITY** in redacted form. Specifically, counsel moves to redact the home address, private phone number, and personal email of a third-party witness, as well as all identifying information about another third-party witness who asked not to be named in this dispute. Petitioner does not seek to proceed *ex parte* and has provided Respondent with un-redacted copies of all documents. In support of this motion, counsel observes as follows:

### STATEMENT OF FACTS

On April 13, 2018, undersigned counsel Joseph Margulies received a voicemail message from a woman who identified herself as Gail Helt. Margulies returned the call and spoke with Ms. Helt at some length. In a subsequent conversation later that afternoon, Ms. Helt agreed to

speak with Margulies in person.  The next day, Margulies flew to eastern Tennessee, and on the morning of April 15, met with Ms. Helt at her home.  Margulies memorialized the conversation in a sworn declaration, which Ms. Helt signed that afternoon.

In her declaration, Ms. Helt identified herself as a former CIA analyst who had been with the Agency for eleven years.  She spent the last two years of her CIA career, from 2012-2014, with the Office of Detainee Affairs preparing recommendations for the CIA about prisoners at Guantanamo.  She worked at length on Petitioner's case.

In 2013, Ms. Helt had a conversation with another Agency employee who admitted, *inter alia*, that the tapes of Petitioner's torture, as well as drawings made by Petitioner depicting his torture, had not been destroyed and that representations by the Agency to the contrary had been untrue.  This witness told Ms. Helt s/he had sent this material to the archives of the Director of National Intelligence in Liberty Crossing, Virginia.  Ms. Helt memorialized the conversation in notes she took shortly after the conversation.  She stored these notes in a lock box in her home and forgot about them after she left the Agency in 2014.  She recalled them when Gina Haspel was nominated to head the Agency, which led to a series of events culminating in her phone call to Margulies.[1]

In her phone conversations with Margulies, Ms. Helt did not identify the witness who told her about the existence of the tapes.  When they spoke in her home, however, Ms. Helt identified and described this witness—but only after assuring Margulies that the witness did not have a covert position within the Agency.  Ms. Helt did not know where the witness was located,

---

[1] The facts surrounding Ms. Helt's conversation with this witness are described in greater detail in the appended MOTION TO ORDER THE DIRECTOR OF NATIONAL INTELLIGENCE TO SEARCH FOR THE TAPES AND DRAWINGS DEPICTING PETITIONER'S TORTURE, TO REPORT THE RESULTS OF THAT SEARCH UNDER OATH, AND TO DELIVER ANY RESPONSIVE MATERIAL TO COURT SECURITY.  *See* Appendix.

and had had no contact with the witness since Ms. Helt left the CIA in 2014.  She believed, but was not certain, that the witness had since retired from the Agency.  Ms. Helt also provided Margulies with a copy of the notes she took memorializing her conversation with the witness. Finally, Ms. Helt provided Margulies with a copy of a letter she delivered to the members of the Senate Select Committee on Intelligence March 14, 2018, which included, *inter alia*, her home address, personal phone number, and private email.

On the afternoon of April 15, 2018, Margulies contacted an investigator with whom he has worked in the past and asked her to try to locate the witness.  The investigator found an address for the witness on a public database, which identified the witness by name and indicated that s/he worked for the Agency.  At that point undersigned counsel believed there was at least some likelihood that the witness remained an Agency employee.

From prior experience in the Guantanamo litigation, undersigned counsel do not trust that their intra-team communications are secure.[2]  We feared, therefore, that the Agency may have obtained a copy of Ms. Helt's declaration and learned the identity of the witness who described her/his role in archiving the tapes.  Because it appeared this witness still worked for the Agency, we believed we needed to act urgently to seek protection both for the witness, and for the tapes and drawings.  We hastily prepared an emergency motion for specified relief, which we sought to file *ex parte* and under seal.  That motion was completed late Tuesday evening, April 17, 2018, and filed by hand the following morning.  We filed by hand in order to minimize the risk of inadvertent disclosure through the ECF system.

---

[2] *See*, *e.g.*, Carol Rosenberg, "Who's listening? Sept. 11 lawyers ask if intelligence agencies are spying on them," *Miami Herald* (Mar. 21, 2017); Charlie Savage, "Guantánamo Lawyers Challenge Government's Explanation for Hidden Microphone," *New York Times* (Mar. 12, 2018).

On Thursday, April 19, 2018, the Court denied Petitioner's motion to file under seal. In a minute order, the Court concluded Petitioner had not made a sufficient case for removing material from public view. The Court also indicated a strong preference against litigating this matter *ex parte*. On Saturday, April 21, Margulies asked his investigator to try to speak with the witness Ms. Helt had identified. The investigator agreed, and traveled to the address we had for the witness the following day. Her first attempt to contact the witness was unsuccessful; another attempt the evening of April 22 led to the first interview with the witness. It was followed by a second interview the morning of April 23.

The witness recalled Ms. Helt warmly. In candor to the Court, however, the witness told the investigator that the conversation described by Ms. Helt never took place. The witness has retired. The investigator asked whether the witness had a preference about disclosing her/his identity. The witness indicated s/he would prefer to have her/his name redacted because s/he was considering returning to the Agency part-time. The witness said, however, that s/he is willing to have her/his name disclosed if the Court orders it.

Undersigned counsel is thus presented with two conflicting accounts: Ms. Helt, a CIA analyst for eleven years, has sworn under oath that the conversation took place, and supports her account with contemporaneous notes of the conversation. The witness, however, denies it.

## THE COURT SHOULD HONOR THE WITNESS' REQUEST AND REDACT HER/HIS IDENTITY. THE COURT SHOULD ALSO HONOR MS. HELT'S REQUEST AND REDACT HER HOME ADDRESS, PRIVATE PHONE NUMBER, AND PERSONAL EMAIL

Whether the Agency has a copy of the torture tapes—and whether officials at the Agency and elsewhere within the national security community lied about the existence of this copy—is a matter of immense importance, both to Petitioner and the public. In the underlying motion, we ask the Court to take steps to determine whether these tapes exist, and if they do, to secure them.

