**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ZAYN AL ABIDIN MUHAMMAD ) | |
| HUSAYN (ISN # 10016), ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 08-cv-1360 (EGS) |
| ) | |
| THE HONORABLE LLOYD J. AUSTIN, III, ) | |
| SECRETARY OF DEFENSE, *et al.*, ) | |
| ) | |
| Respondents. ) | |
| _____ ) | |

**RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR AN
ORDER REQUIRING PETITIONER'S IMMEDIATE RELEASE AND REPATRIATION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 5

    I.     Armed Conflict with al-Qaida, Taliban, and Associated Forces ........................... 5

    II.    The Instant Case................................................................................................ 17

ARGUMENT .................................................................................................................. 17

    I.     Petitioner's Detention Remains Authorized by the AUMF Because
          Active Hostilities Against al-Qaida, Taliban, and Associated Forces
          Are Ongoing.................................................................................................... 17

          A.     Detention Remains Consistent with the Law of War While Active
                Hostilities Are Ongoing. ...................................................................... 17

          B.     Hostilities Authorized by the AUMF Remain Ongoing. ......................... 20

          C.     Petitioner Misapprehends the President's Remarks on the Way
                Forward in Afghanistan. ...................................................................... 25

    II.    The 2006 Military Commissions Act Forecloses Petitioner from Invoking
          the Third Geneva Convention, and He Cannot Invoke It Indirectly
          Through Army Regulation 190-8......................................................................... 31

          A.     Petitioner Cannot Invoke the Provisions of AR 190-8 Including
                Because The Secretary of the Army Has Excepted Guantanamo
                Detainees Like Petitioner from the Regulation......................................... 33

          B.     The Exception Memorandum Is a Valid Exercise of the Authority
                of the Secretary of the Army.................................................................. 34

          C.     The Exception Memorandum Is Consistent with Controlling Law
                and Regulation ..................................................................................... 39

    III.   There is No Basis on Which to Order the Alternative Relief that Petitioner
          Seeks. .............................................................................................................. 44

CONCLUSION............................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Al Odah v. United States*,
   62 F. Supp. 3d 101 (D.D.C. 2014) .......................................................................... 45

*Al Warafi v. Obama*,
   716 F.3d 627 (D.C. Cir. 2013) .................................................................. 40, 42, 43

*Al-Alwi v. Trump*,
   901 F.3d 294 (D.C. Cir. 2018) ......................................................................... *passim*

*Al-Bihani v. Obama*,
   590 F.3d 866 (D.C. Cir. 2010) ......................................................................... *passim*

*Ali v. Obama*,
   736 F.3d 542 (D.C. Cir. 2013) ................................................................. 19, 22, 27

*Alsabri v. Obama*,
   684 F.3d 1298 (D.C. Cir. 2012) ................................................................................ 27

*Al-Kandari v. United States*,
   No. 15-CV-329 (CKK) Unclassified Mem. Op., (D.D.C. Aug. 31, 2015), *decision vacated,*
   *appeal dismissed*, No. 15-5268 (D.C. Cir. Mar. 4, 2016 .......................................... 8

*Al-Warafi v. Obama*,
   No. CV 09-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015), *decision vacated,*
   *appeal dismissed*, No. 15-5266 (D.C. Cir. Mar. 4, 2016) ........................................ 8

*Awad v. Obama*,
   608 F.3d 1 (D.C. Cir. 2010) ...................................................................................... 27

*Baker v. Carr*,
   369 U.S. 186 (1962) ............................................................................................ 21, 31

*Benton v. Laborers' Joint Training Fund*,
   121 F. Supp. 3d 41 (D.D.C. 2015) ............................................................................ 33

*Center for Nat. Sec. Studies v. U.S. Dep't of Justice*,
   331 F.3d 918 (D.C. Cir. 2003) .................................................................................. 30

*Chevron Oil Co. v. Andrus*,
   588 F.2d 1383 (5th Cir. 1979) .................................................................................. 35

*Citizens Protective League v. Clark*,
   155 F.2d 290 (D.C. Cir. 1946) ................................................................ 21

*Commercial Trust Co. of New Jersey v. Miller*,
   262 U.S. 51 (1923) ................................................................................. 21

*El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) ................................................................ 30

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) ................................................................................... 37

*Hamdan v. Rumsfeld*,
   415 F.3d 33 (D.C. Cir. 2005) .......................................................... 40, 42

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ...................................................................... 40, 42

*Hamdi v. Rumsfeld*,
   337 F.3d 335 (4th Cir. 2003) ................................................................. 31

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ........................................................................ *passim*

*Hamilton v. Kentucky Distilleries & Warehouse Co.*,
   251 U.S. 146 (1919) ............................................................................... 28

*Heggestad v. U.S. Dep't of Justice*,
   182 F. Supp. 2d 1 (D.D.C. 2000) ........................................................... 35

*In re Territo*,
   156 F.2d 142 (9th Cir. 1946) ................................................................. 29

*Khan v. Obama*,
   2014 WL 4843907 (D.D.C. Sept. 2, 2014) ............................................ 45

*Knight v. United Land Ass'n*,
   142 U.S. 161 (1891) ............................................................................... 35

*Ludecke v. Watkins*,
   335 U.S. 160 (1948) ........................................................................ *passim*

iii

*Maqaleh v. Hagel*,
  738 F.3d 312 (D.C. Cir. 2013) ........................................................................... 20

*Morrow v. Clayton*,
  326 F.2d 36 (10th Cir. 1963) ............................................................................. 35

*Nat'l Black Police Ass'n v. District of Columbia*,
  108 F.3d 346 (D.C. Cir. 1997) ............................................................................. 8

*Rabbani v. Obama*,
  76 F. Supp. 3d 21 (D.D.C. 2014) ......................................................................... 8

*Razak v. Obama*,
  174 F. Supp. 3d 300 (D.D.C. 2016) *decision vacated, appeal dismissed*, No. 16-5074
  (D.C. Cir. Apr. 12, 2017) ...................................................................................... 8

*Texas v. United States*,
  523 U.S. 296 (1998) ............................................................................................ 45

*The Prize Cases*,
  67 U.S. (2 Black) 635 (1862) ............................................................................. 30

*The Protector*,
  79 U.S. 700 (1871) ............................................................................................. 21

*The Three Friends*,
  166 U.S. 1 (1897) ............................................................................................... 21

*Trump v. New York*,
  141 S. Ct. 530 (2020) ......................................................................................... 45

*United States v. Anderson*,
  76 U.S. 56 (1869) ............................................................................................... 21

*United States v. Hamidullin*,
  888 F.3d 62 (4th Cir. 2018) ............................................................................... 42

*United States v. Hennis*,
  75 M.J. 797 (A. Ct. Crim. App. 2016) ................................................................ 36

*Uthman v. Obama*,
  637 F.3d 400 (D.C. Cir. 2011) ........................................................................... 18

*Warafi v. Obama*,
 409 F. App'x 360 (D.C. Cir. 2011) ........................................................... 43

**Constitutional Provisions**

U.S. Const. Art. I, § 8, Cl. 12 ................................................................... 36

U.S. Const. Art. I, § 8, Cl. 13 ................................................................... 36

U.S. Const. Art. I, § 8, Cl. 14 ................................................................... 36

U.S. Const. Art. II, § 2, Cl. 1 ................................................................... 36

**Statutes**

10 U.S.C. § 113 ........................................................................... 35, 37, 38

10 U.S.C. § 7013 ............................................................................... 35, 36

10 U.S.C. § 7031 ..................................................................................... 36

10 U.S.C. § 7032 ..................................................................................... 36

Authorization for the Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 .................. *passim*

Military Commissions Act of 2006 (2006 MCA), Pub. L. No. 109-3661, 20 Stat. 2631
 (28 U.S.C. 2241 note) ................................................................... 3, 4, 32

National Defense Authorization Act for Fiscal Year 2012 (NDAA), Pub. L. No. 112-81,
 125 Stat. 1562 (10 U.S.C. 801 note) ............................................... *passim*

**Other Authorities**

Army Regulation 190-8 ................................................................... *passim*

Convention Between the United States of America and other Powers Relating to Prisoners of
 War, art. 75, July 27, 1929, 47 Stat. 2021 (1932) .................................. 29

DoD Directive 5101.1 ......................................................................... 38, 39

General Orders No. 2020-01, *Assignment of Functions and Responsibilities Within
 Headquarters* (Mar. 6, 2020) ............................................................... 36

Geneva Convention (III) Relative to the Treatment of Prisoners of War (Third Geneva
 Convention), Aug. 12, 1949, 6 U.S.T. 3316, art. 118 ......................... *passim*

Headquarters Department of the Army, General Order No. 3 (July 9, 2002)......................... 34, 35

Headquarters Department of the Army,General Order No. 3 (April 1, 2005)............................ 35

Memorandum from Ryan D. McCarthy, Sec'y of the Army, to Commander,
U.S. Southern Command, Re: Army Regulation (AR) 190-8 Clarification/Exception
(January 11, 2021) ............................................................................................... *passim*

Office of General Counsel, U.S. Department of Defense, Law of War Manual
(June 2015, Updated Dec. 2016)......................................................... 19, 34, 40, 41

U.S. Dep't of Def., Directive 2310.01E............................................................... *passim*

## INTRODUCTION

Respondents respectfully submit this opposition to the Motion for an Order Requiring Petitioner's Immediate Release and Repatriation, ECF No. 576 ("Petitioner's Motion"). Petitioner insists that his "motion is readily distinguishable from previous challenges in which detainees have alleged that the war in Afghanistan is over."  Mem. of Law in Support of Motion for an Order Requiring Petitioner's Immediate Release and Repatriation, ECF No. 576-1 ("Petr's Br.") at 9.  It is not.  In reality, Petitioner repeats—nearly verbatim—the argument submitted by Asadullah Haroon Gul approximately two months ago in his own habeas case before Judge Mehta.  *See Gul v. Biden*, 16-cv-1462-APM, Mem. of Law in Support of Motion for an Order Requiring the Immediate Release of Asadullah Haroon Gul, ECF No. 117-1.  On May 28, 2021, Judge Mehta declined to issue the relief requested by Mr. Gul, instead holding that the Court would consider how the U.S. military withdrawal from Afghanistan affects the Government's detention authority at some point after that withdrawal was actually completed.  *Gul v. Biden*, Civ. No. 16-1462, ECF No. 128, "May 28, 2021 Tr." at 29:24–30:4.

Petitioner here—just like Mr. Gul—argues that active hostilities against Taliban, al-Qaida, and associated forces already have ended based on the President's April 14, 2021 announcement that the United States plans to withdraw its military forces from Afghanistan by September 11, 2021.  *See* Petr's Br, *generally*.  However, an examination of the President's April 14, 2021 remarks—as well as additional information regarding the ongoing nature of the withdrawal from Afghanistan and the continuing threat posed by al-Qaida—makes clear that hostilities authorized by the Authorization for Use of Military Force (the "AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), have not ceased.  Under the law of war, and the precedents of both the

Supreme Court and the Court of Appeals, detention remains lawful while active hostilities are ongoing.  And it is well established that "the 'termination' of hostilities is 'a political act.'"  *Al-Alwi v. Trump*, 901 F.3d 294 (D.C. Cir. 2018) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 168–69 (1948)).  Petitioner does not contest that principle, but contends that the President's April 14 Remarks on the Way Forward in Afghanistan constitute the President's determination that hostilities have ceased.  This is not so.  The President stated that "We'll hold the Taliban accountable for its commitment not to allow any terrorists to threaten the United States or its allies from Afghan soil."  With respect to al-Qaida, while noting that al-Qaida has been significantly degraded, the President made clear that the threat has become more dispersed, metastasizing around the globe, and that the United States will continue to focus its full attention on the threat it faces today from al-Qaida and associated forces.  Yesterday, the President reiterated that the terrorist threat has metastasized beyond Afghanistan.  Indeed, al-Qaida operatives had announced in a recent interview that al-Qaida's war against the United States will be continuing throughout the world, and the Intelligence Community assesses that al-Qaida and ISIS "remain the greatest Sunni terrorist threats to US interests overseas."

