[ORAL ARGUMENT REQUESTED][1]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016),** | ) ) ) | |
| *Petitioner,* | ) ) | |
| **v.** | ) ) | **No. 08-CV-1360 (EGS)** |
| **LLOYD J. AUSTIN III,** | ) ) | |
| *Respondent.* | ) ) | |

**PETITIONER'S REPLY TO RESPONDENTS' OPPOSITION TO HIS MOTION FOR
AN ORDER REQUIRING HIS IMMEDIATE RELEASE AND REPATRIATION**

## I. INTRODUCTION

The United States stands at a critical juncture.  History surely will remember how our nation decides to act.  Basically, the U.S. must choose between two diametrically opposed options:

**A. Option 1—Continuing to imprison Petitioner despite the cessation of hostilities by the U.S. in Afghanistan, and the fact that he never has been charged with any offense.**

The U.S. Government continues to imprison a Palestinian man raised in Saudi Arabia commonly known as Abu Zubaydah, who more than 19 years ago was gunned down by CIA and

---

[1] Inadvertently, Petitioner omitted to comply with Local Rule 7(f) by requesting oral argument in his original Motion.  Pet'r respectfully requests that the Court allow him to amend his Motion *nunc pro tunc* to include such a request.  In support of this application, Pet'r relies on F.R.Civ.P. 6(b), which "permits a Court to extend deadlines, even though the time to act has expired, if there is good cause and the party 'failed to act because of excusable neglect.'"  *Cohen v. Bd. of Trustees of the Univ. of D.C.,* 819 F.3d 476, 479 (D.C. Cir.2016).

Pakistani forces in the dark of night, and wounded so grievously that he came within a hair's breadth of dying.[2]  The CIA, after participating in Petitioner's near murder, then reversed course, flying a top trauma surgeon from Johns Hopkins many thousands of miles to Petitioner's bedside in a desperate and ultimately successful effort to save his life.[3]  As soon as the medical team permitted, FBI Special Agents[4] commenced interrogating him with its time-tested technique— rapport building.  From the beginning, Abu Zubaydah expressed his willingness to cooperate, confirming to the FBI agents his identity, supplying them with background information on his activities, and telling them that "Mukhtar" was the al Qaeda "mastermind" of the 9/11 attacks while identifying him in a photo of Khalid Sheikh Mohammed ("KSM").[5]  He also confided that two men had approached him with a plan to detonate a uranium-based explosive in the U.S., and offered their descriptions.  He provided as well key information about other extremists in Pakistan.[6]  The FBI even had Abu Zubaydah talking about threat information.[7]  Despite the FBI's success, on April 12, 2002 DCI George Tenet ordered that the CIA would have sole

---

[2] Executive Summary to Senate Select Committee on Intelligence *Study of the [CIA's] Detention and Interrogation Program* (Dec. 2014) ("SSCI ES") at 21, 24-25.

[3] J. Mayer, *The Dark Side: The Inside Story of How the War on Terror Turned into a War on American Ideals* (Doubleday 2008) at 142

[4] The CIA's Counterterrorism Center ("CTC"), tasked with conducting interrogations for the Agency, had decided not to send a team to join the FBI agents.  They didn't believe it was Abu Zubaydah who had been captured.  A. Soufan, *The Black Banners—Declassified* (Norton, 2020) at 375-76.

[5] SSCI ES at 24-5.

[6] *Id.* at 26.

[7] *Id.* at 27, where an FBI Special Agent wrote that: "[W]e have obtained critical information regarding Abu Zubaydah thus far and **have now got him speaking about threat information… We have built tremendous rapport with him." (Bold supplied.)**

custody of the prisoner going forward, and that the FBI no longer would be permitted to interrogate him.[8]

The CIA had already decided to change its interrogation tactics dramatically.  The reason for this was that Abu Zubaydah had been assessed by CIA officers in ALEC STATION, the office within the CIA with specific responsibility for al Qaeda, "to possess detailed knowledge of al Qaeda terrorist attack plans."[9]  This, of course, was entirely mistaken; indeed the CIA later admitted that "Abu Zubaydah was not (even) a member of al Qaeda."[10]  Nonetheless, based on its colossal misunderstanding, the CIA "formally proposed that Abu Zubaydah be kept in an all-white room that was lit 24 hours a day, that [he] not be provided any amenities, that his sleep be disrupted, that loud noise be constantly fed into his cell, and that a small number of people interact with him… [T]hese proposals were based on the idea that such conditions would lead Abu Zubaydah to develop a sense of "learned helplessness."'[11]

On April 13, 2002, while Abu Zubaydah was still in the hospital, the CIA introduced its "new interrogation program."  Just one CIA interrogator, who had been coached by the CIA's "psychological team," was present at the initial meeting, which lasted only 11 minutes.  The

---

[8] *Id.* at 27.

[9] *Id.* at 21.

[10] *Id.* at 410, 430 and 466.  Effective Jan. 24, 2018, in Case No. 78, the United Nations Security Council delisted Abu Zubaydah from its Islamic State and al-Qaeda Sanctions List based on the recommendation of the U.N. Ombudsperson, who concluded that Abu Zubaydah was not a member of al Qaeda.  C. Church, "What Politics and the Media Still Get Wrong About Abu Zubaydah" https://www.lawfareblog.com/what-politics-and-media-still-get-wrong-about-abu-zubaydah

[11] SSCI ES at 26.

interrogator advised the prisoner that "he had a most important secret that [the interrogator] needed to know." Abu Zubaydah "amazingly" nodded in agreement but "did not divulge any information, as [the interrogation team had] expected." A cable further explained that the prisoner indicated that he knew the question was about "impending future terrorist plans against the" U.S. The officer told him to signal "when he decides to discuss that 'one key item he knows he is keeping from the [interrogator].'" Observers in the next room waited for their prisoner to signal. Instead, he apparently went to sleep.[12]

Later, the CIA would falsely claim that, "during the use of 'established U.S. Government interrogation techniques,'" Abu Zubaydah "stopped all cooperation" in June 2002," requiring the development of the CIA's "enhanced interrogation techniques." ("EITs") But, in fact, even after use of the EITs Abu Zubaydah "never provided this information, and CIA officials later concluded that this was information [he] did not possess."[13]

In early July 2002, while Abu Zubaydah was—strangely—being held in isolation while being asked no questions,[14] CIA officials convened several meetings to discuss the possible use of "novel interrogation methods" on him. Yet the CIA realized full well that it "would be heading into uncharted territory."[15] Desperate for help, the Agency had turned to two

---

[12] *Id.* at 27-8.

