**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ZAYN AL ABIDIN MUHAMMAD ) | |
| HUSAYN (ISN #10016), ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 08-CV-1360 (EGS) |
| ) | |
| LLOYD J. AUSTIN III, in his official, ) | |
| capacity as Secretary of Defense, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

**RESPONDENT'S SUR-REPLY TO PETITIONER'S REPLY
TO RESPONDENT'S OPPOSITION TO PETITIONER'S MOTION FOR
<u>FOR AN ORDER REQUIRING HIS IMMEDIATE RELEASE AND REPATRIATION</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 5

A.  The AUMF Authorizes the Use of Force Against al-Qaida and Associated Forces. .............. 5

B.  Respondent's Actions Against Al-Qaida and Associated Forces Reflect the Scope of the
    Authority Conferred by the AUMF. ....................................................................... 9

    1.  Throughout the Conflict, Hostilities Against Al-Qaida and Associated Forces Have
        Extended Far Beyond Afghanistan. ............................................................... 9

    2.  Hostilities Against al-Qaida and Associated Forces Remain Ongoing. ...................... 14

C.  Precedent Does Not Support the Limitations that Petitioner Advocates. ............................ 20

CONCLUSION .............................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Al Hela v. Trump*,
  972 F.3d 120 (D.C. Cir. 2020), *judgment vacated for rehearing en banc* .............................. 12

*\*Al-Alwi v. Trump*,
  901 F.3d 294 (D.C. Cir. 2018) ........................................................................................... *passim*

*Al-Bihani v. Obama,*
  590 F.3d 866 (D.C. Cir. 2010) ........................................................................................... *passim*

*Al Odah v. United States*,
  62 F. Supp. 3d 101 (D.D.C. 2014). ........................................................................................... 22

*Ali v. Obama*,
  736 F.3d 542 (D.C. Cir. 2013) ..................................................................................... 3, 9, 23

*Al-Warafi v. Obama*,
  No. CV 09-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015), *decision vacated,*
  *appeal dismissed*, No. 15-5266 (D.C. Cir. Mar. 4, 2016) ..................................................... 22

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ........................................................................................................... 11

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) .......................................................................................... 18, 21, 22, 25

*Hamilton v. Kentucky Distilleries & Warehouse Co.*,
  251 U.S. 146 (1919) ........................................................................................................... 24

*Ludecke v. Watkins*,
  335 U.S. 160 (1948) ............................................................................................ 22, 23, 24

*Nasser v. Obama*,
  234 F. Supp. 3d 121 (D.D.C. 2017) ................................................................................... 22

*Razak v. Obama*,
  174 F. Supp. 3d 300 (D.D.C. 2016) *decision vacated, appeal dismissed*, No. 16-5074
  (D.C. Cir. Apr. 12, 2017) ..................................................................................................... 22

*Whitman v. Am. Trucking Ass'n,*
  531 U.S. 457 (2001)................................................................................................ 23

**Statutes**

Pub. L. No. 4, 69 Stat. 7 (1955) .............................................................................. 7-8

Pub. L. No. 98-119, 97 Stat. 805 (1983) ..................................................................... 7

Pub. L. No. 107-40, 115 Stat. 224 (2001)......................................................... *passim*

Pub. L. No. 107-243, 116 Stat. 1498 (2002) ............................................................... 7

Pub. L. No. 112-81, 125 Stat. 1562 (2012)........................................................... 1, 23

**Legislative Materials**

107 Cong. Rec. H5641 (daily ed. Sept. 14, 2001) ...................................................... 8

107 Cong. Rec. H5643 (daily ed. Sept. 14, 2001) ...................................................... 8

107 Cong. Rec. H5644 (daily ed. Sept. 14, 2001) ...................................................... 8

**Regulations**

Exec. Order No. 13,567, 76 Fed. Reg. 13,277 (Mar. 7, 2011)...................................... 5

**INTRODUCTION**

Respondent respectfully submits this sur-reply to Petitioner's Reply to Respondent's Opposition to Petitioner's Motion for an Order Requiring his Immediate Release and Repatriation, ECF No. 585 ("Petitioner's Reply"). The 2012 National Defense Authorization Act, Pub. L. No. 112-81, 125 Stat. 1562 (2012) (the "NDAA") affirms the President's authority to detain under the law of war "until the end of the hostilities authorized by the Authorization for Use of Military Force." NDAA § 1021(c)(1). Petitioner insists that those hostilities have ceased because the United States has completed its withdrawal from Afghanistan. Petr's Reply at 17–19. Petitioner's position ignores the text of the Authorization for Use of Military Force (the "AUMF" or "2001 AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001); controlling D.C. Circuit precedent; and—just as importantly—the facts on the ground. The United States is still conducting military operations against al-Qaida and associated forces, in Afghanistan and elsewhere, and continues to deploy service members, vehicles, weapons, equipment, and other resources throughout the Middle East and Africa to conduct such operations. Hostilities against al-Qaida and associated forces are ongoing, as further explained in the accompanying classified declarations Respondent is filing today from Dagvin Anderson, a Major General in the United States Air Force serving as the Vice Director of Operations for the Joint Chiefs of Staff at the Pentagon ("Anderson Decl."), and from a senior defense intelligence analyst for counterterrorism for the Defense Intelligence Agency ("DIA") within the Department of Defense ("DIA Decl.").[1]

---

[1] The Government initially filed those declarations and accompanying classified notice on October 1, 2021 in No. 16-1462, *Gul v. Biden* (D.D.C.) in support of an opposition to a habeas petitioner's motion seeking immediate release predicated on a purported "end of

Just last week, asked specifically about "the al Qaeda threat today," the Chairman of the

Joint Chiefs of Staff testified: "the Al Qaeda threat globally is still there," and he described

"several affiliates worldwide, some of which are quite capab[le] and definitely have aspirations

to attack the United States."  Bloomberg Government, Testimony before the Senate Armed

Services Committee Hearing (Sept. 28, 2021) (Exh. 3) ("Sept. 28, 2021 SASC Hearing

Transcript") at 93–94.  Indeed, although it has been severely disrupted and degraded, al-Qaida

remains in Afghanistan, *id.* at 46, and the Chairman was unequivocal:  "Al-Qaeda is at war with

the United States, still."  *Id.* at 70.  Separately, General McKenzie, Commander, U.S. Central

Command, noted that the Islamic State of Iraq and Syria ("ISIS") in Afghanistan has been

"rejuvenated" by prisoner releases, and "they're gathering strength"; while "we have yet to see

how that's going to manifest itself, . . .we know for [a] certainty that they do aspire to attack us

in our own land.  *And we know the same for Al Qaeda.*  So, [while] that threat . . . has

metastasized and it is resident in other parts of the world . . . it certainly is in Afghanistan."  *Id.* at

91 (emphasis added).  Vividly illustrating that hostilities against al-Qaida remain active, last

week, U.S. forces conducted an operation against a senior al-Qaida figure in Syria.  *Id.* at 8.  And

on August 27, U.S. forces conducted an over-the-horizon[2] counterterrorism operation against an

---

hostilities," which Petitioner in this case has substantially tracked.  *See, e.g.*, Pet'r Reply at 14–
15 (quoting May 28, 2021 *Gul* hearing transcript).

