**[ORAL ARGUMENT REQUESTED]**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016), | ) ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | **No. 08-CV-1360 (EGS)** |
| | ) | |
| LLOYD J. AUSTIN III, | ) | |
| | ) | |
| *Respondent.* | ) ) | |

**PETITIONER'S SUPERSEDING MOTION FOR SANCTIONS**

Pursuant to the Court's Minute Orders dated May 31, 2023 and June 27, 2023, Petitioner hereby moves for sanctions on account of the CIA's intentional spoliation of evidence, as set forth in the attached Memorandum of Law.  The relief Petitioner seeks is set forth in the Proposed Order also filed concurrently as required by Local Rule 7(c).

Date: September 29, 2023

Respectfully submitted,

/s/ Solomon B. Shinerock
Solomon B. Shinerock
Adam S. Kaufmann
Eric L. Lewis (D.C. Bar #394643)
Elizabeth M. Vélez
Lewis Baach Kaufmann Middlemiss PLLC
The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
(t) 212.826.7001
(f) 212.826.7146

1

Charles R. Church
The Law Office of Charles R. Church LLC
76 Lincoln City Road
Salisbury, CT 06068
(t) 860.596.4166
(f) 860.596.4166

*Counsel for Petitioner*

**[ORAL ARGUMENT REQUESTED]**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016),** | ) ) ) | |
| *Petitioner,* | ) ) | |
| **v.** | ) ) | **No. 08-CV-1360 (EGS)** |
| **LLOYD J. AUSTIN III,** | ) ) | |
| *Respondent.* | ) ) | |

**MEMORANDUM IN SUPPORT OF PETITIONER'S SUPERSEDING MOTION FOR
SANCTIONS FOR SPOLIATION OF EVIDENCE**

Eric L. Lewis (D.C. Bar #394643)
Adam S. Kaufmann
Solomon B. Shinerock
Elizabeth M. Vélez
Lewis Baach Kaufmann Middlemiss PLLC
The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
(t) 212.826.7001
(f) 212.826.7146

Charles R. Church
The Law Office of Charles R.
Church LLC
76 Lincoln City Road
Salisbury, CT 06068
(t) 860.596.4166
(f) 860.596.4166

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................ii

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS .........................................................................................2

   (a) The Proffered Basis for Abu Zubaydah's Continued Detention has been
      Significantly Overstated.................................................................................2

   (b) The Video Evidence Would Have Assisted the Court in Evaluating the
      Basis for Abu Zubaydah's Continued Detention with Evidence from the Beginning of his
      Capture in 2002.............................................................................................4

   (c) The CIA was on Notice Concerning the Importance of the Video Evidence to Reasonably
      Anticipated Legal Proceedings ......................................................................14

   (d) The CIA Destroyed the Video Evidence to Avoid Confronting the Legal and Reputational
      Risk It Posed ................................................................................................17

   (e) Abu Zubaydah's Declaration Provides the Best Indicator of the Content of the Video
      Evidence........................................................................................................19

ARGUMENT ............................................................................................................22

   I. THIS COURT SHOULD IMPOSE SANCTIONS FOR THE GOVERNMENT'S
      DELIBERATE SPOLIATION OF EVIDENCE.............................................22

      A. The CIA had an obligation to preserve the Video Evidence ....................23

      B. The CIA Deliberately Destroyed the Video Evidence With a Culpable State of
         Mind..........................................................................................................26

      C. The Destruction Deprived Petitioner of Relevant Evidence.....................28

   II. AN ADVERSE INFERENCE IS AN APPROPRIATE SANCTION .............31

CONCLUSION.........................................................................................................33

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdah v. Bush*,
   Civ. No. 04-1254 (D.D.C. June 10, 2005) ............................................................................24

*Abdullah v. Bush*,
   Civ. No. 05-23 (D.D.C. July 18, 2005) .................................................................................24

*ACLU v. U.S. Dep't of Defense*
   827 F.Supp.2d 217 (S.D.N.Y. 2011) ............................................................................ *passim*

*Al-Marri v. Bush*,
   Civ. No. 04-2035 (D.D.C. March 7, 2005) ...........................................................................24

*Bonds v. District of Columbia*,
   93 F.3d 801 (D.C. Cir. 1996) ...............................................................................................31

*Brady v. Maryland*,
   373 U.S. 83 (1963) ................................................................................................................30

*D'Onfrio v. SFX Sports Group, Inc.*,
   No. 06-687(JDB/JMF), 2010 WL 3324964 (D.D.C. 2010)...................................................23

*Gerlich v. U.S. Dep't of Justice*,
   711 F.3d 161 (D.C. Cir. 2013) .........................................................................................23, 27

*Husayn v. Austin*,
   No. 08-cv-1360(EGS), 2021 WL 2073439 (D.D.C. 2021)...................................................30

*Kronisch v. United States*,
   150 F.3d 112 (2d Cir. 1998)........................................................................................ *passim*

*Mannina v. District of Columbia*,
   437 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................................23, 26

*Mazloum v. D.C. Metro. Police Dep't*,
   530 F. Supp. 2d 282 (D.D.C. 2008) .................................................................................23, 31

*Mohammed v. Obama*,
   No. 05-1347 (GK), 2009 WL 1220441 (D.D.C. 2009).........................................................30

*More v. Snow*,
   480 F. Supp. 2d 257 (D.D.C. 2007) ......................................................................................26

*Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*,
  692 F.2d 214 (1st Cir. 1982) .............................................................................22

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)) .........................................................................................15

*Rasul v. Bush*,
  542 U.S. 466 (2004) ................................................................................1, 15, 24

*Reasonover v. Washington*,
  60 F. Supp. 2d 937 (E.D. Mo. 1999) .................................................................30

*Robertson v. Cartinhour*,
  867 F.Supp.2d 37 (D.D.C. 2012) .......................................................................15

*Shepherd v. American Broad. Cos., Inc.*,
  62 F.3d 1469 (D.C. Cir. 1995) .....................................................................22, 23

*Talavera v. Shah*,
  638 F.3d 303 (D.D.C. 2011) ..............................................................................31

*United States v. Husayn*,
  No. 20-827 (Oct. 6, 2021) ...................................................................................2

*United States v. Phillip Morris USA, Inc.*,
  327 F. Supp. 2d 21 (D.D.C. 2004) .....................................................................31

*United States v. Severdija*,
  790 F.2d 1556 (11th Cir. 1986) .........................................................................30

*Vasser v. Shulkin*,
  No. 14-0185 (RC), 2017 WL 5634860 (D.D.C. 2017) .........................................31

*Webb v. District of Columbia*,
  146 F.3d 964 (D.C. Cir. 1998) ...........................................................................23

*Zhi Chen v. District of Columbia*,
  839 F. Supp. 2d 7 (D.D.C. 2011) ......................................................28, 29, 31, 32

**Statutes**

Freedom of Information Act ........................................................................15, 17, 24

U.S. Code Title 18 Section 2340A...............................................................................7

## Other Authorities

C. Church, "What Politics and the Media Still Get Wrong About Abu Zubaydah"
(Aug. 1, 2018), https://www.lawfareblog.com/what-politics-and-media-still-
get-wrong-about-abu-zubaydah ................................................................3, 8, 12

C. Rosenberg, "Agent who interrogated Abu Zubaydah: 'Where we went wrong
as a nation.'" https://www.miamiherald.com ........................................................14

Central Intelligence Agency, *Interrogation of al Qaeda Operative* (Aug. 1, 2002),
https://www.justice.gov/sites/default/files/olc/legacy/2010/08/05/memo-
bybee2002.pdf................................................................................................. 7-10

Gen. Mike Hayden, Director's Statement on the Taping of Early Detainee
Interrogations (Dec. 6, 2007), *available at*: https://www.cia.gov/news-
information/press-releases/statements/press-release-archive-2007/taping-of-
early-detainee-interrogations.html .......................................................................27

M. Apuzzo & A. Goldman, "Key omission in memo to destroy CIA terror tapes,"
https://www.seattletimes.com/seattle-news/politics/key-omission-in-memo-to-
destroy-cia-terror-tapes/................................................................................18

M. Mazzetti, "CIA Destroyed Tapes of Interrogations,"
https://www.nytimes.com/2007/12/06/washington/06cnd-intel.html....................16

M. Mazzetti & C. Savage "No Criminal Charges Sought Over CIA Tapes,"
https://www.nytimes.com/2010/11/10/world/10tapes.html...................................18

