# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ZAYN AL ABIDIN MUHAMMAD
HUSAYN (ISN 10016),

Petitioner,

v.                                                    Civil Action No. 08-CV-1360 (EGS)

LLOYD J. AUSTIN, III, in his official capacity
as Secretary of Defense,

Respondent.

## RESPONDENT'S OPPOSITION TO PETITIONER'S
## SUPERSEDING MOTION FOR SANCTIONS

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND .................................................................................................... 4

ARGUMENT ......................................................................................................... 12

I.  Respondent Does Not Dispute That the Court May Impose an Appropriate
    Evidentiary Remedy for Destruction of the Interrogation Videotapes. .......................... 13

    A.  Respondent Does Not Seek To Relitigate the Determination in the *ACLU*
        FOIA Case of the CIA's Duty to Preserve the Interrogation Videotapes. ............. 14

    B.  Respondent Acknowledges the Videotapes Were Intentionally Destroyed. ........ 16

    C.  Respondent Acknowledges the Videotapes Depicted Relevant
        Information, as Interpreted by this Court's Discovery Order. .............................. 17

II. Respondent's Proposed Evidentiary Remedies are Reasonable and Proportional to
    Redress the Loss of the Interrogation Videotapes. .......................................................... 20

    A.  Respondent Agrees to Produce Contemporaneous Documents About the
        Interrogations Depicted on the Videotapes. .......................................................... 21

    B.  Respondent Agrees the Court May Preclude Respondent from Introducing
        Evidence to Rebut Petitioner's Evidence about the Interrogations Depicted
        on the Destroyed Videotapes. ............................................................................... 25

III. Petitioner's Proposed Sanctions are Overbroad and Unduly Burdensome ...................... 27

    A.  The Court Should Reject Petitioner's Purported Adverse Inferences as
        Inappropriate Findings of Fact and Legal Conclusions. ....................................... 28

    B.  The Court Should Reject Petitioner's Request for Additional Discovery. ........... 35

CONCLUSION ....................................................................................................... 44

# TABLE OF AUTHORITIES

## CASES

*3E Mobile, LLC v. Glob. Cellular, Inc.*,
  222 F. Supp. 3d 50 (D.D.C. 2016) ................................................................................. *passim*

*Abdullah v. Bush*,
  534 F. Supp. 2d 22 (D.D.C. 2008) ......................................................................................... 11

*Abdulmalik v. Obama*,
  802 F. Supp. 2d 1 (D.D.C. 2011) ..................................................................................... 26, 39

*ACLU v. CIA*,
  No. 16-cv-1256 (EGS), 2021 WL 5505448 (D.D.C. Nov. 24, 2021) ..................................... 42

*ACLU v. Dep't of Def.*,
  827 F. Supp. 2d 217 (S.D.N.Y. 2011) ............................................................................. *passim*

*Al Habashi v. Bush*,
  591 F. Supp. 2d 1 (D.D.C. 2008) ......................................................................................... 38

*Al-Adahi v. Obama,*
  613 F.3d 1102 (D.C. Cir. 2010) ........................................................................................... 30

*al-Qurashi v. Obama*,
  733 F. Supp. 2d 69 (D.D.C. 2010) ....................................................................................... 18

*Ali v. Obama*,
  736 F.3d 542 (D.C. Cir. 2013) ............................................................................................. 32

*Alsa'ary v. Obama*,
  631 F. Supp. 2d 9 (D.D.C. 2009) ......................................................................................... 37

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
  738 F.3d 387 (D.C. Cir. 2013) ............................................................................................. 34

*Ashraf-Hassan v. Embassy of France in the United States*,
  130 F. Supp. 3d 337 (D.D.C. 2015) ..................................................................................... 29

*Awad v. Obama*,
  608 F.3d 1 (D.C. Cir. 2010) ........................................................................................... 30, 35

*Ball v. George Washington Univ.*,
  798 F. App'x 654 (D.C. Cir. 2020) ....................................................................................... 14

*Bensayah v. Obama*,
  610 F.3d 718 (D.C. Cir. 2010) ............................................................................................. 18

*Bethel v. Rodriguez,*
   No. CV 20-1940 (RC), 2022 WL 2157065 (D.D.C. June 15, 2022) ....................................... 15

*Bin Attash v. Obama,*
   628 F. Supp. 2d 24 (D.D.C. 2009) ........................................................................................... 37

*Bistrian v. Levi,*
   448 F. Supp. 3d 454 (E.D. Pa. 2020) ...................................................................................... 29

*Borum v. Brentwood Vill., LLC,*
   332 F.R.D. 38 (D.D.C. 2019) ................................................................................................... 20

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ................................................................................................................. 41

*California v. Trombetta,*
   467 U.S. 479 (1984) .......................................................................................................... 13, 25

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991) ................................................................................................................... 20

*CIA v. Sims,*
   471 U.S. 159 (1985) .......................................................................................................... 41, 42

*Clarke v. Washington Metro. Area Transit Authority,*
   904 F. Supp. 2d 11 (D.D.C. 2012) .......................................................................................... 13

*Da'Vage v. D.C. Housing Authority,*
   No. CV 21-1318 (RDM), 2023 WL 4531768 (D.D.C. July 12, 2023) ..................................... 17

*Daval Steel Prods. v. M/V Fakredine,*
   951 F.2d 1357 (2d Cir. 1991) ............................................................................................. 26-27

*Dep't of Navy v. Egan,*
   484 U.S. 518 (1988) ................................................................................................................. 42

*Devs. Diversified of Tennessee, Inc. v. Tokio Marine & Fire Ins. Co.,*
   No. 3:04-0015, 2015 WL 6696330 (M.D. Tenn. Nov. 3, 2015) .......................................... 29-30

*Estate of Gaither ex. rel. Gaither v. District of Columbia,*
   No. 03-cv-01458 (CKK), 2013 WL 12320339 (D.D.C. Jan. 9, 2013) ......................... 17, 21, 24

*Gerlich v. U.S. Dep't of Justice,*
   711 F.3d 161 (D.C. Cir. 2013) ................................................................................................. 12

*In re Executive Office of the President,*
   215 F.3d 20 (D.C. Cir. 2000) ................................................................................................... 32

*Johnson v. BAE Sys., Inc.,*
   4 F. Supp. 3d 62 (D.D.C. 2013) ........................................................................ 32

*Johnson v. BAE Sys., Inc.,*
   307 F.R.D. 220 (D.D.C. 2013) ......................................................................... 21

*Kronisch v. United States,*
   150 F.3d 112 (2d Cir. 1998) ............................................................................. 21

*Latif v. Obama,*
   677 F.3d 1175 (D.C. Cir. 2011) ....................................................................... 24

*M & T Mortg. Corp. v. Miller,*
   No. CV-2002-5410 (NG) (MDG), 2007 WL 2403565 (E.D.N.Y. Aug. 17, 2007) ................. 27

*Mahaffey v. Marriott Int'l, Inc.,*
   898 F. Supp. 2d 54 (D.D.C. 2012) .............................................................. 16, 17

*Mannina v. District of Columbia.,*
   437 F. Supp. 3d 1 (D.D.C. 2020) ............................................................... 13, 16

*Mazloum v. D.C. Metro. Police Dep't,*
   530 F. Supp. 2d 282 (D.D.C. 2008) ............................................................ 13, 16

*Minier v. CIA,*
   88 F.3d 796 (9th Cir. 1996) .............................................................................. 42

*Rasul v. Bush,*
   542 U.S. 466 (2004) .......................................................................................... 14

*Roadway Express, Inc. v. Piper,*
   447 U.S. 752 (1980) .......................................................................................... 20

*Shealayno'sun v. McCarthy,*
   No. 18-cv-0746 (APM), 2021 WL 39620 (D.D.C. Jan. 5, 2021) ........................... 13

*Shepherd v. Am. Broad. Companies, Inc.,*
   62 F.3d 1469 (D.C. Cir. 1995) ................................................................. *passim*

*Talavera v. Shah,*
   638 F.3d 303 (D.C. Cir. 2011) ................................................................... 30, 31

*Thompson v. U.S. Dep't of Hous. & Urb. Dev.,*
   219 F.R.D. 93 (D. Md. 2003) ........................................................................... 29

*Torres v. Lexington Ins. Co.,*
   237 F.R.D. 533 (D.P.R. 2006) ......................................................................... 27

*Turner v. United States,*
    736 F.3d 274 (4th Cir. 2013) ............................................................... 14

*Ungar v. City of New York,*
    329 F.R.D. 8 (E.D.N.Y. 2018) .........................................................24-25

*United States v. Al Nashiri* (Mil. Comm'n Sept. 19, 2022) ......................... 22

*United States v. Daoud,*
    755 F.3d 479 (7th Cir. 2014) ............................................................... 42

*United States v. El-Mezain,*
    664 F.3d 467 (5th Cir. 2011) ............................................................... 42

*United States v. Mendoza,*
    464 U.S. 154 (1984) ............................................................................ 16

*United States v. Reynolds,*
    345 U.S. 1 (1953) ................................................................................ 41

*United States v. Zubaydah,*
    595 U.S. 195 (2022) ............................................................................ 41

*Vasser v. Shulkin,*
    No. CV 14-0185 (RC), 2017 WL 5634860 (D.D.C. Nov. 22, 2017) ....... 31

*Zaid v. Obama,*
    No. 05-1646 (JDB), 2009 WL 799420 (D.D.C. Mar. 24, 2009) ............. 37

*Zhi Chen v. District of Columbia,*
    839 F. Supp. 2d 7 (D.D.C. 2011) ......................................... 13, 16, 31

## STATUTES

18 U.S.C. §§ 2340-2340B .......................................................................... 7

28 U.S.C. § 2241 .................................................................................... 14

50 U.S.C. § 431 ...................................................................................... 16

50 U.S.C. § 3024 .................................................................................... 42

50 U.S.C. § 3093 ...................................................................................... 5

50 U.S.C. § 3141 .................................................................................... 24

50 U.S.C. § 3507 .................................................................................... 42

## LOCAL RULES

LCvR 7 ......................................................................................................................... 35

## OTHER AUTHORITIES

4 Modern Federal Jury Instructions - Civil § 75-7 (2023) ...................................... 30, 31

Department of Justice Statement on the Investigation into the Destruction of Videotapes
    by CIA Personnel,
    www.justice.gov/opa/pr/department-justice-statement-investigation-destruction-
    videotapes-cia-personnel.......................................................................................... 11

Jamie S. Gorelick *et al.*, Destruction of Evidence (1989) ...................................... 21, 25

Jamie S. Gorelick *et al.*, *Destruction of Evidence 2019-1 Cumulative Supplement* (2019) ......... 25

*Pictures From an Interrogation: Drawings by Abu Zubaydah,*
    https://www.propublica.org/article/abu-zubaydah-drawings-pictures-from-an-interrogation ... 2

S. Rep. No. 113-288 (2014) .................................................................................. *passim*

*Withdrawal of Office of Legal Counsel CIA Interrogation Opinions,*
    2009 WL 2810456 (Apr. 15, 2009) ............................................................................ 7

## <u>INTRODUCTION</u>

The events surrounding the destruction of the CIA's interrogation videotapes are well known and have been extensively investigated.  On November 8, 2005, Jose Rodriguez, at the time the CIA's Deputy Director for Operations, authorized the destruction of 90 videotapes depicting interrogations of Petitioner Abu Zubaydah at a clandestine overseas CIA detention site. The CIA found that he took this action with awareness that senior government officials had expressed opposition to or reservations about the destruction of the tapes.  The decision to authorize destruction of the videotapes led to intense public, congressional, Executive Branch, and judicial scrutiny in the ensuing years.  The Department of Justice conducted a criminal investigation into the matter, the CIA formally reprimanded Mr. Rodriguez for his actions, the Senate Select Committee on Intelligence issued a lengthy public report critical of the CIA, and a federal district court in New York subjected the CIA to contempt proceedings.  The CIA and its former Deputy Director for Operations have been held to account by every branch of government for the destruction of the videotapes.  The CIA has committed to and remains committed to never again operating such a program of enhanced interrogation techniques.

