# EXHIBIT F

~~SECRET//NOFORN~~



THE DEPUTY DIRECTOR
CENTRAL INTELLIGENCE AGENCY
WASHINGTON, D.C. 20505

20 December 2011

MEMORANDUM FOR: Director, Central Intelligence Agency

SUBJECT: ~~(S//NF)~~ Disciplinary Review Related to Destruction of Interrogation Tapes

REFERENCE: 15 September 2011 D/CIA Memorandum "Disciplinary Review"

1. ~~(S//NF)~~ In the referenced memorandum, you directed me to undertake a disciplinary review of NCS officers relating to their conduct in the events surrounding the CIA's 9 November 2005 destruction of detainee interrogation videotapes. You directed that I take the disciplinary actions I deemed appropriate and that I report my decision to you. This memorandum is that report.

2. ~~(S//NF)~~ In my review, I focused on the performance of former D/NCS Jose Rodriguez, now retired, and his then Chief of Staff, Gina Haspel [redacted] who is currently serving as Chief [redacted] I focused on these two individuals because the extensive record assembled by Special Prosecutor John Durham--and my discussions with the OGC attorneys who assisted me in my review--indicated that Mr. Rodriguez and Ms. Haspel [redacted] were the NCS officers directly involved in the decision to destroy the tapes.

- I considered including a review of the actions undertaken by the NCS officer who was then Chief of [redacted] Division. It was a phone call from him to COS [redacted] that prompted [redacted] Station on 8 November to send to HQS the cable requesting permission to destroy the tapes to which Mr. Rodriguez responded affirmatively that same day. That phone call preempted an email with the same



~~SECRET//NOFORN~~

SUBJECT: ~~(C//NF)~~ Disciplinary Review Related to Destruction of Interrogation Tapes

message to [REDACTED] Station that OGC attorneys were preparing. I concluded, however, that the then C/[REDACTED] reflecting D/NCS' sense of urgency on this issue, was simply trying to expedite the process. Most important, the cable from [REDACTED] Station requesting approval to destroy the tapes was neither a necessary nor dispositive step in the decision to destroy the tapes. Hence, I decided not to review, for disciplinary actions, then C/[REDACTED]'s role in the matter.

- Neither did I review the actions of those officers in [REDACTED] Station who actually destroyed the tapes, as they were following a direct order from the D/NCS.

3. ~~(S//NF)~~ In carrying out your directive, I reviewed a subset of the documents gathered by the Special Prosecutor that was prepared for me by the OGC, along with other relevant documents, including draft book chapters describing the events surrounding the tapes destruction by Mr. Rodriguez and by former Acting General Counsel John Rizzo, as well as the relevant portion of the draft SSCI report on renditions, detentions, and interrogations. In addition, I interviewed Mr. Rodriguez and Ms. Haspel[REDACTED]. I also discussed the case with several senior officials--General Counsel Stephen Preston and members of his staff, and my Chief of Staff, [REDACTED]. While these discussions were useful in refining my thinking, I want to note that the decisions outlined below are entirely my own.

4. ~~(S//NF)~~ I have found no fault with the performance of Ms. Haspel[REDACTED]. I have concluded that she acted appropriately in her role as Mr. Rodriguez's Chief of Staff, including in her efforts to press for and facilitate a resolution of the matter, as well as in her drafting of the cable that authorized the destruction of the tapes. She drafted the cable on the direct orders of Mr. Rodriguez; she did not release that cable. It was not her decision to destroy the tapes; it was Mr. Rodriguez's. In addition, Ms. Haspel[REDACTED] claims that she believed--incorrectly, as it turned out--that Mr. Rodriguez was going to obtain approval from then Director Goss before releasing the cable and that she took action after the release of the cable to

SUBJECT: (C//NF) Disciplinary Review Related to Destruction of Interrogation Tapes

ascertain from Mr. Rodriguez whether he had obtained that approval. Although there is no "good soldier" defense in the case of an act that violates the law or Agency regulations, the Special Prosecutor evidently found no prosecutable offense, nor did I find a violation of Agency regulations.

