**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ZAYN AL ABIDIN MUHAMMAD HUSAYN (ISN # 10016),<br><br>              Petitioner,<br><br>v.<br><br>LLOYD J. AUSTIN, III, in his official capacity as Secretary of Defense,<br><br>              Respondent. | Civil Action No. 08-1360 (EGS) |

## MEMORANDUM OPINION AND ORDER

### I.   Introduction

Petitioner Zayn al Abidin Muhammad Husayn ("Petitioner") moves for sanctions against Respondent Lloyd J. Austin, III in his official capacity as Secretary of Defense ("Respondent") based on allegations that in 2005, the Central Intelligence Agency ("CIA" or "the Agency") engaged in the intentional spoliation of video evidence that would have supported Petitioner's position that his ongoing detention at the Guantanamo Bay Naval Base is unjustified. *See* Pet'r's Superseding Mot. for Sanctions for Spoliation of Evidence ("Pet'r's Mot."), ECF No. 661 at 1, 9.[1] Petitioner initially

---

[1] When citing electronic filings throughout this Memorandum Opinion and Order, the Court cites to the ECF header page number, not the original page number of the filed document.

moved for sanctions against Respondent in 2009, but the Court denied those motions without prejudice so that Petitioner could file a "single, consolidated, superseding briefing on this issue[.]" Min. Order (June 27, 2023). Accordingly, pending before the Court is Petitioner's Superseding Motion for Sanctions for the Spoliation of Evidence, *see* Pet'r's Mot., ECF No. 661; which Respondent opposes, *see* Resp't's Opp'n, ECF No. 665. Respondent has also filed a sur-reply in opposition to Petitioner's pending motion. *See* Resp't's Sur-Reply in Opp'n to Pet'r's Mot. ("Resp't's Sur-Reply"), ECF No. 667-2.

Upon careful consideration of Petitioner's pending motion, Respondent's opposition, and the reply thereto; Respondent's sur-reply and Petitioner's response thereto; the applicable law; and for the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** Petitioner's motion for sanctions.

## II. Background

### A. Factual Background

#### 1. Petitioner's Capture and His Early Cooperation

On September 17, 2001, following al-Qaeda's 9/11 terrorist attacks on the United States ("U.S."), President George W. Bush authorized the CIA to "undertake operations designed to capture and detain persons who pose a continuing, serious threat of violence or death to U.S. persons and interests or who are planning terrorist activities." Ex. A to Resp't's Opp'n, CIA

Office of Inspector General ("OIG"), Special Review:
Counterterrorism Detention and Interrogation Activities
September 2001 – October 2003 (May 7, 2004) [hereinafter "CIA
OIG Special Review Report"], ECF No. 665-1 at 9 ¶ 1.[2] Pursuant to
this directive, the CIA established a program in the
Counterterrorist Center to detain and interrogate terrorists at
sites abroad (the "CTC Program"). *Id.* ¶ 2. In March 2002,
Petitioner became the first person to be detained at a foreign
CIA site pursuant to the CTC Program following his capture in a
combined Pakistani authority and CIA raid of a safehouse in
Faisalabad, Pakistan, during which he sustained serious gunshot
wounds. *Id.* at 10 ¶ 4; Senate Select Committee on Intelligence
("SSCI"), Committee Study of the CIA's Detention and
Interrogation Program, S. Rep. No. 113-288 [hereinafter "SSCI
Report"], at 21 (2014).[3] News reports suggest that the covert CIA

---

[2] Both Petitioner and Respondent have attached the CIA OIG
Special Review Report as a partially redacted exhibit to their
respective briefings. *See* Ex. A to Resp't's Opp'n, ECF No. 665-
1; Ex. 3 to Pet'r's Mot., ECF No. 661-4. This 2004 report
regarding the CIA's "treatment and interrogation of all
individuals detained by or on behalf of [the] CIA after 9/11"
was based on the CIA OIG's review of over 38,000 pages of
documents, over 100 interviews with CIA officials, and site
visits to CIA interrogation facilities. CIA OIG Special Review
Report, ECF No. 665-1 at 119 ¶¶ 2-3. The review covered the
period of September 2001 to mid-October 2003. *Id.* at 10 ¶ 2.
[3] The SSCI Report's findings and conclusions and a detailed 499-
page executive summary were the result of a "comprehensive
review" of the CIA's detention and interrogation program from
its authorization on September 17, 2001 to its official end on
January 22, 2009. SSCI Report at 8-9. The report was based

detention facility to which Petitioner was rendered was located in Thailand, *ACLU v. U.S. Dep't of Def.*, 827 F. Supp. 2d 217, 222 (S.D.N.Y. 2011); but official reports only refer to this facility as "Detention Site Green," SSCI Report at 23. Upon his arrival there and in response to questioning by agents from the Federal Bureau of Investigation ("FBI") who spoke Arabic, Petitioner "confirmed his identity to the FBI officers, informed [them] he wanted to cooperate, and provided background on his activities." *Id.* at 24-25.

However, on the evening of his arrival, Petitioner's medical condition rapidly deteriorated, causing him to require immediate hospitalization. *Id.* at 25. Although largely unable to communicate because of a breathing tube, Petitioner "continued to provide information to FBI and CIA officials at the hospital using an Arabic alphabet chart." *Id.* On April 8, 2002, Petitioner's breathing tube was removed, following which he "provided additional intelligence and reiterated his intention to cooperate." *Id.* Two days later, in the hospital's intensive care unit, Petitioner told FBI officers that an individual named

---

primarily on a review of more than six million pages of CIA documents, which included "CIA operational cables, reports, memoranda, intelligence products, and numerous interviews conducted of CIA personnel by various entities within the CIA, . . . , as well as internal email and other communications[,]" and it was published after declassification by the Executive Branch as Senate Report No. 113-288 in 2014. *Id.* at 9.

"Mukhtar" was the "mastermind" of al-Qaeda's 9/11 attacks, and he identified a picture of this man—Khalid Shaykh Mohammad ("KSM")—from the FBI's Most Wanted list. *Id.* Petitioner told the FBI officers that "Mukhtar" had trained the 9/11 hijackers and provided additional information on KSM's background—disclosures which the CIA described as "important" and "vital." *Id.*

While Petitioner was hospitalized, senior agency officials at CIA Headquarters began discussing the possible use of coercive interrogation techniques against him upon his transfer back to Detention Site Green because they believed he "was withholding information that could not be obtained through then-authorized interrogation techniques" and that "a more robust approach was necessary to elicit threat information from" him. *Id.* at 25-26; CIA OIG Special Review Report, ECF No. 665-1 at 11 ¶ 4. On April 15, 2002, Petitioner was returned to Detention Site Green and placed in conditions which aimed to ensure that he was "at his most vulnerable state." SSCI Report at 28. He was placed in handcuffs and leg shackles, locked in a white cell typically "naked and sleep deprived," and subjected to either loud rock music or noise generators. *Id.* at 28-29. The focus of the CIA's questioning at this time was on "impending future terrorist plans against the [U.S.]," but Petitioner "denied any knowledge related to specific targets for a pending attack." *Id.* Instead, he provided generalized background information on al-

Qaeda, his past travel to the U.S., and extremists in Pakistan, including KSM. *Id.* at 29.

Petitioner continued to provide interrogators with information throughout April 2002 "but not information on pending attacks against the [U.S.]" *Id.* He provided information on al-Qaeda's "activities, plans, capabilities, and relationships, in addition to information on its leadership structure, including personalities, decision-making processes, training, and tactics." *Id.* at 31. However, his inability to provide information on any next attack on the U.S. or the locations of al-Qaeda operatives there "served as the basis for CIA representations that [he] was 'uncooperative,' as well as for the CIA's determination that [he] required the use of what would later be known as the CIA's 'enhanced interrogation techniques [("EITs")]' to . . . reveal the information the CIA believed he was withholding." *Id.* However, Petitioner "never provided this information, and CIA officers later concluded this was information [he] did not possess." *Id.*

## 2. The Decision to Use Enhanced Interrogation Techniques Against Petitioner

Beginning on June 18, 2002, through August 4, 2002, Petitioner "spent 47 days in isolation without being asked any questions." *Id.* at 30-31. During this period, on July 13, 2002, the CIA's then-acting general counsel, John Rizzo ("Mr. Rizzo"),

met with attorneys from the National Security Council and the
Department of Justice's ("DOJ") Office of Legal Counsel ("OLC"),
among others, to provide an overview of the CIA's proposed EITs
to be used against Petitioner and to ask for a formal DOJ
opinion regarding the lawfulness of doing so. *Id.* at 33. In
response to this request, that same day OLC's Deputy Assistant
Attorney General John Yoo wrote to Mr. Rizzo that "the criminal
prohibition on torture would not prohibit the methods proposed
by the interrogation team because of the absence of any specific
intent to inflict severe physical or mental pain or suffering."
*Id.* at 34. On July 24, 2002, then-Attorney General John Ashcroft
verbally approved the use of ten interrogation techniques
against Petitioner, which included: (1) the attention grasp; (2)
walling; (3) the facial hold; (4) the facial/insult slap; (5)
cramped confinement; (6) wall standing; (7) stress positions;
(8) sleep deprivation; (9) use of diapers; and (10) use of
insects. *Id.* at 36. Two days later, he also verbally approved
the use of the waterboard. *Id.* at 36-37.

On August 1, 2002, OLC finalized its written legal opinion
in which it determined that these specific EITs would not
violate the torture prohibition pursuant to the Convention
Against Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment, as implemented in the U.S. criminal code, 18
U.S.C. §§ 2340-2340A. *Id.* at 37; CIA OIG Special Review Report,

ECF No. 665-1 at 12 ¶ 6, 24 ¶ 36; *see* DOJ OLC, Memorandum for John Rizzo Acting General Counsel of the CIA: *Interrogation of al Qaeda Operative* (Aug. 1, 2002), available at https://www.justice.gov/sites/default/files/olc/legacy/2010/08/05/memo-bybee2002.pdf [hereinafter "DOJ OLC Memorandum"]. "This OLC opinion was based upon specific representations by [the] CIA concerning the manner in which EITs would be applied in the interrogation of [Petitioner]." CIA OIG Special Review Report, ECF No. 665-1 at 28 ¶ 43.[4] OLC also relied on the CIA's representations "to support its conclusion that no physical harm or prolonged mental harm would result from the use on [Petitioner] of the EITs, including the waterboard." *Id.* at 29 ¶ 43. In addition, to gain approval for using the EITs, the CIA represented that it believed that Petitioner "continue[d] to withhold critical threat information[,]" and that therefore, "the use of more aggressive techniques was required." SSCI Report at 37. However, cables from that time indicate that "CIA interrogators at the detention site had not determined that 'the

---

[4] The OLC opinion specifically stated: "Our advice is based upon the following facts, which [the CIA has] provided to us. We also understand that [the CIA does] not have any facts in [its] possession contrary to the facts outlined here, and this opinion is limited to these facts. If these facts were to change, this advice would not necessarily apply." DOJ OLC, Memorandum for John Rizzo Acting General Counsel of the CIA: *Interrogation of al Qaeda Operative* (Aug. 1, 2002), available at https://www.justice.gov/sites/default/files/olc/legacy/2010/08/05/memo-bybee2002.pdf.

use of more aggressive techniques was required' to 'persuade'
[Petitioner] to provide threat information." *Id.* Instead, the
detention site interrogation team believed that the objective of
the use of the EITs was to confirm that Petitioner "did not have
additional information on threats to the [U.S.]" beyond that
which he had already provided. *Id.* CIA records furthermore
"indicate that [Petitioner] maintained that he always intended
to talk and never believed he could withhold information from
interrogators." *Id.* at 48.

### 3. Petitioner Is Subjected to Twenty Days of "Aggressive" Enhanced Interrogation Techniques

Beginning on August 4, 2002, and continuing for twenty days
through August 23, 2002, the CIA subjected Petitioner to its
"most aggressive interrogation phase." *Id.* at 40. During this
time period, Petitioner experienced "at least 83 applications of
the waterboard technique[,]" many of which "resulted in
immediate fluid intake and involuntary leg, chest and arm
spasms[;]" spent 266 hours (11 days, 2 hours) in a coffin-size
confinement box and 29 hours in a small confinement box (which
had a width of 21 inches, a depth of 2.5 feet, and a height of
2.5 feet); and was subjected to "walling, attention grasps,
slapping, facial hold, stress positions, cramped confinement,
white noise[,] and sleep deprivation"—all in varying
combinations—on a nearly 24-hour basis. *Id.* at 40, 42-43, 118

n.698. Whenever Petitioner was not being actively subjected to
EITs, he was left alone in a stress position, on a waterboard
with a cloth over his face, or locked in one of the two
confinement boxes. *Id.* at 42. At times during the
interrogations, Petitioner was described as "hysterical" and
"distressed to the level that he was unable to effectively
communicate." *Id.* at 43. In at least one waterboarding session,
Petitioner "became completely unresponsive, with bubbles rising
through his open, full mouth[,]" and he remained unresponsive
until medical intervention. *Id.* at 43-44. CIA personnel at the
detention site "reported being disturbed by the use of the CIA's
[EITs] against [Petitioner]." *Id.* at 44.

According to daily cables from Detention Site Green,
Petitioner frequently "cried," "begged," "pleaded," and
"whimpered," while continually denying "that he had any
additional information on current threats to, or operatives in,
the [U.S.]" *Id.* at 42. By August 9, 2002, the sixth day of the
aggressive interrogation period, the interrogation team informed
CIA Headquarters that it was their "collective preliminary
assessment" that it was "unlikely" Petitioner "had actionable
new information about current threats to the [U.S.,]" and by the
next day, they raised this conclusion to "highly unlikely." *Id.*
They requested that personnel from CIA Headquarters travel to
the detention site to view the interrogations and stated their

10

concern that the application of the EITs against Petitioner was "approach[ing] the legal limit." *Id.* at 43. Nonetheless, CIA Headquarters responded with their continued belief that Petitioner "was withholding threat information and instructed the CIA interrogators to continue using the CIA's [EITs]." *Id.* After the CIA ceased using EITs against Petitioner on August 30, 2002, "CIA personnel at the detention site concluded that [he] had been truthful and that he did not possess any new terrorist threat information." *Id.* at 42 n.190, 45. Ultimately, Detention Site Green, where these enhanced interrogations took place, was closed in December 2002, and Petitioner was transferred to a second detention site. *Id.* at 24, 67.

### 4. The CIA's Decision to Videotape Petitioner's Enhanced Interrogation Sessions

Between April and December 2002, the CIA recorded, on at least ninety-two videotapes, interrogation sessions with two detainees: Petitioner and Abd Al-Rabim Al-Nashiri ("Mr. Al-Nashiri"). *ACLU*, 827 F. Supp. 2d at 222. Of these ninety-two tapes, ninety were from the CIA's interrogation sessions of Petitioner, two were from similar sessions with Mr. Al-Nashiri, and twelve included EIT applications. *Id.*; Ex. B to Resp't's Opp'n, Inventory and Review of Interrogation Videotapes (Dec. 3, 2002), ECF No. 665-2 at 2. The CIA interrogation teams at Detention Site Green initially decided to videotape their

sessions with Petitioner following his capture "to ensure a
record of [his] medical condition and treatment should he
succumb to his [gunshot] wounds and questions arise about the
medical care provided to him by [the] CIA." CIA OIG Special
Review Report, ECF No. 665-1 at 44 ¶ 77. The videotapes were
also intended "to assist in the preparation of the debriefing
reports" about Petitioner's interrogations, although they
"rarely, if ever, were used for that purpose." *Id.*

Furthermore, CIA Headquarters had "intense interest" in
ensuring that all aspects of Petitioner's interrogations
complied "with the guidance provided to the [detention] site
relative to the use of EITs." *Id.* Pursuant to this purpose, in
November and December 2002, an attorney in the CIA's Office of
General Counsel reviewed the videotapes "to ascertain compliance
with the August 2002 DOJ opinion [regarding the use of EITs] and
compare what actually happened with what was reported to
Headquarters." *Id.* This attorney "reviewed every minute of the
videotapes in either the 'play' or 'play/fast forward' mode" and
confirmed, in a memorandum dated January 9, 2003, "that the
cable traffic accurately describe[d] the interrogation methods
employed" against Petitioner. Ex. C to Resp't's Opp'n, Review of
Interrogation Videotapes (Jan. 9, 2003), ECF No. 665-3 at 2, 4,
6; *see also* CIA OIG Special Review Report, ECF No. 665-1 at 44 ¶

77 (stating that the attorney reported "no deviation [in the videotapes] from the DOJ guidance or the written record").