In this motion, we seek leave to file a redacted version of Ms. Helt's declaration, protecting the identity of the third-party witness. We also seek to remove Ms. Helt's home address, personal phone number, and private email. We do not seek leave to proceed *ex parte*.

Petitioner acknowledges the common law right to view court documents. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978). Indeed, as a rule in this litigation, Petitioner favors the broadest possible disclosure of material connected to his torture and detention. The right, however, is not absolute, and the trial court has wide discretion to limit disclosure when the interest "in privacy or confidentiality ... outweighs th[e] strong presumption in favor of public access." *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir. 1991); *see also Nixon*, 435 U.S. at 598-99.

In *United States v. Hubbard*, the D.C. Circuit established a six-part test to determine whether all or part of a document should be sealed from public access. 650 F. 2d 293, 317-22 (D.C. Cir. 1980). A court must ask: (1) whether the public needs to get access to the document; (2) whether the public has had access to the information contained within the document prior to the filing; (3) whether a party has objected to disclosure and the identity of that party; (4) the strength of the property and privacy interests involved; (5) the risk of prejudice to those who oppose disclosure; and (6) the purposes for which the documents were introduced. *Id.*

In this case, Petitioner does not seek to shield the entire submission. Instead, we seek to make two small redactions, both at the request of the respective witnesses. First, we seek to redact the personal identifiers in Ms. Helt's letter to the members of the SSCI. Second, though Ms. Helt has no objection to the complete disclosure of her declaration, her declaration identifies the witness with whom Ms. Helt spoke. That witness has asked that her/his identity be redacted. Petitioner thus seeks to redact Ms. Helt's declaration to the extent it identifies the other witness.

Applying the six factors in *Hubbard* abundantly supports this compromise. Indeed, as the Court in *Hubbard* correctly foresaw, this "partial or redacted disclosure" satisfies both the public interest in access and the private interest in confidentiality. *Hubbard*, 650 F. 2d at 324-25. We analyze the *Hubbard* factors in turn.

1)      *The Public Need to Know.* While the public has a need to know the information contained in Ms. Helt's declaration and letter, not all the information is equally important. In particular, the fact that the tapes and drawings may have existed long after the CIA reported their destruction, as well as the circumstances surrounding that discovery, are far more important than Ms. Helt's home address, personal phone number, and private email, or the identity of the former Agency employee with whom she spoke. The public need, therefore, is not fatally compromised by the redactions we propose. Furthermore, since Petitioner is not seeking to proceed *ex parte*, opposing counsel will know the identity of the witness and the personal identifiers for Ms. Helt. Respondent is free to take such steps as are available to any litigant to test the veracity of the statements by the witness and Ms. Helt.

2)      *Prior Access.* The public has had no prior access to the information we propose to redact. Neither the witness' identity nor Ms. Helt's personal identifiers have previously appeared in connection with this controversy.

3)      *Authorization.* The witness asked that we redact her/his identity and expressed a willingness to be identified only if the Court orders it. Ms. Helt asked that her private identifiers be removed.

4)      *Property or Privacy Interests*. The public has no property or privacy interest in obtaining this information.  Both the witness and Ms. Helt, however, have an undeniable interest in maintaining their privacy.

5)      *Risk of Prejudice*. The risk of prejudice to both Ms. Helt and the witness is considerable.  This is an issue of exceptional public visibility.  If the witness were identified, the court and parties can fairly expect s/he would quickly be deluged by the press.  S/he could also become the target of unregulated campaigns on social media, the likes of which have become all too common.  The public has an admitted need to know the information the witness relates, but in providing this information, it is not fair that the witness also become a target of uncontrollable scrutiny.  We say this fully mindful of the fact that the witness has not provided information helpful to Petitioner.  The witness spoke to us in good faith and asked that her/his name be redacted.  We feel ethically bound to honor that request.  As for Ms. Helt, she is prepared to weather whatever storm may come, but asks only that it greet her at work and not in the shelter of her home.

6)      *Purpose of the Material.*  Ms. Helt's declaration has been prepared as part of a challenge to Petitioner's continued detention at Guantanamo Bay.  Because we do not seek to proceed *ex parte*, nothing about that litigation will be affected by the proposed redactions.  Should we uncover lost copies of the tapes and drawings, their discoverability and admissibility can be litigated in due course.  For the purpose of this motion for redaction, however, it suffices that the compromise we propose will not prejudice the Court or parties as the *habeas* litigation unfolds.

In short, each of the *Hubbard* factors weighs heavily in favor of the proposed redactions: The most important information will still become part of the public record; the litigation will proceed unimpaired; and the requests by both the witness and Ms. Helt will be honored.[3]

Accordingly, Petitioner respectfully requests that this Court:

1. Grant Petitioner's motion for leave to proceed under seal.

2. Direct the Clerk of Court to file a redacted version of Petitioner's Motion, removing:

    a. All information that could tend to identify the witness with whom Ms. Helt spoke.

    b. Ms. Helt's home address, private phone number, and personal email.

For the convenience of the Court and parties, Petitioner has attached as an Appendix a suitably redacted copy of **PETITIONER'S MOTION TO ORDER THE DIRECTOR OF NATIONAL INTELLIGENCE TO SEARCH FOR THE TAPES AND DRAWINGS DEPICTING PETITIONER'S TORTURE, TO REPORT THE RESULTS OF THAT SEARCH UNDER OATH, AND TO DELIVER ANY RESPONSIVE MATERIAL TO COURT SECURITY**.

We have attached a proposed Order for the Court's convenience.