Far from announcing the end of hostilities, the President's remarks set forth a timeline for the future withdrawal of U.S. forces from Afghanistan; that withdrawal process includes the reality that service members remain engaged in military operations, including in Afghanistan.  Although more than ninety percent of the withdrawal process has been completed, the President, just yesterday, was unequivocal:  "The U.S. military mission in Afghanistan continues through the end of August" and "we retain personnel and capacities in the country" under "the same authority under which we've been operating for some time."  The drawdown process is not

complete and remains ongoing; service members currently remain in theater, and in harm's way. This point is far from academic—the Secretary of Defense previously approved the deployment of hundreds of maritime, air, and land forces and other assets to the region to ensure the safety of U.S. and NATO forces and contractors as they withdraw, and also plans to conduct combat air patrols over Afghanistan throughout the withdrawal to maintain security.  There is good reason for these precautions:  after the withdrawal began, Taliban forces fired on Kandahar airfield, and U.S. forces recently struck a suspected Taliban position in self-defense.

The continued presence of deployed U.S. forces in Afghanistan, the prior deployment of additional U.S. forces and equipment to address and disrupt threats in that country during the drawdown, and the continuing threats from hostile forces both in that country and elsewhere all support the Executive Branch determination that hostilities authorized by the AUMF are ongoing, in Afghanistan and globally against al-Qaida.  When "the Executive Branch represents, with ample support from record evidence that the hostilities described in the AUMF continue," "[i]n the absence of a contrary Congressional command, that controls."  *Al-Alwi*, 901 F.3d at 300.  For this reason, as explained further below, Petitioner's Motion should be denied.

Petitioner's efforts to invoke Article 118 of the Third Geneva Convention (which is applicable to prisoners of war in international armed conflicts, rather than Petitioner, an unprivileged belligerent in a non-international armed conflict) are misplaced because Congress has foreclosed Petitioner from invoking the Geneva Conventions as a source of rights in this action.  *See* Military Commissions Act of 2006 (2006 MCA), § 5, Pub. L. No. 109-366, 120 Stat. 2631 (28 U.S.C. 2241 note).  Instead, Petitioner's detention is properly examined through governing statutes.  The AUMF authorized "the President . . . to use all necessary and

- 3 -

appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." § 2(a), 115 Stat. 224. Then, in the National Defense Authorization Act for Fiscal Year 2012 (NDAA), Pub. L. No. 112-81, § 1021(c)(1), 125 Stat. 1562 (10 U.S.C. 801 note), Congress "affirm[ed]" that the authority granted by the AUMF includes the authority to detain, "under the law of war   . . . until the end of the hostilities authorized by the [AUMF]," any "person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners." This provision thus clarifies that the AUMF authorizes detention "until the end of the hostilities"—not until some indeterminate deadline before then. Further, the end of the hostilities in question is not the end of hostilities in Afghanistan, but the end of hostilities against al-Qaida, which was responsible for the 9/11 attacks, the Taliban, which harbored al-Qaida, and associated forces. But, it must be emphasized, that is a matter of applying the pertinent *statutes as informed by the law of war*.

Moreover, Petitioner cannot circumvent the 2006 MCA's limitation on his effort to directly invoke the Geneva Conventions by resorting to Army Regulation (AR) 190-8. Petitioner merely cites AR 190-8 to bolster his assertion that he should be released "at the cessation of hostilities," and not as a separate ground for release. However, the hostilities authorizing Petitioner's detention have neither ended nor ceased. In any event, the Secretary of the Army (SecArmy) in January 2021 issued an Exception Memorandum that renders AR 190-8 inapplicable to Guantanamo Bay detainees, including Petitioner. The Exception Memorandum is valid and binding here, and Petitioner has not even attempted to argue otherwise. He has

forfeited any challenge to the Exception Memorandum—but even if he had not, such a challenge would fail, because the Exception Memorandum falls within the statutory and regulatory authority granted to the SecArmy.

For all these reasons, and the reasons set forth herein, the Court should deny Petitioner's Motion.  If the Court declines to deny the Motion, Respondents respectfully request that the Court—as Judge Mehta did with Mr. Gul's motion—postpone its consideration of any motion addressing the Government's detention authority following the completion of the withdrawal of U.S. forces from Afghanistan until the withdrawal is actually completed.  *See* May 28, 2021 Tr. at 29:24–30:4 (explaining that the Court is "not going to be in a position to make this decision on this record," and that the Court will "hold[] off until we get to this point that we've all been talking about, where U.S. troops have finally withdrawn"); *see also id.* at 29:16–17 (observing, on May 28, 2021, that "the facts on the ground are changing").

## BACKGROUND

### I.    Armed Conflict with al-Qaida, Taliban, and Associated Forces

**1.**  In response to the attacks of September 11, 2001, Congress passed and the President signed into law the AUMF.  In October 2001, U.S. and coalition forces began a military campaign against al-Qaida, in Afghanistan and elsewhere, and to remove the Taliban from power in Afghanistan.  *See* National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report*, at 337–338, *available at* https://9-11commission.gov/report/.  The U.S.-led military campaign removed the Taliban from control of much of Afghanistan in December 2001, but Taliban, al-Qaida, and associated forces continued to operate and conduct attacks in Afghanistan.  *See id.*  From 2001 until the end of 2014, the United States led a large-scale

military combat operation known as Operation Enduring Freedom designed to bring safety, security, and stability to Afghanistan.  *See* Statement by Secretary of Defense Chuck Hagel (Dec. 28, 2014) (Exh. 1) *available at* https://www.defense.gov/Newsroom/Releases/Release/Article/605332/statement-by-secretary-of-defense-chuck-hagel-on-operation-enduring-freedom-and/. More than half a million U.S. service members participated in this major combat mission in the course of its thirteen years.  *See* Statement by the President on Ten Years of American Service in Afghanistan (Oct. 7, 2011) (Exh. 2) *available at* https://obamawhitehouse.archives.gov/the-press-office/2011/10/07/statement-president-ten-years-american-service-afghanistan.

In addition, the International Security Assistance Force ("ISAF"), a United Nations-authorized international coalition operating under the command of the North Atlantic Treaty Organization ("NATO"), conducted combat and other military operations in Afghanistan with the goal of maintaining security and creating conditions for stabilization and reconstruction.  *See* ISAF's Mission in Afghanistan (2001–2014) (Exh. 3), *available at* https://www.nato.int/cps/en/natohq/topics_69366.htm.  The ISAF consisted of tens of thousands of military personnel from more than fifty contributing nations, including the United States.  *See id.*

On June 22, 2011, President Obama announced a multi-year plan to reduce the number of U.S. forces in Afghanistan, with the goal of transitioning from a combat mission to a support mission by 2014.  *See* Remarks by the President on the Way Forward in Afghanistan (June 22, 2011) (Exh. 4) *available at* https://obamawhitehouse.archives.gov/the-press-office/2011/06/22/remarks-president-way-forward-afghanistan.  The United States and its coalition partners then steadily reduced the number of armed forces in Afghanistan as the Afghan government took greater responsibility for its own security and reconstruction.  On May 27, 2014, the President

announced that, after 2014, U.S. military personnel would maintain a presence in Afghanistan for "two narrow missions:  training Afghan forces and supporting counterterrorism operations against the remnants of al Qaeda."  *See* Statement by the President on Afghanistan (May 27, 2014) (Exh. 5) *available at* https://obamawhitehouse.archives.gov/the-press-office/2014/05/27/statement-president-afghanistan.  On December 28, 2014, the President announced "our combat mission in Afghanistan is ending, and the longest war in American history is coming to a responsible conclusion."  *See* Statement by the President on the End of the Combat Mission in Afghanistan (Dec. 28, 2014) (Exh. 6) *available at* https://obamawhitehouse.archives.gov/the-press-office/2014/12/28/statement-president-end-combat-mission-afghanistan.

On January 1, 2015, the United States and NATO transitioned their military missions in Afghanistan.  The United States concluded Operation Enduring Freedom and immediately transitioned to "Operation Freedom's Sentinel," which included two complementary missions. *See* Dep't of Defense Report on Enhancing Security and Stability in Afghanistan (December 2020) (Exh. 7) ("December 2020 DoD Afghanistan Report") *available at* https://media.defense.gov/2021/Apr/23/2002626546/-1/-1/0/ENHANCING-SECURITY-AND-STABILITY-IN-AFGHANISTAN.PDF at 1.  First, U.S. personnel participated in the NATO-led mission Resolute Support to train, advise, and assist the Afghan Ministries of Defense and Interior.  *Id.* Second, U.S. personnel conducted a counterterrorism mission to counter threats from terrorist groups.  *Id.*

Following this transition to a support and counterterrorism mission, several detainees brought renewed habeas challenges similar to the one Petitioner asserts here, arguing that their detention was unlawful because the combat mission had ended.  These challenges were

- 7 -

uniformly rejected by the Court of Appeals and multiple judges of this Court.  *See Al-Alwi v. Trump*, 901 F.3d at 111; *Al-Warafi v. Obama*, No. CV 09-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015), *decision vacated, appeal dismissed*, No. 15-5266 (D.C. Cir. Mar. 4, 2016); *Al-Kandari v. United States*, No. 15-CV-329 (CKK) (D.D.C. Aug. 31, 2015) (ECF No. 24), Unclassified Mem. Op., *decision vacated, appeal dismissed*, No. 15-5268 (D.C. Cir. Mar. 4, 2016); *Razak v. Obama*, 174 F. Supp. 3d 300, 302 (D.D.C. 2016) (Kessler, J.), *decision vacated, appeal dismissed*, No. 16-5074 (D.C. Cir. Apr. 12, 2017).[1]  In *Al-Alwi*, the Court of Appeals rejected an argument that the U.S.-Afghanistan bilateral security agreement in which the United States declared that its "forces shall not conduct combat operations in Afghanistan" undermined the authorization for Al-Alwi's continued detention.  *See Al-Alwi*, 901 F.3d at 299–300.