[13] *Id.* at 31.

[14] Abu Zubaydah's 47 days of isolation extended from June 18 through August 4, 2002. *Id.* at 30-1. The CIA's allowance of this period of isolation was "strange" because the Agency had insisted that Abu Zubaydah had critical, time-sensitive information on imminent threats to the U.S. *See, e.g., id.* at 19.

[15] *Id.* at 32, n. 138.

psychologists, Drs. James Mitchell and John "Bruce" Jessen, [16] both of whom lacked any experience related to actual interrogations or counterterrorism, and any relevant cultural, geographic, or linguistic[17] experience.[18]  A former CIA operative involved at the time said that at first the Agency was crippled by its dearth of experience.  "It began right away, in Afghanistan, on the fly.  They invented the program…with people who had no understanding of al Qaeda or the Arab world.  You hear all this hubbub about hanging people upside down.  But the key to interrogation is knowledge, not techniques.  We didn't know anything.  And if you don't know anything, you can't get anything."[19]  But the CIA defended its choices, urging that these two "had the closest proximate expertise CIA sought at the beginning of the program, specifically in the area of *non-standard means on interrogation.*"[20] Clearly, from the start the CIA was envisioning torturing its captives.[21]

---

[16] *See, e.g.,* J. Mitchell, *Enhanced Interrogation*  (Crown Forum 2016).

[17] By way of contrast, Special FBI Agent Ali Soufan, who interrogated Abu Zubaydah extensively, spoke Arabic fluently.  *See* A. Khan, "Ali Soufan: The World Would Be Very Different Today," https://www.pbs.org/wgbh/frontline/article/ali-soufan-the-world-would-be-very-different-today/

[18] SSCI ES at 32, n. 138.

[19] J. Mayer, *supra* at n. 2, at 144.

[20] SSCI ES at 32, n.138.  (Italics original.)

[21] Torturing Abu Zubaydah would provide the additional benefit of ensuring that the CIA would no longer have to compete with the FBI for access to Abu Zubaydah.  The FBI was forbidden to engage in such activities.  It's mission is "[t]o protect the American people and *uphold the Constitution of the [U.S.]"*  https://www.fbi.gov/about/faqs/what-is-the-mission-of-the-fbi (Emphasis supplied.)  The CIA mission statement contains no requirement that the Agency uphold the Constitution.  *See* https://www.cia.gov/about/mission-vision/#:~:text=At%20the%20CIA%2C%20our%20mission,U.S.%20national%20security%20objectives%20by%3A&text=Producing%20objective%20all%2Dsource%20analysis,help%20keep%20our%20Nation%20safe.

In the course of these CIA meetings, Mitchell proposed using techniques derived from the U.S. military's SERE school.[22]  He proposed employing 12 techniques for possible use by the CIA.[23]  Many of them soon would be approved in a legal memorandum to be discussed. To set the stage for this new kind of interrogation, the CIA drafted a so-called Psychological Assessment ("PA"), dated June 24, 2002,[24] which provided a panoply of falsehoods that the Justice Department's Office of Legal Counsel ("OLC") could utilize to justify torturing Abu Zubaydah.

**(a) Most significant of the many false allegations in the PA, followed by their refutation in bold.**

The common thread that binds these false allegations is Abu Zubaydah's purported membership and high-rank in al Qaeda, plus the significant responsibilities assigned to him by that group.  **But the SSCI ES severed that thread deftly, when it determined that "[t]he CIA…concluded that Abu Zubaydah was not (even) a member of al Qaeda."[25]**

The falsehoods in the PA included unfounded claims that:

---

[22] SERE stands for Survival, Evasion, Resistance and Escape.  The program intends to teach our soldiers how to resist interrogation by enemies that refuse to follow the Geneva Conventions and international law.  SSCI at ES 32, n. 135.

[23] *Id.* at 32.

[24] https://www.thetorturedatabase.org/document/cia-memo-psychological-assessment-abu-zubaydah?search_url=search/apachesolr_search&search_args=filters=sm_cck_field_doc_type:78%26solrsort=relevance

[25] *See* n. 10, *supra.*

- "Abu Zubaydah worked from very low-level mujahidin…to (by age 31) third or fourth man in al Qaeda…."[26]  **The CIA knew that this was false before it drafted the PA.**[27]

- He is "alleged to have written al Qaeda's manual on resistance techniques and lectured on the topic."[28]  **The SSCI's review of 6.3 million pages of relevant CIA records**[29] **revealed nothing to support these claims.**[30] **CIA records instead indicate that Abu Zubaydah maintained that he always intended to talk and never believed he could withhold information from interrogators.**[31]

- He was "involved in every major al Qaeda terrorist operation; served as the operational planner for the millennium plot, the Paris embassy, and a planner of the 11 September hijackings which killed and maimed thousands of Americans."[32] **Again, those 6.3 million pages contained nothing to support such claims.**[33]

- He "served as senior Usama Bin Ladin ("UBL") lieutenant and played a key role in the movement and training of operatives on behalf of al Qaeda, the Egyptian Islamic Jihad, and other terrorist elements inside Pakistan and Afghanistan…"[34] **Again, the SSCI ES determined that "the CIA…concluded that Abu Zubaydah was not (even) a member of al Qaeda."**[35]

---

[26] PA at 2.

[27] *See* n. 10, *supra*.

[28] PA at 2.

[29] These CIA materials included "operational cables, intelligence reports, internal memoranda and emails, briefing materials, interview transcripts, contracts and others records."  SSCI ES Foreword at 5.

[30] *See* n. 10, *supra*.