    Unclassified versions of the Anderson Declaration and the DIA Declaration are submitted
herewith as Exhibits 1 and 2, respectively.  The Government is working to prepare an
unclassified version of the classified notice accompanying those declarations, and will submit
that as soon as it becomes available.

    [2]  Over-the-horizon operations "refer to assets and target analysis that come from outside
the country in which the operation occurs."  Secretary of Defense Lloyd J. Austin III Prepared

ISIS-Khorasan planner in the Nangarhar Province of Afghanistan.  *See* U.S. Central Command

statement on counterterrorism strike on ISIS-K planner (Aug. 27, 2021) (Exh. 4), *available at*

https://www.centcom.mil/MEDIA/STATEMENTS/Statements-View/Article/2755890/us-

central-command-statement-on-counterterrorism-strike-on-isis-k-planner/.

Circuit precedent provides that when "the Executive Branch represents, with ample

support from record evidence that the hostilities described in the AUMF continue," "[i]n the

absence of a contrary Congressional command, that controls."  *Al-Alwi v. Trump*, 901 F.3d 294,

300 (D.C. Cir. 2018).  In light of the ample support from the record evidence here—including

very recent congressional testimony from Department of Defense leadership, public reporting,

and two classified declarations—it is evident that Petitioner's request for release based on his

assertion about an end of hostilities is without merit.  Petitioner was an associate and longtime

terrorist ally of Osama bin Laden (*Ali v. Obama*, 736 F.3d 542, 546 (D.C. Cir. 2013)

(Kavanaugh, J.), *cert. denied*, 574 U.S. 848 (2014)), and remains lawfully subject to detention

under the AUMF as informed by the law of war.

Petitioner argues that the authority supplied by the AUMF must be limited to

Afghanistan.  Even aside from the fact that there are continuing operations to address the threat

with respect to al-Qaida and associated forces in that country, Congress neither wrote nor

intended such a limitation on the AUMF:  the AUMF authorizes the use of military force not just

against threats emanating from Afghanistan, but "against those nations, organizations, or persons

---

Remarks Before the Senate Armed Services Committee at 3 (Sept. 28, 2021), *available at*
https://www.armed-services.senate.gov/hearings/to-receive-testimony-on-the-conclusion-of-
military-operations-in-afghanistan-and-plans-for-future-counterterrorism-operations.

[the President] determines planned, authorized, committed, or aided the terrorist attacks that

occurred on September 11, 2001, or harbored such organizations or persons." AUMF, § 2(a),

115 Stat. at 224. The text includes no geographic limitation. For more than two decades, with

congressional acquiescence and support, the Government has used the authority conferred by the

AUMF to pursue and engage al-Qaida and associated forces not only in Afghanistan but in other

theaters.

 The relief that Petitioner seeks is unprecedented. Petitioner urges this Court to be the

first not only to declare that active hostilities have ceased while the Executive maintains, backed

by record evidence, that the conflict is ongoing, but also to read a geographic limitation into a

congressional authorization for use of force that lawmakers did not supply. Even as U.S. forces

engage with al-Qaida and associated forces under the authority of the AUMF, including in Africa

and the Middle East, Petitioner would have this Court declare that the hostilities authorized

under the AUMF do not extend so far. Faced with a request by another Guantanamo petitioner

to add an extratextual, temporal limitation to the AUMF, the D.C. Circuit in *Al-Alwi* refused to

do so. *Al-Alwi*, 901 F.3d at 297. Likewise, this Court should decline to give credence to

Petitioner's request to impose an extratextual geographic limitation on the use of force

authorization in the AUMF.

 For all the reasons explained herein and in Respondent's Opposition to Petitioner's

Motion for an Order Requiring Petitioner's Immediate Release and Repatriation, ECF No. 578

("Respondent's Opposition"), the Court should deny Petitioner's motion for immediate release.[3]

## ARGUMENT

### A. The AUMF Authorizes the Use of Force Against al-Qaida and Associated Forces.

Petitioner, detained on the grounds that he was part of or substantially supported al-Qaida, *see* Resp.'s Opp'n at 17 (summarizing operative factual return), contends that the authority to detain such individuals under the AUMF is defined with respect to the conflict in Afghanistan. *See* Petr's Reply at 18–19. Aside from the reality that hostilities with al-Qaida and associated forces in Afghanistan are not concluded, the limitation Petitioner seeks to impose is inconsistent with the plain language of the AUMF, as well as Congress's clear intent in responding to al-Qaida's attacks on the United States.

The AUMF authorizes the President to "use all necessary and appropriate force"—not solely or specifically within Afghanistan—but, rather, "against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future

---

[3] To be clear, Petitioner is making a legal argument with far-reaching implications beyond his individual detention. That said, the fact that *detention authority* as a matter of law continues to exist does not mean that Petitioner lacks a forum in which the issue of *the need to continue his detention* is addressed. In light of the nature of the conflict against al-Qaida and associated forces, the Executive established a system of periodic reviews of eligible detainees such as Petitioner to determine whether continued detention of a detainee is necessary to protect against a continuing significant threat to the security of the United States. *See* Exec. Order No. 13,567, 76 Fed. Reg. 13,277 (Mar. 7, 2011). These reviews through the Periodic Review Board (PRB) do not address the issue of the legality of detention, but rather are "a process to review on a periodic basis the executive branch's continued, discretionary exercise of existing detention authority in individual cases." *Id.* § 1(b). Petitioner's most recent PRB review hearing occurred on July 15, 2021, *see* https://www.prs.mil/Review-Information/Subsequent-Full-Review/ ("Zayn al-Ibidin Muhammed Husayn").

acts of international terrorism against the United States by such nations, organizations or persons." AUMF, § 2(a), 115 Stat. at 224. As the preamble to the AUMF explains, its purpose is "[t]o authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States." *Id.*, preamble. The statute includes no reference to Afghanistan and no restriction on the statute's geographic reach.