P. Taylor, "'Vomiting and screaming' in destroyed waterboarding tapes,"
https://www.bbc.com/news/world-us-canada-17990955......................................18

Pioneer Press, "Judge says Moussaoui jury made right decision,"
https://www.twincities.com/2008/07/23/judge-says-moussaoui-jury-made-
right-decision/ ......................................................................................................17

R. Suskind, *The One Percent Doctrine* (Simon & Schuster 2006),
*https://www.amazon.com/One-Percent-Doctrine-Americas-
Pursuit/dp/0743271106*................................................................................3, 4

Remarks by the President at Connecticut Republican Committee Luncheon  (Apr.
9, 2002), https://georgewbush-
whitehouse.archives.gov/news/releases/2002/04/20020409-8.html........................3

S. Shane & M. Mazzetti, "Tapes by the CIA Lived and Died to Save Image,"
https://www.nytimes.com/2007/12/30/washington/30intel.html.............................4

*Study of the [CIA's] Detention and Interrogation Program,* December 2014,
  https://www.feinstein.senate.gov/public/_cache/files/7/c/7c85429a-ec38-
  4bb5-968f-
  289799bf6d0e/D87288C34A6D9FF736F9459ABCF83210.sscistudy1.pdf .................. *passim*

T. McGirk, "Anatomy of a Raid,"
  https://content.time.com/time/magazine/article/0,9171,227502,00.html ................................4

Verbatim Transcript of the CSRT of ISN, March 27, 2007,
  https://www.aclu.org/documents/abu-zubaydah-csrt-transcript ............................................20

## **PRELIMINARY STATEMENT**

Between April and December of 2002, the U.S. Central Intelligence Agency ("CIA" or the "Agency") recorded videos of Petitioner Zayn al Abidin Muhammad Husayn ("Petitioner," or "Abu Zubaydah") during interrogation sessions at an undisclosed location in Thailand. The recordings were preserved on approximately 90 tapes (the "Video Evidence") and thereafter held by the CIA. The Video Evidence depicted numerous instances of unauthorized interrogation techniques and torture, and it quickly became the subject of inquiry by litigants and the CIA Inspector General. Litigation involving the Video Evidence was reasonably anticipated following the Supreme Court's decision *Rasul v. Bush*, 542 U.S. 466 (2004), confirming the *habeas corpus* rights of Guantanamo Bay detainees. By July of 2005 private litigants and officials in every branch of government—including judges of this Court—had ordered, instructed, and requested the production and/or preservation of the Video Evidence.

On November 9, 2005, the CIA destroyed all of the tapes in an effort to evade the legal and reputational damage that would come from their introduction in legal proceedings. As one CIA document reports, CIA officials agreed that the "heat from destroying [the Video Evidence] is nothing compared to what it would be if the tapes ever got into the public domain . . . they would make us look terrible; it would be devastating to us." *See* Shinerock Decl., Ex. 2 (Nov. 10, 2005 email sent at 5:48 PM to Kyle "Dusty" Foggo).

The Video Evidence would have supported Petitioner's position that his ongoing detention at the Guantanamo Bay Naval Base is unjustified. During the more than 20 years that he has been in United States custody, he has not been charged. Rather, he has been held on the basis of an overstated and ill-informed assessment that he poses a threat to the United States. The Video

Evidence would have assisted the Court in obtaining full and accurate information as it determines the key question before it: whether there is today a justification for Petitioner's continuing detention.

As Justice Breyer stated in an unrelated case concerning Abu Zubaydah's detention in Guantanamo Bay: "I don't understand why he's still there after 14 years." Transcript of Oral Argument, *United States v. Husayn*, No. 20-827 at 72-73 (Oct. 6, 2021). The reason is that a pattern of misinformation, outright misstatements, and withheld evidence has resulted in a picture of Abu Zubaydah that is far worse than the reality. The destruction of the Video Evidence represents a significant part of what allowed a false narrative to persist so long. The requested relief will begin to correct that muddied record.

A portion of the relief requested herein was previously sought by Petitioner (ECF Nos. 359 and 401). Per orders of this Court dated May 31, 2023 and June 27, 2023, Petitioner now submits this superseding motion consolidating his prior applications and adding additional requests for relief. As explained below, the Court should impose sanctions in response to the spoliation of the Video Evidence, including by ordering discovery, making adverse inferential findings concerning the content of the destroyed Video Evidence, as set forth in the Proposed Order attached hereto, and ordering such other and further relief as is just and proper.

## STATEMENT OF FACTS

### (a) The Proffered Basis for Abu Zubaydah's Continued Detention has been Significantly Overstated.

In an April 9, 2002 speech, President Bush stated: "The other day we hauled in a guy named Abu Zubaydah. He's one of the top operatives plotting and planning death and destruction on the

[U.S.].   He's not plotting and planning anymore.   He's where he belongs."[1]   Other officials underscored the message of Abu Zubaydah's purported ties to terrorism, incorrectly labelling him "the chief of operations" for all of al Qaeda, and a putative "number three" to bin Laden and Zawahiri.[2]  During that April and the months that followed, intelligence officials at the CIA reading Abu Zubaydah's diary arrived at the conclusion that Abu Zubaydah was, in fact, not involved in al Qaeda operations or strategy.  Indeed, Abu Zubaydah never even belonged to al Qaeda.  *See id*. On January 24, 2018, the United Nations Security Council delisted Abu Zubaydah from its Islamic State and al Qaeda Sanctions List, based on the recommendation of the Ombudsperson, who also concluded that Abu Zubaydah was not a member of al Qaeda.[3]

The conclusion that Abu Zubaydah was not in fact a member of al Qaeda was echoed at the top of the CIA and was, of course, briefed to the President.  The reaction to this view was to keep up appearances rather than acknowledge and adjust to the new intelligence.  "I said he was important," Bush said to CIA Director George Tenet during a daily briefing.  "You're not going to let me lose face on this, are you?"  Tenet replied dutifully: "No sir, Mr. President."[4]  Perpetuating this false image of Abu Zubaydah, rather than revising the security assessment to match the facts, set the stage for all that followed.

---

[1] Press Release: "Remarks by the President at Connecticut Republican Committee Luncheon," (Apr. 9, 2002), https://georgewbush-whitehouse.archives.gov/news/releases/2002/04/20020409-8.html.

[2] R. Suskind, *The One Percent Doctrine* (Simon & Schuster 2006) at 99-100.

[3] C. Church, "What Politics and the Media Still Get Wrong About Abu Zubaydah" (Aug. 1, 2018), https://www.lawfareblog.com/what-politics-and-media-still-get-wrong-about-abu-zubaydah.

[4] R. Suskind, *supra* at n. 2, at 99-100.

**(b) The Video Evidence Would Have Assisted the Court in Evaluating the Basis for Abu Zubaydah's Continued Detention with Evidence from the Beginning of his Capture in 2002.**

In March 2002, Pakistani authorities, working with the CIA, conducted a sweep in Faisalabad, Pakistan.[5]  Abu Zubaydah was present and, caught in a crossfire, was hit in the leg, stomach, and groin, nearly dying as a result of his wounds.[6]  During his subsequent detention and hospitalization, the CIA "set up video cameras to record his every moment: asleep in his cell, having his bandages changed, being interrogated."[7]

Almost immediately, U.S. authorities rendered Abu Zubaydah to a CIA "black site" in Thailand, where he was questioned by Federal Bureau of Investigation ("FBI") special agents who spoke Arabic.  He confirmed his identity and provided background information on his activities. That evening "his medical condition deteriorated rapidly, and he required immediate hospitalization."  Though he largely was unable to communicate because of a breathing tube, Abu Zubaydah continued to provide information to the FBI and CIA officials at the hospital using an Arabic alphabet chart.  When his breathing tube was removed on April 8, 2002, he "provided additional intelligence and reiterated his intention to cooperate."  SSCI ES at 24-25.[8]  Despite later

---

[5] T. McGirk, "Anatomy of a Raid,"
https://content.time.com/time/magazine/article/0,9171,227502,00.html.

[6] R. Suskind, *supra* at n. 2, at 89.

[7]  S. Shane & M. Mazzetti, "Tapes by the CIA Lived and Died to Save Image,"
https://www.nytimes.com/2007/12/30/washington/30intel.html.