Although the destruction of the videotapes occurred nearly three years before Petitioner filed this habeas case and did not violate any order from this Court, Respondent, as explained below, agrees to the imposition of a reasonable evidentiary alternative that would serve as an adequate substitute for the loss of the videotapes for purposes of this case.  In similar situations where evidence has been destroyed, courts have emphasized that the remedial rationale for relief is to return the party, insofar as possible, to the position he would have been in had the destruction not occurred.  Applying that guiding principle here, Respondent proposes two forms of relief that would attempt to reconstruct the information on the videotapes in the light most favorable to Petitioner.

First, pursuant to a court order in connection with contempt proceedings in a Freedom of Information Act case about destruction of the videotapes, the CIA identified 580 documents that reflect the content of the tapes during the entire period in 2002 when Petitioner's interrogations were recorded.  Respondent has initiated a process to locate those documents and agrees to produce to Petitioner's security-cleared counsel the classified documents retrieved from this collection that pertain to Petitioner, subject to appropriate redactions for sensitive national security and privileged information in accordance with the Protective Order entered in this case. These documents include CIA cables describing the interrogations, treatment, medical care, and statements of Petitioner depicted on the videotapes that were sent to CIA Headquarters from the CIA facility where the interrogations were conducted.  The documents represent the best contemporaneous evidence describing the interrogations recorded on the videotapes and will enable Petitioner, should he desire, to present the Court with information about the way the interrogations were conducted during the time of the destroyed videotapes.

Second, Respondent will not oppose or seek to rebut evidence or testimony from Petitioner about the circumstances or content of the interrogations that occurred on the dates of the videotapes.  Petitioner may present his evidence though his own testimony, by declaration, or through other documents, such as his drawings of the interrogations.[1]  To the extent the Court in any merits hearing in this case considers evidence about the interrogations, Respondent would not offer rebuttal evidence about the way the interrogations were conducted, how Petitioner was treated, or the statements that Petitioner made during the recorded sessions, provided Petitioner's

---

[1] Drawings by Petitioner depicting his treatment in CIA custody have been publicly released in response to Freedom of Information Act requests.  *See Pictures From an Interrogation: Drawings by Abu Zubaydah, at* https://www.propublica.org/article/abu-zubaydah-drawings-pictures-from-an-interrogation.

evidence is nonfanciful.  The Court could therefore credit Petitioner's unrebutted version of events about the interrogations in deciding whether his detention is lawful.  This evidentiary substitute would ensure that any evidence the Court receives about the interrogations that occurred on the destroyed tapes would be controlled by Petitioner and presented in a way he determines is most favorable to his claim for habeas relief.

Respondent's proposed measures are appropriately proportional to the evidentiary value of the destroyed videotapes in the context of this habeas case.  Further, they would place Petitioner in a favorable evidentiary posture during any merits proceeding to the extent the Court entertains evidence regarding Petitioner's treatment during the interrogations covered by the destroyed videotapes.  By contrast, Petitioner's proposed sanctions sweep far too broadly and would impose undue burdens on both the Court and Respondent.  Petitioner's proposed adverse judicial findings consist of wide-ranging legal and factual characterizations about the legality of Petitioner's detention, the intelligence value of the information Petitioner provided, and his connections to Al-Qaida that are neither tailored nor proportional to the lost evidence.  Petitioner provides no support for such extreme sanctions generally, let alone in the specific context of this case where the missing videos constitute only one of several available forms of evidence about Petitioner's interrogations, interrogations that Respondent does not rely upon to justify the legality of Petitioner's detention.

The Court should also reject Petitioner's request for depositions of other detainees and of individuals who were present during the recorded interrogations.  The interrogations recorded on the videotapes occurred over 20 years ago, and there is no reasonable basis to conclude that anyone present during the recorded sessions would now recall more details than reflected in the contemporaneously written reports or in Petitioner's own evidence about the interrogations.  The

proposed depositions also raise complex legal and practical issues about deposing CIA officers—
some of whom were and may still be in covert status—and other government officials about
classified and privileged information that the government is lawfully entitled to protect.
Similarly, depositions of other detainees with their own pending habeas or military commission
proceedings will likely create conflicts with those other matters and raise their own set of
complex privilege and logistical issues.  Petitioner's approach would enmesh the Court and
parties in burdensome collateral litigation that would be unprecedented in the Guantanamo Bay
habeas cases.  There is no basis for the Court to take such drastic steps when the tailored relief
Respondent proposes is an adequate evidentiary substitute for the loss of the videotapes.

For these reasons, as explained further below, the Court should deny Petitioner's
proposed sanctions and instead adopt Respondent's proposed evidentiary measures for the
destruction of the videotapes.

## BACKGROUND

The CIA's former detention and interrogation program has been the subject of two
detailed and critical reports that provide a public accounting of the CIA's actions involving the
former program.  First, in May 2004, the CIA Office of Inspector General issued a lengthy report
about the former program titled, "Special Review, Counterterrorism Detention and Interrogation
Activities (September 2001–October 2003)."  *See* Exhibit A ("CIA IG Report").  The report was
based on the Inspector General's review of over 38,000 pages of documents, over 100 interviews
of CIA officials, and site visits to CIA interrogation facilities, including to review the now-
destroyed videotapes of Petitioner's interrogations.  *See id.* at D0121.  Second, the Senate Select
Committee on Intelligence ("SSCI") conducted a "comprehensive review" of the former CIA
Program over five years between 2009-2014, during which the SSCI examined more than "six
million pages" of CIA documents.  S. Rep. No. 113-288, at 8–9, 9 n.2 (2014) ("SSCI Report").

The SSCI's Findings and Conclusions, its detailed 499-page Executive Summary, and the separate views of its members have been published—after declassification by the Executive Branch—as Senate Report 113-288 (2014) (hereinafter "SSCI Report"). A significant portion of both reports concern Petitioner and the videotapes of his interrogations while in CIA custody.

On September 17, 2001, in the wake of Al-Qaida's 9/11 terrorist attacks on the United States, the President authorized the CIA to undertake covert operations "to capture and detain persons who pose a continuing, serious threat of violence or death to U.S. persons and interests or who are planning terrorist activities." CIA IG Report ¶ 1; *cf.* 50 U.S.C. 3093(a), (e). Petitioner was the first person detained in the CIA's former program. *See* CIA IG Report ¶ 4. He was captured in a raid of a safehouse in Faisalabad, Pakistan, in March 2002, during which he suffered serious gunshot wounds. *See* Factual Return ¶ 29 (ECF No. 474); SSCI Report at 21.[2]

As set forth in Respondent's factual return, Petitioner was a part of and substantially supported al-Qaida and associated forces, including based on evidence that he facilitated travel for and provided other assistance to recruits so they could receive terrorist training; facilitated at least one large financial transaction for terrorism activities; maintained a close relationship with and actively supported Usama Bin Laden; actively associated with enemy forces and directly aided enemy forces engaged in hostilities in Afghanistan after the United States invasion; facilitated the retreat and escape of enemy forces out of Afghanistan after the United States' invasion; was captured harboring several terrorists; and plotted future terrorist operations. *See* Factual Return at 1 (ECF No. 474). Respondent's factual return does not rely on any post-capture custodial statements from Petitioner, whether from his time in CIA or in DoD custody.

---

[2] Unless otherwise noted, citations to the SSCI Report refer to pages in the publicly released declassified version of the Executive Summary portion of the report.

Instead, Respondent relies on statements and documents Petitioner made prior to his capture (*e.g.*, diaries and videos) and evidence from persons or sources other than Petitioner.  *See id.* ¶ 20 n.2.

Shortly after his capture in Pakistan, Petitioner was moved to a different country "where he was held at the first CIA detention site."  SSCI Report at 23.  According to the SSCI Report, soon after arriving at the site, Petitioner's "medical condition deteriorated rapidly and he required immediate hospitalization."  *Id.* at 25.  While in the hospital, Petitioner was questioned by FBI special agents.  *See id.* at 24-25.  Petitioner remained in the hospital until April 15, 2002.  *Id.* at 45 n.215; *see* CIA IG Report ¶ 31 (stating that the CIA provided "intensive medical care from the outset").

After returning to the detention site, the questioning of Petitioner focused on "impending future terrorist plans against the United States."  SSCI Report at 27-28; *see id.* at 29-30.  During this time, Petitioner was placed in "hand-cuffs and leg shackles," "loud rock music was played or noise generators were used," and Petitioner "was typically kept naked and sleep deprived."  *Id.* at 29.  Beginning in mid-June 2002, Petitioner "spent 47 days in isolation without being asked any questions."  *Id.* at 30-31.

The CIA "was under pressure to do everything possible to prevent additional terrorist attacks."  *See* CIA IG Report ¶ 4.  The CIA believed that Petitioner "was withholding information that could not be obtained through then-authorized interrogation techniques."  *Id.* ¶¶ 4, 31.  The CIA therefore determined that a "more robust approach was necessary to elicit threat information from Abu Zubaydah."  *Id.* ¶ 4.

The "most aggressive interrogation phase" of Petitioner's interrogations began on August 4, 2002.  SSCI Report at 40.  The Department of Justice's Office of Legal Counsel provided the

CIA with a legal opinion in which it determined that application of 10 specific enhanced interrogation techniques on Petitioner would not violate the criminal prohibition against torture, 18 U.S.C. §§ 2340-2340B.[3]  *See* CIA IG Report ¶ 6 & Tab C.  During this phase of the interrogations, the SSCI Report states that Petitioner experienced "at least 83 applications of the waterboard technique"; spent over 11 days in a coffin-size confinement box and 29 hours confined in a small enclosure; and was subjected to "walling, attention grasps, slapping, facial hold[s], stress positions," "white noise[,] and sleep deprivation."  SSCI Report at 42, 118 n.698.  The SSCI Report found that "[t]he CIA continued to use its enhanced interrogation techniques against Abu Zubaydah until August 30, 2002," *id*. at 42 n.190, and that "CIA records indicate that the use of the CIA's enhanced interrogation techniques [against Petitioner] ceased on [that date]," *id*. at 231 n.1316.  The detention site where these interrogations took place was closed in December 2002, and Petitioner was then transferred to a second detention site.  *Id.* at 24, 67.