5. (S//NF) I have found fault with the performance of Mr. Rodriguez, and I have decided to issue to him a letter of reprimand to remain in his official personnel file for two years. But I have also decided that the letter of reprimand will not carry any sanctions against Mr. Rodriguez. These two decisions reflect the following reasoning.

- Mr. Rodriguez served the Agency with distinction for 31 years. He served three tours as Chief of Station [redacted] His performance evaluations consistently describe the units under his command as highly motivated, innovative, and productive, and commend him for his operational creativity, managerial skill, and political and bureaucratic savvy. Mr. Rodriguez also held a succession of increasingly responsible and challenging headquarters assignments, including Chief of [redacted] Task Force, Deputy Director of the Counternarcotics Center, Chief of the Latin America Division, Chief of the Counterterrorism Center in the years following 9/11, and ultimately the Deputy Director of Operations and founding Director of the National Clandestine Service. He is the recipient of multiple awards, including the National Intelligence Distinguished Service Medal, which was awarded to him for his service [redacted] Mr. Rodriguez also received a Director's Award from Director Goss in May 2006, and the same award from Director Hayden in October 2007 as Mr. Rodriguez was stepping down as D/NCS. In August 2007, Mr. Rodriguez was acclaimed in a public ceremony by then HPSCI Chairman Sylvester Reyes as an "American hero."

SUBJECT: ~~(C//NF)~~ Disciplinary Review Related to Destruction of Interrogation Tapes

- Mr. Rodriguez's decision to destroy the tapes was not motivated by any personal gain or interest. His decision was motivated by what he believed to be the best interests of the CIA and its officers, particularly the latter. He has repeatedly said that he was told--which he was--that the written record fully and accurately recorded the events depicted on the tapes and that he was deeply concerned that the tapes would ultimately leak--or be officially released--and expose the affiliation of the Agency officers shown in the tapes, thereby putting their livelihood and personal security at risk. He also says that he was concerned that publication of the tapes would damage the domestic and international standing of the CIA, perhaps significantly degrading our operational capabilities. He says that the worldwide reaction to the leak of photos of the actions of US military personnel at Iraq's Abu Ghuraib prison in April 2004 cemented his view that the tapes represented a threat to his officers and the Agency. His focus on what he believed to be the best for the CIA and its officers, rather than on what was best for him, reflects values that we try to instill in all Agency officers.

- Mr. Rodriguez never denied making the decision to destroy the tapes nor did he ever attempt to cover up his decision in any way. On the contrary, from day one, Mr. Rodriguez has admitted that he made the decision and he has been consistent in his explanation of why he made that decision. In doing so, he has demonstrated candor, another trait on which we place high value.

- The leadership of the Agency failed Mr. Rodriguez. It failed him when he was D/CTC and it failed him when he was DDO and D/NCS. Beyond the Acting General Counsel discussing the issue with White House Counsel, there is no record of any effort on the part of the Agency leadership to engage White House policymakers. The Director should have taken this issue to the White House and requested that it be addressed as a policy issue. Because no effort was undertaken by CIA leadership to

SUBJECT: ~~(C//NF)~~ Disciplinary Review Related to Destruction of Interrogation Tapes

tackle the issue at the policy level, Mr. Rodriguez was left believing, rightly or wrongly, that he had no other choice but to act on his own authority.

- Mr. Rodriguez in the days leading up to the destruction was told by senior agency attorneys that there was no legal constraint to destroying the tapes and that, as D/NCS, he had the authority to order their destruction. Accounts differ over whether he was reminded at that time of the White House Counsel's direction that the DNI and Attorney General be briefed prior to destruction, or the fact that others in his chain of command had expressed opposition to or reservations about destruction. What is clear, however, is that Mr. Rodriguez believed his actions were legally permissible and that, under CIA regulations, he had the authority to issue the order to destroy the tapes.