After receiving allegations that CIA personnel had used "unauthorized interrogation techniques" with Mr. Al-Nashiri and information that some CIA employees "were concerned that certain covert Agency activities at an overseas detention and interrogation site might involve violations of human rights[,]" in January 2003, the CIA's OIG initiated a special review of the CIA's CTC Program, which included the OIG conducting its own review of the ninety-two videotapes in May 2003. CIA OIG Special Review Report, ECF No. 665-1 at 9-10 ¶ 2, 44 ¶ 78. The OIG found that eleven of the tapes were blank, two were blank except for one or two minutes of recording, and two were broken and could not be reviewed. *Id.* at 45 ¶ 78. The OIG also compared the videotapes to written logs and cables "and identified a 21-hour period of time, which included two waterboard sessions, that was not captured on the videotapes." *Id.* On May 7, 2004, the CIA's OIG published its findings regarding the Agency's treatment and interrogation of Petitioner, in addition to others detained by or on behalf of the CIA after 9/11, in a report titled Special Review: Counterterrorism Detention and Interrogation Activities (September 2001 – October 2003). *See generally* CIA OIG Special Review Report, ECF No. 665-1; *see also supra* note 2. The CIA OIG concluded that the CIA had used "[u]nauthorized, improvised,

inhumane, and undocumented detention and interrogation techniques" throughout the administration of its CTC Program, and that the Agency could face resulting "long-term political and legal challenges," particularly related to "its use of EITs." CIA OIG Special Review Report, ECF No. 665-1 at 110 ¶ 258, 113 ¶ 266.

Of note, the CIA OIG's review of the videotapes identified 83 waterboard applications against Petitioner, most of which lasted less than ten seconds, but were employed in a manner "different from the technique as described in the DOJ opinion" as to "the manner in which [Petitioner's] breathing was obstructed." *Id.* at 44-45 ¶¶ 78-79. Instead of applying "a small amount of water to the cloth [placed over Petitioner's air passages] in a controlled manner[,]" the videotapes showed that Petitioner's interrogators "continuously applied large volumes of water to a cloth that covered [his] mouth and nose." *Id.* at 45 ¶ 79. In addition, the OIG discovered one instance in which "a psychologist/interrogator verbally threatened [Petitioner] by stating, 'If one child dies in America, and I found out you knew something about it, I will personally cut your mother's throat.'" *Id.* at 44-45 ¶ 78. Similarly, in the SSCI's later Committee Study of the CIA's CTC Program, published in declassified form in 2014, *see supra* note 3; the SSCI also concluded that the manner in which the CIA applied the EITs to

Petitioner "was quite different from the [description] presented in 2002" in the DOJ OLC's memorandum, which summarized how the CIA had represented to the OLC that the techniques would be applied, *see* SSCI Report at 411-12 (stating that "the CIA used the waterboarding technique against [Petitioner] . . . in a manner inconsistent with CIA representations to the OLC, as well as the OCL's description of the technique in the August 1, 2002, memorandum)*; compare* DOJ OLC Memorandum at 2 (stating that during the "walling" technique, the head and neck are to be supported with a rolled hood or towel to prevent whiplash, and the individual is pulled forward and then quickly pushed into the wall such that the shoulder blades hit the wall and the person is allowed to rebound from the wall to prevent injury), *with* SSCI Report at 40-41 (reporting that interrogators placed a rolled towel around Petitioner's neck as a collar, backed him up into the cell wall, and used the collar "to slam [him] against a concrete wall"). The SSCI concluded that Petitioner's interrogations "were brutal and far worse than the CIA represented to policymakers and others." SSCI Report at xii.

During the period of the creation of the videotapes, there was a videoconference in August 2002 between Detention Site Green and CIA Headquarters, in which the interrogation team described one of Petitioner's interrogation videos "as 'quite graphic' and possibly 'disturbing to some viewers.'" *Id.* at 43

n.197. After this meeting, CIA Headquarters sent two officers to the detention site to observe the use of EITs, including waterboarding, against Petitioner first-hand. *Id.* Ultimately, the "aggressive phase" of Petitioner's interrogations "ended days after the arrival of the officers from CIA Headquarters." *Id.* CIA records indicate that on August 11, 2002, personnel stated that "[v]iewing the pressures on [Petitioner] on video 'has produced strong feelings of futility (and legality) of escalating or even maintaining the pressure.' Per viewing the tapes, 'prepare for something not seen previously.'" *Id.* at 45.

### 5. The CIA's Destruction of the Videotapes Depicting Petitioner's Enhanced Interrogation Sessions

In 2003, various organizations, including the American Civil Liberties Union ("ACLU"), filed suit in the Southern District of New York under the Freedom of Information Act ("FOIA") seeking to compel federal agencies, including the CIA, to produce records concerning the treatment of detainees pursuant to the CTC Program at overseas detention facilities. *ACLU*, 827 F. Supp. 2d at 219. Despite the ninety-two videotapes being "plainly [ ] responsive to [the] plaintiffs' requests[,]" the CIA failed to identify or produce the tapes. *Id.* at 225. Instead, records indicate that there was internal discussion at the Agency about destroying the tapes as early as 2002, the same year of their creation, *id.* at 223; and in the fall of 2005,

16

there was "renewed interest at the CIA to destroy the videotapes" due to a congressional proposal "to establish an independent commission to investigate U.S. detention policies and allegations of detainee abuse," SSCI Report at 443. In addition, that same year, then-White House counsel Harriet Miers had directed Mr. Rizzo to notify her of the status of the videotapes before any action was taken with them. Ex. 4 to Pet'r's Mot., ECF No. 661-5 at 2. Although the proposal to establish the independent commission failed on November 8, 2005, SSCI Report at 444; that same day, Jose Rodriguez ("Mr. Rodriguez"), the CIA's then-Deputy Director for Operations ("DDO"), authorized officials in the field to destroy the tapes, stating in his cable that there was "no legal or OIG requirement to continue to retain the tapes[,]" Ex. 5 to Pet'r's Mot., ECF No. 661-6 at 2. Pursuant to this authorization, the next day—on November 9, 2005—all ninety-two interrogation videotapes were destroyed. Ex. 6 to Pet'r's Mot., ECF No. 661-7 at 2.

At 5:48 p.m. the next day—on November 10, 2005—an email from an individual whose identity has been redacted was sent to Kyle Dustin "Dusty" Foggo ("Mr. Foggo"), the CIA's then-Executive Director, to recount an agency "update" meeting with the Directorate of Operations ("DO") and internal CIA discussions regarding the destruction of the videotapes. *See* Ex. 2 to Pet'r's Mot., ECF No. 661-3 at 2. The email stated:

17

"Current [redacted] not wanting—smartly—to continue to be custodian of these [videotapes] was advised to send in a cable asking for guidance. He did so. Guidance just sent—cleared by [Inspector General ("IG")], DDO and [redacted]—told him to destroy. He did so." *Id.* The email then suggests that the CIA's then-acting General Counsel, Mr. Rizzo, was not notified prior to the destruction of the videotapes: "Rizzo found out today this had occurred as [sic] was upset—apparently because he had not been consulted—not sure if there was another reason. He raised at DO update but was 'calmed' (only slightly) when told [redacted] had approved." *Id.* The email further explains that Mr. Rodriguez allegedly told then-CIA Director Porter Goss, the email's sender, and another redacted individual that he "felt it was extremely important to destroy the tapes and that if there was any heat, he would take it" because "the heat from destroying is nothing compared to what it would be if the tapes ever got into public domain." *Id.* Mr. Rodriguez then allegedly said that the videotapes "out of context . . . would make [the CIA] look terrible; it would be 'devastating' to us[,]" a view with which "[a]ll in the room agreed." *Id.*

Less than two hours later, at 7:25 p.m., the same person sent another email to Mr. Foggo, stating that "on [Petitioner's] tapes—I am no longer feeling comfortable." Ex. 4 to Pet'r's Mot., ECF No. 661-5 at 2. The unidentified sender wrote:

18

> While I understand Jose's 'decision' (and
> believe the tapes were bad news) I was just
> told by Rizzo that [redacted] DID NOT concur
> on the cable—It was never discussed with him
> (this is perhaps worse news, in that we may
> have 'improperly' destroyed something). In
> fact, it is unclear now whether the IG did as
> well. Cable was apparently drafted by
> [redacted] and released by Jose; they are the
> only two names on it, so I am told by Rizzo.
> Either [redacted] lied to Jose about
> 'clearing' with [redacted] and IG (my bet) or
> Jose misstated the facts. (It is not without
> relevance that [redacted] figured prominently
> in the tapes, as [redacted] was in charge of
> [redacted] at the time and clearly would want
> the tapes destroyed.) Rizzo is clearly upset,
> because he was on the hook to notify Harriet
> Miers of the status of the tapes because it
> was she who had asked to be advised before any
> action was taken[.] Apparently Rizzo called
> Harriet this afternoon and she was livid,
> which he said was actually unusual for her.
> Rizzo does not think this is likely to just go
> away.

*Id.*

The CIA conducted a disciplinary review of Mr. Rodriguez's decision to authorize destruction of the interrogation tapes. *See* Ex. F to Resp't's Opp'n, ECF No. 665-6 at 2-9. The Agency "found fault with the performance of Mr. Rodriguez" and "issue[d] to him a letter of reprimand to remain in his official personnel file for two years." *Id.* at 4. The disciplinary review determined that Mr. Rodriguez was told "that the written record fully and accurately recorded the events depicted on the tapes" and that he was motivated not by personal gain or interest but rather by "his view that the [leak or official release of the]

19

tapes represented a threat to" the security of his officers and "the domestic and international standing of the CIA[.]" *Id.* at 5. Furthermore, Mr. Rodriguez "never denied making the decision to destroy the tapes nor did he ever attempt to cover up his decision in any way." *Id.* Nonetheless, the disciplinary review found fault with Mr. Rodriguez's decision because he "was aware that two White House Counsels, the counsel to the Vice President, the [Director of National Intelligence], the [Director of the CIA], and the [House Permanent Select Committee on Intelligence] ranking member had either expressed opposition to or reservations about the destruction of the tapes." *Id.* at 4, 7-8. The review concluded with an emphasis that CIA employees cannot "disregard the views of those above them" "because they think their view is the right one—even if it is." *Id.* at 7-8.

More than two years passed before the CIA publicly acknowledged, due to involvement from the press, "that it had both created and destroyed videotapes of detainee interrogation sessions[,]" including those involving Petitioner. *ACLU*, 827 F. Supp. 2d at 227. On December 6, 2007, then-CIA Director Michael Hayden issued a press release to the Agency's employees stating:

> The press has learned that back in 2002,
> during the initial stage of our terrorist
> detention program, [the] CIA videotaped
> interrogations, and destroyed the tapes in
> 2005. I understand that the Agency did so only
> after it was determined they were no longer of
> intelligence value and not relevant to any

> internal, legislative, or judicial inquiries
> . . . . The decision to destroy the tapes was
> made within [the] CIA itself.

Ex. H to Resp't's Opp'n, ECF No. 665-8 at 2. The press release
specifically mentioned Petitioner, stating that the CTC Program
began after his capture and that when Petitioner became "defiant
and evasive" in response to "normal questioning," it became
"imperative" to use "other [interrogation] means to obtain the
information—means that were lawful, safe, and effective" and
that "were reviewed and approved by the [DOJ] and by other
elements of the Executive Branch[,]" thereby leading the CIA to
"beg[i]n to videotape interrogations." *Id.* Director Hayden
explained that the decision to destroy the tapes "was done in
line with the law" because "[b]eyond their lack of intelligence
value—as the interrogation sessions had already been
exhaustively detailed in written channels—and the absence of any
legal or internal reason to keep them, the tapes posed a serious
security risk" to CIA personnel who had "served in the [CTC]
program[.]" *Id.* He claimed that "[i]f the story of the[] tapes
is told fairly, it will underscore those facts." *Id.*

Ultimately, the CIA's CTC Program and the Agency's
disclosure of the destruction of the interrogation tapes "set
off a series of [reports, inquiries, and] investigations [by all
three branches of the government] and litigation that lasted

years" and continues to date, including with Petitioner's habeas case and instant motion. Resp't's Opp'n, ECF No. 665 at 18.

### 6. Response to the CIA's Destruction of the Videotapes Depicting Petitioner's Enhanced Interrogation Sessions

Days after the CIA announced the destruction of the videotapes, the plaintiff organizations in the then-pending above-referenced FOIA litigation in the Southern District of New York moved to hold the CIA in civil contempt for disregarding the presiding judge's 2004 order to "produce or identify all responsive documents" in the matter, and they "sought, as part of their remedy, discovery related to the contents and destruction of the videotapes." *ACLU*, 827 F. Supp. 2d at 219, 227. The district court judge determined that the videotapes should have been produced in response to the plaintiffs' FOIA requests, but he deferred the CIA's obligation to comply with the court's order and his ruling on the contempt motion due to the initiation of a formal criminal investigation on January 2, 2008 into the destruction of the videotapes, led by John H. Durham ("Mr. Durham"), then-Deputy U.S. Attorney for the District of Connecticut (who was appointed to lead the investigation by then-Attorney General Michael Mukasey). *See id.* at 225, 227-30 (abiding by Mr. Durham's "concern that holding civil contempt proceedings simultaneously with the criminal investigation would compromise the integrity of the

22

investigation"); Ex. G to Resp't's Opp'n, ECF No. 665-7 at 5.
Mr. Durham's investigation focused on "reviewing whether any
federal criminal laws were violated in relation to the
destruction of the videotapes" and "included a review of whether
any person or persons obstructed justice, knowingly made
materially false statements, committed or suborned perjury, or
acted in contempt of court of Congress." Ex. 2 to Resp't's Opp'n
to Pet'r's Mot. for Discovery & Mot. for Sanctions, *Ex Parte*
Decl. of John H. Durham, ECF No. 406 at 118 ¶ 6.