Dated:  May 1, 2018                                   Respectfully submitted,


                                                      _____/s/_____
                                                      Joseph Margulies
                                                      Professor of Law and Government
                                                      Cornell University

---

[3] Petitioner has conferred with opposing counsel, who indicates Respondent does not oppose this motion provided Petitioner provides opposing counsel with unredacted copies of all papers and files unredacted copies with the Court under seal.  Petitioner has not yet sought Respondent's position on the underlying motion, which has not yet been filed.

607.255.6477

George Brent Mickum IV [Bar No. 396142]
Amanda L. Jacobsen
Erin Herro
5800 Wiltshire Drive
Bethesda, Maryland 20816

Mark P. Denbeaux
Charles R. Church
Denbeaux & Denbeaux
366 Kinderkamack Road
Westwood, NJ 07675

# APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ZAYN AL ABIDIN MUHAMMAD | ) | |
| HUSAYN (ISN # 10016), | ) | |
| | ) | |
| *Petitioner.* | ) | |
| | ) | |
| v. | ) | No. 08-CV-1360 (EGS) |
| | ) | |
| JIM MATTIS, | ) | |
| | ) | |
| Respondent | ) | |

## MOTION TO ORDER THE DIRECTOR OF NATIONAL INTELLIGENCE TO SEARCH FOR THE TAPES AND DRAWINGS DEPICTING PETITIONER'S TORTURE, TO REPORT THE RESULTS OF THAT SEARCH UNDER OATH, AND TO DELIVER ANY RESPONSIVE MATERIAL TO COURT SECURITY

For years, the CIA told Petitioner and the rest of the world that it had destroyed the tapes of his torture.[1]  We now know that a copy of the tapes likely exists.  In this motion, we seek relief to correct this state of affairs.

I.   Statement of Facts

   A. Former CIA Analyst Gail Helt Admits the CIA Lied About Having Destroyed the Torture Tapes

On April 13, 2018, Gail Helt, who worked as a non-covert analyst with the CIA from April 2003 until July 2014, contacted Joseph Margulies, lead counsel for Petitioner's habeas team.[2]  During the last two years of her tenure with the Agency, Ms. Helt worked in the Office of

---

[1] *See, e.g.*, P. Taddonio, *Why You Never Saw The CIA's Interrogation Tapes,* May 19, 2015, available at: *https://www.pbs.org/wgbh/frontline/article/why-you-never-saw-the-cias-interrogation-tapes/*

[2] April 15, 2018 Declaration of Gail Helt ("Helt Decl."), annexed as Ex. 1, pars. 4 and 15.

1

Detainee Affairs, preparing files for the Period Review Boards ("PRBs').[3]  One of her tasks was to review the dossiers prepared by the CIA for the Task Force set up by the Obama Administration in 2009.  These dossiers were part of the inter-agency review of all detainees initiated shortly after President Obama took office.  She was asked to fact-check these dossiers and to distill them into shorter documents to be used by the PRBs.  As part of that task, Ms. Helt "reviewed the dossier that had been prepared about Abu Zubaydah, along with the underlying CIA cables relied upon to support the dossier."[4]

This is what Ms. Helt found: "For a number of dossiers, but pervasively and horrifyingly in Abu Zubaydah's case, there were statements in the dossier that were simply not supported by the underlying documentation.  That is, there were statements in the dossier attributed to him in which he supposedly had made threatening statements or taken threatening actions against the United States.  But when I went to the underlying cables, I discovered time and again that the cables didn't support what the [dossier] said.  Sometimes the underlying documents didn't even involve Abu Zubaydah.  I would estimate these discrepancies happened between 12 & 20 times.  Absent those 12-20 statements, I would not have believed he was plotting against the U.S. or that he was a threat to the U.S.  Because the goal of the PRB was to determine whether he

---

[3] Such Periodic Review Boards ("PRBs") were created pursuant to President Obama's E.O. 13567, promulgated on March 7, 2011.  Under Sec. 2, *Standard for Continued Detention,* continued detention is warranted "if it is necessary to protect against a significant threat to the security" of the U.S.

[4] Helt Decl. par. 6.  The Task Force was created pursuant to President Obama's E.O. 13492, dated Jan. 22, 2009.  Under Sec. 4, *Immediate Review of All Guantánamo Detentions,* sub-sec. (b), "The Review shall be conducted with the full cooperation and participation of the following officials," which includes the Director of National Intelligence.

represented a threat the country, I was particularly attuned to these allegations and studied them with care."[5]

  She describes what she then did. "I was shocked and disappointed by what I discovered and recall talking about it with one of my colleagues... I told [my colleague] what I found and said something like: 'I can't believe this.' [My colleague] said words to the effect of, 'Yes, they were urged to stack the deck against the detainees.' [My colleague] had been with the predecessor review team, starting there in approximately 2010. Then [my colleague] said something like, 'You think that's bad? **The tapes that we told the White House and DOJ did not exist, we still have those tapes. We still have tapes of that man's torture.'** [My colleague] told me [s/he] had been given tapes of Abu Zubaydah's torture and had been told to archive them at DNI HQ in Liberty Crossing."[6]

  Ms. Helt added: "[S/he] said the same thing about some drawings made by Abu Zubaydah in which he depicted his torture that had also been supposedly 'lost.' [My colleague] said [s/he] archived those as well and described to me what they showed. [S/he] told me that [s/he] saw the tapes, but as I think about it, I don't know if [s/he] meant [s/he] physically watched the tapes or saw them and someone told [her/him] what they contained for archival purposes. All I know is that [s/he] said we still have the tapes of Abu Zubaydah's torture, and that [s/he] sent them to be archived at DNI HQ. But as horrified as [s/he] was, I don't believe [s/he] was just guessing about the content of the tapes. [S/he] was morally outraged. … [S/he]

---

[5] Helt Decl., par. 7.