**2.**  On February 29, 2020, the United States signed an agreement with the Taliban under which the Taliban committed, *inter alia*, to prevent any group or individual, including al-Qaida, from using Afghanistan to threaten the security of the United States and its allies, and to enter intra-Afghan negotiations to determine the date and modalities of a permanent and comprehensive ceasefire and to reach an agreement over the future political roadmap of

---

[1] As noted, the decisions in *Al-Warafi*, *Al-Kandari*, and *Razak* were subsequently vacated by the Court of Appeals because the detainees in those cases were released from United States custody while the cases were on appeal, thereby rendering the cases moot.  Although vacated, Circuit precedent establishes that these decisions still retain their persuasive value on the factual and legal issues decided.  *See Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997) ("Moreover, since the district court's opinion will remain 'on the books' even if vacated, albeit without any preclusive effect [between the parties], future courts will be able to consult its reasoning."); *Rabbani v. Obama*, 76 F. Supp. 3d 21, 24–25 n.3 (D.D.C. 2014) ("even if [Guantanamo detainee] Dhiab's release subjects Judge Kessler's Memorandum Opinion to vacatur, the persuasiveness of Judge Kessler's factual findings and legal reasoning remains intact."); see *Razak*, 174 F. Supp.3d at 304 n.2 (relying on *Al-Warafi* and *Al-Kandari* post-vacatur for their "persuasive value").

Afghanistan.  *See* Agreement for Bringing Peace to Afghanistan (Feb. 29, 2020) (Exh. 8) ("U.S.-Taliban Agreement") *available at* https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf.  For its part, the United States committed to withdraw all of its military forces from Afghanistan by May 1, 2021.  *See id.*  Although the agreement was a step toward a negotiated political settlement in Afghanistan, hostilities did not cease upon its conclusion.  *See* Jim Garamone, Taliban Agreement Is Afghanistan's Best Chance for Peace, Esper Says, DoD News (March 2, 2020) (Exh. 9) *available at* https://www.defense.gov/Explore/News/Article/Article/2099047/taliban-agreement-is-afghanistans-best-chance-for-peace-esper-says/, at 4 (reporting attacks just days after the agreement was announced).  On September 12, 2020, representatives of the Islamic Republic of Afghanistan and the Taliban began negotiations.  *See* December 2020 DoD Afghanistan Report at 3.

Consistent with the U.S.-Taliban Agreement, in mid-2020, the United States began the process of reducing its military footprint in Afghanistan.  *See id.* at 3–4.  U.S. bases in Afghanistan, as well as some equipment, were transitioned primarily to the Ministry of Defense and other Afghan forces.  *See* Chandelis Duster and Nicky Robertson, US begins local withdrawal from Afghanistan, CNN, (Exh. 10) *available at* https://www.cnn.com/2021/04/25/politics/us-troops-afghanistan-withdrawal-austin-scott-miller/index.html.  All the while, however, although attacks against U.S. and coalition personnel substantially decreased, with three U.S. personnel wounded due to hostile action between June 1, 2020, and November 30, 2020, the level of violence in Afghanistan remained above seasonal norms.  December 2020 DoD Afghanistan Report at 1, 14.  The Department of Defense has reported that the Taliban, al-Qaida and its regional affiliate, al-Qaida in the Indian Subcontinent (AQIS), and other violent

extremist organizations continue to threaten the stability and security of Afghanistan and U.S. forces, with al-Qaida and AQIS maintaining a presence in Afghanistan's remote areas and rugged border regions.  *Id.* at 8; *see also* Decl. of Major General Jeff Taliaferro, Vice Director of Operations for the Joint Chiefs of Staff (Exh. 11) ("Taliaferro Decl.") ¶ 12.[2]  While al-Qaida's remaining core leaders pose a more limited threat to U.S. and coalition forces in Afghanistan, being focused primarily on their own survival, AQIS maintains "an enduring interest in attacking U.S. Forces and Western targets in the region" and continues to pose a threat to U.S. personnel and allies in Afghanistan through its continued interaction with local Taliban commanders. December 2020 DoD Afghanistan Report at 8.  *See also* Taliaferro Decl. ¶¶ 12, 16–21.

**3.**  On April 14, 2021, President Biden laid out his plan with respect to ending the United States' military presence in Afghanistan.  *See* Remarks by President Biden on the Way Forward in Afghanistan (Apr. 14, 2021) (Exh. 12) *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/14/remarks-by-president-biden-on-the-way-forward-in-afghanistan/.  He said that the United States had achieved its objective:  "to ensure Afghanistan would not be used as a base from which to attack our homeland again."  *Id.* at 1.  He also referred specifically to the United States having "delivered justice to bin Laden a decade ago," and noted that "al Qaeda is degraded . . . in Afghanistan."  *Id.* at 6.  The President explained:

---

[2] The declaration of Major General Taliaferro, previously submitted in connection with proceedings before Judge Mehta in *Gul*, is classified at the SECRET/NOFORN level and, accordingly, has been filed separately under seal.  The recitation of facts herein is unclassified. The facts as recited in the declaration of Major General Taliaferro were accurate at the time that declaration was executed, but, as is indicated here, the situation in Afghanistan continues to evolve and specific numbers recounted therein may have changed since the time of that filing. The premise that the withdrawal continues and is not complete, however, remains accurate.

"[T]he terrorist threat that we went to fight [has] evolved.  Over the past 20 years, the threat has become more dispersed, metastasizing around the globe . . . With the terror threat now in many places, keeping thousands of troops grounded and concentrated in just one country . . . .makes little sense to me."  *Id.*; *see id.* at 4 ("We have to track and disrupt terrorist networks and operations that spread far beyond Afghanistan since 9/11.").  Thus, the President said, he "concluded that it's time to end America's longest war.  It's time for American troops to come home."  *Id.* at 2; *id.*  at 6 ("[I]t's time to end the forever war.").

Citing the U.S.-Taliban agreement and the United States' commitments therein, the President announced that, on May 1, 2021, the United States would begin the drawdown of the over 2,500 military personnel remaining in Afghanistan, with the withdrawal to be completed by September 11, 2021.  *See id.* at 2.  Recognizing the continuing threat to U.S. forces both during and after the withdrawal, the President warned, "[T]he Taliban should know that if they attack us as we draw down, we will defend ourselves and our partners with all the tools at our disposal."  *Id.* at 3.  The President also cautioned that "we'll not take our eye off the terrorist threat," and will broaden the national strategy "to monitor and disrupt significant terrorist threats not only in Afghanistan, but anywhere they may arise" moving forward.  *Id.*

Days after the President's remarks, Pentagon Press Secretary Kirby again referred to the Taliban threats to the U.S. military drawdown, saying:  "[w]e've seen their threats, and it would be imprudent for us not to take those threats seriously."  *See* Terri Moon Cronk, Any Terrorist Attack on U.S. Military Drawdown in Afghanistan Will Be Met Forcefully, Kirby Says, DoD News (April 16, 2021) (Exh. 13) *available at* https://www.defense.gov/Explore/News/Article/Article/2575982/any-terrorist-attack-on-us-military-drawdown-in-afghanistan-will-be-met-

forcefu/.  General Kenneth McKenzie, the head of U.S. Central Command (USCENTCOM), testified before that the United States is prepared for Taliban attacks on U.S. forces "should they occur and we will be able to defend ourselves."  Hearing on National Security Challenges and US Military Activities in the Greater Middle East and Africa Before the H. Armed Servs. Comm., 117th Cong. 98 (2021) (testimony of Gen. McKenzie) (Exh. 14) ("HASC Transcript") *available at* https://www.centcom.mil/Portals/6/Documents/Transcripts/ 04222021SASCCENTCOMandAFRICOMTranscript.pdf.  General McKenzie indicated that the United States is "positioning significant combat power to guard against the possibility that the Taliban decide to interfere in any way with our orderly redeployment."  *Id.* at 10.

To provide force protection during the planned withdrawal, the Secretary of Defense approved the deployment of hundreds of maritime, air, and land forces to the region.  *See* Barbara Starr, US begins to move equipment out of Afghanistan and approves deployment of forces to protect withdrawal, CNN, Apr. 23, 2021 (Exh. 15) *available at* https://www.cnn.com/2021/04/23/politics/afghanistan-military-withdrawal-equipment/ index.html (citing comments from three Defense officials); *see also* Taliaferro Decl. ¶¶ 7–8. Several hundred military personnel were sent to Afghanistan, and up to one thousand were authorized.  *See id.*  The USS Eisenhower aircraft carrier's mission to remain in the region was extended.  *See id.*  The addition of some long range bombers to the region was approved, and, accordingly, B-52 bombers were added.  *See id.*  Furthermore, the military planned to maintain combat air patrols over Afghanistan throughout the withdrawal to maintain security.  *See id.* Currently, the withdrawal is over ninety percent complete and remains ongoing.  *See* Press Release, U.S. Central Command, July 6, 2021, (Exh. 16) *available at* https://www.centcom.mil/

MEDIA/PRESS-RELEASES/Press-Release-View/Article/2675417/update-on-withdrawal-of-us-forces-from-afghanistan-july-5-2021/.  On July 2, 2021, Pentagon Press Secretary Kirby indicated that while U.S. forces "continue to execute a safe, orderly draw down in accordance with the President's guidance," currently, "the mission continues."  U.S. Dep't of Defense, *Pentagon Press Secretary John F. Kirby Holds a Press Briefing* (July 2, 2021) (Exh. 17), *available at* https://www.defense.gov/Newsroom/Transcripts/Transcript/Article/2681883/ pentagon-press-secretary-john-f-kirby-holds-a-press-briefing/, at 17, 21; *see also id.* at 18 (U.S. forces in Afghanistan "will remain focused on four things over the coming period.  One, protecting our diplomatic presence in the country.  Two, supporting security requirements at Hamid Karzai International Airport.  Three, continued advice and assistance to Afghan National Defense and Security Forces as appropriate.  And four, supporting our counterterrorism efforts.").  Yesterday, the President reiterated:  "[t]he drawdown is proceeding in a secure and orderly way," and "[t]he U.S. military mission in Afghanistan continues through the end of August."  *See* Remarks by President Biden on the Drawdown of U.S. Forces in Afghanistan (July 8, 2021) (Exh. 18), *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/07/08/remarks-by-president-biden-on-the-drawdown-of-u-s-forces-in-afghanistan/ at 1; *see id.* 1–2 ("we retain personnel and capacities in the country, and we maintain . . . . the same authority under which we've been operating for some time").

For its part, on May 1, 2021, the Taliban issued a public statement indicating they were authorized "to take every counteraction [they] deem[ed] appropriate against the occupying forces" after the withdrawal date in the U.S.-Taliban Agreement passed.  *See* Tal Axelrod, Taliban warns of attacks on US troops after withdrawal deadline under Trump deal passes, The

Hill, May 3, 2021 (Exh. 19) *available at* https://thehill.com/policy/defense/551301-taliban-warns-of-attacks-on-us-troops-after-withdrawal-deadline-under-trump (noting that "the Taliban is considered to be at its strongest point since the U.S.'s 2001 invasion, holding sway or full control of an estimated half of the country").  Also on May 1, 2021, Kandahar Airfield received ineffective indirect fire; in response, the United States carried out a precision strike against additional rockets aimed at the airfield.  *See* USFOR-A Spokesman Col. Sonny Leggett, (@USFOR_A), Twitter (May 1, 2021), https://twitter.com/USFOR_A/status/1388474917495185410 (Exh. 20); *see also* Taliaferro Decl. ¶¶ 9, 23.  The Taliban then launched an offensive against Afghan forces in Southern Helmand province, with a resident describing "a thunderstorm of heavy weapons and blasts," and mounted attacks in at least six other provinces. *See* Taliban launches huge Afghan offensive after deadline for US pullout, Reuters, May 4, 2021 (Exh. 21) *available at* https://www.reuters.com/world/asia-pacific/taliban-launches-huge-afghan-offensive-after-deadline-us-pullout-2021-05-04/.  *See also* Taliaferro Decl. ¶ 13–15.  That offensive continues.  *See* Taliban Advances Test Afghan Forces' Morale, *Wall Street Journal*, June 20, 2021 (Exh. 22) available at https://www.wsj.com/articles/taliban-advances-test-afghan-forces-morale-as-the-u-s-leaves-11624209389?page=1, at 3 (citing an Afghan government official's assessment that "July to September are likely to be the deadliest months").