[31] SSCI ES at 48. Indeed, in February 2003, Abu Zubaydah told a CIA psychologist that he believed prior to his capture that every captured "brother" would talk in detention and that "brothers should be able to expect that the organization will make adjustments to protect people and plans when someone with knowledge is captured."  *Id.*

[32] PA at 2.

[33] *See* n. 10, *supra*.

[34] PA at 2.

[35] *See* n. 10, *supra*.

- He "[s]erved as Deputy Camp Commander for al Qaeda training camps in Afghanistan… From 1996-1999, (he) personally approved all individuals going in and out of Afghanistan to the training camps… Served as al Qaeda's coordinator of external contacts, or foreign communications."[36] **Given the CIA's crucial admission, all of these allegations cannot possibly be true.[37]**

- He "[a]cted as al Qaeda's CI officer and was trusted to find spies in their midst."[38] **As with the allegations just above, this one also cannot conceivably be true.[39]**

In sum, the SSCI concluded that **"[t]he CIA repeatedly provided inaccurate information to the Department of Justice (the OLC is an important office in the DoJ), impeding a proper analysis of the CIA's Detention and Interrogation Program."[40]**

> **(b) The OLC, following the CIA's script, prepares a memorandum that provides legal cover to the Agency for torturing Abu Zubaydah.**

Equipped with the factual predicate (the PA) required to justify legally the "enhanced interrogation techniques"—"[i]n plain language, torture"[41]—the OLC on August 1, 2002 issued a

---

[36] PA at 3.

[37] *See* n. 10, *supra.*

[38] PA at 3.

[39] *See* n. 10, *supra.*

[40] SSCI ES Findings and Conclusions ("F&C") #5 at 4. (Bold supplied.)  Special FBI Agent Ali Soufan who, as noted, interrogated Abu Zubaydah was even more emphatic: "I do not recall a case during the war on terror years that contained more elements of deceit and exaggerations aimed to promote the ill-conceived torture program like the case of Abu Zubaydah."  C. Rosenberg, "Agent who interrogated Abu Zubaydah: 'Where we went wrong as a nation'" https://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article81232607.html

[41] A. Soufan, *The Black Banners—Declassified* at n. 4, pg. xiii.

memo to the CIA's top-ranking lawyer titled inaccurately: *Interrogation of Al Qaeda Operative*.[42]  With self-protection clearly in mind, the OLC at the outset warned:

> Our advice is based on the following facts, which you (the CIA) have provided to us.  We also understand that you do not have any facts in your possession contrary to the facts outlined here, and **this opinion is limited to these facts.**  If these facts were to change, this advice would not necessarily apply.[43]

The OLC then approved, in a clinical manner that made them sound almost benign, ten techniques the CIA "would like to employ."[44]  But these favored techniques were the polar opposite of benign. In fact, among its Findings and Conclusions in the SSCI ES, the Committee found that "[t]he interrogations of CIA detainees were brutal and far worse than the CIA represented to policymakers and others."[45]

In the meantime, doubtful about the validity of the assurances of legality of the EITs that were issuing from the OLC, on July 15, 2002, the CIA officers at the interrogation site had cabled to their superiors:

> [E]specially in light of the [EITs] to be implemented, we need to get reasonable assurances that Abu Zubaydah will remain in isolation and incommunicado for the rest of this life.

Officers from the CIA's ALEC station soon responded:

---

[42] The title is inaccurate because Petitioner never was a member of Al Qaeda, nor an Al Qaeda operative, as the CIA admitted long ago. *See* n. 10, *supra*.

[43] OLC Memo at 1. (Bold supplied.)

[44] OLC Memo.  On July 24 & 26, 2002, Attorney General Ashcroft verbally approved all techniques, SSCI ES at 36-7, while—tellingly—President Bush was not briefed on the EITs until April 8, 2006, nearly four years after they began to be employed.  *Id.* at 40.

[45] F&C # 3, SSCI ES at 3.

> There is fairly unanimous sentiment within [Heaquarters] that Abu Zubaydah will never be placed in a situation where he has any significant contact with others and/**or the opportunity to be released… [A]ll major players are in concurrence that Abu Zubaydah should remain incommunicado for the remainder of his life.  This may preclude Abu Zubaydah from being turned over to another country….[46]**

From August 4 through 23, 2002, "the CIA subjected Abu Zubaydah to its [EITs] on a near 24-hours-per-day basis… Security personnel entered the cell, shackled and hooded [the naked] Abu Zubaydah… Without asking any questions, the interrogators placed a rolled towel around his neck…backed him up into the cell wall" and slammed "him—"headfirst"[47]--against [the] concrete wall.[48]  This EIT was called "walling," which for a prisoner with shrapnel "lodged in his skull"[49] was an absurdly dangerous technique to employ.  Other EITs employed by the CIA during that period included the "near-drowning" technique,[50] "waterboarding"—all told, 83 sessions[51] were utilized during that infamous August, one of which nearly killed Abu

---

[46] SSCI ES, 34-5 (Bold supplied.)

[47] J. Mayer, *supra* at n. 2, at 169.

[48] SSCI ES at 40-1.

[49] Gov't Factual Return ("FR"), ECF No. 474-1 at 32.

[50]  S. Shane, "Waterboarding Used 266 Times on 2 Suspects," https://www.nytimes.com/2009/04/20/world/20detain.html

[51] Each of these sessions involved "multiple iterations of the watering cycle during each application."  SSCI ES at 42.

Zubaydah;[52]— "stress positions,[53] cramped confinement,[54] white noise, and sleep deprivation."[55] According to the daily cables from the torture site, Abu Zubaydah frequently "cried," "begged," "pleaded," and "whimpered," but continued to deny that he had any additional information on current threats to, or operatives in, the U.S.[56]  CIA personnel reported being very disturbed by the use of the EITs.  Three examples will suffice:

- August 8, 2002: "Today's first session…had a profound effect on all staff members present...it seems the collective opinion that we should not go much further…."
- August 8, 2002: "Several on the team profoundly affected…some to the point of tears and choking up."