In his August 16, 2021 remarks, the President observed that "we went to Afghanistan almost 20 years ago with clear goals: get those who attacked us on September 11th, 2001, and make sure al-Qaeda could not use Afghanistan as a base from which to attack us again." Remarks by President Biden on Afghanistan (Aug. 16, 2021) at 5, *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/08/16/remarks-by-president-biden-on-afghanistan/. But although Afghanistan had served as a home base or hub for al-Qaida, that organization's far-flung terrorist activities had hardly been confined to that country. The September 11, 2001 attacks occurred on U.S. soil, the plot having been hatched and preparations made in places as geographically scattered as Malaysia, Germany, the United Arab Emirates, and Pakistan, by nationals of a number of different countries. *See The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States* 156–68, 236–37 (2004) ("*9/11 Report*").

Even before September 11, 2001, al-Qaida had carried out a series of armed attacks against the United States in locations as far from Afghanistan as Kenya, Tanzania, and the port of Aden in Yemen. *See 9/11 Report* at 115–16 (U.S. embassy attacks), 190–91 (U.S.S. Cole attack). Responding to this terrorist group that did not respect national borders, Congress wrote no geographic limitation into the AUMF. A report addressing the legislative history of the

AUMF observed:  "A notable feature of [the AUMF] is that unlike all other major legislation authorizing the use of military force by the President, this joint resolution authorizes military force against 'organizations and persons' linked to the September 11, 2001 attacks on the United States.  In its past authorizations for use of U.S. military force, Congress has permitted action against unnamed nations in specific regions of the world, or against named individual nations, but never against 'organizations or persons.'"  Congressional Research Service, Authorization for Use of Military Force in Response to the 9/11 Attacks (P.L. 107-40): Legislative History (Jan. 16, 2007) (Exh. 5) at 3, *available at* https://www.everycrsreport.com/files/ 20070116_RS22357_ab70455dadf67abeaac870ec366f2ab688f260d3.pdf.

In contrast to the 2001 AUMF, during the following year, Congress enacted an authorization for use of military force expressly focused on the threat emanating specifically from Iraq.  *See* Pub. L. No. 107-243, 116 Stat. at 1500.  The 2002 Iraq AUMF provides that the "President is authorized to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat *posed by Iraq*."  *Id.*, § 3(a)(1), 116 Stat. at 1500 (emphasis added).  Such a reference to or nexus with a particular region or country has appeared in more than a dozen other congressional authorizations for use of military force.  For example, in 1983, Congress authorized the President "to continue participation by United States Armed Forces in the Multinational Force in Lebanon."  Multinational Force in Lebanon, Pub. Law No. 98-119, § 3, 97 Stat. 805 (1983).  Likewise, in 1955, Congress authorized the President specifically "to employ the Armed Forces of the United States for protecting the security of Formosa, the Pescadores and related positions and territories of that area."  Joint Resolution, Pub. L. No. 4, 69

Stat. 7 (1955). These and numerous other authorizations for use of force referring to particular

locales demonstrate that when Congress intends to include a geographic aspect or reference in

such an authorization, Congress does so unambiguously. It did not do so in the 2001 AUMF.

In considering passage of the 2001 AUMF, contemporaneous remarks confirm that

Congress intended to grant authority in the 2001 AUMF to use force not with respect to a

particular country or region, but with respect to those responsible for the terrorist attacks that the

country had just endured. *See*, *e.g.*, 107 Cong. Rec. H5641 ("I rise tonight to fully endorse and

authorize the use of force as directed by the President of this great Nation . . . Mr. President, *no*

*matter where we have to go*, no matter how long we have to fight, we are prepared to fulfill our

duty to generations to come.") (Rep. Norwood) (emphasis added); *id.* at H5643 ("I join my

colleagues in support of this resolution authorizing the use of military force . . . [o]ur enemies,

whoever and *wherever they are*, and those who harbor them, must clearly understand that we

will never tolerate the acts of terrorism, acts of war, that have been perpetrated upon us and they

must understand that there is no escape from American justice.") (Rep. Napolitano) (emphasis

added); *id.* at H5644 ("The current circumstances leave us with great uncertainty. We do not yet

know who committed these unspeakable acts *or where we may find them*, we do not know the

scale and scope of what bringing the perpetrators to justice may mean, and we do not know how

long it may take.") (Rep. Skelton) (emphasis added).

The 2012 NDAA provides further evidence that Congress did not intend for the detention

authority conferred by the AUMF to be predicated on the existence of U.S. military operations in

a particular location. In the NDAA, Congress affirmed that the AUMF authorizes the detention

of "[a] person who was a part of or substantially supported al-Qaeda, the Taliban, or associated

forces that are engaged in hostilities against the United States or its coalition partners,"

§ 1021(b)(2), 125 Stat. at 1562, again without any territorial or geographic limitation.  Congress

thus affirmed the scope of the 2001 AUMF and did not provide a geographic restriction.

**B.    Respondent's Actions Against Al-Qaida and Associated Forces Reflect the Scope of the Authority Conferred by the AUMF.**

Consistent with the text of the AUMF and the manifest intention of Congress in passing

it, U.S. forces have long employed the authority granted therein to pursue and engage al-Qaida

and associated forces not only in Afghanistan but across borders.  Indeed, the use of AUMF

authority beyond Afghanistan is a longstanding consequence of the reality that al-Qaida and

associated forces are non-state armed groups that do not respect national boundaries.