[8] "SSCI ES" as used herein refers to the Executive Summary of the Senate Select Committee on Intelligence *Study of the [CIA's] Detention and Interrogation Program,* published in December 2014, https://www.feinstein.senate.gov/public/_cache/files/7/c/7c85429a-ec38-4bb5-968f-289799bf6d0e/D87288C34A6D9FF736F9459ABCF83210.sscistudy1.pdf.   That study is a comprehensive review of the CIA's Detention and Interrogation Program, prepared from among other things the review of over six million pages of material produced by the CIA.  *See* SSCI ES at 8-9.

4

allegations that Abu Zubaydah was withholding information, CIA records showed that Abu Zubaydah maintained that he "always intended to talk and never believed he could withhold information from interrogators." *Id.* at 48.

During this initial interrogation period, he revealed to the FBI Special Agents that a man named "Mukhtar" was the mastermind of al Qaeda's 9/11 attacks, and identified a photograph of Mukhtar from among those included in the FBI's Most Wanted List.  The photo was of Khalid Shaykh Mohammad ("KSM") who, Abu Zubaydah explained, "trained the 9/11 hijackers."  The CIA later described these disclosures as "important" and "vital."  *Id.* at 25.  During this period, Abu Zubaydah also provided to FBI Special Agents what CIA records describe as "key intelligence."  *Id.* at 47.  This consisted of information related to suspected terrorists Jose Padilla, Binyam Mohammad and al Qaeda member Jaffar al-Tayyar.  *Id.*

Repeatedly, Abu Zubaydah denied having any knowledge relating to specific targets for pending attack.  He "advised that many of the brothers on the front lines…talked about all kinds of attacks against America, but that…this was usually just talk and that [the U.S.] should not be concerned about this type of talk."  *Id.* at 29.  Abu Zubaydah also provided information on al Qaeda, KSM, his own past travels in the U.S. and general information on extremists in Pakistan. Throughout April 2002, Abu Zubaydah continued to provide information, though he had no information on pending attacks against the U.S.  *Id.*

Despite Abu Zubaydah's ongoing cooperation, the interrogation team in Thailand stepped up the severity of their methods under the direction of independent contractor James Mitchell.[9]  *Id.*

---

[9] Though referred to pseudonymously in the SSCI ES, Mitchell and his partner, John "Bruce" Jessen, became publicly known figures, in substantial measure on account of the book Mitchell wrote seeking to justify their horrific activities—*Enhanced Interrogation* (Crown Forum 2016).

at 30.  Mitchell's approach included "single-minded, consistent, totally focused questioning [on] current threat information," and Petitioner continued to provide what he knew, which was generalized background intelligence, including on "al-Qaeda's activities, plans, capabilities, and relationships, in addition to information on its leadership structure, including personalities, decision-making processes, training and tactics."  *Id.* at 30-31.  He had no information about "threats to the [U.S.] and information about al-Qaeda operatives located" there.  *Id.* at 30.  "CIA officers later concluded that this was information Abu Zubaydah did not possess." *Id.* at 31. Tragically, they reached this conclusion only after contract interrogators had tortured Petitioner savagely over an extensive time period.

On July 13, 2002, the CIA's acting general counsel, John Rizzo, met with attorneys from the National Security Council, the Department of Justice's ("DOJ") Office of Legal Counsel ("OLC") and others, regarding the lawfulness of employing yet harsher interrogation methods against Abu Zubaydah.  The CIA maintained that Abu Zubaydah "continued to withhold critical intelligence on the identities of al-Qaeda personnel in the [U.S.] and planned al-Qaeda attacks." The same day, presumably in response to the John Rizzo's presentation, the OLC's Deputy Assistant Attorney General John Yoo wrote to Rizzo confirming that the criminal prohibition on torture would not reach the methods proposed by the interrogation team "because of the absence of any specific intent to inflict severe physical or mental pain or suffering."  *Id.* at 33-34.

The Video Evidence could have assisted the Court in evaluating whether the interrogators implemented the methods consistently with John Rizzo's representations to OLC concerning a lack of severe physical or mental pain or suffering.

On July 24, 2002, Attorney General Ashcroft verbally approved the use of 10 interrogation techniques, and on July 26 he added the use of the waterboard.  To gain these approvals, the CIA represented that the [interrogation team] believed "[Abu Zubaydah] continues to withhold critical threat information," and that the "use of more aggressive techniques is required."  *Id.* at 36-37. Like other representations concerning Abu Zubaydah,[10] this was false.  "According to cables…the CIA interrogators at the detention site had not determined that 'the use of more aggressive techniques was required' to 'persuade' Abu Zubaydah to provide threat information.  Rather, the interrogation team believed the objective of the [EITs] was to confirm Abu Zubaydah did not have additional information on threats to the [U.S.]."  Hence, they wrote:

> Our assumption is the objective of this operation is to achieve a high degree of confidence that [Abu Zubaydah] is not holding back actionable information concerning threats to the [U.S.] beyond that which [he] already has provided.

SSCI ES at 37.

On August 1, 2002, the OLC's John Yoo issued a memorandum opining on the criminality of the 10 interrogation techniques already verbally approved by Attorney General Ashcroft.  The memo, directed to the CIA's Acting General Counsel John Rizzo was titled *Interrogation of al Qaeda Operative* ("OLC Memo"), on whether the EITs described therein would violate Section 2340A of Title 18 of the U.S. Code[11]—it was not a broader pronouncement about the legality of

---

[10] *See* SSCI ES, Findings and Conclusion ("F&C") #5 at 4: "The CIA repeatedly provided inaccurate information to the [DOJ], impeding a proper legal analysis of the CIA's Detention and Interrogation Program."

[11] *See* Memorandum for John Rizzo, Acting General Counsel of the Central Intelligence Agency, *Interrogation of al Qaeda Operative* (Aug. 1, 2002), https://www.justice.gov/sites/default/files/olc/legacy/2010/08/05/memo-bybee2002.pdf.  The EITS approved by the OLC were: (1) attention grasp, (2) walling, (3) facial hold, (4) insult slap, (5) cramped confinement, (6) wall standing, (7) stress positions, (8) sleep deprivation, (9) insects placed in confinement box, and (10) the waterboard.  *Id.* at 2.

the EITs under the applicable civil statutes, military field manuals, the Geneva Conventions, or any other domestic or international policy, norms, or law.  Remarkably, even the title was false in a significant way;  Abu Zubaydah never belonged to al Qaeda, as the CIA itself later conceded.[12] SSCI ES at 410.  Immediately following the introductory paragraph, the OLC included a proviso underscoring that its opinion was strictly limited to the facts as provided by CIA personnel:

> Our advice is based upon the following facts, which you have provided to us.  We also understand that you do not have any facts in your possession contrary to the facts outlined here, and this opinion is limited to these facts.  If these facts were to change, this advice would not necessarily apply.

> OLC Memo at 1.

The proviso was prescient, as it turns out that many of those factual assertions have been contradicted by the record.  The SSCI ES found misstatements and contradictions in many CIA statements to OLC, which the OLC then incorporated into its memo approving additional interrogation techniques based upon CIA misrepresentations.  It flatly concluded that "[m]uch of the information provided by the CIA to the OLC was unsupported by CIA records."  SSCI ES at 410.  The following examples are illustrative:

1.  *Petitioner's Status in al Qaeda.*

    a.  The OLC memo repeated the CIA's representation that Abu Zubaydah was the "third or fourth man" in al Qaeda.

    b.  The SSCI ES found that this assessment was based on single-source reporting that was recanted well before publication of the [OLC] memorandum.  Indeed, the retraction was provided to several senior CIA

---

[12] Further, the UN Security Council delisted Abu Zubaydah from its Islamic State and al Qaeda Sanctions List, based on the recommendation of the Ombudsperson, who also concluded that Abu Zubaydah was not a member of al Qaeda.  (Case 78).  C. Church, "What Politics and the Media Still Get Wrong About Abu Zubaydah" (Aug. 1, 2018), https://www.lawfareblog.com/what-politics-and-media-still-get-wrong-about-abu-zubaydah.

officers, including Counterterrorism Center (CTC) Legal on July 10, 2002, three weeks prior to the issuance of the August 1, 2002 OLC Memo. Further, the CIA later concluded that Petitioner was not a member of al Qaeda.  SSCI ES at 410.

2.  *Petitioner's Role in al Qaeda Plots*.

   a.  The OLC Memo repeated the CIA's representation that Abu Zubaydah "has been involved in every major terrorist operation carried out by al Qaeda" and that he "was one of the planners of the [9/11] attacks."

   b.  The SSCI ES found that "CIA records **do not** support these claims."  SSCI ES at 410 (bold supplied).