The "interrogations teams" at the first detention site "decided to videotape [Petitioner's] interrogation sessions."  CIA IG Report ¶ 77.  The "initial purpose" of the recordings "was to ensure a record of Abu Zubaydah's medical condition and treatment should he succumb to his wounds and questions arise about the medical care provided to him by CIA."  *Id.*  Another purpose of the videotapes "was to assist in the preparation of the debriefing reports" about Petitioner's interrogations, although the videos "rarely, if ever, were used for that purpose."  *Id.*

In December 2002, CIA conducted an inventory at the detention site and identified 92 videotapes, 90 of which depicted interrogations of Petitioner.  *See* Inventory and Review of

---

[3] The Department of Justice withdrew this opinion in 2009 as no longer reflecting the views of the Office of Legal Counsel.  *See Withdrawal of Office of Legal Counsel CIA Interrogation Opinions*, 2009 WL 2810456, at *1 (Apr. 15, 2009).

Interrogation Videotapes (Dec. 3, 2002) (attached as Exhibit B).[4]  The tapes recorded

interrogations between April and December 2002.  An attorney from the CIA reviewed the tapes

"to ascertain compliance with the August 2002 DoJ opinion and compare what actually

happened with what was reported to Headquarters."  CIA IG Report ¶ 77.  The attorney

"reviewed every minute of the videotapes" and "confirm[ed] that the cable traffic accurately

describes the interrogation methods employed."  *See* Review of Interrogation Videotapes (Jan. 9,

2003) (attached as Exhibit C); *see also* CIA IG Report ¶ 77 (stating that the attorney reported

"that there was no deviation from the DoJ guidance or the written record").

The CIA Office of Inspector General ("OIG") learned of the existence of the videotapes

as part of its review of the former CIA program.  In May 2003, CIA OIG conducted its own

review of the 92 videotapes at the detention site.  *Id.* ¶ 78.  Eleven tapes were blank and two

others "were blank except for one or two minutes of recording."  *Id.*  Two tapes "were broken

and could not be reviewed."  *Id.*  Twelve tapes depicted applications of enhanced interrogation

techniques.  *Id.* ¶ 77.  OIG "identified 83 waterboard applications, most of which lasted less than

10 seconds."  *Id.* ¶ 78.  CIA OIG also compared the videotapes to written reports and "identified

a 21-hour period of time, which included two waterboard sessions, that was not captured on the

videotapes."  *Id.*  Further, CIA OIG found that the "videotapes revealed that the waterboard

technique employed at [the site] was different from the technique as described in the DoJ

opinion" as to "the manner in which the detainee's breathing was obstructed."  *Id.* ¶ 79.  Instead

of applying "a small amount of water to the cloth in a controlled manner," the videotapes showed

that the interrogator "continuously applied large volumes of water to a cloth that covered the

---

[4] The unclassified CIA documents appended to this brief were released publicly in
connection with Freedom of Information Act requests or other official CIA disclosures.

detainee's mouth and nose." *Id.*  CIA OIG also identified one instance in which an interrogator "verbally threatened Abu Zubaydah by stating, 'If one child dies in America, and I find out you knew something about it, I will personally cut your mother's throat.'"  *Id.* ¶ 78. The SSCI Report states that the interrogation team at the site described one of the videos to personnel at CIA headquarters as "quite graphic and possibly disturbing to some viewers."  SSCI Report at 43 n.197.

In the Fall of 2005, as Congress began to consider an "independent commission to investigate U.S. detention policies and allegations of detainee abuse," the SSCI Report states that there was "concern at the CIA that such a commission would lead to the discovery of videotapes documenting CIA interrogations." *Id.* at 443.  Those concerns prompted discussions within the CIA about whether "to destroy the videotapes." *Id.* & n.2482.  On November 8, 2005, Jose Rodriguez, then the CIA's Deputy Director for Operations, authorized officials at the detention site to destroy the videotapes. *See* DDO Approval to Destroy Video Tapes (Nov. 8, 2005) (attached as Exhibit D).  The detention site confirmed that all 92 videotapes were destroyed on November 9, 2005. *See* Destruction of Video Tapes (Nov. 9, 2005) (attached as Exhibit E).

The CIA conducted a disciplinary review of Mr. Rodriguez's decision to authorize destruction of the videotapes. *See* Disciplinary Review Related to Destruction of Interrogation Tapes (Dec. 20, 2011) (attached as Exhibit F).  The CIA "found fault with the performance of Mr. Rodriguez" and issued a formal letter of reprimand to remain in his official personnel file for two years. *Id.* at 3.  The CIA's disciplinary review found that Mr. Rodriguez candidly admitted that he made the decision to destroy the videotapes and that he had "been consistent in his explanation of why he made that decision." *Id.* at 4.  The disciplinary review found that Mr. Rodriguez was told "that the written record fully and accurately recorded the events depicted on

the tapes and that he was deeply concerned that the tapes would ultimately leak – or be officially released – and expose the affiliation of the Agency officers shown in the tapes, thereby putting their livelihood and personal security at risk." *Id.* Mr. Rodriguez also was "concerned that publication of the tapes would damage the domestic and international standing of the CIA, perhaps significantly degrading [its] operational capabilities." *Id.* "[T]he worldwide reaction to the leak of photos of the actions of US military personnel at Iraq's Abu Ghuraib prison in April 2004 cemented [Mr. Rodriguez's] view that the tapes represented a threat to his officers and the Agency." *Id.*

The CIA's disciplinary review found fault with Mr. Rodriguez's decision based on its finding that he "was aware that two White House Counsels, the counsel to the Vice President, the [Director of National Intelligence], the [CIA Director], and the [House Permanent Select Committee on Intelligence] ranking member had either expressed opposition to or reservations about the destruction of the tapes." *Id.* at 6; *see also* SSCI Report, Timeline of CIA Detention and Interrogation Program at 3 (stating that Mr. Rodriguez authorized destruction of the videotapes "[c]ontrary to the direction from the White House and the Office of the DNI") (attached as Exhibit G). The CIA's disciplinary review emphasized that no CIA employee can "ignore the direction and/or the intent of senior Agency, [Intelligence Community], or White House officials because they think their view is the right one—even if it is." *See* CIA Disciplinary Review at 6. The review reinforced "the principal that no one–whatever their rank or their belief in the righteousness of their position–can disregard the views of those above them." *Id.* at 7.

On December 6, 2007, CIA Director Michael Hayden publicly announced the destruction of the videotapes. *See* Press Release, Central Intelligence Agency, Director's Statement on the

Taping of Early Detainee Interrogations (Dec. 6, 2007) (attached as Exhibit H).  This disclosure

set off a series of investigations and litigation that lasted years.  In addition to the OIG and SSCI

reports discussed above, the CIA was subjected to discovery and contempt proceedings in a

Freedom of Information Act ("FOIA") case in the Southern District of New York.  *See ACLU v.*

*Dep't of Def.*, 827 F. Supp. 2d 217 (S.D.N.Y. 2011).  Many detainees with then-pending

Guantanamo Bay habeas cases also filed emergency motions related to the destruction of the

tapes.  *See, e.g.*, *Abdullah v. Bush*, 534 F. Supp. 2d 22 (D.D.C. 2008).

On January 2, 2008, Attorney General Michael Mukasey announced the appointment of

John H. Durham, then First Assistant United States Attorney for the District of Connecticut, to

conduct a full criminal investigation into the destruction the videotapes.  *See* Declaration of John

H. Durham (ECF No. 406, Ex. 2).  The criminal investigation encompassed a review of whether

any person obstructed justice, knowingly made materially false statements, committed or

suborned perjury, or acted in contempt of court or Congress in connection with the destruction of

the videotapes.  *Id.* ¶ 6.  On November 9, 2010, the Department of Justice publicly announced

that "Mr. Durham has concluded that he will not pursue criminal charges for the destruction of

the interrogation videotapes."  *See* Department of Justice Statement on the Investigation into the

Destruction of Videotapes by CIA Personnel, at www.justice.gov/opa/pr/department-justice-

statement-investigation-destruction-videotapes-cia-personnel.

The CIA's former detention and interrogation program, as well as the destruction of the

videotapes depicting certain of Petitioner's interrogations, has been the subject of multiple

reports, inquiries, and investigations by all three branches of the Government.  The CIA

responded to the destruction of the videotapes by implementing new policies designed to

enhance its record retention and preservation procedures, including with respect to records

subject to judicial orders, and instituted training for its attorneys on these policies and their

professional obligations.  *See* Declaration of Stephen W. Preston General Counsel, Central

Intelligence Agency (April 15, 2011) (attached as Exhibit J) (originally filed in *ACLU v. DoD*,

04-CV-4151-AKH (S.D.N.Y.)); *see also ACLU*, 827 F. Supp. 2d at 231-32 (explaining the

"improved protocols for the retention of records potentially relevant to an investigation or a

judicial, congressional, or administrative proceeding").  Respondent also filed a comprehensive

report in all Guantanamo Bay habeas cases explaining the new and additional steps CIA

implemented to ensure that material relating to all Guantanamo Bay detainees is preserved.  *See*

Respondent's Notice of Report Regarding Preservation, *Rasul v. Bush*, No. 02-cv-0299 (D.D.C.

Feb. 13, 2008) (ECF No. 231) (filed in every then-pending Guantanamo Bay habeas case on Feb.

13, 2008).  These improved protocols were the product of an informed, considered process, and

were specifically designed to further ensure that CIA documents are properly handled and that

the Agency complies with all of its legal obligations and responsibilities in criminal and civil

proceedings.  As summarized by another district court, "[t]he CIA's new protocols should lead to

greater accountability within the Agency and prevent another episode like the videotapes'

destruction."  *ACLU*, 827 F. Supp. 2d at 232.

## **ARGUMENT**

The D.C. Circuit has recognized that courts have inherent power to impose evidentiary

sanctions "where the defendant has destroyed potentially relevant evidence."  *Gerlich v. U.S.*

*Dep't of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2013) (citing cases).  Destruction of relevant

evidence may subject a party to an "issue-related sanction" such as an "adverse evidentiary

determination" or "precluding the admission of evidence."  *Shepherd v. Am. Broad. Companies,*

*Inc.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995). Issue-related sanctions are "fundamentally remedial rather than punitive and do not preclude a trial on the merits." *Id.*[5]

Courts typically analyze the imposition of sanctions for destroyed evidence in two steps. First, the Court must determine whether an "issue-related sanction, such as an adverse inference, is warranted." *Clarke v. Washington Metro. Area Transit Authority*, 904 F. Supp. 2d 11, 21 (D.D.C. 2012). Second, the Court must "select[] the appropriate sanction." *Shealayno'sun v. McCarthy*, No. 18-cv-0746 (APM), 2021 WL 39620, at *5 (D.D.C. Jan. 5, 2021) (citation omitted). The appropriate remedy is informed by whether adequate and "comparable evidence" is available. *See California v. Trombetta*, 467 U.S. 479, 489 (1984). Here, the Court should reject Petitioner's overbroad sanctions and instead adopt Respondent's tailored evidentiary remedies.