- Neither the leadership of the Agency nor the White House took any action against Mr. Rodriguez at the time of the tapes destruction, even though they had the same facts that I currently possess. This appears to have been a conscious decision on the part of Director Goss. According to a contemporaneous account by the then Deputy Executive Director [redacted] of the meeting with Director Goss during which Mr. Rodriguez reported the destruction and conveyed his willingness to take the heat for it, the Director joked that he would be the one to take the heat but added that he agreed with the decision. Also, there is no record that, for its part, the White House, despite the White House Counsel's reported anger when she heard the news, asked for a review, an investigation, or an accountability decision. I conclude from this inaction that Mr. Rodriguez's superiors in the Agency and at the White House did not see his action as insubordination or even a significant error in judgment.

  - Having concluded that, I must note that this is a source of concern in making the accountability decision I have made. I do not know of another case

SUBJECT: ~~(C//NF)~~ Disciplinary Review Related to Destruction of Interrogation Tapes

in which, without new information, an Agency leader or Accountability Board has overturned an earlier accountability decision, particularly one made by a Director.

- Accountability is critical, but it should also be swift. Mr. Rodriguez's action occurred six years ago. I find it deeply unfair to our employees to undertake accountability reviews and make accountability decisions so far after the fact. Although some of that delay was caused by the more than three years it took the Special Prosecutor to come to the evident conclusion that Mr. Rodriguez did not commit a prosecutable offense, this does not, in my view, lessen the unfairness to the employee of the lack of a timely accountability review.

- Mr. Rodriguez has already paid a significant price for the decision. He was investigated by a Special Prosecutor, he had to retain counsel, and he says he found it difficult to find post-retirement employment with a legal cloud hanging over his head. I find this latter point compelling, as I believe that a former D/NCS and C/CTC would have secured a prominent corporate position immediately upon retirement, which in Mr. Rodriguez's case did not happen until almost a year after he entered the Transition Program.

- Taken together, all of the above would argue for a decision on my part of no finding of fault. And that is what I would have decided, save one additional and critical factor: The record is clear that Mr. Rodriguez was aware that two White House Counsels, the counsel to the Vice President, the DNI, the DCIA, and the HPSCI ranking member had either expressed opposition to or reservations about the destruction of the tapes. No organization, particularly the CIA, can function effectively if its employees believe that they can ignore the direction and/or the intent of senior Agency, IC, or White House officials because they think their view is the right one--even if it is.

SUBJECT: ~~(C//NF)~~ Disciplinary Review Related to Destruction of Interrogation Tapes

- What Mr. Rodriguez should have done is take his entreaties frequently and increasingly forcefully to the Director rather than focus so heavily on the Acting General Counsel. As this was clearly a matter of deep conviction and conscience for Mr. Rodriguez, had he failed to persuade the Director to work the issue at the White House, he should have--after informing the Director of his intent to do so--taken his case to the DNI and, failing that, to the White House himself.

- Ultimately, it is my firm belief in the need for an effectively functioning chain of command that has caused me to find fault in Mr. Rodriguez's decision to destroy the tapes and for me to give him a letter of reprimand. My purpose in doing so is to confirm the principal that no one--whatever their rank or their belief in the righteousness of their position--can disregard the views of those above them. Having said that, I believe the factors that I have cited above are mitigating ones--and significantly so--and this is why I have opted not to attach sanctions to the letter of reprimand.

6. ~~(S//NF)~~ There is one more issue I want to address, given its importance, and that is CIA's failure to inform Congress of the destruction of the tapes. This is a serious issue. Notification should have occurred within days of the destruction, even though the leadership of the oversight committees had been told in early 2003 of CIA's intent to destroy the tapes. I do not hold Mr. Rodriguez accountable for this failure, as it was ultimately the responsibility of the Director. According to Mr. Rizzo's draft chapter, Director Goss made clear that he intended to notify the leadership of the

SUBJECT: ~~(C//NF)~~ Disciplinary Review Related to Destruction of Interrogation Tapes

oversight committees in private without staff present. Mr. Rodriguez is not responsible for the fact that Congress was not informed about the tapes destruction until two years after the fact.

Michael J. Morell