In November 2010, Mr. Durham publicly announced that he had
concluded his investigation and would not pursue criminal
charges for the destruction of the interrogation tapes. *ACLU*,
827 F. Supp. 2d at 230. Following this determination, although
stating that the lapses of individuals at the Agency could not
excuse the CIA "in its dereliction," the Southern District of
New York judge denied the plaintiffs' motion for civil contempt
because he found that the "CIA's failure to identify or produce
the videotapes in response to [the] plaintiffs' FOIA requests
and [his] repeated orders" had already "been remedied" and that
therefore, "a finding of civil contempt at th[at] point would
serve no beneficial purpose." *Id.* at 230-31. Specifically, the
district court judge concluded that the CIA had remedied its
failure by identifying and processing, in response to his April
2009 order, 580 documents "relating to the *content* of the

23

videotapes" for the entire period of their creation—April through December 2002. *Id.* at 228-29. In addition, the CIA identified and processed 220 documents "relating to the videotapes' destruction," "in particular, the persons and reasons behind the destruction, corresponding in time to both the videotapes' creation and destruction"—the periods April 1, 2002 through June 30, 2003 and June 1, 2005 through January 31, 2006. *Id.* at 229-31. Furthermore, that judge was satisfied by "the remedial relief put in place by the CIA [following the tapes' destruction]—improved protocols for the retention of records potentially relevant to an investigation or a judicial, congressional, or administrative proceeding[,]" new document preservation and destruction protocols, and training for the Agency's attorneys on these new protocols. *Id.* at 231-32.

In addition to these contempt proceedings, following the public announcement of the CIA's destruction of the videotapes, many Guantanamo Bay detainees with then-pending habeas corpus cases filed emergency motions related to the destruction of the tapes. *See, e.g., Abdullah v. Bush*, 534 F. Supp. 2d 22, 23-25 (D.D.C. 2008). Several years earlier, the Supreme Court had determined that Guantanamo Bay detainees have habeas corpus rights of judicial review regarding the legality of their detention. *Rasul v. Bush*, 542 U.S. 466, 483-84, 124 S. Ct. 2686, 159 L. Ed. 2d 548 (2004). On February 13, 2008, in response to

court orders issued after the tapes' destruction, Respondent filed a report in all Guantanamo Bay habeas cases pending in this district court that detailed the steps taken to ensure the preservation of material relating to all detainees detained at the Guantanamo Bay Naval Base. *See, e.g.*, Resp't's Report Filed in Connection with Order of Jan. 24, 2008 (Feb. 13, 2008), *Rasul v. Bush*, No. 02-299 (CKK), ECF No. 231.

Apart from litigation-based responses to the destruction of the videotapes, in 2009, the SSCI initiated its Committee Study of the CIA's detention and interrogation program to "document[] the abuses and countless mistakes made between late 2001 and early 2009." SSCI Report at v; *see supra* note 3. On April 3, 2014, the SSCI voted to send the Committee's resulting report, which included twenty specific findings and conclusions and a nearly 500-page executive summary, to then-President Barack Obama for declassification and subsequent public release. SSCI Report at iv. Notably, the report was heavily critical of the CIA's use of EITs against detainees, concluding that the use of EITs "was not an effective means of acquiring intelligence," rested on the CIA's "inaccurate claims of their effectiveness," and resulted in interrogations that "were brutal and far worse than the CIA [outwardly] represented." *Id.* at xi-xiii (Findings and Conclusions #1, #2, and #3). The Committee additionally concluded that CIA detainees were subjected to EITs that had not

25

been approved by the DOJ or authorized by CIA Headquarters and that the CIA had "repeatedly provided inaccurate information to the [DOJ], [thereby] impeding a proper legal analysis of the [CTC Program]." *Id.* at xiii-xiv, xxi (Findings and Conclusions #5 and #14). For example, the Committee determined that "[m]uch of the information provided by the CIA to the OLC [to support its legal analysis in the DOJ OLC's August 1, 2002 memorandum] was unsupported by CIA records[,]" and as noted above, that the CIA's representations to the OLC about the EIT techniques to be used in interrogations were "inconsistent with how the techniques would later be applied." *Id.* at xiv, 410. A large portion of the SSCI Report also discusses Petitioner, the videotapes of his CIA interrogation sessions, and "inaccurate CIA representations" given to the OLC regarding Petitioner and his alleged status and role in al-Qaeda. *See id.* at xiv, 410-11.[5]

   In sum, "[t]he decision to authorize destruction of the videotapes led to intense public, congressional, Executive Branch, and judicial scrutiny in the ensuing years[,]" Resp't's Opp'n, ECF No. 665 at 8; as it was a decision that contravened

---

[5] In addition, Appendix 3 to the SSCI Report is a chart titled "Example of Inaccurate CIA Testimony to the Committee." *See* SSCI Report at 462-99. It compares excerpts of testimony from then-CIA Director Michael Hayden before the SSCI on April 12, 2007 to a sampling of information from CIA records to highlight the inaccuracies in his testimony. Much of the highlighted testimony concerns Petitioner and his interrogations. *See id.*

various requests between 2003 and 2005 encompassing the

identification, production, and/or preservation of the

videotapes, including from the White House, the 9/11 Commission,

members of Congress, federal judges, and private litigants, *see*

Pet'r's Mot., ECF No. 661 at 9, 24-25. As a result, Respondent

claims that the CIA and its former DDO "have been held to

account by every branch of government for the destruction of the

videotapes" depicting Petitioner's interrogation sessions and

that the Agency "has committed to and remains committed to never

again operating such a program of [EITs]." Resp't's Opp'n, ECF

No. 665 at 8.

### B. Procedural Background

Petitioner filed the instant habeas corpus case on August

6, 2008, nearly three years after the destruction of the

interrogation tapes on November 9, 2005. *See* Pet. for Writ of

Habeas Corpus, ECF No. 1. On April 3, 2009, Respondent filed the

initial factual return outlining the legal justification for

Petitioner's detention at Guantanamo Bay, *see* ECF Nos. 136, 369;

and on March 29, 2017, Respondent filed an updated public

version of the factual return disclosing additional material

regarding Petitioner's detention, *see* ECF No. 474. The factual

return states:

> [Petitioner] was a part of and substantially
> supported al-Qaida and associated forces,
> including based on evidence that he

> facilitated travel for and provided other
> assistance to recruits so they could receive
> terrorist training; facilitated at least one
> large financial transaction for terrorism
> activities; maintained a close relationship
> with and actively supported Usama Bin Laden [
> ]; actively associated with enemy forces and
> directly aided enemy forces engaged in
> hostilities in Afghanistan after the [U.S.]
> invasion; facilitated the retreat and escape
> of enemy forces out of Afghanistan after the
> [U.S.] invasion; was captured harboring
> several terrorists; and plotted future
> terrorist operations. Consequently, for these
> and other reasons, [Petitioner] is lawfully
> subject to detention pursuant to the
> Authorization for the Use of Military Force
> and the laws of war.

Factual Return for Abu Zubaydah (ISN 10016), ECF No. 474-1 at

24-25 ¶ 1. Respondent alleges that this factual return "does not

rely on any post-capture custodial statements from Petitioner,

whether from his time in CIA or in [Department of Defense

[("DoD")] custody" but rather "on statements and documents

Petitioner made prior to his capture (*e.g.*, diaries and videos)

and evidence from persons or sources other than Petitioner."

Resp't's Opp'n, ECF No. 665 at 12-13 (citing Factual Return for

Abu Zubaydah (ISN 10016), ECF No. 474-1 at 30 ¶ 20 n.2).

Throughout this litigation, Petitioner has contested

Respondent's justifications for his detention and argues that he

has been detained for more than twenty years, without any

charge, "on the basis of an overstated and ill-informed

assessment that he poses a threat to the [U.S.,]" a contention

he claims would have been supported by the now-destroyed interrogation tapes. Pet'r's Mot., ECF No. 661 at 9-10.

Petitioner initially moved for sanctions against Respondent alleging the CIA's intentional spoliation of the video evidence on September 21, 2009, *see* ECF Nos. 217-18, 355-56; and on November 20, 2009, he filed an unopposed motion for leave to file a corrected memorandum of law in support of this motion, *see* ECF Nos. 401-02 (Parts 1 and 2 of this motion). Then, on June 28, 2010, Petitioner moved to supplement his motion for sanctions for the spoliation of evidence. *See* ECF Nos. 250, 359. In one of Respondent's opposition briefings in response to Petitioner's motions for sanctions—dated October 27, 2009— Respondent asked the Court to stay any "evidentiary proceedings into the grounds for Petitioner's motion[s] because such proceedings could interfere with [Mr. Durham's] ongoing criminal investigation into the destruction of the interrogation tapes at issue." *See* ECF No. 406 at 2-3, 115-21 (Mr. Durham's *ex parte* declaration, dated October 26, 2009).

On May 31, 2023, "[i]n view of [ ] changes to Petitioner's legal team," the Court ordered Petitioner to file "a status report informing the Court whether [he] seeks to replace Motion for Sanctions for the Spoliation of Evidence, ECF No. 401; and/or Motion to Supplement Motion for Sanctions for the Spoliation of Evidence, ECF No. 359." Min. Order (May 31, 2023).

The Court further ordered Respondent to file "a status report regarding the results of [Mr. Durham's] criminal investigation into the destruction of the videotapes." *Id.* In response to the Court's order, on June 23, 2023, the parties filed a joint status report, in which Respondent informed the Court that Mr. Durham had concluded in November 2010 that he would not pursue criminal charges for the CIA's destruction of the videotapes, and Petitioner "request[ed] leave to amend his motions for sanctions related to the spoliation of evidence to the limited extent that he seeks an adverse inference as to the content of the spoliated evidence" because the "[t]he motions as currently formulated seek only additional discovery" from Respondent. Joint Status Report, ECF No. 644 at 1-2. As a result, on June 27, 2023, the Court denied without prejudice Petitioner's earlier motions for sanctions for the spoliation of evidence, *see* ECF Nos. 359, 401; so that Petitioner could file a "single, consolidated, superseding briefing on this issue[,]" Min. Order (June 27, 2023).

On September 29, 2023, Petitioner filed his superseding motion for sanctions for the spoliation of evidence, *see* Pet'r's Mot., ECF No. 661; along with supporting exhibits, including internal CIA documents and Petitioner's handwritten declaration detailing his detention and interrogation by the CIA, *see* Ex. 1 to Pet'r's Mot., Decl. of Zayn al Abidin Muhammed Husayn

[hereinafter "Pet'r's Decl."], ECF No. 661-2.[6] In his motion, Petitioner asks the Court to impose sanctions for the CIA's deliberate spoliation of the interrogation tapes by making various adverse inferential findings regarding the content of the tapes and by compelling the government to produce additional discovery. Pet'r's Mot., ECF No. 661 at 10. On November 17, 2023, Respondent filed his opposition to Petitioner's superseding motion, accompanied by supporting exhibits. *See* Resp't's Opp'n, ECF No. 665. Respondent asks the Court to deny Petitioner's "overbroad and unduly burdensome" proposed sanctions and to instead adopt Respondent's proposed evidentiary alternatives, which include producing contemporaneous documents about the interrogations depicted on the tapes and proposing that he be precluded from opposing or rebutting Petitioner's evidence about the content of the tapes. *See id.* at 8-11, 27-34. Petitioner filed his reply (and two exhibits) to Respondent's opposition on December 1, 2023. *See* Pet'r's Reply, ECF No. 666.

On December 8, 2023, Respondent filed a motion for leave to file a sur-reply in response "to the new relief requested by Petitioner in his Reply in Support of Petitioner's Superseding Motion for Sanctions." Resp't's Mot. for Leave to File Sur-

---

[6] Petitioner's handwritten declaration, in addition to a typed version of it, was initially appended as an exhibit to his original motion for sanctions for the spoliation of evidence filed on September 21, 2009. *See* ECF No. 356 at 23-44.

Reply, ECF No. 667 at 1. Respondent argued that a sur-reply "would be helpful to the Court's resolution of Petitioner's [sanctions] motion" since "Petitioner's reply significantly modifies the discovery relief that Petitioner seeks for the destruction of the CIA videotapes." *Id.* at 2-3. On December 11, 2023, the Court granted, over objection for good cause shown, Respondent's motion for leave to file a sur-reply, Min. Order (Dec. 11, 2023); thereby deeming as filed Respondent's sur-reply in opposition to Petitioner's superseding motion for sanctions, *see* Resp't's Sur-Reply, ECF No. 667-2 (appended as an exhibit to Respondent's motion for leave to file a sur-reply). Petitioner filed a response to Respondent's sur-reply on December 26, 2023. *See* Pet'r's Resp. in Further Support of Mot. for Sanctions ("Pet'r's Resp."), ECF No. 669.

Accordingly, Petitioner's superseding motion for sanctions alleging the CIA's intentional spoliation of evidence is now ripe and ready for the Court's adjudication.

## III. Legal Standard

"Once a party anticipates that it will be subject to litigation, the party has a duty to preserve any evidence that may be potentially relevant." *Clarke v. Wash. Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 19-20 (D.D.C. 2012), *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013); *see also Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1481 (D.C. Cir. 1995) (explaining that

a litigant has an obligation to preserve documents "it knew or
reasonably should have known were relevant to the [ ] litigation
if it knew the destruction . . . of those documents would
prejudice the [opposing party]"). If a party fails to preserve
relevant evidence, it "'runs the risk of being justly accused of
spoliation'—defined as 'the destruction or material alteration
of evidence or the failure to preserve property for another's
use as evidence in pending or reasonably foreseeable
litigation'—and find itself the subject of sanctions." *Clarke*,
904 F. Supp. 2d at 20 (quoting *D'Onofrio v. SFX Sports Grp.,
Inc.*, No. 06-687, 2010 WL 3324964, at *5 & n.5 (D.D.C. Aug. 24,
2010)). The Court of Appeals for the District of Columbia
Circuit ("D.C. Circuit") has recognized the "inherent power" of
federal courts "to sanction attorney or party misconduct,"
including "where [a] defendant has destroyed potentially
relevant evidence[,]" so as "to achieve the orderly and
expeditious disposition of cases" and enforce "our judicial
system's strong presumption in favor of adjudications on the
merits[.]" *Shepherd*, 62 F.3d at 1474-75 (citations and internal
quotation marks omitted); *Gerlich v. U.S. Dep't of Just.*, 711
F.3d 161, 170 (D.C. Cir. 2013).

Courts have a wide variety of tools at their disposal to
employ as sanctions, which can be divided into two categories:
(1) punitive or penal sanctions; and (2) issue-related

sanctions. *Clarke*, 904 F. Supp. 2d at 20. The former penal category includes dismissals, default judgments, contempt orders, awards of attorneys' fees, and the imposition of fines— all of which must be proven by "clear and convincing evidence of the predicate misconduct[,]" *Shepherd*, 62 F.3d at 1478; while the latter issue-related sanctions "are targeted to remedy the precise evidentiary issue; for example, a party who fails to retain evidence may be precluded from introducing types of evidence, or the jury may draw an adverse inference from the missing evidence[,]" *Clarke*, 904 F. Supp. 2d at 20. "Because issue-related sanctions are fundamentally remedial rather than punitive and do not preclude a trial on the merits, . . . a district court may impose [them] whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Shepherd*, 62 F.3d at 1478.

Courts in the D.C. Circuit employ a three-part test to determine whether "[a]n issue-related sanction, such as an adverse inference, is warranted" for the destruction of evidence:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could

34

> conclude that the lost evidence would have
> supported the claims or defense of the party
> that sought it.

*Clarke*, 904 F. Supp. 2d at 21 (quoting *Mazloum v. Dist. of Columbia Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008)).