[6] Helt Dec., par. 8. Bold supplied. Ms. Helt named her colleague and described her/him in detail. Helt Decl., par. 12. At the witness' request, Petitioner has moved that this identifying information be redacted from Ms. Helt's declaration.

was a very serious person, not flighty or prone to … making things up. … I don't know exactly when [s/he] archived them, probably sometime in late 2010 or 2011.[7]

An investigator for undersigned counsel located and interviewed the witness with whom Ms. Helt spoke. The witness denied having had this conversation with Ms. Helt and asked that s/he not be named in this litigation. Yet Ms. Helt memorialized her conversation with this witness shortly after the conversation took place in a pink notebook she carried in her purse. Knowing this information was important, she placed the notebook in a lockbox in her closet, where it has remained since.[8] "Frankly, after I put my notebook away, I didn't think about it again. I knew what they had done was wrong, but there's such a strong culture of looking out for each other at the [CIA] that I just didn't do anything about it. After I left the Agency, I just wanted to get on with my life. I don't feel good about that, but that's what happened."[9] Ms. Helt provided undersigned counsel with copies of the notes she made in this notebook. In addition, Ms. Helt, a former CIA analyst and current professor at King University, provided her statement under oath.

Ms. Helt described her motive for coming forward at this time. "[I]t all came back to me when Gina Haspel was nominated to head the [CIA]. Then I knew I had to do something about

---

[7] Helt Dec., pars. 9-10. Ms. Helt explained: "To archive something, [s/he] had to describe the material in searchable online form so [s/he] would've made a computer entry describing the content of the tape. The whole system was searchable online. I know this because a couple of times in [a] previous office, I had to send and retrieve things from the archive and the office down the hall [used] the online system to identify them." Helt Decl., par. 11.

[8] True and correct copies of relevant pages from Ms. Helt's notebook, which are annexed to her Declaration, add detail about Abu Zubaydah's torture and provide support for Ms. Helt's Declaration. Helt Decl., par 16.

[9] Helt Decl., par. 13.

this.  In mid-March I wrote a letter to the members of the Senate Select Committee on

Intelligence,[10] which I faxed to committee headquarters, in Washington, D.C.  I also hand-

delivered a copy of the letter to Senator Warner's office in Abingdon, Virginia.  I never heard

anything back from anyone."[11]  On Friday, April 13, 2018, Ms. Helt contacted undersigned

counsel, who flew to Tennessee the next day and took her statement the day after.[12]

### B. The CIA Has Consistently Lied About Petitioner

Ms. Helt's disclosure is merely the latest revelation in a long history of dissembling and

deception about Petitioner by the CIA.  The August 1, 2002, OLC memorandum that authorized

CIA contractors to torture Petitioner, titled *Interrogation of al Qaeda Operative* but known

colloquially as the torture memo, began a litany of falsehoods about Petitioner that continues to

this day.  The OLC relied on a set of factual assertions, most of which were provided by a

Psychological Assessment prepared by the Agency.[13]  As of this writing, almost all of these

assertions have been repudiated, withdrawn, or debunked.  Even the title of this memo was false,

as Petitioner never belonged to al Qaeda.[14]

---

[10] A true and correct copy of the letter is annexed to the Helt Declaration.  Helt Decl., par. 16.
Ms. Helt has asked that we redact her home address, private email, and personal phone number
from this letter.

[11] Helt Decl., Par. 14.

[12] Helt Decl., Par. 15.

[13] *CIA Memo: Draft Psychological Assessment of Abu Zubaydah,*
*https://www.thetorturedatabase.org/document/cia-memo-draft-psychological-assessment-abu-*
*zubaydah-0*

[14] Senate Select Committee on Intelligence *Study of the [CIA's] Detention and Interrogation
Program,* pub'd on Dec. 14, 2012, at 410.

For instance, the OLC Memo stated, *inter alia*, "As we understand it, [Petitioner] is one of the highest ranking members of the Al Qaeda terrorist organization...."[15] "[T]hough only 31, [Petitioner] rose quickly from very low level mujahedin to third or fourth man in al Qaeda. He has served as Usama Bin Laden's senior lieutenant... [Petitioner] has been involved in every major terrorist operation carried out by al Qaeda... He also served as a planner for the Paris Embassy plot in 2001. Moreover, he was one of the planners of the September 11 attacks. Prior to his capture, he was engaged in planning future terrorist attacks against U.S. interests."[16]

All these assertions were false. As the SSCI ES points out, "The facts provided by the CIA...were cited in the [OLC Memo], and many were repeated in subsequent OLC memoranda on the CIA's enhanced interrogation techniques ("EITs"). **Much of the information provided by the CIA...was unsupported by CIA records."**[17] More particularly:

- The "third or fourth man" in al Qaeda accusation was based on single-source reporting that was recanted prior" to issuance of the OLC Memo.[18]

- As said, "[Petitioner] was not a member of al Qaeda."[19]

- The allegations that Petitioner was involved in "every major terrorist operation carried out by al Qaeda," and "was one of the planners of the September 11 attacks" are simply untrue and were not supported by CIA records.[20]

---

[15] OLC Memo, at 1.

[16] OLC Memo, at 7.

[17] SSCI ES, at 410; bold supplied.

[18] *Id.*

[19] *Id.*

[20] *Id.*

Of course, the CIA falsehoods to the OLC were only the beginning. Over the years, the Agency has lied about Petitioner to the SSCI itself;[21] to the White House, the National Security Council, the DoJ, the CIA Office of Inspector General, the Congress, and the public.[22]

## II. The Court Should Order the Director of National Intelligence to Search the Archives of the DNI, Report on the Results under Oath, and Deliver Responsive Material to Court Security

If Ms. Helt is correct, some or all of the videotapes of Petitioner's torture are in the archives of the Office of the DNI. So too are Petitioner's drawings of his torture. These items are obviously a matter of immediate relevance and immense importance, both to Petitioner and to the Court. Precisely what happened to Petitioner (and what the United States Government learned) during his torture is at the core of his current habeas petition and bears directly on whether he was or is a threat to the United States. In addition, the dissembling revealed by Ms.