Al-Qaida has promised to continue its war against the United States, not just in Afghanistan but throughout the world.  Nic Robertson and Saleem Mehsud, Al Qaeda promises 'war on all fronts' against America as Biden pulls out of Afghanistan, CNN, Apr. 30, 2021 (Exh. 23) (noting "now al Qaeda claims its war with America is far from over") *available at* https://www.cnn.com/2021/04/30/asia/al-qaeda-afghanistan-biden-intl-cmd/index.html.  Two al-

Qaida operatives reportedly told CNN that the "war against the US will be continuing on all other fronts unless they are expelled from the rest of the Islamic world." *Id.* On May 3, 2021, in answer to a question about Al-Qaida's threat and capabilities ten years after the death of Usama bin Laden, Pentagon Press Secretary Kirby responded as follows:

> Nobody is suggesting that Al-Qaeda's gone away or the threat of Al-Qaeda is gone 10 years after the raid which killed bin Laden were still -- is still a threat, and we still have to be focused on that threat […] Nobody's taking our eye off the continued challenge that Al-Qaeda and other terrorist networks continue to pose. [Al-Qaida] is a greatly diminished threat no question since 9/11, and Al-Qaeda is a greatly-diminished network in terms of its reach and its power, but it still exists […] it still does pose a threat not only to us but to our allies and partners in the region, and again we're not going to lose focus.

U.S. Dep't of Defense, *Pentagon Press Secretary John F. Kirby Holds a Press Briefing* (May 3, 2021) (Exh. 24), *available at* https://www.defense.gov/Newsroom/Transcripts/Transcript/ Article/2594232/pentagon-press-secretary-john-f-kirby-holds-a-press-briefing/. *See also* Taliaferro Decl. ¶¶ 16–21. In his April 22, 2021 Posture Statement before the Senate Armed Services Committee, USCENTCOM Commander McKenzie described U.S. forces under his command as continuing "active campaigns against al-Qaida, ISIS, and other [violent extremism organizations]." Posture Statement of General Kenneth F. McKenzie, Jr., Commander, United States Central Command, Senate Armed Services Committee (Apr. 22, 2021) ("Posture Statement") (Exh. 25), *available at* https://www.centcom.mil/ABOUT-US/POSTURE-STATEMENT/. *See also* Taliaferro Decl. ¶¶ 10, 22.

Indeed, General McKenzie, addressing the House Armed Services Committee, testified that the "known aspiration of these groups to launch attacks against the United States . . . hasn't gone away." HASC Transcript at 68; *see id.* (noting that, although they "currently have very

little ability to do that . . . they could reestablish themselves in the future").  The Annual Threat Assessment of the US Intelligence Community likewise acknowledged an ongoing, although somewhat diminished, threat from al-Qaida and associated forces:

> Al-Qa'ida's senior leadership cadre has suffered severe losses in the past few years, but remaining leaders will encourage cooperation among regional elements, continue calls for attacks against the United States and other international targets, and seek to advance plotting around the world.  Al Qa'ida's regional affiliates will exploit local conflicts and ungoverned spaces to threaten US and Western interests, as well as local governments and populations abroad.

Office of the Director of National Intelligence, Annual Threat Assessment, Apr. 9, 2021 (Exh. 26) *available at* https://www.dni.gov/files/ODNI/documents/assessments/ATA-2021-Unclassified-Report.pdf at 23.  The assessment concluded that al-Qaida and associated forces such as ISIS "continue to plot terrorist attacks against US persons and interests, including to varying degrees in the United States."  *Id.* at 4.

As for al-Qaida in Afghanistan, according to a recent report submitted to the United Nations Security Council by its Analytical Support and Sanctions Monitoring Team, al-Qaida remains in the country but has "relocated to more remote areas . . . to avoid potential exposure and targeting."  Twelfth Report of the Analytical Support and Sanctions Monitoring Team, April 28, 2021 (Exh. 27) *available at* https://www.undocs.org/en/S/2021/486, at 13.  The report cited Member State information that al-Qaida is resident in at least 15 Afghan provinces, and notes assessments "that have suggested a longer-term Al-Qaida core strategy of strategic patience for a period of time before it would seek to plan attacks against international targets again."  *Id.* at 12–13.  The report further notes that "Al-Qaida's presence in Afghanistan has also been confirmed by its own affiliated propaganda and media wings. Al-Qaida's weekly *Thabat* newsletter

reported on Al-Qaida operations inside Afghanistan, listing Al-Qaida attacks since 2020 in 18 provinces." *Id.* at 14.

## II.    The Instant Case

Petitioner is a Palestinian currently detained at the United States Naval Station in Guantanamo Bay, Cuba.  Petitioner filed his petition for writ of habeas corpus on August 6, 2008.  *See* ECF No. 1.  As Respondents explained in their factual return, Petitioner is detained because he was part of and substantially supported al-Qaida and associated forces.  *See* Factual Return, ECF No. 474-1 at 24.  Respondents have provided the Court with extensive evidence of Petitioner's work and activities on behalf of al-Qaida and associated forces, including materials demonstrating that he facilitated travel for and provided other assistance to recruits so they could receive terrorist training; facilitated at least one large financial transaction for terrorist activities; maintained a close relationship with and actively supported Usama Bin Laden; actively associated with enemy forces and directly aided enemy forces engaged in hostilities with U.S. forces in Afghanistan; facilitated the retreat and escape of enemy forces out of Afghanistan; was captured harboring several terrorists, and plotted future terrorist operations.  *See id.* at 24, 31–67 (discussing evidence).  Petitioner filed his motion seeking immediate release on June 25, 2021.

## ARGUMENT

### I.    Petitioner's Detention Remains Authorized by the AUMF Because Active Hostilities Against al-Qaida, Taliban, and Associated Forces Are Ongoing.

#### A.    Detention Remains Consistent with the Law of War While Active Hostilities Are Ongoing.

In *Hamdi v. Rumsfeld*, a plurality of the Supreme Court held that "[i]t is a clearly established principle of the law of war that detention may last no longer than active hostilities."

542 U.S. 507, 520 (2004) (plurality opinion).[3]  The plurality based this conclusion on Article 118

of the Third Geneva Convention of 1949, which provides that '[p]risoners of war shall be

released and repatriated without delay after the cessation of active hostilities." *Id.* (citing Geneva

Convention (III) Relative to the Treatment of Prisoners of War (Third Geneva Convention), Aug.

12, 1949, 6 U.S.T. 3316, 3406, art. 118).  Drawing on "longstanding law of war principles," the

*Hamdi* plurality held that "Congress' grant of authority for the use of 'necessary and appropriate

force' in the AUMF 'include[s] the authority to detain for the duration of the relevant conflict.'"

*Hamdi*, 542 U.S. at 521; *see also Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011) ("The

AUMF, among other things, authorizes the Executive Branch to detain for the duration of

hostilities those individuals who are part of al Qaeda or the Taliban.") (citing *Hamdi*, 542 U.S. at

518).  Congress subsequently affirmed this understanding of the Government's detention

authority in the 2012 NDAA and specified that this detention authority includes "[d]etention

under the law of war without trial until the end of the hostilities authorized by the Authorization

for the Use of Military Force."  NDAA § 1021(c)(1).

In 2018, the Court of Appeals reiterated:  "[t]he AUMF authorizes detention for the

duration of the conflict between the United States and the Taliban and al Qaeda."  *Al-Alwi*, 901

F.3d at 299.  After discussing the AUMF and the NDAA, the Court of Appeals observed that

"[n]either of these enactments places limits on the length of detention in an ongoing conflict,"

and concluded:  "the AUMF remains in force if hostilities between the United States and the

---

[3] Justice Thomas provided a fifth vote for upholding law of war detention authority under the AUMF, but would have gone further than the plurality, stating that 'the power to detain does not end with cessation of formal hostilities.'"  *See Hamdi*, 542 U.S. at 587–88 (Thomas, J., dissenting).

Taliban and al Qaeda continue." *Id.* at 297 (citing *Ali v. Obama*, 736 F.3d 542, 552 (D.C. Cir. 2013) ("[T]he 2001 AUMF does not have a time limit, and the Constitution allows detention of enemy combatants for the duration of hostilities.")).

The Court of Appeals has also rejected any approach to assessing an end of hostilities by which release of combatants would be required at the conclusion of "each successful campaign of a long war." *Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010).[4]  Such a principle, if accepted, would be "a Pyrrhic prelude to defeat" because it "would trigger an obligation to release . . . fighters captured in earlier clashes" and result in "constantly refresh[ing] the ranks" of enemy forces during the persistence of hostilities.  *Id.*

Petitioner acknowledges that the Government's detention authority continues while active hostilities are ongoing, *see* Petr's Br. at 5–8, but erroneously argues that the "hostilities have been publicly declared by the President to have ceased." *Id.* at 7.  As discussed in Sections

---

[4] This accords with Department of Defense's interpretation of the law of war.  See DoD Law of War Manual § 8.14.3.1 (June 2015, Updated Dec. 2016) ("For persons who have participated in hostilities or belong to armed groups that are engaged in hostilities, the circumstance that justifies their continued detention is the continuation of hostilities. Thus, release of such persons is generally only required after the conflict has ceased."); *id.* at § 9.73.2 ("[Cessation of active hostilities] is the complete end of the fighting with clearly no probability of resumption of hostilities in the near future.").  Other international law commentators interpret Article 118 similarly. *See e.*g. 3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, art. 118 at 547 (J. Pictet ed., 1960) (the rationale for detention—to prevent the detainee from taking up arms against the captor State again—no longer exists "once the fighting is over"); l G. Schwarzenberger, International Law 216 (5th ed. 1967) (stating that Article 118 "prescribes repatriation . .. on cessation of active hostilities, that is, when, in good faith, neither side expects a resumption of hostilities."); The Handbook of Humanitarian Law in Armed Conflicts § 732 (Dieter Fleck ed., 1995) (explaining that "cessation of active hostilities" involves a situation where "the fighting has stopped" as reflected by "lasting peace" and "demobilization of the parties to the conflict" as opposed to "merely an interruption in the hostilities").

I.B and I.C, the President has made no such declaration.  Indeed, as explained below, hostilities

against Taliban, al-Qaida, and associated forces, remain ongoing, including in Afghanistan.

Accordingly, Petitioner's detention remains lawful at this time.