---

[52] In at least one waterboarding session, Abu Zubaydah "became completely unresponsive, with bubbles rising through his open, full mouth. [H]e remained unresponsive until medical intervention, when he regained consciousness and expelled "copious amounts of liquid."  SSCI ES at 43-4.  Other waterboarding sessions "resulted in immediate fluid intake and involuntary leg, chest and arm spasms," and "hysterical pleas."  *Id.* at 43.  "As recently as 1983, the [DoJ] had in fact prosecuted waterboarding as a crime."  J. Mayer, *supra* at n. 2, at 171.

[53] The stress position "long time standing," was described by detainees as "not just standing, but being kept up on their tiptoes with their arms extended out and over their heads, attached by shackles on their wrists and ankles, for what they described as eight hours at a stretch. During the entire period, they said they were kept stark naked and often cold."  The detainees told the ICRC "that it 'became extremely painful over time.'"  *Id.* at 168.

[54] Over the course of the entire 20 day "aggressive phase of interrogation," Abu Zubaydah spent a total of 266 hours (11days, 2 hours) in the large (coffin size) confinement box and 29 hours in a small confinement box, which had a width of 21 inches, a depth of 2.5 feet, and a height of 2.5 feet.  SSCI ES at 42.

[55] Sleep deprivation sometimes continued for as long as 180 hours, usually while standing or forced into stress positions.  C. Church, "What Politics and the Media Still Get Wrong About Abu Zubaydah," https://www.lawfareblog.com/what-politics-and-media-still-get-wrong-about-abu-zubaydah

[56] SSCI ES at 42.  The use of the EITs—including "walling, attention grasps, slapping, facial hold, stress positions, cramped confinement, white noise and sleep deprivation"—continued in "varying combinations, 24 hours a day" for 17 straight days.  When Abu Zubaydah was left alone during this period, he was placed in a stress position, left on the waterboard with a cloth over his face, or locked in one of two confinement boxes.  *Id.*

- August 9, 2002: "Two, perhaps three [personnel] likely to elect transfer…."[57]

"By August 9, 2002, the sixth day of aggressive interrogation, the interrogation team informed CIA [HQ] that they had come to the 'collective preliminary assessment' that it was unlikely Abu Zubaydah 'had actionable new information about current threats' to the U.S.  On August 10, the interrogation team stated that it was 'highly unlikely' that he possessed the information they were seeking. [That same day], the team reiterated a request for personnel from [CIA HQ] to travel to the detention site to view the interrogations."[58]  But CIA HQ "continued to believe that Abu Zubaydah was withholding threat information and instructed the CIA interrogators to continue using" the EITs.[59] Detention Site personnel "also informed CIA HQ that it was their assessment that the application of the CIA's [EITs] was 'approach[ing] the legal limit,'" provoking a stinging rebuke from CTC Chief Jose Rodriguez for having put such an opinion in writing.[60] After the use of the CIA's EITs finally stopped, the CIA personnel at the detention site concluded that "Abu Zubaydah had been truthful and that he did not possess any new terrorist threat information."[61]

Nonetheless, Mitchell and Jessen cabled from the detention site that the interrogation of Abu Zubaydah had been a "success," recommending that the "aggressive phase at [the detention

---

[57] *Id.* at 44-5.

[58] *Id.* at 42-3.  After a video-conference, CIA HQ instructed the personnel at the torture site to continue the use of the CIA's EITs against Abu Zubaydah, but agreed to send two CIA HQ officers to the site to observe the interrogations first-hand.  *Id.* at 43, n. 197.

[59] *Id.* at 43.

[60] *Id.*

[61] *Id.* at 45.

site] should be used as a template for future interrogations of high value captives," not because the CIA's EITs produced useful information, but rather since their use confirmed that Abu Zubaydah **did not** possess the intelligence that CIA HQ had assessed him to have.[62] In their eyes, they had invented a game best called: "Heads we win, tails we win, and heads or tails Abu Zubaydah is the big loser."[63] "This paradox should be terrifying to any sane man."[64]

But the end of the "aggressive phase" of Abu Zubaydah treatment by no means signaled that his torture would stop. For example, the CIA then flew him from "black site" to "black site" around the globe.[65] While it has long been publicly known that Abu Zubaydah lost his left eye while imprisoned at one of the CIA "black sites,"[66] details remain classified. Further, as a result of their complicity in Abu Zubaydah's captivity and torture in those countries, the European Court of Human Rights ruled that Poland and Lithuania each owed him 100,000 euros.[67]

**B. Option 2—Follow the dictates of domestic and international law and immediately release and repatriate Abu Zubaydah to a country to be named.**

---

[62] *Id.* at 45-6. (Bold supplied.)

[63] It is unclear from all those CIA records whether the Agency ever informed the NSC Legal Adviser or anyone else at the NSC or the [DoJ] that Abu Zubaydah failed to provide information about future attacks against the [U.S.] or operatives tasked to commit attacks in the U.S. during or after the use of the CIA's [EITs]. *Id.* at 45, n. 216.

[64] J. Hickman and J. Kiriakou, *The Convenient Terrorist* (Hot Books 2017) at 103.

[65] *See generally* "The Rendition Project"
https://www.therenditionproject.org.uk/prisoners/index.html

[66] *See* D. Filkins, "How Did Abu Zubaydah Lose His Eye?"
https://www.newyorker.com/news/news-desk/how-did-abu-zubaydah-lose-his-eye

[67] *See* C. Church, *supra* at n. 55.

The facts set forth above for Option 1 fully justify—nay, demand—choosing Option 2 rather than Option 1.  For the event that Respondents fail to agree, Petitioner submits this Reply which—distilled to its essentials—argues that, inasmuch as our nation's involvement in an armed conflict in Afghanistan has ended, as evidenced by the complete withdrawal of its fighting forces, Petitioner must be immediately released and repatriated.  If Respondents fail to recognize this simple truth, then Petitioner respectfully requests that this Court grant the relief that he seeks in his motion.