**1.    Throughout the Conflict, Hostilities Against Al-Qaida and Associated Forces Have Extended Far Beyond Afghanistan.**

From the outset of the hostilities authorized under the AUMF, the armed conflict against

al-Qaida and associated forces has not been limited to Afghanistan.  Petitioner's own case amply

illustrates this reality.  To begin with, he acknowledges that he was captured in Faisalabad,

Pakistan, and not in Afghanistan.  *See* Petr's Reply at 14 n.70.[4]  Petitioner dismisses this as "a

mere technicality," *id.* at 14, because, according to Petitioner, the factual return "focus[es]

overwhelmingly on his alleged hostile activities in or related to Afghanistan and Khaldan

training camp."  *Id.*  Yet, although the factual return describes significant activities by Petitioner

---

[4] Faisalabad is not in the border region of Afghanistan and Pakistan, but in central Pakistan, closer to its border with India.  *See* The World Fact Book, Political Map of Asia, (Exh. 6) *available at https://www.cia.gov/the-world-factbook/static/52d349583f80504ad 84838593330b2e4/asia_pol.pdf*

in Afghanistan, the allegations in the factual return regarding his activities beyond Afghanistan also form an important part of the asserted factual basis for Petitioner's detention.[5]

For example, the factual return describes the assistance that Petitioner provided—including via Petitioner's Pakistan guesthouse—to Ahmed Ressam, who was arrested on various terrorism-related charges based on his plan to bomb the Los Angeles International Airport (LAX) at the start of the millennium. *See* Factual Return, ECF No. 474-1 at 24 (pdf) at 12–17 (discussing Ressam's activities and the information he provided about Petitioner). In addition to facilitating Ressam's travel to and from terrorist training camps, Petitioner facilitated Ressam's travel to Canada, from which Ressam planned to launch his attack against the United States. *See id.*

The factual return also describes Petitioner's plans at the time of his capture in Pakistan to, in his own words reflected in his diary, "create a cell in Iran and meet the group which [would] work in Palestine, without the knowledge of the Iranian government." *Id.* at 39 (quotation omitted). According to contemporaneous writings of a member of that group, Petitioner was then trying to find a location to house that group "until [they left] Pakistan to where [they] could work on [their] main projects and kill the enemies of God." *Id.* at 40. The same writer anticipated that the day would come when he would "offer [his] soul for [Petitioner] inside America or Palestine." *Id.* Petitioner's presence in Pakistan was not a mere "technicality" as he now contends, Petr's Reply at 14 n.70, but the intended launching point for his subsequent

---

[5] In light of the examples discussed herein, Petitioner plainly is not, as he asserts, subject to detention "solely on account of his allegedly hostile activities in Afghanistan." Petr's Reply at 16.

operations against the United States and its coalition partners in various countries around the world, including Pakistan itself.  After describing "[a] general war, non stop and without mercy" against the United States, Petitioner also noted "[a]nother thing is to retaliate against those who stood with America[]."  FR at 44.  He noted "Pakistan is first, Britain is second" and wrote "without forgetting American, of course, . . . and the other countries that will get [their] share at the right time, if that is suitable."  *Id.*

The background underlying *Boumediene v. Bush* further illustrates that hostilities against al-Qaida and associated forces are not limited to Afghanistan.  Although some of the petitioners in that case were captured in Afghanistan, others were apprehended "in places as far away from there as Bosnia and Gambia."  *Boumediene v. Bush,* 553 U.S. 723, 734 (2008).[6]  Throughout the Guantanamo Bay habeas litigation, courts have properly focused not on the location where a detainee's activities took place, but rather on whether a detainee was part of or substantially supported al-Qaida, Taliban, and associated forces.  *See. e.g.*, *Ali*, 736 F.3d at 547 (relying on activities in Pakistan).

---

[6]As early as 2004, the Government's submissions to the courts referred to "the military campaign in Afghanistan and the war against al Qaeda more generally."  Resp. to Petitions for Writ of Habeas Corpus and Mot. To Dismiss or for Judgment as a Matter of Law and Mem. in Support, Civ. No. 04-1142, ECF No. 25 (D.D.C. Oct. 4, 2004) at 15.  Subsequently, in a 2009 submission addressing the Government's detention authority, the Government explained that imposing a geographic limit on the authority conferred by the AUMF "would contradict Congress's clear intention and would unduly hinder both the President's ability to protect our country from future acts of terrorism and his ability to gather vital intelligence regarding the capability, operations, and intentions of this elusive and cunning adversary."  Resps.' Mem. Regarding the Gov't's Detention Authority Relative to the Detainees Held at Guantanamo Bay, *In re Guantanamo Bay Detainee Litigation*, No. 08-442, ECF No. 1690 (D.D.C. Mar. 13, 2009) at 7 (internal quotation omitted).

Thus, in *Al Hela v. Trump*, the D.C. Circuit affirmed that detention was lawful based on a Yemeni citizen's activities—largely in Yemen—substantially supporting al-Qaida and two groups found to be associated forces of al-Qaida:  Egyptian Islamic Jihad ("EIJ") and the Aden-Abyan Islamic Army ("AAIA").  *See Al Hela v. Trump*, 972 F.3d 120 (D.C. Cir. 2020), *judgment vacated for rehearing en banc on other grounds*.  In affirming the district court's determination that the groups were associated forces of al-Qaida, the D.C. Circuit focused on both groups' activities throughout the Middle East—outside of Afghanistan—and noted the "global and diffuse nature of the conflict."  *Id.* at 133–34, 135.[7]

A 2016 White House report addressing the legal and policy frameworks guiding the United States' use of military force and related national security operations likewise confirms the Government's position that the use of force authorized under the AUMF was not limited to

---

[7] Similarly, Guantanamo Bay detainees Encep Nurjaman (ISN 10019), Mohammed Nazir Bin Lep (ISN 10022), and Mohammed Farik Bin Amin (ISN 10021) are subject to detention based on activities inside and outside of Afghanistan, and, earlier this year, were jointly referred for trial by a military commission for multiple violations of the law of war in connection with their alleged roles in the bombing of nightclubs in Bali, Indonesia, in 2002, and the bombing of a J.W. Marriott hotel in Jakarta, Indonesia, in 2003.  As explained by the Military Commission website posting the charge sheets:  "The charges include conspiracy, murder, attempted murder, intentionally causing serious bodily injury, terrorism, attacking civilians, attacking civilian objects, destruction of property, and accessory after the fact, *all in violation of the law of war*." https://www.mc.mil/CASES.aspx (emphasis added); *see also* Charge Sheet (Encep Nurjaman), *available at* https://www.mc.mil/Portals/0/pdfs/Nurjaman/Nurjaman%20 (RefCharges%20Hambali%2020210121).pdf; Charge Sheet (Mohammed Nazir Bin Lep), *available at* https://www.mc.mil/Portals/0/pdfs/Nurjaman/Nurjaman%20 (RefCharges%20Lillie%2020210121).pdf; Charge Sheet (Mohammed Farik Bin Amin), *available at* https://www.mc.mil/Portals/0/pdfs/Nurjaman/Nurjaman%20 (RefCharges%20Zubair%2020210121).pdf.  Although all three accused allegedly trained as part of al-Qaida in Afghanistan, where some overt acts allegedly took place, the nexus with that country is not central to the charges that they acted in violation of the law of war; rather, their activities in Southeast Asia are at the heart of the allegations against them.