3.  *Petitioner's Expertise in Interrogation Resistance Training*.

   a.  The OLC Memo also repeated the CIA's representation that Abu Zubaydah was "well-versed" in resistance to interrogation techniques, and that "it is believed [he] wrote al Qaeda's manual on resistance techniques."  OLC Memo at 7.

   b.  The SSCI ES noted that the CIA records contained no information to support these claims.  "To the contrary, Abu Zubaydah later stated that it was his belief that all individuals provide information in detention, and that captured individuals should expect that the organization will make adjustments to protect people and plans when someone with knowledge is captured."  SSCI ES at 410-11.

4.  *Petitioner's Withholding of Information on Pending Attacks*.

   a.  The OLC Memo repeated CIA representations stating the "the interrogation team is certain" Abu Zubaydah was withholding information relating to planned attacks against the U.S., either within the U.S. homeland or abroad.  OLC Memo at 1.

   b.  The SSCI ES found that CIA records do not support this claim.  To the contrary, the interrogation team was "not certain" that Abu Zubaydah was withholding "critical threat information."  Rather, , the interrogation team believed that "the objective of this operation [the interrogation of Abu Zubaydah] is to achieve a high degree of confidence that [he] is not holding back actionable information concerning threats to the [U.S.] beyond that which [he] has already provided."  SSCI ES at 411.

The SSCI ES stated in its Findings and Conclusions that "[t]he CIA repeatedly provided

inaccurate information to the [DOJ], impeding a proper legal analysis of the CIA's Detention and

9

Interrogation Program."[13]  SSCI ES F&C #5 at 4.  The Video Evidence would have clarified what happened and assisted in evaluating the CIA's conclusions and the SSCI ES's assertions.

Just as concerning, the manner in which the interrogation team implemented the techniques "was quite different from the description presented" in the OLC Memo.  SSCI ES at 412; *see also* Shinerock Decl., Ex. 3 at. 37 and 102.  A single example is compelling.  In the OLC Memo, the "walling" technique was described thusly: "a flexible wall will be constructed.  The individual is placed with his heels touching the wall.  The interrogator pulls the individual forward then quickly and firmly pushes the individual into the wall.  It is the individual's shoulder blades that hit the wall.  During this motion, the head and neck are supported with a rolled hood or towel that provides a c-collar effect to help prevent whiplash.  To further reduce the possibility of injury, the individual is allowed to rebound from the flexible wall…."  *See* OLC Memo at 2.

In contrast, following 47 days of complete isolation in a cell (intended to keep Abu Zubaydah "off balance," SSCI ES at 30-31), the version of "walling" inflicted on Abu Zubaydah was described as follows: "[s]ecurity personnel entered [his] cell, shackled and hooded [him], and removed his towel (Abu Zubaydah was then naked).  Without asking any questions, the interrogators placed a rolled towel around his neck as a collar…backed him up into the cell wall

---

[13] The CIA's propensity for relying on falsehoods is highlighted elsewhere.  Appendix 3 to the SSCI ES contains a grid highlighting the CIA's Inaccurate Testimony before the SSCI.  The Appendix consists of thirty-eight pages—462 to 499.  On the left side of the grid, excerpts from the testimony of then-CIA Director Michael Hayden are placed adjacent to excerpts on the right side from CIA records on the same subjects.  The great majority of the excerpts from Hayden's testimony deals with Abu Zubaydah.  Astonishingly, time after time, Hayden's testimony is completely contradicted by the content of the CIA's own records.

and slammed him 'headfirst' against [the] concrete wall." *Id.* at 40-41.[14]  For a prisoner with

shrapnel "lodged in his skull,"[15] this was an absurdly dangerous technique to employ.

This savage reality was nothing like the benign description provided by the OLC.  Hence, the SSCI was correct in concluding that: "The interrogations of CIA detainees were brutal and far worse than the CIA represented…."  SSCI ES F&C #3 at 3.  Indeed, while the EITs may have been approved on a conditional basis, nowhere were they permitted to be applied in the manner that they were applied to Abu Zubaydah.  For example, from August 4 through 23, 2002, using the techniques in quick repetition and in combination, interrogators "subjected Abu Zubaydah to its [EITs] on a near 24-hours per day basis…."  SSCI ES at 40-41.

During this same period, Abu Zubaydah was subjected to 83 instances[16] of waterboarding—a "technique" which Senator John McCain has described flatly as *de facto* torture.[17]  In at least one session, Abu Zubaydah "became completely unresponsive, with bubbles rising through his open, full mouth.  [H]e remained completely unresponsive until medical intervention, when he regained consciousness and expelled 'copious amounts of liquid.'"  SSCI ES at 43-44.  Other waterboarding sessions "resulted in immediate fluid intake and involuntary leg, chest, and arm spasms," and "hysterical pleas."  *Id.* at 43.  "As recently as 1983, the [DOJ] had in fact prosecuted waterboarding as a crime."[18]  Abu Zubaydah was also subjected to stress

---

[14]  *See also* J. Mayer, *The Dark Side: The Inside Story of How the War on Terror Turned into a War on American Ideals* (Doubleday 2008) at 169.

[15] Gov't's Amended Factual Return Narr., ECF No. 474-1 at ¶ 23.

[16] Each of these sessions involved "multiple iterations of the watering cycle during each application.  *Id.* at 42.

[17] *See* 163 Cong. Rec. S7204 (daily ed. Nov. 14, 2017).

[18] J. Mayer, *supra* at n. 14, at 171.

positions,[19] cramped confinement,[20] constant noise, cold, and sleep deprivation.[21]   According to

the daily cables from the torture site, Abu Zubaydah frequently "cried," "begged," "pleaded," and

"whimpered," while continuing to deny that he had any additional information on current threats

to, or operatives in, the U.S.[22]   SSCI ES at 42.   At times, Abu Zubaydah was described as

"hysterical," and "distressed to the level that he was unable to effectively communicate."

Waterboarding sessions "resulted in immediate fluid intake and involuntary leg, chest and arm

spasms, and hysterical pleas.   *Id.* at 43.   CIA personnel reported being very disturbed by the use

of the EITs.   Three examples will suffice:

- August 8, 2002: "Today's first session…had a profound effect on all staff members

   present...it seems the collective opinion that we should not go much further…."

---

[19] The stress position "long time standing" was described by detainees as "not just standing, but being kept up on their tiptoes with their arms extended out and over their heads, attached by shackles on their wrists and ankles for what they described as eight hours at a stretch.  During the entire period, they said they were kept stark naked and often cold."  The detainees told the ICRC "that it 'became extremely painful over time.'"  *Id.* at 168.

[20] Over the course of the entire 20 day "aggressive phase of interrogation," Abu Zubaydah spent a total of 266 hours (11 days, 2 hours) in the large (coffin size) confinement box and 29 hours in the small confinement box, which had a width of 21 inches, a depth of 2.5 feet, and a height of 2.5 feet.  "The CIA interrogators told Abu Zubaydah that the only way he would leave the facility was in the coffin-shaped confinement box."  SSCI ES at 42.

[21] Sleep deprivation sometimes continued for as long as 180 hours, usually while standing or forced into stress positions.  C. Church, "What Politics and the Media Still Get Wrong About Abu Zubaydah," https://www.lawfareblog.com/what-politics-and-media-still-get-wrong-about-abu-zubaydah.

[22] The use of the EITs continued in "varying combinations, 24 hours a day" for 17 straight days. (Actually, three days were added to the "aggressive phase," hence the actual number of days was 20.  *See* SSCI ES at 42, n. 190.)  When Abu Zubaydah was left alone during this period, he was placed in a stress position, left on the waterboard with a cloth over his face, or locked in one of two confinement boxes."  *Id.* at 42.

- August 8, 2002: "Several on the team profoundly affected…some to the point of tears and choking up."

- August 9, 2002: "Two, perhaps three [personnel] likely to elect transfer…." *Id.* at 44-45.

By August 9, 2002, the sixth day of the aggressive interrogation, the interrogation team informed CIA that they had come to the "collective preliminary assessment" that it was unlikely Abu Zubaydah "had actionable new information about current threats" to the U.S. On August 10, the interrogation team stated that it was "highly unlikely" that he possessed the information they were seeking. [That same day], the team reiterated a request for personnel from [CIA Headquarters] to travel to the detention site to view the interrogations."[23] *Id.* at 42-43. But CIA Headquarters "continued to believe that Abu Zubaydah was withholding threat information and instructed the CIA interrogators to continue using" the EITs. *Id.* at 43. When detention site personnel informed CIA Headquarters that it was their assessment that the application of the CIA's EITs "was approach[ing] the legal limit," that provoked a stinging rebuke from CTC Chief Jose Rodriguez for having put such an opinion in writing. *Id.* After the use of the CIA's EIT's finally stopped, the CIA personnel at the detention site concluded—astonishingly—that "[Abu Zubaydah] had been truthful and that he did not possess any new terrorist threat information." *Id.* at 45-46.