I.   **Respondent Does Not Dispute That the Court May Impose an Appropriate Evidentiary Remedy for Destruction of the Interrogation Videotapes.**

Courts in this Circuit apply a three-element test in assessing whether destruction of evidence warrants an issue-related sanction:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.

---

[5] The D.C. Circuit also recognizes "penal sanctions" such as "dismissals, default judgments, contempt orders, awards of attorneys' fees, and imposition of fines." *3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50, 53-54 (D.D.C. 2016). These types of sanctions, which are subject to a higher burden of proof, are not at issue in this case because Petitioner's motion seeks only an issue-related sanction in the form of an adverse inference and discovery. *See* Pet'r's Superseding Mot. for Sanctions at 31 (ECF No. 661) ("Pet'r's Mot.") ("An adverse inference is an appropriate sanction."); Proposed Order (ECF No. 661-8).

*Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (citation

omitted); *see, e.g., Mannina v. District of Columbia.*, 437 F. Supp. 3d 1, 6 (D.D.C. 2020) (same);

*Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 13 (D.D.C. 2011) (same).  The burden of

proof to award an issue-related sanction is a preponderance of the evidence.  *See Shepherd*, 62

F.3d at 1478.

> A.  Respondent Does Not Seek to Relitigate the Determination in the *ACLU* FOIA Case
>      of the CIA's Duty to Preserve the Interrogation Videotapes.

At the outset, Respondent emphasizes that Petitioner filed this habeas case in 2008, three

years *after* the CIA destroyed the videotapes.  The destruction therefore did not violate any order

or preservation obligation in this case.  Petitioner also did not notify Respondent that habeas

litigation was reasonably foreseeable prior to the destruction of the tapes, such as through a

demand letter, a request for evidence preservation, a threat of litigation, or an administrative

claim for relief.  *See, e.g., Ball v. George Washington Univ.*, 798 F. App'x 654, 655 (D.C. Cir.

2020) (holding no duty to preserve when evidence was destroyed before plaintiff filed

administrative complaint); *see also Turner v. United States,* 736 F.3d 274, 282 (4th Cir. 2013)

(stating that "[g]enerally, it is the filing of a lawsuit that triggers the duty to preserve evidence"

and holding no duty to preserve before filing suit where the plaintiff "did not send the [Coast

Guard] a document preservation letter, or any other correspondence threatening litigation").

Indeed, Petitioner does not contend that any duty to preserve the videotapes arose from this

litigation.

Petitioner instead argues that Respondent's duty to preserve the videotapes came from a

combination of other investigations, congressional inquiries, and judicial proceedings separate

from this case.  *See* Pet'r's Mot. at 14-17, 23-25.  Respondent disagrees with Petitioner's

overbroad arguments about the source of any preservation duty in this case.  For example,

14

Petitioner asserts that a duty to preserve the videotapes arose in 2004 following the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466 (2004), holding that aliens detained at Guantanamo Bay could invoke the habeas jurisdiction of a district court under 28 U.S.C. § 2241. Petitioner, however, was not at Guantanamo Bay at the time of that decision, and the mere fact that Petitioner was in United States custody abroad did not automatically trigger any duty of preservation. *See Bethel v. Rodriguez*, No. CV 20-1940 (RC), 2022 WL 2157065, at *3-4 (D.D.C. June 15, 2022) (stating mere fact of arrest does not trigger duty to preserve evidence for potential civil litigation and finding that a duty to preserve was triggered only when plaintiff sent a letter about preservation).

Similarly, the preservation orders entered in 2005 in other Guantanamo Bay habeas cases required preservation of information about "detainees now at the United States Naval Base at Guantánamo Bay, Cuba." *See, e.g., Anam v. Bush*, No. 04-CV-1194 (D.D.C. June 10, 2005) (ECF No. 124); *Abdah v. Bush*, No. 04-CV-1254 (D.D.C. June 10, 2005) (ECF No. 155) (same); *Al-Marri v. Bush*, No. 04-CV-2035 (D.D.C. Mar. 7, 2005) (ECF No. 25) (similar). Petitioner previously conceded these orders cannot serve as a basis for a preservation duty in this case because Petitioner was not a detainee at Guantanamo Bay in 2005. *See* Memorandum Order at 5 (ECF No. 643-1) (summarizing Petitioner's argument that this Court should enter a preservation order in this case because the preservation orders previously entered in other Guantanamo Bay cases did not apply to him because he was not at Guantanamo during the relevant time).

There is no need, however, for the Court to address these and other overbroad theories that Petitioner asserts about the source of the duty to preserve the videotapes, because Respondent acknowledges the issue can be resolved on more narrow grounds for purposes of this case. *See* Pet'r's Mot. at 14-17, 23-25. In *ACLU v. Dep't of Defense*, 827 F. Supp. 2d 217

(S.D.N.Y. 2011), the district court addressed whether the CIA should be held in contempt for destruction of the videotapes and concluded that the tapes fell within the scope of a FOIA request submitted in 2003 for records about the treatment of detainees apprehended by the United States after the 9/11 attacks. *Id.* at 224–25.  The court also found that the videotapes were not exempt from FOIA under the operational files exception in the CIA Act, 50 U.S.C. § 431, because the tapes concerned the "specific subject matter of an investigation by the Office of Inspector General to any alleged impropriety or illegality in the conduct of an intelligence activity." *ACLU*, 827 F. Supp. 2d at 225 (citation omitted).  The court therefore held that the "CIA should have identified or produced the videotapes in response to plaintiffs' FOIA requests." *Id.* Although neither Respondent nor this Court is bound by this decision as a matter of stare decisis or collateral estoppel,[6] Respondent does not seek to relitigate that decision here and acknowledges that the district court's interpretation of the CIA's duty in the FOIA case required preservation of the videotapes.  This Court should accordingly find that any duty the CIA had to preserve the videotapes only arose in connection with the FOIA litigation in the Southern District of New York.  There is no need for the Court to go further to address Petitioner's other disputed theories about the source of the preservation obligation.

B.  Respondent Acknowledges the Videotapes Were Intentionally Destroyed.

The second element of the sanctions test requires the Court to assess whether "the destruction or loss was accompanied by a culpable state of mind." *Mazloum*, 530 F. Supp. 2d at 291 (citation omitted).  Courts in this district that have analyzed this element have concluded that the "destruction need not be purposeful" and "negligent spoliation may suffice." *Mahaffey v.*

---

[6] Contrary to Petitioner's argument, there is no non-mutual collateral estoppel against the federal government. *See United States v. Mendoza*, 464 U.S. 154, 159-62 (1984); Pet'r's Mot. at 15.

*Marriott Int'l, Inc.*, 898 F. Supp. 2d 54, 61 (D.D.C. 2012); *Zhi Chen,* 839 F. Supp. 2d at 13; *see*

*Da'Vage v. D.C. Housing Authority*, No. CV 21-1318 (RDM), 2023 WL 4531768, at *4 (D.D.C.

July 12, 2023); *see Mannina,* 437 F. Supp. 3d at 12.

Respondent acknowledges that the state-of-mind element is satisfied here.  As explained

above, both the CIA and SSCI found that Mr. Rodriguez intentionally authorized destruction of

the videotapes with awareness that senior government officials had expressed opposition to or

reservations about the destruction.  *See supra* at 9-10.  Respondent acknowledges that the tapes

were not destroyed because of an inadvertent routine or automatic document retention process.

*See Mahaffey v. Marriott Int'l, Inc.*, 898 F. Supp. 2d 54, 62 (D.D.C. 2012) ("[T]here is no

indication that this was anything other than an unfortunate accident and, as such, Marriott did not

act with the requisite culpable state of mind to merit sanctions.").  Accordingly, Respondent does

not dispute here that destruction occurred with requisite state of mind.

    C.  Respondent Acknowledges the Videotapes Depicted Relevant Information, as
       Interpreted by this Court's Discovery Order.

The final element required for an issue-related sanction "is a showing that the destroyed

evidence was relevant to the moving party's claims or defenses."  *Chen*, 839 F. Supp. 2d at 14.

"In this context, the concept of 'relevance' encompasses not only the ordinary meaning of the

term, but also that the destroyed evidence would have been favorable to the movant." *Id.*

(internal quotations omitted); *see Estate of Gaither ex. rel. Gaither v. District of Columbia*, No.

03-cv-01458 (CKK), 2013 WL 12320339, at *3 (D.D.C. Jan. 9, 2013).

The relevance of the videotapes to this habeas case must be considered within the

evidentiary context of Respondent's basis for Petitioner's detention.  As explained above,

Respondent's factual return does not rely on any statements Petitioner made while in CIA or

DoD custody, nor will Respondent rely on such statements in this case.  *See* Factual Return ¶ 20

n.2 (ECF No. 474).  Instead, Respondent relies exclusively on statements Petitioner made prior

to his detention (*e.g.*, Petitioner's handwritten diaries and a video recorded by Petitioner before

his capture) and evidence from persons or sources other than Petitioner.  *See id.*  This case,

therefore, does not present a situation where the Court must assess the reliability or voluntariness

of Petitioner's custodial statements in deciding whether his detention is lawful.  *See al-Qurashi*

*v. Obama*, 733 F. Supp. 2d 69, 71 (D.D.C. 2010) (analyzing whether the petitioner's statements

relied on by the government to support detention "were involuntary and procured through

coercion and torture").  Accordingly, Petitioner's conditions of confinement while in CIA

custody and the way he was treated during his interrogations, whether depicted on the videotapes

or another evidentiary source, are irrelevant to the legality of Petitioner's detention.  The ultimate

merits question this Court must answer is whether Respondent has established by a

preponderance of the evidence that Petitioner is part of, or substantially supported, Al-Qaida or

its associated forces under the "functional" test mandated by the D.C. Circuit.  *See Bensayah v.*

*Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010).  Petitioner's treatment by the CIA has no bearing on

the outcome of that question and would not undermine the reliability of Petitioner's pre-capture

statements or the evidence Respondent relies on from sources other than Petitioner.

Separate and apart from any treatment of Petitioner depicted on the videotapes,

Respondent concedes that the tapes would have shown Petitioner's statements and responses to

questions during the recorded interrogation sessions.  According to the SSCI Report, Petitioner

provided a voluminous amount of information about "al-Qa'ida activities, plans, capabilities, and

relationships, in addition to information on its leadership structure, including personalities,

decision-making processes, training, and tactics."  SSCI Report at 46.  Further, the SSCI Report

states that Petitioner did not "provide information about operatives in, or future attacks against,

the United States." *Id.* at 46-47.  In deciding Petitioner's discovery motion for production of his statements under the Case Management Order, the Court ordered Respondent to produce Petitioner's exculpatory statements as well as "evidence of the circumstances, in whatever form maintained, under which Petitioner made exculpatory statements to the government, including evidence revealing the method and manner of the 'enhanced interrogation techniques' employed on Petitioner when such statements were made." *See* Mem. Op. & Order at 18, 20 (May 24, 2021) (ECF No. 573) (stating "it is clear that Petitioner is entitled to this information").  In accordance with the Court's discovery order, Respondent has been producing classified versions of CIA documents memorializing Petitioner's statements and the circumstances of those statements on a rolling basis since 2021.  *See* Resp't's Unopposed Mot. for Extension of Time to Complete Production of Certain Classified Docs. (ECF No. 659) (reporting production of over 3,000 pages of classified documents containing Petitioner's statements that were sent from any covert overseas facility where Petitioner was detained to CIA headquarters between March 2002 to late 2003); Joint Status Report (ECF No. 604) (reporting production of 2,700 pages of classified documents containing Petitioner's statements contained in classified intelligence reports disseminated by the CIA to other Intelligence Community components).