Once the moving party has proven that: (1) the party who destroyed the evidence had a "duty to preserve" it and (2) a "culpable state of mind" in doing so; and (3) the destroyed evidence was "relevant to the contested issue[,]" *Gerlich*, 711 F.3d at 170-71; *Mazloum*, 530 F. Supp. 2d at 291; the court must then "select[] the appropriate sanction"—ensuring that the "'gravity'" of the chosen sanction "'corresponds to the misconduct[,]'" *Davis v. Dist. of Columbia Child & Fam. Servs. Agency*, 304 F.R.D. 51, 60 (D.D.C. 2014) (quoting *Shepherd*, 62 F.3d at 1479). "'[T]he choice of an appropriate sanction is necessarily a highly fact-based determination,'" *Shealayno'sun v. McCarthy*, No. 18-0746, 2021 WL 39620, at *5 (D.D.C. Jan. 5, 2021) (quoting *Bonds v. Dist. of Columbia*, 93 F.3d 801, 804 (D.C. Cir. 1996)), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2453, 138 L. Ed. 2d 211 (1997); and is focused on "plac[ing] the innocent party in the same position he would have been in had the evidence not been destroyed by the offending party[,]" *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998).

## IV.  Analysis

Petitioner's superseding motion for sanctions for the spoliation of evidence—which "consolidat[es] his prior applications and add[s] additional requests for relief"—seeks issue-related sanctions (as opposed to penal sanctions) in the form of adverse inferential findings and compelled discovery, Pet'r's Mot., ECF No. 661 at 10; the specifics of which are discussed in further detail below, *see infra* section IV.B.

The Court addresses Petitioner's motion in two parts. First, the Court analyzes each of the three elements of the D.C. Circuit's test for determining whether an issue-related sanction is warranted based on the CIA's destruction of the ninety videotapes depicting Petitioner's interrogation sessions, specifically whether: (1) the CIA had an obligation to preserve the tapes; (2) the CIA intentionally destroyed the tapes with a culpable state of mind; and (3) the tapes' destruction deprived Petitioner of relevant evidence to the claims advanced in his habeas corpus case. *See Clarke*, 904 F. Supp. 2d at 21. Second, the Court assesses the parties' differing proposed evidentiary remedies for the destruction of the interrogation tapes and their supporting arguments before ultimately selecting the appropriate sanctions to impose for the CIA's spoliation of the video evidence. *See Shealayno'sun*, 2021 WL 39620, at *5.

### A. The Parties Agree That the Court May Impose Appropriate Sanctions for the CIA's Intentional Spoliation of Petitioner's Interrogation Videotapes

The Court's first inquiry—whether an issue-related sanction is warranted for the CIA's destruction of Petitioner's interrogation videotapes—is straightforward because Respondent has stated that he "does not dispute that the Court may impose an appropriate evidentiary remedy for [the] destruction of the interrogation videotapes." Resp't's Opp'n, ECF No. 665 at 20. Respondent either "acknowledges" or has expressed an intent not to "relitigate" all three elements of this circuit's test for assessing the appropriateness of an issue-related sanction for the destruction of evidence. *See id.* at 21-27.

### 1. The CIA Had an Obligation to Preserve Petitioner's Interrogation Videotapes

First, Respondent has stated his desire not to "relitigate the determination in the [above referenced] ACLU FOIA case [in the Southern District of New York] of the CIA's duty to preserve the interrogation videotapes." *Id.* at 21. As discussed, in that case, the district court judge concluded that the CIA "had the obligation to identify or produce the videotapes" in response to his "repeated orders that the CIA search for, review, and either identify or produce responsive records" to the plaintiffs' 2003 and 2004 FOIA requests regarding the treatment of detainees at overseas detention facilities following 9/11. *ACLU*, 827 F. Supp.

37

2d at 225, 231. That judge further explained that the ninety-two videotapes, including those depicting the use of EITs against Petitioner, "plainly were responsive to [the] plaintiffs' requests" and were subject to FOIA disclosure since they fell within the scope of the investigation exception to the CIA Information Act— 50 U.S.C. § 431(c)(3)—because the tapes concerned "the specific subject matter of an investigation by the [OIG] into any impropriety or illegality in the conduct of an intelligence activity." *Id.* at 225 (citation and internal quotation marks omitted). Based on these conclusions "in connection with the FOIA litigation in the Southern District of New York[,]" Respondent concedes that the Court may find in this case, too, that the CIA had a duty to preserve the videotapes. Resp't's Opp'n, ECF No. 665 at 23.[7] Accordingly, the Court

---

[7] As Respondent notes, Petitioner raises "other disputed theories about the source of the [CIA's] preservation obligation[,]" Resp't's Opp'n, ECF No. 665 at 23; including that "[l]itigation involving the Video Evidence was reasonably anticipated following" the Supreme Court's 2004 decision in *Rasul v. Bush*, 542 U.S. 466, 124 S. Ct. 2686, 159 L. Ed. 2d 548 (2004); the entry of preservation orders between March 7 and July 18, 2005 in other Guantanamo Bay habeas cases in this district court; the OIG's review of the CTC Program resulting in its 2004 Special Review Report; and other "preservation instructions from Congress, the 9/11 Commission, and the White House Counsel's Office," *see* Pet'r's Mot., ECF No. 661 at 9, 32-33; Pet'r's Reply, ECF No. 666 at 4-5. Respondent raises compelling arguments for negating these arguments, notably that: (1) Petitioner was not a detainee at Guantanamo Bay in 2004 when the Supreme Court decided *Rasul* or in 2005 when preservation orders were entered in other Guantanamo Bay habeas cases; and (2) the destruction of the videotapes "did not violate any order or

concludes that the Agency, having had control over Petitioner's interrogation tapes in 2005, had an existing obligation to preserve them when they were destroyed, and that the first element of the issue-related sanctions test is therefore met.

### 2. The CIA Intentionally Destroyed Petitioner's Interrogation Videotapes with a Culpable State of Mind

Second, Respondent "acknowledges" and "does not dispute" that Petitioner's interrogation videotapes were intentionally destroyed with the requisite "culpable state of mind." Resp't's Opp'n, ECF No. 665 at 23-24. Courts in this district "have found that 'bad faith' destruction or concealment of evidence" is one such culpable state of mind for the imposition of issue-related sanctions, which "encompasses both 'deliberate' destruction or concealment, and destruction or concealment with 'reckless disregard' for the relevance of the evidence." *More v. Snow*, 480 F. Supp. 2d 257, 274-75 (D.D.C. 2007) (citations omitted). Even "negligent spoliation suffices" as a culpable state of mind, *i.e.*, when the destruction was not "purposeful." *Mahaffey v. Marriot Int'l, Inc.*, 898 F. Supp. 2d 54, 61 (D.D.C. 2012).

---

preservation obligation in this case"—which was filed three years after the CIA destroyed the tapes. *See* Resp't's Opp'n, ECF No. 665 at 21-22. Regardless, the Court agrees with Respondent that there is no need to address Petitioner's other arguments regarding the source of the CIA's preservation obligation since "the issue can be resolved on more narrow grounds for purposes of this case" using the conclusions from the FOIA litigation in the Southern District of New York. *See id.* at 22-23.

Here, rather than make "excuses," Pet'r's Mot., ECF No. 661 at 35; the CIA has conceded "that the tapes were not destroyed because of an inadvertent routine or automatic document retention process" but because "Mr. Rodriguez intentionally authorized destruction of the videotapes with awareness that senior government officials had expressed opposition to or reservations about the destruction[,]" Resp't's Opp'n, ECF No. 665 at 24; *see, e.g.*, Ex. 5 to Pet'r's Mot., ECF No. 661-6 at 2 (CIA cable from Mr. Rodriguez authorizing destruction of the videotapes); Ex. 2 to Pet'r's Mot., ECF No. 661-3 at 2 (CIA cable recounting Mr. Rodriguez's statement that he would take "any heat" for destroying the tapes since it would be "nothing compared to what it would be if the tapes ever got into public domain"); Ex. 4 to Pet'r's Mot., ECF No. 661-5 at 2 (CIA cable expressing concern that the destruction was ordered through deception: "Either [redacted] lied to Jose about 'clearing' with [redacted] and IG (my bet) or Jose misstated the facts."); Ex. F to Resp't's Opp'n, ECF No. 665-6 at 4, 7-8 (CIA's disciplinary review finding fault with Mr. Rodriguez's decision to authorize destruction of the tapes because he did so despite awareness of opposition or concern from "two White House Counsels, the counsel to the Vice President, the [Director of National Intelligence], the [Director of the CIA], and the [House Permanent Select Committee on Intelligence] ranking member").

Accordingly, the Court concludes that the CIA deliberately destroyed Petitioner's interrogation tapes in 2005 with the requisite culpable state of mind, and that the second element of the issue-related sanctions test is therefore met.

### 3. The CIA's Destruction of Petitioner's Interrogation Videotapes Deprived Him of Relevant Evidence to the Claims Advanced in His Habeas Corpus Case

Third, the final element required for a court to impose an issue-related sanction "is a showing that the destroyed evidence was relevant to the moving party's claims or defenses[,]" which in this context, "encompasses not only the ordinary meaning of the term ['relevance'], but also that the destroyed evidence would have been favorable to the movant." *Zhi Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7, 14 (D.D.C. 2011) (citation and some internal quotation marks omitted). Although Respondent contends that the "[t]he relevance of the videotapes to this habeas case must be considered within the evidentiary context of Respondent's basis for Petitioner's detention"—which, as set out in the factual return, "does not rely on any statements Petitioner made while in CIA or DoD custody" but rather on statements he made prior to his detention (*e.g.*, his handwritten diaries and a video recording before his capture) and "evidence from persons or sources other than Petitioner"—Respondent nonetheless "concedes for the purposes of this case" the

41

relevance of the destroyed interrogation tapes. *See* Resp't's Opp'n, ECF No. 665 at 24-27.

Specifically, "Respondent acknowledges [that] the videotapes depicted relevant information, as interpreted by this Court's [May 24, 2021] discovery order[,]" *id.* at 24; which ordered Respondent to produce Petitioner's "exculpatory statements to the government, including evidence revealing the method and manner of the '[EITs]' employed on Petitioner when such statements were made[,]" *see Husayn v. Austin*, No. 08-1360 (EGS), 2021 WL 2073439, at *6-7 (D.D.C. May 24, 2021) (stating that "the circumstances under which Petitioner made these statements are part and parcel of [the] statements themselves" and that "it is clear that Petitioner is entitled to this information").[8] In accordance with the Court's order, in September 2021, Respondent began producing on a rolling basis agency documents memorializing Petitioner's exculpatory statements "addressing myriad topics while in CIA custody following his capture in March 2002 until his transfer to DoD custody in September 2006." *See, e.g.*, Joint Status Report, ECF No. 604 at 1-2 (reporting production of 650 such documents totaling 2,700 pages); Resp't's Unopposed Mot. for Extension of Time to Complete Production of Certain Classified Docs., ECF No.

---

[8] This Memorandum Opinion and Order is docketed at ECF No. 573.

659 at 1-2 (reporting production of over 3,000 pages of such documents). Therefore, since the Court previously concluded in its discovery order that Petitioner's exculpatory statements and the circumstances under which they were made are "discoverable information in this case, Respondent acknowledges that the 'relevance' element is satisfied[,]"—namely because "the videotapes would have depicted at least some relevant statements Petitioner made during recorded interrogation sessions, including any denials he made about his connection to terrorist activities" and his knowledge regarding "'[al Qaeda] operatives in, or future attacks against, the [U.S.]'" Resp't's Opp'n, ECF No. 665 at 25-27 (quoting SSCI Report at 46-47); *see also* Pet'r's Mot., ECF No. 661 at 37-39 (arguing that the content of the tapes would have relevantly "shown the exact circumstances of Petitioner's detention and torture," during which he "repeatedly den[ied] allegations that he was an al Qaeda operative or . . . that he played a role in unlawful acts against the [U.S.]").

Accordingly, the Court concludes that the CIA's destruction of Petitioner's interrogation tapes in 2005 deprived him of relevant evidence to the claims advanced in his habeas corpus case, and that the third and final element of the issue-related

sanctions test is therefore met.[9] Because both the parties and the Court agree that all three elements of this test "are satisfied in this case[,]" Resp't's Opp'n, ECF No. 665 at 27; Pet'r's Reply, ECF No. 666 at 3; the Court concludes that it may impose appropriate issue-related sanctions for the CIA's intentional destruction and spoliation of the ninety videotapes depicting Petitioner's interrogation sessions by the Agency.

### B. The Court Imposes Appropriate Issue-Related Sanctions for the CIA's Intentional Spoliation of Petitioner's Interrogation Videotape Evidence

Given that issue-related sanctions are warranted, the only remaining issue is the appropriate remedy for the CIA's deliberate misconduct in destroying the videotapes of Petitioner's interrogation sessions, including those which depicted the Agency's use of EITs against him.

---

[9] As Respondent notes, Petitioner raises other broader theories for "why the videotapes are relevant to the legality of Petitioner's detention," Resp't's Opp'n, ECF No. 665 at 26; including that "statements given under duress of torture and the threat of future torture are relevant in determining the exculpatory nature of statements made by the torture subject[,]" Pet'r's Mot., ECF No. 661 at 38. The parties seemingly continue to disagree on "[w]hether the circumstances [of Petitioner's interrogations] make the statements more or less reliable," *Husayn v. Austin*, No. 08-1360 (EGS), 2021 WL 2073439, at *7 (D.D.C. May 24, 2021); *compare* Pet'r's Mot., ECF No. 661 at 38-39 & n.38, *with* Resp't's Opp'n, ECF No. 665 at 26-27 n.7; but regardless, the Court maintains its earlier position that this "is something the parties can argue about at a later time," *Husayn*, 2021 WL 2073439, at *7. Despite the parties' disagreement on that issue, they both agree that the relevance element of the issue-related sanctions test is met here.

A "primary aspect" of a court's inherent power to impose sanctions "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). This potent judicial authority "must be exercised with restraint and discretion[,]" *id.* at 44; such that "the district court must properly 'calibrate the scales' to ensure that the gravity of an inherent power sanction corresponds to the misconduct[,]" *Shepherd*, 62 F.2d at 1479; *see also Bonds*, 93 F.3d at 808 (emphasizing that "[t]he choice of sanction should be guided by the 'concept of proportionality' between offense and sanction"). "The graver the sanction under consideration, the more precision this calibration requires[,]" and in so "calibrating the scales," the district court "should carefully balance the policy favoring adjudication on the merits with competing policies such as the need to maintain institutional integrity and the desirability of deterring future misconduct." *Shepherd*, 62 F.2d at 1478-79 (citation and internal quotation marks omitted).

As a result, the court's election of an appropriate sanction "is necessarily a highly fact-based determination," *Bonds*, 93 F.3d at 804; and should include consideration of "the degree of negligence or bad faith involved, the importance of the evidence involved, the importance of the evidence lost to

the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point[,]" *More*, 480 F. Supp. 2d at 275 (citation and internal quotation marks omitted). The goal in selecting "an appropriate response to the particular misconduct," *Shepherd*, 62 F.3d at 1475; is "to restore the accuracy of the original trial[,]" Jamie S. Gorelick *et al.*, DESTRUCTION OF EVIDENCE § 3.15, at 114 (1989); and to "restor[e] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party[,]" *Kronisch*, 150 F.3d at 126.

Here, for the CIA's intentional spoliation of the videotapes, Petitioner seeks "issue-related inherent power sanction[s]," *Shepherd*, 62 F.3d at 1484; in the form of adverse inferences and a court order requiring Respondent to respond to and produce Petitioner's specific, additional discovery requests as enumerated in his "original spoliation motions," *see* Pet'r's Mot., ECF No. 661 at 10, 39-40; Pet'r's [Proposed] Order, ECF No. 661-8 at 1-2. Respondent "disagrees with Petitioner's proposed adverse inferences and discovery sanctions as overbroad, unduly burdensome, and contrary to accepted remedial measures[,]" and instead proposes two sanctions that he claims are "tailored evidentiary measures[ that] attempt to reconstruct the information on the videotapes in the light most favorable to Petitioner." Resp't's Opp'n, ECF No. 665 at 27. These sanctions

46

would entail Respondent producing contemporaneous documents reflecting the content of the tapes and agreeing to be precluded from the admission of evidence rebutting Petitioner's evidence and testimony about the interrogations depicted on the tapes. *See id.* at 9-10, 28-34. Accordingly, the Court addresses the parties' proposed evidentiary remedial measures in turn below before arriving at the properly calibrated sanctions for the CIA's deliberate spoliation of the videotape evidence.