---

[21] On April 12, 2007, DCI Michael Hayden testified before the SSCI in a manner which, as judged by the Committee, warranted creation of a thirty-seven page Appendix to the SSCI ES, titled: **"Example of Inaccurate CIA Testimony to the Committee."** The appendix appears as a grid, with boxes on the left setting forth portions of Hayden's testimony and corresponding boxes on the right containing what the CIA's own records said on the subject. *See* SSCI ES, at 462-99.

[22] For a small sampling of these falsehoods, *see* SSCI ES Finding and Conclusion #2, at 2-3; #4, at 4: #5, at 4-5; #6, at 5-6; #7, at 6-7; 3, #8, at 7-8, #9, at 8; #10, at 8-9 and #18, at 14-15. SSCI Finding and Conclusion #10 found, *inter alia*: **"The CIA coordinated the release of classified information to the media, including inaccurate information concerning the effectiveness of the CIA's [EITs]."** (Bold original.) For example: "Much of the information the CIA provided to the media on the operation of the CIA's Detention and Interrogation Program and the effectiveness of the [EITs] was inaccurate and was similar to the inaccurate information provided by the CIA to Congress, the [DoJ], and the White House." *Id.* SSCI Finding and Conclusion #18, at 14-5, states: **"The CIA marginalized and ignored numerous internal critiques, criticisms, and objections concerning the operation and management of the CIA's Detention and Interrogation Program."** (Bold original.) "In several instances, CIA officers identified inaccuracies in CIA representations about the program and its effectiveness to the [OIG], the White House, the [DoJ], the Congress and the American public. The CIA nonetheless failed to take action to correct these representations, and allowed inaccurate information to remain as the CIA's official position." *Id.*

Helt casts additional doubt on whether the Agency has provided the Court and parties with the necessary discovery.  Finally, Ms. Helt has called into question whether the CIA fairly complied with E. O. 13567, which created the Periodic Review Boards.

Under these circumstances, the Court should order the following relief:  First, because the Director of National Intelligence ("DNI") serves as the head of the intelligence community,[23] and because, according to Ms. Helt, videotapes of Petitioner's interrogation and torture and drawings made by him of such torture were archived at DNI Headquarters, the Court should immediately direct that the Office of the DNI conduct a diligent search of the DNI archives for all videotapes of Petitioner's interrogation, and all drawings he may have prepared depicting that interrogation. Second, because the gravamen of Ms. Helt's sworn declaration is that the CIA has repeatedly lied about these tapes and drawings, **the DNI must now be obligated to state the results of this search _under oath_**.  The Court should direct that within 7 days of this order, a senior official within the DNI must be directed to deliver to the Court and parties a sworn declaration based on firsthand information which reports on the results of the search, including how the search was conducted, what was searched, and with what results.  And finally, because the CIA has unlawfully destroyed and lied about critical evidence in Petitioner's case for more than a decade, the Court should order that the DNI immediately preserve complete and un-redacted copies of all documents, records, and things pertaining to Petitioner resulting from the search described above, and deliver them to the Court Security Officer for safekeeping, with an accounting provided to the Court and parties.

The Court has ample power to order the requested relief.  Indeed, it has exercised this power at least twice in this case.  On September 30, 2009, the Court issued an order directing

---

[23] Public Law 108-458, Sec. 102 (b)(1).

Respondent to "preserve and maintain all evidence, documents and information, without limitation, now or ever in his possession, custody, or control, or that of his agents, servants, employees and confederates, and of any governmental agencies and private contractors ever acting in concert with him concerning the Petitioner, relevant to any claim and/or defense related to the basis for Petitioner's continued detention."  ECF No. 357.  And on January 23, 2017, the Court by minute order directed Respondent to produce the entire SSCI report to the Court Security Office "for secure storage."  As it has twice before, the Court should again take steps to preserve vital evidence and insure the integrity of the process.

   *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (2004), provides the relevant standard.  A court should issue a preservation order when, absent such an order, there is (a) a "significant risk that relevant evidence will be lost or destroyed," and (b) "the particular steps to be adopted will be effective, but not overbroad."  *Id.* at 138; *accord United Med. Supply Co. v. United States*, 73 Fed. Cl. 35, 36-37 & n.1 (2006); *Williams v. Mass. Mut. Life Ins.* Co., 226 F.R.D. 144, 147 (D. Mass. 2005); *Walker v. Cash Flow Consultants, Inc.*, 200 F.R.D. 613, 617 (N.D. Ill. 2001).  Petitioner has satisfied both conditions.[24]

---

[24] Elsewhere, the government has mistakenly suggested that a preservation order is an injunction. As the court in *Pueblo of Laguna* explained, a preservation order "is no more an injunction than an order requiring a party to identify witnesses or produce documents in discovery." *Pueblo of Laguna*, 60 Fed. Cl. at 138 n.8 (*citing Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir. 1994)); *accord United Med. Supply*, 73 Fed. Cl. at 36-37 n.1 ("[T]he court sees no reason for it to consider whether plaintiff is likely to be successful on the merits of its case in deciding whether to protect records from destruction. . . . [S]uch an approach would be decidedly to put the cart before the horse."); *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 433 (W.D. Pa. 2004) (declining to adopt four-factor injunctive relief test for preservation orders).  District courts in the Guantánamo Bay detainee litigation have frequently rejected the government's suggestion that motions for preservation orders be treated as motions for injunctive relief.  *See, e.g.*, *El-Banna v. Bush*, No. 04-1144, 2005 WL 1903561, at *1 n.3 (D.D.C. July 18, 2005).

### i.      The Government's Past Destruction of Evidence Establishes a Significant Risk of its Repetition

A party establishes a significant risk of future destruction by showing either that the opposing party has lost or destroyed evidence in the past, or that it has inadequate retention procedures in place. *Pueblo of Laguna*, 60 Fed. Cl. at 138; *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006); *see also Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 437 (W.D. Pa. 2004) (even evidence of attempted damage or destruction of evidence heightens concern about the protection and integrity of the proceedings before it). Petitioner has demonstrated that both are true: the Agency concededly tried to destroy the very evidence at stake, and apparently *did* destroy other copies of the tapes. It is only by happenstance that we learned that additional copies still exist. In addition, the prior destruction demonstrates convincingly that the Agency's retention procedures do not eliminate the risk that the CIA will try to finish what it started.