### B.  Hostilities Authorized by the AUMF Remain Ongoing.

The D.C. Circuit recently reaffirmed that the determination of when hostilities have

ceased is a political decision.  *See Al-Alwi*, 901 F.3d at 299 ("termination" of hostilities is "a

political act") (quoting *Ludecke*, 335 US at 168-69); *see also Maqaleh v. Hagel*, 738 F.3d 312,

341 (D.C. Cir. 2013) ("whether an armed conflict has ended is a question left exclusively to the

political branches").  "If the 'life of a statute' conferring war powers on the Executive 'is defined

by the existence of a war, Congress leaves the determination of when a war is concluded to the

usual political agencies of the Government.'"  *Al-Alwi*, 901 F.3d at 299; *see also Al-Bihani*, 590

F.3d 874 (emphasizing that, under separation of powers principles, the judiciary is obligated to

give the political branches 'wide deference' on questions concerning the cessation of hostilities).

In so holding, the Court of Appeals relied principally on *Ludecke v. Watkins*, a case in

which the Supreme Court held that the President retained the war power to deport enemy aliens

notwithstanding the surrender of Germany in World War II, because the political branches had

not terminated hostilities.  *See Al-Alwi*, 901 F.3d at 300 (describing and quoting *Ludecke*, 335

U.S. at 168–70).  Noting that the law does not "lag behind common sense," the Supreme Court

recognized that war does not necessarily end with a cease-fire order; rather, war "may be

terminated by treaty or legislation or Presidential proclamation.  Whatever the mode, its

termination is a political act."  *Ludecke*, 335 U.S. at 168–69.  In reaching this conclusion, the

Supreme Court emphasized that questions concerning the time at which wars end are "matters of

political judgment for which judges have neither the technical competence nor official responsibility." *Id.* at 170.

*Ludecke*, in turn, followed a long line of Supreme Court cases addressing other armed conflicts. *See, e.g.*, *United States v. Anderson*, 76 U.S. 56, 70–71 (1869) (relying on a public proclamation from President Andrew Johnson to establish the end date for the Civil War, explaining the "inherent difficulty of determining" when the Civil War ended, and rejecting an argument that a court could determine the end point of the Civil War by identifying "when the last Confederate general surrendered to the National authority"); *The Protector*, 79 U.S. 700, 701-702 (1871) ("Acts of hostility by the insurgents occurred at periods so various, and of such different degrees of importance, and in parts of the country so remote from each other, both at the commencement and the close of the late civil war, that it would be difficult, if not impossible, to say on what precise date it began or terminated. It is necessary, therefore, to refer to some public act of the political departments of the government to fix the dates"); *The Three Friends*, 166 U.S. 1, 63 (1897) ("But it belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted to the terms of the intention expressed."); *Commercial Trust Co. of New Jersey v. Miller*, 262 U.S. 51, 57 (1923) (stating that a "court cannot estimate the effects of a great war and pronounce their termination at a particular moment of time"); *see also Citizens Protective League v. Clark*, 155 F.2d 290, 295 (D.C. Cir. 1946) ("It is not for the courts to determine the end of a war declared by the Congress.").

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court summarized this line of cases and concluded that they support the proposition that questions concerning the "dates of duration of hostilities" are committed to the political branches. *Id.* at 213. The Court explained that

questions concerning "when and whether a war has ended" require "finality in the political determination" and lack "clearly definable criteria for decision" by courts.

In *Al-Alwi*, the Court of Appeals applied this rule with respect to the current armed conflict. *See Al-Alwi*, 901 F.3d at 299. There the petitioner claimed that the United States' detention authority under the AUMF had expired because the conflict in which he was captured and detained had ended. *Id.* at 299-300 ("The transition from Operation Enduring Freedom [during which Al-Alwi was captured] to Operation Freedom's Sentinel, Al-Alwi contends, terminated the Government's power under the AUMF to detain him."). Consistent with the Supreme Court's guidance in *Ludecke*, the Court of Appeals looked first to the Executive Branch's determination that active hostilities continued, and then observed that the record confirmed the Executive Branch's representations. *See id.* at 299 (citing evidence of ongoing fighting, and that "there have been numerous specific instances of hostile forces, including the Taliban and al-Qaeda, attacking or planning to attack U.S. personnel and facilities in Afghanistan"). The Court of Appeals concluded: "the Executive Branch represents, with ample support from record evidence, that the hostilities described in the AUMF continue. In the absence of a contrary Congressional command, that controls." *Id.* (citing and quoting *Ludecke*, 335 U.S. at 168–70).

In this case, too, Congress and the Executive Branch are in agreement that the hostilities authorized by the AUMF continue. The AUMF, which authorizes the use of force against al-Qaida, Taliban, and associated forces, remains in effect, and has not been repealed or amended by Congress. *See Ali*, 736 F.3d at 552. Nor has Congress passed a resolution that hostilities against al-Qaida, Taliban, and associated forces have ended. In fact, in the 2012 NDAA,

- 22 -

Congress reaffirmed "the authority of the President to use all necessary and appropriate force pursuant to the [AUMF]," including "[d]etention under the law of war without trial until the end of the hostilities authorized by the [AUMF]," *see* NDAA 1021(a) and (b)(2), 125 Stat. 1562. That provision and the AUMF both remain in effect.

Pursuant to the AUMF, U.S. forces remain in hostilities.  *See supra* 10–17.  Just yesterday, the President stated:  "[t]he U.S. military mission in Afghanistan continues through the end of August."  *See* Remarks by President Biden on the Drawdown of U.S. Forces in Afghanistan (July 8, 2021) at 1.  Indeed, even after the President's April 14 announcement, U.S. forces continued in "active campaigns against al-Qaida, ISIS, and other [violent extremist organizations]."  Posture Statement of General McKenzie.  *See* Taliaferro Decl. ¶¶ 10, 22. Although al-Qaida's core leadership has been degraded, al-Qaida remains an active threat on which the U.S. Department of Defense is focused.  *See supra* 14–17.  Furthermore, in the face of the planned withdrawal from Afghanistan, al-Qaida has announced that its "war against the US will be continuing on all other fronts" after the withdrawal from Afghanistan, unless the United States is "expelled from the rest of the Islamic world."  *See id.*  The April 9, 2021 Annual Threat Assessment of the US Intelligence Community listed al-Qaida and ISIS as "remain[ing] the greatest Sunni terror threats to US interests overseas."  Annual Threat Assessment at 23.  A report recently submitted by the Analytical Support and Sanctions Monitoring Team to the United Nations Security Council notes that al-Qaida remains present in Afghanistan and has claimed responsibility for attacks in 18 provinces since 2020.  *See supra* 23.  The Intelligence Community assesses that, notwithstanding losses in al-Qaida's senior leadership cadre, al-Qaida

will "continue calls for attacks against the United States and other International targets, and seek to advance plotting around the world." *Id.*; *see also* Taliaferro Decl. ¶¶ 16–21.

And in Afghanistan, U.S. service members remain in force-ready posture, due to attacks such as those described above. *See supra* 14, 16; *see also* Remarks by President Biden on the Drawdown of U.S. Forces in Afghanistan (July 8, 2021) at 1 ("we retain personnel and capacities in the country, and we . . . maintain the same authority under which we've been operating for some time."). Taliban forces have announced they considered themselves to be authorized "to take every counteraction [they] deem[ed] appropriate against the occupying forces" after the withdrawal date in the U.S.-Taliban Agreement, initiated an offensive against Afghan forces in Helmand province, and launched attacks in at least six other provinces. *See supra* 14. That offensive continues. *See id.*

The President announced as to the planned withdrawal: "the Taliban should know that if they attack us as we draw down, we will defend ourselves and our partners with all the tools at our disposal." Remarks by President Biden on the Way Forward in Afghanistan at 3. Indeed, the Secretary of Defense approved the deployment of hundreds of maritime, air, and land forces to the region and significant other military assets to provide force protection for the drawdown of U.S. military and other personnel currently stationed in Afghanistan.

In *Hamdi v. Rumsfeld*, the Supreme Court concluded that the presence of U.S. military personnel in Afghanistan engaged in combat operations against Taliban fighters confirmed that active hostilities were ongoing, and further held that the United States' detention authority would extend "for the duration of these hostilities." *See Hamdi*, 542 U.S. at 521 (citing various news articles and government press releases to support position that between 13,500 and 20,000 U.S.

military personnel remained in Afghanistan at the time and operations continued there); *see also Ludecke*, 335 U.S. at 169 (reasoning that the United States [in 1948] still had "armies abroad exercising our war powers," supporting the Executive's position that the war at issue had not ended). Although there are now substantially fewer U.S. military personnel in Afghanistan than the 13,500–20,000 cited in *Hamdi*, their diminished number does not alter the analysis, and only underscores the importance of keeping enemy fighters off the battlefield until the Executive has determined active hostilities have ceased. *See Hamdi*, 542 U.S. at 519 (noting that the purpose of detention in these cases is "to prevent a combatant's return to the battlefield").

### C. Petitioner Misapprehends the President's Remarks on the Way Forward in Afghanistan.

Petitioner acknowledges that the Executive Branch's determination as to the state of hostilities is controlling, Petr's Br. at 8, but erroneously argues that the President's Remarks on the Way Forward in Afghanistan constitute "a political decision" that active hostilities have ceased, requiring Petitioner's release. *Id.* Petitioner misunderstands the President's statements.

In his remarks, the President said that the United States had met its objectives in Afghanistan by having ensured that Afghanistan would not be used as a base from which to attack the United States and by having delivered justice to Usama bin Laden. President Biden's Remarks on the Way Forward in Afghanistan at 1–2. He further explained that "the terrorist threat that we went to fight [has] evolved" and "become more dispersed, metastasizing around the globe." *Id.* at 2. The President reasoned that "[w]ith the terror threat now in many places, keeping thousands of troops grounded and concentrated in just one country . . . makes little sense to me and to our leaders." *Id.* Thus, the President announced a schedule for the United States'

final withdrawal, to begin on May 1, 2021 and conclude by September 11, 2021.  *Id.* at 2, 3.  In

announcing that timeline, the President said "I have concluded that it's time to end America's

longest war.  It's time for American troops to come home."  *Id.* at 2.

Petitioner insists these remarks mean that al-Qaida has been defeated and that the war has

already ended.  Petr's Br. at 1, 4, 8.[5]  Petitioner is wrong.  Declaring that U.S. forces will shift

their posture does not mean that the war has ended.  With respect to al-Qaida—although the

President explained that it had been "degraded" in Afghanistan such that it could no longer use

Afghanistan as a base from which to launch an attack on U.S. soil—the President cited the extent

to which al-Qaida "evolved" and "metastasiz[ed]" as reasons why thousands of U.S. military

personnel should no longer be concentrated just in Afghanistan.  President Biden's Remarks on

the Way Forward in Afghanistan at 1–2, 6; Remarks by President Biden on the Drawdown of

U.S. Forces in Afghanistan (July 8, 2021) at 5 ("Today, the terrorist threat has metastasized

beyond Afghanistan").  *See also* Taliaferro Decl. ¶¶ 10, 22.  Nor did the President comment on

al-Qaida's ability to threaten U.S. forces or interests abroad, including in Afghanistan.  Indeed,

the Annual Threat Assessment of the US Intelligence Community lists al-Qaida and ISIS as

"remain[ing] the greatest Sunni terrorist threats to US interests overseas."  Annual Threat

Assessment of the US Intelligence Community, Apr. 9, 2021, at 23 (noting that remaining al-

---

[5] In support of the argument that the Executive has determined al-Qaida has been defeated, Petitioner also relies on a statement by a senior Administration official that al-Qaida does not "currently possess an external plotting capability that can threaten the homeland." Petr's Br. at 4.  As to this statement, too, Petitioner misses that the question of whether al-Qaida currently is assessed to have the capability to conduct attacks on U.S. territory is distinct from the question of whether it can continue hostilities and threaten U.S. interests elsewhere in the world, including in Afghanistan.