## II. LEGAL ARGUMENT

### A.  Respondents' key position that is untenable on its face.

Respondents argue that hostilities between the U.S., on one hand, and the Taliban and al Qaeda on the other, must cease across the globe before Petitioner may be released.[68]  To the extent there might be any doubt about that, such doubt has been obliterated by the following colloquy on May 28, 2021 in *Gul v. Biden*,[69] a case similar to the matter at bar.

> Judge Mehta: [L]ook, it's a question that needs to be asked.  **[I]f there are no U.S. troops on the ground in Afghanistan where these detainees were captured, almost by definition, it seems to me, there can no longer be hostilities in Afghanistan.**
>
> &ast; &ast; &ast;
>
> Gov't:  It is our position that hostilities against al Qaeda are global, and indeed that's consistent with al Qaeda's position…
>
> Judge Mehta: So does that mean that anyone captured in the Afghan theater[70] since 2001 that remains detained at Guantánamo

---

[68]  *See* Opp. at 2, 4.

[69]  1.16-cv-1462 (D.D.C 2016).

[70]  It is a mere technicality that Petitioner was captured in Faisalabad, Pakistan, and not in Afghanistan. The Narrative in Resp's Amended Factual Return ("FR"), *see* ECF No. 474-1 at 24-67, focuses its allegations against Petitioner overwhelmingly on his allegedly hostile activities in or related to Afghanistan and Khaldan training camp, "a basic and advanced terrorist training

can remain indefinitely detained until some peaceable event occurs with al Qaeda?... **Do you think there would need to be something more than a complete withdrawal of troops from Afghanistan to establish a cessation of hostilities to conclude that the government's detention authority has lapsed in this case?**

Gov't: **[Y]es, because of the global nature of the conflict with al Qaeda....** (May 28, 2021 (afternoon session) Tr., at 25:5-27:1; bold supplied.)

Respondents plainly have lost their way. First, as we have seen, Petitioner has never been a member of al Qaeda. Neither does the FR allege that he has ever been a member of the Taliban  The most that Respondents have alleged is that Petitioner "was a part of and substantially supported al Qaeda and associated forces."[71]  As seen, President Biden on April 14, 2021 declared that "al Qaeda is degraded in Afghanistan."[72]  His spokesman made clear that "we are not taking our eye off of...signs of al Qaeda's resurgence.  They do not currently possess an external plotting capability that can threaten the homeland.  But this is something that we have to focus on: its potential for reemerging in the years ahead...."[73]

---

camp in the Khost Province of Afghanistan." *Id.* at 34.  Pet'r is alleged to have been the camp's "key facilitator." *Id.* at 37. "The Khaldan training camp was not controlled by UBL, and was operationally and organizationally independent of al Qaeda." *Id.* at 35.  Hence, when the armed conflict ceased in Afghanistan, the detention authority relating to a participant in that conflict disappeared.

[71] FR, ECF No. 474-1, at 24.

[72] "Remarks by President Biden on the Way Forward in Afghanistan," https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/14/remarks-by-president-biden-on-the-way-forward-in-afghanistan/ at 5.

[73] "Background Press Call by a Senior Administration Official on Afghanistan," https://www.whitehouse.gov/briefing-room/press-briefings/2021/04/13/background-press-call-by-a-senior-administration-official-on-afghanistan/ at 3.

Yet, as seen, Respondents insist that this absence of U.S. active hostilities with al Qaeda in Afghanistan is irrelevant, Opp. at 4, even though the al Qaeda that existed when Abu Zubaydah was captured and almost killed way back in March 2002 no longer exists. Rather, al Qaeda has morphed into a shadowy and ill-defined network in quasi-franchise form all over the world. "There is really not one al Qaeda anymore. It has taken on the local flavor of wherever it is…."[74] Moreover, Respondents' legal point is absurd. Certainly, the presence of some group that calls itself al Qaeda in various countries is not tantamount to the conduct of active hostilities against the U.S. by the "degraded"[75] group in Afghanistan that calls itself al Qaeda, with which such hostilities don't even exist. Hypothetically, under Respondents' theory, if active hostilities were to break out between the U.S. and, say, the al Qaeda affiliate in Somalia, al-Shabaab,[76] that would extend exponentially our nation's right to detain a man imprisoned on account of his allegedly hostile activities in Afghanistan. Hence, it comes as no surprise that Respondents have cited nary a single case in support of such an extreme theory. But there is authority that supports Petitioner's position. In another end-of-hostilities habeas action, for example, the Court found the suggestion that the government would not release the Petitioner at the end of hostilities in

---

[74] B. Hubbard, "The Franchising of al Qaeda," https://www.nytimes.com/2014/01/26/sunday-review/the-franchising-of-al-qaeda.html quoting Gregory D. Johnson, the author of *The Last Refuge*. *See* B. Hubbard, E. Schmitt and M. Rosenberg, "An ISIS Offshoot Claims Responsibility as Terror Groups Find a New Foothold" https://blendle.com/i/newyorktimes/an-isis-offshoot-claims-responsibility-as-terror-groups-find-a-new-foothold/bnl-newyorktimes-20210827-1_2 ("Al Qaeda has changed substantially since [UBL] oversaw the organization… It established affiliates…some of which modified, or even discarded the group's ideology in support of local goals… In general, al Qaeda did not maintain the same operational control over its affiliates as [ISIS] did….").

[75] Denbeaux Decl. ¶ 2, Ex. 1 at 7, ECF No. 576-1.

[76] The Somali terrorist group al-Shabaab was, in reality, a part of al Qaeda. P. Bergen, *The Rise and Fall of Osama Bin Laden* (Simon & Schuster 2021) at 217.

Afghanistan literally incredible and dismissed the petition. *al Odah v. United States,* 62 F. Supp.3d 101, 108-9 (D.D.C. 2014) (citing to record evidence of the President's statements and actions with regard to repatriating detainees to Afghanistan and Iraq).

Respondents argue that when President Biden in his historic speech on April 14 declared that "it's time to end America's longest war," and "it's time to end the forever war" he was speaking only "colloquially." Opp. at 28. That absurd reversal in position forgets that, as the Supreme Court plurality pointed out in *Hamdi,* "As the Government concedes, 'given its unconventional nature, the current conflict (in Afghanistan) is unlikely to end with a formal cease-fire agreement.'" 542 U.S. at 520.