Afghanistan.  That report noted:  "All three branches of the U.S. Government have affirmed the ongoing authority conferred by the 2001 AUMF and its application to al-Qa'ida, to the Taliban, and to forces associated with those two organizations within *and outside* Afghanistan."  Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations (Dec. 2016) (Exh. 7), *available at* https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/Legal_Policy _Report.pdf ("2016 White House Report") at 4 (emphasis added).  The 2016 White House Report further explained: "[a]lthough Afghanistan was the focus when the 2001 AUMF was enacted in September 2001, the President's authority to use force pursuant to that statute is not limited to Afghanistan.  The 2001 AUMF itself contains no such geographic limitation, and neither Congress nor U.S. Federal courts have limited the President's ability to use force in that way."  *Id.* at 49 n.13.  The same report noted that the 2001 AUMF authorized then-ongoing military operations in Afghanistan, Iraq, Syria, Somalia, Libya, and Yemen.  *See id.* at 15–18. Afghanistan was just one of six "key theaters" identified therein.  *Id.* at 15.[8]

Accordingly, Respondent's position that the hostilities against al-Qaida and associated forces are not limited to Afghanistan is neither new nor unique to this case.

---

[8] The United States has conducted airstrikes on al-Qaida targets in at least seven countries since 2012, and U.S. forces have engaged in ground combat against al-Qaida in Afghanistan, Somalia, and Yemen in recent years.  *See* Congressional Research Service, Al Qaeda: Background, Current Status, and U.S. Policy at 2, *available at* https://crsreports.congress.gov/ product/pdf/IF/IF11854; *see generally* Anderson Decl.; DIA Decl.

**2. Hostilities Against al-Qaida and Associated Forces Remain Ongoing.**

Petitioner also argues that hostilities against al-Qaida in Afghanistan "don't even exist" and dismisses as irrelevant the mere "presence" of al-Qaida's associated forces "in various countries," Petr's Reply at 16, implying that al-Qaida and associated forces have now laid down their arms.[9] Petitioner is mistaken.

As reflected in the recent testimony of the Secretary of Defense and Chairman of the Joint Chiefs of Staff before the Senate Armed Services Committee and House Armed Services Committee, hostilities against al-Qaida and associated forces have not ceased. *See supra* 2, *and infra* 17. Furthermore, on September 9, 2021, the President reaffirmed that "[t]he terrorist threat that led to the declaration on September 14, 2001, of a national emergency continues." Letter to the Speaker of the House of Representatives and the President of the Senate on the Continuation of the National Emergency with Respect to Certain Terrorist Attacks (Sept. 9, 2021) (Exh. 8), *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/09/letter-to-the-speaker-of-the-house-of-representatives-and-the-president-of-the-senate-on-the-continuation-of-the-national-emergency-with-respect-to-certain-terrorist-attacks/. As the President explained on August 16, 2021, "[t]oday, the terrorist threat has metastasized well beyond Afghanistan: al Shabaab in Somalia, al Qaeda in the Arabian Peninsula, al-Nusra in Syria, ISIS attempting to create a caliphate in Syria and Iraq, and establishing affiliates in multiple countries in Africa and

---

[9] Petitioner directs his argument at "some group that calls itself al Qaeda in various countries," Petr's Reply at 16, but associated forces are not limited to those groups that adopt "al-Qaida" as part of their name. *See* 2016 White House Report at 4–5 (describing the criteria for assessing whether a group is an associated force under the AUMF). Indeed, on the very same page, Petitioner asserts "[t]he Somali terrorist group al-Shabaab was, in reality, a part of al Qaeda." *Id.* at 16 n.76.

Asia. "  Remarks by President Biden on Afghanistan (Aug. 16, 2021) at 5, *available at*
https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/08/16/remarks-by-president-
biden-on-afghanistan/.  U.S. forces continue to engage in active hostilities with al-Qaida and
associated forces where al-Qaida and associated forces are present, as authorized by the AUMF.

The two classified declarations submitted herewith further detail the nature of the current
ongoing conflict against al-Qaida and associated forces in areas of Africa and the Middle East,
including Afghanistan, noting specifically that U.S. forces remain engaged in active hostilities
with al-Qaida and associated forces in these regions.

Petitioner argues that "the al Qaeda that existed" when he was captured "no longer
exists," Petr's Reply at 16, but that is not so.  Although al-Qaida's remaining core leadership has
been degraded and currently poses a more limited threat to the U.S. homeland, that leadership
continues to assert direction for, seek the loyalty of, and encourage cooperation and growth
among regional al-Qaida affiliates, which continue to pursue recruitment and plotting, especially
in unstable or vulnerable areas, and threaten local U.S. personnel, interests, and partners.  *See*
Office of the Director of National Intelligence, Annual Threat Assessment, (Apr. 9, 2021) (Exh.
9) *available at* https://www.dni.gov/files/ODNI/documents/assessments/ATA-2021-
Unclassified-Report.pdf at 23; *see also* Congressional Research Service, Al Qaeda: Background,
Current Status, and U.S. Policy (June 14, 2021) (Exh. 10) at 2; *see generally* Anderson Decl.;
DIA Decl.

For its part, al-Qaida considers its war against the United States to continue and remains
intent on perpetrating attacks against the United States.  Barely four weeks ago, on the
anniversary of the September 11 attacks, al-Qaida reportedly released a propaganda video

- 15 -

featuring its leader, Ayman al-Zawahiri, praising "martyrs" from al-Qaida and associated forces who had been killed in the ongoing hostilities against the United States in locations including Yemen, Egypt, and Syria.  *See* FDD's Long War Journal, Ayman al Zawahiri promotes 'Jerusalem Will Not Be Judaized' campaign in new video, (Sept. 11, 2021) (Exh. 11), *available at* https://www.longwarjournal.org/archives/2021/09/ayman-al-zawahiri-promotes-jerusalem-will-not-be-judaized-campaign-in-new-video.php.  Zawahiri exhorted his followers that their enemies, *i.e.* the United States and its allies, "can be bled to death . . . waging a war in which the entire world is the battlefield."  *Id.*; *see also id.* ("We are a united Ummah [community], waging one war on different fronts").