The continuing fiction that the brutal interrogation of Abu Zubaydah was successful, and that Abu Zubaydah was a threat, has also been contradicted by Ali Soufan, the FBI Special Agent who first interrogated Abu Zubaydah in Thailand. Abu Zubaydah's "case represents the A to Z of

---

[23] After a videoconference, CIA HQ instructed the personnel at the torture site to continue the use of the CIA's EITs on Abu Zubaydah, but agreed to send two CIA HQ officers to the site to observe the interrogations first-hand. *Id.* at 43, n. 197.

where we went wrong as a nation . . . . In a way, it was the original sin that led to institutionalization of the so-called [EITs] . . . . I do not recall a case during the war on terror years that contained more elements of deceit and exaggerations aimed to promote the ill-conceived torture program like the case of Abu Zubaydah."[24]

In sum, the record pertaining to Abu Zubaydah's involvement in activities that could support an ongoing threat assessment has been muddied, contradicted, and pulled out of all proportion by competing institutional priorities, legal theories, and political ambitions. The Video Evidence would have provided an objective, real time view of Abu Zubaydah's good faith provision of full information, and a record of his consistent statements that he was not involved in terrorism or otherwise threatening the United States.

**(c)   The CIA was on Notice Concerning the Importance of the Video Evidence to Reasonably Anticipated Legal Proceedings.**

As early as January 2003, the Video Evidence was at issue in a special review by the CIA's Office of the Inspector General ("OIG") commenced in response to allegations of the use of "unauthorized interrogation techniques" and concerns among CIA employees "that certain covert Agency activities at an overseas detention and interrogation site might involve violations of human rights."  Shinerock Decl., Ex. 3 at 1-2.  Based among other things on review of the Video Evidence, the OIG concluded that Abu Zubaydah and others had been subjected to "'[u]nauthorized, improvised, inhumane, and undocumented detention and interrogation techniques…'"  *Id.* at 102. Given these conclusions (which were part of a 2004 report), it was reasonably foreseeable that litigation would arise based on the unauthorized techniques.

---

[24] C. Rosenberg, "Agent who interrogated Abu Zubaydah: 'Where we went wrong as a nation.'" https://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article81232607.html.

The Video Evidence was also responsive to a 2003 Freedom of Information Act ("FOIA") request to the CIA.  That request was litigated in the Southern District of New York and was pending when the CIA destroyed the Video Evidence.  *See ACLU v. U.S. Dep't of Defense*, 827 F.Supp.2d 217, 225 (S.D.N.Y. 2011).  Days after the destruction of the Video Evidence was made public in 2010, plaintiffs in that case moved for civil contempt.  In considering the contempt motion, the court concluded that the Video Evidence was responsive to the Plaintiff's document requests and should have been identified or produced.  *Id.* at 225 (citation omitted).  Although the CIA attempted to excuse the destruction as the failure of individuals, the court rejected this argument.  The court explained that "[t]he CIA, *qua* agency, had the obligation to identify or produce the videotapes, and the CIA cannot be excused in its dereliction because of particular individuals' lapses."  *Id.* at 231.  While apparently viewing the motion as legally sufficient, the court denied the contempt motion "because a finding of civil contempt at this point would serve no beneficial purpose."  *Id.* at 230.  The CIA had voluntarily taken remedial steps that satisfied the court and agreed that the court could require the payment of attorneys' fees and costs without a finding of contempt "as a matter of fairness and equity."  *Id.* at 232.  Any argument the CIA may make in this case arguing the contrary is barred by judicial estoppel. *Robertson v. Cartinhour*, 867 F.Supp.2d 37, 50-51 (D.D.C. 2012) (judicial estoppel "'prevents a party prom asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'") (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

In 2004, the Supreme Court affirmed that detainees in Guantanamo Bay had rights of *habeas corpus* review, *Rasul*, 542 U.S. at 480–81, thus putting the government on notice that litigation surrounding the detention and interrogation of such detainees should be anticipated, and as a result the Video Evidence would become relevant to legal claims.

Other government components also made requests that encompassed the Video Evidence. Staff members of the 9/11 Commission, which completed its work in 2004, expressed surprise when they were told that interrogation videotapes existed until 2005. "The Commission did formally request material of this kind from all relevant agencies, and the commission was assured that we had received all material relating to our request," said Philip D. Zelikow, who served as Executive Director of the 9/l1 Commission. "No tapes were acknowledged or turned over…."[25]

Preservation instructions also came from the White House. In early 2005, White House counsel Harriet Miers directed acting CIA General Counsel John Rizzo to notify her of the status of the Video Evidence and notify her before any action was taken. Shinerock Decl., Ex. 4 (Nov. 10, 2005 email sent at 7:25 PM to Kyle "Dusty" Foggo). When John Rizzo called to tell Harriet Miers that the tapes had been destroyed, "she was livid." *Id.*

Likewise, members of Congress had requested records that would have included the Video Evidence. In May 2005, Senator Jay Rockefeller, the ranking member of the Senate Intelligence Committee, requested documents related to the CIA black sites. "Among the items Rockefeller specifically sought was a legal analysis of the CIA's interrogation videotapes. Rockefeller wanted to know if the [CIA's] top lawyer believed that the waterboarding of Abu Zubaydah and [KSM], as captured on the secret videotapes, was entirely legal. The CIA refused to produce the requested documents to Rockefeller."[26] Senator Rockefeller made a second request for these records to CIA Director Porter Goss in September 2005, just two months before the CIA destroyed the tapes.

---

[25] M. Mazzetti, "CIA Destroyed Tapes of Interrogations," https://www.nytimes.com/2007/12/06/washington/06cnd-intel.html.

[26] J. Mayer, *supra* at n. 14, at 313.

Then in May 2005, Judge Leonie Brinkema, the federal judge presiding over the September 11 conspiracy trial of Zacarias Moussaoui, ordered Justice Department prosecutors to tell her of the existence of any videotapes of terror suspects in U.S. custody, including Abu Zubaydah.  More than a year after the trial, the prosecutors wrote to Judge Brinkema, "admitting the CIA has wrongly assured her that no recordings existed" of interrogations of certain so-called high-value detainees.  At a speech at Colby College, she stated: "One of the saddest realities I've had to face— in the Moussaoui case in particular—has been the reality that my government didn't always tell me the truth."[27]

### (d)  The CIA Destroyed the Video Evidence to Avoid Confronting the Legal and Reputational Risk It Posed

Internal CIA emails released in response to the American Civil Liberties Union's FOIA suit show that CTC chief Jose Rodriguez confessed his motive in ordering the destruction.  "The heat" agency officials would take over destroying the tapes "is nothing compared to what it would be if the tapes ever got into the public domain."  Rodriguez told other CIA officials that if the images were disclosed "they would make us look terrible;" "it would be 'devastating' to us," a sentiment with which "[a]ll in the room agreed."  Shinerock Decl., Ex. 2.

The government destroyed the videotapes also because officials were concerned that tapes documenting controversial interrogation methods could expose agency officials to a greater risk of legal jeopardy.  The OIG's report explained that, "The Agency faces potentially serious long-

---

[27]  Pioneer Press, "Judge says Moussaoui jury made right decision,"
https://www.twincities.com/2008/07/23/judge-says-moussaoui-jury-made-right-decision/.

term political and legal challenges as a result of the CTC Detention and Interrogation Program, particularly its use of EITs." Shinerock Decl., Ex. 3 at 105.

In sum, though it had "been widely reported that Abu Zubaydah was subjected to several tough tactics, including waterboarding, which involves near-suffocation… CIA officers judged that the release of photos or videos would nonetheless provoke a strong reaction. 'People know what happened, but seeing it in living color would have far greater power, a former intelligence official said.'"[28]  The destroyed videos of Abu Zubaydah's waterboarding "show him vomiting and screaming."[29]  According to an OLC officer, "portions of the tapes, particularly those of Zubaydah being waterboarded were extraordinarily hard to watch."  The prisoner was "reacting visibly in a very disturbing way."[30]  In short, "[t]he destruction of the tapes wiped away the most graphic evidence of the CIA's…network of overseas prisons, where suspects were interrogated using some of the most aggressive tactics in U.S. history."[31]

Removing any doubt that the CIA was aware of the impropriety of destroying the Video Evidence, it waited until the five-year statute of limitations for related criminal charges had expired before announcing that the tapes had been destroyed.[32]  This provides further evidence that the

---

[28] M. Mazzetti, "CIA Destroyed Tapes of Interrogation," https://www.nytimes.com/2007/12/06/washington/06cnd-intel.html.