Based on the Court's finding that Petitioner's exculpatory statements and the circumstances under which those statements were made are discoverable information in this case, Respondent acknowledges that the "relevance" element is satisfied.  Although Respondent continues to dispute Petitioner's overbroad theory of why the videotapes are relevant to the legality of Petitioner's detention,[7] Respondent concedes for purposes of this case that the

---

[7] For example, Respondent continues to object to Petitioner's argument that the circumstances in which Petitioner made any exculpatory statements enhances their reliability. As the Court previously noted, Petitioner has provided "no support" for his assertion that "the

videotapes would have depicted at least some relevant statements Petitioner made during recorded interrogations sessions, including any denials he made about his connection to terrorist activities, and thus would have been within the scope of discovery ordered by the Court in this case.

## II.    Respondent's Proposed Evidentiary Remedies are Reasonable and Proportional to Redress the Loss of the Interrogation Videotapes.

As explained above, Respondent concedes that the three elements required for an issue-related sanction are satisfied in this case.  Respondent, however, disagrees with Petitioner's proposed adverse inferences and discovery sanctions as overbroad, unduly burdensome, and contrary to accepted remedial measures.  *See* Pet'r's Mot. at 31-32; Proposed Order.  The Court should reject Petitioner's proposed sanctions and instead adopt Respondent's tailored evidentiary measures, which attempt to reconstruct the information on the videotapes in the light most favorable to Petitioner.

The D.C. Circuit has emphasized that when a court employs its inherent power to issue a remedy for destruction of evidence, it must take care to fashion an "*appropriate* sanction." *Shepherd*, 62 F.3d at 1478 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)). Such authority must be exercised "with restraint and discretion."  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980); *see Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 44 (D.D.C. 2019).  "[T]he district court must properly 'calibrate the scales' to ensure that the gravity of an

---

reliability of an exculpatory statement made under duress is enhanced."  Mem. Op. & Order at 18 (ECF No. 573).  It is unclear whether Petitioner continues to stand by that theory, which essentially asks the Court to find that statements favorable to Petitioner are reliable but unfavorable statements made under the same circumstances are not reliable.  *See* Pet'r's Mot. at 31 n.38.  In any event, "[w]hether the circumstances make the statements more or less reliable is something the parties can argue about at a later time" in a merits hearing.  Mem. Op. & Order at 19.

inherent power sanction corresponds to the misconduct." *Shepherd*, 62 F.3d at 1479.  When

fashioning an appropriate issue-related sanction, the goal is "to restore the accuracy of the

original trial."  *See* Jamie S. Gorelick *et al.*, Destruction of Evidence § 3.15, at 114 (1989)

(Gorelick, *Destruction of Evidence*).  To that end, courts "attempt to place the innocent party in

the same position he would have been in had the evidence not been destroyed by the offending

party." *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998); *see Shepherd*, 62 F.3d at

1475 (emphasizing sanctions "should reflect our judicial system's strong presumption in favor of

adjudications on the merits").  In doing so, courts "should keep in mind the practical effect of its

sanction when determining whether that sanction is appropriate." *Johnson v. BAE Sys., Inc.*, 307

F.R.D. 220, 225 (D.D.C. 2013).  Courts also consider "the importance of the evidence involved,

the importance of the evidence lost to the issues at hand, and the availability of other proof

enabling the party deprived of the evidence to make the same point." *Estate of Gaither*, 2013

WL 12320339, at *4 (citation omitted).

    Applying these principles to the specific context of this case, relief as proposed below

that would redress the loss of the videotapes by providing Petitioner documentary evidence to

enable him to present evidence about the content of the tapes, and relief prohibiting Respondent

from rebutting that evidentiary presentation of treatment during detention, would be appropriate

in this case.

    A.  Respondent Agrees to Produce Contemporaneous Documents About the
          Interrogations Depicted on the Videotapes.

    The CIA has previously identified 580 documents that reflect the content of the

videotapes during the entire period between April and December 2002 when Petitioner's

interrogations were recorded.  Respondent has initiated a process to locate those documents and

agrees to produce to Petitioner's security-cleared counsel the classified documents retrieved from

this collection that pertain to Petitioner, subject to appropriate redactions for sensitive national security and privileged information in accordance with the Protective Order entered in this case. The CIA identified these documents during litigation in the FOIA case in the Southern District of New York.  *See ACLU*, 827 F. Supp. 2d at 228-29.  Following the CIA's public acknowledgment of the destruction of the tapes in 2007, the ACLU moved to hold the CIA in contempt.  *Id.* at 227.  The district court ordered the CIA to "produce records relating to the content of the tapes . . . from the entire period of the tapes that were destroyed."  *Id.*  In response, "the CIA identified and processed" 580 responsive documents "relating to the content of the videotapes." *Id.* at 229 (citation omitted).  Based on a review of Respondent's prior discovery productions in this case, Respondent has already produced approximately 510 of the 580 documents to Petitioner's counsel in classified form.  Respondent agrees to prioritize production of the remaining documents it retrieves that pertain to Petitioner after finishing production of the next batch of Petitioner's statements that the Court has ordered completed by May 31, 2024.[8]  *See* Minute Order (July 12, 2022).

These 580 documents are the most complete and contemporaneous records of Petitioner's interrogations during the time the videos were recorded.  *See* Declaration of Leon Panetta, Director, Central Intelligence Agency ¶ 5 (June 8, 2009) (attached as Exhibit I) (originally filed

---

[8] The CIA is currently working to gather the outstanding documents from this collection. Some of the 580 documents pertain to another detainee, Abd Al-Rahim Al-Nashiri, whose interrogations may have also been recorded on two videotapes.  *See ACLU*, 827 F. Supp. 2d at 222, 228; *see also United States v. Al Nashiri* (Mil. Comm'n Sept. 19, 2022) (AE 354T, Ruling at 8) (noting that, because "it is undisputed that the CIA recorded interrogations of [Al-Nashiri] on only the two video tapes, repeatedly recording over the contents of the tapes," the tapes' contents are unknown).  In September 2022, the judge handling Nashiri's military commission case denied Nashiri's motion to abate proceedings because of the destruction of the videotapes. *See Al Nashiri*, AE 354T at 11.  Documents in the FOIA collection about Al-Nashiri's interrogations are irrelevant to this case and would not be produced.

in *ACLU v. DoD*, 04-CV-4151-AKH (S.D.N.Y.)).  Most of the documents are classified

communications to CIA Headquarters from a covert overseas CIA facility where interrogations

were being conducted.  *Id.*  These communications consist primarily of sensitive intelligence and

operational information concerning Petitioner interrogations, including descriptions of enhanced

interrogations techniques that were applied during Petitioner's interrogations.  *Id.*  Drafted during

the timeframe that the interrogations were being conducted, the communications are the most

contemporaneous documents the CIA possesses concerning these interrogations.  *Id.*  In addition,

the documents include notes of CIA employees who reviewed the videotapes before they were

destroyed and logbooks containing details of the interrogations, all of which were drafted either

contemporaneously with the interrogations or in connection with viewing the now-destroyed

videotapes.  *Id.*

      In denying the ACLU's motion for contempt, the district court acknowledged that the

videos "cannot now be produced," but nevertheless found that "the CIA has remedied that failure

by a massive production" of documents that "describe the contents of the videotapes,

corresponding in time to their creation."  *ACLU*, 827 F. Supp. 2d at 231.  Respondent's

production of the same comprehensive collection of documents in this case will allow Petitioner

to present this Court with the best available evidence about the conduct of the interrogations

during the time when the videos were recorded.

      Citing the *ACLU* FOIA decision, Petitioner contends that "CIA reporting in this matter

has lacked the credibility that would make such records an adequate substitute" for the

videotapes.  *See* Pet'r's Mot. at 32.  The *ACLU* decision does not support Petitioner's unfounded

statement.  In addressing the CIA's argument that the videotapes were not subject to FOIA, and

thus the agency was not subject to contempt for the tapes' destruction, because the Inspector

General had conducted only a "special review," not an "investigation," the district court stated

that the CIA's argument was "contradicted by its own contemporary writings" about the reasons

for the Inspector General's inquiry.  *ACLU*, 827 F. Supp. 2d at 224-25.  The court's comments

addressed only the CIA's attempt to make a distinction about the type and scope of the Inspector

General's review "in an effort to show that the videotapes were not subject to FOIA disclosure."

*Id.* at 224.[9]  Nothing in the *ACLU* decision undermines the entirely separate point that the CIA

cable traffic accurately describes the videotapes.  *See* Review of Interrogation Videotapes at 5

(Jan. 9, 2003) (Ex. C) (finding that the "cable traffic accurately describes the interrogation

methods employed" on the videotapes).  Indeed, in denying the ACLU's motion for contempt

and requests for depositions and further discovery, the district court expressly relied on the fact

that the CIA documents "describe the contents of the videotapes, corresponding in time to their

creation."  *ACLU*, 827 F. Supp. 2d at 231; *see also Latif v. Obama,* 677 F.3d 1175, 1180 (D.C.

Cir. 2011) (holding that a presumption of accuracy applies to intelligence reports in Guantanamo

Bay habeas cases and "presumes the government official accurately identified the source and

accurately summarized his statement").

Although different in form from the videotapes, the CIA documents, along with

Petitioner's own testimony about the interrogations, will provide Petitioner ample evidence to

make the same points about his treatment, conditions of confinement, and responses to questions

during any merits hearing in this case.  *See Estate of Gaither*, 2013 WL 12320339, at *4.  This

---

[9] Ordinarily, the CIA is statutorily exempt from searching operational files for documents responsive to FOIA requests.  There is an exception, however, that provides operational files "shall continue to be subject to search and review for information concerning . . . the specific subject matter of an investigation by . . . the Office of Inspector General of the Central Intelligence Agency . . . for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity."   50 U.S.C. § 3141(c)(3).

case therefore does not present a situation where Respondent destroyed the "only evidence that might vindicate [Petitioner's] claims." *Ungar v. City of New York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018); *cf. California v. Trombetta*, 467 U.S. 479, 489-90 (1984) (finding no Due Process violation for failure to preserve alcohol breath samples where criminal defendants had "alternative means" of presenting their arguments and were "perfectly capable of raising [their objections] without resort to preserved breath samples"). While destruction of the tapes is regrettable, the tapes would have been an additional form of evidence to establish facts about Petitioner's interrogations that are already well known to him and separately memorialized in CIA documents. Petitioner's inability to use the videotapes in this litigation will not hinder him from presenting the CIA documents and his own evidence about his interrogations, or making any arguments based on that evidence that he deems appropriate to support his habeas petition. Given this fulsome evidentiary context, production of this collection of CIA documents is an appropriately calibrated remedy to redress the loss of the videotapes.