### 1. The Court Rejects Petitioner's Nine Proposed Adverse Inferences as Inappropriate Findings of Fact and Conclusions of Law

Petitioner's first proposed sanction is "an *evidentiary* sanction—namely, that the factfinder should draw certain adverse inferences." *Ashraf-Hassan v. Embassy of Fr. in the U.S.*, 130 F. Supp. 3d 337, 340 (D.D.C. 2015) (emphasis in original). He proposes nine "adverse inferential findings concerning the content of the destroyed Video Evidence, as set forth in the [attached] Proposed Order." Pet'r's Mot., ECF No. 661 at 10. Petitioner's nine proposed "inferential findings" that he contends the Court should grant "for the purpose of this case and any other related proceeding" are quoted in full below:

> (a) During the course of his interrogations, [Petitioner] provided no information that would support the view that he was a high-ranking member of al Qaeda, had ever been involved with any attacks on the U.S., or had any plans to attack the U.S.

47

(b)   At no time while his interrogation was being videotaped did [Petitioner] withhold intelligence regarding the identities of al Qaeda personnel in the U.S. and/or planned al Qaeda attacks on the U.S. and/or to its interests.

(c)   [Petitioner] was never a member of al Qaeda.

(d)   [Petitioner] never supported al Qaeda's operations against the U.S. or Americans.

(e)   [Petitioner] had no knowledge of any post-9/11 attack planned against the U.S.

(f)   Information provided by [Petitioner] to U.S. interrogators regarding al Qaeda was limited to information then commonly known to many people in Afghanistan, and is not evidence of any link or affiliation with terrorism.

(g)   [Petitioner] willingly spoke to U.S. Government interrogators, and never attempted to withhold information from them.

(h)   The Video Evidence depicted that the interrogation team used unauthorized, improvised, inhumane, and undocumented detention and interrogation techniques against [Petitioner].

(i)   The Video Evidence depicted interrogations that were so physically and psychologically brutal that it was difficult to watch.

Pet'r's [Proposed] Order, ECF No. 661-8 at 1-2 ¶¶ (a)-(i).

Petitioner urges the Court to adopt these inferences because he claims they are supported by his "own first-person account," as detailed in his declaration, *see* Pet'r's Decl., ECF No. 661-2;

which "[i]n the absence of the Video Evidence," "provides the
best indicator of the content" of the tapes and what occurred
during his interrogations, Pet'r's Mot., ECF No. 661 at 27.

The D.C. Circuit "has recognized that a negative inference
may be justified where the defendant has destroyed potentially
relevant evidence." *Gerlich*, 711 F.3d at 170 (citing *Talavera v.
Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011); *Webb v. Dist. of
Columbia*, 146 F.3d 964, 972-73 (D.C. Cir. 1998); *Shepherd*, 62
F.3d at 1475). In such circumstances, an adverse inference is an
"evidentiary presumption that the destroyed documents contained
favorable evidence for the party prejudiced by their
destruction." *Talavera*, 638 F.3d at 311; *see also D'Onofrio*,
2010 WL 3324964, at *6 (stating that an adverse inference means
"to infer from evidence that was not produced that its
production would have been harmful to the non-producing party").
Thus, here, were the Court to draw an adverse inference as a
sanction for the CIA's intentional spoliation of evidence, it
would mean presuming that the destroyed videotapes contained
favorable evidence for Petitioner, as the prejudiced party, and
unfavorable evidence for Respondent, as the spoliating party.

Contrary to this traditional definition of an adverse
inference, the Court agrees with Respondent that Petitioner's
Proposed Order asks the Court "to issue nine sweeping
categorical 'find[ings]'" that are "tantamount" to the Court

49

making "overbroad factual and legal findings before [it] has received evidence or argument for purposes of resolving the merits of this case." Resp't's Opp'n, ECF No. 665 at 35-36.

First, Petitioner's Proposed Order states that the adverse inferential findings would be binding "for the purpose of this case and any other related proceeding[.]" Pet'r's [Proposed] Order, ECF No. 661-8 at 1. As Respondent correctly notes, Petitioner has provided no authority to support his claim that the Court can "bind non-parties or courts in this or other jurisdictions through an adverse inference in this habeas case." Resp't's Opp'n, ECF No. 665 at 39; *see In re Exec. Off. of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district[.]" (internal citations and quotation marks omitted)).

Second, several of Petitioner's proposed adverse inferences ask the Court to presume matters both beyond information that could have been found on the destroyed videotapes and beyond the time frame of Petitioner's interrogation sessions that were recorded—April to December 2002. For example, one of the proposed inferences asks the Court to presume that the information Petitioner provided to CIA interrogators regarding al-Qaeda was "limited to information then commonly known to many people in Afghanistan, and is not evidence of any link or

affiliation with terrorism." Pet'r's [Proposed] Order, ECF No. 661-8 at 2 ¶ (f). Respondent argues, and the Court agrees, that "[t]he videotapes could not have said anything about what the average Afghan citizen knew of Al-Qaida and its operational activities in the late 1990s and early 2000s." Resp't's Opp'n, ECF No. 665 at 40. Next, other proposed inferences ask the Court to presume that, Petitioner has always "willingly spoke[n] to U.S. Government interrogators, and [has] never attempted to withhold information from them[,]" and that he has never, during the entire "course of his interrogations," provided "information that would support the view that he was a high-ranking member of al-Qaeda . . . [or] involved with any attacks on the U.S." Pet'r's [Proposed] Order, ECF No. 661-8 at 1-2 ¶¶ (a), (g). However, the phrasing of these inferences aim to extend their conclusory effect beyond "the limited dates when [Petitioner's] interrogations were recorded on the video[tapes]." Resp't's Opp'n, ECF No. 665 at 41.

Third, two of Petitioner's proposed inferences ask the Court to make conclusions that are irrelevant to its instant sanctions determinations. Specifically, one of the proposed inferences asks the Court to presume that the videotapes depicted "unauthorized, improvised, inhumane, and undocumented detention and interrogation techniques." Pet'r's [Proposed] Order, ECF No. 661-8 at 2 ¶ (h). The Court views this inference

as a request for a legal determination regarding the Agency's use of EITs against Petitioner, but as Respondent correctly argues, "[t]he legality of the CIA's [EITs] is not before the Court in this case because Respondent is not relying on any of Petitioner's custodial statements to support his detention" and therefore, the legality of his detention "does not turn on any legal determinations about the lawfulness of the circumstances of Petitioner's interrogations" or his treatment by the CIA. Resp't's Opp'n, ECF No. 665 at 25, 41. Relatedly, Petitioner's last proposed inference asks the Court to presume subjective feelings and emotions regarding the content of the destroyed tapes, namely that they "depicted interrogations that were so physically and psychologically brutal that it was difficult to watch." Pet'r's [Proposed] Order, ECF No. 661-8 at 2 ¶ (i). Such a determination, apart from being subjective to an individual viewer, is also irrelevant to the legality of Petitioner's detention as stated in Respondent's factual return, which again, "relies exclusively on statements Petitioner made prior to his detention . . . and evidence from persons or sources other than Petitioner." Resp't's Opp'n, ECF No. 665 at 25.

Fourth, and most importantly, several of Petitioner's remaining proposed inferences are directed at resolving the ultimate merits issue in this case—whether Petitioner is lawfully detained because the government has proven by a

52

preponderance of the evidence that he is a "'person who was part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the [U.S.]'" *Ali v. Obama*, 736 F.3d 542, 544 & n.1 (D.C. Cir. 2013) (quoting National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011), and setting forth the standard for legality of detention); *see also Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010) (stating that the Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001), authorizes the government "to detain, at the least, any individual who is functionally part of al Qaeda").

Specifically, Petitioner proposes that from Respondent's destruction of the interrogation tapes, the Court should infer, prior to any evidentiary hearing in this case, that Petitioner: (1) "was never a member of al Qaeda[;]" (2) "never supported al Qaeda's operations against the U.S. or Americans[;]" and (3) "had no knowledge of any post-9/11 attack planned against the U.S." Pet'r's [Proposed] Order, ECF No. 661-8 at 2 ¶¶ (c)-(e). Although characterized as "adverse inferences," the Court agrees with Respondent that these are actually proposed findings of fact and conclusions of law that would act "as the functional equivalent of judgment in Petitioner's favor by conclusively resolving Petitioner's connection to Al-Qaida and prohibiting

Respondent from offering any evidence to the contrary." Resp't's Opp'n, ECF No. 665 at 39. The Court views Petitioner's "backdoor" attempt at final judgment, *id.;* as entirely inappropriate at this stage in the litigation, especially since Respondent does not, as noted above, rely on Petitioner's custodial statements in the factual return, and because the Court has yet to hold a merits hearing regarding the legality of Petitioner's detention. And as Respondent points out, Petitioner has proffered no caselaw to suggest that the Court may "take the extraordinary step of making *ex ante* findings of fact and law prior to a merits hearing, particularly when Petitioner has never filed a Traverse setting forth his reasons for habeas relief." *Id.* at 36-37; *see Al Bihani v. Bush*, 588 F. Supp. 2d 19, 21 (D.D.C. 2008) (explaining that "[t]he petitioner shall file a traverse in response to the Government's return[,]" which should "include, at a minimum, the relevant facts in support of the petition [for writ of habeas corpus] and a succinct rebuttal of the Government's legal justification for detention").

Instead, Petitioner claims that his proposed adverse inferences are "appropriate here" because they are "a measure intended to be [limited and] remedial in nature." Pet'r's Mot., ECF No. 661 at 39; Pet'r's Reply, ECF No. 666 at 6. Contrary to his claims, however, Petitioner's broad proposed adverse inferences are more punitive than "remedial in nature" because

they ask the Court to make conclusive findings on key disputed
issues prior to an evidentiary hearing that, as discussed above,
"sweep far beyond" the probable timeline of and content depicted
on the destroyed interrogation tapes. Resp't's Opp'n, ECF No.
665 at 41. In addition, as Respondent notes and the Court
agrees, many of the proposed inferential findings touch on
"Petitioner's mental state and subjective motivations," for
example his "knowledge" of attacks planned against the U.S. and
his "willing[ness]" to speak with interrogators—matters which
are better suited to the Court's review of the totality of the
evidence, which would include Petitioner's own handwritten
diaries and video recordings. *Id.* (citing Pet'r's [Proposed]
Order, ECF No. 661-8 at 2 ¶¶ (e), (g)). Petitioner's approach is
therefore contrary to the D.C. Circuit's instruction to district
courts that they must "consider all of the evidence taken as a
whole" in deciding the legality of a prisoner's detention in
Guantanamo Bay habeas cases. *See Awad v. Obama*, 608 F.3d 1, 7, 9
(D.C. Cir. 2010) (asking "whether the district court, in light
of *all* of the evidence, made an erroneous finding that [the
petitioner] was 'part of' al Qaeda"); *Al-Adahi v. Obama*, 613
F.3d 1102, 1106 (D.C. Cir. 2010) ("When the evidence is properly
considered, it becomes clear that [the petitioner] was—at the
very least-more likely than not a part of al-Qaida."); *Bensayah*,
610 F.3d at 725-27 (evaluating all the "raw evidence" "together"

to determine "with the requisite degree of certainty" whether the petitioner was functionally "part of al Qaeda").

The parties dispute whether the Court's conclusion should change depending on whether the adverse inference instruction is given to a jury or by a judge in a bench trial. *Compare* Resp't's Opp'n, ECF No. 665 at 36 ("Petitioner's request for an adverse inference instruction makes little sense in a habeas case where this Court, not the jury, will be the finder of fact and decide the legality of Petitioner's detention."), *with* Pet'r's Reply, ECF No. 666 at 5 ("Contrary to [R]espondent's argument, there is no requirement that the judge be able to give an adverse inference instruction to the jury."). While the Court agrees with Petitioner that adverse inferences can be given in jury and bench trials alike, *see Ashraf-Hassan*, 130 F. Supp. 3d at 340 ("In a bench trial, . . . the question is not about how a *jury* should be instructed, but whether the Court itself should draw particular adverse inferences."); the Court notes that the drawing of such inferences in a bench trial is "a serious step for the Court to take" and therefore rare and disfavored, since "courts must remain circumspect in their drawing of inferences before the actual evidence is presented[,]" *id.* at 340-41; *see, e.g.*, *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 219 F.R.D. 93, 105 (D. Md. 2003) ("An adverse inference instruction . . . was not appropriate for the simple fact that this is a bench

trial, and [the trial judge] will be aware of these proceedings and certainly will be able to draw reasonable inferences from the [ ] Defendants' failure to preserve and produce e-mail records as ordered."); *Devs. Diversified of Tenn., Inc. v. Tokio Marine & Fire Ins. Co.*, No. 3:04-0015, 2015 WL 6696330, at *5 n.1 (M.D. Tenn. Nov. 3, 2015) ("[T]his Court does not understand how a permissive negative inference instruction could be given in a bench trial, nor does this Court understand how a judge in a bench trial could properly give himself or herself such an instruction."). This is because the drawing of such adverse inferences could, as is the case here in certain respects, improperly result in premature judgment in the movant's favor. The Court declines to impose issue-related sanctions that "would be the functional equivalent of a dismissal" or default judgment. *See 3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50, 55 (D.D.C. 2016) (rejecting the defendant's proposed factual findings because adopting them "would, for all intents and purposes, amount to summary judgment in [its] favor"); *Webb*, 146 F.3d at 973 (stating that an adverse inference, "even if accepted by the trier of fact, [cannot] effectively dispose of the merits" (citation and internal quotation marks omitted)); *Shepherd*, 62 F.3d at 1475 (emphasizing that appropriate sanctions should "reflect our

judicial system's strong presumption in favor of adjudications on the merits").

Accordingly, the Court declines to adopt any of Petitioner's proposed adverse inferences because they would factually and legally resolve key issues before the Court has had the opportunity to conduct an evidentiary hearing and would furthermore preclude Respondent from presenting evidence outside of the destroyed interrogation tapes about Petitioner's ties to and support of al-Qaeda or other terrorist organizations. In other words, Petitioner's desired sanction "simply casts too wide a net." *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 25 (D.D.C. 2004).

### 2. The Court Adopts Respondent's Two Proposed "Reasonable Evidentiary Alternatives" as Appropriate Issue-Related Sanctions

Having rejected "the full scope of relief requested by Petitioner" in his proposed adverse inferences, Pet'r's Reply, ECF No. 666 at 4; the Court next turns to Respondent's two proposed "reasonable evidentiary alternative[s] that [he alleges can] serve as an adequate substitute for the loss of the videotapes for purposes of this case[,]" Resp't's Opp'n, ECF No. 665 at 8. Petitioner was "clear" in his reply brief that were the Court not to accept his proposed inferential findings, then he would "welcome[] the relief offered by Respondent[.]" Pet'r's Reply, ECF No. 666 at 4. Accordingly, for the reasons discussed

below, the Court addresses and then adopts both of Respondent's
proposed issue-related sanctions.