The prior attempts to destroy these tapes are a matter of record. In October 2003 and May 2004, the ACLU and others submitted FOIA requests for videotapes taken by the CIA of its interrogation and torture of Petitioner. When those requests were not honored, they filed a FOIA suit. Southern District of New York Judge Alvin Hellerstein repeatedly ordered the CIA to search for and either identify or produce responsive records, which the judge deemed subject to disclosure. Instead of complying with the court's orders, the CIA attempted to destroy the videotapes and apparently believed it had been successful.[25] Then Chief of the CIA's Counterterrorism Center ("CTC") Jose

---

[25] October 5, 2011, Opinion and Order, *ACLU, et al. v. Department of Defense, et al.,* Case 1:04-cv-04151 (Doc. 472), at 13. Moreover, at the time the CIA tried to destroy them, military commission defense attorneys were exerting increased pressure to obtain the videotapes. Further, the CIA had kept secret the tapes' existence from the 9/11 Commission, which had

10

Rodriguez confessed his motive for flouting the law by ordering the destruction. The "heat from destroying [the tapes] is nothing compared to what it would be if the tapes ever got into the public domain...; it would be devastating to us... All in the room agreed."[26] As consummate proof of guilty knowledge of wrongdoing, the CIA destroyed the tapes on the morning of November 9, 2005, yet the Agency delayed announcing the destruction for five years and one day—until November 10, 2010—after the applicable statute of limitations had run.

It is likewise clear that Respondent does not have adequate retention procedures in place. Respondent will likely maintain that the existing preservation order entered in 2009 by Judge Roberts provides adequate assurance that the Agency will preserve the tapes. ECF 357. To be sure, the tapes and drawings are undoubtedly subject to preservation under this Order. Yet as we have already learned, to Petitioner's detriment, the Order is not sufficient to preserve evidence in this matter. Indeed, Judge Hellerstein, presiding over the FOIA litigation in the Southern District of New York, had entered production orders when Jose Rodriguez destroyed other copies of the tapes. Though Judge Hellerstein declined to hold anyone in contempt, he left no doubt that the Agency, as an entity, had failed to retain responsive records. "The CIA, qua agency, had the obligation to identify or produce the videotapes, and the CIA cannot be excused in its dereliction because of particular individuals' lapses."[27] The Agency should not be heard to say that now it has finally learned its lesson and can be trusted to preserve the tapes it has tried so diligently to

---

asked the Agency for records of its interrogations. M. Mazzetti and C. Savage, *No Criminal Charges Sought Over C.I.A. Tapes,* http://www.nytimes.com/2010/11/10/world/10tapes.html.

[26] Peter Taylor, "'Vomiting and screaming' in destroyed waterboarding tapes, *BBC Newsnight*, May 9, 2012, available at: http://www.bbc.com/news/world-us-canada-17990955.

[27] October 5, 2011, Opinion and Order, *ACLU, et al. v. Department of Defense, et al.,* Case 1:04-cv-04151 (Doc. 472), at 22.

destroy.  The only solution is for the Court to take custody of the tapes of Petitioner's torture, as well as the drawings he made depicting the same.

ii.     **The Relief Requested by Petitioner is Effective but not Overbroad**

Given Ms. Helt's sworn declaration, the relief Petitioner seeks is both effective and narrowly tailored.  The tapes and drawings were sent to the DNI archives; Petitioner therefore asks that the archives be searched.  The CIA has tried to destroy the tapes; Petitioner therefore asks that the CIA be relieved of any role in searching for the tapes and drawings, and that the obligation be transferred to the Office of the DNI.  The CIA has lied about the tapes for years; Petitioner therefore asks that the DNI, who serves as the head of the U.S. intelligence community, be directed to report the results of the DNI search under oath.  And finally, the CIA has already tried to destroy the tapes; Petitioner therefore asks that the DNI turn over the fruits of the search to Court Security.  At each step, the relief requested is calculated to achieve the result sought without imposing an undue burden on Respondent or any Executive agency.  Indeed, inasmuch as Respondent believes it is already obligated to preserve the tapes, an Order by the Court that makes this obligation explicit would hardly impose an additional burden.

Finally, there can be no suggestion that directing the DNI to look for the tapes and report on the results of the search is somehow an impermissible expansion of the Court's authority under *Laguna*.  On the contrary, the court in *Laguna* expressly recognized that it may compel preservation "*and issue orders in furtherance thereof.*"  60 Fed. Cl. at 134.  Thus, in order to effect the preservation at issue in *Laguna*, the court ordered the parties to create an index of responsive "documents, data, and tangible things."  *Id.* at 138.  In a subsequent case by the same court, the judge entered a preservation order, and in furtherance thereof, ordered the defendant to search for responsive documents and describe its search "in detail."  *United Med. Supply Co. v.*

*United States*, 73 Fed. Cl. at 36-37 (directing defendant to search particular facilities for documents, and if it "claims it does not have any responsive documents, it shall describe, in detail, the efforts made to locate such documents and whether it believes such documents once existed but were destroyed, and how and when they were destroyed.")  Petitioner seeks equivalent relief in order to effect the preservation of the tapes:  the DNI must search the archives, report the results of the search under oath, and deliver responsive materials to Court Security.  Each of these steps is necessary to protect the integrity of the process and assure the preservation of vital evidence.