Qaida leaders will "continue calls for attacks against the United States and other international targets, and seek to advance plotting around the world," while al-Qaida's regional affiliates "will exploit local conflicts and ungoverned spaces to threaten US and Western interests."). In light of this ongoing threat—and al-Qaida's recent announcement that its war with the United States remains ongoing, *see supra*—it is clear that armed conflict with al-Qaida continues. The President has not said otherwise.

Further, while, as explained *supra*, active hostilities are ongoing in Afghanistan, relevant to the existence of hostilities against al-Qaida, Circuit precedent establishes that the lawfulness of detention under the AUMF is based not on *where* a detainee's activities took place, but rather on *whether* the detainee was part of or substantially supported al-Qaida. *See Ali*, 736 F.3d at 547 (relying on activities outside Afghanistan); *Alsabri v. Obama*, 684 F.3d 1298, 1301 (D.C. Cir. 2012) (same). Nor is there any basis for Petitioner to argue that he is entitled to an individualized judicial determination whether he is likely to return to the battlefield or continues to pose a threat to national security. The Court of Appeals has expressly rejected that position. *See Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010) ("the United States's authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released but rather upon the continuation of hostilities."); *id.* ("Whether a detainee would pose a threat to U.S. interests if released is not at issue in habeas corpus proceedings . . . concerning aliens detained under the authority conferred by the AUMF.").

Petitioner also misunderstands the President's remarks as announcing that the war already has ended. It is clear, however, from the context of the President's remarks— announcing the timeline for a future withdrawal of military personnel—that as the President was

speaking, U.S. forces remained, as they do now, in a theater of active military operations in

Afghanistan and ready to engage with the enemy.  Indeed, the President warned Taliban forces

expressly, saying, "[T]he Taliban should know that if they attack us as we draw down, we will

defend ourselves and our partners with all the tools at our disposal."  President Biden's Remarks

on the Way Forward in Afghanistan at 3.  That remark proved prescient—as discussed above, the

Taliban shortly thereafter attacked Kandahar airfield, and the United States responded against a

suspected Taliban position.  *See supra* 14.

Petitioner places great weight on the President's comments that "it's time to end

America's longest war," and "it's time to end the forever war," but it is clear from the context

that the President was speaking colloquially about the time having come to withdraw U.S.

military personnel currently stationed in Afghanistan.[6]  Such a colloquial expression, especially

one reflecting future intent, cannot reasonably be understood to be a formal declaration that

active hostilities against Taliban or al-Qaida or associated forces already have ceased—

---

[6] The Supreme Court has emphasized that congressionally-authorized war powers cannot be terminated by "passing references in messages to Congress, nor by newspaper interviews with high officers of the army or with officials of the War Department."  *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 167 (1919).  Indeed, if the President concluded that active hostilities were over, he would doubtless have issued a clear statement to that effect.  He has not.

In *Hamilton*, the Supreme Court rejected an argument similar to the one Petitioner advances here.  Relying on "statements of the President to the effect that the war has ended and peace has come," the plaintiff argued that President Woodrow Wilson's public statement announcing the end of World War I terminated certain congressionally-authorized wartime powers.  *Id.* at 159.  The Supreme Court rejected that position, concluding that the President's announcement that the war was over was "doubtless used in a popular sense" and did not terminate restrictions on the sale of certain types of alcoholic beverages imposed by the War-Time Prohibition Act where the wartime actions of the Executive continued.  *Id.* at 167–68.

particularly given that the President described the threat from al-Qaida and associated forces in

those same remarks as having "evolved" and "metastasiz[ed]" and that the President noted that

resolve of the United States to "hold the Taliban accountable for its commitment not to allow any

terrorists to threaten the United States or its allies from Afghan soil."  President Biden's Remarks

on the Way Forward in Afghanistan at 2.   An evolving threat is not the same as an end of

hostilities against that threat.

    Even assuming there were some ambiguity in the President's public statements about the

continued existence of active hostilities (and there is not), the law requires that the Court give the

political branches "wide deference" on questions concerning the cessation of hostilities.[7]  *Al-

Bihani*, 590 F.3d at 875.  The Court of Appeals recently reaffirmed in *Al-Alwi* that "in the

absence of Congressional definition of end of war," "we defer to the Executive's opinion on the

matter."  901 F.3d at 299 (quoting *Al-Bihani*, 590 F.3d at 874).  Here, where it is evident from

the context of the President's statements—and the events in theater, *see supra* 10–17—that U.S.

forces remain engaged in active hostilities authorized by the AUMF, there is no basis for the

---

[7] In *In re Territo*, 156 F.2d 142 (9th Cir. 1946), an American citizen captured on the battlefield in Italy in 1943 while serving in the Italian army filed a petition for a writ of habeas corpus and argued that his detention had become unlawful by 1946 because of, *inter alia*, "the cessation of hostilities between the United States and Italy."  *Id.* at 147 (explaining that Italy switched sides in World War II and subsequently initiated hostilities against the Axis powers).  At the time *Territo* was decided, the 1929 Geneva Convention provided that "repatriation of prisoners shall be effected as soon as possible after the conclusion of peace."  *See* Convention Between the United States of America and other Powers Relating to Prisoners of War, art. 75, July 27, 1929, 47 Stat. 2021 (1932).  In denying the petition, the Court deferred to the judgment of the political branches, and it concluded that release was not required because "no treaty of peace has been negotiated with Italy."  *Id.* at 145 n.2, 148.  Similarly here, as explained above, the Court should defer to the Executive's position, consistent with the words and actions of the opposing forces, that active hostilities, including against al Qaida, continue.

Court to ascribe a meaning to the President's remarks that would be at odds with the manner in which he, as Commander-in-Chief, has directed the U.S. armed forces to conduct certain continuing military operations in Afghanistan. *See The Prize Cases*, 67 U.S. (2 Black) 635, 666 (1862) (holding that the issue of whether a state of war existed such that President Lincoln could invoke the laws of war and impose a blockade on the southern states during the Civil War "is a question to be decided *by him*, and this Court must be governed by the decision and acts of the political department") (emphasis in original).

The D.C. Circuit has held that courts have neither the authority nor the expertise to evaluate the operational capacity and future threat posed by an enemy of the United States, especially when that enemy is a transnational terrorist organization such as al-Qaida. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) ("whether the terrorist activities of foreign organizations constitute threats to the United States are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry") (citations omitted). This reality underscores the need for judicial deference to the determination of the political branches with respect to the point at which hostilities end. *See Center for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003) (acknowledging the "long-recognized deference to the executive on national security issues" and applying that deference in the context of the current armed conflict where "America faces an enemy just as real as its former Cold War foes, with capabilities beyond the capacity of the judiciary to explore.")

Any holding to the contrary by the Court would raise serious separation of powers concerns on a question of national security that "uniquely demand[s] [a] single-voiced statement of the Government's views."  *See Baker*, 369 U.S. at 211; *see also Hamdi v. Rumsfeld*, 337 F.3d 335, 341 n.1 (4th Cir. 2003) (Wilkinson, J., concurring in the denial of rehearing *en banc*) ("It would be an intrusive venture into international relations for an inferior federal court to declare a cessation of hostilities and order a combatant's release when an American military presence remained in the theater of combat, and when the status of combatants, their terms of release, and the mutuality of exchanges may all remain subjects for negotiation and diplomacy.").  Precisely because questions surrounding the end point of active hostilities rest on military judgments regarding factors that critically affect the national defense, the Supreme Court has consistently held for more than 100 years that these decisions are properly left to the political branches.  *See Anderson*, 76 U.S. at 70–71.  There is no basis for this Court to depart from that precedent.

*****

In sum, an examination of the President's remarks on which Petitioner's Motion is predicated—as well as the facts on the ground—demonstrates that active hostilities authorized by the AUMF continue in Afghanistan and elsewhere.  There remain U.S. forces currently stationed in Afghanistan.  Al-Qaida, by word and deed, has made clear that its fight against the United States continues.  Petitioner's Motion predicated on the cessations of hostilities should be denied.

## II.   The 2006 Military Commissions Act Forecloses Petitioner from Invoking the Third Geneva Convention, and He Cannot Invoke It Indirectly Through Army Regulation 190-8.

Petitioner's argument fails on its own terms for the reasons just stated—because the hostilities have not ended—so this Court has no need to go further.  Nevertheless, in this Part, for

clarity and completeness, Respondents now address the reasons why Petitioner is wrong to frame

his demand for "immediate release" as a claim for enforcement of Article 118 of the Third

Geneva Convention.  Petr's Br. 4–6, 8 (citing or quoting Art. 118).

First, Petitioner's framing cannot be reconciled with § 5 of the Military Commissions Act

of 2006 ("2006 MCA"), Pub. L. No. 109-366, 120 Stat. 2631.  That clear statute means that a

habeas petitioner such as Petitioner may not "invoke the Geneva Conventions or any protocols

thereto in any habeas corpus or other civil action or proceeding to which the United States, or . . .

agent of the United States is a party as a source of rights in any court."  Al-Bihani, 590 F.3d at

875; see id. at 876 (noting 2009 MCA did not alter that 2006 MCA provision).

The proper framework here, instead, is found in Section 1021 of the National Defense

Authorization Act for Fiscal Year 2012 (NDAA), Pub. L. No. 112-81, 125 Stat. 1562 (10 U.S.C.

801 note).  There, Congress "affirm[ed]" that the authority granted by the AUMF includes the

authority to detain, "under the law of war," any "person who was a part of or substantially

supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the

United States or its coalition partners."  Further, such detention is authorized "*until the end of the

hostilities authorized by the* [AUMF]") (emphasis added); see id. § 1024(b), 125 Stat. 1565 (10

U.S.C. 801 note) (referring to "detention under the law of war pursuant to the [AUMF]").

Petitioner's claim therefore must be analyzed by examining domestic statutes, namely the

AUMF and NDAA § 1021(c)(1)—not Article 118 of the Third Geneva Convention.[8]

---

[8] Whether the NDAA's use of the term, "end of hostilities," contemplates detention beyond that envisioned by Article 118's concept of "cessation of active hostilities," need not be decided in this matter because, as explained *supra*, active hostilities continue.

*Second*, Petitioner's framing, which also seeks to enforce Article 118 *by way of* AR 190-8, is incorrect.  Of course, as explained above, hostilities authorized by the AUMF have not ended. Petitioner characterizes AR 190-8 as "formally incorporat[ing]" the Third Geneva Convention's requirement for release at the end of hostilities, ECF 117-1 at 6 (citing AR 190-8 ¶ 1-1, which provides, "In the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence."). Thus, AR 190-8 provides Petitioner no better argument than his meritless claim for release under Art. 118 of the Convention.

In any event, the Exception Memorandum issued in January 2021 forecloses Petitioner's effort to use AR 190-8 as a vehicle for a claim under the Third Geneva Convention.  Petitioner does not address the Exception Memorandum at all, and has forfeited any challenge to its validity.  *See*, *e.g.*, *Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) (explaining why courts do not generally entertain arguments first raised in a reply brief). But even if Petitioner *had* presented such a challenge, it would fail, as explained below.