**B. Inasmuch as active hostilities in Afghanistan involving the U.S. have ceased, Petitioner must be granted the relief he seeks.**

President Biden in his April 14, 2021 announcement set September 11, 2021 as the deadline for withdrawal of U.S. forces.[77] On July 8, President Biden stated that the U.S. mission in Afghanistan would end by August 31.[78] CENTCOM estimated on July 26 that they had completed more than 95% of the entire withdrawal process.[79] President Biden, on August 30, 2021 announced that the "dangerous retrograde from Afghanistan [had been completed as scheduled] in the early morning hours of August 31, Kabul time."[80] The next day, President

---

[77] *See* "Remarks…," *supra* at n. 69 at 2.

[78] https://www.cnbc.com/2021/07/08/us-military-mission-in-afghanistan-will-end-by-august-31-biden-says-.html

[79] https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/2708638/update-on-the-withdrawal-of-us-forces-from-afghanistan-july-26-2021/

[80] https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/30/statement-by-president-joe-biden/

Biden spoke to the nation: "Last night in Kabul, the [U.S.] ended 20 years of war in Afghanistan. The longest war in American history… I was not going to extend this forever war…  My fellow Americans, the war in Afghanistan is now over."[81]

Respondents in their Opposition complained about the absence of complete clarity that the war had truly ended.  Now they have all the clarity they could reasonably want.  Our nation's 20-year engagement in an armed conflict in Afghanistan has, at long last, truly ceased.

The end of hostilities must be tied to the "relevant conflict," and that conflict is the war in Afghanistan.  *Hamdi v. Rumsfeld,* 542 U.S. 507, 518, 520-21 (2004) ("There can be no doubt that individuals who fought against the [U.S.] in **Afghanistan**…are individuals Congress sought to target in passing the AUMF.  We conclude that detention of [those] individuals…**for the duration of the particular conflict in which they were captured,**[82] is so fundamental and accepted an incident of war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use." (Plurality opin.; bold supplied.); *Boumediene v. Bush,* 553 U.S. 723, 733 (2008) (quoting this passage from *Hamdi* approvingly).[83]  In every case considering the "end of hostilities" question raised by a Guantánamo detainee, the court has always conducted the analysis with respect to whether the U.S. forces were engaged in hostilities in **Afghanistan**.  *See Hamdi v. Rumsfeld,* 542 U.S. 507, 520-21 (2004); *Al-Alwi v. Trump,* 901

---

[81] https://www.nytimes.com/2021/08/31/us/politics/transcript-biden-speech-afghanistan.html

[82] It matters not at all that Petitioner happened to be captured in Pakistan, not Afghanistan. Without doubt, the latter was the scene of the "relevant conflict" as *Hamdi* employs that term. *See* analysis at n. 70 *supra.*

[83] Even Respondents agree, as they must: "Drawing on 'longstanding law of war principles,' the *Hamdi* plurality held that 'Congress' grant of authority of the use of 'necessary and appropriate force' in the AUMF 'include[s] the authority to detain for the **for the duration of the relevant conflict.'"** Oppos. at 18, citing *Hamdi,* 542 U.S. at 521.  (Bold supplied.)

F.3d 294,  298 (D.C. Cir. 2018); *Al-Bihani v. Obama,* 590 F.3d 866, 874 (D.C. Cir. 2010); *Razak v. Obama,* 174 F. Supp.3d 300, 305 (D.D.C. 2016), *decision vacated on Petitioner's release, appeal dismissed* (Oct. 5, 2016); *Al Warafi v. Obama,* 1:09-cv-2368 (RJL), 2015 WL 4600420 at *7 (D.D.C. July 30, 2015), *order vacated on release, appeal dismissed* (Mar. 4, 2016); *al Odah v. United States,* 62 F. Supp.3d 101, 112 (D.D.C. 2014); and *Nasser v. Obama,* 234 F. Supp. 3 121, 124 (D.D.C. 2017).  This is consistent with the development of the law of war, which grants the right of detention based upon a defined battlefield and a defined conflict, not some abstract Hobbesian notion of  "a war of all men against all men."[84]

## C.  Respondents mistakenly urge that the 2006 Military Commissions Act Forecloses Petitioner from Invoking the Third Geneva Convention.

Respondents rely on § 5 of the Military Commissions Act of 2006 ("2006 MCA") and *Al-Bihani v. Obama,* 590 F.3d at 875 in support of their argument that Petitioner is precluded from invoking "the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the [U.S.]…or any agent of the [U.S.] is a party as a source of rights in any court of the [U.S.]…."[85]  Having made their argument, however, Respondents proceed to refute it, urging that "[t]he proper framework…is found in section 1021 of the National Defense Authorization Act for Fiscal Year 2012 ("2012 NDAA"), Pub. L. No. 112-81, 125 Stat. 1298 (10 U.S.C. 801 note).[86]   There, Congress "affirm[ed] that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the

---

[84] T. Hobbes, *The Leviathan*.

[85] Opp. at 32.

[86] *Id.*

authority to detain covered persons[87] pending **disposition under the law of war.**" Sec. 1021 (a).

(Bold supplied.)

According to the "[U.S. DoD] Law of War Manual" § 1.3.1 <u>Law of War—Notes on</u>

<u>Terminology,</u> the "law of war" is:

> The part of international law that regulates the conduct of
> hostilities and the protection of victims of armed conflict in both
> international and non-international armed conflict…It
> encompasses all international law applicable to the conduct of
> military operations in armed conflicts that is binding on the [U.S.]
> or its individual citizens, including **treaties**, and agreements to
> which the [U.S.] is a party (**e.g., the Geneva Conventions of
> 1949**), and applicable customary international law. (Bold
> supplied.)[88]

Since the 2012 NDAA expressly applies the "law of war," and that body of law includes

the Geneva Conventions of 1949 (*see* quote from "DoD Law of War Manual," just above),

Respondents plainly have abandoned any argument that the Third Geneva Convention Relative

to the Treatment of Prisoners of War does not apply to this case, as well they should, since they

---

[87] A "covered person" is "a person who was a part of or substantially supported al Qaeda, the
Taliban, or associated forces that are engaged in hostilities against the [U.S.] or its coalition
partners, including any person who has committed a belligerent act or has directly supported
such hostilities in aid of such enemy forces."  Sec. 1021(b)(2).