Indeed, no cessation of hostilities against al-Qaida and associated forces including in Afghanistan has been reached.  As discussed above, the Secretary of Defense and Chairman of the Joint Chiefs of Staff, testifying before the Senate Armed Services Committee, assessed that al-Qaida remains in Afghanistan and it and associated forces remain at war with the United States.  *See supra* 2; *see also infra* 17 (similar testimony before House Armed Services Committee).  Many al-Qaida senior leaders remain based in the Afghanistan region, where the group is weakened but not eliminated.  *See* Congressional Research Service, Al Qaeda: Background, Current Status, and U.S. Policy at 1.  As discussed above, al-Qaida has demonstrated continued intent and design to attack the United States.  A report to the U.N. Security Council published in June assessed that "[l]arge numbers of Al-Qaida fighters . . . are located in various parts of Afghanistan."  Report of the Analytic Support and Sanctions Monitoring Team, U.N. Doc. S/2021/486 (June 1, 2021) (Exh. 12) at 3, *available at* https://www.undocs.org/pdf?symbol=en/S/2021/486, and a report to the U.N. Security Council

published in July indicated that al-Qaida has a presence in at least 15 Afghan provinces, Report

of the Analytical Support and Sanctions Monitoring Team, at 14, U.N. Doc. S/2021/655 (July 21,

2021) (Exh. 13), at 14, *available at* https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B

-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/S_2021_655_E.pdf.  As a result, U.S. forces remain

"laser-focused" on Afghanistan, closely monitoring al-Qaida and associated forces to ensure that

it does not regenerate and redevelop the capability "to export terror from Afghanistan . . . to the

United States."  Sept. 28, 2021 SASC Hearing Transcript at 119; Bloomberg Government,

Testimony before the House Armed Services Committee Hearing (Sept. 29, 2021) (Exh. 14) at

82 (explaining that U.S. forces will be monitoring factors such as "leadership capability, training

. . . and demonstrations of intent that al Qaeda and/or ISIS is going to do external operations

against the United States or our interests" from Afghanistan); *see* Anderson Decl. ¶¶ 36-42; DIA

Decl. ¶¶ 2–4.

    Additionally, other al-Qaida groups or associated forces, such as AQIS, *see* Resp.'s

Opp'n at 9, and ISIS-Khorasan, maintain a significant presence in the country.  *See* Anderson

Decl. ¶¶ 28-29, 39; DIA Decl. ¶¶ 4–5.  Indeed, ISIS-Khorasan was responsible for the recent

violent and deadly attack on U.S. forces and Afghan civilians during the military's evacuation of

civilians from the international airport in Kabul, *see* Remarks by President Biden on the Terror

Attack at Hamid Karzai International Airport (Aug. 26, 2021) at 1, *available at*

https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/08/26/remarks-by-president-

biden-on-the-terror-attack-at-hamid-karzai-international-airport/; *see also id.* at 3 (announcing

that the President had ordered commanders "to develop operational plans to strike ISIS-K assets,

leadership, and facilities").  U.S. military forces then conducted an over-the-horizon operation

that killed an ISIS-Khorasan planner in Afghanistan.  *See* U.S. Central Command statement on

counterterrorism strike on ISIS-K planner (August 27, 2021); *see also supra* 17 (discussing that

U.S. forces continue to monitor closely threats from al-Qaida and associated forces in

Afghanistan).

  Thus, even if the scope of the armed conflict were limited to Afghanistan as Petitioner

mistakenly contends, the current situation would not amount to a "cessation of hostilities" such

that release would be required.  In *Hamdi v. Rumsfeld*, a plurality of the Supreme Court looked to

Article 118 of the Third Geneva Convention Relative to the Treatment of Prisoners of War

("Third Geneva Convention"), providing that "Prisoners of war shall be released and repatriated

without delay after the cessation of active hostilities," to inform the authority to detain granted

by the 2001 AUMF.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 520 (2004) (plurality).  Petitioner

highlights the Supreme Court's comment that the armed conflict with al-Qaida "is unlikely to

end with a formal cease-fire agreement," Petr's Reply at 17 (quoting *Hamdi*, 542 U.S. at 520),

but that is a straw man argument; active hostilities are measured by conditions in the fight.  The

Department of Defense Law of War Manual provides "[cessation of active hostilities] is the

complete end of the fighting with clearly no probability of resumption of hostilities in the near

future."  DoD Law of War Manual § 9.37.2; *see also Al-Bihani v. Obama,* 590 F.3d 866, 874

(D.C. Cir. 2010) ("The Conventions, in short, codify what common sense tells us must be true:

release is only required when the fighting stops.").  The International Committee of the Red

Cross, in its recent commentary on the Third Geneva Convention, likewise refers to "a lasting

cessation of armed confrontations without real risk of resumption."  *See* ICRC Commentary of

2020, Convention (III) relative to the Treatment of Prisoners of War. Geneva, 12 August 1949,

525.  And other commentators agree.  For example, Professor Georg Schwarzenberger described "cessation of active hostilities" as "when, in good faith, neither side expects a resumption of hostilities."  1 G. Schwarzenberger, International Law 216 (5th ed. 1967); *see also* 2 Lassa Oppenheim, International Law 613 (Hersch Lauterpacht ed., 7th ed. 1952) ("Probably the phrase 'cessation of active hostilities' in the sense of Article 118 refers not to suspension of hostilities in pursuance of an ordinary armistice which leaves open the possibility of a resumption of the struggle, but to a cessation of hostilities as the result of total surrender or of such circumstances or conditions of an armistice as render it out of the question for the defeated party to resume hostilities."); Resp.'s Opp'n at 19 n.4 (collecting commentary).  Given the present and evolving threat from al-Qaida and associated forces in Afghanistan, that does not describe the situation there at this time.