[29] P. Taylor, "'Vomiting and screaming' in destroyed waterboarding tapes," https://www.bbc.com/news/world-us-canada-17990955.

[30] Id.

[31] M. Apuzzo & A. Goldman, "Key omission in memo to destroy CIA terror tapes," https://www.seattletimes.com/seattle-news/politics/key-omission-in-memo-to-destroy-cia-terror-tapes/.

[32] M. Mazzetti & C. Savage "No Criminal Charges Sought Over CIA Tapes," https://www.nytimes.com/2010/11/10/world/10tapes.html.

destruction of the Video Evidence was part of a considered attempt by the government to evade legal and reputational risk, in knowing contravention of its obligation to preserve the materials.

### (e) Abu Zubaydah's Declaration Provides the Best Indicator of the Content of the Video Evidence.

In the absence of the Video Evidence, the best existing proof of what occurred during Abu Zubaydah's interrogations is Abu Zubaydah's own first-person account. To assist the Court, he has provided a declaration describing some of what he said during his interrogations. *See* Shinerock Decl., Ex. 1 (Declaration of Petitioner).[33]

Abu Zubaydah "repeatedly explained that [he] was **not** a member of or affiliated with al Qaeda and that [he] never supported or engaged in hostilities against the [U.S.] . . . . Any videotapes of [his] interrogations would have recorded these repeated statements of [his] innocence." *Id.* at ¶ 2. While Abu Zubaydah was recovering from the severe wounds sustained in his capture, the FBI transferred him to an interrogation room. He states:

> Here, I endured constant sleep deprivation, was shackled to a chair naked in freezing temperatures…and bombarded with high-decibel noise, and without solid food. FBI interrogators questioned me for hours each day.[34] [The FBI] asked me many questions about al Qaeda, which made me think they believed I was a member. As I explained during my CSRT…I was **not** and never was a member of al Qaeda. I was unconnected to al Qaeda, and did not train anyone for operations and did not support violence against the [U.S.] or Americans. In fact, people with the CIA later admitted to me they were wrong to think I was in al Qaeda and apologized to me for my torture.

---

[33] The Declaration of Zayn Al Abidin Muhammed Husayn, ECF No. 356, was filed originally with Petitioner's Motion for Sanctions for the Spoliation of Evidence, ECF No. 355.

[34] *Id.* at ¶ 3.

*Id.* at ¶¶ 4-5 (bold in original).[35]

Initially, "the interrogators believed that Abu Zubaydah was the "number 3 in al Qaeda." Upon realizing this, Abu Zubaydah believed that such an assertion "was absurd":

> I explained repeatedly that I was not a member and opposed violence against civilians. I did give them basic information about . . . al Qaeda, but this is information that everyone who spent time in Afghanistan could know.
>
> They also asked me repeatedly 3 questions. [Redacted.] I kept telling them I can't answer these questions because I was not involved with al Qaeda or any of its operations.
>
> *Id.* at ¶¶ 6-8

After over a month spent in isolation, Abu Zubaydah was "kept naked, underfed, and freezing." *Id.* at ¶ 9 Though vitally important, Abu Zubaydah's description of the brutal "aggressive phase" of his torment has been omitted, since that has been detailed in the references to the authoritative SSCI ES, except to state what by now is familiar: "Over and over I told them, 'I don't know! I have nothing to tell you! I don't know al Qaeda or what they are doing!' This was the truth as they later admitted to me." *See id.* at ¶¶ 10-13, 15-21.

Other examples of the CIA interrogators admitting they were wrong about Abu Zubaydah follow:

> [Redacted] told me about interrogations of al Qaeda members [KSM] and Abdel Rahim al Nashiri. [Redacted] explained that when these men were asked about me, they each explained that I was never a member of al Qaeda. . . . [T]hese men seemed to think that the notion that I was a member of al Qaeda was absurd and were surprised the Americans suggested it.

---

[35] *See also* March 27, 2007 Verbatim Transcript of the CSRT of ISN 10016, stating: "They told me sorry we discover that you are not number three, not a partner, not even a fighter." https://www.aclu.org/documents/abu-zubaydah-csrt-transcript   *Id.* at 27.

*Id.* at ¶ 24. *See also* ¶ 23.

At this point, the notion that Abu Zubaydah was a high ranking al Qaeda official was so absurd that it became fodder for jokes between the detainee and his interrogators. In another discussion, when Abu Zubaydah said that "you thought I was al Qaeda," the interrogator smiled, nodded his head, and said "well your case was a mistake." These joking conversations were followed up with conversations with [Redacted] in which it was acknowledged that Abu Zubaydah was not a member of al Qaeda. *Id.* at ¶ 24. *See also* ¶ 23.

> [S]ometime in 2005, I was visited by (redacted). We got into a political discussion about my beliefs…my opposition to violence against civilians and that I had no interest in hurting Americans or fighting against them. He said he understood this. During this conversation he admitted to me that the U.S. was wrong about me. He said he had no problem doing what he did (torture) to [KSM], but he was very sorry about what had been done to me, because I was not the person they once thought I was. At one point…(redacted) became emotional and…unable to speak; he removed his glasses and wiped his eyes.

*Id.* at ¶ 25.

At another time in 2005, Abu Zubaydah was visited by a high-level government official, who admitted that "what happened to [Abu Zubaydah] was bad, and took personal responsibility for it, even saying it was a mistake. In an attempt to "put these events behind us, and make things better for [Abu Zubaydah], now and in the future," he agreed to return Abu Zubaydah's diaries, grant him access to exercise equipment, improve the quality food offered, and cease conducting body cavity searches. *Id.* at ¶ 26. These are not the actions taken by someone feeling vindicated that years of torture were justified.

Statements by the government on the subject do not offer a reliable substitute. In addition to the discrepancies between the SSCI and corresponding CIA reports, described above, and the findings of the Southern District of New York that CIA statements were contrary to the record,

*ACLU*, 827 F.Supp.2d at 224, the record is muddy at best.  For example, on December 6, 2007, CIA Director Michael Hayden issued a statement conceding that the Agency had destroyed the tapes, but asserted that it did so "only after it was determined that they were no longer of intelligence value and not relevant to any internal, legislative, or judicial inquiries."  Based on the significant number of authorities referred to herein calling for the preservation and production of the Video Evidence in the years leading up to its destruction, it must be concluded that Director Hayden did not receive accurate reports.  Similarly, while internal CIA records reflect that the Video Evidence contained "nothing remarkable," *see ACLU*, 827 F.Supp.2d at 223, as described above, CIA personnel involved in the interrogations reported being so disturbed that they elected to transfer, and were profoundly affected, even to the point of tears.  SSCI ES at 44-45.

## ARGUMENT

### I.    THIS COURT SHOULD IMPOSE SANCTIONS FOR THE GOVERNMENT'S DELIBERATE SPOLIATION OF EVIDENCE.

Federal courts have long held that it is within their inherent powers to sanction litigation misconduct with an array of tools, including the drawing of an adverse evidentiary inference.  *See Shepherd v. American Broad. Cos., Inc.*, 62 F.3d 1469, 1474–75 (D.C. Cir. 1995) (citing, inter alia, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991); *United States v. Hudson*, 11 U.S. 32, 34 (1812)).  An adverse evidentiary inference posits that "[w]hen the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him."  *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217 (1st Cir. 1982).  Accordingly, drawing an adverse inference is an appropriate sanction in order to "protect [the Court's] integrity and prevent abuses of the

judicial process." *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (quoting *Shepherd*, 62 F.3d at 1474).

The Court may award spoliation sanctions when the following three elements are found: 1) the party in possession of the destroyed evidence had a duty to preserve the evidence; 2) the party that destroyed the evidence had a "culpable state of mind"; and 3) the destroyed evidence was "relevant to the contested issue." *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 170–71 (D.C. Cir. 2013); *Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008). Each of these elements has been met in the instant case and, sanctions against the Respondent are appropriate.