> B.   Respondent Agrees the Court May Preclude Respondent from Introducing Evidence to Rebut Petitioner's Evidence about the Interrogations Depicted on the Destroyed Videotapes.

Courts also recognize that an appropriate issue-related sanction for destruction of evidence is "preventing a spoliator from introducing evidence in support of claim or defense." *See* Gorelick, *Destruction of Evidence* § 3.16, at 121; Jamie S. Gorelick *et al.*, *Destruction of Evidence 2019-1 Cumulative Supplement* § 3.16, at 234-35 (2019) (citing cases). In an effort to restore Petitioner to the position he would have been in had the destruction of the videotapes not occurred, Respondent acknowledges that the Court may issue an order governing the conduct of the merits hearing in this case that restricts Respondent from rebutting evidence or testimony from Petitioner about the circumstances or content of the interrogations recorded on the videotapes. Using the CIA documents described above as well as Petitioner's own evidence,

whether through his own testimony or documents created by him, Petitioner will have the ability during the merits hearing to present the Court with his version of how the interrogations depicted on the videotapes relate to the basis for detention.  Petitioner's version of events would, of course, need to have a reliable factual basis, but short of an inconceivable or fanciful allegation,[10] Respondent would be restricted in presenting any rebuttal to Petitioner's evidentiary presentation about what occurred during the recorded interrogations with contrary evidence.  For example, Petitioner has submitted a declaration that "describes some of what I said during interrogations" and he also has created drawings that depict the way he was treated and questioned.  *See* Declaration of Zayn Al Abidin Muhammed Husayn ¶ 2 (ECF No. 661-2); *see also supra* at 2 n.1. Under Respondent's approach, Petitioner's evidence about the interrogations that happened on the dates of the destroyed tapes would be unrebutted.  The Court would therefore be entitled to credit Petitioner's unrebutted version of events about the interrogations in deciding whether his detention is lawful.  *See Abdulmalik v. Obama*, 802 F. Supp. 2d 1, 4 (D.D.C. 2011) (stating that "[i]f Respondents ultimately fail to rebut Petitioner's allegations of mistreatment, the record at the merits hearing will reflect only Petitioner's version of events, and the Court will be able to consider that evidence as unrebutted").  This remedy would ensure that any evidence the Court receives about the interrogations on the destroyed tapes would be Petitioner's version of events, presented in a way he determines is most favorable to his claim for habeas relief.

---

[10] This provision protects against the unlikely situation in which Petitioner asserts an implausible allegation about his treatment that has no connection to reality.  For example, the SSCI Report found enhanced interrogation techniques against Petitioner ended on August 30, 2002.  *See supra* at 7.  If Petitioner were to allege that these techniques continued for years beyond that date, Respondent would be permitted to present appropriate rebuttal evidence to the Court.  Remedies for spoliated evidence should not completely subvert the fact-finding function of the Court.

This approach of restricting a party from presenting evidence has been accepted by other courts when confronted with similar spoliation claims.  *See, e.g., Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) (barring party from presenting evidence opposing claim); *M & T Mortg. Corp. v. Miller*, No. CV-2002-5410 (NG) (MDG), 2007 WL 2403565, at *12 (E.D.N.Y. Aug. 17, 2007) (precluding defendants from offering evidence with respect to matters that spoliated evidence would have addressed); *Torres v. Lexington Ins. Co.*, 237 F.R.D. 533, 534 (D.P.R. 2006) (preventing plaintiff from introducing evidence of mental suffering due to spoliation of evidence that would have undercut plaintiff's alleged injury).  Here, Respondent's proposed solution would cure the prejudice to Petitioner from the loss of the tapes by restricting Respondent from introducing evidence that would rebut or contradict Petitioner's evidence about his treatment or statements during the recorded interrogations.  The presentation of evidence about the interrogations during this time would be virtually one-sided in favor of Petitioner, thereby allowing him to present the Court with the evidence he selects as most favorable to his position.[11]  By tailoring the remedy to focus on the evidence during the recorded interrogations, Respondent's proposal is both appropriately calibrated to redress the loss of the videotapes in the context of this case and furthers the strong "presumption in favor of adjudications on the merits."  *Shepherd*, 62 F.3d at 1475.

## III.  Petitioner's Proposed Sanctions are Overbroad and Unduly Burdensome.

---

[11] Even though Respondent would not rebut Petitioner's evidence about the conduct of the recorded interrogations, Respondent would be permitted to present other evidence to establish the legality of Petitioner's detention.  For example, while the Court would be entitled to accept Petitioner's assertion that the videotapes would have recorded statements Petitioner made denying his involvement with Al-Qaida, Respondent would be permitted to present the Court with statements Petitioner made before his capture and other evidence showing Petitioner's ties to Al-Qaida and its associated forces.

A. The Court Should Reject Petitioner's Purported Adverse Inferences as Inappropriate Findings of Fact and Legal Conclusions.

Petitioner contends that an adverse inference is an appropriate sanction for the destruction of the videotapes, but his proposed order sweeps far more broadly than a traditional adverse inference instruction and is tantamount to judicial findings that would improperly result in judgment in Petitioner's favor. Although characterized as an "adverse inference," Petitioner asks the Court to issue nine sweeping categorical "find[ings]" that would apply to "this case and any other related proceeding." Pet'r's Proposed Order (ECF No. 661-8). These proposed "find[ings]" are:

(a) During the course of his interrogations, Abu Zubaydah provided no information that would support the view that he was a high-ranking member of al Qaeda, had ever been involved with any attacks on the U.S., or had any plans to attack the U.S.

(b) At no time while his interrogation was being videotaped did Abu Zubaydah withhold intelligence regarding the identities of al Qaeda personnel in the U.S. and/or planned al Qaeda attacks on the U.S. and/or to its interests.

(c) Abu Zubaydah was never a member of al Qaeda.

(d) Abu Zubaydah never supported al Qaeda's operations against the U.S. or Americans.

(e) Abu Zubaydah had no knowledge of any post-9/11 attack planned against the U.S.

(f) Information provided by Abu Zubaydah to U.S. interrogators regarding al Qaeda was limited to information then commonly known to many people in Afghanistan, and is not evidence of any link or affiliation with terrorism.

(g) Abu Zubaydah willingly spoke to U.S. Government interrogators, and never attempted to withhold information from them.

(h) The Video Evidence depicted that the interrogation team used unauthorized, improvised, inhumane, and undocumented detention and interrogation techniques against Abu Zubaydah.

(i) The Video Evidence depicted interrogations that were so physically and psychologically brutal that it was difficult to watch.

28

*Id.* As discussed below, the Court should reject Petitioner's overbroad sanctions, along with his request for additional burdensome discovery. *See* Pet'r's Mot. at 31-33; Proposed Order.

As an initial matter, Petitioner's request for an adverse inference instruction makes little sense in a habeas case where this Court, not a jury, will be the finder of fact and decide the legality of Petitioner's detention. An adverse inference is typically a jury instruction and, unlike a jury trial, in a bench trial this Court can evaluate the nature and relevance of the missing videotapes in reaching a decision on the legality of Petitioner's detention. For that reason, courts have recognized that adverse inference instructions are not an appropriate sanction in matters decided by a bench trial. *See, e.g.*, *Bistrian v. Levi*, 448 F. Supp. 3d 454, 478 (E.D. Pa. 2020) (concluding that the court will not draw an adverse inference and instead "the Court will consider the video's destruction as one factor among many in making its ultimate determination, as the finder of fact"); *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 219 F.R.D. 93, 105 (D. Md. 2003) (concluding that "[a]n adverse inference instruction, however, was not appropriate for the simple fact that this is a bench trial" and the trial judge "certainly will be able to draw reasonable inferences" due to the "failure to preserve and produce e-mail records as ordered"). "In a bench trial, such as the forthcoming one in this case, the question is not about how a *jury* should be instructed, but whether the Court itself should draw particular adverse inferences." *Ashraf-Hassan v. Embassy of France in the United States*, 130 F. Supp. 3d 337, 340 (D.D.C. 2015). Accordingly, in a bench trial setting, "courts must remain circumspect in their drawing of inferences before the actual evidence is presented." *Id.*

Here, Petitioner asks the Court to make overbroad factual and legal findings before the Court has received evidence or argument for purposes of resolving the merits of this case. There is no basis for the Court to take the extraordinary step of making *ex ante* findings of fact and law

prior to a merits hearing, particularly when Petitioner has never filed a Traverse setting forth his reasons for habeas relief. *See Devs. Diversified of Tennessee, Inc. v. Tokio Marine & Fire Ins. Co.*, No. 3:04-0015, 2015 WL 6696330, at *5 n.1 (M.D. Tenn. Nov. 3, 2015) (refusing to issue adverse inference prior to bench trial because the court does not "understand how a judge in a bench trial could properly give himself or herself such an instruction"). Petitioner's approach would also be in tension with the Court of Appeals' repeated instruction that trial courts must "consider all of the evidence taken as a whole" in deciding whether a Guantanamo Bay habeas petitioner's detention is lawful. *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010); *see Al-Adahi v. Obama,* 613 F.3d 1102, 1105-07 (D.C. Cir. 2010). Moreover, Petitioner's reliance on his own attorneys' blog posts and anonymously sourced news articles and books, *see, e.g.*, Pet'r's Mot. at 3-4, is not the type of competent evidence that the Court should rely upon in making any actual findings, let alone the sweeping findings requested by Petitioner. By contrast, Respondent's proposed remedies are both legally well-established and align far better with the bench trial posture of this case by allowing Petitioner to present the Court with his unrebutted version of events about the interrogations that occurred on the videotapes during any merits hearing in this case. *See Shepherd*, 62 F.3d at 1475 (emphasizing appropriate remedies "should reflect our judicial system's strong presumption in favor of adjudications on the merits").

Petitioner cites no case in which a court adopted a remedy similar to his purported adverse inferences. The essence of an adverse inference for destroyed evidence is an instruction to the jury that it may infer that the missing evidence was unfavorable to the spoliating party. *See Talavera v. Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011) (stating that an adverse inference is an "evidentiary presumption that the destroyed documents contained favorable evidence for the party prejudiced by their destruction"); *see* 4 Modern Federal Jury Instructions - Civil § 75-7

(2023) (permitting jury to infer that destroyed evidence would have been unfavorable to the defendant).  Petitioner's proposed factual and legal findings are far afield from any traditional adverse inference that other courts have recognized.  Indeed, the cases that Petitioner relies upon from this district illustrate the stark contrast between the tailored relief that courts have ordered in spoliation situations and Petitioner's overbroad sanctions.  *See* Pet'r's. Mot. at 31-32.