> **a. The Court Orders Respondent to Produce
> Contemporaneous Documents Reflecting the
> Content Depicted on Petitioner's Destroyed
> Interrogation Tapes**

First, "Respondent agrees to produce contemporaneous
documents about the interrogations depicted on the videotapes."
Resp't's Opp'n, ECF No. 665 at 28. Specifically, Respondent has
offered to search for the same 580 documents that the CIA
"identified and processed" in the Southern District of New York
FOIA litigation and contempt proceedings in connection with that
court's order to "produce records relating to the *content* of the
tapes . . . from the entire period of the tapes that were
destroyed," *ACLU*, 827 F. Supp. 2d at 228-29; *i.e.*, from April
through December 2002 when Petitioner's interrogation sessions
were recorded, Resp't's Opp'n, ECF No. 665 at 9, 28. Respondent
states that the Agency "has initiated a process to locate those
documents," *id.* at 28; and proposes to "produce to Petitioner's
security-cleared counsel the classified documents retrieved from
this collection that pertain to Petitioner, subject to
appropriate redactions for sensitive national security and
privileged information in accordance with the Protective Order
entered in this case[,]" Resp't's [Proposed] Order, ECF No. 665-
11 at 1 ¶ 1. Respondent reports that the CIA has already

produced approximately 510 of the 580 documents to Petitioner's
counsel in classified form in prior discovery productions in
this case, and that some of the 580 documents pertain to another
detainee, Mr. Al-Nashiri, whose interrogations were also
recorded on two of the destroyed videotapes. Resp't's Opp'n, ECF
No. 665 at 29 & n.8. Respondent agrees to prioritize production
of the remaining documents from the 580-document collection that
pertain to Petitioner after finishing production of the next
batch of Petitioner's statements appearing in disseminated
intelligence reports and classified communications sent to CIA
Headquarters from overseas facilities between March 2002 and
September 2006 "that the Court has ordered completed by May 31,
2024." *Id.* at 29 (citing Min. Order (July 12, 2022)).

While Petitioner argues that Respondent's proffer of
documents in relation to "another case in 2011" "is too limited
and distant in time to satisfy the proportionality standard" of
a suitable issue-related sanction, *see* Pet'r's Reply, ECF No.
666 at 8-9; the Court concludes that this is an appropriate
remedy in Petitioner's favor for the CIA's spoliation of the
video evidence. In denying the plaintiffs' civil contempt
motion, the Southern District of New York found, in relation to
"this universe of 580 documents" (including ex parte and in
camera review of a sixty-five document sub-sample), that
although the interrogation tapes "cannot now be produced[,]" the

60

CIA "ha[d] remedied that failure by [this] massive production of" documents containing agency "records that describe the contents of the videotapes, corresponding in time to their creation[.]" *ACLU*, 827 F. Supp. 2d at 229-31. This Court therefore similarly concludes that the 580-document collection—made up of classified communications sent to CIA Headquarters from the covert overseas facility where Petitioner was being detained and relaying in concurrent time Petitioner's recorded interrogations, including descriptions of the EITs applied to him; his treatment and medical care; and statements he made during those sessions, represent "the most complete and contemporaneous [existing] records of Petitioner's interrogations during the time the videos were recorded." Resp't's Opp'n, ECF No. 665 at 9, 29-30 (citing Ex. I to Resp't's Opp'n, Decl. of Leon E. Panetta, Director, CIA (June 8, 2009), ECF No. 665-9 at 4 ¶ 5 (originally filed in the Southern District of New York FOIA litigation)). These documents additionally include the notes of CIA employees who reviewed the ninety-two videotapes before they were destroyed and logbooks containing details of the interrogations, all of which "were drafted either contemporaneously with the interrogations or with a viewing of the now-destroyed videotapes." Ex. I to Resp't's Opp'n, Decl. of Leon E. Panetta, Director, CIA (June 8, 2009), ECF No. 665-9 at 4 ¶ 5.

Petitioner takes issue with the "useful[ness]" of these documents because he claims they will be heavily redacted and will primarily consist of reports to CIA Headquarters about the interrogation methods used and therefore do "not reflect the statements or body language of Petitioner, or the reactions of the interrogators." Pet'r's Reply, ECF No. 666 at 8. As a result, Petitioner claims that these documents do not suffice as a sanction because they do not match the "central evidentiary feature" of what the videotapes could have offered Petitioner in this habeas case—namely the ability to assess Petitioner's body language, tone of voice, facial expressions, and other indicators of credibility from the tapes and apply it to assessing his credibility in other key pieces of evidence. *Id.* at 8-9. While the Court agrees with Petitioner that "a picture is [often] worth a thousand words," *id.* at 3; given that the video "picture" no longer exists, the Court is persuaded that the contemporaneous agency records are a properly tailored option—combined with the additional remedy detailed below precluding Respondent from rebutting Petitioner's own testimony about what was depicted on the tapes—for providing Petitioner with "documentary evidence" to present to the Court "about the content of the tapes," *see* Resp't's Opp'n, ECF No. 665 at 9, 28, 32 ("Petitioner's inability to use the videotapes in this litigation will not hinder him from presenting the CIA documents

and his own evidence about his interrogations[.]"). Furthermore, should Petitioner continue to advance concerns regarding the documents' redactions following their production to his counsel, he is free to seek the Court's ex parte, in camera review of a sub-sample of the documents as to the "appropriate[ness]" of the CIA's redactions, *see* Pet'r's Resp., ECF No. 669 at 2; as was done in the Southern District of New York FOIA litigation, *see ACLU*, 827 F. Supp. 2d at 229.

Finally, Petitioner has not shown that Respondent's proffered document collection lacks credibility as "an adequate substitute" for the videotapes, and he inaccurately claims that the judge in the Southern District of New York FOIA case "called out [these materials] as contradictory[,]" Pet'r's Mot., ECF No. 661 at 40; when in fact that court heavily relied on those documents to conclude that a finding of civil contempt "would serve no beneficial purpose" since the destruction of the tapes "ha[d] been remedied[,]" *ACLU*, 827 F. Supp. 2d at 230; *see also* Ex. C to Resp't's Opp'n, Review of Interrogation Videotapes (Jan. 9, 2003), ECF No. 665-3 at 6 (confirming "that the cable traffic accurately describes the interrogation methods employed" on the videotapes). Accordingly, the Court **ORDERS** Respondent to search for and produce to Petitioner's counsel any of the remaining documents from the 580-document collection identified

in the Southern District of New York litigation that reflect the content of Petitioner's destroyed interrogation tapes.

      **b. The Court Orders Respondent to Be Precluded from Introducing Evidence to Rebut Petitioner's Evidence or Testimony About the Interrogations Depicted on the Destroyed Videotapes**

Second, in the merits hearing in this case, "Respondent agrees the Court may preclude [the government] from introducing evidence to rebut Petitioner's evidence about the [circumstances or content of the] interrogations depicted on the destroyed videotapes." Resp't's Opp'n, ECF No. 665 at 32. As a result, Respondent states that Petitioner could then present evidence— without any opposition—through his own testimony, by written declaration, or through other documents, such as the contemporaneous CIA records described above and his drawings depicting his interrogations by the CIA (which have been publicly released in response to FOIA requests). *Id.* at 9 & n.1. Respondent argues that this remedy would "restore Petitioner to the position he would have been in" absent the destruction of the interrogation tapes because he will be free to present to the Court evidence supporting "his version of how the interrogations depicted on the videotapes relate to the basis for [his] detention[,]" including how the interrogations were conducted, how Petitioner was treated, and what statements Petitioner made during the recorded sessions. *Id.* at 9-10, 32-

33. So long as Petitioner's "version of events" has "a reliable factual basis" and is not "inconceivable or fanciful,"[10] Respondent agrees to be precluded from "presenting any rebuttal to Petitioner's evidentiary presentation about what occurred during the recorded interrogations with contrary evidence." *Id.* at 33.

The D.C. Circuit has recognized that appropriate issue-related sanctions for the destruction of evidence can include precluding the spoliator from admitting evidence in support of its claims or defenses. *See Shepherd*, 62 F.3d at 1475. Preclusion can either be "affirmative (a party is precluded from proving a fact) or negative (a party is precluded from disproving what the other party's evidence establishes)." *D'Onofrio*, 2010 WL 3324964, at *7. Negative preclusion is at issue here, as Respondent agrees to "be prohibited from presenting [rebuttal] evidence" regarding what Petitioner's evidence establishes about his treatment or his statements made during the recorded interrogations because the CIA's "behavior

---

[10] Respondent contends that this caveat "protects against the unlikely situation in which Petitioner asserts an implausible allegation about his treatment that has no connection to reality[,]" for example if he alleges that the use of EITs against him continued past August 30, 2002—the date which all CIA records and the SSCI Report indicate that the use of EITs against him ceased. Resp't's Opp'n, ECF No. 665 at 33 n.10. As a result, Respondent indicates the government's intention to reserve the right to present "appropriate rebuttal evidence" to only factually implausible allegations by Petitioner. *Id.*

caused the loss of" the video evidence. *Id.* at *7, *11. Because "any litigation sanction [must] be calibrated as carefully as possible to the prejudice suffered and the harm done[,]" *id.* at *11; the Court agrees, for the reasons stated below, that in a forthcoming merits hearing, Respondent's proposed preclusion remedy, in conjunction with the above document production sanction, are together appropriately tailored to focus on remedying the prejudice to Petitioner that has resulted from the CIA's intentional destruction of the videotapes, while also furthering the judicial system's policy "in favor of adjudications on the merits," *Shepherd*, 62 F.3d at 1475.

To start, the Court agrees with Petitioner that his first-person declaration provides one of the best, if not "the best indicator of the content of the video evidence." Pet'r's Mot., ECF No. 661 at 27. This declaration "describes some of what [Petitioner] said [and experienced] during [the recorded] interrogations," during which he states that he "repeatedly explained that [he] was not a member of or affiliated with al Qaeda and that [he] never supported or engaged in any hostilities against the [U.S.]" Pet'r's Decl., ECF No. 661-2 at 2 ¶ 2. In this declaration, Petitioner explicitly states that "[a]ny videotapes of such interrogations would have recorded these repeated statements of [his] innocence." *Id.* For example, Petitioner writes that during his early interrogations, he told

66

his interrogators that he "was not a member [of al Qaeda] and opposed violence against civilians[,]" and that he could not answer any of their questions "because [he] was not involved with al Qaeda or any of its operations.'" *Id.* at 3-4 ¶¶ 6, 8. He also provides details regarding his "most painful and cruel period of torture," during which interrogators used EITs on him. *See id.* at 4-7 ¶¶ 11-21. Accordingly, by introducing his declaration as unopposed evidence at a merits hearing in this habeas case, Petitioner is able to present "virtually one-sided" evidence to support his account of what happened on the dates of the destroyed tapes, which the Court can credit in ultimately determining whether his detention is lawful. Resp't's Opp'n, ECF No. 665 at 34. Such a remedy is thus anything but "of limited value"—as Petitioner claims. Pet'r's Reply, ECF No. 666 at 10.

Next, the Court concludes that allowing Petitioner to present this declaration, his drawings of his interrogation sessions involving the use of EITs, live testimony at the evidentiary hearing, and any other favorable piece of evidence regarding the content of what would have been depicted on the destroyed tapes—without any contradiction from Respondent—should address Petitioner's concern that the Court must have sufficient alternatives to the video evidence to make "credibility assessments . . . about the statements Petitioner made—not just whether he made the statements." *Id.* at 10. For example, this

67

unrebutted evidence can assist in establishing Petitioner's credibility in regard to his alleged "willingness [during the recorded interrogations] to answer questions and [his] claims that he never attempted to withhold information, had no foreknowledge of attacks against the [U.S.], did not support al Qaida and other terrorist activity, and harbored no animosity toward the [U.S.,]"—the "central evidentiary feature" which Petitioner claims is lacking in Respondent's proffered contemporaneous documents production. *See id.* at 9.

Petitioner also takes issue with Respondent's proposal to be precluded from offering rebuttal evidence because he claims it is "insufficient" in proportionately matching "the evidentiary value" of seeing "the reactions of interrogators to the statements made by Petitioner[,]" which he claims "go to the assessment of the lawfulness of Petitioner's detention[.]" *Id.* at 10. If the Court agrees that the reactions of Petitioner's interrogators speak directly to the legality of his continued detention, Petitioner can testify to his recollection of those reactions that would have been viewable on the videotapes in a sworn declaration or live at the merits hearing.

Finally, the Court is persuaded that preclusion is a more appropriately calibrated sanction to the harm Petitioner has suffered from the interrogation tapes' destruction than adopting his nine proposed adverse inferences. Although it may be true

that Petitioner's proposed inferences "are drawn principally from [his] own accounts," *id.* at 10; Pet'r's Resp., ECF No. 669 at 3; it is one thing to accept Petitioner's sworn declaration as unrebutted evidence and quite another to accept the factual and legal conclusions presented in Petitioner's proposed inferences that effectively seek to dispose of the central issues in this case, *see supra* section IV.B.1. For example, in a similar case involving the destruction of relevant evidence, the District Court for the Eastern District of New York rejected as "too severe" requested sanctions that would "effectively preclude the [ ] defendants from opposing the [third-party plaintiffs'] central factual allegations and would be tantamount to granting judgement in [the third-party plaintiffs'] favor," especially since the requested sanctions "cover[ed] matters going far beyond the information contained in the destroyed or missing documents." *M & T Mortg. Corp. v. Miller*, No. 2002-5410, 2007 WL 2403565, at *12 (E.D.N.Y. Aug. 17, 2007). Instead, that court precluded the defendants from offering any documentary evidence related to matters that the spoliated evidence would have addressed, concluding that this was "a more restricted [ ] sanction [that would] adequately serve to protect the [third-party plaintiffs], remedy the prejudice to them caused by the destruction of the documents[,] and deter future improper conduct." *Id.* So too here does the Court conclude that

preclusion, as opposed to conclusory adverse inferences, is an appropriate issue-related sanction for the CIA's destruction of Petitioner's interrogation tapes.

Accordingly, the Court **ORDERS** Respondent to be precluded during the merits hearing in this case from offering any objection or rebuttal to Petitioner's proffered evidence or testimony about the content of the interrogations that would have been depicted on the dates of the destroyed CIA videotapes. Respondent is only permitted to object to Petitioner's evidence regarding the circumstances or content of the tapes to the extent that it is factually implausible, and Respondent remains able to present other evidence to establish the legality of Petitioner's detention.

In sum, the Court concludes that Respondent's two proposed evidentiary alternatives are appropriate issue-related sanctions for the CIA's intentional spoliation of Petitioner's interrogation videotape evidence. In crafting these remedies, the Court has "ke[pt] in mind the practical effect of its sanction[s] when determining" their appropriateness, *Johnson v. BAE Sys., Inc.*, 307 F.R.D. 220, 225 (D.D.C. 2013); and the fact that the destroyed videos would have been "only one of several available forms of evidence about Petitioner's interrogations, interrogations which Respondent does not [even] rely upon to justify the legality of Petitioner's detention[,]" Resp't's

70

Opp'n, ECF No. 665 at 10. As a result, the Court's calibrated sanctions approach here enables it to adhere to this circuit's teachings that it must consider the totality of the evidence when determining the legality of Petitioner's ongoing detention. *See, e.g.*, *Awad*, 608 F.3d at 9; *Al-Adahi*, 613 F.3d at 1106; *Bensayah*, 610 F.3d at 725-27.