### III.    Alternatively, the Court Should Schedule an Evidentiary Hearing to Resolve the Underlying Factual Dispute

As noted, the witness with whom Ms. Helt spoke denied her part in this conversation to our investigator.  Because Petitioner seeks only to preserve evidence, it is not necessary to resolve this factual dispute.  Ms. Helt's declaration alone provides sufficient evidence to warrant action by the Court to maintain the status quo.  Should the Court consider it necessary to resolve this issue, however, Petitioner respectfully requests the Court schedule an evidentiary hearing at which it may hear from Ms. Helt and the witness.

A proposed Order is attached for the Court's convenience.

Dated:  May 1, 2018                          Respectfully,

                                             /s/
                                    _____
                                    Joseph Margulies
                                    Professor of Law and Government
                                    Cornell University
                                    238 Myron Taylor Hall
                                    Ithaca, NY 14850

George Brent Mickum IV [Bar No. 396142]
Amanda L. Jacobsen
Erin Herro
5800 Wiltshire Drive
Bethesda, Maryland 20816

Mark P. Denbeaux
Charles R. Church
Denbeaux & Denbeaux
366 Kinderkamack Road
Westwood, NJ 07675

## DECLARATION OF GAIL HELT

Pursuant to 28 U.S. Code §1746, I declare as follows:

1. My name is Gail Helt. I am the Director of the Security and Intelligence Studies Program and an Assistant Professor at King University, in Bristol, Tennessee. I have a B.S. in Political Science from the University of Nebraska, Kearney, and a M.A. from Iowa State, also in Political Science. I started the Ph.D. program in Political Science at the University of Arizona but left after I was offered a job with the Central Intelligence Agency in late 2002.

2. I have first-hand knowledge of the information contained in this document, and do not believe any of this information is either classified or otherwise protected from disclosure.

3. I joined the CIA April 6, 2003, and was an analyst with the Agency until July 28, 2014.

4. For most of my career, I was with the CIA Directorate of Intelligence in the ^(Office of) Asian Pacific, Latin American, and African Analysis, assigned to the China group. I was not a covert officer.

5. In, as I recall, early July 2012, I saw a notice within the Agency seeking ~~agents~~ officers to staff the Office of Detainee Affairs, which would be tasked with preparing files for the Periodic Review Boards to be held for detainees at Guantanamo. I ~~applied for~~ volunteered and was accepted into the position, and began my duties with the ODA in late July or early August, 2012. I remained with the ODA until I left the Agency in 2014.

6. One of my jobs was to review the dossiers that had been prepared by the CIA for the initial taskforce set up by the Obama Administration in 2009. These dossiers were part of the inter-agency review of all detainees initiated shortly after President Obama took office in 2009. I was asked to fact-check these dossiers and distill them into shorter documents for use by the PRBs. Our mandate was to assess the likelihood that a detainee represented a future threat to the United States. In that capacity, I reviewed the dossier that had been prepared about Abu Zubaydah, along with the underlying CIA cables relied upon to support the dossier. Additionally, our task force 4

7. For a number of detainees, but pervasively and horrifyingly in Abu Zubaydah's case, there were statements in the dossier that were simply not supported by the underlying documentation. That is, there were statements in the dossier attributed to him in which he supposedly had made threatening statements or taken threatening actions against the United States. But when I went to the underlying cables, I discovered time and again that the cables didn't support

what the 2009 document said.  Sometimes, the underlying documents didn't even involve Abu Zubaydah.  I would estimate these discrepancies happened between 12 & 20 times.  Absent those 12-20 statements, I would not have believed he was plotting against the US or that he was a threat to the US.  Because the goal of the PRB was trying to determine whether he represented a threat to the country, I was particularly attuned to these allegations, and studied them with care.

8.  I was shocked and disappointed by what I discovered and recall talking about it with one of my colleagues.  I remember I was sitting in a little aisle outside cubicle.  I told     what I found and said something like, "I can't believe this."      said words to the effect of, "Yes, we were urged to stack the deck against the detainees."      had been with the predecessor review team, starting there in apx. 2010.  Then     said something like, "You think that's bad?  The tapes that we told the White House and DOJ did not exist, we still have those tapes.  We still have tapes of that man's torture."      told me     had been given tapes of Abu Zubaydah's torture and had been told to archive them at DNI HQ in Liberty Corners. Crossing.

9.      said the same thing about some drawings made by Abu Zubaydah in which he depicted his torture that had also been supposedly "lost."      said archived those as well and described to me what they showed.

10.      told me     saw the tapes, but as I think about it, I don't know if     meant physically watched the tapes or saw them and someone told     what they contained for archival purposes.  All I know is that     said we still have the tapes of Abu Zubaydah's torture, and that     sent them to be archived at DNI HQ.  But as horrified as     was, I don't believe     was just guessing about the content of the tapes.      was morally outraged.  Plus,     was looking forward to retirement.      was not given to exaggeration.      was a very serious person, not flighty or prone to talking about     or making things up.      never said who     got the tapes from.  I don't know exactly when     archived them, probably sometime in late 2010 or 2011.

11.  To archive something,     had to describe the material in a searchable online form, so     would've made a computer entry describing the content of the tape.  The whole system was searchable online.  I know this because a couple times in 2 previous office, I had to retrieve things from the archive and used the online system to identify them. the office down the hall

12.

13. When _____ told me this, I made notes of our conversation in a pink notebook I carried in my purse. After _____ told me, I knew this was information I wanted to preserve, so I put the notebook in a lockbox in my closet, where it's been ever since. Frankly, after I put the notebook away, I didn't think about it again. I knew what they had done was wrong, but there's such a strong culture of looking out for each other at the Agency that I just didn't want to do anything about it. After I left the Agency, I just wanted to get on with my life. I don't feel good about that, but that's what happened.

14. But it all came back to me when Gina Haspel was nominated to head the Agency. Then I knew I had to do something about this. In mid-March I wrote a letter to the members of the Senate Select Committee on Intelligence, which I faxed to committee headquarters Washington, D.C. I also hand-delivered a copy of the letter to Senator Warner's office in Virginia. I never heard anything back from anyone.