## A. Petitioner Cannot Invoke the Provisions of AR 190-8 Including Because the Secretary of the Army Has Excepted Guantanamo Detainees Like Petitioner from the Regulation.

The Secretary of the Army ("SecArmy") has issued an authoritative memorandum excepting the detention operations at Guantanamo Bay from Army Regulation 190-8 ("AR 190-8").  *See* Memorandum from Ryan D. McCarthy, Sec'y of the Army, to Commander, U.S. Southern Command, Re: Army Regulation (AR) 190-8 Clarification/Exception (January 11, 2021) (attached as the Appendix, *infra*) ("Exception Memorandum").  In particular, in the Exception Memorandum, the SecArmy, drawing on the authority "to approve exceptions to" AR

190-8 "that are consistent with controlling law and regulation," AR 190-8 at *i*, "formally and explicitly except[s] the detention operations conducted by JTF-GTMO from AR 190-8," and he also "make[s] clear that AR 190-8 is not applicable to any detainees held at JTF-GTMO."  App., ¶ 4.  "This exception applies with respect to any and all claims—including pending claims—by JTF-GTMO detainees premised on AR 190-8."  *Id.*  The exception forecloses application of AR 190-8 to JTF-GTMO detainees like Petitioner.  *Id.* [9]

### B. The Exception Memorandum is a Valid Exercise of the Authority of the Secretary of the Army.

The Exception Memorandum specifies that it was issued under the SecArmy's authority "as the promulgating official for AR 190-8 and the DoD Executive Agent under DoD Directive 2310.01E."  App., ¶ 4.  As published in 1997, the front matter of AR 190-8 identifies the Secretary of the Army as the lead official on whose authority the regulation issued.  *See* AR 190-8 at *i*.  In its discussion of "Proponent and exception authority," the Secretary of the Army has assigned responsibilities to the Deputy Chief of Staff for Operations and Plans ("DCS") as the regulation's "proponent," who "has the authority to approve exceptions to this regulation that are consistent with controlling law and regulation."  *See* AR 190-8 at *i*.[10]

---

[9] The Exception Memorandum cites pertinent portions of *Hamdan*, the President's Determination, the Department of Defense Law of War Manual, and Directive 2310.01E as "higher-level guidance" regarding the application of the law of war to unprivileged belligerents such as those detained in the conflict against al-Qaida.  App., ¶ 2.  The Exception Memorandum then provides that Army Regulation 190-8 "has not required and does not require that any of the detainees currently held at JTF-GTMO, all of whom are unprivileged belligerents being held in the context of the non-international armed conflict against al-Qaida, the Taliban, and associated forces, be afforded prisoner of war status or treatment, including such treatment or protections on a provisional basis pending a status determination."  App., ¶ 3.

[10] The position of Deputy Chief of Staff for Operations and Plans has been redesignated and is currently known as the Deputy Chief of Staff ("DCS"), G-3/5/7.  *See* Headquarters

Although AR 190-8, as written, assigns exception authority to a DCS, the SecArmy properly issued the Exception Memorandum, consistent with the pertinent DoD directives, the statutes those directives carry out, and general principles of administrative law.

**1.**  The particular statutes defining the authorities of the Secretary of Defense ("SecDef") and of the SecArmy plainly confer on the Secretaries authority to delegate functions, and, at the same time, authority to "supervis[e] and direct[]" the performance of the delegated functions. *See Morrow v. Clayton*, 326 F.2d 36, 45-46 (10th Cir. 1963)) ("the head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate *under the supervision and direction* of the superior or the power to administer is vested in the superior.") (citing *Knight v. United Land Ass'n*, 142 U.S. 161, 176-82 (1891)) (emphasis added).[11]

For example, "[u]nless specifically prohibited by law," the SecDef "may, without being relieved of his responsibility, perform any of his functions or duties, or exercise any of his powers through, or with the aid of, such persons in, or organizations of, the Department of Defense as he may designate."  10 U.S.C. § 113(d).  Moreover, the SecArmy is "responsible for, and has the authority necessary to conduct, *all* affairs of the Department of the Army," "[s]ubject

---

Department of the Army ("HQDA") General Order No. 3 (July 9, 2002); HQDA General Order No. 3 (April 1, 2005).

[11] That is, "[i]t is well established that the head of an agency *retains* the authority to make final decisions for the agency *even if* he or she delegates the authority to make these decisions to his or her subordinates."  *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 9-10 (D.D.C. 2000) (emphasis added); *see id.* at 10 (citing *Morrow*, and concluding authorization of subordinate "to take certain actions does not deprive his superiors of their authority to make final decisions for the agency in certain cases").  "To hold otherwise," the Fifth Circuit remarked, "would create havoc in the administration of our laws."  *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1388 (5th Cir. 1979).

to the authority, direction, and control of" the SecDef.  10 U.S.C. § 7013(b) (emphasis added).

Furthermore, the statute currently numbered 10 U.S.C. § 7013, "which vests in" the SecArmy "a

broad landscape of authorities and responsibilities, specifically authorizes the Secretary to

delegate authorities to subordinate Army officials."  *United States v. Hennis*, 75 M.J. 797, 804-

05 (A. Ct. Crim. App. 2016); *see* 10 U.S.C. § 7013(f) (SecArmy "may assign such of his

functions, powers, and duties as he considers appropriate to the Under Secretary of the Army and

to the Assistant Secretaries of the Army.  Officers of the Army shall, as directed by the

Secretary, report on any matter to the Secretary, the Under Secretary, or any Assistant

Secretary"); *id.*, § 7013(g)(3) (SecArmy "may . . . prescribe regulations to carry out his

functions, powers, and duties under this title").  In addition, the duties of Deputy Chiefs of Staff

and the Army Staff under 10 U.S.C. § 7031 are performed "[u]nder the authority, direction, and

control of" the SecArmy.  10 U.S.C. § 7032(b).[12]

The statutes defining the SecDef and SecArmy roles reflect both the need for a

disciplined chain of command *within* the military and the tradition of civilian control *over* the

military, which is a tradition is rooted in the Constitution itself:  The Constitution grants plenary

authority to Congress "[t]o raise and support Armies," "[t]o provide and maintain a Navy," and

"[t]o make Rules for the Government and Regulation of the land and naval Forces."  U.S. Const.

Art. I, § 8, Cls. 12-14.  It also provides that "[t]he President shall be Commander in Chief of the

Army and Navy of the United States."  *Id.* Art. II, § 2, Cl. 1.  Accordingly, the Supreme Court

---

[12] The SecArmy has assigned the Provost Marshal General, not the DCS, current responsibility for detainee operations.  *See* General Orders No. 2020-01, *Assignment of Functions and Responsibilities Within Headquarters* at 20–21 (Mar. 6, 2020) (prescribing duties).  The Provost Marshal General, like each DCS, remains under the SecArmy's "authority, direction, and control."  10 U.S.C. § 7032(b).

has underscored that the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, *subject always to civilian control* of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis added).

**2.** The SecArmy not only retains the authority to supervise and direct performance of delegated functions, but, here, the SecArmy's *own* exercise of the AR 190-8 exception authority complied with relevant DoD Directives, and is valid.

When the SecArmy issued AR 190-8 in 1997, the regulation "implement[ed]" DoD Directive 2310.01 as it then existed. *See* AR 190-8, at p. *i*. The version of that directive currently in force is Directive 2310.01E. The Deputy Secretary of Defense validly issued that directive, on the authority of the SecDef under Title 10 of the U.S. Code (including 10 U.S.C. § 113, discussed above). The directive designates the SecArmy as the Executive Agent "for the administration of the DoD Detainee Program" (¶ 1(c)) and for "DoD Detainee Operations Policy" (*id*., Enclosure 2, ¶ 9, pp. 10-11). Given that AR 190-8 "implements" Directive 2310.01E, the directive's assignment of responsibility for the detainee program and operations policy to the SecArmy logically entailed full responsibility over AR 190-8, including the exception authority built into that regulation.

Directive 2310.01E also includes, in its Enclosure 2, a list of the SecArmy's responsibilities, further confirming that the SecArmy has the authority to issue exceptions to AR 190-8. The first item on the list of responsibilities Directive 2310.01E assigns to the SecArmy is that he "[e]nsures that all DoD EA responsibilities and functions for the *administration* of DoD detainee operations policy are *assigned* and *executed* in accordance with Reference (f) and this

- 37 -

directive." Directive 2310.01E, Enclosure 2, at ¶ 9(a) (emphasis added). Here, Reference (f) is DoD Directive 5101.1. The terms "administration" and "assign[ment]" and "execut[ion]" are all expansive ones. They would naturally include the function the SecArmy performed in issuing the Exception Memorandum. Because "administration" is a wide-ranging term—a range extended by the terms "assign[ment]" and "execut[ion]" —the SecArmy could readily have concluded for purposes of *administration* of the detainee program that the exception authority in AR 190-8 was a function properly *assigned* to the SecArmy, and *executed* by the SecArmy. His decision would take precedence over other officials.

The DoD Directive defining the Executive Agent role, Directive 5101.1, reinforces the point. Like Directive 2310.01E, Directive 5101.1 also issued under the SecDef's Title 10 authority (including 10 U.S.C. § 113). Under Directive 5101.1, when the SecArmy acts as Executive Agent for the DoD Detainee Program, his "authority takes precedence over the authority of other DoD Component officials performing related or collateral joint or multi-component support responsibilities and functions." The "other . . . officials" include, of course, other Army officials, such as the Deputy Chiefs of Staff, as well as officials from the Navy, the Air Force, and the Marine Corps.

DoD Directive 5101.1 plays an important role by spelling out that the SecArmy's role as the Executive Agent for the DoD Detainee Program means that his "authority *takes precedence over* the authority of other DoD Component officials performing related . . . responsibilities and functions." DoD Directive 5101.1 (emphasis added). The emphasized phrase is properly considered in combination with the designation of the SecArmy as the Executive Agent for DoD detainee program administration and operations policy, yielding a plain result. Although AR

190-8's text in 1997 assigned exception authority to a DCS, the SecArmy retains that authority today.  And the SecArmy's exercise of that authority over the DoD detainee program "takes precedence" over the "authority of other" officials, including the DCS.

The "takes precedence" phrase also shows why express adoption by the *other* military services was not necessary for the Exception Memorandum to be effective.  In context, the SecArmy's Executive Agent role over administration of the DoD Detainee Program means that his exercise of the authority to issue an exception to AR 190-8 "takes precedence" over the "authority of other" officials (that is, "DoD Component officials performing related *or* collateral joint *or* multi-component support responsibilities and functions").  *See* Directive 5101.1 (emphasis added).

Moreover, Directives 2310.01E and 5101.1, issued under the SecDef's Title 10 authority, apply to *all* DoD components, including the military services.  It is apparent that the Department of Defense assigned the responsibility for administration of the detainee program *to the SecArmy*, recognizing the need to focus DoD resources and "to minimize duplication or redundancy." DoD Directive 5101.1, ¶ 4.1.2.