[88] *See also* the "Bouvier Law Dictionary, Law of War (Law of Armed Conflict, LOW or
LOAC)," which writes to similar effect.  The law of war is:

> The law that governs states and individuals in armed conflict.  The
> law of war is both a part of international law that regulates the
> conduct of armed hostilities and a part of the law of the [U.S.] and
> other nation-states that binds those individuals within its
> jurisdiction to comply.  The law of war includes all international
> law for the conduct of hostilities binding on the [U.S.] or its
> individual citizens, including **treaties** and international agreements
> to which the [U.S.] is a party, and applicable customary
> international law.

Wolters Kluwer Bouvier Law Dictionary (Desk Ed. 2012, bold supplied).

invoke that very Convention themselves.  Opp. at 17-18.  Moreover, both the D.C. Court of

Appeals and the Supreme Court have looked to the Third Geneva Convention to answer the

question presented here: whether hostilities have ceased in the particular conflict in which

Petitioner was allegedly involved, thereby requiring his release.  *See Boumediene v. Bush,* 553

U.S. 723, 733 (2008); *Hamdi v. Rumsfeld,* 542 U.S. 507, 518, 520-21 (2004); *Al-Bihani v.*

*Obama,* 590 F.3d 866, 874-5 (D.C. Cir. 2018) and *Al-Alwi v. Trump,* 236 F.Supp.3d 417, 420

(D.D.C. 2017), *aff'd,* 901 F.3d 294 (D.C. Cir. 2018) as they all direct courts to evaluate detention

authority based on the record before the court in the context of the particular conflict in which

the detainee was involved—in this case, the war in Afghanistan.[89]

**D.  Respondents' vain attempt to prevent this Court from ruling based on a non-existent separation of powers issue.**

Respondents attempt to insulate their decision to end hostilities from judicial review by

asserting that the Court's determination would violate the separation of powers doctrine.  Op. at

29-31.  To the contrary, this Court has the exclusive jurisdiction to determine based on record

evidence whether Petitioner is entitled to the Great Writ on the basis that he has been held—

unlawfully—beyond the end of hostilities.  Whether detention authority has expired is a legal

question requiring judicial resolution.  The right to file a petition for a writ of habeas corpus in

federal court is a bulwark against an otherwise "unchecked system of detention [that] carries the

potential to become a means of oppression and abuse…."  *Hamdi v. Rumsfeld,* 542 U.S. 507, 530

---

[89] Respondents fruitlessly argue, without support, that Article 118 of the Third Geneva Convention applies only to prisoners of war in international armed conflicts, and not to Pet'r, whom they allege was an actor in a non-international armed conflict.  Opp. at 3.  This surely would come as news to the *Hamdi* plurality which, at 542 U.S. at 520, relied primarily on that Article in holding that: "It is a clearly established principle of the law of war that detention may last no longer than active hostilities."

(2004).  Absent the suspension of the writ, the Constitution "protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account."  *Boumediene v. Bush,* 553 U.S. 723, 745 (2008) (internal citation omitted).  The government cannot encroach on the Constitution's delegation of authority to the judiciary by reserving for itself the right to detain a person until it chooses not to, based upon its sole and unfettered discretion.  That untrammeled executive authority is precisely what the right to habeas corpus is designed to prevent.  The Court may rely on the record to determine whether detention is legal by deciding whether there are active hostilities within the meaning of the law of war.

As *Hamdi* recognized, military detention is permissible only when "the record establishes" that the relevant conflict persists.  542 U.S. at 521.  The judicial record consists of evidence, not an executive decree.  In holding that the right to seek release via a petition for a writ of habeas corpus applies in the Guantánamo detainee context, the Supreme Court in *Boumediene v. Bush* confirmed that this Court has the jurisdiction to review the record giving rise to the government's claim of detention authority.  Federal courts assessing Executive action is nothing new: the "one constant in the  history of habeas has never been a certain set of procedures, but rather the independent power of a judge to assess the actions of the Executive."  *Al-Bihani v. Obama,* 590 F.3d 866, 880 (D.C. 2010).  For this reason, courts examining the end of hostilities do not simply adopt the Executive's opinion; they seek instead to match the Executive's representation "with ample support from record evidence."  *Al-Alwi v. Trump,* 901 F.3d 294, 300 (D.C. Cir. 2018).

While the Courts defer to the Executive on issues of national security, they are not required to embrace incoherent and contradictory statements such as those made by Respondents.  It is well within this Court's decision-making power to evaluate the Government's

conduct when the President publicly declares that the war is over, after withdrawing all U.S. troops, even though his representatives may seek to disavow the import of that declaration and conduct in this Court.

In an attempt to elude the wealth of precedent that applies directly to Guantánamo detainees, Respondents cite precedents from the Civil War and World War II.  Opp. 20-2. These authorities are unavailing here.  They do not mean that detention authority exists until the political branches say otherwise, which is what the government purports to cite them for.  Opp. at 2, 4, 20-21,  For example, *Ludecke v. Watkins,* 335 U.S. 160 (1948) deals with the specific requirement under the Alien Enemy Act that the *formal* end to a "declared war" be announced by "public proclamation" or treaty.  *Id.* at 161, 168.  That is emphatically not the issue here.  Here, there is no statutory requirement for a formal proclamation of the end of the war (though the President has made one).  The relevant determination to be made here is whether "active hostilities" involving the U.S. have ceased in Afghanistan.