Furthermore, within the last year, pursuant to the AUMF, the United States has conducted operations, including airstrikes, against al-Qaida and ISIS in Syria[10] and against ISIS in Iraq.  *See*

---

[10] The AUMF has authorized the use of force against ISIS since at least 2004.  *See* White House Report at 5.  In 2004, Abu Mu'sab al-Zarqawi, the founder of al-Qaida in Iraq (AQI) — the group that became ISIS—in response to an invitation from bin Laden to merge with al-Qaida publicly pledged his group's allegiance to bin Laden, and bin Laden publicly endorsed al-Zarqawi as al-Qaida's leader in Iraq.  *See id.*  For years afterwards, al-Zarqawi's group conducted deadly terrorist attacks against U.S. and Coalition forces.  *See id.*  The group has continued to plot attacks against U.S. persons and interests in Iraq and the region—including the brutal murder of kidnapped American citizens in Syria and threats to U.S. military personnel that are now present in Iraq at the invitation of the Iraqi Government.  *See id.* at 6.  The subsequent 2014 split between ISIS and current al-Qaida leadership does not remove ISIS from coverage under the AUMF.  *See id.*  Although ISIS broke its affiliation with al-Qaida, the same organization continues to wage hostilities against the United States as it has since 2004, when it joined bin Laden's al-Qaida organization in its conflict against the United States, and ISIS now claims that it—not al-Qaida's current leadership—is the true executor of bin Laden's legacy.  *See id.*  Nothing in the AUMF requires perpetual amity between organizations subject to its

Letter from the President, Letter to the Speaker of the House and President Pro Tempore of the Senate Regarding the War Powers Report (June 8, 2021) (Exh. 15) ("WPR Report") at 2, 3, *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/08/letter-to-the-speaker-of-the-house-and-president-pro-tempore-of-the-senate-regarding-the-war-powers-report/; *see also* Anderson Decl. ¶ 32.  A small number of U.S. military personnel are deployed to Yemen to conduct operations against al-Qaida in the Arabian Peninsula and ISIS.  *See* WPR Report at 2, 3.  In East Africa, U.S. forces continue to counter the threat posed by ISIS and al-Shabaab, an associated force of al-Qaida; recently, U.S. forces conducted air strikes against al-Shabaab and remain prepared to conduct airstrikes against ISIS and al-Shabaab.  WPR Report at 3–4; *see also* Anderson Decl. ¶¶ 12-16; DIA Decl. ¶¶ 5, 9.

The record evidence demonstrates that hostilities against al-Qaida and associated forces have not ceased, whether in Afghanistan or elsewhere.

**C.  Precedent Does Not Support the Limitations that Petitioner Advocates.**

Overlooking the text of the AUMF and the reality of the continuing nature of the conflict, Petitioner insists that the hostilities during which his detention remains lawful are defined with respect to the conflict in Afghanistan, and contends that those hostilities have ended such that his release is required.  Petr's Reply at 17–19.  Petitioner is wrong on both points.

To begin with, although Petitioner contends that "the court has always conducted the [end of hostilities] analysis with respect to whether the U.S. forces were engaged in hostilities in

---

authorization of force, and a contrary interpretation of the statute would allow an enemy force to manipulate the scope of the AUMF by splintering into rival factions while continuing to prosecute the same conflict against the United States.  *See id.*

Afghanistan," *id.* at 18, Petitioner overlooks that neither the Supreme Court nor the D.C. Circuit

has had occasion to rule upon the geographic scope of the hostilities authorized by the AUMF.

In *Hamdi v. Rumsfeld*, the Supreme Court addressed a habeas petition by a detainee who had

taken up arms with the Taliban in Afghanistan. *See Hamdi*, 542 U.S. at 510. Focusing on the

facts presented in that case, the Supreme Court observed that "active combat operations against

Taliban fighters apparently are ongoing in Afghanistan," and held that the petitioner's detention

remained lawful while that was the case. *Id.* at 521. The Court did not purport to limit detention

authority under the AUMF in the case of the broader conflict against al-Qaida and associated

forces. The Court stated that the AUMF "include[s] the authority to detain for the duration of the

relevant conflict," *id.*; in this case, that "relevant" conflict is the conflict against al-Qaida and

associated forces.

Nor do the two D.C. Circuit cases on which Petitioner relies support his position. *See*

Petr's Reply at 18–19 (citing *Al-Alwi v. Trump*, 901 F.3d 294, 298 (D.C. Cir. 2018) and *Al-*

*Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010)). In *Al-Alwi*, the D.C. Circuit addressed

the petitioner's "alleg[ation] that the conflict in Afghanistan that resulted in his detention had

ended," based on the President's announcement of the end of Operation Enduring Freedom. 901

F.3d at 296, 299–300. The very heart of the question in that case was whether the armed conflict

*in Afghanistan* continued; there was no occasion for the D.C. Circuit to discuss the geographic

scope of the AUMF.

Similarly, in *Al-Bihani*, the issue before the Court was the petitioner's contention that his

release was required "because the conflict with the Taliban [had] allegedly ended." *Al-Bihani*,

590 F.3d at 874. In the passage upon which Petitioner relies, *see* Petr's Reply at 19, the D.C.

- 21 -

Circuit's holding was that the question of whether the hostilities had ended was for the political branches to decide; the question of whether the conflict was broader than or limited to Afghanistan did not arise in that case.  *See id.*[11]

Indeed, Respondent is not aware of any case in which a court has imposed geographic limits on a Congressional authorization for the use of military force where Congress had supplied none.  Especially given the gravity of the separation of powers concerns presented by the issue, *cf. Ludecke v. Watkins*, 335 U.S. 160, 169 (1948), it would have been remarkable had the D.C. Circuit circumscribed the geographic scope of the AUMF in *Al- Alwi* or *Al-Bihani* as Petitioner suggests, *sub silentio*, without so much as a comment regarding the momentous step that it was taking.  *Cf. Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) (observing that Congress does not "hide elephants in mouseholes.").  Even more far-fetched is the notion that the D.C. Circuit might have taken such a decision in the context of the particular discussions upon which

---

[11]  The same is true of the district court decisions on which Petitioner relies.  *See* Petitioner's Reply at 19 (citing *Razak v. Obama*, 174 F. Supp. 3d 300, 305 (D.D.C. 2016), *decision vacated, appeal dismissed* No. 16-5074 (D.C. Cir. Apr. 12, 2017); *Al Warafi v. Obama*, 1:09-cv-2368 (RJL), 2015 WL 4600420 at *7 (D.D.C. July 30, 2015), *decision vacated, appeal dismissed* (Mar. 4, 2016); *Al Odah v. United States*, 62 F. Supp. 3d 101, 112 (D.D.C. 2014); and *Nasser v. Obama*, 234 F. Supp. 3d 121, 124 (D.D.C. 2017)).  In three of the four cases cited, the petitioners had argued that President Obama's announcement regarding the end of combat operations in Afghanistan had terminated the Government's detention authority under the AUMF.  *See Razak*, 174 F. Supp. 3d at 304; *Al Warafi*, 2015 WL 4600420 at *7; *Al Odah*, 62 F. Supp. 3d at 104.  Thus, it is unremarkable that, in each of those cases, the court's discussion focused on whether hostilities in Afghanistan continued.