## A.   The CIA had an obligation to preserve the Video Evidence.

The government had ample reason to believe that the Video Evidence was relevant to existing and reasonably anticipated litigation. A party is under the obligation to preserve relevant evidence once the party can reasonably anticipate litigation. *D'Onfrio v. SFX Sports Group, Inc.*, No. 06-687(JDB/JMF), 2010 WL 3324964, at *5 (D.D.C. 2010) (citing *Smith v. Cafe Asia*, 246 F.R.D. 19, 21 n.2 (D.D.C. 2007)). The duty begins "when a party *should have known* that the evidence may be relevant to future litigation." *Mannina v. District of Columbia*, 437 F. Supp. 3d 1, 10 (D.D.C. 2020) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)) (emphasis in original). The duty may furthermore be triggered by a reasonably foreseeable departmental investigation, with such an investigation being even more likely when the conduct of department officials is in "egregious and notorious violation of [d]epartment policy" and of the law generally. *Gerlich*, 711 F.3d at 171.

The CIA was aware of its duty to preserve the tapes.  In January 2003, OIG initiated a review of Agency counterterrorism detention and interrogation activities, which included a review of the Video Evidence, and concluded by 2004 with the view that the videos showed "[u]nauthorized, improvised, inhumane, and undocumented" techniques being used against detainees.  Shinerock Decl. Ex. 3 at 102.  This made further departmental investigations likely.

Also in 2003, the FOIA litigation commenced, and would ultimately result in a finding by the Southern District of New York that "the CIA had the obligation to identify or produce the videotapes," *ACLU*, 827 F.Supp.2d at 231, and failed to do so "[d]espite plaintiffs' having submitted FOIA requests in October 2003 and May 2004 and having then filed this lawsuit; and despite [the court's] repeated orders that the CIA search for, review, and either identify or produce response records." *Id.* at 225.

In 2004, the Supreme Court decided *Rasul*, 542 U.S. 466 at 480–81, putting the government on notice of the Petitioner's ability to initiate litigation to challenge the lawfulness of his detention notwithstanding his circumstances as a detainee at Guantanamo Bay, Cuba.  The likelihood that the Video Evidence would become an issue in litigation became near certain with the *Rasul* decision.

Furthermore, at least three orders of this Court had directed the CIA to preserve the Video Evidence between March 7 and July 18, 2005.[36]  And this was in addition to the requests and

---

[36] Order, *Al-Marri v. Bush*, Civ. No. 04-2035 (D.D.C. March 7, 2005) (ECF No. 25). *See also* Order, *Abdah v. Bush*, Civ. No. 04-1254 (D.D.C. June 10, 2005) (ECF No. 155); Memorandum & Order, *Abdullah v. Bush*, Civ. No. 05-23 (D.D.C. July 18, 2005) (ECF No. 36).

preservation instructions from Congress, the 9/11 Commission, and the White House Counsel's Office noted above.

The passage of time between the destruction of the tapes and the commencement of litigation does not absolve the government of its obligation to preserve evidence. In *Kronisch*, the plaintiff sued the United States and two CIA officials, alleging that in 1952 they administered LSD to him without his knowledge as part of a covert, controversial testing program. *Kronisch*, 150 F.3d at 116. In 1973, Agency officials destroyed files that would have been relevant to the litigation. The court found that the defendants were under a duty to preserve the destroyed evidence, despite there being no active litigation, because they should have reasonably anticipated litigation as a result of their controversial conduct. *Id.* at 126–27. In particular, the court noted that the destroyed evidence could have given rise to liability for the defendants and concluded that their decision to order the destruction of the files could have been impacted by the fear of their own litigation exposure. *Id.* at 127.

Here, the CIA's records reflect similar concerns. The OIG's 2004 report indicated that the "Agency faces potentially serious long-term political and legal challenges as a result of the CTC Detention and Interrogation Program." Shinerock Decl. Ex. 3 at 105. Likewise, an internal email to the Executive Director of the CIA reflects deep uncertainty and controversy within the Agency. Shinerock Decl. Ex. 4. The author states that the CIA's acting general counsel, John Rizzo, was "clearly upset" by the fact that the Video Evidence was destroyed, and casts doubt upon the credibility of the people involved. *Id.*

### B.      The CIA Destroyed the Video Evidence With a Culpable State of Mind.

To find a party culpable for spoliation of evidence, the destruction must have been accompanied by a culpable state of mind. *Mannina*, 437 F. Supp. 3d at 10. The "'bad faith' destruction or concealment of evidence" is one such culpable state of mind and includes "both 'deliberate' destruction or concealment, and destruction or concealment with 'reckless disregard' for the relevance of the evidence." *More v. Snow*, 480 F. Supp. 2d 257, 274–75 (D.D.C. 2007).

Here, the CIA has conceded that the destruction was deliberate. *See* Shinerock Decl. Exs. 5 (CIA cable conveying permission to destroy the Video Evidence), 6 (CIA cable confirming that the Video Evidence was destroyed on November 9, 2005). The facts and circumstances support that it was done with intent to evade the legal obligation to preserve or produce the Video Evidence, and flout the orders of this Court and numerous government officials as described herein. CIA records indicate that the person principally responsible for the destruction of the Video Evidence, Jose Rodriguez, was keenly aware of the legal and reputational consequences that would flow from the release of the Video Evidence. *See* Shinerock Decl. Ex. 2. Furthermore, the fact that a federal criminal investigation of CIA officials was opened to investigate the destruction of the tapes and the fact that the Senate Intelligence Committee later opened an investigation into the entire extraordinary rendition and detention program due to the destruction of the tapes is telling of the fact that the tapes were destroyed in bad faith.

CIA records likewise demonstrate that the Agency was aware that it was wrong to destroy the Video Evidence. As one CIA official bluntly put it the day after the tapes were destroyed,

> I am no longer feeling comfortable. While I understand Jose's 'decision' (and believe the tapes were bad news) I was just told by [CIA General Counsel] Rizzo that [redacted] DID NOT concur on the cable – It was never discussed with him

(this is perhaps worse news, in that we may have 'improperly' destroyed something).

Shinerock Decl. Ex. 4.  This official went on to conclude that the destruction was ordered through deception: "Either [redacted] lied to Jose about [clearing the destruction with the inspector general] or Jose misstated the facts."  Internal conflict on the subject, the blunt acknowledgement of impropriety, and the apparent deception between officials that was necessary to secure the destruction of the Video Evidence all point to a culpable intent on the part of the CTC Chief Jose Rodriguez who played a significant role in the destruction of the tapes.

Furthermore, in contrast to *Gerlich*, where the D.C. Circuit Court of Appeals determined that the timing of the destruction of evidence coupled by the well-publicized controversy underlying the litigation meant that "a reasonable trier of fact could find that the record destruction was neither accidental nor simply a matter of utilizing the [DOJ]'s record destruction schedule." *Gerlich*, 711 F.3d at 171.  The destruction of the tapes here was not even subject to a regular record destruction policy.  In fact, there appears to have been controversy and differing opinions within the CIA on what should have been done with the tapes, as well as internal frustration and disagreement when they were destroyed.  *See* Shinerock Decl., Ex. 4.

The excuses proffered by the Respondent cannot be accepted.  The CIA has suggested that the tapes were destroyed in order to protect the safety and the identity of the operatives involved in the interrogation program.[37]  The court in *Kronisch* rejected that same reasoning, finding it "somewhat hard to believe that" the defendants were not motivated by "the possible consequences to themselves or to the CIA," and that the defendants' concern that the evidence would be

---

[37] Press Release, Gen. Mike Hayden, Director's Statement on the Taping of Early Detainee Interrogations (Dec. 6, 2007), *available at*: https://www.cia.gov/news-information/press-releases/statements/press-release-archive-2007/taping-of-early-detainee-interrogations.html.

"misunderstood" demonstrated an anticipation of litigation. *Kronisch*, 150 F.3d at 127.   The answer is to seek appropriate protection orders, not destroy the evidence.   The Respondent's argument is also poorly founded as other measures could have been taken to obscure the identities of the CIA operatives in the tapes.   The justifications offered by the Respondent are further weakened by now declassified emails and internal memos which show that leadership in the CIA determined that the repercussions of destroying the tapes were far less than the ensuing damage if the tapes had made it into the public sphere.   Accordingly, the CIA should face the consequences of such bad faith destruction of the tapes, much as it already anticipated by willfully destroying them.