For example, in *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7 (D.D.C. 2011), the Court found that an adverse inference was warranted because of a hotel's failure to preserve security video of an altercation between a guest and a security guard.  *Id.* at 15.  The plaintiff proposed an instruction similar to Petitioner's proposal here, asking the Court to enter an overbroad factual and legal finding that the hotel "had no reason or probable cause to pursue Plaintiff at all."  *Id.* at 16.  The Court rejected that approach as "inappropriate" because it "it directs the jury to reach a particular result and makes no reference to the lost evidence."  *Id.* Instead, the Court followed the Modern Federal Jury Instructions cited above and adopted a tailored instruction that the jury would be permitted "to infer that the [destroyed] evidence would have been unfavorable to the defendant."  *Id.*  Similarly, in *Vasser v. Shulkin*, No. CV 14-0185 (RC), 2017 WL 5634860, (D.D.C. Nov. 22, 2017), the court rejected as "inappropriate" a proposed adverse inference that would have required the jury to make a specific inference about the destroyed evidence.  *Id.* at *7 (adopting same approach as *Zhi Chen* based on Model Federal Jury Instructions).  And in *Talavera*, the D.C. Circuit found that destruction of a decisionmaker's interview notes in a Title VII case "supports an inference that the notes would have contained information favorable to [plaintiff's] claim."  638 F.3d at 312.  Petitioner's proposed sanctions bear no resemblance to the tailored adverse inferences accepted by the courts in this Circuit.

The overbreadth of Petitioner's proposed findings is also evident on their face. Petitioner's findings would purportedly be binding on "this case and any other related proceeding." *See* Pet'r's Proposed Order at 1.  Petitioner, however, provides no authority for the extraordinary proposition that this Court could bind non-parties or courts in this or other jurisdictions through an adverse inference in this habeas case.  *See In re Executive Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district.").

The findings also appear intended to resolve the ultimate issue in this case, namely whether Petitioner is lawfully detained because he is part of, or substantially supported, Al-Qaida and its associated forces.  *See Ali v. Obama*, 736 F.3d 542, 544 & n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (setting forth standard for legality of detention).  For example, Petitioner proposes that the Court make findings prior to any evidentiary hearing in this case that Petitioner "was never a member of al Qaeda"; that he "never supported al Qaeda's operations against the U.S. or Americans"; that he was never "involved with any attacks on the U.S."; and the extensive information he provided during his interrogations "is not evidence of any link or affiliation with terrorism." *See* Pet'r's Proposed Order at 1-2.  Such findings could arguably be interpreted as the functional equivalent of judgment in Petitioner's favor by conclusively resolving Petitioner's connection to Al-Qaida and prohibiting Respondent from offering any evidence to the contrary (even though, as explained *supra*, Respondent does not rely on statements Petitioner provided during his interrogations).

Both this Court and others have rejected similar attempts to use overbroad spoliation sanctions as a backdoor means to a final judgment.  As this Court explained in *3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50 (D.D.C. 2016), "the Court must remain cautious" that

issue-related sanctions "do not effectively amount to a default judgment." *Id.* at 55; *see Johnson v. BAE Sys., Inc.,* 4 F. Supp. 3d 62, 78 (D.D.C. 2013) (refusing to impose issue-related sanction that "is the functional equivalent to dismissal"). In *3E Mobile*, the defendant requested that this Court issue specific findings related to a contract dispute because of the plaintiff's failure to comply with discovery obligations, including a finding that the plaintiff "repeatedly failed to live up to its obligations under" the contract. 222 F. Supp. 3d at 55. The Court rejected the proposed findings because they would, "for all intents and purposes, amount to summary judgment in [defendant's] favor." *Id.* The Court instead found that "alternative and less severe sanctions" would redress the discovery issues and avoid excluding evidence that "may be critical to adjudicating the merits" of the claims. *Id.* at 55-56. The Court should follow the same approach here and reject Petitioner's request for entry of findings that could conclusively resolve this case before the Court has evaluated the totality of the evidence. The requested sanctions, which would effectively preclude the Respondent from presenting evidence about Petitioner's ties to Al-Qaida or other terrorist entities, are far too severe and could be tantamount to granting judgment in Petitioner's favor.

Petitioner's proposed findings also cover matters going far beyond information contained in the destroyed videotapes or relevant to this case. For example, one finding asks the Court to make a judgment that the information Petitioner provided in his interrogations was "commonly known to many people in Afghanistan, and is not evidence of any link or affiliation with terrorism." Pet'r's Proposed Order at 2. The videotapes could not have said anything about what the average Afghan citizen knew of Al-Qaida and its operational activities in the late 1990s and early 2000s. Petitioner is free to offer such evidence in his Traverse, but there is no basis for

the Court to make a conclusive finding on such highly disputed factual issues at this stage of the litigation when it would sweep far beyond any conceivable content on the destroyed tapes.

Other proposed findings would extend to the entire "course of [Petitioner's] interrogations" since his capture in 2002 rather than the limited dates when the interrogations were recorded on the videos. *See id.* Several additional findings addressing Petitioner's mental state and subjective motivations are inappropriate as a sanction for the destroyed videotapes. For example, the extent of Petitioner's "knowledge" about attacks against the United States, his "willing[ness]" to answer questions, and the claim that he "never attempted to withhold information" are subjective matters that should not be conclusively resolved through adverse findings before the Court considers the totality of evidence in this case. *Id.* at 2. Further, Petitioner seeks entry of a legal determination that the CIA interrogations were "unauthorized" and "inhumane," *id.*, but provides no support that it would be appropriate for the Court to reach that issue as part of a sanctions finding. The legality of the CIA's enhanced interrogation techniques is not before the Court in this case because Respondent is not relying on any of Petitioner's custodial statements to support his detention. Respondent condemns torture and cruel, inhuman, and degrading treatment for any reason and acknowledges such treatment is prohibited under both international and domestic law. The legality of Petitioner's detention, however, does not turn on any legal determinations about the lawfulness of the circumstances of Petitioner's interrogations. Any such finding would be a purely advisory opinion in contravention of Article III. *See, e.g., Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 396 (D.C. Cir. 2013).

The myriad problems with Petitioner's proposed sanctions illustrate why Respondent's approach is more appropriate both legally and practically. *See 3E Mobile, LLC*, 222 F. Supp. 3d

at 54 (stating the "court should assess the practical effect of the sanction when determining which sanction is appropriate").  In lieu of Petitioner's broad categorical findings that would foreclose further litigation or factfinding, Respondent's approach would enable Petitioner to present evidence about the interrogations that transpired on the videotapes in the manner he determines is most helpful to his claim for habeas relief.  So long as that evidence is not inconceivable or fanciful, Respondent would be restricted from introducing rebuttal evidence to contradict Petitioner's version of events.  For example, Petitioner could present the Court with his declaration that the videotapes would have recorded Petitioner stating that he "was not a member of or affiliated with al Qaeda and that [he] never supported or engaged in any hostilities against the United States."  Husayn Decl. ¶ 2. (ECF No. 661-2).  The Court would then be able to assess that unrebutted evidence in connection with the totality of the other evidence presented during the merits hearing and make an appropriate determination about the legality of Petitioner's detention.  This approach aligns with the D.C. Circuit's instruction that courts must assess the evidence "as a whole" in deciding the Guantanamo Bay habeas cases and would apply a proportional remedy that is tailored to redress the loss of the videotapes in relation to this case. *Awad*, 608 F.3d at 7.

     B.     <u>The Court Should Reject Petitioner's Request for Additional Discovery.</u>

The final sentence of Petitioner's proposed order includes a vague request that would require the parties to "confer to identify reasonable limitations on the discovery sought by Petitioner in the original spoliation motions" and then direct Respondent to "produce the requested discovery within 90 days."  Pet'r's Proposed Order at 2.  Petitioner's renewed motion for sanctions does not contain any argument or explanation for this relief, let alone a "statement of the specific points of law and authority that support" the requested discovery, as required by the Court's Local Rules.  *See* LCvR 7(a).  Nor has Petitioner attempted to explain how additional

discovery is consistent with the standards set forth in section I.E.2 of the Court's Case

Management Order.  *See* ECF Nos. 48, 62 (stating that discovery must be "(1) narrowly tailored,

not open-ended; (2) specify the discovery sought; (3) explain why the request, if granted, is

likely to produce evidence that demonstrates that the petitioner's detention is unlawful . . . and

(4) explain why the requested discovery will enable the petitioner to rebut the factual basis for

his detention without unfairly disrupting or unduly burdening the government. . . ."); Mem. Op.

& Order (ECF No. 573) (applying § I.E.2 standards in addressing Petitioner's request for

discovery).  The lack of explanation for more discovery is particularly puzzling given the

procedural context of the current motion.  The Court denied Petitioner's original motion for

sanctions without prejudice and granted Petitioner leave to submit "replacement briefing."

Minute Order (May 31, 2023).  Petitioner thus had a fair opportunity to reassert or modify his

original request for discovery in the renewed motion, but did not do so.  Respondent should not

have to guess about the legal or factual basis for a discovery request tacked on at the end of a

proposed order without explanation.  Petitioner's request for discovery should be denied on these

grounds alone.

        To the extent Petitioner bases his request for discovery on the rationale asserted in the

now-denied original motion for sanctions filed by his prior counsel 14 years ago (ECF No. 401),

the Court should deny that request on the merits as well.  The original sanctions motion asked

"this Court only to compel the government to reconstruct the evidence that [has been]

destroyed."  *Id.* at 16.  To that end, the motion requested production of documents identified in

the *ACLU* FOIA case about the content of the destroyed videotapes.  *Id.* at 17-18.  As explained

above, the CIA identified 580 documents in response to a court order to "produce records

relating to the content of the tapes . . . from the entire period of the tapes that were destroyed."

*ACLU*, 827 F. Supp. 2d at 229.  Respondent has initiated a process to locate those documents and agrees to produce the classified documents retrieved from this collection that pertain to Petitioner, subject to appropriate redactions for sensitive national security and privileged information in accordance with the Protective Order.  No further document discovery is required, as these documents constitute the most comprehensive and contemporaneous record of Petitioner's interrogations.  *See supra* at 22-24; Panetta Decl. ¶ 5.

The Court should also reject the request in Petitioner's original sanctions motion "to depose all parties present during or otherwise observing Petitioner's interrogations" as well as "all other persons detained or interrogated at any time at Guantanamo Bay or as part of the CIA program."  ECF No. 401 at 18-19.[12]  This sweeping request for unlimited depositions of any person or detainee who was involved in, observed, or was interrogated under similar conditions does not bear any relation, either in subject matter or scale, to the destruction of the interrogation videotapes.  In other Guantanamo Bay cases governed by the Case Management Order applicable in this case, judges of this Court have repeatedly denied detainees' requests to conduct depositions based on the absence of any provision for depositions in the Case Management Order and the failure to establish that depositions would likely produce evidence that would undermine the government's case for detention.  *See, e.g., Alsa'ary v. Obama*, 631 F. Supp. 2d 9, 17 (D.D.C. 2009) ("Petitioners' requests for depositions [of detainees] appear to fall fully outside the bounds of the Amended CMO. ");  *Bin Attash v. Obama*, 628 F. Supp. 2d 24, 41 (D.D.C. 2009) (denying petitioner's request for depositions of interrogators);  *Zaid v. Obama*, No. 05-

---

[12] After filing the renewed motion for sanctions, Petitioner's counsel contacted counsel for Respondent with a revised proposal for depositions in this matter.  In the event Petitioner asks the Court to adopt any revised proposal for depositions in his forthcoming reply brief, Respondent reserves the right to seek leave to file a sur-reply in response to that new argument.