### 3. The Court Denies Petitioner's Request for Additional Discovery as an Inappropriate Issue-Related Sanction

The remaining issue before the Court comes from the last sentence of Petitioner's Proposed Order, which vaguely asks the Court to order the parties to "confer to identify reasonable limitations on the discovery sought by Petitioner in the original spoliation motions," and then directs Respondent to "produce the requested discovered within 90 days" of the Court's order, "subject to limitations reasonably agreed upon by the [p]arties[.]" Pet'r's [Proposed] Order, ECF No. 661-8 at 2. As Respondent notes, Petitioner's instant spoliation motion "does not contain any argument or explanation for this relief, let alone a 'statement of the specific points of law and authority that support' the requested discovery, as required by the Court's Local Rules." Resp't's Opp'n, ECF No. 665 at 42 (quoting LCvR 7(a)). Instead, this request for discovery in Petitioner's Proposed Order is never mentioned in his memorandum in support of his superseding motion for sanctions and is addressed for the

71

first time in his reply brief. *See* Pet'r's Reply, ECF No. 666 at 3 (stating Petitioner's request for "additional discovery to supplement the loss of the Video Evidence"). Only in his reply does Petitioner provide "additional definition" to his request for further discovery, which is that he is seeking "depositions of a limited number of government officials present during his interrogations as the best alternative to the destroyed Video Evidence." *Id.* at 6. Petitioner contends that Respondent should have been aware of the details of his discovery request due to an October 2023 email his counsel sent to Respondent with a request to confer about "certain [of Petitioner's proposed] discovery procedures and limitations[,]" Decl. of Solomon B. Shinerock, ECF No. 666-1 at 1 ¶ 2; and he claims that Respondent declined to confer or "engage with Petitioner's proposal in his [opposition] brief[,]" Pet'r's Reply, ECF No. 666 at 6 (citing Ex. B to Pet'r's Reply, ECF No. 666-3 at 2).

To begin, the Court summarizes the contents of the email Petitioner's counsel, Solomon Shinerock ("Mr. Shinerock"), sent to Respondent on October 6, 2023—seven days after Petitioner filed his superseding motion for sanctions. Mr. Shinerock stated that in this superseding motion, "we are seeking, among other things, an order for the discovery sought by Petitioner in the original spoliation motions, subject to reasonable limitations agreed upon by the parties." Ex. A to Pet'r's Reply, ECF No.

666-2 at 2. He then summarized the sanctions sought for the
CIA's destruction of the videotapes in Petitioner's original
motion for sanctions filed in 2009, which asked the Court to
order the government to produce:

> 1. Any video, audio, written, or other
>    documentation     of     [Petitioner's]
>    interrogations—including the CIA cables
>    and emails transmitted to and from CIA
>    Headquarters and notes taken during the
>    interrogations which detail all of the
>    events therein;
>
> 2. Depositions of all parties present during
>    or  otherwise  observing  Petitioner's
>    [i]interrogations; and
>
> 3. Depositions of all other persons detained
>    or interrogated at any time at Guantanamo
>    Bay or as part of the CIA program.

*Id.* Mr. Shinerock then proposed "reasonable limits on that
discovery," specifically that: (1) "the first request be limited
to the time period during which [Petitioner] was undergoing
interrogation by the CIA or its contractors at Detention Site
Green[;]" (2) the second request be limited to depositions of
"one member of our choosing from each government component
present during or otherwise observing [Petitioner's]
interrogations, including without limitation CIA-OTS, CIA-OMS,
CIA-CTC, CIA legal staff, CIA medical staff, FBI, and Defense
Department[,]"[11] as well as depositions of "Gina Haspel, Jose

---

[11] "CIA-OTS" refers to the CIA's Office of Technical Service,
"which provides technical support and tools as part of the CIA's

Rodriguez, Scott Shumate[,] and Harriet Miers[;]" and (3) the third request "for depositions of other detainees" be withdrawn so as to take some "issue[s] off the table for the Court." *Id.*

In Respondent's email reply on October 10, 2023, the government stated its "inten[t] to address both [Petitioner's] requests for adverse findings and discovery" in its response brief and to "take this discovery proposal into account as [it] develop[ed] [that] response." Ex. B to Pet'r's Reply, ECF No. 666-3 at 2. As such, the Court finds, contrary to Petitioner's claims, that in his opposition brief, Respondent does "engage with" Petitioner's request for additional discovery by proffering various arguments against it "on the merits," *see* Resp't's Opp'n, ECF No. 665 at 43-50; and also by reserving the right to seek leave to file a sur-reply "[i]n the event Petitioner asks the Court to adopt any revised proposal for depositions in his forthcoming reply brief" in line with his counsel's October 2023 email to Respondent, which was sent only *after* Petitioner filed his superseding motion for sanctions on September 29, 2023 that notably lacked any mention of his request for depositions, *id.* at 44 n.12.

---

clandestine operations[,]" while "CIA-OMS" refers to the CIA's Office of Medical Services, "which is responsible for the CIA's medical programs." Resp't's Sur-Reply, ECF No. 667-2 at 5 n.1.

Given that this is exactly what Petitioner did in his reply, *see* Pet'r's Reply, ECF No. 666 at 11 (asking the Court to enter an order requiring Respondent to produce "his requested [discovery] relief, as modified by the limitations proposed by his counsel" in Mr. Shinerock's email to Respondent); on December 8, 2023, Respondent requested leave to file a sur-reply "to respond to the new" and "significantly modifie[d] [ ] discovery relief" requested by Petitioner in his reply for the CIA's destruction of the videotapes, Resp't's Mot. for Leave to File Sur-Reply, ECF No. 667 at 1-2. Respondent argued that Petitioner's superseding sanctions motion never "provided any indication that his [counsel's then-forthcoming and 'informal post-filing'] email was a binding limitation on the relief he was seeking from the Court[,]" and that it was not until Petitioner's reply that it became "clear" that Petitioner was modifying his discovery request and asking the Court "to incorporate the contents of [Mr. Shinerock's] email into a Court order." *Id.* at 2-3. To provide Respondent with "a fair opportunity to respond to Petitioner's newly requested relief[,]" *id.* at 3; on December 11, 2023, the Court granted, over objection for good cause shown, Respondent's motion for leave to file a sur-reply, *see* Min. Order (Dec. 11, 2023) (deeming as filed Respondent's Sur-Reply in Opposition to Petitioner's Superseding Motion for Sanctions, ECF No. 667-2);

*see also Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) (stating that "[t]he standard for granting a leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply"). Petitioner filed a short response on December 26, 2023, claiming that Respondent's sur-reply "largely tracks back across ground already covered in the moving and opposition briefs." Pet'r's Resp., ECF No. 669 at 1.

As an initial matter and for a moment setting aside Respondent's sur-reply and Petitioner's response thereto, the Court agrees with Respondent's argument that Petitioner's request for discovery can be denied on the grounds that he failed "to reassert or modify his original request for discovery [from his initial spoliation motions] in the renewed motion," instead only "tack[ing] [it] on at the end of a proposed order without explanation." Resp't's Opp'n, ECF No. 665 at 43. On June 27, 2023, the Court denied without prejudice Petitioner's original motion for sanctions for the spoliation of evidence and his supplement to that motion so that he could file a "single, consolidated, superseding briefing on this issue[.]" *See* Min. Order (June 27, 2023) (citing ECF Nos. 401 and 359). Therefore, to the extent Petitioner's Proposed Order and Mr. Shinerock's October 6, 2023 email to Respondent both seek an order for discovery based on modifications to the discovery sought in

Petitioner's "original spoliation motions," Pet'r's [Proposed]
Order, ECF No. 661-8 at 2; *see also* Ex. A to Pet'r's Reply, ECF
No. 666-2 at 2 (proposing "reasonable limitations" to the
discovery requested "per ECF No. 401"); they are improperly
doing so in reference to motions that the Court denied.
Moreover, Petitioner has titled his present motion for sanctions
"superseding," such that if he wished to request the discovery
relief asserted in his original spoliation motions, he should
have not simply mentioned it at the end of the Proposed Order
but rather should have provided a "legal or factual basis" for
this request in his accompanying memorandum of law in support of
his motion. Resp't's Opp'n, ECF No. 665 at 43; *see also* LCvR
7(a) (requiring that a motion include "a statement of the
specific points of law and authority that support the motion").

Furthermore, Petitioner's additional discovery request does
not comply with section I.E.2 of the Court's Case Management
Order ("CMO") in this case, which requires discovery requests to
not only be presented by written motion, but also must "(1) be
narrowly tailored, not open-ended; (2) specify the discovery
sought; (3) explain why the request, if granted, is likely to
produce evidence that demonstrates that [P]etitioner's detention
is unlawful , . . . ; and (4) explain why the requested
discovery will enable [P]etitioner to rebut the factual basis
for his detention without unfairly disrupting or unduly

burdening the government[.]" *See* ECF No. 48; *see, e.g.*, *Husayn*, 2021 WL 2073439, at *21, *31-34 (denying other discovery requests made by Petitioner because they did "not satisfy the requirements of CMO § I.E.2"). To the contrary, Petitioner's discovery request is only stated in the last sentence of his Proposed Order without any of the specifications or explanations that are required by the components of CMO section I.E.2. *See* Resp't's Opp'n, ECF No. 665 at 47-48 (citing CMO § I.E.2 to argue that Petitioner's depositions request "depart[s] from the discovery standards in the [CMO,]" as he "has not carried his burden to show that depositions are likely to produce significant new information that would demonstrate that his detention is unlawful").

The Court next turns to the arguments advanced in Respondent's sur-reply and Petitioner's response thereto (in addition to the arguments as stated in Respondent's opposition and Petitioner's reply), to determine whether, as an appropriate additional issue-related sanction for the CIA's destruction of the videotapes, Respondent should be ordered to produce the specific discovery requested in Mr. Shinerock's October 6, 2023 email to Respondent, specifically the three "limitations" he proposed on that discovery in relation to the sanctions sought in Petitioner's original spoliation motions, Ex. A to Pet'r's Reply, ECF No. 666-2 at 2; Pet'r's Reply, ECF No. 666 at 11.

### a. Petitioner's Discovery Request for Depositions of Other Guantanamo Bay Detainees

At the outset, the Court finds it unnecessary to address Petitioner's third "limitations" proposal in detail, which is Petitioner's offer to withdraw his original sanctions request for "[d]epositions of all other persons detained or interrogated at any time at Guantanamo Bay or as part of the CIA program." Ex. A to Pet'r's Reply, ECF No. 666-2 at 2. In his opposition brief, Respondent proffers various arguments against Petitioner's "need" for deposing other Guantanamo Bay detainees, see Resp't's Opp'n, ECF No. 665 at 44-46; but in Petitioner's reply, he calls these arguments futile because his "superseding motion seeks no such depositions[,]" Pet'r's Reply, ECF No. 666 at 6. Having clearly stated his intention to abandon this third discovery request from his original spoliation motions, both in Petitioner's reply and as proposed in Mr. Shinerock's email, the Court concludes that it need not consider it any further.

### b. Petitioner's Discovery Request for CIA Documentation of Petitioner's Interrogations at Detention Site Green

The Court next addresses Petitioner's first discovery request from his original spoliation motions, namely for "[a]ny video, audio, written, or other documentation of [Petitioner's] interrogations—including the CIA cables and emails transmitted to and from CIA Headquarters and notes taken during the

interrogations which detail all of the events therein[,]" *see*
ECF No. 401 at 21; which Mr. Shinerock has proposed to limit to
the time period during which Petitioner was undergoing CIA
interrogations at Detention Site Green, Ex. A to Pet'r's Reply,
ECF No. 666-2 at 2. Respondent argues that the Court should
"deny [this] amended document discovery request as moot" "in
light of Respondent's commitment to produce" the 580-document
collection identified in the Southern District of New York FOIA
litigation, which contemporaneously "reflect[s] the content of
the interrogations on the destroyed videotapes," and is
therefore "materially indistinguishable" from Petitioner's
instant document discovery request. Resp't's Sur-Reply, ECF No.
667-2 at 2-4.

Although Petitioner responds by claiming that Respondent
"inaccurately equates the 580 documents on offer with the
discovery that Petitioner seeks[,]" claiming instead that his
amended request seeks a "larger scope of records" than the 580
documents can provide, Pet'r's Resp., ECF No. 669 at 2; the
Court disagrees. Mr. Shinerock's email states that Petitioner
seeks any CIA documentation about Petitioner's interrogations
from the time period that he was being interrogated by the
Agency "at Detention Site Green." Ex. A to Pet'r's Reply, ECF
No. 666-2 at 2. The SSCI Report indicates that Detention Site
Green is the pseudonym for the location of Petitioner's "first

CIA detention site," where he was detained from March 2002
following his capture until December 2002 when he was
transferred to another detention site after Detention Site Green
closed. SSCI Report at 23-24, 67. Additionally, the Court has
ordered Respondent—similar to the Southern District of New York
in the FOIA litigation—to produce all "records relating to the
*content* of the tapes . . . from the entire period of the tapes
that were destroyed," *i.e.*, between April and December 2002 when
Petitioner's interrogations were recorded at Detention Site
Green. *ACLU*, 827 F. Supp. 2d at 228-29. The time period for the
documentation requested in Petitioner's first amended document
discovery request therefore overlaps with the time period
covered by the Court's document production sanctions
determination. "That is, records about Petitioner's
interrogations between April and December 2002 are coextensive
with records about interrogations at Detention Site Green, where
Petitioner was detained for the same period of time." Resp't's
Sur-Reply, ECF No. 667-2 at 4. The Court therefore agrees that
"[n]o further document discovery is required" beyond the
delineations of its earlier document production sanctions
determination, *id.*; *see supra* section IV.B.2.a.; especially
because that remedy requires the CIA to provide Petitioner with
"communications to CIA Headquarters from" Detention Site Green
(including cables and emails) "concerning interrogations of

[Petitioner,]"—"the most contemporaneous documents the CIA possesses concerning these [recorded] interrogations[,]"—as well as "notes of CIA employees who reviewed the 92 videotapes before they were destroyed, logbooks containing details of the interrogations, and a photograph[,]" Ex. I to Resp't's Opp'n, Decl. of Leon E. Panetta, Director, CIA (June 8, 2009), ECF No. 665-9 at 4 ¶ 5; all of which matches Petitioner's discovery request as stated in Mr. Shinerock's email to Respondent.

Accordingly, the Court **DENIES** Petitioner's first discovery request, even if subject to the limitations proffered to Respondent in Mr. Shinerock's email, as redundant of its earlier crafted sanctions remedy requiring Respondent to produce contemporaneous documents about the interrogations depicted on the videotapes. To the extent that Petitioner's request somehow requires more beyond "'records relating to the *content* of the tapes[,]'" Pet'r's Resp., ECF No. 669 at 2 (quoting *ACLU*, 827 F. Supp. 2d at 228-29); the Court rejects that request because it is only concerned with making Petitioner whole as to the CIA's destruction of the videotapes depicting his interrogation sessions, *see Kronisch*, 150 F.3d at 126; *see also* ECF No. 401 at 19 (asking "this Court only to compel the government to reconstruct the evidence that it destroyed").