15. On Friday, April 13, 2018, I was contacted by a journalist, who asked me about my time with the CIA. I told him about the tapes and he gave me the phone number for Joseph Margulies, who is counsel for Abu Zubaydah. I called Mr. Margulies that day. He called me back and came to my home Sunday, April 15.

16. I have attached a true and correct copy of the notes from my conversation with _____ and the letter I sent to the Committee members to this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _April 15, 2018_                    _Gail Helt_
        April 15, 2018                              Gail Helt



On 1 April 2013, TG
remarked on the
oddities surrounding
US insistence that
detainees went
rhymed to a country
where they could
face death. He specifically
remarked on China as
an example, and asked
what happens if a
detainee is returned.
I said surely he'd be
tried + then shot. TG
said "but it would be
legal, right?" I said
yes, [?] Chinese [?] call per
Chinese law. He said he
wondered why this
so different from
what [would] happen
to KSM at the end

On 2 April 2013, I was told by a person w/ access that I was told DoJ that AZ's diaries don't exist but we in fact have them. This relates to what I think the press refers to as 7-8-9 - the diaries that contain his drawings of the torture we perpetrated upon him. I was told those drawings include one of him sitting in what was described as an electric chair or electrified chair - w/ wires connected to AZ and a power source. I was told

he will ultimately, b/c end up dead. I said yeah, but in China the power isn't fair. 16 replied - what makes you think those will be found we designed to be fair?

another photo depicts him
stuffed into a fetal
position stuffed into a box –
while he was still
suffering from injuries.
I was told we housed
him from day 1 –
his leg wound was
not sutured and was
left open – intentionally.
we plied him in
stress positions while
he still had open
wounds, and the leg
was so serious at
one point this
considered amputation.
The phrase used to
describe what we
did to him was "we
tortured the hell
out of him and no one

know," I was told
tapes still exist
until we did to him.

I also on a whom
asked this person
some
the doc's compiled on
a previous task force
made statements that
weren't substantiated
on the sources used.
I was told this was
an effort to CYA –
make detainers appear
guilty. when I asked
being somehow
the source said the
opposite of what was
claimed, or if not
reference at all what
was stated, I was

The EITs listed as authorized that required the permission, but the fact we did it + what we documented somewhere.

told it was b/c they assumed no one would ever check. I was told there was pressure to stick the shit against detainees.

I was told there was evidence that we did things to detainees spouses + kids.

back to AZ - I was told that we did things to him and others that were never authorized + never "documented" - ?? meaning they were not part of

March 14, 2018

To: The Senate Select Committee on Intelligence
Senator Mark Warner
Senator Dianne Feinstein
Senator Ron Wyden
Senator Martin Heinrich
Senator Angus King
Senator Joe Manchin
Senator Kamala Harris

Re: Destroyed interrogation tapes and Gina Haspel's nomination for DCIA

Dear Senators:

From mid-2012 until mid-2014 I worked in the CIA's Office of Detainee Affairs.  As you probably know, this office was established to provide support to the Periodic review Board process mandated by Executive Order 13567. In April 2013, in a conversation with a colleague who was responsible for archiving data and other media, I was told that the Agency did NOT destroy all the tapes of the Abu Zubaydah interrogation, and that at least one copy had been archived, presumably at ODNI headquarters.

Similarly, I was also told that copies of allegedly "missing" diaries kept by Abu Zubaydah, allegedly depicting the treatment he experienced during his interrogations, were also not missing, and had been sent to the same facility.

I have no personal knowledge of this, and obviously I have no way to know if this is, in fact, true. However, in light of the nomination of Gina Haspel to be the Director of the CIA, I feel an obligation to let someone know, as the contents of any videotape or diary might very well be relevant in her confirmation hearing.

Sincerely,

Gail Helt

ZAYN AL ABIDIN MUHAMMAD          )
HUSAYN (ISN # 10016),            )
                                 )
*Petitioner*.                    )
                                 )
v.                               )          No. 08-cv-1360 (EGS)
                                 )
JIM MATTIS,                      )
                                 )
*Respondent*.                    )

## [PROPOSED] ORDER

The Court has before it Petitioner's **MOTION TO ORDER THE DIRECTOR OF NATIONAL INTELLIGENCE TO SEARCH FOR THE TAPES AND DRAWINGS DEPICTING PETITIONER'S TORTURE, TO REPORT THE RESULTS OF THAT SEARCH UNDER OATH, AND TO DELIVER ANY RESPONSIVE MATERIAL TO COURT SECURITY**.  Based on the arguments and facts set forth in his papers and on due consideration, Petitioner's motion is hereby GRANTED.

The Director of National Intelligence ("DNI"), personally or through a responsible senior officer, is hereby ordered to conduct a diligent search of the DNI archives for all videotapes of Petitioner's interrogation, and all drawings Petitioner may have prepared depicting that interrogation.  Within seven days of this Order, the DNI is ordered to state the results of this search under oath, specifying in detail how the search was conducted, what was searched, and with what results.  The DNI is further ordered to preserve complete and un-redacted copies of all documents, records, and things pertaining to Petitioner resulting from this search, and to deliver all such documents, records and things, including any tapes and pictures, to the Court Security Officer within ten days of this Order, with an accounting provided simultaneously to the Court and parties.

Dated:

                                        _____

                                        Judge Emmet G. Sullivan
                                        United States District Judge

**ZAYN AL ABIDIN MUHAMMAD**
**HUSAYN (ISN # 10016),**

*Petitioner.*

v.

**JIM MATTIS,**

*Respondent.*

)
)
)
)
)
)
)
)
)
)
)

No. 08-cv-1360 (EGS)

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on opposing counsel, below, by electronic court filing this 1st day of May, 2018.  I also certify that un-redacted copies of all documents mentioned in the foregoing were served upon opposing counsel by email to James.Luh@usdoj.gov.

James Luh
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

_____/s/_____
Joseph Margulies