### C. The Exception Memorandum is Consistent with Controlling Law and Regulation.

The Exception Memorandum also meets the requirement in AR 190-8 that any exception to that regulation be "consistent with controlling law and regulation" including the applicable law of war.  The required "consisten[cy]" is evident from at least three aspects of the content of the Exception Memorandum and its legal context:  (1) the Third Geneva Convention, which does not afford prisoner of war privileges to detainees held in non-international armed conflict; (2) AR 190-8's category of "Other Detainees"; and (3) the Court of Appeals' rationale and

holding in *Al Warafi v. Obama (Al Warafi II)*, 716 F.3d 627, 629 (D.C. Cir. 2013).

*First*, the Exception Memorandum properly describes the application of international and domestic law to this case.  The Exception Memorandum traces the correct relationship between AR 190-8 and the Third Geneva Convention, drawing further on the President's Determination, Directive 23101.01E, and the Department of Defense Law of War Manual.  The United States' conflict with al-Qaida (among other non-State armed groups), after all, is a non-international armed conflict.  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 630-31 (2006); *see also* App., ¶ 2 (citing *Hamdan*).  In such conflicts, the full protections of the Third Geneva Convention do not apply to members of non-State armed groups.  *See* Third Geneva Convention, art. 3.  Under the Convention, the United States is only "bound to apply, as a minimum," the provisions in Article 3 relating to the humane treatment of detainees.  *Id.*

The Convention also provides that, in conflicts between two or more High Contracting Parties, the full protections of the Convention will apply to the "mutual relations" of the High Contracting Parties that are participants, even if "one of the [other] Powers in conflict may not be a party to the present Convention."  Third Geneva Convention, art. 2.  "[T]he Powers who are parties" to the Convention shall "be bound by the Convention in relation to the said [non-party] Power, if the latter accepts and applies the provisions thereof."  *Id.*  But that provision is not applicable to Petitioner or other detainees excepted under the Exception Memorandum.  Importantly, "[n]on-state actors" such as al-Qaida are not "'Power[s]' that would be eligible under Article 2 . . . to secure protection by complying with the Convention's requirements."  *Hamdan v. Rumsfeld*, 415 F.3d 33, 44 (D.C. Cir. 2005) (Williams, J., concurring), *cited approvingly by Hamdan*, 548 U.S. at 630.  Nor has al-Qaida accepted and applied the

- 40 -

Convention's provisions.  For example unlike military forces that are entitled to enemy prisoner

of war status and that obey the laws of war, al-Qaida "makes no distinction between military and

civilian targets."  *See The 9/11 Commission Report* xvi (2004).

     *Second*, the Exception Memorandum explains that the "Other Detainee" definition of AR

190-8 does not extend prisoner of war status to Petitioner or others detained at Guantanamo Bay.

The definition of "Other Detainee" provides that "[p]ersons in the custody of the U.S. Armed

Forces who have not been classified as an" Enemy Prisoner of War, Retained Personnel, or

Civilian Internee, "shall be treated as [Enemy Prisoners of War] *until* a legal status is ascertained

by competent authority."  AR 190-8, glossary, § II (emphasis added).  The provisional-treatment

requirement only applies in conflicts in which prisoner-of-war protections apply.[13]  The United

States' non-international armed conflict with al-Qaida is not such a conflict, and the Exception

Memorandum is consistent with that conclusion.

     Petitioner's effort to rely on the "Other Detainee" definition suffers from a separate

problem, moreover, because even if he could invoke that definition here, his "legal status" has

---

[13]  *E.g.*, Office of General Counsel, U.S. Dep't of Def., *Department of Defense Law of War Manual* § 4.27.2 (June 2015; updated Dec. 2016) ("*During international armed conflict*, should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 of the GPW, such persons shall enjoy the protection of the GPW until such time as their status has been determined by a competent tribunal") (emphasis added), https://dod.defense.gov/Portals/1/ Documents/pubs/DoD%20Law%20of%20War%20Manual%20-%20June%202015% 20Updated%20Dec%202016.pdf?ver=2016-12-13-172036-190; U.S. Dep't of Def., Directive 2310.01E, ⁋ 3(h) ("*During international armed conflict*, should any doubt arise as to whether a detainee belongs to any of the categories enumerated in Article 4 of Reference (d) [*i.e.*, the Third Geneva Convention] and as such is entitled to the protections and privileges afforded POWs, such detainees shall enjoy treatment as POWs until a tribunal convened in accordance with Article 5 of Reference (d), determines whether the detainee is entitled to such status or treatment.") (emphasis added).

already been "ascertained by competent authority."  *See* AR 190-8, glossary, § II.  President

George W. Bush concluded in 2002, that, since al-Qaida is a terrorist organization, al-Qaida's

fighters are unprivileged enemy combatants to whom the full protections of the Geneva

Convention do not apply.  *See* President's Determination.  Al-Qaida is not and cannot be a High

Contracting Party to the Third Geneva Convention.  So the provisional-treatment requirement in

the glossary's definition of "Other Detainee" does not extend prisoner of war treatment to

Petitioner.  *See Hamdan*, 415 F.3d at 43 (holding that the President is a competent authority to

determine a detainee's legal status for purposes of AR 190-8), *rev'd on other grounds*, 548 U.S.

557 (2006); *United States v. Hamidullin*, 888 F.3d 62, 72-73 (4th Cir. 2018) (same).

     The Exception Memorandum's conclusion also properly respects the regulation's

conflicts-or-discrepancies provision.  That provision states that "[i]n the event of conflicts or

discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva

Conventions take precedence."  AR 190-8 § 1-1(b)(4).  There are no "conflicts or discrepancies"

between the Geneva Conventions and the Exception Memorandum.  The Third Geneva

Convention does not afford such privileges to Petitioner and to other members of non-state

terrorist groups.  *Cf. Al Warafi II*, 716 F.3d at 632.

     *Third*, the Exception Memorandum is consistent with the holding and rationale of *Al

Warafi II*.  In the initial appeal by Al Warafi, decided by unpublished decision, the Court of

Appeals *assumed—without deciding*—that the First Geneva Convention and AR 190-8 applied

to Al Warafi's habeas claim.  The District Court, according to the Court of Appeals, "did not

explicitly address whether Al Warafi was permanently and exclusively medical personnel within

the meaning of Article 24 of the First Geneva Convention and Army Regulation 190-8, § 3-15(b)

(1)–(2), *assuming arguendo their applicability.*"  *Warafi v. Obama*, 409 F. App'x 360, 361 (D.C. Cir. 2011) (emphasis added).  The Court of Appeals remanded for the District Court "to consider (or reconsider) Al Warafi's argument he was permanently and exclusively engaged as a medic and to make a finding on this issue."  *Id.*  On remand, the District Court determined that Al Warafi had not met his burden to prove he was "medical personnel," and on appeal from that determination, the Court of Appeals affirmed by published decision.  *Al Warafi II*, 716 F.3d at 628.  Because Al Warafi did not meet his burden on the factual question (whether he was exclusively engaged as a medic), there was no occasion for the Court of Appeals to *hold* that the First Geneva Convention (by way of AR 190-8) actually applied to Al Warafi's case.  The *arguendo* assumption remained just that—an assumption.

To be sure, the Court of Appeals, in the course of addressing Al Warafi's arguments in his second appeal, focused on "analysis" of "the relevant aspects of the Geneva Conventions that have been expressly incorporated into Army Regulation 190-8," because it is AR 190-8, and not the Geneva Conventions, that constitutes "domestic U.S. law."  *Id.* at 629.  The Court of Appeals also noted that "a detainee may invoke Army Regulation 190-8 *to the extent that the regulation* explicitly establishes a detainee's entitlement to release from custody."  *Id.* at 629-30 (emphasis added).   But the Court of Appeals in *Al Warafi* nowhere concluded that AR 190-8 requires that detainees be treated as prisoners of war nor purported to address, let alone to constrict, the exception authority built into AR 190-8.

Accordingly, Petitioner's direct appeals to Article 118 of the Third Geneva Convention and Army Regulation 190-8 are meritless and should be rejected.

- 43 -

III.    **There is No Basis on Which to Order the Alternative Relief that Petitioner Seeks.**

Petitioner asks that, if the Court does not grant Petitioner's request for immediate release, the Court order Respondents to state the factual and legal basis for their detention authority, and to address the status of that detention authority after the complete withdrawal of U.S. forces from Afghanistan.  Petr's Mot at 1.  Although Petitioner does not specify the grounds for that request, it seems to be predicated on Petitioner's contention that the legal justification for his detention has changed since the President's remarks on April 14, 2021.  Petitioner is mistaken.

Although Petitioner argues that the President's remarks announced the end of hostilities and the defeat of al-Qaida, in reality, as explained above, the President's remarks did neither. *See supra* 23–26.  For all the reasons discussed in Section I.B, hostilities authorized by the AUMF, including against al-Qaida and associated forces, remain ongoing.  Thus, there is no change in the basis for Petitioner's detention at this time, and therefore no reason to order a new statement justifying Petitioner's detention.

The Court also should decline to order briefing now on the Government's detention authority after the complete withdrawal of U.S. forces from Afghanistan, as Petitioner proposes because, on its face, that request would have the Court take up an issue that is not ripe.  Any decision rendered by the Court on that subject necessarily would be an advisory opinion addressing a future, undeveloped situation.  Judge Mehta recognized that reality when considering another petitioner's nearly identical motion, and determined that he would take up that petitioner's request for relief after the completion of the withdrawal.  *See* May 28, 2021 Tr. at 29:24–30:4; *see also id.* at 31:6–17.  Likewise, rather than invite briefing now on issues that

plainly are "dependent on 'contingent future events,'" *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 299 (1998)), the Court should deny the Petitioner's request, and return to the question of detention authority following the withdrawal from Afghanistan should it be necessary to do so at that time and based on conditions that may exist at the time. *See Al Odah v. United States*, 62 F. Supp. 3d 101, 106–110 (D.D.C. 2014) (rejecting detainee's argument—based on President Obama's 2013 announcement that "our war in Afghanistan will be over" by the end of 2014—that he was entitled to an order that he be released immediately upon a future cessation of active hostilities; reasoning "the injury Petitioner anticipates upon the cessation of hostilities in Afghanistan is not yet ripe); *see also Khan v. Obama*, 2014 WL 4843907, at *20 (D.D.C. Sept. 2, 2014) ("[W]hatever significance the end of active hostilities in Afghanistan may have for detainees like Khan, that issue can be addressed if and when hostilities cease. As of this date, active hostilities remain ongoing, so any further discussion of this issue would be premature.").

## CONCLUSION

For all the reasons set forth herein, the Court should deny Petitioner's Motion. If the Court declines to deny the Motion, Respondents respectfully request that the Court—as Judge Mehta did with Mr. Gul's nearly identical motion—postpone its consideration of any motion addressing the Government's detention authority following the completion of the withdrawal of U.S. forces from Afghanistan until after the planned withdrawal is actually completed.

Dated: July 9, 2021                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Acting Assistant Attorney General

                                       ALEXANDER K. HAAS
                                       Branch Director

                                       TERRY M. HENRY
                                       Assistant Branch Director

                                        /s/ Julia A. Heiman
                                       RONALD J. WILTSIE (D.C. 431562)
                                       JULIA A. HEIMAN (D.C. 986228)
                                       INDRANEEL SUR
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, N.W.
                                       Washington, D.C. 20530
                                       Tel: (202) 616-8480
                                       Fax: (202) 616-8470
                                       Email: julia.heiman@usdoj.gov
                                       *Attorneys for Respondents*