Moreover, in considering the application of *Ludecke* to the case at bar, the Court should recognize that *Ludecke* was decided *before* the U.S. became a party to the 1949 Geneva Conventions and before the provisions of the law of war were integrated into U.S. domestic law. These circumstances appear not to have been considered by the Circuit in its consideration of *Ludecke.  See Al-Bihani,* 590 F.3d at 874-75; and *Al-Alwi v. Trump,* 901 F.3d 294, 299 (D.C. Cir. 2018).  These later developments were intended precisely for the purpose of avoiding indefinite detention after "active hostilities" have objectively ended.  Geneva (III), Commentary of 2020, 4443.  Nonetheless, Respondents unwittingly have relied on *Al-Bihani* and *Al-Alwi,* despite their crucial omissions.  Opp. at 21.

Respondents, in a vain effort to bolster their case, have resorted to relying on the famous *Baker v. Carr,* 369 U.S. 186 (1962), Opp. at 21-22, 31, whose facts stand worlds apart[90] from those relating to Abu Zubaydah's current motion.   Moreover, Respondents attempt to employ quotations from *Baker* out of relevant context, in that they appear during the Court's comprehensive discussion of "political question" cases.  *Compare* Opp. at 20-21 *with* 369 U.S. at 213. Yet no party to this motion has raised the "political question" issue.  Worse still, Respondents selectively deploy snippets of quotes from *Baker,* Opp. at 214, to create a wholly misleading statement.  For example, where the Supreme Court states: "Further, clearly definable criteria for decision may be available.  In such a case, the 'political question' doctrine falls away," U.S. at 214, Respondents cobbles together those snippets to create a quite different statement, more to their liking.  Opp. at 21-2.

**E. The Trump Administration's last-minute, deeply flawed effort in the Exception Memorandum to deprive detainees of their rights under AR 190-8.[91]**

The "Exception Memorandum" ("EM") was signed by the former Secretary of the Army ("SecArmy") on January 11, 2021, during the waning days of the Trump Administration.  The impetus behind the EM appears to be a District Court's finding that Guantánamo detainees do not exist in a lawless vacuum but, instead, must belong to one of the four categories of detainees

---

[90] As the Court no doubt recalls, *Baker* concerns plaintiffs' claim that a 1901 Tennessee statute apportioning the members of the General Assembly among the State's 95 counties denied them equal protection of the laws under the Fourteenth Amendment "by virtue of the debasement of their votes."  369 U.S. at 187.

[91]  In their evident desperation, Respondents present the novel argument that, since Pet'r did not address the Exception Memorandum in his Motion for Release, he has somehow "forfeited" the right to do so now.  Opp. at 33.  But there simply is no authority that requires a Petitioner to anticipate and address defenses that the government might raise, lest he/she be precluded from responding to a defense once it has been raised.

identified in AR 190-8, titled *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees,* which is binding on the entire U.S. military. *Al-Qahtani v. Trump,* Docket No. 1:05-cv-1971 (RMC), 443 F.Supp.3d 116, 130 (D.D.C. 2020) (Petitioner "meets the criteria for an 'other detainee' in [AR 190-8]: he is a person in the custody of the [U.S.] and he has not been otherwise classified as either an enemy prisoner of law, retained person, or civilian internee.") Accordingly, the Court held in March 2020, that the petitioner was entitled to an examination by a mixed medical commission. ("MMC") *Id.* at 131. In response, shortly before the Biden Administration took office, the former SecArmy decreed via the EM that AR 190-8—and by extension the underlying law of war implemented therein—"is not applicable to any detainees held at JTF-GTMO." Opp. at 34. The government then moved for reconsideration of the District Court's order directing that Al-Qahtani be examined by an MMC. Having sought repeated extensions of time to file its reply, *see Al-Qahtani v. Bush,* 1:05-cv-1971, ECF Nos. 408, 410, 413, 415, 417, 419 and 421, Respondents then were required to file on September 8, 2021. ECF No. 422. Now, pursuant to the Court's September 8 Minute Order, Respondents' date for filing their Reply was again postponed, this time to September 18, after the date when this Reply must be filed.

It is unclear what relevance the EM has here. Petitioner does not look to AR 190-8 as a source of his rights; he looks instead to the Constitution for the right to seek a writ of habeas corpus from this Court. U.S. Const. Art. I § 9. The Court is not just empowered but constitutionally required to adjudicate petitions for writs of habeas corpus based on claims that continuing detention is unlawful. *See Boumediene v. Bush,* 553 U.S.723 (2008).

Even if that were not so, Petitioner notes that neither of the two conditions for issuing exceptions to the application of AR 190-8 appears to have been met. Exceptions are permitted

where they are: (1) consistent with "controlling law and regulation"; and (2) made by the Deputy Chief of Staff for Operations and Plans.  AR 190-8 at i.  The NDAA—authorized by Congress and signed into law by the President—allows for detention "under the law of war."  No stroke of a regulatory pen can undo that law.  Further, the SecArmy is not empowered to issue exceptions, and it is telling that Respondents spills so much ink attempting to explain why the Court should ignore the facial noncompliance with the exception mechanism.  Opp. at 33-43.  Al-Qahtani more fully rebuts Respondents' arguments in his brief in *Al-Qahtani v. Bush,* 1:05-cv-1971, ECF No. 412.

## CONCLUSION

There have always been threats to the U.S. and there always will be—not just from al Qaeda, but from a multitude of state and non-state actors.  That is the reality of history.  But that does not mean that America's involvement in active hostilities in Afghanistan has not terminated.  Clearly, it has, as Respondents no longer are able to dispute.

Wherefore Petitioner respectfully requests that the Court enter an order requiring Respondents immediately to release Petitioner and repatriate him to a country to be named.

September 15, 2021

Respectfully submitted,

/s/ Charles R. Church

Mark P. Denbeaux
Charles R. Church
Max Sirianni
Denbeaux and Denbeaux
372 Kinderkamack Road
Westwood, NJ 07675
crchurch24@gmail.com
860-596-4166

George Brent Mickum IV
5800 Wiltshire Drive
Bethesda, MD 20816

*Counsel for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify, pursuant to Local Rule 5.4(d)(2), that Petitioner's Reply Brief has been served electronically on counsel of record for Respondent.

Date: September 15, 2021                    /s/ Charles R. Church