In *Nasser*, on the other hand, there was no allegation that the relevant hostilities had ceased at all.  *See* 234 F. Supp. 3d at 124.  The Court reasoned that "there has been no Congressional or Executive action to end those hostilities," and proceeded to quote from the Government's brief, which, in turn quoted the President's then-current War Powers Letter.  *Id.* at 124.  That quotation, of course, stops far short of a holding circumscribing the geographic scope of the AUMF.

Petitioner relies.  The relevant paragraph in *Al-Bihani* opens with the D.C. Circuit emphasizing that its holding regarding whether hostilities had ceased rests on "defer[ence] to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war."  *Al-Bihani*, 590 F.3d at 874 (citing *Ludecke*, 335 U.S. at 168–70 n.3).  The sentence preceding the one that Petitioner cites again notes "the wide deference the judiciary is obliged to give to the democratic branches with regard to questions concerning national security."  *Id.* at 875.  In proper context, the discussion in *Al-Bihani* forecloses the relief that Petitioner seeks.

Likewise in *Al-Alwi*, the D.C. Circuit considered and rejected an analogous request to impose extratextual limits on the AUMF.  There, the petitioner asked the Court to impose temporal limitations on the AUMF that are not found in the enactment.  Citing the text of the AUMF as well as the National Defense Authorization Act for Fiscal Year 2012 (NDAA), Pub. L. No. 112-81, § 1021(c)(1), 125 Stat. 1562, the D.C. Circuit reasoned that "[n]either of these enactments places limits on the length of detention in an ongoing conflict.  Our baseline, then, is that the AUMF remains in force if hostilities between the United States and the Taliban and al Qaeda continue."  *Al-Alwi*, 901 F.3d at 297; *see also id.* (citing *Ali*, 736 F.3d at 552) ("The AUMF does not have a time limit . . . .")).  As the D.C. Circuit did with the *temporal* limitations proposed in *Al-Alwi*, this Court should decline to create *geographic* limitations on the AUMF that Congress did not intend.

Furthermore, although Petitioner errs in relying on *Al-Alwi* and *Al-Bihani* for a geographic limitation on the scope of the ongoing conflict against al-Qaida, the holdings in those cases—consistent with numerous cases before them, *see* Resp.'s Opp'n at 20–22 (collecting

- 23 -

cases)—provide that "[t]he determination of when hostilities have ceased is a political decision." *See Al-Bihani*, 590 F.3d at 874 ("[W]e defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war."); *see also Al-Alwi*, 901 F.3d at 299 ("The 'termination' of hostilities is 'a political act.'") (quoting *Ludecke*, 335 U.S. at 168–69).  The political branches have made no such determination here.

Petitioner relies on the President's August 31, 2021 remarks as a "formal proclamation of the end of the war," Petr's Reply at 23, but Petitioner misapprehends the President's statements. As in his other recent remarks regarding the ongoing hostilities against al-Qaida, the President discussed the changing nature of the conflict, explaining that "[t]he terror threat has metastasized across the world" over time.  *See* Remarks by President Biden on the End of the War in Afghanistan (Aug. 31, 2021) at 5, *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/08/31/remarks-by-president-biden-on-the-end-of-the-war-in-afghanistan/); Resp.'s Opp'n at 1, 27–29.[12]  The President also emphasized that "[w]e will maintain the fight against terrorism in Afghanistan and other countries. We just don't need to fight a ground war to do it. We have what's called over-the-horizon capabilities, which means we can strike terrorists and targets without American boots on the ground — or very few, if needed."  *Id.*  Indeed, as demonstrated by the above description of recent and ongoing operations against al-Qaida and associated forces currently being undertaken pursuant to the AUMF, Petitioner's interpretation of the President's remarks is plainly at odds with the President's

---

[12] Furthermore, as explained in Respondent's Opposition, Supreme Court precedent forecloses the termination of congressionally-authorized war powers via colloquial references in a Presidential speech.  *See* Resp.'s Opp'n at 28, n.6 (discussing *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146 (1919)).

exercise of his authority under the AUMF, as well as the facts on the ground both with respect to Afghanistan and elsewhere.  *See supra* 14–20.

Petitioner tries to sever consideration of conditions in Afghanistan from the broader conflict against al-Qaida and associated forces, based merely on the withdrawal of U.S. forces from the country.  But that approach defies *Al-Bihani*, which rejected an end-of-hostilities framework that would require release of combatants at the conclusion of "each successful campaign of a long war"; such a framework would result in "a Pyrrhic prelude to defeat" because it "would trigger an obligation to release . . . fighters captured in earlier clashes" and result in "constantly refresh[ing] the ranks" of enemy forces during the persistence of hostilities.  *Al-Bihani*, 590 F.3d at 874.  As explained above, al-Qaida, although weakened, is not eliminated, and hostilities against it and its associated forces continue in multiple regions of the world; thus, *Al-Bihani*'s reference to refreshing the ranks of these enemy forces is not a merely abstract concern.  In light of this reality, the purpose of these law of war detentions—to "prevent . . . combatant[s'] return to the battlefield," *see Hamdi*, 542 U.S. at 519—is still being served.  *See generally* Anderson Decl.; DIA Decl.

## CONCLUSION

For all the reasons set forth herein and in Respondent's Opposition, the Court should deny Petitioner's motion for immediate release.

Dated: October 7, 2021

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

ALEXANDER K. HAAS
*Branch Director*

TERRY M. HENRY
*Assistant Branch Director*

*/s/ Julia A. Heiman*
RONALD J. WILTSIE (D.C. Bar No. 431562)
ANDREW I. WARDEN (IN Bar No. 23640-49)
*Senior Trial Attorneys*
JULIA A. HEIMAN (D.C. Bar No. 986228)
*Senior Counsel*
INDRANEEL SUR (D.C. Bar No. 978017)
*Trial Attorney*
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7510
Washington, D.C. 20530
Tel: [ ]
*Julia.Heiman@usdoj.gov*