### C.      The Destruction Deprived Petitioner of Relevant Evidence.

Lastly, this Court should award sanctions because the destroyed evidence was relevant to the Petitioner's claims.   This proceeding is fundamentally about the justification for holding someone prisoner, and the tapes are necessary to disprove the  justification for continued detention of Abu Zubaydah. Relevance refers to evidence that is favorable to the Petitioner's case. *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 14 (D.D.C. 2011) (citing *Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 442, 431 (S.D.N.Y. 2004).  This Court has also determined that "'[r]elevance . . . 'may be inferred if the spoliator is shown to have a sufficiently culpable state of mind[']' on the theory that a culpable spoliator may have something to hide." *Zhi Chen*, 839 F. Supp. 2d at 15 (internal citations omitted).   In *Zhi Chen*, the plaintiff sought an adverse inference against the defendants who negligently deleted video footage that showed the plaintiff being unlawfully detained by an off-duty D.C. police officer after being mistaken for another individual. *Id.* at 10–12. This Court decided that although the plaintiff could not prove the contents were favorable to

her, the defendant's gross negligence in destroying the tapes allowed a jury to conclude that the evidence was favorable to the plaintiff. *Id.* at 14–15.

Here, the CIA destroyed relevant evidence that would have been favorable to the Petitioner's case. Similar to *Zhi Chen*, the content of these tapes would have shown an objective and truthful depiction of the events and the torture suffered by the Petitioner. The tapes would have shown Petitioner repeatedly denying allegations that he was an al Qaeda operative or subscribed to the terrorist organization's radical and extreme beliefs, and denying that he played a role in unlawful acts against the United States. Shinerock Decl., Ex. 1 (Declaration of Petitioner) ¶¶ 2, 4-8, 24. The Petitioner made these assertions while being subjected to brutal sessions of physical pain and water boarding that were calculated to bring about coerced confessions. The tapes would depict a man gasping for air and vomiting up water forced down his nose and throat by CIA operatives, all the while declaring his innocence. Accordingly, these tapes would have provided the best possible proof to aid Petitioner's case.

Notwithstanding the fact that the content of the video tapes is clearly relevant to Petitioner's case, the culpable state of mind of the CIA officials who ordered the destruction of the tapes further supports the contention that the evidence is relevant to the Petitioner's case. In *Zhi Chen*, the state of mind of the defendants who destroyed the video tapes was described as "grossly negligent" at best. 839 F. Supp. 2d at 15. If this Court determined that gross negligence was sufficient for a fact finder to infer relevance in that case, it only stands to reason that the CIA's intentional and reckless destruction of the tapes in this case shows that the CIA was trying to hide information from coming to light and, therefore, that the tapes are relevant to the claims and arguments put forth by the Petitioner. The CIA acted against the advice of legal counsel, internal and external officials, and the orders of various courts. The only logical conclusion to be deduced

29

from these actions is that these tapes were destroyed because they "would make [the CIA] look terrible . . ." and "would be 'devastating' to [the CIA]."  Shinerock Decl., Ex. 2.  Such strong assertions coming from within the CIA merely showcase the damning nature of these tapes and supports the definitive conclusion that they would be negative for the CIA's case while serving to support the Petitioner's case.

Furthermore, courts have consistently held that recordings of an individual's statements made while in the custody of the United States are material and must be disclosed when the circumstances surrounding those statements confirm their truthful or exculpatory character.  *See, e.g., Reasonover v. Washington*, 60 F. Supp. 2d 937, 954–55, 973 (E.D. Mo. 1999) (finding a surreptitiously recorded conversation tended to prove innocence and was required to be disclosed under *Brady v. Maryland,* 373 U.S. 83 (1963)); *United States v. Severdija*, 790 F.2d 1556, 1557–61 (11th Cir. 1986) (finding that written statement of Respondent during boarding of his ship by the Coast Guard was exculpatory and that it was a *Brady* violation when the prosecution failed to discover it and turn over it over to defense counsel).  This underscores that as a matter of law, the Video Evidence is relevant to this case, and, at the time of its destruction, was relevant to reasonably anticipated habeas proceedings to be brought by the Petitioner.

Additionally, this Court has already alluded to the evidentiary value of the statements the Petitioner made while being tortured and of the relevance of the circumstances of his detention, stating that "the circumstances under which Petitioner made these statements are part and parcel of [the] statements themselves." *Husayn v. Austin*, No. 08-cv-1360(EGS), 2021 WL 2073439 at *7 (D.D.C. 2021).   Moreover, this Court has found in similar cases that statements given under the duress of torture and the threat of future torture are relevant in determining the exculpatory nature of statements made by the torture subject. *See Mohammed v. Obama*, No. 05-1347 (GK),

2009 WL 1220441 at *1 (D.D.C. 2009).  Accordingly, the tapes would have shown the exact circumstances of Petitioner's detention and torture, the circumstances of which would have supported the exculpatory statements that he made, and, thus, the tapes would have been material to the Petitioner's case here.[38]

## II.    AN ADVERSE INFERENCE IS AN APPROPRIATE SANCTION.

Although nothing can be done to restore the tapes and fully remedy the government's malfeasance, this Court has broad authority to order an appropriate remedy, including an adverse inference. *Mazloum*, 530 F. Supp. 2d at 291.  An adverse inference instruction is appropriate here because it is a measure intended to be remedial in nature.  *Vasser v. Shulkin*, No. 14-0185 (RC), 2017 WL 5634860, at *7 (D.D.C. 2017).  Most importantly, this Court should "restor[e] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Kronisch*, 150 F.3d at 126.  This Court should furthermore "be guided by the 'concept of proportionality' between offense and sanction." *United States v. Phillip Morris USA, Inc.*, 327 F. Supp. 2d 21, 25 (D.D.C. 2004) (citing *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996)).

This Court has permitted adverse inferences in cases involving the destruction of evidence on less egregious facts than presented here.  *See Talavera v. Shah*, 638 F.3d 303 (D.D.C. 2011); *Zhi Chen*, 839 F. Supp. 2d at 13.  *Talavera* imposed sanctions where a government official negligently ignored departmental policy, despite that he thought he was acting properly based on his prior conduct. *Talavera*, 638 F.3d at 311.  *Zhi Chen* involved a hotel manager who carelessly

---

[38] Although the Petitioner argues that the circumstances of his detention and torture should be considered in assessing the exculpatory nature of his statements and of their materiality to his claims here, Petitioner maintains that torture is an inherently unreliable manner of acquiring information.

allowed evidence to be deleted. *Zhi Chen*, 839 F. Supp. 2d at 13. Here, the CIA knowingly acted against legal advice and court orders when it ordered the destruction of the tapes, well aware of the likelihood that they would make it into public light due to impending litigation. The culpable state of mind here could thus be classified as nothing other than intentional, calculated, and premeditated.

The scope of the destruction and degree of harm done furthermore justifies a strong adverse inference. Ninety tapes, covering possibly hundreds of hours of interrogations, were destroyed. The tapes were relevant to terrorism investigations, criminal investigations, and the Petitioner's deprivation of liberty. This is a massive amount of evidence that would have significantly aided the Petitioner's case. Even if cables and other records were available to document the contents of these tapes, CIA reporting in this matter has lacked the credibility that would make such records an adequate substitute—indeed, even material submitted to courts has been called out as contradictory. *See, e.g. ACLU*, 827 F.Supp.2d at 224. And while initially the CIA took standard steps to preserve the Video Evidence—demonstrating that it had full knowledge of their significance—it deliberately destroyed them based on a calculated decision to suffer the consequences of destroying evidence rather than meet the consequences of having that evidence introduced in court.

The CIA has even admitted to this. And while covert operations may be part of the CIA's modus operandi, when dealing with Article III courts, it is held to the same standards as any litigant. Its decision to flout the judicial process and destroy evidence that it had an obligation to preserve should be met with full accountability.

32

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioner respectfully requests that the Court impose sanctions for the willful destruction of the Video Evidence, and grant the relief set forth in the accompanying proposed order, as well as all such other and further relief as is just and proper.

Dated: September 29, 2023

Respectfully submitted,

  /s/ Solomon B. Shinerock  
Solomon B. Shinerock
Eric L. Lewis (D.C. Bar #394643)
Adam S. Kaufmann
Elizabeth M. Vélez
Lewis Baach Kaufmann Middlemiss PLLC
The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
(t) 212.826.7001
(f) 212.826.7146

Charles R. Church
The Law Office of Charles R. Church LLC
76 Lincoln City Road
Salisbury, CT 06068
(t) 860.596.4166
(f) 860.596.4166

*Counsel for Petitioner*