1646 (JDB), 2009 WL 799420, at *1 (D.D.C. Mar. 24, 2009) ("Without some sort of showing that a deposition—which is beyond the scope of discovery contemplated in the CMO—would substantially help *this case*, the Court will not grant such an open-ended, potentially burdensome request.").

Respondent's counsel acknowledges that this Court ordered a deposition some 15 years ago in a prior Guantanamo Bay habeas case. *See Al Habashi v. Bush*, 591 F. Supp. 2d 1 (D.D.C. 2008). In *Al Habashi*, this Court ordered the deposition of a criminal investigator with the Department of Defense "who conducted the interviews with the Petitioner . . . upon which Respondent relies in its Amended Factual Return." *Id.* at 2. *Al Habashi*, however, involved a unique and distinguishable situation in which Respondent's primary basis for detention was a handwritten confession by the petitioner that he composed during interviews with the DoD investigator and his counsel challenged as the product of coercion. *See Al Habashi v. Gates*, 05-CV-765 (EGS) (ECF No. 93-1). This Court's limited order for a single deposition, which focused on "the circumstances surrounding [the agent's] interviews and the resulting statements by Petitioner" that Respondent relied on to support detention in that case, cannot support Petitioner's speculative and overbroad request for a potentially large number of open-ended depositions of CIA officers and detainees. *Al Habashi*, 591 F. Supp. 2d at 2. Petitioner makes no effort to explain how such depositions would be consistent with the requirements of the Case Management Order or nearly two-decades of practice in the Guantanamo Bay habeas cases.

Petitioner asserts two general rationales for the depositions, but they both miss the mark. First, Petitioner contends he needs depositions of other detainees "for the purpose of cross-corroborating their accounts of their respective interrogations to abu Zubaydah's." ECF No. 401 at 19. The Court should reject that rationale because Respondent's proposed evidentiary remedy

eliminates the need to corroborate Petitioner's evidence about his treatment during the interrogations on the destroyed videotapes.  If Respondent's evidentiary remedy is adopted, Respondent would be restricted from contesting Petitioner's evidence about his treatment on the destroyed tapes, thus "the record at the merits hearing will reflect only Petitioner's version of events, and the Court will be able to consider that evidence as unrebutted, thereby reducing the importance of potentially corroborative deposition testimony." *Abdulmalik*, 802 F. Supp. 2d at 4 (denying motion for depositions of interrogators).  The purpose of corroboration is to enhance the reliability of disputed evidence.  But in a posture where Petitioner's evidence is unrebutted and Respondent is restricted from offering contrary evidence, there is no need for the Court to receive deposition testimony about the treatment of other detainees at Guantanamo Bay or CIA detention sites to corroborate Petitioner's uncontested evidence.  Because Respondent's remedial measures appropriately redress the loss of the videotapes, the Court should not take the extraordinary step of ordering depositions of current and former detainees.

Second, Petitioner argues that depositions of everyone who observed Petitioner's interrogations are needed to "collect and present the remaining pieces of the evidence destroyed by the government."  ECF No. 401 at 19.  Such an unbounded and overbroad request is neither reasonable nor appropriate considering not only that Petitioner's evidence regarding his treatment during the videotaped interrogations will be unrebutted, but also the large volume of documents about Petitioner's interrogations that Respondent has agreed to process for disclosure. As explained above, the written communications from the detention site are the best contemporaneous documents the CIA possesses concerning Petitioner's interrogations.  Relying on this "massive production" of documents "that describe the contents of the videotapes, corresponding in time to their creation," the court in the *ACLU* FOIA case denied the plaintiff's

request for "depositions and further discovery" about the destruction of the videotapes.  *ACLU*, 827 F. Supp. 2d at 231.  This Court should follow the same approach here.

Further, Petitioner's request for depositions must take account of the fact that the interrogations recorded on the videotapes occurred 21 years ago.  There is no reasonable basis to think that anyone present during recorded interrogations in 2002 would be able to recall in 2024 more specific details of the events depicted on the videotapes than were included in the contemporaneous documents and notes.  Moreover, Petitioner's request for depositions ignores the thousands of pages of classified documents Respondent has already produced in this case memorializing Petitioner's medical care, interrogations, and treatment in the interrogations.  In the face of those productions and Respondent's commitment here to process additional documents retrieved from the *ACLU* FOIA case, Petitioner has not carried his burden to show that depositions are likely to produce significant new information that would demonstrate that his detention is unlawful.  *See* Case Management Order § I.E.2.  Nor has Petitioner cited any case in which a Court ordered a spoliating party to attempt to recreate destroyed video evidence through deposition testimony, let alone in a situation where the witnesses would be asked to recall minute details of events that occurred over 20 years ago.  The documents are the best and most reliable evidence of the events that occurred on the videotapes.  The Court should not condone an unprecedented fishing expedition of depositions that attempt to recreate the content of the tapes by asking CIA officers 21 years after the fact whether they remember tidbits of information that may have been recorded on the tapes, but not included in the contemporaneous documents.  Petitioner's mere speculation that depositions might provide some sliver of new information is not an appropriate basis on which the Court should depart from the discovery standards in the

Case Management Order or the longstanding authority declining to order depositions in the Guantanamo Bay habeas cases.

The depositions that Petitioner contemplates also would impose undue burdens on Respondent and likely generate a high volume of privilege assertions and motions to quash subpoenas that this Court would have to resolve. While the Court has inherent equitable power to impose appropriate sanctions for the loss of evidence, that power is not unlimited, and here it "must be exercised with restraint and discretion" consistent with the compelling national security interests at issue in this case. *Shepherd*, 62 F.3d at 1475 (citation omitted). Petitioner's apparent purpose for the depositions is to gain access to classified and sensitive national security information by identifying and then questioning current and former CIA officers, other government officials, and contractors who may have been involved in Petitioner's interrogations in the CIA's former detention and interrogation program, some of whom were and may still be in covert status or have not been officially acknowledged publicly to have been involved in the CIA program. Such overbroad and unduly burdensome depositions would be contrary to the requirement that the Court "properly calibrate the scales" when "selecting the appropriate sanction" for the loss of the videotapes. *Shepherd*, 62 F.3d at 1479 (citation omitted); *3E Mobile, LLC*, 222 F. Supp. 3d at 53 (citation omitted).

As the Supreme Court explained in *Boumediene v. Bush*, 553 U.S. 723 (2008), the "Government has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible." *Id.* at 796 (citing *United States v. Reynolds,* 345 U.S. 1 (1953) (recognizing state secrets privilege). Indeed, the CIA has "broad power to protect the secrecy and integrity of the intelligence process" in furtherance of the national security. *CIA v.*

41

*Sims*, 471 U.S. 159, 169-70 (1985).  In recognition of those interests, the Supreme Court recently

upheld the assertion of the state secrets privilege in a subpoena matter initiated by Petitioner

seeking information about the operation of the CIA's former detention and interrogation

program, including identities of certain individuals involved in aspects of the program.  *See*

*United States v. Zubaydah*, 595 U.S. 195, 203 (2022).  Other courts have quashed depositions

like the ones Petitioner seeks here.  *See* Order re: Third & Fourth Mot. to Compel & Assertion of

State Secrets Privilege, *Salim v. Mitchell*, No. 15-CV-286 (JLQ) (E.D. Wash. May 31, 2017)

(ECF No. 188) (quashing deposition of CIA officers alleged to have participated in the former

CIA program based on the state secrets privilege).

      The depositions that Petitioner requests would run headlong into Respondent's

"compelling interest" in preventing unauthorized disclosure of information that would harm

national security or intelligence interests.  *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).

In addition to the state secrets privilege, Section 6 of the CIA Act, currently codified at 50 U.S.C.

§ 3507, protects against "disclos[ure of] 'the organization, functions, names, official titles,

salaries, or numbers of personnel employed by the Agency."  *See Minier v. CIA*, 88 F.3d 796,

801 (9th Cir. 1996) ("there can be no doubt" that the CIA Act "authorizes the CIA's refusal to

confirm or deny the existence of an employment relationship" and the CIA "may also decline to

disclose [the employee's] alleged CIA activities.").  This statute reflects "Congress's express

acknowledgment that the CIA may withhold agent names."  *Id.*; *ACLU v. CIA*, No. 16-cv-1256

(EGS), 2021 WL 5505448, at *5 (D.D.C. Nov. 24, 2021) (holding that "the names of the CIA

employees are protected by Section 6 of the CIA Act").  In addition, Section 102A(i)(1) of the

National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1), provides that "[t]he Director

of National Intelligence shall protect . . . intelligence sources and methods from unauthorized

disclosure." *Id*.  This statute grants the CIA "very broad authority to protect all sources of intelligence information from disclosure."  *Sims*, 471 U.S. at 168-69.[13]

In light of these weighty concerns, the Court should reject Petitioner's request for depositions of officials who observed the recorded interrogations.  Proceeding with depositions in the face of these national security constraints would be inconsistent with the "restraint and discretion" that the D.C. Circuit has instructed courts to exercise when calibrating the appropriate scope of an issue-related sanction.  *Shepherd*, 62 F.3d at 1478.[14]  Similarly, depositions of other detainees with their own pending habeas or military commission criminal proceedings could create conflicts with those other matters and raise their own set of complex privilege issues, such as refusals by detainees with pending matters to testify in this proceeding about their treatment while in CIA custody.  The complex privilege and burdensome logistical issues associated with Petitioner's proposed depositions would enmesh the Court and parties in resource-consuming collateral litigation that would be unprecedented in the Guantanamo Bay habeas cases.  The Court should not be the first to take such extraordinary steps, particularly when Respondent has proposed tailored and effective measures that appropriately address the loss of the videotapes for purposes of this habeas case.

---

[13] The fact that Petitioner's counsel have limited security clearances does not entitle them to pierce Respondent's privileged information. *See, e.g., United States v. Daoud*, 755 F.3d 479, 484 (7th Cir. 2014) (reversing order compelling disclosure of classified materials to security-cleared defense counsel); *United States v. El-Mezain*, 664 F.3d 467, 567-68 (5th Cir. 2011) (approving denial of discovery to security cleared defense counsel because of the government's substantial interest in maintaining secrecy).

[14] In the event any such depositions are ordered, Respondent would reserve the right to assert all appropriate privileges to move to quash or for entry of appropriate protective orders in this case or other separate subpoena matters.

## <u>CONCLUSION</u>

For the reasons explained above, the Court should deny Petitioner's proposed sanctions and instead adopt Respondent's two proposed evidentiary measures to redress the destruction of the videotapes.  A proposed order is attached.

Dated:  November 17, 2023  Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

TERRY M. HENRY
Assistant Branch Director

/s/ *Andrew I. Warden*
ANDREW I. WARDEN (IN Bar No. 23840-49)
RONALD J. WILTSIE
Senior Trial Counsel
JASON LYNCH
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7506
Washington, D.C. 20530
Tel: 202-616-5084
Fax: 202-616-8460
Email:  Andrew.Warden@usdoj.gov

*Counsel for Respondent*