### c. Petitioner's Discovery Request for Depositions of Government Officials, Former and Current CIA Officers, and Other Agency Officials Who Were Present for or Otherwise Observed Petitioner's Interrogations

Finally, the Court addresses Petitioner's remaining discovery request from his original spoliation motions, namely for "[d]epositions of all parties present during or otherwise observing Petitioner's [i]nterrogations[,]" *see* ECF No. 401 at 21-22; but limited by Mr. Shinerock's proposal to "one member of [his] choosing from each government component present during or otherwise observing [Petitioner's] interrogations, including without limitation CIA-OTS, CIA-OMS, CIA-CTC, CIA legal staff, CIA medical staff, FBI, and Defense Department[,]" Ex. A to Pet'r's Reply, ECF No. 666-2 at 2. "In other words," Petitioner proposes "to review a list of all individuals present at Detention Site Green, their dates present, and their government affiliation, and from that list [his counsel] would select a representative deponent for each component." *Id.* Furthermore, Petitioner asks, as part of this amended discovery request, to depose four specific individuals: Gina Haspel (former CIA Director), Jose Rodriguez, Scott Shumate, and Harriet Miers (former White House Counsel). *Id.* Petitioner argues that the requested depositions "are far more useful to [him] than the [two] remedies offered by Respondent" because he claims that "[s]peaking to people involved in the interrogations" will

83

provide both descriptions of "the circumstances [depicted on the videotapes] and reactions of key decisionmakers" who were assessing Petitioner's "level of involvement with terrorism" and therefore "the lawfulness of [his] detention[.]" Pet'r's Reply, ECF No. 666 at 9-10. Respondent, however, argues that "Petitioner's request for roughly a dozen depositions of high-ranking former government officials, CIA intelligence officers, FBI agents, and [DoD] military personnel . . . is overbroad, unduly burdensome, and legally unfounded[,]" Resp't's Sur-Reply, ECF No. 667-2 at 2; and bears no "relation, either in subject matter or scale, to the destruction of the interrogation videotapes[,]" Resp't's Opp'n, ECF No. 665 at 44.

The Court is not persuaded by Petitioner's arguments for his second discovery request as described in Mr. Shinerock's email and instead agrees with Respondent that such a remedy for the CIA's spoliation of the video evidence is not consistent with the "'restraint and discretion'" that courts must exercise when calibrating appropriate issue-related sanctions. *Id.* at 50 (quoting *Shepherd*, 62 F.3d at 1478). Petitioner contends that Respondent's proposed evidentiary alternatives are insufficient because: (1) "CIA documents tell only part of the story[,]" and that "without the requested depositions, there will be no way to test the veracity, comprehensiveness, or impact of" the documents, Pet'r's Resp., ECF No. 669 at 2; and (2) accepting

Petitioner's evidence about his interrogations without rebuttal "is of limited value without the requested depositions[,]" Pet'r's Reply, ECF No. 666 at 10. The Court rejects both of these arguments, as it has concluded that Respondent's two proposed remedies provide a comprehensive way to tell "the story" of the destroyed tapes in the light most favorable to Petitioner, with Petitioner's unopposed evidence and testimony—or what Petitioner himself calls "the best indicator of the content of the video evidence[,]" Pet'r's Mot., ECF No. 661 at 27; providing a check on the "veracity" and "comprehensiveness" of the CIA's contemporaneous document production. Thus, "the truth finding function" of the Court does not rely on the documents alone, or on the imposition of just one sanction for that matter, such that Petitioner's requested depositions do not play the vital role that he claims. Pet'r's Resp., ECF No. 669 at 2.

In addition, the Court concludes that Petitioner's amended request for depositions is an inappropriate and unreasonably tailored issue-related sanction to the gravity of the spoliation at issue for the various reasons proffered by Respondent and that go largely unanswered by Petitioner in his reply brief and in his short response to Respondent's sur-reply.

First, Respondent argues in his sur-reply that Petitioner's "sweeping request should be denied" because he fails to meet his

85

"heavy burden" in establishing "extraordinary" need for deposing the current or former high-ranking government officials that would be encompassed by Mr. Shinerock's list in his email. Resp't's Sur-Reply, ECF No. 667-2 at 5. Pursuant to the "apex doctrine," which is the governing "law of [this] Circuit, a party attempting to depose a high-ranking government official must demonstrate 'extraordinary circumstances' requiring such a deposition." *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021) (quoting *Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575, 586 (D.C. Cir. 1985) (citing *United States v. Morgan*, 313 U.S. 409, 422, 61 S. Ct. 999, 85 L. Ed. 1429 (1941))). Under the apex doctrine, which equally applies to both former and current government officials, "there is a presumption against deposing high-ranking government officials" so as to: (1) "protect the integrity and independence of the government's decision-making processes[;]" (2) "permit high-ranking government officials to perform their official tasks without disruption or diversion[;]" and (3) "limit indiscriminate depositions that would discourage individuals from accepting positions as public servants[.]" *Id.* (citations and internal quotation marks omitted). Consequently, "high ranking government officials are generally not subject to depositions unless they have *some* personal knowledge about the matter and the party seeking the deposition makes a showing that the information

cannot be obtained elsewhere." *Alexander v. FBI*, 186 F.R.D. 1, 4 (D.D.C. 1998) (emphasis in original).

As Respondent correctly notes, "Petitioner makes no effort to satisfy this [apex doctrine] standard in his reply brief[,]" or even mention its existence as governing law. Resp't's Sur-Reply, ECF No. 667-2 at 5. Thus, although Petitioner seeks to depose individuals "actually involved in [his] interrogations and the subsequent destruction of the tapes[,]" Pet'r's Resp., ECF No. 669 at 3; *i.e.*, people with "*some* personal knowledge" about the tapes, he has failed to adequately argue that such information could not "be obtained elsewhere[,]" *Alexander*, 186 F.R.D. at 4; *i.e.*, via the Court's above-mentioned remedies for the CIA's intentional destruction of the tapes. In fact, as Respondent argues, the contemporaneous documents and notes that the Court has ordered the CIA to produce as a remedial sanction are more likely to be a "reliable" and accurate source of evidence about what occurred on the videotapes than individual deponents' "recall in 2024" about the recorded interrogations from 2002, *see* Resp't's Opp'n, ECF No. 665 at 47 (calling it "an unprecedented fishing expedition" for the Court to ask "CIA officers 21 years after the fact whether they remember tidbits of information that may have been recorded on the tapes, but not included in the contemporaneous documents"); even if the interrogations were "a harrowing affair that [ ] left deep

impressions in the minds and memories of those involved,"
Pet'r's Reply, ECF No. 666 at 6. The Court therefore concludes
that Petitioner's amended depositions request fails pursuant to
the rigors of the apex doctrine. *See In re Cheney*, 544 F.3d 311,
314 (D.C. Cir. 2008) ("The duties of high-ranking executive
officers should not be interrupted by judicial demands for
information that could be obtained elsewhere.").

Second, Respondent argues in his sur-reply that
"Petitioner's request for Respondent to produce a list of names
and employment duties of CIA officers who observed Petitioner's
interrogations conflicts with the statutory privilege that
prevents the disclosure of such information." Resp't's Sur-
Reply, ECF No. 667-2 at 6. Specifically, Respondent points to
section 6 of the CIA Act, which provides that "[i]n the
interests of the security of the foreign intelligence activities
of the [U.S.,]" the CIA is "exempted" from "disclosure of the
organization or functions of the Agency, or of the names,
official titles, salaries, or numbers of personnel employed by
the Agency[.]" *Id.*; 50 U.S.C. § 3507; *see also ACLU v. CIA*, No.
16-1256 (EGS), 2021 WL 5505448, at *5 (D.D.C. Nov. 24, 2021)
(concluding that "the names of [ ] CIA employees are protected
by Section 6 of the CIA Act").

In addition to this statutory privilege, Respondent argues
that the "state secrets privilege" applies here to shield

discovery into the "national security information that
Petitioner appears to seek in this case." Resp't's Sur-Reply,
ECF No. 667-2 at 7. The application of the state secrets
privilege, which "permits the Government to prevent disclosure
of information when that disclosure would harm national security
interests[,]" was recently upheld by the Supreme Court to quash
a subpoena matter initiated by Petitioner seeking information
about the Agency's former CTC Program and depositions of two of
the former CIA contractors allegedly involved in his
interrogations. *United States v. Zubaydah*, 595 U.S. 195, 198-99,
204, 142 S. Ct. 959, 212 L. Ed. 2d 65 (2022). Although the
burden is on the government to formally assert a claim of the
state secrets privilege, courts are "reluctant to intrude upon
the authority of the Executive in military and national security
affairs[,]" *Dep't of Navy v. Egan*, 484 U.S. 518, 530, 108 S. Ct.
818, 98 L. Ed. 2d 918 (1988); such that "the party seeking
disclosure of the ostensibly privileged information" must make a
strong and sufficiently compelling showing of necessity,
*Zubaydah*, 595 U.S. at 205; *see also United States v. Reynolds*,
345 U.S. 1, 11, 73 S. Ct. 528, 97 L. Ed. 727 (1953) ("[E]ven the
most compelling necessity cannot overcome the claim of privilege
if the court is ultimately satisfied that military secrets are
at stake."). Accordingly, the Supreme Court determined that any
response to Petitioner's subpoenas would "have the effect of"

confirming or denying the existence of a CIA detention facility overseas, and it concluded that any such confirmation "could significantly harm national security interests" and therefore fell "within the scope of the state secrets privilege." *Zubaydah*, 595 U.S. at 199, 207.

Using the Supreme Court's example and another lower court's decision to quash depositions of CIA officers who allegedly participated in the CTC Program (including Gina Haspel, who Petitioner names in his discovery request) pursuant to the state secrets privilege and the CIA Act, *see* Order re: Third and Fourth Mot. to Compel & Assertion of State Secrets Privilege, *Salim v. Mitchell*, No. 15-cv-0286 (E.D. Wash. May 31, 2017), ECF No. 188 at 1, 20-21; Respondent argues that Petitioner's depositions request must be prohibited by both the state secrets privilege and the CIA Act because they "run headlong into [the government's] 'compelling interest' in preventing unauthorized disclosure of information that would harm national security or intelligence interests[,]" Resp't's Opp'n, ECF No. 665 at 49 (quoting *Egan*, 484 U.S. at 527).

Akin to his failure to address Respondent's arguments regarding the apex doctrine, Petitioner also does not respond to any of Respondent's arguments regarding the state secrets privilege or the Agency's statutory privilege under the CIA Act in his response to Respondent's sur-reply. In his reply brief,

Petitioner only claims, without legal support, that he is "[o]f course . . . entitled to a substantial amount of classified and sensitive information" pursuant to his habeas rights and that his requested depositions "present no national security or secrecy issue not routinely presented (and properly handled) as part of document discovery in this case." Pet'r's Reply, ECF No. 666 at 7. Petitioner contends that Respondent's "'high volume' of privilege assertions and threat[s to] 'national security'" regarding his depositions request merely "evoke[] a parade of horribles" that can be addressed by "prophylactic" measures, including the CMO, related protective orders, his counsel's security clearance, and accommodations to ensure that deponents' names are not made public. *Id.* As a result, Petitioner claims that these combined measures plus the "additional limitations set forth in [his] deposition proposal" will "minimize impact and disruption to government agencies while balancing the need to redress the willful destruction of the Video Evidence." Pet'r's Resp., ECF No. 669 at 3.

The Court is not persuaded that Petitioner's claims are a sufficient response to Respondent's arguments regarding "[t]he complex privilege and burdensome logistical issues associated with Petitioner's proposed depositions," especially given Respondent's indication that the government would move to quash any such subpoenas by asserting "all appropriate privileges,"

thereby likely "enmesh[ing] the Court" in a "high volume of collateral litigation." Resp't's Opp'n, ECF No. 665 at 50 & n.14; Resp't's Sur-Reply, ECF No. 667-2 at 9. As the Supreme Court has stated, "the Government has a legitimate interest in protecting sources and methods of intelligence gathering[,]" and it expects district courts to use their "discretion to accommodate this interest to the greatest extent possible." *Boumediene v. Bush*, 553 U.S. 723, 796, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008). Therefore, the Court agrees with Respondent that Petitioner's failure to properly justify his request to depose high-ranking government and agency officials and various current and former CIA officers who may still be in "covert status" or were never publicly acknowledged to have been a part of the CTC Program demonstrates that his modified discovery request, as stated in Mr. Shinerock's email, is "overbroad," "unduly burdensome," and not a properly calibrated sanction for the CIA's destruction of the videotapes. Resp't's Opp'n, ECF No. 665 at 48; Resp't's Sur-Reply, ECF No. 667-2 at 8.

Finally, Respondent advances four smaller arguments for why Petitioner's depositions request should be denied as an inappropriate remedial sanction. First, Respondent argues that Petitioner's request exceeds "the presumptive limit [on depositions] for entire cases under the Federal Rules of Civil Procedure[,]" especially since discovery is "more confined" in

habeas corpus actions. Resp't's Sur-Reply, ECF No. 667-2 at 6-7
& n.2 (citing Fed. R. Civ. P. 30(a)(2), which requires leave of
court for "more than 10 depositions"). Second, Respondent argues
that the Court should follow the Southern District of New York's
approach in the FOIA litigation in denying the plaintiffs'
request for additional discovery, which would have included
depositions of CIA officials involved in the destruction of the
videotapes. Resp't's Opp'n, ECF No. 665 at 46-47; Resp't's Sur-
Reply, ECF No. 667-2 at 9-10 (both citing *ACLU*, 827 F. Supp. 2d
at 231). Lastly, Respondent argues that since the factual return
does not rely on any post-capture custodial statements from
Petitioner's time in CIA or DoD custody, there is no "compelling
need" for the depositions of officials involved in his custodial
interrogations. Resp't's Sur-Reply, ECF No. 667-2 at 7.
Petitioner "offers no response" to any of these arguments, *id.*
at 7, 9; thereby further buttressing the Court's conclusion that
his amended depositions request is not an appropriately tailored
evidentiary remedy for the CIA's destruction of the videotapes.

For all the above reasons, the Court **DENIES** Petitioner's
second discovery request for the various depositions as stated
in Mr. Shinerock's email to Respondent. Accordingly, the Court
**DENIES** Petitioner's overall request that it order Respondent to
produce any of the additional discovery sought by Petitioner in
the final paragraph of his Proposed Order or as limited by the

proposal in Mr. Shinerock's email as an inappropriate issue-related sanction.

## V.    Conclusion and Order

For the foregoing reasons stated in this Memorandum Opinion, it is hereby

**ORDERED** that Petitioner's Superseding Motion for Sanctions for the Spoliation of Evidence, ECF No. 661, is **GRANTED IN PART AND DENIED IN PART.** The Court will impose two appropriately tailored sanctions for the CIA's deliberate spoliation of the video evidence of Petitioner's interrogation sessions by the Agency. It is further

**ORDERED** that Respondent shall search for the 580 documents identified in *ACLU v. Department of Defense*, 827 F. Supp. 2d 217 (S.D.N.Y. 2011), relating to the content of the destroyed videotapes. Respondent shall produce to Petitioner's security-cleared counsel the classified documents retrieved from this collection that pertain to Petitioner, subject to appropriate redactions for sensitive national security and privileged information in accordance with the Protective Order entered in this case. Respondent shall prioritize production of these documents following the completion of its ongoing production of documents containing Petitioner's statements in disseminated intelligence reports and classified CIA communications, currently scheduled to be completed by May 31, 2024, *see* Min.

Order (July 12, 2022); and shall file a status report by no later than 14 days of the issuance of this Memorandum Opinion and Order with recommendations for a reasonable schedule for this next production of documents. It is further

**ORDERED** that during the merits hearing in this case, Respondent is precluded from offering any objection or rebuttal to Petitioner's evidence about the circumstances or content of the interrogations that occurred on the dates of the destroyed CIA videotapes. Respondent may assert an objection or rebuttal to Petitioner's evidence only to the extent Petitioner's evidence is factually implausible.

In view of the above, the Court concludes that a hearing on Petitioner's superseding motion for sanctions is unwarranted.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**United States District Judge**
**October 8, 2024**